2025-1875

---

# United States Court of Appeals
## for the Federal Circuit

---

AUROBINDO PHARMA LTD., AUROBINDO PHARMA USA, INC., MSN
LABORATORIES PRIVATE LTD., AND MSN PHARMACEUTICALS, INC.

*Appellants*

v.

ACADIA PHARMACEUTICALS INC.

*Appellee*

---

On Appeal from the United States District Court for the District of Delaware
Hon. Gregory B. Williams
Case No. 1:22-cv-01387 (GBW)

---

## APPELLANTS' OPENING BRIEF

---

Timothy H. Kratz
George J. Barry III
**KRATZ & BARRY LLP**
1050 Crown Pointe Parkway, Suite 500
Atlanta, GA 30338
(404) 431-6600
tkratz@kratzandbarry.com
gbarry@kratzandbarry.com

Michael P. Hogan
**KRATZ & BARRY LLP**
P.O. Box 63765
622 S. 4th Street
Philadelphia, PA 19147
(917) 216-8585
mhogan@kratzandbarry.com

Richard J. Berman
Janine A. Carlan
Bradford C. Frese
**ARENTFOX SCHIFF LLP**
1717 K. St. NW
Washington, DC 20006
T: (202) 857-6000
richard.berman@afslaw.com
janine.carlan@afslaw.com
bradford.frese@afslaw.com

*Attorney for Appellants, MSN
Laboratories Private Ltd., and MSN
Pharmaceuticals*

R Touhey Myer
**KRATZ & BARRY LLP**
800 N. West Street
Wilmington, DE 19801
(302) 527-9378
tmyer@kratzandbarry.com

*Attorney for Appellants, Aurobindo
Pharma Limited and Aurobindo
Pharma USA, Inc.*

# PATENT CLAIMS AT ISSUE

4. A pharmaceutically acceptable capsule for orally delivering 34 mg of pimavanserin to a patient, wherein the capsule has a capsule shell with a capsule shell size 3 or 4, that encapsulates a blended pimavanserin composition comprising: granules comprising 40 mg pimavanserin tartrate and one or more pharmaceutically acceptable excipients; and wherein the bulk density of the granules is >0.4 g/ml as determined by USP, method 1.

5. The pharmaceutically acceptable capsule of claim 4, wherein the capsule shell is a hard shell size 4 capsule.

FORM 9. Certificate of Interest

Form 9 (p. 1)
March 2023

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## <u>CERTIFICATE OF INTEREST</u>

**Case Number** 2025-1875

**Short Case Caption** Acadia Pharms. Inc. v. Aurobindo Pharma Ltd.

**Filing Party/Entity** MSN Laboratories Private Ltd., and MSN Pharmaceuticals, Inc.

---

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.

2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.

3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.

4. Please do not duplicate entries within Section 5.

5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes.  Fed. Cir. R. 47.4(c).

---

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 07/07/2025

Signature: /s/ Richard J. Berman

Name: Richard J. Berman

FORM 9. Certificate of Interest

| 1. Represented Entities. Fed. Cir. R. 47.4(a)(1). | 2. Real Party in Interest. Fed. Cir. R. 47.4(a)(2). | 3. Parent Corporations and Stockholders. Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.<br><br>☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.<br><br>☑ None/Not Applicable |
| MSN Laboratories Private Ltd. | | |
| MSN Pharmaceuticals, Inc. | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐    Additional pages attached

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☐ None/Not Applicable          ☐ Additional pages attached

| | | |
|---|---|---|
| James S. Green<br>Seitz, Van Ogtrop & Green, P.A. | Yixin H. Tang<br>Upadhye Tang LLP | |
| Brent A. Batzer<br>Upadhye Tang LLP | Michael J. Baldwin<br>ArentFox Schiff LLP | |
| Shashank Upadhye<br>Upadhye Tang LLP | Julie A. Vernon<br>ArentFox Schiff LLP | |

**5. Related Cases.** Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☐ Yes (file separate notice; see below)   ☑ No   ☐ N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b). **Please do not duplicate information.** This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal. Fed. Cir. R. 47.5(b).

**6. Organizational Victims and Bankruptcy Cases.** Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☑ None/Not Applicable          ☐ Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## <u>CERTIFICATE OF INTEREST</u>

| | |
|---|---|
| **Case Number** | 2025-1875 |
| **Short Case Caption** | Acadia Pharmaceuticals Inc. v. Aurobindo Pharma Ltd. |
| **Filing Party/Entity** | Aurobindo Pharma Ltd. and Aurobindo Pharma USA, Inc. |

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.

2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.

3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.

4. Please do not duplicate entries within Section 5.

5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes.  Fed. Cir. R. 47.4(c).

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 07/07/2025

Signature: /s/ R Touhey Myer

Name: R Touhey Myer

FORM 9. Certificate of Interest

| 1. Represented Entities. Fed. Cir. R. 47.4(a)(1). | 2. Real Party in Interest. Fed. Cir. R. 47.4(a)(2). | 3. Parent Corporations and Stockholders. Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.  ☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.  ☐ None/Not Applicable |
| Aurobindo Pharma Ltd. | | N/A |
| Aurobindo Pharma USA, Inc. | | Aurobindo Pharma Ltd. |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐    Additional pages attached

FORM 9. Certificate of Interest

**4. Legal Representatives.**  List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities.  Do not include those who have already entered an appearance in this court.  Fed. Cir. R. 47.4(a)(4).

☐    None/Not Applicable                ☐    Additional pages attached

| | | |
|---|---|---|
| John Thallemer (Kratz & Barry LLP) | | |
| | | |
| | | |

**5. Related Cases.**  Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☑    Yes (file separate notice; see below)    ☐    No    ☐    N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b).  **Please do not duplicate information.**  This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal.  Fed. Cir. R. 47.5(b).

**6. Organizational Victims and Bankruptcy Cases**.  Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees).  Fed. Cir. R. 47.4(a)(6).

☑    None/Not Applicable                ☐    Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

# TABLE OF CONTENTS

PATENT CLAIMS AT ISSUE ................................................................. i

CERTIFICATES OF INTEREST ............................................................ ii

TABLE OF CONTENTS ...................................................................... iii

TABLE OF AUTHORITIES ................................................................. vi

TABLE OF ABBREVIATIONS ............................................................. ix

STATEMENT OF RELATED CASES ....................................................... x

JURISDICTIONAL STATEMENT ......................................................... xi

I.     STATEMENT OF THE CASE ..................................................... 1

II.    STATEMENT OF THE ISSUES ................................................... 1

III.   STANDARD OF REVIEW .......................................................... 2

IV.    JOINT APPEAL FROM THE DISTRICT COURT'S HOLDING OF NO
       INVALIDITY ...................................................................... 3

       A. INTRODUCTION ............................................................. 3

       B. FACTUAL BACKGROUND .................................................. 6

              1.    Nuplazid capsules, prior art Nuplazid tablets, and the Asserted
                    Patent ............................................................... 6

              2.    Ragnar-Tolf and other prior art ................................... 8

              3.    Appellee's Arguments and the Decision Below ................. 14

       C. SUMMARY OF ARGUMENT ............................................... 17

       D. ARGUMENT ................................................................. 18

1.    The District Court erred in concluding that the Asserted Claims were not obvious in view of the prior art...................................18

2.    The District Court erred in finding that a POSA would not have been able to achieve pimavanserin granules having the bulk density of the Asserted Claims with a reasonable expectation of success...................................................................................28

E. CONCLUSION .......................................................................34

V.   AUROBINDO APPELLANTS' APPEAL FROM THE DISTRICT COURT'S FINDING OF INFRINGEMENT ...............................34

A. INTRODUCTION ...................................................................34

B. FACTUAL BACKGROUND ...................................................35

1.    The relevant claim limitation–"granules comprising 40 mg pimavanserin tartrate"–requires proof that 100% of the pimavanserin tartrate in Aurobindo's ANDA product be in granules. ...................................................................................35

2.    The Aurobindo Appellants' proof that its ANDA capsule product does not contain 100% of the pimavanserin tartrate in granules is overwhelming. ...........................................................36

3.    Appellee did not offer any competent evidence that 100% of the pimavanserin tartrate in Aurobindo's ANDA product is in granules. ...................................................................................40

4.    The District Court excused Appellee from proving the relevant claim limitation had been met...................................................46

C. SUMMARY OF ARGUMENT.................................................48

D. ARGUMENT.............................................................................51

1.    The District Court erred by relying on Aurobindo's ANDA to establish infringement of the asserted claims where, if anything, the ANDA establishes that Aurobindo's product would not infringe the claims...................................................................53

2. The District Court erred in excusing Appellee from proving that Aurobindo's ANDA product meets the disputed claim limitation. ...................................................................................57

E. CONCLUSION ...........................................................................60

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Acorda Therapeutics, Inc. v. Roxane Lab'ys, Inc.*,
  903 F.3d 1310 (Fed. Cir. 2018) ............................................................33

*Adapt Pharma Operations Ltd. v. Teva Pharms. USA, Inc.*,
  25 F.4th 1354 (Fed. Cir. 2022) ............................................................26

*Allergan, Inc. v. Apotex Inc.*,
  754 F.3d 952 (Fed. Cir. 2014) ......................................................*passim*

*Allergan, Inc. v. Exela Pharmsci Inc.*,
  643 F.3d 1366 (Fed. Cir. 2011) ............................................................55

*Allergan, Inc. v. Sandoz Inc.*,
  726 F.3d 1286 (Fed. Cir. 2013) ............................................................32

*Allergan, Inc. v. Sandoz Inc.*,
  796 F.3d 1293 (Fed. Cir. 2015) ............................................................32

*Alza Corp. v. Andrx Pharms., LLC*,
  607 F. Supp. 2d 614 (D. Del. 2009)...............................................52, 53

*Apple Inc. v. Samsung Elecs. Co.*,
  816 F.3d 788 (Fed. Cir. 2016) ..............................................................26

*Bayer AG v. Elan Pharm. Rsch. Corp.*,
  212 F.3d 1241 (Fed. Cir. 2000) .....................................................52, 53

*Bayer Pharma AG v. Watson Lab'ys, Inc.*,
  874 F.3d 1316 (Fed. Cir. 2017) ............................................................27

*In re Boe*,
  355 F.2d 961 (C.C.P.A. 1966) ......................................................26, 27

*DeMarini Sports, Inc. v. Worth, Inc.*,
  239 F.3d 1314 (Fed. Cir. 2001) .....................................................53, 58

*In re Ethicon, Inc.*,
844 F.3d 1344 (Fed. Cir. 2017) ............................................................2

*Ferring B.V. v. Watson Labs, Inc.*,
764 F.3d 1382 (Fed. Cir. 2014) ....................................53, 54, 55, 58

*Gen. Elec. Co. v. Raytheon Techs. Corp.*,
983 F.3d 1334 (Fed. Cir. 2020) ............................................19, 20, 21

*Glaxo Inc. v. Novopharm Ltd.*,
110 F.3d 1562 (Fed. Cir. 1997) ............................................3, 52, 53

*H. Lundbeck A/S v. Lupin Ltd.*,
87 F.4th 1361 (Fed. Cir. 2023) ...............................................2, 3

*Honeywell Int'l Inc. v. 3G Licensing, S.A.*,
124 F.4th 1345 (Fed. Cir. 2025) .........................................22, 23, 24

*ImmunoGen, Inc. v. Stewart*,
130 F.4th 1328 (Fed. Cir. 2025) .........................................29

*Intel Corp. v. PACT XPP Schweiz AG*,
61 F.4th 1373 (Fed. Cir. 2023) ...........................................23

*KSR Int'l Co. v. Teleflex Inc.*,
550 U.S. 398 (2007) ............................................................27

*MicroStrategy Inc. v. Bus. Objects, S.A.*,
429 F.3d 1344 (Fed. Cir. 2005) .........................................53

*Panduit Corp. v. Dennison Mfg. Co., Inc.*,
836 F.2d 1329 (Fed. Cir. 1987) .........................................53

*Par Pharm., Inc. v. Eagle Pharms, Inc.*,
44 F.4th 1379 (Fed. Cir. 2022) ............................................54, 55, 58

*Pfizer, Inc. v. Apotex, Inc.*,
480 F.3d 1348 (Fed. Cir. 2007) ............................................*passim*

*Sunovian Pharms., Inc. v. Teva Pharms, USA, Inc.*,
731 F.3d 1271 (Fed. Cir. 2013) ............................................54, 55, 56

*Takeda Pharm. Co. Ltd. v. Teva Pharm. USA,*
    Inc., 668 F.Supp. 2d 614 (D. Del. 2009) ...........................................51

*Tech. Licensing Corp. v. Videotek, Inc.,*
    545 F.3d 1316 (Fed. Cir. 2008) ...................................................51, 57

*Teva Pharms. USA, Inc. v. Corcept Therapeutics, Inc.,*
    18 F.4th 1377 (Fed. Cir. 2021) ..........................................................31

*Vanda Pharm. Inc. v. W.-Ward Pharm. Int'l Ltd.,*
    887 F.3d 1117 (Fed. Cir. 2018) ..........................................................51

*Warner-Lambert Co. v. Apotex Corp.,*
    316 F.3d 1348 (Fed. Cir. 2003) ...................................................51, 52

*Wavetronix LLC v. EIS Elec. Integrated Sys.,*
    573 F.3d 1343 (Fed. Cir. 2009) ...................................................53, 58

*In re Wesslau,*
    353 F.2d 238 (C.C.P.A. 1965) ............................................................26

**Statutes**

21 U.S.C. § 505 ....................................................................................51

28 U.S.C. § 1295 .................................................................................. xii

28 U.S.C. § 1338 .................................................................................. xii

35 U.S.C. § 271 ....................................................................................51

## TABLE OF ABBREVIATIONS

| ANDA | Abbreviated New Drug Application |
|---|---|
| Appellants | The Aurobindo Appellants and the MSN Appellants |
| Appellee or Acadia | Acadia Pharmaceuticals Inc. |
| Asserted Claims | Claims 4 and 5 of the Asserted Patent |
| Asserted Patent | U.S. Patent No. 11,452,721 |
| Aurobindo or Aurobindo Appellants | Aurobindo Pharma Limited and Aurobindo Pharma USA, Inc. |
| District Court | The United States District Court for the District of Delaware |
| FDA | U.S. Food and Drug Administration |
| MSN Appellants | MSN Laboratories Private Ltd. and MSN Pharmaceuticals Inc. |
| POSA | Person of Ordinary Skill in the Art |
| PTAB or Board | Patent Trial and Appeal Board |
| Ragnar-Tolf | U.S. Patent Application Publication 2007/0264330 Al |
| Schiele | Julia T. Schiele, *Difficulties swallowing solid oral dosage forms in a general practice population: prevalence, causes, and relationship to dosage forms,* Pharmacoepidemiology and Prescription (Sept. 29, 2012) |
| Stegemann 2002 | Sven Stegemann, Hard gelatin capsules today – and tomorrow. Capsugel Library (2nd Ed., 2002) |

## STATEMENT OF RELATED CASES

Under Federal Circuit Rule 47.5, counsel for Appellants state that no appeal from the same proceeding was previously before this or any other appellate court. Counsel also states that this Court's decision may directly affect or be affected by the following cases: none.

## JURISDICTIONAL STATEMENT

The United States District Court for the District of Delaware has subject matter jurisdiction over this patent infringement action under 28 U.S.C. § 1338(a). This Court has appellate jurisdiction pursuant to 28 U.S.C. § 1295(a)(1). The District Court entered final judgment on June 9, 2025. Appellants filed their notice of appeal on June 20, 2025.

I.    **STATEMENT OF THE CASE**

Appellee sued the MSN Appellants on July 30, 2020, and the Aurobindo Appellants on October 21, 2022, alleging infringement of the Asserted Patent. Prior to trial, the MSN Appellants stipulated to infringement. A three-day trial began on December 3, 2024, on the issues of validity (for all Appellants) and infringement (for the Aurobindo Appellants). The District Court entered final judgment for Appellee on June 9, 2025.

II.    **STATEMENT OF THE ISSUES**

The issues presented are:

1.  Did the District Court err in holding that a POSA would not have been motivated to formulate a capsule version of pimavanserin tartrate, when the prior art already disclosed pimavanserin tartrate capsules?

2.  Did the District Court err in requiring Appellants to show that a POSA would have been motivated to choose a pimavanserin capsule over a pimavanserin tablet, despite the fact that both dosage forms were disclosed in the prior art?

3.  Did the District Court err in not assessing "reasonable expectation of success" in the context of the Asserted Claims?

4. Did the District Court err in requiring an absolute predictability of achieving the claimed bulk density, rather than a reasonable expectation of success?

5. Did the District Court err in finding that Appellee met its burden of proving that the Aurobindo Appellants' product infringed the patent claims despite the absence of any competent evidence that Aurobindo's product met one of the claim limitations and overwhelming evidence that the claim limitation could not be met?

## III.   <u>STANDARD OF REVIEW</u>

This Court reviews the judgment of a district court for errors of law and clearly erroneous findings of fact. *H. Lundbeck A/S v. Lupin Ltd.*, 87 F.4th 1361, 1368 (Fed. Cir. 2023). The ultimate conclusion of whether a claimed invention is obvious is a question of law, which this Court reviews *de novo*, based upon underlying factual questions that are reviewed for clear error. *Pfizer, Inc. v. Apotex, Inc.*, 480 F.3d 1348, 1359, 1364-65 (Fed. Cir. 2007). Those underlying factual questions include what a reference teaches, whether a person of ordinary skill in the art would have been motivated to combine the references, and any relevant objective indicia of nonobviousness. *In re Ethicon, Inc.*, 844 F.3d 1344, 1349 (Fed. Cir. 2017). A factual finding is clearly erroneous if, despite some supporting evidence, the reviewing

2

court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. *Pfizer*, 480 F.3d at 1359.

For Aurobindo's appeal from the District Court's finding of infringement, this Court reviews the District Court's conclusions of law de novo and its factual findings for clear error. *H. Lundbeck*, 87 F.4th at 1368. A determination of infringement requires a two-step analysis–claim construction and comparison of the accused device to the claim as properly construed. *Glaxo Inc. v. Novopharm Ltd.*,110 F.3d 1562, 1565-66, 1570 (Fed. Cir. 1997). The first step is a question of law which this Court reviews de novo. *Id.* The second step is a question of fact which is reviewed for clear error. *Id.* Under the clear error standard, this Court reverses a finding of infringement if there is a definite and firm conviction that a mistake has been committed. *Pfizer*, 480 F.3d at 1359.

## IV.   JOINT APPEAL FROM THE DISTRICT COURT'S HOLDING OF NO INVALIDITY

### A.   INTRODUCTION

The Asserted Claims are directed to a capsule form of an old drug, pimavanserin. Appellee markets the drug under the brand name Nuplazid. A *single* Nuplazid capsule contains the full daily dose of pimavanserin. The Nuplazid capsule product replaced the prior art Nuplazid tablet product, which provided the same daily dose of pimavanserin in *two tablets* taken together. Thus, the patient now takes *one capsule* per day instead of *two tablets* per day.

3

The Asserted Claims are obvious.

Despite a strong case of obviousness, the District Court failed to invalidate the Asserted Claims, because it committed significant legal and factual errors. In fact, the prior art Ragnar-Tolf reference discloses *almost all* of the limitations of the Asserted Claims *including* putting the pimavanserin into capsules. The sole difference is that Ragnar-Tolf explicitly discloses a "size 0" capsule, while the Asserted Claims require a *smaller* ("size 3 or 4") capsule. A POSA would have been motivated to put the pimavanserin into a small capsule, because smaller capsules are easier to swallow than larger ones—which matters to the Parkinson's disease patients taking this drug, as they have difficulty swallowing their medicines. Thus, the Asserted Claims would have been obvious to a POSA.

The errors the District Court committed are as follows: *First*, the District Court erred in its analysis of motivation with respect to the Ragnar-Tolf reference. Notwithstanding Ragnar-Tolf's *explicit disclosure* of capsules for pimavanserin, the District Court erroneously required Appellants to show *separate motivation* for a POSA to put pimavanserin into capsules. But the law *presumes* that a POSA would have had motivation to combine the various claim limitations disclosed within the Ragnar-Tolf reference, and there is no need to provide separate motivation to "re-do" the work already done in Ragnar-Tolf. Yet the "re-do" is exactly what the District Court required here.

4

*Second*, and relatedly, the District Court erred in requiring Appellants to show that a POSA would have been motivated to *choose a pimavanserin capsule over a pimavanserin tablet*, despite the fact that *both* dosage forms were disclosed in the prior art. By turning the inquiry into an improper requirement to show a POSA's motivation to choose a capsule over a tablet *because it is better than a tablet*, the District Court committed legal error. The law is clear: a POSA can choose to use a capsule even if it isn't the "best" option. It simply needs to be an *obvious* option, which it was here.

*Third*, the District Court committed legal error in not assessing "reasonable expectation of success" in the context of the Asserted Claims. The Asserted Claims require the full dose of pimavanserin to be present in granules having a bulk density of ">0.4 g/mL." But the District Court failed to consider whether a POSA would have had a reasonable expectation of success in meeting the *claimed* bulk density limitation. Instead, the District Court held there was no reasonable expectation of success because a POSA would not have expected to *maintain* the exact bulk density of *Ragnar-Tolf's* pimavanserin granules. Failure to consider reasonable expectation of success in the context of the proper scope of the claims is legal error.

*Fourth*, the District Court required an *absolute predictability* of achieving the claimed bulk density, rather than a *reasonable expectation* of success. There was no evidence that modifying Ragnar-Tolf would have "materially and unpredictably"

altered the bulk density of the pimavanserin granules below the claimed threshold. To the contrary, the evidence showed that a POSA would have expected the bulk density of Ragnar-Tolf's pimavanserin granules to stay well above the claimed threshold. The District Court's requirement for absolute, rather than reasonable, expectation of success constitutes reversible error.

This Court should reverse the District Court's obviousness holding.

### B.    FACTUAL BACKGROUND

1.    Nuplazid capsules, prior art Nuplazid tablets, and the Asserted Patent

Appellee Acadia markets a drug called Nuplazid, in capsules. APPX5 ¶15. Nuplazid capsules contain 40 mg pimavanserin tartrate (which is a dose of 34 mg pimavanserin) in a single capsule administered once daily for the treatment of hallucinations and delusions associated with Parkinson's disease psychosis. This is a condition that primarily affects the elderly. APPX5, ¶¶15-16; APPX467 at 291:12-18 (Muzzio). The Aurobindo Appellants and the MSN Appellants each submitted an ANDA seeking FDA approval for a generic version of Nuplazid capsules prior to the expiration of the Asserted Patent. APPX7, ¶¶28-31.

More than one year prior to filing the Asserted Patent, Appellee had received FDA approval of Nuplazid tablets. Like Nuplazid capsules, Nuplazid tablets contain pimavanserin, are administered once daily, and are indicated for the same medical condition. Unlike Nuplazid capsules (in which a *single capsule* contains 40 mg

pimavanserin tartrate), prior art Nuplazid tablets each contained only *20 mg* of the drug, and *two* tablets were taken together. APPX5 ¶¶17-18. Thus, the Nuplazid capsules regimen of one capsule per day replaced the two-tablets-per-day regimen of the prior Nuplazid tablets. *See, e.g.*, APPX107 at 1:39-47.

Elderly patients in general, and Parkinson's disease patients in particular, have difficulty swallowing their medicines, which leads to non-compliance with their treatment. APPX30 ¶84, APPX32 ¶87. In addition, elderly patients, and particularly Parkinson's disease patients, were known to have a high "pill burden" (the daily number of pills a patient has to take), which also affects compliance. APPX484-487 at 308:13–311:4 (Muzzio); APPX3940; APPX3934; APPX3927, right column. Thus, there is a general motivation in the art to make medicines such as pimavanserin easier to swallow, and to decrease pill burden. APPX28 ¶79, APPX30 ¶83.

The Asserted Patent acknowledges that these facts and motivations existed before the filing date. APPX107 at 1:34-38 ("Patients suffering from neurodegenerative diseases, such as Parkinson's disease are at a risk of non-compliance when administered a drug of too large size, or if taken as more than one tablet per day as said patients often have difficulty swallowing.") The Asserted Patent goes on to state: "In order to simplify administration and patient compliance of pimavanserin it would be advantageous to administer pimavanserin as a single dose." APPX107 at 1:44-47. The Asserted Claims are directed to a capsule

formulation of pimavanserin tartrate, which (unlike the prior Nuplazid tablets) contains the *full 40 mg* amount in a *small, single pill* that is easy to swallow.

Specifically, the Asserted Claims recite:

> 4. A pharmaceutically acceptable capsule for orally delivering 34 mg of pimavanserin to a patient, wherein **[1a]** the capsule has a capsule shell **[1b]** with a capsule shell size 3 or 4, **[2a]** that encapsulates a blended pimavanserin composition comprising: granules **[2b]** comprising 40 mg pimavanserin tartrate and one or more pharmaceutically acceptable excipients; and **[3]** wherein the bulk density of the granules is >0.4 g/ml as determined by USP, method 1.

> 5. The pharmaceutically acceptable capsule of claim 4, wherein **[1b]** the capsule shell is a hard shell size 4 capsule.

APPX118 (brackets added to separate limitations).

### 2. Ragnar-Tolf and other prior art

Besides Nuplazid tablets, additional prior art is relevant to whether the Asserted Claims would have been obvious to a POSA.

#### a. Ragnar-Tolf

Ragnar-Tolf discloses almost all the limitations of the Asserted Claims. Ragnar-Tolf is a published U.S. patent application titled "Pharmaceutical Formulations of Pimavanserin." APPX3480.[1] The District Court found, "A POSA

---

[1] Inventor Bo Ragnar-Tolf was associated with Appellee and, among other things, Ragnar-Tolf describes the product marketed as Nuplazid tablets. APPX581 at 405:1-5 (Little).

seeking to develop a new dosage form of pimavanserin would have looked to the Ragnar-Tolf reference." APPX38 ¶117.

Table 7 of Ragnar-Tolf discloses several examples of pimavanserin compositions comprising granules of pimavanserin tartrate and pharmaceutically acceptable excipients, such as mannitol:

TABLE 7

| Ingredient amounts (%) for wet granulation formulations. | | | |
|---|---|---|---|
| | Tablet strength | | |
| | 1 mg | 5 mg | 20 mg |
| Drug | 1.03 | 5.13 | 20.5 |
| Mannitol | 91.3 | 87.2 | 71.1 |
| Pregelatinized Starch | 5.00 | 5.00 | 5.00 |
| Povidone | 1.15 | 1.15 | 1.15 |
| Magnesium stearate | 1.5 | 1.5 | 2.0 |
| Ethanol 99.5%** | 19.8 | 16.5 | 16 |

**Evaporates during manufacturing process

APPX40 ¶126. Table 7 teaches a POSA that the pimavanserin tartrate concentration in the granulation can be increased from 1 to 20 mg by taking out a corresponding amount of mannitol, while keeping the other ingredients fairly constant. APPX509 at 333:17-22 (Muzzio).

Table 8 "discloses examples of pimavanserin tablets that were formulated, including in 1 mg, 5 mg, and 20 mg dosages," with granules "that ranged in bulk-density between 0.56 g/ml and 0.61 g/ml":

9

TABLE 8

Physical and analytical characteristics of wet granulation formulations.

| Tablet strength | 1 mg | 5 mg | 20 mg | 5 mg | 20 mg |
|---|---|---|---|---|---|
| LOD (%) | 1.5% | 0.8% | 2.3% | 0.9% | 1.6% |
| Sieving analysis (%) | | | | | |
| >710 | 0 | 0 | 0 | 0 | 0 |
| 500-710 | 0 | 0 | 1 | 0 | 1 |
| 250-500 | 8 | 5 | 7 | 4 | 6 |
| 125-250 | 69 | 69 | 69 | 71 | 72 |
| 90-125 | 19 | 21 | 18 | 21 | 18 |
| <90 | 5 | 4 | 6 | 5 | 4 |
| Bulk/Tapped density g/ml | 0.57/0.60 | 0.58/0.64 | 0.61/0.63 | 0.55/0.60 | 0.56/0.61 |
| Tablet weight | 100 mg | 100 mg | 100 mg | 101 mg | 99.7 mg |
| Crushing strength | 61N | 51N | 58N | 61N | 44N |
| Tablet height | 3.7 mm | 3.8 mm | 3.8 mm | 3.7 mm | 3.8 mm |
| Friability, 100 rot. (%) | 0.1 | 0.1 | 0 | --- | --- |
| Friability, 200 rot. (%) | --- | --- | --- | 0.1 | 0.1 |
| Disintegration time | 6 min | 6 min | 5 min | 6 min | 5 min |
| Content uniformity, mg/tabl | 1.0 mg | 5.4 mg | 20.5 mg | --- | 20.1 mg |
| Released amount %, 30 min | 98% | 117% | 102% | --- | --- |

APPX40 ¶126. Ragnar-Tolf also "discloses embodiments of 1 to 80 mg tablets of pimavanserin tartrate, including 40 mg tablets." APPX40 ¶125. And, importantly, as an alternative to tablets, Ragnar-Tolf teaches that pimavanserin tartrate granules could be put into capsules. APPX40 ¶124.

Thus, Ragnar-Tolf discloses claim limitations **[1a]** (capsules), **[2a]** (granules), **[2b]** (40 mg pimavanserin tartrate and excipients), and **[3]** (bulk density >0.4 g/ml)—all of the claim limitations except element **[1b]** (capsule shell "size 3 or 4"). Instead, Ragnar-Tolf explicitly discloses a "size 0" capsule, which is larger than a size 3 and 4. APPX38 ¶120. Notably, the District Court found that a POSA would

have understood how to modify Ragnar-Tolf to fit 40 mg of the pimavanserin tartrate composition into a smaller (size 4) capsule. APPX42 ¶128.

> b.   Schiele and Stegemann 2002

> (1)   Schiele

Schiele provides motivation for a POSA to choose a small capsule for administering pimavanserin.

Schiele is an article entitled "Difficulties swallowing solid oral dosage forms in a general practice population: prevalence, causes, and relationship to dosage forms." APPX3912. Schiele confirms that elderly patients, and particularly Parkinson's disease patients, have difficulty swallowing medicines. APPX3913 ("Generally, the prevalence of swallowing impairment increases with old age as functional impairment evolves and the number of diseases linked to dysphagia like stroke, Parkinson's and Alzheimer's disease, or cancer increase.") (citations omitted). Schiele thus "aimed at quantifying the overall prevalence of problems with swallowing tablets and capsules . . . ." *Id.* Table 2 of Schiele discloses the relationship between dimensions of various types of tablets and capsules and swallowing difficulties:

Table 2 Relationship between dimensions of tablets and capsules and swallowing difficulties

| | Mean of tablets and capsules that caused difficulties | Mean of tablets and capsules that did not cause difficulties | Difference of the geometric means [%] | *p*-value |
|---|---|---|---|---|
| Round: Diameter [mm] | 8.7±2.0 | 8.1±1.7 | - 7.1 | <0.0001 |
| Round: Height [mm] | 3.8±1.2 | 3.5±1.1 | - 6.9 | <0.01 |
| Oval: Length [mm] | 15.0±4.4 | 13.2±3.3 | - 10.3 | <0.001 |
| Oval: Width [mm] | 7.4±1.8 | 6.6±1.4 | - 9.3 | <0.001 |
| Oval: Height [mm] | 4.5±1.5 | 4.6±1.3 | + 3.3 | n.s. |
| Oblong: Length [mm] | 16.7±4.0 | 13.3±4.7 | - 22.2 | <0.0001 |
| Oblong: Width [mm] | 7.3±1.6 | 6.2±2.0 | - 16.3 | <0.0001 |
| Oblong: Height [mm] | 5.8±1.6 | 4.9±1.7 | - 18.6 | <0.01 |
| Irregular shapes: Diameter [mm] | 9.4±1.1 | 8.8±1.4 | - 6.7 | n.s. |
| Irregular shapes: Height [mm] | 3.5±0.8 | 3.5±0.8 | - 1.2 | n.s. |
| Irregular shapes: Length [mm] | 7.3±0.5 | 8.1±1.5 | + 10.2 | n.s. |
| Irregular shapes: Width [mm] | 6.7±0.2 | 7.0±1.3 | + 2.1 | n.s. |
| Hard capsules: Diameter [mm] | 6.8±1.4 | 6.4±1.2 | - 7.1 | <0.05 |
| Hard capsules: Length [mm] | 19.0±2.0 | 17.5±2.8 | - 9.3 | <0.001 |
| Soft capsules: Diameter [mm] | 8.6±1.7 | 8.0±1.1 | - 7.0 | n.s. |
| Soft capsules: Length [mm] | 20.8±2.0 | 18.3±5.8 | - 16.7 | n.s. |

APPX3917.

This table discloses to a POSA that hard capsules "are easy to swallow when they are smaller than 6.4 mm in diameter and 17.5 mm in length." APPX505-506 at 329:21-330:1 (Muzzio). Based on readily-available capsule size tables, a POSA would have known that capsule sizes 3, 4, and 5 are smaller than 6.4 mm in diameter and 17.5 mm in length, thus making these sizes easiest to swallow. APPX505-506 at 329:14-330:20 (Muzzio).[2] Thus, Schiele provides strong motivation for a POSA to choose a small capsule, such as size 4, for administering pimavanserin. *Id.*

---

[2] *See, e.g.*, Fig. 1 of the Asserted Patent, "a table disclosing specifications of capsule sizes, commercially available." APPX103, APPX107. A POSA would have had access to such capsule size tables as of the Asserted Patent's priority date. APPX506 at 330:10-14 (Muzzio).

(2)    Stegemann 2002

Stegemann 2002 also provides motivation for a POSA to choose a small capsule for administering pimavanserin. In addition, Stegemann 2002 provides a POSA with a reasonable expectation of success in modifying Ragnar-Tolf to achieve a small (size 4) capsule containing the full daily dose of pimavanserin.

Stegemann 2002 is an article entitled "Hard gelatin capsules today – and tomorrow." APPX3882. Stegemann 2002 reports the results of a study concluding that 66% of patients preferred capsules for ease of swallowing. APPX34 ¶97. Based on Stegemann 2002 and his or her own experience, a POSA also would have known that smaller capsules are easier to swallow. APPX491-492 at 315:13–316:17 (Muzzio). Thus, as with Schiele, Stegemann 2002 provides strong motivation for a POSA to choose a small capsule for administering pimavanserin. *Id.*

Table 1 of Stegemann 2002 shows the sizes of standard capsules going from size 000, which is the largest, to size 5, which is the smallest. Table 1 further discloses the volume that can be filled into the capsule and based on four different listed bulk densities of the material to be put into the capsule, how much material (by weight) can fit inside the capsule. APPX3885; APPX384 at 248:7-15 (Muzzio).

13

| Capsule size | Capsule volume in ml | Capacity in mg powder density | | | |
|---|---|---|---|---|---|
| | | 0.6 | 0.8 | 1.0 | 1.2 g/ml |
| 000 | 1.37 | 822 | 1096 | 1370 | 1644 |
| 00el | 1.02 | 612 | 816 | 1020 | 1224 |
| 00 | 0.91 | 546 | 728 | 910 | 1092 |
| 0el | 078 | 468 | 624 | 780 | 936 |
| 0 | 0.68 | 408 | 544 | 680 | 816 |
| 1 | 0.50 | 300 | 400 | 500 | 600 |
| 2 | 0.37 | 222 | 296 | 370 | 444 |
| 3 | 0.30 | 180 | 240 | 300 | 360 |
| 4 | 0.21 | 126 | 168 | 210 | 252 |
| 5 | 0.10 | 78 | 104 | 130 | 156 |

*Table 1: Examples for hard gelatin capsule dimensions and filling capacities.*

APPX3885.

Based on this table, a POSA would know, for example, that 126 mg of pimavanserin tartrate granules having a bulk density of about 0.6 g/ml (as disclosed in Ragnar-Tolf) can fit into a size 4 capsule. APPX508-509 at 332:7–333:7 (Muzzio). A POSA would thus use Stegemann 2002 to modify Ragnar-Tolf to achieve a small (size 4) capsule containing the full daily dose of pimavanserin, with a reasonable expectation of success. APPX507-511 at 333:1–335:24 (Muzzio).

3.    Appellee's Arguments and the Decision Below

Appellee presented two primary arguments below. First, Appellee argued that a POSA would not have been "motivated to reformulate Nuplazid [t]ablets" and choose a capsule formulation of pimavanserin tartrate over the existing Nuplazid tablet formulation. APPX1006-1011. Second, Appellee argued that a POSA would

not have had a reasonable expectation of success in "[m]odifying Nuplazid [t]ablets" to achieve the Asserted Claims. APPX1111-1114. Following the thread that sounded like a POSA had to discard tablets and choose capsules as the preferred dosage form, the District Court sided with Appellee on both arguments.

First, the District Court held that "[a] POSA would not have been motivated to formulate a capsule dosage of pimavanserin *over a tablet dosage of pimavanserin*[.]" APPX38 ¶116.[3] In so finding, the District Court seemed to (1) ignore that Ragnar-Tolf *already disclosed* capsules for pimavanserin tartrate; and (2) require a showing that a POSA would have been motivated to *switch* from Nuplazid tablets to capsules based on an explicitly-disclosed problem with Nuplazid tablets, rather than based on the art as a whole. *See* APPX29 ¶¶81-82 ("The prior art does not disclose a pill burden problem *for the Nuplazid tablets*," therefore "[a] POSA would not have been motivated to formulate a capsule dosage of pimavanserin *over a tablet dosage of pimavanserin* on the basis of pill burden."); APPX34 ¶99 (A POSA would not have been motivated to formulate a capsule dosage of pimavanserin *over a tablet dosage of pimavanserin* on the basis of swallowability."); *see also* APPX34 ¶106 (taste masking); APPX37 ¶111 (color coating). The District Court also based its ruling, in part, on the facts that "[t]ablet dosages of pimavanserin

---

[3] All emphasis is added unless otherwise indicated.

already existed" and Appellant's expert "was not aware of 'any complaints'" regarding Nuplazid tablets. APPX37 ¶112, APPX37 ¶114, APPX38 ¶116.

Along similar lines, the District Court dismissed the Schiele reference because it "teaches that capsules cause more swallowing problems than tablets" and that "patients with swallowing difficulty are more likely to prefer tablets compared to capsules." APPX30-31 ¶¶85-86; *see also* APPX31 ¶86 (crediting Appellee's expert testimony that "if 'you're just looking at the Schiele reference . . . you're going to pick a tablet over a capsule'"). And the District Court found that Stegemann 2002 "has diminished credibility" because "Mr. Stegemann's employment at a capsule manufacturer" created a "conflict of interest," without any evidence of record stating that a POSA would reach the same conclusion. APPX34 ¶98.

Second, the District Court held that "[a] POSA would have not been motivated to formulate the recited capsule dosage of pimavanserin with the claimed bulk density with a reasonable expectation of success in doing so." APPX43 ¶130. While the District Court credited Appellants' expert testimony that, based on the information from Stegemann 2002 and the formulations disclosed in Table 7 of Ragnar-Tolf, a POSA "can put 40 mgs [of pimavanserin tartrate] within the 126 mgs of total blend that I can put inside the capsule . . . just by taking some of the mannitol

out,"[4] the District Court held that a POSA doing so would have understood that such action "could have increased or decreased the bulk density of the granules," and therefore there was no reasonable expectation of success. APPX42-43 ¶¶129-130.

### C.   <u>SUMMARY OF ARGUMENT</u>

The District Court erred in concluding that the Asserted Claims are not obvious in view of the prior art.

*First*, the District Court erred in holding that a POSA would not have been motivated to formulate a capsule version of pimavanserin tartrate, when Ragnar-Tolf already disclosed pimavanserin tartrate capsules. Relatedly, the District Court erred in requiring Appellant to show motivation to make a capsule "over a tablet." In fact, the prior art and a POSA's experience motivated a POSA to use a size 3 or 4 capsule for pimavanserin.

*Second*, the District Court erred in finding that a POSA would not have been able to achieve pimavanserin granules having the bulk density of the Asserted Claims with a reasonable expectation of success. The District Court did not consider "reasonable expectation of success" in light of claim scope, and erroneously required absolute predictability instead.

---

[4] Appellants' expert further testified that a POSA "would have succeeded at being able to create a formulation with granulated pimavanserin tartrate such that you can put the 40 mgs inside that size 4 capsule within one or maybe two experiments." APPX511 at 335:20-24 (Muzzio).

The District Court's holding should be reversed.

**D.    ARGUMENT**

1.    The District Court erred in concluding that the Asserted Claims were not obvious in view of the prior art.

The District Court's analysis of obviousness was erroneous. The District Court committed multiple legal errors in its analysis of the ultimate question of obviousness after resolving the underlying factual issues. The District Court further committed legal errors in its analysis of whether a POSA would have had a reasonable expectation of success in achieving pimavanserin granules with a bulk density of greater than 0.4 g/ml, as claimed.

a.    The District Court erred in holding that a POSA would not have been motivated to formulate a capsule version of pimavanserin tartrate.

The District Court found that Nuplazid tablets and Ragnar-Tolf were both prior art. APPX29 ¶80, APPX38 ¶117. The District Court also found that a POSA could be motivated to minimize the number of tablets or capsules administered to patients to decrease pill burden. APPX28 ¶79. Further, the District Court found that a POSA seeking to develop a new dosage form of pimavanserin would have looked to the Ragnar-Tolf reference. APPX38 ¶¶117, 118. Ragnar-Tolf discloses both tablets and capsules. APPX3490 (paragraph [0063]). Yet, even despite finding all of these facts, the District Court held that, since Appellants "fail[ed] to demonstrate the motivation of a POSA to formulate a capsule dosage of pimavanserin by clear and

convincing evidence, [Appellants] failed to meet their burden of demonstrating obviousness." APPX64. This holding is clearly erroneous.

> b.    The District Court legally erred in requiring Appellants to show that a POSA would have been motivated to formulate a capsule dosage of pimavanserin tartrate when Ragnar-Tolf already disclosed pimavanserin tartrate capsules.

It was legal error for the Court to hold that a "POSA would not have been motivated to formulate a capsule dosage of pimavanserin." APPX63. Ragnar-Tolf *already disclosed* (and the Court found) that pimavanserin could be put into a capsule. *See*, *e.g.*, APPX40 ¶124.

The concept of showing a "motivation to modify" the prior art typically focuses on whether there is a reason to combine two or more prior art references that *together* disclose the various claim limitations. *See Gen. Elec. Co. v. Raytheon Techs. Corp.*, 983 F.3d 1334, 1339–40, 1351–52 (Fed. Cir. 2020) ("the law has always evaluated the motivation to combine elements based on the combination of prior art *references* that together disclose all of the elements of the invention.") (emphasis in original). But there is no requirement for a motivation to combine individual elements *already disclosed within a single prior art reference*. *Id.* Rather, when analyzing "motivation to modify" in light of a *single* prior art reference, the law effectively *presumes* that a POSA would have been motivated to combine the *various claim limitations* disclosed within that single reference. *See id.* (finding a

19

PTAB decision lacked substantial evidence when the Board required "a motivation to combine each element of the claim—even those present together in a [single] reference"). Indeed, "a party showing obviousness [need not] re-do the work already done in the prior art reference." *Id*. at 1352. That is exactly what the District Court required here.

The District Court properly found that: (1) "a POSA seeking to develop a new dosage form of pimavanserin would have looked to the Ragnar-Tolf reference[;]" (2) Ragnar-Tolf discloses a pimavanserin composition composed of granules of pimavanserin tartrate and excipients, where the bulk density of the granules is between 0.56 and 0.61 g/ml; (3) "the Ragnar-Tolf reference discloses embodiments of 1 to 80 mg tablets of pimavanserin tartrate, including 40 mg tablets;" and (4) "[t]he Ragnar-Tolf reference discloses that the wet granulated formulations could be compressed into not only tablets with film coating, *but also into capsules*." APPX38 ¶117; APPX40-42 ¶¶124-127. These findings correspond to claim elements **[1a]** (capsules), **[2a]** (granules), **[2b]** (40 mg pimavanserin tartrate and excipients), and **[3]** (bulk density >0.4 g/ml)—all claim elements except one. *See* APPX118, claims 4 and 5. Nevertheless, the District Court required Appellants to "re-do the work already done in" Ragnar-Tolf by showing a *separate motivation* to modify Nuplazid tablets to meet the "capsule" limitation **[1a]**, and held that Appellants "fail[ed] to

meet their burden of demonstrating obviousness" by not doing so. APPX64. The District Court's obviousness analysis is thus legally flawed.

The facts of *Raytheon* are instructive. There, G.E. asserted, in an *inter partes* review proceeding before the PTAB, that certain claims of Raytheon's patent on an engine using a two-stage high pressure turbine were obvious based on the combination of two prior art references, Wendus and Moxon. *Gen. Elec. Co.*, 983 F.3d at 1339. Similar to Ragnar-Tolf and the Asserted Claims here, Wendus disclosed all elements of the challenged claims except one—it taught a one-stage high pressure turbine instead of the claimed two-stage high pressure turbine. *Id*. Moxon disclosed this missing limitation. *Id*. at 1340. In its decision upholding Raytheon's patent, the Board held that G.E. failed to provide motivation for a POSA to maintain *all of the other claim elements* disclosed in Wendus when modifying the reference to include Moxon's two-stage high pressure turbine. *Id*. This Court reversed due to a lack of substantial evidence, holding that the Board's incorrect approach "unduly dissects prior art references into collections of individual elements," rather than analyzing the prior art reference "as a whole." *Id*. at 1352.

Here, the District Court similarly "dissect[ed]" Ragnar-Tolf into its "individual elements" and wrongfully required Appellants to prove *again* that a POSA would have been motivated to make a capsule formulation of pimavanserin. *See id.* But Ragnar-Tolf's disclosure that pimavanserin *could be put into capsules*

shows that the claimed capsule was nothing more than an obvious application of the disclosure of Ragnar-Tolf. No *additional* motivation is necessary. The District Court's heightened requirement was legally erroneous.

> c.    The District Court committed legal error in requiring Appellant to show motivation to make a capsule "over a tablet."

It was also legal error for the District Court to require Appellants to show motivation to *switch* from pimavanserin tablets to pimavanserin capsules. In holding that "[Appellants] fail[ed] to demonstrate the motivation of a POSA to formulate a capsule," the District Court noted the advantages of tablets over capsules, that there were no reported problems with pimavanserin tablets, and relied *extensively* on facts that concluded, for several reasons, that "[a] POSA would not have been motivated to formulate a capsule dosage of pimavanserin *over a tablet dosage of pimavanserin*[.]" APPX82, APPX99, APPX106, APPX111, APPX116; APPX64. But the District Court erred in its overall analysis of obviousness by basing "[no] motivation … to formulate a capsule" on "[no] motivat[ion] to formulate a capsule … *over a tablet*[.]" *See* APPX64. Even if one accepts that some prior art references (such as Schiele) express a *general* preference for tablets over capsules, the law has long been clear that "obviousness does not require that a particular combination must be the preferred, or the most desirable, combination described in the prior art in order to provide motivation for the current invention." *Honeywell Int'l Inc. v. 3G*

*Licensing, S.A.*, 124 F.4th 1345, 1355–56 (Fed. Cir. 2025). Rather, "the question is whether there is something in the prior art as a whole to suggest the desirability, and thus the obviousness, of the claimed invention." *Id*. By requiring Appellants to demonstrate a motivation to use a capsule "over a tablet," the District Court's decision ran afoul of this bedrock principle.

Notably, the District Court acknowledged that, besides Ragnar-Tolf, other prior art would have motivated a POSA to choose capsules as a suitable option for pimavanserin. For instance, the District Court found that "a POSA could be motivated to formulate a medication on the basis of taste," that "pimavanserin has a pronounced bitter taste," and that "capsule dosage forms may provide better taste masking than tablet dosage forms." APPX34 ¶¶100-101, APPX35 ¶105. But the District Court *also* found that "[t]he Nuplazid tablets have a film-coating that masks the taste of pimavanserin, *negating* the motivation for a POSA to develop other dosage forms." APPX ¶104. This "weighing" of motivation was legal error. A patent challenger does not have to show that a proposed modification of the prior art provides an improvement in a categorical sense; rather, the patent challenger need only show that the proposed modification was a *suitable option* to address the same problem as the prior art. *Intel Corp. v. PACT XPP Schweiz AG*, 61 F.4th 1373, 1381 (Fed. Cir. 2023). Here, the District Court found that capsules were a suitable option for taste masking the bitter pimavanserin, providing a POSA with ample motivation

to choose capsules. That the District Court required more indicates legal error in the overall analysis.

The erroneous requirement for an "improvement" over the prior art runs throughout the District Court's findings. For instance, the District Court found that coloring dosage forms facilitates medication identification, and that *both* tablets and capsules can be distinctively colored, but concluded there was no motivation to select a capsule *over a tablet* on the basis of coloring. APPX36-37 ¶¶107-111. Likewise, the District Court found that, in general, a POSA could be motivated to make dosage forms that are easy to swallow, and that one prior art study concluded that patients preferred the swallowability of capsules. APPX30 ¶¶83-84, APPX34 ¶97. Yet the District Court held that there was no motivation "to formulate a capsule dosage of pimavanserin *over a tablet* dosage of pimavanserin on the basis of swallowability." APPX34 ¶99. This failure "to recognize that the claimed modification needed only to be desirable in light of the prior art and not the 'best' or 'preferred' approach," constitutes legal error requiring reversal. *See Honeywell*, 124 F.4th at 1356.

> d.    The prior art and a POSA's experience motivated a
>        POSA to use a size 3 or 4 capsule for pimavanserin.

The District Court never explicitly ruled on whether a POSA would have been motivated to choose a size 3 or 4 capsule from among the limited available options.

But the District Court's findings, the prior art references, and unrebutted expert testimony support such a ruling.

The District Court found that Parkinson's disease patients taking pimavanserin "were 'known to have a high … difficulty swallowing,'" and credited Appellants' expert testimony that "difficulty swallowing 'would motivate a [POSA] to formulate pimavanserin into a dosage form that is as easy to swallow as possible.'" APPX30 ¶¶83-84. Appellants' expert testified that, both from training and common sense, a POSA would know that a smaller capsule is easier to swallow than a larger one. APPX504 at 328:16-21 (Muzzio). Appellee's expert agreed. *See* APPX778 at 576:9-18 (Little). Indeed, Appellee's expert testified that, based on the bulk density and pimavanserin amounts in the Asserted Claims, along with what a POSA already knew about capsule sizes and fill volumes, a POSA would "kind of squeeze down to [size] 3 and four." APPX685 at 483:15-485:2 (Little).

Appellants' expert also testified that a POSA would have known that a size 4 capsule, in particular, "was a good choice for this formulation because, as per the data in Schiele, it would be easy to swallow." APPX506 at 330:15-20 (Muzzio). The District Court did not specifically address this testimony, which was unrebutted (and based on common sense). Instead, the District Court dismissed the Schiele reference on other grounds, namely on Appellee's expert testimony that, based on Schiele, "you're going to pick a tablet over a capsule." APPX31 ¶86. But *even if* Schiele's

study showed that tablets were generally easier to swallow than capsules, that does not change Schiele's teaching to a POSA that capsules corresponding to size 3 or smaller are easy to swallow. *See* APPX505-506 at 329:14–330:20 (Muzzio). A reference does not teach away if a skilled artisan, upon reading the reference, would not be discouraged from following the path set out in the reference, and would not be led in a direction divergent from the path that was taken by the applicant. *Adapt Pharma Operations Ltd. v. Teva Pharms. USA, Inc.*, 25 F.4th 1354, 1370 (Fed. Cir. 2022). Likewise, a motivation to use smaller capsules here need not be supported by a finding that capsules are the preferred, or the most desirable, option. *Apple Inc. v. Samsung Elecs. Co.*, 816 F.3d 788, 801 (Fed. Cir. 2016), *vacated in part on reh'g en banc*, 839 F.3d 1034 (Fed. Cir. 2016). Any comparison of tablets to capsules in Schiele is simply *not* relevant, given that the reference as a whole teaches what *is* relevant here—that smaller capsules do not cause swallowing problems. *See In re Boe*, 355 F.2d 961, 965 (C.C.P.A. 1966) ("All of the disclosures in a reference must be evaluated for what they fairly teach one of ordinary skill in the art."); *see also In re Wesslau*, 353 F.2d 238, 241 (C.C.P.A. 1965) ("It is impermissible within the framework of section 103 to pick and choose from any one reference only so much of it as will support a given position, to the exclusion of other parts necessary to the full appreciation of what such reference fairly suggests to one of ordinary skill in the art.")

26

Likewise, the District Court wrongly dismissed Stegemann 2002 because "Mr. Stegemann's employment at a capsule manufacturer" created a perceived "conflict of interest," assumely biasing the choice of capsules over tablets. *See* APPX34 ¶98. Notably, the District Court cited no testimony in the record that indicated that a POSA would *also* have dismissed Stegemann 2002 for that reason. "[A] district court cannot, through a credibility determination, ignore the wealth of evidence, especially as in this case where the expert did not even address it." *Bayer Pharma AG v. Watson Lab'ys, Inc.*, 874 F.3d 1316, 1324 (Fed. Cir. 2017). Even crediting the District Court's analysis, any "conflict of interest" in favor of capsules is not relevant to the question of *which size* capsule from the available options a POSA would choose. *See Boe*, 355 F.2d 961 at 965. And as with Schiele, based on Stegemann 2002 and his or her own experience, a POSA would have known that smaller capsules are easier to swallow. APPX491-492 at 315:13–316:17 (Muzzio).[5] In sum, the prior art (and a POSA's experience) motivated a POSA to choose a small capsule, such as size 3 or 4, for administering pimavanserin.[6] *See KSR Int'l Co. v.*

---

[5] The District Court's reliance on other facts to support lack of motivation, such that "[t]ablet dosages of pimavanserin already existed" and a lack of complaints regarding Nuplazid tablets is likewise irrelevant to the question of which size capsule a POSA would choose. *See* APPX37 ¶112, APPX37 ¶¶114, 116.

[6] Appellee argued in post-trial briefing that, if anything, a POSA "would have been motivated to pursue . . . size 5 capsules, which are the smallest and thus the easiest to swallow, but not a size 3 or 4 capsule." APPX1029 ¶15 (citing APPX685-687 at 483:15-485:2 (Little)). But this implicitly concedes that a POSA need only have

*Teleflex Inc.,* 550 U.S. 398, 402 (2007) ("When there is a design need or market pressure to solve a problem and there are a finite number of identified, predictable solutions, a person of ordinary skill in the art has good reason to pursue the known options within his or her technical grasp.").

"Given the overwhelming weight of evidence, remand is unnecessary, 'as here, the content of the prior art, the scope of the patent claim, and the level of ordinary skill in the art are not in material dispute, and the obviousness of the claim is apparent in light of these factors.'" *Allergan, Inc. v. Apotex Inc.*, 754 F.3d 952, 962, 966, 970 (Fed. Cir. 2014). Accordingly, this Court should reverse the District Court's judgment that the '721 patent is not invalid as obvious.

2.    The District Court erred in finding that a POSA would not have been able to achieve pimavanserin granules having the bulk density of the Asserted Claims with a reasonable expectation of success.

The District Court held that Appellants failed to demonstrate obviousness because a POSA would not have been able to achieve pimavanserin granules having the claimed bulk density with a reasonable expectation of success. APPX69. This holding is legally erroneous. The District Court failed to consider whether a POSA had a reasonable expectation of success *in light of the broad scope of the Asserted Claims*. In a second legal error, the District Court wrongly required an *absolute*

---

chosen between limited suitable options (size 3, 4, or 5), any one of which was obvious.

*predictability* in achieving a particular bulk density, rather than a *reasonable expectation* of success.

> a.   The District Court did not consider "reasonable expectation of success" in light of claim scope.

The District Court failed to consider the scope of the Asserted Claims in the context of whether a POSA had a reasonable expectation of success in achieving pimavanserin granules with the claimed ">0.4 g/ml" bulk density. Failure to consider reasonable expectation of success in the context of the proper scope of the claims is a legal error, which this Court should review *de novo*. *See ImmunoGen, Inc. v. Stewart*, 130 F.4th 1328, 1336 (Fed. Cir. 2025); *see also Allergan*, 754 F.3d at 966.

While the Asserted Claims require the bulk density of the pimavanserin granules to be *greater than 0.4 g/ml*, the District Court failed to consider whether a POSA would have a reasonable expectation of success of meeting *that threshold*. Instead, the District Court held that there was no reasonable expectation of success because a POSA would not have expected to *maintain* the bulk density of *Ragnar-Tolf's* pimavanserin granules, which is *much higher* than the claims require. *See* APPX42 ¶129.

Ragnar-Tolf discloses granules containing up to 20 mg pimavanserin, which ranged in bulk density between 0.56 g/ml and 0.61 g/ml, *much higher* than the claimed threshold of ">0.4 g/ml." APPX41 ¶127. Appellants provided evidence

(which the District Court credited) that a POSA could have modified Ragnar-Tolf's granules to go from 20 mg to the claimed 40 mg "just by taking some of the mannitol out." APPX42 ¶129. The Court also credited Appellants' evidence that a POSA would have expected the increase from 20 mg to 40 mg to *slightly* increase or decrease the bulk density of Ragnar-Tolf's granules. *See* APPX42 ¶129 (citing testimony that the bulk density may "come[] up [to] 0.62" g/ml or down to "let's say, 0.57" g/ml). But, erroneously, the District Court took this testimony to conclude that there was no reasonable expectation of success, because a POSA would not necessarily expect to *maintain* the bulk density of Ragnar-Tolf's granules when the pimavanserin was increased from 20 mg to 40 mg. APPX68. But the appropriate question was not whether a POSA would have reasonably expected the bulk density of *Ragnar-Tolf's granules* to be *maintained*; rather, it was whether a POSA would have reasonably expected to be able to modify Ragnar-Tolf's granules from 20 mg pimavanserin to 40 mg pimavanserin and meet the *claimed* bulk density threshold of ">0.4 g/ml." *See* APPX118 claim 4. Failure to consider the appropriate scope of the claims in evaluating the reasonable expectation of success constitutes legal error. *Allergan*, 754 F.3d at 966.

There is no evidence that a POSA would have expected that increasing the pimavanserin in Ragnar-Tolf's granules from 20 mg to 40 mg (and taking out the corresponding mannitol) would reduce the bulk density all the way below 0.4 g/ml.

Indeed, the District Court merely cited Appellee's expert's speculative testimony that "it is *possible* that changing the pimavanserin concentration" in Ragnar-Tolf's granules "is going to be the one thing that *has the highest likelihood* of changing the bulk density." *See* APPX42 ¶129 (quoting APPX740-741 at 538:21-539:8 (Little)); *see also* APPX741 at 539:15-17 (Little) ("you have the *possibility* of . . . not needing [*sic*, meeting] the bulk density that we're talking about here[.]"). But that is nowhere near showing that a POSA would *expect* the bulk density of Ragnar-Tolf's granules to fall below 0.4 g/ml. Mere *possibility* of failure does not negate the POSA's reasonable expectation of success. *See Pfizer*, 480 F.3d at 1364–65.

> b.    The District Court erroneously required absolute predictability instead of a reasonable expectation of success.

The District Court erroneously required an *absolute predictability* of achieving the claimed bulk density of ">0.4 g/ml," rather than a *reasonable expectation* of success. Whether the trier of fact applied "the correct standard in assessing reasonable expectation of success . . . is a question of law" that this Court reviews *de novo. Teva Pharms. USA, Inc. v. Corcept Therapeutics, Inc.*, 18 F.4th 1377, 1381 (Fed. Cir. 2021). The case law is clear that "only a reasonable expectation of success, not a guarantee, is needed." *Pfizer*, 480 F.3d at 1364. Here, the District Court found that Ragnar-Tolf's granules had "consistent bulk densities" whether the granules contained 1 mg, 5 mg, or 20 mg pimavanserin. APPX68.

31

Appellant presented evidence that a POSA would have reasonably expected a similar bulk density to be achieved for granules containing 40 mg pimavanserin, thus rendering the claims obvious. *See* APPX512 at 336:3-15 (Muzzio). But the District Court dismissed this evidence, finding that this case aligned with *Allergan, Inc. v. Sandoz Inc.*, 796 F.3d 1293, 1305 (Fed. Cir. 2015). But in *Allergan*, the record showed that the proposed modification "could and did *materially* and *unpredictably* alter the property of the claimed formulation"—facts which were *not* established here. *See id.*

Here, based on Appellants' evidence, the District Court merely found that increasing the pimavanserin from 20 mg to 40 mg "could have *increased* or *decreased* the bulk density of the granules." *See id.* But this is a far cry from *Allergan*'s "*material[]* and *unpredictabl[e]*" changes, especially since there were factual showings of teaching away and unexpected results in that case. *See Allergan*, 796 F.3d at 1305–6.[7] Tellingly, Appellee *never identified a single pimavanserin granulation* that had a bulk density below the claimed threshold. *See Allergan, Inc. v. Sandoz Inc.*, 726 F.3d 1286, 1292 (Fed. Cir. 2013) ("the person of ordinary skill need only have a reasonable expectation of success of developing the claimed invention.") On the contrary, here, "expert and other evidence indicates that a person of skill in the present context can draw reasonable inferences about the likelihood of

---

[7] Notably, Appellee offered no evidence of objective indicia of nonobviousness.

success" in achieving the claimed bulk density. *Acorda Therapeutics, Inc. v. Roxane Lab'ys, Inc.*, 903 F.3d 1310, 1334 (Fed. Cir. 2018). Prior to granulation, pimavanserin has a bulk density of about 0.3 g/ml (APPX11 (Table 1)). A POSA would have expected pimavanserin granules to have a *higher* bulk density than pimavanserin alone, somewhere between 0.5-0.6 g/ml. APPX379-380 at 243:24–244:3; APPX512 at 336:7-15 (Muzzio). The inventors themselves expected to be able to make pimavanserin granules with bulk density between 0.6 and 0.8 g/ml using known techniques. *See* APPX515 at 339:18–341:1; APPX3523-3524; *see also Pfizer*, 480 F.3d 1348, 1364–65 (inventor's expectation of success relevant to existence of reasonable expectation of success). Thus, there was no indication that a POSA would expect the bulk density of Ragnar-Tolf's granules to fall below the claimed threshold when the pimavanserin was increased from 20 mg to 40 mg.

The District Court's failure to evaluate whether the evidence of record demonstrated that a POSA would have a *reasonable*, rather than *absolute*, expectation of success of achieving the claimed bulk density, and thus the ability to fit 40 mg of pimavanserin tartrate granules into a size 4 capsule, constitutes reversible error. *See Allergan*, 754 F.3d at 966 ("the district court's . . . errors leading to its overall conclusion of non-obviousness" required reversal).

### E.    CONCLUSION

For the reasons stated above, Appellants respectfully request that this Court reverse the District Court's holding that the Asserted Patent is not invalid.

## V.    AUROBINDO APPELLANTS' APPEAL FROM THE DISTRICT COURT'S FINDING OF INFRINGEMENT

### A.    INTRODUCTION

Aurobindo designed around Appellee's asserted claims. Appellee Acadia was able to fit the claimed quantity of pimavanserin into the claimed capsule size by making granules which have a high bulk density, so a composition was claimed containing 100% of the pimavanserin in granules. Instead of making granules, Aurobindo employed a different process altogether, a dry blending process under controlled low humidity so the capsules could be filled with a high concentration of the dry powder active ingredient, which a POSA would understand to not form granules.

Despite this, Appellee asserted its patent claims anyway and attempted to offer proof that arguably suggested that some of the pimavanserin in Aurobindo's capsules would adhere sufficiently to be called a granule. At trial, its "proof" of the presence of any granules was shaky, and the district court's acceptance of such proof was clearly erroneous. But more egregiously, Appellee offered no competent proof that all of the pimavanserin in Aurobindo's capsules was in granules, yet the asserted claims required that 100% of the pimavanserin be in granules. The district court

erred in excusing Appellee from proving that Aurobindo's product met that claim limitation.

### B.  **FACTUAL BACKGROUND**

> 1.   The relevant claim limitation–"granules comprising 40 mg pimavanserin tartrate"–requires proof that 100% of the pimavanserin tartrate in Aurobindo's ANDA product be in granules.

The patent in suit is the '721 patent. Appellee asserted claim 4 and 5 of the '721 patent against the Aurobindo Appellants. APPX94.

Claim 4 of the '721 patent claims (APPX118):

> A pharmaceutically acceptable capsule for orally delivering 34 mg of pimavanserin to a patient, wherein the capsule has a capsule shell with a capsule shell size 3 or 4, that encapsulates a blended pimavanserin composition comprising: granules comprising 40 mg pimavanserin tartrate and one or more pharmaceutically acceptable excipients; and wherein the bulk density of the granules is >0.4 g/ml as determined by USP<616>, method 1.

Claim 5 of the '721 patent claims (APPX118):

> The pharmaceutically acceptable capsule of claim 4, wherein the capsule shell is a hard shell size 4 capsule.

Both claims thereby require that Aurobindo's ANDA capsule contains "granules comprising 40 mg pimavanserin tartrate."

The District Court construed "granules comprising 40 mg pimavanserin tartrate" as follows: "Plain and ordinary meaning; the scope of the term granule

35

includes granules granulated with pimavanserin and excipients." APPX8 ¶33; APPX899-900.

There is no dispute that the totality of Aurobindo's ANDA capsule contains exactly 40 mg pimavanserin tartrate. APPX4297; APPX9 ¶37.

Accordingly, by the claim term's plain and ordinary meaning, all of the pimavanserin tartrate of Aurobindo's ANDA capsule must be in granules in order to meet the disputed claim limitation.

      2.      The Aurobindo Appellants' proof that its ANDA capsule product does not contain 100% of the pimavanserin tartrate in granules is overwhelming.

           a.     The Aurobindo Appellants established that its ANDA described a capsule product that would not contain any granules in its capsules.

Aurobindo's ANDA capsule is formulated using a dry blend process. APPX4298-4299; APPX4281-4282; APPX277 at 141:18-25; APPX333 at 197:4-11; APPX339-340 at 203:9–204:8. No granulation step is involved in Aurobindo's dry blending process. APPX278 at 142:1-7. Aurobindo's ANDA capsule contains pimavanserin tartrate in powder form, not in granules. APPX332 at 196:18-21.

A POSA would understand that a dry blend process is distinct from the various processes that result in the formation of granules, as construed by the court and described by the patent specification. APPX327 at 191:15-20; APPX380-381 at 244:23–245:12; APPX474-476 at 298:24–300:22; APPX4126. A POSA would

understand Aurobindo's ANDA to be describing a capsule formulation that did not contain granules. APPX337-338 at 201:8–202:15.

Aurobindo's ANDA capsule is formulated in carefully controlled low humidity conditions. APPX4282; APPX4298.

The microcrystalline cellulose ("MCC") in Aurobindo's formulation is added during the dry blend process with no indication of any pressure applied during the formation of the capsule. APPX4281-4282; APPX4298-4299; APPX342-343 at 206:20–207:19. Aurobindo's dry blend process is distinct from a dry granulation process, which even Appellee's expert Dr. Smith agrees requires high pressure to create granules. APPX267 at 131:16-23; *see also* Aurobindo's expert Dr. Moreton's testimony in accord at APPX318 at 182:4-8; APPX325 at 189:1-4; APPX343 at 207:15-19. The MCC in Aurobindo's formulation acts as a diluent and does not act as a binder because no pressure is applied. APPX322-323 at 186:2–187:12; APPX342-343 at 206:20–207:7. *See also* Appellee's validity expert Dr. Little in accord–MCC can be a binder "when you apply forces" or otherwise, it functions as a filler. APPX786-787 at 584:20–585:3.

The patent specification does not define "granules," but it does define "granulation" as follows: "The term 'granulation' as used herein, and as conventionally used in the pharmaceutical industry, refers to the act or process in which primary powder particles are made to adhere to form larger, multiparticle

entities called granules. Granules may, for example, be formed collecting particles together by creating mechanical bonds between them, *e.g.* by compression or by using a binder." APPX107 at Col. 4, ll. 43-49. Accordingly, the District Court construed granules to have been "granulated." APPX8 ¶33; APPX899 at 1-2.

Both parties' experts define granules in terms of a type of agglomeration. Dr. Smith for Appellee refers to undesired, unintended agglomeration as clumping and not as granules, whereas granules are the result of "purposeful agglomeration" APPX257-258 at 121:15–122:11. Dr. Moreton for Aurobindo distinguishes loose agglomeration as being clumping of powder, whereas granules are "rigid agglomeration." APPX323-324 at 187:25–188:15. Dr. Moreton agrees with Dr. Smith that granules do not form spontaneously; they have to be made to stick together. APPX324 at 188:22-23; *see also* Appellants' invalidity expert Dr. Muzzio in agreement with this and a POSA's understanding that the bond must be "rigid," APPX376 at 240:13-17. This intentional action component of a POSA's understanding of granules is consistent with the District Court's explanation that granules have to be "granulated" and the specification which requires that the particles to be "made to adhere." APPX900; APPX107; *see also* APPX329 at 193:12-22.

b.    Aurobindo's ANDA does not describe a product that meets the limitations of the asserted claims.

In addition to the evidence above clearly establishing Aurobindo's ANDA as non-infringing, Aurobindo did not report to the FDA any analysis that Aurobindo's ANDA capsule contained any quantity of granules comprising any amount of pimavanserin. APPX4278; APPX4296.

Aurobindo's final signed Master Formula Cards for its ANDA capsule contains no references to granules or granulation. APPX4296; APPX4301; APPX4306. Any reference to granules in unsigned drafts were deliberately removed in preparing and executing the final version. (*Compare* APPX3758, APPX3654, and APPX3658 with APPX4296, APPX4301, and APPX4306.)

The section of Aurobindo's ANDA, 3.2.P.3.3 Description of Manufacturing Process and Process Controls, which both parties' experts' reference in forming their opinions, contains no references to granules or granulation. APPX4278. This document, along with the final Master Formula Card, is the ANDA document that provides a description of Aurobindo's manufacturing process and its finished product to the FDA,and does not use the terms granules or granulation. APPX4278; APPX4296. No granulation process is described here. (*Id.*) A POSA reading Aurobindo's ANDA would understand that it describes a process in which granules are not made. APPX337-338 at 201:8–202:15.

39

        c.      None of the evidence regarding Aurobindo's ANDA comes close to establishing that 100% of the pimavanserin tartrate would be in granules.

Not only must there be granules as understood by a POSA in the accused capsule product, the quantity of pimavanserin tartrate required to be found in granule form is a limitation of both claims 4 and 5. APPX118. Under the plain claim language, there must be 40 mg of pimavanserin tartrate in the granules in the capsule. APPX118. It is insufficient for Appellee to claim the existence of some granules in the accused capsule product containing some pimavanserin tartrate; there must be the full 40 mg in granular form. Accordingly, based on the evidence set forth herein and presented at trial, Aurobindo established that it was improbable to have any granules in its capsules, and certainly established that any such granules would not have comprised 100% of the contents of its capsules. APPX4278; APPX4296; APPX337-338 at 201:8–202:15.

        3.      Appellee did not offer any competent evidence that 100% of the pimavanserin tartrate in Aurobindo's ANDA product is in granules.

        a.      Appellee's attempt to prove the existence of any granules in Aurobindo's ANDA product was substantially flawed.

Acadia's expert used stereo microscopy and polarized light microscopy to show slides of some of the clumps from Aurobindo's ANDA capsule captured by a series of sieves. APPX218 at 82:12-15.

This testing does not show how the pimavanserin tartrate is bonded to any excipients, just that there are various components of the capsule in clumps caught by the various sieve diameters, which clumps appear to be touching rather than how they are touching. APPX256-252 at 120:23–121:14; APPX353-355 at 217:24–219:19. Yet the District Court's construction requires the alleged granule to be "granulated," which in turn requires an act in which the particles are made to adhere to form "larger" entities. APPX8 ¶33; APPX900; APPX107 at Col. 4, ll. 43-49.

Dr. Smith's experiments used the material from an Aurobindo capsule sample, which was opened and then subjected to a sieving process, the data of which was reported in duplicate in the notebooks for both the stereo microscopy and polarized light microscopy experiments as follows:

| | Capsule | | Weight (g) | Weight empty (g) | Weight contents (g) | |
|---|---|---|---|---|---|---|
| | 12-38-01 | | 0.1332 | 0.0367 | 0.0964 | |
| Fraction ID | Micron | Mesh size | Weight of tared sieve (g) | Weight of sieve with sample retained (g) | Weight of sieved material (g) | Fraction retained % |
| 12-38-1-1 | 850 | 20 | 134.5308 | 134.5441 | 0.0134 | 12 |
| 12-38-1-2 | 600 | 30 | 127.8941 | 127.8993 | 0.0052 | 4.86 |
| 12-38-1-3 | 425 | 40 | 115.6797 | 115.6843 | 0.0046 | 4.24 |
| 12-38-1-4 | 250 | 60 | 116.7843 | 116.7863 | 0.0020 | 1.86 |
| 12-38-1-5 | 180 | 80 | 111.6109 | 111.6160 | 0.0051 | 4.70 |
| 12-38-1-6 | 106 | 140 | 108.8219 | 108.8447 | 0.0228 | 21.19 |
| 12-38-1-7 | 75 | 200 | 108.7757 | 108.7992 | 0.0235 | 21.81 |
| 12-38-1-8 | 53 | 270 | 105.4002 | 105.4180 | 0.0178 | 16.5 |
| 12-38-1-9 | Collection pan | | 85.0397 | 85.0531 | 0.0134 | 12.4 |
| Total weight | | | | | 0.1078 | 89.48 |

APPX3626; APPX3561.

A total of eight sieves were used, with increasingly smaller mesh sizes such that the contents of Aurobindo's capsule would pass through or be captured by the meshes from top to bottom. APPX252-253 at 116:13–117:1. The right-hand column of the table represents the percentage by weight retained by each sieve, as well as the percentage by weight which passed through all 8 sieves and onto the collection pan. APPX3626; APPX3561; APPX253 at 117:2-17. The smallest mesh sieve is 1/16th the size of the largest. APPX3626; APPX3561.

In addition to there being an array of increasingly smaller mesh that captured various quantities from the Aurobindo ANDA capsule, 12.4% of the total weight of the pill made it through all eight sieves and were collected in a pan at the bottom. APPX255 at 119:4-8. Additionally, 10.52% of the Aurobindo ANDA pill is unaccounted for entirely in the experiment, as the total weight collected in a sieve or in the bottom pan was 89.48%. APPX255 at 119:9-16. Thus, the total quantity of the Aurobindo ANDA pill that was either not captured by a sieve or was lost to any possible analysis in the experiment was 22.92% of the total contents of the Aurobindo ANDA capsule.

Dr. Smith admitted that humidity was not controlled in her experiments, which exposed the capsule fill to ambient humidity when opened. APPX260-1 at 124:13–125:8.

42

In working with pimavanserin tartrate, humidity needed to be tightly controlled, as Aurobindo does in its dry blend manufacturing process, or it would absorb water and become more sticky and bind to the other materials. The result would be to change the capsule fill from loose agglomerates to be bound in a different way impacting the experimental results. APPX352 at 216:4-21. Pimavanserin was known to have a tendency to form clumps. APPX475 at 299:11-13; *see also* Acadia's invalidity expert Dr. Little agreeing at APPX683 at 481:7; APPX684 at 482:20-22, and APPX735 at 533:22-24.

Without information regarding how the materials alleged to be in granular form are bonded together, and with the lack of experimental control of a critical factor in handling pimavanserin (one which Aurobindo tightly controlled in its dry blend ANDA process), Dr. Smith's experiments do not establish the existence of granules in Aurobindo's ANDA product as defined by the District Court and the patent at issue. APPX8 ¶33; APPX900; APPX107 at Col 4, ll. 43-49.

> b.    Appellee offered no competent evidence that 100% of the pimavanserin tartrate in Aurobindo's ANDA product were in granules.

The big picture of a clump in the stereo microscopy experiment was captured by the first sieve, which accounted for only 12% of the total quantity of the contents of the Aurobindo ANDA capsule. APPX3628. The pictures of material, alleged by Dr. Smith to be pimavanserin tartrate and MCC shown to be touching each other

with no information on how they are bonded, captured by polarized light microscopy principally came from the fourth sieve, which in accumulated percentage accounted for 22.96% of the total quantity of the contents of the Aurobindo ANDA capsule. APPX3564-3578.

There is no record of any observation (microscopic or otherwise), data, or pictures from the material collected by the smallest sieve, and the material that passed through all of the sieves or was lost and unaccounted for. The total amount of material with no record of any observation of any kind was 39.42% of the total capsule, of which at least 28.9% was smaller than any observed material. APPX3626; APPX3561.

Even if some of the agglomerates depicted in Dr. Smith's experiments could be considered granules (they are not), the quantity of pimavanserin in those granules would fall far short of the quantity required to be proven in order to meet the claim limitation of 40 mg of pimavanserin tartrate in granular form. Dr. Smith concedes conducting no tests to prove that all of the pimavanserin tartrate was in granules, but instead relied on depictions taken from a small portion of the samples captured by the larger mesh sizes of the sieves. APPX269 at 133:5-15.

The 39.42% of material from Aurobindo's ANDA product for which Dr. Smith obtained no information is more than sufficient to prevent her experiment from establishing the claim limitation that requires 40 mg of pimavanserin tartrate

to be in the capsules. This is especially true considering that the 39.42% unobserved and unrecorded material represent the smallest particles, whereas granules must "adhere to form larger, multiparticle entities." APPX107 at Col. 4, ll. 43-49.

Dr. Smith never testified that, in her opinion, 100% of the pimavanserin tartrate in Aurobindo's ANDA capsule was in granules. Instead, she testified that she did not do any testing to determine what percentage of the capsules were granules. APPX269 at 133:1-12. She merely testified that every captured image was a granule in her opinion. APPX255 at 119:17-24. But she also testified that although she looked at every sieve and the material that fell all the way through, she captured no images beyond the images discussed above. APPX266 at 130:2-9. Moreover, she conceded that 10.52% was unaccounted for completely, and was not in any sieve or in the collection pan so could not even have been casually observed. APPX255 at 119:9-16.

Dr. Smith's testimony, and the District Court's acceptance of it, regarding her naked eye observation of the smaller material is not credible. Her testimony purporting to establish the presence of any granules required microscopic images, not replicable by the naked eye. For example, she relied on images such as this for the claim that a granule was formed which included Pimavanserin tartrate and other excipients:



APPX3575; APPX225-226 at 89:15–90:15; APPX3559.

Of course, Dr. Smith offered no similar opinions regarding the material too small to be captured by the sieves from which images were made and certainly not regarding the material which disappeared altogether. APPX3626; APPX3561.

4.    The District Court excused Appellee from proving the relevant claim limitation had been met.

Despite bearing the burden of proof, the District Court excused all of the infirmities of proof set forth above and concluded that Appellee proved infringement by a preponderance of the evidence. APPX53.

With respect to the ANDA documents, the District Court disregarded the manufacturing process on the grounds that this process "could" produce a granule. APPX11-12 ¶53. But gave full credit to ***draft*** Master Formula Cards and stray language in other sections of the ANDA, none of which described the finished ANDA product as containing granules. APPX13-16. The District Court specifically acknowledged that there was not a uniform reference to granules in the ANDA and that the finished product is not described as containing granules. APPX56 at fn. 6. It just ignored that evidence in misapplying the law of what Appellee needed to prove to establish that Aurobindo's ANDA product would infringe the patent claims.

The District Court framed the term in dispute as only whether Appellee proved the "presence of granules" rather than the specific quantity of granules required, amounting to 100% of the pimavanserin tartrate in Aurobindo's capsule. APPX56.

With respect to the work of Dr. Smith, the District Court acknowledged but ignored the flaws of the study, giving credit to her testimony beyond even what she actually opined. The District Court acknowledged that images were only taken of the larger pieces of material (APPX20) but gave full credit to a naked eye observation of some of the otherwise unobserved material acknowledging while ignoring entirely that 10.52% was not even observable by the naked eye, as it was lost in the experiment. APPX20-21. The District Court excused this gaping hole in Appellee's infringement theory by crediting Dr. Smith's testimony that there is no

test to prove that all of Aurobindo's pimavanserin tartrate were granules, as if that testimony excuses Appellee from actually proving the claim limitation that it wrote and the Patent Office allowed. APPX20.

The District Court further acknowledged but then ignored the lack of humidity controls and the importance of controlling humidity, as failing to do so could cause the phenomenon observed by Dr. Smith in her images and certainly in her naked eye observation. APPX26.

Without explanation, or reference, to an actual opinion given by Dr. Smith, the District Court concludes that Aurobindo's ANDA product contains only granules with pimavanserin and excipients. APPX27.

## C.    <u>SUMMARY OF ARGUMENT</u>

Aurobindo does not infringe the asserted claims, which requires proof of a capsule formulation, where all of the active ingredient, pimavanserin tartrate, is in granules. Aurobindo designed around the '721 patent and developed a dry blend capsule formulation, which is understood to be diametrically opposed to formulations that are granulated. Appellee's attempt to nonetheless prove infringement is a failure. Put another way, dry blending and sifting (Aurobindo's process) is the opposite of granulating, which results in the claimed granules.

Appellee relies on two arguments to meet its burden of proving infringement, contending that the ANDA described Aurobindo's product as containing granules

and relying on an experiment performed on one of Aurobindo's ANDA capsules with magnified pictures claimed to show granules. Neither argument comes close to establishing infringement, and in fact both point to non-infringement.

With respect to the ANDA, there is no dispute that Aurobindo describes a dry blend capsule formulation. There is no dispute that a POSA would understand such a formulation described by Aurobindo's ANDA to be distinct from the many ways of making granules. The overwhelming evidence establishes that the manufacturing steps described by Aurobindo's ANDA would not result in a capsule wherein the entirety of the pimavanserin tartrate was in granules.

Faced with this reality, Appellee asked the District Court to bind Aurobindo to an exaggerated rendition of the few instances where reference is made to granules in unexecuted ***draft*** versions of the Master Formula Card, and in the section of the ANDA describing Aurobindo's development of its product. Appellee asked the District Court to ignore the correction made by Aurobindo in the final, executed versions of the Master Formula Card clarifying that granules were not present in Aurobindo's product, and the ANDA section of its final Description of Manufacturing Process and Process Controls which make no reference to granules at all. As a whole, Aurobindo's ANDA establishes that its ANDA product is not infringing, and Appellee cannot meet its burden of proving infringement under applicable Federal Circuit law.

49

Appellee's experiment is even more flawed. Appellee's expert did not control her experiment for humidity and instead exposed the powder in Aurobindo's capsule to ambient humidity which was known to cause pimavanserin to clump. Appellee's expert sifted the powder through a series of increasingly smaller sieves and took magnified pictures of the larger sized pieces which at best showed the pimavanserin touching an excipient with no indication of the binding of the pictured clumps, a feature necessary to qualify as a granule. Appellee's response to these flaws was to seek to flip the burden of proof and ignore the massive flaws in its experiment as if they are not Appellee's concern to address, which the District Court did. Then, incredibly, Appellee's expert noted the weight of the substantial portion of material too small to be captured by the sieves used to take her magnified pictures or lost entirely during the experiment, and did not record any observation of that smaller material, despite the requirement that all of the pimavanserin in Aurobindo's capsule had to be in the granules. In other words, her experiment, if anything, proved that Aurobindo's product ***did not*** meet the asserted claim limitations.

The District Court committed reversible error by (1) crediting Aurobindo's ANDA in establishing infringement without further proof by misapplying *Sunovian*, whereas the ANDA actually proves non-infringement, and (2) excusing Appellee from proving 100% of the pimavanserin tartrate in Aurobindo's ANDA product

meets the claim limitations, as construed by the District Court, which require exactly that.

### D.    ARGUMENT

The patent owner has the burden of proving infringement and must meet its burden by a preponderance of the evidence and cannot shift this burden to the defendant. *Takeda Pharm. Co. Ltd. v. Teva Pharm. USA*, Inc., 668 F.Supp. 2d 614, 619 (D. Del. 2009); *Tech. Licensing Corp. v. Videotek, Inc.*, 545 F.3d 1316, 1327 (Fed. Cir. 2008); *see also Vanda Pharm. Inc. v. W.-Ward Pharm. Int'l Ltd.*, 887 F.3d 1117, 1125 (Fed. Cir. 2018) ("The patentee bears the burden of proving infringement by a preponderance of the evidence.").

In the context of pharmaceutical litigation, it is an "artificial" act of infringement under 35 U.S.C. § 271(e)(2)(A) to submit an abbreviated new drug application under Section 505(j) of the Federal Food, Drug, and Cosmetic Act for a drug that is claimed in a patent, to establish jurisdiction before the proposed product is marketed, and therefore enable the resolution of any such disputes. *Warner-Lambert Co. v. Apotex Corp.*, 316 F.3d 1348, 1365 (Fed. Cir. 2003). "Once jurisdiction is established, however, the substantive determination whether actual infringement or inducement will take place is determined by traditional patent infringement analysis, just the same as it is in other infringement suits, including those in a non-ANDA context, the only difference being that the inquiries now are

hypothetical because the allegedly infringing product has not yet been marketed." *Id.* "The infringement case is therefore limited to an analysis of whether that the generic drug maker is requesting authorization for in the ANDA would be an act of infringement if performed." *Id.* at 1364.

The infringement inquiry is hypothetical and requires the court to compare the claims with the product described in the ANDA. *Bayer AG v. Elan Pharm. Rsch. Corp.*, 212 F.3d 1241, 1247-49 (Fed. Cir. 2000). However, a patentee cannot rely solely on the filing of an ANDA under § 271(e)(2)(A) to establish infringement: "[T]he patentee's burden of proving ultimate infringement is not met by the filing of the ANDA." *Glaxo,* 110 F.3d at 1570. The burden of proof does not shift to the ANDA filer merely by the filing of the ANDA. *Id.* ("The relevant inquiry is whether the patentee has proven by a preponderance of the evidence that the alleged infringer will likely market an infringing product."). This analysis, as set forth in *Glaxo, Inc.*, requires proof "by a preponderance of the evidence that the alleged infringer will likely market an infringing product. What is likely to be sold, or preferably, what will be sold, will ultimately determine whether infringement exists." *Id.*

Determining direct infringement requires a two-step inquiry. Step one is to construe the disputed terms of the patent at issue; step two is to compare the accused product with the properly construed claims of the patent. *Alza Corp. v. Andrx Pharms., LLC*, 607 F. Supp. 2d 614, 623 (D. Del. 2009). Step one is a question of

law; step two is a question of fact. *Id.*; *see also Wavetronix LLC v. EIS Elec. Integrated Sys.*, 573 F.3d 1343, 1359 (Fed. Cir. 2009).

"Literal infringement occurs when each element of at least one claim of the patent is found in the alleged infringer's product." *Alza*, 607 F. Supp. 2d at 623 (*citing Panduit Corp. v. Dennison Mfg. Co., Inc.*, 836 F.2d 1329, 1330 (Fed. Cir. 1987)); *see also DeMarini Sports, Inc. v. Worth, Inc.*, 239 F.3d 1314, 1331 (Fed. Cir. 2001). "If, however, even one claim limitation is missing or not met, there is no literal infringement." *MicroStrategy Inc. v. Bus. Objects, S.A.*, 429 F.3d 1344, 1352 (Fed. Cir. 2005); *see also Bayer*, 212 F.3d at 1247 ("If any claim limitation is absent from the accused device, there is no literal infringement as a matter of law."); *Glaxo, Inc.*, 110 F.3d at 1566 ("It is elementary patent law that all limitations are material[,]" and plaintiffs are "required to establish the presence of each limitation of the asserted claims."). Similarly, if there is any deviation from any claim limitation, there can be no literal infringement as a matter of law. *See, e.g.*, *DeMarini Sports*, 239 F.3d at 1331; *Wavetronix*, 573 F.3d at 1359.

1.    The District Court erred by relying on Aurobindo's ANDA to establish infringement of the asserted claims where, if anything, the ANDA establishes that Aurobindo's product would not infringe the claims.

In assessing whether a Hatch-Waxman plaintiff has met its burden of proving infringement in ANDA cases, this Court described two pathways in *Ferring B.V. v. Watson Lab'ys, Inc.*, 764 F.3d 1382, 1387-88 (Fed. Cir. 2014). First, if the ANDA

53

"clearly describes a product that meets the limitations of the asserted claims," then the infringement issue can be decided as in *Sunovian Pharms., Inc. v. Teva Pharms., USA, Inc.*, 731 F.3d 1271, 1278-80 (Fed. Cir. 2013). In those instances, with a clear answer to the infringement question, the ANDA is binding, and no further proof is required. *Id.* at 1279. But, if "the ANDA specification does not speak clearly and directly to the question of infringement," then a *Glaxo*-type analysis is required and evidence such as data or samples of the ANDA product is required to assess whether a proposed product will infringe. *Par Pharm., Inc. v. Eagle Pharms., Inc.*, 44 F.4th 1379, 1383-84 (Fed. Cir. 2022); *Ferring*, 764 F.3d at 1388.

Since Aurobindo's ANDA considered as a whole does not "clearly describe[] a product that meets the limitations of the asserted claims," then the infringement issue cannot be decided as in *Sunovian*. *Sunovian,* 731 F.3d at 1280. Instead, analysis is required of the product likely to be sold under the ANDA, and evidence such as data or samples of the ANDA product is required to assess whether a proposed product will infringe. *Par*, 44 F.4th at 1379; *Ferring*, 764 F.3d at 1382.

Aurobindo did not report to the FDA any analysis of whether Aurobindo's ANDA capsule contained any quantity of granules comprising any amount of pimavanserin. APPX4278; APPX4296. Aurobindo's ANDA does not have a certification of the composition of the finished dosage form as containing granules and certainly not any amount of pimavanserin in granules. Accordingly, this is not

the type of ANDA that "directly resolves the infringement question" as required by *Par*, 44 F.4th at 1382 (with a specific restriction of a particular pH range); *Sunovian*, 731 F.3d at 1278 (with a specification of a particular purity range); or *In re Brimonidine Patent Litig; Allergan, Inc. v. Exela Pharmsci Inc.*, 643 F. 3d 1366, 1378 (Fed. Cir. 2011) (also with a specific restriction of a particular pH range). Instead, the infringement inquiry here requires an assessment of Aurobindo's ANDA product likely to be sold, as in the *Glaxo*-type situation. *Par*, 44 F.4th at 1383-34; *Ferring*, 764 F.3d at 1388.

Appellee downplayed these problematic truths and instead points to a different section in the pharmaceutical development report of the ANDA where there were a few references to granules. APPX3662. These few references are exaggerated in Acadia's briefing by a sleight of hand, wherein the processes between the development report are compared with the actual 3.2.P.3.3 section, and then Appellee repeatedly implies that "granules" appears in that section as well, even though there is no mention of granules in that ANDA section, either because they were deliberately removed or because there was no linkage to the two sections. (*See* APPX946-949.) If anything, the final version of the Master Formula Cards and the 3.2.P.3.3 section, both of which do not mention granules, indicate that Aurobindo did ***not*** describe its finished product, the product to be sold under its ANDA, as containing granules.

Incredibly, Appellee, Dr. Smith, and the District Court all relied on the unsigned *draft* Master Formula Card that referenced granules. APPX213 at 77:8-21; APPX16. Aurobindo's final signed Master Formula Cards for its ANDA capsule contains no references to granules or granulation. APPX4296, APPX4301, and APPX4306. Any reference to granules in unsigned drafts were deliberately removed in preparing and executing the final version, which, if anything, would indicate that Aurobindo intended not to describe its final product as containing granules and that its product would in fact contain no granules. *Compare* APPX3758, APPX3654, and APPX3658 *with* APPX4296, APPX4301, and APPX4306.

Appellee's overreliance on the pharmaceutical development report simply does not match the situations presented in *Sunovian* and related cases, and thus cannot excuse Appellee from proving that Aurobindo's product actually infringes the '721 patent. A POSA and the FDA would understand that Aurobindo's product to be sold was made with a dry blend and sifting process, and its capsules did not contain any quantity of granules. APPX332 at 196:18-21; APPX337-338 at 201:8–202:15; APPX4278; APPX4296. And in no way does the ANDA describe that all of the pimavanserin tartrate in its product was in the granules, as it has to be to meet the quantity limitation.

The District Court agreed that there was a "lack of uniform reference to granules" and there is nothing in the ANDA that describes the finished product as

containing granules. APPX56 at fn. 6. Applying *Sunovion* under these circumstances is legal error. Moreover, as established above, Aurobindo's ANDA in fact describes a product that does not make granules, and to hold otherwise is clear error.

On this issue, the District Court also openly disregarded the full claim limitation in dispute. In applying *Sunovion*, the District Court specifically relied on its misstatement of the claim term by asserting that "[t]he only limitation from claim 4 of the '721 patent that Aurobindo disputes is the presence of granules." APPX56. By doing so, the District Court misapplied *Sunovion* to the ANDA for simply occasionally referencing granules (though none in the final product) and ignoring the requirement that Aurobindo's finished product must contain 100% of its pimavanserin tartrate in granules, on which the ANDA establishes the opposite. The District Court did not require Appellee to actually prove that Aurobindo's ANDA, or the product to be sold under the ANDA meet the claim limitation as properly construed, which is legal error.

2.    The District Court erred in excusing Appellee from proving that Aurobindo's ANDA product meets the disputed claim limitation.

As set forth above, the burden of proving infringement is on Appellee, and the burden cannot be shifted to Aurobindo. *Tech. Licensing*, 545 F.3d at 1327. If there is any deviation from any claim limitation, there can be no infringement. *DeMarini Sports*, 239 F.3d at 1331; *Wavetronix*, 573 F.3d at 1359. Since the ANDA does not

clearly establish infringement, Appellee must analyze the product likely to be sold under the ANDA to assess whether it would infringe. *Par*, 44 F.4th at 1383-34; *Ferring*, 764 F. 3d at 1388.

Appellee offered no evidence that 100% of the pimavanserin tartrate in Aurobindo's ANDA product was in granules, as required by the asserted claim limitation. Accordingly, it was legal error for the District Court to find infringement of this claim term, either through misconstruction or by ignoring Appellee's burden of proof, which cannot be shifted to Aurobindo.

Appellee only offered evidence regarding, at best, 60.58% of the contents of Aurobindo's ANDA product, representing the largest pieces of material. Of that material, Appellee's expert magnified the clumped material, took magnified pictures, and offered her opinion that this material had formed a granule. The remaining 39.42% of the material was not subject to the same observation and was smaller than any observed material (28.9%) or had vanished from her experiment altogether and was thus incapable of even naked eye observation (10.52%). APPX3626; APPX3561. The 39.42% of material from Aurobindo's ANDA product for which Dr. Smith obtained no information about is more than sufficient to prevent her experiment from establishing that the Aurobindo ANDA product meets the claim limitation which requires 40 mg of pimavanserin tartrate to be in the capsules. This is especially true considering that the 39.42% unobserved and unrecorded material

represent the smallest particles, whereas granules must "adhere to form *larger*, multiparticle entities." APPX1047 at Col. 4, ll. 43-49. If anything, Dr. Smith proved non-infringement by proving that Aurobindo's capsule did not consistently contain the larger multiparticle entities required, establishing without dispute that Aurobindo's ANDA product did not contain *40 mg of pimavanserin tartrate in granules*.

The infringement inquiry should have ended here, yet the District Court erred in accepting an infringement case with no proof, in contravention to the established legal cannons of patent infringement jurisprudence.

Further, accepting Dr. Smith's opinions regarding the presence of granules at all in Aurobindo's ANDA product was clearly erroneous. Dr. Smith's experiments were not controlled for humidity despite both sides' experts confirming humid conditions caused pimavanserin in particular to clump. APPX260-261 at 124:13–125:8; APPX352 at 216:4-21; APPX475 at 299:11-13; APPX683 at 481:7; APPX684 at 482:20-22; APPX735 at 533:22-24. This error is compounded by the fact that Dr. Smith's experiments, at best, established that some of the larger material in Aurobindo's ANDA product had "clumped" in the sense of touching and sticking together, without any testimony regarding whether or how the material had been made to adhere together as required by the patent's definition of granulation. APPX256-257 at 120:23 – 121:14; APPX353-355 at 217:24 – 219:19; APPX8 ¶33;

APPX899 at 1-2; APPX107 at Col. 4, ll. 43-49. Dr. Smith's own testimony that undesired, unintended agglomeration was "clumping" and not granules, whereas granules are the result of "purposeful agglomeration," fatally indicts her own uncontrolled experiment. APPX257-258 at 121:15–122:11. Accepting such evidence as proof of infringement meets the clear error standard for reversal of this finding.

### E.    <u>CONCLUSION</u>

Appellee utterly failed to meet its burden of proving that Aurobindo's ANDA product infringes either claim 4 or 5 of the '721 patent because it has not shown that the product likely to be sold under Aurobindo's ANDA *contains any granules*. The only competent evidence establishes that Aurobindo's ANDA product, as described by the ANDA and physically examined by Appellee's expert, contains a dry blended powder, and any unintended agglomeration of clumps in Aurobindo's capsule are not granules, as defined by the Court and understood by a POSA.

Appellee also failed to meet its burden of proving that Aurobindo's ANDA product infringes either claim 4 or 5 of the '721 patent, because it has not shown that the product likely to be sold under Aurobindo's ANDA contains *granules comprising 40 mg of pimavanserin tartrate*. The preponderance of the evidence establishes that Aurobindo's ANDA product, as described by the ANDA and physically examined by Appellee's expert, does not contain granules comprising the

40 mg of pimavanserin tartrate quantity required. This was specifically shown by Appellee's expert wherein a significant percentage of Aurobindo's product was not shown to be observed in agglomeration form sufficient to even arguably be characterized as a granule.

Accordingly, the District Court's judgment of infringement against Aurobindo Appellants should be REVERSED and the District Court directed to enter Judgment of Non-Infringement in favor of Aurobindo.

August 22, 2025                    Respectfully submitted,


*/s/ Timothy H. Kratz*                */s/ Richard J. Berman*
Timothy H. Kratz                      Richard J. Berman
George J. Barry III                   Janine A. Carlan
**KRATZ & BARRY LLP**                 Bradford C. Frese
1050 Crown Pointe Parkway, Suite 500  **ARENTFOX SCHIFF LLP**
Atlanta, GA 30338                     1717 K. St. NW
(404) 431-6600                        Washington, DC 20006
tkratz@kratzandbarry.com              T: (202) 857-6000
gbarry@kratzandbarry.com              janine.carlan@afslaw.com

Michael P. Hogan                      *Attorney for Appellants, MSN*
**KRATZ & BARRY LLP**                 *Laboratories Private Ltd., and MSN*
P.O. Box 63765                        *Pharmaceuticals*
622 S. 4th Street
Philadelphia, PA 19147
(917) 216-8585
mhogan@kratzandbarry.com

R Touhey Myer
**KRATZ & BARRY LLP**
800 N. West Street
Wilmington, DE 19801
(302) 527-9378
tmyer@kratzandbarry.com

*Attorney for Appellants, Aurobindo*
*Pharma Limited and Aurobindo*
*Pharma USA, Inc.*

# ADDENDUM

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| ACADIA PHARMACEUTICALS INC., | |
| Plaintiff, | |
| v. | Civil Action No. 22-1387-GBW |
| AUROBINDO PHARMA LIMITED, et al., | CONSOLIDATED |
| Defendants. | **FILED UNDER SEAL** |

---

James D. Taylor, Jr., Jessica M. Jones, Michelle C. Streifthau-Livizos, SAUL EWING LLP, Wilmington, DE; Chad J. Peterman, Bruce M. Wexler, Scott F. Peachman, Peter E. Conway, PAUL HASTINGS LLP, New York, NY; Felix A. Eyzaguirre, PAUL HASTINGS LLP, Houston, TX.

    *Counsel for Plaintiff*

R Touhey Myer, KRATZ & BARRY LLP, Wilmington, DE; Timothy H. Kratz, George J. Barry III, John Thallemer, KRATZ & BARRY LLP, Atlanta, GA; Michael P. Hogan, KRATZ & BARRY LLP, Philadelphia, PA.

    *Counsel for Defendants Aurobindo Pharma Limited and Aurobindo Pharma USA, Inc.*

James S. Green, Jr., SEITZ, VAN OGTROP & GREEN, P.A., Wilmington, DE; Richard J. Berman, Janine A. Carlan, Bradford C. Frese, Michael Baldwin, ARENTFOX SCHIFF LLP, Washington, DC.

    *Counsel for Defendants MSN Laboratories Private Ltd. and MSN Pharmaceuticals Inc.*

**OPINION**

May 16, 2025
Wilmington, Delaware

GREGORY B. WILLIAMS
UNITED STATES DISTRICT JUDGE

This Hatch-Waxman action[1] arises from Aurobindo's and MSN's Abbreviated New Drug

Applications ("ANDA") to the Food and Drug Administration ("FDA") to market a generic

version of Acadia's 34 mg Nuplazid® pharmaceutical capsule. Following these applications,

Acadia filed separate actions against Aurobindo and MSN, each alleging infringement of U.S.

Patent No. 11,452,721 ("the '721 patent"). On May 19, 2023, the Court consolidated the two

actions. On December 3, 4, and 6, 2024, the Court presided over a three-day bench trial, during

which the parties disputed whether Aurobindo infringes claims 4 and 5 of the '721 patent and

whether claims 4 and 5 of the '721 patent are invalid. MSN stipulated to infringement on the eve

of trial.

The parties submitted post-trial briefs (D.I. 126; D.I. 127; D.I. 131; D.I. 134) and proposed

findings of fact and conclusions of law (D.I. 126-1; D.I. 128; D.I. 132; D.I. 134-1). Upon review

of these documents, along with consideration of the trial record, the exhibits introduced into

evidence, and the stipulations of fact by the parties (*see* D.I. 101-1), the Court concludes that

Aurobindo infringes claims 4 and 5 of the '721 patent and that claims 4 and 5 of the '721 patent

are not invalid. Below, the Court separately sets forth its findings of fact and conclusions of law

as required by Rule 52(a)(1) of the Federal Rules of Civil Procedure.

Also pending before the Court is MSN's Motion for Leave to File Post-Trial Reply Brief

("Motion for Leave") (D.I. 137), which has been fully briefed (D.I. 138; D.I. 139). For the reasons

---

[1] "Hatch-Waxman" refers to the Patent Term Restoration Act of 1984. In this action, the Plaintiff
is Acadia Pharmaceuticals Inc. ("Acadia" or "Plaintiff"). The Defendants are Aurobindo Pharma
Limited and Aurobindo Pharma USA, Inc. (together, "Aurobindo") and MSN Laboratories Private
Ltd. and MSN Pharmaceuticals Inc. (together, "MSN") (together with Aurobindo, "Defendants").

set forth in the penultimate Section of this Opinion, the Court denies MSN's Motion for Leave. The Court also denies-as-moot Acadia's contingent request for leave to file a sur-reply brief in support of its opposition to Defendants' post-trial brief (D.I. 138 at 8).

## I.    FINDINGS OF FACT

The Court divides its Findings of Fact into the following Sections: (A) Background, (B) Infringement, (C) Obviousness, (D) Indefiniteness, and (E) Written Description / Enablement.

### A.    Background

The Court divides its Background Findings of Fact into the following Sections: (1) the Parties, (2) the Experts, (3) Nuplazid®, (4) the Asserted Patent, (5) Defendants' ANDAs, and (6) the Court's Claim Constructions.

### 1.    The Parties

1.    Acadia is a corporation organized and existing under the laws of the State of Delaware, having a principal place of business at 12830 El Camino Real, Suite 400, San Diego, California 92130. D.I. 101-1 ¶ 1.

2.    MSN Laboratories Private Limited is an entity organized and existing under the laws of India, having a principal place of business at MSN House, Plot No. C-24, Industrial Estate, Sanathnagar, Hyderabad, Telangana, 500018 India. D.I. 101-1 ¶ 2.

3.    MSN Pharmaceuticals, Inc. is a corporation organized and existing under the laws of the State of Delaware, having a principal place of business at 20 Duke Road, Piscataway, New Jersey 08854. D.I. 101-1 ¶ 3.

4.    Aurobindo Pharma Limited is an entity organized and existing under the laws of India, having a principal place of business at Plot No. 2, Maitrivihar, Ameerpet, Hyderabad-500038, Telangana, India. D.I. 101-1 ¶ 5.

3

Appx3

5. Aurobindo Pharma USA, Inc. is a corporation organized and existing under the laws of the State of Delaware, having a principal place of business at 279 Princeton-Hightstown Road, East Windsor, New Jersey, 08520. D.I. 101-1 ¶ 6.

6. Aurobindo Pharma Limited and Aurobindo Pharma USA, Inc. work in concert, either directly or indirectly, with respect to the regulatory approval, manufacturing, marketing, sale, and distribution of generic pharmaceutical products throughout the United States, including in the State of Delaware. D.I. 101-1 ¶ 7.

**2. The Experts**

7. Dr. Pamela Smith ("Dr. Smith"), Acadia's infringement expert, has a Bachelor of Arts in Chemistry from Illinois Wesleyan University and a PhD in Analytical Chemistry from Miami University. Tr. 51:11-17.

8. Dr. Smith was admitted in this case as an expert in pharmaceutical science. Tr. 53:6-13.

9. Dr. Christian Moreton ("Dr. Moreton"), Aurobindo's non-infringement expert, has a Bachelor of Pharmacy from the University of Nottingham, a Master of Science in Pharmaceutical Analysis from the University of Strathclyde, and a PhD in Pharmaceuticals from the University of Wales, Cardiff. Tr. 173:5-12.

10. Dr. Moreton was admitted in this case as an expert in pharmaceutical formulation. Tr. 177:13-19.

11. Dr. Fernando Muzzio ("Dr. Muzzio"), Defendants' invalidity expert, has a Bachelor of Science in Chemical Engineering from the University of Mar del Plata in Argentina, and a PhD in Chemical Engineering from University of Massachusetts at Amherst. DTX-81 at 0001.

12. Dr. Muzzio was admitted in this case as an expert in pharmaceutical formulation. Tr. 234:18–235:2.

13.    Dr. Steven Little ("Dr. Little"), Acadia's validity expert, has a Bachelor of Science in Chemical Engineering from Youngstown State University, and a PhD in Chemical Engineering from Massachusetts Institute of Technology. Tr. 436:7-11; PTX-0119 at 1.

14.    Dr. Little was admitted in this case as an expert in pharmaceutical science. Tr. 440:15-21.

**3.    NUPLAZID®**

15.    Acadia holds FDA-approved New Drug Application ("NDA") No. 210793, which provides for the use of Nuplazid® (pimavanserin) immediate-release, oral capsules of 34 mg ("Nuplazid capsules"). D.I. 101-1 ¶ 9.

16.    Nuplazid capsules are indicated for the treatment of hallucinations and delusions associated with Parkinson's disease psychosis. D.I. 101-1 ¶ 10.

17.    Acadia's earlier pimavanserin product is a pimavanserin tablet made with excipients ("Nuplazid tablets"). JTX-12 at 0007-0008 ("NUPLAZID tablets are intended for oral administration only. Each round, white to off-white, immediate-release, film-coated tablet contains 20 mg of pimavanserin tartrate, which is equivalent to 17 mg of pimavanserin free base. Inactive ingredients include pregelatinized starch, magnesium stearate, and microcrystalline cellulose. Additionally, the following inactive ingredients are present as components of the film coat: hypromellose, talc, titanium dioxide, polyethylene glycol, and saccharin sodium."); Tr. 496:15-21 (Dr. Little confirming the ingredients in Nuplazid tablets); *see* FoF ¶¶ 38, 40, 42 (finding that microcrystalline cellulose, colloidal silicon dioxide, and magnesium stearate are excipients).

18.    The Nuplazid tablets, like the Nuplazid capsules, are "indicated for the treatment of hallucinations and delusions associated with Parkinson's disease psychosis." JTX-12 at 0001.

5

4.    **The Asserted Patent**

19.    On September 27, 2022, the United States Patent and Trademark Office issued the '721

patent. D.I. 101-1 ¶ 11; JTX-09 at 0002.

20.    The '721 patent is titled "FORMULATIONS OF PIMAVANSERIN." JTX-09 at 0002.

21.    The application for the '721 patent, filed on March 14, 2022, is U.S. Application No.

17/693,830 ("the '830 application"). D.I. 101-1 ¶ 11.

22.    The '830 application claims priority to U.S. Provisional Patent Application No.

62/552,300, which was filed on August 30, 2017. D.I. 101-1 ¶ 11.

23.    The '721 patent names Ravindra Tejwani, Stephen Edward Abele, and Emanuel Joseph

Vizzotti as inventors, and lists Acadia as assignee. D.I. 101-1 ¶ 12.

24.    Acadia owns the '721 patent. D.I. 101-1 ¶ 13.

25.    The '721 patent is listed in Approved Drug Products with Therapeutic Equivalence

Evaluations (i.e., the "Orange Book")[2] in conjunction with the Nuplazid capsules. D.I.

101-1 ¶ 14.

26.    The Orange Book provides an expiration date for the '721 patent of August 27, 2038. D.I.

101-1 ¶ 15.

27.    Claims 4 and 5 of the '721 patent (i.e., the only claims asserted at the December 2024

bench trial) recite:

> 4. A pharmaceutically acceptable capsule for orally delivering 34 mg of
> pimavanserin to a patient, wherein [1] the capsule has a capsule shell with
> a capsule shell size 3 or 4, [2] that encapsulates a blended pimavanserin
> composition comprising: granules comprising 40 mg pimavanserin tartrate

---

[2] "The 'Orange Book' is an FDA database 'that contains summary information about active drug
patents submitted by patentholders.'" *Jazz Pharms., Inc. v. Avadel CNS Pharms., LLC*, 641 F.
Supp. 3d 85, 89 (D. Del. 2022) (citation omitted).

and one or more pharmaceutically acceptable excipients; and [3] wherein the bulk density of the granules is >0.4 g/ml as determined by USP, method 1.

5. The pharmaceutically acceptable capsule of claim 4, wherein the capsule shell is a hard shell size 4 capsule.

JTX-09 at 0025 (brackets added to separate limitations).

**5.    Defendants' ANDAs**

28.    MSN submitted ANDA No. 214925 pursuant to § 505(j)(2) of the Federal Food, Drug, and Cosmetic Act seeking FDA approval to engage in the commercial manufacture, use, sale, or offer for sale of pimavanserin 34 mg capsules (the "MSN's Product") prior to the expiration of the '721 patent. D.I. 101-1 ¶ 23.

29.    If approved by the FDA, MSN's Product will be indicated for the treatment of hallucinations and delusions associated with Parkinson's disease psychosis. D.I. 101-1 ¶ 24.

30.    Aurobindo submitted ANDA No. 214782 pursuant to § 505(j)(2) of the Federal Food, Drug, and Cosmetic Act seeking FDA approval to engage in the commercial manufacture, use, sale, or offer for sale of pimavanserin 34 mg capsules ("Aurobindo's Product" or "Aurobindo's Capsule") prior to the expiration of the '721 patent. D.I. 101-1 ¶ 25.

31.    If approved by the FDA, Aurobindo's Product will be indicated for the treatment of hallucinations and delusions associated with Parkinson's disease psychosis. D.I. 101-1 ¶ 26.

**6.    The Court's Claim Constructions**

32.    This Court construed "[a] blended pimavanserin comprising: granules comprising 40 mg pimavanserin tartrate and one or more pharmaceutically acceptable excipients" of claim 4

7

Appx7

of the '721 patent as: "Plain and ordinary meaning; an extra-granular component is not required." D.I. 44 at 1.

33. This Court construed "[g]ranules comprising 40 mg pimavanserin tartrate" of claim 4 of the '721 patent as: "Plain and ordinary meaning; the scope of the term granule includes granules granulated with pimavanserin and excipients." D.I. 44 at 1-2.

34. This Court construed "[g]ranules comprising 40 mg pimavanserin tartrate and one or more pharmaceutically acceptable excipients" of claim 4 of the '721 patent as: "Plain and ordinary meaning; the scope of the term granule includes granules granulated with pimavanserin and excipients." D.I. 44 at 2.

**B.    Infringement**

The Court divides its Infringement Findings of Fact into the following Sections: (1) Dosage Form, (2) Pharmaceutical Composition, and (3) Bulk Density. These Sections reflect the three overarching limitations in claim 4 of the '721 patent.

**1.    Dosage Form**

35. The dosage form of Aurobindo's Product is an orally-administered hard shell size 4 capsule. JTX-0103 at AURO0002; JTX-0105 at AURO0002-AURO0003.

**2.    Pharmaceutical Composition**

The Court divides its Pharmaceutical Composition Findings of Fact into the following Sections: (a) Materials in Aurobindo's Product, (b) Granules, (c) Aurobindo's Manufacturing Process, (d) Aurobindo's Documents, (e) Dr. Smith's Examinations, and (f) General Findings.

**a.    Materials in Aurobindo's Product**

36. Pimavanserin is a pharmaceutical ingredient and pimavanserin tartrate is the salt form of pimavanserin. Tr. 56:17-22 (Dr. Smith testifying as such).

8

37.    Aurobindo's Product encapsulates 40 mg of pimavanserin tartrate, which is equivalent to 34 mg of pimavanserin free base. PTX-1213 at Section 11 ("Each capsule contains 40 mg of pimavanserin tartrate, which is equivalent to 34 mg of pimavanserin free base."); Tr. 59:24–61:12 (Dr. Smith testifying that Aurobindo's Product contains "40 mgs of pimavanserin tartrate" which "is equivalent to 34 mgs of pimavanserin freebase").

38.    Microcrystalline cellulose ("MCC") is an excipient.    Tr. 170:4-5 (Mr. Saravanan Kannusamy ("Mr. Kannusamy"), Aurobindo's Associate Vice President in Formulation Research and Development Center, testifying that "Aurobindo's process involves co-sifting of pimavanserin with other excipients like MCC"); *see* Tr. 139:16-17 (Mr. Kannusamy confirming his title); Tr. 584:16-22 (Dr. Little testifying *inter alia*: "Yeah, so MCC is what we call a filler binder, so it's -- I think it's like the prototypical filler binder.").

39.    Aurobindo's Product encapsulates microcrystalline cellulose.    PTX-1213 at Section 11 ("Each capsule contains . . . microcrystalline cellulose."); JTX-0106 at AURO0004-0005 (describing Aurobindo's manufacturing process).

40.    Colloidal silicon dioxide is an excipient.    Tr. 170:4-6 (Mr. Kannusamy testifying that "Aurobindo's process involves co-sifting of pimavanserin with other excipients like . . . colloidal silicon dioxide").

41.    Aurobindo's Product encapsulates colloidal silicon dioxide.    PTX-1213 at Section 11 ("Each capsule contains . . . colloidal silicon dioxide."); JTX-0106 at AURO0004-0005 (describing Aurobindo's manufacturing process).

42.    Magnesium stearate is an excipient. Tr. 476:20-23 (Dr. Smith testifying: "And then in the third one, you have granulation pimavanserin and microcrystalline cellulose and magnesium stearate. So it's, in that case, more than one intragranular excipient.").

9

43. Aurobindo's Product encapsulates magnesium stearate. PTX-1213 at Section 11 ("Each capsule contains . . . magnesium stearate."); JTX-0106 at AURO0004-0005 (describing Aurobindo's manufacturing process).

44. Aurobindo's Product encapsulates 40 mg of pimavanserin tartrate and various excipients (including microcrystalline cellulose, colloidal silicon dioxide, and magnesium stearate). FoF ¶¶ 36-43.

**b.  Granules**

45. Granules are "[p]rimary powder particles . . . made to adhere to form larger, multiparticle entities." JTX-09 at 4:45-47.

46. "Adhere" in this context means "particles of different types sticking together." Tr. 225:14-25 (Dr. Moreton confirming).

47. The '721 patent specification does not qualify the term "adhere" in its description of granules. JTX-09; Tr. 226:1-4 (Dr. Moreton testifying as such).

48. A person of ordinary skill in the art ("POSA") would have understood that "one reason to granulate is because you want to make larger particles because the smaller particles can be problematic" in that they might, for example, "not flow well, they might be cohesive, they might stick to equipment, they might form clumps that you want to prevent so you would granulate to avoid that." Tr. 242:3-9 (Dr. Muzzio testimony).

49. Granulation, as used in the specification of the '721 patent "and as conventionally used in the pharmaceutical industry, refers to the act or process in which primary powder particles are made to adhere to form larger, multiparticle entities called granules." JTX-09 at 4:43-50; Tr. 240:24 241:5 (Dr. Muzzio testifying: "Generally, granules are made by running a process called granulation that makes the particles stick together so that the smaller particles are now permanently bond to each other in a way that doesn't really change the

10

state of aggregation, the face of the particles themselves, but rather bonds them together into a composite particle, a larger particle.").

50. Granules may "be formed collecting particles together by creating mechanical bonds between them, e.g. by compression or by using a binder," and granulation "is extensively used in the manufacturing of tablets and capsules." JTX-09 at 4:47-50; Tr. 241:24-25 (Dr. Muzzio testifying: "Typically granulations are used to make either capsules or tablets."); Tr. 226:17–227:1 (Dr. Moreton agreeing that the specification of the '721 patent teaches that granules may "be formed by collecting particles together by creating mechanical bonds between them, e.g. by compression or using a binder" and that this is "a nonlimiting example of how granules may be formed").

51. The specification of the '721 patent describes granulation generally without requiring a specific process: "[g]enerally a granulation process combines one or more particles and forms a granule that will allow tableting or the encapsulation process to be within required limits." JTX-09 at 4:53-55; Tr. 226:17–227:1 (Dr. Moreton testifying that the examples of granulation from the specification of the '721 patent are "nonlimiting").

52. The specification describes non-limiting examples of equipment that can be used for granulation: "granulation can be performed in a variety of equipment such as, but not limited to, low shear, high shear granulators, fluid bed granulator, roller compactor, and slugger." JTX-09 at 4:56-58.

53. Dry mixing and sifting could produce a granule. FoF ¶¶ 51-52; Tr. 131:16-23 (Dr. Smith testifying that dry mixing and sifting "could" produce a granule, even though "when people think about dry granulation process, what's most commonly talked about are the ones with some high pressure [sometimes referred to by the parties as compression] involved."); Tr.

11

584:14–585:4 (Dr. Little testifying *inter alia* that pimavanserin is a "sticky drug" and that mixing pimavanserin and microcrystalline cellulose "could result in granules").

**c.    Aurobindo's Manufacturing Process**

54.    The ten steps of Aurobindo's manufacturing process are as follows (JTX-0106 at AURO0004-AURO0005):

i.    **Raw Materials Sifting**: Co-sift 40 mg pimavanserin tartrate and half of the microcrystalline cellulose;

ii.    **Raw Materials Sifting**: Co-sift the material from Step (i) with the remaining half quantity of microcrystalline cellulose and all colloidal silicon dioxide;

iii.    **Raw Materials Sifting**: Re-sift the material from Step (ii);

iv.    **Sifting of Lubrication Material**: Separately sift the magnesium stearate;

v.    **Pre-Lubrication and Lubrication**: Load the material from Step (iii) into a blender and blend for 20 minutes at 12 revolutions per minute ("RPM");

vi.    **Pre-Lubrication and Lubrication**: Load the material from Step (iv) into the blender with material from Step (v) for lubrication for 5 minutes at 12 RPM;

vii.    **Pre-Lubrication and Lubrication**: Unload the material from Step (vi) into bags;

viii.    **Blend Sample Analysis**: Send the blend sample for analysis;

ix.    **Capsule Filling**: Encapsulate the materials from Step (vii) into capsules; and

x.    **Capsule Filling**: Pack the capsules from Step (ix).

55.    The conditions of Aurobindo's manufacturing process involved a "relative humidity" of "NMT20%RH." AURO-DTX-320 at 0005.

56.    Aurobindo's Capsule is formulated using a dry blending process. FoF ¶ 54; DTX-347 at 0003-0004 (describing the process); DTX-320 at 0004-0005 (describing the process); Tr. 141:18-25 (Mr. Kannusamy explaining that Aurobindo's Product is formulated using "a

12

dry blending process"); Tr. 77:1-3 (Dr. Smith testifying that the composition of Aurobindo's product is "blended").

**d.    Aurobindo's Documents**

57.    Aurobindo describes the presence of granules in its Product in (a) the manufacturing process map in its ANDA, (b) the section on control strategy in its ANDA, and (c) draft master formula cards:

> a.    **Manufacturing Process Map**: Aurobindo's ANDA contains Section "3.2.P.2 Pharmaceutical Development," which is a "[p]harmaceutical development report [that] summarizes the development" of Aurobindo's Product ("Aurobindo's Pharmaceutical Development Report"). JTX-0125 at AURO0001, AURO0007.

> b.    On April 15, 2020, three Aurobindo employees (including Mr. Kannusamy) signed Aurobindo's Pharmaceutical Development Report; Mr. Kannusamy also approved Aurobindo's Pharmaceutical Development Report. JTX-0125 at AURO0004; Tr. 154:8-19 (Mr. Kannusamy confirming that he signed and approved the report); Tr. 162:1-25 (Mr. Kannusamy confirming that two others also signed the report).

> c.    Subsection 3.2. P.2.3 of Aurobindo's Pharmaceutical Development Report is titled "Manufacturing Process Development" and includes a manufacturing process map for Aurobindo's Product. JTX-0125 at AURO0046-AURO0047; Tr. 73:5-25 (Dr. Smith confirming).

> d.    The manufacturing process map identifies "Process parameters," "Material attributes of input materials," "Manufacturing process steps," and "Quality attributes of output materials" for Aurobindo's Product. JTX-0125 at AURO0047.

> e.    In the manufacturing process map, Aurobindo describes the input to Steps (v)-(vii) from FoF ¶ 54 (i.e., the steps regarding Pre-lubrication and Lubrication in

13

Aurobindo's manufacturing process), which is the output of Step (iii) (i.e., the output being 40 mg pimavanserin tartrate and the excipients), as granules. JTX-0125 at AURO0047. In particular, Aurobindo lists the material attributes of the input materials as "granule bulk and tapped density," "granule uniformity," and "granule size distribution." JTX-0125 at AURO0047; Tr. 74:4–77:3 (Dr. Smith testifying *inter alia*: "This [the manufacturing process map] tells me that they [Aurobindo] want to ensure that they've got control of their process and that there are certain attributes or characteristics that must be present, and so these would be locations throughout the manufacture where you stop and you take a look at what you've made and maybe do a test and get the go-ahead to more forward with the rest of the manufacturing. . . . So now, if we're looking at this middle step, this pre-lubrication and lubrication step, immediately to the left of that lists the material attributes of the input materials. So these would be -- since these are the input materials going in the pre-lubrication and lubrication, they are the output materials of the sifting and the API and excipients step above it. And they're saying here that the tests that you need to ensure are proper at this point are granule bulk and tapped density, granule uniformity and granule size distribution. . . . It [the manufacturing process map] tells me that they wanted to make granules at that point and then tested to make sure that the granules had the right properties.").

    i. Mr. Kannusamy agreed that, "[i]f Aurobindo believed that something was incorrect in its ANDA, it would take steps to correct it with the FDA." Tr. 149:12-19.

    ii. As found above, Aurobindo's Pharmaceutical Development Report is part of Aurobindo's ANDA and, thus, Aurobindo was representing to the FDA that its product contains granules.   FoF ¶ 57(a); Tr. 167:7-10 (Mr. Kannusamy confirming that JTX-0125 "is part of the ANDA dossier").

    iii. Aurobindo introduced no evidence that it corrected, or attempted to correct, the disclosures of "granules" in its Pharmaceutical Development Report.

f.  **Control Strategy**: Section 3.2. P.2.7 of Aurobindo's Pharmaceutical Development Report is titled "Control Strategy." JTX-0125 at AURO0065.

g.  Control strategy "is important in pharmaceutical development to make sure that throughout your process you're making what you intend to make, and so typically there will be some tests that are done at various points throughout the process to ensure that it's okay to move forward with the next step." Tr. 71:13-25 (Dr. Smith testifying as such).

h.  Section 3.2. P.2.7.3 of Aurobindo's Pharmaceutical Development Report is titled "Control strategy for Pre-lubrication process." JTX-0125 at AURO0070.

i.  This Section conveys that the blending step of Aurobindo's manufacturing process involves granules. JTX-0125 at AURO0070 ("Therefore, control strategy for blending the granules with extra-granular materials is to blend for 20 minutes."); Tr. 72:4-18 (Dr. Smith confirming).

j.  Section 3.2. P.2.7.4 of Aurobindo's Pharmaceutical Development Report is titled "Control strategy for Lubrication process." JTX-0125 at AURO0070.

k.  This Section conveys that the blending step of Aurobindo's manufacturing process involves granules. JTX-0125 at AURO0070 ("Therefore, control strategy for

15

blending the granules with extra-granular materials is to lubricate for 5 minutes.);
Tr. 72:19–73:4 (Dr. Smith confirming).

1. **Draft Master Formula Cards:** Three of Aurobindo's draft "Master Formula Cards" describe the presence of granules. JTX-0134 at AURO0004 ("Unload the lubricated granules into suitable containers."), JTX-0108 at AURO0003 ("Unload the lubricated granules into suitable containers."), JTX-0109 at AURO0004 ("Unload the lubricated granules into suitable containers."); Tr. 77:8–81:10 (Dr. Smith testifying *inter alia* that JTX-0134, JTX-0108 and JTX-0109 are drafts of Aurobindo's Master Formula cards); Tr. 82:2-7 (Dr. Smith testifying: "Since these [Aurobindo's draft Master Formula Cards] were documents that were throughout the process of it, the development, this told me that throughout the process, it suggested to me that they [Aurobindo] were cognizant of the fact that they were making granules.").

   i. Mr. Kannusamy refused to answer whether the draft Master Formula Cards referenced granules, even though he was asked about it at least six times during trial. Tr. 167:19–169:20 (Mr. Kannusamy refusing to answer whether the draft Master Formula Cards describe the presence of granules).

   ii. Aurobindo's final signed Master Formula Cards for its ANDA capsule do not reference granules or granulation. AURO-DTX-347; AURO-DTX-348; AURO-DTX-349.

58. Aurobindo's description, in its own documents, of the presence of granules in its Product supports that Aurobindo's Product contains granules. FoF ¶ 57.

16

e.   **Dr. Smith's Examinations**

59.   Dr. Smith examined the contents of Aurobindo's Product sample using stereomicroscopy. Tr. 82:8-15 (Dr. Smith confirming that she "did stereo microscopy . . . on Aurobindo's products").

    a.   Stereomicroscopy provides a magnified image of materials using reflected light and helps to determine whether granules are present. Tr. 82:23–83:5 (Dr. Smith explaining the "stereo microscopy imaging technique," which involves "looking at something with a naked eye but zoomed in, so it's a magnified image, looking at it in a reflected light," and that this technique helped her "see whether or not granules were present" in Aurobindo's Product sample).

    b.   To conduct her experiment, Dr. Smith opened Aurobindo's Capsule sample and subjected the material therein to a sieving process. JTX-62 at 003.

    c.   Sieving served to break up any agglomerates, which would allow for improved sample viewing. Tr. 128:7-12 (Dr. Smith confirming).

    d.   Dr. Smith used a total of eight sieves, with increasingly smaller mesh sizes, such that the contents of Aurobindo's Capsule sample would pass through or be captured by the sieves from top to bottom. Tr. 116:13–117:1 (Dr. Smith testifying *inter alia* that "the contents of Aurobindo's pill" passed through "1-8 sieves of -- of increasingly smaller meshes").

    e.   Dr. Smith reported her data as follows:

| | Capsule | | Weight (g) | Weight empty (g) | Weight contents (g) | |
|---|---|---|---|---|---|---|
| | 12-38-01 | | 0.1332 | 0.0367 | 0.0964 | |
| Fraction ID | Micron | Mesh size | Weight of tared sieve (g) | Weight of sieve with sample retained (g) | Weight of sieved material (g) | Fraction retained % |
| 12-38-1-1 | 850 | 20 | 134.5308 | 134.5441 | 0.0134 | 12 |
| 12-38-1-2 | 600 | 30 | 127.8941 | 127.8993 | 0.0052 | 4.86 |
| 12-38-1-3 | 425 | 40 | 115.6797 | 115.6843 | 0.0046 | 4.24 |
| 12-38-1-4 | 250 | 60 | 116.7843 | 116.7863 | 0.0020 | 1.86 |
| 12-38-1-5 | 180 | 80 | 111.6109 | 111.6160 | 0.0051 | 4.70 |
| 12-38-1-6 | 106 | 140 | 108.8219 | 108.8447 | 0.0228 | 21.19 |
| 12-38-1-7 | 75 | 200 | 108.7757 | 108.7992 | 0.0235 | 21.81 |
| 12-38-1-8 | 53 | 270 | 105.4002 | 105.4180 | 0.0178 | 16.5 |
| 12-38-1-9 | Collection pan | | | 85.0397 | 85.0531 | 0.0134 | 12.4 |
| Total weight | | | | | 0.1078 | 89.48 |

JTX-0062 at 003; JTX-0061 at 003; Tr. 116:13-21 (Dr. Smith confirming that this data is from her "notebook").

f.   The right hand column of the table from FoF ¶ 59(e) represents the percentage by weight retained by each sieve, as well as the percentage by weight which passed through all 8 sieves and onto the collection pan. JTX-0062 at 003; JTX-0061 at 003; Tr. 117:2-17 (Dr. Smith confirming *inter alia* that "the right-hand column of this table is the fraction retained by each of those sieves and then a fraction that went into a collection pan to come up with the total weight as a percentage of the starting contents of the pill").

g.   After sieving, Dr. Smith viewed portions of Aurobindo's Capsule sample from the sieves on a slide under a microscope. Tr. 96:3–97:24 (Dr. Smith explaining as such).

18

h.  Before viewing, Dr. Smith added mineral oil to the slides containing the contents of Aurobindo's Product sample. Tr. 96:3–97:24 (Dr. Smith testifying that she "put a drop of mineral oil" on the "cover slip" of the "microscope slide[s]").

i.  Dr. Smith's deposit of mineral oil on the sample slides would have spread apart any material that was loosely aggregated together (such as non-granular material). Tr. 96:15 97:12 (Dr. Smith testifying: "Now, the mineral oil, through capillary action, will get drawn under the coverslip, and it will pass through all those particles, whatever sample you have there, flow over it. And you can actually watch it under the microscope like a -- like a wave coming through, and as it passes through the material, if you have anything loosely agglomerated onto the surface, it will spread that out so that you can see things more clearly . . . when you put that coverslip on top and you allow the mineral oil to pass through, it spreads out anything that was loosely aggregated together, so this would -- this is a proper preparation.").

j.  Dr. Smith's deposit of mineral oil on the sample slides did not reveal any material that was loosely aggregated together. Tr. 97:13-18 ("And what I noted was that every single preparation we did of the Aurobindo materials, this didn't happen. That meant that how those particles were stuck together was strong enough to withstand my standard sample prep which was meant to dislodge anything that's loosely associated.").

k.  As explained above, Dr. Smith recorded her stereomicroscopy imaging of Aurobindo's Product sample in JTX-0062. FoF ¶ 59(e); JTX-0062.

l.  The image labeled "12-38-1-1-1" depicts a granule. JTX-0062 at 0005; Tr. 83:18–84:5 (Dr. Smith confirming that the "image that has a legend 12-38-1-1-1" "is an

19

image of a large granule, approximately 2.75 by 3.7 millimeters in size" and that the "granule came from the inside of one of Aurobindo's capsules").

m. The image labeled "Sieve Number 200-75 micro-2" depicts a collection of granules. JTX-0062 at 0007; Tr. 84:19–85:3 (Dr. Smith confirming that the image labeled "Sieve Number 200-75 micro-2" "is a collection of multiple granules just to show what it would look like with the naked eye . . . under stereomicroscope under reflective light").

n. 16.5% of the total weight of the contents of Aurobindo's Capsule sample was collected by the smallest mesh sieve. FoF ¶ 59(e).

o. 12.4% of the total weight of the contents of Aurobindo's Capsule sample was collected in the pan at the bottom. FoF ¶ 59(e); Tr. 119:4-8 (Dr. Smith confirming that "12.4 percent by weight of the pill just scooted all the way through to -- no matter what the mesh was, it went to the bottom").

p. 10.52% of the total weight of the contents of Aurobindo's Capsule sample was unaccounted for. FoF ¶ 59(e); Tr. 119:9-16 (Dr. Smith confirming that "10.52 percent just didn't get measured"); JTX-0062 at 003 (Dr. Smith writing in her notebook that "not all the materials were recovered from the sieves due to the . . . caking").

q. Aurobindo proposes the fact that Dr. Smith did not provide images for the material that was collected by the smallest sieve or the collection pan, or the material that was unaccounted for, all of which amount to 39.42% of the total weight of the contents of Aurobindo's Capsule sample. D.I. 132 ¶ 30 (citing JTX-0062 at 003; JTX-0061 at 003).

20

r.  Dr. Smith observed material from the smallest sieve and her observation of the material from the smallest sieve was consistent with her other observations. Tr. 130:8-12 (Dr. Smith testifying: "I looked at every single sieve. I looked at every single thing that passed . . . through those sieves and then -- that was in the capsule."); Tr. 117:18-25 (Dr. Smith confirming that everything she "saw were primary powder particles adhering together").

s.  Dr. Smith observed material from the collection pan and her observation of the material from the collection pan was consistent with her other observations. Tr. 117:18–118:1 (Dr. Smith confirming that everything she "saw were primary powder particles adhering together, whether I was looking at sieve fraction one or the collection pan"); Tr. 130:7-8 (Dr. Smith testifying: "I looked at the collection pan; I just didn't collect any images of it.").

t.  There is no practical way to examine every single solid in Aurobindo's Capsule sample to confirm that it is in a granule. Tr. 133:5-15 (Dr. Smith confirming that she was "not aware of a quantitative test in order to say that every single -- every single solid that came out of that capsule was a granule, which is why [she] looked at every -- every sample").

u.  Dr. Smith's conclusion, on the basis of her stereomicroscopy examination of the contents of Aurobindo's Capsule sample, that Aurobindo's Capsule sample contains granules supports that Aurobindo's Product contains granules. FoF ¶ 59(a)-(t); *see* FoF ¶¶ 61-62; *see also* FoF ¶¶ 7-8.

60.  Dr. Smith also examined the contents of Aurobindo's Product using "polarized light microscopy." Tr. 82:8-15 (Dr. Smith confirming).

21

a. Polarized light microscopy transmits light through a sample. Tr. 85:7-18 (Dr. Smith testifying *inter alia*: "So in this case [i.e., polarized light microscopy], we're transmitting light through the sample instead of reflecting it from the top like in stereo microscopy, we're transferring light through the sample.").

b. Dr. Smith employed three techniques of polarized light microscopy to view Aurobindo's Product. Tr. 86:14–87:12 (Dr. Smith testifying: "So when I walk through the images, I'm going to show you them in groups of three. And the first image is always going to be the image with a single polarizer in place, so it would be the equivalent to looking at an image like this, a clear image. . . . The second type of image is called crossed polars. So that means I have two polarizers in place. . . . [I]f the sample is amorphous, no light will pass through and it will look like a dark field in your view. If you have a crystalline sample, light will pass through. So looking at a sample on your cross polars is the definitive way as a microscopist to determine whether you have a amorphous material or crystalline material . . . This is important for us because if we look at the ingredients that are in the capsule, you have the API which is amorphous. You have microcrystalline cellulose, which is crystalline. You have collodial silicon dioxide which is amorphous and then you have magnesium stearate which is crystalline. . . . the third configuration is a crossed polars with a first order of red compensator plate, that's a lot of words to say, I'm going to put in a filter to make it easier to see some of the differences I'm pointing out.").

c. Dr. Smith recorded her polarized light microscopy images of material from Aurobindo's Product sample in JTX-0061. Tr. 88:12-19 (Dr. Smith confirming).

22

d. The three polarized light microscopy images (one for each technique) at JTX-0061 at 0015-0017 are titled "12-38-1-4- 10," "12-38-1-4- 11," and "12-38-1-4- 1" and depict two granules of pimavanserin and microcrystalline cellulose and nothing else. JTX-0061 at 0015-0017; Tr. 89:1–92:5 (Dr. Smith testifying *inter alia*: "I'll point out that these are two granules and these are the exact same view just with single polarizer, cross polars and then cross polars with the first order red compensator plate. . . . So when the first image, which is the one under 'single polarizer,' I see two granules, and I can see light areas in the granules and I can see dark areas in the granules. . . . The second image is where I mentioned we have the cross polars, and so anything that is amorphous will not . . . allow light to pass through. So I can see dark areas within the granules and then I can see light areas within the granules. And if there is overlap of dark and light, sometimes you can see light coming through but just a little bit less intense that -- if it didn't have anything dark on top of it. . . . in the third image, that's with the first plate -- compensator plate and we can really see things pretty clearly in the images at this point. . . . These granules consist of amorphous API and the microcrystalline cellulose. . . . Just to explain what it is that I'm seeing. When I talk about an area that's lighter and light is passing through it, I outline some examples of that in these images with the yellow box, that's due to the microcrystalline cellulose. . . . I don't see anything but granules here.").

e. The three polarized light microscopy images (one for each technique) at JTX-0061 at 0039-0041 are titled "12-38-1-6- 4," "12-38-1-6- 5," and "12-38-1-6- 6" and depict multiple granules of pimavanserin, microcrystalline cellulose, and colloidal

23

silicon dioxide. JTX-0061 at 0039-0041; Tr. 92:6–94:15 (Dr. Smith testifying *inter alia* that image 12-38-1-6- 6 is "is another image of multiple granules" that have "microcrystalline cellulose" and "colloidal silicon dioxide" and that "[s]ilicon oxide is glass so that's what a very small particle of glass looks like" and explaining why she recognizes silicon oxide).

f.  Dr. Smith observed pimavanserin adhered to microcrystalline cellulose in every observation of Aurobindo's Product (including materials in the bottom collection pan); not once did Dr. Smith observe a pimavanserin particle in isolation, i.e., not adhered to microcrystalline cellulose or not in a granule. Tr. 94:16–95:19 (Dr. Smith confirming that she "collected dozens of images of multiple different sizes of granules" and that in "in every single image that [she] looked at, [she] never once saw the API not attached to the microcrystalline cellulose"); Tr. 116:7-12 (Dr. Smith confirming that she "never saw the API not associated in a granule"); Tr. 117:18–118:1 (Dr. Smith confirming that everything she "saw were primary powder particles adhering together, whether I was looking at sieve fraction one or the collection pan"); Tr. 119:21-24 (Dr. Smith testifying that while she did not observe all of the material from Aurobindo's Capsule, that she thinks her conclusion is "fair" because she "consistently saw the same thing over and over and over again"); Tr. 131:11-14 (Dr. Smith confirming that "everything [she] saw, including in the collection pan, [was] pimavanserin in granular form").

g.  Microcrystalline cellulose can serve as a filler and a binder to form granules. Tr. 180:14-18 (Dr. Moreton testifying *inter alia* that [p]harmaceutical excipients can have more than one function"), Tr. 186:6-10 (Dr. Moreton confirming that "the

24

function of MCC depend[s] on the formulation it's being used in"), Tr. 584:16-22 (Dr. Little testifying *inter alia*: "Yeah, so MCC is what we call a filler binder, so it's -- I think it's like the prototypical filler binder."); Tr. 584:14–585:4 (Dr. Little testifying that pimavanserin is a "sticky drug" and that mixing pimavanserin and microcrystalline cellulose "could result in granules"); Tr. 226:9-12 (Dr. Moreton agreeing that "pimavanserin can adhere to microcrystalline cellulose, depending on the particle size").

h.  Dr. Smith's conclusion, on the basis of her polarized light microscopy examination of the contents of Aurobindo's Capsule sample, that Aurobindo's Capsule sample contains only granules with pimavanserin and excipients supports that Aurobindo's Product contains only granules comprising pimavanserin and excipients. FoF ¶ 60(a)-(g); *see* FoF ¶¶ 61-62; *see also* FoF ¶¶ 7-8.

61.  Dr. Smith's expertise lies in microscopy techniques, including stereomicroscopy and polarized light microscopy, which she has used to analyze solid dosage forms "hundreds of times." Tr. 52:2-21 (Dr. Smith confirming).

62.  As a microscopist, Dr. Smith has "been trained to recognize" the ingredients in Aurobindo's Capsule sample "after looking at hundreds and thousands of images over [her] lifetime" and, thus, the images are "easily recognizable " to her. Tr. 87:22-25 (Dr. Smith testifying as such).

63.  Dr. Moreton is not an expert in polarized light microscopy and has never "operated" a polarized light microscope, but has "used microscopy and polarized light microscopy in the past." Tr. 227:16–228:2 (Dr. Moreton testifying as such).

25

64. Dr. Moreton "never handled" Aurobindo's pimavanserin product nor "perform[ed] any testing of Aurobindo's pimavanserin product." Tr. 220:24–221:10 (Dr. Moreton confirming).

65. Dr. Smith did not control for humidity in her experiments. Tr. 124:13–125:8 (Dr. Smith stating that "there's no humidity reading noted on [her] notebook page").

66. Humidity could cause pimavanserin to clump. Tr. 216:4-21 (Dr. Moreton testifying *inter alia* that certain humidity thresholds could cause pimavanserin to "absorb water"); Tr. 222:4-15 (Dr. Moreton testifying that: "[Pimavanserin is] recognized as a hygroscopic . . . . I do understand that with very hygroscopic materials, because I've handled them, that very often only an exposure of an hour can change the whole characteristic of the powder."); FoF ¶ 123.

67. Dr. Moreton did not perform any studies to determine whether humidity impacted the results of Dr. Smith's testing and could not "definitely" attest that humidity changed Dr. Smith's results. Tr. 222:1-24 (Dr. Moreton testifying as such).

**f.  General Findings**

68. On the basis of Findings of Fact ¶¶ 36-67, the Court finds that Aurobindo's Product encapsulates a blended pimavanserin composition containing granules and that those granules comprise pimavanserin and one or more pharmaceutically acceptable excipients.

69. The Court also finds that Aurobindo's Product encapsulates a blended pimavanserin composition containing granules and that those granules comprise pimavanserin and one or more pharmaceutically acceptable excipients, on the basis of the same Findings of Fact (i.e., Findings of Fact ¶¶ 36-67), but excluding either Findings of Fact ¶¶ 57-58 (i.e., the facts regarding Aurobindo's description of the presence of granules in its product), Findings of Fact ¶ 59 (i.e., facts regarding Dr. Smith's conclusion, on the basis of her

26

stereomicroscopy examination of the contents of Aurobindo's Capsule sample, that Aurobindo's Capsule contains granules), or Finding of Fact ¶ 60 (i.e., facts regarding Dr. Smith's conclusion, on the basis of her polarized light microscopy examination of the contents of Aurobindo's capsule, that Aurobindo's Capsule contains only granules with pimavanserin and excipients).

70.    The Court also finds that Aurobindo's Product encapsulates a blended pimavanserin composition containing granules and that those granules comprise pimavanserin and one or more pharmaceutically acceptable excipients, on the basis of the same Findings of Fact described in Finding of Fact ¶ 68, but excluding all of the facts regarding Dr. Smith's examinations of Aurobindo's Capsule sample (i.e., Findings of Fact ¶¶ 59-67).

71.    The Court also finds, on the basis of Findings of Fact ¶¶ 36-67, that Aurobindo's dry blending process (which includes mixing pimavanserin with microcrystalline cellulose) was capable of, and in fact did, produce granules.

**3.    Bulk Density**

72.    Bulk density is the ratio of mass over volume and is expressed as grams per milliliter (i.e., g/ml). Tr. 106:2-6 (Dr. Smith confirming as such).

73.    A POSA would have understood that granulation can increase the bulk density of a pharmaceutical composition. DTX-005 at 0010 ("Doses over 600 mg in powder form are virtually impossible to put into capsules of acceptable size. It has, though, been possible to produce such doses in hard gelatin capsule form by increasing the density of the formulation; for instance, by granulation."); Tr. 246:22–247:2 (Dr. Muzzio confirming).

74.    Aurobindo produced three exhibit batches of its Product titled "TPIA019001," "TPIA019002," and "TPIA019003." JTX-0106 at AURO-0013.

27

75. In its ANDA, Aurobindo reported the bulk density of its Product from the exhibit batches, in Finding of Fact ¶ 74, as 0.413, 0.407, and 0.404 g/ml, respectively. JTX-0106 at AURO-0013.

76. Dr. Smith conducted two bulk density tests on Aurobindo's Product: the first test produced a bulk density reading of 0.4134 g/ml and the second test produced a bulk density reading of 0.4151 g/ml. Tr. 104:14-24 (Dr. Smith confirming).

77. Dr. Smith's results are consistent with the results that appear in Aurobindo's ANDA. Tr. 104:25–105:5 (Dr. Smith confirming); JTX-0106 at AURO-0013.

78. On the basis of Findings of Fact ¶¶ 72-77, the Court finds that Aurobindo's Product contains a bulk density between 0.4 g/ml and 0.6 g/ml.

**C.    Obviousness**

The Court divides its Obviousness Findings of Fact into the following Sections: (1) A POSA Would Not Have Been Motivated to Formulate a Capsule Dosage of Pimavanserin, and (2) A POSA Would Not Have Been Motivated to Achieve the Bulk Density in Claim 4 of the '721 Patent with a Reasonable Expectation Of Success.

**1.    A POSA Would Not Have Been Motivated to Formulate a Capsule Dosage of Pimavanserin**

The Court divides its Findings of Fact regarding whether a POSA would have been motivated to formulate a capsule dosage of pimavanserin into the following Sections: (a) Pill Burden, (b), Swallowability, (c) Taste-Masking, (d) Color Coating and Pill Identification, and (e) General Findings.

**a.    Pill Burden**

79. Generally, a POSA could be motivated to minimize the number of tablets or capsules administered to patients to decrease the pill burden. Tr. 312:10-15 (Dr. Muzzio testifying:

28

"It [i.e., pill burden] would motivate a person of ordinary skill in the art to try to formulate it in such a way where you can put all 40 mgs of pimavanserin tartrate in a single dosage form.").

80.  The prescribing information for the Nuplazid tablets recommended that patients take two tablets at a time.  JTX-12 at 0002 ("The recommended dose of NUPLAZID is 34 mg, taken orally as two 17 mg strength tablets once daily, without titration.").

81.  The prior art does not disclose a pill burden problem for the Nuplazid tablets.  Tr. 409:1–412:7 (Dr. Muzzio testifying that the prior art does not disclose a pill burden problem for the tablet formulation of pimavanserin); Tr. 502:14-19 (Dr. Little responding "[no]" to the question of whether "the prior art expressly disclose[s] any of Dr. Muzzio's alleged problems with respect to the 17 mg Nuplazid tablets"); Tr. 513:1-12 (Dr. Little confirming that none of "the references provided by Dr. Muzzio suggest to a POSA that patients taking Nuplazid tablets were at an increased risk of pill burden or noncompliance due to its two-tablet dosage form"); Tr. 515:5-9 (Dr. Little confirming that he was not "aware of any prior art reference teaching that a single capsule dosage form of Nuplazid would be preferable for alleviating pill burden or noncompliance").

82.  A POSA would not have been motivated to formulate a capsule dosage of pimavanserin over a tablet dosage of pimavanserin on the basis of pill burden.  FoF ¶¶ 79-81; *see* Tr. 512:14-25 (Dr. Little testifying: "So, again, this is one of those general motivations. So it's not like pill burden couldn't provide motivation in some context. It could be part of something. It's generally known, okay. But if you're talking about pill burden, in this particular instance, what you're saying is what kind of change would I make. So if I am going to pill burden, okay, it's my opinion that you wouldn't be doing a capsule. And

29

there's reasons why I will describe to you."); Tr. 527:3-10 (Dr. Little's testimony: "Q. If pill burden was a motivation for a POSA to reformulate, would a POSA have selected a single capsule dosage form based on the Schiele reference? A. No. If you're just looking at the Schiele reference and now you're limited to only a capsule or a tablet and that you're not going to consider the other dosage forms that we looked at in the last reference that talks about those, you're going to pick a tablet over a capsule.").

**b.**    **Swallowability**

83.    Generally, a POSA could be motivated to minimize the difficulty of swallowing medications. Tr. 315:6-12 (Dr. Muzzio testifying that difficulty swallowing "would motivate a person of ordinary skill in the art to formulate pimavanserin into a dosage form that is as easy to swallow as possible").

84.    Dr. Muzzio opined that the patients taking the Nuplazid tablets were "known to have a high . . . difficulty swallowing because they're older patients with Parkinson's disease." Tr. 295:11-17.

85.    The Schiele reference[3] teaches that capsules cause more swallowing problems than tablets. DTX-007 at 0005 ("Hard gelatin capsules, soft gelatin capsules and oblong tablets caused problems almost twice as often as tablets with irregular shapes, nearly 1.6 times more frequently than round tablets, and about 1.2 times more often than oval tablets."); *id.* at Figure 3 (depicting that hard gelatin and soft gelatin capsules cause swallowing difficulties in 21.4% and 21.2% of patients, respectively, while round tablets, oval tablets, oblong

---

[3] Julia T. Schiele, *Difficulties swallowing solid oral dosage forms in a general practice population: prevalence, causes, and relationship to dosage forms*, Pharmacoepidemiology and Prescription (Sept. 29, 2012).

tablets, and irregularly shaped tablets cause swallowing difficulties in 13.4%, 17.3%,

19.8%, and 11% of patients, respectively):



Fig. 3  Proportion of different kinds of tablets and capsules that caused swallowing difficulties in a general practice population of 1,051 consecutive patients

86.    The Schiele reference teaches that patients with swallowing difficulty are more likely to

prefer tablets compared to capsules.  DTX-007 at Figure 6 (

31



Fig. 6 Preferred types of dosage forms and tablet shapes in a general practice population with (37.4 %) and without (62.6 %) swallowing difficulties (*N*=1,051 consecutive patients)

); *see* Tr. 523:4–527:10 (Dr. Little testifying *inter alia* that the Schiele reference teaches that "every type of tablet was preferred over the capsule" among patients with swallowing difficulties and that if "you're just looking at the Schiele reference and now you're limited to only a capsule or a tablet and that you're not going to consider the other dosage forms that we looked at in the last reference that talks about those, you're going to pick a tablet over a capsule").

87.    The Liu reference[4] teaches that "safe swallowing is the key formulation factor in designing medicines for older patients" and "[i]n older patients, age- or disease-related swallowing difficulties affect their ability to take solid oral medicines." DTX-013 at 0001, 0002, 0004.

---

[4] Fang Liu et al., *Patient-Centered Pharmaceutical Design to Improve Acceptability of Medicine: Similarities and Differences in Paediatric and Geriatric Populations* (October 2, 2014).

32

88. The Liu reference teaches that liquid and "flexible oral solid medicines [] are convenient to use by patients who cannot swallow tablets and capsules." DTX-013 at 0011.

89. The Liu reference teaches that orally disintegrating tablets (otherwise known as orally dispersible tablets) "and film formulations have been developed for the treatment of diseases that are common in the older population such as . . . Parkinson's disease." DTX-013 at 0013.

90. The Liu reference teaches that orally dispersible tablets are considered advantageous with respect to administration for patients with Parkinson's disease and dysphagia. DTX-013 at Table 5.

91. The Liu reference teaches that more than twice as many older patients with Parkinson's disease prefer orally dispersible tablets "compared with conventional tablets." DTX-013 at Table 5.

92. The Liu reference teaches that a "film formulation provides easy swallow through the application of a dry film that turns into a jelly instantaneously in the mouth" and that such a formulation improves "swallowing for older patients." DTX-013 at 0013.

93. The Liu reference teaches that "effervescent tablets are solid dosage forms that can be dispersed or dissolved in a liquid to form a solution or suspension" and "are beneficial in the delivery of large doses of active drug substances as they are easier to swallow than large tablets" and otherwise "[m]ay be a useful technology to promote safe swallowing in older patients." DTX-0013 at 0011.

94. Dr. Little opined on the swallowability benefits of "dispersible and effervescent tablets" in the context of the Liu reference (i.e., in the context of prior art). Tr. 516:2–523:3.

33

95.    The Ragnar-Tolf reference[5] discloses that pimavanserin can be formulated "to form tablets, pills, dragees, capsules, liquids, gels, syrups, slurries, suspensions, and the like, for oral ingestion by a patient to be treated." JTX-11 at 0049; Tr. 417:18-23 (Dr. Muzzio confirming that Ragnar-Tolf discloses "different types of ways to formulate [pimavanserin], including tablets, pills, liquids, gels, syrups, slurries, [and] suspensions").

96.    Sven Stegemann ("Mr. Stegemann") is an employee of Capsugel, a capsule manufacturing company, and authored an article published by Capsugel titled "Hard gelatin capsules today – and tomorrow" (the "Stegemann reference"). DTX-005.

97.    In the Stegemann reference, Mr. Stegemann reported on a study concluding that "66 % of the patients choses capsules, 19 % chose coated tablets and only 4 % uncoated tablets as easy to swallow." DTX-005 at 13.

98.    In light of the conflict of interest arising from Mr. Stegemann's employment at a capsule manufacturer, the Stegemann reference has diminished credibility.

99.    A POSA would not have been motivated to formulate a capsule dosage of pimavanserin over a tablet dosage of pimavanserin on the basis of swallowability. FoF ¶¶ 83-98; *see* Tr. 527:11-17 (Dr. Little answering "[n]o" to the question: "And if size of a dosage form was a motivation for a POSA to reformulate, would a POSA have selected a single capsule dosage form here?").

c.    **Taste-Masking**

100.   Generally, a POSA could be motivated to formulate a medication on the basis of taste. Tr. 527:23-25 (Dr. Little testifying that "taste is something that you would definitely consider as a general motivation").

---

[5] U.S. Patent Application Publication, 2007/0264330 A1 (November 15, 2017).

34

101.    Pimavanserin "has a pronounced bitter taste." JTX-11 at 0132.

102.    Ragnar-Tolf discloses that "a taste-masking coating was applied to" the pimavanserin

tablets" that "was water based and selected to minimize wetting of the tablet cores." JTX-

11 at 0132.

103.    A POSA would not have been motivated to develop a capsule for pimavanserin on the basis

of paragraph 63 of Ragnar-Tolf, which states that in "some embodiments, tablets . . . are

coated . . . with a taste masking film" and that in "some embodiments, instead of

compression into tablets, a dry or wet blend . . . is placed in a gelatin capsule or HPMC

capsule." JTX-11 at 0063; Tr. 530:9-16 (Dr. Little testifying: "But I don't take issue with

the fact that you can taste-coat with gelatin capsules. I don't think that's what this is saying,

but you can, okay. But what I cannot understand is how somebody would read paragraph

63 as put up here on the screen and say that it would teach you to move away from a tablet

taste-masking film to a capsule. The only way you would read that into this paragraph is if

you're looking at it through the lens of the invention.").

104.    The Nuplazid tablets have a film-coating that masks the taste of pimavanserin, negating

the motivation for a POSA to develop other dosage forms. Tr. 527:23–528:2 (Dr. Little

testifying: "I would say that taste is something that you would definitely consider as a

general motivation, but as we saw, the Nuplazid cap- -- tablets had a film-coating on them

that allowed you to taste-mask, so that's something that you could do.").

105.    A POSA would have understood that capsule dosage forms may provide better taste

masking than tablet dosage forms. Tr. 320:5-24 (Dr. Muzzio testifying: "But if you're

coating the tablet also to mask taste, then you would be very concerned with something

called film failure. . . . So as a result of all of this, some tablets would be taste-masked, but

35

there would be some that are not properly taste-masked and so, once in a while, the patient would actually experience a bitter taste of the medicine. That doesn't happen with capsules because the power doesn't leak out of the capsule.").

106.    A POSA would not have been motivated to formulate a capsule dosage of pimavanserin over a tablet dosage of pimavanserin on the basis of taste. FoF ¶¶ 100-05.

**d.      Color Coating and Pill Identification**

107.    A POSA would have understood that color coating dosage forms may facilitate medication identification and patient compliance. Tr. 317:3-21 (Dr. Muzzio testifying *inter alia*: "So this passage talks about something that is also mentioned in some of the other references that we have been talking about, which is basically that -- it says for elder patients who take a number of medications every day, they need to identify those medications, right. Some are to be taken in the morning, some are to be taken in the evening, etc. And so it says that to help the patients automatically process, distinguish, you know, figure out how to take the medication, the dosage form should be easy for the person to identify.").

108.    Film-coated tablets can be distinctively color coated. Tr. 530:20-22 (Dr. Little confirming that "film-coated tablets" can "be distinctively color coated"); JTX-91 at 0001 ("Opadry fx systems are formulated by incorporating pearlescent pigments into high gloss, clear polymer systems from Colorcon. The results are film coated tablets that exhibit stimulating colors and lustrous effects.").

109.    A POSA would have understood that there may be difficulties in color coating. Tr. 320:1-7 (Dr Muzzio testifying: "The person of ordinary skill in the art would know that film coating a tablet is a complex process, it's also an expensive process, it's a time-consuming process, and it's also a process that can have failures. If you're just coating the tablet to make it pretty, it's one thing.").

36

110. Capsules, like tablets, can be distinctively color coated. Tr. 318:14-17 (Dr. Muzzio confirming).

111. A POSA would not have been motivated to formulate a capsule dosage of pimavanserin over a tablet dosage of pimavanserin on the basis of color coating. FoF ¶¶ 107-10; *see* Tr. 531:10-13 (Dr. Little responding "[no]" to the question of whether "a POSA have been motivated to make a capsule dosage form over a tablet due to the cost to film coat and print on tablets").

**e.  General Findings**

112. Dr. Muzzio was not aware of "any complaints" from "doctors or patients or any other healthcare professional or anyone regarding the two . . . 17 mg tablets for pimavanserin." Tr. 414:4-9.

113. Dr. Muzzio admitted that "[t]he tablet, the most frequently prescribed commercial dosage form, is stable, elegant and effective" and "provides the patient with a convenient product for handling, identification and administration." Tr. 413:21–414:2.

114. Tablet dosages of pimavanserin already existed. JTX-12 at 0007-0008.

115. A POSA would have been aware of various difficulties associated with the formulation of dosage forms other than tablets or capsules, such as effervescent tablets, orally disintegrating formulations, chewable tablets, films and jellies. Tr. 322:7–326:8 (Dr. Muzzio testifying *inter alia*: "Effervescent tablets . . . require effective taste-masking . . . [and] also require more effort by the caregiver. They're also more expensive to make. . . . Orally disintegrating formulations . . . are more expensive to make . . . [and] require more . . . protection from exposure to moisture. . . . Chewable tablets . . . are also, generally speaking, more expensive to make. . . . Films . . . [are] also more expensive to make. . . .

37

Jellies . . . would disperse in the mouth. . . . [C]hewable tablets . . . [are] not very common.").

116.    A POSA would not have been motivated to formulate a capsule dosage of pimavanserin over a tablet dosage of pimavanserin on the basis of the following non-exhaustive list of factors: pill burden, swallowability, taste-masking, color coating and pill identification, commonality of dosage forms, effort by the caregiver, protection from moisture, dispersion in the mouth, and costs associated with formulation. FoF ¶¶ 79-115.

**2.    A POSA Would Not Have Been Motivated to Achieve the Bulk Density in Claim 4 of the '721 Patent with a Reasonable Expectation Of Success**

117.    A POSA seeking to develop a new dosage form of pimavanserin would have looked to the Ragnar-Tolf reference. Tr. 293:22–296:6 (Dr Muzzio testifying: "So a person of ordinary skill in the art seeking to develop a new version of this product would start by a literature search looking for information about preformulation or formulation studies that have been performed for this particular drug substance. . . . [T]he POSA would have found Ragnar-Tolf immediately."); JTX-11.

118.    The Ragnar-Tolf reference was published on November 15, 2007, almost ten years before the earliest effective filing date of the '721 patent. JTX-11 at 0001; Tr. 296:7-12 (Dr. Muzzio testifying: "This [i.e., the Ragnar-Tolf patent application] was published in November 2007, almost -- almost ten years before the '721 patent.").

119.    The Ragnar-Tolf reference, as well as the Nuplazid Tablet Label, are listed on the face of the '721 patent. JTX-09 at 0003, 0008.

120.    The Ragnar-Tolf reference "does not explicitly talk about any one [capsule] size other than size 0." Tr. at 416:23–417:6 (Dr. Muzzio stating as such).

121.    The Ragnar-Tolf reference discloses that pimavanserin tends to aggregate when subjected to dry blending, and also discloses, as an alternative to dry blending, examples of wet granulation to produce granules containing 1 mg, 5 mg or 20 mg of pimavanserin tartrate. JTX-11 at 0125 ("It was discovered that during blending, the mixture tended to form aggregates, potentially affecting content uniformity. Accordingly, pimavanserin tartrate Form A was blended with spray-dried lactose prior to sieving at 0.5 mm for 1 mg and 5 mg formulations and at 0.7 mm for 20 mg formulations. It was found that the stepwise blending/sieving procedure ensured that a homogenous blend was maintained."); *see* Tr. 300:19–301:3 (Dr. Muzzio testifying: "So when a POSA would see that the drug has a tendency to form clumps and that those clumps can lead to these problems for what's relatively a low-dose product, the most common approach to solve this problem is to wet granulate. . . . Right, so right on cue, the very next thing in Ragnar-Tolf after example 8 is example 9 where they do what is the most common solution to the problem. They go ahead and they wet granulate.").

122.    A POSA would have understood that pimavanserin is a "bad-behaving" material — in that pimavanserin has a low bulk density and tends to clump up — and requires a lot of excipients to allay its bad behavior. FoF ¶ 157; Tr. 533:16-18 (Dr. Little testifying: "That it's [i.e., pimavanserin] a bad-behaving material. It is a low bulk density. It needs a lot of excipients in order to cover up its bad behavior and has a tendency to clump.").

123.    A POSA would have understood that Pimavanserin is hygroscopic, meaning that pimavanserin tends to absorb moisture and, thus, that formulating dosages of pimavanserin could be difficult. Tr. 222:5-15 (Dr. Moreton testifying that: "[Pimavanserin is] recognized as a hygroscopic material, and in the manufacturing instructions, the manufacturing area is

39

-- is conditioned below 20 percent relative humidity, which tells me that it's a very hygroscopic material. . . . I do understand that with very hygroscopic materials, because I've handled them, that very often only an exposure of an hour can change the whole characteristic of the powder.").

124. The Ragnar-Tolf reference discloses that the wet granulated formulations could be compressed into not only tablets with film coating, but also into capsules. JTX-11 at 0063 ("In some embodiments, tablets produced by any of the methods described above are coated such as with a taste masking film (e.g., an OPADRYR film). In some embodiments, instead of compression into tablets, a dry or wet blend, such as those described above, is placed in a gelatin capsule or HPMC capsule.").

125. With respect to tablets, the Ragnar-Tolf reference discloses embodiments of 1 to 80 mg tablets of pimavanserin tartrate, including 40 mg tablets. JTX-11 at 0067 ("Various embodiments include tablets as described above containing 1 mg, 2 mg, 5 mg, 10 mg, 20 mg, 40 mg, 60 mg, or 80 mg of pimavanserin tartrate."); Tr. 296:17-25 (Dr. Muzzio testifying: "So reading this paragraph, the person of ordinary skill in the art would immediately learn that Ragnar-Tolf has concerned itself with dosages containing anywhere from 1 mg to maybe up to 80 mg.").

126. The Ragnar-Tolf reference has the following tables (Table 7 and Table 8):

TABLE 7

Ingredient amounts (%) for wet granulation formulations.

| | Tablet strength | | |
|---|---|---|---|
| | 1 mg | 5 mg | 20 mg |
| Drug | 1.03 | 5.13 | 20.5 |
| Mannitol | 91.3 | 87.2 | 71.1 |
| Pregelatinized Starch | 5.00 | 5.00 | 5.00 |
| Povidone | 1.15 | 1.15 | 1.15 |
| Magnesium stearate | 1.5 | 1.5 | 2.0 |
| Ethanol 99.5%** | 19.8 | 16.5 | 16 |

**Evaporates during manufacturing process

TABLE 8

Physical and analytical characteristics of wet granulation formulations.

| Tablet strength | 1 mg | 5 mg | 20 mg | 5 mg | 20 mg |
|---|---|---|---|---|---|
| LOD (%) | 1.5% | 0.8% | 2.3% | 0.9% | 1.6% |
| Sieving analysis (%) | | | | | |
| >710 | 0 | 0 | 0 | 0 | 0 |
| 500-710 | 0 | 0 | 1 | 0 | 1 |
| 250-500 | 8 | 5 | 7 | 4 | 6 |
| 125-250 | 69 | 69 | 69 | 71 | 72 |
| 90-125 | 19 | 21 | 18 | 21 | 18 |
| <90 | 5 | 4 | 6 | 5 | 4 |
| Bulk/Tapped density g/ml | 0.57/0.60 | 0.58/0.64 | 0.61/0.63 | 0.5610.60 | 0.56/0.61 |
| Tablet weight | 100 mg | 100 mg | 100 mg | 101 mg | 99.7 mg |
| Crushing strength | 61N | 51N | 58N | 61N | 44N |
| Tablet height | 3.7 mm | 3.8 mm | 3.8 mm | 3.7 mm | 3.8 mm |
| Friability, 100 rot. (%) | 0.1 | 0.1 | 0 | — | — |
| Friability, 200 rot. (%) | — | — | — | 0.1 | 0.1 |
| Disintegration time | 6 min | 6 min | 5 min | 6 min | 5 min |
| Content uniformity, mg/tabl | 1.0 mg | 5.4 mg | 20.5 mg | — | 20.1 mg |
| Released amount %, 30 min | 98% | 117% | 102% | — | — |

JTX-11 at Tables 7, 8.

127.    As depicted in Table 8, the Ragnar-Tolf reference discloses examples of pimavanserin

tablets that were formulated, including in 1 mg, 5 mg, and 20 mg dosages, that ranged in

41

bulk-density between 0.56 g/ml and 0.61 g/ml. JTX-11 at Table 8; Tr. 342:25–343:3 (Dr. Muzzio testifying: "Ragnar-Tolf is already disclosing granules that have a bulk density somewhere between 0.56 and 0.61 for a wide range of drug concentrations from 1 percent to 20 percent."); Tr. 538:1-5 (Dr. Little testifying that Table 8 "taught a POSA, in terms of bulk densities you can see that you are around 0.6 for the amount of pimavanserin that was used here. But what you see is it stops at 20 mg.").

128.    A POSA would have understood, including on the basis of the Ragnar-Tolf reference, that, in order to fit 40 mg of pimavanserin tartrate in a size 4 capsule, he or she would have had to increase the pimavanserin tartrate concentration in the 20 mg formulation identified in Finding of Fact ¶ 127 from approximately 20% to 32.4% (i.e., by over 60%) and such an increase could potentially be accomplished by also decreasing the concentration of mannitol. Tr. 332:21–335:1 (Dr. Muzzio testifying *inter alia*: "So the next obvious thing to try is to do this calculation, right; is to say, okay, if the 40 mgs of pimavanserin tartrate need to be contained in 126 mgs of final blend, that means that the concentration of pimavanserin tartrate in the final blend is going to be 31.7 percent. And because 2 percent of that blend is magnesium stearate, it would say that the granules themselves need to have a little higher concentration, about 32.4 percent.").

129.    If possible, a POSA would have understood that increasing the concentration of pimavanserin tartrate, and likewise decreasing the inactive mannitol diluent, in the blended pimavanserin in the manner described in Finding of Fact ¶ 128 could have increased or decreased the bulk density of the granules. Tr. 538:21–539:8 (Dr. Little testifying: "So as I was describing to Your Honor before, when you change something, it is possible you can change any number of parameters. So in the case Dr. Muzzio looks at the claim and he says

42

pharmaceutically acceptable would be known to have all of these other parameters that would be in them, it is possible that changing the pimavanserin concentration in this in order to get it up to the point where you can fit it into a size 3 and 4 capsule, which by the way, if you're going to change one thing, the pimavanserin concentration is going to be the one thing that has the highest likelihood of changing the bulk density. It's the thing that has the worst behavior in the formulation."); Tr. 333:23–335:13 (Dr. Muzzio testifying: "So the POSA looks at this data and says, okay, I need to put more drug in the blend. I need to increase the concentration of drug in the blend so that I can put my 40 mgs within the 126 mgs of total blend that I can put inside that capsule. . . . And I can do that just by taking some of the mannitol out. . . . And when you granulate that way, if your density comes out at 0.6, as would be the expectation, problem solved. Now, you put 126 mgs of that final blend into the capsule and you have your 40 mgs of pimavanserin . . . Let's say that the density . . . comes up 0.62, then you will want to put a little bit less than 12 -- than, you know, 32.4 percent, so you would then run one more experiment and you would go down to maybe 34 percent. Conversely, if the density comes out, let's say, 0.57, now you're off by about three percentage points. So you could say, oh, maybe I need to run one more experiment; instead of 32.4 percent, I need to go to maybe 34 percent, right.").

130. A POSA would have not been motivated to formulate the recited capsule dosage of pimavanserin with the claimed bulk density with a reasonable expectation of success in doing so. FoF ¶¶ 117-29.

131. The patent examiner already considered Defendants' basis for the validity challenge during patent prosecution and, in the Reasons for Allowance, he determined that the Asserted Claims were not obvious over the closest prior art, the Ragnar-Tolf reference, because "the

density of [its] granulation would not allow for the same amount of the drug to be present in the capsule." JTX-10 at 2404.

132. A diluent is a material that provides bulk or volume to dilute a drug substance, which can provide ease of handling. Tr. 253:2-8 (Dr. Muzzio testifying: "So diluents are materials that are used to -- as it says here, to provide bulk, to provide volume to a mixture. And this is particularly important when, for example, I'm handling very small doses of the drug substance and I need to dilute that small amount of drug substance into a larger volume so I can more easily and more accurately handle that.").

**D.  Indefiniteness**

133. A POSA would have understood that the '721 patent specification discloses "comparative experiments" of various manufacturing processes that resulted in products with "unacceptable" characteristics. JTX-09 at 13:33–15:2 ("The top spray fluid-bed layering resulted in particles having . . . unacceptable stability and particle size distribution as well an unacceptable amount of impurities. . . . Wurster Layering (a similar and more common process to the Top Spray Layering described above) was tested and found to produce particles having an . . . unacceptable stability and particle size distribution as well an unacceptable amount of impurities. . . . Extrusion/spheronization is especially useful in producing semi-spherical, dense granules . . . [but] resulted in particles having an acceptable flow and bulk density but unacceptable stability and particle size distribution as well an unacceptable amount of impurities. . . . Twin-Screw Melt Granulation . . . result[ed] in particles having . . . unacceptable finding of impurities as well as unacceptable dissolution. . . . Conventionally wet granulation . . . proved to be problematic resulting in very large, wet, adhesive pimavanserin granules that would not be easily dried in a fluid bed dryer."); *see* Tr. 261:10 271:5 (Dr. Muzzio discussing the comparative experiments);

44

Tr. 283:5–284:17 (same); Tr. 464:15 466:3 (Dr. Little explaining *inter alia*: "I think a person of ordinary skill in the art would first understand that what we're talking about in these comparative experiments, as I will show you, that the inventors were going through their process in order to determine or deem whether those processes were suitable or not. That's why the word is being used here. They would not be seeing the word and then trying to find a claim term in order to exclude things from a claim that is about compositions and not about pharmaceutical manufacturing processes.").

134.    A POSA would have understood that the unacceptable characteristics of the comparative experiments included, for example, "stability, particle size, impurity levels, or dissolution." JTX-09 at 13:33–15:2; *see, e.g.,* JTX-09 at 13:52-55 ("The top spray fluid-bed layering resulted in particles having . . . unacceptable stability and particle size distribution as well an unacceptable amount of impurities."); Tr. 261:17-22 (Dr. Muzzio testifying: "So the first comparative experiment uses a technique called top spray layering, uses excipients, it has acceptable density and flow, but it says to have – it's said to have an unacceptable stability, unacceptable limits of impurity, unacceptable particle size distribution, less favorable dissolution, so those attributes are mentioned.").

135.    A POSA would have understood that the '721 patent does not describe the comparative experiments as "embodiments," but rather that the '721 patent describes how various embodiments were evaluated when subjected to the manufacturing processes discussed in the comparative experiments.    JTX-09 at 14:64–15:2 ("Several embodiments were evaluated using excipients commonly used to mitigate the impact of high water content while providing excellent granule properties. These did not improve the resulting over-

45

wetting of the pimavanserin blend and resulted in an adhesive wet mass that would not would not be easily dried in a fluid bed dryer.").

136.    A POSA would have understood that "[c]ontrary to the disclosed comparative experiments," the '721 patent also "describes [acceptable] processes to manufacture capsules of size 4 comprising 5-34 mg pimavanserin." JTX-09 at 15:3-5.

137.    The section of the '721 patent discussing the comparative experiments does not utilize the term "pharmaceutically acceptable capsule" or "pharmaceutically acceptable." *See* JTX-09 at 13:33–15:2; *see also, e.g.*, Tr. 380:19-24 (Dr. Muzzio stating that "'pharmaceutically acceptable' doesn't appear" in the section of the '721 patent discussing the comparative experiments).

138.    During the *Markman* stage of this proceeding, Defendants contended:

> The specification . . . discloses comparative experiments resulting in unacceptable products. In contrast to such "unacceptable products," the specification again discloses the invention, which would presumably generate acceptable products, as involving a wet granulation process with "a small quantity of water" conducted on pimavanserin API alone. . . . The specification has more, and consistent, disclosures on granulating pimavanserin or pimavanserin tartrate API alone to form granules, followed by a mixing process involving the API granules and extra-granular excipients to form the blended composition, which is then filled into capsules. . . . To summarize, the '721 patent specification is very consistent on the points that (1) the pimavanserin tartrate API in the claimed compositions is to be granulated alone (i.e. with water in a wet granulation process), and (2) the granules are then mixed with excipients by blending.

D.I. 39 at 18-19.

139.    "The Court, however, held that 'Acadia did not clearly disavow granules containing both pimavanserin and excipients.'" D.I. 112 at 17 (quotation omitted).

46

140. The specification does not define the term "pharmaceutically acceptable" or the term "pharmaceutically acceptable capsule." JTX-09; Tr. 395:25–396:2 (Dr. Muzzio confirming); Tr. 449:1–450:6 (Dr. Little confirming).

141. The specification of the '721 patent states that, "[u]nless defined otherwise, all technical and scientific terms used herein have the same meaning as is commonly understood by one of ordinary skill in the art." JTX-09 at 2:34-36.

142. Dr. Little states that the phrase "pharmaceutically acceptable" is used "in thousands of patents" and "just means generally suitable for use in pharmaceutical compositions." Tr. at 450:9-13. Dr. Little testifies that the phrase does not mean "something different for capsules as opposed to excipients." Tr. 449:23–450:2; Tr. 450:24–451:3 (Dr. Little stating: "So it would be applied, as I said, the plain and ordinary meaning, which is generally suitable for use in pharmaceutical compositions. And since it's seen twice in this claim, it would be applied the same in both instances that it's used.").

143. Dr. Muzzio states that "pharmaceutically acceptable excipient" means "an excipient that has been proved to be pharmaceutically acceptable by a regulatory authority" or means "generally suitable for use in a pharmaceutical composition" at least "[w]hen used the right way and in the correct amount." Tr. 377:17–378:3. Dr. Muzzio avers that he does not "know" the meaning of the phrase "pharmaceutically acceptable capsule" and that neither would a "POSA" in light of, at least, the comparative experiments in the '721 specification. Tr. 382:4-9; Tr. 377:13-16 (Dr. Muzzio stating: "So, indeed, there are different ways in which you need to look at the words 'pharmaceutically acceptable' and see what it is that they are modifying to understand what that means.").

47

E.     **Written Description / Enablement**

144.   The '721 patent does not limit the number of "pharmaceutically acceptable excipients."
       JTX-09.

145.   The specification discloses various embodiments of "pharmaceutically acceptable
       excipients." *See, e.g.*, JTX-09 at 16:4-10 ("As disclosed herein it has been demonstrated
       that pimavanserin can be granulated without the use of a binder, i.e. utilizing water only. It
       is however contemplated that in some embodiments suitable binders, such as cellulose,
       methyl cellulose, polyvinylpyrrolidone and polyethylene glycol may be used, although not
       a necessity."); Tr. 474:17–475:8 (Dr. Little confirming that the list of excipients from JTX-
       09 at 16:4-10 "is the first of a number of disclosures" in the specification of the '721 patent
       "that demonstrate to a person of ordinary skill in the art that the inventors were envisioning
       adding excipients to the granules"); Tr. 396:3–397:6 (Dr. Muzzio testifying that JTX-09 at
       16:4-10 discloses "four" binders and that "binders" are "excipients"); JTX-09 at 17:34-41
       ("Another embodiment of the composition described above includes pimavanserin tartrate
       granulation containing less than 10% w/w Avicel PH302 and colloidal silicon dioxide, e.g.
       Aerosil Pharma 200 manufactured by Evonik, with a specific surface area from about 175
       to about 225 m$^2$/g blended with less than 60% w/w microcrystalline cellulose, such as
       Avicel PH302 or equivalent microcrystalline cellulose, and about 1% w/w magnesium
       stearate."); JTX-09 at 17:42-49 ("Another embodiment of the composition described above
       includes pimavanserin tartrate granulation containing less than 10% w/w Avicel PH101
       and colloidal silicon dioxide with a specific surface area from about 175 to about 225 m$^2$/g,
       e.g. Aerosil Pharma 200 manufactured by Evonik, blended with less than 60% w/w
       microcrystalline cellulose, such as Avicel PH302 or equivalent thereof, and about 1% w/w
       magnesium stearate."); Tr. 397:7-17 (Dr. Muzzio admitting that these two disclosures from

48

column 17 of the '721 patent disclose compositions with "Avicel PH302," "Avicel PH101" and "silicon dioxide").

146.    A POSA would have understood that excipients can be intragranular. Tr. 472:6-12 (Dr. Little explaining: "On the left-hand side, you will then see as part of the pimavanserin granulation, you have 40 mgs of pimavanserin tartrate in the pimavanserin granulation, you have 59 mgs of microcrystalline cellulose in the pimavanserin granulation, and you have 1 mg of magnesium stearate in the pimavanserin granulation, leading to a total of 100 mgs."); Tr. 399:23–400:10 (Dr. Muzzio explaining *inter alia* that colloidal silicon dioxide "can be put inside granules").

147.    As stated above, the Court construed "[g]ranules comprising 40 mg pimavanserin tartrate and one or more pharmaceutically acceptable excipients" as having "plain and ordinary meaning; the scope of the term includes granules granulated with pimavanserin and excipients." FoF ¶ 34.

148.    A POSA would have understood that the '721 patent discloses excipients that may "provide, without limitation, bulk, consistency, stability, binding ability, lubrication, disintegrating ability." JTX-09 at 3:50-53.

149.    The comparative experiments that resulted in "unacceptable products" describe the manufacturing process for pimavanserin granules with certain excipients. JTX-09 at 13:33–15:2.

150.    A POSA would not have considered the comparative experiments to understand the Asserted Claims. Tr. 469:7-12 (Dr. Little testifying that a POSA would not "place any limitation on the asserted claims" based on "the comparative experiments" from "columns 13-15 of the '721 patent specification"); Tr. 474:8-10 (Dr. Little reiterating that he does

49

not "think that you should be reading what [Dr. Muzzio] believes to be restrictions in the comparative [experiments] on to the claims").

151.    The '721 patent discloses the following table (Table 2):

TABLE 2

| Composition of Pimavanserin granulation (34 mg) | | |
|---|---|---|
| Ingredients | Qty (% w/w) | Qty (mg)/dose |
| Pimavanserin Tartrate | 40.0 | 40.0* |
| Microcrystalline Cellulose (Avicel PH302, NF, EP) | 59.0 | 59.0 |
| Magnesium Stearate (Vegetable Source, USP, EP) | 1.0 | 1.0 |
| Total | 100.0 | 100.0 |

*40 mg pimavanserin tartrate salt is equivalent to 34 mg pimavanserin free base

152.    A POSA would have understood that Table 2 of the specification describes a pimavanserin granulation with intragranular excipients. Tr. 471:14-24 (Dr. Little explaining: "So we've got pimavanserin granulation, and this is the composition of the pimavanserin granulation. So what you see in the left-hand column is the ingredients of the pimavanserin granulation, and then you see a column that says 'quantity, percent weight by weight, and you see a column that says quantity mg/dose.'").

153.    The '721 patent specification discloses a bulk density range of pimavanserin granulation between 0.4 to 0.6 g/ml and one embodiment within that range of 0.508 g/ml. JTX-09 at 22:9-14 ("The bulk density of pimavanserin granulation is >0.4 g/ml, such as 0.4-0.6 g/ml, such as about 0.5 g/ml, determined according to USP <616>, method 1. In some embodiments the bulk density of the pimavanserin granulation is >0.4 g/ml, such as about 0.5 g/ml, such as 0.51 g/ml, such as 0.508 g/ml."); Tr. 582:17–583:2 (Dr. Little stating that

"[t]here's an example plan of 0.508" in response to the question of whether .508 g/ml was "the only actual example" of a bulk density between 0.4 g/ml and 0.6 g/ml).

154.    The specification of the '721 patent does not teach a POSA how to make granules of pimavanserin having a bulk density greater than 0.6 g/ml. Tr. 581:11–582:16 (Dr. Little explaining that the '721 patent does not "teach[] how to select excipients to use to make pimavanserin granules with a bulk density in the range of 0.6 to 0.8 g/ml" and that "once you go above 0.8, you know, there's no disclosures in [the '721 patent] of that because a person of ordinary skill in the art is not thinking whether a difficult material like this is going up above for what you would expect for even an average material").

155.    A POSA would not have applied the "typical" bulk densities from Figure 1 of the '721 patent to the claimed bulk density for pimavanserin granules. JTX-09 at Figure 1 (listing the "conventional fill weight" for "typical powder density"); Tr. 400:11–401:13 (Dr. Muzzio confirming that the "conventional fill weight" in Figure 1 is "not specific to pimavanserin").

156.    A POSA would have understood that generally the upper limit of bulk density for "standard" materials is 0.7 g/ml. Tr. at 480:15-20 (Dr. Little testifying: "And you have sort of your standard materials that you're used to working with. And I would actually agree with him on this, that for a standard material you could see [a bulk density of] 0.4, 0.5, 0.6 and 0.7."); Tr. 583:10-13 (Dr. Little testifying: "So you've got your conventional materials that you would use, and I agree with Dr. Muzzio on that, those are the ranges you'd see up to like 0.7, you know?"); Tr. 583:14-16 (Dr. Little agreeing that for "a common material, the upper limit would be 0.7"); Tr. 582:1-6 (Dr. Little testifying that

"[f]or any material, there's going to be an upper limit . . . . I don't mean to be silly about this, but this claim doesn't talk about black holes").

157.  A POSA would have understood, including on the basis of the teachings of the '721 patent, that pimavanserin is a "bad behaving material."  JTX-09 at 1:54-58 ("Pimavanserin manufactured following conventional techniques has low bulk density and poor flowability and a tendency to clump, which will adversely impact reproducibility and quantitative accurate filling of capsules during the manufacturing process."); Tr. 583:3-8 (Dr. Little explaining that pimavanserin "has bad behavior"); Tr. 583:22 (Dr. Little explaining: "In this case, you have bad behaving materials."); *see* FoF ¶ 122.

158.  A POSA would have understood that granules of pimavanserin, as "bad-behaving," will have a bulk density upper limit that is lower than the bulk density upper limit for standard materials, and that this lower bulk density limit for granules of pimavanserin would be 0.6 g/ml.  Tr. 533:16-18 (Dr. Little explaining that a "bad-behaving material" will have a "low[er] bulk density"); Tr. 583:3-8 (Dr. Little agreeing that a POSA would know that granules of pimavanserin cannot have a bulk density above "0.6 because" "pimavanserin is . . . a 'bad material'"); Tr. 583:22-23 (Dr. Little explaining: "In this case, you have bad behaving materials. You're not thinking of the top of the [normal] range [that goes up to 0.7].").

159.  A POSA would have understood that the bulk density of the granules of pimavanserin are limited to the range of 0.4 g/ml to 0.6 g/ml.  FoF ¶¶ 153-58.

## II.    LEGAL STANDARD

Rule 52(a)(1) of the Federal Rules of Civil Procedure provides: "In an action tried on the facts without a jury or with an advisory jury, the court must find the facts specially and state its

52

conclusions of law separately." Fed. R. Civ. P. 52(a)(1). "The classical statement of the burden of proof in an ordinary civil case such as this is that the facts must be proved by a 'preponderance of the evidence.'" *Burch v. Reading Co.*, 240 F.2d 574, 578 (3d Cir. 1957); *see E.M.D. Sales, Inc. v. Carrera*, 604 U.S. 45, 50 (2025) (confirming that "the preponderance-of-the-evidence standard has remained the default standard of proof in American civil litigation"). It is within the province of the district court as the finder of fact to "make subjective credibility determinations about the witnesses who testified." *Bayer AG v. Housey Pharms., Inc.*, 386 F. Supp. 2d 578, 580 (D. Del. 2005), *aff'd*, 189 F. App'x 969 (Fed. Cir. 2006).

## III.    DISCUSSION: INFRINGEMENT AND INVALIDITY

This Discussion has four Sections: (A) Acadia Demonstrates Infringement by a Preponderance of the Evidence, (B) Defendants Fail to Demonstrate Obviousness by Clear and Convincing Evidence, (C) Defendants Fail to Demonstrate Indefiniteness by Clear and Convincing Evidence, and (D) Defendants Fail to Demonstrate a Lack of Written Description by Clear and Convincing Evidence; Defendants Fail to Demonstrate a Lack of Enablement by Clear and Convincing Evidence.

## A.    Acadia Demonstrates Infringement by a Preponderance of the Evidence

"A patent owner has the burden of proving infringement by a preponderance of the evidence." *H. Lundbeck A/S v. Lupin Ltd. ("Lundbeck")*, No. 18-88-LPS, 2021 U.S. Dist. LEXIS 204535, at *234-35 (D. Del. Sep. 30, 2021) (citing *SmithKline Diagnostics, Inc. v. Helena Lab. Corp.*, 859 F.2d 878, 889 (Fed. Cir. 1988)). A patent is infringed when a person "without authority makes, uses, offers to sell, or sells any patented invention, within the United States . . . during the term of the patent." 35 U.S.C. § 271(a). Literal infringement, which is the only type of infringement asserted here, generally "occurs when each element of at least one claim of the patent

53

is found in the alleged infringer's product." *Alza Corp. v. Andrx Pharms., LLC*, 607 F. Supp. 2d 614, 623 (citing *Panduit Corp. v. Dennison Mfg. Co., Inc.*, 836 F.2d 1329, 1330 (Fed. Cir. 1987)).

Courts employ a two-step analysis in making a literal infringement determination. *Lundbeck*, 2021 U.S. Dist. LEXIS 204535, at *235 (citing *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 976 (Fed. Cir. 1995)). "First, a court must construe the asserted claims." *Id.* "Next, the trier of fact must compare the properly-construed claims to the accused infringing product." *Id.* "If an accused product does not infringe an independent claim, it also does not infringe any claim depending from that independent claim." *Id.* (citing *Wahpeton Canvas Co. v. Frontier, Inc.*, 870 F.2d 1546, 1553 (Fed. Cir. 1989)). "However, one may infringe an independent claim and not infringe a claim dependent on that claim." *Id.* (cleaned up).

In cases arising under 35 U.S.C. § 271(e)(2)(A) (like the present case), the infringement inquiry concerns "whether, if a particular drug *were* put on the market, it *would* infringe the relevant patent." *Acorda Therapeutics, Inc. v. Mylan Pharms., Inc.*, 817 F.3d 755, 760 (Fed. Cir. 2016) (emphases added); *accord Warner-Lambert Co. v. Apotex Corp.*, 316 F.3d 1348, 1365 (Fed. Cir. 2003) ("Once jurisdiction is established, however, the substantive determination whether actual infringement or inducement will take place is determined by traditional patent infringement analysis, just the same as it is in other infringement suits, including those in a non-ANDA context, the only difference being that the inquiries now are hypothetical because the allegedly infringing product has not yet been marketed.").

"If the ANDA defines a proposed generic drug in a manner that directly addresses the issue of infringement, [the ANDA] controls the infringement inquiry." *Par Pharm., Inc. v. Eagle Pharms., Inc.*, 44 F.4th 1379, 1383 (Fed. Cir. 2022) (cleaned up). In such instances, that a generic manufacturer "tells the court that its manufacturing guidelines will keep [its product] outside the

54

scope of the claims or has even filed a declaration in the court stating that [its product] will stay outside the scope of the claims [cannot] overcome the basic fact that it has asked the FDA to approve, and hopes to receive from the FDA, approval to market a product within the scope of the issued claims." *Sunovion Pharms., Inc. v. Teva Pharms. USA, Inc.*, 731 F.3d 1271, 1278 (Fed. Cir. 2013). However, if "the ANDA specification does not speak clearly and directly to the question of infringement, courts may look to other relevant evidence, such as data or samples the ANDA filer has submitted to the FDA, to assess whether a proposed product will infringe." *Par Pharm.*, 44 F.4th 1379, 1384 (citations omitted).

In this action, Acadia alleges that Aurobindo infringes claims 4 and 5 of the '721 patent, the former of which recites (alterations added):

> 4. A pharmaceutically acceptable capsule for orally delivering 34 mg of pimavanserin to a patient, wherein [1] the capsule has a capsule shell with a capsule shell size 3 or 4, [2] that encapsulates a blended pimavanserin composition comprising: granules comprising 40 mg pimavanserin tartrate and one or more pharmaceutically acceptable excipients; and [3] wherein the bulk density of the granules is >0.4 g/ml as determined by USP, method 1.

The Court construed claim 4 of the '721 patent such that "an extra-granular component is not required" and that "the scope of the term granule includes granules granulated with pimavanserin and excipients." FoF ¶¶ 32-34.

After comparing the properly-construed claims to the Court's Findings of Fact regarding the accused infringing product (*see Lundbeck*, 2021 U.S. Dist. LEXIS 204535, at *235), the Court holds that Acadia demonstrates by a preponderance of the evidence that Aurobindo's Product practices every limitation of claim 4 of the '721 patent. The following Findings of Fact show that each claim limitation is met:

> A pharmaceutically acceptable capsule for orally delivering 34 mg of pimavanserin to a patient, wherein the capsule has a capsule shell with a capsule shell size 3 or 4 [FoF ¶ 35], that encapsulates a blended pimavanserin composition comprising:

55

granules comprising 40 mg pimavanserin tartrate and one or more pharmaceutically acceptable excipients [FoF ¶¶ 68-71]; and wherein the bulk density of the granules is >0.4 g/ml as determined by USP, method 1 [FoF ¶¶ 78].

The only limitation from claim 4 of the '721 patent that Aurobindo disputes is the presence of granules. However, similar to the ANDA from the generic manufacturer in *Sunvion*, Aurobindo's "ANDA specification clearly describes a product that" includes granules. *See Sunovion Pharms., Inc.*, 731 F.3d 1271, 1280; FoF ¶¶ 57-58.[6] Any argument from Aurobindo that the disclosures of granules in its ANDA were inadvertent (*see* D.I. 131 at 10) or that Aurobindo's actual product does not infringe (*see* D.I. 131) "cannot override" that Aurobindo sought "FDA approval to market a generic compound within the scope of" the '721 patent and, thus, infringed the '721 patent. *See Sunovion Pharms., Inc.*, 731 F.3d 1271, 1280; *see also id.* ("Simply saying 'But I won't do it' is not enough to avoid infringement."). If the disclosures of granules in Aurobindo's specification were inadvertent, Aurobindo could have taken steps to amend its ANDA. However, Aurobindo neglected to do so (FoF ¶ 57(e)(ii)-(iii)), notwithstanding that Mr. Kannusamy acknowledged that "[i]f Aurobindo believed that something was incorrect in its ANDA, it would take steps to correct it with the FDA" (FoF ¶ 57(c)(i)). Furthermore, several other Findings of Fact also supported (and in fact independently served as a basis for) the conclusion that Aurobindo's Product contains granules, including Dr. Smith's stereomicroscopy and polarized light microscopy examinations of Aurobindo's Product sample. *See* FoF ¶¶ 59-67.

---

[6] The Court acknowledges that not every section of Aurobindo's specification references granules and, indeed, the lack of uniform reference to granules support Aurobindo's argument that the specification does not "clearly describe[]" a product that contains granules. *See* D.I. 132 ¶ 22. The Court also acknowledges Aurobindo's argument that its ANDA does not expressly state that its "finished" product has granules. *See* D.I. 131 at 9. Ultimately, however, the Court found these arguments unconvincing in light of the repeated references to granules in Aurobindo's documents.

Separately, the Court holds that the preamble to claim 4 of the '721 patent is not a limitation. "What is required to meet the written description requirement 'varies with the nature and scope of the invention at issue, and with the scientific and technologic knowledge already in existence.'" *Juno Therapeutics, Inc. v. Kite Pharma, Inc.*, 10 F.4th 1330, 1335 (Fed. Cir. 2021) (quoting *Capon v. Eshhar*, 418 F.3d 1349, 1357 (Fed. Cir. 2005)). "Whether to treat a preamble as a limitation is a determination resolved only on review of the entire patent to gain an understanding of what the inventors actually invented and intended to encompass by the claim." *In re Xencor, Inc.*, 130 F.4th 1350, 1356-57 (Fed. Cir. 2025) (cleaned up). "The mere fact that a structural term in the preamble is part of the claim does not mean that the preamble's statement of purpose or other description is also part of the claim." *Id.* at 1357 (cleaned up). "That is, where a patentee defines a structurally complete invention in the claim body and uses the preamble only to state a purpose or intended use for the invention, the preamble is not a claim limitation." *Id.* (cleaned up). However, courts do read the preamble as limiting "if the claim preamble, when read in the context of the entire claim, recites limitations of the claim, or, if the claim preamble is necessary to give life, meaning, and vitality to the claim." *Id.* (cleaned up).

Here, Acadia "defines a structurally complete invention in the claim body" of claim 4 "and uses the preamble only to state a purpose or intended use for the invention" and, thus, the preamble is not a claim limitation." *See id.* Even were the Court to determine that the preamble is a limitation, however, the Court would have still found that Aurobindo infringed. *Compare* claim 4 of the '721 patent, preamble ("A pharmaceutically acceptable capsule for orally delivering 34 mg of pimavanserin to a patient"), *with* FoF ¶¶ 35, 68-71.

In addition to claim 4, the Court, after comparing the properly-construed claims to the accused infringing product (*see Lundbeck*, 2021 U.S. Dist. LEXIS 204535, at *235), holds that

Acadia demonstrates by a preponderance of the evidence that Aurobindo's Product practices every limitation of claim 5 of the '721 patent. *Compare* claim 5 of the '721 patent (reciting: "The pharmaceutically acceptable capsule of claim 4, wherein the capsule shell is a hard shell size 4 capsule."); *with* FoF ¶ 35 ("The dosage form of Aurobindo's Product is an orally-administered hard shell size 4 capsule.").

The Court does not adopt several of Aurobindo's proposed findings of fact, which generally contest that Aurobindo's Product contains granules, or, to the extent that Court does adopt some of Aurobindo's proposed findings of fact, the Court nonetheless maintains that Acadia demonstrates infringement by a preponderance of the evidence. Aurobindo's proposed findings of fact (and corresponding legal arguments) broadly fit into two categories, including Aurobindo's manufacturing process and Dr. Smith's examinations, categories of which the Court will address in turn.

Regarding the former category, Aurobindo proposes that its manufacturing process could not have produced granules. In particular, Aurobindo proposes that no "granulation step is involved in Aurobindo's dry blending process." D.I. 132 ¶ 14. Aurobindo also proposes that a "POSA would understand that a dry blend process is distinct from the various processes that result in the formation of granules." D.I. 132 ¶ 15. Accordingly, Aurobindo proposes that "Aurobindo's ANDA capsule contains pimavanserin tartrate in powder form, not in granules" and likewise that a "POSA would understand Aurobindo's ANDA to be describing a capsule formulation that did not contain granules." D.I. 132 ¶¶ 14, 15; *see* D.I. 131 at 8-9. Having weighed the evidence, having assessed the credibility of the expert witnesses, and having reviewed the entire trial record, however, the Court found that Aurobindo's Product contains granules. The Court also found that

58

Aurobindo's dry blending process could have produced granules and that Aurobindo's dry blending process did in fact produce granules. FoF ¶ 71.[7]

Regarding the latter category, Aurobindo proposes several facts challenging the propriety of Dr. Smith's examinations of Aurobindo's Product.[8] Aurobindo proposes, for example, that there "is no record of any observation (microscopic or otherwise), data or pictures from the material collected by the smallest sieve, the material that passed through all of the sieves, or was lost and unaccounted for" and that "the total amount of material with no record of any observation of any kind was 39.42% of the total capsule." D.I. 132 ¶ 30; *see* D.I. 132 ¶ 35 (similar); D.I. 131 at 14. Aurobindo somewhat similarly proposes that, even "if some of the agglomerates depicted in Dr. Smith's experiments were granules, the quantity of pimavanserin in those granules would fall far short of the quantity required to be proven in order to meet the claim limitation of 40 mg of pimavanserin tartrate in granular form." D.I. 132 ¶ 34; D.I. 131 at 14. For these reasons, Aurobindo contends that Acadia cannot demonstrate infringement by a preponderance of the evidence. D.I. 131 at 14-15.

However, as found above:

- "Dr. Smith observed material from the smallest sieve and her observation of the material from the smallest sieve was consistent with her other observations." FoF ¶ 59(r).

---

[7] Aurobindo similarly proposes that Dr. Smith agrees that Aurobindo's dry blend process "*requires high pressure to create granule.*" D.I. 132 ¶ 18 (emphasis added). However, Dr. Smith did not so agree. Rather, while Dr. Smith acknowledged that "when people think about dry granulation process, what's most commonly talked about are the ones with some high pressure involved." FoF ¶ 53. Dr. Smith also testified that dry mixing and sifting "could" be a type of manufacturing that produces granules. FoF ¶ 53. Aurobindo similarly proposes that microcrystalline cellulose does not act as a binder in Aurobindo's Product. D.I. 132 ¶ 19. However, as found above, Aurobindo's manufacturing process produced granules (FoF ¶ 71).

[8] Aurobindo also contends that Dr. Smith's examinations fail to show granules at all. D.I. 131 at 11. The Court, however, found otherwise.

- "Dr. Smith observed material from the collection pan and her observation of the material from the collection pan was consistent with her other observations." FoF ¶ 59(s).

- "There is no practical way to test every single solid in Aurobindo's capsule to confirm that it is in a granule." FoF ¶ 59(t).

These Findings of Fact, in concert with various other Findings of Fact, in totality, show that Aurobindo infringes the '721 patent by a preponderance of the evidence (and in particular, the presence of granules), notwithstanding that Dr. Smith did not image every granule in Aurobindo's Product sample. FoF ¶¶ 36-71.

Aurobindo also flags Dr. Smith's admission that humidity was not controlled in her experiments. D.I. 132 ¶ 31; *see* FoF ¶ 65. However, as found above, "Dr. Moreton did not perform any studies to determine whether humidity impacted the results of Dr. Smith's testing and could not 'definitely' attest that humidity changed Dr. Smith's results." FoF ¶ 67. Considering the totality of the evidence, the Court maintains that Aurobindo infringes the '721 patent. *See Galderma Labs., L.P. v. Sun Pharm. Indus.*, 411 F. Supp. 3d 271, 312 (D. Del. 2019) (recognizing that the preponderance of the evidence standard "does not require proof to a level of scientific certainty" (cleaned up)).

In sum, the Court weighed the evidence from the parties and the credibility of the parties' experts and concludes that Acadia demonstrates that Aurobindo infringes claims 4 and 5 of the '721 patent by a preponderance of the evidence.

**B.    Defendants Fail to Demonstrate Obviousness by Clear and Convincing Evidence**

Under the Patent Act, an invention cannot be patented "if the differences between the claimed invention and the prior art are such that the claimed invention as a whole would have been obvious before the effective filing date of the claimed invention to a person having ordinary skill

in the art to which the claimed invention pertains." 35 U.S.C. § 103. "Patents are presumed to be valid." *P&G v. Teva Pharms. USA, Inc.*, 566 F.3d 989, 994 (Fed. Cir. 2009). Thus, any "party seeking to invalidate a patent based on obviousness must demonstrate by clear and convincing evidence that a skilled artisan would have been motivated to combine the teachings of the prior art references to achieve the claimed invention, and that the skilled artisan would have had a reasonable expectation of success in doing so." *Eli Lilly & Co. v. Teva Pharms. Int'l GmbH*, 8 F.4th 1331, 1344 (Fed. Cir. 2021). "Clear and convincing evidence places in the fact finder 'an abiding conviction that the truth of [the] factual contentions are highly probable.'" *P&G*, 566 F.3d 989, 994 (quoting *Colorado v. New Mexico*, 467 U.S. 310, 316 (1984)). "The obviousness determination turns on underlying factual inquiries involving: (1) the scope and content of prior art, (2) differences between claims and prior art, (3) the level of ordinary skill in pertinent art, and (4) secondary considerations such as commercial success and satisfaction of a long-felt need." *Id.* (citing *Graham v. John Deere Co.*, 383 U.S. 1 (1966)). The "motivation to combine references[] serves to prevent hindsight bias." *Medichem, S.A. v. Rolabo, S.L.*, 437 F.3d 1157, 1164-65 (Fed. Cir. 2006).

As stated above, claims 4 and 5 of the '721 patent recite:

> 4. A pharmaceutically acceptable capsule for orally delivering 34 mg of pimavanserin to a patient, wherein the capsule has a capsule shell with a capsule shell size 3 or 4, that encapsulates a blended pimavanserin composition comprising: granules comprising 40 mg pimavanserin tartrate and one or more pharmaceutically acceptable excipients; and wherein the bulk density of the granules is >0.4 g/ml as determined by USP, method 1.

> 5. The pharmaceutically acceptable capsule of claim 4, wherein the capsule shell is a hard shell size 4 capsule.

FoF ¶ 27.

61

The Court divides its obviousness discussion into the following Sections: (1) Plaintiff is Wrong as a Matter of Law That Only the Combination of Prior Art May Render an Invention Obvious; Modification of the Prior Art May Also Render an Invention Obvious; (2) Defendants Fail to Demonstrate by Clear and Convincing Evidence That a POSA Would Have Been Motivated to Formulate a Capsule Dosage of Pimavanserin, and (3) Defendants Fail to Demonstrate by Clear and Convincing Evidence That a POSA Would Have Been Motivated to Achieve the Bulk Density of the Claimed Invention With a Reasonable Expectation of Success in Doing So.[9]

### 1. Plaintiff is Wrong as a Matter of Law that Only the Combination of Prior Art May Render an Invention Obvious; Modification of the Prior Art May Also Render an Invention Obvious

Plaintiff suggests that only the *combination* of prior art references can render an invention obvious. D.I. 134 at 1-2 ("Defendants' stated theory is that a 'POSA would have been motivated to modify Nuplazid Tablets to achieve the Asserted Claims with a reasonable expectation of success.' The Court 'first must determine whether [Defendants] carried [their] burden to prove that all claimed limitations are disclosed in the prior art' before even 'consider[ing] motivation to combine and reasonable expectation of success.' . . . None of Defendants' references disclose [the claim limitations]. . . . As the required elements are missing, Defendants failed to meet their burden on this threshold inquiry.").

Plaintiff is, however, incorrect since the *modification* of prior art references may also render an invention obvious. *See In re Gorris*, 847 F. App'x 889, 891 (Fed. Cir. 2021) ("Obviousness is a question of law based on underlying factual findings. Such factual findings include determinations as to: (1) the scope and content of the prior art; and (2) whether a person of ordinary skill in the art would have been motivated to combine or *modify* prior art

---

[9] In light of the holdings herein, the Court does not address every argument raised by the parties.

references with a reasonable expectation of success." (emphasis added) (citation omitted)); *Unification Techs. LLC v. Micron Tech. Inc.*, No. 2023-1348, 2024 U.S. App. LEXIS 20014, at *14 (Fed. Cir. Aug. 9, 2024) ("And 'in appropriate circumstances, a patent can be obvious in light of a single prior art reference if it would have been obvious to *modify* that reference to arrive at the patented invention.'" (emphasis added) (quoting *Arendi S.A.R.L. v. Apple Inc.*, 832 F.3d 1355, 1361 (Fed. Cir. 2016)); Matthews, *Annotated Patent Digest* § 18:43.50 ("It can be error to assume that to show obviousness based on a combination of prior art references, the combination must actually disclose each and every claim limitation. The proper focus of the analysis looks to see if the combination of the prior art provides enough information such that a person applying routine skill would find the claimed invention obvious from the prior art, rather than whether each limitation is literally disclosed somewhere in the prior art."). Therefore, the Court rejects, as a matter of law, Plaintiff's contention that the invention was not obvious because the prior art did not include all of the claim limitations.

2. **Defendants Fail to Demonstrate by Clear and Convincing Evidence that a POSA Would Have Been Motivated to Formulate a Capsule Dosage of Pimavanserin**

Defendants contend that claims 4 and 5 of the '721 patent are obvious, including because a "POSA would have been motivated to use a . . . capsule" as the formulated dosage form of pimavanserin. D.I. 126 at 4. However, as the Court found above on the basis of the trial record, a "POSA would not have been motivated to formulate a capsule dosage of pimavanserin." FoF ¶ 116. The following predicate findings support the finding:

- "The tablet, the most frequently prescribed commercial dosage form, is stable, elegant and effective and provides the patient with a convenient product for handling, identification and administration." FoF ¶ 113 (cleaned up).

- "Tablet dosages of pimavanserin already existed." FoF ¶ 114.

- "Dr. Muzzio was not aware of any complaints from doctors or patients or any other healthcare professional or anyone regarding the two 17 mg tablets for pimavanserin." FoF ¶ 112 (cleaned up).

- "A POSA would not have been motivated to formulate a capsule dosage of pimavanserin over a tablet dosage of pimavanserin on the basis of pill burden." FoF ¶ 82.

- "A POSA would not have been motivated to formulate a capsule dosage of pimavanserin over a tablet dosage of pimavanserin on the basis of swallowability." FoF ¶ 99.

- "A POSA would not have been motivated to formulate a capsule dosage of pimavanserin over a tablet dosage of pimavanserin on the basis of taste." FoF ¶ 106.

- "A POSA would not have been motivated to formulate a capsule dosage of pimavanserin over a tablet dosage of pimavanserin on the basis of color coating." FoF ¶ 111.

- "A POSA would not have been motivated to formulate a capsule dosage of pimavanserin over a tablet dosage of pimavanserin on the basis of . . . commonality of dosage forms, effort by the caregiver, protection from moisture, dispersion in the mouth, and costs associated with formulation." FoF ¶ 116.

Since Defendants fail to demonstrate the motivation of a POSA to formulate a capsule dosage of pimavanserin by clear and convincing evidence, Defendants fail to meet their burden of demonstrating obviousness. *Eli Lilly & Co.*, 8 F.4th 1331, 1344 ("[A]ny party seeking to invalidate a patent based on obviousness must demonstrate by clear and convincing evidence that a skilled artisan would have been motivated to combine the teachings of the prior art references to achieve the claimed invention, and that the skilled artisan would have had a reasonable expectation of success in doing so.").

The Court does not adopt several of Defendants' proposed findings of fact, or, to the extent that Court does adopt some of Defendants' proposed findings of fact, the Court nonetheless maintains that Defendants fail to demonstrate, by clear and convincing evidence, that a POSA would have been motivated to pursue a capsule formulation of pimavanserin. For example, the Court does not adopt Defendants' proposed fact that a POSA "would have been motivated to modify Nuplazid Tablets to decrease the two-tablet-per-day regimen to a single pill that was easy to swallow." D.I. 126-1 ¶ 18; *see* D.I. 126 at 4. While the Court found that in general "a POSA could be motivated to minimize the number of tablets or capsules administered to patients to decrease the pill burden" (FoF ¶ 79), the Court found that here a "POSA would not have been motivated to formulate a capsule dosage of pimavanserin over a tablet dosage of pimavanserin on the basis of pill burden" (FoF ¶ 82 ).

Defendants also raise various legal contentions that are without merit. For example, Defendants contend that Dr. Little's recital of various alternatives to a capsule formulation improperly "abstract[s] back out to the larger problem . . . and ask[s] how many ways that could be done . . . completely disconnected from where the prior art would have already led a person of ordinary skill in the art." D.I. 126 at 7-8 (quoting *Purdue Pharma L.P. v. Accord Healthcare, Inc.*, No. 2023-1953, 2024 WL 5244764, at *6 (Fed. Cir. Dec. 30, 2024)). Defendants are wrong. Dr. Little's discussion of various alternatives to a capsule formulation was not abstract and not disconnected from the prior art. For example, "Dr. Little opined on the swallowability benefits of 'dispersible and effervescent tablets' in the context of the Liu reference (i.e., in the context of prior art)." FoF ¶ 94.

Defendants correctly observe that the prior art does "not need to hold itself out as flawed for a POSA to alter it." D.I. 126 at 8 (quoting *Janssen Pharms., Inc. v. Teva Pharms. USA, Inc.*,

97 F.4th 915, 929 (Fed. Cir. 2024)).   Defendants could have, for example, demonstrated obviousness by "demonstrating a different motivation based on publicly available information." *Janssen Pharms., Inc.*, 97 F.4th 915, 929.   However, Defendants fail to demonstrate obviousness based on publicly available information.

For the foregoing reasons, Defendants fail to demonstrate by clear and convincing evidence that a POSA would have been motivated to formulate a capsule dosage of pimavanserin.

**3.      Defendants Fail to Demonstrate by Clear and Convincing Evidence that a POSA Would Have Been Motivated to Achieve the Bulk Density of the Claimed Invention With a Reasonable Expectation of Success in Doing So**

With respect to bulk density (one of the limitations of claim 4 of the '721 patent), Defendants contend:

> Based on Ragnar-Tolf, a POSA would have known that, in order to fit the full 40 mg daily dose of pimavanserin tartrate in a size 4 capsule, he or she would have to slightly increase the pimavanserin tartrate concentration (by about 12%),[10] and this easily could be done by decreasing the concentration of the inactive mannitol diluent by the same amount. Based on the consistent 0.6 g/ml bulk densities shown for the pimavanserin granules in Ragnar-Tolf, a POSA would have expected the bulk density of the 40 mg strength to remain roughly the same 0.6 g/ml when the concentration of the drug was increased. Thus, a POSA would have reasonably expected that 40 mg of pimavanserin tartrate granules could fit within a size 4 capsule, and would have been able to achieve the result within one or two routine experiments.

D.I. 126 at 5-6 (citations omitted).

However, the patent examiner for the '721 patent already examined Ragnar-Tolf and explained that Ragnar-Tolf, the "closet prior art" to the Asserted Claims, does not render the Asserted Claims obvious because "the density of the granulation" in Ragnar-Tolf "would not allow for the same amount of the drug to be present in the capsule" in the Asserted Claims. FoF ¶ 131.

---

[10] Defendants explain in a footnote that the "concentration would increase from 20 percent (for the 20 mg dose disclosed in Ragnar-Tolf) to about 32.4 percent (for a 40 mg dose)" (D.I. 126 at 5 n.1 (citation omitted)) which is more accurately characterized as an increase of more than 60%.

66

To overcome the patent examiner's conclusion, Defendants bear a "particularly heavy" burden. *Impax Labs., Inc. v. Aventis Pharms., Inc.*, 545 F.3d 1312, 1314 (Fed. Cir. 2008); *see Shire LLC v. Amneal Pharms., LLC*, 802 F.3d 1301, 1307 (Fed. Cir. 2015). Defendants fail to meet this burden.

As found above, a "POSA would have not been motivated to formulate the recited capsule dosage of pimavanserin with the claimed bulk density with a reasonable expectation of success in doing so." FoF ¶ 130. The following Findings of Fact evince the foregoing:

- "A POSA seeking to develop a new dosage form of pimavanserin would have looked to the Ragnar-Tolf reference." FoF ¶ 117.

- A "POSA would have understood that pimavanserin is a 'bad-behaving' material — in that pimavanserin has a low bulk density and tends to clump up — and requires a lot of excipients to allay its bad behavior." FoF ¶ 122.

- "A POSA would have understood that Pimavanserin is hygroscopic, meaning that pimavanserin tends to absorb moisture and, thus, that formulating dosages of pimavanserin could be difficult." FoF ¶ 123.

- The "Ragnar-Tolf reference discloses examples of pimavanserin tablets that were formulated, including in 1 mg, 5 mg, and 20 mg dosages, that ranged in bulk-density between 0.56 g/ml and 0.61 g/ml." FoF ¶ 127.

- "A POSA would have understood, including on the basis of the Ragnar-Tolf reference, that, in order to fit 40 mg of pimavanserin tartrate in a size 4 capsule, he or she would have had to increase the pimavanserin tartrate concentration in the 20 mg formulation identified in Finding of Fact ¶ 127 from approximately 20% to 32.4% (i.e., by over 60%) and such

67

an increase could potentially be accomplished by also decreasing the concentration of mannitol." FoF ¶ 128.

- If possible, "a POSA would have understood that increasing the concentration of pimavanserin tartrate, and likewise decreasing the inactive mannitol diluent, in the blended pimavanserin in the manner described in Finding of Fact ¶ 128 could have increased or decreased the bulk density of the granules." FoF ¶ 129.

In particular, the increase of concentration of pimavanserin by more than 60%, while maintaining the appropriate bulk density, militates against a POSA's reasonable expectation of success here, notwithstanding that the Ragnar-Tolf reference discloses consistent bulk densities for pimavanserin in 1 mg, 5 mg, and 20 mg dosages. *See Allergan, Inc. v. Sandoz Inc.*, 796 F.3d 1293, 1305 (Fed. Cir. 2015) ("Here in this case, the prior art ranges are broader than the range in *Galderma*, and the record shows that the claimed amounts of the two different ingredients could and did materially and unpredictably alter the property of the claimed formulation. Thus, *Galderma* does not compel a conclusion of obviousness in this case."); *see also Alza Corp. v. Andrx Pharms.*, LLC, 607 F. Supp. 2d 614, 656 (D. Del. 2009) (acknowledging "expert witness testimony" that indicated "a significant level of unpredictability in the field of pharmaceutical product design").

In addition, "[t]he long delay between [the Ragnar-Tolf reference] and [the one capsule formulation] . . . supports the inference that it was difficult for researchers to create [the capsule formulation] product." *See Eurand, Inc. v. Mylan Pharms., Inc.*, 676 F.3d 1063, 1083 (Fed. Cir. 2012); FoF ¶ 118 ("The Ragnar-Tolf reference was published on November 15, 2007, almost ten years before the earliest effective filing date of the '721 patent."). Assuming that "a desire existed

68

for such a product, researchers, presumably, would have created one if they were able to do so." *See Eurand*, 676 F.3d 1063, 1083.

Since Defendants fail to demonstrate by clear and convincing evidence that a POSA would have been motivated to achieve the bulk density in the claimed invention with a reasonable expectation of success in doing so, Defendants fail to meet their burden of demonstrating obviousness. *Eli Lilly & Co.*, 8 F.4th 1331, 1344.[11]

## C.    Defendants Fail to Demonstrate Indefiniteness by Clear and Convincing Evidence

Section 112 of the Patent Act requires that the claims of a patent "particularly point[] out and distinctly claim[] the subject matter which the inventor . . . regards as the invention." 35 U.S.C. § 112(b). The "primary purpose of the definiteness requirement" that § 112(b) contains "is to ensure that the claims are written in such a way that they give notice to the public of the extent of the legal protection afforded by the patent, so that interested members of the public, e.g., competitors of the patent owner, can determine whether or not they infringe." *All Dental Prodx, LLC v. Advantage Dental Prods., Inc.*, 309 F.3d 774, 779-80 (Fed. Cir. 2002) (citation omitted).

"[A] patent is invalid for indefiniteness if its claims, read in light of the specification delineating the patent, and the prosecution history, fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention." *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 901 (2014). While a "potential infringer" need not "be able to determine *ex ante* if a particular act infringes the claims," the patentee must "apprise the public 'of what is still open to them[]'" such that "a person of ordinary skill in the art could determine whether or not an accused

---

[11] The Court does not adopt several of Defendants' proposed findings of fact, or, to the extent that Court does adopt some of Defendants' proposed findings of fact, the Court nonetheless concludes that Defendants fail to demonstrate, by clear and convincing evidence, that a POSA would have been motivated to pursue a capsule formulation of pimavanserin with the claimed bulk density with a reasonable likelihood of success.

69

product or method infringes the claim." *Niazi Licensing Corp. v. St. Jude Med. S.C., Inc.*, 30 F.4th 1339, 1346-47 (Fed. Cir. 2022) (citations omitted).

Like claim construction, definiteness is a question of law, but the Court must sometimes render factual findings based on extrinsic evidence to resolve the ultimate issue of definiteness. *See Sonix Tech. Co. v. Publications Int'l, Ltd.*, 844 F.3d 1370, 1376 (Fed. Cir. 2017). "Patent claims are presumed to be valid and definite." *B.E. Tech., LLC v. Twitter Inc.*, No. CV 20-621-GBW, 2024 WL 579076, at *1 (D. Del. Feb. 13, 2024) (citing 35 U.S.C. § 282). Thus, the challenger must prove indefiniteness by clear and convincing evidence. *See Nippon Shinyaku Co. v. Sarepta Therapeutics, Inc.*, No. CV 21-1015-GBW, 2023 WL 4314485, at *6 (D. Del. July 3, 2023).

Here, Defendants contend that the term "pharmaceutically acceptable capsule" from the preamble of claim 4 of the '721 patent is indefinite because the specification does not provide a POSA with reasonable certainty regarding what goes into making a capsule "pharmaceutically acceptable." D.I. 126 at 9; D.I. 126-1 ¶ 33. In particular, Defendants contend that the specification discloses "comparative examples"[12] of granulations that are "unacceptable" in light of various "subjective" standards, such as "stability." D.I. 126 at 10. Defendants contend further that, without "an objective anchor," a POSA would not be able to determine the meaning of these subjective standards and thus the meaning of "pharmaceutically acceptable capsule" from the preamble of claim 4. D.I. 126 at 10. Without being able to determine the meaning of "pharmaceutically acceptable capsule" from the preamble of claim 4, Defendants theorize that a POSA would not be able to determine "the scope of the claimed invention." D.I. 126 at 10.

---

[12] The specification of the '721 patent uses the term "comparative experiments" and not the term "comparative examples." JTX-09 at 13:33-34.

Defendants' theory, however, dissolves upon scrutiny. Critically, the term "pharmaceutically acceptable capsule" appears in the preamble and the Court already determined above that the preamble to claim 4 of the '721 patent is not a limitation. *See supra* § III(A). Since the preamble is not limiting, it cannot be indefinite. *See Sunoco Partners Mktg. & Terminals L.P. v. Powder Springs Logistics, LLC*, Civil Action No. 17-1390-LPS-CJB, 2019 U.S. Dist. LEXIS 146831, at *27 (D. Del. Aug. 28, 2019) ("In light of the Court's conclusion that these preamble terms are not limiting, no further construction (or consideration of Defendants' indefiniteness argument) is required." (collecting cases)).

Moreover, Defendants omit that the specification discloses that certain attributes of the products from the comparative experiments were unacceptable as a result of various *manufacturing processes*. *See* FoF ¶ 133 ("A POSA would have understood that the '721 patent specification discloses 'comparative experiments' of various manufacturing processes that resulted in products with 'unacceptable' characteristics'"). That the specification discloses unacceptable attributes of products that resulted from manufacturing *processes* does not render the *apparatus* claims here indefinite. *See 10Tales, Inc. v. Tiktok Inc.*, No. 21-cv-03868-VKD, 2023 U.S. Dist. LEXIS 141602, at *16 (N.D. Cal. Aug. 14, 2023) (holding that the apparatus claim was not indefinite where the specification described a process); *see also* (claim 4 of the '721 patent (reciting a capsule that encapsulates a blended pimavanserin composition)).[13] In addition, while a "patent claim is indefinite if it combines two different statutory classes of invention—such as combining a 'machine' with a 'process'" (*Smart Denture Conversions, LLC v. Straumann USA,*

---

[13] The Court notes that a "POSA would have understood that, '[c]ontrary to the disclosed comparative experiments,' the '721 patent also 'describes [acceptable] processes to manufacture capsules of size 4 comprising 5-34 mg pimavanserin.'" FoF ¶ 136.

71

*LLC*, 759 F. Supp. 3d 555, 555 (D. Del. 2024)), claims 4 and 5 of the '721 patent do not combine apparatus and process elements (*see* FoF ¶ 27).

As a contingency, Defendants assert that the Asserted Claims otherwise "read on the comparative [experiments] and are invalid for claiming that which the patentees did not regard as their invention." D.I. 126 at 11; D.I. 126-1 ¶ 34. However, this contingency theory also fails since, as discussed above, the specification of the '721 patent discloses that the unacceptable attributes of the invention arose from *processes*, not different formulations of the *apparatus* itself. *See 10Tales*, 2023 U.S. Dist. LEXIS 141602, at *16. At bottom, Defendants fail to demonstrate that claim 4, when "read in light of the specification delineating the" '721 patent (including the portion of the '721 patent discussing the comparative experiments) "and the prosecution history, fail[s] to inform, with reasonable certainty, those skilled in the art about the scope of the invention." *See Nautilus*, 572 U.S. 898, 901.

Defendants' reliance (*see* D.I. 126 at 9, 11) on *Allen Engineering Corp. v. Bartell Industries*, 299 F.3d 1336 (Fed. Cir. 2002) is misplaced. "[T]his case is unlike *Allen*, where the patentee agreed that the claim language did not match what he regarded as his invention, as the intrinsic record unambiguously showed." *Ancora Techs. v. Apple, Inc.*, 744 F.3d 732, 739 (Fed. Cir. 2014). "Here, [Acadia] embraces the claim language's clear, ordinary meaning, and . . . the specification and prosecution history [do not] establish that the applicants regarded their invention as something contrary." *Id.*[14]

---

[14] Aurobindo also cites *Juxtacomm-Texas Software, LLC v. Axway, Inc.*, No. 6:10CV011, 2012 WL 7637197, at *4 (E.D. Tex. July 5, 2012). D.I. 126 at 12. However, the Court need not follow this case. *Daubert v. NRA Grp., LLC*, 861 F.3d 382, 395 (3d Cir. 2017) ("A decision of a federal district court judge is not binding precedent in either a different judicial district, the same judicial district, or even upon the same [district] judge in a different case." (alteration in original) (quoting *Camreta v. Greene*, 563 U.S. 692 (2011)); *Wahl Clipper Corp. v. Conair Corp. & Conair*

For the foregoing reasons, the Court holds that Defendants have failed to demonstrate indefiniteness by clear and convincing evidence.[15]

**D.    Defendants Fail to Demonstrate a Lack of Written Description by Clear and Convincing Evidence; Defendants Fail to Demonstrate a Lack of Enablement by Clear and Convincing Evidence**

35 U.S.C. § 112(a) contains both the written description and enablement requirements under the Patent Act. In particular, § 112(a) provides that the "specification shall contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same, and shall set forth the best mode contemplated by the inventor or joint inventor of carrying out the invention." 35 U.S.C. § 112(a).

The "written description requirement is satisfied if the specification conveys with reasonable clarity to those skilled in the art that the inventor was in possession of the claimed invention." *Pharmacyclics LLC v. Alvogen, Inc.*, No. 2021-2270, 2022 U.S. App. LEXIS 31479, at *18 (Fed. Cir. Nov. 15, 2022) (citing *Biogen Int'l GmbH v. Mylan Pharms., Inc.*, 18 F.4th 1333, 1341-42 (Fed. Cir. 2021)). A patent claim "need not provide *in haec verba* support for the claimed subject matter at issue" to satisfy the written description requirement. *Lampi Corp. v. American Power Prods., Inc.*, 228 F.3d 1365, 1378 (Fed. Cir. 2000). To satisfy the separate requirement of enablement, "the specification must enable the full scope of the invention *as defined by its claims.*" *Amgen Inc. v. Sanofi*, 598 U.S. 594, 610 (2023) (emphasis added). Defendants bear the

---

*LLC*, No. 23-cv-00114-JCG-LDH, 2024 U.S. Dist. LEXIS 23526, at *2 (D. Del. Jan. 16, 2024) (confirming that out-of-circuit cases "are not binding on this Court").

[15] The Court notes that Defendants also invoked the comparative experiments during the *Markman* stage of the proceeding to promote a construction of claim 4 requiring that the excipients were extra-granular. FoF ¶ 138. Defendants' argument now, like Defendants' arguments then, lacks merit.

burden of demonstrating a lack of written description and enablement by clear and convincing evidence. *Invitrogen Corp. v. Clontech Labs., Inc.*, 429 F.3d 1052, 1072 (Fed. Cir. 2005).

Defendants challenge whether the specification of the '721 patent (1) describes the full scope of "pharmaceutically acceptable excipients" and (2) describes and enables pimavanserin granules having the full scope of bulk densities greater than 0.4 g/ml. D.I. 126 at 12-15. As discussed sequentially below, both of Defendants' challenges fail.

**1.    Defendants Fail to Demonstrate by Clear and Convincing Evidence that the '721 Patent Does Not Describe the Full Scope of "Pharmaceutically Acceptable Excipients"**

Defendants fail to demonstrate by clear and convincing evidence that the '721 patent does not describe the full scope of "pharmaceutically acceptable excipients." In other words, Defendants fail to demonstrate by clear and convincing evidence that the '721 patent does not "convey[] with reasonable clarity to those skilled in the art that [Acadia] was in possession of" "pharmaceutically acceptable excipients." *See Pharmacyclics*, 2022 U.S. App. LEXIS 31479, at *18. The Court will address each of Defendants' arguments in turn.

*First*, Defendants contend that claim 4 broadly encompasses virtually any excipient, whereas the specification only exemplifies some excipients and, accordingly, that the '721 patent does not describe the full scope of pharmaceutically acceptable excipients. D.I. 126 at 12-14; *see* Tr. 345:12-17 (Dr. Muzzio testifying that the asserted claims are directed to "any excipient, any number of excipients in any amount having any function, so the entire universe of excipients in principle is now a claim here"). However, that the '721 patent does not disclose every potential excipient does not foreclose adequate written description. *See Baxalta Inc. v. Bayer Healthcare LLC*, 513 F. Supp. 3d 426, 453 (D. Del. Jan. 19, 2021) ("Every species in a genus need not be described in order that a genus meet the written description requirement."); *Lochner Techs., LLC v. Vizio, Inc.*, 567 F. App'x 931, 940 (Fed. Cir. 2014) (explaining that courts should consider that

74

"a patentee cannot be required to disclose every possible embodiment" when addressing "written description issue[s]").

Instead, the '721 patent only need describe "a representative number of [particular excipients] falling within the scope of [excipients] or structural features common to the members of the [excipients] so that one of skill in the art can visualize or recognize the members of the [excipients]." *See Baxalta*, 513 F. Supp. 3d 426, 453 (cleaned up); *see also* D.I. 126 at 13 (Defendants admitting that "disclosure of a species within a claim can provide support for a generic claim"). Here, the '721 patent describes "a representative number of [particular excipients] falling within the scope of [excipients]." *See Baxalta*, 513 F. Supp. 3d 426, 453; *see also* FoF ¶ 145 ("The specification discloses various embodiments of 'pharmaceutically acceptable excipients.'"); D.I. 126 at 13 (Defendants admitting that the specification describes "granules containing pimavanserin alone, or with a binder, or with a combination of colloidal silicon dioxide and Avicel"). The '721 patent also describes certain "features . . . of the [excipients]," including that the excipients may "provide, without limitation, bulk, consistency, stability, binding ability, lubrication, disintegrating ability." *See Baxalta*, 513 F. Supp. 3d 426, 453 (first set of quotations); FoF ¶ 148 (second set of quotations).

*Second*, Defendants contend that the comparative experiments from the '721 specification foreclose adequate written description. D.I. 126 at 13. However, similar to the Court's discussion *supra* § III(D), that the specification discloses unacceptable attributes of the invention that arose from certain manufacturing *processes* does not foreclose the sufficiency of Acadia's written description in connection with its *apparatus* claims. *See EVM Sys., LLC v. Rex Med., L.P.*, No. 6:13-CV-184, 2015 U.S. Dist. LEXIS 107736, at *17 (E.D. Tex. Aug. 17, 2015) ("Here, the Court previously construed that the term 'retrieval basket' is an apparatus, which is defined by its claimed

75

structural elements and does not refer to a specific medical device. Imposing a standard for the written description requirement as it applies to method claims would be improper for apparatus claims, such as those disclosed in the '670 Patent." (citation omitted)).[16] Defendants here simply "read too much into the specification." *See BASF Corp. v. Johnson Matthey Inc.*, 875 F.3d 1360, 1367 (Fed. Cir. 2017).

*Third*, Defendants posit that, "although Dr. Little pointed to Table 2 of the patent as describing pimavanserin with intragranular excipients, [Dr. Little] admitted on cross examination that this example does not disclose the identity of any excipients being added to the pimavanserin during granulation." D.I. 126 at 14. Defendants reach too far. Table 2 (reproduced below) supports the adequacy of the '721 patent's written description of "pharmaceutically acceptable excipients" because Table 2 exemplifies "pharmaceutically acceptable excipients" composing the "the Pimavanserin granulation."

TABLE 2

| Composition of Pimavanserin granulation (34 mg) | | |
|---|---|---|
| Ingredients | Qty (% w/w) | Qty (mg)/dose |
| Pimavanserin Tartrate | 40.0 | 40.0[a] |
| Microcrystalline Cellulose (Avicel PH302, NF, EP) | 59.0 | 59.0 |
| Magnesium Stearate (Vegetable Source, USP, EP) | 1.0 | 1.0 |
| Total | 100.0 | 100.0 |

[a] 40 mg pimavanserin tartrate salt is equivalent to 34 mg pimavanserin free base

---

[16] The Court notes again that a "POSA would have understood that '[c]ontrary to the disclosed comparative experiments,' the '721 patent also 'describes [acceptable] processes to manufacture capsules of size 4 comprising 5-34 mg pimavanserin.'" FoF ¶ 136.

FoF ¶ 151. Moreover, as discussed above, "a representative number of [particular excipients] falling within the scope of [excipients]," like those from Table 2, may satisfy the written description requirement. *See Baxalta Inc.*, 513 F. Supp. 3d 426, 453.

For the foregoing reasons, Defendants fail to demonstrate by clear and convincing evidence that the '721 patent fails to describe "pharmaceutically acceptable excipients."

**2.    Defendants Fail to Show by Clear and Convincing Evidence that the '721 Patent Does Not Describe or Enable the Limitation of Claim 4 of "[W]herein the Bulk Density of the Granules is >0.4 g/ml"**

Defendants contend that the '721 patent does not describe or enable a bulk density of granules above 0.6 g/ml. D.I. 126 at 14-15. To achieve a bulk density above 0.6 g/ml, Defendants propose that a "POSA would need to engage in an extensive trial-and-error research program, 'equivalent to a Ph.D. dissertation,' which would constitute undue experimentation." D.I. 126-1 ¶ 40 (citation omitted). Defendants are wrong.

The Federal Circuit has explained that open-ended claims, like the bulk density limitation of claim 4 of the '721 patent, can be proper "if there is an inherent, albeit not precisely known, upper limit." *Fs.Com Inc. v. Int'l Trade Comm'n*, 65 F.4th 1373, 1376 (Fed. Cir. 2023) (considering rule in the context of enablement) (quoting *Andersen Corp. v. Fiber Composites, LLC*, 474 F.3d 1361 (Fed. Cir. 2007)); *First Quality Tissue, LLC v. Irving Consumer Prods. Ltd.*, Civil Action No. 19-428-RGA, 2022 U.S. Dist. LEXIS 58289, at *26 (D. Del. Mar. 30, 2022) (considering rule in the context of written description).

Here, the claim limitation ">0.4 g/ml" includes such "an inherent, albeit [perhaps] not precisely known, upper limit." *See Fs.Com Inc.*, 65 F.4th 1373, 1376. As found above, "[t]he '721 patent specification discloses a bulk density range of pimavanserin granulation between 0.4 to 0.6 g/ml and one embodiment within that range of 0.508 g/ml." FoF ¶ 153. Similarly, the "specification of the '721 patent does not teach a POSA how to make granules of pimavanserin

77

having a bulk density greater than 0.6 g/ml." FoF ¶ 154. "A POSA would have understood that generally the upper limit of bulk density for 'standard' materials is 0.7 g/ml." FoF ¶ 156. In addition, a "POSA would have understood, including on the basis of the teachings of the '721 patent, that pimavanserin is a 'bad behaving material.'" FoF ¶ 157. As such, a "POSA would have understood that granules of pimavanserin, as 'bad behaving,' will have a bulk density upper limit that is lower than the bulk density upper limit for standard materials, and that this lower bulk density limit for granules of pimavanserin would be 0.6 g/ml." FoF ¶ 158. Therefore, a POSA would have understood that the bulk density requirement of claim 4 of the '721 patent includes "an inherent, albeit [perhaps] not precisely known, upper limit" of 0.6 g/ml. *See Fs.Com Inc.*, 65 F.4th 1373, 1376; FoF ¶ 159.

Defendants' arguments to the contrary are without merit. Defendants contend that Acadia and Dr. Little fail to point to anywhere in the specification that supports an implicit upper limit of 0.6 g/ml. D.I. 126 at 14. However, the specification does support an implicit upper limit of 0.6 g/ml for the reasons discussed in the preceding paragraph. Defendants also somewhat contradict themselves by asserting that "Dr. Little relied on the background section of the specification to argue that it would have been difficult to achieve bulk densities of pimavanserin granules above 0.6 g/ml." D.I. 126 at 15.

Defendants contend that it "is undisputed that a POSA would recognize that granules of bulk densities of 0.4 to 1 g/ml were generally known to be achievable in the art." D.I. 126 at 14 n.10. However, insofar that a POSA would have recognized that *some* granule compositions may have been able to achieve a bulk density above 0.6 g/ml does not mean that a POSA would have recognized that granule compositions *of pimavanserin* would have been able to achieve a bulk density above 0.6 g/ml.

For the above reasons, Defendants fail to show by clear and convincing evidence that the specification of the '721 patent does not sufficiently describe or enable the bulk density limitation of claim 4.

## IV.     DISCUSSION: MSN's MOTION FOR LEAVE

On March 18, 2025, MSN filed its motion (D.I. 137) for leave to file a reply brief in further support of its post-trial brief on invalidity (D.I. 126), along with a draft of the proposed reply brief (D.I. 137-1 Ex. A). For the reasons discussed below, the Court denies MSN's Motion.

Motions for leave to file reply briefs are highly disfavored where the reply brief is prohibited by a rule or the operative scheduling order. *See Atkinson v. Veolia N. Am.*, No. 5:19-CV-526-BO, 2021 U.S. Dist. LEXIS 22157, at *9 (E.D.N.C. Feb. 5, 2021) ("Furthermore, since reply briefs are not permitted under the rules of this Court, defendant's motion for leave to file a reply memorandum is highly disfavored."); *Harpo v. Intermark Mgmt. Co.*, No. 1:21-cv-87, 2022 U.S. Dist. LEXIS 245058, at *3 (S.D. Ga. July 11, 2022) ("Additionally, Plaintiff has no right to file a Reply, and reply briefs are generally disfavored."); *Atencio v. TuneCore, Inc.*, No. CV 16-1925-DMG (MRWx), 2018 U.S. Dist. LEXIS 223997, at *29 n.9 (C.D. Cal. Nov. 13, 2018) (acknowledging that "the Court generally disfavors reply briefing in support of motions in *limine*"); *Regions Bank v. Hyman*, No. 8:09-cv-1841-T-17MAP, 2013 U.S. Dist. LEXIS 199553, at *5 (M.D. Fla. Aug. 26, 2013) ("Contrary to the Plaintiff's comment that such motions are commonly allowed, motions for leave to file a reply are not typically granted. Indeed, replies or any other pleading directed to the motion are disfavored (*see* Local Rule 3.01(c), which requires leave of court before filing a reply; hence, the rule infers the practice should be sparingly considered).").

Few grounds overcome this disfavor. For example, courts may grant motions for leave to file a reply brief where the proposed reply "brief responds to new evidence, facts, or arguments raised for the first time in the" opposition brief. *See Versar Env't Servs., LLC v. Black & Veatch Special Projects Corp.*, C.A. No. 23-1450-RGA, 2024 WL 5090804, at \*6 (D. Del. Dec. 12, 2024) (ruling on a motion for leave to file a sur-reply); *see also St. Clair Intellectual Prop. Consultants, Inc. v. Samsung Elecs. Co. Ltd.*, 291 F.R.D. 75, 80 (D. Del. 2013) (same). Critically, content from an opposition brief is not "new" if it "is directly responsive to arguments made in" the opening brief. *See Cephea Valve Techs., Inc. Equityholders' Representative v. Abbott Labs.*, Civil Action No. 23-691-GBW-SRF, 2024 U.S. Dist. LEXIS 83381, at \*22 (D. Del. Mar. 18, 2024) (ruling on a motion for leave to file a sur-reply).

Courts may, but need not, grant motions for leave to file a reply brief where the opposition brief contains a "court opinion" that "did not appear in" the opening brief, even where the opposition brief relies on the court opinion in response to arguments made in the opening brief. *Cf. Empower Brands LLC v. Tristar Prods., Inc.*, Civil Action No. 23-01225-RGA, 2024 U.S. Dist. LEXIS 225561, at \*5 (D. Del. Dec. 12, 2024) (ruling on a motion for leave to file a sur-reply brief where the reply brief included a decision that "did not appear in" the opening memorandum); *see Int'l Bus. Machines Corp. v. The Priceline Grp. Inc.*, No. CV 15-137-LPS-CJB, 2016 WL 626495, at \*1 (D. Del. Feb. 16, 2016) (contemplating the "the need to respond to judicial opinions cited in" a reply brief), *report and recommendation adopted*, No. CV 15-137-LPS-CJB, 2016 WL 1253472 (D. Del. Mar. 30, 2016).

When the evidence, facts and arguments in the opposition brief are not "new," they do "not open the door to an expansion of briefing." *See Cephea Valve Techs.*, 2024 U.S. Dist. LEXIS 83381, at \*22. Similarly, courts may deny motions for leave to file a reply brief where the

80

proposed reply brief raises an issue that "could have been raised" in the opening brief. *See Bishop v. JPMorgan Chase & Co.*, No. CA 13-1-RGA-MPT, 2013 WL 3177826, at *6 (D. Del. June 21, 2013) (ruling on a motion for leave to file a sur-reply brief), *report and recommendation adopted*, No. CV 13-1- RGA, 2013 WL 4007508 (D. Del. Aug. 5, 2013); *Jazayeri v. Avaya, Inc.*, No. 2:19-CV-06003-JDW, 2021 WL 2186367, at *6 (E.D. Pa. May 28, 2021) (same).

Courts may also grant motions for leave to file a reply brief where the reply brief seeks to "correct a demonstrable inaccuracy." *Choma v. Blue Cross Blue Shield of Delaware*, No. CIV.A. 06-486-JJF, 2008 WL 4276546, at *15 (D. Del. Sept. 18, 2008) (ruling on a motion for leave to file a sur-reply brief).

Although there may be occasion where the most expedient resolution of the matters underlying the briefing would be to consider "the additional briefing," the better approach is often "to encourage the parties to follow the rules." *See Waters Techs. Corp. v. Aurora SFC Sys. Inc.*, C.A. No. 11-708-RGA, 2012 WL 13167829, at *1 (D. Del. Apr. 20, 2012) (ruling on motion for leave to file a sur-reply). The decision on whether to grant leave to file a reply is ultimately one of "discretion" for the district court. *See Levey v. Brownstone Inv. Grp., LLC*, 590 F. App'x 132, 137 (3d Cir. 2014) (confirming that "permission for leave to file a sur-reply is a matter committed to the District Court's sound discretion" (cleaned up)).

As an initial matter, the operative Scheduling Order in this action instructs that "[t]here shall be no reply trial briefs filed." D.I. 120 ¶ 1; *see* D.I. 121-1 (modifying other portions of the D.I. 120 Scheduling Order). Therefore, MSN's motion requesting leave to file a reply brief is highly disfavored. The grounds that MSN sets forth in its Motion for Leave fail to overcome such disfavor. In particular, MSN identifies eight arguments from Acadia's opposition brief that purportedly merit a reply from MSN. D.I. 137 at 1-2. The Court discusses each below. Since the

81

Court declines MSN's request for leave to file a reply, the Court also declines-as-moot Acadia's contingent request for leave to file a sur-reply (D.I. 138 at 8).

A.    **The Liu reference (DTX-013) "discouraged the use of capsules unless other dosage forms were not acceptable." (Resp. Br. at 4.)**

Defendants rely on the Liu reference in their opening brief to opine on the difficulty that elderly patients have in swallowing their medications. D.I. 126 at 3 (citing D.I. 126-1 ¶ 16 (relying on the Liu reference)). Acadia likewise relies on the Liu reference in its opposition brief to opine on the difficulty that elderly patients have in swallowing their medications, particularly as it pertains to capsules. D.I. 134 at 4 (citing D.I. 134-1 ¶ 12). Therefore, the referenced argument in Acadia's opposition brief "is directly responsive to arguments made in" Defendants' opening brief and not "new." *See Cephea Valve Techs.*, 2024 U.S. Dist. LEXIS 83381, at *22. Since the argument in Acadia's opposition brief is not "new," the argument does "not open the door to an expansion of briefing." *See id.* Even were the Court to consider the arguments in MSN's proposed reply brief, they "would not change the outcome" of the Court's decision on invalidity. *See Del. Life Ins. Co. v. Short*, No. 20-996-LPS, 2021 U.S. Dist. LEXIS 50053, at *1 n.1 (D. Del. Mar. 17, 2021).

For the foregoing reasons, the Court denies MSN's Motion for Leave with respect to argument (A).

B.    **The Schiele reference (DTX-007) "explicitly teaches both larger dosage forms and capsules cause more swallowing difficulties." (Resp. Br. at 6.)**

Defendants rely on the Schiele reference in their opening brief to opine on the swallowability of dosage forms. D.I. 126 at 8. Acadia likewise relies on the Schiele reference in its opposition brief to opine on the swallowability of dosage forms, again, particularly as it pertains to capsules. D.I. 134 at 6. Therefore, the referenced argument in Acadia's opposition brief "is directly responsive to arguments made in" Defendants' opening brief and not "new." *See Cephea*

82

*Valve Techs.*, 2024 U.S. Dist. LEXIS 83381, at *22. Since the argument in Acadia's opposition brief is not "new," the argument does "not open the door to an expansion of briefing." *See id.* Even were the Court to consider the arguments in MSN's proposed reply brief, they "would not change the outcome" of the Court's decision on obviousness. *See Del. Life Ins. Co.*, 2021 U.S. Dist. LEXIS 50053, at *1 n.1.

For the foregoing reasons, the Court denies MSN's Motion for Leave with respect to argument (B).

**C.    Ragnar-Tolf (JTX-011) teaches a POSA towards "direct compression tablet formulations, not capsules." (Resp. Br. at 6.)**

Defendants rely on the Ragnar-Tolf reference in their opening brief to opine on a POSA's motivation to formulate capsule dosages of pimavanserin. D.I. 126 at 5-6. Acadia likewise relies on the Ragnar-Tolf reference in its opposition brief to opine on a POSA's motivation (or lack thereof) to formulate capsule dosages of pimavanserin. D.I. 134 at 6. Therefore, the referenced argument in Acadia's opposition brief "is directly responsive to arguments made in" Defendants' opening brief and not "new." *See Cephea Valve Techs.*, 2024 U.S. Dist. LEXIS 83381, at *22. Since the argument in Acadia's opposition brief is not "new," the argument does "not open the door to an expansion of briefing." *See id.* Even were the Court to consider the arguments in MSN's proposed reply brief, they "would not change the outcome" of the Court's decision on obviousness. *See Del. Life Ins. Co.*, 2021 U.S. Dist. LEXIS 50053, at *1 n.1.

For the foregoing reasons, the Court denies MSN's Motion for Leave with respect to argument (C).

**D.    That a "plain reading of the testimony, however, indicates that Dr. [Muzzio] never expressed even an expectation of success[.]" (Resp. Br. at 9.)**

MSN is correct that "Dr. Muzzio explicitly testified that a POSA would have had such an expectation [of success]" regarding the bulk density limitation of claim 4 of the '721 patent. D.I.

83

137 Ex. A at 3; *see* Tr. 335:15–336:15 (Dr. Muzzio testifying *inter alia* that a "POSA would expect the density to remain roughly there when the concentration is increased from 20 to 32 percent"). Accordingly, Acadia's argument is a "demonstrable inaccuracy" that MSN seeks to "correct." *See Choma*, 2008 WL 4276546, at *15.

However, the Court does not rely on argument (D) in its Opinion and, thus, the arguments in MSN's proposed reply brief would "not change the outcome" of the Court's decision. *See Del. Life Ins. Co.*, 2021 U.S. Dist. LEXIS 50053, at *1 n.1. For this reason, the Court denies MSN's Motion for Leave with respect to argument (D).

**E.    That "the record shows that the claimed amount[] of [pimavanserin tartrate] could and did materially and unpredictably alter the property of the claimed formulation[.]" (Resp. Br. at 9.)**

This argument pertains to bulk density. The full quote from Plaintiffs' opposition brief is: "This is especially speculative here, where pimavanserin was known to be a bad behaving material, and the record shows that the claimed amount of pimavanserin tartrate could and did materially and unpredictably alter the property of the claimed formulation, i.e., the BD of the granules." D.I. 134 at 9 (cleaned up). Defendants rely on prior art (in particular, the Ragnar-Tolf reference) in their opening brief to opine on a POSA's motivation and reasonable expectation of success in formulating a pimavanserin capsule with a bulk density above 0.4 g/ml. D.I. 126 at 5-6. Acadia similarly relies on prior art (in particular, the Catalent reference (JTX-13)) in its opposition brief to opine on a POSA's motivation and reasonable expectation of success (or lack thereof) in formulating a pimavanserin capsule with a bulk density above 0.4 g/ml. D.I. 134 at 9 (citing D.I. 134-1 ¶ 22 (citing Tr. 340:11-341:1 (Dr. Muzzio discussing the Catalent reference))). Therefore, the referenced argument in Acadia's opposition brief "is directly responsive to arguments made in" Defendants' opening brief and not "new." *See Cephea Valve Techs.*, 2024 U.S. Dist. LEXIS

84

83381, at *22. Since the argument in Acadia's opposition brief is not "new," the argument does "not open the door to an expansion of briefing." *See id.*

Unlike argument (D), argument (E) is not a "demonstrable inaccuracy." *See Choma*, 2008 WL 4276546, at *15. Rather, the parties rely on different references to contend whether a POSA would have had a reasonable expectation of success in obtaining a bulk density of the pimavanserin composition above 0.4 g/ml. Defendants rely on the Ragnar-Tolf reference, which "discloses examples of pimavanserin tablets that were formulated, including in 1 mg, 5 mg, and 20 mg dosages, that ranged in bulk-density between 0.56 and 0.61." FoF ¶ 127 (citing the record). Acadia relies on the Catalent reference, which teaches that high shear "granulations are known to be capable of [bulk density] in the $0.6 - 0.8$ g/ml range." JTX-13 at 0004. That the parties disagree on whether these references would have motivated a POSA to formulate the claimed invention with a reasonable likelihood of success is hardly surprising.

The Court does not necessarily agree with Acadia's characterization that the record shows that the claimed amount of pimavanserin tartrate materially and unpredictably changed the bulk density of the claimed invention. However, the Court found that a POSA would not have had a reasonable expectation of success in formulating a bulk density greater than 0.4 g/ml on other grounds. In addition, the arguments in MSN's proposed reply brief are essentially identical to the arguments from Defendants' opening brief. *Compare* D.I. 137 at 3, *with* D.I. 126 at 5. Thus, the arguments in MSN's proposed reply brief do "not change the outcome" of the Court's decision. *See Del. Life Ins. Co.*, 2021 U.S. Dist. LEXIS 50053, at *1 n.1.

For the foregoing reasons, the Court denies MSN's Motion for Leave with respect to argument (E).

**F.**     **That "[ACADIA's] failure to develop a single size 4 capsule formulation suggests that skilled artisans would not have reasonably expected to succeed[.]" (Resp. Br. at 9.)**

The Court does not rely on argument (F) in its Opinion and, thus, the arguments in MSN's proposed reply brief would "not change the outcome" of the Court's decision. *See Del. Life Ins. Co.*, 2021 U.S. Dist. LEXIS 50053, at *1 n.1. For this reason, the Court denies MSN's Motion for Leave with respect to argument (F).

**G.**     **That "'the long delay between the marketing of the [two tablet] formulation and [the one capsule formulation] . . . supports the inference that it was difficult for researchers to create a [single size 4 capsule] product.'" (Resp. Br. at 9.)**

The Court does not rely on argument (G) in its Opinion on obviousness and, thus, the arguments in MSN's proposed reply brief would "not change the outcome" of the Court's decision. *See Del. Life Ins. Co.*, 2021 U.S. Dist. LEXIS 50053, at *1 n.1. Though, the Court does rely on the underlying case upon which Acadia relies to reason that "the long delay between the Ragnar-Tolf reference and the one capsule formulation supports the inference that it was difficult for researchers to create the capsule formulation product." *Supra* § III(B)(3) (cleaned up). The facts undergirding the Court's reasoning are in the trial record. FoF ¶ 118 ("The Ragnar-Tolf reference was published on November 15, 2007, almost ten years before the earliest effective filing date of the '721 patent." (citing JTX-011 at 0001; Tr. 296:7-12)). Since MSN does not take issue with the underlying court decision, and since the Court relies on facts in the record and not new evidence introduced by Acadia, there is no basis for MSN's proposed reply brief.

For the foregoing reasons, the Court denies MSN's Motion for Leave with respect to argument (G).

**H.    That column 19 of the '721 patent provides "express disclosures for manufacturing processes for granules" including various excipients may be included. (See Resp. Br. at 13 (citing JTX09 at 19:12–15))**

The Court does not rely on argument (H) in forming its Opinion and, thus, the arguments in MSN's proposed reply brief would "not change the outcome" of the Court's decision. *See Del. Life Ins. Co.*, 2021 U.S. Dist. LEXIS 50053, at *1 n.1. For this reason, the Court denies MSN's Motion for Leave with respect to argument (H).

## V.    CONCLUSION

For the reasons discussed above, the Court concludes that Aurobindo infringes claims 4 and 5 of the '721 patent and that claims 4 and 5 of the '721 patent are not invalid. The Court also, for the reasons discussed above, denies MSN's Motion for Leave to File Post-Trial Reply Brief (D.I. 137) and denies-as-moot Acadia's contingent request for leave to file a sur-reply (D.I. 138 at 8). The Court will enter an Order consistent with this Opinion.

87

Appx87

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| ACADIA PHARMACEUTICALS INC., | |
| Plaintiff, | |
| v. | C.A. No. 22-1387-GBW |
| AUROBINDO PHARMA LIMITED, et al., | CONSOLIDATED |
| Defendants. | |

---

## ORDER

At Wilmington this 16th day of May 2025, **IT IS HEREBY ORDERED** as follows:

1. The Court concludes that Acadia demonstrated by a preponderance of the evidence that Aurobindo infringes claims 4 and 5 of U.S. Patent No. 11,452,721.

2. The Court concludes that Defendants failed to demonstrate by clear and convincing evidence that claims 4 and 5 of U.S. Patent No. 11,452,721 are invalid.

3. The Court denies MSN's Motion for Leave to File Post-Trial Reply Brief (D.I. 137) and denies-as-moot Acadia's contingent request for leave to file a sur-reply (D.I. 138 at 8).

4. Within fourteen (14) days of the entry of this Order, the parties shall meet and confer in attempt to reach agreement on how this action should proceed. If the parties reach agreement, they shall file a joint letter with this Court not to exceed five (5) pages by no later than twenty-one (21) days from the entry of this Order describing the agreement. If the parties are unable to reach agreement, the parties shall file a joint letter with this Court not to exceed ten (10) pages by no later than twenty-one (21) days from the entry of this

Appx88

Order setting forth the parties' positions on how the action should proceed. Either letter shall address the relief requested in the parties' Proposed Joint Pretrial Order (D.I. 101).

5. During trial, Mr. Chad Peterman (counsel for Acadia) stated: "I do want to state on the record that we are only asserting Claims 4 and 5 of the '721 patent against -- against the defendants. We will work with MSN to file a revised stipulation because that included -- that included Claim 13 as well. But we will be only pursuing Claims 4 and 5." Tr. 18:19-24. Acadia shall file a letter with this Court not to exceed two (2) pages by no later than seven (7) days from the entry of this Order updating the Court on status of this revised stipulation.

6. Because the Court's Opinion is filed under seal, the parties shall meet and confer and, no later than thirty (30) days after entry of this Order, file a proposed redacted version of the Opinion, along with a motion supported by a declaration that contains a clear, factually detailed explanation as to why disclosure of any proposed redacted material would "work a clearly defined and serious injury to the party seeking closure." *In re Avandia Mktg., Sales Pracs. & Prod. Liab. Litig.*, 924 F.3d 662, 672 (3d Cir. 2019). If the parties do not file a proposed redacted version and corresponding motion by the deadline, or if the Court determines the motion lacks a meritorious basis, the Opinion will be unsealed in whole or in part.

GREGORY B. WILLIAMS
UNITED STATES DISTRICT JUDGE

2

Appx89

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| ACADIA PHARMACEUTICALS INC., )<br><br>Plaintiff, )<br><br>v. )<br><br>AUROBINDO PHARMA LIMITED *et al.*, )<br><br>Defendants. ) | C.A. No. 22-1387-GBW<br><br>CONSOLIDATED |

## FINAL JUDGMENT

**WHEREAS,** Plaintiff Acadia Pharmaceuticals Inc. ("Acadia") in the above-captioned suit has asserted that Defendants MSN Laboratories Private Ltd. and MSN Pharmaceuticals Inc. (collectively, "MSN"), and Aurobindo Pharma Limited and Aurobindo Pharma USA, Inc. (collectively, "Aurobindo") both infringed claims 4 and 5 of Acadia's United States Patent No. 11,452,721 ("the '721 patent") by filing their respective Abbreviated New Drug Applications ("ANDA") (specifically, Aurobindo's ANDA No. 214782 and MSN's ANDA No. 214925);

**WHEREAS,** the Court held a three-day bench trial in this action on December 3, 4, and 6, 2024; and

**WHEREAS,** the Court issued an opinion setting forth its Findings of Fact and Conclusions of Law on May 16, 2025 (D.I. 140);

**NOW THEREFORE, IT IS HEREBY ORDERED, DECREED, AND ADJUDGED:**

1.    The Court has jurisdiction over Acadia, MSN, and Aurobindo, and the subject matter of this action.

1

Appx90

2.     Final Judgment is entered in favor of Acadia and against MSN and Aurobindo on all claims and counterclaims with respect to the '721 patent. Claims 4 and 5 of the '721 patent are not invalid.

3.     The manufacture, use, offer for sale, or sale within the United States, or importation into the United States, of Aurobindo's ANDA product that is the subject of ANDA No. 214782 before the expiration of the '721 patent would infringe claims 4 and 5 of the '721 patent.

4.     The manufacture, use, offer for sale, or sale within the United States, or importation into the United States, of MSN's ANDA product that is the subject of ANDA No. 214925 before the expiration of the '721 patent would infringe claims 4 and 5 of the '721 patent.

5.     Pursuant to 35 U.S.C. § 271(e)(4)(A), the effective date for any approval of Aurobindo's ANDA No. 214782 and MSN's ANDA No. 214925 shall be no earlier than the expiration date of the '721 patent (currently August 27, 2038). If Acadia becomes entitled to any other exclusivities that are not referenced herein, Acadia may apply to the Court for further relief as may be appropriate.

6.     Pursuant to 35 U.S.C. § 271(e)(4)(B), Aurobindo and its affiliates, successors, partners, officers, agents, servants, employees, and attorneys, and other persons or entities in active concert or participation with any of them, are hereby enjoined from making, using, offering to sell, or selling within the United States, or importing into the United States, the product that is the subject of ANDA No. 214782 until no earlier than the expiration date of the '721 patent (currently August 27, 2038).

7.     In accordance with 21 C.F.R. § 314.107(e), Aurobindo shall submit a copy of this Final Judgment to the FDA within fourteen (14) days of the date of entry of this Final Judgment by the Court.

2

Appx91

8.    Pursuant to 35 U.S.C. § 271(e)(4)(B), MSN and its affiliates, successors, partners, officers, agents, servants, employees, and attorneys, and other persons or entities in active concert or participation with any of them, are hereby enjoined from making, using, offering to sell, or selling within the United States, or importing into the United States, the product that is the subject of ANDA No. 214925 until no earlier than the expiration date of the '721 patent (currently August 27, 2038).

9.    In accordance with 21 C.F.R. § 314.107(e), MSN shall submit a copy of this Final Judgment to the FDA within fourteen (14) days of the date of entry of this Final Judgment by the Court.

10.    Pursuant to Fed. R. Civ. P. 54, D. Del. LR 54.1, and 28 U.S.C. § 1920, Acadia may seek its costs, subject to Paragraphs 11 and 12, in an amount to be determined by the Clerk of the Court.

11.    In the event that a party appeals this Final Judgment, any motion for attorneys' fees or submission of a bill of costs, including any motion that this case is exceptional under 35 U.S.C. § 285, shall be considered timely if filed within 60 days after the expiration of the time to petition for certiorari to the United States Supreme Court or, if the appeal is withdrawn or dismissed, within 60 days after such withdrawal or dismissal.

12.    In the event that no party appeals this Final Judgment, any motion for attorneys' fees or submission of a bill of costs, including any motion that this case is exceptional under 35 U.S.C. § 285, shall be considered timely if filed within 60 days after the expiration of the time for filing a notice of appeal under Fed. R. App. P. 3 and 4.

13.    This is a final, appealable judgment.

Appx92

**IT IS SO ORDERED**, on this _____ day of _____, 2025

_____

HONORABLE GREGORY B. WILLIAMS
UNITED STATES DISTRICT JUDGE

4



Agarwal
Exhibit 6
(4-10-24)
WWW.DIGITALEVIDENCEGROUP.COM

# THE UNITED STATES OF AMERICA

## TO ALL TO WHOM THESE PRESENTS SHALL COME:

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office

June 5, 2023

THIS IS TO CERTIFY THAT ANNEXED HERETO IS A TRUE COPY FROM
THE RECORDS OF THIS OFFICE OF:

PATENT NUMBER: *11,452,721*
ISSUE DATE: *September 27, 2022*

By Authority of the
Under Secretary of Commerce for Intellectual Property
and Director of the United States Patent and Trademark Office

Sylvia Holley
Certifying Officer

C.A. No. 22-1387-GBW
JOINT TRIAL
EXHIBIT
**JTX-0009**

JTX09-0001

ACADIA_1287386

Appx94



US011452721B2

(12) **United States Patent**
Tejwani et al.

(10) Patent No.: **US 11,452,721 B2**
(45) Date of Patent: *Sep. 27, 2022

(54) **FORMULATIONS OF PIMAVANSERIN**

(71) Applicant: **ACADIA Pharmaceuticals Inc.**, San Diego, CA (US)

(72) Inventors: **Ravindra Tejwani**, Monmouth Junction, NJ (US); **Stephen Edward Abele**, White Plains, NY (US); **Emanuel Joseph Vizzotti**, Millburn, NJ (US)

(73) Assignee: **ACADIA Pharmaceuticals Inc.**, San Diego, CA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **17/693,830**

(22) Filed: **Mar. 14, 2022**

(65) **Prior Publication Data**

US 2022/0193057 A1    Jun. 23, 2022

**Related U.S. Application Data**

(63) Continuation of application No. 17/080,731, filed on Oct. 26, 2020, which is a continuation of application No. 16/836,086, filed on Mar. 31, 2020, now Pat. No. 10,849,891, which is a continuation of application No. 16/571,554, filed on Sep. 16, 2019, now Pat. No. 10,646,480, which is a continuation of application No. 16/363,378, filed on Mar. 25, 2019, now Pat. No. 10,449,185, which is a continuation of application No. PCT/US2018/048096, filed on Aug. 27, 2018.

(60) Provisional application No. 62/552,300, filed on Aug. 30, 2017.

(30) **Foreign Application Priority Data**

Sep. 1, 2017    (SE) .......................... 1730232-4

(51) **Int. Cl.**
| | |
|---|---|
| *A61K 9/48* | (2006.01) |
| *A61K 31/4468* | (2006.01) |
| *A61K 9/16* | (2006.01) |
| *A61K 9/20* | (2006.01) |
| *A61K 47/38* | (2006.01) |

(52) **U.S. Cl.**
CPC ........ *A61K 31/4468* (2013.01); *A61K 9/1652* (2013.01); *A61K 9/1688* (2013.01); *A61K 9/1694* (2013.01); *A61K 9/2009* (2013.01); *A61K 9/2013* (2013.01); *A61K 9/2054* (2013.01); *A61K 9/485* (2013.01); *A61K 9/4808* (2013.01); *A61K 9/4833* (2013.01); *A61K 9/4858* (2013.01); *A61K 9/4866* (2013.01); *A61K 47/38* (2013.01); *C07B 2200/13* (2013.01)

(58) **Field of Classification Search**
CPC .. A61K 9/4833; A61K 9/4841; A61K 9/4883; A61K 9/4891
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 3,983,234 | A | 9/1976 | Sayers |
| 4,138,492 | A | 2/1979 | Noverola et al. |
| 4,255,432 | A | 3/1981 | Kluge et al. |
| 4,332,804 | A | 6/1982 | Clark |
| 4,353,900 | A | 10/1982 | Clark |
| 4,353,901 | A | 10/1982 | Clark |
| 4,367,232 | A | 1/1983 | Boix-Iglesias et al. |
| 4,795,646 | A | 1/1989 | Schlunken |
| 4,853,394 | A | 8/1989 | King |
| 5,025,013 | A | 6/1991 | Barreau |
| 5,214,055 | A | 5/1993 | Pegilion et al. |
| 5,216,165 | A | 6/1993 | Mobilio et al. |
| 5,461,066 | A | 10/1995 | Gericke et al. |
| 5,595,872 | A | 1/1997 | Wetterau, II et al. |
| 5,621,010 | A | 4/1997 | Sueda et al. |
| 5,707,798 | A | 1/1998 | Brann |
| 5,795,894 | A | 8/1998 | Shue |
| 5,837,730 | A | 11/1998 | Javitt |
| 5,869,488 | A | 2/1999 | Shue |
| 5,877,173 | A | 3/1999 | Olney et al. |
| 5,912,132 | A | 6/1999 | Brann |
| 5,955,281 | A | 9/1999 | Brann |
| 6,107,324 | A | 8/2000 | Behan |
| 6,140,509 | A | 10/2000 | Behan |
| 6,150,393 | A | 11/2000 | Behan |
| 6,358,698 | B1 | 3/2002 | Weiner et al. |
| 6,451,343 | B1 | 9/2002 | Glinecke et al. |
| 6,479,480 | B1 | 11/2002 | Moyes |
| 6,486,153 | B1 | 11/2002 | Castro Pineiro |
| 6,670,137 | B2 | 12/2003 | VanMechelen et al. |
| 6,756,393 | B2 | 6/2004 | Andersson et al. |
| 6,815,458 | B2 | 11/2004 | Andersson et al. |
| 6,911,452 | B2 | 6/2005 | Schlienger |
| 7,022,698 | B2 | 4/2006 | Hamied et al. |
| 7,041,667 | B1 | 5/2006 | Armour et al. |
| 7,087,593 | B2 | 8/2006 | Kelly et al. |
| 7,115,634 | B2 | 10/2006 | Thurieau et al. |
| 7,217,719 | B2 | 5/2007 | Schlienger |
| 7,253,186 | B2 | 8/2007 | Andersson et al. |
| 7,351,707 | B2 | 4/2008 | Schlienger |
| 7,393,861 | B2 | 7/2008 | Thurieau et al. |
| 7,476,682 | B2 | 1/2009 | Andersson et al. |
| 7,538,222 | B2 | 5/2009 | Andersson et al. |
| 7,601,740 | B2 | 10/2009 | Weiner et al. |

(Continued)

FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| CA | 984843 | A | 3/1976 |
| CN | 104844502 | A | 8/2015 |

(Continued)

OTHER PUBLICATIONS

U.S. Appl. No. 09/800,096, Azacyclic compounds, filed Mar. 6, 2001, U.S. Pat. No. 6,815,458.

(Continued)

*Primary Examiner* — Micah Paul Young

(74) *Attorney, Agent, or Firm* — Goodwin Procter LLP

(57) **ABSTRACT**

Provided herein are capsules containing pimavanserin, processes for manufacturing said capsule, and pharmaceutical compositions containing pimavanserin.

**13 Claims, 4 Drawing Sheets**

ACADIA_1287387

Appx95

**US 11,452,721 B2**

Page 2

(56)                    **References Cited**

**U.S. PATENT DOCUMENTS**

| | | | |
|---|---|---|---|
| 7,659,285 | B2 | 2/2010 | Weiner et al. |
| 7,713,995 | B2 | 5/2010 | Weiner et al. |
| 7,732,462 | B2 | 6/2010 | Weiner et al. |
| 7,732,615 | B2 | 6/2010 | Thygesen et al. |
| 7,790,899 | B2 | 9/2010 | Tolf et al. |
| 7,816,383 | B1 | 10/2010 | Bradford et al. |
| 7,820,695 | B2 | 10/2010 | Weiner et al. |
| 7,858,789 | B2 | 12/2010 | Thurieau et al. |
| 7,863,296 | B2 | 1/2011 | Weiner et al. |
| 7,868,176 | B2 | 1/2011 | Thygesen et al. |
| 7,875,632 | B2 | 1/2011 | Weiner et al. |
| 7,923,564 | B2 | 4/2011 | Thygesen et al. |
| 7,994,193 | B2 | 8/2011 | Weiner et al. |
| 8,008,323 | B2 | 8/2011 | Weiner et al. |
| 8,110,574 | B2 | 2/2012 | Thurieau et al. |
| 8,227,487 | B2 | 7/2012 | Weiner et al. |
| 8,236,960 | B2 | 8/2012 | Thygesen et al. |
| 8,377,959 | B2 | 2/2013 | Weiner et al. |
| 8,618,130 | B2 | 12/2013 | Weiner et al. |
| 8,921,393 | B2 | 12/2014 | Weiner et al. |
| 9,050,343 | B2 | 6/2015 | Peters et al. |
| 9,211,289 | B2 | 12/2015 | Weiner et al. |
| 9,296,694 | B2 | 3/2016 | Andersson et al. |
| 9,446,037 | B2 | 9/2016 | Mills et al. |
| 9,486,453 | B2 | 11/2016 | Javitt |
| 9,566,271 | B2 | 2/2017 | Weiner et al. |
| 9,757,366 | B2 | 9/2017 | Mills et al. |
| 9,765,053 | B2 | 9/2017 | Andersson et al. |
| 10,028,944 | B2 | 7/2018 | Weiner et al. |
| 10,449,185 | B2 * | 10/2019 | Tejwani ............. A61C 9/485 |
| 10,517,860 | B2 | 12/2019 | Parkinson |
| 10,525,046 | B2 | 1/2020 | Weiner et al. |
| 10,597,363 | B2 | 3/2020 | Carlos et al. |
| 10,646,480 | B2 * | 5/2020 | Tejwani ............. A61K 9/4833 |
| 10,849,891 | B2 * | 12/2020 | Tejwani ............. A61K 9/2054 |
| 10,953,080 | B2 | 3/2021 | Parkinson |
| 10,981,870 | B2 | 4/2021 | Carlos et al. |
| 10,981,871 | B2 | 4/2021 | Carlos et al. |
| 11,135,211 | B2 | 10/2021 | Burstein |
| 11,191,757 | B2 | 12/2021 | Parkinson |
| 2002/0004513 | A1 | 1/2002 | Andersson et al. |
| 2002/0156068 | A1 | 10/2002 | Behan |
| 2002/0165225 | A1 | 11/2002 | Kankan et al. |
| 2004/0006081 | A1 | 1/2004 | Burrows |
| 2004/0006600 | A1 | 6/2004 | Andersson et al. |
| 2004/0213816 | A1 | 10/2004 | Weiner et al. |
| 2004/0229908 | A1 | 11/2004 | Nelson |
| 2005/0014757 | A1 | 1/2005 | Andersson et al. |
| 2005/0148018 | A1 | 7/2005 | Weiner et al. |
| 2005/0244862 | A1 | 11/2005 | Brann |
| 2005/0256108 | A1 | 11/2005 | Schlienger |
| 2005/0261278 | A1 | 11/2005 | Weiner et al. |
| 2005/0261340 | A1 | 11/2005 | Weiner et al. |
| 2005/0288328 | A1 | 12/2005 | Weiner et al. |
| 2006/0094758 | A1 | 5/2006 | Andersson et al. |
| 2006/0106063 | A1 | 5/2006 | Thhygesen et al. |
| 2006/0111399 | A1 | 5/2006 | Thhygesen et al. |
| 2006/0194778 | A1 | 8/2006 | Andersson et al. |
| 2006/0194834 | A1 | 8/2006 | Andersson et al. |
| 2006/0199794 | A1 | 9/2006 | Schlienger |
| 2006/0199818 | A1 | 9/2006 | Andersson et al. |
| 2006/0199842 | A1 | 9/2006 | Weiner et al. |
| 2006/0204486 | A1 | 9/2006 | Pyke et al. |
| 2006/0205710 | A1 | 9/2006 | Schlienger |
| 2006/0205722 | A1 | 9/2006 | Andersson et al. |
| 2006/0205780 | A1 | 9/2006 | Thygesen et al. |
| 2006/0205781 | A1 | 9/2006 | Thygesen et al. |
| 2006/0264465 | A1 | 11/2006 | Weiner et al. |
| 2006/0264466 | A1 | 11/2006 | Weiner et al. |
| 2006/0286610 | A1 | 12/2006 | Brann |
| 2006/0292606 | A1 | 12/2006 | Brann |
| 2007/0260064 | A1 | 11/2007 | Tolf et al. |
| 2007/0264330 | A1 * | 11/2007 | Ragnu-Tolf ......... A61K 9/2059 |
| | | | 424/464 |
| 2008/0051429 | A1 | 2/2008 | Van Kammen et al. |
| 2008/0280886 | A1 | 11/2008 | Gant et al. |
| 2009/0053329 | A1 | 2/2009 | Peters et al. |
| 2009/0082342 | A1 | 3/2009 | Uldam et al. |
| 2009/0082388 | A1 | 3/2009 | Hacksell |
| 2009/0186921 | A1 | 7/2009 | Andersson et al. |
| 2014/0018348 | A1 | 1/2014 | Javitt |
| 2014/0162942 | A1 | 6/2014 | Ghosal et al. |
| 2014/0221395 | A1 | 8/2014 | Dhnoa |
| 2014/0329903 | A1 | 11/2014 | Burstein et al. |
| 2014/0349976 | A1 | 11/2014 | Hacksell et al. |
| 2015/0231126 | A1 | 8/2015 | Peters |
| 2015/0313888 | A1 | 11/2015 | Mills et al. |
| 2016/0237036 | A1 | 8/2016 | Andersson et al. |
| 2018/0037549 | A1 | 2/2018 | Biljan |
| 2019/0030015 | A1 | 1/2019 | Weiner et al. |
| 2019/0047955 | A1 | 2/2019 | Carlos et al. |
| 2019/0117636 | A1 | 4/2019 | Burstein |
| 2019/0216791 | A1 | 7/2019 | Tejwani et al. |
| 2019/0231767 | A1 | 8/2019 | Parkinson |
| 2019/0240211 | A1 | 8/2019 | Parkinson |
| 2020/0009122 | A1 | 1/2020 | Tejwani et al. |
| 2020/0061045 | A1 | 2/2020 | Burstein |
| 2020/0078346 | A1 | 3/2020 | Parkinson |
| 2020/0165202 | A1 | 5/2020 | Carlos et al. |
| 2020/0181087 | A1 | 6/2020 | Carlos et al. |
| 2020/0222381 | A1 | 7/2020 | Tejwani et al. |
| 2020/0237739 | A1 | 7/2020 | Coate et al. |
| 2020/0323836 | A1 | 10/2020 | Weiner et al. |
| 2021/0077479 | A1 | 3/2021 | Tejwani et al. |
| 2021/0161880 | A1 | 6/2021 | Foff |
| 2021/0283118 | A1 | 9/2021 | Tejwani et al. |
| 2022/0000852 | A1 | 1/2022 | Burstein |
| 2022/0016101 | A1 | 1/2022 | Burstein et al. |
| 2022/0024871 | A1 | 1/2022 | Carlos et al. |

**FOREIGN PATENT DOCUMENTS**

| | | |
|---|---|---|
| CN | 104961672 A | 10/2015 |
| CN | 105111123 A | 12/2015 |
| CN | 105153016 A | 12/2015 |
| CN | 105418460 A | 3/2016 |
| CN | 105481757 A | 4/2016 |
| CN | 105820110 A | 8/2016 |
| CN | 106543072 A | 3/2017 |
| EP | 0005318 B1 | 1/1979 |
| EP | 0061333 B1 | 9/1982 |
| EP | 0260070 B1 | 3/1988 |
| EP | 0379441 A1 | 7/1990 |
| EP | 0548015 B1 | 6/1993 |
| EP | 0625507 B1 | 11/1994 |
| EP | 1576985 A1 | 9/2005 |
| HU | 157325 | 3/1998 |
| JP | 51052176 | 5/1976 |
| JP | 52085174 A | 7/1977 |
| WO | WO-9427967 A1 | 12/1994 |
| WO | WO-9708166 A1 | 3/1997 |
| WO | WO-9711940 A1 | 10/1997 |
| WO | WO-9738665 A2 | 10/1997 |
| WO | WO-9738984 A1 | 10/1997 |
| WO | WO-9811128 A1 | 3/1998 |
| WO | WO-9817646 A1 | 4/1998 |
| WO | WO-98/44921 A1 | 10/1998 |
| WO | WO-98/50534 A1 | 11/1998 |
| WO | WO-9952927 A1 | 10/1999 |
| WO | WO-2000/020636 A1 | 4/2000 |
| WO | WO-0023076 A1 | 4/2000 |
| WO | WO-0056335 A1 | 9/2000 |
| WO | WO-0069497 A1 | 10/2000 |
| WO | WO-0069810 A1 | 11/2000 |
| WO | WO-2001/029008 A1 | 4/2001 |
| WO | WO-0144191 A1 | 6/2001 |
| WO | WO-0166521 A1 | 9/2001 |
| WO | WO-0187839 A1 | 11/2001 |
| WO | WO-2001089498 A2 | 11/2001 |
| WO | WO-0224649 A1 | 3/2002 |
| WO | WO-2002038142 A2 | 5/2002 |
| WO | WO-02076464 A1 | 10/2002 |
| WO | WO-02079186 A2 | 10/2002 |
| WO | WO-03057698 A2 | 7/2003 |

ACADIA_1287388

Appx96

**US 11,452,721 B2**

Page 3

(56)                **References Cited**

FOREIGN PATENT DOCUMENTS

| WO | WO-03062206 A2 | 7/2003 |
|----|----------------|--------|
| WO | WO-03070246 A1 | 8/2003 |
| WO | WO-03086400 A1 | 10/2003 |
| WO | WO-04000808 A2 | 12/2003 |
| WO | WO-04039322 A2 | 5/2004 |
| WO | WO-04064753 A2 | 8/2004 |
| WO | WO-2004064738 A2 | 8/2004 |
| WO | WO-05053796 A1 | 6/2005 |
| WO | WO-05063254 A2 | 7/2005 |
| WO | WO-05112927 A1 | 12/2005 |
| WO | WO-2006036874 A1 | 4/2006 |
| WO | WO-2006037043 A1 | 4/2006 |
| WO | WO-06104826 A2 | 10/2006 |
| WO | WO-2007124136 A1 | 11/2007 |
| WO | WO-2007133802 A2 | 11/2007 |
| WO | WO-2008116024 A2 | 9/2008 |
| WO | WO-2008141057 A1 | 11/2008 |
| WO | WO-2008144326 A2 | 11/2008 |
| WO | WO-2008144665 A1 | 11/2008 |
| WO | WO-2009035473 A2 | 3/2009 |
| WO | WO-2009039460 A2 | 3/2009 |
| WO | WO-2009039461 A2 | 3/2009 |
| WO | WO-2010111353 A1 | 9/2010 |
| WO | WO-2011047341 A2 | 4/2011 |
| WO | WO-2011085216 A2 | 7/2011 |
| WO | WO-2014085362 A1 | 6/2014 |
| WO | WO-2015085283 A1 | 6/2015 |
| WO | WO-2016201373 A1 | 12/2016 |
| WO | WO-2017011767 A2 | 1/2017 |
| WO | WO-2017015272 A1 | 1/2017 |
| WO | WO-2017165635 A1 | 9/2017 |
| WO | WO-2017172757 A1 | 10/2017 |
| WO | WO-2018118626 A1 | 6/2018 |
| WO | WO-2018200977 A1 | 11/2018 |
| WO | WO-2019046167 A1 | 3/2019 |
| WO | WO-2019177973 A1 | 9/2019 |
| WO | WO-2020092618 A1 | 5/2020 |
| WO | WO-2021016369 A1 | 1/2021 |
| WO | WO-2021030607 A1 | 2/2021 |

OTHER PUBLICATIONS

U.S. Appl. No. 10/409,782, Azacyclic compounds, filed Apr. 7, 2003, U.S. Pat. No. 6,756,393.
U.S. Appl. No. 13/053,079, Methods of treatment using selective 5-HT2A inverse agonists, filed Mar. 21, 2011, U.S. Pat. No. 9,765,053.
U.S. Appl. No. 14/628,156, Azacyclic compounds, filed Feb. 20, 2015, U.S. Pat. No. 9,296,694.
U.S. Appl. No. 10/759,564, Selective serotonin 2A/2C receptor inverse agonists as therapeutics for neurodegenerative diseases, filed Jan. 15, 2004, U.S. Pat. No. 7,601,740.
U.S. Appl. No. 11/416,527, Selective Serotonin 2A/2C Receptor Inverse Agonists as Therapeutics for Neurodegenerative Diseases, filed May 3, 2006 2006, U.S. Pat. No. 7,732,462.
U.S. Appl. No. 11/416,855, Selective serotonin 2A/2C receptor inverse agonists as therapeutics for neurodegenerative diseases, filed May 3, 2006, U.S. Pat. No. 7,659,285.
U.S. Appl. No. 11/416,594, Selective serotonin 2A/2C receptor inverse agonists as therapeutics for neurodegenerative diseases, filed May 3, 2006, U.S. Pat. No. 7,713,995.
U.S. Appl. No. 12/759,662, Selective serotonin 2A/2C receptor inverse agonists as therapeutics for neurodegenerative diseases, filed Apr. 13, 2010, U.S. Pat. No. 7,994,193.
U.S. Appl. No. 12/759,664, Selective serotonin 2A/2C receptor inverse agonists as therapeutics for neurodegenerative diseases, filed Apr. 13, 2010, U.S. Pat. No. 8,008,323.
U.S. Appl. No. 13/169,893, Selective serotonin 2A/2C receptor inverse agonists as therapeutics for neurodegenerative diseases, filed Jun. 27, 2011, U.S. Pat. No. 8,227,487.
U.S. Appl. No. 13/539,011, Selective serotonin 2A/2C receptor inverse agonists as therapeutics for neurodegenerative diseases, filed Jun. 29, 2012, U.S. Pat. No. 8,377,959.

U.S. Appl. No. 13/750,778, Selective serotonin 2A/2C receptor inverse agonists as therapeutics for neurodegenerative diseases, filed Jan. 25, 2013, U.S. Pat. No. 8,618,130.
U.S. Appl. No. 14/086,838, Selective serotonin 2A/2C receptor inverse agonists as therapeutics for neurodegenerative diseases, filed Nov. 21, 2013, U.S. Pat. No. 8,921,393.
U.S. Appl. No. 14/537,793, Selective serotonin 2A/2C receptor inverse agonists as therapeutics for neurodegenerative diseases, filed Nov. 10, 2014, U.S. Pat. No. 9,211,289.
U.S. Appl. No. 14/935,246, Selective serotonin 2A/2C receptor inverse agonists as therapeutics for neurodegenerative diseases, filed Nov. 6, 2015, U.S. Pat. No. 9,566,271.
U.S. Appl. No. 15/397,582, Selective serotonin 2A/2C receptor inverse agonists as therapeutics for neurodegenerative diseases, filed Jan. 3, 2017, U.S. Pat. No. 10,028,944.
U.S. Appl. No. 16/019,485, Selective serotonin 2A/2C receptor inverse agonists as therapeutics for neurodegenerative diseases, filed Jun. 26, 2018, U.S. Pat. No. 10,525,046.
U.S. Appl. No. 17/474,816, Selective serotonin 2A/2C receptor inverse agonists as therapeutics for neurodegenerative diseases, filed Sep. 14, 2021, Pending.
U.S. Appl. No. 10/850,819, Selective serotonin receptor inverse agonists as therapeutics for disease, filed May 21, 2004, U.S. Pat. No. 7,820,695.
U.S. Appl. No. 11/134,769, Selective serotonin receptor inverse agonists as therapeutics for disease, filed May 20, 2005, U.S. Pat. No. 7,863,296.
U.S. Appl. No. 12/378,385, Selective serotonin receptor inverse agonists as therapeutics for disease, filed Feb. 11, 2009, U.S. Pat. No. 7,875,632.
U.S. Appl. No. 11/235,558, N-(4-fluorobenzyl)-N-(1-methylpiperidin-4-yl)-N'-(4-(2-methylpropyloxy)phenylmethyl)carbamide and its tartrate salt and crystalline forms, filed Sep. 26, 2005, U.S. Pat. No. 7,732,615.
U.S. Appl. No. 11/235,381, Salts of N-(4-fluorobenzyl)-N-(1-methylpiperidin-4-yl)-N'-(4-(2-methylprop-yloxy)phenylmethyl)carbamide and their preparation, filed Sep. 26, 2005, U.S. Pat. No. 7,868,176.
U.S. Appl. No. 12/795,547, Synthesis of N-(4-fluorobenzyl)-N-(1-methylpiperidin-4-yl)-N'-(4-(2-methylpropyloxy)phenylmethyl)carbamide and its tartrate salt and crystalline forms, filed Jun. 7, 2010, U.S. Pat. No. 7,923,564.
U.S. Appl. No. 13/081,427, Synthesis of N-(4-fluorobenzyl)-N-(1-methylpiperidin-4-yl)-N'-(4-(2-methylpropyloxy)phenylmethyl)carbamide and its tartrate salt and crystalline forms, filed Apr. 6, 2011, U.S. Pat. No. 8,236,960.
U.S. Appl. No. Synthesis of N-(4-fluorobenzyl)-N-(1-methylpiperidin-4-yl)-N'-(4-(2-methylpropyloxy)phenylmethyl)carbamide and its tartrate salt and crystalline forms, filed May 15, 2007, U.S. Pat. No. 7,790,899.
U.S. Appl. No. 13/754,769, Combination of pimavanserin and risperidone for the treatment of psychosis, filed Jan. 30, 2013, U.S. Pat. No. 9,050,343.
U.S. Appl. No. 14/647,438, Methods for the treatment of Parkinson's disease psychosis using pimavanserin, filed May 26, 2015, U.S. Pat. No. 9,446,037.
U.S. Appl. No. 15/246,412, Methods for the treatment of Parkinson's disease psychosis using pimavanserin, filed Aug. 24, 2016, U.S. Pat. No. 9,757,366.
U.S. Appl. No. 15/744,636, Methods for preparing N-(4-fluorobenzyl)-N-(1-methylpiperidin-4-yl)-N'-(4-(2-methylpropyloxy)phenylmethyl)carbamide and its tartrate salt and polymorphic form, filed Jan. 12, 2018, U.S. Pat. No. 10,597,363.
U.S. Appl. No. 16/743,607, Methods for preparing N-(4-fluorobenzyl)-N-(1-methylpiperidin-4-yl)-N'-(4-(2-methylpropyloxy)phenylmethyl)carbamide and its tartrate salt and polymorphic form, filed Jan. 15, 2020, U.S. Pat. No. 10,981,870.
U.S. Appl. No. 16/686,809, Methods for preparing N-(4-fluorobenzyl)-N-(1-methylpiperidin-4-yl)-N'-(4-(2-methylpropyloxy)phenylmethyl)carbamide and its tartrate salt and polymorphic form, filed Feb. 10, 2020, U.S. Pat. No. 10,981,871.
U.S. Appl. No. 17/203,266, Methods for preparing N-(4-fluorobenzyl)-N-(1-methylpiperidin-4-yl)-N'-(4-(2-

US 11,452,721 B2

Page 4

(56)　　　References Cited

OTHER PUBLICATIONS

methylpropyloxy)phenylmethyl)carbamide and its tartrate salt and polymorphic form, filed Mar. 16, 2021, Pending, 20220024871.

U.S. Appl. No. 17/176,723, 5-HT2A serotonin receptor inverse agonists or antagonists for use in reducing amyloid-beta peptides and accumulation of amyloid plaques, filed Feb. 16, 2021, Pending, 20220000852.

U.S. Appl. No. 16/087,604, Combination of pimavanserin and cytochrome p450 modulators, filed Sep. 21, 2018, U.S. Pat. No. 10,953,000.

U.S. Appl. No. 16/379,169, Combination of pimavanserin and cytochrome p450 modulators, filed Apr. 9, 2019, U.S. Pat. No. 10,517,860.

U.S. Appl. No. 16/684,883, Combination of pimavanserin and cytochrome p450 modulators, filed Nov. 19, 2019, U.S. Pat. No. 11,191,757.

U.S. Appl. No. 17/518,776, Combination of pimavanserin and cytochrome p450 modulators, filed Nov. 4, 2021, Pending.

U.S. Appl. No. 16/607,234, Pimavanserin for Treating Impulse Control Disorder, filed Oct. 22, 2019, U.S. Pat. No. 11,135,211.

U.S. Appl. No. 17/412,659, Pimavanserin for Treating Impulse Control Disorder, filed Aug. 26, 2021, Pending.

U.S. Appl. No. 16/471,543, Methods for the Treatment of Alzheimer's Disease Psychosis Using Pimavanserin, filed Jun. 19, 2019, Pending, 20200237739.

U.S. Appl. No. 16/363,378, Formulations of Pimavanserin, filed Mar. 25, 2019, U.S. Pat. No. 10,449,185.

U.S. Appl. No. 16/571,554, Formulations of Pimavanserin, filed Sep. 16, 2019, U.S. Pat. No. 10,646,480.

U.S. Appl. No. 16/836,086, Formulations of Pimavanserin, filed Mar. 31, 2020, U.S. Pat. No. 10,849,891.

U.S. Appl. No. 17/080,731, Formulations of Pimavanserin, filed Oct. 26, 2020, Pending, 20210283118.

U.S. Appl. No. 17/290,479, Methods of Treating Depression, Anxiety and Sexual Dysfunction Using the Compound Primavanserin, filed Apr. 30, 2021, Pending, 20220016101.

U.S. Appl. No. 17/108,623, Methods for Treating Dementia Related Psychosis, filed Dec. 1, 2020, Pending, 20210161880.

U.S. Appl. No. 17/635,459, Pimavanserin for Treating Neurodegenerative Diseases, filed Feb. 15, 2022, Pending.

U.S. Appl. No. 17/629,098, Pimavanserin for Treating Schizophrenia for Treating Psychosis Secondary to Neurodegenerative Disorders or Depressive Disorder, filed Jan. 21, 2022, Pending.

"ACP-103," Drugs of the Future, Prous Science (2006) vol. 31, No. 11, pp. 939-943.

"NUPLAZID™ (pimavanserin) Sponsor Background Information for a Meeting of the Psychopharmacologic Drugs Advisory Committee on Mar. 29, 2016," Acadia Pharmaceuticals Inc., 2016. Retrieved from the Internet (URL): <https://www.fda.gov/downloads/advisorycommittees/meetingmaterials/drugs/psychopharmacologicdrugsadvisorycommittee/ucm492453.pdf> (173 pages).

"Pimavanserin (Nuplazid) for parkinson's disease psychosis," Medical Letter on Drugs and Therapeutics, New Rochelle, NY, US (Jun. 2016) vol. 58, pp. 74-75.

Aarsland et al., "Decreased burden among caregivers of patients with Parkinson's disease psychosis (PDP) treated with pimavanserin, a selective 5-HT2A inverse agonist," (Meeting Abstract) Neurology (2015) vol. 84, No. 14, Suppl P6.044.

Abbas et al., "Pimavanserin tartrate: a 5-HT2A inverse agonist with potential for treating various neuropsychiatric disorders," Expert Opinion on Pharmacotherapy (2008) vol. 9, No. 18, pp. 3251-3259.

Acadia Pharmaceuticals, "Acadia Pharmaceuticals Announces FDA approval of New Dosing Formulation and Strength for NUPLAZID (Pimavanserin)," Press Release, San Diego (CA) Jun. 29, 2018. Retrieved from the internet (URL): http://ir.acadia-pharm.com/phoenix.zhtml?c=125180&p=irol-newsArticle&ID=2356605 (3 pages).

Adam, et al., "Effects of repeated ritanserin on middle-aged poor sleepers," Psychopharmacology (1989) 99:219-221.

Aizenstein et al., "Frequent Amyloid Deposition Without Significant Cognitive Impairment Among the Elderly," Arch. Neurol. 65(11):1509-1517 (2008).

Akin, et al., "Decreased serotonin 5-HT 2A receptor-stimulated phosphoinositide signaling in fibroblasts from melancholic depressed patients," Neuropsychopharmacology (2004) 29:2081-2087.

Anonymous, "Use of Liquids and/or Soft Foods as Vehicles for Drug Administration: General Considerations for Selection and In Vitro Methods for Product Quality Assessments Guidance for Industry," Jul. 13, 2018 (Jul. 13, 2018), XP055676101, Retrieved from the Internet: URL:https://www.fda.gov/media/114872/downl <http://www.fda.gov/media/114872/downl> oad [retrieved on Mar. 12, 2020].

Antunes, et al., "The novel object recognition memory: neurobiology, test procedure, and its modifications," Cogn. Process (2012) 13:93-110.

Bakshi, et al., "Clozapine antagonizes phencyclidine-induced deficits in sensorimotor gating of the startle response," The Journal of Pharmacology and Experimental Therapeutics (1994) 271(2)787-794.

Basha, A., "Synthesis of N, N'-disubstituted Ureas from Carbamates," Tetrahedron Letters 29(21):2525-2526 (1988).

Bekris et al., "Cerebrospinal Fluid Ab42 Levels and APP processing pathway genes in Parkinson's disease," Movement Disorders, 2015, vol. 30, No. 7, pp. 936-944, 2015.

Bennett, et al., "Suppression of dyskinesias in advanced Parkinson's disease. II. Increasing daily clozapine doses suppress dyskinesias and improve parkinsonism symptoms," Neurology (1993) 43:1551-1554.

Bhana et al., "A Review of its Use in the Management of the Behavioural and Psychological Symptoms of Dementia," Drugs & Aging 16(6):451-471 (2000).

Biagi, et al., "1,2,3-Triazoles: Structural changes on two effective inhibitors of the prostaglandin synthesis in vitro," Farmaco Ed. Sci. (1988) 43:597-611.

Bibbiani, et al., "Serotonin 5-HT1A agonist improves motor complications in rodent and primate parkinsonian models," Neurology (2001) 57:1829-1834.

Blakley, et al., "Bidirectional changes in ethanol consumption in rats with site-specific antisense down-regulation of 5-hydroxytryptamine2A receptors in brain," The Journal of Pharmacology and Experimental Therapeutics (2001) 299(1):277-289.

Blier, et al., "Potential mechanisms of action of atypical antipsychotic medications in treatment-resistant depression and anxiety," J. Clin. Psychiatry (2005) 66(suppl 8):30-40.

Blier, et al., "Putative mechanisms of action of antidepressant drugs in affective and anxiety disorders and pain," Journal of Psychiatry & Neuroscience (2001) 26(1):37-43.

Bogolubsky et al., "Bis(2,2,2-trifluoroethyl) carbonate as a condensing agent in one-pot parallel synthesis of unsymmetrical aliphatic ureas," (2014), pages S1-S67. Retrieved from URL: http://pubs.acs.org/doi/suppl/0.102l/co500025f/suppl_file co500025f_si_001.pdf, Table S2, pp. S9, entry 47.

Bogolubsky et al., "Bis(2,2,2-trifluoroethyl) carbonate as a condensing agent in one-pot parallel synthesis of unsymmetrical aliphatic ureas," ACS Combinatorial Science (2014) vol. 16, Issue 6, pp. 303-308.

Bond et al., "Physiological effects of inverse agonists in transgenic mice with myocardial overexpression of the beta-adrenoceptor," Nature (1995) 374:272-276.

Borman et al., "5-HT2B receptors play a key role in mediating the excitatory effects of 5-HT in human colon in vitro," Br. J. Pharmacol. (2002) vol. 135, No. 5, pp. 1144-1151.

Brann, M. R. "Identification of ligands by selective amplification of cells transfected with receptors and marker enzymes," Chemical Abstracts (1998) 128: 111548.

Buddhala et al. "Correlation between descreased CSF a-synuclein and Ab1-42 in Parkinson disease," Neurobiology of Aging, 2015, vol. 36, pp. 476-484, 2015.

Chaturvedi, D., "Perspectives on the Synthesis of Organic Carbamates," Tetrahedron 68:15-45 (2012).

Chaturvedi, D., "Recent Developments on the Carbamation of Amines," Curr. Org. Chem. 15:1593-1624 (2011).

ACADIA_1287390

Appx98

(56)        References Cited

OTHER PUBLICATIONS

Choi et al., "5HT2B receptor-mediated serotonin morphogenic functions in mouse cranial neural crest and myocardiac cells," *Development* (1997) vol. 124, pp. 1745-1755.

Cirrito et al., "Serotonin signaling is associated with lower amyloid-β levels and plaques in transgenic mice and humans," *PNAS* (2011) vol. 108, No. 36, pp. 14968-14973.

Colovic et al., "Acetylcholinesterase Inhibitors: Pharmacology and Toxicology," Current Neuropharmacology 11:315-335 (2013).

Cummings et al., "Pimavanserin for patients with Parkinson's disease psychosis: a randomised, placebo-controlled phase 3 trial," *Lancet* (2014) vol. 383, pp. 533-540.

Cummings et al., "Pimavanserin: Potential Treatment for Dementia-Related Psychosis." J. Prev. Alzheimers Dis. 5(4) 253-258 (2018).

Cunningham et al., "Serotonin at the Nexus of Impulsivity and Cue Reactivity in Cocaine Addiction," *Neuropharmacology* 76(0 0): 460-478.

Database CA [online] Chemical Abstracts Service, Columbus, Ohio, US; 2016, Wang et al., "Intermediate of pimavanserin and its analog, preparation method thereof and preparation method of pimavanserin and its analog," XP002761533, retrieved from STN Database accession No. 2016:451070 (reference date: Mar. 23, 2016).

Database CA [online] Chemical Abstracts Service, Columbus, Ohio, US; 2016, Zheng, Xuchun et al: "A process for preparing pimavanserin tartrate," XP002761538, retrieved from STN Database accession No. 2016:1261850 (reference date: Aug. 3, 2016).

Database WPI Week 201622, Derwent Publications Ltd., London, GB; AN 2016-17318M, XP002761536 (reference date: Aug. 19, 2015).

Database WPI Week 201623, Derwent Publications Ltd., London, GB; AN 2015-708058, XP002761532 (reference date: Oct. 7, 2015).

Database WPI Week 201635, Derwent Publications Ltd., London, GB; AN 2016-02257F, XP002761534 (reference date: Dec. 2, 2015).

Database WPI Week 201640, Derwent Publications Ltd., London, GB; AN 2016-01442V, XP002761535 (reference date: Dec. 16, 2015).

Database WPI Week 201641, Derwent Publications Ltd., London, GB; AN 2016-24419S, XP002761537 (reference date: Apr. 13, 2016).

DeClerck et al., "Increase in slow-wave sleep in humans with the serotonin-S2 antagonist ritanserin," *Current Therapeutic Research* (1987) 41(4):427-432.

Delecluse, et al., "A case of tardive tremor successfully treated with clozapine." *Movement Disorders* (1998) 13(5):846-847.

Dinc et al., "One-Pot, Solvent-Free Access to Unsymmetrical Ureas by Palladium-Catalysed Reductive Alkylation Using Molecular Hydrogen," Eur. J. Chem., 5445-5454 (2013).

Dube et al., "Carbonyldiimidazole-Mediated Lossen Rearrangement." Org. Lett. 11(24):5622-5625 (2009).

Duan, et al., "Analgetic and antiinflammatory 7-aroylbenzofuran-5-ylacetic acids and 7-aroylbenzothiophene-5-ylacetic acids," *J. Med. Chem.* (1986) 29:2326-2329.

Durif, et al., "Low-dose clozapine improves dyskinesias in Parkinson's disease," *Neurology* (1997) 48:658-662.

Eichelbaum, et al., "Influence of pharmacogenetics on drug disposition and response," *Clinical and Experimental Pharmacology and Physiology* (1996) 23:983-985.

Everett, et al., "L-Dopa: Effect on concentrations of dopamine, norepinephrine, and serotonin in brains of mice," *Science* (1970) 168:849-850.

Factor, et al. "Clozapine for the treatment of drug-induced psychosis in Parkinson's disease: Results of the 12 week open label extension in the PSYCLOPS trial," *Movement Disorders* (2001) 16(1):135-139.

Factor, et al., "Clozapine prevents recurrence of psychosis in Parkinson's disease," *Movement Disorders* (1992) 7(2):125-131.

Fava, M. et al. "A Phase 2, Randomized, Double-Blind, Placebo-Controlled Study of Adjunctive Pimavanserin in Patients with Major Depressive Disorder and an Inadequate Response to Therapy (CLARITY)." J Clin Psychiatry. Sep. 24, 2019;80(5) (13 pages).

Fitzgerald et al., "Possible Role of Valvular Serotonin 5-HT2B Receptors in the Cardiopathy Associated with Fenfluramine," *Molecular Pharmacol.* (1999) vol. 57, pp. 75-81.

Friedman et al., "A Multi-Center, Placebo-Controlled, Double-Blind Trial to Examine the Safety and Efficacy of Pimavanserin in the Treatment of Psychosis in Parkinson's Disease," *Neurology* (2010) vol. 74, No. 9, Suppl. 2, pp. A299.

Friedman, et al., "Atypical antipsychotics in the treatment of drug-induced psychosis in Parkinson's disease," *Movement Disorders* (2000) 15(2):201-211.

Friedman, et al., "Low-dose clozapine for the treatment of drug-induced psychosis in Parkinson's disease," N. Engl. J. Med. (1999) 340(10):757-763.

Friedman, J. H. "Clozapine treatment of psychosis in patients with tardive dystonia: Report of three cases," *Movement Disorders* (1994) 9(3):321-324.

Gillman, P.K. "Monoamine oxidase inhibitors, opioid analgesics and serotonin toxicity," *British Journal of Anaesthesia* (2005) 95(4):434-441.

Goldman et al., "Genetic counseling and testing for Alzheimer disease: Joint practice guidelines of the American College of Medical Genetics and the National Society of Genetic Counselors," *Genetics in Medicine* (2011) vol. 13, No. 6, pp. 597-605.

Hacksell et al., 2014, "On the Discovery and Development of Pimavanserin: A Novel Drug Candidate for Parkinson's Psychosis," Neurochem. Res., vol. 39, pp. 2008-2017.

Han et al., "Synthesis of Carbamates and Ureas Using Zr(IV)-Catalyzed Exchange Processes," Organic Letters 9(8): 1517-1520 (2007).

Hatoum, H. T. et al., "The Use of the Occupational Disruptiveness Scale of the Neuropsychiatric Inventory-Nursing Home Version to Measure the Impact of Rivastigmine on the Disruptive Behavior of Nursing Home Residents with Alzheimer's Disease," *Journal of the American Medical Directors Association* (2005) vol. 6, No. 4, pp. 238-245.

Highlights of Prescribing Information Nuplazid™ (pimavanserin), Revised Apr. 2016. Retrieved from the Internet (URL): https://www.accessdata.fda.gov/drugsatfda_docs/label/2016/207318lbl.pdf (14 pages).

Highlights of Prescribing Information Nuplazid® (pimavanserin), Revised Jun. 2018. Retrieved from the Internet (URL): https://www.accessdata.fda.gov/drugsatfda_docs/label/2018/207318s005lbl.pdf (15 pages).

Highlights of Prescribing Information Nuplazid® (pimavanserin), Revised Mar. 2018. Retrieved from the Internet (URL): https://www.accessdata.fda.gov/drugsatfda_docs/label/2018/207318s002s004lbl.pdf (15 pages).

Idzikowski, et al. 1991. A dose response study examining the effects of ritanserin on human slow wave sleep. Br J. Clin. Pharmac, 31:193-196.Idzikowski, et al., "A dose response study examining the effects of ritanserin on human slow wave sleep," Br. J. Clin. Pharmac. (1991) 31:193-196.

International Search Report and Written Opinion for International Application No. PCT/US2013/071792, dated, Jan. 1, 2014 (9 pages).

International Search Report and Written Opinion in corresponding PCT Application PCT/US2016/042933 dated Oct. 14, 2016 (13 pages).

International Search Report and Written Opinion in corresponding PCT Patent Application No. PCT/US08/057557 dated Oct. 24, 2008 (10 pages).

International Search Report and Written Opinion in corresponding PCT Patent Application No. PCT/US2017/023795 dated May 29, 2017 (11 pages).

International Search Report and Written Opinion in corresponding PCT Patent Application No. PCT/US2017/024526 dated Jul. 5, 2017 (18 pages).

International Search Report and Written Opinion in corresponding PCT Patent Application No. PCT/US2017/066340 dted Mar. 5, 2018 (13 pages).

(56)            **References Cited**

OTHER PUBLICATIONS

International Search Report and Written Opinion in corresponding PCT Patent Application No. PCT/US2018/029831 dated Jul. 11, 2018 (10 pages).
International Search Report and Written Opinion in corresponding PCT Patent Application No. PCT/US2018/048096 dated Oct. 30, 2018 (12 pages).
International Search Report and Written Opinion of the International Searching Authority for International Application No. PCT/US2019/021618 dated Jun. 12, 2019 (10 pages).
International Search Report and Written Opinion of the International Searching Authority for International Application No. PCT/US2019/058927 dated Jan. 23, 2020 (16 pages).
International Search Report and Written Opinion of the International Searching Authority for International Application No. PCT/US2020/043103 dated Dec. 18, 2020 (12 pages).
International Search Report and Written Opinion of the International Searching Authority for International Application No. PCT/US2020/046212 dated Oct. 23, 2020 (10 pages).
International-type Search Report by International Searching Authority for SE1630067-5 dated Sep. 23, 2016 (18 pages).
Ito et al., "Prediction of Human Drug Clearance from in Vitro and Preclinical Data Using Physiologically Based and Empirical Approaches," Pharm. Res., (2005) vol. 22, No. 1, pp. 103-112.
Kalgutkar, et al., "Selective inhibitors of monoamine oxidase (MAO-A and MAO-B) as probes of its catalytic site and mechanism," Medicinal Research Reviews (1995) 15(4)325-388.
Katritzky et al., Chapter V. "Reaction of Amines with Carbamic Acid Esters," Comprehensive Organic Functional Group Transformations, pp. 501-502 (1995).
Kennedy et al., "The BACE1 inhibitor verubecestat (MK-8931) reduces CNS β-amyloid in animal models and in Alzheimer's disease patients," Sci. Transl. Med. 8, 363ra150 13 pages (2016).
Kondo et al., "Novel Ruthenium-Complex Catalyzed Synthesis of Ureas from Formamides and Amines," Organometallics 16:2562-2570 (1997).
Kotachi et al., "Ruthenium catalysed N,N'-Diarylurea Synthesis from N-Aryl Substituted Formamides and Aminoarenes," J. Chem. Soc., Chem. Comm., 7:549-550 (1990).
Lane et al., "Alzheimer's Disease," Eur. J. Neurol. 25:59-70 (2018).
Lashley et al. "Cortical α-synuclein load is associated with amyloid-b plaque burden in subset of Parkinson disease patients," Acta Neuropathol. 2008, 115, 417-425.
Leysen, et al. "Serotonergic component of neuroleptic receptors," Nature (1978) 272:168-171.
Liechti, et al., "Effects of MDMA (ecstasy) on prepulse inhibition and habituation of startle in humans after pretreatment with Citalopram, Haloperidol, or Ketanserin," Neuropsychopharmacology (2001) 24(3):240-252.
Linder, et al. "Pharmacogenetics: A laboratory tool for optimizing therapeutic efficiency," Clinical Chemistry (1997) 43(2):254-266.
Loudon et al., "Conversion of Aliphatic Amides into Amines with [I,I-Bis(trifluoroacetoxy)iodo]benzene. 1. Scope of Reaction," J. Org. Chem. 49:4272-4276 (1984).
Marek et al., "The Selective 5-HT2A receptor Antagonist M100907 Enhances Antidepressant-Like Behavioral Effects of the SSRI Fluoxetine," Neuropsychopharmacology (2005) vol. 30, No. 12, pp. 2205-2215.
Marek, et al., "Synergistic action of 5-HT2A antagonists and selective serotonin reuptake inhibitors in neuropsychiatric disorders," Neuropsychopharmacology (2003) 28:402-412.
Matsumura et al., "A New Method for Synthesis of Unsymmetrical Ureas Using Electrochemically Prepared Trifluoroethyl Carbamates," J. Org. Chem. 65:1549-1551 (2000).
Medical Review(s), Application No. 207318Orig1s000, Center for Drug Evaluation and Research, Submission Date Sep. 1, 2015 [available online Jun. 3, 2016]. Retrieved from the Internet (URL): <https://www.accessdata.fda.gov/drugsatfda_docs/nda/2016/207318Orig1s000MedR.pdf> (173 pages).

Meltzer et al., "Co-therapy with pimavanserin and risperidone 2 mg provides an improved clinical profile," Schizophrenia Research (2008) vol. 98, pp. 16.
Meltzer et al., "Pimavanserin, a Serotonin(2A) Receptor Inverse Agonist, for the Treatment of Parkinson's Disease Psychosis," Neuropsychopharmacology (2010) vol. 35, No. 4, pp. 881-892.
Meltzer et al., "Serotonin Receptors: Their Key Role in Drugs to Treat Schizophrenia," Progress in Neuro-Psychopharmacology & Biol. Psych. (2003) vol. 27, pp. 1159-1172.
Meltzer, et al., "Plasma clozapine levels and the treatment of L-DOPA-induced psychosis in Parkinson's disease," Neuropsychopharmacology (1995) 12(1):39-45.
Meltzer, H. Y. "The role of serotonin in antipsychotic drug action," Neuropsychopharmacology (1999) 21(2S): 106S-115S.
Morley et al., "Antibody to Amyloid p Protein Alleviates Impaired Acquisition, Retention, and Memory Processing in SAMP8 Mice," Neurobiology of Learning and Memory (2002), 78(1):125-138.
Naritomi et al., "Prediction of human hepatic clearance from in vivo animal experiments and in vitro metabolic studies with liver microsomes from animals and humans," Drug Metab. Dispos. (2001) vol. 29, No. 10, pp. 1316-1324.
NDA Approval/Supplement Approval, NDA 210793 NDA 207318/S-003, Letter Signed Jun. 28, 2018. Retrieved from the Internet (URL): https://www.accessdata.fda.gov/drugsatfda_docs/appletter/2018/210793Orig1s000,207318Orig1s003ltr.pdf (5 pages).
Nebigil et al., "Serotonin is a novel survival factor of cardiomyocytes: mitochondria as a target of 5-HT2B-receptor signaling," FASEB J. (2003) vol. 27, No. 10, pp. 1373-1375.
Ng, et al., "L-dopa-induced release of cerebral monoamines," Science (1970) 170:76-77.
Nordstrom, et al., "High 5-HT2 receptor occupancy in clozapine treated patients demonstrated by PET," Psychopharmacology (1993) 110:365-367.
Norton et al., "Caregivers of PDP patients have an increased risk of developing emotional and social distress that is decreased when PDP is treated with pimavanserin," (Meeting Abstract) Journal of Parkinson's Disease (Sep. 2016) vol. 6, No. S1, pp. 257, Abstract No. P42.11.
Norton et al., "Decreased burden among caregivers of patients with Parkinson's disease psychosis (PDP) treated with pimavanserin, a selective 5-HT2A inverse agonist," (Meeting Abstract) Journal of Parkinson's Disease (Sep. 2016) vol. 6, No. S1, p. 88, Abstract No. P12.08.
Obach et al., "The Prediction of Human Pharmacokinetic Parameters from Preclinical and In Vitro Metabolism Data," J. Pharm. Exp. Therap. (1997) vol. 283, No. 1, pp. 46-58.
Ogawa, et al., "Effects of R-102444 and its active metabolite R-96544, selective 5-HT2A receptor antagonists, on experimental acute and chronic pancreatitis: Additional evidence for possible involvement of 5-HT2A receptors in the development of experimental pancreatitis," European Journal of Pharmacology (2005) 521:156-163.
Paiva, et al., "Effects of ritanserin on sleep disturbances of dysthymic patients," Psychopharmacology (1988) 96:395-399.
Patel, et al., "The highly selective 5-hydroxytryptamine (5-HT)2A receptor antagonist, EMO 281014, significantly increases swimming and decreases immobility in male congenital learned helpless rats in the forced swim test," Synapse (2004) 52:73-75.
Pierce, et al., "5-hydroxytryptamine-induced synovial plasma extravasation is mediated via 5-hydroxytryptamine2A receptors on sympathetic efferent terminals," Journal of Pharmacology and Experimental Therapeutics (1995) 275(1):502-508.
Poewe, W. "Psychosis in Parkinson's disease," Movement Disorders (2006) vol. 18, Suppl. 6, pp. S80-S87.
Pollak, et al., "Clozapine in drug-induced psychosis in Parkinson's disease," Lancet (1999) 353:2041-2042.
Price et al., "Pimavanserin, a 5-HT2A receptor inverse agonist, reverses psychosis-like behaviors in a rodent model of Alzheimer's disease," Behavioural Pharmacology (2002), 23:426-433.
R&D Focus Drug News (Jan. 24, 2000). Pimvaserin ACADIA lead compounds identified.
R&D Focus Drug News (Nov. 12, 2001). Pimvaserin ACADIA preclinical data.

**US 11,452,721 B2**

Page 7

(56)          **References Cited**

OTHER PUBLICATIONS

Sadzot, et al., "Hallucinogenic drug interactions at human brain 5-HT2 receptors: Implications for treating LSD-induced hallucinogenesis," *Psychopharmacology* (1989) 98:495-499.

Saltzman, et al., "Cloning of the human serotonin 5-HT2 and 5-HT1C receptor subtypes," *Biochemical and Biophysical Research Communications* (1991) 181(3):1469-1478.

Sandler and Karo, Chapter E., "Reaction of Amines with Urethanes and Carbamates," Organic Functional Group Preparations, Academic Press pp. 161-162 (1986).

Satori and Maggi, "Acyclic and Cyclic Ureas," Science of Synthesis 18: 695-699 (2005).

Saxena, et al., "Cardiovascular effects of serotonin agonists and antagonists," *Journal of Cardiovascular Pharmacology* (1990) 15(Supp. 7):S17-S34.

Shanmugam, S. "Granulation Techniques and Technologies: Recent Progresses," *BioImpacts* (2015) vol. 5, No. 1, pp. 55-63.

Shigemori et al., "The factorial structure of the mini mental state examination (MMSE) in Japanese dementia patients," BMC Geriatrics 10(36): 7 pages (2010).

Stoner et al., "Integrated oral bioavailability projection using in vitro screening data as a selection tool in drug discovery," *Int. J. Pharm.* (2004) vol. 269, No. 1, pp. 241-249.

Swedish Search Report for Patent Application No. 1730232-4 dated Mar. 28, 2018 (10 pages).

Thavonekham, "A Practical Synthesis of Ureas from Phenyl Carbamates," Synthesis 11:1189-1194 (1997).

Vanover et al., "Pharmacological Characterization of AC-90179 [2-(4-Methoxy-phenyl)-N-(4-methyl-benzyl)-N-(1-methyl-piperidin-4-yl)-acetamide Hydrochloride]: A Selective Serotonin 2A Receptor Inverse Agonist," *J. Pharmacology & Experimental Therapeutics* (2004) vol. 310, No. 3, pp. 943-951.

Vanover, Kimberly E. et al., "Pharmacokinetics, tolerability, and safety of ACP-103 following single or multiple oral dose administration in healthy volunteers," *Journal of Clinical Phamacol.* (2007) vol. 47, No. 6, pp. 704-714.

Vanover, Kimberly E. et al., "Pharmacological and Behavioral Profile of N-(4-Fluorophenylmethyl)-N-(1-methylpiperidin-4-yl)-N'-(4-(2-methylpropyloxy)phenylmethyl) Carbamide (2R,3R)-Dihydroxybutanedioate (2:1) (ACP-103), a Novel 5-Hydroxytryptamine₂ₐ Receptor Inverse Agonist," *The Journal of Pharmacology and Experimental Therapeutics* (2006) 317(2):910-918.

Vinogradova et al., Palladium Catalyzed Cross-Coupling of Aryl Chlorides and Triflates with Sodium Cyanate: A Practical Synthesis of Unsymmetrical Ureas, J. Am. Chem. Soc. 134:11132-11135 (2012).

Volk et al., "Synthesis of methyl ethyl and phenyl 4 2 methylpropoxy benzyl carbamates," The IP.com Prior Art Database, Disclosure No. IPCOM000244271D, (Nov. 27, 2015).

Weintraub et al., "Association of Dopamine Agonist Use With Impulse Control Disorders in Parkinson Disease," *Arch Neurol.* 2006 63(7):969-973.

Weintraub et al., "Clinical Spectrum of Impulse Control Disorders in Parkinson's Disease," *Movement Disorders 2015* 30(2):121-127.

Wood et al., "The Use of the Neuropsychiatric Inventory in Nursing Home Residents: Characterization and Measurement," Am. J. Geriatr. Psychiatr. 8(1):75-83 (2000).

Ye et al. "Improving response inhibition in Parkinson's disease with Atomoxetine," Biological Psychiatry, Apr. 15, 2015, 77, 740-748.

Yoshimura et al., "Hypervalent Iodine Catalyzed Hofmann Rearrangement of Carboxamides Using Oxone as Terminal Oxidant," JOC 77:11399-11404 (2012).

Yoshimura et al., (Tosylimino)phenyl-A3-iodane as a Reagent for the Synthesis of Methyl Carbamates via Hofmann Rearrangement of Aromatic and Aliphatic Carboxamides, Journal of Organic Chemistry 77:2087-2091 (2012).

*Acadia Pharmaceuticals Inc.* v. *Aurobindo Pharma Ltd., et al.* Civil Action No. 1:20-cv-00985-RGA, Declaration of R. Christian Moreton, Ph.D in Support of Defendants' Reply Claim Construction Brief, dated Jan. 19, 2022 (11 pages).

*Acadia Pharmaceuticals Inc.* v. *Aurobindo Pharma Ltd., et al.* Civil Action No. 1:20-cv-00985-RGA, Defendants' Sur-Reply Claim Construction Brief, dated Jan. 21, 2022 (23 pages).

*Acadia Pharmaceuticals Inc.* v. *Aurobindo Pharma Ltd., et al.* Civil Action No. 1:20-cv-00985-RGA, Acadia's Opening Claim Construction Brief, dated Oct. 8, 2021 (24 pages).

Acadia's NUPLAZID® product information, Retrieved from the Internet (URL): https://www.acadia-pharm.com/product/ (dated Oct. 4, 2021, 2 pages) (Exhibit 1 of *Acadia Pharmaceuticals Inc.* v. *Aurobindo Pharma Ltd., et al.* Civil Action No. 1:20-cv-00985-RGA, Acadia's Opening Claim Construction Brief, dated Oct. 8, 2021).

Highlights of Prescribing Information NUPLAZID™ (pimavanserin), Revised Apr. 2016. Retrieved from the Internet (URL): https://www.accessdata.fda.gov/drugsatfda_docs/label/2016/207318lbl.pdf (14 pages) (Exhibit 2 of *Acadia Pharmaceuticals Inc.* v. *Aurobindo Pharma Ltd., et al.* Civil Action No. 1:20-cv-00985-RGA, Acadia's Opening Claim Construction Brief, dated Oct. 8, 2021).

Highlights of Prescribing Information NUPLAZID® (pimavanserin), Revised Jun. 2018. Retrieved from the Internet (URL): https://www.accessdata.fda.gov/drugsatfda_docs/label/2018/207318s005lbl.pdf (15 pages) (Exhibit 3 of *Acadia Pharmaceuticals Inc.* v. *Aurobindo Pharma Ltd., et al.* Civil Action No. 1:20-cv-00985-RGA, Acadia's Opening Claim Construction Brief, dated Oct. 8, 2021).

2017 U.S. Pharmacopeia National Formulary, vol. 1 (7 pages) (Exhibit 4 of *Acadia Pharmaceuticals Inc.* v. *Aurobindo Pharma Ltd., et al.* Civil Action No. 1:20-cv-00985-RGA, Acadia's Opening Claim Construction Brief, dated Oct. 8, 2021).

*Acadia Pharmaceuticals Inc.* v. *Aurobindo Pharma Ltd., et al.* Civil Action No. 1:20-cv-00985-RGA, Declaration of R. Christian Moreton, Ph.D in Support of Defendants' Answering Claim Construction Brief, dated Nov. 12, 2021 (28 pages).

*Acadia Pharmaceuticals Inc.* v. *Aurobindo Pharma Ltd., et al.* Civil Action No. 1:20-cv-00985-RGA, Declaration of R. Christian Moreton, Ph.D in Support of Defendants' Answering Claim Construction Brief, dated Nov. 12, 2021 (64 pages).

*Acadia Pharmaceuticals Inc.* v. *Aurobindo Pharma Ltd., et al.* Civil Action No. 1:20-cv-00985-RGA, Defendants' Responsive Claim Construction Brief, dated Nov. 12, 2021 (30 pages).

USP 40 Phase-solubility analysis-general information, Retrieved from the Internet (URL): www.getintopharma.com <http://www.getintopharma.com> (5 pages) (Exhibit 1 of *Acadia Pharmaceuticals Inc.* v. *Aurobindo Pharma Ltd., et al.* Civil Action No. 1:20-cv-00985-RGA, Declaration of R. Christian Moreton, Ph.D in Support of Defendants' Answering Claim Construction Brief, dated Nov. 12, 2021).

Curriculum Vitae of Richard Christian Moreton (29 pages) (Exhibit A of *Acadia Pharmaceuticals Inc.* v. *Aurobindo Pharma Ltd., et al.* Civil Action No. 1:20-cv-00985-RGA, Declaration of R. Christian Moreton, Ph.D in Support of Defendants' Answering Claim Construction Brief, dated Nov. 12, 2021).

*Acadia Pharmaceuticals Inc.* v. *Aurobindo Pharma Ltd., et al.* Civil Action No. 1:20-cv-00985-RGA, Acadia's Reply Claim Construction Brief, dated Dec. 17, 2021 (28 pages).

*Acadia Pharmaceuticals Inc.* v. *Aurobindo Pharma Ltd., et al.* Civil Action No. 1:20-cv-00985-RGA, Declaration of Alexander M. Klibanov, Ph.D., in Support of Plaintiff's Reply Claim Construction Brief, dated Dec. 16, 2021 (61 pages).

Curriculum vitae of Alexander M. Klibanov (43 pages) (Exhibit A of *Acadia Pharmaceuticals Inc.* v. *Aurobindo Pharma Ltd., et al.* Civil Action No. 1:20-cv-00985-RGA, Declaration of Alexander M. Klibanov, Ph.D., in Support of Plaintiff's Reply Claim Construction Brief, dated Dec. 16, 2021).

Notice Letter of Paragraph IV Certification Regarding U.S. Pat. Nos. 10,449,185 and 10,646,480 from Aurobindo Pharma Ltd. to Acadia Pharmaceuticals, Inc. dated Jun. 10, 2020 (179 pages).

Notice Letter of Paragraph IV Certification Regarding U.S. Pat. No. 10,449,185 from Teva Pharmaceuticals USA, Inc. to Acadia Pharmaceuticals, Inc. dated Jun. 10, 2020 (83 pages).

ACADIA_1287393

Appx101

**US 11,452,721 B2**

Page 8

(56)                **References Cited**

OTHER PUBLICATIONS

Notice Letter of Paragraph IV Certification Regarding U.S. Pat. Nos. 7,732,615; 7,923,564; and 10,449,185 from MSN Laboratories Private Ltd. to Acadia Pharmaceuticals, Inc. dated Jun. 15, 2020 (18 pages).
Notice Letter of Paragraph IV Certification Regarding U.S. Pat. No. 10,646,480 from MSN Laboratories Private Ltd. to Acadia Pharmaceuticals, Inc. dated Jun. 18, 2020 (28 pages).
Notice Letter of Paragraph IV Certification Regarding U.S. Pat. Nos. 10,449,185, and 10,646,480 from Zydus Pharmaceuticals (USA) Inc. to Acadia Pharmaceuticals, Inc. dated Jun. 22, 2020 (67 pages).
Notice Letter of Paragraph IV Certification Regarding U.S. Pat. No. 10,646,480 from Teva Pharmaceuticals USA, Inc. to Acadia Pharmaceuticals, Inc. dated Jun. 23, 2020 (18 pages).
Notice Letter of Paragraph IV Certification Regarding U.S. Pat. No. 10,849,891 from Teva Pharmaceuticals USA, Inc. to Acadia Pharmaceuticals, Inc. received Dec. 23, 2020 (16 pages).
Notice Letter of Paragraph IV Certification Regarding U.S. Pat. No. 10,849,891 from Aurobindo Pharma Ltd. to Acadia Pharmaceuticals, Inc. dated Jan. 13, 2021 (26 pages).
Notice Letter of Paragraph IV Certification Regarding U.S. Pat. No. 10,849,891 from Zydus Pharmaceuticals (USA) Inc. to Acadia Pharmaceuticals, Inc. received Feb. 17, 2021 (22 pages).
Notice Letter of Paragraph IV Certification Regarding U.S. Par. No. 10,849,891 from MSN Laboratories Private Ltd. to Acadia Pharmaceuticals, Inc. received Apr. 16, 2021 (38 pages).
*Acadia Pharmaceuticals Inc. v. Aurobindo Pharma Ltd., et al.* Civil Action No. 1:20-cv-00985-RGA, Defendants' Initial Invalidity Contentions, dated Apr. 26, 2021 (241 pages) (redacted).
*Acadia Pharmaceuticals Inc. v. Aurobindo Pharma Ltd., et al.* Civil Action No. 1:20-cv-00985-RGA, Joint Claim Construction Brief, filed Jan. 28, 2022 (93 pages).
*Acadia Pharmaceuticals Inc. v. Aurobindo Pharma Ltd., et al.* Civil Action No. 1:20-cv-00985-RGA, Joint Claim Construction Appendix, filed Jan. 28, 2022 (225 pages).
*Acadia Pharmaceuticals Inc. v. Aurobindo Pharma Ltd., et al.* Civil Action No. 20-985-RGA, Memorandum Opinion, filed Apr. 6, 2022 (13 pages).
*Acadia Pharmaceuticals Inc. v. Aurobindo Pharma Limited and Aurobindo Pharma USA, Inc.,* D.Del. Civil Action No. 1-20-cv-00985: Complaint against Aurobindo Pharma Limited and Aurobindo Pharma USA, Inc. filed by Acadia Pharmaceuticals Inc., Jul. 24, 2020 (127 pages).
*Acadia Pharmaceuticals Inc. v. Hetero Labs Limited, Hetero Labs Limited Unit-V, and Hetero USA Inc.,* D.Del. Civil Action No. 1-20-cv-01022: Complaint against Hetero Labs Limited, Hetero Labs Limited Unit-V, and Hetero USA Inc. filed by Acadia Pharmaceuticals Inc., Jul. 30, 2020 (90 pages).
*Acadia Pharmaceuticals Inc. v. MSN Laboratories Private Ltd. and MSN Pharmaceuticals, Inc.,* D.Del. Civil Action No. 1-20-cv-01029: Complaint against MSN Laboratories Private Ltd. and MSN Pharmaceuticals, Inc. filed by Acadia Pharmaceuticals Inc., Jul. 30, 2020 (71 pages).
*Acadia Pharmaceuticals Inc. v. Teva Pharmaceuticals USA, Inc. and Teva Pharmaceutical Industries Ltd.,* D.Del. Civil Action No. 1-20-cv-00986: Complaint against Teva Pharmaceuticals USA, Inc. and Teva Pharmaceutical Industries Ltd. filed by Acadia Pharmaceuticals Inc., Jul. 24, 2020(126 pages).
*Acadia Pharmaceuticals Inc. v. Zydus Pharmaceuticals (USA) Inc. and Cadila Healthcare Limited,* D.Del. Civil Action No. 1-20-cv-01021: Complaint against Zydus Pharmaceuticals (USA) Inc. and Cadila Healthcare Limited filed by Acadia Pharmaceuticals Inc., Jul. 30, 2020 (153 pages).

* cited by examiner

ACADIA_1287394

EMPTY HARD CAPSULE SPECIFICATIONS

| APPROXIMATE COMPARATIVE SIZE | CAPSULE SIZE | CONVENTIONAL FILL WEIGHT (mg) TYPICAL POWDER DENSITY | | | VOLUME (Theoretical) (ml) | LENGTH ±0.8(mm) | EXTERNAL DIAMETER (mm) | WEIGHT ±10% |
|---|---|---|---|---|---|---|---|---|
| | | 0.45 (light) | 0.7 (standard) | 1.0 (heavy) | | | | |
| | 000 | 615 | 960 | 1370 | 1.37 | 26.1 | 9.9 | 163 |
| | 00 | 430 | 665 | 950 | 0.95 | 23.3 | 8.5 | 118 |
| | 0 | 305 | 475 | 680 | 0.68 | 21.7 | 7.65 | 96 |
| | 1 | 225 | 350 | 500 | 0.5 | 19.4 | 6.91 | 76 |
| | 2 | 165 | 260 | 370 | 0.37 | 18.0 | 6.35 | 61 |
| | 3 | 135 | 210 | 300 | 0.3 | 15.9 | 5.82 | 48 |
| | 4 | 95 | 145 | 210 | 0.21 | 14.3 | 5.31 | 38 |
| | 5 | 60 | 90 | 130 | 0.13 | 11.1 | 4.91 | 28 |

FIG. 1

ACADIA_1287395

Appx103



FIG. 2

ACADIA_1287396

Appx104



FIG. 3

ACADIA_1287397

Appx105



FIG. 4



FIG. 5

ACADIA_1287398

Appx106

US 11,452,721 B2

1

# FORMULATIONS OF PIMAVANSERIN

## CROSS-REFERENCE TO RELATED APPLICATIONS

This application is a continuation of U.S. patent application Ser. No. 17/080,731, filed on Oct. 26, 2020, which is a continuation of U.S. patent application Ser. No. 16/836,086, filed on Mar. 31, 2020, which is a continuation of U.S. patent application Ser. No. 16/571,554, filed on Sep. 16, 2019, which is a continuation of U.S. patent application Ser. No. 16/363,378, filed on Mar. 25, 2019, which is a continuation of International Patent Application No. PCT/US2018/048096, filed on Aug. 27, 2018, which claims priority to and the benefit of U.S. Provisional Patent Application No. 62/552,300, filed Aug. 30, 2017, and Swedish Patent Application No. 1730232-4, filed Sep. 1, 2017.

## BACKGROUND

Pimavanserin, the active component in Nuplazid®, is approved for treatment of hallucinations and delusions associated with Parkinson's disease psychosis at a dose of 34 mg, taken as two 17 mg tablets once a day. The tablets are immediate release, film-coated tablet containing 20 mg of pimavanserin tartrate, which is equivalent to 17 mg of pimavanserin free base. Inactive ingredients include pregelatinized starch, magnesium stearate, and microcrystalline cellulose. Additionally, the following inactive ingredients are present as components of the film coat: hypromellose, talc, titanium dioxide, polyethylene glycol, and saccharin sodium.

Patients suffering from neurodegenerative diseases, such as Parkinson's disease are at a risk of non-compliance when administered a drug of too large size, or if taken as more than one tablet per day as said patients often have difficulty swallowing. Formulations of pimavanserin are described in WO 2007/133802. Pimavanserin is currently approved and administered as tablets containing 20 mg pimavanserin tartrate (equivalent to 17 mg pimavanserin), taken as two tablets once a day. Each with a total 150 mg tablet weight before film coating, i.e. total weight per dose is 300 mg (equivalent to 34 mg pimavanserin). In order to simplify administration and patient compliance of pimavanserin it would be advantageous to administer pimavanserin as a single dose.

Improved manufacturing processes for single unit dose forms, particularly for smaller sized single unit dosage forms, for oral administration of a therapeutic quantity of pimavanserin are critical. The physical properties of pimavanserin, e.g. bulk density and flow, when prepared in a tablet form requires, e.g. binders and other agents that increase the finished dosage size. Pimavanserin manufactured following conventional techniques has low bulk density and poor flowability and a tendency to clump, which will adversely impact reproducibility and quantitative accurate filling of capsules during the manufacturing process.

Consequently there is a need to improve the properties of pimavanserin allowing dosing of the daily therapeutic dose as a single administration.

## SUMMARY

Provided herein are capsules comprising 5-34 mg pimavanserin (equivalent to 6-40 mg pimavanserin tartrate), or a pharmaceutically acceptable salt thereof

2

Provided herein are also pharmaceutical compositions consisting of 5-34 mg pimavanserin or a pharmaceutically acceptable salt thereof, a filler and a lubricant .

Provided herein are also processes for manufacturing a capsule comprising 5-34 mg pimavanserin or a pharmaceutically acceptable salt thereof comprising: adding water to pimavanserin or a pharmaceutically acceptable salt thereof, and granulating pimavanserin or a pharmaceutically acceptable salt thereof with the water; controlling the impeller speed and/or amperage; drying the granulated pimavanserin or a pharmaceutically acceptable salt thereof; sizing the dried granulated pimavanserin or a pharmaceutically acceptable salt thereof; blending the dried and granulated pimavanserin or a pharmaceutically acceptable salt thereof and one or more filler; encapsulating the blended pimavanserin composition in a capsule of size 3 or 4.

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 shows a table disclosing specifications of capsule sizes, commercially available.

FIG. 2 schematically discloses a process flow chart for pimavanserin granulation.

FIG. 3 schematically discloses a process flow chart for encapsulating pimavanserin granulation.

FIG. 4 shows a particle size distribution diagram of pimavanserin tartrate.

FIG. 5 shows a particle size distribution diagram of granulated pimavanserin.

## DETAILED DESCRIPTION

### Definitions

Unless defined otherwise, all technical and scientific terms used herein have the same meaning as is commonly understood by one of ordinary skill in the art. All patents, applications, published applications and other publications referenced herein are incorporated by reference in their entirety. In the event that there are a plurality of definitions for a term herein, those in this section prevail unless stated otherwise.

As used herein, "pharmaceutical composition" refers to a composition of one or more active pharmaceutical ingredient(s) alone, or administered with other chemical components, such as diluents, binders, lubricants, pharmaceutical flow agents, and/or other excipients, e.g. for forming a unit dose, such as a tablet, a capsule etc.

As used herein, "physiologically acceptable" defines a diluent, binder, or excipient that does not abrogate the biological activity and properties of the pharmaceutically active compound.

As used herein, "pharmaceutically acceptable salt" refers to a salt of a compound that does not abrogate the biological activity and properties of the compound. Pharmaceutical salts can be obtained by reaction of a compound disclosed herein with an acid or base. Base-formed salts include, without limitation, ammonium salt ($NH_4^+$); alkali metal, such as, without limitation, sodium or potassium, salts; alkaline earth, such as, without limitation, calcium or magnesium, salts; salts of organic bases such as, without limitation, dicyclohexylamine, piperidine, piperazine, methylpiperazine, N-methyl-D-glucamine, diethylamine, ethylenediamine, tris(hydroxymethyl)methylamine; and salts with the amino group of amino acids such as, without limitation, arginine and lysine. Useful acid-based salts include, without limitation, acetates, adipates, aspartates, ascorbates, benzoates, butyrates, caparate, caproate, capry-

ACADIA_1287399

Appx107

US 11,452,721 B2

3                                                    4

late, camsylates, citrates, decanoates, formates, fumarates, gluconates, glutarate, glycolates, hexanoates, laurates, lactates, maleates, nitrates, oleates, oxalates, octanoates, propanoates, palmitates, phosphates, sebacates, succinates, stearates, sulfates, sulfonates, such as methanesulfonates, ethanesulfonates, p-toluenesulfonates, salicylates, tartrates, and tosylates.

Pharmaceutically acceptable solvates and hydrates are complexes of a compound with one or more solvent of water molecules, or 0.5 to about 100, or 1 to about 100, or 1 to about 10, or one to about 2, 3 or 4, solvent or water molecules.

As used herein, to "modulate" the activity of a receptor means either to activate it, i.e., to increase its cellular function over the base level measured in the particular environment in which it is found, or deactivate it. i.e., decrease its cellular function to less than the measured base level in the environment in which it is found and/or render it unable to perform its cellular function at all, even in the presence of a natural binding partner. A natural binding partner is an endogenous molecule that is an agonist for the receptor.

An "agonist" is defined as a compound that increases the basal activity of a receptor (e.g. signal transduction mediated by the receptor).

As used herein, "partial agonist" refers to a compound that has an affinity for a receptor but, unlike an agonist, when bound to the receptor it elicits only a fractional degree of the pharmacological response normally associated with the receptor even if a large number of receptors are occupied by the compound.

An "inverse agonist" is defined as a compound, which reduces, or suppresses the basal activity of a receptor, such that the compound is not technically an antagonist but, rather, is an agonist with negative intrinsic activity.

As used herein, "antagonist" refers to a compound that binds to a receptor to form a complex that does not give rise to any response, as if the receptor was unoccupied. An antagonist attenuates the action of an agonist on a receptor. An antagonist may bind reversibly or irreversibly, effectively eliminating the activity of the receptor permanently or at least until the antagonist is metabolized or dissociates or is otherwise removed by a physical or biological process.

As used herein, a "subject" refers to an animal that is the object of treatment, observation or experiment. "Animal" includes cold- and warm-blooded vertebrates and invertebrates such as birds, fish, shellfish, reptiles and, in particular, mammals. "Mammal" includes, without limitation, mice; rats; rabbits; guinea pigs; dogs; cats; sheep; goats; cows; horses; primates, such as monkeys, chimpanzees, and apes, and, in particular, humans.

As used herein, an "excipient" refers to an inactive ingredient that is added to a pharmaceutical composition to provide, without limitation, bulk, consistency, stability, binding ability, lubrication, disintegrating ability, etc., to the composition. A "diluent" is a type of excipient.

As used herein, a "diluent", "bulking agent" and "filler" refer to an ingredient (excipient) in a pharmaceutical composition that lacks pharmacological activity but may be pharmaceutically necessary or desirable, e.g. to enhance or improve the properties of the pharmaceutical blend for manufacturing or physiological purposes. For example, a diluent or filler may be used to increase the bulk of a potent drug, whose mass is too small for manufacture or administration.

As used herein, a "binder" is an excipient holding the ingredients together, and forming granules or tablets with required mechanical strength, and may give volume to the formulation. Specific examples of binders are mono-, di-, and poly-saccharides and derivatives thereof; sugar alcohols

such as xylitol, sorbitol or maltitol; protein, such as; synthetic polymers, such as polyvinylpyrrolidone (PVP), polyethylene glycol (PEG). Binders are classified according to their application, e.g. solution binders are dissolved in a solvent (for example water or alcohol may be used in wet granulation processes). Examples include gelatin, cellulose, cellulose derivatives, polyvinylpyrrolidone, starch, sucrose and polyethylene glycol. Dry binders are added to the powder blend, either after a wet granulation step, or as part of a direct powder compression (DC) formula. Examples include cellulose, methyl cellulose, polyvinylpyrrolidone and polyethylene glycol.

As used herein a "lubricant" refers to an excipient which for example prevents ingredients and excipients to lump together, and/or sticking to the capsule filling machine. A lubricant may also ensure that the formation, filing and ejection of the capsule can occur, for example by lowering friction. Examples of lubricants are talc, silicon dioxide (silica), fatty acids or fatty acid salts, such as magnesium stearate, sodium stearate fumarate, stearic acid, etc.

As used herein a "disintegrant" refers to an excipient which disintegrate a pharmaceutical preparation on contact with an aqueous fluid.

As used herein, "coadministration" of pharmacologically active compounds refers to the delivery of two or more separate chemical entities, whether in vitro or in vivo. Coadministration means the simultaneous delivery of separate agents; the simultaneous delivery of a mixture of agents; as well as the delivery of one agent followed by delivery of a second agent or additional agents. Agents that are coadministered are typically intended to work in conjunction with each other.

The term "an effective amount" as used herein means an amount of active compound or pharmaceutical agent that elicits the biological or medicinal response in a tissue, system, animal or human that is being sought by a researcher, veterinarian, medical doctor or other clinician, which includes alleviation or palliation of the symptoms of the disease being treated.

The terms screen, screening, delump, delumping, dry milling, and sizing are used interchangeably herein. These terms refer to separation according to size.

The term "granulation" as used herein, and as conventionally used in the pharmaceutical industry, refers to the act or process in which primary powder particles are made to adhere to form larger, multiparticle entities called granules. Granules may for example be formed collecting particles together by creating mechanical bonds between them, e.g. by compression or by using a binder. Granulation is extensively used in the manufacturing of tablets and capsules.

The terms "granulated pimavanserin" and "pimavanserin granulation" are used interchangeably herein.

Generally a granulation process combines one or more particles and forms a granule that will allow tableting or the encapsulation process to be within required limits. The granulation process can be made predictable and repeatable. The granulation can be performed in a variety of equipment such as, but not limited to, low shear, high shear granulators, fluid bed granulator, roller compactor, and slugger.

The term "blending" refers to the mixing of pharmaceutical ingredients to form a mixture of the ingredients, e.g. active pharmaceutical ingredient (API) and diluent, as defined by pharmaceutical specifications in the compendial references using a variety of equipment such as, but not limited to, "V"-blenders, bin-blenders, cone-blenders.

The term "encapsulation" refers to a range of techniques used to enclose medicines in a shell, e.g. a two-piece capsule, such as a two-piece hard shell capsule. The capsule

ACADIA_1287400

Appx108

US 11,452,721 B2

**5**

referred to herein may be taken orally. Capsules may be designed with a telescoping cap and body manufactured from e.g. gelatin or cellulose.

Compounds

Pimavanserin, which is also known as N-(1-methylpiperidin-4-yl)-N-(4-fluorophenylmethyl)-N'-(4-(2-methylpro-

**6**

pyloxy)phenylmethyl)carbamide,     N-[(4-fluorophenyl) methyl]-N-(1-methyl-4-piperidinyl)-N'-[4-(2-methylpropoxy)phenyl]methyl -urea, 1-(4-fluorobenzyl)-1-(1-methylpiperidin-4-yl)-3-[4-(2-methylpropoxy)benzyl] urea, or ACP-103. Pimavanserin commonly is administered as pimavanserin tartrate and has the structure of Formula (I):

(I)



Pimavanserin has previously been synthesized according to the method disclosed in Scheme I.

SCHEME I: SYNTHESIS OF PIMAVANSERIN

ACADIA_1287401

Appx109

US 11,452,721 B2

7                    -continued                    8



30

Alternative methods for preparing pimavanserin are disclosed in WO2017/015272, which is incorporated herein by reference in its entirety.

Pimavanserin and methods for its use are described in U.S. Pat. Nos. 7,601,740; 7,659,285; 7,713,995; 7,732,462; 7,994,193 and 8,008,323, the entirety of each of which is hereby incorporated by reference. Pimavanserin can be obtained in a number of salt and crystalline forms. Exemplary pharmaceutically acceptable salts include the tartrate, hemi-tartrate, citrate, fumarate, maleate, malate, phosphate, succinate, sulphate, and edisylate (ethanedisulfonate) salts. Pimavanserin salts including the aforementioned ions, among others, are described in U.S. Patent Publication No. 2006-0111399, filed Sep. 26, 2005, the entirety of which is incorporated herein by reference. In an embodiment provided herein, pimavanserin is the tartrate salt of pimavanserin. Several crystalline forms of the tartrate salt of pimavanserin have been described in U.S. Patent Publication No. 2006-0106063, filed Sep. 26, 2006, the entirety of which is incorporated herein by reference. See also U.S. Pat. Nos. 7,732,615; 7,795,547; 7,790,899; 7,868,176, the entirety of each of which is incorporated by reference. In an embodiment provided herein, pimavanserin is the crystalline form of the tartrate salt of pimavanserin Form A. In another embodiment, pimavanserin is the crystalline form of the tartrate salt of pimavanserin Form C. Pimavanserin (including, for example, the tartrate salt) may be formulated into tablets, such as is described in U.S. Patent Publication Nos. 2007-0260064, filed May 15, 2007 and 2007-0264330, filed May 15, 2007, each of which are incorporated herein by reference in their entireties.

The pharmacological activity of pimavanserin has been previously reported. See U.S. Patent Publication Nos. 2004/0213816 and 2009/0053329, the entirety of each of which is hereby incorporated by reference. Pimavanserin is active in a number of models thought to be predictive of antipsychotic activity such as DOI ((±)-2,5-dimethoxy-4-iodoamphetamine, a serotonin agonist) induced head twitches in the rat and attenuation of hyperactivity in mice induced by the N-methyl-D-aspartate antagonist MK-801. The compound was effective in these models at oral doses of 3 and 10 mg/kg.

Suitable routes of administration of pimavanserin may, for example, include oral, rectal, transmucosal, topical, or intestinal administration; parenteral delivery, including intramuscular, subcutaneous, intravenous, intramedullary injections, as well as intrathecal, direct intraventricular, intraperitoneal, intranasal, or intraocular injections. The compounds can also be administered in sustained or controlled release dosage forms, including depot injections, osmotic pumps, pills, transdermal (including electrotransport) patches, and the like, for prolonged and/or timed, pulsed administration at a predetermined rate. Embodiments provided herein relate to oral administration of a capsule comprising pimavanserin granulation.

The pharmaceutical compositions described herein comprised in a capsule refer to compositions prepared by methodologies not conventionally used in granulation, such as high and low shear granulation, e.g. using low amounts of water.

For oral administration, the compositions can be formulated readily by combining the active pharmaceutical ingredient (API) (e.g., pimavanserin or pimavanserin tartrate) with pharmaceutically acceptable binders or diluents well known in the art. Such binders or diluents enable the API disclosed herein to be formulated as tablets, pills, dragees, capsules, liquids, gels, syrups, slurries, suspensions and the like, for oral ingestion by a patient to be treated.

Provided herein is pimavanserin and pharmaceutically acceptable salts thereof having altered properties, such as increased bulk density, improved flow, and compressibility allowing the pharmaceutical manufacturing of a capsule

ACADIA_1287402

Appx110

US 11,452,721 B2

9

comprising about 5-34 mg pimavanserin, such as about 34 mg, which for example may be filled in a size 3 or 4 capsule, such as a capsule of size 4.

It has herein been demonstrated that altering the flow and bulk density of pimavanserin, and compositions comprising pimavanserin using methods described herein results in a reproducible and quantitatively accurate filling of small sized capsules (e.g. size 3 or 4 capsules) in a scaled up pharmaceutical manufacturing processes, e.g. for manufacturing of about 1,000,000 capsules or more, for example at a speed of 40-90,000 capsules per hour.

Pharmaceutical manufacturing as used herein implies certain requirement being met such as manufacturing efficiency and economical requirements. Although also product quality and performance are ensured through the design of effective and efficient manufacturing processes, product and process specifications are based on a mechanistic understanding of how formulation and process factors affect product performance, e.g. variability between batches, assuring continuous real-time quality of the product and the materials, e.g. excipients. Additionally, regulatory policies and procedures used to meet official requirements such as those set forth by health authorities, such as EMA (European Medicine agency) and FDA (U.S. Food and Drug Administration) and similar agencies in order to obtain the required quality of a drug product has an impact on the pharmaceutical manufacturing. For example, risk-based regulatory approaches recognize the level of scientific understanding of how formulation and manufacturing process factors affect product quality and performance and the capability of process control strategies to prevent or mitigate the risk of producing a poor quality product. For example, manual filling of capsules would not be considered relevant by those skilled in the art as manual filling of capsules cannot provide high reproducibility at the filling speed required to manufacture batches containing more than 100,000 capsules. Consequently those skilled in the art setting out to improve the formulation of an existing active pharmaceutical ingredient (API) for example to improve patient compliance, are working with tools used within the field of pharmaceutical manufacturing of small molecules.

Generally when improving the flow of an API (active pharmaceutical ingredient) the fill weight is increased. Increasing the fill weight is counterproductive to filling a small volume, such as a size 3 or even a size 4 capsule, at the production speeds required, such as 40-90,000 capsules per hour.

Disclosed herein are pharmaceutical manufacturing processes for obtaining suitable strength capsules of pimavanserin or a pharmaceutically acceptable salt thereof, said process comprises spraying water to pimavanserin, followed by a granulation process, wherein pimavanserin is granulated without addition of a binder, and blending followed by encapsulation. The particle size distribution, and/or bulk density of the granulated pimavanserin is controlled and matched to other excipient(s) to improve flow of the composition and assure content uniformity and low variability of the product. Additionally matching of excipient(s) allows reproducibility during encapsulation of pimavanserin. The matching of physical properties of API and other excipients used herein enables pharmaceutical manufacturing, in particular capsule filling (encapsulating the dried pimavanserin granulation in capsules of size 3 or 4) at sufficient speed such as more than 40,000 capsules per hour. Matching of API may for example be done by matching the particle size distribu-

10

tion of the API and one or more excipient. The bulk density of the API and the one or more excipients may also be matched.

For example, as shown in table 1, pimavanserin granulation, as obtained by the pharmaceutical manufacturing described herein vs the native API (active pharmaceutical ingredient (e.g., pimavanserin tartrate), obtained for example as decribed in W02017/015272), the bulk density and the Carr's Index (Carr's Compressibility Index) have been substantially altered which enables the filling of the above mentioned small capsule. Carr's Index compares the difference between the bulk density and tapped density of a substance to determine its compressibility. The bulk density and the Carr's Index may be determined in accordance with USP<616> (method for performing Bulk and Tapped Densities, method 1) and USP<1174> (definition of powder flow) respectively.

TABLE 1

|  | Pimavanserin granulation* | Native API |
|---|---|---|
| Bulk density (g/ml) according to USP <616> | 0.508 (n = 4) | 0.294 (n = 2) |
| Carr's Index | 24 (n = 4) | 36 (n = 2) |

*final blend as disclosed in the example herein below and in table 2

Table 1 visualizes that filling of a capsule, in particular a capsule of size 3 or 4 (capsule volumes of 0.30 and 0.21 ml respectively, approximately 120 mg and 85 mg respectively at a bulk density of 0.5 g/ml). As evident from Table 1, native pimavanserin (API) would be challenging for a size 3 capsule and not possible for a capsule of size 4 without improving the bulk density (as comparison 85 mg of pimavanserin granulation would require about 0.17 ml compared to 0.29 ml for the native API) and flowability (Carr index is frequently used in pharmaceutical manufacturing as an indication of the flowability of a powder, e.g. 2016 U.S. Pharmacopoeias-National Formulary [USP 35 NF 30]).

In particular, disclosed herein are formulation, granulation, dry milling, blending, and encapsulation of pimavanserin containing novel elements. Salient features are that the known granulation technology uses atypical parameters to achieve the desired results. Spray rate, atomization and quantity of water are examples of atypical parameters used in combination with wet granulation to obtain the targeted properties of pimavanserin formulation disclosed herein. For example, pimavanserin has been successfully granulated without the use of binder by spraying, at a controlled rate and under controlled atomization conditions, a controlled amount of water to pimavanserin during the wet granulation to provide granulated pimavanserin suitable for further processing (e.g. drying, blending, etc.) in the pharmaceutical manufacturing of capsules containing 5-34 mg pimavanserin, such as 10-34 mg capsules of size 3 or 4. Prior to the surprising finding that pimavanserin could be successfully wet granulated achieving the targeted improved physical properties (e.g. bulk density) without the addition of a binder, and by adding a small, such as 2-15% w/w, e.g. 3-10% w/w, 3-8% w/w amount of water to pimavanserin by spraying, many different granulation methods were contemplated and tested, and some discussed more in detail hereinbelow.

In one embodiment, High Shear Granulation (HSG) utilizing a small quantity of water, such as approximately 3-8% w/w of the dry ingredients, under appropriate HSG parameters for atomization, spray rate, impeller speed, and chopper speed was found to provide the required improvements

ACADIA_1287403

US 11,452,721 B2

11

to the pimavanserin (API) physical properties, such as increased bulk density, improved flow, and compressibility. The small quantity of water, its application using appropriate water atomization and/or water application rate are important reasons for the improved properties of pimavanserin. It has herein been demonstrated that the atomized spraying of a small amount of water during the granulation of pimavanserin achieves a wetting of pimavanserin that provides a granulated pimavanserin suitable for pharmaceutical manufacturing of a capsule, such as a capsule of size 4 comprising 10-34 mg pimavanserin. The actual amount of water to be sprayed at the granulation of pimavanserin may vary from batch to batch (depending on surrounding factors such as humidity, temperature, exact properties of the API batch, etc) but is still consider to be a small amount, e.g. 3-10% w/w based on the dry ingredients. The amount of water and the granulation process disclosed herein is controlled by controlling the impeller energy to achieve the targeted impeller speed. The appropriate impeller speed ensures sufficient mixing and controls the growth of granules. The specific small amount of water needed for each batch is controlled by the power consumption (amperage) of the granulator, i.e., if the amperage is too high, additional amounts of water could be sprayed to the granulate in order to obtain pimavanserin having the properties desired in order to pharmaceutically manufacture capsules comprising 5-34 mg pimavanserin. Adding too much water may alter other properties of the API, such as its crystallinity. The properties are achieved via a manufacturing process that includes granulation, using a suitable granulator, e.g. a high shear granulator, simultaneously spraying the adequate amount of water while mixing, followed by screening, and blending appropriate quantities of excipients. In some embodiments the lack of a binder, and using pimavanserin, properly wetted and not over-wetted are believed to be reasons for the fill uniformity observed using the herein described manufacturing process. Over-wetted granulation could seriously affect the further processing. In some embodiments particle size distribution of the granulated pimavanserin is controlled and matched to the particle size distribution of the diluents and other excipients to minimize segregation and improve flow and capsule filling reproducibility. The particle size distribution is also considered a factor involved in the successful filing of capsules of size 3 or 4, as a too aggressive milling would cause a wider particle size distribution and hamper the encapsulation. Examples of suitable particles size distribution of the granulated pimavanserin is a particle size distribution (D90) of 60-450 μm, such as 100-420 μm, such as above 250 μm. Particle size distribution referred to herein is obtained using Laser light scattering particle size (LLS PS) analyses of granulated pimavanserin conducted on a Malvern Mastersizer 2000 LLS PS system using a Scirocco 2000 dry dispersion unit using standard non-GMP conditions, and in a sample size of about 2 -10 g. Suitable diluents such as microcrystalline cellulose, silicified microcrystalline cellulose, low substituted hydroxylpropyl cellulose or similar materials to a concentration approximately one-half of the granulation and lubricated with magnesium stearate, sodium stearyl fumarate or other suitable lubricants to prevent sticking to the encapsulation tooling. In some embodiments the particle size distribution of the diluent is matched to the above mentioned particle size distribution of granulated pimavanserin, for example microcrystalline cellulose having a particle size distribution (D90) is 180-420 μm, such as above 250 μm. In some embodiments the lubricant, such as magnesium stearate is also matched to the API. In some embodiments the matching

12

of the particle size distribution of the lubricant, compared to the diluent, is less important in view of the lower amounts used in some embodiments. Optionally suitable binders and/or disintegrants may be included in the blending of the pimavanserin granulation. In some embodiments pimavanserin is blended with a diluent, e.g. microcrystalline cellulose and lubricant, magnesium stearate only, whereas amounts of water were added by spraying during the granulation process

In some embodiments the particle size distribution (D90) of the composition is 60-380 μm, such as 75-350 μm, such as 100-300 μm.

FIG. 4 discloses the particle size distribution of pimavanserin tartrate, prior to the herein disclosed granulation process.

FIG. 5 discloses the particle size distribution of the granulated pimavanserin. The arrow in FIG. 5 indicates the area of particles size distribution of the API. A substantial change in the particle size distribution can be seen, e.g. the D90 has increased from about 30 μm for the API to above 279 μm.

The matching of particles size distribution of the API and diluent is considered one factor influencing the herein disclosed robust process and reproducible encapsulation of pimavanserin, e.g. 10-34 mg pimavanserin in size 4 capsules, e.g. two-piece capsules.

In some embodiment bulk density between the API and the diluent and optionally the lubricant are matched, for example granulated pimavanserin having a bulk density above >0.40 g/ml, such as about 0.5 g/ml, and the diluent 0.35-0.46 g/ml.

In some embodiments both the bulk density and the particle size distribution is used in combination in order to adequately match at least the pimavanserin granulate and the diluent in order to obtain capsules of size 4 comprising 10-34 mg pimavanserin.

In some particular embodiments the granulation of pimavanserin may be completed and the obtained pimavanserin granulation having suitable properties for the herein disclosed manufacturing process, in the absence of a binder. It is however possible to include a binder in the granulation but for various reasons not necessarily preferred.

In some embodiments disclosed herein the blended pimavanserin composition, as described herein, comprised in a capsule (e.g a size 4 capsule) have an average Specific Energy (SE) of less than 5 mJ/g, such as less than 4.5 mJ/g, such as less than 4 mJ/g, as obtained by FT4 measurement.

In some embodiments disclosed herein the blended pimavanserin composition, as described herein, comprised in a capsule (e.g a size 4 capsule) have an average Flow Rate Index (FRI) of 0.9-1.2, such as 1.0-1.1, as obtained by FT4 measurement.

In some embodiments disclosed herein the blended pimavanserin composition, as described herein, comprised in a capsule (e.g a size 4 capsule) have an average Specific Energy (SE) of less than 4.5 mJ/g, and an average Flow Rate Index (FRI) of 0.9-1.2.

Pharmaceutical Formulations

Some embodiments include a pharmaceutical composition comprising granulated pimavanserin tartrate, Form C which may include a small percentage of Form A, including a pharmaceutically acceptable diluent, binder or excipient, or combination thereof.

The pharmaceutical compositions disclosed herein, are in some embodiments, provided as a two-piece hard shell capsules made of gelatin (fish, mammalian, or vegetable sourced) or other combinations. The two-piece hard shell

ACADIA_1287404

Appx112

US 11,452,721 B2

13

capsules may contain the pimavanserin granules with a filler/diluent and/or lubricants.

The finished dosage forms may be presented in packaging containing metal or plastic foil such as a blister pack. The pack may also be accompanied with a notice associated with the container in form prescribed by a governmental agency regulating the manufacture, use, or sale of pharmaceuticals, which notice is reflective of approval by the agency of the form of the drug for human or veterinary administration. Such notice, for example, may be the labeling approved by the U.S. Food and Drug Administration for prescription of drugs, or the approved package insert.

WO 2007/133802 discloses that only certain components are compatible with pimavanserin, and although certain components are compatible their use in the herein disclosed capsule may not be preferred. A particular example is lactose as it may have implications to the administration to subject being lactose intolerant.

Some requirements of the pharmaceutical manufacturing for pimavanserin are commercial operational speed, as well as stringent regulatory requirements. For example, the encapsulation equipment used is capable of ~100,000 capsules per hour, such as 40,000-90,000 capsules per hour, such as 60,000-86,000 capsules per hour, such as 60,000-70,000 capsules per hour. The manufacturing must be reproducible and robust to be capable of this output while producing quality product.

Prior to the surprising finding, i.e. the herein disclosed processes and compositions resulting in a robust and reliable filling of 5-34 mg pimavanserin in capsules of size 3 or 4, such as size 4 capsules, many experiments were done.

Comparative experiments resulting in unacceptable products

For example, the pharmaceutical industry has used fluid-bed layering extensively for several decades to produce small spherical particles with improved properties (e.g. flowability and compressibility) for further downstream processing, such as capsule filling. During this two-phase process that includes simultaneous spraying and drying, the addition of a binder causes primary particles to increase the diameter of the substrate by the addition of a dense layer of the drug and a binder, one such technique evaluated was top spray layering (use of conventional top-spray fluidized bed granulation equipment to apply the drug layer to a small substrate particle), e.g. using the following composition about 63% w/w microcrystalline cellulose (the spherical particle (bead) around which the API is layered or applied), about 28% w/w of pimavanserin tartrate (API), about 6% w/w povidone (binder), such as povidone K30, and about 2% w/w HPMC E5 (Methocel™ E5) (hydroxypropylmethyl cellulose). The top spray fluid-bed layering resulted in particles having an acceptable flow and bulk density but unacceptable stability and particle size distribution as well an unacceptable amount of impurities. These unacceptable disadvantages, such as unacceptable stability, less favourable dissolution, resulted in deeming this process option unsuitable for the current purpose.

Wurster Layering (a similar and more common process to the Top Spray Layering described above) was tested and found to produce particles having an acceptable flow and bulk density but unacceptable stability and particle size distribution as well an unacceptable amount of impurities. These unacceptable disadvantages, such as unacceptable stability, less favourable dissolution, resulted in deeming this process option unsuitable for the current purpose. One composition tested was the same as in the top spray layering.

14

Extrusion/spheronization is especially useful in producing semi-spherical, dense granules. The physical advantages of extrusion/spheronization vs. other multiparticulate approaches can include relatively high drug loading, improved flow properties, narrow particle size distribution, smooth and a coatable surface, low friability, and uniform packing characteristics. The process consists of five operations, i.e. wet granulating the formulation, followed by screening to form cylindrical extrudates, adding the extrudate to a spheronizer forming spheres from the extrudate, and drying the spheres. Optionally coatings may be applied to the spheres. A composition containing about 27% w/w pimavanserin tartrate as a 32% w/w slurry in water, about 68% w/w microcrystalline cellulose (e.g. Avicel PH 101), about 4% hydroxypropylmethyl cellulose (e.g. Methocel™ A15LV), and about 1% w/w povidone (e.g. povidone K30) resulted in particles having an acceptable flow and bulk density but unacceptable stability and particle size distribution as well an unacceptable amount of impurities. The particles were milled in order to achieve a uniform particle size, yet the amount of impurities and stability were found to be unacceptable.

Twin-Screw Melt Granulation has increased in popularity in pharmaceutical manufacturing due to the numerous advantages of this continuous manufacturing technique over traditional batch wet granulation. Twin-Screw Melt Granulation does not require the use of organic or aqueous solvents, making the entire process less consuming in terms of time and energy as compared to wet granulation, and in view of other tests disclosed hereinabove the use of solvent was deemed as a potential source for the impurities and may have been a factor for the stability issues observed. Consequently Twin-Screw Melt Granulation was evaluated using a binder/disintegrant, heat and agitation. As binder/disintegrant a low substituted hydroxypropyl cellulose (e.g. LH-B1 marketed by Shin Etsu), and Kollidon® VA64 marketed by BASF were used in separate compositions using about 50% w/w pimavanserin tartrate and LH-B1 and Kollidon VA64 respectively. In either case the resulting particles were screened and evaluated resulting in particles having an acceptable flow and bulk density but unacceptable finding of impurities as well as unacceptable dissolution.

Conventionally wet granulation (both high shear and low shear) have been used for a long time in pharmaceutical manufacturing, an example of a conventional wet granulation process is described in WO2009/061909 wherein table 7 discloses 40-50% w/w of water being used in the wet granulation, i.e. conventionally a wet granulation uses a liquid, e.g. water in order to prepare a wet mass with sufficient plasticity which can be subsequently wet-milled and dried produce granules with improved flow and density properties. High shear granulation was chosen for evaluation due to the higher energy it is capable of imparting to the particles, which was known to improve the particle density, spherocity, and consequently the capsule filling capability and particle flow, respectively. The quantity of water used in conventional or traditional wet granulation proved to be problematic resulting in very large, wet, adhesive pimavanserin granules that would not be easily dried in a fluid bed dryer. Additionally, large quantity of water would also result in high impurities and changes in the crystallinity of pimavanserin.

Several embodiments were evaluated using excipients commonly used to mitigate the impact of high water content while providing excellent granule properties. These did not improve the resulting over-wetting of the pimavanserin

ACADIA_1287405

Appx113

US 11,452,721 B2

15 | 16

blend and resulted in an adhesive wet mass that would not would not be easily dried in a fluid bed dryer.

Contrary to the above disclosed comparative experiments the present application describes processes to manufacture capsules of size 4 comprising 5-34 mg pimavanserin. As additionally disclosed above it was surprisingly found that a 100% pimavanserin high-shear granulation was possible by using only small water quantities, often large quantities of water and a binder conventionally used in high-shear granulation. In order for a small quantity of water to be effective, the distribution of the water should be finely divided providing small points of localized wetting of pimavanserin. Localized wetting is considered wetting of an immediate area around the water droplets. Examples of suitable size of the water droplets to be sprayed are about 0.05-0.15 mm The granulation of pimavanserin, for example without the presence of a binder, was achieved using a small amount of water and a nozzle, such as an atomizing nozzle, capable of producing a spray pattern that covered a large area of pimavanserin and preventing over-wetting of large areas of the batch. Suitable nozzles are commercially available, e.g. from Spraying Systems Co. Spraying of low amounts of water and appropriate impeller speed and chopper speed of the high shear granulator achieved pimavanserin granulation having altered properties and improved the flow, e.g. bulk density compared to the native API. The total quantity of water added to the pimavanserin granulation should be limited to a global value the would not result in a global state of over-wetting (global refers to a large area of the batch being over-wetted), which as described above would occur during conventional wet granulation of pimavanserin, causing an adhesive wet mass that would not be easily dried in a fluid bed dryer, i.e. not resulting in a sufficiently dried product, or too long drying times, and increasing the risk of changing the crystalline form of pimavanserin (e.g. changing pimavanserin into amorphous forms), which could result in slow dissolution when administered to a patient. As disclosed above conventionally high shear granulation utilizes amounts of water that would lead to over wetting of an API, such as pimavanserin, and the present inventors have demonstrated that an appropriate water application, e.g. using a nozzle, capable of spraying water over a large area of the API, combined with a chopper/impeller speed (e.g. by controlling amperage), results in granulated pimavanserin having improved bulk density for filling amounts disclosed herein into capsules of size 4.

In addition to the global, or batch, over-wetting a local over-wetting may also impair the properties of the API. One solution presented herein relates to applying a spray of water having a droplet size such as 0.05-0.15 mm, e.g. using a nozzle spraying the water and resulting in adequate wetting, locally and globally.

Suitable drying times of the wet granulation described herein is 120 min, such as 100 min, such as 80 min, such as 60 min. A drying time of 60 min is preferred, e.g. in view of process efficiency etc. The global quantity of water will vary depending on many factors such as the capacity of the high shear granulator, loading of the high shear granulator, the batch of pimavanserin to be granulated, surrounding environment, and may be controlled by impeller speed and chopper speed as well as the spray rate and spray pattern parameters (e.g. using a atomization nozzle), and the amperage (energy consumption) of the granulator. As the high shear granulator is an "open" system and energy from the impeller actually incorporates into the product causing the product temperature to increase favorably limiting the global impact of the added water when applied at a low rate.

However, the range of water was found to be approximately 3-15% w/w, such as 3-10% w/w, such as 3-8% w/w (based on the mass of the pimavanserin in the granulator at the start of the granulation process). As disclosed herein it has been demonstrated that pimavanserin can be granulated without the use of a binder, i.e. utilizing water only. It is however contemplated that in some embodiments suitable binders, such as cellulose, methyl cellulose, polyvinylpyrrolidone and polyethylene glycol may be used, although not a necessity. The present high shear granulation of pimavanserin utilizing e.g. 3-8% w/w water, applied by a nozzle, which can generate an atomized spray pattern, provides benefits.

Embodiments disclosed herein relate to pimavanserin tartrate as crystalline Form C, Form A or a combination thereof.

The doses referred to herein, i.e. 5-34 mg refers to pimavanserin free base (equivalent to about 6 mg-40 mg pimavanserin tartrate).

Some embodiments relates to pimavanserin tartrate Form C (40 mg of pimavanserin tartrate, equivalent to 34 mg pimavanserin free base) being encapsulated in capsules of size 3 or 4, such as capsules of size 4.

One embodiment of the compositions described herein includes pimavanserin tartrate granulation without binder, dried, and thereafter blended with less than 60% w/w microcrystalline cellulose such as Avicel PH302 or equivalent microcrystalline cellulose, and about 1% w/w magnesium stearate.

In some embodiments the compositions described herein comprises granulated pimavanserin and microcrystalline cellulose is at least 20% w/w microcrystalline cellulose, such as 30% w/w microcrystalline cellulose, such as 40% w/w microcrystalline cellulose, such as 50% w/w microcrystalline cellulose, such as 50-89% w/w microcrystalline cellulose, such as 20-94% w/w, such as 50-94% w/w, such as 57-94% w/w, such as 57-89% w/w microcrystalline cellulose, such as 57-79% w/w microcrystalline cellulose, or 57-60% w/w microcrystalline cellulose, or 57-59.5% w/w microcrystalline cellulose, or 58.5-59.5% w/w microcrystalline cellulose, or 59% w/w microcrystalline cellulose.

In some embodiments the compositions described herein comprises granulated pimavanserin and microcrystalline cellulose and magnesium stearate, such as 0.1-3% w/w, such as 0.5-2% w/w magnesium stearate, or 0.5-1.5% w/w magnesium stearate, or 1% w/w magnesium stearate.

In some embodiments the compositions described herein comprises granulated pimavanserin (5, 10, 20 or 34 mg) and microcrystalline cellulose is at least 20% w/w microcrystalline cellulose, such as 30% w/w microcrystalline cellulose, such as 40% w/w microcrystalline cellulose, such as 50% w/w microcrystalline cellulose, such as 50-89% w/w microcrystalline cellulose, such as 20-94% w/w, such as 50-94% w/w, such as 57-94% w/w, such as 57-89% w/w microcrystalline cellulose, such as 57-79% w/w microcrystalline cellulose, or 57-60% w/w microcrystalline cellulose, or 57-59.5% w/w microcrystalline cellulose, or 58.5-59.5% w/w microcrystalline cellulose and magnesium stearate, such as 0.1-3% w/w, such as 0.5-2% w/w magnesium stearate, or 0.5-1.5% w/w magnesium stearate, or 1% w/w magnesium stearate.

The compositions described herein comprise pimavanserin and additional compatible excipients, e.g. sugars, sucrose, mannitol, sorbitol, polysaccharides (e.g. from corn, wheat, rice, potato), as well as pregelatinized or partially pregelatinized starches (e.g. STARCH 1500®), cellulose preparations such as microcrystalline cellulose (MCC) (e.g. AVICEL® PH 302, AVICEL® PH 102, VIVAPUR® 302,

ACADIA_1287406

US 11,452,721 B2

17

VIVAPUR® 102, EMCOCEL® HD 90), silicified microcrystalline cellulose (e.g. PROSOLV® 50, PROSOLV® 90, PROSOLV® HD90), lactose cellulose blends (e.g. CELLA-TOSE® 80, CELLATOSE® 90, PROSOLV® EASYtab SP), hydroxypropylmethyl cellulose, hydroxymethyl cellulose, polyvinylpyrrolidone, lubricants such as magnesium stearate, sodium stearyl fumarate, colloidal silicon dioxide, and talc.

Several tests attempting to mitigate the impact of the high water quantity used in high-shear granulation by the use of excipients generally capable of absorption of the water were made. However, these proved to be unsuccessful.

One embodiment of the compositions described herein includes pimavanserin tartrate granulation without binder, drying, and blending said granulation with microcrystalline cellulose having a bulk density of 0.35-0.46 g/ml, and wherein the bulk density of the blended composition is >0.4 g/ml, such as >0.5 g/ml.

In some embodiments the composition comprises microcrystalline cellulose (MCC) having a bulk density of about 0.40 g/ml, such as 0.3-0.5 g/ml, such as 0.35-0.46 g/ml. In some embodiment the API having a bulk density of >0.40 g/ml and MCC having a bulk density of 0.30-0.50 g/ml and is blended with magnesium stearate in order to make up a composition having a bulk density of 0.40-0.55 g/ml.

One embodiment of the compositions described herein includes pimavanserin tartrate granulation with spraying water and without any binder, followed by, drying, and blending said granulation with less than 50% w/w microcrystalline cellulose such as Avicel PH302 or equivalent microcrystalline cellulose, and about 1% w/w magnesium stearate. The spraying of water to pimavanserin tartrate is done while mixing in an appropriate granulator.

Another embodiment of the composition described above includes pimavanserin tartrate granulation containing less than 10% w/w Avicel PH302 and colloidal silicon dioxide, e.g. Aerosil Pharma 200 manufactured by Evonik, with a specific surface area from about 175 to about 225 m²/g, blended with less than 60% w/w microcrystalline cellulose, such as Avicel PH302 or equivalent microcrystalline cellulose, and about 1% w/w magnesium stearate.

Another embodiment of the composition described above includes pimavanserin tartrate granulation containing less than 10% w/w Avicel PH101 and colloidal silicon dioxide with a specific surface area from about 175 to about 225 m²/g, e.g. Aerosil Pharma 200 manufactured by Evonik, blended with less than 60% w/w microcrystalline cellulose, such as Avicel PH302 or equivalent thereof, and about 1% w/w magnesium stearate.

As used herein, whenever a USP is referred to it is the current official version at the time of filing of the application, i.e 40-NF 35, released Nov. 1, 2016 and official May 1, 2017.

Provided herein are embodiment for manufacturing pimavanserin granulation comprising: providing pimavanserin and adding water while mixing in an appropriate granulator, such as a high shear granulator; granulating and; drying the wet pimavanserin granulation, sizing the pimavanserin granulation, e.g. through a screen, such as a 10-20 mesh screen; and obtaining pimavanserin granulation. Said pimavanserin granulation being suitable for encapsulation in size 4 capsules, for example by blending with a diluent before capsule filling (encapsulation).

Provided herein are embodiment for manufacturing pimavanserin granulation by: providing pimavanserin (weighed and the loss-on-drying (LOD) moisture content determined) to a high shear granulator; pre-blending (optional); providing granulation water, e.g. 3-8% w/w, e.g. by spraying at a

18

controlled rate and/or a controlled pattern (e.g. using an atomization nozzle) while monitoring the impeller speed and/or amperage, and granulating; stopping the provision of granulation water, e.g. when the impeller amperage increases; wet massing, e.g. without changing the impeller speed; drying the wet granulation, e.g. in a fluid bed dryer until the LOD moisture is at or below the LOD moisture of the LOD moisture as provided; and sizing, e.g. through a 10-mesh screen; and obtaining pimavanserin granulation. Said pimavanserin granulation being suitable for encapsulation in size 3 or 4 capsules, for example by providing additional excipients during the screening, followed by filling of the capsule.

It is important to control the amount of water, the water application rate and/or water application method thereof (e.g. using an atomization nozzle, or another suitable spraying device) as too much water may have a negative impact, e.g. change its properties, such as its crystallinity, of pimavanserin. Adding too much water, e.g. 25% w/w, would have undesired effects on properties of pimavanserin, which would cause issues with the continued pharmaceutical manufacturing of capsules. In some embodiments water is sprayed (e.g. using an atomization nozzle) to pimavanserin while mixing. Addition of water without mixing may lead to localized over-wetting. Provided herein are embodiments wherein pimavanserin, for example pimavanserin tartrate, such as pimavanserin tartrate Form C, is granulated with water using high shear granulation. In some embodiments the amount of water is 1-10% w/w (water based on dry ingredient content), such as 3-8% w/w. In some embodiments the impeller speed and/or chopper speed of the high shear granulator is controlled in order to obtain a granulation of sufficient quality for further processing. The wet granulation is then dried, e.g. in fluid bed dryers or tray dryers at controlled conditions of temperature and drying air flow. The dried granulation is then sized using a screening mill or other appropriate milling (delumping), and blended with appropriate pharmaceutical diluents and/or binders, such as microcrystalline cellulose, enabling the filling of 5-34 mg granulated pimavanserin (equivalent to about 6 mg-40 mg pimavanserin tartrate) in a size 3 (0.30 ml volume) or 4 (0.21 ml volume) capsule. Some embodiments relates to the capsule being a capsule of size 4, and a two-piece capsule.

Provided herein is a process for manufacturing capsules containing 5-34 mg pimavanserin; by providing pimavanserin, for example pimavanserin tartrate, such as pimavanserin tartrate Form C and water, e.g. 1-10% w/w, such as 2-9% w/w, such as 3-8% w/w, such as 4-8% w/w, such as 5-8% w/w, such as 5-7% w/w to a high shear granulator, granulating pimavanserin and water, drying the pimavanserin granulation, sizing (or screening, may also be referred to as delumping) the dried pimavanserin granulation, e.g. using a screening mill, blending with one or more pharmaceutical excipients, such as one or more filler (diluent) filling a size 3 or 4 capsule, e.g. a two-piece capsule, with pimavanserin granulation . Provided herein is a process for manufacturing capsules containing 5-34 mg pimavanserin, wherein the process comprises the following (e.g. in said order): providing pimavanserin, for example pimavanserin tartrate, such as pimavanserin tartrate Form C to a high shear granulator, granulating pimavanserin together with water (e.g. 1-10% w/w, such as 2-9% w/w, such as 3-8% w/w, such as 4-8% w/w, such as 5-8% w/w, such as 5-7% w/w) while controlling the water application rate, and/or atomization parameters (e.g. by using an externally mixed, two-fluid, air-atomizing spray nozzle, such as an externally mixed, two-fluid, air-atomizing spray nozzle such as an externally mixed, two-fluid, air-atomizing spray nozzle), impeller speed (e.g. by monitoring amperage),

ACADIA_1287407

US 11,452,721 B2

19

and/or chopper speed (e.g. by monitoring amperage), drying the granulated pimavanserin, e.g. using fluid bed drying, sizing the dried pimavanserin granulation, e.g. using a screening mill or other appropriate milling device (such as oscillating mills, impact mills), blending the sized pimavanserin granulation with one or more filler/diluent (optionally including a lubricant), and final blending with a lubricant (unless the filler/diluent includes a lubricant), filling a size 3 or 4 two-piece capsule with the blended pimavanserin composition. In some embodiments the capsule is a capsule of size 4 and the amount of pimavanserin is 34 mg. As specified herein, such as hereinbelow, excipients such as diluents, binders, lubricants, pharmaceutical flow agents, and/or other excipients compatible with pimavanserin may be included. Some embodiments provide pimavanserin, microcrystalline cellulose and magnesium stearate only. Some embodiments relate to the microcrystalline cellulose having a particle size distribution (D90) of 180-340 μm. Some embodiments relate to microcrystalline cellulose having a bulk density above >0.40 g/ml. Some embodiements relate to the microcrystalline cellulose having a particle size distribution (D90) of 180-340 μm and a bulk density above >0.40 g/ml.

Provided herein are embodiments wherein the capsule is a capsule of size 4, e.g. a two-piece capsule, such as a two-piece hard shell capsule, e.g. a two-piece capsule of gelatin or hydroxypropyl methylcellulose (HPMC). Some commercial examples are VCaps®, VCaps® Plus, Coni-Snap® marketed by Capsugel.

Provided are also embodiments wherein pimavanserin (granulated), microcrystalline cellulose, for example Avicel PH302 or an equivalent microcrystalline cellulose, and/or magnesium stearate, for example vegetable grade are encapsulated in a capsule of size 4, for example a two-piece capsule.

Provided are also embodiments wherein 34 mg pimavanserin (granulated) (equivalent to 40 mg pimavanserin tartrate), microcrystalline cellulose, such as microcrystalline cellulose having a particle size distribution (D90) of 180-340 μm, for example Avicel PH302 or an equivalent microcrystalline cellulose, and/or magnesium stearate, for example vegetable grade are encapsulated in a capsule of size 4, for example a two-piece capsule.

Provided are also embodiments wherein 10 or 20 mg pimavanserin (granulated), microcrystalline cellulose, for example Avicel PH302 or an equivalent microcrystalline cellulose, and/or magnesium stearate, for example vegetable grade are encapsulated in a capsule of size 4, for example a two-piece capsule.

Provided are also embodiments wherein 34 mg pimavanserin (granulated), 59 mg microcrystalline cellulose, for example Avicel PH302 or an equivalent microcrystalline cellulose, and/or 1 mg magnesium stearate, for example vegetable grade are encapsulated in a capsule of size 4, for example a two-piece capsule. No other excipients were added.

Also provided is a pharmaceutical composition, comprising a capsule of pimavanserin and one or more pharmaceutically acceptable excipient(s) as provided herein, wherein the composition is formulated such that at least 80% of pimavanserin is released in 30 minutes upon administration to a subject.

Also provided is a pharmaceutical composition, comprising a capsule of pimavanserin and one or more pharmaceutically acceptable excipient(s) as provided herein, wherein the composition is formulated such that at least 80% of the pimavanserin is released from the composition within 30

20

minutes upon in vitro dissolution testing according to USP<711> (apparatus 1 (basket apparatus)).

The final moisture content of the pimavanserin granulation is equivalent to the starting moisture content of the pimavanserin.

Another requirement achieved by the pimavanserin capsules disclosed herein can be a long shelf-life, i.e., a shelf-life of at least 1 year is obtained, such as 2 years of shelf-life.

Examples

Manufacturing of a capsule, size 4 two-piece capsule, comprising 34 mg pimavanserin equivalent to 40 mg pimavanserin tartrate

Pimavanserin 34 mg capsules may be prepared as outline herein below.

Granulation: The required ingredients for all operations of the entire process are weighed. The loss-on-drying (LOD) moisture content of the pimavanserin is determined, for example using an appropriate LOD instrument such as those manufacture by Mettler, Ariz. Instruments, Ohaus or Denver Instruments. Drying end point may be determined using temperature, time or weight loss. Pimavanserin is charged through a screen (25-40 mesh) into a high shear granulator, for example a Glatt Powerex 50 liter high shear granulator equipped with a 25 liter bowl. Following a pre-blend in the high shear granulator (200-400 rpm), granulation water, e.g. 5-8% w/w is sprayed at a controlled rate ((18.5-26.5 g/min) at 15 psi (10.0-20.0) atomization air pressure while monitoring the impeller speed ((200-400 rpm)) and amperage, chopper speed (1600-2000 rpm). When the impeller amperage increases (such as 13-18%,), the spray of water is stopped and the mixture wet massing for 5 minutes without changing the impeller or chopper speeds. Following the 5-minute wet massing, the wet granulation is discharged and placed in a fluid bed dryer (100-140 cfm; 45-55° C.); dew point 10° C.; filter shaking 15 sec/5 sec (interval/duration) until the LOD moisture is at or below the LOD moisture of the pimavanserin at dispensing. The dried granulation is discharged from the fluid bed dryer, screened through a screen (4-12 mesh), and packaged until diluent blending and encapsulation.

Diluent Blending: The screened, dried pimavanserin granulation is dispensed (weighed) for blending/encapsulation unit operations. The required diluent and lubricant quantities are also dispensed. The dispensing is followed by delumping of pimavanserin granulation with a screening mill such as 197S or U10 Comil equipped with a screen (4-12 mesh) at 2300-2500 rpm, blending of the granulation with diluent using a bin type blender such as 2 liter TOTE blender 20 minutes at 19-21 rpm or other appropriate blender, final blending with lubricant using the same bin type blender or other appropriate blender (3 minutes at 19-21 rpm) , and encapsulation using a IIM 2100 equipped with size 4 change parts and 5-12 mm dosing disk (50-90 segments per minute (spm)).

Optionally low shear granulation such as a V-Blender equipped with an intensifier bar, twin screw granulation, may be used instead of the granulation equipment specified above with appropriate adjustment to the milling/screening parameters to manufacture capsules of pimavanserin

Pimavanserin hard shell capsules (34 mg pimavanserin, equivalent to 40 mg pimavanserin tartrate) were manufactured. Table 2 contains an example of a suitable formulation.

As an alternative, the herein disclosed pimavanserin granulation may be compressed as a tablet.

As an alternative, the herein disclosed pimavanserin granulations may be compressed into a tablet without further excipients. Thus the composition disclosed in table 2 in some embodiments is used to form tablets. Said tablets may be formed as an alternative to the filling of a capsule.

ACADIA_1287408

Appx116

US 11,452,721 B2

| 21 | 22 |

Consequently the obtained pimavanserin granulation may be compressed into a tablet of a weight of about 100 mg.

TABLE 2

Composition of Pimavanserin granulation (34 mg)

| Ingredients | Qty (% w/w) | Qty (mg)/dose |
|---|---|---|
| Pimavanserin Tartrate | 40.0 | 40.0" |
| Microcrystalline Cellulose (Avicel PH302, NF, EP) | 59.0 | 59.0 |
| Magnesium Stearate (Vegetable Source, USP, EP) | 1.0 | 1.0 |
| Total | 100.0 | 100.0 |

"40 mg pimavanserin tartrate salt is equivalent to 34 mg pimavanserin free base

Table 3 contains the manufacturing process equipment for pimavanserin capsules.

TABLE 3

| Process Step | Equipment class, sub-class | Manufacturer, model, size |
|---|---|---|
| Screening I (API) | Hand screen | 30 Mesh hand screen |
| Granulation | Vertical granulator | Glatt/Powrex VG-50M with 25 L Bowl |
| Fluid Bed Drying | Fluid bed | Glatt GPCG-5 with 25 L bowl |
| Screening II (granulation) | Hand screen | 10 Mesh hand screen |
| Milling | Screening mills, rotating impeller | Comil 197S or U10 with 045R03125 screen |
| Blending I | Diffusion mixers (Tumble), bin blender | TOTE Bin blender, 2 cubic foot |
| Screening III (Magnesium stearate) | Hand screen | 30 Mesh hand screen |
| Final Blending | Diffusion mixers (Tumble), bin blender | TOTE Bin blender, 2 cubic foot |
| Encapsulation | Encapsulator, dosing disk | IIM 2100, Size 4 change parts and 10 mm dosing disk |
| Polishing and weight checking | Not applicable | Bosch KKE 1500 |

Table 4 outlines the process parameters and ranges for pimavanserin capsules, 34 mg manufacture. Bold references are target values with the ranges displayed in parenthesis.

TABLE 4

| Process Step: Equipment | Process Parameter | Ranges |
|---|---|---|
| Screening I (API) 25-40 Mesh hand screen | Screen size | 25-40 Mesh hand screen |
| Granulation Glatt/Powrex VG-50M with 25 L bowl | Spray rate | (10-50) [g/min] |
| | Impeller speed | (200-400) [rpm] |
| | Chopper speed | (1600-2000) [rpm] |
| | Atomization Air Pressure | (3-20) [psig] |
| Fluid Bed Drying Glatt GPCG-5 with 25 L bowl | Process Air Volume | (50-210) [cfm] |
| | Inlet Air Temperature | (40-60) [° C.] |
| Screening II (granulation) 4-12 Mesh hand screen | Screen size | 4-12 Mesh hand screen |
| Screening Blending I | Screen size Diffusion blender | 25-40 mesh |
| Screening (Magnesium stearate) | Screen size | 25-40 Mesh |
| Blending I | Diffusion blending | |
| Encapsulation dosing disk based encapsulator | Dosing disk | 5-12 mm |

In some embodiments disclosed herein relate to pimavanserin granulation, e.g. composed as in table 2, having a

weight of granulation of 100 mg ±7 (average of 20 samples), i.e. the weight relates to the granulation only, i.e. excluding capsule shell weight.

The bulk density of the blended composition is >0.4 g/ml, such as 0.4-0.6 g/ml, such as about 0.5 g/ml determined according to USP <616>, method 1. In some embodiments the bulk density of the composition is >0.4 g/ml, such as about 0.5 g/ml, such as 0.51 g/ml, such as 0.508 g/ml.

The bulk density of pimavanserin granulation is >0.4 g/ml, such as 0.4-0.6 g/ml, such as about 0.5 g/ml, determined according to USP <616>, method 1. In some embodiments the bulk density of the pimavanserin granulation is >0.4 g/ml, such as about 0.5 g/ml, such as 0.51 g/ml, such as 0.508 g/ml.

In addition to the bulk density and Carr's Index obtained according to USP <616>, method 1, FT4 Powder Rheology was obtained for the API (pimavanserin tartrate) and for the compositions disclosed herein using a FT4 Powder Rheometer according to ASTM D7891-15; Standard Test Method for Shear Testing of Powders Using the Freeman Technology FT4 Powder Rheometer Shear Cell.

As discussed herein above the flowability of the composition has been improved compared to the API (pimavanserin tartrate), which for example can be supported by the Specific Energy (SE) obtained from the FT4 measurements. Specific Energy is a measure of the powder's flowability when unconfined, such as during low stress filling, or low shear blending. The average Specific Energy (SE) for the API is about 10.08+/−0.23 mJ/g. The granulated pimavanserin had an average SE of 6.81+/−0.63 mJ/g, and the blended pimavanserin composition an average SE of 3.96+/−0.36 mJ/g. Thus the unconfined flowability was substantially improved compared to the API.

In addition to SE, the Flow Rate Index (FRI) of the composition showed significant improvement compared to the API (pimavanserin tartrate). FRI indicates sensitivity to changing the rate of flow, and the pimavanserin tartrate had an average FRI of 1.90±0.01, the granulated pimavanserin an average FRI of 1.52+/−0.10, and the blended pimavanserin composition had an average FRI of 1.08±0.06, again showing the improved properties for the granulated pimavanserin as well as the blended pimavanserin composition for filling into a capsule of size 3 or 4.

The FT4 Powder Rheometer was also used as yet another means to compare the bulk density between the API, the granulated pimavanserin and the blended pimavanserin compositions disclosed herein and in the accompanying claims. The bulk density is a conditioned bulk density as obtained by the FT4 measurement, in accordance with ASTM D7891-15; Standard Test Method for Shear Testing of Powders Using the Freeman Technology FT4 Powder Rheometer Shear Cell. Pimavanserin tartrate (API) had an average conditioned bulk density (CBD) of 0.336±0.006 g/ml, granulated pimavanserin tartrate had an average conditioned bulk density (CBD) of 0.478±0.028 g/ml, and the blended pimavanserin composition an average CBD of 0.504±0.020 g/ml.

The conditioned bulk density of the blended composition is >0.45 g/ml, such as 0.45-0.6 g/ml, such as 0.47-0.55 g/ml determined according to ASTM D7891-15. In some embodiments the bulk density of the composition >0.45 g/ml, such as an average of about 0.5 g/ml.

The conditioned bulk density of the granulated pimavanserin is >0.42 g/ml, such as 0.42-0.55 g/ml, such as 0.43-0.53 g/ml determined according to ASTM D7891-15. In some embodiments the bulk density of the granulated pimavanserin >0.42 g/ml, such as an average of about 0.48 g/ml.

ACADIA_1287409

Appx117

US 11,452,721 B2

<table>
<tr><td>23</td><td>24</td></tr>
</table>

The blended pimavanserin composition used in the herein mention FT4 Powder Rheometry measurements comprised 34 mg pimavanserin, 59 mg microcrystalline cellulose and 1 mg magnesium stearate.

The capsules comprising 5-34 mg pimavanserin are stable upon actual or simulated storage under open conditions at 25° C.±2°/60%±5% (RH) relative humidity for at least 1 year, such as at least 1.5 years.

Alternative methods and equipment to be used in connection with the herein disclosed methods, compositions, capsules, tablets and disclosures may be found in SUPAC: manufacturing equipment addendum, an U.S. Department of Health and Human Services, Food and Drug Administration, Center for Drug Evaluation and Research (CDER) issued guidance for industry, e.g. in the December 2014 version, Pharmaceutical Quality/CMC.

The embodiments disclosed herein above meet all specifications outlined relating to the marketing authorization of Nuplazid®, for example:

Assay (90.0-110.0% of Label Claim), i.e. quantify the amount of pimavanserin free base in the drug product, for example using reverse phase HPLC with UV-detection at 210 nm. An example of eluent is a gradient comprised of two mobile phases such as ammonium buffer (pH 9.0), and acetonitrile/methanol (80/20 vol/vol).

Content Uniformity as determined using USP <905>, Uniformity of Dosage Forms and wherein the maximum Acceptance Value (AV) NMT (not more than) 15.0. The AV is calculated for the number of units tested; Level 1=10 units; Level 2=30 units using the following: the mean Assay value for the number of units tested Minus Either 98.5 (when the mean is less than 98.5% of target assay) and 101.5 (when the mean is greater than 101.5% of target assay) times 2.4 (10 units) or 2.0 (30 units) plus the difference between the Mean and the appropriate Upper/Lower % of target assay, using the method for hard capsules.

Dissolution USP <711>:

Stage 1: Q=80% within 30 minutes

Stage 2: Average of 12 units (Stage 1 & Stage 2) is equal to or greater than Q with no unit less than Q-15%

X-ray powder diffraction (XRPD) analyses on a Bruker AXS D8 Advance system with a Bragg-Brentano configuration using CuKα radiation confirmed that all XRPD patterns for the granulations correspond to the XRPD patterns of the currently approved NUPLAZID 17 mg tablet (pimavanserin tartrate form C) , which for example as disclosed in U.S. 7,732, 615.

Long term stability data for capsules containing 34 mg pimavanserin, 59 mg microcrystalline cellulose and 1 mg magnesium stearate at 18 months were determined using standard procedures such as actual or simulated storage under open conditions at 25° C.±2°/60%±5% (RH) relative humidity, e.g. as outlined in WHO Technical Report Series, No. 953, 2009, Annex 2, and the following observations and determinations were made:

Appearance: unchanged at 18 months

Assay (90.0-110.0% of Label Claim): Day 8: 100±2%; 18 months: 100±2%

Total impurities: Day 0: 0.3%; 18 months: 0.3%, determined in line with Assay.

Dissolution (at 18 months): at least 80% of the pimavanserin is released from the composition within 30 minutes upon in vitro dissolution testing according to USP<711> (apparatus 1 (basket apparatus)).

Water content (determined in line with USP<921>, method Ia: Day 0: 2.9%; 18 months: 2.9%.

What is claimed is:

1. A pharmaceutically acceptable capsule for orally delivering 34 mg of pimavanserin to a patient, wherein the capsule has a size 3 or 4 capsule shell that contains a blended pimavanserin composition comprising:

granules comprising 40 mg pimavanserin tartrate and optionally one or more pharmaceutically acceptable excipients;

and one or more blending excipients; wherein the bulk density of the granules is >0.4 g/ml as determined by USP<616>, method 1.

2. The pharmaceutically acceptable capsule of claim 1, wherein one of the blending excipients is selected from the group consisting of magnesium stearate, sodium stearyl fumarate, colloidal silicon dioxide, and talc.

3. The pharmaceutically acceptable capsule of claim 1, wherein the blended pimavanserin composition has a D90 particle size distribution of 60-450 μm as measured using laser scattering particle size analysis.

4. A pharmaceutically acceptable capsule for orally delivering 34 mg of pimavanserin to a patient, wherein the capsule has a capsule shell with a capsule shell size 3 or 4, that encapsulates a blended pimavanserin composition comprising:

granules comprising 40 mg pimavanserin tartrate and one or more pharmaceutically acceptable excipients; and wherein the bulk density of the granules is >0.4 g/ml as determined by USP<616>, method 1.

5. The pharmaceutically acceptable capsule of claim 4, wherein the capsule shell is a hard shell size 4 capsule.

6. The pharmaceutically acceptable capsule of claim 1, wherein one of the blending excipients is selected from the group consisting of a cellulose, a polysaccharide, and polyvinylpyrrolidone.

7. The pharmaceutically acceptable capsule of claim 1, wherein one of the blending excipients is selected from the group consisting of microcrystalline cellulose, silicified microcrystalline cellulose, hydroxypropyl cellulose, hydroxypropylmethyl cellulose, hydroxymethyl cellulose, and a lactose cellulose blend.

8. The pharmaceutically acceptable capsule of claim 1, wherein the one of the blending excipients is selected from the group consisting of sucrose, mannitol, sorbitol, pregelatinized starch, and partially pregelatinized starch.

9. The pharmaceutically acceptable capsule of claim 1, wherein the blending excipients comprise microcrystalline cellulose and magnesium stearate.

10. The pharmaceutically acceptable capsule of claim 1, wherein the blending excipients are selected from the group consisting of filler/diluents, lubricants and mixtures thereof.

11. The pharmaceutically acceptable capsule of claim 1, wherein the granules comprise a pharmaceutically acceptable excipient which is a binder.

12. The pharmaceutically acceptable capsule of claim 10, wherein the binder is selected from the group consisting of cellulose, methyl cellulose, polyvinylpyrrolidone and polyethylene glycol.

13. The pharmaceutically acceptable capsule of claim 4 wherein the pharmaceutically acceptable excipients comprise a binder.

* * * * *

ACADIA_1287410

# CERTIFICATE OF SERVICE AND FILING

I hereby certify that a true and correct copy of the foregoing has been filed

using the Court's CM/ECF system. All counsel of record will be served via

CM/ECF.

August 22, 2025                          Respectfully submitted,

*/s/ Richard J. Berman*
Richard J. Berman
**ARENTFOX SCHIFF LLP**
1717 K. St. NW
Washington, DC 20006
T: (202) 857-6000
richard.berman@afslaw.com

*Attorney for Appellants MSN Laboratories*
*Private Ltd., and MSN Pharmaceuticals*

## CERTIFICATE OF COMPLIANCE WITH RULE 32

I, Richard J. Berman, counsel for Appellant MSN Laboratories Private Ltd., and MSN Pharmaceuticals, hereby certify that the foregoing brief complies with the length limits set forth in Fed. R. App. P. 32 and Fed. Cir. R. 32. Specifically, this brief contains 13,031 words excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and Fed. Cir. R. 32(b) as determined by the word count feature of the word processing program used to create this brief.

I further certify that the foregoing brief complies with the typeface requirements set forth in Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6). Specifically, this brief has been prepared using a proportionally spaced typeface using Microsoft Word 2013, in 14-point Times New Roman font.

August 22, 2025

*/s/ Richard J. Berman*
Richard J. Berman
**ARENTFOX SCHIFF LLP**
1717 K. St. NW
Washington, DC 20006
T: (202) 857-6000
richard.berman@afslaw.com

*Attorney for Appellants MSN Laboratories Private Ltd., and MSN Pharmaceuticals*