**2025-1875**

# United States Court of Appeals for the Federal Circuit

ACADIA PHARMACEUTICALS INC.,

*Plaintiff-Appellee*,

– v. –

AUROBINDO PHARMA LTD., AUROBINDO PHARMA USA, INC., MSN LABORATORIES PRIVATE LTD., AND MSN PHARMACEUTICALS, INC.,

*Defendants-Appellants.*

*On Appeal from the United States District Court for the District of Delaware, Case No. 1:22-cv-01387-GBW, Honorable Gregory B. Williams, U.S. District Judge*

## CORRECTED BRIEF FOR PLAINTIFF-APPELLEE

CHAD J. PETERMAN
BRUCE M. WEXLER
SCOTT F. PEACHMAN
ZACHARY D. HADD
PETER E. CONWAY
PAUL HASTINGS LLP
200 Park Avenue
New York, NY 10166
(212) 318-6000
chadpeterman@paulhastings.com
brucewexler@paulhastings.com
scottpeachman@paulhastings.com
zacharyhadd@paulhastings.com
peterconway@paulhastings.com

FELIX A. EYZAGUIRRE
PAUL HASTINGS LLP
609 Main Street, Suite 2500
Houston, TX 77002
(713) 860-7300
felixeyzaguirre@paulhastings.com

OCTOBER 27, 2025

*Counsel for Plaintiff-Appellee*

## ASSERTED CLAIMS

Asserted claim 4 of U.S. Patent No. 11,452,721:

4. A pharmaceutically acceptable capsule for orally delivering 34 mg of pimavanserin to a patient, wherein the capsule has a capsule shell with a capsule shell size 3 or 4, that encapsulates a blended pimavanserin composition comprising:

granules comprising 40 mg pimavanserin tartrate and one or more pharmaceutically acceptable excipients; and

wherein the bulk density of the granules is >0.4 g/ml as determined by USP, method 1.

Asserted claim 5 of U.S. Patent No. 11,452,721 depends from claim 4:

5. The pharmaceutically acceptable capsule of claim 4, wherein the capsule shell is a hard shell size 4 capsule.

## <u>CERTIFICATE OF INTEREST</u>

Counsel for Acadia Pharmaceuticals Inc. certifies the following:

| 1. Provide the full names of all entities represented by undersigned counsel in this case. | 2. Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities. | 3. Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities. |
| --- | --- | --- |
| Acadia Pharmaceuticals Inc. | None | None |

1.    The names of all law firms and the partners or associates that appeared for the party now represented for the entities in the originating court or agency or are expected to appear in this Court (and who have not or will not enter an appearance in this case) are:

      Paul Hastings LLP: Rebecca A. Hilgar

      Saul Ewing Arnstein & Leir LLP: James D. Taylor, Jr., Jessica M. Jones, Michelle C. Streifthau-Livizos, Patrick A. Lockwood

2.    The title and number of any case known to counsel to be pending in this or any other court or agency that will directly affect or be directly affected by this court's decision in the pending appeal. *See* Fed. Cir. R. 47.4(a)(5) and 47.5(b).

      None

3.    Information required by Federal Rule of Appellate Procedure 26.1(b) and (c) that identifies organizational victims in criminal cases and debtors and trustees in bankruptcy cases.

      Not Applicable

Respectfully submitted,

Dated:  October 27, 2025

/s/ Chad J. Peterman

Chad J. Peterman
PAUL HASTINGS LLP
200 Park Avenue
New York, NY 10166
(212) 318-6000
chadpeterman@paulhastings.com

*Counsel for Plaintiff-Appellee*

# TABLE OF CONTENTS

**Page**

STATEMENT OF ISSUES ....................................................................1

STATEMENT OF THE CASE..............................................................1

STANDARD OF REVIEW ..................................................................2

RESPONSE TO APPELLANTS' JOINT APPEAL ON NO INVALIDITY ..........4

I.   The District Court Correctly Found
     That Appellants Failed to Demonstrate
     Obviousness by Clear and Convincing Evidence.............................4

     A.   Introduction ....................................................................4

     B.   Background ......................................................................5

          1.   The Innovative Nuplazid Capsule..............................5

          2.   Claims 4 and 5 of the '721 Patent.............................7

     C.   Appellants' Arguments Before the District
          Court and the Court's Responsive Fact Findings................11

          1.   The District Court Reasonably Found
               That Appellants' Theory of Motivation
               Was Not Sufficiently Supported by the Record .......11

          2.   The District Court Reasonably Determined
               That Appellants' Reasonable Expectation of Success
               Theory Was Not Sufficiently Supported by the Record..........16

II.  The District Court Did Not Clearly Err
     in Finding That Appellants Failed to Show a
     Motivation to Formulate the Claimed Capsules.............................22

III. Appellants Misrepresent
     the Record to Improperly Assert
     That the District Court Legally Erred.............................................24

     A.   Appellants' Arguments on Appeal Conflict with
          Their Affirmative Position Below That It Would Have
          Been Obvious to Reformulate Nuplazid Tablets into Capsules..........25

     B.   Appellants' Arguments on Appeal Employ
          an Incorrect Standard for Analyzing the Prior Art..............26

C.     Appellants' Arguments on Appeal Impermissibly Seek to Transform Their Burden of Proof into Legal Error by the District Court ......................28

IV.   The District Court's Factual Findings Were Not Limited to a POSA's Motivation to Use a Capsule Over a Tablet .................................................29

    A.     The Present Case Is Analogous to *Janssen 2025* ................................31

    B.     The Present Case Is Analogous to *Insite* .............................................33

    C.     The Present Case Is Analogous to *Medichem* ....................................36

V.    The District Court Properly Found That Appellants Failed to Show a POSA Would Have Reasonably Expected to Achieve the Claimed Capsules .....................................................39

    A.     The District Court Properly Found That a POSA Lacked a Reasonable Expectation of Success .........................42

    B.     The District Court Did Not Require "Absolute Predictability" ..........43

RESPONSE TO AUROBINDO'S APPEAL ON INFRINGEMENT ...................45

VI.   The District Court Correctly Found Infringement by Aurobindo .................................................................45

    A.     Introduction and Summary of Argument ...........................................45

    B.     Background .........................................................................................47

         1.    The Relevant Claim Limitation and Construction....................47

         2.    Aurobindo's ANDA Describes an Infringing Product .............49

         3.    Dr. Smith's Testing Confirms Infringement.............................50

    C.     Argument............................................................................................53

         1.    The ANDA Admissions Alone Establish Infringement ..........54

         2.    Independent Testing Confirms Infringement............................58

CONCLUSION ........................................................................................61

# TABLE OF AUTHORITIES

**Cases**                                                                      **Page(s)**

*Abbott Lab'ys v. TorPharm, Inc.*,
    300 F.3d 1367 (Fed. Cir. 2002) .........................................................56

*Allergan, Inc. v. Sandoz Inc.*,
    796 F.3d 1293 (Fed. Cir. 2015) ...........................................41, 43, 46

*Alza Corp. v. Mylan Lab'ys, Inc.*,
    464 F.3d 1286 (Fed. Cir. 2006) ...........................................................3

*Amazon.com, Inc. v. Barnesandnoble.com, Inc.*,
    239 F.3d 1343 (Fed. Cir. 2001) .....................................................3, 27

*Anderson v. Bessemer City*,
    470 U.S. 564 (1985)..............................................................*passim*

*Bayer AG v. Elan Pharm. Research Corp.*,
    212 F.3d 1241 (Fed. Cir. 2000) .........................................................56

*Commscope Techs. v. Dali Wireless Inc.*,
    10 F.4th 1289 (Fed. Cir. 2021) ...........................................................8

*In re Cyclobenzaprine Hydrochloride Extended-Release Capsule*
    *Patent Litigation*,
    676 F.3d 1063 (Fed. Cir. 2012) ...................................................41, 44

*Dome Pat. L.P. v. Lee*,
    799 F.3d 1372 (Fed. Cir. 2015) ...........................................................4

*Eli Lilly & Co. v. Teva Pharms. Int'l GmbH*,
    8 F.4th 1331 (Fed. Cir. 2021) ...........................................................44

*Ferring B.V. v. Watson Lab'ys Inc.*,
    764 F.3d 1382 (Fed. Cir. 2014) .........................................................55

*In re Fine*,
    837 F.2d 1071 (Fed. Cir. 1988) .........................................................35

*Fromson v. Advance Offset Plate, Inc.*,
    720 F.2d 1565 (Fed. Cir. 1983) ...........................................................3

v

*Gen. Elec. Co. v. Raytheon Techs. Corp.*,
   983 F.3d 1334 (Fed. Cir. 2020) ............................................................3

*Glaxo Inc. v. Novopharm Ltd.*,
   110 F.3d 1562 (Fed. Cir. 1997) ...........................................................55

*Henny Penny Corp. v. Frymaster LLC*,
   938 F.3d 1324 (Fed. Cir. 2019) ....................................................37, 39

*Impax Labs., Inc. v. Aventis Pharms., Inc.*,
   545 F.3d 1312 (Fed. Cir. 2008) ............................................................2

*Insite Vision Inc. v. Sandoz, Inc.*,
   783 F.3d 853 (Fed. Cir. 2015) ......................................................33, 34

*Janssen Pharms., Inc. v. Teva Pharms. USA, Inc.*,
   141 F.4th 1367 (Fed. Cir. 2025) ...................................................*passim*

*Janssen Pharms., Inc. v. Teva Pharms. USA, Inc.*,
   97 F.4th 915 (Fed. Cir. 2024) ..............................................................2

*Lab'y Corp. of Am. Holdings v. Ravgen, Inc.*,
   No. 2023-1342, 2025 WL 32904 (Fed. Cir. Jan. 6, 2025)...................39

*Medichem, S.A. v. Rolabo, S.L.*,
   437 F.3d 1157 (Fed. Cir. 2006) ...................................................*passim*

*Medtronic, Inc. v. Teleflex Life Scis.*,
   86 F.4th 902 (Fed. Cir. 2023) ........................................................8, 23

*Mintz v. Dietz & Watson, Inc.*,
   679 F.3d 1372 (Fed. Cir. 2012) .........................................................34

*Natera, Inc. v. NeoGenomics Lab'ys, Inc.*,
   106 F.4th 1369 (Fed. Cir. 2024) ........................................................40

*In re Omeprazole Pat. Litig.*,
   281 F. App'x 974 (Fed. Cir. 2008) ....................................................61

*OSI Pharms., LLC v. Apotex Inc.*,
   939 F.3d 1375 (Fed. Cir. 2019) .........................................................40

*Phil-Insul Corp. v. Airlite Plastics Co.*,
854 F.3d 1344 (Fed. Cir. 2017) ............................................................8

*Polaris Indus., Inc. v. Arctic Cat, Inc.*,
882 F.3d 1056 (Fed. Cir. 2018) ..........................................................36

*Ruiz v. A.B. Chance Co.*,
357 F.3d 1270 (Fed. Cir. 2004) ..........................................................27

*Sunovion Pharms., Inc. v. Teva Pharms. USA, Inc.*,
731 F.3d 1271 (Fed. Cir. 2013) ..........................................................55

*Univ. of Strathclyde v. Clear-Vu Lighting LLC*,
17 F.4th 155 (Fed. Cir. 2021) ..............................................................3

*Vanda Pharms., Inc. v. West-Ward Pharms. Int'l, Ltd.*,
887 F. 3d 1117 (Fed. Cir. 2018) ..........................................................24

*W.L. Gore & Assocs., Inc. v. Garlock, Inc.*,
721 F.2d 1540 (Fed. Cir. 1983) ..........................................................36

**Statutes**

35 U.S.C. § 271(e)(2)(A) ...........................................................................1

## STATEMENT OF RELATED CASES

No other appeals have been taken in this case, and counsel for Plaintiff-Appellee Acadia Pharmaceuticals Inc. is aware of no other cases pending in any court or agency that will directly affect, or be directly affected by, this Court's decision in the instant appeal.

