**2025-1875**

# United States Court of Appeals
# for the Federal Circuit

AUROBINDO PHARMA LTD., AUROBINDO PHARMA USA, INC.,
MSN LABORATORIES PRIVATE LTD. and
MSN PHARMACEUTICALS, INC.,

*Appellants,*

– v. –

ACADIA PHARMACEUTICALS INC.,

*Appellee.*

*On Appeal from the United States District Court for the District of Delaware, Hon. Gregory B. Williams in Case No. 1:22-cv-01387 (GBW)*

## REPLY BRIEF FOR APPELLANTS

TIMOTHY H. KRATZ
GEORGE J. BARRY III
JOHN THALLEMER
KRATZ & BARRY LLP
1050 Crown Pointe Parkway, Suite 500
Atlanta, Georgia 30338
(404) 341-6600
tkratz@kratzandbarry.com
gbarry@kratzandbarry.com
jthallemer@kratzandbarry.com

MICHAEL P. HOGAN
KRATZ & BARRY LLP
325 Chestnut Street, Suite 876, #259
Philadelphia, Pennsylvania 19106
(917) 216-8585
mhogan@kratzandbarry.com

*Counsel for Appellants
  Aurobindo Pharma Limited and
  Aurobindo Pharma USA, Inc.*

RICHARD J. BERMAN
JANINE A. CARLAN
BRADFORD C. FRESE
ARENTFOX SCHIFF LLP
1717 K Street NW
Washington, DC 20006
(202) 857-6000
richard.berman@afslaw.com
janine.carlan@afslaw.com
bradford.frese@afslaw.com

*Counsel for Appellants
  MSN Laboratories Private Ltd.
  and MSN Pharmaceuticals*

DECEMBER 19, 2025

# TABLE OF CONTENTS

I.    INTRODUCTION ........................................................................1

II.   ARGUMENT................................................................................2

A. The Asserted Claims are obvious over Ragnar-Tolf and other prior art –
   which is what Appellants have been arguing all along .............................2

B. The District Court's holding that a POSA would not have been motivated
   to formulate a capsule version of pimavanserin tartrate is factually and
   legally erroneous, because Ragnar-Tolf *explicitly* discloses capsules. ......4

C. The District Court legally erred in holding that a POSA would not have
   been motivated to formulate a capsule version of pimavanserin tartrate
   "over a tablet." ..........................................................................6

    1.    Appellee wrongly attempts to recast the District Court's
          holding. ........................................................................6

    2.    It was legal error for the District Court to require Appellants to
          show motivation to "switch" from pimavanserin tablets to
          pimavanserin capsules. .................................................8

    3.    Other prior art does not "teach away" from using a small
          capsule.........................................................................8

D. The District Court erred in holding that a POSA would not have been
   able to modify Ragnar-Tolf to achieve the Asserted Claims with a
   reasonable expectation of success. ...........................................12

    1.    There's no dispute as to how a POSA would have had to
          modify Ragnar-Tolf to achieve the Asserted Claims ..............12

    2.    The District Court failed to analyze REOS in the context of the
          Asserted Claims ........................................................13

    3.    The District Court erroneously required absolute predictability
          and, despite Appellee's characterizations, never found any
          unpredictability here. .................................................16

E. The District Court committed clear error in finding that Acadia met its burden to prove that Aurobindo infringed the Asserted Claims. .............18

    1.    Aurobindo's ANDA does not clearly describe an infringing product, such that Acadia cannot avoid the burden of proving that Aurobindo's ANDA product meets the claim limitations .20

    2.    Acadia completely failed to meet its burden of proving that Aurobindo's ANDA product meets the claim limitations. .......25

III.    CONCLUSION.............................................................................................31

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Abbott Lab'ys, v. Torpharm, Inc.*,
    300 F.3d 1367 (Fed. Cir. 2002) ..................................................................24, 25

*Adapt Pharma Operations Ltd. v. Teva Pharms. USA, Inc.*,
    25 F.4th 1354 (Fed. Cir. 2022) ..........................................................................10

*Bayer AG v. Elan Pharm. Research Corp.*,
    212 F.3d 1241 (Fed. Cir. 2000) ..........................................................................24

*Bayer Pharma AG v. Watson Lab'ys, Inc.*,
    874 F.3d 1316 (Fed. Cir. 2017) ........................................................5, 11, 15, 24

*Ferring B.V. v. Watson Lab'ys, Inc.*,
    764 F.3d 1382 (Fed. Cir. 2014) .................................................................*passim*

*Gen. Elec. Co. v. Raytheon Techs. Corp.*,
    983 F.3d 1334 (Fed. Cir. 2020) .......................................................................5, 9

*Glaxo Inc. v. Novopharm Ltd.*,
    110 F.3d 1562 (Fed. Cir. 1997) ...........................................................19, 20, 26

*Honeywell Int'l Inc. v. 3G Licensing, S.A.*,
    124 F.4th 1345 (Fed. Cir. 2025) ..........................................................................8

*ImmunoGen, Inc. v. Stewart*,
    130 F.4th 1328 (Fed. Cir. 2025) ..........................................................................7

*Insite Vision Inc. v. Sandoz, Inc.*,
    783 F.3d 853 (Fed. Cir. 2015) ..............................................................................6

*Janssen Pharms., Inc. v. Teva Pharms. USA, Inc.*,
    141 F.4th 1367 (Fed. Cir. 2025) ..........................................................................8

*Janssen Pharms., Inc. v. Teva Pharms. USA, Inc.*,
    97 F.4th 915 (Fed. Cir. 2024) ...............................................................................7

*In re Merck & Co., Inc.*,
    800 F.2d 1091 (Fed. Cir. 1986) .............................................................................5

*Mintz v. Dietz & Watson, Inc.*,
    679 F.3d 1372 (Fed. Cir. 2012) .............................................................7

*Par Pharm., Inc. v. Eagle Pharms., Inc.*,
    44 F. 4th 1379 (Fed. Cir. 2022) ..................................................20, 26

*Schwendimann v. Neenah, Inc.*,
    82 F.4th 1371 (Fed. Cir. 2023) ..............................................................2

*Sunovian Pharms., Inc. v. Teva Pharms.,USA, Inc.*,
    731 F.3d 1271 (Fed. Cir. 2013) ..................................................*passim*

## Other Authorities

Fed. Cir. R. 32 ........................................................................................34

Fed. R. App. P. 32 .................................................................................34