## <u>TABLE OF ABBREVIATIONS</u>

| | |
|---|---|
| '721 patent or asserted patent | U.S. Patent No. 11,452,721 |
| '830 application | U.S. Patent Application No. 17/693,830 |
| Asserted claims | Claims 4 and 5 of the '721 patent |
| Appellee or Acadia | Acadia Pharmaceuticals Inc. |
| Aurobindo | Aurobindo Pharma Limited and Aurobindo Pharma USA, Inc. |
| MSN | MSN Laboratories Private Ltd. and MSN Pharmaceuticals Inc. |
| Appellants | Aurobindo and MSN |
| Br. | Appellants' Opening Brief |
| FDA | U.S. Food and Drug Administration |
| NDA | New Drug Application |
| ANDA | Abbreviated New Drug Application |
| Nuplazid Tablets | Acadia's earlier Nuplazid (pimavanserin) product that was the subject of its FDA-approved NDA No. 207318.  The immediate-release, film-coated oral 17 mg tablet contains 20 mg of pimavanserin tartrate and is indicated for the treatment of hallucinations and delusions associated with Parkinson's disease psychosis as two tablets, once daily. |
| Nuplazid Capsules | Acadia's later Nuplazid (pimavanserin) product that was the subject of its FDA-approved NDA No. 210793.  The immediate-release, oral 34 mg capsule is a size 4 capsule containing 40 mg of pimavanserin tartrate and is indicated for the treatment of hallucinations and delusions associated with Parkinson's disease psychosis as one capsule, once daily. |
| Aurobindo's Product | Aurobindo's pimavanserin 34 mg capsules that are described in Aurobindo's ANDA No. 214782 |
| PD | Parkinson's disease |

ix

| | |
|---|---|
| PDP | Parkinson's disease psychosis |
| POSA | Person of ordinary skill in the art |
| USPTO | U.S. Patent and Trademark Office |
| Ragnar-Tolf | U.S. Patent Application Publication 2007/0264330 Al |
| Ragnar-Tolf's 20 mg Formulation | Ragnar-Tolf's 20 mg Formulation refers to the "wet granulation tablet of pimavanserin tartrate" disclosed in Example 9 and Tables 7-8 of Ragnar-Tolf and consisting of granules that (i) contain 20 mg of pimavanserin tartrate plus excipients as described in Table 7, and (ii) have a bulk-density between 0.56-0.61 g/ml, *see, e.g.*, Appx39-43; Appx3499; Appx507-12 |
| Nuplazid Tablets Label | Acadia Pharmaceuticals Inc. Nuplazid Tablets Prescribing Information (Apr. 29, 2016) |
| Schiele | Julia T. Schiele, *Difficulties swallowing solid oral dosage forms in a general practice population: prevalence, causes, and relationship to dosage forms*, Pharmacoepidemiology and Prescription (Sept. 29, 2012) |
| Stegemann 2002 | Sven Stegemann, *Hard gelatin capsules today – and tomorrow*, Capsugel Library (2nd Ed., 2002) |
| Section 103 or § 103 | 35 U.S.C. § 103 |
| *Janssen 2024* | *Janssen Pharms., Inc. v. Teva Pharms. USA, Inc.*, 97 F.4th 915 (Fed. Cir. 2024) |
| *Janssen 2025* | *Janssen Pharms., Inc. v. Teva Pharms. USA, Inc.*, 141 F.4th 1367 (Fed. Cir. 2025) |
| Dosage Form Limitation or DFL | As identified by the district court, the Dosage Form Limitation refers to the limitation in claim 4 that reads "the capsule has a capsule shell with a capsule shell size 3 or 4" and the limitation in claim 5 that reads "the capsule shell is a hard shell size 4 capsule" |
| Pharmaceutical Composition Limitation or PCL | As identified by the district court, the Pharmaceutical Composition Limitation refers to the limitation in claims 4 and 5 that reads "that encapsulates a blended pimavanserin |

| | composition comprising: granules comprising 40 mg pimavanserin tartrate and one or more pharmaceutically acceptable excipients" |
|---|---|
| Bulk Density Limitation or BDL | As identified by the district court, the Bulk Density Limitation refers to the limitation in claims 4 and 5 that reads "the bulk density of the granules is >0.4 g/ml as determined by USP, method 1" |

## STATEMENT OF ISSUES

1)      Did the district court commit clear error in its findings that Appellants failed to prove the key facts needed to establish obviousness of the asserted claims by clear and convincing evidence?

2)      Did the district court commit clear error in its findings that—based on two independent and mutually reinforcing evidentiary grounds and supported by unrebutted expert testimony—Acadia proved the key facts needed to demonstrate that Aurobindo infringes the asserted claims by a preponderance of the evidence?

## STATEMENT OF THE CASE

Acadia filed actions against Aurobindo and MSN alleging infringement of the '721 patent by Aurobindo's ANDA No. 214782 and MSN's ANDA No. 214925 for generic versions of Nuplazid (pimavanserin) under 35 U.S.C. § 271(e)(2)(A). Appx7 ¶¶28-31. MSN stipulated to infringement. Appx2. The district court presided over a three-day bench trial, during which the parties disputed whether Aurobindo infringes claims 4 and 5 of the '721 patent and whether those claims are invalid. Appx2. After a careful review of the record, the court held that Aurobindo infringes the asserted claims and that the asserted claims are not invalid. Appx1-2.

1

## STANDARD OF REVIEW

Obviousness is a question of law based on underlying factual determinations, including (1) the scope and content of the prior art; (2) the differences between the claims and the prior art; (3) the level of ordinary skill in the pertinent art; and (4) any secondary considerations of non-obviousness. *Janssen Pharms., Inc. v. Teva Pharms. USA, Inc.*, 97 F.4th 915, 925 (Fed. Cir. 2024) ("*Janssen 2024*").[1]  This Court reviews the overall obviousness determination de novo and the district court's underlying factual findings for clear error.  *Janssen Pharms., Inc. v. Teva Pharms. USA, Inc.*, 141 F.4th 1367, 1374 (Fed. Cir. 2025) ("*Janssen 2025*").  "As the challenger[s] in district court, [Appellants] bore the burden of proving, by clear and convincing evidence, the facts needed to show obviousness."  *Id.*  Where the patent examiner has considered the "basis for the validity challenge during patent prosecution," the burden "becomes particularly heavy."  *Impax Labs., Inc. v. Aventis Pharms., Inc.*, 545 F.3d 1312, 1314 (Fed. Cir. 2008).

"Under the generally applicable framework for showing obviousness, [Appellants] had to show by clear and convincing evidence that a skilled artisan would have been motivated to combine or modify the teachings of the prior art

---

[1] Unless otherwise noted, all citations have been modified for clarity, all internal citations and quotations have been omitted, and all emphasis has been added.

references to achieve the claimed invention, and that the skilled artisan would have had a reasonable expectation of success in doing so, both parts of which are well-recognized to be factual issues." *Janssen 2025* at 1374 (citation modified). Additional factual issues relevant here include whether the prior art discloses a claim limitation, what a prior art reference teaches, and whether the prior art teaches toward or away from the claimed invention. *See, e.g.*, *Univ. of Strathclyde v. Clear-Vu Lighting LLC*, 17 F.4th 155, 160 (Fed. Cir. 2021); *Medichem, S.A. v. Rolabo, S.L.*, 437 F.3d 1157, 1164-65 (Fed. Cir. 2006); *Gen. Elec. Co. v. Raytheon Techs. Corp.*, 983 F.3d 1334, 1345 (Fed. Cir. 2020). This Court "review[s] the district court's assessment of the prior art references for clear error," including when it "necessarily makes fact-findings, explicitly or implicitly, concerning the meaning of the asserted references." *Amazon.com, Inc. v. Barnesandnoble.com, Inc.*, 239 F.3d 1343, 1358 (Fed. Cir. 2001).

Infringement is a question of fact, which must be proven by a preponderance of the evidence. *See Fromson v. Advance Offset Plate, Inc.*, 720 F.2d 1565, 1569 (Fed. Cir. 1983). This Court reviews the factual infringement determination for clear error. *Alza Corp. v. Mylan Lab'ys, Inc.*, 464 F.3d 1286, 1289 (Fed. Cir. 2006). "Under the clear-error standard, [this Court] uphold[s] the district court's findings in the absence of a definite and firm conviction that a mistake has been made." *Janssen 2025* at 1374 (citation modified). "The burden of overcoming the

district court's factual findings is, as it should be, a heavy one." *Dome Pat. L.P. v. Lee*, 799 F.3d 1372, 1382 (Fed. Cir. 2015) (citation modified). "If the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently." *Anderson v. Bessemer City*, 470 U.S. 564, 565 (1985).

## RESPONSE TO APPELLANTS' JOINT APPEAL ON NO INVALIDITY

## I.  THE DISTRICT COURT CORRECTLY FOUND THAT APPELLANTS FAILED TO DEMONSTRATE OBVIOUSNESS BY CLEAR AND CONVINCING EVIDENCE

### A.  Introduction

Before the district court, Appellants argued that "the asserted claims are obvious over 'Nuplazid Tablets' in view of Ragnar-Tolf," Appx906, because "[a] POSA would have been motivated to modify Nuplazid Tablets to achieve the Asserted Claims with a reasonable expectation of success," Appx908. After carefully considering Appellants' obviousness theories, the district court reasonably found that Appellants failed to meet their evidentiary burden on two well-recognized factual issues—motivation and reasonable expectation of success. Appx64, 69; *Janssen 2025* at 1374. "Of particular significance to [the] resolution of the appeal now before [this Court], the district court found against [Appellants] on the factual issues of motivation to combine references and reasonable

4

expectation of success to arrive at the claim[ed]" invention. *Janssen 2025* at 1374.

In their opening brief on appeal, Appellants did not challenge the court's factual

determinations and instead only argued that "[t]he District Court committed

*multiple legal errors* in its analysis of the ultimate question of obviousness *after*

*resolving the underlying factual issues*." Br. 18. Accordingly, Appellants appear

to concede that the court did not commit clear error in its findings that, *inter alia*,

neither Appellants' theory of motivation, nor their theory of reasonable expectation

of success, was supported by the record. Appx64, 69; *Janssen 2025* at 1384-85

("We see no clear error in the district court's . . . determining that [Appellants']

theory of motivation was not supported by the record, so we uphold this factual

determination.").

**B.      Background**

**1.      The Innovative Nuplazid Capsule**

Parkinson's disease is a common, chronic, and progressive

neurodegenerative disease that affects millions of people worldwide. *See*

Appx2488. While patients suffering from PD experience various motor and non-

motor symptoms, two are particularly relevant here: (1) psychosis, and (2)

dysphagia. Appx3948-49; Appx30-32 ¶¶84-87. PDP is a debilitating condition

characterized by intense delusions and hallucinations that severely impacts a

patient's quality of life and risk of morbidity. Appx161. Dysphagia is defined as

difficulty in swallowing and affects a patient's ability to take oral dosage forms, such as tablets or capsules. Appx3948-49.

Acadia pioneered the development of pimavanserin (and its salt form, pimavanserin tartrate), a novel atypical antipsychotic that effectively treats PDP. Appx3507-19; Appx5 ¶¶15-18. The recommended dose for treating PDP is 40 mg of pimavanserin tartrate taken once daily. Appx3507-19; Appx5 ¶¶15-18; Appx29 ¶80. Taking 20 or 40 mg of pimavanserin tartrate is equivalent to taking 17 or 34 mg of pimavanserin, respectively. Appx8-9 ¶¶36-37; Appx5 ¶¶15-18. In 2016, Acadia's pimavanserin-based Nuplazid became the first and only FDA-approved drug product for the treatment of hallucinations and delusions associated with PDP. Appx3507-19. While developing Nuplazid, Acadia recognized that formulating 40 mg of pimavanserin tartrate as one large pill could put patients at risk of non-compliance because PD patients with dysphagia could have difficulty swallowing (or be unable to swallow) it. Appx3948-49; Appx30-32 ¶¶84-87; Appx107, 1:34-38; Appx587, 411:10-18; Appx908; Br. 7 ("Parkinson's disease patients in particular, have difficulty swallowing their medicines, which leads to non-compliance with their treatment."). However, pimavanserin is a bad-behaving, hygroscopic material that has a low bulk density and a tendency to clump up. Appx39 ¶¶122-23. Therefore, while "formulating dosages of pimavanserin could be difficult" in general, developing a small dosage form was

particularly difficult because pimavanserin "requires a lot of excipients to allay its bad behavior." Appx39 ¶¶122-23. Because Acadia initially struggled to develop a single, small, 40 mg dosage form for Nuplazid, it divided the full dose into two small 20 mg tablets to avoid a large pill that could cause swallowing difficulties. Appx587, 411:10-18. Consequently, Acadia first brought Nuplazid to market as two small, round, immediate-release, film-coated oral 20 mg tablets ("Nuplazid tablets"). Appx5.

While Nuplazid tablets were generally well-accepted by patients and doctors without reports of complaints or problems, (Appx37 ¶112), Acadia still sought to improve upon its formulation by further simplifying administration and reducing the risk of non-compliance. Appx908. Accordingly, Acadia further invested in developing a small 40 mg dosage form that was easy to swallow, and eventually invented a formulation with a high enough bulk density to fit the full 40 mg dose into a small, size 4 capsule. Appx908 (Appellants admitting as much). Acadia disclosed its newly developed 40 mg capsule formulation in various patents, including the '721 patent, and obtained FDA-approval for using it to treat PDP in NDA No. 210793 ("Nuplazid capsules"). Appx5 ¶¶15-16.