## TABLE OF ABBREVIATIONS

| | |
|---|---|
| ANDA | Abbreviated New Drug Application |
| Appellants | The Aurobindo Appellants and the MSN Appellants |
| Appellee or Acadia | Acadia Pharmaceuticals Inc. |
| AB | Appellee's Responsive Brief (ECF No. 19) |
| Asserted Claims | Claims 4 and 5 of the Asserted Patent |
| Asserted Patent | U.S. Patent No. 11,452,721 |
| Aurobindo or Aurobindo Appellants | Aurobindo Pharma Limited and Aurobindo Pharma USA, Inc. |
| District Court | The United States District Court for the District of Delaware |
| FDA | U.S. Food and Drug Administration |
| MSN Appellants | MSN Laboratories Private Ltd. and MSN Pharmaceuticals Inc. |
| OB | Appellants' Opening Brief (ECF No. 12) |
| POSA | Person of Ordinary Skill in the Art |
| Ragnar-Tolf | U.S. Patent Application Publication 2007/0264330 Al |
| REOS | Reasonable Expectation of Success |
| Schiele | Julia T. Schiele, *Difficulties swallowing solid oral dosage forms in a general practice population: prevalence, causes, and relationship to dosage forms,* Pharmacoepidemiology and Prescription (Sept. 29, 2012) |
| Stegemann 2002 | Sven Stegemann, Hard gelatin capsules today – and tomorrow. Capsugel Library (2nd Ed., 2002) |

## I.    <u>INTRODUCTION</u>

No matter what standard of review this Court employs, it is readily apparent that something is wrong with the District Court's ruling. Somehow, the District Court held there was *no motivation* for a pharmaceutical formulator POSA to select a capsule—the second most common oral dosage form after tablets—as the dosage form for pimavanserin, when Ragnar-Tolf, the key prior art reference, *explicitly discloses* (and recommends) formulating that drug in a capsule. "Well, that doesn't seem right," one may surmise. That is because it's not.

The District Court's second major holding, that a pharmaceutical formulator POSA would not have a reasonable expectation of success, fares no better. Ragnar-Tolf also showed (in *actual* examples) that a range of pimavanserin dosages—from 1 to 20 mg, a *20-fold* difference—could be made into granules without significantly changing the bulk density of the granules from around 0.6 g/ml. But, based on no evidence except Appellee's expert's mere speculation that raising the dose an additional *2-fold* (to 40 mg) would somehow drastically drop the bulk density below the claimed floor of 0.4 g/ml, the District Court held that such a pharmaceutical formulator would have *no reasonable expectation* that successful granules could be produced. "Well, that doesn't seem quite right either," one may say. Again, that is because it's not. The District Court's holding that the Asserted Claims are not invalid should be reversed.

1

## II.   <u>ARGUMENT</u>

### A.   <u>The Asserted Claims are obvious over Ragnar-Tolf and other prior art – which is what Appellants have been arguing all along</u>

Appellee spends roughly ten pages of its brief arguing that Appellants somehow changed course in their obviousness case. *See* AB 11-14, 24-29. But Appellants have consistently argued that the Asserted Claims are obvious over Ragnar-Tolf[1] and other prior art.

Appellant's post-trial brief contains a section entitled, "A POSA would have looked to Ragnar-Tolf to design a small capsule containing the full daily dose of pimavanserin, with a reasonable expectation of success." APPX910-11. That Appellants chose first to discuss how "[a] POSA would have been motivated to consolidate the full 34 mg pimavanserin dose of Nuplazid Tablets into a single dosage form" (APPX928) is legally irrelevant. This Court has stated that "characterizing references as 'primary' and 'secondary' is merely a matter of presentation with no legal significance." *Schwendimann v. Neenah, Inc.*, 82 F.4th 1371, 1384 (Fed. Cir. 2023) (citation modified).

---

[1] Appellee says the Examiner's consideration of Ragnar-Tolf mitigates obviousness here. *See* AB 10. But, as Appellants' expert testified: "the examiner missed the very obvious flag, that the POSA could simply increase the concentration of the drug … which is a very obvious thing to try." APPX584, 408:12-16 (Muzzio).

In their post-trial briefing (and Opening Brief), Appellants detail the known problems in the art (swallowability and pill burden) that would have led a POSA to identify the *same problems* with Nuplazid Tablets that the inventors did. *See* APPX907-909; OB 6-7. These initial discussions set the stage for the main reference, Ragnar-Tolf. *See* APPX910-911; OB 8-11.

Contrary to Appellee's contentions (*see* AB 24), Appellants demonstrated how Ragnar-Tolf taught capsules; the 40 mg dose; granules comprising pimavanserin tartrate and excipients; and the claimed bulk density—*i.e.*, *every limitation except a size 3 or 4 capsule shell*. *See* APPX910. Further, Appellants discussed how a POSA would have modified Ragnar-Tolf to achieve a small capsule containing the full pimavanserin dose, with a reasonable expectation of success. *See* APPX910-911.[2] There is no inconsistency in Appellant's argument.[3]

---

[2] Appellants also listed *other* motivations a POSA would have had to choose a small capsule and identified why a POSA thought capsules had benefits versus other dosage forms. *See* APPX909.

[3] Appellee argues that Appellants are trying to interpret the claims as requiring all of the pimavanserin to be present in granules for the infringement determination, but requiring something else for invalidity. *See* AB 27. That's a red herring: Appellee never argued that Ragnar-Tolf put less than all of the pimavanserin in its granules.

**B.**    **The District Court's holding that a POSA would not have been motivated to formulate a capsule version of pimavanserin tartrate is factually and legally erroneous, because Ragnar-Tolf *explicitly* discloses capsules.**[4]

Appellee asserts that "the district court conducted a fact-driven inquiry and reasonably found that Appellants had failed to meet their evidentiary burden for showing that 'a POSA would have been motivated to formulate a capsule dosage of pimavanserin.'" AB 14 (quoting APPX64). But Appellee ignores the key factual findings the District Court made, which are inconsistent with its ultimate conclusion.

The court found that "[a] POSA seeking to develop a new dosage form of pimavanserin would have looked to the Ragnar-Tolf reference." APPX38 ¶117. It also found that Nuplazid tablets were "take[n] two tablets at a time," and that "a POSA could be motivated to minimize the number of tablets or capsules administered to patients to decrease the pill burden." APPX28–29 ¶¶79-80. Further, the court found that "the Ragnar-Tolf reference discloses … 40 mg tablets" and "that the wet granulated formulations could be compressed into not only tablets with film coating, *but also into capsules*." APPX40 ¶124-125. Just looking at these key factual findings, the *combined teachings* of the prior art indisputably disclose the claimed

---

[4] Appellee spends two pages addressing Section IV.D.1.a. of Appellants' Opening Brief, which sets forth the District Court's predicate factual findings that contradict its ultimate determination of no motivation. *See* AB 22-23; OB 18-19. That section also serves to introduce the further analysis in the sections that follow. There is no "clear waiver" of any argument.

pimavanserin dose and dosage form, *plus* the motivation to put the *full 40 mg dose* into a single capsule. The District Court's conclusion otherwise is erroneous because obviousness concerns the *combined teachings* of the references. *See In re Merck & Co., Inc.*, 800 F.2d 1091, 1097 (Fed. Cir. 1986).