### 2.    Claims 4 and 5 of the '721 Patent

At issue here are claims 4 and 5 of the '721 patent, which issued from the '830 application and has a priority date of August 30, 2017. Appx6; Appx95. As a

preliminary matter, Appellants did not substantively challenge the district court's claim construction or its identification of the three overarching limitations in their opening brief. *See, e.g.*, Br. 17 (challenging only factual findings on motivation and reasonable expectation), 35-36 (acquiescing to construction), 48-51 (arguing noninfringement under "the claim limitations, as construed by the District Court"). They have therefore waived or forfeited any challenge to the construction, including the court's delineation of the three limitations. *See, e.g.*, *Phil-Insul Corp. v. Airlite Plastics Co.*, 854 F.3d 1344, 1357 (Fed. Cir. 2017) ("An issue that falls within the scope of the judgment appealed from but is not raised by the appellant in its opening brief on appeal is necessarily waived."); *Commscope Techs. v. Dali Wireless Inc.*, 10 F.4th 1289, 1296 (Fed. Cir. 2021) (holding that argument is "forfeited," when "insufficiently developed"); *Medtronic, Inc. v. Teleflex Life Scis.*, 86 F.4th 902, 907 (Fed. Cir. 2023) (same).

In its opinion, the district court listed claims 4 and 5 of the '721 patent with brackets added to identify their claim limitations as follows:

> 4. A pharmaceutically acceptable capsule for orally delivering 34 mg of pimavanserin to a patient, wherein **[1]** the capsule has a capsule shell with a capsule shell size 3 or 4, **[2]** that encapsulates a blended pimavanserin composition comprising: granules comprising 40 mg pimavanserin tartrate and one or more pharmaceutically acceptable excipients; and **[3]** wherein the bulk density of the granules is >0.4 g/ml as determined by USP, method 1.

> 5. The pharmaceutically acceptable capsule of claim 4, wherein the capsule shell is a hard shell size 4 capsule.

JTX-09 at 0025 (**brackets added to separate limitations**).

Appx6-7 ¶27 (emphasis added).  The court properly interpreted claim 4 as having "three overarching limitations" that "reflect" the required **[1]** "Dosage Form,"[2] **[2]** "Pharmaceutical Composition,"[3] and **[3]** "Bulk Density."[4]  Appx6-7 ¶27; Appx8; Appx55-56; Appx61.  Additionally, the district court found that "a POSA would have understood that the bulk density requirement of claim 4 . . . includes an inherent . . . upper limit of 0.6 g/ml," and thus properly interpreted ">0.4 g/ml" to mean "0.4-0.6 g/ml."  Appx78; Appx52 ¶159.  Furthermore, the capsule-volume (0.30 or 0.21 ml)[5] and bulk-density (0.4-0.6 g/ml) requirements inherently cap the total mass of the blended pimavanserin composition of the claims.  Appx27 ¶¶72-73; Appx508-09; Br. 13-14.  Lastly, claim 5 depends from claim 4 and only differs by requiring a size 4 capsule.  Appx7.

---

[2] Hereinafter "Dosage Form Limitation" or "DFL" per the Table of Abbreviations *supra*.

[3] Hereinafter "Pharmaceutical Composition Limitation" or "PCL" per the Table of Abbreviations *supra*.

[4] Hereinafter "Bulk Density Limitation" or "BDL" per the Table of Abbreviations *supra*.

[5] Capsule sizes indicate volumes, so size 3 is 0.30 ml and size 4 is 0.21 ml.  Br. 14.

Notably, the Ragnar-Tolf reference is also a patent application filed by Acadia, which was published on November 15, 2007, and is directed to the Nuplazid Tablet formulations.  Appx38; Br. 8 n.1; Appx581.  Unsurprisingly, "[t]he patent examiner already considered [Appellants'] basis for the validity challenge during patent prosecution and, in the Reasons for Allowance, he determined that the Asserted Claims were not obvious over the closest prior art, the Ragnar-Tolf reference, because the density of its granulation would not allow for the same amount of the drug to be present in the capsule."  Appx43-44.  Indeed, both experts agreed with the examiner's determination that Ragnar-Tolf's 20 mg Formulation does not allow 40 mg of pimavanserin tartrate to fit in a size 4 capsule because its bulk density or concentration of pimavanserin tartrate is too low.  For instance, while Ragnar-Tolf's 20 mg Formulation can provide granules that comprise 40 mg of pimavanserin tartrate and have a bulk density of ~0.6 g/ml, it also requires 160 mg of excipients, (*i.e.*, a 200 mg composition), to accomplish that feat.  However, a size 4 capsule can only fit a 126 mg composition with a bulk density of ~0.6 g/ml.  Appx508-09.  In sum, Ragnar-Tolf's 20 mg Formulation cannot fit in a size 4 capsule, and consequently, Ragnar-Tolf and the Nuplazid Tablets Label are both listed on the face of the '721 patent.  Appx38.

**C.     Appellants' Arguments Before the District
Court and the Court's Responsive Fact Findings**

Appellants' appellate positions and theories stray significantly from their
district court counterparts as presented during trial and post-trial briefing. To
demonstrate these discrepancies, the subsequent sections each provide (i) a
summary of an obviousness theory that Appellants had affirmatively argued before
the district court, (ii) exemplary fact findings that the court made in response to
Appellants' theory, and (iii) a comparison between Appellants' district court theory
and their arguments on appeal, which seek to blame the district court and/or
Acadia for how ***Appellants chose*** to present their case.

**1.     The District Court Reasonably Found
That Appellants' Theory of Motivation
Was Not Sufficiently Supported by the Record**

Before the district court, Appellants' motivation theory was that a POSA
would have been motivated by various formulation factors[6] to modify or
reformulate[7] the Nuplazid Tablets to create a new size 4 capsule dosage form.

---

[6] Appellants argued that a POSA would have reasonably considered a "non-exhaustive list of [formulation] factors"—including pill burden, swallowability, taste-masking, etc.—which would have collectively motivated a POSA to reformulate Nuplazid Tablets in such a way as to arrive at the claimed invention. Appx38 ¶116; Appx64.

[7] Because Appellants use "modify" and "reformulate" interchangeably, Acadia does the same. *Compare* Appx488 (312:10-15 ("motivate a [POSA] to reformulate Nuplazid tablets")), *with* Appx928 ("motivated to modify Nuplazid Tablets") (citing 312:10-15).

Appx908-09; Appx928-29.  Table 1 summarizes Appellants' theory of motivation

using quotes from Appellants' counsel (Frese), trial expert (Muzzio) (Appx137-

816), and post-trial briefs (Appx901-935) to illustrate their consistent attempts to

establish this theory with sufficient record support:

| Table 1:  Appellants' Theory of Motivation—Modifying Nuplazid Tablets | | |
|---|---|---|
| **Appellants Argued: A POSA would have . . .** | **Quote** | **Citation** |
| (a) Identified Nuplazid Tablets' two-tablet-per-day regimen as presenting a non-compliance problem | "[POSA] [would] be concerned with the patient population having difficulty swallowing . . . [b]ecause it's one of the key factors that leads to the patient not complying with medication." | Appx489-90 |
| | "Parkinson's disease patients have difficulty swallowing their medicines . . . ." | Appx908; Appx928 |
| | "Unfortunately, the Nuplazid tablets required taking two tablets at a time . . . ." | |
| | "Recognizing these issues, Acadia hired Catalent . . . to develop pimavanserin capsules, with the goal to produce small sized capsules, each containing the full daily dose of pimavanserin." | |
| (b) Tried modifying Nuplazid Tablets to solve the purported compliance problem | "[K]nowing that Parkinson's patients have difficulty swallowing . . . would motivate a [POSA] to formulate pimavanserin into a dosage form that is as easy to swallow as possible." | Appx491; Appx519 |
| | "[C]oncept of pill burden [would] motivate a [POSA] to reformulate Nuplazid tablets . . . in such a way where you can put all 40 mgs of pimavanserin tartrate in a single dosage form." | Appx488; Appx519 |

| | | |
|---|---|---|
| | "POSA would have motivation to modify Nuplazid Tablets to boost swallowability . . . ." | Appx908 |
| | "[T]here was motivation to modify Nuplazid Tablets to decrease the two-tablet-per-day regimen to a single pill that was easy to swallow." | Appx909 |
| | "[POSA] seeking to develop a new version of this product would . . . put together a target product profile for the reformulated product." | Appx470 |
| (c) Narrowed the dosage form down to a tablet or capsule | "[POSA] reading Ragnar-Tolf . . . would see that the product can be formulated either as capsules or tablets." | Appx482-83; Appx518 |
| | POSA would not have chosen a flexible oral solid dosage form "unless and until the simpler, more common solutions of . . . tablets and capsules have failed." | Appx498-502 |
| | "[L]ist of alternative pimavanserin formulations a POSA might have tried instead of capsules to make an easy-to-swallow dosage form . . . attempts to abstract back out to the larger problem and ask how many ways that could be done completely disconnected from where the prior art would have already led a [POSA]—namely, tablets and capsules of pimavanserin." | Appx912-13 |
| (d) Then chosen a size 4 capsule | "POSA would have been motivated to select a size 4 capsule shell to make the capsule easy to swallow for the older patients that have Parkinson's disease as stated in the label." | Appx518-19; Appx491-98 |
| | "These factors would have motivated a POSA to go from the round white tablets disclosed in Nuplazid Tablets to a capsule as the new pimavanserin dosage form . . . [and] a size 4 capsule shell . . . was a particularly good choice because . . . [it is] easier to swallow." | Appx909; Appx929-30 |

13

In response to the case Appellants presented, the district court conducted a fact-driven inquiry and reasonably found that Appellants had failed to meet their evidentiary burden for showing that "a POSA would have been motivated to formulate a capsule dosage of pimavanserin." Appx64. The court had an adequate evidentiary basis for rejecting Appellants' theory of motivation based on the record, Appellants' expert testimony, and the court's predicate fact-findings. These include the court's (i) assessment of what the prior art references teach, (ii) crediting of Acadia's expert testimony, and (iii) determination that Appellants' theory lacked sufficient evidentiary support in the record. Appx63-64; *Janssen 2025* at 1381-82.

For example, the district court made various predicate fact findings to evaluate the teachings of the prior art (*e.g.*, Schiele), credit Acadia's expert over Appellants' expert, and decide "not [to] adopt [Appellants'] proposed fact that a POSA 'would have been motivated to modify Nuplazid Tablets to decrease the two-tablet-per-day regimen to a single pill that was easy to swallow.'" Appx65. First, the court found that while "[t]he prior art does not disclose a pill burden problem for the Nuplazid tablets," (Appx29 ¶81), it does disclose that "patients taking the Nuplazid tablets were known to have a high difficulty swallowing because they're older patients with Parkinson's disease," (Appx30 ¶84). Next, the court found that "[t]he Liu reference teaches that safe swallowing is the key

14

formulation factor in designing medicines for older patients and in older patients, age- or disease-related swallowing difficulties affect their ability to take solid oral medicines." Appx32 ¶87. Then, the court found that "[t]he Schiele reference teaches that capsules cause more swallowing problems than tablets" and "that patients with swallowing difficulty are more likely to prefer tablets compared to capsules." Appx30-32 ¶¶85-86.

Furthermore, the court credited the testimony of Acadia's expert that "[i]f pill burden was a motivation for a POSA to reformulate," (Appx29-30 ¶82), and a POSA is "just looking at the Schiele reference," while "limited to only a capsule or a tablet," the POSA is "going to pick a tablet over a capsule," (Appx29-30 ¶82; Appx31-32 ¶86), because "the Schiele reference teaches that 'every type of tablet was preferred over the capsule' among patients with swallowing difficulties," (Appx31-32 ¶86). Accordingly, the district court resolved these disputes between the experts in favor of Acadia to find that a "POSA would not have been motivated to formulate a capsule dosage of pimavanserin over a tablet dosage of pimavanserin on the basis of pill burden," (Appx29 ¶82), or "swallowability," (Appx34 ¶99).

As the court explained, "[w]hile [it] found that in general 'a POSA could be motivated to minimize the number of tablets or capsules administered to patients to decrease the pill burden' (FoF ¶79), [it] found that here a 'POSA would not have

15

been motivated to formulate a capsule dosage of pimavanserin over a tablet dosage of pimavanserin on the basis of pill burden' (FoF ¶82)." Appx65. In other words, the district court determined that Appellants "fail[ed] to demonstrate, by clear and convincing evidence, that a POSA would have been motivated to pursue a capsule formulation of pimavanserin" at all, (Appx65), because there was insufficient evidence to support that a POSA would have been motivated "based on publicly available information," (Appx66; Appx64), to modify the "[t]ablet dosages of pimavanserin [that] already existed," (Appx63). *Janssen 2025* at 1381-82. "Since [Appellants] fail[ed] to demonstrate the motivation of a POSA to formulate a capsule dosage of pimavanserin by clear and convincing evidence, [Appellants] fail[ed] to meet their burden of demonstrating obviousness." Appx64.