Ragnar-Tolf discloses granules of pimavanserin tartrate and excipients (*see* APPX930-931 ¶27) and that the granules could be compressed into tablets, or alternatively, "placed in a gelatin capsule or HPMC capsule." APPX3490 [0063]. Thus, Ragnar-Tolf unmistakably teaches the *exact* limitation (a capsule), in the *exact* context (containing granules of pimavanserin tartrate and excipients), that the District Court found lacking. This is clear error. *See Bayer Pharma AG v. Watson Lab'ys, Inc.*, 874 F.3d 1316, 1322 (Fed. Cir. 2017) (failure to address "express disclosures" of "highly relevant" prior art "cause the district court fact finding regarding motivation to combine to be clear error.").

In addition, as Appellants stated in its Opening Brief, it was *legally* erroneous for the court to require Appellants to "re-do the work already done in" Ragnar-Tolf by showing a *separate* motivation to select a capsule. OB 20-21 (quoting *Gen. Elec. Co. v. Raytheon Techs. Corp.*, 983 F.3d 1334, 1352 (Fed. Cir. 2020)). Notably, Appellee never argues that *Gen. Elec.* does not apply, nor discusses what it means in the context of this case.

The District Court's holding that a POSA would not have been motivated to formulate a capsule version of pimavanserin tartrate is factually and legally erroneous.

### C. The District Court legally erred in holding that a POSA would not have been motivated to formulate a capsule version of pimavanserin tartrate "over a tablet."

1. Appellee wrongly attempts to recast the District Court's holding.

Appellee argues that "[n]othing in [the District Court's] findings suggests that the court required Appellants to prove a preference for capsules *over* tablets." AB 30-31. But this grossly misrepresents the District Court's "predicate findings" that a POSA would not have chosen a "capsule dosage [form] of pimavanserin *over a tablet dosage form* of pimavanserin[.]" *See* APPX63-64. Appellee elsewhere concedes that the District Court (improperly) framed the obviousness issue as whether "*reformulating Nuplazid tablets into capsules* addressed any known deficiency." *See* AB 33. Appellee's attempt to recast the District Court's holding is unavailing.

Appellee's citation to *Insite* is inapposite. *See* AB 33 (citing *Insite Vision Inc. v. Sandoz, Inc.*, 783 F.3d 853, 859-60 (Fed. Cir. 2015)). In *Insite*, this Court reviewed whether the district court's "framing of the obviousness inquiry" resulted in a bias against finding motivation to modify the prior art. *See id.* at 859-60. This has nothing

to do with the present case. Here, the District Court erred in requiring motivation to modify the prior art when the prior art *already disclosed* the alleged modification.

Appellants identified a recognized problem or need in the prior art—swallowability and pill burden—that would have motivated a POSA to put the full daily dose of pimavanserin into a single small capsule for this elderly patient population. *See* APPX908-909; OB 7; *see also ImmunoGen, Inc. v. Stewart*, 130 F.4th 1328, 1333 (Fed. Cir. 2025) ("[I]dentifying a recognized problem or need in the prior art is one way to demonstrate motivation[,]" *quoting Janssen Pharms., Inc. v. Teva Pharms. USA, Inc.*, 97 F.4th 915, 929 (Fed. Cir. 2024)). Even under Appellee's heightened burden of showing "that [a POSA] at the time of the invention would have recognized *the problem identified by the inventors*" (*see* AB 34, quoting *Mintz v. Dietz & Watson, Inc.*, 679 F.3d 1372, 1377-78 (Fed. Cir. 2012)), Appellee admits that *the inventors here recognized the same problems*. *See* AB 7 (Nuplazid tablets "divided the full dose into two small 20 mg tablets to avoid a large pill that could cause swallowing difficulties" and Appellee "invested in developing a small 40 mg dosage form that was easy to swallow[.]"). Thus, Appellee effectively concedes that a pharmaceutical formulator POSA would have been motivated to put the full dose of 40 mg pimavanserin tartrate into a single, small dosage form. Appellee certainly does not argue to the contrary.

> 2.    It was legal error for the District Court to require Appellants to show motivation to "switch" from pimavanserin tablets to pimavanserin capsules.

As Appellants explained in their Opening Brief, even accepting the District Court's premise that some prior art references (such as Schiele) may express a *general* preference for tablets over capsules, it was legal error for the District Court to require Appellants to show motivation to *switch* from pimavanserin tablets to pimavanserin capsules. *See* OB 22 (citing *Honeywell Int'l Inc. v. 3G Licensing, S.A.*, 124 F.4th 1345, 1355-56 (Fed. Cir. 2025)). Notably, Appellee never cites or discusses *Honeywell*. Instead, Appellee argues that this case is analogous to *Janssen 2025. See* AB 31 (citing *Janssen Pharms., Inc. v. Teva Pharms. USA, Inc.*, 141 F.4th 1367, 1384 (Fed. Cir. 2025)). But *Janssen 2025* dealt with whether the district court's motivation inquiry was "an erroneous reading-in of an extraneous limitation[,]" an issue not present here. *See Janssen 2005* at 1384.

> 3.    Other prior art does not "teach away" from using a small capsule.

To justify the court's holding of no motivation, Appellee relies heavily on the District Court's findings that "[t]he Schiele reference teaches that capsules cause more swallowing problems than tablets" and "that patients with swallowing difficulty are more likely to prefer tablets compared to capsules." AB 15 (quoting APPX30-32 ¶¶85-86); *see also* AB 35 ("if a POSA 'were limited to choosing between a capsule or a tablet, [they] would pick a tablet over a capsule.'" (quoting

APPX31 ¶86)). ***But that's not the proper question here***—rather, the question is whether a POSA reading Ragnar-Tolf's disclosure of a *larger* ("size 0") capsule, would have been motivated to choose a *smaller* ("size 3 or 4") capsule. *See* OB 10-11. Schiele provides *exactly* that motivation. *See* OB 11-12; APPX506, 330:15-20 (Muzzio) (Schiele would tell a POSA "that the size 4 was a good choice for this formulation because, as per the data in Schiele, it would be easy to swallow.").