## 2. The District Court Reasonably Determined That Appellants' Reasonable Expectation of Success Theory Was Not Sufficiently Supported by the Record

As explained-in-part, *supra* I.B.2., and admitted by Appellants, (Br. 13-14), the size 4 capsule requirement of claim 5 likewise limits its encapsulated pimavanserin composition to a volume ≤ 0.21 ml. Appx515. A POSA would have known that the bulk density (g/ml) dictates the mass of composition (mg) that can fit in the size 4 capsule (ml). Appx508-09. The table below illustrates the relationship between bulk density to the corresponding mass of (1) the blend that

could fit inside the size 4 capsule and (2) the excipients that could be in the

formulation:

| Granule Bulk Density | Mass of Composition |
|---|---|
| 0.4 g/ml | 84 mg |
| 0.5 g/ml | 105 mg |
| 0.6 g/ml | 126 mg |

In other words, a POSA would know that for the claimed size 4 capsule

formulations, a 0.6 g/ml bulk density requires ≤ 126 mg of composition, while a

0.4 g/ml requires ≤ 84 mg of composition instead.  Appx508-09.

Before the district court, Appellants' reasonable expectation of success

theory was that a POSA would have reasonably expected to create 126 mg of

pimavanserin tartrate granules with a ~0.6 g/ml bulk density to fit 40 mg of

pimavanserin tartrate into a size 4 capsule by modifying the concentrations of

Ragnar-Tolf's 20 mg Formulation without altering its ~0.6 g/ml bulk density.

Appx66; Appx930-31; Br. 13-14.  Specifically, Appellants argued that "a POSA

would have expected the bulk density . . . to remain roughly the same 0.6 g/ml

when the concentration of the drug was increased" by over 60% while the

mannitol's concentration was decreased by a corresponding amount.  Appx66;

Appx930-31.  The following table provides Appellants' theory in full and

illustrates their consistent focus on that theory, both at trial, (Appx137-816

(Muzzio)), and in post-trial briefing, (Appx901-935):

17

| Table 2:  Appellants' Theory of Reasonable Expectation of Success—Modifying the Rangar-Tolf Granulation | | |
|---|---|---|
| **Appellants Argued: The POSA reformulating Nuplazid as a size 4 capsule would have . . .** | **Quote** | **Citation** |
| (a) Identified Ragnar-Tolf's granulations as a possible solution | "[POSA] seeking to develop a new version of this product would start by a literature search looking for information about preformulation or formulation studies that have been performed for this particular drug substance." | Appx470; Appx520 |
| | "POSA seeking to develop a new, small capsule dosage form of pimavanserin would have immediately found Ragnar-Tolf" and "looked to Ragnar-Tolf for information on granulating pimavanserin." | Appx910-11 |
| (b) Determined that for 40 mg of pimavanserin tartrate, Ragnar-Tolf's granulations would not fit in a size 4 capsule | "Ragnar-Tolf discloses pimavanserin tartrate granules having a bulk density of about 0.6 g/ml, the only difference being the amount of pimavanserin tartrate in the granules (20 mg vs. 40 mg)." | Appx912 |
| | Looking at Ragnar-Tolf's 20 mg blends, a POSA would know that "to put 40 mgs of pimavanserin tartrate, I'm going to need 200 mgs of the final blend[, b]ut . . . with a density of around 0.6, the most you can put inside a size 4 capsule is 126 mgs of total blend." | Appx507-12 |
| (c) Determined that modifying the granule's ingredient concentrations could fit 40 mg API in a size 4 capsule if density is maintained at 0.6 g/ml | "POSA would have known that, in order to fit the full 40 mg . . . in a size 4 capsule, [POSA] would have to slightly increase the pimavanserin tartrate concentration . . . [while] decreasing the concentration of [mannitol] by the same amount." | Appx910 |
| | POSA would go about solving that problem by increasing the concentration of pimavanserin tartrate in the blend from 20% to about 32.4% and reducing the mannitol from 71% to 59%. | Appx509-10 |

18

| (d) Reasonably expected those concentration changes to not affect bulk density and thus achieve successful reformulation in "one or two routine experiments" | "Based on the consistent 0.6 g/ml bulk densities shown for the pimavanserin granules in Ragnar-Tolf, a POSA would have expected the bulk density of the 40 mg strength to remain roughly the same 0.6 g/ml when the concentration of the drug was increased" and "would have expected that 40 mg of pimavanserin tartrate granules could fit within a size 4 capsule, and would have been able to achieve the result within one or two routine experiments." | Appx910-11; Appx930-31 |
|---|---|---|
| | "POSA would . . . assume that a density is going to stay at 0.6 because it has been pretty stable around 0.56 to 0.6, then . . . when you granulate that way, if your density comes out at 0.6, as would be the expectation, problem solved.  Now, you put 126 mgs of that final blend into the capsule and you have your 40 mgs of pimavanserin." | Appx510 |
| | "[POSA] would have succeeded at being able to create a formulation with granulated pimavanserin tartrate such that you can put the 40 mgs inside that size 4 capsule within one or maybe two experiments." | Appx511 |

In response to the case Appellants presented, the district court conducted a fact-driven inquiry that carefully considered Appellants' theory of reasonable expectation of success before rejecting it.  The court found that "a POSA would have not been motivated to formulate the recited capsule dosage of pimavanserin with the claimed bulk density with a reasonable expectation of success in doing so" based on the record evidence and its predicate fact findings, such as the court's (i)

19

assessment of prior art references, (ii) weighing of expert testimony, and (iii)

determination of the differences between the claims and the prior art. Appx66-69.

For instance, the district court made a series of predicate fact findings when

it assessed the prior art (*e.g.*, Ragnar-Tolf), credited Acadia's expert over

Appellants' expert, and determined that multiple differences exist between the

asserted claims and Ragnar-Tolf including "[w]ith respect to bulk density (one of

the limitations of claim 4[)]." Appx66; Appx40-44. First, the court emphasized

that "[w]ith respect to **tablets**, the Ragnar-Tolf reference discloses embodiments of

1 to 80 mg **tablets** of pimavanserin tartrate, including 40 mg **tablets**," in stark

contrast to both the claimed 40 mg size 4 capsules and the court's citation to

Appellants' expert's broader "dosages" testimony. Appx40 ¶125. Next, the court

provided that Ragnar-Tolf's Table 8 "discloses examples of pimavanserin **tablets**

that were formulated, including [1, 5,] and **20 mg** dosages, that ranged in bulk-

density between 0.56 g/ml and 0.61 g/ml," while also citing Acadia's expert's

testimony that "Table 8 'taught a POSA, in terms of bulk densities you can

see . . . around 0.6 for the amount of pimavanserin that was used

here[ b]ut . . . **stops at 20 mg**.'" Appx41-42 ¶127.

Based on those findings, the court assessed Ragnar-Tolf and found that a

"POSA would have understood . . . that, in order to fit 40 mg of pimavanserin

tartrate in a size 4 capsule, [they] would have had to increase the pimavanserin

tartrate concentration in the 20 mg formulation identified in . . . ¶127 . . . by over 60%," while "also decreasing the concentration of mannitol." Appx42 ¶128. Because, as explained *supra* I.B.2, "the 40 mgs of pimavanserin tartrate need to be contained in 126 mgs of final blend" with a density of 0.6 g/ml to fit in a size 4 capsule. Appx42 ¶128. Then, the court resolved a dispute between experts by crediting Acadia's expert's testimony that changing "pimavanserin concentration . . . has the highest likelihood of changing the bulk density" because it "has the worst behavior in the formulation" over Appellants' expert testimony that "when you granulate that way, if your density comes out at 0.6, as would be the expectation, problem solved." Appx42-43 ¶129. Accordingly, the court found that "[i]f possible, a POSA would have understood that increasing the concentration of pimavanserin tartrate, and likewise decreasing the inactive mannitol diluent, in the blended pimavanserin in the manner described in . . . ¶128 could have increased or decreased the bulk density of the granules." *Id.*

As a result, the court found that "the increase of concentration of pimavanserin by more than 60%, while maintaining the **appropriate bulk density**, militates against a POSA's reasonable expectation of success here." Appx68. Therefore, "a POSA would have not been motivated to formulate the recited capsule dosage of pimavanserin with the claimed bulk density with a reasonable expectation of success in doing so." Appx43 ¶130; Appx67-68. Consequently,

Appellants "fail[ed] to demonstrate by clear and convincing evidence that a POSA would have been motivated to achieve the bulk density in the claimed invention with a reasonable expectation of success in doing so, [and] fail[ed] to meet their burden of demonstrating obviousness." Appx69.

## II.    THE DISTRICT COURT DID NOT CLEARLY ERR IN FINDING THAT APPELLANTS FAILED TO SHOW A MOTIVATION TO FORMULATE THE CLAIMED CAPSULES

It is unclear whether section IV.D.1.a.—"The District Court erred in holding that a POSA would not have been motivated to formulate a capsule version of pimavanserin tartrate"—is simply an introduction to Appellants' argument in section IV.D.1.b., or is meant to independently challenge the court's factual determination on motivation. Br. 18-19. If the latter, section IV.D.1.a.'s solitary paragraph consists of six sentences that provide, at best, an insufficiently developed argument. *Id.* While allegedly providing bases for their sought-after key fact findings in the first four sentences, Appellants have to mischaracterize the district court's fact findings to supposedly support the second and third, and cite Ragnar-Tolf, rather than the court, to supposedly support the fourth. *Compare* Br. 18-19 (second sentence), *with* Appx65, Appx29-30 ¶¶81-82; (third sentence), *with* Appx38 ¶117 (assumes POSA is already motivated to develop a new pimavanserin dosage form); (fourth sentence (only citing Ragnar-Tolf's paragraph 63 for support)), *with* Appx35 ¶103 (finding that "paragraph 63 of Ragnar-Tolf" would

not provide required motivation here and crediting Acadia's expert testimony that "[t]he only way [POSAs] would read that [motivation] into this paragraph is [via hindsight]"). Appellants' failure to acknowledge, let alone substantively challenge, any of these fact findings illustrates that Appellants insufficiently developed any would-be argument here. *Medtronic*, 86 F.4th at 907.

Furthermore, Appellants' contentions in the fifth and sixth sentences are vague and conclusory, merely arguing that "[y]et, even despite finding all of these facts, the District Court held that . . . Appellants failed to meet their burden of demonstrating obviousness," which "is clearly erroneous." Br. 18-19. Accordingly, it is unclear whether Appellants were trying to assert that the court committed clear error when making some unspecified fact finding here, or were just using "clearly" to mean "obviously"—not invoking the clear-error standard. Regardless of what they meant, Appellants either failed to (i) challenge the court's fact findings on motivation or (ii) include a sufficiently developed argument in their opening. In either case, Appellants' choice not to include any developed arguments in their opening brief seeking to prove clear error in the court's fact findings deprived Acadia of its opportunity to respond and therefore constitutes a clear waiver of any such clear-error challenge. *Medtronic*, 86 F.4th at 907.

Nevertheless, the district court had an adequate evidentiary basis for rejecting Appellants' obviousness theories and did not commit clear error in its

findings that Appellants failed to demonstrate the key facts needed to establish

obviousness of the asserted claims by clear and convincing evidence. *See, e.g.,*

*Janssen 2025* at 1380-85; *Vanda Pharms., Inc. v. West-Ward Pharms. Int'l, Ltd.*,

887 F. 3d 1117, 1132 (Fed. Cir. 2018) ("reject[ing] the testimony" of an expert "as

not credible" can "virtually never be clear error"); *supra* I.C.

## III.    APPELLANTS MISREPRESENT THE RECORD TO IMPROPERLY ASSERT THAT THE DISTRICT COURT LEGALLY ERRED

Appellants seek to avoid the deferential clear-error standard by recasting

their factual disputes as questions of law.  In their first attempt, Appellants

improperly bifurcate two of the three overarching limitations to purportedly obtain

five bite-sized limitations to use in their obviousness analysis.  Br. 8.  They divide

the [1] DFL into [1a] (capsules) and [1b] (capsule size 3 or 4) and the [2] PCL into

[2a] (granules) and [2b] (40 mg pimavanserin tartrate and excipients), Br. 8,

thereby making it easier for Appellants to allegedly find these bite-sized limitations

in the disclosures of the prior art during their obviousness analysis on appeal.  Br.

8.  This coincidentally happens as Appellants now allege for the first time that

"Ragnar-Tolf discloses almost all the limitations of the Asserted Claims."  *Id.*

Based on this generous misapplication of Ragnar-Tolf's disclosures to the claim

limitations, Appellants likewise disavow most of the theories they advanced below,

mischaracterize Acadia's rebuttals as affirmative positions, and complain that the

24

court's responsive fact-findings are legal error instead. Specifically, Appellants

argue that "the District Court required Appellants to 're-do the work already done

in' Ragnar-Tolf by showing a separate motivation to modify Nuplazid tablets to

meet the 'capsule' limitation **[1a]**." Br. 20. Appellants' arguments are meritless

because they, *inter alia*, (1) conflict with their affirmative positions before the

district court, (2) are premised on an incorrect standard for analyzing the prior art,

and (3) impermissibly seek to transform their burden of proof into legal error by

the district court.