Appellees try to present Schiele as "teaching away" from using capsules, something the District Court did not conclude. *See* AB 38 (citing APPX30-31 ¶85). But to the extent that the District Court did implicitly "hold" that Schiele teaches away, such a "holding" would be a clear mistake. Schiele does not teach away from using small capsules—*indeed, it encourages it. See* APPX3920 ("On average, dimensions of drugs causing swallowing difficulties were about 11 % larger than the dimensions of corresponding drugs not causing problems *thus indicating the importance of size*."); OB 12 (based on Schiele, "a POSA would have known that capsule sizes 3, 4, and 5 are … easiest to swallow"). Like this Court said in *Gen. Elec.*, "[Schiele] does not make a single negative statement about the use of a [small capsule]; therefore, [Schiele] does not criticize, discredit, or discourage the use of a [small capsule]. For that reason, substantial evidence does not support the [District Court's] conclusion that [Schiele] teaches away from modifying [Ragnar-Tolf] to include [a small capsule]." *See Gen. Elec.*, 983 F.3d at 1349.

Appellee further argues that the District Court "assessed Ragnar-Tolf's mention of capsules against other references and reasonably found that those teachings diminished any motivation gleaned from Ragnar-Tolf's cursory capsule disclosure." *See* AB 38.[5] But Ragnar-Tolf *explicitly* identifies capsules as a *direct alternative to tablets*. *See* APPX3490 [0063] ("In some embodiments, *instead of compression into tablets*, a dry or wet blend, such as those described above, *is placed in a gelatin capsule or HPMC capsule*."). Since Ragnar-Tolf identifies capsules as a suitable option, the prior art as a whole cannot teach away from that option. *See Adapt Pharma Operations Ltd. v. Teva Pharms. USA, Inc.*, 25 F.4th 1354, 1370-71 (Fed. Cir. 2022) (finding prior art as a whole did not teach away from use of a certain excipient in claimed naloxone formulations when two references specifically taught the same excipient's use in other naloxone formulations).

Nor do Liu or Stegemann 2002 "diminish any motivation" to modify Ragnar-Tolf. *See* AB 38. Appellee defends Liu by arguing that "the court credited testimony identifying swallowability benefits of dispersible and effervescent tablets" disclosed in the reference. *Id*. But *even if* Liu disclosed that dispersible and effervescent tablets provide swallowability benefits, that does not "teach away" from small capsules. *See*

---

[5] Appellee repeatedly seeks to diminish the disclosure of capsules in Ragnar-Tolf. *See* AB 38-39 ("Ragnar-Tolf's cursory capsule reference," "Ragnar-Tolf's cursory capsule disclosure[,]" and "Ragnar-Tolf's capsule mention"). This does not change the fact that Ragnar-Tolf *explicitly* identifies capsules as an alternative to tablets.

*Adapt*, 25 F.4th at 1370 (holding that "a reference does not teach away if a skilled artisan, upon reading the reference, would *not* be 'discouraged from following the path set out in the reference,' and would *not* be 'led in a direction divergent from the path that was taken by the [patentee].'") (emphasis in original). And the District Court found that "[a] POSA would have been aware of *various difficulties* associated with the formulation of dosage forms other than tablets or capsules, *such as effervescent tablets*," further tempering any "teaching away" in Liu. *See* APPX37 ¶115.

As to Stegemann 2002, Appellee states that "the court reasonably found the capsule-favoring data had diminished credibility given the author's employment by a capsule manufacturer." *See* AB 38. But such a finding is not supported by *any* evidence. The District Court simply chose to disregard the reference without *any* testimony that a POSA would consider the author's employment relevant to the "weight" of the disclosure. *See* APPX34 ¶98. Again, disregarding the *explicit* teachings of the prior art in the motivation analysis indicates clear error. *See Bayer*, 874 F.3d at 1322. This Court should thus reverse the decision below.

**D.** **The District Court erred in holding that a POSA would not have been able to modify Ragnar-Tolf to achieve the Asserted Claims with a reasonable expectation of success.**

    1.    There's no dispute as to how a POSA would have had to modify Ragnar-Tolf to achieve the Asserted Claims

Despite initially misstating the District Court's analysis of REOS,[6] both parties seem to agree that the District Court properly framed the issue of how a POSA would have had to modify Ragnar-Tolf to achieve the Asserted Claims: "[a] POSA would have understood … that, in order to fit 40 mg of pimavanserin tartrate in a size 4 capsule, he or she would have had to increase the pimavanserin tartrate concentration in [Ragnar-Tolf's exemplified 20 mg formulation] from approximately 20% to 32.4% (i.e., by over 60%) … [while] also decreasing the concentration of mannitol." APPX42 ¶128; *see also* AB 20-21, 40. The dispute is whether a POSA had a REOS in doing so. In finding there was no REOS, the District Court erred.

---

[6] Without any support, Appellee initially frames the District Court's REOS analysis as "whether a POSA, in view of the prior art and pimavanserin's formulation behavior, would have reasonably expected to achieve the claimed bulk-density requirement *when reformulating from tablets to capsules*." *See* AB 40. But the District Court solely focused on modifying Ragnar-Tolf and never discussed "reformulating from tablets to capsules" in its analysis of REOS. *See* APPX67-68.

2.     The District Court failed to analyze REOS in the context of the Asserted Claims

As Appellants stated in their Opening Brief, the District Court legally erred by failing to consider the scope of the Asserted Claims in the context of whether a POSA had a REOS in achieving pimavanserin granules with the claimed ">0.4 g/ml" bulk density. *See* OB 29. Instead, the District Court held that there was no REOS because a POSA would not have expected to maintain the bulk density of *Ragnar-Tolf's* pimavanserin granules, which (at around 0.6 g/ml) is *much higher* than the claims require. *See* APPX42 ¶129.[7]

The District Court's legal determination with respect to REOS boils down to a single sentence: "In particular, the increase of concentration of pimavanserin by more than 60%, *while maintaining the appropriate bulk density*, militates against a POSA's reasonable expectation of success here, notwithstanding that the Ragnar-Tolf reference discloses consistent bulk densities for pimavanserin in 1 mg, 5 mg, and 20 mg dosages." APPX68. Appellee initially concedes that this language relates to Ragnar-Tolf's pimavanserin granules, and not the claims: "[t]he court's reference to maintaining an 'appropriate' bulk density reflected the court's recognition that a

---

[7]Appellees try to frame the District Court's decision as resolving "a dispute between experts" with respect to the REOS, in an effort to cast the court's decision as factual rather than legal. *See* AB 21. But Appellee does not (and cannot) point to *any* testimony where Appellee's expert testified that a POSA would not have a REOS in achieving the *claimed* bulk density, or fitting 40 mg pimavanserin tartrate into a size 4 capsule. *See* APPX42-43 ¶129.