### A. Appellants' Arguments on Appeal Conflict with Their Affirmative Position Below That It Would Have Been Obvious to Reformulate Nuplazid Tablets into Capsules

On appeal, Appellants assert that "Ragnar-Tolf discloses claim limitations

[1a] (capsules), [2a] (granules), [2b] (40 mg pimavanserin tartrate and excipients),

and [3] (bulk density >0.4 g/ml)—all of the claim limitations except element [1b]

(capsule shell "size 3 or 4")." Br. 10. However, Appellants and their expert

expressly admitted to multiple other differences between Ragnar-Tolf's disclosures

and the claim limitations in addition to shell size. *See, e.g.*, Appx38-44; Appx66-

69; Appx 910-12; Appx517-20; *supra* I.C.2. For example, at trial Appellants'

expert "compare[d] the elements of Claim 4 to what the POSA would know when

reading the prior art," and only identified four elements—the first was the

preamble and the second through fourth were the same three overarching

limitations identified by the court.  Appx517-20.  Furthermore, Appellants' expert

testified that Ragnar-Tolf does not disclose the second and third elements, so a

POSA would have had to modify the teachings to reach the claims.  Appx518.

Likewise, Appellants admitted in post-trial briefing that one "difference [is] the

amount of pimavanserin tartrate in the granules (20 mg vs. 40 mg)," Appx912, and

that the concentration of Ragnar-Tolf's granulations is too low to fit in a size 4

capsule, Appx910-11.  Moreover, they contended that "Dr. Muzzio's obviousness

analysis … compared the prior art to the claims, pointed out the *differences*

between them, and explained how the prior art showed those differences."

Appx913.  Therefore, the district court compared the claims to the prior art and

determined the differences in the exact manner that Appellants had requested.

Evidently, because it is the court's fact findings—not legal analysis—that

Appellants dispute, this Court should reject Appellants' attempt to cry legal error.

### B.    Appellants' Arguments on Appeal Employ an Incorrect Standard for Analyzing the Prior Art

The district court correctly found that Aurobindo failed to show a motivation

to modify Nuplazid tablets to arrive at the claimed pimavanserin capsules.  On

appeal, Appellants pivot and now argue that they bore no burden to establish

motivation at all because, they claim, Ragnar-Tolf discloses "all claim elements

except one."  Br. 20.  As this Court has long held, infringement and validity

analyses follow the same two-step framework:  the claims must be construed and

26

then compared to either the accused product or the prior art. *Amazon.com,* 239 F.3d at 1351. A patent "may not, like a nose of wax, be twisted one way to avoid [infringement] and another to find [invalidity]." *Id.* The evidentiary showing required to determine that a limitation is met is therefore identical in both contexts. *Id.*

Applying that rule, the district court identified three overarching claim limitations—dosage form, pharmaceutical composition, and bulk density—and applied them consistently to both infringement and obviousness. Appx6-8. Appellants accepted that construction below and on appeal but then applied two different standards to those same limitations: a lenient one when comparing them to the prior art, and a stringent one when comparing them to its own product. Br. 7-11, 18-22, 34-61. That inconsistency is fatal.

For example, on infringement, Aurobindo argued that the "pharmaceutical composition" limitation—"granules comprising 40 mg pimavanserin tartrate"— requires proof that all pimavanserin in its product exists in granules. Br. 35. But in its obviousness argument, Aurobindo divided that same limitation into two sub-elements ("granules" and "40 mg pimavanserin tartrate and excipients") and claimed Ragnar-Tolf meets it by disclosing each separately. Br. 8, 20. That approach contravenes basic law requiring claim limitations to be considered as a whole. *Ruiz v. A.B. Chance Co.*, 357 F.3d 1270, 1275 (Fed. Cir. 2004). By treating

27

the same limitation differently across analyses, Aurobindo contradicts its own infringement position and distorts the governing standard.

This inconsistency extends to Appellants' expert, who admitted that Ragnar-Tolf discloses only 20 mg granules and that a skilled artisan "would need to increase the concentration to about 32–33 percent to put 40 mg in a size 4 capsule." Appx518. That testimony confirms Ragnar-Tolf does not disclose the claimed pharmaceutical composition and would require modification to meet it— precisely the finding the district court made.

In short, Appellants cannot alter the standard to suit their preferred outcome. The district court applied a single, coherent framework; Appellants ask this Court to replace it with two incompatible ones. Clear-error review does not permit that result, and the judgment should be affirmed.

## C.  Appellants' Arguments on Appeal Impermissibly Seek to Transform Their Burden of Proof into Legal Error by the District Court

The district court correctly found—without clear error—that Appellants failed to show a motivation to modify Nuplazid Tablets to arrive at the claimed pimavanserin capsules. On appeal, Appellants pivot to now argue that they bore no burden to establish motivation at all because, they claim, Ragnar-Tolf discloses "all claim elements except one." Br. 20. That argument misstates both the law and the record.

As explained *supra* I.C.1, Appellants' theory of motivation before the district court was that "[a] POSA would have been motivated to **modify Nuplazid Tablets** to . . . decrease the two-tablet-per-day regimen to a single pill that was easy to swallow." Appx908-09. Appellants framed the motivation inquiry as whether a POSA would have been motivated to modify Nuplazid Tablets in such a way as to arrive at the claimed size 4 capsules. However, to avoid a POSA being motivated to pursue an alternative formulation—*e.g.*, tablets, liquids, flexible oral solids—Appellants provided a list of formulation factors that a POSA would have reasonably considered, including: minimizing pill burden, (Appx487-488), maximizing swallowability, (Appx489-492), taste-masking (Appx495-498), and color-coating and pill identification (Appx492-495).

Indeed, Appellants argued that a POSA would have chosen a capsule over a tablet and now cannot be heard to complain that the court simply evaluated the factual question Appellants themselves raised. The district court explicitly considered these arguments and found that they would not have motivated a POSA to formulate a capsule dosage of pimavanserin.

## IV. THE DISTRICT COURT'S FACTUAL FINDINGS WERE NOT LIMITED TO A POSA'S MOTIVATION TO USE A CAPSULE OVER A TABLET

Appellants failed to prove by clear and convincing evidence that a POSA would have been motivated to modify the prior art to arrive at the claimed capsule

formulation. The district court therefore correctly rejected their obviousness theory. On appeal, Appellants now attempt to reframe the issue as legal error, asserting that the court "required Appellants to demonstrate a motivation to use a capsule 'over a tablet.'" Br. 22. That argument misreads the decision. The district court did not apply any erroneous legal standard; rather, its factual findings—viewed in full—addressed the absence of any motivation to pursue a capsule formulation of pimavanserin at all.

To the extent the district court imposed any such requirement—which it did not—it was only addressing the argument Appellants themselves advanced. *See supra* I.C.1-2. In any event, Appellants' allegation of "legal error" fails because the district court's factual findings extended to the nonobviousness of formulating a capsule version of pimavanserin *at all*, not merely choosing a capsule "over" a tablet. The district court's opinion makes that clear. It contains an entire section titled "A POSA Would Not Have Been Motivated to Formulate a Capsule Dosage of Pimavanserin." Appx28. The court explained that it was dividing its findings "regarding whether a POSA would have been motivated to formulate a capsule dosage of pimavanserin," and later reiterated that "Defendants fail to demonstrate, by clear and convincing evidence, that a POSA would have been motivated to formulate a capsule dosage of pimavanserin." Appx63-65. Nothing in these findings suggests that the court required Appellants to prove a preference for

capsules *over* tablets.  The court found that Appellants offered no persuasive reason for a POSA to pursue a capsule dosage form at all.  Consistent with *Janssen 2025*, those determinations are quintessentially factual, turning on the court's evaluation of the evidence and credibility of the experts.  *See Janssen 2025* at 1374.

## A.    The Present Case Is Analogous to *Janssen 2025*

Having failed to persuade the district court that a POSA would have been motivated to reformulate Nuplazid tablets as a capsule dosage form, Appellants now urge this Court to hold that it was *legal error* for the court to have considered those arguments in the first place.  *See* Br. 19.  But it was not legal error for the district court to evaluate Appellants' own arguments and conclude that they "fail[ed] to demonstrate, by clear and convincing evidence, that a POSA would have been motivated to pursue a capsule formulation of pimavanserin."  Appx65.  Appellants' attempted about-face must be rejected because the court made the only appropriate factual finding based on the evidence presented.

In fact, this case closely parallels *Janssen 2025*, in which this Court rejected a similar effort by an appellant to miscast the district court's "fact-driven inquiry in response to the case [the appellant] presented."  *Id*. at 1384.  There, the Court explained that "the district court reasonably determined, based on [the appellant's] expert testimony, that 'patients with moderate to severe renal impairment are not to receive [the drug] at all,' and that [the appellant's] theory of motivation focused on

treating patients with mild renal impairment." *Id.* "In other words, the district court's focus on how a relevant artisan would modify a dosing regimen for patients with mild renal impairment was not an erroneous reading-in of an extraneous limitation but a fact-driven inquiry in response to the case [the appellant] presented." *Id.*

Here, the district court likewise made a reasoned finding in response to Appellants' own theory. It relied on Appellants' expert testimony that "the patients taking the Nuplazid tablets were 'known to have a high difficulty swallowing because they're older patients with Parkinson's disease.'" Appx30 ¶84 (quoting Appellants' expert). Appellants' theory thus focused on "modify[ing] Nuplazid Tablets to decrease the two-tablet-per-day regimen to a single pill that was easy to swallow." Appx65. In other words, the district court's focus on how a relevant artisan would modify Nuplazid Tablets for Parkinson's disease patients with swallowing difficulties was not an erroneous reading-in of an extraneous limitation but a fact-driven inquiry compelled by Appellants' own evidence. As in *Janssen 2025*, where this Court affirmed because the district court "found—without clear error—that [the appellant] failed to prove a motivation to reduce the prior art's dosing regimens in such a way as to arrive at the [claimed invention]," *Janssen 2025* at 1384, it should do the same here.

32

### B.     The Present Case Is Analogous to *Insite*

As the record confirms, the district court did not require Appellants to show that a POSA would prefer capsules "over tablets." Rather, it asked the correct factual question—whether a POSA would have been motivated to pursue *any* capsule formulation of pimavanserin. Consistent with *Insite*, the court credited both sides' experts that there was no publicly known problem with the existing pimavanserin tablets to suggest reformulation. *See* Appx37 ¶112 (Appellants' expert unaware of "any complaints" from patients or physicians); Appx38 ¶116; Appx64. The court then evaluated the alleged motivations Appellants proposed— pill burden, swallowability, taste, dosage form convenience—and correctly found that none would have led a POSA toward a capsule formulation. Appx38 ¶116; Appx64.

This approach mirrors *Insite*, where the Federal Circuit affirmed that a district court "did not clearly err in framing the obviousness inquiry based on its understanding of the problem facing those skilled in the art at the time of the invention." 783 F.3d at 859-60. The court here likewise considered the problem a POSA would have perceived and reasonably found no record evidence that reformulating Nuplazid tablets into capsules addressed any known deficiency.

The district court began its obviousness analysis with the proper factual inquiry: what problem would a skilled artisan have perceived at the time of the

invention? To establish motivation, Appellants had to prove "by clear and convincing evidence that [a POSA] at the time of the invention would have recognized the problem identified by the inventors and found it obvious to produce the [invention] to solve that problem." *Mintz v. Dietz & Watson, Inc.*, 679 F.3d 1372, 1377-78 (Fed. Cir. 2012). Whether a POSA "would narrow the research focus to lead to the invention depends on the facts," and a district court "d[oes] not clearly err in framing the obviousness inquiry" when it does so "based on its understanding of the problem facing those skilled in the art at the time." *Insite Vision Inc. v. Sandoz, Inc.*, 783 F.3d 853, 859-60 (Fed. Cir. 2015).

Ignoring that foundational inquiry, Appellants now claim the district court legally erred by "requiring [them] to 're-do the work already done in' Ragnar-Tolf" and to show a separate motivation to modify Nuplazid tablets into capsules. Br. 20-21. That characterization misstates the record. The court properly examined what problem a POSA would have perceived—not what Ragnar-Tolf disclosed—and reasonably found that Appellants failed to prove a motivation to pursue the claimed capsule form. *See Insite*, 783 F.3d at 860.