POSA would need to make multiple interdependent *changes to Ragnar-Tolf's formulation*[.]" AB 40. Then, a few pages later, Appellee changes course, baldly asserting that "[a]s the context shows, the court referred to maintaining *an appropriate* bulk density, not Ragnar-Tolf's specific value." AB 43 (emphasis in original). But here Appellee makes a clever, if misleading edit: the court *actually* found that increasing the pimavanserin concentration of Ragnar-Tolf's granules, "while maintaining ***the*** appropriate bulk density," militates against a POSA's REOS—not "maintaining ***an*** appropriate bulk density," as Appellee states. Compare APPX68 and AB 43. This is an important difference, as the use of the article "*the*" refers back to Ragnar-Tolf, rather than the more abstract article "*an*" in Appellee's edit. When the sentence is viewed in the *actual* context, it is unmistakable that the District Court's analysis is erroneous.

As discussed above, the court initially framed the REOS analysis in finding of fact ¶128. APPX42 ¶128. Just prior to its single-sentence legal determination, the District Court again referred to finding of fact ¶128, stating "a POSA would have understood that increasing the concentration of pimavanserin tartrate, and likewise decreasing the inactive mannitol diluent, in the blended pimavanserin *in the manner described in Finding of Fact ¶ 128* could have increased or decreased the bulk density of the granules." Appx68. Thereafter, the court made its legal determination, stating: "In particular, the increase of concentration of pimavanserin *by more than*

*60%*," echoing the proposed modification to Ragnar-Tolf's granules. *Id.* Directly after this passage, the court said, "*while maintaining the appropriate bulk density*, militates against a POSA's reasonable expectation of success here[.]" *Id*. In the next passage, the District Court discusses Ragnar-Tolf's *other* formulations: "notwithstanding that the Ragnar-Tolf reference discloses consistent bulk densities for pimavanserin in 1 mg, 5 mg, and 20 mg dosages." *Id*. Thus, the court's *entire* legal determination (including the "while maintaining the appropriate bulk density" passage) *solely* focuses on Ragnar-Tolf and *never hints* at the claim limitations.

And here, there was *unrebutted* testimony from Appellants' expert, credited by the District Court, that a POSA could simply vary the concentration of pimavanserin upwards or downwards as needed to account for any variations in the bulk density, to achieve the claim limitations. *See* APPX43 ¶129 (citing APPX509-511, 333:23-335:13 (Muzzio)). By contrast, there was *no* testimony that a POSA would have expected the bulk density of Ragnar-Tolf's granules to fall below 0.4 g/ml, such that he or she could not fit the full 40 mg pimavanserin dose in a small capsule.

Thus, the District Court committed legal error for failing to consider REOS in the context of claim scope.

3.    The District Court erroneously required absolute predictability and, despite Appellee's characterizations, never found any unpredictability here.

Appellee says several times in its brief that the District Court found that the increase in pimavanserin concentration could "unpredictably" alter the bulk density of Ragnar-Tolf's granules. *See* AB 40-41, 43. The court made no such finding. *See* APPX39-40 ¶¶122-23, APPX42-43 ¶129.

As Appellants stated in their Opening Brief, a POSA would have had a REOS and there is no "unpredictability" here. *See* OB at 31-33. The District Court found that Ragnar-Tolf's granules had "consistent bulk densities" whether the granules contained 1 mg, 5 mg, or 20 mg pimavanserin (a *20-fold* difference). APPX68. Appellants presented evidence that a POSA would have reasonably expected similar bulk density for granules containing 40 mg pimavanserin (a *2-fold* difference from Ragnar-Tolf's 20 mg example). *See* APPX512, 336:3-15 (Muzzio); Appx931 ¶30. Appellee's expert merely speculates to the contrary. *See* APPX740-741, 538:21-539:8 (Little) ("[I]t is *possible* that changing the pimavanserin concentration" in Ragnar-Tolf's granules "is going to be the one thing that has the highest *likelihood* of changing the bulk density.").

There's nothing to support the District Court's holding that increasing the pimavanserin concentration will cause the bulk density of the granules to fall below

0.4 g/ml.[8] The court's findings of fact bear this out. *See* APPX39-40 ¶¶122-23, APPX42-43 ¶129. Findings of fact ¶¶122-23 merely state that "[a] POSA would have understood that pimavanserin is a 'bad-behaving' material—in that pimavanserin has a low bulk density and tends to clump up[,]" and "[a] POSA would have understood … that formulating dosages of pimavanserin could be difficult." APPX39-40 ¶¶122-23. These findings neither explicitly or implicitly support Appellee's assertion that "the court found that the[] changes [to Ragnar-Tolf's formulations] *would likely and unpredictably alter bulk density*." *See* AB 40-41. And given Ragnar-Tolf's success in achieving pimavanserin granules with a bulk density *well above* the claimed requirement, there's nothing to support that pimavanserin's "bad behav[ior]" affected the granules' bulk density *at all*. Indeed, as Appellants noted in their Opening Brief, the *inventors themselves* expected to achieve pimavanserin granules with bulk density between 0.6 and 0.8 g/ml using known techniques, and there is no evidence that there was *ever* a pimavanserin granulation *that did not achieve* the claimed bulk density. *See* OB 32-33. Further, in a related patent, Appellee claimed that granulating pimavanserin alone with *just water* yields granules with a bulk density of "0.4 g/ml to 0.6 g/ml[.]" *See* APPX4070 (claims 8

---

[8] Contrary to Appellee's protestations, Appellants are not arguing for any burden shifting. *See* AB 44. Rather, Appellants simply noted that Appellee adduced *no* evidence that there was *ever* a pimavanserin granulation that fell below 0.4 g/ml. *See* OB 33.

and 13), APPX408, 272:9-22 (Muzzio). This further supports that a POSA would have had a REOS in achieving pimavanserin granules with the claimed bulk density.

Despite Appellee's attempts, it remains clear the District Court's obviousness analysis is both legally and factually flawed. The Asserted Claims are obvious.

### E.    The District Court committed clear error in finding that Acadia met its burden to prove that Aurobindo infringed the Asserted Claims.

Acadia conceded that the Asserted Claims require proof that all of the pimavanserin contained in Aurobindo's ANDA capsules to be in the form of granules. AB 47. Acadia advanced two arguments in support of its infringement claim, and the District Court erroneously adopted both.

First, Acadia argues certain uses of the word granules found on two pages in Aurobindo's 15,000+ page ANDA conclusively establish that Aurobindo's ANDA product meets the claim limitations. However, those references fall far short of the standard required under established Federal Circuit precedence to resolve the infringement question without actual proof that the product likely to be sold meets the claim limitations. *Sunovian Pharms., Inc. v. Teva Pharms., USA, Inc.*, 731 F.3d 1271, 1278-80 (Fed. Cir. 2013) (ANDA words alone resolve infringement only if it "clearly describes a product that meets the limitations of the asserted claims.").