Appellants' own trial theory confirms that finding. They asserted that a POSA would have recognized pill burden and swallowability as the key problems with Nuplazid tablets, particularly for elderly Parkinson's patients, and therefore would have been motivated to reformulate to "a dosage form that would reduce pill

34

burden and enhance swallowability." Appx907-08. But the record proved the opposite. The Schiele reference teaches that capsules, not tablets, cause more swallowing problems, and that patients with dysphagia "are more likely to prefer tablets compared to capsules." Appx30-31 ¶¶85-86. Acadia's expert's unrebutted testimony reinforced that conclusion: if a POSA "were limited to choosing between a capsule or a tablet, [they] would pick a tablet over a capsule." Appx31 ¶86.

Weighing this evidence, the district court found that if the motivation were truly to improve swallowability, a POSA "would have been motivated to choose the dosage form that is as easy to swallow as possible"—that is, a tablet, not a capsule. Appx31 ¶86; Appx64. Having credited Acadia's expert's testimony and the plain teachings of Schiele, the court reasonably determined that Appellants' proffered motivation theory was unsupported by the record. *See Janssen 2025* at 1384-85.

Further consistent with Federal Circuit precedent, the district court did not limit its evaluation to a POSA's motivation to pursue only capsule or tablet formulations. *See In re Fine*, 837 F.2d 1071, 1075 (Fed. Cir. 1988) ("One cannot use hindsight reconstruction to pick and choose among isolated disclosures in the prior art to deprecate the claimed invention."). To the contrary, the court properly considered the *full scope* of the prior art, including the range of dosage forms

35

disclosed in Ragnar-Tolf. *See* Appx65 (citing Appx33 ¶94) (crediting Acadia's expert's unrebutted testimony that, to the extent a POSA considered the disclosure of capsules in Ragnar-Tolf, the POSA would also consider other formulation strategies disclosed there, viewed in light of the prior art as a whole, including Liu). This is the same inquiry endorsed in *Polaris* and *W.L. Gore*, which direct courts to evaluate the *full field of possible solutions*, not an artificial binary. *See Polaris Indus., Inc. v. Arctic Cat, Inc.*, 882 F.3d 1056, 1069 (Fed. Cir. 2018) ("A reference must be considered for all it taught . . . including disclosures that taught away from the invention at hand."); *W.L. Gore & Assocs., Inc. v. Garlock, Inc.*, 721 F.2d 1540, 1550 (Fed. Cir. 1983) (error to consider references "in less than their entireties, *i.e.*, in disregarding disclosures that teach away from the invention at hand"). The holistic view taken by the district court—considering the entire disclosure of Ragnar-Tolf and other references—is precisely what Federal Circuit precedent requires.

### C.     The Present Case Is Analogous to *Medichem*

The court properly treated Ragnar-Tolf's passing reference to capsules as one among many possible dosage forms—including tablets, pills, liquids, gels, syrups, slurries, and suspensions—and weighed those alternatives in Ragnar-Tolf in light of other prior-art teachings such as Liu and Schiele. Appx32-34 ¶¶87-95. For Schiele, the court found that capsules cause more swallowing problems than

tablets, (Appx30-31 ¶85), and that patients with swallowing difficulty are more likely to prefer tablets, (Appx31-32 ¶86).  For Liu, the court credited testimony identifying swallowability benefits of dispersible and effervescent tablets. Appx32-33 ¶¶87-94; Appx34 ¶95 (citing Appx593 (417:18–23) (Muzzio)); *see also* Appx718-724 (516:2-523:3) (Little).  The court credited Acadia's unrebutted expert testimony that a POSA would have understood these references collectively to favor tablet or dispersible formulations for patients with swallowing difficulties, while recognizing that the Stegemann reference's capsule preference carried diminished credibility because its author was employed by a capsule manufacturer. Appx30-34 ¶¶85–98.

That evaluation is precisely what *Medichem* and *Henny Penny* direct:  when prior art presents conflicting teachings, the factfinder must assess the degree to which one reference discredits another and weigh "benefits, both lost and gained." *See Medichem, S.A. v. Rolabo, S.L.*, 437 F.3d 1157, 1164-65 (Fed. Cir. 2006); *Henny Penny Corp. v. Frymaster LLC*, 938 F.3d 1324, 1332 (Fed. Cir. 2019) ("[c]onsistent with the longstanding principle that the prior art must be considered for all its teachings, not selectively," the court weighed "benefits, both lost and gained," across references).  The district court did so, requiring only what the law demands—clear and convincing evidence that, viewed as a whole, the prior art would have motivated a POSA to pursue a capsule formulation of pimavanserin.

Despite Ragnar-Tolf's cursory capsule reference, the district court reasonably found that Appellants failed to make that showing.

The district court also properly examined teaching away as a factual matter in view of the prior art as a whole. *See, e.g.*, *Medichem,* 437 F.3d at 1164-65 (when references conflict, the factfinder must assess "the degree to which one reference might accurately discredit another"; what a reference teaches, and whether it teaches toward or away, are questions of fact). Specifically, the court assessed Ragnar-Tolf's mention of capsules against other references and reasonably found that those teachings diminished any motivation gleaned from Ragnar-Tolf's cursory capsule disclosure.

For Schiele, the court found that capsules cause more swallowing problems than tablets (Appx30-31 ¶85) and that patients with swallowing difficulty are more likely to prefer tablets (Appx31-32 ¶86). For Liu, the court credited testimony identifying swallowability benefits of dispersible and effervescent tablets and recognized Ragnar-Tolf's multiple dosage form options (tablets, pills, liquids, gels, syrups, slurries, suspensions). Appx32-33 ¶¶87-94; Appx34 ¶95 (citing Appx593 (417:18-23) (Appellants' expert)); *see also* Appx718-724 (516:2-523:3) (Acadia's expert). For Stegemann, the court reasonably found the capsule-favoring data had diminished credibility given the author's employment by a capsule manufacturer. Appx34 ¶¶96-98.

38

In making these findings, the district court did not impose a "heightened standard," as Appellants suggest, by requiring proof "sufficient to clearly and convincingly support" obviousness. Br. 21-22. Rather, consistent with Federal Circuit precedent, where the prior art presents conflicting teachings, a challenger must "provide persuasive argument or evidence" showing why the capsule path would have been acceptable to a POSA. *Lab'y Corp. of Am. Holdings v. Ravgen, Inc.*, No. 2023-1342, 2025 WL 32904, at *3 (Fed. Cir. Jan. 6, 2025). Treating Ragnar-Tolf's capsule mention as one option among many, the court properly weighed contradictory teachings—exactly what *Medichem* contemplates when the prior art "contains apparently conflicting teachings." 437 F.3d at 1164-65; *see also Henny Penny*, 938 F.3d at 1332 (weighing benefits "lost and gained"). The court required only what the law demands: clear and convincing evidence that, **considered as a whole**, the prior art would have motivated a POSA to pursue a capsule formulation of pimavanserin. Despite Ragnar-Tolf's cursory capsule reference, the district court reasonably found that Appellants failed to make that showing.

## V. THE DISTRICT COURT PROPERLY FOUND THAT APPELLANTS FAILED TO SHOW A POSA WOULD HAVE REASONABLY EXPECTED TO ACHIEVE THE CLAIMED CAPSULES

"The reasonable expectation of success requirement refers to the likelihood of success in combining references to meet the limitations of the claimed

39

invention." *Janssen 2025* at 1383. Here, the district court correctly found that Appellants "fail[ed] to demonstrate by clear and convincing evidence that a POSA would have been motivated to achieve the bulk density in the claimed invention with a reasonable expectation of success in doing so. . . ." Appx69. The district court thus applied the correct standard: it asked whether a POSA, in view of the prior art and pimavanserin's formulation behavior, would have reasonably expected to achieve the claimed bulk-density requirement when reformulating from tablets to capsules. In doing so, it permissibly considered the practical variables—excipient choice, granulation method, and process parameters—that a formulation scientist would actually weigh. *See Natera, Inc. v. NeoGenomics Lab'ys, Inc.*, 106 F.4th 1369, 1378 (Fed. Cir. 2024); *OSI Pharms., LLC v. Apotex Inc.*, 939 F.3d 1375, 1385 (Fed. Cir. 2019); *Janssen 2025* at 1383.

The court's reference to maintaining an "appropriate" bulk density reflected the court's recognition that a POSA would need to make multiple interdependent changes to Ragnar-Tolf's formulation: doubling the active ingredient from 20 mg to 40 mg, (Appx41-42 ¶127), reducing the capsule from size 0 to size 4, (Appx42 ¶128), increasing the active concentration from 20% to roughly 32.4%, and decreasing excipients such as mannitol to accommodate the higher load. *Id.* Given pimavanserin's known low density and tendency to clump, the court found that

these changes would likely and unpredictably alter bulk density.  Appx39-40 ¶¶122-23.

In short, the court did exactly what the law requires:  assuming a POSA were motivated to pursue a capsule, it then asked whether that POSA would reasonably expect success in achieving the claimed bulk density under those modified conditions.  After weighing expert testimony, the court found that both experts agreed the changes could increase or decrease bulk density unpredictably. Appx42-43 ¶129.  On that evidence, it reasonably concluded that Appellants failed to prove by clear and convincing evidence that a POSA "would have been motivated to formulate the recited capsule dosage of pimavanserin with the claimed bulk density with a reasonable expectation of success."  Appx43 ¶130.

That finding accords with *Allergan, Inc. v. Sandoz Inc.*, 796 F.3d 1293, 1305 (Fed. Cir. 2015), where "minor formulation changes materially and unpredictably altered key properties," precluding a reasonable expectation of success.  The same is true here:  significant formulation adjustments—active concentration, capsule size, and excipient composition—rendered outcomes unpredictable.  As in *In re Cyclobenzaprine Hydrochloride Extended-Release Capsule Patent Litigation*, 676 F.3d 1063, 1083 (Fed. Cir. 2012), the long delay between the marketed tablet and capsule forms of pimavanserin likewise supports the inference that the claimed capsule was difficult to achieve.  *See* Appx68-69.

41

In short, the district court's factual finding—that a POSA would not have reasonably expected to achieve the claimed bulk density when reformulating pimavanserin into a size 4 capsule—was **amply supported by the record** and is entitled to deference.  Appx43.  There was no clear error.

### A.    The District Court Properly Found That a POSA Lacked a Reasonable Expectation of Success

Here, Appellants argue that the district court legally erred by (1) asking whether a POSA would have expected to *maintain* the bulk density of Ragnar-Tolf's granules and (2) requiring "absolute predictability."  Br. 5-6.  They contend the law requires only a reasonable expectation of achieving the claimed bulk density limitation, not maintaining a prior art value.  Br. 30.  That argument fails for two reasons.  First, it mischaracterizes the opinion: the court did not require preservation of a prior-art measurement; it evaluated whether a POSA, attempting to achieve the *claimed* bulk-density requirement in a capsule formulation, would reasonably expect success given the interdependent formulation changes required.  Appx67-69.  Second, Appellants' reframing improperly narrows the claim scope; the claims require granules meeting the specified bulk-density threshold *within the claimed composition and dosage form*, not in isolation.  *See supra* I.B.2; I.C.2.

Appellants' claim that the district court found no reasonable expectation "because a POSA would not have expected to maintain the bulk density of Ragnar-

42

Tolf's granules" (Br. 29) misstates the record.  The court mentioned "maintaining" bulk density only once:  "[T]he increase of concentration of pimavanserin by more than 60%, while maintaining the appropriate bulk density, militates against a POSA's reasonable expectation of success . . . ."  Appx68.  As the context shows, the court referred to maintaining *an appropriate* bulk density, not Ragnar-Tolf's specific value.  Nowhere did the court require that the prior art density be preserved.  To the contrary, it expressly focused on "the claimed bulk density." Appx43.

### B.    The District Court Did Not Require "Absolute Predictability"

Appellants' final contention—that the district court applied an "absolute predictability" standard—is equally unfounded.  Br. 31-33.  They claim the court "dismissed" evidence suggesting a POSA would expect similar bulk densities when increasing pimavanserin from 20 mg to 40 mg.  Br. 31-32.  The court did no such thing.  It weighed that evidence and found it insufficient in light of pimavanserin's unpredictable behavior.  Appx68.  The court credited testimony that the claimed amount of pimavanserin "could and did materially and unpredictably alter" bulk density—language drawn directly from *Allergan.*  796 F.3d at 1305; Appx68.  Nothing in that analysis suggests the court required certainty; it simply found that Appellants failed to prove a reasonable expectation of success.

43

The district court's approach mirrors *Eli Lilly & Co. v. Teva Pharms. Int'l GmbH*, 8 F.4th 1331, 1349 (Fed. Cir. 2021), which held that a challenger must "demonstrate that despite any unpredictability in the literature, a skilled artisan nevertheless would have had a reasonable expectation of success." Appellants' attempt to shift that burden onto Acadia underscores their error. It was Appellants' burden to show success, not Acadia's to prove failure.