As a whole, Aurobindo's ANDA describes a product more likely to *not* contain any granules and certainly would have far less than the total quantity of the

pimavanserin in granule form required by the Asserted Claims. The District Court committed clear error by applying *Sunovian* to the Aurobindo ANDA, which does not clearly describe a product that meets the limitation that all of the pimavanserin in its capsules be in the form of granules. Accordingly, application of settled law requires Acadia to prove infringement by analyzing the product likely to be sold, referred to herein and in case law as a *Glaxo*-type analysis, referring to *Glaxo Inc. v. Novopharm Ltd*., 110 F.3d 1562 (Fed. Cir. 1997).

Second, Acadia argues its expert's examination of a single sample capsule of Aurobindo's actual ANDA Product was sufficient to establish infringement under *Glaxo*. However, this test, the only attempt Acadia made to actually meet its burden of proving infringement, falls far short in its goal. Aside from substantial flaws in methodology and control, Acadia's failure of proof is inescapable given that 10.52% of the material was completely lost in the experiment and could not be characterized whatsoever. APPX3626; APPX3561. A further 12.4% of the material was sifted through to the bottom of the pan and thereafter unobserved, and an additional 16.5% of the material was collected by the smallest sieve and also unobserved. APPX3626; APPX3561.

The patent requires 100% of the pimavanserin be in the form of granules, and Acadia asserts no theory that the claim limitations are met by establishing that some, or even most of the pimavanserin is in the form of granules. So, a test that is completely

incapable of establishing the characteristics of 10.52% of the material and testimony not competent to prove the characteristics of 28.9% more of the material, simply fails to prove that Aurobindo's ANDA product meets the asserted claim limitations. It is clear error to excuse Acadia from actually proving infringement.

1.    Aurobindo's ANDA does not clearly describe an infringing product, such that Acadia cannot avoid the burden of proving that Aurobindo's ANDA product meets the claim limitations

Under *Glaxo*, an infringement inquiry requires proof that the product to be sold meets each and every claim limitation. 110 F. 3d at 1565, 1570. Acadia, as the accusing party must meet its burden by comparing the accused product with the properly construed claims of the patent – here that all of the pimavanserin in Aurobindo's capsules were in the form of granules – and must provide evidence such as data or analysis of samples of the ANDA product to meet each and every claim limitation. *Par Pharm., Inc. v. Eagle Pharms., Inc.*, 44 F. 4th 1379, 1383-84 (Fed. Cir. 2022); *Ferring B.V. v. Watson Labs, Inc.*, 764 F.3d 1382, 1388 (Fed. Cir. 2014).

Acadia first tries to excuse itself from any such burden of proof by claiming that Aurobindo's ANDA clearly establishes that its product will meet the claim limitations. The District Court committed clear error by excusing Acadia from the burden of proving its case with a *Glaxo*-type analysis.

Aurobindo's ANDA establishes that its capsules are made using dry blend sifting of the ingredients, with no granulation step and its capsules contain

pimavanserin in powder form, not in granules. *See* references at AB 36. A POSA would understand that this is an entirely different method than the different methods of granulation, and Aurobindo's method is unlikely to result in the formation of any granules in its product. *Id.*

Aurobindo's ANDA contains an entire section on its composition in section 3.2.P.3.3 Description of Manufacturing and Process Controls which both parties' experts reference in describing Aurobindo's method of making its capsules. There are no references to "granules" or "granulation" at all in this section. APPX4278-4295. Aurobindo prepared Master Formula Cards, finalized and signed in contrast to the draft cards Acadia misleadingly references, and there is no reference in those documents to "granules" or "granulation" at all. APPX4296-4310.

Most conclusively, the Asserted Claims do not just require there to be some granules but all of the pimavanserin in Aurobindo's capsules must be in the form of granules. There is not a single statement in the ANDA that describes the entire quantity of the pimavanserin to be in the form of granules. The District Court simply and erroneously excused Acadia from its burden.

Against this virtually conclusive record of establishing non-infringement, Acadia points to 2 single pieces of paper from the 15,000+ page ANDA that use the word "granule", although Acadia consistently briefs the recitation of its facts to imply the existence of more references to granules. APPX3708; APPX3731. Both

of those pages appear in the Product Development Report section of the ANDA which is not the final Manufacturing and Product Control or the final Master Formula Card section, where there are no references to granules, and neither of these pages describe the finished capsule form of Aurobindo's ANDA product as having granules and certainly do not represent that 100% of the pimavanserin in Aurobindo's finished product is contained in granule form. *Id*.

Acadia and the Court erroneously rely on the fact that Aurobindo took no steps to correct the two pages in its ANDA that used the word granules, which entirely begs the question of infringement – the references to granules in the draft Master Formula Cards were corrected and the final Manufacturing and Product Control section contains no such references. The stray pages referenced by Acadia and the Court do not meet the standard of representation to FDA required under *Sunovian*, such that there is nothing for Aurobindo to have corrected.

Acadia cites four cases in its Appellee brief for the proposition that where the ANDA directly addresses the issue of infringement, the patentee is excused from proving the ANDA Product actually infringes, without describing the facts of those cases or how Aurobindo's ANDA is similarly situated. Even a brief review of those cases underscores the striking difference between them and the case here.

In *Sunovian*, the claim limitation was a composition containing a specific isomer that was 'essentially free" of a different isomer, which the court held to mean

"less an 0.25%" of that isomer. 731 F.2d at 1273-74. The ANDA applicant made a specific clear representation to FDA in response to inquiry that its product would contain not more than 0.6% isomer. *Id*. at 1276. Accordingly, the Federal Circuit found the definitive ANDA statement responding to a direct inquiry by FDA to clearly encompass the infringing numerical range found in the claim limitation. *Id*. at 1280. Here, the alleged "statements" are at best indirect and not at all in response to an FDA query, qualitative and not quantitative, ambiguous on their face and contradicted by the ANDA as a whole, not even found in the section describing the characteristics of the finished capsule and do not even meet the claim limitation as a whole.