Appellants' argument that "there is no evidence that a POSA would have expected the density to fall below 0.4 g/ml," (Br. 30), misallocates that burden. Likewise, their complaint that "Appellee never identified a granulation below 0.4 g/ml," (Br. 32), ignores that Appellants never identified any example meeting the claimed threshold either—further confirming the speculative nature of their theory. See *Cyclobenzaprine*, 676 F.3d at 1083.

Likewise, Appellants assert that Acadia's expert "came nowhere near showing that a POSA would expect the bulk density of Ragnar-Tolf's granules to fall below 0.4 g/ml." Br. 31. Again, the burden was not Acadia's to prove failure but Appellants' to prove success. The court properly considered the record as a whole and found that Appellants had not met their evidentiary burden. *See Eli Lilly*, 8 F.4th at 1349.

Appellants' final refrain—that "there was no indication that a POSA would expect the bulk density . . . to fall below the claimed threshold when the

pimavanserin was increased from 20 mg to 40 mg," (Br. 32)—again relies on an absence of rebuttal evidence rather than affirmative proof of a reasonable expectation of success. That does not meet Appellants' burden.

In sum, the district court did not demand "absolute predictability." It applied the correct legal standard, considered the evidence as a whole, and found that Appellants failed to prove—by clear and convincing evidence—that a POSA would have reasonably expected to achieve the claimed bulk-density limitation. There was no legal or factual error. The judgment should be affirmed.

## RESPONSE TO AUROBINDO'S APPEAL ON INFRINGEMENT

## VI.   THE DISTRICT COURT CORRECTLY FOUND INFRINGEMENT BY AUROBINDO

### A.   Introduction and Summary of Argument

After a three-day bench trial in which "the Court weighed the evidence from the parties and the credibility of the parties' experts," the district court correctly found that "Aurobindo infringes claims 4 and 5 of the '721 patent by a preponderance of the evidence." Appx60. That finding rests on two independent and mutually reinforcing grounds: (1) Aurobindo's own ANDA admissions, and (2) unrebutted testing by Acadia's expert, Dr. Pamela Smith, showing that the pimavanserin in Aurobindo's capsules exists in granules meeting the claimed limitations. Each is sufficient on its own to sustain the judgment; together they leave no room for doubt.

45

Aurobindo's ANDA told the FDA that its manufacturing process produces granules comprising 40 mg pimavanserin tartrate and excipients. Appx3708-31; Appx13-14 ¶57(e). At trial, Aurobindo tried to dismiss those statements as "typographical errors." The district court properly rejected that story, noting that the statements were approved by Aurobindo's own scientists—including its trial witness—and never corrected with the FDA. Appx14; Appx285, 149:16-19 (Aurobindo's witness admitting "[i]f Aurobindo believed that something was incorrect in its ANDA, it would take steps to correct it with the FDA.")

Dr. Smith independently confirmed that the pimavanserin in Aurobindo's product meets the claim limitations. Aurobindo offered no testing of its own and no credible rebuttal. Appx25-26, 58-60; Appx3559-3623; Appx3624-3631.

Under the deferential clear error standard, Aurobindo identifies no finding that is not "plausible in light of the record viewed in its entirety," *Anderson*, 470 U.S. at 574, nor "a definite and firm conviction that a mistake has been made." *Allergan,* 796 F.3d at 1303. The court's factual findings are not merely plausible—they are inescapable. The infringement judgment should therefore be affirmed.

### B.    Background

#### 1.    The Relevant Claim Limitation and Construction

The only disputed limitation on appeal is whether Aurobindo's product has "granules comprising 40 mg pimavanserin tartrate." Br. 35. Aurobindo does not challenge claim construction. Instead, it argues (1) that its ANDA does not establish infringement and (2) that, even if granules exist, Acadia failed to prove they contain 40 mg of pimavanserin. Br. 50. Both arguments fail. The court expressly addressed and rejected each. Appx8-27, 55-56, 58-60.

#### a.    Granules are structural, not process-limited

The district court construed "[g]ranules comprising 40 mg pimavanserin tartrate" to have its plain meaning: "the scope of the term granule includes granules granulated with pimavanserin and excipients." Appx8 ¶33 (citing Appx899-900). The specification describes granules by structure—"powder particles . . . made to adhere to form larger, multiparticle entities." Appx10 ¶45 (citing Appx108, 4:45-47). Aurobindo's own expert, Dr. Richard Moreton, agreed that "adhere" means "particles of different types sticking together" and confirmed that the patent "does not qualify the term adhere." Appx10 ¶¶46-47 (citing Appx361, 225:14-25; Appx362, 226:1-4).

As the district court observed, and Aurobindo does not challenge on appeal, "the asserted claims are not product-by-process claims and do not otherwise involve any process limitations . . . ." Appx4331. The specification's examples for

manufacturing granules are expressly "non-limiting."  Appx11 ¶¶50-52;
Appx362-63, 226:17-227:15.

Aurobindo's appellate briefing rests on distortions of Dr. Smith's testimony.
Aurobindo claims she "agreed that dry granulation requires high pressure."  Br. 37.
She said the opposite—testifying that Aurobindo's dry mixing process "could be a
type [of dry granulation] if it makes a granule," even without high pressure.
Appx267, 131:16-22.  Aurobindo also asserts that Dr. Smith required "purposeful
agglomeration."  Br. 38.  Again, false.  She testified that "you can have granules
whether you intended to make them or you accidentally made them," and declined
repeated attempts by Aurobindo's counsel to elicit trial testimony suggesting
otherwise.  Appx257-59, 121:15-123:16.

Granules are defined by structure, not intent or process.  The district court
correctly applied that understanding.

### b.    Aurobindo's process produces granules

The record firmly supports the district court's finding that Aurobindo's "dry
mixing and sifting" process could—and did—produce granules.  Appx11-12 ¶53;
Appx27 ¶71.  Dr. Smith testified extensively to that effect (Appx204-18,
68:24-82:7), and Acadia's formulation expert confirmed that for a "sticky drug"
like pimavanserin, microcrystalline cellulose (MCC) "could result in granules
because of its known function."  Appx786-87, 584:20-585:10.  Even Aurobindo's

expert conceded that "pimavanserin can adhere to MCC, depending on particle size." Appx25 ¶60(g) (citing Appx362, 226:9-12). That adhesion—between pimavanserin and excipient—is precisely what the court's construction describes. And Aurobindo's internal development documents repeatedly characterize its dry-mixing process as producing "granules." Appx3654-57, 3658-61, 3708, 3731, 3760-61. The court's finding that Aurobindo's process yields the claimed granules is therefore well-supported.

### 2. Aurobindo's ANDA Describes an Infringing Product

The district court correctly found that Aurobindo's ANDA describes an infringing product. Aurobindo's "Pharmaceutical Development" report in its ANDA—signed by three Aurobindo scientists, including trial witness Mr. Kannusamy—summarizes the development of its 34 mg capsule product. Appx3662-3757. Section 3.2.P.2.3 ("Manufacturing Process Development") details the process rationale, and Section 3.2.P.2.7 ("Control Strategy") outlines the pre-lubrication and lubrication controls. Appx3707-3720, 3726-3732.

Within this report, the process map for the finalized formulation identifies the inputs to the pre-lubrication and lubrication steps as granules, listing "granule bulk and tapped density," "granule uniformity," and "granule size distribution" as key attributes. Appx3708. Those granules are the output of Step (iii), which co-sifts 40 mg pimavanserin tartrate with microcrystalline cellulose and colloidal

silicon dioxide. Appx12-14 ¶¶54(iii), 57(e); Appx27 ¶71; Appx4281. The district court therefore correctly found that the ANDA "describes the inputs to Steps (v)–(vii) . . . which is the output of Step (iii) (i.e., the output being 40 mg pimavanserin tartrate and the excipients), as granules." Appx13-14 ¶57(e).

The "Control Strategy" (Section 3.2.P.2.7) confirms the same: it directs "blending the granules [from Step (iii)] with extra-granular materials." Appx3731. This internal consistency across multiple sections of the ANDA firmly supports the district court's finding that Aurobindo's process produces granules comprising 40 mg pimavanserin tartrate and excipients. Aurobindo's claim (Br. 56) that "in no way does the ANDA describe" such granules, therefore, is flatly contradicted by its own filing and Aurobindo fails to identify clear error in the district court's finding of infringement.

Indeed, other Aurobindo documents outside of the ANDA described the same mixing/blending and sifting process used in Aurobindo's ANDA product as producing granules, further supporting the finding of infringement. Appx3656, 3660-61, 3760-61.

### 3. Dr. Smith's Testing Confirms Infringement

Acadia's expert, Dr. Smith, an analytical chemist with over twenty years of experience in solid-state characterization, performed stereomicroscopy and polarized-light microscopy on representative Aurobindo samples.

Appx3559-3623; Appx3624-31; Appx3799-3809; Appx186-89 (50:22-53:13); Appx218-39 (82:8-103:16).  Dr. Smith separated the samples by sieve fractions, analyzed each—including the bottom collection pan—and photographed representative fields.  Appx3559-3623; Appx3624-31; Appx252-56 (116:7-120:21).  The court considered Dr. Smith's examinations, noting her expertise, while also finding that Aurobindo's expert Dr. Moreton neither handled Aurobindo's product nor was an expert in polarized light microscopy.  Appx17-26 ¶¶59-67.

Dr. Smith's observations were unequivocal:

- Every field showed multi-component agglomerates containing pimavanserin and excipients.  Appx59-60.

- No isolated pimavanserin particles appeared in any fraction or in the bottom pan.  Appx59-60; Appx252-56, 116:7-120:21.

- The agglomerates displayed the size, cohesion, and density described in the patent and adopted in the court's construction.  Appx10-12 ¶¶45-53.

As Dr. Smith explained at trial, her imaging (Appx3559-3623, 3624-3631) showed cohesive, dense particles—true granules distinguished by excipient adhesion and uniform drug distribution, not loose powder.  Appx225-39, 89:1-103:16.  Her preparation methods would have dispersed any pimavanserin that was not in granules; none appeared.  Appx232-34, 96:3-98:4.

While acknowledging that it is impractical to test all of the material in Aurobindo's product, Dr. Smith explained that her extensive imaging and

observations that she did not capture images of—including the bottom pan residue—gave her complete confidence that all 40 mg of pimavanserin tartrate existed in granules. Appx265-69, 129:24-130:1, 131:6-14, 132:21-133:16. Aurobindo's suggestion that Dr. Smith relied on "naked-eye" observations for her opinions (Br. 45, 47) is misleading; her observations were made using microscopes. The "naked eye" reference comes from Dr. Smith describing "stereo microscopy" as "looking at something with a naked eye, ***but zoomed in, so it's a magnified image***, looking at it in a reflected light." Appx218, 82:18-25.

Aurobindo's expert, Dr. Moreton, offered only criticism—without data. He is not trained in polarized-light microscopy, has never operated such an instrument, performed no testing, and never handled Aurobindo's product. Appx25-26 ¶¶63-64. He even conceded that "a lot of what Dr. Smith explained [about her testing] may be valid." Appx349 (213:9-20). His speculation that humidity or manipulation affected morphology was unsupported; he admitted performing no humidity studies and was "not saying definitely" that any effect occurred. Appx26 ¶67 (citing Appx358–59 (222:1-24)). Dr. Smith, by contrast, conducted all testing under standard laboratory conditions and obtained consistent structural results across all samples. Appx17-26 ¶¶59-67; Appx230-31 (94:16-95:19); Appx232-34 (96:3-98:4).

The district court found Dr. Smith's testimony credible, methodologically sound, and unrebutted.  Appx56, 59-60.  It expressly rejected Aurobindo's claim that "even if some agglomerates . . . were granules, the quantity of pimavanserin in those granules would fall far short" of the 40 mg limitation, noting that every material Dr. Smith examined—including from the collection pan—showed pimavanserin as part of a granule.  Appx59-60.

On this record, the court correctly concluded that Acadia proved infringement by a preponderance of the evidence.

### C.    Argument

As detailed above, the district court's infringement finding was the product of a full bench trial, careful evidentiary weighing, and detailed factual findings— all amply supported by the record and entitled to deference on appeal.  The evidence of infringement was overwhelming.  Aurobindo's own ANDA admissions and Acadia's expert testing each independently and conclusively establish that Aurobindo's product contains granules comprising 40 mg of pimavanserin tartrate, exactly as claimed.

The record leaves no serious dispute that Aurobindo's manufacturing process produces, and its ANDA product contains, the claimed granules.  The district court's findings are not merely plausible—they are compelling.  Reversal is

warranted only if the appellate court has a definite and firm conviction that the district court made a mistake—an exacting burden Aurobindo cannot meet.