Acadia string cites to *Ferring*, 764 F.3d at 1387, for the same proposition that "when an ANDA clearly describes an infringing product, that description is dispositive". In *Ferring*, the claim limitation was a specific quantity of dissolution of the tranexamic acid material in water within a specific time period. *Id*. at 1385. The ANDA analyzed in the cited part of the holding in *Ferring* did not contain dissolution specifications at all. The Federal Circuit reversed the District Court's misapplication of *Sunovian* by clarifying that the ANDA has to clearly affirmatively determine that the ANDA product would be infringing. *Id*. at 1387. Where the ANDA did not resolve the infringement question, as in where there it only established that it was not precluded from an infringing quantitative range, a "*Glaxo-*

23

type" analysis was required, and the patent-holder must rely on evidence that the ANDA application would likely sell an infringing composition." *Id*. at 1388. The Aurobindo ANDA fits here as it does not clearly resolve the infringement question, and certainly not in Acadia's favor.

Without any analysis of whether the facts are applicable, Acadia cites two more cases to support its proposition that, where the ANDA directly addresses the issue of infringement, it is controlling. *Bayer AG v. Elan Pharm. Research Corp.*, 212 F.3d 1241 (Fed. Cir. 2000) and *Abbott Lab'ys, v. Torpharm, Inc.*, 300 F.3d 1367, 1373 (Fed. Cir. 2002). In *Bayer*, the patent claim recited nifepedine crystals with a range of specific surface area of 1.0 to 4 m$^2$/g, and the ANDA specified that its crystals would have a SSA of 5 m$^2$/g or greater. *Bayer*, 212 F.2d at 1246. The District Court granted summary judgment of non-infringement to Elan and the Federal Circuit affirmed noting the ANDA ended the inquiry and a *Glaxo*-type analysis was not required. *Id*. at 1250. No such statement of quantitative certainty is present in Aurobindo's ANDA.

In *Abbott*, one of the asserted claims recited an oligomer "having a 1:1 molar ratio of sodium valproate and valproic acid." *Abbott*, 300 F.3d at 1373. TorPharm's ANDA stated that its product contained divalproex sodium, which "is a stable coordination compound comprised of sodium valproate and valproic acid in a 1:1 molar relationship." *Id*. at 1374. The District Court granted summary judgment of

infringement on this limitation and the Federal Circuit affirmed finding that a *Glaxo*-type analysis was not needed due to the clarity of the ANDA specification. *Id*. at 1375. However, the Federal Circuit reversed the District Court's grant of summary judgment on a second claim limitation requiring oligomers with specific numbers of repeating sub-units. The ANDA did not specify the number of repeating sub-units, such that analysis as required of the samples of ANDA Product. *Id*. The Federal Circuit reversed summary judgment in favor of Abbott because its submitted proof was insufficient. *Id*. at 1377.

Accordingly, the record does not support the conclusion that Aurobindo's ANDA resolved the question affirmatively of whether its capsules would contain 100% of the pimavanserin in the form of granules, and the trial court committed clear error to excuse Acadia excused from proving its actual infringement case by establishing that the product likely to be sold by Aurobindo meets the asserted claim limitations.

2.    Acadia completely failed to meet its burden of proving that Aurobindo's ANDA product meets the claim limitations.

Stripped of the comfort of a *Sunovian*-type finding of infringement, Acadia is left with the burden of proving that each element of the asserted claims is found in the actual Aurobindo ANDA product to be sold. *Glaxo,* 110 F. 3d at 1570. When a *Glaxo*-type analysis is required, as should have been the case here, evidence such as data or analysis of samples of the ANDA product is required to assess whether a

proposed product will infringe. *Par Pharm.*, 44 F.4th at 1383-84; *Ferring,* 764 F.3d at 1388.

Acadia makes only one attempt to meet its burden, but designed and presented the results of a test completely incapable of determining whether Aurobindo's ANDA product meets each and every claim limitation of the Asserted Claims. The District Court acknowledged that Acadia's testing was incapable of establishing infringement of each and every Asserted Claim limitation, but then erroneously excused Acadia from the burden of proving its infringement case. The District Court was not weighing credibility or accepting unrebutted evidence as wildly suggested by Acadia; the District Court was making a reversable mistake.

The Asserted Claims require that all of the pimavanserin contained in the Aurobindo Product be in granules. Both asserted claims are directed to a composition "comprising: granules comprising 40 mg pimavanserin tartrate…" APPX118. Since Aurobindo's ANDA product capsule contains exactly 40 mg pimavanserin tartrate, all of the pimavanserin must be in the form of granules. APPX4297; APPX9 ¶37. Acadia does not assert any theories of infringement based on the doctrine of equivalents, so there is no substitute for granule form and it is not sufficient for Acadia to prove that the Aurobindo ANDA Product has about 60% granules, or about 77%, or at most but not more than 89.48%.

The test designed, at best[9] was capable of establishing that some of the pimavanserin had formed granules but there is no dispute that the test was incapable of meeting the burden of proving that 100% of the Aurobindo ANDA product was in granules. Acadia's expert Dr. Smith was in possession of 619 capsules of Aurobindo's ANDA product. APPX3560. For both the Stereoscoping Imaging and Polarized Light Microscopy experiments, Dr. Smith opened a single capsule and emptied onto a stack of sieves of ever-increasingly fine mesh. APPX356; APPX3626. The sieve stack was shaken for 1 minute so the contents of the capsule would be caught at the various meshes so sorted according to the size of the material. *Id.* The following chart was produced showing the results of this sorting:

---

[9] Significant additional flaws in the testing methodology and conclusions reached therefrom were revealed at trial and discussed in AB 42-44. This Reply Brief is focused on the complete absence of proof regarding the 100% granule form requirement.

| Fraction ID | Micron | Mesh size | Weight of tared sieve (g) | Weight of sieve with sample retained (g) | Weight of sieved material (g) | Fraction retained % |
|---|---|---|---|---|---|---|
| | Capsule | | Weight (g) | Weight empty (g) | Weight contents (g) | |
| 12-38-01 | | | 0.1332 | 0.0367 | 0.0964 | |
| 12-38-1-1 | 850 | 20 | 134.5308 | 134.5441 | 0.0134 | 12 |
| 12-38-1-2 | 600 | 30 | 127.8941 | 127.8993 | 0.0052 | 4.86 |
| 12-38-1-3 | 425 | 40 | 115.6797 | 115.6843 | 0.0046 | 4.24 |
| 12-38-1-4 | 250 | 60 | 116.7843 | 116.7863 | 0.0020 | 1.86 |
| 12-38-1-5 | 180 | 80 | 111.6109 | 111.6160 | 0.0051 | 4.70 |
| 12-38-1-6 | 106 | 140 | 108.8219 | 108.8447 | 0.0228 | 21.19 |
| 12-38-1-7 | 75 | 200 | 108.7757 | 108.7992 | 0.0235 | 21.81 |
| 12-38-1-8 | 53 | 270 | 105.4002 | 105.4180 | 0.0178 | 16.5 |
| 12-38-1-9 | Collection pan | | 85.0397 | 85.0531 | 0.0134 | 12.4 |
| Total weight | | | | | 0.1078 | 89.48 |

APPX3626; APPX3561

For one of the two experiments conducted by Dr. Smith, Stereomicroscopy Imaging, only one piece of material collected from the largest mesh (shown as 12-38-1-1 above) was imaged. APPX3627. The source of this material only represented the largest 12% of the capsule contents and no other Stereomicroscopy Imaging was conducted. APPX3624-3627.