### 1.    The ANDA Admissions Alone Establish Infringement

The district court correctly held that Aurobindo's own ANDA admissions establish infringement by a preponderance of the evidence. The ANDA's Pharmaceutical Development narrative and process map clearly identify the material entering the pre-lubrication and lubrication steps as granules, and they tie those granules to the Step (iii) output that co-sifts 40 mg pimavanserin tartrate with excipients. Appx4278-95 (3.2.P.3.3 Description of Manufacturing Process and Process Controls); Appx3708 (3.2.P.2 Pharmaceutical Development, Process Map). The Control Strategy confirms that the output of the co-sifting of the 40 mg pimavanserin tartrate with excipients are granules, which are then mixed with extra-granular material. Appx3731 (3.2.P.2.7 Control Strategy).

Based on these ANDA documents, which speak directly to the question of infringement, the court correctly found that Aurobindo "describes the inputs to Steps (v)–(vii)[,] which is the output of Step (iii) (i.e., the output being 40 mg pimavanserin tartrate and excipients), as granules." Appx13-14 ¶57(a-k).[8] Thus, it

---

[8] In addition to the district court expressly finding that the ANDA "describe[s] . . . output being 40 mg pimavanserin tartrate and excipients[], as granules," (Appx13 ¶57(e)), the court noted that three of Aurobindo's draft "Master Formula Cards" describe Aurobindo's mixing/blending/sifting process as creating granules.

is not the case that the ANDA is silent on infringement as Aurobindo contends.

Under settled law, when an ANDA clearly describes an infringing product, that

description is dispositive. *See, e.g.*, *Sunovion Pharms., Inc. v. Teva Pharms. USA,*

*Inc.*, 731 F.3d 1271, 1280 (Fed. Cir. 2013); *Ferring B.V. v. Watson Lab'ys Inc.*, 764

F.3d 1382, 1387 (Fed. Cir. 2014).

> ### a.     The ANDA admissions are binding and dispositive

Aurobindo's ANDA repeatedly characterizes the output of its blending and

sifting process as granules and lists granule bulk/tapped density, granule

uniformity, and granule size distribution as critical attributes—confirming that

Aurobindo's manufacturing process makes and controls granules, and not some

loose powder blend.  Appx12-16 ¶¶54-58.  Those admissions are not ambiguous,

qualified, or hypothetical; they are the sponsor's own technical representations to

the FDA, signed off by Aurobindo scientists (including Mr. Kannusamy, who

approved the sections containing these admissions).  Appx13-15 ¶57.

This is not a situation where the ANDA is silent, ambiguous, or expressly

carves out the infringing feature as in *Glaxo Inc. v. Novopharm Ltd.*, 110 F.3d

1562, 1569 (Fed. Cir. 1997).  As this Court has explained, the ANDA defines the

accused product for infringement purposes; patentees need not prove actual

---

Appx13 ¶57(l).  The court expressly noted that these cards were not in the ANDA.
*Id*.  The court's finding that the ANDA discloses an infringing product stands
independently of these draft cards.

batches infringe when the ANDA's description itself addresses whether the

infringing configuration exists.  *See, e.g.*, *Bayer AG v. Elan Pharm. Research

Corp.*, 212 F.3d 1241 (Fed. Cir. 2000) (finding the ANDA defined the product in a

way that directly addresses the question of infringement, and appellant "[was]

bound by this specification."); *Abbott Lab'ys v. TorPharm, Inc.*, 300 F.3d 1367,

1373 (Fed. Cir. 2002) ("[A]n ANDA specification defining a proposed generic drug

in a manner that directly addresses the issue of infringement will control the

infringement inquiry.").  Here, the ANDA affirmatively describes granules and

regulates granule attributes in downstream steps.  Appx3708, 3731.  In such

circumstances, an ANDA defining a proposed generic drug in a manner that

directly addresses infringement will control.  *Bayer*, 212 F.3d at 1249-50.

### b.    The District Court properly rejected Aurobindo's shifting explanations

At trial, Aurobindo argued that references to "granules" were "typographical

errors," and that later iterations purportedly removed the term.  Appx296

(160:7-11).  The district court rejected that explanation for two independent

reasons.  First, Aurobindo's own witness, Mr. Kannusamy, admitted that if the

company believed an ANDA statement was wrong, it would seek a correction with

FDA—but it never did correct the Pharmaceutical Development report, which

repeatedly describes the creation of infringing granules.  Appx285 (149:16-19).

Mr. Kannusamy further eroded his credibility with the court by refusing—"at least

six times"—during trial to acknowledge Aurobindo documents that expressly described its dry-mixing process as producing granules. Appx16 ¶57(l)(i).

Second, the internal consistency of the document defeats the "typographical error" claim: the manufacturing process map labels the Step (iii) output as granules, and the Control Strategy regulates granule attributes in the subsequent steps. Appx13 ¶57(e); Appx3708; Appx3731; Appx4281. On this record, the court reasonably found the "error" narrative not credible and treated the ANDA as written (and as provided to the FDA). That fact-bound credibility determination is unassailable on clear-error review. *See Anderson*, 470 U.S. at 574.

Nor does the "deliberatively removed" contention help Aurobindo. Even if later drafting softens a word choice, the operative ANDA language the court credited remains in the ANDA, and describes a product that has granules comprising 40 mg pimavanserin tartrate and excipients.

### c.    The ANDA admissions reach the "quantity" element

Aurobindo argues that even if granules exist, Acadia failed to prove the 40 mg quantity is present in granules. Br. 40-46. The district court correctly found that the ANDA defeats that claim. The process map "describes the inputs to Steps (v)–(vii)[,] which is the output of Step (iii) (i.e., the output being 40 mg pimavanserin tartrate and excipients), as granules." Appx13-14 ¶57(a-k). Step (iii) is co-sifting of 40 mg pimavanserin tartrate with excipients, and the ANDA's

Control Strategy describes the further processing of those granules.  Appx11-12 ¶53; Appx27 ¶71; Appx3708; Appx3731; Appx4281.  The district court expressly considered and rejected Aurobindo's quantity objection, relying on the ANDA's descriptions as set forth above.  Appx11-16 ¶¶53-58; Appx59-60.  The district court's finding is more than "plausible in light of the record viewed in its entirety" and must be affirmed.  *Anderson*, 470 U.S. at 574.

### 2.    Independent Testing Confirms Infringement

#### a.    The district court properly found Dr. Smith's testimony credible and supported

The district court properly credited Dr. Smith's analysis.  Even apart from Aurobindo's ANDA admissions, the district court properly found infringement based on the unrefuted testing and testimony of Dr. Smith.  Appx59-60.  Dr. Smith performed multiple microscopy techniques, including stereomicroscopy and polarized-light microscopy, on representative samples of Aurobindo's ANDA product.  Appx3559-3623; Appx3624-3631; Appx3799-3809; Appx186-189, 50:22-53:13; Appx218-239, 82:8-103:16.  She fractionated the material by sieving, examined each fraction (including the bottom collection pan), and photographed representative fields.  Appx265-67, 129:22-130:10, 131:6-14; Appx3559-3623; Appx3624-3631.

Her observations were unequivocal: every field showed multi-component agglomerates containing pimavanserin and excipients; no isolated pimavanserin

particles appeared in any fraction or the bottom pan; and the observed agglomerates exhibited the size, cohesion, and density consistent with the patent and the court's construction.  Appx218-39, 82:8-103:16; Appx3559-3623; Appx3624-3631.  She explained why these features distinguish true granules from a loose powder blend—excipient adhesion and uniform API distribution—and why her preparation would have dispersed any ungranulated API if present. Appx232-35, 96:3-99:2.  None was observed.  Appx59-60.

Aurobindo's expert, Dr. Moreton, performed no microscopy, no replication, and never handled the product, and he lacks training on polarized-light microscopy. Appx25-26 ¶¶63, 64, 67.  He conceded that "a lot of what Dr. Smith explained [about her testing] may be valid."  Appx349, 213:16-17.  His humidity/clumping theory was unsupported: he ran no humidity studies and was "not saying definitely" any effect occurred.  Appx26 ¶67 (citing Appx358-59, 222:1-24).  By contrast, Dr. Smith conducted her work under standard laboratory conditions and obtained consistent structural results across all samples.  Appx17-26 ¶¶59-67; Appx230-31, 94:16-95:19; Appx232-34, 96:3-98:4.  Weighing this record, the district court found Dr. Smith credible and her conclusions unrebutted. Appx59-60.  Those credibility and weight determinations are classic fact findings owed deference.  *Anderson*, 470 U.S. at 574.

> **b.    The district court applied the correct burden of proof**

The district court did not clearly err by finding infringement even though Dr. Smith did not examine every single particle of Aurobindo's product. This issue was squarely addressed at trial and in the district court's decision. Appx59-60.

Dr. Smith acknowledged that examining every individual solid particle in Aurobindo's product would be impractical, but explained that the numerous consistent images and multiple other observations that she did not capture images of, including those from all sieve fractions and the collection pan, gave her confidence that 40 mg of pimavanserin tartrate in Aurobindo's product was present in granules. Appx255, 119:21-24 ("I think that's a fair assumption [that all of the pimavanserin is in granules] because based on every image that I looked at, every image that I captured, everything I saw through the microscope, I consistently saw the same thing over and over and over again."). Had any portion remained ungranulated, loose pimavanserin particles would have been visible—she saw none. Appx230-31, 94:16-95:4.

Aurobindo recasts the evidentiary burden as if Acadia had to individually assay every particle to prove—conclusively—that all 40 mg of pimavanserin exists in granules. That is not the law on infringement, which only imposes a preponderance burden. A plain read of the district court's decision reveals that the district court applied the proper standard of proof, *viz.*, whether it is more likely

than not that the accused product meets the "granules comprising 40 mg pimavanserin tartrate" limitation. *See, e.g.*, *In re Omeprazole Pat. Litig.*, 281 F. App'x 974, 979 (Fed. Cir. 2008) (finding no clear error because district judge knew, understood, and applied the proper standard of proof—*preponderance* of the evidence—on the infringement issue). The court expressly considered and rejected Aurobindo's "quantity" argument, crediting Dr. Smith's testimony and finding the evidence "in totality" (including documents and other testimony) sufficient to prove infringement under the preponderance standard "notwithstanding that Dr. Smith did not image every granule in Aurobindo's Product sample." Appx59-60.

Aurobindo's "39.42% unobserved" refrain (suggesting that because not every particle was observed, infringement fails) misstates both methodology and burden. Br. 44-45. The law does not demand absolute verification, and the record does not show any pimavanserin existing apart from granules. The court's finding—that Dr. Smith's results, viewed with the ANDA, establish the claimed granules comprising 40 mg pimavanserin tartrate—is more than plausible and must be affirmed under clear error review. *Anderson*, 470 U.S. at 574.

For the foregoing reasons, the judgment of infringement should be affirmed.

## CONCLUSION

This Court should affirm the judgments of no invalidity and infringement as to claims 4 and 5 of the '721 patent.

61

Respectfully submitted,

/s/ *Chad J. Peterman*

| | |
|---|---|
| Felix A. Eyzaguirre | Chad J. Peterman |
| PAUL HASTINGS LLP | Bruce M. Wexler |
| 609 Main Street, Suite 2500 | Scott F. Peachman |
| Houston, TX 77002 | Zachary D. Hadd |
| (713) 860-7300 | Peter E. Conway |
| felixeyzaguirre@paulhastings.com | PAUL HASTINGS LLP |
| | 200 Park Avenue |
| | New York, NY 10166 |
| | (212) 318-6000 |
| | chadpeterman@paulhastings.com |
| | brucewexler@paulhastings.com |
| | scottpeachman@paulhastings.com |
| | zacharyhadd@paulhastings.com |
| Dated:  October 27, 2025 | peterconway@paulhastings.com |

*Counsel for Plaintiff-Appellee*

## **CERTIFICATE OF COMPLIANCE**

Pursuant to Federal Circuit Rule 32(b)(3) and Federal Rule of Appellate Procedure 32(g)(1), I hereby certify that the foregoing Principal Brief of Plaintiff-Appellee complies with the type-volume limitations in Federal Circuit Rule 32(b)(1), because it contains 13,518 words, excluding the exempted parts under Federal Rule of Appellate Procedure 32(f) and Federal Circuit Rule 32(b)(2).

I future certify that this brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because the brief was prepared using Microsoft Word 365 in 14-point Times New Roman font.


/s/ *Chad J. Peterman*

Chad J. Peterman

## **CERTIFICATE OF SERVICE**

I, Chad Peterman, hereby certify that, on October 27, 2025, the

foregoing document was filed using the Court's CM/ECF system and a copy

served on the parties' counsel of record via ECF.


Date:  October 27, 2025                    /s/ Chad J. Peterman

                                           Chad J. Peterman
                                           PAUL HASTINGS LLP
                                           200 Park Avenue
                                           New York, NY 10166
                                           (212) 318-6000
                                           chadpeterman@paulhastings.com