For the second of two experiments conducted by Dr. Smith, Polarized Light Microscopy, only material collected from meshes 4 – 7 was imaged. APPX3562-3563. The source of this material only represented the largest 60.58% of the capsule contents and no other Polarized Light Microscopy was conducted. APPX3559-3563.

Of the 39.42% of the Aurobindo ANDA Product capsule material that was not subject to Dr. Smith's experiments, 16.5% was collected by the smallest of sieves,

12.4% were so small so as to fall through the sieve stack completely, and 10.52% were entirely unaccounted for. APPX3626; APPX3561.

Under the imaging experiment of Dr. Smith, the sample material was imaged under specific light and magnified conditions to result in an image such as this, from which Dr. Smith opined the existence of a granule based on the attributes of the material, including the coloration of the edges, borders and the center mass:



APPX3575; APPX225-226 at 89:15-90:15; APPX3559.

No such testing was performed on the 28.9% of material that was smaller than the smallest material that was imaged, and an additional 10.52% of material was unaccounted for completely. APPX3626; APPX3561.

The District Court committed clear error when it excused Acadia from proving that the unobserved material was in the form of granules. Acadia offered two excuses for its lack of proof to the District Court and repeats these excuses here: (1) that Dr. Smith somehow made "multiple other observations" of all of the sieve fractions and the collection pan; and (2) that the observations she made were sufficient to meet the preponderance of evidence burden. AB 60. However, the only testimony (ironically cited by Acadia on the same page of its brief) was that these images were consistent with "every image that I looked at, every image that I captured, everything I saw through the microscope". *Id*.; APPX230-231 at 94:16-95:4. This testimony proves Aurobindo's argument – Dr. Smith did not collect any material from the smallest mesh or the collection pan, and thereby the material in that smallest mesh, the collection pan and the missing material – 39.42% of the entire capsule – was unobserved. APPX3626; APPX3561.

With respect to its burden, Acadia conflates the preponderance of evidence standard, often phrased as more probable than not, or something above 50% certainty, with the quantity required by the claim limitation. AB 61. In other words, by observing and arguably meeting (disputed by Aurobindo) the preponderance standard for 60.58% of the largest material in the capsule, it is somehow to be excused from having to prove anything regarding the 39.42% of unobserved smaller material. Such a position, adopted by the trial court, runs afoul of the law of literal

infringement, which requires proof of each claim limitation which includes the quantity of granules required in Aurobindo's ANDA product. *See* references in OB 53.

The District Court also improperly relieves Acadia from proving infringement by accepting the argument that it would be impractical to examine 100% of Aurobindo's capsule material. First, this does not excuse Acadia from not sampling and observing the material from the smallest sieve and the material small enough to pass through every sieve, which accounts for 28.9% of the total material in the capsule, particularly since the patent taught granules tended to be larger entities. APPX3626; APPX3561; APPX107 at Col. 4, ll.43-49. Nor does it excuse conducting a single experiment with a single capsule out of 619 capsules in its possession where 10.52% of the material are simply lost. *Id*.

## III.   **CONCLUSION**

Based on the erroneous application of *Sunovian* to Aurobindo's ANDA, and the failure of proof in conducting a *Glaxo*-type infringement analysis, Aurobindo submits there is a definite and firm conviction that a mistake has been made and the trial court's infringement holding should be REVERSED.

December 19, 2025                    Respectfully submitted,


/s/ Timothy H. Kratz                  /s/ Richard J. Berman
Timothy H. Kratz                      Richard J. Berman
George J. Barry III                   Janine A. Carlan
**KRATZ & BARRY LLP**                 Bradford C. Frese
1050 Crown Pointe Parkway, Suite 500  **ARENTFOX SCHIFF LLP**
Atlanta, GA 30338                     1717 K. St. NW
(404) 431-6600                        Washington, DC 20006
tkratz@kratzandbarry.com             (202) 857-6000
gbarry@kratzandbarry.com             richard.berman@afslaw.com
                                      janine.carlan@afslaw.com
Michael P. Hogan                      bradford.frese@afslaw.com
**KRATZ & BARRY LLP**
P.O. Box 63765                        *Attorney for Appellants, MSN*
622 S. 4th Street                     *Laboratories Private Ltd., and MSN*
Philadelphia, PA 19147                *Pharmaceuticals*
(917) 216-8585
mhogan@kratzandbarry.com

R Touhey Myer
**KRATZ & BARRY LLP**
800 N. West Street
Wilmington, DE 19801
(302) 527-9378
tmyer@kratzandbarry.com

*Attorney for Appellants, Aurobindo*
*Pharma Limited and Aurobindo*
*Pharma USA, Inc.*

## CERTIFICATE OF SERVICE AND FILING

I hereby certify that a true and correct copy of the foregoing has been filed

using the Court's CM/ECF system. All counsel of record will be served via

CM/ECF.


December 19, 2025                        Respectfully submitted,

*/s/ Richard J. Berman*
Richard J. Berman
**ARENTFOX SCHIFF LLP**
1717 K. St. NW
Washington, DC 20006
(202) 857-6000
richard.berman@afslaw.com

*Attorney for Appellants MSN Laboratories*
*Private Ltd., and MSN Pharmaceuticals*

## CERTIFICATE OF COMPLIANCE WITH RULE 32

I, Richard J. Berman, counsel for Appellant MSN Laboratories Private Ltd., and MSN Pharmaceuticals, hereby certify that the foregoing brief complies with the length limits set forth in Fed. R. App. P. 32 and Fed. Cir. R. 32. Specifically, this brief contains 6,972 words excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and Fed. Cir. R. 32(b) as determined by the word count feature of the word processing program used to create this brief.

I further certify that the foregoing brief complies with the typeface requirements set forth in Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6). Specifically, this brief has been prepared using a proportionally spaced typeface using Microsoft Word 2013, in 14-point Times New Roman font.

December 19, 2025                    */s/ Richard J. Berman*
                                     Richard J. Berman
                                     **ARENTFOX SCHIFF LLP**
                                     1717 K. St. NW
                                     Washington, DC 20006
                                     (202) 857-6000
                                     richard.berman@afslaw.com

                                     *Attorney for Appellants MSN Laboratories*
                                     *Private Ltd., and MSN Pharmaceuticals*