**2025-1875**
**Volume I of II (Pages Appx1 to Appx633)**

# United States Court of Appeals
# for the Federal Circuit

ACADIA PHARMACEUTICALS INC.,

*Plaintiff-Appellee,*

– v. –

AUROBINDO PHARMA LTD., AUROBINDO PHARMA
USA, INC., MSN LABORATORIES PRIVATE LTD.,
MSN PHARMACEUTICALS, INC.,

*Defendants-Appellants.*

*On Appeal from the United States District Court for the
District of Delaware, Case No. 1:22-cv-01387-GBW,
Honorable Gregory Brian Williams. U.S. District Judge*

## NON-CONFIDENTIAL JOINT APPENDIX

TIMOTHY H. KRATZ
GEORGE J. BARRY III
KRATZ & BARRY LLP
1050 Crown Pointe Parkway, Suite 500
Atlanta, Georgia 30338
(404) 431-6600
tkratz@kratzandbarry.com
gbarry@kratzandbarry.com

*Counsel for Defendants-Appellants
Aurobindo Pharma Limited and
Aurobindo Pharma USA, Inc.*

RICHARD J. BERMAN
JANINE A. CARLAN
BRADFORD C. FRESE
ARENTFOX SCHIFF LLP
125 Summer Street
1717 K Street NW
Washington, DC 20006
(202) 857-6000
richard.berman@afslaw.com
janine.carlan@afslaw.com
bradford.frese@afslaw.com

*Counsel for Defendants-Appellants
MSN Laboratories Private Ltd.,
and MSN Pharmaceuticals*

*(For Continuation of Appearances See Inside Cover)*

JANUARY 5, 2026

 COUNSEL PRESS    (800) 4-APPEAL • (388974)

MICHAEL P. HOGAN
KRATZ & BARRY LLP
P.O. Box 63765
622 South 4th Street
Philadelphia, Pennsylvania 19147
(917) 216-8585
mhogan@kratzandbarry.com

R. TOUHEY MYER
KRATZ & BARRY LLP
800 North West Street
Wilmington, Delaware 19801
(302) 527-9378
tmyer@kratzandbarry.com

*Counsel for Defendants-Appellants
Aurobindo Pharma Limited and
Aurobindo Pharma USA, Inc.*

CHAD J. PETERMAN
BRUCE M. WEXLER
SCOTT F. PEACHMAN
ZACHARY D. HADD
PETER E. CONWAY
PAUL HASTINGS LLP
200 Park Avenue
New York, New York 10166
(212) 318-6000
chadpeterman@paulhastings.com
brucewexler@paulhastings.com
scottpeachman@paulhastings.com
zacharyhadd@paulhastings.com
peterconway@paulhastings.com

FELIX A. EYZAGUIRRE
PAUL HASTINGS LLP
609 Main Street, Suite 2500
Houston, Texas 77002
(713) 860-7300
felixeyzaguirre@paulhastings.com

*Counsel for Plaintiff-Appellee
   Acadia Pharmaceuticals Inc.*

## TABLE OF CONTENTS FOR JOINT APPENDIX

| Date | Dkt/Trial Exhibit No. | Document | APPX Page |
|---|---|---|---|
| 6/8/2023 | Dkt. 20 | Joint Stipulated Protective Order (Granted by Text Order on 6/8/2023) | APPXI-APPXLVII |
| 5/16/2025 | Dkt. 140 | Opinion | APPX1-APPX87 |
| 5/16/2025 | Dkt. 141 | Order | APPX88-APPX89 |
| 6/9/2025 | Dkt. 145 | Final Judgment | APPX90-APPX93 |
| 9/27/2022 | JTX-0009 | Certified Copy of U.S. Patent No. 11,452,721 | APPX94-APPX118 |
| As of 7/22/2025 | required document per Rule 30(a)(1)(a)(i) | District Court Docket Sheet | APPX119-APPX136 |
| 12/3/2024 | Docket No. not Issued | Trial Transcript, December 3, 2024 | APPX137-APPX455 |
| 12/4/2024 | Docket No. not Issued | Trial Transcript, December 4, 2024 | APPX456-APPX633 |
| 12/6/2024 | Docket No. not Issued | Trial Transcript, December 6, 2024 | APPX634-APPX816 |
| 12/13/2023 | Dkt. 44 | Order on Claim Construction | APPX899-APPX900 |
| 1/13/2025 | Dkt. 126 | MSN Laboratories Private Ltd., and MSN Pharmaceuticals, Inc. Opening Post-Trial Brief | APPX901-APPX921 |

| Date | Dkt/Trial Exhibit No. | Document | APPX Page |
|---|---|---|---|
| 1/13/2025 | Dkt. 126-1 | MSN Laboratories Private Ltd., and MSN Pharmaceuticals, Inc. Post-Trial Findings of Fact | APPX922-APPX935 |
| 1/13/2025 | Dkt. 127 | Acadia Pharmaceuticals Inc.'s Opening Post-Trial Brief on Infringement | APPX936; APPX946-APPX949 |
| 2/12/2025 | Dkt. 131 | Aurobindo Pharma Limited and Aurobindo Pharma USA, Inc.'s Responsive Post-Trial Brief on Non-Infringement | APPX969; APPX977 |
| 2/12/2025 | Dkt. 134 | Acadia Pharmaceuticals Inc.'s Responsive Post-Trial Brief on Invalidity | APPX1000; APPX1006-APPX1011 |
| 2/12/2025 | Dkt. 134-1 | Acadia Pharmaceuticals Inc.'s Proposed Findings of Fact and Conclusions of Law | APPX1021; APPX1029 |
| 3/14/2022 | JTX-0010 | Certified Copy of File History of U.S. Patent No. 11,452,721 | APPX1036; APPX1111-APPX1114; APPX2488; APPX3449 |
| 11/15/2007 | JTX-0011 | U.S. Patent Application Publication No. 2007/0264330 (Ragnar-Tolf) | APPX3480-APPX3506 |

| Date | Dkt/Trial Exhibit No. | Document | APPX Page |
|---|---|---|---|
| 04/29/2016 | JTX-0012 | Acadia Pharmaceuticals, Inc. NUPLAZID® Tablets Prescribing Information (Apr. 29, 2016) ("Nuplazid Label") | APPX3507-APPX3519 |
| 8/17/2015 | JTX-0013 | Development Strategy for 40 mg IR Pimavanserin Capsule | APPX3521; APPX3523-APPX3524 |
| 09/00/2021 | JTX-0061 | Pam Smith Opening Report Appendix A: Polarized Light Microscopy | APPX3559-APPX3623 |
| 09/00/2021 | JTX-0062 | Pam Smith Opening Report Appendix B: Stereomicroscopy Imaging | APPX3624-APPX3631 |
| -- | JTX-0108-AURO | Aurobindo ANDA (Master Formula Card - Undated) | APPX3654-APPX3657 |
| -- | JTX-0109-AURO | Aurobindo ANDA (Master Formula Card - Undated) | APPX3658-APPX3661 |
| -- | JTX-0125-AURO | Aurobindo ANDA (3.2.P.2 - Pharmaceutical Development) | APPX3662-APPX3757 |
| -- | JTX-0134-AURO | Aurobindo ANDA (Master Formula Card - Undated) | APPX3758; APPX3760-APPX3761 |
| 6/26/2018 | PTX-0021 | U.S. Patent No. 10,004,682 | APPX3762-APPX3798 |

| Date | Dkt/Trial Exhibit No. | Document | APPX Page |
|---|---|---|---|
| -- | PTX-0052 | Pamela A. (Martoglio) Smith, Ph.D. CV | APPX3799-APPX3809 |
| 00/00/2002 | DTX-005 | Sven Stegemann, HARD GELATIN CAPSULES TODAY - AND TOMORROW 1-23 (2nd Ed. 2002) | APPX3810; APPX3882; APPX3885 |
| 00/00/2013 | DTX-007 | Julia T. Schiele, et al., *Difficulties Swallowing Solid Oral Dosage Forms in a General Practice Population: Prevalence, Causes, and Relationship to Dosage Forms* 69 EUR. J CLIN PHARMACOL. 937, 937-948 (2013) | APPX3912-APPX3913; APPX3917; APPX3920 |
| 5/23/2005 | DTX-009 | Richard Chapman, et al., *Predictors of Adherence With Antihypertensive and Lipid-Lowering Therapy*, 165 ARCH. INTERN. MED. 1147, 1147-1152 (2005) | APPX3924; APPX3927 |
| 00/00/2012 | DTX-010 | Nobutaka Hattori, et al., *Patient Perspectives on Parkinson's Disease Therapy in Japan and the United States: Results of Two Patient Surveys*, 3 PROMs 38, 31-38 (2012) | APPX3930; APPX3934 |

| Date | Dkt/Trial Exhibit No. | Document | APPX Page |
|---|---|---|---|
| 01/00/2014 | DTX-011 | Anil Kumar, et al., *Impact of Pill Burden and Socio-Economic Status of Patients on Adherence to Pharmacologic Therapy in Elderly*, 6 WEST LOND. MED. J 22, 23-28 (2014) | APPX3939; APPX3940 |
| 10/02/2014 | DTX-013 | Fang Liu et al, *Patient-Centered Pharmaceutical Design to Improve Acceptability of Medicines: Similarities and Differences in Paediatric and Geriatric Populations*, 74 DRUGS 1871, 1871-1889 (2014) | APPX3946; APPX3948-APPX3949 |
| 12/1/2020 | DTX-216 | U.S. Patent No. 10,849,891 | APPX4050-APPX4071 |
| 00/00/2015 | DTX-329 | Srinivasan Shanmugam, *Granulation Techniques and Technologies: Recent Progresses,* BioImpacts. 5(1), 55-63 (2015) | APPX4126 |
| -- | AURO-DTX-320 | Aurobindo ANDA (3.2.P.3.3 - Description of Manufacturing Process and Process Controls) | APPX4278-APPX4295 |
| 6/26/2019 | AURO-DTX-347 | Aurobindo ANDA (Master Formula Card - Effective Date 06/25/2019) | APPX4296-APPX4300 |

| Date | Dkt/Trial Exhibit No. | Document | APPX Page |
|---|---|---|---|
| 9/12/2019 | AURO-DTX-348 | Aurobindo ANDA (Master Formula Card - Effective Date 09/12/2019) | APPX4301-APPX4305 |
| 1/28/2020 | AURO-DTX-349 | Aurobindo ANDA (Master Formula Card - Effective Date 01/25/2020) | APPX4306-APPX4310 |
| 11/25/2024 | Dkt. 112 (Confidential) Dkt. 125 (Redacted) | Memorandum Opinion on Daubert Motion and Motions in Limine | APPX4311-APPX4322 |

CONFIDENTIAL MATERIAL OMITTED

Pursuant to the Federal Circuit Rule 28(d)(1)(B), material subject to a protective order entered by the District Court of Delaware has been redacted. Appx3654-Appx3758; Appx3760-Appx3761, Appx4278-Appx4310; Appx4311-Appx4322.

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| ACADIA PHARMACEUTICALS INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 22-1387-GBW |
| | ) | |
| AUROBINDO PHARMA LIMITED *et al.*, | ) | CONSOLIDATED |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

**[PROPOSED] STPULATED PROTECTIVE ORDER**

WHEREAS the Parties agree that the Protective Order entered in Consolidated Action No. 20-985-GBW, attached as **Exhibit 1**, shall govern the above-captioned matter pertaining to U.S. Patent No. 11,452,721 (the "patent-in-suit" for purposes of the above-captioned matter);

WHEREAS Exhibit A to the Protective Order entered in Consolidated Action No. 20-985-GBW shall be replaced with **Exhibit 2**, attached hereto;

WHEREAS Exhibit B to the Protective Order entered in Consolidated Action No. 20-985-GBW shall be replaced with **Exhibit 3**, attached hereto; and

WHEREAS Exhibit C to the Protective Order entered in Consolidated Action No. 20-985-GBW shall be replaced with **Exhibit 4**, attached hereto.

Appxl

Dated:  May 31, 2023

SAUL EWING LLP

*/s/Michelle C. Streifthau-Livizos*
James D. Taylor, Jr. (#4009)
Jessica M. Jones (#6246)
Michelle C. Streifthau-Livizos (#6584)
1201 N. Market Street, Suite 2300
P.O. Box 1266
Wilmington, Delaware 19801
(302) 421-6800
james.taylor@saul.com
jessica.jones@saul.com
michelle.streifthau-livizos@saul.com

*Attorneys for Plaintiff*
*ACADIA Pharmaceuticals Inc.*

SEITZ, VAN OGTROP & GREEN, P.A.

*/s/ James S. Green, Jr.*
James S. Green, Jr. (#4406)
222 Delaware Avenue, Suite 1500
Wilmington, DE 19801
(302) 888-7607
jsgreen@svglaw.com

*Attorneys for Defendants MSN Laboratories*
*Private Ltd. and MSN Pharmaceuticals, Inc.*

KRATZ & BARRY LLP

*/s/ R. Touhey Myer*
R. Touhey Myer (#5939)
800 N. West Street
Wilmington, DE 19801
(302) 527-9378
tmyer@kratzandbarry.com

*Attorneys for Defendants Aurobindo Pharma Ltd.*
*and Aurobindo Pharma USA, Inc*

SO ORDERED this_____day of_____, 2023.

_____
THE HONORABLE GREGORY B. WILLIAMS

Appxll

06/08/2023

SO ORDERED, re 20 Stipulated Protective Order. Signed by Judge Gregory B. Williams on 6/8/23. (ntl) (Entered: 06/08/2023)

AppxIII

# EXHIBIT 1

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| ACADIA PHARMACEUTICALS INC., ) | |
| ) | |
| Plaintiff, ) | |
| ) | C.A. No. 1:20-cv-00985-RGA |
| v. ) | |
| ) | |
| AUROBINDO PHARMA LIMITED and ) | |
| AUROBINDO PHARMA USA, INC., ) | |
| ) | |
| Defendants. ) | |
| ) | |
| ACADIA PHARMACEUTICALS INC., ) | |
| ) | |
| Plaintiff, ) | |
| ) | C.A. No. 1:20-cv-00986 RGA |
| v. ) | |
| ) | |
| TEVA PHARMACEUTICALS USA, INC. ) | |
| ) | |
| Defendant. ) | |
| ) | |
| ACADIA PHARMACEUTICALS INC., ) | |
| ) | |
| Plaintiff, ) | |
| ) | C.A. No. 1:20-cv-01021-RGA |
| v. ) | |
| ) | |
| ZYDUS PHARMACEUTICALS (USA) INC. ) | |
| and CADILA HEALTHCARE LIMITED, ) | |
| ) | |
| Defendants. ) | |

AppxV

|  | ) |  |
| --- | --- | --- |
| ACADIA PHARMACEUTICALS INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 1:20-cv-01022-RGA |
| | ) | |
| HETERO LABS LIMITED, | ) | |
| HETERO LABS LIMITED UNIT-V, and | ) | |
| HETERO USA INC., | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| | ) | |
| ACADIA PHARMACEUTICALS INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 1:20-cv-01029-RGA |
| | ) | |
| MSN LABORATORIES PRIVATE LTD. | ) | |
| and MSN PHARMACEUTICALS, INC., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## [PROPOSED] STIPULATED PROTECTIVE ORDER

WHEREAS the Parties expect discovery requests made in this litigation ("Litigation," which includes any appeals therefrom), to encompass certain documents, things, and information that may constitute trade secrets and/or other confidential research, development, business, or commercial information within the meaning of Federal Rule of Civil Procedure 26(c)(1)(G) for which special protection from public disclosure and from use for any purpose other than in this Litigation is warranted;

WHEREAS, the Parties to this action seek to establish a mechanism to protect information produced by parties and non-parties in this case from improper disclosure;

38055093.1

AppxVI

NOW THEREFORE, the Parties HEREBY STIPULATE to the entry of this Protective Order regarding discovery in this Litigation.

## **DEFINITIONS**

1.      "Affiliate" means any Third Party that directly or indirectly through one or more intermediaries controls, or is controlled by, or is under common control with, a Party to this Litigation.

2.      "**Confidential Information**" means information that constitutes, contains, reveals, or reflects trade secrets or other confidential business and/or commercial information within the meaning of Fed. R. Civ. P. 26(c)(1)(G), including but not limited to: product information; financial, budgeting and/or accounting information; information about existing and potential customers; marketing and other business strategies, decisions, or negotiations; personnel compensation, evaluations, and other employment information; information received from a Third Party pursuant to a confidentiality, non-disclosure, or similar agreement; and includes such confidential and proprietary information about a Third Party, including parents, subsidiaries, and/or other Affiliates.  Provisions of this Protective Order relating to Confidential Information shall be understood to encompass any information derived from, as well as testimony and oral conversation related to, Confidential Information, and all copies, excerpts, and summaries thereof.

3.      "**Highly Confidential Information – Counsels' Eyes Only**" means Confidential Information that is of such a sensitive nature that it supports a reasonable and good-faith belief that access to such information should be limited to outside counsel or designated inside counsel to avoid the risk of placing the Producing Party at a competitive disadvantage. Such information includes, without limitation:

3

AppxVII

(a)     Unpublished pending patent applications, any investigational new drug applications or approved or unapproved new drug applications, as well as any related submissions and correspondence to and from the U.S. Food and Drug Administration ("FDA"), highly-sensitive research and development information, and highly-sensitive business and financial information;

(b)     Abbreviated New Drug Application ("ANDA") No. 214750, as well as any related submissions and correspondences to and from the FDA and highly-sensitive research and development information; and

(c)     ANDA No. 214828, as well as any related submissions and correspondences to and from the FDA and highly-sensitive research and development information.

4.     "**Highly Confidential Information – Outside Counsels' Eyes Only**" means Confidential Information that is of such a sensitive nature that it supports a reasonable and good-faith belief that granting access to such information to an employee or officer of a competitor will place the Producing Party at a competitive disadvantage, including, without limitation:

(a)     Non-public financial or marketing information, including but not limited to confidential business, business relationship and/or business intelligence information;

(b)     Information relating to products in development or not yet commercially launched;

(c)     ANDA No. 214925, as well as any related submissions and correspondences to and from the FDA and highly-sensitive research and development information;

AppxVIII

(d)    ANDA Nos. 214493 and 214502, as well as any related submissions and correspondences to and from the FDA and highly-sensitive research and development information; and

(e)    ANDA No. 214782, as well as any related submissions and correspondences to and from the FDA and highly-sensitive research and development information.

5.    "Designated Inside Representative" means an Inside Counsel or in-house person who is designated during this Litigation pursuant to Paragraph 35(c) of this Protective Order.

6.    "Discovery Material" means all documents, testimony, pleadings, exhibits, and all other material or information produced or disclosed in this Litigation, including responses to requests for production of documents and/or tangible objects, answers to interrogatories, responses to requests for admissions, documents and things made available for inspection, deposition testimony, expert testimony and reports, and all other discovery taken pursuant to the Federal Rules of Civil Procedure, including Third Party discovery pursuant to Fed. R. Civ. P. 45, matters in evidence and any other information hereafter furnished, directly or indirectly, by or on behalf of any Party, Third Party, or witness in connection with this Litigation.  This Protective Order and protections herein shall apply to all Discovery Material.

7.    "Expert" means a person with specialized knowledge or experience in a matter pertinent to this Litigation who has been retained by a Party or its Inside or Outside Counsel to serve as an expert witness or as a consultant in this Litigation who, at the time of retention, is not an officer, director, or employee of a Party or an Affiliate and is not anticipated to become an officer, director, or employee of a Party or an Affiliate.  Nothing in this Protective Order purports to alter in any way the requirements for offering testimony under Fed. R. Evid. 703, or to define the term "expert" for purposes other than those addressed in this Protective Order.

AppxIX

8.     "Inside Counsel" means any attorney who works in the legal department of a Party or an Affiliate.

9.     "Outside Counsel" means attorneys who are not employees of a Party or Affiliate but are retained to represent or advise a Party to this Litigation and have appeared in this Litigation on behalf of that Party or are affiliated with a law firm that has appeared on behalf of that Party.

10.     "Party" means a party to this Litigation.

11.     "Producing Party" means any Party or any Third Party who produces or otherwise discloses, whether through formal or informal means, Discovery Material in this Litigation.

12.     "Professional Vendor(s)" means persons or entities that provide litigation support services (*e.g.*, photocopying; audio or video recording; translating, preparing exhibits or demonstrations; organizing, storing, or retrieving data in any form or medium; jury consulting; trial technicians, or mock trial coordination) and their employees and subcontractors.

13.     "Patents-in-Suit" means any patent on which claims or counterclaims have been asserted by the Parties in this Litigation, including but not limited to United States Patent Nos. 7,601,740 ("the '740 patent"), 7,732,615 ("the '615 patent"), 10,449,185 ("the '185 patent"), 10,646,480 ("the '480 patent"), 10,517,860 ("the '860 patent"), 7,659,285 ("the '285 patent"), and 7,923,564 ("the '564 patent").

14.     "Patent Prosecution" means participation in or direct contribution to drafting, revising, amending, or modifying – or advising regarding the drafting, revising, amending, or modifying – the scope of patent claims during prosecution proceedings in the United States or in any foreign country.  Patent Prosecution proceedings do not include opposition, *inter partes*

AppxX

review, interference, or other post-grant proceedings before the United States Patent and

Trademark Office ("USPTO") or any foreign patent-granting authority, provided, however, that

anyone involved in such proceedings may not participate in, directly contribute to, or advise

concerning the drafting, revising, amending, or modifying of patent claims.

15.     "Protective Order" or "this Order" means this Stipulated Protective Order.

16.     "Receiving Party" means any Party that receives information produced or

otherwise disclosed by any Producing Party.

17.     "Third Party" means a person or entity that is not a Party.

## SCOPE

18.     The protections conferred by this Order shall govern all Confidential Information

from a Producing Party in response to a discovery request, whether formal or informal, in this

action.  Those protections shall also extend to any information copied or extracted therefrom, as

well as all copies, excerpts, summaries, or compilations thereof, plus testimony, conversations,

or presentations by Receiving Parties or counsel for Receiving Parties in other settings that might

reveal Confidential Information.

## DESIGNATION

19.     Any Producing Party may designate Discovery Material as CONFIDENTIAL,

HIGHLY CONFIDENTIAL – COUNSELS' EYES ONLY, or HIGHLY CONFIDENTIAL –

OUTSIDE COUNSELS' EYES ONLY in accordance with this Protective Order if such Party in

good-faith believes that such Discovery Material contains Confidential Information as defined in

Paragraphs 2, 3 and 4.

38055093.1

AppxXI

20.     Notwithstanding anything to the contrary herein, the description "Confidential Information" shall apply to all that information so designated as "CONFIDENTIAL," and the description "Highly Confidential Information" shall apply to all that information so designated as "HIGHLY CONFIDENTIAL – COUNSELS' EYES ONLY" or "HIGHLY CONFIDENTIAL – OUTSIDE COUNSELS' EYES ONLY" by the Producing Party absent an order of the Court or subsequent written agreement of the Producing Party providing otherwise.

21.     Discovery Material may, as appropriate, be marked by the Producing Party with the legend "CONFIDENTIAL," "HIGHLY CONFIDENTIAL – COUNSELS' EYES ONLY," or "HIGHLY CONFIDENTIAL – OUTSIDE COUNSELS' EYES ONLY" and the Producing Party must use reasonable efforts to ensure that such legend appears on each page of each document or file as the format permits.  Tangible objects constituting or containing Confidential Information or Highly Confidential Information may be designated by affixing, to the object or its container, a label or tag marked "CONFIDENTIAL," "HIGHLY CONFIDENTIAL – COUNSELS' EYES ONLY," or "HIGHLY CONFIDENTIAL – OUTSIDE COUNSELS' EYES ONLY."  With respect to documents containing Confidential Information or Highly Confidential Information produced in native format, the Producing Party shall include the designation "CONFIDENTIAL," "HIGHLY CONFIDENTIAL – COUNSELS' EYES ONLY," or "HIGHLY CONFIDENTIAL – OUTSIDE COUNSELS' EYES ONLY" in the filename.  With respect to all documents produced that contain Confidential Information or Highly Confidential Information, the Producing Party shall also include in the load file the designation "CONFIDENTIAL," "HIGHLY CONFIDENTIAL – COUNSELS' EYES ONLY," or "HIGHLY CONFIDENTIAL – OUTSIDE COUNSELS' EYES ONLY."

8

AppxXII

22.     Information revealed by inspection of things and premises under Fed. R. Civ. P. 34 shall be treated as though it were designated CONFIDENTIAL, HIGHLY CONFIDENTIAL – COUNSELS' EYES ONLY, or HIGHLY CONFIDENTIAL – OUTSIDE COUNSELS' EYES ONLY provided that, prior to or at any time up to 30 days (as calculated by Fed. R. Civ. P. 6) after the inspection, the Party permitting inspection specifically identifies in writing any Discovery Material to be designated as CONFIDENTIAL, HIGHLY CONFIDENTIAL – COUNSELS' EYES ONLY, or HIGHLY CONFIDENTIAL – OUTSIDE COUNSELS' EYES ONLY that will be or was disclosed by the inspection.  There will be no waiver of confidentiality, or any privilege or immunity, by the inspection of Discovery Material before it is copied and marked pursuant to this Order.  Inspection of Discovery Material designated CONFIDENTIAL by any Party shall be conducted by persons eligible under Paragraph 35 below.  Inspection of Discovery Material designated HIGHLY CONFIDENTIAL – COUNSELS' EYES ONLY by any Party shall be conducted by persons eligible under Paragraph 36 below.  Inspection of Discovery Material designated HIGHLY CONFIDENTIAL – OUTSIDE COUNSELS' EYES ONLY by any Party shall be conducted by persons eligible under Paragraph 37 below.

23.     Notwithstanding the provisions of this Order, Parties may redact from any document, whether designated as Confidential Information, Highly Confidential Information, or not, any information containing privileged material, or any data protected from disclosure by state, federal, or foreign laws or regulations.  By way of non-limiting example, these categories may include sexual orientation, religion, health information, labor union affiliation, financial information, and political affiliation or similar data.  The basis for redactions should be identified at the location of each redaction (e.g., "Privileged," "Privacy," or "Nonresponsive").  The parties

38055093.1

AppxXIII

agree that productions of any information subject to state, federal, or foreign data protection laws or other privacy obligations may require additional safeguards and will meet and confer to implement these safeguards if and when needed. This Paragraph shall not be construed as a waiver of any Party's right to seek disclosure of redacted information.

24.     The Parties agree to meet and confer regarding additional safeguards for particular documents if and when needed. The Parties also agree to meet and confer on all other disputes relating to this Protective Order and discovery generally prior to seeking the intervention of the Court.

25.     The Parties agree that non-responsive attachments to responsive parent documents need not be produced. For any such attachments not produced, a placeholder slip-sheet endorsed "Withheld Non-Responsive" will be produced to capture the relationship.

26.     Information of a Producing Party revealed during a hearing or deposition upon oral or written examination under Fed. R. Civ. P. 30 shall be treated as Confidential Information or Highly Confidential Information by a Receiving Party for 30 days (as calculated by Fed. R. Civ. P. 6) following receipt of the final transcript by Outside Counsel for the Producing Party, but not thereafter unless, before the 30-day period has expired, Outside Counsel or Designated Inside Representative for the Producing Party notifies Outside Counsel or Designated Inside Representative for the Receiving Party in writing that the Discovery Material set forth in the transcript is Confidential Information or Highly Confidential Information. Counsel for any Party or Third Party whose Confidential Information or Highly Confidential Information has been disclosed during a deposition or hearing also may designate the transcript or portions thereof to be Confidential Information or Highly Confidential Information during the deposition. The legend "CONFIDENTIAL," "HIGHLY CONFIDENTIAL – COUNSELS' EYES ONLY," or

38055093.1

AppxXIV

"HIGHLY CONFIDENTIAL – OUTSIDE COUNSELS' EYES ONLY" shall be placed on the front of any deposition transcript (and, if recorded, any copies of the recording) containing Confidential Information or Highly Confidential Information.

      27.     Any Court filing that contains, describes, or discusses Confidential Information or Highly Confidential Information shall be filed under seal pursuant to the requirements of District of Delaware Local Rule 5.1.3, the Court's CM/ECF procedures, and any other applicable rules or procedures.  The filing Party must include on the cover page of the brief or other filing a descriptive legend in the following format: "CONTAINS PLAINTIFF'S HIGHLY CONFIDENTIAL INFORMATION – COUNSELS' EYES ONLY" or "CONTAINS DEFENDANT'S CONFIDENTIAL INFORMATION" or "CONTAINS PLAINTIFF'S AND DEFENDANT'S HIGHLY CONFIDENTIAL INFORMATION – OUTSIDE COUNSELS' EYES ONLY" or "CONTAINS THIRD-PARTY CONFIDENTIAL INFORMATION" or another suitable legend.  The sealed material shall not be opened or released from the custody of the Clerk of Court except by order of the Court.  Outside Counsel for the Party filing papers containing, describing, or discussing Confidential Information or Highly Confidential Information shall be responsible for providing appropriately redacted copies of the filed document to the Court in accordance with paragraph (G)(1) of the District of Delaware's Revised Administrative Procedures Governing Filing and Service by Electronic Means, and any other applicable rules or procedures.  If the filing contains the Confidential Information or Highly Confidential Information of the Party who did not file the document, within five days from the date of a filing made under seal, Outside Counsel for the filing Party or filing Third Party shall deliver to Outside Counsel for the non-filing Party or Parties a proposed public version of the filing that was made under seal if it contains the non-filing Party's Confidential Information or

AppxXV

Highly Confidential Information, and this proposed public version shall include redactions of Confidential Information or Highly Confidential Information. Within five days after receipt of the proposed public version, Outside Counsel for the non-filing Party shall provide any additional redactions it believes appropriate. Redacted versions of papers filed under seal may be made publicly available provided that (a) all Confidential Information is redacted; and (b) such redacted versions are clearly marked "Public Version," and clearly identify each place where information or exhibits have been redacted or deleted.

## **USE**

28.    All information designated as Confidential Information or Highly Confidential Information by the Producing Party or Third Party pursuant to this Order and disclosed in this Litigation shall be used by the Receiving Party solely for the purposes of prosecuting, defending, or attempting to settle this Litigation (including using such information for evaluating the assertion of additional patents in this Litigation or separate actions) and in any related appellate proceeding, and not for any other purpose whatsoever, except as permitted by order of the Court, or as agreed by the Parties. If the need arises, the parties agree to meet and confer to discuss whether Confidential Information or Highly Confidential Information may be used in any post-grant proceedings before the USPTO, such as in an *inter partes* review proceeding, involving one or more Patents-in-Suit.

29.    All Confidential Information and Highly Confidential Information shall be held in confidence by each person to whom it is disclosed and shall not be disclosed to any person who is not entitled to receive it under the terms of this Protective Order. All Confidential Information and Highly Confidential Information and things shall be securely maintained by recipients so as to preclude access by persons who are not entitled to receive such information and things.

38055093.1

AppxXVI

30.     Nothing in this Order shall bar or otherwise restrict counsel from rendering advice to his or her client with respect to this Litigation and, in the course thereof, relying in a general way upon his or her examination of Confidential Information or Highly Confidential Information produced or exchanged in this Litigation; provided, however, that in rendering such advice and in otherwise communicating with a person not entitled to view any Confidential Information or Highly Confidential Information, the attorney shall not disclose the contents of Confidential Information or Highly Confidential Information produced by any other Party or Third Party.

31.     Absent written consent from the Producing Party, any attorney, patent agent, independent Expert, or other person who receives Confidential Information or Highly Confidential Information shall not (1) be involved in Patent Prosecution pertaining to pimavanserin (including its salts), crystalline forms of pimavanserin, formulations containing pimavanserin, and methods of treatment including pimavanserin and (2) have any involvement in preparing or submitting any Citizen Petition relating to pimavanserin during the pendency of this Litigation and for one (1) year after the termination of this Litigation, including any appeals. Nothing in this paragraph shall be construed to prohibit an individual from communicating with or providing submissions to the FDA on behalf of a Party relating to that Party's own ANDA or NDA, including responding to any Citizen Petition relating to that Party's own ANDA or NDA, so long as such individual does not use Confidential Information or Highly Confidential Information received from an opposing party in this action in connection with such submission. Nothing in this paragraph shall be construed to prohibit an individual from participating in reexamination, reissue, or post-grant proceedings, such as an *inter partes* review, on behalf of an entity attempting to invalidate or defend the validity of the Patents-in-Suit provided, however, that anyone involved in such proceedings may not participate in, directly contribute to, or advise

13

AppxXVII

concerning the drafting, revising, amending, or modifying of patent claims.  Nothing in this paragraph shall prevent any attorney from sending non-confidential prior art to an attorney involved in Patent Prosecution for purposes of ensuring that such prior art is submitted to the U.S. Patent and Trademark Office, or any similar agency of a foreign government, to assist a patent applicant in complying with its duty of candor.  The Parties expressly agree that the prosecution bar and Citizen Petition bar set forth herein shall be personal to any attorney who reviews Confidential Information or Highly Confidential Information and shall not be imputed to any other persons or attorneys at the attorneys' law firm or company.

32.     Any current employee or expert witness of a Party may be examined at trial or upon deposition concerning any Confidential Information or Highly Confidential Information of such Party.  Additionally, a formerly employed officer or employee of a Party may be examined at trial or upon deposition concerning Confidential Information or Highly Confidential Information if the material reveals on its face, or it is otherwise established, that the witness authored, saw, or had access to the Confidential Information or Highly Confidential Information in the ordinary course of business and outside the context of this Litigation.

33.     At the deposition of any corporate representative designated to testify on behalf on a Party on a particular topic or subject area pursuant to Fed. R. Civ. P. 30(b)(6), such witness may be shown Confidential Information or Highly Confidential Information that is within the particular topic or subject area if the Producing Party is the Party being deposed.

34.     Any other person may be examined as a witness at trial or upon deposition concerning any Confidential Information or Highly Confidential Information which that person had lawfully generated, received, or which was previously communicated to that witness.  Third Parties may designate as Confidential Information or Highly Confidential Information deposition

38055093.1

AppxXVIII

Case 1:22-cv-00985-GBW    Document 201    Filed 02/06/23    Page 56 of 467 PageID #: 935

transcripts of their witnesses and any Discovery Material they produce, whether voluntarily or by

subpoena, to the same extent and in the same manner as Parties.  Any such Confidential

Information or Highly Confidential Information shall be treated by the Parties in the same

manner as the Confidential Information or Highly Confidential Information produced by a Party.

Third Parties shall have the same rights and obligations under this Protective Order as Parties

and may move the Court to enforce the provisions of this Protective Order.

### DISCLOSURE OF INFORMATION MARKED "CONFIDENTIAL"

35.    Unless otherwise directed by the Court or authorized in writing by the Producing

Party, information marked "CONFIDENTIAL" may be disclosed by the Receiving Party only to

the following persons:

(a)    Outside Counsel for Plaintiff in the above-captioned case.

(b)    Outside Counsel for Defendants in the above-captioned case.

(c)    Two (2) Designated Inside Representatives for Plaintiff, and two (2) Designated

Inside Representatives per Defendant Group,[1] who, because of their duties and responsibilities,

require access to Confidential Information, provided such Designated Inside Representatives

abide by the restrictions set forth in this Order, including in Paragraph 31, and provided that such

persons are not involved in advising others within the company with regard to the pricing, sales,

or marketing of any pimavanserin product.  A Designated Inside Representative's role as

supervisor of an attorney or patent agent engaged in Patent Prosecution described herein shall

not, in itself, constitute evidence that the Designated Inside Representative is engaged in Patent

Prosecution.  The restriction described in this Paragraph shall begin when access to Confidential

---

[1] "Defendant Group" refers to all parties sued in a single cause of action.

AppxXXIX

Information is first received by the affected individual and shall end the earlier of (i) one year after final termination of this Litigation with respect to the Party that designated such person as a representative or (ii) one year after a Designated Inside Representative withdraws from representing a Party in this Litigation and the Party that the Designated Inside Representative represents removes him or her from its list of Designated Inside Representatives.

(d)     Support personnel for attorneys or representatives listed in Paragraph 35(a), (b), and (c), such as law clerks, paralegals, secretaries, IT personnel, and clerical staff, assisting with this Litigation under the supervision of an attorney or representative described in Paragraph 35(a), (b), and (c).

(e)     Scientific advisors, and patent agents regularly employed by Outside Counsel so long as they are subject to the same restrictions as Outside Counsel set forth in Paragraph 31.

(f)     Professional Vendors.

(g)     Any Expert who is expressly retained by any Outside Counsel or Designated Inside Representative to assist in this Litigation, including any associates or analysts working under the supervision of the Expert, with disclosure only to the extent necessary to perform such work.

(h)     Support personnel for Experts listed in Paragraph 35(g), such as secretaries and clerical staff assisting with this Litigation under the supervision of an Expert described in Paragraph 35(g).

(i)     Any interpreter, court reporter, or other shorthand reporter or typist who is translating, recording, or transcribing documents or testimony in connection with this Litigation or any videographer who is recording a deposition in connection with this Litigation.

AppxXX

(j)    Personnel of the Court and all appropriate courts of appellate jurisdiction.

(k)    A corporate witness designated by the Producing Party under Fed. R. Civ. P. 30(b)(6) to provide testimony on a topic relevant to the Confidential Information.

(l)    Any other person requested by a Receiving Party and agreed to by the Producing Party in writing pursuant to Paragraph 35.

## DISCLOSURE OF INFORMATION MARKED "HIGHLY CONFIDENTIAL – COUNSELS' EYES ONLY"

36.    Unless otherwise directed by the Court or authorized in writing by the Producing Party, information marked "HIGHLY CONFIDENTIAL – COUNSELS' EYES ONLY" may be disclosed by the Receiving Party only to the persons identified in Paragraph 35(a), (b), (e)-(l), and:

(a)    Designated Inside Representatives listed in Paragraph 35(c) who meet the definition of Inside Counsel provided in Paragraph 8.

(b)    Support personnel for attorneys listed in Paragraphs 35(a), (b), and 36(a), such as law clerks, paralegals, secretaries, IT personnel, and clerical staff, assisting with this Litigation under the supervision of an attorney described in Paragraphs 35(a), (b) and 36(a).

## DISCLOSURE OF INFORMATION MARKED "HIGHLY CONFIDENTIAL – OUTSIDE COUNSELS' EYES ONLY"

37.    Unless otherwise directed by the Court or authorized in writing by the Producing Party, Highly Confidential Information may be disclosed by the Receiving Party only to the persons identified in Paragraph 35(a), (b), (e)-(l), and:

17

AppxXXI

(a)     Support personnel for attorneys listed in Paragraph 35(a) and (b), such as law clerks, paralegals, secretaries, IT personnel, and clerical staff, assisting with this Litigation under the supervision of an attorney described in Paragraph 35(a) and (b).

38.     For the avoidance of doubt, the restrictions in Paragraphs 31 and 35 shall apply only to individuals who obtain, receive, or otherwise learn of, in whole or in part, Confidential Information or Highly Confidential Information, and not by implication to other employees of the firms or organizations by which they are employed.

39.     Confidential Information or Highly Confidential Information other than a party's own shall not be disclosed to persons described in Paragraph 35(e), (f), (g), or (k) unless and until such person has executed an acknowledgement in the form attached as Exhibit A.  Either Outside Counsel or Designated Inside Representatives must maintain a copy of the executed Exhibit A for each individual falling under Paragraph 35(e), (f), (g), or (k) during the Litigation and for a period of one year thereafter.

40.     As a condition precedent to disclosure of any Confidential Information or Highly Confidential Information of a Producing Party to an individual described above in Paragraph 35(g), at least seven days (as calculated by Fed. R. Civ. P. 6) before the disclosure of the Confidential Information or Highly Confidential Information is made, Outside Counsel for the Receiving Party shall serve a Notice on the Producing Party identifying such individual by name and including a curriculum vitae ("CV") or equivalent resume disclosing the individual's employment history, all cases in which the individual has testified in a deposition or a trial in the past five years, and an executed acknowledgment from the individual to whom the disclosure is to be made, in the form of Exhibit A attached hereto.  If a Producing Party objects to the proposed disclosure to such individual, the Parties shall promptly confer in good-faith to resolve

18

AppxXXII

the concerns giving rise to the objection.  If the Parties are unable to reach agreement regarding

such disclosure, the objecting Party must apply to the Court for a protective order no later than

10 days (as calculated by Fed. R. Civ. P. 6) after receipt of the executed acknowledgement in the

form attached as Exhibit A and the CV or resume.  The burden shall be on the objecting Party to

demonstrate to the Court why such individual should not be permitted to receive Confidential

Information or Highly Confidential Information under the Protective Order.  Confidential

Information and Highly Confidential Information shall not be disclosed to such individual

pending the Court's resolution of the dispute.  The foregoing 7- and 10-day periods may be

extended or shortened by agreement of the Parties or by Order of the Court.

    41.    Confidential Information shall not be disclosed to persons described in Paragraph

35(c) or 36(a) unless and until such a person has executed an acknowledgement in the form

attached as Exhibit B (for non-attorneys) or Exhibit C (for attorneys).  Either Outside Counsel or

Designated Inside Representatives must maintain a copy of the executed Exhibit B or Exhibit C

for each individual falling under Paragraphs 35(c) or 36(a) during the Litigation and for a period

of one year thereafter.  During the pendency of this Litigation, a Party that seeks to designate a

Designated Inside Representative or designate a replacement Designated Inside Representative

with a new designee (as provided herein) must first provide notice to the Producing Party by

service of the acknowledgement in the form attached as Exhibit B or Exhibit C completed and

signed by the proposed Designated Inside Representative.  A Party that designates a Designated

Inside Representative or replaces a Designated Inside Representative and provides the

information specified in the preceding sentence may disclose Confidential Information to the

newly identified Designated Inside Representative unless, within seven days of delivering the

notice (as calculated by Fed. R. Civ. P. 6), the Party receives a written objection from an

AppxXXIII

objecting Party. Any such objection must set forth in detail the grounds on which such objection is based. A Party that receives a timely written objection must meet and confer with the objecting Party to try to resolve the matter by agreement. If the Parties are unable to reach agreement regarding such designation, the objecting Party must apply to the Court for a protective order no later than ten days (as calculated by Fed. R. Civ. P. 6) after receipt of the executed acknowledgement in the form attached as Exhibit B or Exhibit C. The foregoing 7- and 10-day periods may be extended or shortened by agreement of the Parties or by Order of the Court.

42.     Without prior written approval of the Producing Party, which shall not be unreasonably withheld, or an order from the Court, no person or Party permitted access to any Confidential Information or Highly Confidential Information may disclose the Confidential Information or Highly Confidential Information of one Defendant Group to any other Defendant Group.

43.     The recipient of any Confidential Information and/or Highly Confidential Information that is provided under this Protective Order (including any copies or excerpts made thereof) shall maintain such information (including any summaries, analyses, or other derivative materials disclosing or reflecting the content of that information) in a secure and safe area and shall exercise reasonable and proper care with respect to the storage, custody, use, and/or dissemination of such information.

**EXEMPTED MATERIALS AND OBJECTION TO DESIGNATIONS**

44.     Any Receiving Party may object to the designation by the Producing Party of any Discovery Material as Confidential Information or Highly Confidential Information at any time.

38055093.1

AppxXXIV

Case 1:22-cv-00985-GBW    Document 201    Filed 02/04/23    Page 22 of 47 PageID #: 4941

The process for making an objection to the designation of Discovery Material as Confidential Information or Highly Confidential Information and for resolving the dispute shall be as follows:

(a)    For Discovery Material designated as Confidential Information, Outside Counsel or Designated Inside Representative for a Receiving Party shall notify Outside Counsel for the Producing Party in writing as to its objection(s) to the designations.  This notice shall include, at a minimum, a specific identification of the designated Confidential Information well as the reasons for the objection.

(b)    For Discovery Material designated as Highly Confidential Information, Outside Counsel for a Receiving Party shall notify Outside Counsel for the Producing Party in writing as to its objection(s) to the designations.  This notice shall include, at a minimum, a specific identification of the designated Highly Confidential Information well as the reasons for the objection.

(c)    Within 14 days of the service of the notice in section (a), Outside Counsel or Designated Inside Representative for the Receiving Party shall thereafter have the burden of conferring either in-person or by telephone with Outside Counsel for the Producing Party claiming protection (as well as any other interested Third Party) in a good-faith effort to resolve the dispute.  In conferring, the Receiving Party must explain, as to each challenged document or material, the basis for its belief that the confidentiality designation was not proper and must give the Producing Party an opportunity to review the designated material, to reconsider the circumstances, and, if no change in designation is offered, to explain the basis for the confidentiality designation.  The Receiving Party may proceed to the next stage of the challenge process only if it has engaged in this meet-and-confer process first or establishes that the Producing Party is unwilling to participate in the meet-and-confer process in a timely manner.

AppxXXV

(d)     With respect to the notice in section (b), the same procedures will be followed as stated in (c) excluding the participation of Designated Inside Counsel for the Receiving Party.

(e)     Failing agreement, the Receiving Party may apply to the Court for a ruling that the Discovery Material sought to be protected is not entitled to such designation.  The Receiving Party must contact the Court within 21 days of the initial notice in section (a) or (b) or within 14 days of the parties agreeing that the meet-and-confer process in section (c) or (d) will not resolve their dispute, whichever is earlier.  If the parties do not agree to some other deadline, the Receiving Party's failure to contact the Court within the period described in this section waives the Receiving Party's objection(s).  The Producing Party bears the burden to establish that the Discovery Material is Confidential Information as defined in Paragraph 2 or Highly Confidential Information in Paragraphs 3 or 4 and entitled to such protection under this Protective Order.

45.     The right to challenge, and the process for challenging, the existence or designation of redactions shall be the same as the right to challenge and the process for challenging the designation of Confidential Information or Highly Confidential Information as set forth in Paragraph 44.

46.     The restrictions and obligations set forth herein relating to material designated as Confidential Information or Highly Confidential Information shall not apply to any information that:

(a)     the Parties (and, if a Third Party produced Confidential Information, the Third Party) agree or the Court rules, is already public knowledge or was improperly designated by the Producing Party because it does not satisfy the definition of Confidential Information or Highly Confidential Information set forth in this Order;

AppxXXVI

(b)      the Parties (and any respective Producing Party) agree or the Court rules, has

become public knowledge other than as a result of disclosure by a Receiving Party, its employees

or agents in violation of this Order;

(c)      has come into a Receiving Party's legitimate possession independently of the

Producing Party; or

(d)      has been independently developed by or for the Party without use of, or reference

to, the other Party's Confidential Information or Highly Confidential Information, which shall

remain protected.

47.      Notwithstanding any such challenge to the designation of Discovery Material as

Confidential Information or Highly Confidential Information, all such material so designated

shall be treated as such and shall be subject to the provisions of this Protective Order until one of

the following occurs: (a) the Party that designated the material as Confidential Information or

Highly Confidential Information withdraws such designation in writing, or (b) the Court rules

that the designation is not proper.

## <u>NO WAIVER OF PRIVILEGE</u>

48.      Pursuant to Fed. R. Evid. 502(d), the inadvertent production of documents subject

to the attorney-client privilege, the work-product immunity, or any other privilege or immunity,

will not waive the attorney-client privilege, work-product immunity, or other privilege or

immunity in this Litigation or in any other federal or state proceeding.  For example, the mere

production of privileged or work-product-protected information in this Litigation as part of a

production is not itself a waiver in this Litigation or in any other federal or state proceeding.

Further, neither the fact that information was produced, nor the content of the information shall

be used in any manner as evidence in support of any such alleged waiver.  If a Party has

23

AppxXXVII

produced information subject to a claim of privilege or immunity, upon request identifying such information or in the event that a Receiving Party discovers a document that it believes to be privileged ("Recalled Information"), the information and all copies thereof shall be returned promptly, or a signed verification by Outside Counsel for a Receiving Party certifying that all such information and copies have been destroyed shall be provided to Outside Counsel for the Producing Party no later than ten days (as calculated by Fed. R. Civ. P. 6) after a request is made by the Producing Party or discovery is made by the Receiving Party, as required by Fed. R. Civ. P. 26(b)(5)(B).  Moreover, any notes or summaries referring to or reflecting the content of Recalled Information shall be destroyed.  After the return, or destruction of Recalled Information, a Receiving Party may challenge the Producing Party's claim(s) of privilege or immunity by making an application to the Court.

49.    Nothing in this Order overrides any attorney's ethical responsibilities related to the inadvertent production of privileged information.

50.    This Order is not intended to impose on a Party a waiver of its rights to review its documents for privilege or any other reason (including to identify non-responsive documents) and the existence of this Order cannot be used to compel a party to produce documents without review.  Moreover, this Order does not mean that the cost of review should not be considered in whether any particular discovery is disproportionate (*i.e.*, that the marginal benefit of the discovery is not as great as the marginal cost of said discovery including review).  Further, production under this Order is not a concession of the relevance of information produced or a waiver of discovery objections.

AppxXXVIII

## FAILURE TO DESIGNATE

51.     The failure by a Producing Party to designate Discovery Material as Confidential

Information or Highly Confidential Information shall not be a waiver of such designation

provided that the Producing Party that fails to make such designation informs the Receiving

Party that such Discovery Material is Confidential Information or Highly Confidential

Information promptly but not more than 20 days (as calculated by Fed. R. Civ. P. 6) after the

failure to designate first becomes known to the Producing Party.  The failure by a Producing

Party to designate Discovery Material as Confidential Information, or Highly Confidential

Information, or to redact such information shall not preclude the filing of a motion at a later date

seeking to impose such designation or redaction or challenging the propriety thereof.  The

Receiving Party in receipt of Discovery Material that the Producing Party failed to designate as

Confidential Information or Highly Confidential Information shall not be in violation of this

Protective Order for any use made of such Discovery Material before the Receiving Party is

informed of the failure to designate.  Once the Receiving Party has been informed of the failure

to designate pursuant to this Paragraph, the Receiving Party shall take reasonable steps to, at the

Producing Party's option, either ensure that all copies of any such Discovery Materials are

returned promptly to the Producing Party for proper designation or ensure that all copies of any

such Discovery Materials are marked with the proper designation and distributed only as

permitted under this Protective Order.

## UNAUTHORIZED DISCLOSURE OF CONFIDENTIAL INFORMATION

52.     In the event of disclosure of Confidential Information or Highly Confidential

Information to any person not authorized to have such access under this Protective Order, the

Party responsible for having made such disclosure, and each Party with knowledge thereof, shall

38055093.1

AppxXXXIX

immediately inform Outside Counsel for the Party whose Confidential Information or Highly Confidential Information has been disclosed of all known relevant information concerning the nature and circumstances of the disclosure.  The Party responsible for improperly disclosing such Confidential Information or Highly Confidential Information shall also promptly take all reasonable measures to retrieve the improperly disclosed Confidential Information or Highly Confidential Information and to ensure that no further or greater unauthorized disclosure and/or use thereof is made.  Nothing in this agreement shall prevent the Party whose Confidential Information or Highly Confidential Information was improperly disclosed from seeking other remedies from the disclosing Party, including damages or injunctive relief.

## SECURITY AND DATA BREACH

53.     Any person in possession of another Party's Discovery Material shall exercise the same care with regard to the storage, custody, or use of such Discovery Material as they would apply to their own material of the same or comparable sensitivity, but no less than the reasonable precautions set forth in Paragraph 54.

54.     Receiving Parties must take reasonable precautions to protect Discovery Material from loss, misuse, and unauthorized access, disclosure, and alteration.  Such measures shall include:

(a)     Reasonably preventing unauthorized persons from gaining access to Discovery Material (physical access control);

(b)     Reasonably preventing Discovery Material from being used without authorization (logical access control) including, but not limited to, the use of passwords;

38055093.1

AppxXXX

(c)    Reasonably ensuring that persons entitled to use Discovery Material gain access only to such Discovery Material as they are entitled to access in accordance with their access rights, and that, in the course of processing or use and after storage, Discovery Material cannot be read, copied, modified or deleted without authorization (data access control);

(d)    Reasonably ensuring that Discovery Material cannot be read, copied, modified or deleted without authorization during electronic transmission, transport or storage on storage media, and that the target entities for any transfer of Discovery Material by means of data transmission facilities can be established and verified (data transfer control);

(e)    Reasonably ensuring the establishment of an audit trail to document whether and by whom Discovery Material have been entered into, modified in, or removed from Discovery Material processing systems, (entry control); and

(f)    Reasonably ensuring that Discovery Material is processed solely in accordance with instructions from counsel or the Receiving Party (control of instructions).

55.    If the Receiving Party discovers a breach of security relating to the Discovery Material of another Party, the Receiving Party shall: (1) provide written notice to Producing Party of such breach no later than 24 hours of Receiving Party's discovery of the breach; (2) investigate and remediate the effects of the breach, and provide Producing Party with assurance reasonably satisfactory to Producing Party that such breach shall not recur; and (3) provide sufficient information about the breach that the Producing Party can reasonably ascertain the size and scope of the breach.  If required by any judicial or governmental request, requirement, or order to disclose such information, the Receiving Party shall take all reasonable steps to give the Producing Party sufficient prior notice in order to contest such request, requirement, or order through legal means.  The Receiving Party agrees to provide reasonable cooperation to the

27

AppxXXXI

Producing Party or law enforcement in investigating any such security incident. In any event, the Receiving Party shall promptly take all necessary and appropriate corrective action to terminate the unauthorized access as it deems appropriate in its good-faith and reasonable judgment.

56.     If a Receiving Party learns that, by inadvertence or otherwise, it has disclosed the Discovery Material to any person or in any circumstance not authorized under this Order, the Receiving Party must, as soon as is practicable: (a) notify in writing the Producing Party of the unauthorized disclosure; (b) use its best efforts to retrieve all copies of the materials; and (c) inform the person or persons to whom unauthorized disclosures were made, to the extent the person or persons are identifiable, of all the terms of this Order and have the person or persons execute the acknowledgement form attached as Exhibit B or Exhibit C.

## RETURN/DESTRUCTION OF MATERIALS

57.     Not later than 90 days (as calculated by Fed. R. Civ. P. 6) after entry of final judgment or dismissal with prejudice in this Litigation (including disposition of any appeals or petitions for review), or after the execution of a settlement agreement among all the parties finally disposing of all issues raised in this Litigation, Outside Counsel and all other persons having possession or control of another Party's Confidential Information or Highly Confidential Information, including any briefs, motions, pleadings, expert reports, or other documents created during the course of this litigation that contain Confidential Information or Highly Confidential Information, shall: (a) return all Confidential Information and Highly Confidential Information, and any copies thereof to the appropriate Outside Counsel who produced the Confidential Information or Highly Confidential Information; or (b) destroy such Confidential Information and Highly Confidential Information. Each Party shall give written notice of such destruction to

38055093.1

Outside Counsel for the Producing Party.  However, Outside Counsel may retain an archival copy of all papers filed with the Court, expert reports, discovery responses, transcripts of testimony and exhibits, correspondence, and mediation briefs.  Outside Counsel may retain copies of their own work product containing such Discovery Material.  Further, all notes, summaries, or other documents prepared by attorneys, Experts, or internal or external consultants derived from or containing Confidential Information or Highly Confidential Information shall, after the conclusion of the Litigation, be kept within the files of Outside Counsel for the Party creating such work product or be destroyed.  Such Party, and their respective Outside Counsel, shall not disclose any Party's Confidential Information or Highly Confidential Information contained therein to any person or entity except pursuant to a written agreement with the Producing Party or as otherwise provided in this Protective Order and shall maintain the safeguards set forth in Paragraph 41.  Not later than 90 days (as calculated by Fed. R. Civ. P. 6) after the termination of this Litigation, each Party that received any Confidential Information or Highly Confidential Information shall certify in writing to each Producing Party that it has complied with the requirements of this Paragraph.

## **MISCELLANEOUS PROVISIONS**

58.     This Protective Order is without prejudice to the right of any Party to seek further or additional protection of information for which the protection of this Protective Order is not believed by any Party to be adequate.  Nothing in this Protective Order shall be deemed to bar or preclude any Producing Party from seeking such additional protection, including, without limitation, an order that certain information may not be discovered at all.

38055093.1

AppxXXXIII

59.    Without application to the Court, any Party that is a beneficiary of this Protective Order may enter a written agreement releasing any other Party from one or more requirements of this Order, except for requirements that protect the information or rights of another Party.

60.    The entry of this Protective Order shall not be construed as a waiver of any right to object to the furnishing of information in response to discovery in this Litigation, and except as expressly provided, shall not relieve any Party of the obligation of producing information in the course of discovery.

61.    If at any time Confidential Information or Highly Confidential Information of a Producing Party is subpoenaed from a Receiving Party or is the subject of a discovery request directed to a Receiving Party in any proceeding before any court or arbitral, administrative, or legislative body, the person to whom the subpoena or other request is directed shall immediately give written and email notice pursuant to the provisions of Paragraph 55 and shall provide the Producing Party with an opportunity to object to the production of such materials.  If the Producing Party does not move for a protective order within 15 days (as calculated by Fed. R. Civ. P. 6) of the date written notice is given, a Receiving Party to whom the subpoena or other request is directed may produce, on or after the date set for production in the subpoena or other request but not before the end of the 15-day notice period, such material in response thereto, under a protective order with confidentiality provisions equal to or more restrictive than those of this Protective Order.

62.    Other Proceedings.  By entering this Order and limiting the disclosure of information in this Litigation, the Court does not intend to preclude the USPTO or another court from finding that information may be relevant and subject to disclosure in another case or proceeding.  Any person or Party subject to this Order who becomes subject to a motion to

38055093.1

AppxXXXIV

disclose another Party's information designated as Confidential Information or Highly
Confidential Information pursuant to this Order shall promptly notify that Party of the motion so
that the Party may have the opportunity to appear and be heard on whether that information
should be disclosed.

     63.    Outside Counsel and Designated Inside Representatives shall have the right to
exclude from depositions, other than the deponent, the court reporter, and videographer, any
person who is not authorized under this Protective Order to receive Confidential Information or
Highly Confidential Information.  Such right of exclusion shall be applicable only during periods
of examination or testimony directed to Confidential Information or Highly Confidential
Information.  The failure of any person who is not authorized under this Protective Order to
receive Confidential Information or Highly Confidential Information (other than the deponent,
the court reporter, and/or the videographer) to leave the deposition room during any portion of
the deposition that inquires into matters designated as Confidential Information or Highly
Confidential Information by the Producing Party shall permit Outside Counsel for the Producing
Party to instruct the deponent that he or she should not answer inquiries into matters designated
as Confidential Information or Highly Confidential Information.

     64.    All notices during this Litigation required by this Protective Order are to be made
by email to a Party's Outside Counsel (including, if available, to Outside Counsel's service
distribution email address designated for this Litigation), and all notices subsequent to the
termination of Litigation are to be made by email to a Party's Outside Counsel or other person
designated by a Party's Outside Counsel.  The date by which a Party receiving notice shall
respond or otherwise take action shall be computed from the date the Party's Outside Counsel,
the Party's Designated Inside Representatives, or the Party's general counsel first receives the

AppxXXXV

notice via either email or U.S. mail sent and addressed as required under this Paragraph.  Any of
the notice requirements herein may be waived in whole or in part, but only in writing signed by
Outside Counsel or Designated Inside Representatives for the Producing Party.

65.    Execution of this Protective Order shall not constitute a waiver of the right of any
Party to claim in this Litigation or otherwise that any document, communication, or any portion
thereof is privileged or otherwise non-discoverable or is not admissible in evidence in this
Litigation or any other proceeding.

66.    Each person who receives Confidential Information or Highly Confidential
Information agrees to be subject to the jurisdiction of this Court for the purpose of any
proceedings relating to the performance under, compliance with, or violation of this Protective
Order.

67.    This Order may be amended by the agreement of the Parties, including through
their Outside Counsel, in the form of a written Stipulated Amended Protective Order signed by
each Party's Outside Counsel and filed with the Court for approval.  The Court retains the right
to allow disclosure of any subject covered by this Protective Order or to modify this Protective
Order at any time in the interest of justice.

68.    Neither the termination of this Litigation nor the termination of employment of
any person with access to any Confidential Information or Highly Confidential Information shall
relieve a Party or any person from the obligation of maintaining the confidentiality of such
information in accordance with this Protective Order or abiding by any of its restrictions.  The
Court shall retain jurisdiction to enforce the terms of the Protective Order after final termination
of this Litigation.  All disputes concerning Confidential Information or Highly Confidential

38055093.1

AppxXXXVI

Information under this Protective Order shall be resolved by the United States District Court for the District of Delaware.

69.     The Court retains the right to allow disclosure of any subject covered by this stipulation or to modify this stipulation at any time in the interest of justice.


**SO ORDERED**, this ___9___ day of __February__, 20 21.

/s/ Richard G. Andrews
United States District Judge

*EXHIBIT A*

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| ACADIA PHARMACEUTICALS INC., ) | |
| ) | |
| Plaintiff, ) | |
| ) | C.A. No. 1:20-cv-00985-RGA |
| v. ) | |
| ) | |
| AUROBINDO PHARMA LIMITED and ) | |
| AUROBINDO PHARMA USA, INC., ) | |
| ) | |
| Defendants. ) | |

| | |
|---|---|
| ACADIA PHARMACEUTICALS INC., ) | |
| ) | |
| Plaintiff, ) | |
| ) | C.A. No. 1:20-cv-00986 RGA |
| v. ) | |
| ) | |
| TEVA PHARMACEUTICALS USA, INC. ) | |
| ) | |
| Defendant. ) | |

| | |
|---|---|
| ACADIA PHARMACEUTICALS INC., ) | |
| ) | |
| Plaintiff, ) | |
| ) | C.A. No. 1:20-cv-01021-RGA |
| v. ) | |
| ) | |
| ZYDUS PHARMACEUTICALS (USA) INC. ) | |
| and CADILA HEALTHCARE LIMITED, ) | |
| ) | |
| Defendants. ) | |

38055093.1

AppxXXXVIII

Case 1:20-cv-01022-RGA   Document 201   Filed 05/01/23   Page 36 of 47 PageID #: 5155

|  |  |  |
|---|---|---|
| ACADIA PHARMACEUTICALS INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 1:20-cv-01022-RGA |
| | ) | |
| HETERO LABS LIMITED, | ) | |
| HETERO LABS LIMITED UNIT-V, and | ) | |
| HETERO USA INC., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| ACADIA PHARMACEUTICALS INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 1:20-cv-01029-RGA |
| | ) | |
| MSN LABORATORIES PRIVATE LTD. | ) | |
| and MSN PHARMACEUTICALS, INC., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

### DECLARATION TO BE BOUND BY PROTECTIVE ORDER

I, _____, declare under penalty of perjury that:

My present employer is _____ and the address of my present employer

is _____.

My present occupation or job description is _____

_____.

I have received the Protective Order in this Litigation dated _____.

I understand that I am obligated, under order of the Court, to hold in confidence and not to

disclose the contents of anything marked CONFIDENTIAL, HIGHLY CONFIDENTIAL –

38055093.1

AppxXXXIX

COUNSELS' EYES ONLY, or HIGHLY CONFIDENTIAL – OUTSIDE COUNSELS' EYES ONLY except as permitted by the Protective Order.  I further understand that (1) with regard to Confidential Information, I am not to disclose to anyone other than those persons identified in Paragraph 35 of the Protective Order any words, substances, summaries, abstracts, or indices of any Confidential Information disclosed to me; and (2) with regard to Highly Confidential Information, I am not to disclose to anyone other than those persons identified in Paragraph 36 (for information marked "HIGHLY CONFIDENTIAL – COUNSELS' EYES ONLY") or Paragraph 37 (for information marked "HIGHLY CONFIDENTIAL – OUTSIDE COUNSELS' EYES ONLY") of the Protective Order any words, substances, summaries, abstracts, or indices of any Confidential Information or Highly Confidential Information disclosed to me.  According to the restrictions of Paragraph 28 of the Protective Order, I will use Discovery Material, including Confidential Information, Highly Confidential Information, or information derived therefrom, solely for purposes relating to the above-captioned Litigation.  I will never use Confidential Information, Highly Confidential Information, or information derived therefrom, directly or indirectly, in competition with the Producing Party nor will I permit others to do so.  In addition to the foregoing, I understand that I must abide by all of the provisions of the Protective Order.

At the termination of this Litigation or any time requested by Outside Counsel for the Party by whom I am engaged, I will return or destroy all documents and other materials, including notes, computer data, summaries, abstracts, or any other materials containing or reflecting Confidential Information or Highly Confidential Information which have come into my possession, and will return or destroy all documents or things I have prepared relating to or reflecting such information.

38055093.1

AppxXL

I understand that if I violate the provisions of the Protective Order, I will be in violation of a Court Order and subject to sanctions or other remedies that may be imposed by the Court and potentially liable in a civil action for damages by the Producing Party.  I hereby submit to the jurisdiction of this Court for the purpose of enforcement of the Protective Order in this Litigation.  I declare under penalty of perjury of the laws of the United States that the foregoing is true and correct.

Respectfully submitted,

_____
Date:                                                              Signature

38055093.1

AppxXLI

*EXHIBIT B*

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| ACADIA PHARMACEUTICALS INC., ) | |
| ) | |
| Plaintiff, ) | |
| ) | C.A. No. 1:20-cv-00985-RGA |
| v. ) | |
| ) | |
| AUROBINDO PHARMA LIMITED and ) | |
| AUROBINDO PHARMA USA, INC., ) | |
| ) | |
| Defendants. ) | |
| ) | |
| ACADIA PHARMACEUTICALS INC., ) | |
| ) | |
| Plaintiff, ) | |
| ) | C.A. No. 1:20-cv-00986 RGA |
| v. ) | |
| ) | |
| TEVA PHARMACEUTICALS USA, INC. ) | |
| ) | |
| Defendant. ) | |
| ) | |
| ) | |
| ACADIA PHARMACEUTICALS INC., ) | |
| ) | |
| Plaintiff, ) | |
| ) | C.A. No. 1:20-cv-01021-RGA |
| v. ) | |
| ) | |
| ZYDUS PHARMACEUTICALS (USA) INC. ) | |
| and CADILA HEALTHCARE LIMITED, ) | |
| ) | |
| Defendants. ) | |
| ) | |

38055093.1

AppxXLII

```
_____  )
                               )
ACADIA PHARMACEUTICALS INC.,   )
                               )
              Plaintiff,       )
                               )
       v.                      )   C.A. No. 1:20-cv-01022-RGA
                               )
HETERO LABS LIMITED,           )
HETERO LABS LIMITED UNIT-V, and)
HETERO USA INC.,               )
                               )
                               )
              Defendants.      )
                               )
_____  )
                               )
ACADIA PHARMACEUTICALS INC.,   )
                               )
              Plaintiff,       )
                               )
       v.                      )   C.A. No. 1:20-cv-01029-RGA
                               )
MSN LABORATORIES PRIVATE LTD.  )
and MSN PHARMACEUTICALS, INC., )
                               )
              Defendants.      )
                               )
_____  )
```

## DECLARATION TO BE BOUND BY PROTECTIVE ORDER
### [NON-ATTORNEY INSIDE REPRESENTATIVE]

I, _____, declare under penalty of perjury that:

My present employer is _____ and the address of my present employer

is _____.

My present occupation or job description is _____

_____.

I have received the Protective Order in this Litigation dated _____.

I agree:

38055093.1

AppxXLIII

(i) to be bound by the terms of the Protective Order;

(ii) to use Confidential Information solely for the purposes delineated within the Protective Order;

(iii) to not disclose any Confidential Information to any person, firm, corporation or other entity not qualified to have access to such information pursuant to the terms of the Protective Order; and that

(iv) I meet the requirements for Designated Inside Representative as set forth in Paragraph 35(c) of the Protective Order.

I will return or destroy all Confidential Information at the relevant time in accordance with Paragraph 57 of the Protective Order.

I hereby submit to the jurisdiction of the United States District Court for the District of Delaware for the purpose of enforcement of the Protective Order. I understand that if I violate the provisions of the Protective Order, I will be in violation of a Court Order and subject to sanctions or other remedies that may be imposed by the Court and may be liable in a civil action by one or more of the parties in this action.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Respectfully submitted,

_____

Date:                                        Signature

38055093.1

AppxXLIV

*EXHIBIT C*

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| ACADIA PHARMACEUTICALS INC., )<br><br>Plaintiff, )<br><br>v. )<br><br>AUROBINDO PHARMA LIMITED and )<br>AUROBINDO PHARMA USA, INC., )<br><br>Defendants. ) | C.A. No. 1:20-cv-00985-RGA |
| ACADIA PHARMACEUTICALS INC., )<br><br>Plaintiff, )<br><br>v. )<br><br>TEVA PHARMACEUTICALS USA, INC. )<br><br>Defendant. ) | C.A. No. 1:20-cv-00986 RGA |
| ACADIA PHARMACEUTICALS INC., )<br><br>Plaintiff, )<br><br>v. )<br><br>ZYDUS PHARMACEUTICALS (USA) INC. )<br>and CADILA HEALTHCARE LIMITED, )<br><br>Defendants. ) | C.A. No. 1:20-cv-01021-RGA |

38055093.1

AppxXLV

|  |  |  |
|---|---|---|
| ACADIA PHARMACEUTICALS INC., | ) | |
| Plaintiff, | ) | |
| v. | ) | C.A. No. 1:20-cv-01022-RGA |
| HETERO LABS LIMITED, HETERO LABS LIMITED UNIT-V, and HETERO USA INC., | ) | |
| Defendants. | ) | |
| ACADIA PHARMACEUTICALS INC., | ) | |
| Plaintiff, | ) | |
| v. | ) | C.A. No. 1:20-cv-01029-RGA |
| MSN LABORATORIES PRIVATE LTD. and MSN PHARMACEUTICALS, INC., | ) | |
| Defendants. | ) | |

## DECLARATION TO BE BOUND BY PROTECTIVE ORDER
### [ATTORNEY INSIDE REPRESENTATIVE]

I, _____, declare under penalty of perjury that:

My present employer is _____ and the address of my present employer

is _____.

My present occupation or job description is _____

_____.

42

AppxXLVI

Case 1:22-cv-00985-GBW   Document 201   Filed 05/04/23   Page 44 of 47 PageID #: 5103

I have received the Protective Order in this Litigation dated _____.

I meet the definition of Inside Counsel provided in Paragraph 8 of the Protective Order and I

agree:

(v) to be bound by the terms of the Protective Order;

(vi) to use information marked "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL –

COUNSELS' EYES ONLY" solely for the purposes delineated within the Protective Order;

(vii) to not disclose any information marked "CONFIDENTIAL" or "HIGHLY

CONFIDENTIAL – COUNSELS' EYES ONLY" to any person, firm, corporation or other entity

not qualified to have access to such information pursuant to the terms of the Protective Order;

and that

(viii) I meet the requirements for Designated Inside Representative as set forth in

Paragraph 35(c) of the Protective Order.

I will return or destroy all information marked "CONFIDENTIAL" or "HIGHLY

CONFIDENTIAL – COUNSELS' EYES ONLY" at the relevant time in accordance with

Paragraph 57 of the Protective Order.

I hereby submit to the jurisdiction of the United States District Court for the District of

Delaware for the purpose of enforcement of the Protective Order.  I understand that if I violate

the provisions of the Protective Order, I will be in violation of a Court Order and subject to

sanctions or other remedies that may be imposed by the Court and may be liable in a civil action

by one or more of the parties in this action.

I declare under penalty of perjury under the laws of the United States of America that the

foregoing is true and correct.

38055093.1

AppxXLVII

Dated:  February 9, 2021

**SAUL EWING ARNSTEIN & LEHR LLP**

*/s/ James D. Taylor, Jr.*
James D. Taylor, Jr. (#4009)
Jessica M. Jones (#6246)
Charles E. Davis (#6402)
Aubrey J. Morin (#6568)
1201 N. Market Street, Suite 2300
P.O. Box 1266
Wilmington, Delaware 19899
(302) 421-6800
James.Taylor@saul.com
Jessica.Jones@saul.com
Chad.Davis@saul.com
Aubrey.Morin@saul.com

OF COUNSEL:

Chad J. Peterman
Bruce M. Wexler
Scott F. Peachman
PAUL HASTINGS LLP
200 Park Avenue
New York, New York 10166
(212) 318-6000
chadpeterman@paulhastings.com
brucewexler@paulhastings.com
scottpeachman@paulhastings.com

*Attorneys for Plaintiff ACADIA
Pharmaceuticals Inc.*

**SHAW KELLER LLP**

*/s/ Nathan R. Hoeschen*
Karen Elizabeth Keller
John W. Shaw
Nathan Roger Hoeschen
Shaw Keller LLP
1105 North Market Street, 12th Floor
Wilmington, DE 19801
kkeller@shawkeller.com
jshaw@shaw@shawkeller.com
nhoeschen@shawkeller.com

**MORRIS JAMES LLP**

*/s/  Kenneth L. Dorsney*
Kenneth Laurence Dorsney
Morris James LLP
500 Delaware Avenue
Suite 1500
Wilmington, DE 19899-2306
kdorsney@morrisjames.com

OF COUNSEL:

Timothy H. Kratz
George J. Barry III
KRATZ & BARRY LLP
1050 Crown Pointe Parkway
Suite 500
Atlanta, GA 30338
tkratz@kratzandbarry.com
gbarry@kratzandbarry.com

*Attorneys for Defendants Aurobindo Pharma
Limited and Aurobindo Pharma USA, Inc.*

**PHILLIPS, MCLAUGHLIN & HALL,
P.A.**

*/s/  John C. Phillips, Jr.*
John C. Phillips, Jr.
Davis A. Bilson
Phillips, McLaughlin & Hall, P.A.
1200 N. Broom Street
Wilmington, DE 19806
jcp@pgmhlaw.com
dab@pgmhlaw.com

44

38055093.1

OF COUNSEL:

Michael K. Nutter
Ivan M. Poullaos
Linda A. Greene
Katherine D. Hundt
WINSTON & STRAWN LLP
35 W. Wacker Drive
Chicago, IL 60601-9703
mnutter@winston.com
ipoullaos@winston.com
lgreene@winston.com
khundt@winston.com

*Attorneys for Defendants Teva
Pharmaceuticals USA, Inc. and Teva
Pharmaceutical Industries Ltd.*

**BAYARD, P.A.**

*/s/ Stephen B. Brauerman*
Stephen B. Brauerman
Bayard, P.A.
600 N. King Street
Suite 400
Wilmington, DE 19801
sbrauerman@bayardlaw.com

OF COUNSEL:

Todd S. Werner
Megan E. Christner
CARLSON,CASPERS, VANDENBURGH &
LINDQUIST, P.A.
225 South Sixth Street
Suite 4200
Minneapolis, MN 55402
twerner@carlsoncaspers.com
mchristner@carlsoncaspers.com

*Attorneys for Defendants Hetero Labs
Limited, Hetero Labs Limited Unit-V, and
Hetero USA Inc.*

OF COUNSEL:

James T. Peterka
Michael J. Gaertner
Christopher J. Cassella
Timothy F. Peterson
Locke Lord LLP
111 South Wacker Drive
Chicago, IL 60606
jpeterka@lockelord.com
mgaertner@lockelord.com
Christopher.cassella@lockelord.com
tpeterson@lockelord.com

*Attorneys for Defendants Zydus
Pharmaceuticals (USA) Inc. and Cadila
healthcare Limited*

**SEITZ, VAN OGTROP & GREEN, P.A.**

*/s/ James S. Green, Jr.*
James S. Green, Jr.
Seitz, Van Ogtrop & Green, P.A.
222 Delaware Avenue, Suite 1500
P.O. Box 68
Wilmington, DE 19899
jsgreen@svglaw.com

OF COUNSEL:

Shashank D. Upadhye
Yixin H. Tang
Brent A. Batzer
UPADHYE CWIK LLP
135 S. LaSalle Street Suite 1930
Chicago, IL 60603
shashank@ipfdalaw.com
yixin@ipfdalaw.com
brent@ipfdalaw.com

*Attorneys for Defendants MSN Laboratories
Private Ltd. and MSN Pharmaceuticals, Inc.*

45

AppxXLIX

SO ORDERED this _____ day of _____, 2021.

_____
THE HONORABLE RICHARD G. ANDREWS

AppxL

**EXHIBIT 2**

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| ACADIA PHARMACEUTICALS INC., | ) ) ) |
| Plaintiff, | ) ) ) |
| v. | ) ) ) |
| AURORINDO PHARMA LIMITED *et al*., | ) ) ) |
| Defendants. | ) ) ) |

C.A. No. 22-1387-GBW

CONSOLIDATED

**DECLARATION TO BE BOUND BY PROTECTIVE ORDER**

I,_____, declare under penalty of perjury that:

My present employer is _____and the address of my present employer

is_____.

My present occupation or job description is _____

_____.

I have received the Protective Order in this Litigation dated_____.

I understand that I am obligated, under order of the Court, to hold in confidence and not to

disclose the contents of anything marked CONFIDENTIAL, HIGHLY CONFIDENTIAL –

COUNSELS' EYES ONLY, or HIGHLY CONFIDENTIAL – OUTSIDE COUNSELS' EYES

ONLY except as permitted by the Protective Order. I further understand that (1) with regard to

Confidential Information, I am not to disclose to anyone other than those persons identified in

Paragraph 35 of the Protective Order any words, substances, summaries, abstracts, or indices of

1

AppxLI

any Confidential Information disclosed to me; and (2) with regard to Highly Confidential

Information, I am not to disclose to anyone other than those persons identified in Paragraph 36

(for information marked "HIGHLY CONFIDENTIAL – COUNSELS' EYES ONLY) or

Paragraph 37 (for information marked "HIGHLY CONFIDENTIAL – OUTSIDE COUNSELS'

EYES ONLY) of the Protective Order any words, substances, summaries, abstracts, or indices of

any Confidential Information or Highly Confidential Information disclosed to me. According to

the restrictions of Paragraph 28 of the Protective Order, I will use Discovery Material, including

Confidential Information, Highly Confidential Information, or information derived therefrom,

solely for purposes relating to the above-captioned Litigation. I will never use Confidential

Information, Highly Confidential Information, or information derived therefrom, directly or

indirectly, in competition with the Producing Party nor will I permit others to do so. In addition

to the foregoing, I understand that I must abide by all of the provisions of the Protective Order.

At the termination of this Litigation or any time requested by Outside Counsel for the

Party by whom I am engaged, I will return or destroy all documents and other materials,

including notes, computer data, summaries, abstracts, or any other materials containing or

reflecting Confidential Information or Highly Confidential Information which have come into

my possession, and will return or destroy all documents or things I have prepared relating to or

reflecting such information.

I understand that if I violate the provisions of the Protective Order, I will be in violation

of a Court Order and subject to sanctions or other remedies that may be imposed by the Court

and potentially liable in a civil action for damages by the Producing Party. I hereby submit to

the jurisdiction of this Court for the purpose of enforcement of the Protective Order in this

Litigation. I declare under penalty of perjury of the laws of the United States that the foregoing

is true and correct.

2

AppxLII

Respectfully submitted,

Date: _____    _____
Signature

AppxLIII

**EXHIBIT 3**

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| ACADIA PHARMACEUTICALS INC., | ) |
| Plaintiff, | ) ) ) |
| v. | ) C.A. No. 22-1387-GBW ) |
| AUROBINDO PHARMA LIMITED *et al*., | ) CONSOLIDATED ) ) |
| Defendants. | ) ) ) |

**DECLARATION TO BE BOUND BY PROTECTIVE ORDER
[NON-ATTORNEY INSIDE REPRESENTATIVE]**

I,_____, declare under penalty of perjury that:

My present employer is _____and the address of my present employer is_____.

My present occupation or job description is _____

_____.

I have received the Protective Order in this Litigation dated_____.

I agree:

(i) to be bound by the terms of the Protective Order;

(ii) to use Confidential Information solely for the purposes delineated within the

Protective Order;

(iii) to not disclose any Confidential Information to any person, firm, corporation or other

entity not qualified to have access to such information pursuant to the terms of the Protective

1

AppxLIV

Order; and that

(iv) I meet the requirements for Designated Inside Representative as set forth in Paragraph 35(c) of the Protective Order.

I will return or destroy all Confidential Information at the relevant time in accordance with Paragraph 57 of the Protective Order.

I hereby submit to the jurisdiction of the United States District Court for the District of Delaware for the purpose of enforcement of the Protective Order. I understand that if I violate the provisions of the Protective Order, I will be in violation of a Court Order and subject to sanctions or other remedies that may be imposed by the Court and may be liable in a civil action by one or more of the parties in this action.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Respectfully submitted,

_____
Date:                                             Signature

2

**EXHIBIT 4**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| ACADIA PHARMACEUTICALS INC., ) | |
| ) | |
| Plaintiff, ) | |
| ) | C.A. No. 22-1387-GBW |
| v. ) | |
| ) | CONSOLIDATED |
| AUROBINDO PHARMA LIMITED *et* ) | |
| *al.*, ) | |
| ) | |
| Defendants. ) | |
| ) | |

**DECLARATION TO BE BOUND BY PROTECTIVE ORDER**
**[ATTORNEY INSIDE REPRESENTATIVE]**

I,_____, declare under penalty of perjury that:

My present employer is _____and the address of my present employer

is_____.

My present occupation or job description is _____

_____.

I have received the Protective Order in this Litigation dated_____.

I meet the definition of Inside Counsel provided in Paragraph 8 of the Protective Order and I

agree:

(v) to be bound by the terms of the Protective Order;

(vi) to use information marked "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL –

COUNSELS' EYES ONLY" solely for the purposes delineated within the Protective Order;

1

AppxLVI

(vii) to not disclose any information marked "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL – COUNSELS' EYES ONLY" to any person, firm, corporation or other entity not qualified to have access to such information pursuant to the terms of the Protective Order; and that

(viii) I meet the requirements for Designated Inside Representative as set forth in Paragraph 35(c) of the Protective Order.

I will return or destroy all information marked "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL – COUNSELS' EYES ONLY" at the relevant time in accordance with Paragraph 57 of the Protective Order.

I hereby submit to the jurisdiction of the United States District Court for the District of Delaware for the purpose of enforcement of the Protective Order. I understand that if I violate the provisions of the Protective Order, I will be in violation of a Court Order and subject to sanctions or other remedies that may be imposed by the Court and may be liable in a civil action by one or more of the parties in this action.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Respectfully submitted,

Date:                                                   _____
                                                         Signature

2

AppxLVII

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| ACADIA PHARMACEUTICALS INC., | |
| Plaintiff, | |
| v. | Civil Action No. 22-1387-GBW |
| AUROBINDO PHARMA LIMITED, et al., | CONSOLIDATED |
| Defendants. | **FILED UNDER SEAL** |

James D. Taylor, Jr., Jessica M. Jones, Michelle C. Streifthau-Livizos, SAUL EWING LLP, Wilmington, DE; Chad J. Peterman, Bruce M. Wexler, Scott F. Peachman, Peter E. Conway, PAUL HASTINGS LLP, New York, NY; Felix A. Eyzaguirre, PAUL HASTINGS LLP, Houston, TX.

*Counsel for Plaintiff*

R Touhey Myer, KRATZ & BARRY LLP, Wilmington, DE; Timothy H. Kratz, George J. Barry III, John Thallemer, KRATZ & BARRY LLP, Atlanta, GA; Michael P. Hogan, KRATZ & BARRY LLP, Philadelphia, PA.

*Counsel for Defendants Aurobindo Pharma Limited and Aurobindo Pharma USA, Inc.*

James S. Green, Jr., SEITZ, VAN OGTROP & GREEN, P.A., Wilmington, DE; Richard J. Berman, Janine A. Carlan, Bradford C. Frese, Michael Baldwin, ARENTFOX SCHIFF LLP, Washington, DC.

*Counsel for Defendants MSN Laboratories Private Ltd. and MSN Pharmaceuticals Inc.*

## OPINION

May 16, 2025
Wilmington, Delaware

GREGORY B. WILLIAMS
UNITED STATES DISTRICT JUDGE

This Hatch-Waxman action[1] arises from Aurobindo's and MSN's Abbreviated New Drug

Applications ("ANDA") to the Food and Drug Administration ("FDA") to market a generic

version of Acadia's 34 mg Nuplazid® pharmaceutical capsule. Following these applications,

Acadia filed separate actions against Aurobindo and MSN, each alleging infringement of U.S.

Patent No. 11,452,721 ("the '721 patent"). On May 19, 2023, the Court consolidated the two

actions. On December 3, 4, and 6, 2024, the Court presided over a three-day bench trial, during

which the parties disputed whether Aurobindo infringes claims 4 and 5 of the '721 patent and

whether claims 4 and 5 of the '721 patent are invalid. MSN stipulated to infringement on the eve

of trial.

The parties submitted post-trial briefs (D.I. 126; D.I. 127; D.I. 131; D.I. 134) and proposed

findings of fact and conclusions of law (D.I. 126-1; D.I. 128; D.I. 132; D.I. 134-1). Upon review

of these documents, along with consideration of the trial record, the exhibits introduced into

evidence, and the stipulations of fact by the parties (*see* D.I. 101-1), the Court concludes that

Aurobindo infringes claims 4 and 5 of the '721 patent and that claims 4 and 5 of the '721 patent

are not invalid. Below, the Court separately sets forth its findings of fact and conclusions of law

as required by Rule 52(a)(1) of the Federal Rules of Civil Procedure.

Also pending before the Court is MSN's Motion for Leave to File Post-Trial Reply Brief

("Motion for Leave") (D.I. 137), which has been fully briefed (D.I. 138; D.I. 139). For the reasons

---

[1] "Hatch-Waxman" refers to the Patent Term Restoration Act of 1984. In this action, the Plaintiff is Acadia Pharmaceuticals Inc. ("Acadia" or "Plaintiff"). The Defendants are Aurobindo Pharma Limited and Aurobindo Pharma USA, Inc. (together, "Aurobindo") and MSN Laboratories Private Ltd. and MSN Pharmaceuticals Inc. (together, "MSN") (together with Aurobindo, "Defendants").

2

set forth in the penultimate Section of this Opinion, the Court denies MSN's Motion for Leave. The Court also denies-as-moot Acadia's contingent request for leave to file a sur-reply brief in support of its opposition to Defendants' post-trial brief (D.I. 138 at 8).

## I.    FINDINGS OF FACT

The Court divides its Findings of Fact into the following Sections: (A) Background, (B) Infringement, (C) Obviousness, (D) Indefiniteness, and (E) Written Description / Enablement.

## A.    Background

The Court divides its Background Findings of Fact into the following Sections: (1) the Parties, (2) the Experts, (3) Nuplazid®, (4) the Asserted Patent, (5) Defendants' ANDAs, and (6) the Court's Claim Constructions.

## 1.    The Parties

1.    Acadia is a corporation organized and existing under the laws of the State of Delaware, having a principal place of business at 12830 El Camino Real, Suite 400, San Diego, California 92130. D.I. 101-1 ¶ 1.

2.    MSN Laboratories Private Limited is an entity organized and existing under the laws of India, having a principal place of business at MSN House, Plot No. C-24, Industrial Estate, Sanathnagar, Hyderabad, Telangana, 500018 India. D.I. 101-1 ¶ 2.

3.    MSN Pharmaceuticals, Inc. is a corporation organized and existing under the laws of the State of Delaware, having a principal place of business at 20 Duke Road, Piscataway, New Jersey 08854. D.I. 101-1 ¶ 3.

4.    Aurobindo Pharma Limited is an entity organized and existing under the laws of India, having a principal place of business at Plot No. 2, Maitrivihar, Ameerpet, Hyderabad-500038, Telangana, India. D.I. 101-1 ¶ 5.

3

5.      Aurobindo Pharma USA, Inc. is a corporation organized and existing under the laws of the State of Delaware, having a principal place of business at 279 Princeton-Hightstown Road, East Windsor, New Jersey, 08520. D.I. 101-1 ¶ 6.

6.      Aurobindo Pharma Limited and Aurobindo Pharma USA, Inc. work in concert, either directly or indirectly, with respect to the regulatory approval, manufacturing, marketing, sale, and distribution of generic pharmaceutical products throughout the United States, including in the State of Delaware. D.I. 101-1 ¶ 7.

**2.    The Experts**

7.      Dr. Pamela Smith ("Dr. Smith"), Acadia's infringement expert, has a Bachelor of Arts in Chemistry from Illinois Wesleyan University and a PhD in Analytical Chemistry from Miami University. Tr. 51:11-17.

8.      Dr. Smith was admitted in this case as an expert in pharmaceutical science. Tr. 53:6-13.

9.      Dr. Christian Moreton ("Dr. Moreton"), Aurobindo's non-infringement expert, has a Bachelor of Pharmacy from the University of Nottingham, a Master of Science in Pharmaceutical Analysis from the University of Strathclyde, and a PhD in Pharmaceuticals from the University of Wales, Cardiff. Tr. 173:5-12.

10.    Dr. Moreton was admitted in this case as an expert in pharmaceutical formulation. Tr. 177:13-19.

11.    Dr. Fernando Muzzio ("Dr. Muzzio"), Defendants' invalidity expert, has a Bachelor of Science in Chemical Engineering from the University of Mar del Plata in Argentina, and a PhD in Chemical Engineering from University of Massachusetts at Amherst. DTX-81 at 0001.

12.    Dr. Muzzio was admitted in this case as an expert in pharmaceutical formulation. Tr. 234:18–235:2.

13. Dr. Steven Little ("Dr. Little"), Acadia's validity expert, has a Bachelor of Science in Chemical Engineering from Youngstown State University, and a PhD in Chemical Engineering from Massachusetts Institute of Technology. Tr. 436:7-11; PTX-0119 at 1.

14. Dr. Little was admitted in this case as an expert in pharmaceutical science. Tr. 440:15-21.

### 3.    NUPLAZID®

15. Acadia holds FDA-approved New Drug Application ("NDA") No. 210793, which provides for the use of Nuplazid® (pimavanserin) immediate-release, oral capsules of 34 mg ("Nuplazid capsules"). D.I. 101-1 ¶ 9.

16. Nuplazid capsules are indicated for the treatment of hallucinations and delusions associated with Parkinson's disease psychosis. D.I. 101-1 ¶ 10.

17. Acadia's earlier pimavanserin product is a pimavanserin tablet made with excipients ("Nuplazid tablets"). JTX-12 at 0007-0008 ("NUPLAZID tablets are intended for oral administration only. Each round, white to off-white, immediate-release, film-coated tablet contains 20 mg of pimavanserin tartrate, which is equivalent to 17 mg of pimavanserin free base. Inactive ingredients include pregelatinized starch, magnesium stearate, and microcrystalline cellulose. Additionally, the following inactive ingredients are present as components of the film coat: hypromellose, talc, titanium dioxide, polyethylene glycol, and saccharin sodium."); Tr. 496:15-21 (Dr. Little confirming the ingredients in Nuplazid tablets); *see* FoF ¶¶ 38, 40, 42 (finding that microcrystalline cellulose, colloidal silicon dioxide, and magnesium stearate are excipients).

18. The Nuplazid tablets, like the Nuplazid capsules, are "indicated for the treatment of hallucinations and delusions associated with Parkinson's disease psychosis." JTX-12 at 0001.

5

**4.    The Asserted Patent**

19.    On September 27, 2022, the United States Patent and Trademark Office issued the '721 patent. D.I. 101-1 ¶ 11; JTX-09 at 0002.

20.    The '721 patent is titled "FORMULATIONS OF PIMAVANSERIN." JTX-09 at 0002.

21.    The application for the '721 patent, filed on March 14, 2022, is U.S. Application No. 17/693,830 ("the '830 application"). D.I. 101-1 ¶ 11.

22.    The '830 application claims priority to U.S. Provisional Patent Application No. 62/552,300, which was filed on August 30, 2017. D.I. 101-1 ¶ 11.

23.    The '721 patent names Ravindra Tejwani, Stephen Edward Abele, and Emanuel Joseph Vizzotti as inventors, and lists Acadia as assignee. D.I. 101-1 ¶ 12.

24.    Acadia owns the '721 patent. D.I. 101-1 ¶ 13.

25.    The '721 patent is listed in Approved Drug Products with Therapeutic Equivalence Evaluations (i.e., the "Orange Book")[2] in conjunction with the Nuplazid capsules. D.I. 101-1 ¶ 14.

26.    The Orange Book provides an expiration date for the '721 patent of August 27, 2038. D.I. 101-1 ¶ 15.

27.    Claims 4 and 5 of the '721 patent (i.e., the only claims asserted at the December 2024 bench trial) recite:

> 4. A pharmaceutically acceptable capsule for orally delivering 34 mg of pimavanserin to a patient, wherein [1] the capsule has a capsule shell with a capsule shell size 3 or 4, [2] that encapsulates a blended pimavanserin composition comprising: granules comprising 40 mg pimavanserin tartrate

---

[2] "The 'Orange Book' is an FDA database 'that contains summary information about active drug patents submitted by patentholders.'" *Jazz Pharms., Inc. v. Avadel CNS Pharms., LLC*, 641 F. Supp. 3d 85, 89 (D. Del. 2022) (citation omitted).

and one or more pharmaceutically acceptable excipients; and [3] wherein the bulk density of the granules is >0.4 g/ml as determined by USP, method 1.

5. The pharmaceutically acceptable capsule of claim 4, wherein the capsule shell is a hard shell size 4 capsule.

JTX-09 at 0025 (brackets added to separate limitations).

**5.    Defendants' ANDAs**

28.    MSN submitted ANDA No. 214925 pursuant to § 505(j)(2) of the Federal Food, Drug, and Cosmetic Act seeking FDA approval to engage in the commercial manufacture, use, sale, or offer for sale of pimavanserin 34 mg capsules (the "MSN's Product") prior to the expiration of the '721 patent.  D.I. 101-1 ¶ 23.

29.    If approved by the FDA, MSN's Product will be indicated for the treatment of hallucinations and delusions associated with Parkinson's disease psychosis.  D.I. 101-1 ¶ 24.

30.    Aurobindo submitted ANDA No. 214782 pursuant to § 505(j)(2) of the Federal Food, Drug, and Cosmetic Act seeking FDA approval to engage in the commercial manufacture, use, sale, or offer for sale of pimavanserin 34 mg capsules ("Aurobindo's Product" or "Aurobindo's Capsule") prior to the expiration of the '721 patent.  D.I. 101-1 ¶ 25.

31.    If approved by the FDA, Aurobindo's Product will be indicated for the treatment of hallucinations and delusions associated with Parkinson's disease psychosis.  D.I. 101-1 ¶ 26.

**6.    The Court's Claim Constructions**

32.    This Court construed "[a] blended pimavanserin comprising: granules comprising 40 mg pimavanserin tartrate and one or more pharmaceutically acceptable excipients" of claim 4

7

of the '721 patent as: "Plain and ordinary meaning; an extra-granular component is not required." D.I. 44 at 1.

33.     This Court construed "[g]ranules comprising 40 mg pimavanserin tartrate" of claim 4 of the '721 patent as: "Plain and ordinary meaning; the scope of the term granule includes granules granulated with pimavanserin and excipients." D.I. 44 at 1-2.

34.     This Court construed "[g]ranules comprising 40 mg pimavanserin tartrate and one or more pharmaceutically acceptable excipients" of claim 4 of the '721 patent as: "Plain and ordinary meaning; the scope of the term granule includes granules granulated with pimavanserin and excipients." D.I. 44 at 2.

**B.     Infringement**

The Court divides its Infringement Findings of Fact into the following Sections: (1) Dosage Form, (2) Pharmaceutical Composition, and (3) Bulk Density. These Sections reflect the three overarching limitations in claim 4 of the '721 patent.

**1.     Dosage Form**

35.     The dosage form of Aurobindo's Product is an orally-administered hard shell size 4 capsule. JTX-0103 at AURO0002; JTX-0105 at AURO0002-AURO0003.

**2.     Pharmaceutical Composition**

The Court divides its Pharmaceutical Composition Findings of Fact into the following Sections: (a) Materials in Aurobindo's Product, (b) Granules, (c) Aurobindo's Manufacturing Process, (d) Aurobindo's Documents, (e) Dr. Smith's Examinations, and (f) General Findings.

**a.     Materials in Aurobindo's Product**

36.     Pimavanserin is a pharmaceutical ingredient and pimavanserin tartrate is the salt form of pimavanserin. Tr. 56:17-22 (Dr. Smith testifying as such).

8

37. Aurobindo's Product encapsulates 40 mg of pimavanserin tartrate, which is equivalent to 34 mg of pimavanserin free base. PTX-1213 at Section 11 ("Each capsule contains 40 mg of pimavanserin tartrate, which is equivalent to 34 mg of pimavanserin free base."); Tr. 59:24–61:12 (Dr. Smith testifying that Aurobindo's Product contains "40 mgs of pimavanserin tartrate" which "is equivalent to 34 mgs of pimavanserin freebase").

38. Microcrystalline cellulose ("MCC") is an excipient. Tr. 170:4-5 (Mr. Saravanan Kannusamy ("Mr. Kannusamy"), Aurobindo's Associate Vice President in Formulation Research and Development Center, testifying that "Aurobindo's process involves co-sifting of pimavanserin with other excipients like MCC"); *see* Tr. 139:16-17 (Mr. Kannusamy confirming his title); Tr. 584:16-22 (Dr. Little testifying *inter alia*: "Yeah, so MCC is what we call a filler binder, so it's -- I think it's like the prototypical filler binder.").

39. Aurobindo's Product encapsulates microcrystalline cellulose. PTX-1213 at Section 11 ("Each capsule contains . . . microcrystalline cellulose."); JTX-0106 at AURO0004-0005 (describing Aurobindo's manufacturing process).

40. Colloidal silicon dioxide is an excipient. Tr. 170:4-6 (Mr. Kannusamy testifying that "Aurobindo's process involves co-sifting of pimavanserin with other excipients like . . . colloidal silicon dioxide").

41. Aurobindo's Product encapsulates colloidal silicon dioxide. PTX-1213 at Section 11 ("Each capsule contains . . . colloidal silicon dioxide."); JTX-0106 at AURO0004-0005 (describing Aurobindo's manufacturing process).

42. Magnesium stearate is an excipient. Tr. 476:20-23 (Dr. Smith testifying: "And then in the third one, you have granulation pimavanserin and microcrystalline cellulose and magnesium stearate. So it's, in that case, more than one intragranular excipient.").

9

43.    Aurobindo's Product encapsulates magnesium stearate. PTX-1213 at Section 11 ("Each capsule contains . . . magnesium stearate."); JTX-0106 at AURO0004-0005 (describing Aurobindo's manufacturing process).

44.    Aurobindo's Product encapsulates 40 mg of pimavanserin tartrate and various excipients (including microcrystalline cellulose, colloidal silicon dioxide, and magnesium stearate). FoF ¶¶ 36-43.

**b.    Granules**

45.    Granules are "[p]rimary powder particles . . . made to adhere to form larger, multiparticle entities." JTX-09 at 4:45-47.

46.    "Adhere" in this context means "particles of different types sticking together." Tr. 225:14-25 (Dr. Moreton confirming).

47.    The '721 patent specification does not qualify the term "adhere" in its description of granules. JTX-09; Tr. 226:1-4 (Dr. Moreton testifying as such).

48.    A person of ordinary skill in the art ("POSA") would have understood that "one reason to granulate is because you want to make larger particles because the smaller particles can be problematic" in that they might, for example, "not flow well, they might be cohesive, they might stick to equipment, they might form clumps that you want to prevent so you would granulate to avoid that." Tr. 242:3-9 (Dr. Muzzio testimony).

49.    Granulation, as used in the specification of the '721 patent "and as conventionally used in the pharmaceutical industry, refers to the act or process in which primary powder particles are made to adhere to form larger, multiparticle entities called granules." JTX-09 at 4:43-50; Tr. 240:24–241:5 (Dr. Muzzio testifying: "Generally, granules are made by running a process called granulation that makes the particles stick together so that the smaller particles are now permanently bond to each other in a way that doesn't really change the

10

state of aggregation, the face of the particles themselves, but rather bonds them together into a composite particle, a larger particle.").

50. Granules may "be formed collecting particles together by creating mechanical bonds between them, e.g. by compression or by using a binder," and granulation "is extensively used in the manufacturing of tablets and capsules." JTX-09 at 4:47-50; Tr. 241:24-25 (Dr. Muzzio testifying: "Typically granulations are used to make either capsules or tablets."); Tr. 226:17–227:1 (Dr. Moreton agreeing that the specification of the '721 patent teaches that granules may "be formed by collecting particles together by creating mechanical bonds between them, e.g. by compression or using a binder" and that this is "a nonlimiting example of how granules may be formed").

51. The specification of the '721 patent describes granulation generally without requiring a specific process: "[g]enerally a granulation process combines one or more particles and forms a granule that will allow tableting or the encapsulation process to be within required limits." JTX-09 at 4:53-55; Tr. 226:17–227:1 (Dr. Moreton testifying that the examples of granulation from the specification of the '721 patent are "nonlimiting").

52. The specification describes non-limiting examples of equipment that can be used for granulation: "granulation can be performed in a variety of equipment such as, but not limited to, low shear, high shear granulators, fluid bed granulator, roller compactor, and slugger." JTX-09 at 4:56-58.

53. Dry mixing and sifting could produce a granule. FoF ¶¶ 51-52; Tr. 131:16-23 (Dr. Smith testifying that dry mixing and sifting "could" produce a granule, even though "when people think about dry granulation process, what's most commonly talked about are the ones with some high pressure [sometimes referred to by the parties as compression] involved."); Tr.

11

584:14–585:4 (Dr. Little testifying *inter alia* that pimavanserin is a "sticky drug" and that mixing pimavanserin and microcrystalline cellulose "could result in granules").

**c.     Aurobindo's Manufacturing Process**

54.    The ten steps of Aurobindo's manufacturing process are as follows (JTX-0106 at AURO0004-AURO0005):

    i.    **Raw Materials Sifting**: Co-sift 40 mg pimavanserin tartrate and half of the microcrystalline cellulose;

    ii.    **Raw Materials Sifting**: Co-sift the material from Step (i) with the remaining half quantity of microcrystalline cellulose and all colloidal silicon dioxide;

    iii.    **Raw Materials Sifting**: Re-sift the material from Step (ii);

    iv.    **Sifting of Lubrication Material**: Separately sift the magnesium stearate;

    v.    **Pre-Lubrication and Lubrication**: Load the material from Step (iii) into a blender and blend for 20 minutes at 12 revolutions per minute ("RPM");

    vi.    **Pre-Lubrication and Lubrication**: Load the material from Step (iv) into the blender with material from Step (v) for lubrication for 5 minutes at 12 RPM;

    vii.    **Pre-Lubrication and Lubrication**: Unload the material from Step (vi) into bags;

    viii.    **Blend Sample Analysis**: Send the blend sample for analysis;

    ix.    **Capsule Filling**: Encapsulate the materials from Step (vii) into capsules; and

    x.    **Capsule Filling**: Pack the capsules from Step (ix).

55.    The conditions of Aurobindo's manufacturing process involved a "relative humidity" of "NMT20%RH." AURO-DTX-320 at 0005.

56.    Aurobindo's Capsule is formulated using a dry blending process. FoF ¶ 54; DTX-347 at 0003-0004 (describing the process); DTX-320 at 0004-0005 (describing the process); Tr. 141:18-25 (Mr. Kannusamy explaining that Aurobindo's Product is formulated using "a

12

dry blending process"); Tr. 77:1-3 (Dr. Smith testifying that the composition of Aurobindo's product is "blended").

**d.   Aurobindo's Documents**

57.   Aurobindo describes the presence of granules in its Product in (a) the manufacturing process map in its ANDA, (b) the section on control strategy in its ANDA, and (c) draft master formula cards:

   a. **Manufacturing Process Map**: Aurobindo's ANDA contains Section "3.2.P.2 Pharmaceutical Development," which is a "[p]harmaceutical development report [that] summarizes the development" of Aurobindo's Product ("Aurobindo's Pharmaceutical Development Report"). JTX-0125 at AURO0001, AURO0007.

   b. On April 15, 2020, three Aurobindo employees (including Mr. Kannusamy) signed Aurobindo's Pharmaceutical Development Report; Mr. Kannusamy also approved Aurobindo's Pharmaceutical Development Report. JTX-0125 at AURO0004; Tr. 154:8-19 (Mr. Kannusamy confirming that he signed and approved the report); Tr. 162:1-25 (Mr. Kannusamy confirming that two others also signed the report).

   c. Subsection 3.2. P.2.3 of Aurobindo's Pharmaceutical Development Report is titled "Manufacturing Process Development" and includes a manufacturing process map for Aurobindo's Product. JTX-0125 at AURO0046-AURO0047; Tr. 73:5-25 (Dr. Smith confirming).

   d. The manufacturing process map identifies "Process parameters," "Material attributes of input materials," "Manufacturing process steps," and "Quality attributes of output materials" for Aurobindo's Product. JTX-0125 at AURO0047.

   e. In the manufacturing process map, Aurobindo describes the input to Steps (v)-(vii) from FoF ¶ 54 (i.e., the steps regarding Pre-lubrication and Lubrication in

13

Aurobindo's manufacturing process), which is the output of Step (iii) (i.e., the output being 40 mg pimavanserin tartrate and the excipients), as granules. JTX-0125 at AURO0047. In particular, Aurobindo lists the material attributes of the input materials as "granule bulk and tapped density," "granule uniformity," and "granule size distribution." JTX-0125 at AURO0047; Tr. 74:4–77:3 (Dr. Smith testifying *inter alia*: "This [the manufacturing process map] tells me that they [Aurobindo] want to ensure that they've got control of their process and that there are certain attributes or characteristics that must be present, and so these would be locations throughout the manufacture where you stop and you take a look at what you've made and maybe do a test and get the go-ahead to more forward with the rest of the manufacturing. . . . So now, if we're looking at this middle step, this pre-lubrication and lubrication step, immediately to the left of that lists the material attributes of the input materials. So these would be -- since these are the input materials going in the pre-lubrication and lubrication, they are the output materials of the sifting and the API and excipients step above it. And they're saying here that the tests that you need to ensure are proper at this point are granule bulk and tapped density, granule uniformity and granule size distribution. . . . It [the manufacturing process map] tells me that they wanted to make granules at that point and then tested to make sure that the granules had the right properties.").

 i. Mr. Kannusamy agreed that, "[i]f Aurobindo believed that something was incorrect in its ANDA, it would take steps to correct it with the FDA." Tr. 149:12-19.

14

    ii. As found above, Aurobindo's Pharmaceutical Development Report is part of Aurobindo's ANDA and, thus, Aurobindo was representing to the FDA that its product contains granules. FoF ¶ 57(a); Tr. 167:7-10 (Mr. Kannusamy confirming that JTX-0125 "is part of the ANDA dossier").

    iii. Aurobindo introduced no evidence that it corrected, or attempted to correct, the disclosures of "granules" in its Pharmaceutical Development Report.

f. **Control Strategy**: Section 3.2. P.2.7 of Aurobindo's Pharmaceutical Development Report is titled "Control Strategy." JTX-0125 at AURO0065.

g. Control strategy "is important in pharmaceutical development to make sure that throughout your process you're making what you intend to make, and so typically there will be some tests that are done at various points throughout the process to ensure that it's okay to move forward with the next step." Tr. 71:13-25 (Dr. Smith testifying as such).

h. Section 3.2. P.2.7.3 of Aurobindo's Pharmaceutical Development Report is titled "Control strategy for Pre-lubrication process." JTX-0125 at AURO0070.

i. This Section conveys that the blending step of Aurobindo's manufacturing process involves granules. JTX-0125 at AURO0070 ("Therefore, control strategy for blending the granules with extra-granular materials is to blend for 20 minutes."); Tr. 72:4-18 (Dr. Smith confirming).

j. Section 3.2. P.2.7.4 of Aurobindo's Pharmaceutical Development Report is titled "Control strategy for Lubrication process." JTX-0125 at AURO0070.

k. This Section conveys that the blending step of Aurobindo's manufacturing process involves granules. JTX-0125 at AURO0070 ("Therefore, control strategy for

15

blending the granules with extra-granular materials is to lubricate for 5 minutes.);
Tr. 72:19–73:4 (Dr. Smith confirming).

1. **Draft Master Formula Cards**: Three of Aurobindo's draft "Master Formula
Cards" describe the presence of granules. JTX-0134 at AURO0004 ("Unload the
lubricated granules into suitable containers."), JTX-0108 at AURO0003 ("Unload
the lubricated granules into suitable containers."), JTX-0109 at AURO0004
("Unload the lubricated granules into suitable containers."); Tr. 77:8–81:10 (Dr.
Smith testifying *inter alia* that JTX-0134, JTX-0108 and JTX-0109 are drafts of
Aurobindo's Master Formula cards); Tr. 82:2-7 (Dr. Smith testifying: "Since these
[Aurobindo's draft Master Formula Cards] were documents that were throughout
the process of it, the development, this told me that throughout the process, it
suggested to me that they [Aurobindo] were cognizant of the fact that they were
making granules.").

   i. Mr. Kannusamy refused to answer whether the draft Master Formula Cards
   referenced granules, even though he was asked about it at least six times
   during trial. Tr. 167:19–169:20 (Mr. Kannusamy refusing to answer
   whether the draft Master Formula Cards describe the presence of granules).

   ii. Aurobindo's final signed Master Formula Cards for its ANDA capsule do
   not reference granules or granulation. AURO-DTX-347; AURO-DTX-348;
   AURO-DTX-349.

58. Aurobindo's description, in its own documents, of the presence of granules in its Product
supports that Aurobindo's Product contains granules. FoF ¶ 57.

16

Appx16

**e.    Dr. Smith's Examinations**

59.    Dr. Smith examined the contents of Aurobindo's Product sample using stereomicroscopy.
Tr. 82:8-15 (Dr. Smith confirming that she "did stereo microscopy . . . on Aurobindo's
products").

> a.    Stereomicroscopy provides a magnified image of materials using reflected light and
> helps to determine whether granules are present.    Tr. 82:23–83:5 (Dr. Smith
> explaining the "stereo microscopy imaging technique," which involves "looking at
> something with a naked eye but zoomed in, so it's a magnified image, looking at it
> in a reflected light," and that this technique helped her "see whether or not granules
> were present" in Aurobindo's Product sample).
>
> b.    To conduct her experiment, Dr. Smith opened Aurobindo's Capsule sample and
> subjected the material therein to a sieving process.    JTX-62 at 003.
>
> c.    Sieving served to break up any agglomerates, which would allow for improved
> sample viewing.    Tr. 128:7-12 (Dr. Smith confirming).
>
> d.    Dr. Smith used a total of eight sieves, with increasingly smaller mesh sizes, such
> that the contents of Aurobindo's Capsule sample would pass through or be captured
> by the sieves from top to bottom.    Tr. 116:13–117:1 (Dr. Smith testifying *inter alia*
> that "the contents of Aurobindo's pill" passed through "1-8 sieves of -- of
> increasingly smaller meshes").
>
> e.    Dr. Smith reported her data as follows:

17

| | Capsule | | Weight (g) | Weight empty (g) | Weight contents (g) | |
|---|---|---|---|---|---|---|
| | 12-38-01 | | 0.1332 | 0.0367 | 0.0964 | |
| Fraction ID | Micron | Mesh size | Weight of tared sieve (g) | Weight of sieve with sample retained (g) | Weight of sieved material (g) | Fraction retained % |
| 12-38-1-1 | 850 | 20 | 134.5308 | 134.5441 | 0.0134 | 12 |
| 12-38-1-2 | 600 | 30 | 127.8941 | 127.8993 | 0.0052 | 4.86 |
| 12-38-1-3 | 425 | 40 | 115.6797 | 115.6843 | 0.0046 | 4.24 |
| 12-38-1-4 | 250 | 60 | 116.7843 | 116.7863 | 0.0020 | 1.86 |
| 12-38-1-5 | 180 | 80 | 111.6109 | 111.6160 | 0.0051 | 4.70 |
| 12-38-1-6 | 106 | 140 | 108.8219 | 108.8447 | 0.0228 | 21.19 |
| 12-38-1-7 | 75 | 200 | 108.7757 | 108.7992 | 0.0235 | 21.81 |
| 12-38-1-8 | 53 | 270 | 105.4002 | 105.4180 | 0.0178 | 16.5 |
| 12-38-1-9 | Collection pan | | 85.0397 | 85.0531 | 0.0134 | 12.4 |
| Total weight | | | | | 0.1078 | 89.48 |

JTX-0062 at 003; JTX-0061 at 003; Tr. 116:13-21 (Dr. Smith confirming that this data is from her "notebook").

f.   The right hand column of the table from FoF ¶ 59(e) represents the percentage by weight retained by each sieve, as well as the percentage by weight which passed through all 8 sieves and onto the collection pan. JTX-0062 at 003; JTX-0061 at 003; Tr. 117:2-17 (Dr. Smith confirming *inter alia* that "the right-hand column of this table is the fraction retained by each of those sieves and then a fraction that went into a collection pan to come up with the total weight as a percentage of the starting contents of the pill").

g.   After sieving, Dr. Smith viewed portions of Aurobindo's Capsule sample from the sieves on a slide under a microscope. Tr. 96:3–97:24 (Dr. Smith explaining as such).

18

h. Before viewing, Dr. Smith added mineral oil to the slides containing the contents of Aurobindo's Product sample. Tr. 96:3–97:24 (Dr. Smith testifying that she "put a drop of mineral oil" on the "cover slip" of the "microscope slide[s]").

i. Dr. Smith's deposit of mineral oil on the sample slides would have spread apart any material that was loosely aggregated together (such as non-granular material). Tr. 96:15–97:12 (Dr. Smith testifying: "Now, the mineral oil, through capillary action, will get drawn under the coverslip, and it will pass through all those particles, whatever sample you have there, flow over it. And you can actually watch it under the microscope like a -- like a wave coming through, and as it passes through the material, if you have anything loosely agglomerated onto the surface, it will spread that out so that you can see things more clearly . . . when you put that coverslip on top and you allow the mineral oil to pass through, it spreads out anything that was loosely aggregated together, so this would -- this is a proper preparation.").

j. Dr. Smith's deposit of mineral oil on the sample slides did not reveal any material that was loosely aggregated together. Tr. 97:13-18 ("And what I noted was that every single preparation we did of the Aurobindo materials, this didn't happen. That meant that how those particles were stuck together was strong enough to withstand my standard sample prep which was meant to dislodge anything that's loosely associated.").

k. As explained above, Dr. Smith recorded her stereomicroscopy imaging of Aurobindo's Product sample in JTX-0062. FoF ¶ 59(e); JTX-0062.

l. The image labeled "12-38-1-1-1" depicts a granule. JTX-0062 at 0005; Tr. 83:18–84:5 (Dr. Smith confirming that the "image that has a legend 12-38-1-1-1" "is an

19

image of a large granule, approximately 2.75 by 3.7 millimeters in size" and that the "granule came from the inside of one of Aurobindo's capsules").

m. The image labeled "Sieve Number 200-75 micro-2" depicts a collection of granules. JTX-0062 at 0007; Tr. 84:19–85:3 (Dr. Smith confirming that the image labeled "Sieve Number 200-75 micro-2" "is a collection of multiple granules just to show what it would look like with the naked eye . . . under stereomicroscope under reflective light").

n. 16.5% of the total weight of the contents of Aurobindo's Capsule sample was collected by the smallest mesh sieve. FoF ¶ 59(e).

o. 12.4% of the total weight of the contents of Aurobindo's Capsule sample was collected in the pan at the bottom. FoF ¶ 59(e); Tr. 119:4-8 (Dr. Smith confirming that "12.4 percent by weight of the pill just scooted all the way through to -- no matter what the mesh was, it went to the bottom").

p. 10.52% of the total weight of the contents of Aurobindo's Capsule sample was unaccounted for. FoF ¶ 59(e); Tr. 119:9-16 (Dr. Smith confirming that "10.52 percent just didn't get measured"); JTX-0062 at 003 (Dr. Smith writing in her notebook that "not all the materials were recovered from the sieves due to the . . . caking").

q. Aurobindo proposes the fact that Dr. Smith did not provide images for the material that was collected by the smallest sieve or the collection pan, or the material that was unaccounted for, all of which amount to 39.42% of the total weight of the contents of Aurobindo's Capsule sample. D.I. 132 ¶ 30 (citing JTX-0062 at 003; JTX-0061 at 003).

20

r.  Dr. Smith observed material from the smallest sieve and her observation of the material from the smallest sieve was consistent with her other observations. Tr. 130:8-12 (Dr. Smith testifying: "I looked at every single sieve. I looked at every single thing that passed . . . through those sieves and then -- that was in the capsule."); Tr. 117:18-25 (Dr. Smith confirming that everything she "saw were primary powder particles adhering together").

s.  Dr. Smith observed material from the collection pan and her observation of the material from the collection pan was consistent with her other observations. Tr. 117:18–118:1 (Dr. Smith confirming that everything she "saw were primary powder particles adhering together, whether I was looking at sieve fraction one or the collection pan"); Tr. 130:7-8 (Dr. Smith testifying: "I looked at the collection pan; I just didn't collect any images of it.").

t.  There is no practical way to examine every single solid in Aurobindo's Capsule sample to confirm that it is in a granule. Tr. 133:5-15 (Dr. Smith confirming that she was "not aware of a quantitative test in order to say that every single -- every single solid that came out of that capsule was a granule, which is why [she] looked at every -- every sample").

u.  Dr. Smith's conclusion, on the basis of her stereomicroscopy examination of the contents of Aurobindo's Capsule sample, that Aurobindo's Capsule sample contains granules supports that Aurobindo's Product contains granules. FoF ¶ 59(a)-(t); *see* FoF ¶¶ 61-62; *see also* FoF ¶¶ 7-8.

60.  Dr. Smith also examined the contents of Aurobindo's Product using "polarized light microscopy." Tr. 82:8-15 (Dr. Smith confirming).

21

a. Polarized light microscopy transmits light through a sample. Tr. 85:7-18 (Dr. Smith testifying *inter alia*: "So in this case [i.e., polarized light microscopy], we're transmitting light through the sample instead of reflecting it from the top like in stereo microscopy, we're transferring light through the sample.").

b. Dr. Smith employed three techniques of polarized light microscopy to view Aurobindo's Product. Tr. 86:14–87:12 (Dr. Smith testifying: "So when I walk through the images, I'm going to show you them in groups of three. And the first image is always going to be the image with a single polarizer in place, so it would be the equivalent to looking at an image like this, a clear image. . . . The second type of image is called crossed polars. So that means I have two polarizers in place. . . . [I]f the sample is amorphous, no light will pass through and it will look like a dark field in your view. If you have a crystalline sample, light will pass through. So looking at a sample on your cross polars is the definitive way as a microscopist to determine whether you have a amorphous material or crystalline material . . . This is important for us because if we look at the ingredients that are in the capsule, you have the API which is amorphous. You have microcrystalline cellulose, which is crystalline. You have collodial silicon dioxide which is amorphous and then you have magnesium stearate which is crystalline. . . . the third configuration is a crossed polars with a first order of red compensator plate, that's a lot of words to say, I'm going to put in a filter to make it easier to see some of the differences I'm pointing out.").

c. Dr. Smith recorded her polarized light microscopy images of material from Aurobindo's Product sample in JTX-0061. Tr. 88:12-19 (Dr. Smith confirming).

22

d. The three polarized light microscopy images (one for each technique) at JTX-0061 at 0015-0017 are titled "12-38-1-4- 10," "12-38-1-4- 11," and "12-38-1-4- 1" and depict two granules of pimavanserin and microcrystalline cellulose and nothing else. JTX-0061 at 0015-0017; Tr. 89:1–92:5 (Dr. Smith testifying *inter alia*: "I'll point out that these are two granules and these are the exact same view just with single polarizer, cross polars and then cross polars with the first order red compensator plate. . . . So when the first image, which is the one under 'single polarizer,' I see two granules, and I can see light areas in the granules and I can see dark areas in the granules. . . . The second image is where I mentioned we have the cross polars, and so anything that is amorphous will not . . . allow light to pass through. So I can see dark areas within the granules and then I can see light areas within the granules. And if there is overlap of dark and light, sometimes you can see light coming through but just a little bit less intense that -- if it didn't have anything dark on top of it. . . . in the third image, that's with the first plate -- compensator plate and we can really see things pretty clearly in the images at this point. . . . These granules consist of amorphous API and the microcrystalline cellulose. . . . Just to explain what it is that I'm seeing. When I talk about an area that's lighter and light is passing through it, I outline some examples of that in these images with the yellow box, that's due to the microcrystalline cellulose. . . . I don't see anything but granules here.").

e. The three polarized light microscopy images (one for each technique) at JTX-0061 at 0039-0041 are titled "12-38-1-6- 4," "12-38-1-6- 5," and "12-38-1-6- 6" and depict multiple granules of pimavanserin, microcrystalline cellulose, and colloidal

23

silicon dioxide. JTX-0061 at 0039-0041; Tr. 92:6–94:15 (Dr. Smith testifying *inter alia* that image 12-38-1-6- 6 is "is another image of multiple granules" that have "microcrystalline cellulose" and "colloidal silicon dioxide" and that "[s]ilicon oxide is glass so that's what a very small particle of glass looks like" and explaining why she recognizes silicon oxide).

f.  Dr. Smith observed pimavanserin adhered to microcrystalline cellulose in every observation of Aurobindo's Product (including materials in the bottom collection pan); not once did Dr. Smith observe a pimavanserin particle in isolation, i.e., not adhered to microcrystalline cellulose or not in a granule.  Tr. 94:16–95:19 (Dr. Smith confirming that she "collected dozens of images of multiple different sizes of granules" and that in "in every single image that [she] looked at, [she] never once saw the API not attached to the microcrystalline cellulose"); Tr. 116:7-12 (Dr. Smith confirming that she "never saw the API not associated in a granule"); Tr. 117:18–118:1 (Dr. Smith confirming that everything she "saw were primary powder particles adhering together, whether I was looking at sieve fraction one or the collection pan"); Tr. 119:21-24 (Dr. Smith testifying that while she did not observe all of the material from Aurobindo's Capsule, that she thinks her conclusion is "fair" because she "consistently saw the same thing over and over and over again"); Tr. 131:11-14 (Dr. Smith confirming that "everything [she] saw, including in the collection pan, [was] pimavanserin in granular form").

g.  Microcrystalline cellulose can serve as a filler and a binder to form granules.  Tr. 180:14-18 (Dr. Moreton testifying *inter alia* that [p]harmaceutical excipients can have more than one function"), Tr. 186:6-10 (Dr. Moreton confirming that "the

24

function of MCC depend[s] on the formulation it's being used in"), Tr. 584:16-22 (Dr. Little testifying *inter alia*: "Yeah, so MCC is what we call a filler binder, so it's -- I think it's like the prototypical filler binder."); Tr. 584:14–585:4 (Dr. Little testifying that pimavanserin is a "sticky drug" and that mixing pimavanserin and microcrystalline cellulose "could result in granules"); Tr. 226:9-12 (Dr. Moreton agreeing that "pimavanserin can adhere to microcrystalline cellulose, depending on the particle size").

    h.  Dr. Smith's conclusion, on the basis of her polarized light microscopy examination of the contents of Aurobindo's Capsule sample, that Aurobindo's Capsule sample contains only granules with pimavanserin and excipients supports that Aurobindo's Product contains only granules comprising pimavanserin and excipients. FoF ¶ 60(a)-(g); *see* FoF ¶¶ 61-62; *see also* FoF ¶¶ 7-8.

61.    Dr. Smith's expertise lies in microscopy techniques, including stereomicroscopy and polarized light microscopy, which she has used to analyze solid dosage forms "hundreds of times." Tr. 52:2-21 (Dr. Smith confirming).

62.    As a microscopist, Dr. Smith has "been trained to recognize" the ingredients in Aurobindo's Capsule sample "after looking at hundreds and thousands of images over [her] lifetime" and, thus, the images are "easily recognizable " to her. Tr. 87:22-25 (Dr. Smith testifying as such).

63.    Dr. Moreton is not an expert in polarized light microscopy and has never "operated" a polarized light microscope, but has "used microscopy and polarized light microscopy in the past." Tr. 227:16–228:2 (Dr. Moreton testifying as such).

64.     Dr. Moreton "never handled" Aurobindo's pimavanserin product nor "perform[ed] any testing of Aurobindo's pimavanserin product." Tr. 220:24–221:10 (Dr. Moreton confirming).

65.     Dr. Smith did not control for humidity in her experiments. Tr. 124:13–125:8 (Dr. Smith stating that "there's no humidity reading noted on [her] notebook page").

66.     Humidity could cause pimavanserin to clump. Tr. 216:4-21 (Dr. Moreton testifying *inter alia* that certain humidity thresholds could cause pimavanserin to "absorb water"); Tr. 222:4-15 (Dr. Moreton testifying that: "[Pimavanserin is] recognized as a hygroscopic . . . . I do understand that with very hygroscopic materials, because I've handled them, that very often only an exposure of an hour can change the whole characteristic of the powder."); FoF ¶ 123.

67.     Dr. Moreton did not perform any studies to determine whether humidity impacted the results of Dr. Smith's testing and could not "definitely" attest that humidity changed Dr. Smith's results. Tr. 222:1-24 (Dr. Moreton testifying as such).

**f.     General Findings**

68.     On the basis of Findings of Fact ¶¶ 36-67, the Court finds that Aurobindo's Product encapsulates a blended pimavanserin composition containing granules and that those granules comprise pimavanserin and one or more pharmaceutically acceptable excipients.

69.     The Court also finds that Aurobindo's Product encapsulates a blended pimavanserin composition containing granules and that those granules comprise pimavanserin and one or more pharmaceutically acceptable excipients, on the basis of the same Findings of Fact (i.e., Findings of Fact ¶¶ 36-67), but excluding either Findings of Fact ¶¶ 57-58 (i.e., the facts regarding Aurobindo's description of the presence of granules in its product), Findings of Fact ¶ 59 (i.e., facts regarding Dr. Smith's conclusion, on the basis of her

26

stereomicroscopy examination of the contents of Aurobindo's Capsule sample, that Aurobindo's Capsule contains granules), or Finding of Fact ¶ 60 (i.e., facts regarding Dr. Smith's conclusion, on the basis of her polarized light microscopy examination of the contents of Aurobindo's capsule, that Aurobindo's Capsule contains only granules with pimavanserin and excipients).

70.    The Court also finds that Aurobindo's Product encapsulates a blended pimavanserin composition containing granules and that those granules comprise pimavanserin and one or more pharmaceutically acceptable excipients, on the basis of the same Findings of Fact described in Finding of Fact ¶ 68, but excluding all of the facts regarding Dr. Smith's examinations of Aurobindo's Capsule sample (i.e., Findings of Fact ¶¶ 59-67).

71.    The Court also finds, on the basis of Findings of Fact ¶¶ 36-67, that Aurobindo's dry blending process (which includes mixing pimavanserin with microcrystalline cellulose) was capable of, and in fact did, produce granules.

**3.    Bulk Density**

72.    Bulk density is the ratio of mass over volume and is expressed as grams per milliliter (i.e., g/ml). Tr. 106:2-6 (Dr. Smith confirming as such).

73.    A POSA would have understood that granulation can increase the bulk density of a pharmaceutical composition. DTX-005 at 0010 ("Doses over 600 mg in powder form are virtually impossible to put into capsules of acceptable size. It has, though, been possible to produce such doses in hard gelatin capsule form by increasing the density of the formulation; for instance, by granulation."); Tr. 246:22–247:2 (Dr. Muzzio confirming).

74.    Aurobindo produced three exhibit batches of its Product titled "TPIA019001," "TPIA019002," and "TPIA019003." JTX-0106 at AURO-0013.

27

75. In its ANDA, Aurobindo reported the bulk density of its Product from the exhibit batches, in Finding of Fact ¶ 74, as 0.413, 0.407, and 0.404 g/ml, respectively. JTX-0106 at AURO-0013.

76. Dr. Smith conducted two bulk density tests on Aurobindo's Product: the first test produced a bulk density reading of 0.4134 g/ml and the second test produced a bulk density reading of 0.4151 g/ml. Tr. 104:14-24 (Dr. Smith confirming).

77. Dr. Smith's results are consistent with the results that appear in Aurobindo's ANDA. Tr. 104:25–105:5 (Dr. Smith confirming); JTX-0106 at AURO-0013.

78. On the basis of Findings of Fact ¶¶ 72-77, the Court finds that Aurobindo's Product contains a bulk density between 0.4 g/ml and 0.6 g/ml.

**C.     Obviousness**

The Court divides its Obviousness Findings of Fact into the following Sections: (1) A POSA Would Not Have Been Motivated to Formulate a Capsule Dosage of Pimavanserin, and (2) A POSA Would Not Have Been Motivated to Achieve the Bulk Density in Claim 4 of the '721 Patent with a Reasonable Expectation Of Success.

**1.     A POSA Would Not Have Been Motivated to Formulate a Capsule Dosage of Pimavanserin**

The Court divides its Findings of Fact regarding whether a POSA would have been motivated to formulate a capsule dosage of pimavanserin into the following Sections: (a) Pill Burden, (b), Swallowability, (c) Taste-Masking, (d) Color Coating and Pill Identification, and (e) General Findings.

**a.     Pill Burden**

79. Generally, a POSA could be motivated to minimize the number of tablets or capsules administered to patients to decrease the pill burden. Tr. 312:10-15 (Dr. Muzzio testifying:

28

"It [i.e., pill burden] would motivate a person of ordinary skill in the art to try to formulate it in such a way where you can put all 40 mgs of pimavanserin tartrate in a single dosage form.").

80.     The prescribing information for the Nuplazid tablets recommended that patients take two tablets at a time. JTX-12 at 0002 ("The recommended dose of NUPLAZID is 34 mg, taken orally as two 17 mg strength tablets once daily, without titration.").

81.     The prior art does not disclose a pill burden problem for the Nuplazid tablets. Tr. 409:1–412:7 (Dr. Muzzio testifying that the prior art does not disclose a pill burden problem for the tablet formulation of pimavanserin); Tr. 502:14-19 (Dr. Little responding "[no]" to the question of whether "the prior art expressly disclose[s] any of Dr. Muzzio's alleged problems with respect to the 17 mg Nuplazid tablets"); Tr. 513:1-12 (Dr. Little confirming that none of "the references provided by Dr. Muzzio suggest to a POSA that patients taking Nuplazid tablets were at an increased risk of pill burden or noncompliance due to its two-tablet dosage form"); Tr. 515:5-9 (Dr. Little confirming that he was not "aware of any prior art reference teaching that a single capsule dosage form of Nuplazid would be preferable for alleviating pill burden or noncompliance").

82.     A POSA would not have been motivated to formulate a capsule dosage of pimavanserin over a tablet dosage of pimavanserin on the basis of pill burden. FoF ¶¶ 79-81; *see* Tr. 512:14-25 (Dr. Little testifying: "So, again, this is one of those general motivations. So it's not like pill burden couldn't provide motivation in some context. It could be part of something. It's generally known, okay. But if you're talking about pill burden, in this particular instance, what you're saying is what kind of change would I make. So if I am going to pill burden, okay, it's my opinion that you wouldn't be doing a capsule. And

29

there's reasons why I will describe to you."); Tr. 527:3-10 (Dr. Little's testimony: "Q. If pill burden was a motivation for a POSA to reformulate, would a POSA have selected a single capsule dosage form based on the Schiele reference? A. No. If you're just looking at the Schiele reference and now you're limited to only a capsule or a tablet and that you're not going to consider the other dosage forms that we looked at in the last reference that talks about those, you're going to pick a tablet over a capsule.").

**b.    Swallowability**

83.    Generally, a POSA could be motivated to minimize the difficulty of swallowing medications.  Tr. 315:6-12 (Dr. Muzzio testifying that difficulty swallowing "would motivate a person of ordinary skill in the art to formulate pimavanserin into a dosage form that is as easy to swallow as possible").

84.    Dr. Muzzio opined that the patients taking the Nuplazid tablets were "known to have a high . . . difficulty swallowing because they're older patients with Parkinson's disease."  Tr. 295:11-17.

85.    The Schiele reference[3] teaches that capsules cause more swallowing problems than tablets. DTX-007 at 0005 ("Hard gelatin capsules, soft gelatin capsules and oblong tablets caused problems almost twice as often as tablets with irregular shapes, nearly 1.6 times more frequently than round tablets, and about 1.2 times more often than oval tablets."); *id.* at Figure 3 (depicting that hard gelatin and soft gelatin capsules cause swallowing difficulties in 21.4% and 21.2% of patients, respectively, while round tablets, oval tablets, oblong

---

[3] Julia T. Schiele, *Difficulties swallowing solid oral dosage forms in a general practice population: prevalence, causes, and relationship to dosage forms*, Pharmacoepidemiology and Prescription (Sept. 29, 2012).

tablets, and irregularly shaped tablets cause swallowing difficulties in 13.4%, 17.3%,

19.8%, and 11% of patients, respectively):



Fig. 3 Proportion of different kinds of tablets and capsules that caused swallowing difficulties in a general practice population of 1,051 consecutive patients

86.     The Schiele reference teaches that patients with swallowing difficulty are more likely to

prefer tablets compared to capsules. DTX-007 at Figure 6 (

31



Fig. 6 Preferred types of dosage forms and tablet shapes in a general practice population with (37.4 %) and without (62.6 %) swallowing difficulties (N=1,051 consecutive patients)

); *see* Tr. 523:4–527:10 (Dr. Little testifying *inter alia* that the Schiele reference teaches that "every type of tablet was preferred over the capsule" among patients with swallowing difficulties and that if "you're just looking at the Schiele reference and now you're limited to only a capsule or a tablet and that you're not going to consider the other dosage forms that we looked at in the last reference that talks about those, you're going to pick a tablet over a capsule").

87.     The Liu reference[4] teaches that "safe swallowing is the key formulation factor in designing medicines for older patients" and "[i]n older patients, age- or disease-related swallowing difficulties affect their ability to take solid oral medicines." DTX-013 at 0001, 0002, 0004.

---

[4] Fang Liu et al., *Patient-Centered Pharmaceutical Design to Improve Acceptability of Medicine: Similarities and Differences in Paediatric and Geriatric Populations* (October 2, 2014).

32

88. The Liu reference teaches that liquid and "flexible oral solid medicines [] are convenient to use by patients who cannot swallow tablets and capsules." DTX-013 at 0011.

89. The Liu reference teaches that orally disintegrating tablets (otherwise known as orally dispersible tablets) "and film formulations have been developed for the treatment of diseases that are common in the older population such as . . . Parkinson's disease." DTX-013 at 0013.

90. The Liu reference teaches that orally dispersible tablets are considered advantageous with respect to administration for patients with Parkinson's disease and dysphagia. DTX-013 at Table 5.

91. The Liu reference teaches that more than twice as many older patients with Parkinson's disease prefer orally dispersible tablets "compared with conventional tablets." DTX-013 at Table 5.

92. The Liu reference teaches that a "film formulation provides easy swallow through the application of a dry film that turns into a jelly instantaneously in the mouth" and that such a formulation improves "swallowing for older patients." DTX-013 at 0013.

93. The Liu reference teaches that "effervescent tablets are solid dosage forms that can be dispersed or dissolved in a liquid to form a solution or suspension" and "are beneficial in the delivery of large doses of active drug substances as they are easier to swallow than large tablets" and otherwise "[m]ay be a useful technology to promote safe swallowing in older patients." DTX-0013 at 0011.

94. Dr. Little opined on the swallowability benefits of "dispersible and effervescent tablets" in the context of the Liu reference (i.e., in the context of prior art). Tr. 516:2–523:3.

33

95.  The Ragnar-Tolf reference[5] discloses that pimavanserin can be formulated "to form tablets, pills, dragees, capsules, liquids, gels, syrups, slurries, suspensions, and the like, for oral ingestion by a patient to be treated." JTX-11 at 0049; Tr. 417:18-23 (Dr. Muzzio confirming that Ragnar-Tolf discloses "different types of ways to formulate [pimavanserin], including tablets, pills, liquids, gels, syrups, slurries, [and] suspensions").

96.  Sven Stegemann ("Mr. Stegemann") is an employee of Capsugel, a capsule manufacturing company, and authored an article published by Capsugel titled "Hard gelatin capsules today – and tomorrow" (the "Stegemann reference"). DTX-005.

97.  In the Stegemann reference, Mr. Stegemann reported on a study concluding that "66 % of the patients choses capsules, 19 % chose coated tablets and only 4 % uncoated tablets as easy to swallow." DTX-005 at 13.

98.  In light of the conflict of interest arising from Mr. Stegemann's employment at a capsule manufacturer, the Stegemann reference has diminished credibility.

99.  A POSA would not have been motivated to formulate a capsule dosage of pimavanserin over a tablet dosage of pimavanserin on the basis of swallowability. FoF ¶¶ 83-98; *see* Tr. 527:11-17 (Dr. Little answering "[n]o" to the question: "And if size of a dosage form was a motivation for a POSA to reformulate, would a POSA have selected a single capsule dosage form here?").

c.  **Taste-Masking**

100.  Generally, a POSA could be motivated to formulate a medication on the basis of taste. Tr. 527:23-25 (Dr. Little testifying that "taste is something that you would definitely consider as a general motivation").

---

[5] U.S. Patent Application Publication, 2007/0264330 A1 (November 15, 2017).

34

101. Pimavanserin "has a pronounced bitter taste." JTX-11 at 0132.

102. Ragnar-Tolf discloses that "a taste-masking coating was applied to" the pimavanserin tablets" that "was water based and selected to minimize wetting of the tablet cores." JTX-11 at 0132.

103. A POSA would not have been motivated to develop a capsule for pimavanserin on the basis of paragraph 63 of Ragnar-Tolf, which states that in "some embodiments, tablets . . . are coated . . . with a taste masking film" and that in "some embodiments, instead of compression into tablets, a dry or wet blend . . . is placed in a gelatin capsule or HPMC capsule." JTX-11 at 0063; Tr. 530:9-16 (Dr. Little testifying: "But I don't take issue with the fact that you can taste-coat with gelatin capsules. I don't think that's what this is saying, but you can, okay. But what I cannot understand is how somebody would read paragraph 63 as put up here on the screen and say that it would teach you to move away from a tablet taste-masking film to a capsule. The only way you would read that into this paragraph is if you're looking at it through the lens of the invention.").

104. The Nuplazid tablets have a film-coating that masks the taste of pimavanserin, negating the motivation for a POSA to develop other dosage forms. Tr. 527:23–528:2 (Dr. Little testifying: "I would say that taste is something that you would definitely consider as a general motivation, but as we saw, the Nuplazid cap- -- tablets had a film-coating on them that allowed you to taste-mask, so that's something that you could do.").

105. A POSA would have understood that capsule dosage forms may provide better taste masking than tablet dosage forms. Tr. 320:5-24 (Dr. Muzzio testifying: "But if you're coating the tablet also to mask taste, then you would be very concerned with something called film failure. . . . So as a result of all of this, some tablets would be taste-masked, but

35

there would be some that are not properly taste-masked and so, once in a while, the patient would actually experience a bitter taste of the medicine. That doesn't happen with capsules because the power doesn't leak out of the capsule.").

106. A POSA would not have been motivated to formulate a capsule dosage of pimavanserin over a tablet dosage of pimavanserin on the basis of taste. FoF ¶¶ 100-05.

**d.    Color Coating and Pill Identification**

107. A POSA would have understood that color coating dosage forms may facilitate medication identification and patient compliance. Tr. 317:3-21 (Dr. Muzzio testifying *inter alia*: "So this passage talks about something that is also mentioned in some of the other references that we have been talking about, which is basically that -- it says for elder patients who take a number of medications every day, they need to identify those medications, right. Some are to be taken in the morning, some are to be taken in the evening, etc. And so it says that to help the patients automatically process, distinguish, you know, figure out how to take the medication, the dosage form should be easy for the person to identify.").

108. Film-coated tablets can be distinctively color coated. Tr. 530:20-22 (Dr. Little confirming that "film-coated tablets" can "be distinctively color coated"); JTX-91 at 0001 ("Opadry fx systems are formulated by incorporating pearlescent pigments into high gloss, clear polymer systems from Colorcon. The results are film coated tablets that exhibit stimulating colors and lustrous effects.").

109. A POSA would have understood that there may be difficulties in color coating. Tr. 320:1-7 (Dr Muzzio testifying: "The person of ordinary skill in the art would know that film coating a tablet is a complex process, it's also an expensive process, it's a time-consuming process, and it's also a process that can have failures. If you're just coating the tablet to make it pretty, it's one thing.").

36

110. Capsules, like tablets, can be distinctively color coated. Tr. 318:14-17 (Dr. Muzzio confirming).

111. A POSA would not have been motivated to formulate a capsule dosage of pimavanserin over a tablet dosage of pimavanserin on the basis of color coating. FoF ¶¶ 107-10; *see* Tr. 531:10-13 (Dr. Little responding "[no]" to the question of whether "a POSA have been motivated to make a capsule dosage form over a tablet due to the cost to film coat and print on tablets").

**e.    General Findings**

112. Dr. Muzzio was not aware of "any complaints" from "doctors or patients or any other healthcare professional or anyone regarding the two . . . 17 mg tablets for pimavanserin." Tr. 414:4-9.

113. Dr. Muzzio admitted that "[t]he tablet, the most frequently prescribed commercial dosage form, is stable, elegant and effective" and "provides the patient with a convenient product for handling, identification and administration." Tr. 413:21–414:2.

114. Tablet dosages of pimavanserin already existed. JTX-12 at 0007-0008.

115. A POSA would have been aware of various difficulties associated with the formulation of dosage forms other than tablets or capsules, such as effervescent tablets, orally disintegrating formulations, chewable tablets, films and jellies. Tr. 322:7–326:8 (Dr. Muzzio testifying *inter alia*: "Effervescent tablets . . . require effective taste-masking . . . [and] also require more effort by the caregiver. They're also more expensive to make. . . . Orally disintegrating formulations . . . are more expensive to make . . . [and] require more . . . protection from exposure to moisture. . . . Chewable tablets . . . are also, generally speaking, more expensive to make. . . . Films . . . [are] also more expensive to make. . . .

37

Jellies . . . would disperse in the mouth. . . . [C]hewable tablets . . . [are] not very common.").

116.   A POSA would not have been motivated to formulate a capsule dosage of pimavanserin over a tablet dosage of pimavanserin on the basis of the following non-exhaustive list of factors: pill burden, swallowability, taste-masking, color coating and pill identification, commonality of dosage forms, effort by the caregiver, protection from moisture, dispersion in the mouth, and costs associated with formulation.  FoF ¶¶ 79-115.

**2.    A POSA Would Not Have Been Motivated to Achieve the Bulk Density in Claim 4 of the '721 Patent with a Reasonable Expectation Of Success**

117.   A POSA seeking to develop a new dosage form of pimavanserin would have looked to the Ragnar-Tolf reference.  Tr. 293:22–296:6 (Dr Muzzio testifying: "So a person of ordinary skill in the art seeking to develop a new version of this product would start by a literature search looking for information about preformulation or formulation studies that have been performed for this particular drug substance. . . . [T]he POSA would have found Ragnar-Tolf immediately."); JTX-11.

118.   The Ragnar-Tolf reference was published on November 15, 2007, almost ten years before the earliest effective filing date of the '721 patent.  JTX-11 at 0001; Tr. 296:7-12 (Dr. Muzzio testifying: "This [i.e., the Ragnar-Tolf patent application] was published in November 2007, almost -- almost ten years before the '721 patent.").

119.   The Ragnar-Tolf reference, as well as the Nuplazid Tablet Label, are listed on the face of the '721 patent.  JTX-09 at 0003, 0008.

120.   The Ragnar-Tolf reference "does not explicitly talk about any one [capsule] size other than size 0."  Tr. at 416:23–417:6 (Dr. Muzzio stating as such).

38

121. The Ragnar-Tolf reference discloses that pimavanserin tends to aggregate when subjected to dry blending, and also discloses, as an alternative to dry blending, examples of wet granulation to produce granules containing 1 mg, 5 mg or 20 mg of pimavanserin tartrate. JTX-11 at 0125 ("It was discovered that during blending, the mixture tended to form aggregates, potentially affecting content uniformity. Accordingly, pimavanserin tartrate Form A was blended with spray-dried lactose prior to sieving at 0.5 mm for 1 mg and 5 mg formulations and at 0.7 mm for 20 mg formulations. It was found that the stepwise blending/sieving procedure ensured that a homogenous blend was maintained."); *see* Tr. 300:19–301:3 (Dr. Muzzio testifying: "So when a POSA would see that the drug has a tendency to form clumps and that those clumps can lead to these problems for what's relatively a low-dose product, the most common approach to solve this problem is to wet granulate. . . . Right, so right on cue, the very next thing in Ragnar-Tolf after example 8 is example 9 where they do what is the most common solution to the problem. They go ahead and they wet granulate.").

122. A POSA would have understood that pimavanserin is a "bad-behaving" material — in that pimavanserin has a low bulk density and tends to clump up — and requires a lot of excipients to allay its bad behavior. FoF ¶ 157; Tr. 533:16-18 (Dr. Little testifying: "That it's [i.e., pimavanserin] a bad-behaving material. It is a low bulk density. It needs a lot of excipients in order to cover up its bad behavior and has a tendency to clump.").

123. A POSA would have understood that Pimavanserin is hygroscopic, meaning that pimavanserin tends to absorb moisture and, thus, that formulating dosages of pimavanserin could be difficult. Tr. 222:5-15 (Dr. Moreton testifying that: "[Pimavanserin is] recognized as a hygroscopic material, and in the manufacturing instructions, the manufacturing area is

39

-- is conditioned below 20 percent relative humidity, which tells me that it's a very hygroscopic material. . . . I do understand that with very hygroscopic materials, because I've handled them, that very often only an exposure of an hour can change the whole characteristic of the powder.").

124.    The Ragnar-Tolf reference discloses that the wet granulated formulations could be compressed into not only tablets with film coating, but also into capsules. JTX-11 at 0063 ("In some embodiments, tablets produced by any of the methods described above are coated such as with a taste masking film (e.g., an OPADRYR film). In some embodiments, instead of compression into tablets, a dry or wet blend, such as those described above, is placed in a gelatin capsule or HPMC capsule.").

125.    With respect to tablets, the Ragnar-Tolf reference discloses embodiments of 1 to 80 mg tablets of pimavanserin tartrate, including 40 mg tablets. JTX-11 at 0067 ("Various embodiments include tablets as described above containing 1 mg, 2 mg, 5 mg, 10 mg, 20 mg, 40 mg, 60 mg, or 80 mg of pimavanserin tartrate."); Tr. 296:17-25 (Dr. Muzzio testifying: "So reading this paragraph, the person of ordinary skill in the art would immediately learn that Ragnar-Tolf has concerned itself with dosages containing anywhere from 1 mg to maybe up to 80 mg.").

126.    The Ragnar-Tolf reference has the following tables (Table 7 and Table 8):

40

TABLE 7

Ingredient amounts (%) for wet granulation formulations.

| | Tablet strength | | |
| --- | --- | --- | --- |
| | 1 mg | 5 mg | 20 mg |
| Drug | 1.03 | 5.13 | 20.5 |
| Mannitol | 91.3 | 87.2 | 71.1 |
| Pregelatinized Starch | 5.00 | 5.00 | 5.00 |
| Povidone | 1.15 | 1.15 | 1.15 |
| Magnesium stearate | 1.5 | 1.5 | 2.0 |
| Ethanol 99.5%** | 19.8 | 16.5 | 16 |

**Evaporates during manufacturing process

TABLE 8

Physical and analytical characteristics of wet granulation formulations.

| Tablet strength | 1 mg | 5 mg | 20 mg | 5 mg | 20 mg |
| --- | --- | --- | --- | --- | --- |
| LOD (%) | 1.5% | 0.8% | 2.3% | 0.9% | 1.6% |
| Sieving analysis (%) | | | | | |
| >710 | 0 | 0 | 0 | 0 | 0 |
| 500-710 | 0 | 0 | 1 | 0 | 1 |
| 250-500 | 8 | 5 | 7 | 4 | 6 |
| 125-250 | 69 | 69 | 69 | 71 | 72 |
| 90-125 | 19 | 21 | 18 | 21 | 18 |
| <90 | 5 | 4 | 6 | 5 | 4 |
| Bulk/Tapped density g/ml | 0.57/0.60 | 0.58/0.64 | 0.61/0.63 | 0.5610.60 | 0.56/0.61 |
| Tablet weight | 100 mg | 100 mg | 100 mg | 101 mg | 99.7 mg |
| Crushing strength | 61N | 51N | 58N | 61N | 44N |
| Tablet height | 3.7 mm | 3.8 mm | 3.8 mm | 3.7 mm | 3.8 mm |
| Friability, 100 rot. (%) | 0.1 | 0.1 | 0 | — | — |
| Friability, 200 rot. (%) | — | — | — | 0.1 | 0.1 |
| Disintegration time | 6 min | 6 min | 5 min | 6 min | 5 min |
| Content uniformity, mg/tabl | 1.0 mg | 5.4 mg | 20.5 mg | — | 20.1 mg |
| Released amount %, 30 min | 98% | 117% | 102% | — | — |

JTX-11 at Tables 7, 8.

127.    As depicted in Table 8, the Ragnar-Tolf reference discloses examples of pimavanserin

tablets that were formulated, including in 1 mg, 5 mg, and 20 mg dosages, that ranged in

41

Appx41

bulk-density between 0.56 g/ml and 0.61 g/ml. JTX-11 at Table 8; Tr. 342:25–343:3 (Dr. Muzzio testifying: "Ragnar-Tolf is already disclosing granules that have a bulk density somewhere between 0.56 and 0.61 for a wide range of drug concentrations from 1 percent to 20 percent."); Tr. 538:1-5 (Dr. Little testifying that Table 8 "taught a POSA, in terms of bulk densities you can see that you are around 0.6 for the amount of pimavanserin that was used here. But what you see is it stops at 20 mg.").

128. A POSA would have understood, including on the basis of the Ragnar-Tolf reference, that, in order to fit 40 mg of pimavanserin tartrate in a size 4 capsule, he or she would have had to increase the pimavanserin tartrate concentration in the 20 mg formulation identified in Finding of Fact ¶ 127 from approximately 20% to 32.4% (i.e., by over 60%) and such an increase could potentially be accomplished by also decreasing the concentration of mannitol. Tr. 332:21–335:1 (Dr. Muzzio testifying *inter alia*: "So the next obvious thing to try is to do this calculation, right; is to say, okay, if the 40 mgs of pimavanserin tartrate need to be contained in 126 mgs of final blend, that means that the concentration of pimavanserin tartrate in the final blend is going to be 31.7 percent. And because 2 percent of that blend is magnesium stearate, it would say that the granules themselves need to have a little higher concentration, about 32.4 percent.").

129. If possible, a POSA would have understood that increasing the concentration of pimavanserin tartrate, and likewise decreasing the inactive mannitol diluent, in the blended pimavanserin in the manner described in Finding of Fact ¶ 128 could have increased or decreased the bulk density of the granules. Tr. 538:21–539:8 (Dr. Little testifying: "So as I was describing to Your Honor before, when you change something, it is possible you can change any number of parameters. So in the case Dr. Muzzio looks at the claim and he says

42

pharmaceutically acceptable would be known to have all of these other parameters that would be in them, it is possible that changing the pimavanserin concentration in this in order to get it up to the point where you can fit it into a size 3 and 4 capsule, which by the way, if you're going to change one thing, the pimavanserin concentration is going to be the one thing that has the highest likelihood of changing the bulk density. It's the thing that has the worst behavior in the formulation."); Tr. 333:23–335:13 (Dr. Muzzio testifying: "So the POSA looks at this data and says, okay, I need to put more drug in the blend. I need to increase the concentration of drug in the blend so that I can put my 40 mgs within the 126 mgs of total blend that I can put inside that capsule. . . . And I can do that just by taking some of the mannitol out. . . . And when you granulate that way, if your density comes out at 0.6, as would be the expectation, problem solved. Now, you put 126 mgs of that final blend into the capsule and you have your 40 mgs of pimavanserin . . . Let's say that the density . . . comes up 0.62, then you will want to put a little bit less than 12 -- than, you know, 32.4 percent, so you would then run one more experiment and you would go down to maybe 34 percent. Conversely, if the density comes out, let's say, 0.57, now you're off by about three percentage points. So you could say, oh, maybe I need to run one more experiment; instead of 32.4 percent, I need to go to maybe 34 percent, right.").

130. A POSA would have not been motivated to formulate the recited capsule dosage of pimavanserin with the claimed bulk density with a reasonable expectation of success in doing so.  FoF ¶¶ 117-29.

131. The patent examiner already considered Defendants' basis for the validity challenge during patent prosecution and, in the Reasons for Allowance, he determined that the Asserted Claims were not obvious over the closest prior art, the Ragnar-Tolf reference, because "the

43

density of [its] granulation would not allow for the same amount of the drug to be present in the capsule." JTX-10 at 2404.

132.   A diluent is a material that provides bulk or volume to dilute a drug substance, which can provide ease of handling. Tr. 253:2-8 (Dr. Muzzio testifying: "So diluents are materials that are used to -- as it says here, to provide bulk, to provide volume to a mixture. And this is particularly important when, for example, I'm handling very small doses of the drug substance and I need to dilute that small amount of drug substance into a larger volume so I can more easily and more accurately handle that.").

**D.    Indefiniteness**

133.   A POSA would have understood that the '721 patent specification discloses "comparative experiments" of various manufacturing processes that resulted in products with "unacceptable" characteristics. JTX-09 at 13:33–15:2 ("The top spray fluid-bed layering resulted in particles having . . . unacceptable stability and particle size distribution as well an unacceptable amount of impurities. . . . Wurster Layering (a similar and more common process to the Top Spray Layering described above) was tested and found to produce particles having an . . . unacceptable stability and particle size distribution as well an unacceptable amount of impurities. . . . Extrusion/spheronization is especially useful in producing semi-spherical, dense granules . . . [but] resulted in particles having an acceptable flow and bulk density but unacceptable stability and particle size distribution as well an unacceptable amount of impurities. . . . Twin-Screw Melt Granulation . . . result[ed] in particles having . . . unacceptable finding of impurities as well as unacceptable dissolution. . . . Conventionally wet granulation . . . proved to be problematic resulting in very large, wet, adhesive pimavanserin granules that would not be easily dried in a fluid bed dryer."); *see* Tr. 261:10–271:5 (Dr. Muzzio discussing the comparative experiments);

44

Tr. 283:5–284:17 (same); Tr. 464:15–466:3 (Dr. Little explaining *inter alia*: "I think a person of ordinary skill in the art would first understand that what we're talking about in these comparative experiments, as I will show you, that the inventors were going through their process in order to determine or deem whether those processes were suitable or not. That's why the word is being used here. They would not be seeing the word and then trying to find a claim term in order to exclude things from a claim that is about compositions and not about pharmaceutical manufacturing processes.").

134.    A POSA would have understood that the unacceptable characteristics of the comparative experiments included, for example, "stability, particle size, impurity levels, or dissolution." JTX-09 at 13:33–15:2; *see, e.g.*, JTX-09 at 13:52-55 ("The top spray fluid-bed layering resulted in particles having . . . unacceptable stability and particle size distribution as well an unacceptable amount of impurities."); Tr. 261:17-22 (Dr. Muzzio testifying: "So the first comparative experiment uses a technique called top spray layering, uses excipients, it has acceptable density and flow, but it says to have – it's said to have an unacceptable stability, unacceptable limits of impurity, unacceptable particle size distribution, less favorable dissolution, so those attributes are mentioned.").

135.    A POSA would have understood that the '721 patent does not describe the comparative experiments as "embodiments," but rather that the '721 patent describes how various embodiments were evaluated when subjected to the manufacturing processes discussed in the comparative experiments.   JTX-09 at 14:64–15:2 ("Several embodiments were evaluated using excipients commonly used to mitigate the impact of high water content while providing excellent granule properties. These did not improve the resulting over-

45

wetting of the pimavanserin blend and resulted in an adhesive wet mass that would not would not be easily dried in a fluid bed dryer.").

136.   A POSA would have understood that "[c]ontrary to the disclosed comparative experiments," the '721 patent also "describes [acceptable] processes to manufacture capsules of size 4 comprising 5-34 mg pimavanserin." JTX-09 at 15:3-5.

137.   The section of the '721 patent discussing the comparative experiments does not utilize the term "pharmaceutically acceptable capsule" or "pharmaceutically acceptable." *See* JTX-09 at 13:33–15:2; *see also, e.g.*, Tr. 380:19-24 (Dr. Muzzio stating that "'pharmaceutically acceptable' doesn't appear" in the section of the '721 patent discussing the comparative experiments).

138.   During the *Markman* stage of this proceeding, Defendants contended:

> The specification . . . discloses comparative experiments resulting in unacceptable products. In contrast to such "unacceptable products," the specification again discloses the invention, which would presumably generate acceptable products, as involving a wet granulation process with "a small quantity of water" conducted on pimavanserin API alone. . . . The specification has more, and consistent, disclosures on granulating pimavanserin or pimavanserin tartrate API alone to form granules, followed by a mixing process involving the API granules and extra-granular excipients to form the blended composition, which is then filled into capsules. . . . To summarize, the '721 patent specification is very consistent on the points that (1) the pimavanserin tartrate API in the claimed compositions is to be granulated alone (i.e. with water in a wet granulation process), and (2) the granules are then mixed with excipients by blending.

D.I. 39 at 18-19.

139.   "The Court, however, held that 'Acadia did not clearly disavow granules containing both pimavanserin and excipients.'" D.I. 112 at 17 (quotation omitted).

46

140. The specification does not define the term "pharmaceutically acceptable" or the term "pharmaceutically acceptable capsule." JTX-09; Tr. 395:25–396:2 (Dr. Muzzio confirming); Tr. 449:1–450:6 (Dr. Little confirming).

141. The specification of the '721 patent states that, "[u]nless defined otherwise, all technical and scientific terms used herein have the same meaning as is commonly understood by one of ordinary skill in the art." JTX-09 at 2:34-36.

142. Dr. Little states that the phrase "pharmaceutically acceptable" is used "in thousands of patents" and "just means generally suitable for use in pharmaceutical compositions." Tr. at 450:9-13. Dr. Little testifies that the phrase does not mean "something different for capsules as opposed to excipients." Tr. 449:23–450:2; Tr. 450:24–451:3 (Dr. Little stating: "So it would be applied, as I said, the plain and ordinary meaning, which is generally suitable for use in pharmaceutical compositions. And since it's seen twice in this claim, it would be applied the same in both instances that it's used.").

143. Dr. Muzzio states that "pharmaceutically acceptable excipient" means "an excipient that has been proved to be pharmaceutically acceptable by a regulatory authority" or means "generally suitable for use in a pharmaceutical composition" at least "[w]hen used the right way and in the correct amount." Tr. 377:17–378:3. Dr. Muzzio avers that he does not "know" the meaning of the phrase "pharmaceutically acceptable capsule" and that neither would a "POSA" in light of, at least, the comparative experiments in the '721 specification. Tr. 382:4-9; Tr. 377:13-16 (Dr. Muzzio stating: "So, indeed, there are different ways in which you need to look at the words 'pharmaceutically acceptable' and see what it is that they are modifying to understand what that means.").

47

E.    **Written Description / Enablement**

144.    The '721 patent does not limit the number of "pharmaceutically acceptable excipients."
JTX-09.

145.    The specification discloses various embodiments of "pharmaceutically acceptable
excipients." *See, e.g.*, JTX-09 at 16:4-10 ("As disclosed herein it has been demonstrated
that pimavanserin can be granulated without the use of a binder, i.e. utilizing water only. It
is however contemplated that in some embodiments suitable binders, such as cellulose,
methyl cellulose, polyvinylpyrrolidone and polyethylene glycol may be used, although not
a necessity."); Tr. 474:17–475:8 (Dr. Little confirming that the list of excipients from JTX-
09 at 16:4-10 "is the first of a number of disclosures" in the specification of the '721 patent
"that demonstrate to a person of ordinary skill in the art that the inventors were envisioning
adding excipients to the granules"); Tr. 396:3–397:6 (Dr. Muzzio testifying that JTX-09 at
16:4-10 discloses "four" binders and that "binders" are "excipients"); JTX-09 at 17:34-41
("Another embodiment of the composition described above includes pimavanserin tartrate
granulation containing less than 10% w/w Avicel PH302 and colloidal silicon dioxide, e.g.
Aerosil Pharma 200 manufactured by Evonik, with a specific surface area from about 175
to about 225 m$^2$/g blended with less than 60% w/w microcrystalline cellulose, such as
Avicel PH302 or equivalent microcrystalline cellulose, and about 1% w/w magnesium
stearate."); JTX-09 at 17:42-49 ("Another embodiment of the composition described above
includes pimavanserin tartrate granulation containing less than 10% w/w Avicel PH101
and colloidal silicon dioxide with a specific surface area from about 175 to about 225 m$^2$/g,
e.g. Aerosil Pharma 200 manufactured by Evonik, blended with less than 60% w/w
microcrystalline cellulose, such as Avicel PH302 or equivalent thereof, and about 1% w/w
magnesium stearate."); Tr. 397:7-17 (Dr. Muzzio admitting that these two disclosures from

48

column 17 of the '721 patent disclose compositions with "Avicel PH302," "Avicel PH101" and "silicon dioxide").

146. A POSA would have understood that excipients can be intragranular. Tr. 472:6-12 (Dr. Little explaining: "On the left-hand side, you will then see as part of the pimavanserin granulation, you have 40 mgs of pimavanserin tartrate in the pimavanserin granulation, you have 59 mgs of microcrystalline cellulose in the pimavanserin granulation, and you have 1 mg of magnesium stearate in the pimavanserin granulation, leading to a total of 100 mgs."); Tr. 399:23–400:10 (Dr. Muzzio explaining *inter alia* that colloidal silicon dioxide "can be put inside granules").

147. As stated above, the Court construed "[g]ranules comprising 40 mg pimavanserin tartrate and one or more pharmaceutically acceptable excipients" as having "plain and ordinary meaning; the scope of the term includes granules granulated with pimavanserin and excipients." FoF ¶ 34.

148. A POSA would have understood that the '721 patent discloses excipients that may "provide, without limitation, bulk, consistency, stability, binding ability, lubrication, disintegrating ability." JTX-09 at 3:50-53.

149. The comparative experiments that resulted in "unacceptable products" describe the manufacturing process for pimavanserin granules with certain excipients. JTX-09 at 13:33–15:2.

150. A POSA would not have considered the comparative experiments to understand the Asserted Claims. Tr. 469:7-12 (Dr. Little testifying that a POSA would not "place any limitation on the asserted claims" based on "the comparative experiments" from "columns 13-15 of the '721 patent specification"); Tr. 474:8-10 (Dr. Little reiterating that he does

49

not "think that you should be reading what [Dr. Muzzio] believes to be restrictions in the comparative [experiments] on to the claims").

151. The '721 patent discloses the following table (Table 2):

### TABLE 2

| Composition of Pimavanserin granulation (34 mg) | | |
|---|---|---|
| Ingredients | Qty (% w/w) | Qty (mg)/dose |
| Pimavanserin Tartrate | 40.0 | 40.0* |
| Microcrystalline Cellulose (Avicel PH302, NF, EP) | 59.0 | 59.0 |
| Magnesium Stearate (Vegetable Source, USP, EP) | 1.0 | 1.0 |
| Total | 100.0 | 100.0 |

*40 mg pimavanserin tartrate salt is equivalent to 34 mg pimavanserin free base

152. A POSA would have understood that Table 2 of the specification describes a pimavanserin granulation with intragranular excipients. Tr. 471:14-24 (Dr. Little explaining: "So we've got pimavanserin granulation, and this is the composition of the pimavanserin granulation. So what you see in the left-hand column is the ingredients of the pimavanserin granulation, and then you see a column that says 'quantity, percent weight by weight, and you see a column that says quantity mg/dose.'").

153. The '721 patent specification discloses a bulk density range of pimavanserin granulation between 0.4 to 0.6 g/ml and one embodiment within that range of 0.508 g/ml. JTX-09 at 22:9-14 ("The bulk density of pimavanserin granulation is >0.4 g/ml, such as 0.4-0.6 g/ml, such as about 0.5 g/ml, determined according to USP <616>, method 1. In some embodiments the bulk density of the pimavanserin granulation is >0.4 g/ml, such as about 0.5 g/ml, such as 0.51 g/ml, such as 0.508 g/ml."); Tr. 582:17–583:2 (Dr. Little stating that

50

"[t]here's an example plan of 0.508" in response to the question of whether .508 g/ml was "the only actual example" of a bulk density between 0.4 g/ml and 0.6 g/ml).

154.    The specification of the '721 patent does not teach a POSA how to make granules of pimavanserin having a bulk density greater than 0.6 g/ml. Tr. 581:11–582:16 (Dr. Little explaining that the '721 patent does not "teach[] how to select excipients to use to make pimavanserin granules with a bulk density in the range of 0.6 to 0.8 g/ml" and that "once you go above 0.8, you know, there's no disclosures in [the '721 patent] of that because a person of ordinary skill in the art is not thinking whether a difficult material like this is going up above for what you would expect for even an average material").

155.    A POSA would not have applied the "typical" bulk densities from Figure 1 of the '721 patent to the claimed bulk density for pimavanserin granules. JTX-09 at Figure 1 (listing the "conventional fill weight" for "typical powder density"); Tr. 400:11–401:13 (Dr. Muzzio confirming that the "conventional fill weight" in Figure 1 is "not specific to pimavanserin").

156.    A POSA would have understood that generally the upper limit of bulk density for "standard" materials is 0.7 g/ml. Tr. at 480:15-20 (Dr. Little testifying: "And you have sort of your standard materials that you're used to working with. And I would actually agree with him on this, that for a standard material you could see [a bulk density of] 0.4, 0.5, 0.6 and 0.7."); Tr. 583:10-13 (Dr. Little testifying: "So you've got your conventional materials that you would use, and I agree with Dr. Muzzio on that, those are the ranges you'd see up to like 0.7, you know?"); Tr. 583:14-16 (Dr. Little agreeing that for "a common material, the upper limit would be 0.7"); Tr. 582:1-6 (Dr. Little testifying that

51

"[f]or any material, there's going to be an upper limit . . . . I don't mean to be silly about this, but this claim doesn't talk about black holes").

157.  A POSA would have understood, including on the basis of the teachings of the '721 patent, that pimavanserin is a "bad behaving material." JTX-09 at 1:54-58 ("Pimavanserin manufactured following conventional techniques has low bulk density and poor flowability and a tendency to clump, which will adversely impact reproducibility and quantitative accurate filling of capsules during the manufacturing process."); Tr. 583:3-8 (Dr. Little explaining that pimavanserin "has bad behavior"); Tr. 583:22 (Dr. Little explaining: "In this case, you have bad behaving materials."); *see* FoF ¶ 122.

158.  A POSA would have understood that granules of pimavanserin, as "bad-behaving," will have a bulk density upper limit that is lower than the bulk density upper limit for standard materials, and that this lower bulk density limit for granules of pimavanserin would be 0.6 g/ml. Tr. 533:16-18 (Dr. Little explaining that a "bad-behaving material" will have a "low[er] bulk density"); Tr. 583:3-8 (Dr. Little agreeing that a POSA would know that granules of pimavanserin cannot have a bulk density above "0.6 because" "pimavanserin is . . . a 'bad material'"); Tr. 583:22-23 (Dr. Little explaining: "In this case, you have bad behaving materials. You're not thinking of the top of the [normal] range [that goes up to 0.7].").

159.  A POSA would have understood that the bulk density of the granules of pimavanserin are limited to the range of 0.4 g/ml to 0.6 g/ml. FoF ¶¶ 153-58.

## II.    LEGAL STANDARD

Rule 52(a)(1) of the Federal Rules of Civil Procedure provides: "In an action tried on the facts without a jury or with an advisory jury, the court must find the facts specially and state its

52

conclusions of law separately." Fed. R. Civ. P. 52(a)(1). "The classical statement of the burden of proof in an ordinary civil case such as this is that the facts must be proved by a 'preponderance of the evidence.'" *Burch v. Reading Co.*, 240 F.2d 574, 578 (3d Cir. 1957); *see E.M.D. Sales, Inc. v. Carrera*, 604 U.S. 45, 50 (2025) (confirming that "the preponderance-of-the-evidence standard has remained the default standard of proof in American civil litigation"). It is within the province of the district court as the finder of fact to "make subjective credibility determinations about the witnesses who testified." *Bayer AG v. Housey Pharms., Inc.*, 386 F. Supp. 2d 578, 580 (D. Del. 2005), *aff'd*, 189 F. App'x 969 (Fed. Cir. 2006).

## III.    DISCUSSION: INFRINGEMENT AND INVALIDITY

This Discussion has four Sections: (A) Acadia Demonstrates Infringement by a Preponderance of the Evidence, (B) Defendants Fail to Demonstrate Obviousness by Clear and Convincing Evidence, (C) Defendants Fail to Demonstrate Indefiniteness by Clear and Convincing Evidence, and (D) Defendants Fail to Demonstrate a Lack of Written Description by Clear and Convincing Evidence; Defendants Fail to Demonstrate a Lack of Enablement by Clear and Convincing Evidence.

### A.    Acadia Demonstrates Infringement by a Preponderance of the Evidence

"A patent owner has the burden of proving infringement by a preponderance of the evidence." *H. Lundbeck A/S v. Lupin Ltd. ("Lundbeck")*, No. 18-88-LPS, 2021 U.S. Dist. LEXIS 204535, at *234-35 (D. Del. Sep. 30, 2021) (citing *SmithKline Diagnostics, Inc. v. Helena Lab. Corp.*, 859 F.2d 878, 889 (Fed. Cir. 1988)). A patent is infringed when a person "without authority makes, uses, offers to sell, or sells any patented invention, within the United States . . . during the term of the patent." 35 U.S.C. § 271(a). Literal infringement, which is the only type of infringement asserted here, generally "occurs when each element of at least one claim of the patent

53

is found in the alleged infringer's product." *Alza Corp. v. Andrx Pharms., LLC*, 607 F. Supp. 2d 614, 623 (citing *Panduit Corp. v. Dennison Mfg. Co., Inc.*, 836 F.2d 1329, 1330 (Fed. Cir. 1987)).

Courts employ a two-step analysis in making a literal infringement determination. *Lundbeck*, 2021 U.S. Dist. LEXIS 204535, at *235 (citing *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 976 (Fed. Cir. 1995)). "First, a court must construe the asserted claims." *Id.* "Next, the trier of fact must compare the properly-construed claims to the accused infringing product." *Id.* "If an accused product does not infringe an independent claim, it also does not infringe any claim depending from that independent claim." *Id.* (citing *Wahpeton Canvas Co. v. Frontier, Inc.*, 870 F.2d 1546, 1553 (Fed. Cir. 1989)). "However, one may infringe an independent claim and not infringe a claim dependent on that claim." *Id.* (cleaned up).

In cases arising under 35 U.S.C. § 271(e)(2)(A) (like the present case), the infringement inquiry concerns "whether, if a particular drug *were* put on the market, it *would* infringe the relevant patent." *Acorda Therapeutics, Inc. v. Mylan Pharms., Inc.*, 817 F.3d 755, 760 (Fed. Cir. 2016) (emphases added); *accord Warner-Lambert Co. v. Apotex Corp.*, 316 F.3d 1348, 1365 (Fed. Cir. 2003) ("Once jurisdiction is established, however, the substantive determination whether actual infringement or inducement will take place is determined by traditional patent infringement analysis, just the same as it is in other infringement suits, including those in a non-ANDA context, the only difference being that the inquiries now are hypothetical because the allegedly infringing product has not yet been marketed.").

"If the ANDA defines a proposed generic drug in a manner that directly addresses the issue of infringement, [the ANDA] controls the infringement inquiry." *Par Pharm., Inc. v. Eagle Pharms., Inc.*, 44 F.4th 1379, 1383 (Fed. Cir. 2022) (cleaned up). In such instances, that a generic manufacturer "tells the court that its manufacturing guidelines will keep [its product] outside the

54

scope of the claims or has even filed a declaration in the court stating that [its product] will stay outside the scope of the claims [cannot] overcome the basic fact that it has asked the FDA to approve, and hopes to receive from the FDA, approval to market a product within the scope of the issued claims." *Sunovion Pharms., Inc. v. Teva Pharms. USA, Inc.*, 731 F.3d 1271, 1278 (Fed. Cir. 2013). However, if "the ANDA specification does not speak clearly and directly to the question of infringement, courts may look to other relevant evidence, such as data or samples the ANDA filer has submitted to the FDA, to assess whether a proposed product will infringe." *Par Pharm.*, 44 F.4th 1379, 1384 (citations omitted).

In this action, Acadia alleges that Aurobindo infringes claims 4 and 5 of the '721 patent, the former of which recites (alterations added):

> 4. A pharmaceutically acceptable capsule for orally delivering 34 mg of pimavanserin to a patient, wherein [1] the capsule has a capsule shell with a capsule shell size 3 or 4, [2] that encapsulates a blended pimavanserin composition comprising: granules comprising 40 mg pimavanserin tartrate and one or more pharmaceutically acceptable excipients; and [3] wherein the bulk density of the granules is >0.4 g/ml as determined by USP, method 1.

The Court construed claim 4 of the '721 patent such that "an extra-granular component is not required" and that "the scope of the term granule includes granules granulated with pimavanserin and excipients." FoF ¶¶ 32-34.

After comparing the properly-construed claims to the Court's Findings of Fact regarding the accused infringing product (*see Lundbeck*, 2021 U.S. Dist. LEXIS 204535, at *235), the Court holds that Acadia demonstrates by a preponderance of the evidence that Aurobindo's Product practices every limitation of claim 4 of the '721 patent. The following Findings of Fact show that each claim limitation is met:

> A pharmaceutically acceptable capsule for orally delivering 34 mg of pimavanserin to a patient, wherein the capsule has a capsule shell with a capsule shell size 3 or 4 [FoF ¶ 35], that encapsulates a blended pimavanserin composition comprising:

granules comprising 40 mg pimavanserin tartrate and one or more pharmaceutically acceptable excipients [FoF ¶¶ 68-71]; and wherein the bulk density of the granules is >0.4 g/ml as determined by USP, method 1 [FoF ¶¶ 78].

The only limitation from claim 4 of the '721 patent that Aurobindo disputes is the presence of granules. However, similar to the ANDA from the generic manufacturer in *Sunvion*, Aurobindo's "ANDA specification clearly describes a product that" includes granules. *See Sunovion Pharms., Inc.*, 731 F.3d 1271, 1280; FoF ¶¶ 57-58.[6] Any argument from Aurobindo that the disclosures of granules in its ANDA were inadvertent (*see* D.I. 131 at 10) or that Aurobindo's actual product does not infringe (*see* D.I. 131) "cannot override" that Aurobindo sought "FDA approval to market a generic compound within the scope of" the '721 patent and, thus, infringed the '721 patent. *See Sunovion Pharms., Inc.*, 731 F.3d 1271, 1280; *see also id.* ("Simply saying 'But I won't do it' is not enough to avoid infringement."). If the disclosures of granules in Aurobindo's specification were inadvertent, Aurobindo could have taken steps to amend its ANDA. However, Aurobindo neglected to do so (FoF ¶ 57(e)(ii)-(iii)), notwithstanding that Mr. Kannusamy acknowledged that "[i]f Aurobindo believed that something was incorrect in its ANDA, it would take steps to correct it with the FDA" (FoF ¶ 57(e)(i). Furthermore, several other Findings of Fact also supported (and in fact independently served as a basis for) the conclusion that Aurobindo's Product contains granules, including Dr. Smith's stereomicroscopy and polarized light microscopy examinations of Aurobindo's Product sample. *See* FoF ¶¶ 59-67.

---

[6] The Court acknowledges that not every section of Aurobindo's specification references granules and, indeed, the lack of uniform reference to granules support Aurobindo's argument that the specification does not "clearly describe[]" a product that contains granules. *See* D.I. 132 ¶ 22. The Court also acknowledges Aurobindo's argument that its ANDA does not expressly state that its "finished" product has granules. *See* D.I. 131 at 9. Ultimately, however, the Court found these arguments unconvincing in light of the repeated references to granules in Aurobindo's documents.

Separately, the Court holds that the preamble to claim 4 of the '721 patent is not a limitation. "What is required to meet the written description requirement 'varies with the nature and scope of the invention at issue, and with the scientific and technologic knowledge already in existence.'" *Juno Therapeutics, Inc. v. Kite Pharma, Inc.*, 10 F.4th 1330, 1335 (Fed. Cir. 2021) (quoting *Capon v. Eshhar*, 418 F.3d 1349, 1357 (Fed. Cir. 2005)). "Whether to treat a preamble as a limitation is a determination resolved only on review of the entire patent to gain an understanding of what the inventors actually invented and intended to encompass by the claim." *In re Xencor, Inc.*, 130 F.4th 1350, 1356-57 (Fed. Cir. 2025) (cleaned up). "The mere fact that a structural term in the preamble is part of the claim does not mean that the preamble's statement of purpose or other description is also part of the claim." *Id.* at 1357 (cleaned up). "That is, where a patentee defines a structurally complete invention in the claim body and uses the preamble only to state a purpose or intended use for the invention, the preamble is not a claim limitation." *Id.* (cleaned up). However, courts do read the preamble as limiting "if the claim preamble, when read in the context of the entire claim, recites limitations of the claim, or, if the claim preamble is necessary to give life, meaning, and vitality to the claim." *Id.* (cleaned up).

Here, Acadia "defines a structurally complete invention in the claim body" of claim 4 "and uses the preamble only to state a purpose or intended use for the invention" and, thus, the preamble is not a claim limitation." *See id.* Even were the Court to determine that the preamble is a limitation, however, the Court would have still found that Aurobindo infringed. *Compare* claim 4 of the '721 patent, preamble ("A pharmaceutically acceptable capsule for orally delivering 34 mg of pimavanserin to a patient"), *with* FoF ¶¶ 35, 68-71.

In addition to claim 4, the Court, after comparing the properly-construed claims to the accused infringing product (*see Lundbeck*, 2021 U.S. Dist. LEXIS 204535, at *235), holds that

Acadia demonstrates by a preponderance of the evidence that Aurobindo's Product practices every limitation of claim 5 of the '721 patent. *Compare* claim 5 of the '721 patent (reciting: "The pharmaceutically acceptable capsule of claim 4, wherein the capsule shell is a hard shell size 4 capsule."); *with* FoF ¶ 35 ("The dosage form of Aurobindo's Product is an orally-administered hard shell size 4 capsule.").

The Court does not adopt several of Aurobindo's proposed findings of fact, which generally contest that Aurobindo's Product contains granules, or, to the extent that Court does adopt some of Aurobindo's proposed findings of fact, the Court nonetheless maintains that Acadia demonstrates infringement by a preponderance of the evidence. Aurobindo's proposed findings of fact (and corresponding legal arguments) broadly fit into two categories, including Aurobindo's manufacturing process and Dr. Smith's examinations, categories of which the Court will address in turn.

Regarding the former category, Aurobindo proposes that its manufacturing process could not have produced granules. In particular, Aurobindo proposes that no "granulation step is involved in Aurobindo's dry blending process." D.I. 132 ¶ 14. Aurobindo also proposes that a "POSA would understand that a dry blend process is distinct from the various processes that result in the formation of granules." D.I. 132 ¶ 15. Accordingly, Aurobindo proposes that "Aurobindo's ANDA capsule contains pimavanserin tartrate in powder form, not in granules" and likewise that a "POSA would understand Aurobindo's ANDA to be describing a capsule formulation that did not contain granules." D.I. 132 ¶¶ 14, 15; *see* D.I. 131 at 8-9. Having weighed the evidence, having assessed the credibility of the expert witnesses, and having reviewed the entire trial record, however, the Court found that Aurobindo's Product contains granules. The Court also found that

58

Aurobindo's dry blending process could have produced granules and that Aurobindo's dry blending process did in fact produce granules. FoF ¶ 71.[7]

Regarding the latter category, Aurobindo proposes several facts challenging the propriety of Dr. Smith's examinations of Aurobindo's Product.[8] Aurobindo proposes, for example, that there "is no record of any observation (microscopic or otherwise), data or pictures from the material collected by the smallest sieve, the material that passed through all of the sieves, or was lost and unaccounted for" and that "the total amount of material with no record of any observation of any kind was 39.42% of the total capsule." D.I. 132 ¶ 30; *see* D.I. 132 ¶ 35 (similar); D.I. 131 at 14. Aurobindo somewhat similarly proposes that, even "if some of the agglomerates depicted in Dr. Smith's experiments were granules, the quantity of pimavanserin in those granules would fall far short of the quantity required to be proven in order to meet the claim limitation of 40 mg of pimavanserin tartrate in granular form." D.I. 132 ¶ 34; D.I. 131 at 14. For these reasons, Aurobindo contends that Acadia cannot demonstrate infringement by a preponderance of the evidence. D.I. 131 at 14-15.

However, as found above:

- "Dr. Smith observed material from the smallest sieve and her observation of the material from the smallest sieve was consistent with her other observations." FoF ¶ 59(r).

---

[7] Aurobindo similarly proposes that Dr. Smith agrees that Aurobindo's dry blend process "*requires* high pressure to create granule." D.I. 132 ¶ 18 (emphasis added). However, Dr. Smith did not so agree. Rather, while Dr. Smith acknowledged that "when people think about dry granulation process, what's most commonly talked about are the ones with some high pressure involved." FoF ¶ 53. Dr. Smith also testified that dry mixing and sifting "could" be a type of manufacturing that produces granules. FoF ¶ 53. Aurobindo similarly proposes that microcrystalline cellulose does not act as a binder in Aurobindo's Product. D.I. 132 ¶ 19. However, as found above, Aurobindo's manufacturing process produced granules (FoF ¶ 71).

[8] Aurobindo also contends that Dr. Smith's examinations fail to show granules at all. D.I. 131 at 11. The Court, however, found otherwise.

59

- "Dr. Smith observed material from the collection pan and her observation of the material from the collection pan was consistent with her other observations." FoF ¶ 59(s).

- "There is no practical way to test every single solid in Aurobindo's capsule to confirm that it is in a granule." FoF ¶ 59(t).

These Findings of Fact, in concert with various other Findings of Fact, in totality, show that Aurobindo infringes the '721 patent by a preponderance of the evidence (and in particular, the presence of granules), notwithstanding that Dr. Smith did not image every granule in Aurobindo's Product sample. FoF ¶¶ 36-71.

Aurobindo also flags Dr. Smith's admission that humidity was not controlled in her experiments. D.I. 132 ¶ 31; *see* FoF ¶ 65. However, as found above, "Dr. Moreton did not perform any studies to determine whether humidity impacted the results of Dr. Smith's testing and could not 'definitely' attest that humidity changed Dr. Smith's results." FoF ¶ 67. Considering the totality of the evidence, the Court maintains that Aurobindo infringes the '721 patent. *See Galderma Labs., L.P. v. Sun Pharm. Indus.*, 411 F. Supp. 3d 271, 312 (D. Del. 2019) (recognizing that the preponderance of the evidence standard "does not require proof to a level of scientific certainty" (cleaned up)).

In sum, the Court weighed the evidence from the parties and the credibility of the parties' experts and concludes that Acadia demonstrates that Aurobindo infringes claims 4 and 5 of the '721 patent by a preponderance of the evidence.

**B.    Defendants Fail to Demonstrate Obviousness by Clear and Convincing Evidence**

Under the Patent Act, an invention cannot be patented "if the differences between the claimed invention and the prior art are such that the claimed invention as a whole would have been obvious before the effective filing date of the claimed invention to a person having ordinary skill

60

in the art to which the claimed invention pertains." 35 U.S.C. § 103. "Patents are presumed to be valid." *P&G v. Teva Pharms. USA, Inc.*, 566 F.3d 989, 994 (Fed. Cir. 2009). Thus, any "party seeking to invalidate a patent based on obviousness must demonstrate by clear and convincing evidence that a skilled artisan would have been motivated to combine the teachings of the prior art references to achieve the claimed invention, and that the skilled artisan would have had a reasonable expectation of success in doing so." *Eli Lilly & Co. v. Teva Pharms. Int'l GmbH*, 8 F.4th 1331, 1344 (Fed. Cir. 2021). "Clear and convincing evidence places in the fact finder 'an abiding conviction that the truth of [the] factual contentions are highly probable.'" *P&G*, 566 F.3d 989, 994 (quoting *Colorado v. New Mexico*, 467 U.S. 310, 316 (1984)). "The obviousness determination turns on underlying factual inquiries involving: (1) the scope and content of prior art, (2) differences between claims and prior art, (3) the level of ordinary skill in pertinent art, and (4) secondary considerations such as commercial success and satisfaction of a long-felt need." *Id.* (citing *Graham v. John Deere Co.*, 383 U.S. 1 (1966)). The "motivation to combine references[] serves to prevent hindsight bias." *Medichem, S.A. v. Rolabo, S.L.*, 437 F.3d 1157, 1164-65 (Fed. Cir. 2006).

As stated above, claims 4 and 5 of the '721 patent recite:

> 4. A pharmaceutically acceptable capsule for orally delivering 34 mg of pimavanserin to a patient, wherein the capsule has a capsule shell with a capsule shell size 3 or 4, that encapsulates a blended pimavanserin composition comprising: granules comprising 40 mg pimavanserin tartrate and one or more pharmaceutically acceptable excipients; and wherein the bulk density of the granules is >0.4 g/ml as determined by USP, method 1.

> 5. The pharmaceutically acceptable capsule of claim 4, wherein the capsule shell is a hard shell size 4 capsule.

FoF ¶ 27.

61

The Court divides its obviousness discussion into the following Sections: (1) Plaintiff is Wrong as a Matter of Law That Only the Combination of Prior Art May Render an Invention Obvious; Modification of the Prior Art May Also Render an Invention Obvious; (2) Defendants Fail to Demonstrate by Clear and Convincing Evidence That a POSA Would Have Been Motivated to Formulate a Capsule Dosage of Pimavanserin, and (3) Defendants Fail to Demonstrate by Clear and Convincing Evidence That a POSA Would Have Been Motivated to Achieve the Bulk Density of the Claimed Invention With a Reasonable Expectation of Success in Doing So.[9]

1.  **Plaintiff is Wrong as a Matter of Law that Only the Combination of Prior Art May Render an Invention Obvious; Modification of the Prior Art May Also Render an Invention Obvious**

Plaintiff suggests that only the *combination* of prior art references can render an invention obvious. D.I. 134 at 1-2 ("Defendants' stated theory is that a 'POSA would have been motivated to modify Nuplazid Tablets to achieve the Asserted Claims with a reasonable expectation of success.' The Court 'first must determine whether [Defendants] carried [their] burden to prove that all claimed limitations are disclosed in the prior art' before even 'consider[ing] motivation to combine and reasonable expectation of success.' . . . None of Defendants' references disclose [the claim limitations]. . . . As the required elements are missing, Defendants failed to meet their burden on this threshold inquiry.").

Plaintiff is, however, incorrect since the *modification* of prior art references may also render an invention obvious. *See In re Gorris*, 847 F. App'x 889, 891 (Fed. Cir. 2021) ("Obviousness is a question of law based on underlying factual findings. Such factual findings include determinations as to: (1) the scope and content of the prior art; and (2) whether a person of ordinary skill in the art would have been motivated to combine or *modify* prior art

---

[9] In light of the holdings herein, the Court does not address every argument raised by the parties.

references with a reasonable expectation of success." (emphasis added) (citation omitted));

*Unification Techs. LLC v. Micron Tech. Inc.*, No. 2023-1348, 2024 U.S. App. LEXIS 20014, at

*14 (Fed. Cir. Aug. 9, 2024) ("And 'in appropriate circumstances, a patent can be obvious in light

of a single prior art reference if it would have been obvious to *modify* that reference to arrive at

the patented invention.'" (emphasis added) (quoting *Arendi S.A.R.L. v. Apple Inc.*, 832 F.3d 1355,

1361 (Fed. Cir. 2016)); Matthews, *Annotated Patent Digest* § 18:43.50 ("It can be error to assume

that to show obviousness based on a combination of prior art references, the combination must

actually disclose each and every claim limitation. The proper focus of the analysis looks to see if

the combination of the prior art provides enough information such that a person applying routine

skill would find the claimed invention obvious from the prior art, rather than whether each

limitation is literally disclosed somewhere in the prior art."). Therefore, the Court rejects, as a

matter of law, Plaintiff's contention that the invention was not obvious because the prior art did

not include all of the claim limitations.

**2.      Defendants Fail to Demonstrate by Clear and Convincing Evidence that a POSA Would Have Been Motivated to Formulate a Capsule Dosage of Pimavanserin**

Defendants contend that claims 4 and 5 of the '721 patent are obvious, including because

a "POSA would have been motivated to use a . . . capsule" as the formulated dosage form of

pimavanserin. D.I. 126 at 4. However, as the Court found above on the basis of the trial record,

a "POSA would not have been motivated to formulate a capsule dosage of pimavanserin." FoF ¶

116. The following predicate findings support the finding:

- "The tablet, the most frequently prescribed commercial dosage form, is stable, elegant and effective and provides the patient with a convenient product for handling, identification and administration." FoF ¶ 113 (cleaned up).

- "Tablet dosages of pimavanserin already existed." FoF ¶ 114.

63

- "Dr. Muzzio was not aware of any complaints from doctors or patients or any other healthcare professional or anyone regarding the two 17 mg tablets for pimavanserin." FoF ¶ 112 (cleaned up).

- "A POSA would not have been motivated to formulate a capsule dosage of pimavanserin over a tablet dosage of pimavanserin on the basis of pill burden." FoF ¶ 82.

- "A POSA would not have been motivated to formulate a capsule dosage of pimavanserin over a tablet dosage of pimavanserin on the basis of swallowability." FoF ¶ 99.

- "A POSA would not have been motivated to formulate a capsule dosage of pimavanserin over a tablet dosage of pimavanserin on the basis of taste." FoF ¶ 106.

- "A POSA would not have been motivated to formulate a capsule dosage of pimavanserin over a tablet dosage of pimavanserin on the basis of color coating." FoF ¶ 111.

- "A POSA would not have been motivated to formulate a capsule dosage of pimavanserin over a tablet dosage of pimavanserin on the basis of . . . commonality of dosage forms, effort by the caregiver, protection from moisture, dispersion in the mouth, and costs associated with formulation." FoF ¶ 116.

Since Defendants fail to demonstrate the motivation of a POSA to formulate a capsule dosage of pimavanserin by clear and convincing evidence, Defendants fail to meet their burden of demonstrating obviousness. *Eli Lilly & Co.*, 8 F.4th 1331, 1344 ("[A]ny party seeking to invalidate a patent based on obviousness must demonstrate by clear and convincing evidence that a skilled artisan would have been motivated to combine the teachings of the prior art references to achieve the claimed invention, and that the skilled artisan would have had a reasonable expectation of success in doing so.").

64

The Court does not adopt several of Defendants' proposed findings of fact, or, to the extent that Court does adopt some of Defendants' proposed findings of fact, the Court nonetheless maintains that Defendants fail to demonstrate, by clear and convincing evidence, that a POSA would have been motivated to pursue a capsule formulation of pimavanserin. For example, the Court does not adopt Defendants' proposed fact that a POSA "would have been motivated to modify Nuplazid Tablets to decrease the two-tablet-per-day regimen to a single pill that was easy to swallow." D.I. 126-1 ¶ 18; *see* D.I. 126 at 4. While the Court found that in general "a POSA could be motivated to minimize the number of tablets or capsules administered to patients to decrease the pill burden" (FoF ¶ 79), the Court found that here a "POSA would not have been motivated to formulate a capsule dosage of pimavanserin over a tablet dosage of pimavanserin on the basis of pill burden" (FoF ¶ 82 ).

Defendants also raise various legal contentions that are without merit. For example, Defendants contend that Dr. Little's recital of various alternatives to a capsule formulation improperly "abstract[s] back out to the larger problem . . . and ask[s] how many ways that could be done . . . completely disconnected from where the prior art would have already led a person of ordinary skill in the art." D.I. 126 at 7-8 (quoting *Purdue Pharma L.P. v. Accord Healthcare, Inc.*, No. 2023-1953, 2024 WL 5244764, at *6 (Fed. Cir. Dec. 30, 2024)). Defendants are wrong. Dr. Little's discussion of various alternatives to a capsule formulation was not abstract and not disconnected from the prior art. For example, "Dr. Little opined on the swallowability benefits of 'dispersible and effervescent tablets' in the context of the Liu reference (i.e., in the context of prior art)." FoF ¶ 94.

Defendants correctly observe that the prior art does "not need to hold itself out as flawed for a POSA to alter it." D.I. 126 at 8 (quoting *Janssen Pharms., Inc. v. Teva Pharms. USA, Inc.*,

65

97 F.4th 915, 929 (Fed. Cir. 2024)). Defendants could have, for example, demonstrated obviousness by "demonstrating a different motivation based on publicly available information." *Janssen Pharms., Inc.*, 97 F.4th 915, 929. However, Defendants fail to demonstrate obviousness based on publicly available information.

For the foregoing reasons, Defendants fail to demonstrate by clear and convincing evidence that a POSA would have been motivated to formulate a capsule dosage of pimavanserin.

### 3.     Defendants Fail to Demonstrate by Clear and Convincing Evidence that a POSA Would Have Been Motivated to Achieve the Bulk Density of the Claimed Invention With a Reasonable Expectation of Success in Doing So

With respect to bulk density (one of the limitations of claim 4 of the '721 patent), Defendants contend:

> Based on Ragnar-Tolf, a POSA would have known that, in order to fit the full 40 mg daily dose of pimavanserin tartrate in a size 4 capsule, he or she would have to slightly increase the pimavanserin tartrate concentration (by about 12%),[10] and this easily could be done by decreasing the concentration of the inactive mannitol diluent by the same amount. Based on the consistent 0.6 g/ml bulk densities shown for the pimavanserin granules in Ragnar-Tolf, a POSA would have expected the bulk density of the 40 mg strength to remain roughly the same 0.6 g/ml when the concentration of the drug was increased. Thus, a POSA would have reasonably expected that 40 mg of pimavanserin tartrate granules could fit within a size 4 capsule, and would have been able to achieve the result within one or two routine experiments.

D.I. 126 at 5-6 (citations omitted).

However, the patent examiner for the '721 patent already examined Ragnar-Tolf and explained that Ragnar-Tolf, the "closet prior art" to the Asserted Claims, does not render the Asserted Claims obvious because "the density of the granulation" in Ragnar-Tolf "would not allow for the same amount of the drug to be present in the capsule" in the Asserted Claims. FoF ¶ 131.

---

[10] Defendants explain in a footnote that the "concentration would increase from 20 percent (for the 20 mg dose disclosed in Ragnar-Tolf) to about 32.4 percent (for a 40 mg dose)" (D.I. 126 at 5 n.1 (citation omitted)) which is more accurately characterized as an increase of more than 60%.

66

To overcome the patent examiner's conclusion, Defendants bear a "particularly heavy" burden. *Impax Labs., Inc. v. Aventis Pharms., Inc.*, 545 F.3d 1312, 1314 (Fed. Cir. 2008); *see Shire LLC v. Amneal Pharms., LLC*, 802 F.3d 1301, 1307 (Fed. Cir. 2015). Defendants fail to meet this burden.

As found above, a "POSA would have not been motivated to formulate the recited capsule dosage of pimavanserin with the claimed bulk density with a reasonable expectation of success in doing so." FoF ¶ 130. The following Findings of Fact evince the foregoing:

- "A POSA seeking to develop a new dosage form of pimavanserin would have looked to the Ragnar-Tolf reference." FoF ¶ 117.

- A "POSA would have understood that pimavanserin is a 'bad-behaving' material — in that pimavanserin has a low bulk density and tends to clump up — and requires a lot of excipients to allay its bad behavior." FoF ¶ 122.

- "A POSA would have understood that Pimavanserin is hygroscopic, meaning that pimavanserin tends to absorb moisture and, thus, that formulating dosages of pimavanserin could be difficult." FoF ¶ 123.

- The "Ragnar-Tolf reference discloses examples of pimavanserin tablets that were formulated, including in 1 mg, 5 mg, and 20 mg dosages, that ranged in bulk-density between 0.56 g/ml and 0.61 g/ml." FoF ¶ 127.

- "A POSA would have understood, including on the basis of the Ragnar-Tolf reference, that, in order to fit 40 mg of pimavanserin tartrate in a size 4 capsule, he or she would have had to increase the pimavanserin tartrate concentration in the 20 mg formulation identified in Finding of Fact ¶ 127 from approximately 20% to 32.4% (i.e., by over 60%) and such

67

an increase could potentially be accomplished by also decreasing the concentration of mannitol." FoF ¶ 128.

- If possible, "a POSA would have understood that increasing the concentration of pimavanserin tartrate, and likewise decreasing the inactive mannitol diluent, in the blended pimavanserin in the manner described in Finding of Fact ¶ 128 could have increased or decreased the bulk density of the granules." FoF ¶ 129.

In particular, the increase of concentration of pimavanserin by more than 60%, while maintaining the appropriate bulk density, militates against a POSA's reasonable expectation of success here, notwithstanding that the Ragnar-Tolf reference discloses consistent bulk densities for pimavanserin in 1 mg, 5 mg, and 20 mg dosages. *See Allergan, Inc. v. Sandoz Inc.*, 796 F.3d 1293, 1305 (Fed. Cir. 2015) ("Here in this case, the prior art ranges are broader than the range in *Galderma*, and the record shows that the claimed amounts of the two different ingredients could and did materially and unpredictably alter the property of the claimed formulation. Thus, *Galderma* does not compel a conclusion of obviousness in this case."); *see also Alza Corp. v. Andrx Pharms.*, LLC, 607 F. Supp. 2d 614, 656 (D. Del. 2009) (acknowledging "expert witness testimony" that indicated "a significant level of unpredictability in the field of pharmaceutical product design").

In addition, "[t]he long delay between [the Ragnar-Tolf reference] and [the one capsule formulation] . . . supports the inference that it was difficult for researchers to create [the capsule formulation] product." *See Eurand, Inc. v. Mylan Pharms., Inc.*, 676 F.3d 1063, 1083 (Fed. Cir. 2012); FoF ¶ 118 ("The Ragnar-Tolf reference was published on November 15, 2007, almost ten years before the earliest effective filing date of the '721 patent."). Assuming that "a desire existed

68

for such a product, researchers, presumably, would have created one if they were able to do so." *See Eurand*, 676 F.3d 1063, 1083.

Since Defendants fail to demonstrate by clear and convincing evidence that a POSA would have been motivated to achieve the bulk density in the claimed invention with a reasonable expectation of success in doing so, Defendants fail to meet their burden of demonstrating obviousness. *Eli Lilly & Co.*, 8 F.4th 1331, 1344.[11]

## C.    Defendants Fail to Demonstrate Indefiniteness by Clear and Convincing Evidence

Section 112 of the Patent Act requires that the claims of a patent "particularly point[] out and distinctly claim[] the subject matter which the inventor . . . regards as the invention." 35 U.S.C. § 112(b). The "primary purpose of the definiteness requirement" that § 112(b) contains "is to ensure that the claims are written in such a way that they give notice to the public of the extent of the legal protection afforded by the patent, so that interested members of the public, e.g., competitors of the patent owner, can determine whether or not they infringe." *All Dental Prodx, LLC v. Advantage Dental Prods., Inc.*, 309 F.3d 774, 779-80 (Fed. Cir. 2002) (citation omitted).

"[A] patent is invalid for indefiniteness if its claims, read in light of the specification delineating the patent, and the prosecution history, fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention." *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 901 (2014). While a "potential infringer" need not "be able to determine *ex ante* if a particular act infringes the claims," the patentee must "apprise the public 'of what is still open to them[]'" such that "a person of ordinary skill in the art could determine whether or not an accused

---

[11] The Court does not adopt several of Defendants' proposed findings of fact, or, to the extent that Court does adopt some of Defendants' proposed findings of fact, the Court nonetheless concludes that Defendants fail to demonstrate, by clear and convincing evidence, that a POSA would have been motivated to pursue a capsule formulation of pimavanserin with the claimed bulk density with a reasonable likelihood of success.

product or method infringes the claim." *Niazi Licensing Corp. v. St. Jude Med. S.C., Inc.*, 30 F.4th 1339, 1346-47 (Fed. Cir. 2022) (citations omitted).

Like claim construction, definiteness is a question of law, but the Court must sometimes render factual findings based on extrinsic evidence to resolve the ultimate issue of definiteness. *See Sonix Tech. Co. v. Publications Int'l, Ltd.*, 844 F.3d 1370, 1376 (Fed. Cir. 2017). "Patent claims are presumed to be valid and definite." *B.E. Tech., LLC v. Twitter Inc.*, No. CV 20-621-GBW, 2024 WL 579076, at *1 (D. Del. Feb. 13, 2024) (citing 35 U.S.C. § 282). Thus, the challenger must prove indefiniteness by clear and convincing evidence. *See Nippon Shinyaku Co. v. Sarepta Therapeutics, Inc.*, No. CV 21-1015-GBW, 2023 WL 4314485, at *6 (D. Del. July 3, 2023).

Here, Defendants contend that the term "pharmaceutically acceptable capsule" from the preamble of claim 4 of the '721 patent is indefinite because the specification does not provide a POSA with reasonable certainty regarding what goes into making a capsule "pharmaceutically acceptable." D.I. 126 at 9; D.I. 126-1 ¶ 33. In particular, Defendants contend that the specification discloses "comparative examples"[12] of granulations that are "unacceptable" in light of various "subjective" standards, such as "stability." D.I. 126 at 10. Defendants contend further that, without "an objective anchor," a POSA would not be able to determine the meaning of these subjective standards and thus the meaning of "pharmaceutically acceptable capsule" from the preamble of claim 4. D.I. 126 at 10. Without being able to determine the meaning of "pharmaceutically acceptable capsule" from the preamble of claim 4, Defendants theorize that a POSA would not be able to determine "the scope of the claimed invention." D.I. 126 at 10.

---

[12] The specification of the '721 patent uses the term "comparative experiments" and not the term "comparative examples." JTX-09 at 13:33-34.

Defendants' theory, however, dissolves upon scrutiny.    Critically, the term "pharmaceutically acceptable capsule" appears in the preamble and the Court already determined above that the preamble to claim 4 of the '721 patent is not a limitation. *See supra* § III(A).  Since the preamble is not limiting, it cannot be indefinite. *See Sunoco Partners Mktg. & Terminals L.P. v. Powder Springs Logistics, LLC*, Civil Action No. 17-1390-LPS-CJB, 2019 U.S. Dist. LEXIS 146831, at *27 (D. Del. Aug. 28, 2019) ("In light of the Court's conclusion that these preamble terms are not limiting, no further construction (or consideration of Defendants' indefiniteness argument) is required." (collecting cases)).

Moreover, Defendants omit that the specification discloses that certain attributes of the products from the comparative experiments were unacceptable as a result of various *manufacturing processes. See* FoF ¶ 133 ("A POSA would have understood that the '721 patent specification discloses 'comparative experiments' of various manufacturing processes that resulted in products with 'unacceptable' characteristics'").    That the specification discloses unacceptable attributes of products that resulted from manufacturing *processes* does not render the *apparatus* claims here indefinite. *See 10Tales, Inc. v. Tiktok Inc.*, No. 21-cv-03868-VKD, 2023 U.S. Dist. LEXIS 141602, at *16 (N.D. Cal. Aug. 14, 2023) (holding that the apparatus claim was not indefinite where the specification described a process); *see also* (claim 4 of the '721 patent (reciting a capsule that encapsulates a blended pimavanserin composition)).[13]  In addition, while a "patent claim is indefinite if it combines two different statutory classes of invention—such as combining a 'machine' with a 'process'" (*Smart Denture Conversions, LLC v. Straumann USA,*

---

[13] The Court notes that a "POSA would have understood that, '[c]ontrary to the disclosed comparative experiments,' the '721 patent also 'describes [acceptable] processes to manufacture capsules of size 4 comprising 5-34 mg pimavanserin.'" FoF ¶ 136.

*LLC*, 759 F. Supp. 3d 555, 555 (D. Del. 2024)), claims 4 and 5 of the '721 patent do not combine apparatus and process elements (*see* FoF ¶ 27).

As a contingency, Defendants assert that the Asserted Claims otherwise "read on the comparative [experiments] and are invalid for claiming that which the patentees did not regard as their invention." D.I. 126 at 11; D.I. 126-1 ¶ 34. However, this contingency theory also fails since, as discussed above, the specification of the '721 patent discloses that the unacceptable attributes of the invention arose from *processes*, not different formulations of the *apparatus* itself. *See 10Tales*, 2023 U.S. Dist. LEXIS 141602, at *16. At bottom, Defendants fail to demonstrate that claim 4, when "read in light of the specification delineating the" '721 patent (including the portion of the '721 patent discussing the comparative experiments) "and the prosecution history, fail[s] to inform, with reasonable certainty, those skilled in the art about the scope of the invention." *See Nautilus*, 572 U.S. 898, 901.

Defendants' reliance (*see* D.I. 126 at 9, 11) on *Allen Engineering Corp. v. Bartell Industries*, 299 F.3d 1336 (Fed. Cir. 2002) is misplaced. "[T]his case is unlike *Allen*, where the patentee agreed that the claim language did not match what he regarded as his invention, as the intrinsic record unambiguously showed." *Ancora Techs. v. Apple, Inc.*, 744 F.3d 732, 739 (Fed. Cir. 2014). "Here, [Acadia] embraces the claim language's clear, ordinary meaning, and . . . the specification and prosecution history [do not] establish that the applicants regarded their invention as something contrary." *Id.*[14]

---

[14] Aurobindo also cites *Juxtacomm-Texas Software, LLC v. Axway, Inc.*, No. 6:10CV011, 2012 WL 7637197, at *4 (E.D. Tex. July 5, 2012). D.I. 126 at 12. However, the Court need not follow this case. *Daubert v. NRA Grp., LLC*, 861 F.3d 382, 395 (3d Cir. 2017) ("A decision of a federal district court judge is not binding precedent in either a different judicial district, the same judicial district, or even upon the same [district] judge in a different case." (alteration in original) (quoting *Camreta v. Greene*, 563 U.S. 692 (2011)); *Wahl Clipper Corp. v. Conair Corp. & Conair*

For the foregoing reasons, the Court holds that Defendants have failed to demonstrate indefiniteness by clear and convincing evidence.[15]

**D.     Defendants Fail to Demonstrate a Lack of Written Description by Clear and Convincing Evidence; Defendants Fail to Demonstrate a Lack of Enablement by Clear and Convincing Evidence**

35 U.S.C. § 112(a) contains both the written description and enablement requirements under the Patent Act. In particular, § 112(a) provides that the "specification shall contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same, and shall set forth the best mode contemplated by the inventor or joint inventor of carrying out the invention." 35 U.S.C. § 112(a).

The "written description requirement is satisfied if the specification conveys with reasonable clarity to those skilled in the art that the inventor was in possession of the claimed invention." *Pharmacyclics LLC v. Alvogen, Inc.*, No. 2021-2270, 2022 U.S. App. LEXIS 31479, at *18 (Fed. Cir. Nov. 15, 2022) (citing *Biogen Int'l GmbH v. Mylan Pharms., Inc.*, 18 F.4th 1333, 1341-42 (Fed. Cir. 2021)). A patent claim "need not provide *in haec verba* support for the claimed subject matter at issue" to satisfy the written description requirement. *Lampi Corp. v. American Power Prods., Inc.*, 228 F.3d 1365, 1378 (Fed. Cir. 2000). To satisfy the separate requirement of enablement, "the specification must enable the full scope of the invention *as defined by its claims.*" *Amgen Inc. v. Sanofi*, 598 U.S. 594, 610 (2023) (emphasis added). Defendants bear the

---

*LLC*, No. 23-cv-00114-JCG-LDH, 2024 U.S. Dist. LEXIS 23526, at *2 (D. Del. Jan. 16, 2024) (confirming that out-of-circuit cases "are not binding on this Court").

[15] The Court notes that Defendants also invoked the comparative experiments during the *Markman* stage of the proceeding to promote a construction of claim 4 requiring that the excipients were extra-granular. FoF ¶ 138. Defendants' argument now, like Defendants' arguments then, lacks merit.

burden of demonstrating a lack of written description and enablement by clear and convincing evidence. *Invitrogen Corp. v. Clontech Labs., Inc.*, 429 F.3d 1052, 1072 (Fed. Cir. 2005).

Defendants challenge whether the specification of the '721 patent (1) describes the full scope of "pharmaceutically acceptable excipients" and (2) describes and enables pimavanserin granules having the full scope of bulk densities greater than 0.4 g/ml. D.I. 126 at 12-15. As discussed sequentially below, both of Defendants' challenges fail.

**1.     Defendants Fail to Demonstrate by Clear and Convincing Evidence that the '721 Patent Does Not Describe the Full Scope of "Pharmaceutically Acceptable Excipients"**

Defendants fail to demonstrate by clear and convincing evidence that the '721 patent does not describe the full scope of "pharmaceutically acceptable excipients." In other words, Defendants fail to demonstrate by clear and convincing evidence that the '721 patent does not "convey[] with reasonable clarity to those skilled in the art that [Acadia] was in possession of" "pharmaceutically acceptable excipients." *See Pharmacyclics*, 2022 U.S. App. LEXIS 31479, at *18. The Court will address each of Defendants' arguments in turn.

*First*, Defendants contend that claim 4 broadly encompasses virtually any excipient, whereas the specification only exemplifies some excipients and, accordingly, that the '721 patent does not describe the full scope of pharmaceutically acceptable excipients. D.I. 126 at 12-14; *see* Tr. 345:12-17 (Dr. Muzzio testifying that the asserted claims are directed to "any excipient, any number of excipients in any amount having any function, so the entire universe of excipients in principle is now a claim here"). However, that the '721 patent does not disclose every potential excipient does not foreclose adequate written description. *See Baxalta Inc. v. Bayer Healthcare LLC*, 513 F. Supp. 3d 426, 453 (D. Del. Jan. 19, 2021) ("Every species in a genus need not be described in order that a genus meet the written description requirement."); *Lochner Techs., LLC v. Vizio, Inc.*, 567 F. App'x 931, 940 (Fed. Cir. 2014) (explaining that courts should consider that

74

"a patentee cannot be required to disclose every possible embodiment" when addressing "written description issue[s]").

Instead, the '721 patent only need describe "a representative number of [particular excipients] falling within the scope of [excipients] or structural features common to the members of the [excipients] so that one of skill in the art can visualize or recognize the members of the [excipients]." *See Baxalta*, 513 F. Supp. 3d 426, 453 (cleaned up); *see also* D.I. 126 at 13 (Defendants admitting that "disclosure of a species within a claim can provide support for a generic claim"). Here, the '721 patent describes "a representative number of [particular excipients] falling within the scope of [excipients]." *See Baxalta*, 513 F. Supp. 3d 426, 453; *see also* FoF ¶ 145 ("The specification discloses various embodiments of 'pharmaceutically acceptable excipients.'"); D.I. 126 at 13 (Defendants admitting that the specification describes "granules containing pimavanserin alone, or with a binder, or with a combination of colloidal silicon dioxide and Avicel"). The '721 patent also describes certain "features . . . of the [excipients]," including that the excipients may "provide, without limitation, bulk, consistency, stability, binding ability, lubrication, disintegrating ability." *See Baxalta*, 513 F. Supp. 3d 426, 453 (first set of quotations); FoF ¶ 148 (second set of quotations).

*Second*, Defendants contend that the comparative experiments from the '721 specification foreclose adequate written description. D.I. 126 at 13. However, similar to the Court's discussion *supra* § III(D), that the specification discloses unacceptable attributes of the invention that arose from certain manufacturing *processes* does not foreclose the sufficiency of Acadia's written description in connection with its *apparatus* claims. *See EVM Sys., LLC v. Rex Med., L.P.*, No. 6:13-CV-184, 2015 U.S. Dist. LEXIS 107736, at *17 (E.D. Tex. Aug. 17, 2015) ("Here, the Court previously construed that the term 'retrieval basket' is an apparatus, which is defined by its claimed

75

structural elements and does not refer to a specific medical device. Imposing a standard for the written description requirement as it applies to method claims would be improper for apparatus claims, such as those disclosed in the '670 Patent." (citation omitted)).[16] Defendants here simply "read too much into the specification." *See BASF Corp. v. Johnson Matthey Inc.*, 875 F.3d 1360, 1367 (Fed. Cir. 2017).

*Third*, Defendants posit that, "although Dr. Little pointed to Table 2 of the patent as describing pimavanserin with intragranular excipients, [Dr. Little] admitted on cross examination that this example does not disclose the identity of any excipients being added to the pimavanserin during granulation." D.I. 126 at 14. Defendants reach too far. Table 2 (reproduced below) supports the adequacy of the '721 patent's written description of "pharmaceutically acceptable excipients" because Table 2 exemplifies "pharmaceutically acceptable excipients" composing the "the Pimavanserin granulation."

TABLE 2

| Composition of Pimavanserin granulation (34 mg) | | |
|---|---|---|
| Ingredients | Qty (% w/w) | Qty (mg)/dose |
| Pimavanserin Tartrate | 40.0 | 40.0[a] |
| Microcrystalline Cellulose (Avicel PH302, NF, EP) | 59.0 | 59.0 |
| Magnesium Stearate (Vegetable Source, USP, EP) | 1.0 | 1.0 |
| Total | 100.0 | 100.0 |

[a]40 mg pimavanserin tartrate salt is equivalent to 34 mg pimavanserin free base

---

[16] The Court notes again that a "POSA would have understood that '[c]ontrary to the disclosed comparative experiments,' the '721 patent also 'describes [acceptable] processes to manufacture capsules of size 4 comprising 5-34 mg pimavanserin.'" FoF ¶ 136.

FoF ¶ 151. Moreover, as discussed above, "a representative number of [particular excipients] falling within the scope of [excipients]," like those from Table 2, may satisfy the written description requirement. *See Baxalta Inc.*, 513 F. Supp. 3d 426, 453.

For the foregoing reasons, Defendants fail to demonstrate by clear and convincing evidence that the '721 patent fails to describe "pharmaceutically acceptable excipients."

**2.    Defendants Fail to Show by Clear and Convincing Evidence that the '721 Patent Does Not Describe or Enable the Limitation of Claim 4 of "[W]herein the Bulk Density of the Granules is >0.4 g/ml"**

Defendants contend that the '721 patent does not describe or enable a bulk density of granules above 0.6 g/ml. D.I. 126 at 14-15. To achieve a bulk density above 0.6 g/ml, Defendants propose that a "POSA would need to engage in an extensive trial-and-error research program, 'equivalent to a Ph.D. dissertation,' which would constitute undue experimentation." D.I. 126-1 ¶ 40 (citation omitted). Defendants are wrong.

The Federal Circuit has explained that open-ended claims, like the bulk density limitation of claim 4 of the '721 patent, can be proper "if there is an inherent, albeit not precisely known, upper limit." *Fs.Com Inc. v. Int'l Trade Comm'n*, 65 F.4th 1373, 1376 (Fed. Cir. 2023) (considering rule in the context of enablement) (quoting *Andersen Corp. v. Fiber Composites, LLC*, 474 F.3d 1361 (Fed. Cir. 2007)); *First Quality Tissue, LLC v. Irving Consumer Prods. Ltd.*, Civil Action No. 19-428-RGA, 2022 U.S. Dist. LEXIS 58289, at *26 (D. Del. Mar. 30, 2022) (considering rule in the context of written description).

Here, the claim limitation ">0.4 ml" includes such "an inherent, albeit [perhaps] not precisely known, upper limit." *See Fs.Com Inc.*, 65 F.4th 1373, 1376. As found above, "[t]he '721 patent specification discloses a bulk density range of pimavanserin granulation between 0.4 to 0.6 g/ml and one embodiment within that range of 0.508 g/ml." FoF ¶ 153. Similarly, the "specification of the '721 patent does not teach a POSA how to make granules of pimavanserin

77

having a bulk density greater than 0.6 g/ml." FoF ¶ 154. "A POSA would have understood that generally the upper limit of bulk density for 'standard' materials is 0.7 g/ml." FoF ¶ 156. In addition, a "POSA would have understood, including on the basis of the teachings of the '721 patent, that pimavanserin is a 'bad behaving material.'" FoF ¶ 157. As such, a "POSA would have understood that granules of pimavanserin, as 'bad behaving,' will have a bulk density upper limit that is lower than the bulk density upper limit for standard materials, and that this lower bulk density limit for granules of pimavanserin would be 0.6 g/ml." FoF ¶ 158. Therefore, a POSA would have understood that the bulk density requirement of claim 4 of the '721 patent includes "an inherent, albeit [perhaps] not precisely known, upper limit" of 0.6 g/ml. *See Fs.Com Inc.*, 65 F.4th 1373, 1376; FoF ¶ 159.

Defendants' arguments to the contrary are without merit. Defendants contend that Acadia and Dr. Little fail to point to anywhere in the specification that supports an implicit upper limit of 0.6 g/ml. D.I. 126 at 14. However, the specification does support an implicit upper limit of 0.6 g/ml for the reasons discussed in the preceding paragraph. Defendants also somewhat contradict themselves by asserting that "Dr. Little relied on the background section of the specification to argue that it would have been difficult to achieve bulk densities of pimavanserin granules above 0.6 g/ml." D.I. 126 at 15.

Defendants contend that it "is undisputed that a POSA would recognize that granules of bulk densities of 0.4 to 1 g/ml were generally known to be achievable in the art." D.I. 126 at 14 n.10. However, insofar that a POSA would have recognized that *some* granule compositions may have been able to achieve a bulk density above 0.6 g/ml does not mean that a POSA would have recognized that granule compositions *of pimavanserin* would have been able to achieve a bulk density above 0.6 g/ml.

78

Appx78

For the above reasons, Defendants fail to show by clear and convincing evidence that the specification of the '721 patent does not sufficiently describe or enable the bulk density limitation of claim 4.

## IV.    DISCUSSION: MSN's MOTION FOR LEAVE

On March 18, 2025, MSN filed its motion (D.I. 137) for leave to file a reply brief in further support of its post-trial brief on invalidity (D.I. 126), along with a draft of the proposed reply brief (D.I. 137-1 Ex. A). For the reasons discussed below, the Court denies MSN's Motion.

Motions for leave to file reply briefs are highly disfavored where the reply brief is prohibited by a rule or the operative scheduling order. *See Atkinson v. Veolia N. Am.*, No. 5:19-CV-526-BO, 2021 U.S. Dist. LEXIS 22157, at *9 (E.D.N.C. Feb. 5, 2021) ("Furthermore, since reply briefs are not permitted under the rules of this Court, defendant's motion for leave to file a reply memorandum is highly disfavored."); *Harpo v. Intermark Mgmt. Co.*, No. 1:21-cv-87, 2022 U.S. Dist. LEXIS 245058, at *3 (S.D. Ga. July 11, 2022) ("Additionally, Plaintiff has no right to file a Reply, and reply briefs are generally disfavored."); *Atencio v. TuneCore, Inc.*, No. CV 16-1925-DMG (MRWx), 2018 U.S. Dist. LEXIS 223997, at *29 n.9 (C.D. Cal. Nov. 13, 2018) (acknowledging that "the Court generally disfavors reply briefing in support of motions in *limine*"); *Regions Bank v. Hyman*, No. 8:09-cv-1841-T-17MAP, 2013 U.S. Dist. LEXIS 199553, at *5 (M.D. Fla. Aug. 26, 2013) ("Contrary to the Plaintiff's comment that such motions are commonly allowed, motions for leave to file a reply are not typically granted. Indeed, replies or any other pleading directed to the motion are disfavored (*see* Local Rule 3.01(c), which requires leave of court before filing a reply; hence, the rule infers the practice should be sparingly considered).").

Few grounds overcome this disfavor. For example, courts may grant motions for leave to file a reply brief where the proposed reply "brief responds to new evidence, facts, or arguments raised for the first time in the" opposition brief. *See Versar Env't Servs., LLC v. Black & Veatch Special Projects Corp.*, C.A. No. 23-1450-RGA, 2024 WL 5090804, at *6 (D. Del. Dec. 12, 2024) (ruling on a motion for leave to file a sur-reply); *see also St. Clair Intellectual Prop. Consultants, Inc. v. Samsung Elecs. Co. Ltd.*, 291 F.R.D. 75, 80 (D. Del. 2013) (same). Critically, content from an opposition brief is not "new" if it "is directly responsive to arguments made in" the opening brief. *See Cephea Valve Techs., Inc. Equityholders' Representative v. Abbott Labs.*, Civil Action No. 23-691-GBW-SRF, 2024 U.S. Dist. LEXIS 83381, at *22 (D. Del. Mar. 18, 2024) (ruling on a motion for leave to file a sur-reply).

Courts may, but need not, grant motions for leave to file a reply brief where the opposition brief contains a "court opinion" that "did not appear in" the opening brief, even where the opposition brief relies on the court opinion in response to arguments made in the opening brief. *Cf. Empower Brands LLC v. Tristar Prods., Inc.*, Civil Action No. 23-01225-RGA, 2024 U.S. Dist. LEXIS 225561, at *5 (D. Del. Dec. 12, 2024) (ruling on a motion for leave to file a sur-reply brief where the reply brief included a decision that "did not appear in" the opening memorandum); *see Int'l Bus. Machines Corp. v. The Priceline Grp. Inc.*, No. CV 15-137-LPS-CJB, 2016 WL 626495, at *1 (D. Del. Feb. 16, 2016) (contemplating the "the need to respond to judicial opinions cited in" a reply brief), *report and recommendation adopted*, No. CV 15-137-LPS-CJB, 2016 WL 1253472 (D. Del. Mar. 30, 2016).

When the evidence, facts and arguments in the opposition brief are not "new," they do "not open the door to an expansion of briefing." *See Cephea Valve Techs.*, 2024 U.S. Dist. LEXIS 83381, at *22. Similarly, courts may deny motions for leave to file a reply brief where the

proposed reply brief raises an issue that "could have been raised" in the opening brief. *See Bishop v. JPMorgan Chase & Co.*, No. CA 13-1-RGA-MPT, 2013 WL 3177826, at *6 (D. Del. June 21, 2013) (ruling on a motion for leave to file a sur-reply brief), *report and recommendation adopted*, No. CV 13-1- RGA, 2013 WL 4007508 (D. Del. Aug. 5, 2013); *Jazayeri v. Avaya, Inc.*, No. 2:19-CV-06003-JDW, 2021 WL 2186367, at *6 (E.D. Pa. May 28, 2021) (same).

Courts may also grant motions for leave to file a reply brief where the reply brief seeks to "correct a demonstrable inaccuracy." *Choma v. Blue Cross Blue Shield of Delaware*, No. CIV.A. 06-486-JJF, 2008 WL 4276546, at *15 (D. Del. Sept. 18, 2008) (ruling on a motion for leave to file a sur-reply brief).

Although there may be occasion where the most expedient resolution of the matters underlying the briefing would be to consider "the additional briefing," the better approach is often "to encourage the parties to follow the rules." *See Waters Techs. Corp. v. Aurora SFC Sys. Inc.*, C.A. No. 11-708-RGA, 2012 WL 13167829, at *1 (D. Del. Apr. 20, 2012) (ruling on motion for leave to file a sur-reply). The decision on whether to grant leave to file a reply is ultimately one of "discretion" for the district court. *See Levey v. Brownstone Inv. Grp., LLC*, 590 F. App'x 132, 137 (3d Cir. 2014) (confirming that "permission for leave to file a sur-reply is a matter committed to the District Court's sound discretion" (cleaned up)).

As an initial matter, the operative Scheduling Order in this action instructs that "[t]here shall be no reply trial briefs filed." D.I. 120 ¶ 1; *see* D.I. 121-1 (modifying other portions of the D.I. 120 Scheduling Order). Therefore, MSN's motion requesting leave to file a reply brief is highly disfavored. The grounds that MSN sets forth in its Motion for Leave fail to overcome such disfavor. In particular, MSN identifies eight arguments from Acadia's opposition brief that purportedly merit a reply from MSN. D.I. 137 at 1-2. The Court discusses each below. Since the

81

Court declines MSN's request for leave to file a reply, the Court also declines-as-moot Acadia's

contingent request for leave to file a sur-reply (D.I. 138 at 8).

**A.     The Liu reference (DTX-013) "discouraged the use of capsules unless other dosage forms were not acceptable." (Resp. Br. at 4.)**

Defendants rely on the Liu reference in their opening brief to opine on the difficulty that

elderly patients have in swallowing their medications. D.I. 126 at 3 (citing D.I. 126-1 ¶ 16 (relying

on the Liu reference)). Acadia likewise relies on the Liu reference in its opposition brief to opine

on the difficulty that elderly patients have in swallowing their medications, particularly as it

pertains to capsules. D.I. 134 at 4 (citing D.I. 134-1 ¶ 12). Therefore, the referenced argument in

Acadia's opposition brief "is directly responsive to arguments made in" Defendants' opening brief

and not "new." *See Cephea Valve Techs.*, 2024 U.S. Dist. LEXIS 83381, at *22. Since the

argument in Acadia's opposition brief is not "new," the argument does "not open the door to an

expansion of briefing." *See id.* Even were the Court to consider the arguments in MSN's proposed

reply brief, they "would not change the outcome" of the Court's decision on invalidity. *See Del.*

*Life Ins. Co. v. Short*, No. 20-996-LPS, 2021 U.S. Dist. LEXIS 50053, at *1 n.1 (D. Del. Mar. 17,

2021).

For the foregoing reasons, the Court denies MSN's Motion for Leave with respect to

argument (A).

**B.     The Schiele reference (DTX-007) "explicitly teaches both larger dosage forms and capsules cause more swallowing difficulties." (Resp. Br. at 6.)**

Defendants rely on the Schiele reference in their opening brief to opine on the

swallowability of dosage forms. D.I. 126 at 8. Acadia likewise relies on the Schiele reference in

its opposition brief to opine on the swallowability of dosage forms, again, particularly as it pertains

to capsules. D.I. 134 at 6. Therefore, the referenced argument in Acadia's opposition brief "is

directly responsive to arguments made in" Defendants' opening brief and not "new." *See Cephea*

82

*Valve Techs.*, 2024 U.S. Dist. LEXIS 83381, at *22. Since the argument in Acadia's opposition brief is not "new," the argument does "not open the door to an expansion of briefing." *See id.* Even were the Court to consider the arguments in MSN's proposed reply brief, they "would not change the outcome" of the Court's decision on obviousness. *See Del. Life Ins. Co.*, 2021 U.S. Dist. LEXIS 50053, at *1 n.1.

For the foregoing reasons, the Court denies MSN's Motion for Leave with respect to argument (B).

**C.    Ragnar-Tolf (JTX-011) teaches a POSA towards "direct compression tablet formulations, not capsules." (Resp. Br. at 6.)**

Defendants rely on the Ragnar-Tolf reference in their opening brief to opine on a POSA's motivation to formulate capsule dosages of pimavanserin. D.I. 126 at 5-6. Acadia likewise relies on the Ragnar-Tolf reference in its opposition brief to opine on a POSA's motivation (or lack thereof) to formulate capsule dosages of pimavanserin. D.I. 134 at 6. Therefore, the referenced argument in Acadia's opposition brief "is directly responsive to arguments made in" Defendants' opening brief and not "new." *See Cephea Valve Techs.*, 2024 U.S. Dist. LEXIS 83381, at *22. Since the argument in Acadia's opposition brief is not "new," the argument does "not open the door to an expansion of briefing." *See id.* Even were the Court to consider the arguments in MSN's proposed reply brief, they "would not change the outcome" of the Court's decision on obviousness. *See Del. Life Ins. Co.*, 2021 U.S. Dist. LEXIS 50053, at *1 n.1.

For the foregoing reasons, the Court denies MSN's Motion for Leave with respect to argument (C).

**D.    That a "plain reading of the testimony, however, indicates that Dr. [Muzzio] never expressed even an expectation of success[.]" (Resp. Br. at 9.)**

MSN is correct that "Dr. Muzzio explicitly testified that a POSA would have had such an expectation [of success]" regarding the bulk density limitation of claim 4 of the '721 patent. D.I.

83

137 Ex. A at 3; *see* Tr. 335:15–336:15 (Dr. Muzzio testifying *inter alia* that a "POSA would expect the density to remain roughly there when the concentration is increased from 20 to 32 percent"). Accordingly, Acadia's argument is a "demonstrable inaccuracy" that MSN seeks to "correct." *See Choma*, 2008 WL 4276546, at *15.

However, the Court does not rely on argument (D) in its Opinion and, thus, the arguments in MSN's proposed reply brief would "not change the outcome" of the Court's decision. *See Del. Life Ins. Co.*, 2021 U.S. Dist. LEXIS 50053, at *1 n.1. For this reason, the Court denies MSN's Motion for Leave with respect to argument (D).

**E.      That "the record shows that the claimed amount[] of [pimavanserin tartrate] could and did materially and unpredictably alter the property of the claimed formulation[.]" (Resp. Br. at 9.)**

This argument pertains to bulk density. The full quote from Plaintiffs' opposition brief is: "This is especially speculative here, where pimavanserin was known to be a bad behaving material, and the record shows that the claimed amount of pimavanserin tartrate could and did materially and unpredictably alter the property of the claimed formulation, i.e., the BD of the granules." D.I. 134 at 9 (cleaned up). Defendants rely on prior art (in particular, the Ragnar-Tolf reference) in their opening brief to opine on a POSA's motivation and reasonable expectation of success in formulating a pimavanserin capsule with a bulk density above 0.4 g/ml. D.I. 126 at 5-6. Acadia similarly relies on prior art (in particular, the Catalent reference (JTX-13)) in its opposition brief to opine on a POSA's motivation and reasonable expectation of success (or lack thereof) in formulating a pimavanserin capsule with a bulk density above 0.4 g/ml. D.I. 134 at 9 (citing D.I. 134-1 ¶ 22 (citing Tr. 340:11-341:1 (Dr. Muzzio discussing the Catalent reference))). Therefore, the referenced argument in Acadia's opposition brief "is directly responsive to arguments made in" Defendants' opening brief and not "new." *See Cephea Valve Techs.*, 2024 U.S. Dist. LEXIS

84

83381, at *22. Since the argument in Acadia's opposition brief is not "new," the argument does "not open the door to an expansion of briefing." *See id.*

Unlike argument (D), argument (E) is not a "demonstrable inaccuracy." *See Choma*, 2008 WL 4276546, at *15. Rather, the parties rely on different references to contend whether a POSA would have had a reasonable expectation of success in obtaining a bulk density of the pimavanserin composition above 0.4 g/ml. Defendants rely on the Ragnar-Tolf reference, which "discloses examples of pimavanserin tablets that were formulated, including in 1 mg, 5 mg, and 20 mg dosages, that ranged in bulk-density between 0.56 and 0.61." FoF ¶ 127 (citing the record). Acadia relies on the Catalent reference, which teaches that high shear "granulations are known to be capable of [bulk density] in the $0.6 - 0.8$ g/ml range." JTX-13 at 0004. That the parties disagree on whether these references would have motivated a POSA to formulate the claimed invention with a reasonable likelihood of success is hardly surprising.

The Court does not necessarily agree with Acadia's characterization that the record shows that the claimed amount of pimavanserin tartrate materially and unpredictably changed the bulk density of the claimed invention. However, the Court found that a POSA would not have had a reasonable expectation of success in formulating a bulk density greater than 0.4 g/ml on other grounds. In addition, the arguments in MSN's proposed reply brief are essentially identical to the arguments from Defendants' opening brief. *Compare* D.I. 137 at 3, *with* D.I. 126 at 5. Thus, the arguments in MSN's proposed reply brief do "not change the outcome" of the Court's decision. *See Del. Life Ins. Co.*, 2021 U.S. Dist. LEXIS 50053, at *1 n.1.

For the foregoing reasons, the Court denies MSN's Motion for Leave with respect to argument (E).

85

**F.** **That "[ACADIA's] failure to develop a single size 4 capsule formulation suggests that skilled artisans would not have reasonably expected to succeed[.]" (Resp. Br. at 9.)**

The Court does not rely on argument (F) in its Opinion and, thus, the arguments in MSN's proposed reply brief would "not change the outcome" of the Court's decision. *See Del. Life Ins. Co.*, 2021 U.S. Dist. LEXIS 50053, at *1 n.1. For this reason, the Court denies MSN's Motion for Leave with respect to argument (F).

**G.** **That "'the long delay between the marketing of the [two tablet] formulation and [the one capsule formulation] . . . supports the inference that it was difficult for researchers to create a [single size 4 capsule] product.'" (Resp. Br. at 9.)**

The Court does not rely on argument (G) in its Opinion on obviousness and, thus, the arguments in MSN's proposed reply brief would "not change the outcome" of the Court's decision. *See Del. Life Ins. Co.*, 2021 U.S. Dist. LEXIS 50053, at *1 n.1. Though, the Court does rely on the underlying case upon which Acadia relies to reason that "the long delay between the Ragnar-Tolf reference and the one capsule formulation supports the inference that it was difficult for researchers to create the capsule formulation product." *Supra* § III(B)(3) (cleaned up). The facts undergirding the Court's reasoning are in the trial record. FoF ¶ 118 ("The Ragnar-Tolf reference was published on November 15, 2007, almost ten years before the earliest effective filing date of the '721 patent." (citing JTX-011 at 0001; Tr. 296:7-12)). Since MSN does not take issue with the underlying court decision, and since the Court relies on facts in the record and not new evidence introduced by Acadia, there is no basis for MSN's proposed reply brief.

For the foregoing reasons, the Court denies MSN's Motion for Leave with respect to argument (G).

86

**H.**     **That column 19 of the '721 patent provides "express disclosures for manufacturing processes for granules" including various excipients may be included. (See Resp. Br. at 13 (citing JTX09 at 19:12–15))**

The Court does not rely on argument (H) in forming its Opinion and, thus, the arguments in MSN's proposed reply brief would "not change the outcome" of the Court's decision. *See Del. Life Ins. Co.*, 2021 U.S. Dist. LEXIS 50053, at *1 n.1. For this reason, the Court denies MSN's Motion for Leave with respect to argument (H).

## V.     CONCLUSION

For the reasons discussed above, the Court concludes that Aurobindo infringes claims 4 and 5 of the '721 patent and that claims 4 and 5 of the '721 patent are not invalid. The Court also, for the reasons discussed above, denies MSN's Motion for Leave to File Post-Trial Reply Brief (D.I. 137) and denies-as-moot Acadia's contingent request for leave to file a sur-reply (D.I. 138 at 8). The Court will enter an Order consistent with this Opinion.

87

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| ACADIA PHARMACEUTICALS INC., | |
| Plaintiff, | |
| v. | C.A. No. 22-1387-GBW |
| AUROBINDO PHARMA LIMITED, et al., | CONSOLIDATED |
| Defendants. | |

---

## **ORDER**

At Wilmington this 16th day of May 2025, **IT IS HEREBY ORDERED** as follows:

1. The Court concludes that Acadia demonstrated by a preponderance of the evidence that Aurobindo infringes claims 4 and 5 of U.S. Patent No. 11,452,721.

2. The Court concludes that Defendants failed to demonstrate by clear and convincing evidence that claims 4 and 5 of U.S. Patent No. 11,452,721 are invalid.

3. The Court denies MSN's Motion for Leave to File Post-Trial Reply Brief (D.I. 137) and denies-as-moot Acadia's contingent request for leave to file a sur-reply (D.I. 138 at 8).

4. Within fourteen (14) days of the entry of this Order, the parties shall meet and confer in attempt to reach agreement on how this action should proceed. If the parties reach agreement, they shall file a joint letter with this Court not to exceed five (5) pages by no later than twenty-one (21) days from the entry of this Order describing the agreement. If the parties are unable to reach agreement, the parties shall file a joint letter with this Court not to exceed ten (10) pages by no later than twenty-one (21) days from the entry of this

Appx88

Order setting forth the parties' positions on how the action should proceed. Either letter shall address the relief requested in the parties' Proposed Joint Pretrial Order (D.I. 101).

5. During trial, Mr. Chad Peterman (counsel for Acadia) stated: "I do want to state on the record that we are only asserting Claims 4 and 5 of the '721 patent against -- against the defendants. We will work with MSN to file a revised stipulation because that included -- that included Claim 13 as well. But we will be only pursuing Claims 4 and 5." Tr. 18:19-24. Acadia shall file a letter with this Court not to exceed two (2) pages by no later than seven (7) days from the entry of this Order updating the Court on status of this revised stipulation.

6. Because the Court's Opinion is filed under seal, the parties shall meet and confer and, no later than thirty (30) days after entry of this Order, file a proposed redacted version of the Opinion, along with a motion supported by a declaration that contains a clear, factually detailed explanation as to why disclosure of any proposed redacted material would "work a clearly defined and serious injury to the party seeking closure." *In re Avandia Mktg., Sales Pracs. & Prod. Liab. Litig.*, 924 F.3d 662, 672 (3d Cir. 2019). If the parties do not file a proposed redacted version and corresponding motion by the deadline, or if the Court determines the motion lacks a meritorious basis, the Opinion will be unsealed in whole or in part.

_____
GREGORY B. WILLIAMS
UNITED STATES DISTRICT JUDGE

Appx89

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| ACADIA PHARMACEUTICALS INC., ) | |
| ) | |
| Plaintiff, ) | |
| ) | C.A. No. 22-1387-GBW |
| v. ) | |
| ) | CONSOLIDATED |
| AUROBINDO PHARMA LIMITED *et al.*, ) | |
| ) | |
| Defendants. ) | |

**<u>FINAL JUDGMENT</u>**

**WHEREAS,** Plaintiff Acadia Pharmaceuticals Inc. ("Acadia") in the above-captioned suit has asserted that Defendants MSN Laboratories Private Ltd. and MSN Pharmaceuticals Inc. (collectively, "MSN"), and Aurobindo Pharma Limited and Aurobindo Pharma USA, Inc. (collectively, "Aurobindo") both infringed claims 4 and 5 of Acadia's United States Patent No. 11,452,721 ("the '721 patent") by filing their respective Abbreviated New Drug Applications ("ANDA") (specifically, Aurobindo's ANDA No. 214782 and MSN's ANDA No. 214925);

**WHEREAS,** the Court held a three-day bench trial in this action on December 3, 4, and 6, 2024; and

**WHEREAS,** the Court issued an opinion setting forth its Findings of Fact and Conclusions of Law on May 16, 2025 (D.I. 140);

**NOW THEREFORE, IT IS HEREBY ORDERED, DECREED, AND ADJUDGED:**

1.     The Court has jurisdiction over Acadia, MSN, and Aurobindo, and the subject matter of this action.

1

2.     Final Judgment is entered in favor of Acadia and against MSN and Aurobindo on all claims and counterclaims with respect to the '721 patent.  Claims 4 and 5 of the '721 patent are not invalid.

3.     The manufacture, use, offer for sale, or sale within the United States, or importation into the United States, of Aurobindo's ANDA product that is the subject of ANDA No. 214782 before the expiration of the '721 patent would infringe claims 4 and 5 of the '721 patent.

4.     The manufacture, use, offer for sale, or sale within the United States, or importation into the United States, of MSN's ANDA product that is the subject of ANDA No. 214925 before the expiration of the '721 patent would infringe claims 4 and 5 of the '721 patent.

5.     Pursuant to 35 U.S.C. § 271(e)(4)(A), the effective date for any approval of Aurobindo's ANDA No. 214782 and MSN's ANDA No. 214925 shall be no earlier than the expiration date of the '721 patent (currently August 27, 2038).  If Acadia becomes entitled to any other exclusivities that are not referenced herein, Acadia may apply to the Court for further relief as may be appropriate.

6.     Pursuant to 35 U.S.C. § 271(e)(4)(B), Aurobindo and its affiliates, successors, partners, officers, agents, servants, employees, and attorneys, and other persons or entities in active concert or participation with any of them, are hereby enjoined from making, using, offering to sell, or selling within the United States, or importing into the United States, the product that is the subject of ANDA No. 214782 until no earlier than the expiration date of the '721 patent (currently August 27, 2038).

7.     In accordance with 21 C.F.R. § 314.107(e), Aurobindo shall submit a copy of this Final Judgment to the FDA within fourteen (14) days of the date of entry of this Final Judgment by the Court.

2

Appx91

8.    Pursuant to 35 U.S.C. § 271(e)(4)(B), MSN and its affiliates, successors, partners, officers, agents, servants, employees, and attorneys, and other persons or entities in active concert or participation with any of them, are hereby enjoined from making, using, offering to sell, or selling within the United States, or importing into the United States, the product that is the subject of ANDA No. 214925 until no earlier than the expiration date of the '721 patent (currently August 27, 2038).

9.    In accordance with 21 C.F.R. § 314.107(e), MSN shall submit a copy of this Final Judgment to the FDA within fourteen (14) days of the date of entry of this Final Judgment by the Court.

10.    Pursuant to Fed. R. Civ. P. 54, D. Del. LR 54.1, and 28 U.S.C. § 1920, Acadia may seek its costs, subject to Paragraphs 11 and 12, in an amount to be determined by the Clerk of the Court.

11.    In the event that a party appeals this Final Judgment, any motion for attorneys' fees or submission of a bill of costs, including any motion that this case is exceptional under 35 U.S.C. § 285, shall be considered timely if filed within 60 days after the expiration of the time to petition for certiorari to the United States Supreme Court or, if the appeal is withdrawn or dismissed, within 60 days after such withdrawal or dismissal.

12.    In the event that no party appeals this Final Judgment, any motion for attorneys' fees or submission of a bill of costs, including any motion that this case is exceptional under 35 U.S.C. § 285, shall be considered timely if filed within 60 days after the expiration of the time for filing a notice of appeal under Fed. R. App. P. 3 and 4.

13.    This is a final, appealable judgment.

3

**IT IS SO ORDERED**, on this _____ day of _____, 2025

_____

HONORABLE GREGORY B. WILLIAMS
UNITED STATES DISTRICT JUDGE

4



**Agarwal**
**Exhibit 6**
**(4-10-24)**
WWW.DIGITALEVIDENCEGROUP.COM

# THE UNITED STATES OF AMERICA

## TO ALL TO WHOM THESE PRESENTS SHALL COME:

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office

June 5, 2023

THIS IS TO CERTIFY THAT ANNEXED HERETO IS A TRUE COPY FROM THE RECORDS OF THIS OFFICE OF:

PATENT NUMBER: *11,452,721*
ISSUE DATE: *September 27, 2022*

By Authority of the
Under Secretary of Commerce for Intellectual Property
and Director of the United States Patent and Trademark Office

Sylvia Holley
Certifying Officer

C.A. No. 22-1387-GBW
JOINT TRIAL
EXHIBIT

## JTX-0009

ACADIA_1287386

Appx94



US011452721B2

(12) **United States Patent**
Tejwani et al.

(10) Patent No.: **US 11,452,721 B2**
(45) Date of Patent: **\*Sep. 27, 2022**

(54) **FORMULATIONS OF PIMAVANSERIN**

(71) Applicant: **ACADIA Pharmaceuticals Inc.**, San Diego, CA (US)

(72) Inventors: **Ravindra Tejwani**, Monmouth Junction, NJ (US); **Stephen Edward Abele**, White Plains, NY (US); **Emanuel Joseph Vizzotti**, Millburn, NJ (US)

(73) Assignee: **ACADIA Pharmaceuticals Inc.**, San Diego, CA (US)

( \* ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **17/693,830**

(22) Filed: **Mar. 14, 2022**

(65) **Prior Publication Data**

US 2022/0193057 A1      Jun. 23, 2022

**Related U.S. Application Data**

(63) Continuation of application No. 17/080,731, filed on Oct. 26, 2020, which is a continuation of application No. 16/836,086, filed on Mar. 31, 2020, now Pat. No. 10,849,891, which is a continuation of application No. 16/571,554, filed on Sep. 16, 2019, now Pat. No. 10,646,480, which is a continuation of application No. 16/363,378, filed on Mar. 25, 2019, now Pat. No. 10,449,185, which is a continuation of application No. PCT/US2018/048096, filed on Aug. 27, 2018.

(60) Provisional application No. 62/552,300, filed on Aug. 30, 2017.

(30) **Foreign Application Priority Data**

Sep. 1, 2017    (SE) .................................. 1730232-4

(51) **Int. Cl.**
| | |
|---|---|
| *A61K 9/48* | (2006.01) |
| *A61K 31/4468* | (2006.01) |
| *A61K 9/16* | (2006.01) |
| *A61K 9/20* | (2006.01) |
| *A61K 47/38* | (2006.01) |

(52) **U.S. Cl.**
CPC ........ *A61K 31/4468* (2013.01); *A61K 9/1652* (2013.01); *A61K 9/1688* (2013.01); *A61K 9/1694* (2013.01); *A61K 9/2009* (2013.01); *A61K 9/2013* (2013.01); *A61K 9/2054* (2013.01); *A61K 9/485* (2013.01); *A61K 9/4808* (2013.01); *A61K 9/4833* (2013.01); *A61K 9/4858* (2013.01); *A61K 9/4866* (2013.01); *A61K 47/38* (2013.01); *C07B 2200/13* (2013.01)

(58) **Field of Classification Search**
CPC .. A61K 9/4833; A61K 9/4841; A61K 9/4883; A61K 9/4891
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| 3,983,234 A | 9/1976 | Sayers |
| 4,138,492 A | 2/1979 | Noverola et al. |
| 4,255,432 A | 3/1981 | Kluge et al. |
| 4,332,804 A | 6/1982 | Clark |
| 4,353,900 A | 10/1982 | Clark |
| 4,353,901 A | 10/1982 | Clark |
| 4,367,232 A | 1/1983 | Boix-Iglesias et al. |
| 4,795,646 A | 1/1989 | Schlunken |
| 4,853,394 A | 8/1989 | King |
| 5,025,013 A | 6/1991 | Barreau |
| 5,214,055 A | 5/1993 | Peglion et al. |
| 5,216,165 A | 6/1993 | Mobilio et al. |
| 5,461,066 A | 10/1995 | Gericke et al. |
| 5,595,872 A | 1/1997 | Wetterau, II et al. |
| 5,621,010 A | 4/1997 | Sueda et al. |
| 5,707,798 A | 1/1998 | Brann |
| 5,795,894 A | 8/1998 | Shue |
| 5,837,730 A | 11/1998 | Javitt |
| 5,869,488 A | 2/1999 | Shue |
| 5,877,173 A | 3/1999 | Olney et al. |
| 5,912,132 A | 6/1999 | Brann |
| 5,955,281 A | 9/1999 | Brann |
| 6,107,324 A | 8/2000 | Behan |
| 6,140,509 A | 10/2000 | Behan |
| 6,150,393 A | 11/2000 | Behan |
| 6,358,698 B1 | 3/2002 | Weiner et al. |
| 6,451,343 B1 | 9/2002 | Glinecke et al. |
| 6,479,480 B1 | 11/2002 | Moyes |
| 6,486,153 B1 | 11/2002 | Castro Pineiro |
| 6,670,137 B2 | 12/2003 | VanMechelen et al. |
| 6,756,393 B2 | 6/2004 | Andersson et al. |
| 6,815,458 B2 | 11/2004 | Andersson et al. |
| 6,911,452 B2 | 6/2005 | Schlienger |
| 7,022,698 B2 | 4/2006 | Hamied et al. |
| 7,041,667 B1 | 5/2006 | Armour et al. |
| 7,087,593 B2 | 8/2006 | Kelly et al. |
| 7,115,634 B2 | 10/2006 | Thurieau et al. |
| 7,217,719 B2 | 5/2007 | Schlienger |
| 7,253,186 B2 | 8/2007 | Andersson et al. |
| 7,351,707 B2 | 4/2008 | Schlienger |
| 7,393,861 B2 | 7/2008 | Thurieau et al. |
| 7,476,682 B2 | 1/2009 | Andersson et al. |
| 7,538,222 B2 | 5/2009 | Andersson et al. |
| 7,601,740 B2 | 10/2009 | Weiner et al. |

(Continued)

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| CA | 984843 A | 3/1976 |
| CN | 104844502 A | 8/2015 |

(Continued)

OTHER PUBLICATIONS

U.S. Appl. No. 09/800,096, Azacyclic compounds, filed Mar. 6, 2001, U.S. Pat. No. 6,815,458.

(Continued)

*Primary Examiner* — Micah Paul Young

(74) *Attorney, Agent, or Firm* — Goodwin Procter LLP

(57) **ABSTRACT**

Provided herein are capsules containing pimavanserin, processes for manufacturing said capsule, and pharmaceutical compositions containing pimavanserin.

**13 Claims, 4 Drawing Sheets**

JTX09-0002

ACADIA_1287387

Appx95

**US 11,452,721 B2**

Page 2

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 7,659,285 | B2 | 2/2010 | Weiner et al. |
| 7,713,995 | B2 | 5/2010 | Weiner et al. |
| 7,732,462 | B2 | 6/2010 | Weiner et al. |
| 7,732,615 | B2 | 6/2010 | Thygesen et al. |
| 7,790,899 | B2 | 9/2010 | Tolf et al. |
| 7,816,383 | B1 | 10/2010 | Bradford et al. |
| 7,820,695 | B2 | 10/2010 | Weiner et al. |
| 7,858,789 | B2 | 12/2010 | Thurieau et al. |
| 7,863,296 | B2 | 1/2011 | Weiner et al. |
| 7,868,176 | B2 | 1/2011 | Thygesen et al. |
| 7,875,632 | B2 | 1/2011 | Weiner et al. |
| 7,923,564 | B2 | 4/2011 | Thygesen et al. |
| 7,994,193 | B2 | 8/2011 | Weiner et al. |
| 8,008,323 | B2 | 8/2011 | Weiner et al. |
| 8,110,574 | B2 | 2/2012 | Thurieau et al. |
| 8,227,487 | B2 | 7/2012 | Weiner et al. |
| 8,236,960 | B2 | 8/2012 | Thygesen et al. |
| 8,377,959 | B2 | 2/2013 | Weiner et al. |
| 8,618,130 | B2 | 12/2013 | Weiner et al. |
| 8,921,393 | B2 | 12/2014 | Weiner et al. |
| 9,050,343 | B2 | 6/2015 | Peters et al. |
| 9,211,289 | B2 | 12/2015 | Weiner et al. |
| 9,296,694 | B2 | 3/2016 | Andersson et al. |
| 9,446,037 | B2 | 9/2016 | Mills et al. |
| 9,486,453 | B2 | 11/2016 | Javitt |
| 9,566,271 | B2 | 2/2017 | Weiner et al. |
| 9,757,366 | B2 | 9/2017 | Mills et al. |
| 9,765,053 | B2 | 9/2017 | Andersson et al. |
| 10,028,944 | B2 | 7/2018 | Weiner et al. |
| 10,449,185 | B2 * | 10/2019 | Tejwani ............. A61K 9/485 |
| 10,517,860 | B2 | 12/2019 | Parkinson |
| 10,525,046 | B2 | 1/2020 | Weiner et al. |
| 10,597,363 | B2 | 3/2020 | Carlos et al. |
| 10,646,480 | B2 * | 5/2020 | Tejwani ............. A61K 9/4833 |
| 10,849,891 | B2 * | 12/2020 | Tejwani ............. A61K 9/2054 |
| 10,953,000 | B2 | 3/2021 | Parkinson |
| 10,981,870 | B2 | 4/2021 | Carlos et al. |
| 10,981,871 | B2 | 4/2021 | Carlos et al. |
| 11,135,211 | B2 | 10/2021 | Burstein |
| 11,191,757 | B2 | 12/2021 | Parkinson |
| 2002/0004513 | A1 | 1/2002 | Andersson et al. |
| 2002/0156068 | A1 | 10/2002 | Behan |
| 2002/0165225 | A1 | 11/2002 | Kankan et al. |
| 2004/0006081 | A1 | 1/2004 | Burrows |
| 2004/0006600 | A1 | 6/2004 | Andersson et al. |
| 2004/0213816 | A1 | 10/2004 | Weiner et al. |
| 2004/0229908 | A1 | 11/2004 | Nelson |
| 2005/0014757 | A1 | 1/2005 | Andersson et al. |
| 2005/0148018 | A1 | 7/2005 | Weiner et al. |
| 2005/0244862 | A1 | 11/2005 | Brann |
| 2005/0256108 | A1 | 11/2005 | Schlienger |
| 2005/0261278 | A1 | 11/2005 | Weiner et al. |
| 2005/0261340 | A1 | 11/2005 | Weiner et al. |
| 2005/0288328 | A1 | 12/2005 | Weiner et al. |
| 2006/0094758 | A1 | 5/2006 | Andersson et al. |
| 2006/0106063 | A1 | 5/2006 | Thhygesen et al. |
| 2006/0111399 | A1 | 5/2006 | Thhygesen et al. |
| 2006/0194778 | A1 | 8/2006 | Andersson et al. |
| 2006/0194834 | A1 | 8/2006 | Andersson et al. |
| 2006/0199794 | A1 | 9/2006 | Schlienger |
| 2006/0199818 | A1 | 9/2006 | Andersson et al. |
| 2006/0199842 | A1 | 9/2006 | Weiner et al. |
| 2006/0204486 | A1 | 9/2006 | Pyke et al. |
| 2006/0205710 | A1 | 9/2006 | Schlienger |
| 2006/0205722 | A1 | 9/2006 | Andersson et al. |
| 2006/0205780 | A1 | 9/2006 | Thygesen et al. |
| 2006/0205781 | A1 | 9/2006 | Thygesen et al. |
| 2006/0264465 | A1 | 11/2006 | Weiner et al. |
| 2006/0264466 | A1 | 11/2006 | Weiner et al. |
| 2006/0286610 | A1 | 12/2006 | Brann |
| 2006/0292606 | A1 | 12/2006 | Brann |
| 2007/0260064 | A1 | 11/2007 | Tolf et al. |
| 2007/0264330 | A1 * | 11/2007 | Ragnar-Tolf ......... A61K 9/2059 424/464 |
| 2008/0051429 | A1 | 2/2008 | Van Kammen et al. |

| | | | |
|---|---|---|---|
| 2008/0280886 | A1 | 11/2008 | Gant et al. |
| 2009/0053329 | A1 | 2/2009 | Peters et al. |
| 2009/0082342 | A1 | 3/2009 | Uldam et al. |
| 2009/0082388 | A1 | 3/2009 | Hacksell |
| 2009/0186921 | A1 | 7/2009 | Andersson et al. |
| 2014/0018348 | A1 | 1/2014 | Javitt |
| 2014/0162942 | A1 | 6/2014 | Ghosal et al. |
| 2014/0221395 | A1 | 8/2014 | Dhnoa |
| 2014/0329903 | A1 | 11/2014 | Burstein et al. |
| 2014/0349976 | A1 | 11/2014 | Hacksell et al. |
| 2015/0231126 | A1 | 8/2015 | Peters |
| 2015/0313888 | A1 | 11/2015 | Mills et al. |
| 2016/0237036 | A1 | 8/2016 | Andersson et al. |
| 2018/0037549 | A1 | 2/2018 | Biljan |
| 2019/0030015 | A1 | 1/2019 | Weiner et al. |
| 2019/0047955 | A1 | 2/2019 | Carlos et al. |
| 2019/0117636 | A1 | 4/2019 | Burstein |
| 2019/0216791 | A1 | 7/2019 | Tejwani et al. |
| 2019/0231767 | A1 | 8/2019 | Parkinson |
| 2019/0240211 | A1 | 8/2019 | Parkinson |
| 2020/0009122 | A1 | 1/2020 | Tejwani et al. |
| 2020/0061045 | A1 | 2/2020 | Burstein |
| 2020/0078346 | A1 | 3/2020 | Parkinson |
| 2020/0165202 | A1 | 5/2020 | Carlos et al. |
| 2020/0181087 | A1 | 6/2020 | Carlos et al. |
| 2020/0222381 | A1 | 7/2020 | Tejwani et al. |
| 2020/0237739 | A1 | 7/2020 | Coate et al. |
| 2020/0323836 | A1 | 10/2020 | Weiner et al. |
| 2021/0077479 | A1 | 3/2021 | Tejwani et al. |
| 2021/0161880 | A1 | 6/2021 | Foff |
| 2021/0283118 | A1 | 9/2021 | Tejwani et al. |
| 2022/0000852 | A1 | 1/2022 | Burstein |
| 2022/0016101 | A1 | 1/2022 | Burstein et al. |
| 2022/0024871 | A1 | 1/2022 | Carlos et al. |

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| CN | 104961672 A | 10/2015 |
| CN | 105111135 A | 12/2015 |
| CN | 105153016 A | 12/2015 |
| CN | 105418460 A | 3/2016 |
| CN | 105481757 A | 4/2016 |
| CN | 105820110 A | 8/2016 |
| CN | 106543072 A | 3/2017 |
| EP | 0005318 B1 | 11/1979 |
| EP | 0061333 B1 | 9/1982 |
| EP | 0260070 B1 | 3/1988 |
| EP | 0379441 A1 | 7/1990 |
| EP | 0548015 B1 | 6/1993 |
| EP | 0625507 B1 | 11/1994 |
| EP | 1576985 A1 | 9/2005 |
| HU | 157325 | 3/1998 |
| JP | 51052176 | 5/1976 |
| JP | 52085174 A | 7/1977 |
| WO | WO-9427967 A1 | 12/1994 |
| WO | WO-9708166 A1 | 3/1997 |
| WO | WO-9711940 A1 | 4/1997 |
| WO | WO-9738665 A2 | 10/1997 |
| WO | WO-9738984 A1 | 10/1997 |
| WO | WO-9811128 A1 | 3/1998 |
| WO | WO-9817646 A1 | 4/1998 |
| WO | WO-98/44921 A1 | 10/1998 |
| WO | WO-98/50534 A1 | 11/1998 |
| WO | WO-9952927 A1 | 10/1999 |
| WO | WO-2000/020636 A1 | 4/2000 |
| WO | WO-0023076 A1 | 4/2000 |
| WO | WO-0056335 A1 | 9/2000 |
| WO | WO-0059497 A1 | 10/2000 |
| WO | WO-0069810 A1 | 11/2000 |
| WO | WO-2001/029008 A1 | 4/2001 |
| WO | WO-0144191 A1 | 6/2001 |
| WO | WO-0166521 A1 | 9/2001 |
| WO | WO-0187839 A1 | 11/2001 |
| WO | WO-2001089498 A2 | 11/2001 |
| WO | WO-0224649 A1 | 3/2002 |
| WO | WO-2002038142 A2 | 5/2002 |
| WO | WO-02076464 A1 | 10/2002 |
| WO | WO-02079186 A2 | 10/2002 |
| WO | WO-03057698 A2 | 7/2003 |

ACADIA_1287388

Appx96

**US 11,452,721 B2**
Page 3

(56)                **References Cited**

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| WO | WO-03062206 A2 | 7/2003 |
| WO | WO-03070246 A1 | 8/2003 |
| WO | WO-03086400 A1 | 10/2003 |
| WO | WO-04000808 A2 | 12/2003 |
| WO | WO-04039322 A2 | 5/2004 |
| WO | WO-04064753 A1 | 8/2004 |
| WO | WO-2004064738 A2 | 8/2004 |
| WO | WO-05053796 A1 | 6/2005 |
| WO | WO-05063254 A2 | 7/2005 |
| WO | WO-05112927 A1 | 12/2005 |
| WO | WO-2006036874 A1 | 4/2006 |
| WO | WO-2006037043 A1 | 4/2006 |
| WO | WO-06104826 A2 | 10/2006 |
| WO | WO-2007124136 A1 | 11/2007 |
| WO | WO-2007133802 A2 | 11/2007 |
| WO | WO-2008116024 A2 | 9/2008 |
| WO | WO-2008141057 A1 | 11/2008 |
| WO | WO-2008144326 A2 | 11/2008 |
| WO | WO-2008144665 A1 | 11/2008 |
| WO | WO-2009035473 A2 | 3/2009 |
| WO | WO-2009039460 A2 | 3/2009 |
| WO | WO-2009039461 A2 | 3/2009 |
| WO | WO-2010111353 A1 | 9/2010 |
| WO | WO-2011047341 A2 | 4/2011 |
| WO | WO-2011085216 A2 | 7/2011 |
| WO | WO-2014085362 A1 | 6/2014 |
| WO | WO-2015087283 A1 | 6/2015 |
| WO | WO-2016201373 A1 | 12/2016 |
| WO | WO-2017011767 A1 | 1/2017 |
| WO | WO-2017015272 A1 | 1/2017 |
| WO | WO-2017165635 A1 | 9/2017 |
| WO | WO-2017172757 A1 | 10/2017 |
| WO | WO-2018118626 A1 | 6/2018 |
| WO | WO-2018200977 A1 | 11/2018 |
| WO | WO-2019046167 A1 | 3/2019 |
| WO | WO-2019177973 A1 | 9/2019 |
| WO | WO-2020092618 A1 | 5/2020 |
| WO | WO-2021016369 A1 | 1/2021 |
| WO | WO-2021030607 A1 | 2/2021 |

OTHER PUBLICATIONS

U.S. Appl. No. 10/409,782, Azacyclic compounds, filed Apr. 7, 2003, U.S. Pat. No. 6,756,393.
U.S. Appl. No. 13/053,079, Methods of treatment using selective 5-HT2A inverse agonists, filed Mar. 21, 2011, U.S. Pat. No. 9,765,053.
U.S. Appl. No. 14/628,156, Azacyclic compounds, filed Feb. 20, 2015, U.S. Pat. No. 9,296,694.
U.S. Appl. No. 10/759,564, Selective serotonin 2A/2C receptor inverse agonists as therapeutics for neurodegenerative diseases, filed Jan. 15, 2004, U.S. Pat. No. 7,601,740.
U.S. Appl. No. 11/416,527, Selective Serotonin 2A/2C Receptor Inverse Agonists as Therapeutics for Neurodegenerative Diseases, filed May 3, 2006 2006, U.S. Pat. No. 7,732,462.
U.S. Appl. No. 11/416,855, Selective serotonin 2A/2C receptor inverse agonists as therapeutics for neurodegenerative diseases, filed May 3, 2006, U.S. Pat. No. 7,659,285.
U.S. Appl. No. 11/416,594, Selective serotonin 2A/2C receptor inverse agonists as therapeutics for neurodegenerative diseases, filed May 3, 2006, U.S. Pat. No. 7,713,995.
U.S. Appl. No. 12/759,662, Selective serotonin 2A/2C receptor inverse agonists as therapeutics for neurodegenerative diseases, filed Apr. 13, 2010, U.S. Pat. No. 7,994,193.
U.S. Appl. No. 12/759,664, Selective serotonin 2A/2C receptor inverse agonists as therapeutics for neurodegenerative diseases, filed Apr. 13, 2010, U.S. Pat. No. 8,008,323.
U.S. Appl. No. 13/169,893, Selective serotonin 2A/2C receptor inverse agonists as therapeutics for neurodegenerative diseases, filed Jun. 27, 2011, U.S. Pat. No. 8,227,487.
U.S. Appl. No. 13/539,011, Selective serotonin 2A/2C receptor inverse agonists as therapeutics for neurodegenerative diseases, filed Jun. 29, 2012, U.S. Pat. No. 8,377,959.

U.S. Appl. No. 13/750,778, Selective serotonin 2A/2C receptor inverse agonists as therapeutics for neurodegenerative diseases, filed Jan. 25, 2013, U.S. Pat. No. 8,618,130.
U.S. Appl. No. 14/086,838, Selective serotonin 2A/2C receptor inverse agonists as therapeutics for neurodegenerative diseases, filed Nov. 21, 2013, U.S. Pat. No. 8,921,393.
U.S. Appl. No. 14/537,793, Selective serotonin 2A/2C receptor inverse agonists as therapeutics for neurodegenerative diseases, filed Nov. 10, 2014, U.S. Pat. No. 9,211,289.
U.S. Appl. No. 14/935,246, Selective serotonin 2A/2C receptor inverse agonists as therapeutics for neurodegenerative diseases, filed Nov. 6, 2015, U.S. Pat. No. 9,566,271.
U.S. Appl. No. 15/397,582, Selective serotonin 2A/2C receptor inverse agonists as therapeutics for neurodegenerative diseases, filed Jan. 3, 2017, U.S. Pat. No. 10,028,944.
U.S. Appl. No. 16/019,485, Selective serotonin 2A/2C receptor inverse agonists as therapeutics for neurodegenerative diseases, filed Jun. 26, 2018, U.S. Pat. No. 10,525,046.
U.S. Appl. No. 17/474,816, Selective serotonin 2A/2C receptor inverse agonists as therapeutics for neurodegenerative diseases, filed Sep. 14, 2021, Pending.
U.S. Appl. No. 10/850,819, Selective serotonin receptor inverse agonists as therapeutics for disease, filed May 21, 2004, U.S. Pat. No. 7,820,695.
U.S. Appl. No. 11/134,769, Selective serotonin receptor inverse agonists as therapeutics for disease, filed May 20, 2005, U.S. Pat. No. 7,863,296.
U.S. Appl. No. 12/378,385, Selective serotonin receptor inverse agonists as therapeutics for disease, filed Feb. 11, 2009, U.S. Pat. No. 7,875,632.
U.S. Appl. No. 11/235,558, N-(4-fluorobenzyl)-N-(1-methylpiperidin-4-yl)-N'-(4-(2-methylpropyloxy)phenylmethyl)carbamide and its tartrate salt and crystalline forms, filed Sep. 26, 2005, U.S. Pat. No. 7,732,615.
U.S. Appl. No. 11/235,381, Salts of N-(4-fluorobenzyl)-N-(1-methylpiperidin-4-yl)-N'-(4-(2-methylprop-yloxy)phenylmethyl)carbamide and their preparation, filed Sep. 26, 2005, U.S. Pat. No. 7,868,176.
U.S. Appl. No. 12/795,547, Synthesis of N-(4-fluorobenzyl)-N-(1-methylpiperidin-4-yl)-N'-(4-(2-methylpropyloxy)phenylmethyl)carbamide and its tartrate salt and crystalline forms, filed Jun. 7, 2010, U.S. Pat. No. 7,923,564.
U.S. Appl. No. 13/081,427, Synthesis of N-(4-fluorobenzyl)-N-(1-methylpiperidin-4-yl)-N'-(4-(2-methylpropyloxy)phenylmethyl)carbamide and its tartrate salt and crystalline forms, filed Apr. 6, 2011, U.S. Pat. No. 8,236,960.
U.S. Appl. No. Synthesis of N-(4-fluorobenzyl)-N-(1-methylpiperidin-4-yl)-N'-(4-(2-methylpropyloxy)phenylmethyl)carbamide and its tartrate salt and crystalline forms, filed May 15, 2007, U.S. Pat. No. 7,790,899.
U.S. Appl. No. 13/754,769, Combination of pimavanserin and risperidone for the treatment of psychosis, filed Jan. 30, 2013, U.S. Pat. No. 9,050,343.
U.S. Appl. No. 14/647,438, Methods for the treatment of Parkinson's disease psychosis using pimavanserin, filed May 26, 2015, U.S. Pat. No. 9,446,037.
U.S. Appl. No. 15/246,412, Methods for the treatment of Parkinson's disease psychosis using pimavanserin, filed Aug. 24, 2016, U.S. Pat. No. 9,757,366.
U.S. Appl. No. 15/744,636, Methods for preparing N-(4-fluorobenzyl)-N-(1-methylpiperidin-4-yl)-N'-(4-(2-methylpropyloxy)phenylmethyl)carbamide and its tartrate salt and polymorphic form, filed Jan. 12, 2018, U.S. Pat. No. 10,597,363.
U.S. Appl. No. 16/743,607, Methods for preparing N-(4-fluorobenzyl)-N-(1-methylpiperidin-4-yl)-N'-(4-(2-methylpropyloxy)phenylmethyl)carbamide and its tartrate salt and polymorphic form, filed Jan. 15, 2020, U.S. Pat. No. 10,981,870.
U.S. Appl. No. 16/686,809, Methods for preparing N-(4-fluorobenzyl)-N-(1-methylpiperidin-4-yl)-N'-(4-(2-methylpropyloxy)phenylmethyl)carbamide and its tartrate salt and polymorphic form, filed Feb. 10, 2020, U.S. Pat. No. 10,981,871.
U.S. Appl. No. 17/203,266, Methods for preparing N-(4-fluorobenzyl)-N-(1-methylpiperidin-4-yl)-N'-(4-(2-

ACADIA_1287389

Appx97

US 11,452,721 B2

Page 4

(56)    **References Cited**

OTHER PUBLICATIONS

methylpropyloxy)phenylmethyl)carbamide and its tartrate salt and polymorphic form, filed Mar. 16, 2021, Pending, 20220024871.

U.S. Appl. No. 17/176,723, 5-HT2A serotonin receptor inverse agonists or antagonists for use in reducing amyloid-beta peptides and accumulation of amyloid plaques, filed Feb. 16, 2021, Pending, 20220000852.

U.S. Appl. No. 16/087,604, Combination of pimavanserin and cytochrome p450 modulators, filed Sep. 21, 2018, U.S. Pat. No. 10,953,000.

U.S. Appl. No. 16/379,169, Combination of pimavanserin and cytochrome p450 modulators, filed Apr. 9, 2019, U.S. Pat. No. 10,517,860.

U.S. Appl. No. 16/684,883, Combination of pimavanserin and cytochrome p450 modulators, filed Nov. 19, 2019, U.S. Pat. No. 11,191,757.

U.S. Appl. No. 17/518,776, Combination of pimavanserin and cytochrome p450 modulators, filed Nov. 4, 2021, Pending.

U.S. Appl. No. 16/607,234, Pimavanserin for Treating Impulse Control Disorder, filed Oct. 22, 2019, U.S. Pat. No. 11,135,211.

U.S. Appl. No. 17/412,659, Pimavanserin for Treating Impulse Control Disorder, filed Aug. 26, 2021, Pending.

U.S. Appl. No. 16/471,543, Methods for the Treatment of Alzheimer's Disease Psychosis Using Pimavanserin, filed Jun. 19, 2019, Pending, 20200237739.

U.S. Appl. No. 16/363,378, Formulations of Pimavanserin, filed Mar. 25, 2019, U.S. Pat. No. 10,449,185.

U.S. Appl. No. 16/571,554, Formulations of Pimavanserin, filed Sep. 16, 2019, U.S. Pat. No. 10,646,480.

U.S. Appl. No. 16/836,086, Formulations of Pimavanserin, filed Mar. 31, 2020, U.S. Pat. No. 10,849,891.

U.S. Appl. No. 17/080,731, Formulations of Pimavanserin, filed Oct. 26, 2020, Pending, 20210283118.

U.S. Appl. No. 17/290,479, Methods of Treating Depression, Anxiety and Sexual Dysfunction Using the Compound Primavanserin, filed Apr. 30, 2021, Pending, 20220016101.

U.S. Appl. No. 17/108,623, Methods for Treating Dementia Related Psychosis, filed Dec. 1, 2020, Pending, 20210161880.

U.S. Appl. No. 17/635,459, Pimavanserin for Treating Neurodegenerative Diseases, filed Feb. 15, 2022, Pending.

U.S. Appl. No. 17/629,098, Pimavanserin for Treating Schizophrenia for Treating Psychosis Secondary to Neurodegenerative Disorders or Depressive Disorder, filed Jan. 21, 2022, Pending.

"ACP-103," *Drugs of the Future, Prous Science* (2006) vol. 31, No. 11, pp. 939-943.

"NUPLAZID™ (pimavanserin) Sponsor Background Information for a Meeting of the Psychopharmacologic Drugs Advisory Committee on Mar. 29, 2016," Acadia Pharmaceuticals Inc., 2016. Retrieved from the Internet (URL): <https://www.fda.gov/downloads/advisorycommittees/committeesmeetingmaterials/drugs/psychopharmacologicdrugsadvisorycommittee/ucm492453.pdf> (173 pages).

"Pimavanserin (Nuplazid) for parkinson's disease psychosis," Medical Letter on Drugs and Therapeutics, New Rochelle, NY, US (Jun. 2016) vol. 58, pp. 74-75.

Aarsland et al., "Decreased burden among caregivers of patients with Parkinson's disease psychosis (PDP) treated with pimavanserin, a selective 5-HT2A inverse agonist," (Meeting Abstract) *Neurology* (2015) vol. 84, No. 14, Suppl P6.044.

Abbas et al., "Pimavanserin tartrate: a 5-HT2A inverse agonist with potential for treating various neuropsychiatric disorders," *Expert Opinion on Pharmacotherapy* (2008) vol. 9, No. 18, pp. 3251-3259.

Acadia Pharmaceuticals, "Acadia Pharmaceuticals Announces FDA approval of New Dosing Formulation and Strength for NUPLAZID (Pimavanserin)," Press Release, San Diego (CA) Jun. 29, 2018. Retrieved from the Internet (URL): http://ir.acadia-pharm.com/phoenix.zhtml?c=125180&p=irol-newsArticle&ID=2356605 (3 pages).

Adam, et al., "Effects of repeated ritanserin on middle-aged poor sleepers," *Psychopharmacology* (1989) 99:219-221.

Aizenstein et al., "Frequent Amyloid Deposition Without Significant Cognitive Impairment Among the Elderly," Arch. Neurol. 65(11):1509-1517 (2008).

Akin, et al., "Decreased serotonin 5-HT 2A receptor-stimulated phosphoinositide signaling in fibroblasts from melancholic depressed patients," *Neuropsychopharmacology* (2004) 29:2081-2087.

Anonymous, "Use of Liquids and/or Soft Foods as Vehicles for Drug Administration: General Considerations for Selection and In Vitro Methods for Product Quality Assessments Guidance for Industry," Jul. 13, 2018 (Jul. 13, 2018), XP055676101, Retrieved from the Internet: URL:https://www.fda.gov/media/114872/dowal <http://www.fda.gov/media/114872/downl> oad [retrieved on Mar. 12, 2020].

Antunes, et al., "The novel object recognition memory: neurobiology, test procedure, and its modifications," *Cogn. Process* (2012) 13:93-110.

Bakshi, et al., "Clozapine antagonizes phencyclidine-induced deficits in sensorimotor gating of the startle response," *The Journal of Pharmacology and Experimental Therapeutics* (1994) 271(2)787-794.

Basha, A., "Synthesis of N, N'-disubstituted Ureas from Carbamates," Tetrahedron Letters 29(21):2525-2526 (1988).

Bekris et al., "Cerebrospinal Fluid Aβ42 Levels and APP processing pathway genes in Parkinson's disease," Movement Disorders, 2015, vol. 30, No. 7, pp. 936-944, 2015.

Bennett, et al., "Suppression of dyskinesias in advanced Parkinson's disease. II. Increasing daily clozapine doses suppress dyskinesias and improve parkinsonism symptoms," *Neurology* (1993) 43:1551-1554.

Bhana et al., "A Review of its Use in the Management of the Behavioural and Psychological Symptoms of Dementia," Drugs & Aging 16(6):451-471 (2000).

Biagi, et al., "1,2,3-Triazoles: Structural changes on two effective inhibitors of the prostaglandin synthesis in vitro," *Farmaco Ed. Sci.* (1988) 43:597-611.

Bibbiani, et al., "Serotonin 5-HT1A agonist improves motor complications in rodent and primate parkinsonian models," *Neurology* (2001) 57:1829-1834.

Blakley, et al., "Bidirectional changes in ethanol consumption in rats with site-specific antisense down-regulation of 5-hydroxytryptamine2A receptors in brain," *The Journal of Pharmacology and Experimental Therapeutics* (2001) 299(1):277-289.

Blier, et al., "Potential mechanisms of action of atypical antipsychotic medications in treatment-resistant depression and anxiety," *J. Clin. Psychiatry* (2005) 66(suppl 8):30-40.

Blier, et al., "Putative mechanisms of action of antidepressant drugs in affective and anxiety disorders and pain," *Journal of Psychiatry & Neuroscience* (2001) 26(1):37-43.

Bogolubsky et al., "Bis(2,2,2-trifluoroethyl) carbonate as a condensing agent in one-pot parallel synthesis of unsymmetrical aliphatic ureas," (2014), pages S1-S67. Retrieved from URL: http://pubs.acs.org/doi/suppl/10.102 I/co500025f/suppl_file co500025f_si_001.pdf, Table S2, pp. S9, entry 47.

Bogolubsky et al., "Bis(2,2,2-trifluoroethyl) carbonate as a condensing agent in one-pot parallel synthesis of unsymmetrical aliphatic ureas," *ACS Combinatorial Science* (2014) vol. 16, Issue 6, pp. 303-308.

Bond et al., "Physiological effects of inverse agonists in transgenic mice with myocardial overexpression of the beta-adrenoceptor," *Nature* (1995) 374:272-276.

Borman et al., "5-HT2B receptors play a key role in mediating the excitatory effects of 5-HT in human colon in vitro," *Br. J. Pharmacol.* (2002) vol. 135, No. 5, pp. 1144-1151.

Beann, M. R. "Identification of ligands by selective amplification of cells transfected with receptors and marker enzymes," *Chemical Abstracts* (1998) 128: 111548.

Buddhala et al. "Correlation between descreased CSF α-synuclein and Abl-42 in Parkinson disease," Neurobiology of Aging, 2015, vol. 36, pp. 476-484, 2015.

Chaturvedi, D., "Perspectives on the Synthesis of Organic Carbamates," Tetrahedron 68:15-45 (2012).

Chaturvedi, D., "Recent Developments on the Carbamation of Amines," Curr. Org. Chem. 15:1593-1624 (2011).

US 11,452,721 B2

Page 5

(56)        **References Cited**

OTHER PUBLICATIONS

Choi et al., "5HT2B receptor-mediated serotonin morphogenic functions in mouse cranial neural crest and myocardiac cells," *Development* (1997) vol. 124, pp. 1745-1755.

Cirrito et al., "Serotonin signaling is associated with lower amyloid-β levels and plaques in transgenic mice and humans," *PNAS* (2011) vol. 108, No. 36, pp. 14968-14973.

Colovic et al., "Acetylcholinesterase Inhibitors: Pharmacology and Toxicology," Current Neuropharmacology 11:315-335 (2013).

Cummings et al., "Pimavanserin for patients with Parkinson's disease psychosis: a randomised, placebo-controlled phase 3 trial," *Lancet* (2014) vol. 383, pp. 533-540.

Cummings et al., "Pimavanserin: Potential Treatment for Dementia-Related Psychosis." J. Prev. Alzheimers Dis. 5(4): 253-258 (2018).

Cunningham et al., "Serotonin at the Nexus of Impulsivity and Cue Reactivity in Cocaine Addiction," *Neuropharmacology* 76(0 0): 460-478.

Database CA [online] Chemical Abstracts Service, Columbus, Ohio, US; 2016, Wang et al., "Intermediate of pimavanserin and its analog, preparation method thereof and preparation method of pimavanserin and its analog," XP002761533, retrieved from STN Database accession No. 2016:451070 (reference date: Mar. 23, 2016).

Database CA [online] Chemical Abstracts Service, Columbus, Ohio, US; 2016, Zheng, Xuchun et al: "A process for preparing pimavanserin tartrate," XP002761538, retrieved from STN Database accession No. 2016:1261850 (reference date: Aug. 3, 2016).

Database WPI Week 201622, Derwent Publications Ltd., London, GB; AN 2016-17318M, XP002761536 (reference date: Aug. 19, 2015).

Database WPI Week 201623, Derwent Publications Ltd., London, GB; AN 2015-708058, XP002761532 (reference date: Oct. 7, 2015).

Database WPI Week 201635, Derwent Publications Ltd., London, GB; AN 2016-02257F, XP002761534 (reference date: Dec. 2, 2015).

Database WPI Week 201640, Derwent Publications Ltd., London, GB; AN 2016-01442V, XP002761535 (reference date: Dec. 16, 2015).

Database WPI Week 201641, Derwent Publications Ltd., London, GB; AN 2016-24419S, XP002761537 (reference date: Apr. 13, 2016).

DeClerck, et al., "Increase in slow-wave sleep in humans with the serotonin-S2 antagonist ritanserin," *Current Therapeutic Research* (1987) 41(4):427-432.

Delecluse, et al., "A case of tardive tremor successfully treated with clozapine," *Movement Disorders* (1998) 13(5):846-847.

Dine et al., "One-Pot, Solvent-Free Access to Unsymmetrical Ureas by Palladium-Catalysed Reductive Alkylation Using Molecular Hydrogen," Eur. J. Chem., 5445-5454 (2013).

Dube et al., "Carbonyldiimidazole-Mediated Lossen Rearrangement." Org. Lett. 11(24):5622-5625 (2009).

Dunn, et al., "Analgetic and antiinflammatory 7-aroylbenzofuran-5-ylacetic acids and 7-aroylbenzothiophene-5-ylacetic acids," *J. Med. Chem.* (1986) 29:2326-2329.

Durif, et al., "Low-dose clozapine improves dyskinesias in Parkinson's disease," *Neurology* (1997) 48:658-662.

Eichelbaum, et al., "Influence of pharmacogenetics on drug disposition and response," *Clinical and Experimental Pharmacology and Physiology* (1996) 23:983-985.

Everett, et al., "L-Dopa: Effect on concentrations of dopamine, norepinephrine, and serotonin in brains of mice," *Science* (1970) 168:849-850.

Factor, et al., "Clozapine for the treatment of drug-induced psychosis in Parkinson's disease: Results of the 12 week open label extension in the PSYCLOPS trial," *Movement Disorders* (2001) 16(1):135-139.

Factor, et al., "Clozapine prevents recurrence of psychosis in Parkinson's disease," *Movement Disorders* (1992) 7(2):125-131.

Fava, M. et al. "A Phase 2, Randomized, Double-Blind, Placebo-Controlled Study of Adjunctive Pimavanserin in Patients with Major Depressive Disorder and an Inadequate Response to Therapy (CLARITY)." J Clin Psychiatry. Sep. 24, 2019;80(6) (13 pages).

Fitzgerald et al., "Possible Role of Valvular Serotonin 5-HT2B Receptors in the Cardiopathy Associated with Fenfluramine," *Molecular Pharmacol.* (1999) vol. 57, pp. 75-81.

Friedman et al., "A Multi-Center, Placebo-Controlled, Double-Blind Trial to Examine the Safety and Efficacy of Pimavanserin in the Treatment of Psychosis in Parkinson's Disease," *Neurology* (2010) vol. 74, No. 9, Suppl. 2, pp. A299.

Friedman, et al., "Atypical antipsychotics in the treatment of drug-induced psychosis in Parkinson's disease," *Movement Disorders* (2000) 15(2):201-211.

Friedman, et al., "Low-dose clozapine for the treatment of drug-induced psychosis in Parkinson's disease," N. *Engl. J. Med.* (1999) 340(10):757-763.

Friedman, J. H. "Clozapine treatment of psychosis in patients with tardive dystonia: Report of three cases," *Movement Disorders* (1994) 9(3):321-324.

Gillman, P. K. "Monoamine oxidase inhibitors, opioid analgesics and serotonin toxicity," *British Journal of Anaesthesia* (2005) 95(4):434-441.

Goldman et al., "Genetic counseling and testing for Alzheimer disease: Joint practice guidelines of the American College of Medical Genetics and the National Society of Genetic Counselors," *Genetics in Medicine* (2011) vol. 13, No. 6, pp. 597-605.

Hacksell et al., 2014, "On the Discovery and Development of Pimavanserin: A Novel Drug Candidate for Parkinson's Psychosis," Neurochem. Res., vol. 39, pp. 2008-2017.

Han et al., "Synthesis of Carbamates and Ureas Using Zr(IV)-Catalyzed Exchange Processes," Organic Letters 9(8): 1517-1520 (2007).

Hatoum, H. T. et al., "The Use of the Occupational Disruptiveness Scale of the Neuropsychiatric Inventory-Nursing Home Version to Measure the Impact of Rivastigmine on the Disruptive Behavior of Nursing Home Residents with Alzheimer's Disease," *Journal of the American Medical Directors Association* (2005) vol. 6, No. 4, pp. 238-245.

Highlights of Prescribing Information Nuplazid™ (pimavanserin), Revised Apr. 2016. Retrieved from the Internet (URL): https://www.accessdata.fda.gov/drugsatfda_docs/label/2016/207318lbl.pdf (14 pages).

Highlights of Prescribing Information Nuplazid® (pimavanserin), Revised Jun. 2018. Retrieved from the Internet (URL): https://www.accessdata.fda.gov/drugsatfda_docs/label/2018/207318s005lbl.pdf (15 pages).

Highlights of Prescribing Information Nuplazid® (pimavanserin), Revised Mar. 2018. Retrieved from the Internet (URL): https://www.accessdata.fda.gov/drugsatfda_docs/label/2018/207318s002s004lbl.pdf (15 pages).

Idzikowski, et al. 1991. A dose response study examining the effects of ritanserin on human slow wave sleep. Br J. Clin. Pharmac., 31:193-196.Idzikowski, et al., "A dose response study examining the effects of ritanserin on human slow wave sleep," *Br. J. Clin. Pharmac.* (1991) 31:193-196.

International Search Report and Written Opinion for International Application No. PCT/US2013/071792, dated, Jan. 1, 2014 (9 pages).

International Search Report and Written Opinion in corresponding PCT Application PCT/US2016/042933 dated Oct. 14, 2016 (13 pages).

International Search Report and Written Opinion in corresponding PCT Patent Application No. PCT/US08/057557 dated Oct. 24, 2008 (10 pages).

International Search Report and Written Opinion in corresponding PCT Patent Application No. PCT/US2017/023795 dated May 29, 2017 (11 pages).

International Search Report and Written Opinion in corresponding PCT Patent Application No. PCT/US2017/024526 dated Jul. 5, 2017 (18 pages).

International Search Report and Written Opinion in corresponding PCT Patent Application No. PCT/US2017/066340 dted Mar. 5, 2018 (13 pages).

ACADIA_1287391

Appx99

**US 11,452,721 B2**

Page 6

(56)          **References Cited**

OTHER PUBLICATIONS

International Search Report and Written Opinion in corresponding PCT Patent Application No. PCT/US2018/029831 dated Jul. 11, 2018 (10 pages).

International Search Report and Written Opinion in corresponding PCT Patent Application No. PCT/US2018/048096 dated Oct. 30, 2018 (12 pages).

International Search Report and Written Opinion of the International Searching Authority for International Application No. PCT/US2019/021618 dated Jun. 12, 2019 (10 pages).

International Search Report and Written Opinion of the International Searching Authority for International Application No. PCT/US2019/058927 dated Jan. 23, 2020 (16 pages).

International Search Report and Written Opinion of the International Searching Authority for International Application No. PCT/US2020/043103 dated Dec. 18, 2020 (12 pages).

International Search Report and Written Opinion of the International Searching Authority for International Application No. PCT/US2020/46212 dated Oct. 23, 2020 (10 pages).

International-type Search Report by International Searching Authority for SE1630067-5 dated Sep. 23, 2016 (18 pages).

Ito et al., "Prediction of Human Drug Clearance from in Vitro and Preclinical Data Using Physiologically Based and Empirical Approaches," Pharm. Res., (2005) vol. 22, No. 1, pp. 103-112.

Kalgutkar, et al., "Selective inhibitors of monoamine oxidase (MAO-A and MAO-B) as probes of its catalytic site and mechanism," Medicinal Research Reviews (1995) 15(4)325-388.

Katritzky et al., Chapter V. "Reaction of Amines with Carbamic Acid Esters," Comprehensive Organic Functional Group Transformations, pp. 501-502 (1995).

Kennedy et al., "The BACE1 inhibitor verubecestat (MK-8931) reduces CNS β-amyloid in animal models and in Alzheimer's disease patients," Sci. Transl. Med. 8, 363ra150 13 pages (2016).

Kondo et al., "Novel Ruthenium-Complex Catalyzed Synthesis of Ureas from Formamides and Amines," Organometallics 16:2562-2570 (1997).

Kotachi et al., "Ruthenium catalysed N,N'-Diarylurea Synthesis from N-Aryl Substituted Formamides and Aminoarenes," J. Chem. Soc., Chem. Comm., 7:549-550 (1990).

Lane et al., "Alzheimer's Disease," Eur. J. Neurol. 25:59-70 (2018).

Lashley et al. "Cortical α-synuclein load is associated with amyloid-b plaque burden in subset of Parkinson disease patients," Acta Neuropathol. 2008, 115, 417-425.

Leysen, et al. "Serotonergic component of neuroleptic receptors," Nature (1978) 272:168-171.

Liechti, et al., "Effects of MDMA (ecstasy) on prepulse inhibition and habituation of startle in humans after pretreatment with Citalopram, Haloperidol, or Ketanserin," Neuropsychopharmacology (2001) 24(3):240-252.

Linder et al. "Pharmacogenetics: A laboratory tool for optimizing therapeutic efficiency," Clinical Chemistry (1997) 43(2):254-266.

Loudon et al., "Conversion of Aliphatic Amides into Amines with [I,I-Bis(trifluoroacetoxy)iodo]benzene. 1. Scope of Reaction," J. Org. Chem. 49:4272-4276 (1984).

Marek et al., "The Selective 5-HT2A receptor Antagonist MI00907 Enhances Antidepressant-Like Behavioral Effects of the SSRI Fluoxetine," Neuropsychopharmacology (2005) vol. 30, No. 12, pp. 2205-2215.

Marek, et al., "Synergistic action of 5-HT2A antagonists and selective serotonin reuptake inhibitors in neuropsychiatric disorders," Neuropsychopharmacology (2003) 28:402-412.

Matsumura et al., "A New Method for Synthesis of Unsymmetrical Ureas Using Electochemically Prepared Trifluoroethyl Carbamates," J. Org. Chem. 65:1549-1551 (2000).

Medical Review(s), Application No. 207318Orig1s000, Center for Drug Evaluation and Research, Submission Date Sep. 1, 2015 [available online Jun. 3, 2016]. Retrieved from the Internet (URL): <https://www.accessdata.fda.gov/drugsatfda_docs/nda/2016/207318Oriq1s000MedR.pdf> (173 pages).

Meltzer et al., "Co-therapy with pimavanserin and risperidone 2 mg provides an improved clinical profile," Schizophrenia Research (2008) vol. 98, pp. 16.

Meltzer et al., "Pimavanserin, a Serotonin(2A) Receptor Inverse Agonist, for the Treatment of Parkinson's Disease Psychosis," Neuropsychopharmacology (2010) vol. 35, No. 4, pp. 881-892.

Meltzer et al., "Serotonin Receptors: Their Key Role in Drugs to Treat Schizophrenia," Progress in Neuro-Psychopharmacology & Biol. Psych. (2003) vol. 27, pp. 1159-1172.

Meltzer, et al., "Plasma clozapine levels and the treatment of L-DOPA-induced psychosis in Parkinson's disease," Neuropsychopharmacology (1995) 12(1):39-45.

Meltzer, H. Y. "The role of serotonin in antipsychotic drug action," Neuropsychopharmacology (1999) 21(2S): 106S-115S.

Morley et al., "Antibody to Amyloid p Protein Alleviates Imparied Acquisition, Retention, and Memory Processing in SAMP8 Mice," Neurobiology of Learning and Memory (2002), 78(1):125-138.

Naritomi et al., "Prediction of human hepatic clearance from in vivo animal experiments and in vitro metabolic studies with liver microsomes from animals and humans," Drug Metab. Dispos. (2001) vol. 29, No. 10, pp. 1316-1324.

NDA Approval/Supplement Approval, NDA 210793 NDA 207318/S-003, Letter Signed Jun. 28, 2018. Retrieved from the Internet (URL): https://www.accessdata.fda.gov/drugsatfda_docs/appletter/2018/210793Orig1s000,207318Orig1s003lrpdf (5 pages).

Nebigil et al., "Serotonin is a novel survival factor of cardiomyocytes: mitochondria as a target of 5-HT2B-receptor signaling," FASEB J. (2003) vol. 27, No. 10, pp. 1373-1375.

Ng, et al., "L-dopa-induced release of cerebral monoamines," Science (1970) 170:76-77.

Nordstrom, et al., "High 5-HT2 receptor occupancy in clozapine treated patients demonstrated by PET," Psychopharmacology (1993) 110:365-367.

Norton et al., "Caregivers of PDP patients have an increased risk of developing emotional and social distress that is decreased when PDP is treated with pimavanserin," (Meeting Abstract) Journal of Parkinson's Disease (Sep. 2016) vol. 6, No. S1, pp. 257, Abstract No. P42.11.

Norton et al., "Decreased burden among caregivers of patients with Parkinson's disease psychosis (PDP) treated with pimavanserin, a selective 5-HT2A inverse agonist," (Meeting Abstract) Journal of Parkinson's Disease (Sep. 2016) vol. 6, No. S1, p. 88, Abstract No. P12.08.

Obach et al., "The Prediction of Human Pharmacokinetic Parameters from Preclinical and In Vitro Metabolism Data," J. Pharm. Exp. Therap. (1997) vol. 283, No. 1, pp. 46-58.

Ogawa, et al., "Effects of R-102444 and its active metabolite R-96544, selective 5-HT2A receptor antagonists, on experimental acute and chronic pancreatitis: Additional evidence for possible involvement of 5-HT2A receptors in the development of experimental pancreatitis," European Journal of Pharmacology (2005) 521:156-163.

Paiva, et al., "Effects of ritanserin on sleep disturbances of dysthymic patients," Psychopharmacology (1988) 96:395-399.

Patel, et al., "The highly selective 5-hydroxytryptamine (5-HT)2A receptor antagonist, EMO 281014, significantly increases swimming and decreases immobility in male congenital learned helpless rats in the forced swim test," Synapse (2004) 52:73-75.

Pierce, et al., "5-hydroxytryptamine-induced synovial plasma extravasation is mediated via 5-hydroxytryptamine2A receptors on sympathetic efferent terminals," The Journal of Pharmacology and Experimental Therapeutics (1995) 275(1):502-508.

Poewe, W. "Psychosis in Parkinson's disease," Movement Disorders (2006) vol. 18, Suppl. 6, pp. S80-S87.

Pollak, et al., "Clozapine in drug-induced psychosis in Parkinson's disease," Lancet (1999) 353:2041-2042.

Price et al., "Pimavanserin, a 5-HT2A receptor inverse agonist, reverses psychosis-like behaviors in a rodent model of Alzheimer's disease," Behavioural Pharmacology (2002), 23:426-433.

R&D Focus Drug News (Jan. 24, 2000). Pimvaserin ACADIA lead compounds identified.

R&D Focus Drug News (Nov. 12, 2001). Pimavaserin ACADIA preclinical data.

**US 11,452,721 B2**

Page 7

(56)          **References Cited**

OTHER PUBLICATIONS

Sadzot, et al., "Hallucinogenic drug interactions at human brain 5-HT2 receptors: Implications for treating LSD-induced hallucinogenesis," *Psychopharmacology* (1989) 98:495-499.

Saltzman, et al., "Cloning of the human serotonin 5-HT2 and 5-HT1C receptor subtypes," *Biochemical and Biophysical Research Communications* (1991) 181(3):1469-1478.

Sandler and Karo, Chapter E., "Reaction of Amines with Urethanes and Carbamates," Organic Functional Group Preparations, Academic Press pp. 161-162 (1986).

Satori and Maggi, "Acyclic and Cyclic Ureas," Science of Synthesis 18: 695-699 (2005).

Saxena, et al., "Cardiovascular effects of serotonin agonists and antagonists," *Journal of Cardiovascular Pharmacology* (1990) 15(Supp. 7):S17-S34.

Shanmugam, S. "Granulation Techniques and Technologies: Recent Progresses," *BioImpacts* (2015) vol. 5, No. 1, pp. 55-63.

Shigemori et al., "The factorial structure of the mini mental state examination (MMSE) in Japanese dementia patients," BMC Geriatrics 10(36): 7 pages (2010).

Stoner et al., "Integrated oral bioavailability projection using in vitro screening data as a selection tool in drug discovery," *Int. J. Pharm.* (2004) vol. 269, No. 1, pp. 241-249.

Swedish Search Report for Patent Application No. 1730232-4 dated Mar. 28, 2018 (10 pages).

Thavonekham, "A Practical Synthesis of Ureas from Phenyl Carbamates," Synthesis 11:1189-1194 (1997).

Vanover et al., "Pharmacological Characterization of AC-90179 [2-(4-Methoxy-phenyl)-N-(4-methyl-benzyl)-N-(1-methyl-piperidiny-4-yl)-acetamide Hydrochloride]: A Selective Serotonin 2A Receptor Inverse Agonist," *J. Pharmacology & Experimental Therapeutics* (2004) vol. 310, No. 3, pp. 943-951.

Vanover, Kimberly E. et al., "Pharmacokinetics, tolerability, and safety of ACP-103 following single or multiple oral dose administration in healthy volunteers," *Journal of Clinical Phamacol.* (2007) vol. 47, No. 6, pp. 704-714.

Vanover, Kimberly E. et al., "Pharmacological and Behavioral Profile of N-(4-Fluorophenylmethyl)-N-(1-methylpiperidin-4-yl)-N'-(4-(2-methylpropyloxy)phenylmethyl) Carbamide (2R,3R)-Dihydroxybutanedioate (2:1) (ACP-103), a Novel 5-Hydroxytryptamine$_{2A}$ Receptor Inverse Agonist," *The Journal of Pharmacology and Experimental Therapeutics* (2006) 317(2):910-918.

Vinogradova et al., Palladium Catalyzed Cross-Coupling of Aryl Chlorides and Triflates with Socium Cyanate: A Practical Synthesis of Unsymmetrical Ureas, J. Am. Chem. Soc. 134:11132-11135 (2012).

Volk et al., "Synthesis of methyl ethyl and phenyl 4 2 methylpropoxy benzyl carbamates," The IP.com Prior Art Database, Disclosure No. IPCOM000244271D, (Nov. 27, 2015).

Weintraub et al., "Association of Dopamine Agonist Use With Impulse Control Disorders in Parkinson Disease," *Arch Neurol.* 2006 63(7):969-973.

Weintraub et al., "Clinical Spectrum of Impulse Control Disorders in Parkinson's Disease," *Movement Disorders 2015* 30(2):121-127.

Wood et al., "The Use of the Neuropsychiatric Inventory in Nursing Home Residents: Characterization and Measurement," Am. J. Geriatr. Psychiatr. 8(1):75-83 (2000).

Ye et al. "Improving response inhibition in Parkinson's disease with Atomoxetine." Biological Psychiatry, Apr. 15, 2015, 77, 740-748.

Yoshimura et al., "Hypervalent Iodine Catalyzed Hofmann Rearrangement of Carboxamides Using Oxone as Terminal Oxidant," JOC 77:11399-11404 (2012).

Yoshimura et al., (Tosylimino)phenyl-λ3-iodane as a Reagent for the Synthesis of Metyl Carbamates via Hofmann Rearrangement of Aromatic and Aliphatic Carboxamides, Journal of Organic Chemistry 77:2087-2091 (2012).

*Acadia Pharmaceuticals Inc.* v. *Aurobindo Pharma Ltd., et al.* Civil Action No. 1:20-cv-00985-RGA, Declaration of R. Christian Moreton, Ph.D in Support of Defendants' Reply Claim Construction Brief, dated Jan. 19, 2022 (11 pages).

*Acadia Pharmaceuticals Inc.* v. *Aurobindo Pharma Ltd., et al.* Civil Action No. 1:20-cv-00985-RGA, Defendants' Sur-Reply Claim Construction Brief, dated Jan. 21, 2022 (23 pages).

*Acadia Pharmaceuticals Inc.* v. *Aurobindo Pharma Ltd., et al.* Civil Action No. 1:20-cv-00985-RGA, Acadia's Opening Claim Construction Brief, dated Oct. 8, 2021 (24 pages).

Acadia's NUPLAZID® product information, Retrieved from the Internet (URL): https://www.acadia-pharm.com/product/ (dated Oct. 4, 2021, 2 pages) (Exhibit 1 of *Acadia Pharmaceuticals Inc.* v. *Aurobindo Pharma Ltd., et al.* Civil Action No. 1:20-cv-00985-RGA, Acadia's Opening Claim Construction Brief, dated Oct. 8, 2021).

Highlights of Prescribing Information NUPLAZID™ (pimavanserin), Revised Apr. 2016. Retrieved from the Internet (URL): https://www.accessdata.fda.gov/drugsatfda_docs/label/2016/207318lbl.pdf (14 pages) (Exhibit 2 of *Acadia Pharmaceuticals Inc.* v. *Aurobindo Pharma Ltd., et al.* Civil Action No. 1:20-cv-00985-RGA, Acadia's Opening Claim Construction Brief, dated Oct. 8, 2021).

Highlights of Prescribing Information NUPLAZID® (pimavanserin), Revised Jun. 2018. Retrieved from the Internet (URL): https://www.accessdata.fda.gov/drugsatfda_docs/label/2018/207318s005lbl.pdf (15 pages) (Exhibit 3 of *Acadia Pharmaceuticals Inc.* v. *Aurobindo Pharma Ltd., et al.* Civil Action No. 1:20-cv-00985-RGA, Acadia's Opening Claim Construction Brief, dated Oct. 8, 2021).

2017 U.S. Pharmacopeia National Formulary, vol. 1 (7 pages) (Exhibit 4 of *Acadia Pharmaceuticals Inc.* v. *Aurobindo Pharma Ltd., et al.* Civil Action No. 1:20-cv-00985-RGA, Acadia's Opening Claim Construction Brief, dated Oct. 8, 2021).

*Acadia Pharmaceuticals Inc.* v. *Aurobindo Pharma Ltd., et al.* Civil Action No. 1:20-cv-00985-RGA, Declaration of R. Christian Moreton, Ph.D in Support of Defendants' Answering Claim Construction Brief, dated Nov. 12, 2021 (28 pages).

*Acadia Pharmaceuticals Inc.* v. *Aurobindo Pharma Ltd., et al.* Civil Action No. 1:20-cv-00985-RGA, Declaration of R. Christian Moreton, Ph.D in Support of Defendants' Answering Claim Construction Brief, dated Nov. 12, 2021 (64 pages).

*Acadia Pharmaceuticals Inc.* v. *Aurobindo Pharma Ltd., et al.* Civil Action No. 1:20-cv-00985-RGA, Defendants' Responsive Claim Construction Brief, dated Nov. 12, 2021 (30 pages).

USP 40 Phase-solubility analysis-general information, Retrieved from the Internet (URL): www.getintopharma.com <http://www.getintopharma.com> (5 pages) (Exhibit 1 of *Acadia Pharmaceuticals Inc.* v. *Aurobindo Pharma Ltd., et al.* Civil Action No. 1:20-cv-00985-RGA, Declaration of R. Christian Moreton, Ph.D in Support of Defendants' Answering Claim Construction Brief, dated Nov. 12, 2021).

Curriculum Vitae of Richard Christian Moreton (29 pages) (Exhibit A of *Acadia Pharmaceuticals Inc.* v. *Aurobindo Pharma Ltd., et al.* Civil Action No. 1:20-cv-00985-RGA, Declaration of R. Christian Moreton, Ph.D in Support of Defendants' Answering Claim Construction Brief, dated Nov. 12, 2021).

*Acadia Pharmaceuticals Inc.* v. *Aurobindo Pharma Ltd., et al.* Civil Action No. 1:20-cv-00985-RGA, Acadia's Reply Claim Construction Brief, dated Dec. 17, 2021 (28 pages).

*Acadia Pharmaceuticals Inc.* v. *Aurobindo Pharma Ltd., et al.* Civil Action No. 1:20-cv-00985-RGA, Declaration of Alexander M. Klibanov, Ph.D., in Support of Plaintiff's Reply Claim Construction Brief, dated Dec. 16, 2021 (61 pages).

Curriculum vitae of Alexander M. Klibanov (43 pages) (Exhibit A of *Acadia Pharmaceuticals Inc.* v. *Aurobindo Pharma Ltd., et al.* Civil Action No. 1:20-cv-00985-RGA, Declaration of Alexander M. Klibanov, Ph.D., in Support of Plaintiff's Reply Claim Construction Brief, dated Dec. 16, 2021).

Notice Letter of Paragraph IV Certification Regarding U.S. Pat. Nos. 10,449,185 and 10,646,480 from Aurobindo Pharma Ltd. to Acadia Pharmaceuticals, Inc. dated Jun. 10, 2020 (179 pages).

Notice Letter of Paragraph IV Certification Regarding U.S. Pat. No. 10,449,185 from Teva Pharmaceuticals USA, Inc. to Acadia Pharmaceuticals, Inc. dated Jun. 10, 2020 (83 pages).

**US 11,452,721 B2**

Page 8

(56)          **References Cited**

OTHER PUBLICATIONS

Notice Letter of Paragraph IV Certification Regarding U.S. Pat. Nos. 7,732,615; 7,923,564; and 10,449,185 from MSN Laboratories Private Ltd. to Acadia Pharmaceuticals, Inc. dated Jun. 15, 2020 (18 pages).
Notice Letter of Paragraph IV Certification Regarding U.S. Pat. No. 10,646,480 from MSN Laboratories Private Ltd. to Acadia Pharmaceuticals, Inc. dated Jun. 18, 2020 (28 pages).
Notice Letter of Paragraph IV Certification Regarding U.S. Pat. Nos. 10,449,185, and 10,646,480 from Zydus Pharmaceuticals (USA) Inc. to Acadia Pharmaceuticals, Inc. dated Jun. 22, 2020 (67 pages).
Notice Letter of Paragraph IV Certification Regarding U.S. Pat. No. 10,646,480 from Teva Pharmaceuticals USA, Inc. to Acadia Pharmaceuticals, Inc. dated Jun. 23, 2020 (18 pages).
Notice Letter of Paragraph IV Certification Regarding U.S. Pat. No. 10,849,891 from Teva Pharmaceuticals USA, Inc. to Acadia Pharmaceuticals, Inc. received Dec. 23, 2020 (16 pages).
Notice Letter of Paragraph IV Certification Regarding U.S. Pat. No. 10,849,891 from Aurobindo Pharma Ltd. to Acadia Pharmaceuticals, Inc. dated Jan. 13, 2021 (26 pages).
Notice Letter of Paragraph IV Certification Regarding U.S. Pat. No. 10,849,891 from Zydus Pharmaceuticals (USA) Inc. to Acadia Pharmaceuticals, Inc. received Feb. 17, 2021 (22 pages).
Notice Letter of Paragraph IV Certification Regarding U.S. Pat. No. 10,849,891 from MSN Laboratories Private Ltd. to Acadia Pharmaceuticals, Inc. received Apr. 16, 2021 (38 pages).
*Acadia Pharmaceuticals Inc. v. Aurobindo Pharma Ltd., et al.* Civil Action No. 1:20-cv-00985-RGA, Defendants' Initial Invalidity Contentions, dated Apr. 26, 2021 (241 pages) (redacted).
*Acadia Pharmaceuticals Inc. v. Aurobindo Pharma Ltd., et al.* Civil Action No. 1:20-cv-00985-RGA, Joint Claim Construction Brief, filed Jan. 28, 2022 (93 pages).

*Acadia Pharmaceuticals Inc. v. Aurobindo Pharma Ltd., et al.* Civil Action No. 1:20-cv-00985-RGA, Joint Claim Construction Appendix, filed Jan. 28, 2022 (225 pages).
*Acadia Pharmaceuticals Inc. v. Aurobindo Pharma Ltd., et al.* Civil Action No. 20-985-RGA, Memorandum Opinion, filed Apr. 6, 2022 (13 pages).
*Acadia Pharmaceuticals Inc. v. Aurobindo Pharma Limited and Aurobindo Pharma USA, Inc.,* D.Del. Civil Action No. 1-20-cv-00985: Complaint against Aurobindo Pharma Limited and Aurobindo Pharma USA, Inc. filed by Acadia Pharmaceuticals Inc., Jul. 24, 2020 (127 pages).
*Acadia Pharmaceuticals Inc. v. Hetero Labs Limited, Hetero Labs Limited Unit-V, and Hetero USA Inc.,* D.Del. Civil Action No. 1-20-cv-01022: Complaint against Hetero Labs Limited, Hetero Labs Limited Unit-V, and Hetero USA Inc. filed by Acadia Pharmaceuticals Inc., Jul. 30, 2020 (90 pages).
*Acadia Pharmaceuticals Inc. v. MSN Laboratories Private Ltd. and MSN Pharmaceuticals, Inc.,* D.Del. Civil Action No. 1-20-cv-01029: Complaint against MSN Laboratories Private Ltd. and MSN Pharmaceuticals, Inc. filed by Acadia Pharmaceuticals Inc., Jul. 30, 2020 (71 pages).
*Acadia Pharmaceuticals Inc. v. Teva Pharmaceuticals USA, Inc. and Teva Pharmaceutical Industries Ltd.,* D.Del. Civil Action No. 1-20-cv-00986: Complaint against Teva Pharmaceuticals USA, Inc. and Teva Pharmaceutical Industries Ltd. filed by Acadia Pharmaceuticals Inc., Jul. 24, 2020 (126 pages).
*Acadia Pharmaceuticals Inc. v. Zydus Pharmaceuticals (USA) Inc. and Cadila Healthcare Limited,* D.Del. Civil Action No. 1-20-cv-01021: Complaint against Zydus Pharmaceuticals (USA) Inc. and Cadila Healthcare Limited filed by Acadia Pharmaceuticals Inc., Jul. 30, 2020 (153 pages).

* cited by examiner

Appx102

EMPTY HARD CAPSULE SPECIFICATIONS

| APPROXIMATE COMPARATIVE SIZE | CAPSULE SIZE | CONVENTIONAL FILL WEIGHT (mg) TYPICAL POWDER DENSITY | | | VOLUME (Theoretical) (ml) | LENGTH ±0.8(mm) | EXTERNAL DIAMETER (mm) | WEIGHT ±10% |
|---|---|---|---|---|---|---|---|---|
| | | 0.45 (light) | 0.7 (standard) | 1.0 (heavy) | | | | |
| | 000 | 615 | 960 | 1370 | 1.37 | 26.1 | 9.9 | 163 |
| | 00 | 430 | 665 | 950 | 0.95 | 23.3 | 8.5 | 118 |
| | 0 | 305 | 475 | 680 | 0.68 | 21.7 | 7.65 | 96 |
| | 1 | 225 | 350 | 500 | 0.5 | 19.4 | 6.91 | 76 |
| | 2 | 165 | 260 | 370 | 0.37 | 18.0 | 6.35 | 61 |
| | 3 | 135 | 210 | 300 | 0.3 | 15.9 | 5.82 | 48 |
| | 4 | 95 | 145 | 210 | 0.21 | 14.3 | 5.31 | 38 |
| | 5 | 60 | 90 | 130 | 0.13 | 11.1 | 4.91 | 28 |

FIG. 1

ACADIA_1287395

Appx103



FIG. 2

ACADIA_1287396

Appx104



FIG. 3

ACADIA_1287397

Appx105



FIG. 4



FIG. 5

ACADIA_1287398

Appx106

US 11,452,721 B2

1

## FORMULATIONS OF PIMAVANSERIN

### CROSS-REFERENCE TO RELATED APPLICATIONS

This application is a continuation of U.S. patent application Ser. No. 17/080,731, filed on Oct. 26, 2020, which is a continuation of U.S. patent application Ser. No. 16/836,086, filed on Mar. 31, 2020, which is a continuation of U.S. patent application Ser. No. 16/571,554, filed on Sep. 16, 2019, which is a continuation of U.S. patent application Ser. No. 16/363,378, filed on Mar. 25, 2019, which is a continuation of International Patent Application No. PCT/US2018/048096, filed on Aug. 27, 2018, which claims priority to and the benefit of U.S. Provisional Patent Application No. 62/552,300, filed Aug. 30, 2017, and Swedish Patent Application No. 1730232-4, filed Sep. 1, 2017.

### BACKGROUND

Pimavanserin, the active component in Nuplazid®, is approved for treatment of hallucinations and delusions associated with Parkinson's disease psychosis at a dose of 34 mg, taken as two 17 mg tablets once a day. The tablets are immediate release, film-coated tablet containing 20 mg of pimavanserin tartrate, which is equivalent to 17 mg of pimavanserin free base. Inactive ingredients include pregelatinized starch, magnesium stearate, and microcrystalline cellulose. Additionally, the following inactive ingredients are present as components of the film coat: hypromellose, talc, titanium dioxide, polyethylene glycol, and saccharin sodium.

Patients suffering from neurodegenerative diseases, such as Parkinson's disease are at a risk of non-compliance when administered a drug of too large size, or if taken as more than one tablet per day as said patients often have difficulty swallowing. Formulations of pimavanserin are described in WO 2007/133802. Pimavanserin is currently approved and administered as tablets containing 20 mg pimavanserin tartrate (equivalent to 17 mg pimavanserin), in two tablets once a day. Each with a total 150 mg tablet weight before film coating, i.e. total weight per dose is 300 mg (equivalent to 34 mg pimavanserin). In order to simplify administration and patient compliance of pimavanserin it would be advantageous to administer pimavanserin as a single dose.

Improved manufacturing processes for single unit dose forms, particularly for smaller sized single unit dosage forms, for oral administration of a therapeutic quantity of pimavanserin are critical. The physical properties of pimavanserin, e.g. bulk density and flow, when prepared in a tablet form requires, e.g. binders and other agents that increase the finished dosage size. Pimavanserin manufactured following conventional techniques has low bulk density and poor flowability and a tendency to clump, which will adversely impact reproducibility and quantitative accurate filling of capsules during the manufacturing process.

Consequently there is a need to improve the properties of pimavanserin allowing dosing of the daily therapeutic dose as a single administration.

### SUMMARY

Provided herein are capsules comprising 5-34 mg pimavanserin (equivalent to 6-40 mg pimavanserin tartrate), or a pharmaceutically acceptable salt thereof

2

Provided herein are also pharmaceutical compositions consisting of 5-34 mg pimavanserin or a pharmaceutically acceptable salt thereof, a filler and a lubricant .

Provided herein are also processes for manufacturing a capsule comprising 5-34 mg pimavanserin or a pharmaceutically acceptable salt thereof comprising: adding water to pimavanserin or a pharmaceutically acceptable salt thereof, and granulating pimavanserin or a pharmaceutically acceptable salt thereof with the water; controlling the impeller speed and/or amperage; drying the granulated pimavanserin or a pharmaceutically acceptable salt thereof; sizing the dried granulated pimavanserin or a pharmaceutically acceptable salt thereof; blending the dried and granulated pimavanserin or a pharmaceutically acceptable salt thereof and one or more filler; encapsulating the blended pimavanserin composition in a capsule of size 3 or 4.

### BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 shows a table disclosing specifications of capsule sizes, commercially available.

FIG. 2 schematically discloses a process flow chart for pimavanserin granulation.

FIG. 3 schematically discloses a process flow chart for encapsulating pimavanserin granulation.

FIG. 4 shows a particle size distribution diagram of pimavanserin tartrate.

FIG. 5 shows a particle size distribution diagram of granulated pimavanserin.

### DETAILED DESCRIPTION

Definitions

Unless defined otherwise, all technical and scientific terms used herein have the same meaning as is commonly understood by one of ordinary skill in the art. All patents, applications, published applications and other publications referenced herein are incorporated by reference in their entirety. In the event that there are a plurality of definitions for a term herein, those in this section prevail unless stated otherwise.

As used herein, "pharmaceutical composition" refers to a composition of one or more active pharmaceutical ingredient(s) alone, or administered with other chemical components, such as diluents, binders, lubricants, pharmaceutical flow agents, and/or other excipients, e.g. for forming a unit dose, such as a tablet, a capsule etc.

As used herein, "physiologically acceptable" defines a diluent, binder, or excipient that does not abrogate the biological activity and properties of the pharmaceutically active compound.

As used herein, "pharmaceutically acceptable salt" refers to a salt of a compound that does not abrogate the biological activity and properties of the compound. Pharmaceutical salts can be obtained by reaction of a compound disclosed herein with an acid or base. Base-formed salts include, without limitation, ammonium salt ($NH_4^+$); alkali metal, such as, without limitation, sodium or potassium, salts; alkaline earth, such as, without limitation, calcium or magnesium, salts; salts of organic bases such as, without limitation, dicyclohexylamine, piperidine, piperazine, methylpiperazine, N-methyl-D-glucamine, diethylamine, ethylenediamine, tris(hydroxymethyl)methylamine; and salts with the amino group of amino acids such as, without limitation, arginine and lysine. Useful acid-based salts include, without limitation, acetates, adipates, aspartates, ascorbates, benzoates, butyrates, caparate, caproate, capry-

ACADIA_1287399

US 11,452,721 B2

<table>
<tr><td>3</td><td>4</td></tr>
</table>

late, camsylates, citrates, decanoates, formates, fumarates, gluconates, glutarate, glycolates, hexanoates, laurates, lactates, maleates, nitrates, oleates, oxalates, octanoates, propanoates, palmitates, phosphates, sebacates, succinates, stearates, sulfates, sulfonates, such as methanesulfonates, ethanesulfonates, p-toluenesulfonates, salicylates, tartrates, and tosylates.

Pharmaceutically acceptable solvates and hydrates are complexes of a compound with one or more solvent of water molecules, or 0.5 to about 100, or 1 to about 100, or 1 to about 10, or one to about 2, 3 or 4, solvent or water molecules.

As used herein, to "modulate" the activity of a receptor means either to activate it, i.e., to increase its cellular function over the base level measured in the particular environment in which it is found, or deactivate it, i.e., decrease its cellular function to less than the measured base level in the environment in which it is found and/or render it unable to perform its cellular function at all, even in the presence of a natural binding partner. A natural binding partner is an endogenous molecule that is an agonist for the receptor.

An "agonist" is defined as a compound that increases the basal activity of a receptor (e.g. signal transduction mediated by the receptor).

As used herein, "partial agonist" refers to a compound that has an affinity for a receptor but, unlike an agonist, when bound to the receptor it elicits only a fractional degree of the pharmacological response normally associated with the receptor even if a large number of receptors are occupied by the compound.

An "inverse agonist" is defined as a compound, which reduces, or suppresses the basal activity of a receptor, such that the compound is not technically an antagonist but, rather, is an agonist with negative intrinsic activity.

As used herein, "antagonist" refers to a compound that binds to a receptor to form a complex that does not give rise to any response, as if the receptor was unoccupied. An antagonist attenuates the action of an agonist on a receptor. An antagonist may bind reversibly or irreversibly, effectively eliminating the activity of the receptor permanently or at least until the antagonist is metabolized or dissociates or is otherwise removed by a physical or biological process.

As used herein, a "subject" refers to an animal that is the object of treatment, observation or experiment. "Animal" includes cold- and warm-blooded vertebrates and invertebrates such as birds, fish, shellfish, reptiles and, in particular, mammals. "Mammal" includes, without limitation, mice; rats; rabbits; guinea pigs; dogs; cats; sheep; goats; cows; horses; primates, such as monkeys, chimpanzees, and apes, and, in particular, humans.

As used herein, an "excipient" refers to an inactive ingredient that is added to a pharmaceutical composition to provide, without limitation, bulk, consistency, stability, binding ability, lubrication, disintegrating ability, etc., to the composition. A "diluent" is a type of excipient.

As used herein, a "diluent", "bulking agent" and "filler" refer to an ingredient (excipient) in a pharmaceutical composition that lacks pharmacological activity but may be pharmaceutically necessary or desirable, e.g. to enhance or improve the properties of the pharmaceutical blend for manufacturing or physiological purposes. For example, a diluent or filler may be used to increase the bulk of a potent drug whose mass is too small for manufacture or administration.

As used herein, a "binder" is an excipient holding the ingredients together, and forming granules or tablets with required mechanical strength, and may give volume to the formulation. Specific examples of binders are mono-, di-, and poly-saccharides and derivatives thereof; sugar alcohols

such as xylitol, sorbitol or maltitol; protein, such as; synthetic polymers, such as polyvinylpyrrolidone (PVP), polyethylene glycol (PEG). Binders are classified according to their application, e.g. solution binders are dissolved in a solvent (for example water or alcohol may be used in wet granulation processes). Examples include gelatin, cellulose, cellulose derivatives, polyvinylpyrrolidone, starch, sucrose and polyethylene glycol. Dry binders are added to the powder blend, either after a wet granulation step, or as part of a direct powder compression (DC) formula. Examples include cellulose, methyl cellulose, polyvinylpyrrolidone and polyethylene glycol.

As used herein a "lubricant" refers to an excipient which for example prevents ingredients and excipients to lump together, and/or sticking to the capsule filling machine. A lubricant may also ensure that the formation, filing and ejection of the capsule can occur, for example by lowering friction. Examples of lubricants are talc, silicon dioxide (silica), fatty acids or fatty acid salts, such as magnesium stearate, sodium stearate fumarate, stearic acid, etc.

As used herein a "disintegrant" refers to an excipient which disintegrate a pharmaceutical preparation on contact with an aqueous fluid.

As used herein, "coadministration" of pharmacologically active compounds refers to the delivery of two or more separate chemical entities, whether in vitro or in vivo. Coadministration means the simultaneous delivery of separate agents; the simultaneous delivery of a mixture of agents; as well as the delivery of one agent followed by delivery of a second agent or additional agents. Agents that are coadministered are typically intended to work in conjunction with each other.

The term "an effective amount" as used herein means an amount of active compound or pharmaceutical agent that elicits the biological or medicinal response in a tissue, system, animal or human that is being sought by a researcher, veterinarian, medical doctor or other clinician, which includes alleviation or palliation of the symptoms of the disease being treated.

The terms screen, screening, delump, delumping, dry milling, and sizing are used interchangeably herein. These terms refer to separation according to size.

The term "granulation" as used herein, and as conventionally used in the pharmaceutical industry, refers to the act or process in which primary powder particles are made to adhere to form larger, multiparticle entities called granules. Granules may for example be formed collecting particles together by creating mechanical bonds between them, e.g. by compression or by using a binder. Granulation is extensively used in the manufacturing of tablets and capsules.

The terms "granulated pimavanserin" and "pimavanserin granulation" are used interchangeably herein.

Generally a granulation process combines one or more particles and forms a granule that will allow tableting or the encapsulation process to be within required limits. The granulation process can be made predictable and repeatable. The granulation can be performed in a variety of equipment such as, but not limited to, low shear, high shear granulators, fluid bed granulator, roller compactor, and slugger.

The term "blending" refers to the mixing of pharmaceutical ingredients to form a mixture of the ingredients, e.g. active pharmaceutical ingredient (API) and diluent, as defined by pharmaceutical specifications in the compendial references using a variety of equipment such as, but not limited to, "V"-blenders, bin-blenders, cone-blenders.

The term "encapsulation" refers to a range of techniques used to enclose medicines in a shell, e.g. a two-piece capsule, such as a two-piece hard shell capsule. The capsule

ACADIA_1287400

US 11,452,721 B2

**5**

referred to herein may be taken orally. Capsules may be designed with a telescoping cap and body manufactured from e.g. gelatin or cellulose.

Compounds

Pimavanserin, which is also known as N-(1-methylpiperidin-4-yl)-N-(4-fluorophenylmethyl)-N'-(4-(2-methylpro-

**6**

pyloxy)phenylmethyl)carbamide, N-[(4-fluorophenyl)methyl]-N-(1-methyl-4-piperidinyl)-N'-[4-(2-methylpropoxy)phenyl]methyl -urea, 1-(4-fluorobenzyl)-1-(1-methylpiperidin-4-yl)-3-[4-(2-methylpropoxy)benzyl] urea, or ACP-103. Pimavanserin commonly is administered as pimavanserin tartrate and has the structure of Formula (I):

(I)



Pimavanserin has previously been synthesized according to the method disclosed in Scheme I.

SCHEME I: SYNTHESIS OF PIMAVANSERIN

ACADIA_1287401

Appx109

US 11,452,721 B2

**7**                                                                                          **8**

-continued



Step 6 | COCl$_2$, HCl, toluene

Step 7 | 1) THF
2) EtOH

30

Alternative methods for preparing pimavanserin are disclosed in WO2017/015272, which is incorporated herein by reference in its entirety.

Pimavanserin and methods for its use are described in U.S. Pat. Nos. 7,601,740; 7,659,285; 7,713,995; 7,732,462; 7,994,193 and 8,008,323, the entirety of each of which is hereby incorporated by reference. Pimavanserin can be obtained in a number of salt and crystalline forms. Exemplary pharmaceutically acceptable salts include the tartrate, hemi-tartrate, citrate, fumarate, maleate, malate, phosphate, succinate, sulphate, and edisylate (ethanedisulfonate) salts. Pimavanserin salts including the aforementioned ions, among others, are described in U.S. Patent Publication No. 2006-0111399, filed Sep. 26, 2005, the entirety of which is incorporated herein by reference. In an embodiment provided herein, pimavanserin is the tartrate salt of pimavanserin. Several crystalline forms of the tartrate salt of pimavanserin have been described in U.S. Patent Publication No. 2006-0106063, filed Sep. 26, 2006, the entirety of which is incorporated herein by reference. See also U.S. Pat. Nos. 7,732,615; 7,795,547; 7,790,899; 7,868,176, the entirety of each of which is incorporated herein by reference. In an embodiment provided herein, pimavanserin is the crystalline form of the tartrate salt of pimavanserin Form A. In another embodiment, pimavanserin is the crystalline form of the tartrate salt of pimavanserin Form C. Pimavanserin (including, for example, the tartrate salt) may be formulated into tablets, such as is described in U.S. Patent Publication Nos. 2007-0260064, filed May 15, 2007 and 2007-0264330, filed May 15, 2007, each of which are incorporated herein by reference in their entireties.

The pharmacological activity of pimavanserin has been previously reported. See U.S. Patent Publication Nos. 2004/0213816 and 2009/0053329, the entirety of each of which is hereby incorporated by reference. Pimavanserin is active in a number of models thought to be predictive of antipsychotic activity such as DOI ((±)-2,5-dimethoxy-4-iodoamphetamine, a serotonin agonist) induced head twitches in the rat and attenuation of hyperactivity in mice induced by the N-methyl-D-aspartate antagonist MK-801. The compound was effective in these models at oral doses of 3 and 10 mg/kg.

Suitable routes of administration of pimavanserin may, for example, include oral, rectal, transmucosal, topical, or intestinal administration; parenteral delivery, including intramuscular, subcutaneous, intravenous, intramedullary injections, as well as intrathecal, direct intraventricular, intraperitoneal, intranasal, or intraocular injections. The compounds can also be administered in sustained or controlled release dosage forms, including depot injections, osmotic pumps, pills, transdermal (including electrotransport) patches, and the like, for prolonged and/or timed, pulsed administration at a predetermined rate. Embodiments provided herein relate to oral administration of a capsule comprising pimavanserin granulation.

The pharmaceutical compositions described herein comprised in a capsule refer to compositions prepared by methodologies not conventionally used in granulation, such as high and low shear granulation, e.g. using low amounts of water.

For oral administration, the compositions can be formulated readily by combining the active pharmaceutical ingredient (API) (e.g., pimavanserin or pimavanserin tartrate) with pharmaceutically acceptable binders or diluents well known in the art. Such binders or diluents enable the API disclosed herein to be formulated as tablets, pills, dragees, capsules, liquids, gels, syrups, slurries, suspensions and the like, for oral ingestion by a patient to be treated.

Provided herein is pimavanserin and pharmaceutically acceptable salts thereof having altered properties, such as increased bulk density, improved flow, and compressibility allowing the pharmaceutical manufacturing of a capsule

ACADIA_1287402

US 11,452,721 B2

9

comprising about 5-34 mg pimavanserin, such as about 34 mg, which for example may be filled in a size 3 or 4 capsule, such as a capsule of size 4.

It has herein been demonstrated that altering the flow and bulk density of pimavanserin, and compositions comprising pimavanserin using methods described herein results in a reproducible and quantitatively accurate filling of small sized capsules (e.g. size 3 or 4 capsules) in a scaled up pharmaceutical manufacturing processes, e.g. for manufacturing of about 1,000,000 capsules or more, for example at a speed of 40-90,000 capsules per hour.

Pharmaceutical manufacturing as used herein implies certain requirement being met such as manufacturing efficiency and economical requirements. Although also product quality and performance are ensured through the design of effective and efficient manufacturing processes, product and process specifications are based on a mechanistic understanding of how formulation and process factors affect product performance, e.g. variability between batches, assuring continuous real-time quality of the product and the materials, e.g. excipients. Additionally, regulatory policies and procedures used to meet official requirements such as those set out by health authorities, such as EMA (European Medicine agency) and FDA (U.S. Food and Drug Administration) and similar agencies in order to obtain the required quality of a drug product has an impact on the pharmaceutical manufacturing. For example, risk-based regulatory approaches recognize the level of scientific understanding of how formulation and manufacturing process factors affect product quality and performance and the capability of process control strategies to prevent or mitigate the risk of producing a poor quality product. For example, manual filling of capsules would not be considered relevant by those skilled in the art as manual filling of capsules cannot provide high reproducibility at the filling speed required to manufacture batches containing more than 100,000 capsules. Consequently those skilled in the art setting out to improve the formulation of an existing active pharmaceutical ingredient (API) for example to improve patient compliance, are working with tools used within the field of pharmaceutical manufacturing of small molecules.

Generally when improving the flow of an API (active pharmaceutical ingredient) the fill weight is increased. Increasing the fill weight is counterproductive to filling a small volume, such as a size 3 or even a size 4 capsule, at the production speeds required, such as 40-90,000 capsules per hour.

Disclosed herein are pharmaceutical manufacturing processes for obtaining suitable strength capsules of pimavanserin or a pharmaceutically acceptable salt thereof, said process comprises spraying water to pimavanserin, followed by a granulation process, wherein pimavanserin is granulated without addition of a binder, and blending followed by encapsulation. The particle size distribution, and/or bulk density of the granulated pimavanserin is controlled and matched to other excipient(s) to improve flow of the composition and assure content uniformity and low variability of the product. Additionally matching of excipient(s) allows reproducibility during encapsulation of pimavanserin. The matching of physical properties of API and other excipients used herein enables pharmaceutical manufacturing, in particular capsule filling (encapsulating the dried pimavanserin granulation in capsules of size 3 or 4) at sufficient speed such as more than 40,000 capsules per hour. Matching of API may for example be done by matching the particle size distribu-

10

tion of the API and one or more excipient. The bulk density of the API and the one or more excipients may also be matched.

For example, as shown in table 1, pimavanserin granulation, as obtained by the pharmaceutical manufacturing described herein vs the native API (active pharmaceutical ingredient (e.g., pimavanserin tartrate), obtained for example as decribed in W02017/015272), the bulk density and the Carr's Index (Carr's Compressibility Index) have been substantially altered which enables the filling of the above mentioned small capsule. Carr's Index compares the difference between the bulk density and tapped density of a substance to determine its compressibility. The bulk density and the Carr's Index may be determined in accordance with USP<616> (method for performing Bulk and Tapped Densities, method 1) and USP<1174> (definition of powder flow) respectively.

TABLE 1

|  | Pimavanserin granulation* | Native API |
|---|---|---|
| Bulk density (g/ml) according to USP <616> | 0.508 (n = 4) | 0.294 (n = 2) |
| Carr's Index | 24 (n = 4) | 36 (n = 2) |

*final blend as disclosed in the example herein below and in table 2

Table 1 visualizes that filling of a capsule, in particular a capsule of size 3 or 4 (capsule volumes of 0.30 and 0.21 ml respectively, approximately 120 mg and 85 mg respectively at a bulk density of 0.5 g/ml). As evident from Table 1, native pimavanserin (API) would be challenging for a size 3 capsule and not possible for a capsule of size 4 without improving the bulk density (as comparison 85 mg of pimavanserin granulation would require about 0.17 ml compared to 0.29 ml for the native API) and flowability (Carr index is frequently used in pharmaceutical manufacturing as an indication of the flowability of a powder, e.g. 2016 U.S. Pharmacopoeias-National Formulary [USP 35 NF 30]).

In particular, disclosed herein are formulation, granulation, dry milling, blending, and encapsulation of pimavanserin containing novel elements. Salient features are that the known granulation technology uses atypical parameters to achieve the desired results. Spray rate, atomization and quantity of water are examples of atypical parameters used in combination with wet granulation to obtain the targeted properties of pimavanserin formulation disclosed herein. For example, pimavanserin has been successfully granulated without the use of binder by spraying, at a controlled rate and under controlled atomization conditions, a controlled amount of water to pimavanserin during the wet granulation to provide granulated pimavanserin suitable for further processing (e.g. drying, blending, etc.) in the pharmaceutical manufacturing of capsules containing 5-34 mg pimavanserin, such as 10-34 mg capsules of size 3 or 4. Prior to the surprising finding that pimavanserin could be successfully wet granulated achieving the targeted improved physical properties (e.g. bulk density) without the addition of a binder, and by adding a small, such as 2-15% w/w, e.g. 3-10% w/w, 3-8% w/w amount of water to pimavanserin by spraying, many different granulation methods were contemplated and tested, and some discussed more in detail hereinbelow.

In one embodiment, High Shear Granulation (HSG) utilizing a small quantity of water, such as approximately 3-8% w/w of the dry ingredients, under appropriate HSG parameters for atomization, spray rate, impeller speed, and chopper speed was found to provide the required improvements

JTX09-0018

ACADIA_1287403

US 11,452,721 B2

11

to the pimavanserin (API) physical properties, such as increased bulk density, improved flow, and compressibility. The small quantity of water, its application using appropriate water atomization and/or water application rate are important reasons for the improved properties of pimavanserin. It has herein been demonstrated that the atomized spraying of a small amount of water during the granulation of pimavanserin achieves a wetting of pimavanserin that provides a granulated pimavanserin suitable for pharmaceutical manufacturing of a capsule, such as a capsule of size 4 comprising 10-34 mg pimavanserin. The actual amount of water to be sprayed at the granulation of pimavanserin may vary from batch to batch (depending on surrounding factors such as humidity, temperature, exact properties of the API batch, etc) but is still consider to be a small amount, e.g. 3-10% w/w based on the dry ingredients. The amount of water and the granulation process disclosed herein is controlled by controlling the impeller energy to achieve the targeted impeller speed. The appropriate impeller speed ensures sufficient mixing and controls the growth of granules. The specific small amount of water needed for each batch is controlled by the power consumption (amperage) of the granulator, i.e., if the amperage is too high, additional amounts of water could be sprayed to the granulate in order to obtain pimavanserin having the properties desired in order to pharmaceutically manufacture capsules comprising 5-34 mg pimavanserin. Adding too much water may alter other properties of the API, such as its crystallinity. The properties are achieved via a manufacturing process that includes granulation, using a suitable granulator, e.g. a high shear granulator, simultaneously spraying the adequate amount of water while mixing, followed by screening, and blending appropriate quantities of excipients. In some embodiments the lack of a binder, and using pimavanserin, properly wetted and not over-wetted are believed to be reasons for the fill uniformity observed using the herein described manufacturing process. Over-wetted granulation could seriously affect the further processing. In some embodiments particle size distribution of the granulated pimavanserin is controlled and matched to the particle size distribution of the diluents and other excipients to minimize segregation and improve flow and capsule filling reproducibility. The particle size distribution is also considered a factor involved in the successful filing of capsules of size 3 or 4, as a too aggressive milling would cause a wider particle size distribution and hamper the encapsulation. Examples of suitable particles size distribution of the granulated pimavanserin is a particle size distribution (D90) of 60-450 μm, such as 100-420 μm, such as above 250 μm. Particle size distribution referred to herein is obtained using Laser light scattering particle size (LLS PS) analyses of granulated pimavanserin conducted on a Malvern Mastersizer 2000 LLS PS system using a Scirocco 2000 dry dispersion unit using standard non-GMP conditions, and in a sample size of about 2 -10 g. Suitable diluents such as microcrystalline cellulose, silicified microcrystalline cellulose, low substituted hydroxylpropyl cellulose or similar materials to a concentration approximately one-half of the granulation and lubricated with magnesium stearate, sodium stearyl fumarate or other suitable lubricants to prevent sticking to the encapsulation tooling. In some embodiments the particle size distribution of the diluent is matched to the above mentioned particle size distribution of granulated pimavanserin, for example microcrystalline cellulose having a particle size distribution (D90) is 180-420 μm, such as above 250 μm. In some embodiments the lubricant, such as magnesium stearate is also matched to the API. In some embodiments the matching

12

of the particle size distribution of the lubricant, compared to the diluent, is less important in view of the lower amounts used in some embodiments. Optionally suitable binders and/or disintegrants may be included in the blending of the pimavanserin granulation. In some embodiments pimavanserin is blended with a diluent, e.g. microcrystalline cellulose and lubricant, magnesium stearate only, whereas amounts of water were added by spraying during the granulation process

In some embodiments the particle size distribution (D90) of the composition is 60-380 μm, such as 75-350 μm, such as 100-300 μm.

FIG. 4 discloses the particle size distribution of pimavanserin tartrate, prior to the herein disclosed granulation process.

FIG. 5 discloses the particle size distribution of the granulated pimavanserin. The arrow in FIG. 5 indicates the area of particles size distribution of the API. A substantial change in the particle size distribution can be seen, e.g. the D90 has increased from about 30 μm for the API to above 279 μm.

The matching of particles size distribution of the API and diluent is considered one factor influencing the herein disclosed robust process and reproducible encapsulation of pimavanserin, e.g. 10-34 mg pimavanserin in size 4 capsules, e.g. two-piece capsules.

In some embodiment bulk density between the API and the diluent and optionally the lubricant are matched, for example granulated pimavanserin having a bulk density above >0.40 g/ml, such as about 0.5 g/ml, and the diluent 0.35-0.46 g/ml.

In some embodiments both the bulk density and the particle size distribution is used in combination in order to adequately match at least the pimavanserin granulate and the diluent in order to obtain capsules of size 4 comprising 10-34 mg pimavanserin.

In some particular embodiments the granulation of pimavanserin may be completed and the obtained pimavanserin granulation having suitable properties for the herein disclosed manufacturing process, in the absence of a binder. It is however possible to include a binder in the granulation but for various reasons not necessarily preferred.

In some embodiments disclosed herein the blended pimavanserin composition, as described herein, comprised in a capsule (e.g a size 4 capsule) have an average Specific Energy (SE) of less than 5 mJ/g, such as less than 4.5 mJ/g, such as less than 4 mJ/g, as obtained by FT4 measurement.

In some embodiments disclosed herein the blended pimavanserin composition, as described herein, comprised in a capsule (e.g a size 4 capsule) have an average Flow Rate Index (FRI) of 0.9-1.2, such as 1.0-1.1, as obtained by FT4 measurement.

In some embodiments disclosed herein the blended pimavanserin composition, as described herein, comprised in a capsule (e.g a size 4 capsule) have an average Specific Energy (SE) of less than 4.5 mJ/g, and an average Flow Rate Index (FRI) of 0.9-1.2.

Pharmaceutical Formulations

Some embodiments include a pharmaceutical composition comprising granulated pimavanserin tartrate, Form C which may include a small percentage of Form A, including a pharmaceutically acceptable diluent, binder or excipient, or combination thereof.

The pharmaceutical compositions disclosed herein, are in some embodiments, provided as a two-piece hard shell capsules made of gelatin (fish, mammalian, or vegetable sourced) or other combinations. The two-piece hard shell

ACADIA_1287404

US 11,452,721 B2

13

capsules may contain the pimavanserin granules with a filler/diluent and/or lubricants.

The finished dosage forms may be presented in packaging containing metal or plastic foil such as a blister pack. The pack may also be accompanied with a notice associated with the container in form prescribed by a governmental agency regulating the manufacture, use, or sale of pharmaceuticals, which notice is reflective of approval by the agency of the form of the drug for human or veterinary administration. Such notice, for example, may be the labeling approved by the U.S. Food and Drug Administration for prescription of drugs, or the approved package insert.

WO 2007/133802 discloses that only certain components are compatible with pimavanserin, and although certain components are compatible their use in the herein disclosed capsule may not be preferred. A particular example is lactose as it may have implications to the administration to subject being lactose intolerant.

Some requirements of the pharmaceutical manufacturing for pimavanserin are commercial operational speed, as well as stringent regulatory requirements. For example, the encapsulation equipment used is capable of ~100,000 capsules per hour, such as 40,000-90,000 capsules per hour, such as 60,000-86,000 capsules per hour, such as 60,000-70,000 capsules per hour. The manufacturing must be reproducible and robust to be capable of this output while producing quality product.

Prior to the surprising finding, i.e. the herein disclosed processes and compositions resulting in a robust and reliable filling of 5-34 mg pimavanserin in capsules of size 3 or 4, such as size 4 capsules, many experiments were done.

Comparative experiments resulting in unacceptable products

For example, the pharmaceutical industry has used fluid-bed layering extensively for several decades to produce small spherical particles with improved properties (e.g. flowability and compressibility) for further downstream processing, such as capsule filling. During this two-phase process that includes simultaneous spraying and drying, the addition of a binder causes primary particles to increase the diameter of the substrate by the addition of a dense layer of the drug and a binder, one such technique evolved was top spray layering (use of conventional top-spray fluidized bed granulation equipment to apply the drug layer to a small substrate particle), e.g. using the following composition about 63% w/w microcrystalline cellulose (the spherical particle (bead) around which the API is layered or applied), about 28% w/w of pimavanserin tartrate (API), about 6% w/w povidone (binder), such as povidone K30, and about 2% w/w HPMC E5 (Methocel™ E5) (hydroxypropylmethyl cellulose). The top spray fluid-bed layering resulted in particles having an acceptable flow and bulk density but unacceptable stability and particle size distribution as well an unacceptable amount of impurities. These unacceptable disadvantages, such as unacceptable stability, less favourable dissolution, resulted in deeming this process option unsuitable for the current purpose.

Wurster Layering (a similar and more common process to the Top Spray Layering described above) was tested and found to produce particles having an acceptable flow and bulk density but unacceptable stability and particle size distribution as well an unacceptable amount of impurities. These unacceptable disadvantages, such as unacceptable stability, less favourable dissolution, resulted in deeming this process option unsuitable for the current purpose. One composition tested was the same as in the top spray layering.

14

Extrusion/spheronization is especially useful in producing semi-spherical, dense granules. The physical advantages of extrusion/spheronization vs. other multiparticulate approaches can include relatively high drug loading, improved flow properties, narrow particle size distribution, smooth and a coatable surface, low friability, and uniform packing characteristics. The process consists of five operations, i.e. wet granulating the formulation, followed by screening to form cylindrical extrudates, adding the extrudate to a spheronizer forming spheres from the extrudate, and drying the spheres. Optionally coatings may be applied to the spheres. A composition containing about 27% w/w pimavanserin tartrate as a 32% w/w slurry in water, about 68% w/w microcrystalline cellulose (e.g. Avicel PH 101), about 4% hydroxypropylmethyl cellulose (e.g. Methocel™ A15LV), and about 1% w/w povidone (e.g. povidone K30) resulted in particles having an acceptable flow and bulk density but unacceptable stability and particle size distribution as well as an unacceptable amount of impurities. The particles were milled in order to achieve a uniform particle size, yet the amount of impurities and stability were found to be unacceptable.

Twin-Screw Melt Granulation has increased in popularity in pharmaceutical manufacturing due to the numerous advantages of this continuous manufacturing technique over traditional batch wet granulation. Twin-Screw Melt Granulation does not require the use of organic or aqueous solvents, making the entire process less consuming in terms of time and energy as compared to wet granulation, and in view of other tests disclosed hereinabove the use of solvent was deemed as a potential source for the impurities and may have been a factor for the stability issues observed. Consequently Twin-Screw Melt Granulation was evaluated using a binder/disintegrant, heat and agitation. As binder/disintegrant a low substituted hydroxypropyl cellulose (e.g. LH-B1 marketed by Shin Etsu), and Kollidon® VA64 marketed by BASF were used in separate compositions using about 50% w/w pimavanserin tartrate and LH-B1 and Kollidon VA64 respectively. In either case the resulting particles were screened and evaluated resulting in particles having an acceptable flow and bulk density but unacceptable finding of impurities as well as unacceptable dissolution.

Conventionally wet granulation (both high shear and low shear) have been used for a long time in pharmaceutical manufacturing, an example of a conventional wet granulation process is described in WO2009/061909 wherein table 7 discloses 40-50% w/w of water being used in the wet granulation, i.e. conventionally a wet granulation uses a liquid, e.g. water in order to prepare a wet mass with sufficient plasticity which can be subsequently wet-milled and dried produce granules with improved flow and density properties. High shear granulation was chosen for evaluation due to the higher energy it is capable of imparting to the particles, which was known to improve the particle density, spherocity, and consequently the capsule filling capability and particle flow, respectively. The quantity of water used in conventional or traditional wet granulation proved to be problematic resulting in very large, wet, adhesive pimavanserin granules that would not be easily dried in a fluid bed dryer. Additionally, large quantity of water would also result in high impurities and changes in the crystallinity of pimavanserin.

Several embodiments were evaluated using excipients commonly used to mitigate the impact of high water content while providing excellent granule properties. These did not improve the resulting over-wetting of the pimavanserin

JTX09-0020

ACADIA_1287405

Appx113

US 11,452,721 B2

15

blend and resulted in an adhesive wet mass that would not would not be easily dried in a fluid bed dryer.

Contrary to the above disclosed comparative experiments the present application describes processes to manufacture capsules of size 4 comprising 5-34 mg pimavanserin. As additionally disclosed above it was surprisingly found that a 100% pimavanserin high-shear granulation was possible by using only small water quantities, often large quantities of water and a binder conventionally used in high-shear granulation. In order for a small quantity of water to be effective, the distribution of the water should be finely divided providing small points of localized wetting of pimavanserin. Localized wetting is considered wetting of an immediate area around the water droplets. Examples of suitable size of the water droplets are sprayed are about 0.05-0.15 mm The granulation of pimavanserin, for example without the presence of a binder, was achieved using a small amount of water and a nozzle, such as an atomizing nozzle, capable of producing a spray pattern that covered a large area of pimavanserin and preventing over-wetting of large areas of the batch. Suitable nozzles are commercially available, e.g. from Spraying Systems Co. Spraying of low amounts of water and appropriate impeller speed and chopper speed of the high shear granulator achieved pimavanserin granulation having altered properties and improved the flow, e.g. bulk density compared to the native API. The total quantity of water added to the pimavanserin granulation should be limited to a global value the would not result in a global state of over-wetting (global refers to a large area of the batch being over-wetted), which as described above would occur during conventional wet granulation of pimavanserin, causing an adhesive wet mass that would not be easily dried in a fluid bed dryer, i.e. not resulting in a sufficiently dried product, or too long drying times, and increasing the risk of changing the crystalline form of pimavanserin (e.g. changing pimavanserin into amorphous forms), which could result in slow dissolution when administered to a patient. As disclosed above conventionally high shear granulation utilizes amounts of water that would lead to over wetting of an API, such as pimavanserin, and the present inventors have demonstrated that an appropriate water application, e.g. using a nozzle, capable of spraying water over a large area of the API, combined with a chopper/impeller speed (e.g. by controlling amperage), results in granulated pimavanserin having improved bulk density suitable for filling amounts disclosed herein into capsules of size 4.

In addition to the global, or batch, over-wetting a local over-wetting may also impair the properties of the API. One solution presented herein relates to applying a spray of water having a droplet size at 0.05-0.15 mm, e.g. using a nozzle spraying the water and resulting in adequate wetting, locally and globally.

Suitable drying times of the wet granulation described herein is 120 min, such as 100 min, such as 80 min, such as 60 min. A drying time of 60 min is preferred, e.g. in view of process efficiency etc. The global quantity of water will vary depending on many factors such as the capacity of the high shear granulator, loading of the high shear granulator, the batch of pimavanserin to be granulated, surrounding environment, and may be controlled by impeller speed and chopper speed as well as the spray rate and spray pattern parameters (e.g. using a atomization nozzle), and the amperage (energy consumption) of the granulator. As the high shear granulator is an "open" system and energy from the impeller actually incorporates into the product causing the product temperature to increase favorably limiting the global impact of the added water when applied at a low rate.

16

However, the range of water was found to be approximately 3-15% w/w, such as 3-10% w/w, such as 3-8% w/w (based on the mass of the pimavanserin in the granulator at the start of the granulation process). As disclosed herein it has been demonstrated that pimavanserin can be granulated without the use of a binder, i.e. utilizing water only. It is however contemplated that in some embodiments suitable binders, such as cellulose, methyl cellulose, polyvinylpyrrolidone and polyethylene glycol may be used, although not a necessity. The present high shear granulation of pimavanserin utilizing e.g. 3-8% w/w water, applied by an nozzle, which can generate an atomized spray pattern, provides benefits.

Embodiments disclosed herein relate to pimavanserin tartrate as crystalline Form C, Form A or a combination thereof.

The doses referred to herein, i.e. 5-34 mg refers to pimavanserin free base (equivalent to about 6 mg-40 mg pimavanserin tartrate).

Some embodiments relates to pimavanserin tartrate Form C (40 mg of pimavanserin tartrate, equivalent to 34 mg pimavanserin free base) being encapsulated in capsules of size 3 or 4, such as capsules of size 4.

One embodiment of the compositions described herein includes pimavanserin tartrate granulation without binder, dried, and thereafter blended with less than 60% w/w microcrystalline cellulose such as Avicel PH302 or equivalent microcrystalline cellulose, and about 1% w/w magnesium stearate.

In some embodiments the compositions described herein comprises granulated pimavanserin and microcrystalline cellulose is at least 20% w/w microcrystalline cellulose, such as 30% w/w microcrystalline cellulose, such as 40% w/w microcrystalline cellulose, such as 50% w/w microcrystalline cellulose, such as 50-89% w/w microcrystalline cellulose, such as 20-94% w/w, such as 50-94% w/w, such as 57-94% w/w, such as 57-89% w/w microcrystalline cellulose, such as 57-79% w/w microcrystalline cellulose, or 57-60% w/w microcrystalline cellulose, or 57-59.5% w/w microcrystalline cellulose, or 58.5-59.5% w/w microcrystalline cellulose, or 59% w/w microcrystalline cellulose.

In some embodiments the compositions described herein comprises granulated pimavanserin and microcrystalline cellulose and magnesium stearate, such as 0.1-3% w/w, such as 0.5-2% w/w magnesium stearate, or 0.5-1.5% w/w magnesium stearate, or 1% w/w magnesium stearate.

In some embodiments the compositions described herein comprises granulated pimavanserin (5, 10, 20 or 34 mg) and microcrystalline cellulose is at least 20% w/w microcrystalline cellulose, such as 30% w/w microcrystalline cellulose, such as 40% w/w microcrystalline cellulose, such as 50% w/w microcrystalline cellulose, such as 50-89% w/w microcrystalline cellulose, such as 20-94% w/w, such as 50-94% w/w, such as 57-94% w/w, such as 57-89% w/w microcrystalline cellulose, such as 57-79% w/w microcrystalline cellulose, or 57-60% w/w microcrystalline cellulose, or 57-59.5% w/w microcrystalline cellulose, or 58.5-59.5% w/w microcrystalline cellulose, or 59% w/w microcrystalline cellulose and magnesium stearate, such as 0.1-3% w/w, such as 0.5-2% w/w magnesium stearate, or 0.5-1.5% w/w magnesium stearate, or 1% w/w magnesium stearate.

The compositions disclosed herein comprise pimavanserin and additional compatible excipients, e.g. sugars, sucrose, mannitol, sorbitol, polysaccharides (e.g. from corn, wheat, rice, potato), as well as pregelatinized or partially pregelatinized starches (e.g. STARCH 1500®), cellulose preparations such as microcrystalline cellulose (MCC) (e.g. AVICEL® PH 302, AVICEL® PH 102, VIVAPUR® 302,

ACADIA_1287406

US 11,452,721 B2

17

VIVAPUR® 102, EMCOCEL® HD 90), silicified microcrystalline cellulose (e.g. PROSOLV® 50, PROSOLV® 90, PROSOLV® HD90), lactose cellulose blends (e.g. CELLATOSE® 80, CELLATOSE® 90, PROSOLV® EASYtab SP), hydroxypropylmethyl cellulose, hydroxymethyl cellulose, polyvinylpyrrolidone, lubricants such as magnesium stearate, sodium stearyl fumarate, colloidal silicon dioxide, and talc.

Several tests attempting to mitigate the impact of the high water quantity used in high-shear granulation by the use of excipients generally capable of absorption of the water were made. However, these proved to be unsuccessful.

One embodiment of the compositions described herein includes pimavanserin tartrate granulation without binder, drying, and blending said granulation with microcrystalline cellulose having a bulk density of 0.35-0.46 g/ml, and wherein the bulk density of the blended composition is >0.4 g/ml, such as >0.5 g/ml.

In some embodiments the composition comprises microcrystalline cellulose (MCC) having a bulk density of about 0.40 g/ml, such as 0.3-0.5 g/ml, such as 0.35-0.46 g/ml. In some embodiment the API having a bulk density of >0.40 g/ml and MCC having a bulk density of 0.30-0.50 g/ml and is blended with magnesium stearate in order to make up a composition having a bulk density of 0.40-0.55 g/ml.

One embodiment of the compositions described herein includes pimavanserin tartrate granulation with spraying water and without any binder, followed by, drying, and blending said granulation with less than 50% w/w microcrystalline cellulose such as Avicel PH302 or equivalent microcrystalline cellulose, and about 1% w/w magnesium stearate. The spraying of water to pimavanserin tartrate is done while mixing in an appropriate granulator.

Another embodiment of the composition described above includes pimavanserin tartrate granulation containing less than 10% w/w Avicel PH302 and colloidal silicon dioxide, e.g. Aerosil Pharma 200 manufactured by Evonik, with a specific surface area from about 175 to about 225 m²/g blended with less than 60% w/w microcrystalline cellulose, such as Avicel PH302 or equivalent microcrystalline cellulose, and about 1% w/w magnesium stearate.

Another embodiment of the composition described above includes pimavanserin tartrate granulation containing less than 10% w/w Avicel PH101 and colloidal silicon dioxide with a specific surface area from about 175 to about 225 m²/g, e.g. Aerosil Pharma 200 manufactured by Evonik, blended with less than 60% w/w microcrystalline cellulose, such as Avicel PH302 or equivalent thereof, and about 1% w/w magnesium stearate.

As used herein, whenever a USP is referred to it is the current official version at the time of filing of the application, i.e 40-NF 35, released Nov. 1, 2016 and official May 1, 2017.

Provided herein are embodiment for manufacturing pimavanserin granulation comprising: providing pimavanserin and adding water while mixing in an appropriate granulator, such as a high shear granulator; granulating and; drying the wet pimavanserin granulation, sizing the pimavanserin granulation, e.g. through a screen, such as a 10-20 mesh screen; and obtaining pimavanserin granulation. Said pimavanserin granulation being suitable for encapsulation in size 4 capsules, for example by blending with a diluent before capsule filling (encapsulation).

Provided herein are embodiment for manufacturing pimavanserin granulation by: providing pimavanserin (weighed and the loss-on-drying (LOD) moisture content determined) to a high shear granulator; pre-blending (optional); providing granulation water, e.g. 3-8% w/w, e.g. by spraying at a

18

controlled rate and/or a controlled pattern (e.g. using an atomization nozzle) while monitoring the impeller speed and/or amperage, and granulating; stopping the provision of granulation water, e.g. when the impeller amperage increases; wet massing, e.g. without changing the impeller speed; drying the wet granulation, e.g. in a fluid bed dryer until the LOD moisture is at or below the LOD moisture of the pimavanserin as provided; and sizing, e.g. through a 10-mesh screen; and obtaining pimavanserin granulation. Said pimavanserin granulation being suitable for encapsulation in size 3 or 4 capsules, for example by providing additional excipients during the screening, followed by filling of the capsule.

It is important to control the amount of water, the water application rate and/or water application method thereof (e.g. using an atomization nozzle, or another suitable spraying device) as too much water may have a negative impact, e.g. change its properties, such as its crystallinity, of pimavanserin. Adding too much water, e.g. 25% w/w, would have undesired effects on properties of pimavanserin, which would cause issues with the continued pharmaceutical manufacturing of capsules. In some embodiments water is sprayed (e.g. using an atomization nozzle) to pimavanserin while mixing. Addition of water without mixing may lead to localized over-wetting. Provided herein are embodiments wherein pimavanserin, for example pimavanserin tartrate, such as pimavanserin tartrate Form C, is granulated with water using high shear granulation. In some embodiments the amount of water is 1-10% w/w (water based on dry ingredient content), such as 3-8% w/w. In some embodiments the impeller speed and/or chopper speed of the high shear granulator is controlled in order to obtain a granulation of sufficient quality for further processing. The wet granulation is then dried, e.g. in fluid bed dryers or tray dryers at controlled conditions of temperature and drying air flow. The dried granulation is then sized using a screening mill or other appropriate milling (delumping), and blended with appropriate pharmaceutical diluents and/or binders, such as microcrystalline cellulose, enabling the filling of 5-34 mg granulated pimavanserin (equivalent to about 6 mg-40 mg pimavanserin tartrate) in a size 3 (0.30 ml volume) or 4 (0.21 ml volume) capsule. Some embodiments relates to the capsule being a capsule of size 4, and a two-piece capsule.

Provided herein is a process for manufacturing capsules containing 5-34 mg pimavanserin; by providing pimavanserin, for example pimavanserin tartrate, such as pimavanserin tartrate Form C and water, e.g. 1-10% w/w, such as 2-9% w/w, such as 3-8% w/w, such as 4-8% w/w, such as 5-8% w/w, such as 5-7% w/w to a high shear granulator, granulating pimavanserin and the water, drying the pimavanserin granulation, sizing (or screening, may also be referred to as delumping) the dried pimavanserin granulation, e.g. using a screening mill, blending with one or more pharmaceutical excipients, such as one or more filler (diluent) filling a size 3 or 4 capsule, e.g. a two-piece capsule, with pimavanserin granulation . Provided herein is a process for manufacturing capsules containing 5-34 mg pimavanserin, wherein the process comprises the following (e.g. in said order): providing pimavanserin, for example pimavanserin tartrate, such as pimavanserin tartrate Form C to a high shear granulator, granulating pimavanserin together with water, e.g. 1-10% w/w, such as 2-9% w/w, such as 3-8% w/w, such as 4-8% w/w, such as 5-8% w/w, such as 5-7% w/w) while controlling the water application rate, and/or atomization parameters (e.g. by using an appropriate nozzle such as an externally mixed, two-fluid, air-atomizing spray nozzle), impeller speed (e.g. by monitoring amperage),

ACADIA_1287407

Appx115

US 11,452,721 B2

19

and/or chopper speed (e.g. by monitoring amperage), drying the granulated pimavanserin, e.g. using fluid bed drying, sizing the dried pimavanserin granulation, e.g. using a screening mill or other appropriate milling device (such as oscillating mills, impact mills), blending the sized pimavanserin granulation with one or more filler/diluent (optionally including a lubricant), and final blending with a lubricant (unless the filler/diluent includes a lubricant), filling a size 3 or 4 two-piece capsule with the blended pimavanserin composition. In some embodiments the capsule is a capsule of size 4 and the amount of pimavanserin is 34 mg. As specified herein, such as hereinbelow, excipients such as diluents, binders, lubricants, pharmaceutical flow agents, and/or other excipients compatible with pimavanserin may be included. Some embodiments provide pimavanserin, microcrystalline cellulose and magnesium stearate only. Some embodiments relate to the microcrystalline cellulose having a particle size distribution (D90) of 180-340 μm. Some embodiments relate to microcrystalline cellulose having a bulk density above >0.40 g/ml. Some embodiements relate to the microcrystalline cellulose having a particle size distribution (D90) of 180-340 μm and a bulk density above >0.40 g/ml.

Provided herein are embodiments wherein the capsule is a capsule of size 4, e.g. a two-piece capsule, such as a two-piece hard shell capsule, e.g. a two-piece capsule of gelatin or hydroxypropyl methylcellulose (HPMC). Some commercial examples are VCaps®, VCaps® Plus, Coni-Snap® marketed by Capsugel.

Provided are also embodiments wherein pimavanserin (granulated), microcrystalline cellulose, for example Avicel PH302 or an equivalent microcrystalline cellulose, and/or magnesium stearate, for example vegetable grade are encapsulated in a capsule of size 4, for example a two-piece capsule.

Provided are also embodiments wherein 34 mg pimavanserin (granulated) (equivalent to 40 mg pimavanserin tartrate), microcrystalline cellulose, such as microcrystalline cellulose having a particle size distribution (D90) of 180-340 μm, for example Avicel PH302 or an equivalent microcrystalline cellulose, and/or magnesium stearate, for example vegetable grade are encapsulated in a capsule of size 4, for example a two-piece capsule.

Provided are also embodiments wherein 10 or 20 mg pimavanserin (granulated), microcrystalline cellulose, for example Avicel PH302 or an equivalent microcrystalline cellulose, and/or magnesium stearate, for example vegetable grade are encapsulated in a capsule of size 4, for example a two-piece capsule.

Provided are also embodiments wherein 34 mg pimavanserin (granulated), 59 mg microcrystalline cellulose, for example Avicel PH302 or an equivalent microcrystalline cellulose, and/or 1 mg magnesium stearate, for example vegetable grade are encapsulated in a capsule of size 4, for example a two-piece capsule. No other excipients were added.

Also provided is a pharmaceutical composition, comprising a capsule of pimavanserin and one or more pharmaceutically acceptable excipient(s) as provided herein, wherein the composition is formulated such that at least 80% of pimavanserin is released in 30 minutes upon administration to a subject.

Also provided is a pharmaceutical composition, comprising a capsule of pimavanserin and one or more pharmaceutically acceptable excipient(s) as provided herein, wherein the composition is formulated such that at least 80% of the pimavanserin is released from the composition within 30

20

minutes upon in vitro dissolution testing according to USP<711> (apparatus 1 (basket apparatus)).

The final moisture content of the pimavanserin granulation is equivalent to the starting moisture content of the pimavanserin.

Another requirement achieved by the pimavanserin capsules disclosed herein can be a long shelf-life, i.e., a shelf-life of at least 1 year is obtained, such as 2 years of shelf-life.

Examples

Manufacturing of a capsule, size 4 two-piece capsule, comprising 34 mg pimavanserin equivalent to 40 mg pimavanserin tartrate

Pimavanserin 34 mg capsules may be prepared as outline herein below.

Granulation: The required ingredients for all operations of the entire process are weighed. The loss-on-drying (LOD) moisture content of the pimavanserin is determined, for example using an appropriate LOD instrument such as those manufacture by Mettler, Ariz. Instruments, Ohaus or Denver Instruments. Drying end point may be determined using temperature, time or weight loss. Pimavanserin is charged through a screen (25-40 mesh) into a high shear granulator, for example a Glatt Powerex 50 liter high shear granulator equipped with a 25 liter bowl. Following a pre-blend in the high shear granulator (200-400 rpm), granulation water, e.g. 5-8% w/w is sprayed at a controlled rate ((18.5-26.5 g/min) at 15 psi (10.0-20.0) atomization air pressure while monitoring the impeller speed ((200-400 rpm)) and amperage, chopper speed (1600-2000 rpm). When the impeller amperage increases (such as 13-18%,), the spray of water is stopped and the mixture wet massing for 5 minutes without changing the impeller or chopper speeds. Following the 5-minute wet massing, the wet granulation is discharged and placed in a fluid bed dryer (100-140 cfm; 45-55° C.); dew point 10° C.; filter shaking 15 sec/5 sec (interval/duration) until the LOD moisture is at or below the LOD moisture of the pimavanserin at dispensing. The dried granulation is discharged from the fluid bed dryer, screened through a screen (4-12 mesh), and packaged until diluent blending and encapsulation.

Diluent Blending: The screened, dried pimavanserin granulation is dispensed (weighed) for blending/encapsulation unit operations. The required diluent and lubricant quantities are also dispensed. The dispensing is followed by delumping of pimavanserin granulation with a screening mill such as 197S or U10 Comil equipped with a screen (4-12 mesh) at 2300-2500 rpm, blending of the granulation with diluent using a bin type blender such as 2 liter TOTE blender 20 minutes at 19-21 rpm or other appropriate blender, final blending with lubricant using the same bin type blender or other appropriate blender (3 minutes at 19-21 rpm) , and encapsulation using a IIM 2100 equipped with size 4 change parts and 5-12 mm dosing disk (50-90 segments per minute (spm)).

Optionally low shear granulation such as a V-Blender equipped with an intensifier bar, twin screw granulation, may be used instead of the granulation equipment specified above with appropriate adjustment to the milling/screening parameters to manufacture capsules of pimavanserin

Pimavanserin hard shell capsules (34 mg pimavanserin, equivalent to 40 mg pimavanserin tartrate) were manufactured. Table 2 contains an example of a suitable formulation.

As an alternative, the herein disclosed pimavanserin granulation may be compressed as a tablet.

As an alternative, the herein disclosed pimavanserin granulations may be compressed into a tablet without further excipients. Thus the composition disclosed in table 2 in some embodiments is used to form tablets. Said tablets may be formed as an alternative to the filling of a capsule.

ACADIA_1287408

Appx116

US 11,452,721 B2

**21**

Consequently the obtained pimavansering granulation may be compressed into a tablet of a weight of about 100 mg.

TABLE 2

| Composition of Pimavanserin granulation (34 mg) | | |
|---|---|---|
| Ingredients | Qty (% w/w) | Qty (mg)/dose |
| Pimavanserin Tartrate | 40.0 | 40.0* |
| Microcrystalline Cellulose (Avicel PH302, NF, EP) | 59.0 | 59.0 |
| Magnesium Stearate (Vegetable Source, USP, EP) | 1.0 | 1.0 |
| Total | 100.0 | 100.0 |

*40 mg pimavanserin tartrate salt is equivalent to 34 mg pimavanserin free base

Table 3 contains the manufacturing process equipment for pimavanserin capsules, 34 mg.

TABLE 3

| Process Step | Equipment class, sub-class | Manufacturer, model, size |
|---|---|---|
| Screening I (API) | Hand screen | 30 Mesh hand screen |
| Granulation | Vertical granulator | Glatt/Powrex VG-50M with 25 L Bowl |
| Fluid Bed Drying | Fluid bed | Glatt GPCG-5 with 25 L bowl |
| Screening II (granulation) | Hand screen | 10 Mesh hand screen |
| Milling | Screening mills, rotating impeller | Comil 197S or U10 with 045R03125 screen |
| Blending I | Diffusion mixers (Tumble), bin blender | TOTE Bin blender, 2 cubic foot |
| Screening III (Magnesium stearate) | Hand screen | 30 Mesh hand screen |
| Final Blending | Diffusion mixers (Tumble), bin blender | TOTE Bin blender, 2 cubic foot |
| Encapsulation | Encapsulator, dosing disk | IIM 2100, Size 4 change parts and 10 mm dosing disk |
| Polishing and weight checking | Not applicable | Bosch KKE 1500 |

Table 4 outlines the process parameters and ranges for pimavanserin capsules, 34 mg manufacture. Bold references are target values with the ranges displayed in parenthesis.

TABLE 4

| Process Step: Equipment | Process Parameter | Ranges |
|---|---|---|
| Screening I (API) 25-40 Mesh hand screen | Screen size | 25-40 Mesh hand screen |
| Granulation Glatt/Powrex VG-50M with 25 L bowl | Spray rate Impeller speed Chopper speed Atomization Air Pressure | (10-50) [g/min] (200-400) [rpm] (1600-2000) [rpm] (3-20) [psig] |
| Fluid Bed Drying Glatt GPCG-5 with 25 L bowl | Process Air Volume Inlet Air Temperature | (90-210) [cfm] (40-60) [° C.] |
| Screening II (granulation) 4-12 Mesh hand screen | Screen size | 4-12 Mesh hand screen |
| Screening Blending I | Screen size Diffusion blender | 25-40 mesh |
| Screening (Magnesium stearate) | Screen size | 25-40 Mesh |
| Blending I | Diffusion blending | |
| Encapsulation dosing disk based encapsulator | Dosing disk | 5-12 mm |

In some embodiments disclosed herein relate to pimavanserin granulation, e.g. composed as in table 2, having a

**22**

weight of granulation of 100 mg ±7 (average of 20 samples), i.e. the weight relates to the granulation only, i.e. excluding capsule shell weight.

The bulk density of the blended composition is >0.4 g/ml, such as 0.4-0.6 g/ml, such as about 0.5 g/ml determined according to USP <616>, method 1. In some embodiments the bulk density of the composition is >0.4 g/ml, such as about 0.5 g/ml, such as 0.51 g/ml, such as 0.508 g/ml.

The bulk density of pimavanserin granulation is >0.4 g/ml, such as 0.4-0.6 g/ml, such as about 0.5 g/ml, determined according to USP <616>, method 1. In some embodiments the bulk density of the pimavanserin granulation is >0.4 g/ml, such as about 0.5 g/ml, such as 0.51 g/ml, such as 0.508 g/ml.

In addition to the bulk density and Carr's Index obtained according to USP <616>, method 1, FT4 Powder Rheology was obtained for the API (pimavanserin tartrate) and for the compositions disclosed herein using a FT4 Powder Rheometer according to ASTM D7891-15; Standard Test Method for Shear Testing of Powders Using the Freeman Technology FT4 Powder Rheometer Shear Cell.

As discussed herein above the flowability of the composition has been improved compared to the API (pimavanserin tartrate), which for example can be supported by the Specific Energy (SE) obtained from the FT4 measurements. Specific Energy is a measure of the powder's flowability when unconfined, such as during low stress filling, or low shear blending. The average Specific Energy (SE) for the API is about 10.08+/−0.23 mJ/g. The granulated pimavanserin had an average SE of 6.81+/−0.63 mJ/g, and the blended pimavanserin composition an average SE of 3.96+/−0.36 mJ/g. Thus the unconfined flowability was substantially improved compared to the API.

In addition to SE, the Flow Rate Index (FRI) of the composition showed significant improvement compared to the API (pimavanserin tartrate). FRI indicates sensitivity to changing the rate of flow, and the pimavanserin tartrate had an average FRI of 1.90±0.01, the granulated pimavanserin an average FRI of 1.52+/−0.10, and the blended pimavanserin composition had an average FRI of 1.08±0.06, again showing the improved properties for the granulated pimavanserin as well as the blended pimavanserin composition for filling into a capsule of size 3 or 4.

The FT4 Powder Rheometer was also used as yet another means to compare the bulk density between the API, the granulated pimavanserin and the blended pimavanserin compositions disclosed herein and in the accompanying claims. The bulk density is a conditioned bulk density as obtained by the FT4 measurement, in accordance with ASTM D7891-15; Standard Test Method for Shear Testing of Powders Using the Freeman Technology FT4 Powder Rheometer Shear Cell. Pimavanserin tartrate (API) had an average conditioned bulk density (CBD) of 0.336±0.006 g/ml, granulated pimavanserin tartrate had an average conditioned bulk density (CBD) of 0.478±0.028 g/ml, and the blended pimavanserin composition an average CBD of 0.504±0.020 g/ml.

The conditioned bulk density of the blended composition is >0.45 g/ml, such as 0.45-0.6 g/ml, such as 0.47-0.55 g/ml determined according to ASTM D7891-15. In some embodiments the bulk density of the composition >0.45 g/ml, such as an average of about 0.5 g/ml.

The conditioned bulk density of the granulated pimavanserin is >0.42 g/ml, such as 0.42-0.55 g/ml, such as 0.43-0.53 g/ml determined according to ASTM D7891-15. In some embodiments the bulk density of the granulated pimavanserin >0.42 g/ml, such as an average of about 0.48 g/ml.

ACADIA_1287409

US 11,452,721 B2

23

The blended pimavanserin composition used in the herein mention FT4 Powder Rheometry measurements comprised 34 mg pimavanserin, 59 mg microcrystalline cellulose and 1 mg magnesium stearate.

The capsules comprising 5-34 mg pimavanserin are stable upon actual or simulated storage under open conditions at 25° C.±2°/60%±5% (RH) relative humidity for at least 1 year, such as at least 1.5 years.

Alternative methods and equipment to be used in connection with the herein disclosed methods, compositions, capsules, tablets and disclosures may be found in SUPAC: manufacturing equipment addendum, an U.S. Department of Health and Human Services, Food and Drug Administration, Center for Drug Evaluation and Research (CDER) issued guidance for industry, e.g. in the December 2014 version, Pharmaceutical Quality/CMC.

The embodiments disclosed herein above meet all specifications outlined relating to the marketing authorization of Nuplazid®, for example:

Assay (90.0-110.0% of Label Claim), i.e. quantify the amount of pimavanserin free base in the drug product, for example using reverse phase HPLC with UV-detection at 210 nm. An example of eluent is a gradient comprised of two mobile phases such as ammonium buffer (pH 9.0), and acetonitrile/methanol (80/20 vol/vol).

Content Uniformity as determined using USP <905>, Uniformity of Dosage Forms and wherein the maximum Acceptance Value (AV) NMT (not more than) 15.0. The AV is calculated for the number of units tested; Level 1=10 units; Level 2=30 units using the following: the mean Assay value for the number of units tested Minus Either 98.5 (when the mean is less than 98.5% of target assay) and 101.5 (when the mean is greater than 101.5% of target assay) times 2.4 (10 units) or 2.0 (30 units) plus the difference between the Mean and the appropriate Upper/Lower % of target assay, using the method for hard capsules.

Dissolution USP <711>:

Stage 1: Q=80% within 30 minutes

Stage 2: Average of 12 units (Stage 1 & Stage 2) is equal to or greater than Q with no unit less than Q-15%

X-ray powder diffraction (XRPD) analyses on a Bruker AXS D8 Advance system with a Bragg-Brentano configuration using CuKα radiation confirmed that all XRPD patterns for the granulations correspond to the XRPD patterns of the currently approved NUPLAZID 17 mg tablet (pimavanserin tartrate form C) , which for example as disclosed in U.S. 7,732, 615.

Long term stability data for capsules containing 34 mg pimavanserin, 59 mg microcrystalline cellulose and 1 mg magnesium stearate at 18 months were determined using standard procedures such as actual or simulated storage under open conditions at 25° C.±2°/60%±5% (RH) relative humidity, e.g. as outlined in WHO Technical Report Series, No. 953, 2009, Annex 2, and the following observations and determinations were made:

Appearance: unchanged at 18 months

Assay (90.0-110.0% of Label Claim): Day 8: 100±2%; 18 months: 100±2%

Total impurities: Day 0: 0.3%; 18 months: 0.3%, determined in line with Assay.

Dissolution (at 18 months): at least 80% of the pimavanserin is released from the composition within 30 minutes upon in vitro dissolution testing according to USP<711> (apparatus 1 (basket apparatus)).

24

Water content (determined in line with USP<921>, method 1a: Day 0: 2.9%; 18 months: 2.9%.

What is claimed is:

1. A pharmaceutically acceptable capsule for orally delivering 34 mg of pimavanserin to a patient, wherein the capsule has a size 3 or 4 capsule shell that contains a blended pimavanserin composition comprising:

granules comprising 40 mg pimavanserin tartrate and optionally one or more pharmaceutically acceptable excipients;

and one or more blending excipients; wherein the bulk density of the granules is >0.4 g/ml as determined by USP<616>, method 1.

2. The pharmaceutically acceptable capsule of claim 1, wherein one of the blending excipients is selected from the group consisting of magnesium stearate, sodium stearyl fumarate, colloidal silicon dioxide, and talc.

3. The pharmaceutically acceptable capsule of claim 1, wherein the blended pimavanserin composition has a D90 particle size distribution of 60-450 µm as measured using laser scattering particle size analysis.

4. A pharmaceutically acceptable capsule for orally delivering 34 mg of pimavanserin to a patient, wherein the capsule has a capsule shell with a capsule shell size 3 or 4, that encapsulates a blended pimavanserin composition comprising:

granules comprising 40 mg pimavanserin tartrate and one or more pharmaceutically acceptable excipients; and wherein the bulk density of the granules is >0.4 g/ml as determined by USP<616>, method 1.

5. The pharmaceutically acceptable capsule of claim 4, wherein the capsule shell is a hard shell size 4 capsule.

6. The pharmaceutically acceptable capsule of claim 1, wherein one of the blending excipients is selected from the group consisting of a cellulose, a polysaccharide, and polyvinylpyrrolidone.

7. The pharmaceutically acceptable capsule of claim 1, wherein one of the blending excipients is selected from the group consisting of microcrystalline cellulose, silicified microcrystalline cellulose, hydroxypropyl cellulose, hydroxypropylmethyl cellulose, hydroxymethyl cellulose, and a lactose cellulose blend.

8. The pharmaceutically acceptable capsule of claim 1, wherein the one of the blending excipients is selected from the group consisting of sucrose, mannitol, sorbitol, pregelatinized starch, and partially pregelatinized starch.

9. The pharmaceutically acceptable capsule of claim 1, wherein the blending excipients comprise microcrystalline cellulose and magnesium stearate.

10. The pharmaceutically acceptable capsule of claim 1, wherein the blending excipients are selected from the group consisting of filler/diluents, lubricants and mixtures thereof.

11. The pharmaceutically acceptable capsule of claim 1, wherein the granules comprise a pharmaceutically acceptable excipient which is a binder.

12. The pharmaceutically acceptable capsule of claim 10, wherein the binder is selected from the group consisting of cellulose, methyl cellulose, polyvinylpyrrolidone and polyethylene glycol.

13. The pharmaceutically acceptable capsule of claim 4 wherein the pharmaceutically acceptable excipients comprise a binder.

* * * * *

ACADIA_1287410

APPEAL,LEAD,PATENT

**U.S. District Court**
**District of Delaware (Wilmington)**
**CIVIL DOCKET FOR CASE #: 1:22-cv-01387-GBW**

ACADIA Pharmaceuticals Inc. v. Aurobindo Pharma Limited et al | Date Filed: 10/21/2022
Assigned to: Judge Gregory B. Williams | Jury Demand: None
Related Cases: 1:20-cv-00985-GBW | Nature of Suit: 835 Patent - Abbreviated
1:20-cv-00986-GBW | New Drug Application(ANDA)
1:20-cv-01021-GBW | Jurisdiction: Federal Question
1:20-cv-01022-RGA
1:20-cv-01029-GBW
1:22-cv-01386-GBW
1:22-cv-01388-GBW
1:25-cv-00187-GBW
Case in other court:  Federal Circuit, 25-01875
Cause: 35:271 Patent Infringement

**Plaintiff**

**ACADIA Pharmaceuticals Inc.**                     represented by **James Darlington Taylor , Jr.**
Saul Ewing Arnstein & Lehr LLP
1201 N. Market Street, Suite 2300
P.O. Box 1266
Wilmington, DE 19899
(302) 421-6863
Email: James.taylor@saul.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Aubrey James Morin**
Morris James LLP
500 Delaware Ave.
Ste 1500
Wilmington, DE 19801
302-888-6941
Fax: 302-571-1750
Email: amorin@morrisjames.com
*TERMINATED: 12/19/2022*
*ATTORNEY TO BE NOTICED*

**Bruce M. Wexler**
Email: brucewexler@paulhastings.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Chad J. Peterman**
Email: chadpeterman@paulhastings.com

*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Felix A. Eyzaguirre**
Email: felixeyzaguirre@paulhastings.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jennifer Becnel Guzzo**
Saul Ewing LLP
1201 N. Market Street, Suite 2300
Wilmington, DE 19801
302-421-6811
Email: jennifer.becnel-guzzo@saul.com
*ATTORNEY TO BE NOTICED*

**Jessica Marie Jones**
Saul Ewing Arnstein & Lehr LLP
1201 N. Market Street, Suite 2300
P.O. Box 1266
Wilmington, DE 19899
(302) 421-6817
Fax: (302) 421-6813
Email: jessica.jones@saul.com
*ATTORNEY TO BE NOTICED*

**Michelle Streifthau-Livizos**
Saul Ewing Arnstein & Lehr LLP
1201 North Market Street
Ste 23rd Floor
Wilmington, DE 19801
302-421-6819
Fax: 302-421-6813
Email: michelle.streifthau-livizos@saul.com
*ATTORNEY TO BE NOTICED*

**Patrick Lockwood**
Potter Anderson & Corroon
1313 N Market St, 6th Floor
P.O. Box 951
Wilmington, DE 19801
302-984-6125
Email: patrick.lockwood@saul.com
*TERMINATED: 05/31/2024*
*ATTORNEY TO BE NOTICED*

**Peter E. Conway**
Email: peterconway@paulhastings.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Rebecca A. Hilgar**
Email: rebeccahilgar@paulhastings.com
*TERMINATED: 01/08/2024*

*PRO HAC VICE*

**Scott F. Peachman**
Email: scottpeachman@paulhastings.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

V.

**<u>Defendant</u>**

**Aurobindo Pharma Limited**              represented by  **R. Touhey Myer**
Kratz & Barry LLP
800 N. West Street
Wilmington, DE 19801
302-527-8378
Email: tmyer@kratzandbarry.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**George J. Barry , III**
Email: gbarry@kratzandbarry.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Michael P. Hogan**
Email: mhogan@kratzandbarry.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Timothy H. Kratz**
Email: tkratz@kratzandbarry.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**<u>Defendant</u>**

**Aurobindo Pharma USA, Inc.**              represented by  **R. Touhey Myer**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**George J. Barry , III**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Michael P. Hogan**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Timothy H. Kratz**
(See above for address)

*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Defendant**

**MSN Laboratories Private Ltd.**    represented by    **James S. Green , Jr.**
James S Green Jr.
222 Delaware Avenue
Suite 1500
Wilmington, DE 19801
302-897-1674
Fax: 302-888-0606
Email: jsgreen@svglaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Bradford C. Frese**
Email: bradford.frese@afslaw.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Brent A. Batzer**
Email: brent@ipfdalaw.com
*TERMINATED: 12/29/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Janine A. Carlan**
Email: janine.carlan@afslaw.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Julie A. Vernon**
Email: julie.vernon@afslaw.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Michael J. Baldwin**
Email: michael.baldwin@afslaw.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Richard J. Berman**
Email: Richard.Berman@afslaw.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Shashank S. Upadhye**
Email: shashank@ipfdalaw.com
*TERMINATED: 12/29/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Yixin H. Tang**
Email: yixin@ipfdalaw.com

*TERMINATED: 12/29/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Defendant**

**MSN Pharmaceuticals Inc.**                 represented by    **James S. Green , Jr.**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Bradford C. Frese**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Brent A. Batzer**
(See above for address)
*TERMINATED: 12/29/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Janine A. Carlan**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Julie A. Vernon**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Michael J. Baldwin**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Richard J. Berman**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Shashank S. Upadhye**
(See above for address)
*TERMINATED: 12/29/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Yixin H. Tang**
(See above for address)
*TERMINATED: 12/29/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 10/21/2022 | 1 | COMPLAINT for PATENT INFRINGEMENT filed against Aurobindo Pharma Limited and Aurobindo Pharma USA, Inc. (Filing fee $402, receipt number ADEDC-3988503.) - filed by ACADIA Pharmaceuticals Inc. (Attachments: # 1 Exhibit A, # 2 Civil Cover Sheet)(mkr) (Entered: 10/24/2022) |
| 10/21/2022 | 2 | Notice, Consent and Referral forms re: U.S. Magistrate Judge jurisdiction. (mkr) (Entered: 10/24/2022) |
| 10/21/2022 | 3 | Supplemental information for patent cases involving an Abbreviated New Drug Application (ANDA) - Date Patentee(s) Received Notice: N/A. Date of Expiration of Patent: See Attached. (mkr) (Entered: 10/24/2022) |
| 10/21/2022 | 4 | Report to the Commissioner of Patents and Trademarks for Patent/Trademark Number(s) 11,452,271. (mkr) (Entered: 10/24/2022) |
| 10/21/2022 | | No Summons Issued. (mkr) (Entered: 10/24/2022) |
| 10/24/2022 | 5 | Disclosure Statement pursuant to Rule 7.1: No Parents or Affiliates Listed filed by ACADIA Pharmaceuticals Inc.. (Streifthau-Livizos, Michelle) (Entered: 10/24/2022) |
| 10/25/2022 | | Case Assigned to Judge Gregory B. Williams. Please include the initials of the Judge (GBW) after the case number on all documents filed. Associated Cases: 1:22-cv-01386-UNA, 1:22-cv-01387-UNA, 1:22-cv-01388-UNA(nms) (Entered: 10/25/2022) |
| 11/03/2022 | 6 | WAIVER OF SERVICE returned executed by ACADIA Pharmaceuticals Inc.: For Aurobindo Pharma Limited waiver sent on 11/3/2022, answer due 1/3/2023. (Streifthau-Livizos, Michelle) (Entered: 11/03/2022) |
| 11/03/2022 | 7 | WAIVER OF SERVICE returned executed by ACADIA Pharmaceuticals Inc.: For Aurobindo Pharma USA, Inc. waiver sent on 11/3/2022, answer due 1/3/2023. (Streifthau-Livizos, Michelle) (Entered: 11/03/2022) |
| 12/02/2022 | 8 | MOTION for Pro Hac Vice Appearance of Attorney Bruce M. Wexler, Chad J. Peterman, Scott F. Peachman, Rebecca A. Hilgar and Felix A. Eyzaguirre - filed by ACADIA Pharmaceuticals Inc.. (Streifthau-Livizos, Michelle) (Entered: 12/02/2022) |
| 12/05/2022 | | SO ORDERED, re 8 MOTION for Pro Hac Vice Appearance of Attorney Bruce M. Wexler, Chad J. Peterman, Scott F. Peachman, Rebecca A. Hilgar and Felix A. Eyzaguirre filed by ACADIA Pharmaceuticals Inc. Signed by Judge Gregory B. Williams on 12/5/22. (ntl) (Entered: 12/05/2022) |
| 12/19/2022 | 9 | NOTICE requesting Clerk to remove Aubrey J. Morin as co-counsel. Reason for request: No longer with the firm of Saul Ewing LLP. (Streifthau-Livizos, Michelle) (Entered: 12/19/2022) |
| 01/02/2023 | 10 | ANSWER to 1 Complaint, by Aurobindo Pharma Limited, Aurobindo Pharma USA, Inc.. (Myer, R.) (Entered: 01/02/2023) |
| 01/02/2023 | 11 | Disclosure Statement pursuant to Rule 7.1: identifying Corporate Parent Aurobindo Pharma Ltd. for Aurobindo Pharma USA, Inc. filed by Aurobindo Pharma Limited, Aurobindo Pharma USA, Inc.. (Myer, R.) (Entered: 01/02/2023) |
| 01/02/2023 | 12 | NOTICE OF SERVICE of Aurobindo's Production of Core Technical Documents Pursuant to Paragraph 4(b) of the Delaware Default Standard for Discovery and Pursuant to the Standing Order Regarding Hatch-Waxman Cases in Which Infringement is Alleged filed by Aurobindo Pharma Limited, Aurobindo Pharma USA, Inc..(Myer, R.) (Entered: 01/02/2023) |

| 01/02/2023 | 13 | MOTION for Pro Hac Vice Appearance of Attorney Timothy H. Kratz - filed by Aurobindo Pharma Limited, Aurobindo Pharma USA, Inc.. (Myer, R.) (Entered: 01/02/2023) |
|---|---|---|
| 01/02/2023 | 14 | MOTION for Pro Hac Vice Appearance of Attorney Michael P. Hogan - filed by Aurobindo Pharma Limited, Aurobindo Pharma USA, Inc.. (Myer, R.) (Entered: 01/02/2023) |
| 01/03/2023 | | SO ORDERED, re 13 MOTION for Pro Hac Vice Appearance of Attorney Timothy H. Kratz filed by Aurobindo Pharma USA, Inc., Aurobindo Pharma Limited, 14 MOTION for Pro Hac Vice Appearance of Attorney Michael P. Hogan filed by Aurobindo Pharma USA, Inc., Aurobindo Pharma Limited. Signed by Judge Gregory B. Williams on 1/3/23. (ntl) (Entered: 01/03/2023) |
| 01/03/2023 | | Pro Hac Vice Attorney Timothy H. Kratz and Michael P. Hogan for Aurobindo Pharma Limited and Aurobindo Pharma USA, Inc. added for electronic noticing. Pursuant to Local Rule 83.5 (d)., Delaware counsel shall be the registered users of CM/ECF and shall be required to file all papers. (mpb) (Entered: 01/03/2023) |
| 01/04/2023 | | Pro Hac Vice Attorney Bruce M. Wexler, Chad J. Peterman, Rebecca A. Hilgar, Scott F. Peachman, and Felix A. Eyzaguirre for ACADIA Pharmaceuticals Inc. added for electronic noticing. Pursuant to Local Rule 83.5 (d)., Delaware counsel shall be the registered users of CM/ECF and shall be required to file all papers. Associated Cases: 1:22-cv-01386-GBW, 1:22-cv-01387-GBW, 1:22-cv-01388-GBW(mpb) (Entered: 01/04/2023) |
| 05/17/2023 | 15 | Joint STIPULATION Case Consolidation by ACADIA Pharmaceuticals Inc.. (Streifthau-Livizos, Michelle) (Entered: 05/17/2023) |
| 05/19/2023 | | SO ORDERED, re (15 in 1:22-cv-01387-GBW)(15 in 1:22-cv-01388-GBW) Stipulation and Order to Consolidate filed by ACADIA Pharmaceuticals Inc. Signed by Judge Gregory B. Williams on 5/19/23. Associated Cases: 1:22-cv-01387-GBW, 1:22-cv-01388-GBW (ntl) (Entered: 05/19/2023) |
| 05/19/2023 | 16 | SCHEDULING ORDER: Fact Discovery completed by 2/8/2024. Status Report due by 2/22/2024. Joint Claim Construction Brief due by 11/21/2023. A Markman Hearing is set for 12/19/2023 at 01:00 PM in Courtroom 6B before Judge Gregory B. Williams. A Final Pretrial Conference is set for 11/14/2024 at 02:00 PM in Courtroom 6B before Judge Gregory B. Williams. A 3-day Bench Trial is set for 12/2/2024 at 09:30 AM in Courtroom 6B before Judge Gregory B. Williams. Signed by Judge Gregory B. Williams on 5/19/23. (ntl) (Entered: 05/19/2023) |
| 05/25/2023 | 17 | NOTICE OF SERVICE of (1) Defendants Aurobindo Pharma Limited and Aurobindo Pharma USA, Inc.'s Initial Disclosures Pursuant to F.R.C.P. 26(a)(1); and (2) Defendants Aurobindo Pharma Limited and Aurobindo Pharma USA, Inc.'s Disclosures Pursuant to Paragraph 3 of the Delaware Default Standard for Discovery filed by Aurobindo Pharma Limited, Aurobindo Pharma USA, Inc..(Myer, R.) (Entered: 05/25/2023) |
| 05/25/2023 | 18 | NOTICE OF SERVICE of MSNs Initial Disclosures Pursuant to Rule 26(a)(1) and Initial Disclosures Pursuant to Paragraph 3 of the Delaware Default Standard for Discovery filed by MSN Laboratories Private Ltd., MSN Pharmaceuticals Inc..(Green, Jared) (Entered: 05/25/2023) |
| 05/25/2023 | 19 | NOTICE OF SERVICE of Initial rule 26(a)(1) disclosures and ESI disclosures regarding custodians filed by ACADIA Pharmaceuticals Inc..(Streifthau-Livizos, Michelle) (Entered: 05/25/2023) |

| 05/31/2023 | 20 | Joint STIPULATION Protective Order by ACADIA Pharmaceuticals Inc.. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2-4)(Streifthau-Livizos, Michelle) (Entered: 05/31/2023) |
|---|---|---|
| 06/02/2023 | 21 | NOTICE OF SERVICE of Plaintiff's Initial Infringement Contentions to Aurobindo Pharma Limited filed by ACADIA Pharmaceuticals Inc..(Streifthau-Livizos, Michelle) (Entered: 06/02/2023) |
| 06/02/2023 | 22 | NOTICE OF SERVICE of Plaintiff's Initial Infringement Contentions to MSN Laboratories Private Ltd. and MSN Pharmaceuticals Inc. filed by ACADIA Pharmaceuticals Inc..(Streifthau-Livizos, Michelle) (Entered: 06/02/2023) |
| 06/07/2023 | 23 | NOTICE OF SERVICE of Plaintiff's Paragraph 4(a) Disclosures Identifying the Asserted Patent and Accused Products filed by ACADIA Pharmaceuticals Inc..(Streifthau-Livizos, Michelle) (Entered: 06/07/2023) |
| 06/08/2023 | | SO ORDERED, re 20 Stipulated Protective Order. Signed by Judge Gregory B. Williams on 6/8/23. (ntl) (Entered: 06/08/2023) |
| 07/13/2023 | 24 | NOTICE OF SERVICE of Defendants Joint Initial Invalidity Contentions Regarding U.S. Patent No. 11,452,721 filed by MSN Laboratories Private Ltd., MSN Pharmaceuticals Inc..(Green, James) (Entered: 07/13/2023) |
| 07/27/2023 | 25 | NOTICE OF SERVICE of Plaintiff Acadia's Proposed Terms for Construction filed by ACADIA Pharmaceuticals Inc..(Streifthau-Livizos, Michelle) (Entered: 07/27/2023) |
| 07/27/2023 | 26 | NOTICE OF SERVICE of Defendants Aurobindo Pharma Limited, Aurobindo Pharma USA, Inc., MSN Laboratories Private Ltd. and MSN Pharmaceuticals, Inc.'s Proposed Terms for Claim Construction filed by Aurobindo Pharma Limited, Aurobindo Pharma USA, Inc..(Myer, R.) (Entered: 07/27/2023) |
| 08/08/2023 | 27 | NOTICE OF SERVICE of Plaintiff's Proposed Claim Constructions in Response to Defendants' Proposed Terms for Construction filed by ACADIA Pharmaceuticals Inc.. (Streifthau-Livizos, Michelle) (Entered: 08/08/2023) |
| 08/11/2023 | 28 | NOTICE of Appearance by Patrick Lockwood on behalf of ACADIA Pharmaceuticals Inc. (Lockwood, Patrick) (Entered: 08/11/2023) |
| 08/15/2023 | 29 | CLAIM Construction Chart by ACADIA Pharmaceuticals Inc.. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Exhibit G, # 8 Exhibit H, # 9 Exhibit I, # 10 Exhibit J, # 11 Exhibit K, # 12 Exhibit L, # 13 Exhibit M, # 14 Exhibit N, # 15 Exhibit O, # 16 Exhibit P, # 17 Exhibit Q, # 18 Exhibit R, # 19 Exhibit S, # 20 Exhibit T, # 21 Exhibit U, # 22 Exhibit V, # 23 Exhibit W, # 24 Exhibit X) (Lockwood, Patrick) (Entered: 08/15/2023) |
| 08/22/2023 | 30 | Joint STIPULATION TO EXTEND TIME submission of Joint Technology Tutorial to 11/7/2023 - filed by ACADIA Pharmaceuticals Inc.. (Streifthau-Livizos, Michelle) (Entered: 08/22/2023) |
| 08/23/2023 | | SO ORDERED, re 30 Joint STIPULATION TO EXTEND TIME for submission of Joint Technology Tutorial to 11/7/2023 filed by ACADIA Pharmaceuticals Inc. Signed by Judge Gregory B. Williams on 8/23/23. (ntl) (Entered: 08/23/2023) |
| 09/28/2023 | 31 | NOTICE OF SERVICE of Defendants' First set of Interogatories to Plaintiff (Nos. 1-8) and Defendants' First Set of Requests to Plaitiff for the Production of Documents and Things (Nos. 1-66) filed by MSN Laboratories Private Ltd., MSN Pharmaceuticals Inc.. (Green, James) (Entered: 09/28/2023) |
| 10/03/2023 | 32 | Letter to The Honorable Gregory B. Williams from Michelle C. Streifthau-Livizos regarding Markman Hearing. (Streifthau-Livizos, Michelle) (Entered: 10/03/2023) |

| 10/05/2023 | 33 | ORAL ORDER: IT IS HEREBY ORDERED that the parties are granted leave for each side to present live testimony from one expert witness during the Markman hearing scheduled for December 19, 2023, at 1:00 p.m., if they so choose. By no later than November 3, 2023, Plaintiff shall inform Defendants in writing whether Plaintiff will be presenting the live testimony of an expert witness during the Markman hearing and, if so, the identity of the witness. Likewise, by no later than November 17, 2023, Defendants shall inform Plaintiff in writing whether Defendants will be presenting the live testimony of an expert witness during the Markman hearing and, if so, the identity of the witness. Both parties shall make any such expert witnesses who are identified to testify during the Markman hearing available for deposition on a mutually agreeable date and time between November 20, 2023 and December 12, 2023. The Court has allocated three (3) hours for this hearing, with each side being allocated ninety (90) minutes for its presentation inclusive of any live witness testimony. ORDERED by Judge Gregory B. Williams on 10/5/23. (ntl) (Entered: 10/05/2023) |
| 10/25/2023 | 34 | NOTICE OF SERVICE of Plaintiff's Reply Claim Construction Brief and Declaration of Christian Schoneich, Ph.D. in Support of Plaintiff's Reply Claim Construction Brief filed by ACADIA Pharmaceuticals Inc..(Streifthau-Livizos, Michelle) (Entered: 10/25/2023) |
| 10/30/2023 | 35 | NOTICE OF SERVICE of Acadia Pharmaceuticals Inc.'s Objections and Responses to Defendant's First Set of Requests for Production of Documents and Things (1-66) and Interrogatories (1-8) filed by ACADIA Pharmaceuticals Inc..(Streifthau-Livizos, Michelle) (Entered: 10/30/2023) |
| 11/01/2023 | 36 | STIPULATION TO EXTEND TIME for Defendants to Serve Claim Construction Sur-Reply Brief to November 16, 2023 - filed by MSN Laboratories Private Ltd., MSN Pharmaceuticals Inc.. (Green, James) (Entered: 11/01/2023) |
| 11/02/2023 | | SO ORDERED, re 36 STIPULATION TO EXTEND TIME for Defendants to Serve Claim Construction Sur-Reply Brief to November 16, 2023 filed by MSN Laboratories Private Ltd., MSN Pharmaceuticals Inc. Signed by Judge Gregory B. Williams on 11/2/23. (ntl) (Entered: 11/02/2023) |
| 11/07/2023 | 37 | NOTICE of Joint Technology Tutorial by ACADIA Pharmaceuticals Inc. (Streifthau-Livizos, Michelle) (Entered: 11/07/2023) |
| 11/16/2023 | 38 | NOTICE OF SERVICE of Defendants' Sur-Reply Claim Construction Brief and Second Declaration of R. Christian Moreton, Ph.D. filed by Aurobindo Pharma Limited, Aurobindo Pharma USA, Inc..(Myer, R.) (Entered: 11/16/2023) |
| 11/21/2023 | 39 | JOINT CLAIM CONSTRUCTION BRIEF filed by ACADIA Pharmaceuticals Inc.. (Attachments: # 1 Appendix Joint Appendix with Exhibits 1-14)(Streifthau-Livizos, Michelle) (Additional attachment(s) added on 12/4/2023: # 2 Exhibit Exhibit 1 of Exhibit 14, # 3 Exhibit Exhibit 2 of Exhibit 14, # 4 Exhibit Exhibit 3 of Exhibit 14, # 5 Exhibit Exhibit 4 of Exhibit 14) (ntl). (Entered: 11/21/2023) |
| 11/27/2023 | 40 | NOTICE to Take Deposition of Christian Schoneich, PhD on December 8, 2023 @ 8:30 a.m. CST filed by MSN Laboratories Private Ltd., MSN Pharmaceuticals Inc..(Green, James) (Entered: 11/27/2023) |
| 11/28/2023 | 41 | NOTICE to Take Deposition of Christian Moreton, Ph.D. on December 4, 2023 filed by ACADIA Pharmaceuticals Inc..(Streifthau-Livizos, Michelle) (Entered: 11/28/2023) |
| 12/04/2023 | | CORRECTING ENTRY: Additional exhibits added to D.I. 39 per request of counsel. (ntl) (Entered: 12/04/2023) |
| 12/06/2023 | 42 | MOTION for Pro Hac Vice Appearance of Attorney George J. Barry III - filed by Aurobindo Pharma Limited, Aurobindo Pharma USA, Inc.. (Myer, R.) (Entered: |

| | | 12/06/2023) |
|---|---|---|
| 12/07/2023 | | SO ORDERED, re 42 MOTION for Pro Hac Vice Appearance of Attorney George J. Barry III filed by Aurobindo Pharma USA, Inc., Aurobindo Pharma Limited. Signed by Judge Gregory B. Williams on 12/7/23. (ntl) (Entered: 12/07/2023) |
| 12/07/2023 | | Pro Hac Vice Attorney George J. Barry, III for Aurobindo Pharma Limited and Aurobindo Pharma USA, Inc. added for electronic noticing. Pursuant to Local Rule 83.5 (d)., Delaware counsel shall be the registered users of CM/ECF and shall be required to file all papers. (mkr) (Entered: 12/07/2023) |
| 12/13/2023 | 43 | MEMORANDUM OPINION re claim construction. Signed by Judge Gregory B. Williams on 12/13/23. (ntl) (Entered: 12/13/2023) |
| 12/13/2023 | 44 | ORDER re 43 Memorandum Opinion regarding claim construction. The Markman hearing scheduled for 12/19/23 is CANCELLED. Signed by Judge Gregory B. Williams on 12/13/2023. (ntl) (Entered: 12/13/2023) |
| 12/29/2023 | 45 | NOTICE of Withdrawal of Appearance of Shashank Upadhye, Yixin Tang, and Brent Batzer as counsel for Defendants MSN Laboratories Private Limited and MSN Pharmaceuticals, Inc. by MSN Laboratories Private Ltd., MSN Pharmaceuticals Inc. (Green, James) (Entered: 12/29/2023) |
| 01/02/2024 | 46 | Pro Hac Vice Fee - Credit Card Payment received for Richard J. Berman. ( Payment of $ 50, receipt number ADEDC-4304470).(Green, James) (Entered: 01/02/2024) |
| 01/02/2024 | 47 | MOTION for Pro Hac Vice Appearance of Attorney Richard J. Berman - filed by MSN Laboratories Private Ltd., MSN Pharmaceuticals Inc.. (Green, James) (Entered: 01/02/2024) |
| 01/02/2024 | 48 | Pro Hac Vice Fee - Credit Card Payment received for Janine A. Carlan. ( Payment of $ 50, receipt number ADEDC-4304498).(Green, James) (Entered: 01/02/2024) |
| 01/02/2024 | 49 | Pro Hac Vice Fee - Credit Card Payment received for Bradford C. Frese. ( Payment of $ 50, receipt number ADEDC-4304500).(Green, James) (Entered: 01/02/2024) |
| 01/02/2024 | 50 | Pro Hac Vice Fee - Credit Card Payment received for Julie Vernon. ( Payment of $ 50, receipt number ADEDC-4304501).(Green, James) (Entered: 01/02/2024) |
| 01/02/2024 | 51 | MOTION for Pro Hac Vice Appearance of Attorney Janine A. Carlan - filed by MSN Laboratories Private Ltd., MSN Pharmaceuticals Inc.. (Green, James) (Entered: 01/02/2024) |
| 01/02/2024 | 52 | MOTION for Pro Hac Vice Appearance of Attorney Bradford C. Frese - filed by MSN Laboratories Private Ltd., MSN Pharmaceuticals Inc.. (Green, James) (Entered: 01/02/2024) |
| 01/02/2024 | 53 | MOTION for Pro Hac Vice Appearance of Attorney Julie Vernon - filed by MSN Laboratories Private Ltd., MSN Pharmaceuticals Inc.. (Green, James) (Entered: 01/02/2024) |
| 01/04/2024 | | SO ORDERED, re 53 MOTION for Pro Hac Vice Appearance of Attorney Julie Vernon filed by MSN Laboratories Private Ltd., MSN Pharmaceuticals Inc., 52 MOTION for Pro Hac Vice Appearance of Attorney Bradford C. Frese filed by MSN Laboratories Private Ltd., MSN Pharmaceuticals Inc., 47 MOTION for Pro Hac Vice Appearance of Attorney Richard J. Berman filed by MSN Laboratories Private Ltd., MSN Pharmaceuticals Inc., 51 MOTION for Pro Hac Vice Appearance of Attorney Janine A. Carlan filed by MSN Laboratories Private Ltd., MSN Pharmaceuticals Inc. Signed by Judge Gregory B. Williams on 1/3/24. (ntl) (Entered: 01/04/2024) |

| 01/08/2024 | 54 | MOTION for Pro Hac Vice Appearance of Attorney Peter E. Conway - filed by ACADIA Pharmaceuticals Inc.. (Streifthau-Livizos, Michelle) (Entered: 01/08/2024) |
|---|---|---|
| 01/08/2024 | 55 | Pro Hac Vice Fee - Credit Card Payment received for Peter Conway. ( Payment of $ 50, receipt number ADEDC-4308838).(Streifthau-Livizos, Michelle) (Entered: 01/08/2024) |
| 01/08/2024 | 56 | NOTICE requesting Clerk to remove Rebecca A. Hilgar as co-counsel. Reason for request: no longer with the firm. (Streifthau-Livizos, Michelle) (Entered: 01/08/2024) |
| 01/09/2024 | | SO ORDERED, re 54 MOTION for Pro Hac Vice Appearance of Attorney Peter E. Conway filed by ACADIA Pharmaceuticals Inc. Signed by Judge Gregory B. Williams on 1/9/24. (ntl) (Entered: 01/09/2024) |
| 01/09/2024 | 57 | NOTICE OF SERVICE of Defendants Aurobindo Pharma Ltd. and Aurobindo Pharma USA, Inc.'s First Set of Interrogatories to Plaintiff (Nos. 1-8) filed by Aurobindo Pharma Limited, Aurobindo Pharma USA, Inc..(Myer, R.) (Entered: 01/09/2024) |
| 01/10/2024 | | Pro Hac Vice Attorney Peter E. Conway for ACADIA Pharmaceuticals Inc. added for electronic noticing. Pursuant to Local Rule 83.5 (d)., Delaware counsel shall be the registered users of CM/ECF and shall be required to file all papers. Associated Cases: 1:22-cv-01387-GBW, 1:20-cv-00985-GBW(mpb) (Entered: 01/10/2024) |
| 01/10/2024 | 58 | NOTICE OF SERVICE of Plaintiff's First Set of Interrogatories (Nos. 1-10) filed by ACADIA Pharmaceuticals Inc..(Streifthau-Livizos, Michelle) (Entered: 01/10/2024) |
| 02/06/2024 | 59 | Joint STIPULATION to Amend Scheduling Order re 16 Scheduling Order,, by ACADIA Pharmaceuticals Inc.. (Streifthau-Livizos, Michelle) (Entered: 02/06/2024) |
| 02/07/2024 | 60 | SO ORDERED, re 59 STIPULATION to Amend Scheduling Order -- Fact Discovery completed by 3/21/2024. Status Report due by 3/28/2024. A 3-day Bench Trial is set for 12/3/2024 at 09:30 AM in Courtroom 6B before Judge Gregory B. Williams. A Final Pretrial Conference is set for 11/26/2024 at 01:00 PM in Courtroom 6B before Judge Gregory B. Williams. Signed by Judge Gregory B. Williams on 2/7/24. (ntl) (Entered: 02/07/2024) |
| 02/09/2024 | | Pro Hac Vice Attorneys Julie A. Vernon, Richard J. Berman, Janine A. Carlan, and Bradford C. Frese for MSN Laboratories Private Ltd. and MSN Pharmaceuticals Inc. added for electronic noticing. Pursuant to Local Rule 83.5 (d)., Delaware counsel shall be the registered users of CM/ECF and shall be required to file all papers. (mpb) (Entered: 02/09/2024) |
| 02/14/2024 | 61 | NOTICE OF SERVICE of Defendants MSN Laboratories Private Ltd. and MSN Pharmaceuticals, Inc.s Objections And Responses To Plaintiffs First Set Of Interrogatories (Nos. 1-10) filed by MSN Laboratories Private Ltd..(Green, James) (Entered: 02/14/2024) |
| 02/14/2024 | 62 | NOTICE OF SERVICE of Defendants Aurobindo Pharma Ltd. and Aurobindo Pharma USA, Inc.'s Responses and Objections to Plaintiff's First Set of Interrogatories (Nos. 1-10) filed by Aurobindo Pharma Limited, Aurobindo Pharma USA, Inc..(Myer, R.) (Entered: 02/14/2024) |
| 02/15/2024 | 63 | NOTICE OF SERVICE of Plaintiff's Answers to Aurobindo's Interrogatories Nos. 1-8 filed by ACADIA Pharmaceuticals Inc..(Streifthau-Livizos, Michelle) (Entered: 02/15/2024) |
| 02/16/2024 | 64 | NOTICE OF SERVICE of Defendants' First Supplemental And Amended Joint Initial Invalidity Contentions Regarding U.S. Patent No. 11,452,721 filed by MSN Laboratories Private Ltd..(Green, James) (Entered: 02/16/2024) |

| 02/23/2024 | 65 | NOTICE OF SERVICE of Plaintiff's Supplemental Objections and Responses to Defendant MSN's First Set of Interrogatories No. 5) filed by ACADIA Pharmaceuticals Inc..(Streifthau-Livizos, Michelle) (Entered: 02/23/2024) |
|---|---|---|
| 02/23/2024 | 66 | NOTICE OF SERVICE of Plaintiff's Supplemental Objections and Responses to Defendant Aurobindo's First Set of Interrogatories (No. 5) filed by ACADIA Pharmaceuticals Inc..(Streifthau-Livizos, Michelle) (Entered: 02/23/2024) |
| 03/11/2024 | 67 | NOTICE OF SERVICE of Supplemental Objections and Responses to Defendant Aurobindos First Set of Interrogatories (No. 7) filed by ACADIA Pharmaceuticals Inc..(Taylor, James) (Entered: 03/11/2024) |
| 03/12/2024 | 68 | NOTICE OF SERVICE of Defendants' Joint Notice Of Rule 30(b)(6) Deposition Of Plaintiff filed by MSN Laboratories Private Ltd..(Green, James) (Entered: 03/12/2024) |
| 03/13/2024 | 69 | NOTICE OF SERVICE of Plaintiff's Supplemental Objections and Responses to Defendant MSN's First Set of Interrogatories (No.7) filed by ACADIA Pharmaceuticals Inc..(Streifthau-Livizos, Michelle) (Entered: 03/13/2024) |
| 03/15/2024 | 70 | Pro Hac Vice Fee - Credit Card Payment received for Michael Baldwin. ( Payment of $ 50, receipt number ADEDC-4362559).(Green, James) (Entered: 03/15/2024) |
| 03/15/2024 | 71 | MOTION for Pro Hac Vice Appearance of Attorney Michael Baldwin - filed by MSN Laboratories Private Ltd.. (Green, James) (Entered: 03/15/2024) |
| 03/18/2024 | | SO ORDERED, re 71 MOTION for Pro Hac Vice Appearance of Attorney Michael Baldwin filed by MSN Laboratories Private Ltd. Signed by Judge Gregory B. Williams on 3/18/24. (ntl) (Entered: 03/18/2024) |
| 03/19/2024 | 72 | NOTICE OF SERVICE of Plaintiff's Objections to 30(b)(6) Deposition Notices filed by ACADIA Pharmaceuticals Inc..(Streifthau-Livizos, Michelle) (Entered: 03/19/2024) |
| 03/19/2024 | | Pro Hac Vice Attorney Michael J. Baldwin for MSN Laboratories Private Ltd. and MSN Pharmaceuticals Inc. added for electronic noticing. Pursuant to Local Rule 83.5 (d)., Delaware counsel shall be the registered users of CM/ECF and shall be required to file all papers. (oam) (Entered: 03/19/2024) |
| 03/21/2024 | 73 | NOTICE OF SERVICE of Plaintiff's Supplemental Objections and Responses to Defendant MSN's First Set of Interrogatories Nos. 1 and 7 filed by ACADIA Pharmaceuticals Inc..(Streifthau-Livizos, Michelle) (Entered: 03/21/2024) |
| 03/21/2024 | 74 | NOTICE OF SERVICE of Plaintiff's Supplemental Objections and Responses to Aurobindo's First Set of Interrogatories (Nos. 1, 4 and 7) filed by ACADIA Pharmaceuticals Inc..(Streifthau-Livizos, Michelle) (Entered: 03/21/2024) |
| 03/28/2024 | 75 | Joint STATUS REPORT by ACADIA Pharmaceuticals Inc.. (Streifthau-Livizos, Michelle) (Entered: 03/28/2024) |
| 04/04/2024 | 76 | NOTICE OF SERVICE of Plaintiff's Final Infringement Contentions served upon Aurobindo filed by ACADIA Pharmaceuticals Inc..(Taylor, James) (Entered: 04/04/2024) |
| 04/04/2024 | 77 | NOTICE OF SERVICE of Plaintiff's Final Infringement Contentions filed upon MSN filed by ACADIA Pharmaceuticals Inc..(Taylor, James) (Entered: 04/04/2024) |
| 04/18/2024 | 78 | NOTICE of Defendants' Final Joint Initial Invalidity Contentions Regarding U.S. Patent No. 11,452,721 by MSN Laboratories Private Ltd. (Green, James) (Entered: 04/18/2024) |
| 05/31/2024 | 79 | NOTICE requesting Clerk to remove Patrick Lockwood as co-counsel. Reason for request: No longer with Saul Ewing LLP. (Streifthau-Livizos, Michelle) (Entered: 05/31/2024) |

| 06/07/2024 | 80 | NOTICE OF SERVICE of Aurobindo Defendants' Rebuttal Expert Report of R. Christian Moreton, Ph.D. on Noninfringement filed by Aurobindo Pharma Limited, Aurobindo Pharma USA, Inc..(Myer, R.) (Entered: 06/07/2024) |
|---|---|---|
| 06/10/2024 | 81 | NOTICE OF SERVICE of Plaintiff's Rebuttal Report of Pamela A. Smith, Ph.D. and Opening Report of Sean D. Sheridan, Ph.D. filed by ACADIA Pharmaceuticals Inc.. (Streifthau-Livizos, Michelle) (Entered: 06/10/2024) |
| 06/28/2024 | 82 | NOTICE OF SERVICE of Plaintiff Acadia Pharmaceuticals, Inc.'s Reply Expert Report of Pamela A. Smith, Ph.D. Regarding Aurobindo Infringement of U.S. Patent No. 11,452,721 filed by ACADIA Pharmaceuticals Inc..(Streifthau-Livizos, Michelle) (Entered: 06/28/2024) |
| 06/28/2024 | 83 | NOTICE OF SERVICE of Plaintiff Acadia Pharmaceuticals Inc.'s Reply Expert Report of Pamela A. Smith, Ph.D. Regarding Msn's Infringement of U.S. Patent No. 11,452,721 filed by ACADIA Pharmaceuticals Inc..(Streifthau-Livizos, Michelle) (Entered: 06/28/2024) |
| 07/09/2024 | 84 | Joint STIPULATION TO EXTEND TIME July 18, 2024 to July 25, 2024 - filed by ACADIA Pharmaceuticals Inc.. (Streifthau-Livizos, Michelle) (Entered: 07/09/2024) |
| 07/10/2024 | | SO ORDERED, re 84 Joint STIPULATION TO EXTEND TIME TO SERVE SUR-REPLY EXPERTS REPORTS FROM July 18, 2024 to July 25, 2024 filed by ACADIA Pharmaceuticals Inc. Signed by Judge Gregory B. Williams on 7/10/2024. (lnb) (Entered: 07/10/2024) |
| 07/26/2024 | 85 | NOTICE OF SERVICE of Plaintiff Acadia Pharmaceuticals Inc.s Sur-Reply Expert Report of Steven R. Little, Ph.D. Concerning U.S. Patent No. 11,452,721 and Sur-Reply Expert Report of Sean D. Sheridan filed by ACADIA Pharmaceuticals Inc..(Streifthau-Livizos, Michelle) (Entered: 07/26/2024) |
| 07/26/2024 | 86 | NOTICE OF SERVICE of Plaintiff Acadia Pharmaceuticals Inc.s Sur-Reply Expert Report of Steven R. Little, Ph.D. Concerning U.S. Patent No. 11,452,721 and Sur-Reply Expert Report of Sean D. Sheridan filed by ACADIA Pharmaceuticals Inc..(Streifthau-Livizos, Michelle) (Entered: 07/26/2024) |
| 08/09/2024 | 87 | NOTICE to Take Deposition of Pamela A. Smith, Ph.D. on August 13, 2024 filed by Aurobindo Pharma Limited, Aurobindo Pharma USA, Inc..(Myer, R.) (Entered: 08/09/2024) |
| 08/12/2024 | 88 | NOTICE to Take Deposition of Sean D. Sheridan, Ph.D. on August 21, 2024 filed by Aurobindo Pharma Limited, Aurobindo Pharma USA, Inc..(Myer, R.) (Entered: 08/12/2024) |
| 08/19/2024 | 89 | NOTICE to Take Deposition of Dr. R. Christian Moreton on August 20, 2024 filed by ACADIA Pharmaceuticals Inc..(Streifthau-Livizos, Michelle) (Entered: 08/19/2024) |
| 08/21/2024 | 90 | NOTICE to Take Deposition of Dr. Fernando Muzzio on August 22, 2024 filed by ACADIA Pharmaceuticals Inc..(Streifthau-Livizos, Michelle) (Entered: 08/21/2024) |
| 08/21/2024 | 91 | NOTICE to Take Deposition of Dr. Fernando Muzzio on August 23, 2024 filed by ACADIA Pharmaceuticals Inc..(Streifthau-Livizos, Michelle) (Entered: 08/21/2024) |
| 08/21/2024 | 92 | NOTICE to Take Deposition of Mr. Ivan Hoffman on August 23, 2024 filed by ACADIA Pharmaceuticals Inc..(Streifthau-Livizos, Michelle) (Entered: 08/21/2024) |
| 08/22/2024 | 93 | AMENDED DOCUMENT by ACADIA Pharmaceuticals Inc.. Amendment to 91 Notice to Take Deposition of Dr. Fernando Muzzio on August 23, 2024. (Streifthau-Livizos, Michelle) (Entered: 08/22/2024) |

| 09/12/2024 | 94 | MOTION in Limine *Regarding Certain Opinions of Dr. Pamela Smith* - filed by MSN Laboratories Private Ltd.. (Attachments: # 1 Proposed Order)(Green, James) (Entered: 09/12/2024) |
|---|---|---|
| 09/23/2024 | 96 | OPENING BRIEF in Support re 94 MOTION in Limine *Regarding Certain Opinions of Dr. Pamela Smith REDACTED VERSION OF OPENING BRIEF AND EXHIBITS A & B TO DECLARATION* filed by MSN Laboratories Private Ltd..Answering Brief/Response due date per Local Rules is 10/7/2024. (Attachments: # 1 Declaration To Brief, # 2 Exhibit REDACTED VERSION of Exhibit A to Declaration, # 3 Exhibit REDACTED VERSION of Exhibit B to Declaration, # 4 Exhibit Exhibit C to Declaration)(Green, James) (Entered: 09/23/2024) |
| 09/26/2024 | 97 | [SEALED] ANSWERING BRIEF in Opposition re 94 MOTION in Limine *Regarding Certain Opinions of Dr. Pamela Smith* filed by ACADIA Pharmaceuticals Inc..Reply Brief due date per Local Rules is 10/3/2024. (Attachments: # 1 Declaration of Chad Peterman, # 2 Exhibit 1, # 3 Exhibit 2, # 4 Exhibit 3, # 5 Certificate of Service) (Streifthau-Livizos, Michelle) (Entered: 09/26/2024) |
| 10/03/2024 | 98 | [SEALED] REPLY BRIEF *In Support Of Defendants MSN Laboratories Private Limited And MSN Pharmaceutical, Inc.'s Daubert Motion Regarding Certain Opinions Of Dr. Pamela Smith* filed by MSN Laboratories Private Ltd.. (Green, James) (Entered: 10/03/2024) |
| 10/03/2024 | 99 | REDACTED VERSION of 97 Answering Brief in Opposition, *To Defendant MSN's Daubert Motion Regarding Certain Opinions of Dr. Pamela Smith* by ACADIA Pharmaceuticals Inc.. (Attachments: # 1 Exhibit 1)(Streifthau-Livizos, Michelle) (Entered: 10/03/2024) |
| 10/21/2024 | 100 | REPLY BRIEF re 94 MOTION in Limine *Regarding Certain Opinions of Dr. Pamela Smith PUBLIC* filed by MSN Laboratories Private Ltd.. (Green, James) (Entered: 10/21/2024) |
| 11/07/2024 | 101 | [SEALED] Proposed Pretrial Order by ACADIA Pharmaceuticals Inc.. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8, # 9 Exhibit 9, # 10 Exhibit 10, # 11 Exhibit 11, # 12 Exhibit 12, # 13 Exhibit 13, # 14 Exhibit 14, # 15 Exhibit 15A, # 16 Exhibit 15B, # 17 Exhibit 16A, # 18 Exhibit 16B, # 19 Certificate of Service Aurobindo, # 20 Certificate of Service MSN) (Streifthau-Livizos, Michelle) (Entered: 11/07/2024) |
| 11/12/2024 | 102 | NOTICE to Take Deposition of Saravanan Kannusamy on November 21, 2024 filed by Aurobindo Pharma Limited, Aurobindo Pharma USA, Inc..(Myer, R.) (Entered: 11/12/2024) |
| 11/14/2024 | 103 | REDACTED VERSION *Pretrial Order* by ACADIA Pharmaceuticals Inc.. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8, # 9 Exhibit 9, # 10 Exhibit 10, # 11 Exhibit 11, # 12 Exhibit 12, # 13 Exhibit 13, # 14 Exhibit 14, # 15 Exhibit 15A, # 16 Exhibit 15B, # 17 Exhibit 16A, # 18 Exhibit 16B)(Streifthau-Livizos, Michelle) (Entered: 11/14/2024) |
| 11/19/2024 | 104 | MOTION for Exemption of Persons from the District of Delaware's May 17, 2024 Standing Order on Personal Devices - filed by Aurobindo Pharma Limited, Aurobindo Pharma USA, Inc.. (Attachments: # 1 Text of Proposed Order, # 2 Certificate of Service) (Myer, R.) (Entered: 11/19/2024) |

| 11/20/2024 | 105 | ORDER re 104 MOTION for Exemption of Persons from the District of Delaware's May 17, 2024 Standing Order on Personal Devices is Granted filed by Aurobindo Pharma USA, Inc., Aurobindo Pharma Limited. Signed by Judge Gregory B. Williams on 11/20/24. (jaa) (Entered: 11/20/2024) |
| --- | --- | --- |
| 11/20/2024 | 106 | ORAL ORDER: The [Sealed] Opening Brief in Support re 94 Motion in Limine Regarding Certain Opinions of Dr. Pamela Smith and corresponding exhibits (D.I. 95) have been removed from the docket because each document, with the exception of the third exhibit, only included a cover page. Defendants shall refile under seal, and hand deliver to Chambers, the opening brief and corresponding exhibits in their entirety by 2:00 p.m. ET today. ORDERED by Judge Gregory B. Williams on 11/20/24. (jaa) (Entered: 11/20/2024) |
| 11/20/2024 | 107 | [SEALED] SEALED OPENING BRIEF in Support re 94 MOTION in Limine *Regarding Certain Opinions of Dr. Pamela Smith* filed by MSN Laboratories Private Ltd..Answering Brief/Response due date per Local Rules is 12/4/2024. (Attachments: # 1 Declaration To Brief, # 2 Exhibit Exhibit A, # 3 Exhibit Exhibit B, # 4 Exhibit Exhibit C)(Green, James) (Entered: 11/20/2024) |
| 11/20/2024 | 108 | MOTION for Exemption of May 17, 2024 Standing Order On Personal Devices - filed by MSN Laboratories Private Ltd.. (Attachments: # 1 Text of Proposed Order)(Green, James) (Entered: 11/20/2024) |
| 11/20/2024 | 109 | NOTICE of Appearance by Jennifer Becnel Guzzo on behalf of ACADIA Pharmaceuticals Inc. (Guzzo, Jennifer) (Entered: 11/20/2024) |
| 11/21/2024 | 110 | ORDER re 108 MOTION for Exemption of May 17, 2024 Standing Order On Personal Devices is Granted filed by MSN Laboratories Private Ltd. Signed by Judge Gregory B. Williams on 11/21/24. (jaa) (Entered: 11/21/2024) |
| 11/25/2024 | 111 | MOTION Limited Exemption from Standing Order Regarding Personal Electronic Devices - filed by ACADIA Pharmaceuticals Inc.. (Streifthau-Livizos, Michelle) (Entered: 11/25/2024) |
| 11/25/2024 | 112 | [SEALED] MEMORANDUM OPINION. Signed by Judge Gregory B. Williams on 11/25/2024.This order has been emailed to local counsel. (lnb) (Entered: 11/25/2024) |
| 11/25/2024 | 113 | ORDER re 112 Memorandum Opinion. Signed by Judge Gregory B. Williams on 11/25/2024. This order has been emailed to local counsel. (lnb) Unsealed and Modified on 12/18/2024 (lnb). (Entered: 11/25/2024) |
| 11/26/2024 | 114 | SO ORDERED, re 111 MOTION Limited Exemption from Standing Order Regarding Personal Electronic Devices filed by ACADIA Pharmaceuticals Inc. Signed by Judge Gregory B. Williams on 11/26/2024. (lnb) (Entered: 11/26/2024) |
| 11/26/2024 | | Minute Entry for proceedings held before Judge Gregory B. Williams - Final Pretrial Conference held on 11/26/2024. (Court Reporter M. Rolfe.) (lnb) (Entered: 11/26/2024) |
| 11/29/2024 | 115 | Joint STIPULATION OF INFRINGEMENT by ACADIA Pharmaceuticals Inc.. (Streifthau-Livizos, Michelle) (Entered: 11/29/2024) |
| 12/02/2024 | 116 | MOTION Limited Exemption From the Standing ORder Regarding Personal Electronic Devices - filed by ACADIA Pharmaceuticals Inc.. (Streifthau-Livizos, Michelle) (Entered: 12/02/2024) |
| 12/02/2024 | 117 | Exhibit List *[Revised Joint Trial Exhibit List]* by ACADIA Pharmaceuticals Inc.. (Streifthau-Livizos, Michelle) (Entered: 12/02/2024) |

| | | |
|---|---|---|
| 12/02/2024 | 118 | SO ORDERED, re 116 MOTION Limited Exemption From the Standing Order Regarding Personal Electronic Devices filed by ACADIA Pharmaceuticals Inc. Signed by Judge Gregory B. Williams on 12/2/2024. (lnb) (Entered: 12/02/2024) |
| 12/03/2024 | 119 | SO ORDERED, re 115 Stipulation filed by ACADIA Pharmaceuticals Inc. Signed by Judge Gregory B. Williams on 12/3/2024. (lnb) (Entered: 12/03/2024) |
| 12/03/2024 | | Minute Entry for proceedings held before Judge Gregory B. Williams - Day 1 Bench Trial held on 12/3/2024. (Court Reporter M. Rolfe.) (jaa) Modified on 12/4/2024 (jaa). (Entered: 12/04/2024) |
| 12/04/2024 | | Minute Entry for proceedings held before Judge Gregory B. Williams - Day 2 Bench Trial held on 12/4/2024. (Court Reporter M. Rolfe.) (lnb) (Entered: 12/04/2024) |
| 12/09/2024 | 120 | SUPPLEMENTAL SCHEDULING ORDER. Signed by Judge Gregory B. Williams on 12/9/2024. (lnb) (Entered: 12/09/2024) |
| 12/12/2024 | 121 | Letter to The Honorable Gregory B. Williams from James S. Green, Jr., Esquire regarding Joint Request Of All Parties To Amend Supplemental Scheduling Order On Pre-Trial Submission Deadlines. (Attachments: # 1 Stipulation And Proposed Order amending Supplemental Scheduling Order)(Green, James) (Entered: 12/12/2024) |
| 12/13/2024 | | SO ORDERED, re 121 Stipulation Amending Supplemental Scheduling Order. Signed by Judge Gregory B. Williams on 12/13/2024. (lnb) (Entered: 12/13/2024) |
| 12/16/2024 | 122 | Letter to The Honorable Gregory B. Williams from Jennifer Becnel-Guzzo regarding proposed redacted form of the Memorandum Opinion related to the Motions in Limine - re 113 Order, 112 Memorandum Opinion. (Guzzo, Jennifer) (Entered: 12/16/2024) |
| 12/16/2024 | 123 | [SEALED] REDACTED VERSION of 112 Memorandum Opinion *Proposed Redactions* by ACADIA Pharmaceuticals Inc.. (Guzzo, Jennifer) (Entered: 12/16/2024) |
| 12/18/2024 | 124 | ORAL ORDER: Having reviewed the parties' joint letter, D.I. 122, and the proposed public redacted form of the Memorandum Opinion sealed at D.I. 112, the parties may file the public redacted version of D.I. 112 with the redactions proposed in D.I. 123 on or before December 20, 2024. D.I. 113 shall be unsealed in its entirety. ORDERED by Judge Gregory B. Williams on 12/18/2024. (lnb) (Entered: 12/18/2024) |
| 12/20/2024 | 125 | REDACTED VERSION of 112 Memorandum Opinion by ACADIA Pharmaceuticals Inc.. (Guzzo, Jennifer) (Entered: 12/20/2024) |
| 01/13/2025 | 126 | OPENING BRIEF in Support *Post Trial Briefing* filed by MSN Laboratories Private Ltd..Answering Brief/Response due date per Local Rules is 1/27/2025. (Attachments: # 1 Findings Of Fact)(Green, James) (Entered: 01/13/2025) |
| 01/13/2025 | 127 | [SEALED] POST TRIAL BRIEF by ACADIA Pharmaceuticals Inc.. (Attachments: # 1 Certificate of Service)(Streifthau-Livizos, Michelle) (Entered: 01/13/2025) |
| 01/13/2025 | 128 | [SEALED] Proposed Findings of Fact by ACADIA Pharmaceuticals Inc.. (Attachments: # 1 Certificate of Service)(Streifthau-Livizos, Michelle) (Entered: 01/13/2025) |
| 01/21/2025 | 129 | REDACTED VERSION of 127 POST Trial Brief by ACADIA Pharmaceuticals Inc.. (Streifthau-Livizos, Michelle) (Entered: 01/21/2025) |
| 01/21/2025 | 130 | REDACTED VERSION of 128 Proposed Findings of Fact by ACADIA Pharmaceuticals Inc.. (Streifthau-Livizos, Michelle) (Entered: 01/21/2025) |
| 02/12/2025 | 131 | [SEALED] POST TRIAL BRIEF *(Responsive Brief on Non-Infringement)* by Aurobindo Pharma Limited, Aurobindo Pharma USA, Inc.. (Myer, R.) (Entered: 02/12/2025) |

| 02/12/2025 | 132 | [SEALED] Proposed Findings of Fact by Aurobindo Pharma Limited, Aurobindo Pharma USA, Inc.. (Myer, R.) (Entered: 02/12/2025) |
|---|---|---|
| 02/12/2025 | 134 | POST TRIAL BRIEF by ACADIA Pharmaceuticals Inc.. (Attachments: # 1 Proposed Finding of Facts)(Streifthau-Livizos, Michelle) (Entered: 02/12/2025) |
| 02/13/2025 | | CORRECTING ENTRY: Deleted D.I. 133 at the request of counsel as the attachment is filed publicly at D.I. 134. (lnb) (Entered: 02/13/2025) |
| 02/19/2025 | 135 | REDACTED VERSION of 131 POST Trial Brief *(Responsive Brief on Non-Infringement)* by Aurobindo Pharma Limited, Aurobindo Pharma USA, Inc.. (Myer, R.) (Entered: 02/19/2025) |
| 02/19/2025 | 136 | REDACTED VERSION of 132 Proposed Findings of Fact by Aurobindo Pharma Limited, Aurobindo Pharma USA, Inc.. (Myer, R.) (Entered: 02/19/2025) |
| 03/18/2025 | 137 | MOTION for Leave to File *MSN Laboratories Private LTD. And MSN Pharmaceuticals Inc.'s Post-Trial Reply Brief* - filed by MSN Laboratories Private Ltd.. (Attachments: # 1 Text of Proposed Order Proposed Order, # 2 Exhibit Exhibit A Post-Trial Reply Brief) (Green, James) (Entered: 03/18/2025) |
| 04/01/2025 | 138 | ANSWERING BRIEF in Opposition re 137 MOTION for Leave to File *MSN Laboratories Private LTD. And MSN Pharmaceuticals Inc.'s Post-Trial Reply Brief* filed by ACADIA Pharmaceuticals Inc..Reply Brief due date per Local Rules is 4/8/2025. (Attachments: # 1 Exhibit B)(Streifthau-Livizos, Michelle) (Entered: 04/01/2025) |
| 04/08/2025 | 139 | REPLY to Response to Motion re 137 MOTION for Leave to File *MSN Laboratories Private LTD. And MSN Pharmaceuticals Inc.'s Post-Trial Reply Brief MSN Laboratories Private LTD. and MSN Pharmaceuticals Inc.'s Reply In Support Of Their Motion For Leave To File Reply Post-Trial Brief* filed by MSN Laboratories Private Ltd.. (Green, James) (Entered: 04/08/2025) |
| 05/16/2025 | 140 | [SEALED] OPINION. Signed by Judge Gregory B. Williams on 5/16/2025.This document will be emailed to local counsel. (lnb) (Entered: 05/16/2025) |
| 05/16/2025 | 141 | ORDER re 140 Opinion. Signed by Judge Gregory B. Williams on 5/16/2025. (lnb) (Entered: 05/16/2025) |
| 05/23/2025 | 142 | Joint Letter to Judge Gregory B. Williams from Michelle C. Streifthau-Livizos regarding Status of Revised Stipulation of Infringement. (Attachments: # 1 Revised Stipulation of Infringement)(Streifthau-Livizos, Michelle) (Entered: 05/23/2025) |
| 05/27/2025 | 143 | SO ORDERED, re 142 Stipulation of Infringement and Order Regarding U.S. Patent NO. 11,452,721. Signed by Judge Gregory B. Williams on 5/27/25. (jaa) (Entered: 05/27/2025) |
| 06/06/2025 | 144 | Joint Letter to Judge Gregory B. Williams from Michelle C. Streifthau-Livizos regarding Status of Proceedings. (Attachments: # 1 Proposed Final Judgment)(Streifthau-Livizos, Michelle) (Entered: 06/06/2025) |
| 06/09/2025 | 145 | FINAL JUDGMENT. Signed by Judge Gregory B. Williams on 6/9/2025. (lnb) (Entered: 06/09/2025) |
| 06/16/2025 | 146 | NOTICE OF APPEAL to the Federal Circuit of 141 Order, 140 Opinion, 145 Judgment *By MSN Laboratories Private Limited, MSN Pharmaceuticals, Inc., Aurobindo Pharma Limited, and Aurobindo Pharma USA, Inc.*. Appeal filed by MSN Laboratories Private Ltd.. (Green, James) (Entered: 06/16/2025) |
| 06/16/2025 | | APPEAL - Credit Card Payment received re 146 Notice of Appeal (Federal Circuit), filed by MSN Laboratories Private Ltd.. ( Filing fee $605, receipt number ADEDC-4712148.) |

| | | (Green, James) (Entered: 06/16/2025) |
|---|---|---|
| 06/16/2025 | 147 | MOTION to Seal *140 Trial Opinion* - filed by Aurobindo Pharma Limited, Aurobindo Pharma USA, Inc.. (Attachments: # 1 Text of Proposed Order, # 2 Certificate of Service) (Myer, R.) (Entered: 06/16/2025) |
| 06/16/2025 | 148 | DECLARATION of R Touhey Myer in Support of Aurobindo Defendants' Motion to Seal re 147 MOTION to Seal *140 Trial Opinion* by Aurobindo Pharma Limited, Aurobindo Pharma USA, Inc.. (Attachments: # 1 Exhibit 1)(Myer, R.) (Entered: 06/16/2025) |
| 06/17/2025 | | Notification regarding 146 Notice of Appeal (Federal Circuit), sent to Reporter Rolfe (jfm) (Entered: 06/17/2025) |
| 06/17/2025 | | Notice of Appeal and Docket Sheet to US Court of Appeals for the Federal Circuit re 146 Notice of Appeal (Federal Circuit). (jfm) (Entered: 06/17/2025) |
| 06/25/2025 | 149 | NOTICE of Docketing Record on Appeal from USCA for the Federal Circuit re 146 Notice of Appeal (Federal Circuit), filed by MSN Laboratories Private Ltd.. USCA Case Number 2025-1875 (lnb) (Entered: 06/25/2025) |

| PACER Service Center | | |
|---|---|---|
| **Transaction Receipt** | | |
| 07/22/2025 12:50:35 | | |
| **PACER Login:** | carlanj8 | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 1:22-cv-01387-GBW Start date: 1/1/1975 End date: 7/22/2025 |
| **Billable Pages:** | 15 | **Cost:** | 1.50 |

1

1                     IN THE UNITED STATES DISTRICT COURT

2                     IN AND FOR THE DISTRICT OF DELAWARE

3

4  ACADIA PHARMACEUTICALS INC.,              )
                    Plaintiff,               )
5       v.                                   )   C.A. No.
                                             )   1:22-cv-01387-GBW
6  AUROBINDO PHARMA LIMITED, et al.,         )
                                             )
7                   Defendants.              )
                                             )

8

9                              - - - -

10

11                             Wilmington, Delaware
                               Tuesday, December 3, 2024
                               Bench Trial Volume 1 - SEALED

12                             - - - -

13

14

    BEFORE:   HONORABLE GREGORY B. WILLIAMS
15            UNITED STATES DISTRICT COURT JUDGE

16

                               - - - -
17

18

19

20

21

22

23

24

25

                              Michele L. Rolfe, RPR, CRR

2

APPEARANCES:

                        SAUL EWING LLP
                        BY: MICHELLE C. STREIFTHAU-LIVIZOS, ESQ.
                            JENNIFER BECNEL-GUZZO, ESQ.
                                    -and-
                        PAUL HASTINGS LLP
                        BY:   CHAD J. PETERMAN, ESQ.
                              SCOTT F. PEACHMAN, ESQ.
                              PETER E. CONWAY, ESQ.
                              FELIX A. EYZAGUIRRE, ESQ.

                        For Plaintiff ACADIA Pharmaceuticals, Inc.


                        KRATZ & BARRY LLP
                        BY: R. TOUHEY MYER, ESQ.
                            TIMOTHY H. KRATZ, ESQ.
                        For Defendants Aurobindo Pharma Limited and
                        Aurobindo Pharma USA, Inc.



                        SEITZ, VAN OGTROP & GREEN, P.A.
                        BY:  JAMES S. GREEN, ESQ.
                                -and-
                        ARENTFOX SCHIFF LLP
                        BY:  RICHARD J. BERMAN, ESQ.
                             JANINE A. CARLAN, ESQ.
                             BRADFORD C. FRESE, ESQ.
                             MICHAEL BALDWIN, ESQ.
                        For Defendant MSN Laboratories Private
                        Ltd., and MSN Pharmaceuticals, Inc.




                                - - - - -

                          P R O C E E D I N G S


             (REPORTER'S NOTE:  The following bench trial was held

in Courtroom 6-B beginning at 9:00 a.m.)

1                THE COURT:  Good morning.

2                ALL COUNSEL:  Good morning, Your Honor.

3                THE COURT:  You may be seated.

4                All right.  So let's get started by just having

5     counsel put the appearances on the record, and then we'll

6     get into the objections.

7                Plaintiff?

8                MS. STREIFTHAU-LIVIZOS:  Good morning, Your

9     Honor.  Michelle Streifthau-Livizos from Saul Ewing on

10    behalf of Acadia Pharmaceuticals Inc.  I'm joined by my

11    colleague also from Saul Ewing, Jennifer Becnel-Guzzo, and

12    my colleagues from Paul Hastings, Chad Peterman, Scott

13    Peachman, Peter Conway, and Felix Eyzaguirre.

14               MR. EYZAGUIRRE:  All right.  Good morning.

15               THE COURT:  Good morning.

16               MS. STREIFTHAU-LIVIZOS:  Each have been amended

17    pro hac.  Thank you, Your Honor.

18               THE COURT:  All right.  Defendant?

19               MR. GREEN:  Good morning, Your Honor.  For the

20    MSN defendants, I'm James Green from Seitz, Van Ogtrop &

21    Green, and with me from ArentFox is Janine Carlan --

22               MS. CARLAN:  Good morning, Your Honor.

23               THE COURT:  Good morning.

24               MR. GREEN:  -- Richard Berman --

25               MR. BERMAN:  Good morning.

4

```
 1              THE COURT:  Good morning.

 2              MR. GREEN:  -- Bradford Frese --

 3              MR. FRESE:  Good morning, Your Honor.

 4              THE COURT:  Good morning.

 5              MR. GREEN:  -- and Michael Baldwin.

 6              MR. BALDWIN:  Good morning, Your Honor.

 7              THE COURT:  All right.

 8              MR. GREEN:  Thanks, Your Honor.

 9              THE COURT:  Good morning, all.

10              MR. MYER:  Good morning, Your Honor.  Touhey

11   Myer from Kratz & Barry on behalf of the Aurobindo

12   defendants, and also appearing with me today is Timothy

13   Kratz --

14              MR. KRATZ:  Good morning, Your Honor.

15              MR. MYER:  -- Michael Hogan --

16              MR. HOGAN:  Good morning.

17              MR. MYER:  -- and John Thallemer, all from

18   Kratz & Barry as well.

19              THE COURT:  All right.

20              MR. MYER:  Thank you, Your Honor.

21              THE COURT:  Thank you.

22         So the Court received the joint submission and

23   is ready to go through the objections.

24         So with respect to AUROMoreton DDX-0017 and

25   0018, let me hear from the parties regarding it, and we'll
```

1    start with Acadia's objection.  We'll have Acadia first.

2                    MR. PETERMAN:  Good morning, Your Honor.  Chad

3    Peterman.

4                    With respect to those two exhibits, it's an

5    objection based on Your Honor's MIL granting our MIL No. 2

6    which prohibited Defendants Aurobindo and Dr. Moreton from

7    talking about their process.

8                    With respect to that, in Your Honor's opinion,

9    you stated that the -- you know, the patent, you know,

10   doesn't claim a process for preparing granules nor does it

11   contain the limitations that require Dr. Moreton's process

12   steps, and then you go on to conclude that any testimony or

13   contention from Dr. Moreton or Defendants during the

14   upcoming trial in this case concerning the process language

15   quoted above would be an unnecessary trial disruption, and

16   that process language quoted above talked about the various

17   triblending process, processes used by Aurobindo and a

18   compression step and other -- and other portions.

19                   And so these two exhibits, Auro Moreton DDX-17

20   and DDX-18, do cover processes used by Aurobindo.  I believe

21   they're covered by the MIL.

22                   THE COURT:  All right.  Let me hear from

23   Aurobindo.

24                   MR. KRATZ:  Good morning, Your Honor.

25                   THE COURT:  Good morning.

1          MR. KRATZ:  So there's going to be a recurring

2    theme in some of this, but these -- these ones, perhaps, are

3    more directly on point.  Some of the others are simply not.

4          Our argument is essentially that this is a

5    Trojan horse and became an unnecessary distraction from what

6    should be an orderly trial.  The motion in limine was

7    originally brought titled Motion to Preclude Aurobindo from

8    Rearguing Claim Construction.  I think the import of that

9    was that there's no process or patent -- product --

10   product-by-process limitation claim; we accept that.  In

11   fact, the claim construction wasn't even about that.  We --

12   we understood that there was no product-by-process, and

13   we're not making that argument.

14         The argument in this case, they have to prove

15   that our product, as made, contains granules.  And the

16   process by which it's made, we think, is evidence as to

17   whether or not the product contains granules or not, not the

18   process as a limitation, but when you're looking at the two

19   experts that are going to be in this case on infringement,

20   you're going to hear testimony weighing -- that you have to

21   weigh to determine whether it's -- they've met their burden

22   of proof.

23         And one of the pieces of evidence we think that

24   will help us establish that this product does not have

25   granules is that how unlikely it is that it could have

1  granules because of the way it's made.  Not saying that that

2  means that the limitation is not met and we're not making

3  that argument, but instead we want to explain fully what our

4  ANDA is all about.

5           And so they've taken a motion that was directed

6  to just three paragraphs of an expert report, Your Honor

7  granted it, and then there's language in here that suggests

8  that the entirety of the manufacturing process is not

9  relevant, it's not worthy of the Court's consideration.  We

10  think that's too broad.  And so particularly with respect to

11  these exhibits and then later there's an entire witness they

12  want to exclude, we think it's -- they're overreaching.  And

13  so we want the -- all of the arguments that they're making

14  here this morning to be denied so that we can just have the

15  trial and we can all -- you can weigh the evidence for what

16  it's worth.

17           THE COURT:  Okay.  Yeah, when the Court made

18  that ruling, the Court was viewing those three paragraphs

19  recited in Dr. Moreton's rebuttal report.  The Court

20  understands that the invention is about the product and not

21  about the process.  But to say that -- the Court is able to

22  consider and weigh the evidence, given it's a bench trial,

23  and make the proper determination.

24           So I'm going to allow the testimony, and like I

25  said, I'll give it the weight it deserves, knowing what the

1   patent says.

2           MR. PETERMAN:  Understood, Your Honor.  I might,

3   then, be able to short-circuit a few things with the

4   remaining disputes, but we do note our objection.

5           It's basically the same objection with respect

6   to the deposition testimony of Saravanan Kannusamy and the

7   exhibits that he has been used to admit, and that's DTX-320,

8   324, 347, 348, 349, and then for Dr. Moreton, DTX-320.

9   Those all fall under the same objection that we raised with

10  respect to Your Honor's MIL.  We would understand that, you

11  know, your ruling would apply to those exhibits as well.  We

12  would just note our objection for -- for the record, but we

13  don't need to argue with respect to those exhibits.

14          And then the same is true for the recorded trial

15  testimony of Saravanan Kannusamy.  Our objection was based

16  on Your Honor's MIL, and, you know, based on what the Court

17  explained this morning, you know, we would understand that

18  to apply to Mr. Kannusamy's testimony as well.  We would

19  just note our objection but, you know, don't believe that

20  there's any further argument needed, based on Your Honor's

21  ruling.

22          THE COURT:  Okay.  All right.

23          So what I see -- what I believe we have

24  remaining is just the objections to the testimony from the

25  trial deposition of R. Agarwal.

1             MR. PETERMAN:  That's my understanding, Your

2   Honor.  I don't know if there's anything remaining.  I don't

3   know if counsel --

4             MS. CARLAN:  Yes.

5             MR. PETERMAN:  -- has any...

6             THE COURT:  All right.  So the designated

7   testimony objection, that's about relevance.  So Aurobindo

8   says it's relevant to the motivations and knowledge of a

9   person of ordinary skill in the art at the time of the

10   invention.  So tell me why that wouldn't be relevant.

11             MR. PETERMAN:  Okay.  Your Honor, we disagree.

12   This is testimony that was offered by one of the inventors

13   of the patents.  You know, the testimony reflects his

14   understanding and his knowledge.  It's not testimony that's,

15   you know, usable as to prior art, saying that this was

16   something that was generally known to a POSA in the field.

17             So what Defendants are trying to do is they're

18   trying to use the steps of the inventor in order to come up

19   with the motivation and then use his testimony to help

20   support that motivation.

21             Our position is -- and I don't know if Your

22   Honor can see the, you know, portions, you know, that are

23   being objected to -- is that it's not relevant to what a

24   POSA would know, because it talks about -- you know, it has

25   internal documents between Acadia and a company called

1    Catalent and then also information that was known to the --

2    known to the inventor.  The information might be known

3    outside, but that's up to Defendants to prove that a person

4    of skill in the art who wasn't working at Acadia, wasn't

5    privy to internal information at Acadia and Catalent

6    would -- would have that understanding.

7                THE COURT:  All right.  Let me hear from

8    Aurobindo.

9                MR. PETERMAN:  I'm sorry, Your Honor.  I thought

10   you were looking at something.  Are you -- I'm finished with

11   my argument.

12               THE COURT:  You're finished?  Okay.

13               MR. PETERMAN:  Thank you.

14               THE COURT:  Let me hear from Aurobindo.  So tell

15   me why this is broader than just the inventor himself having

16   knowledge about internal information as opposed to knowledge

17   that a person of ordinary skill in the art would have.

18               MS. CARLAN:  Yes, Your Honor.  Janine Carlan for

19   MSN.

20               And there are actually two issues that we've

21   brought in the letter -- that are in the letter that we sent

22   to you.  And the first one is this one that we're discussing

23   which MSN has -- or Defendants have designated testimony to

24   be read, and then the second issue is Plaintiff has

25   designated separate testimony from this same witness to be

1    read.  And in that case, my colleague Michael Baldwin will

2    be addressing that issue.  So I will just address this first

3    one that you have brought up.

4                    THE COURT:  All right.  But counter to

5    Plaintiff -- you're objecting to their

6    counter-designations --

7                    MS. CARLAN:  Exactly.  Yes.

8                    THE COURT:  -- and basically you're saying it's

9    too late -- it was too late.

10                   MS. CARLAN:  But I'll have my colleague --

11                   THE COURT:  It was three hours late.

12                   MS. CARLAN:  I'll have my colleague argue that

13   one.

14                   THE COURT:  All right.

15                   MS. CARLAN:  So for this, first of all, what's

16   important is Mr. Agarwal was a 30(b)(6) designee --

17                   THE COURT:  Okay.

18                   MS. CARLAN:  -- which, of course, we can use his

19   testimony for a lot of things.  Also, he is not an inventor.

20   So for some background, he was senior director of

21   pharmaceutical development at Acadia.  He was put up as

22   their 30(b)(6) witness on a number of topics, and what he

23   was testifying to in these excerpts are -- was basically not

24   the mind of the inventors who were at a third party called

25   Catalent, but he was -- in two of the designations, the one

1    starting on page 21 and the one starting on page 99, was

2    really referencing what was known in the art to everyone

3    which was patients suffering from these diseases, such as

4    Parkinson's, have difficulty swallowing and they have some

5    noncompliance issues.

6            And so both of those at page 21 and 99 are

7    really reflecting what was known in the art about this

8    patient population, having trouble with pills, and that is

9    something that is part of the motivation in this case that

10    goes to the obviousness.  So it's definitely relevant.  It's

11    highly relevant.

12            And the third excerpt that starts on page 49

13    that has been objected to is, again, a discussion of

14    something that was known in the art.  It was, in particular,

15    a quote about known bulk densities.  And we're going to hear

16    a lot about bulk density in this case.  And this was, again,

17    saying something generally about granulation, the process,

18    relates in certain -- it will result in certain bulk

19    densities, so, again, simply saying what was known in the

20    art with respect to granulation, and he was confirming that

21    it was known before they even made anything.  So it's not

22    the inventor saying, Oh, look what we came up with.

23            It -- so all of those excerpts from the 30(b)(6)

24    really just relate to what was known in the art, and it goes

25    to motivation as the -- in part of the invalidity case.

```
 1              THE COURT:  All right.  And this witness isn't
 2      going to testify live?
 3              MS. CARLAN:  We were going to play these --
 4              THE COURT:  Designations.
 5              MS. CARLAN:  -- these designations, and it's, as
 6      you can see, very short.
 7              THE COURT:  All right.  All right.  I'll hear
 8      from you.
 9              MR. PETERMAN:  If I may be heard on this.
10      Counsel said that the witness was testifying regarding what
11      was known in the art.  If Your Honor would take a look at
12      the designations, if you look at the designation on page 21,
13      which, you know -- you can look at the whole context
14      starting from around line 7, questions regarding "when did
15      Acadia decide to pursue development of a 34 mg pimavanserin
16      capsule?"  And then he answers, "Right around the time of
17      the approval of Nuplazid."
18              And then there goes a series of questions, "And
19      why was there a decision to develop -- why did Acadia decide
20      to develop a 34 mg pimavanserin capsule?"  And then he lists
21      several reasons, and these are reasons that Acadia, you
22      know, used and went forward in developing a capsule product.
23      Then the question is, "Why are capsules the preferred dosage
24      form for these patients?"  And then he answered, "Ease of
25      swallowing."
```

1          And so that was in the context of why Acadia

2   went forward; that's not a general statement as to what was

3   known in the prior -- in the prior art.

4          The same is true for the designations that come

5   on page 99, and I will flip to those.  There -- there is a,

6   you know, discussion about some internal documents, internal

7   development documents.  And there's a series of questions

8   beginning on line 20 regarding -- you will see this document

9   is titled Pimavanserin 34 mg Capsule Target Product Profile;

10  that's an internal document that was shared between Acadia

11  and its development partner Catalent.

12         You know, going on to page 100, you know, there

13  are, you know, questions about that document.  And so, you

14  know, this is all -- you know, all information, you know,

15  that was, you know, private, private information between

16  Acadia and Catalent.  There's no statements here saying that

17  this was generally known in the prior art, as counsel was

18  trying to suggest.

19         And the same is true, Your Honor, with respect

20  to the designations that come on page 49.  And, you know,

21  then again, it's also talking about an internal document,

22  you know, shared between Acadia and Catalent.

23         And then on page 50, it is specifically

24  referring to, you know, bullet points in that document.  You

25  know, reading from that document, the witness confirms that

1    he saw that bullet point, and then asked the question,

2    "Prior to this point in time, in August 2015, had there been

3    any work done at Catalent to attempt a high shared

4    granulation of pimavanserin tartrate?"

5            This question specifically about Catalent --

6    work that was being done at Catalent, this, again, is not --

7    not prior art, it's not a statement of something that is

8    generally known to the public.  And so we think that it's

9    trying to be used here for an improper purpose.

10           To the extent, you know, that the defendants'

11   experts want to introduce actual prior art, certainly we

12   don't have objection to that, to the extent that it's, you

13   know, been -- been disclosed.  But these passages all

14   reflect information, you know, with respect to Acadia and

15   Catalent, and no statement that it was publicly known.

16           THE COURT:  But couldn't the Court hear the

17   evidence and weigh whether or not it's limited to Acadia or

18   with something known in the prior art?

19           MR. PETERMAN:  Well, we would say that

20   Defendants need to show that there is actual prior art that

21   contains this information.  And so, you know, we don't see,

22   you know -- I think Defendants -- Defendants may be trying

23   to account for a lack of what's actually in the prior art.

24           THE COURT:  So when -- assume the Court lets

25   them do it, as part of your cross-examination, couldn't you

Appx151

1     bring that out?

2               MR. PETERMAN:  Certainly.  Certainly --

3     certainly I would -- certainly I would do that.  I mean, we

4     certainly wanted to let Your Honor know about this issue.

5     But the way that they're representing this testimony as, you

6     know, being clearly indicative of what was known in the

7     prior art, that just doesn't come out through what -- what

8     the witness actually said.

9               So I think that they're misrepresenting the

10    testimony with respect to our objections, and so, you know,

11    I certainly just want that noted.

12              THE COURT:  So counsel for Aurobindo, when the

13    Court looks at these excerpts, it does appear limited to the

14    specifics of Acadia.  Does it anywhere say -- I haven't seen

15    a statement anywhere about, sort of, prior art or in general

16    or anything like that.

17              Is this the only evidence that you have?

18              MS. CARLAN:  Absolutely not, Your Honor.

19              THE COURT:  Okay.

20              MS. CARLAN:  In fact, this isn't our trial.

21    We're not putting Mr. Agarwal on as our trial.  This is

22    part.  And you'll see, with our -- our evidence and our

23    prior art, which discloses things like, you know, it was

24    known that you could -- you had trouble -- patients who have

25    Parkinson's have trouble swallowing, they have a pill

1    burden.  All these things we're going to show with other --

2    with prior art, with other evidence.

3         However, this is a 30(b)(6), which confirms and

4    it's -- it happened -- what he's describing is all things

5    that were known prefiling of the patent, so the dates here

6    are before the patent-in-suit.  So all of this goes to

7    support our invalidity case.

8         It's -- one of the experts here -- or excerpts

9    here, on page 49, says exactly what -- what you had

10   requested, which is, is it internal or is it talking about

11   what was known.

12        The quote, "Resulting granulations are known to

13   be capable of bulk density in the 0.6 to 0.8 range" is

14   talking about something -- before they even made anything,

15   it was known.  So this isn't looking at what did Acadia

16   figure out.  This is looking at what was known before they

17   even filed the patent, and that's supportive of our

18   invalidity case and it will match the -- the other prior art

19   that we are showing.

20        THE COURT:  Okay.  So the Court will reserve

21   judgment on ruling on this until I hear the other evidence

22   that you're referring to, then, you know -- so before this

23   is put forth to be admitted into evidence, let's talk about

24   it again.

25        MS. CARLAN:  Sounds like a plan, Your Honor,

1    thank you.

2              THE COURT:  All right.  And then I'm going to

3    also reserve judgment on the counter-designation as well.

4              MR. PETERMAN:  Thank you, Your Honor.

5              THE COURT:  Because it's either -- they're

6    either both going to come in or both going to be excluded.

7              MR. PETERMAN:  We understand, Your Honor, thank

8    you.

9              MS. CARLAN:  Thank you, Your Honor.

10             THE COURT:  All right.  So we're done with the

11   objections.

12             I understand there's a -- I saw the stipulation;

13   do the parties still anticipating needing the three days,

14   nine hours per side?

15             MR. PETERMAN:  Your Honor, on behalf of

16   Plaintiffs, I don't think that we will need three days.  I

17   think the stipulation went a long way in helping to narrow

18   the case.

19             I do want to state on the record that we are

20   only asserting Claims 4 and 5 of the '721 patent against --

21   against the defendants.  We will work with MSN to file a

22   revised stipulation because that included -- that included

23   Claim 13 as well.  But we will be only pursuing Claims 4 and

24   5.

25             And, you know, as a result of the stipulation,

```
 1    and then some further case narrowing, some of the witnesses

 2    were dropped.  We will be -- Plaintiff will be having two

 3    witnesses appear live, Dr. Pamela Smith and Dr. Steven

 4    Little.  So I think, you know we -- Your Honor, we don't

 5    want to say how much shorter it will be, but I wouldn't

 6    expect the trial to go past -- past the second day, given

 7    the narrowing that happened over the past couple of days.

 8              THE COURT:  Okay.  All right.

 9              MR. KRATZ:  Your Honor, I think that's generally

10    correct, there's still two issues in the case; there's

11    infringement on Aurobindo and then the invalidity case on

12    behalf of both MSN and Aurobindo.

13              So the scope is -- has narrowed somewhat, but

14    our part of it, because we're obviously going to be

15    attending to infringement today, has probably -- hasn't

16    changed in scope.  So I don't have as well a handle on it as

17    Mr. Peterman here, but I think that maybe tomorrow is

18    correct.

19              THE COURT:  Okay.  All right.  Well, let's get

20    started.

21              MR. KRATZ:  Sorry to -- I was going to stand up

22    in the first place.  Can we address the Court regarding the

23    confidentiality of our information.  We talked about it

24    somewhat at the pretrial conference.

25              My understanding is we're -- obviously, we're
```

1    about to have opening statements.  We couldn't tell from the

2    slides, but we understand this morning that there is going

3    to be some of our information in Plaintiff's opening, but

4    it's only on, again, that issue in the case.  So I don't

5    know what Mr. Peterman's plans are with the sequence of his

6    opening, but that portion is sensitive.

7              My opening is like 6 minutes.  It's going to be

8    after MSN's opening on invalidity.  It's sensitive.  So I

9    don't know how Your Honor wants to do it.  I think we have

10   two or three members of public or press or investors

11   watching.  And so we want the Court to exclude them during

12   just the portion of the opening and then, of course, the

13   infringement case that does have our confidential

14   information, which ironically is that same process evidence

15   that we just had the motion in limine about.

16             But we're going to need the court cleared for

17   those parts of it, but not the full thing, so...

18             THE COURT:  All right.  So, Mr. Peterman, do

19   you -- with respect to your opening, are you able to let the

20   Court know when you're about to get into some sensitive

21   information from the defendants, particularly Aurobindo?

22             MR. PETERMAN:  Yes, Your Honor.  My opening is

23   relatively short, the first half of it does deal with

24   Aurobindo's infringement.

25             THE COURT:  Okay.

1          MR. PETERMAN:  You know, I was -- obviously, I

2    think it's important, I was certainly cognizant of

3    Aurobindo's concerns with confidentiality.  But I certainly

4    think it's important for, you know, our case to be able to

5    talk about those documents, and they are just callouts from

6    exhibits --

7          THE COURT:  All right.

8          MR. PETERMAN:  -- talk about those documents

9    during the -- you know, the opening.  You know, I'm not

10   going to dwell on them, but I do understand that there's

11   some sensitivity here.

12          Obviously, I would rather not have my opening,

13   sort of, interrupted by having the Marshals close the door

14   or anything like that.  But, you know, I have to defer to,

15   you know, counsel, and his client's sensitivities.

16          THE COURT:  So it sounds like at the beginning

17   you're dealing with confidential information.

18          MR. PETERMAN:  Yes.

19          THE COURT:  So we can seal the courtroom for

20   that.  And then if you think -- when you see that you're

21   beyond that information, we can reopen it.

22          MR. PETERMAN:  Yes.  Your Honor, I would

23   suggest -- I mean, it doesn't take me long to get into it.

24   I mean, I introduce my team and then I go into infringement.

25   So I guess I would suggest that if we're going to seal the

1  courtroom, we would do it now.  And then, when I switch to

2  the short section on validity, we could open the courtroom

3  back up.

4          But then our first witness, Dr. Pamela Smith, is

5  going to be talking about Aurobindo's documents a lot.  I

6  mean, her -- basically the entirety of her testimony kind of

7  deals with Aurobindo's documents, testing that she did on

8  Aurobindo's products.

9          So, you know, I don't think that there's, sort

10 of, any place there where I'd say to the Court we're

11 comfortable that we're not going to talk about Aurobindo's

12 products, because we will talk about it until the end.

13         THE COURT:  All right.  All right.  And so with

14 respect to the openings, we'll seal it to start.  And then

15 when you're beyond Defendants' confidential information,

16 you'll let the Court know and we'll reopen the Court.

17         And then when we get to the first witness, we

18 understand that that's going to be -- you know, it's just

19 such a part of it that we're going to have to seal it for

20 her entire testimony.

21         MR. PETERMAN:  Understood, Your Honor, thank

22 you.

23         MR. KRATZ:  And I didn't mean to interrupt.  To

24 preview the rest of the day, perhaps, so after the first

25 opening, MSN has theirs, and there's nothing confidential

1   about that, that's all invalidity.  I have mine, so it will

2   have to be again for that period.  And then almost the

3   entire day, depending on how long things take, we have

4   Dr. Smith, their witness, I think that's your only

5   noninfringement witness --

6                MR. PETERMAN:  Our only infringement witness.

7                MR. KRATZ:  Yeah, sorry.  A preview.

8                -- infringement witness.  Then it's our turn.

9   And we have the video deposition that we've been talking

10  about, the Kannusamy, and that's all confidential.  And then

11  our rebuttal to their Dr. Smith, that's all confidential.

12  And that may take us to the end of the day, I don't know.

13               THE COURT:  Okay.  When you call the next

14  witness, you'll let me know whether you need -- each time.

15               MR. KRATZ:  Perfectly fine.

16               THE COURT:  Because I'm not going to remember

17  all of that.

18               MR. KRATZ:  Great.  Thank you so much.

19               THE COURT:  All right.  So with respect to

20  sealing the courtroom, given the confidential nature of the

21  information that is going to be discussed at the beginning

22  of the opening, if you are not a member of the trial team or

23  a corporate representative, the corporate representative for

24  the party, the Court asks you to please exit the courtroom

25  at this time.  And we will reopen the courtroom once we get

1   past the confidential information.

2               (Whereupon, the courtroom was sealed.)

3               THE COURT:  All right.  Both sides comfortable

4   with everyone that remains?

5               MR. PETERMAN:  Yes, Your Honor.

6               MR. KRATZ:  Yes, Your Honor.

7               THE COURT:  All right.  Let's get started.

8               MR. PETERMAN:  Your Honor, may I approach?

9               THE COURT:  Yes.

10              MR. PETERMAN:  May I proceed, Your Honor?

11              THE COURT:  Yes.

12              MR. PETERMAN:  Good morning, Your Honor.  It's

13  my privilege to appear before you today on behalf of Acadia,

14  the plaintiff patent owner in this important patent

15  litigation for the company.

16              I'm Chad Peterman of Paul Hastings, and I am

17  trying this case along with Scott Peachman, Felix

18  Eyzaguirre, Peter Conway of my firm, and Jennifer Morgan

19  Becnel-Guzzo and Michele Streifthau-Livizos of Saul Ewing,

20  and we're being assisted by Johnna Vitti of Paul Hastings.

21              Attending for Acadia as its corporate

22  representative, we have Amy Hulina, the vice president of

23  intellectual property.

24              This case involves Acadia's groundbreaking

25  pharmaceutical product Nuplazid which is an FDA-approved

1    treatment for hallucinations and delusions associated with

2    Parkinson's disease psychosis, also known as PDP.

3            PDP is a debilitating condition characterized by

4    intense delusions and hallucinations that severely impact

5    the quality of life for those affected.  It's also linked to

6    increased morbidity.

7            Nuplazid is the first-in-class treatment for

8    PDP-related delusions and hallucinations and was approved in

9    2016.

10           Its active ingredient is a compound called

11   pimavanserin, and it's a selective inverse agonist that

12   interacts with the serotonin receptor.  Acadia, through a

13   predecessor company, invented pimavanserin and developed it

14   into the innovative drug Nuplazid.

15           Throughout this case, you may hear reference to

16   pimavanserin tartrate, which is the salt form of

17   pimavanserin.  40 mgs of pimavanserin tartrate is equivalent

18   to about 34 mgs of pimavanserin.

19           Now, initially, Acadia introduced Nuplazid as a

20   tablet containing 17 mgs of pimavanserin.  The recommended

21   dose for Nuplazid, however, was 34 mgs.  Acadia wanted to

22   develop a single dose form of Nuplazid.

23           To this end, Acadia, along with an outside

24   partner, developed a capsule containing 34 mgs of

25   pimavanserin using size 4 capsule shell.  And it patented

its inventions in various patents including U.S. Patent No.

11,452,721, which is the patent at issue in this case.

Now, the '721 patent represents a nonobvious

improvement over the prior art, and it's the sole

patent-in-suit here.

Acadia is asserting Claims 4 and 5 of the '721

patent against the proposed products of Aurobindo and MSN.

Claim 4 is directed towards a capsule acceptable for

pharmaceutical use.  Having a size 3 or 4 capsule shell and

contains granules comprising pimavanserin tartrate and at

least one excipient along with a certain bulk density.

Claim 5 depends on Claim 4 and adds a

requirement that the capsule shell is a hard size 4.

The Court has already construed several terms in

Claim 4 and in its recent memorandum opinion addressing

*Daubert* and motions in limine, clarify that the claims are

not product-by-process claims and that the term "granules"

does not include a process limitation.

Now, with respect to infringement only,

Aurobindo's product is at issue here as MSN has stipulated

to infringement of asserted Claims 4 and 5.

Aurobindo disputes infringement by alleging that

its products are made by a process that does not result in

granules.  However, the evidence will show that Aurobindo's

position is incorrect.

1          Our first witness will be Dr. Pamela Smith

2     testifying as an expert in pharmaceutical science including

3     formation and characterization of pharmaceutical dosage

4     forms such as solid dosage forms and the development of such

5     formulations.

6          Now, Dr. Smith has her PhD in analytical

7     chemistry and that it is a relevant experience.  She is

8     currently the CEO of Improved Pharma, a well-respected

9     research and consulting firm specializing in analysis

10    development of pharmaceutical formulations.

11         Dr. Smith has conducted a thorough analysis of

12    Aurobindo's ANDA documents submitted to the FDA, other

13    internal Aurobindo's materials and samples of Aurobindo's

14    pimavanserin product itself.  Her findings lead her to the

15    conclusion that Aurobindo's products contains granules and

16    otherwise meets all of the other elements of the asserted

17    claims.

18         Dr. Smith will testify that Aurobindo's own

19    documents, including FDA submissions, consistently describe

20    its products as containing granules.  One of the documents

21    that she relies upon is a portion of Aurobindo's ANDA; it's

22    section 3.2.P.2.3 "Manufacturing Process Development."

23         Here, Aurobindo identified to the FDA the

24    processes of its manufacturing and lists the material

25    attributes of the various ingredients and results of the

1    process.

2              Just turning to a little bit further within

3    Aurobindo's ANDA -- and this is all in JTX-125 -- Aurobindo

4    sets forth a process map and in the second column, there is

5    a list of material attributes of input materials.

6              And as the Court can see down in the third row,

7    the input to the pre-lubrication and lubrication case step,

8    the material attributes for granule bulk and cap density,

9    granule uniformity, granule size distribution.  Aurobindo

10   told the FDA three times in this document that the inputs

11   are granules.

12             Later, in the same document, Aurobindo talks

13   about various control strategies that it employs in

14   connection with its manufacturing.

15             Here, in sections 3.2.P.2.7.3 and 3.2.P.2.7.4,

16   Control strategies for pre-lubrication and lubrications

17   processes are disclosed.

18             Aurobindo told the FDA in this document, twice

19   here in this section, that there is a control strategy for

20   blending the granules with other materials, and you blend

21   for 20 minutes in one instant and you blend for 5 minutes in

22   another instance.

23             So, again, in a document as part of their ANDA

24   where they are seeking approval of their generic

25   pimavanserin product, they've told the FDA repeatedly that

1    there are granules.

2             In other draft documents that reflect processes

3    that are similar to the process that Aurobindo used for its

4    final process, it described the result of those products as

5    granules.

6             One instance as shown here from JTX-134, there

7    are a number of sifting and blending steps and then at the

8    end, Aurobindo noted that the unloaded lubricated

9    granules -- unloaded lubricated granules into suitable

10   containers.  So, again, the process elements that it used in

11   connection with its manufacturing resulted in granules.

12            Now, despite the numerous references that

13   Dr. Smith will go through during her direct examination,

14   Aurobindo claims in this litigation that what it represented

15   to the FDA were mere typographical errors, yet no evidence

16   actually suggests that Aurobindo attempted to correct these

17   errors with the FDA.

18            But the evidence beyond these documents actually

19   shows that Aurobindo was not in error; actual testing by

20   Dr. Smith of Aurobindo's product shows that, indeed,

21   granules are present.

22            Inconsistent, Aurobindo has not conducted any

23   testing on its products and instead relies on an assertion

24   that its manufacturing process just can't result in

25   granules.

1          Aurobindo's expert, Dr. Moreton, didn't do any

2     test of Aurobindo's products; the only tests are tests done

3     by Dr. Smith.

4          Now, Aurobindo did mention that it's going to

5     play a video by an internal employee.  That employee says

6     there were typographical errors but there was never any

7     efforts by Aurobindo to fix these errors with the FDA, these

8     alleged errors with the FDA, or experimentally determine

9     whether or not their product contains granules.

10          The evidence that Dr. Smith will go through will

11     show that there are indeed granules; she can see them in the

12     pictures.  And the evidence will also show that all of their

13     claim elements of Claims 4 and 5 are met.

14          Now, Your Honor, I'm done with infringement.

15     I'm going to turn to validity briefly so we can unseal the

16     courtroom, if you'd like.

17          THE COURT:  All right.  We can open the

18     courtroom back up, so if someone would go and tell the folks

19     that if they're congregating outside, they can come back in.

20          (Whereupon, the courtroom was unsealed.)

21          MR. PETERMAN:  Now, Your Honor, turning to the

22     issue of validity, the defendants have raised numerous

23     challenges to the '721 patents' validity, including

24     obviousness, indefiniteness, lack of enablement, lack of

25     written description; however, the evidence will show that

1    the defendants cannot meet their high burden of proof of

2    clear and convincing evidence.

3            Acadia will present Dr. Steven Little as its

4    second and final live witness in response to Defendants'

5    invalidity contentions.

6            Now, Dr. Little is the chair of the department

7    of chemical engineering at University of Pittsburgh.  He has

8    his PhD in chemical engineering from MIT, has over 100

9    peer-reviewed publications, book chapters and lots of

10   awards, including the induction of the National Academy of

11   Inventors and a fellow of the American Institute of

12   Advancement of Science.

13           Now, in connection with Defendants' obviousness

14   challenge, they are making a combination between Acadia's

15   17 mg tablet as well as a patent application from Acadia

16   through an inventor named Bo-Ragnar Tolf.  It's referred to

17   throughout this case as the "Ragnar-Tolf" reference.

18           And that reference reflects the work from

19   Acadia-related companies regarding pimavanserin in

20   connection with the tablet product.

21           Now, at the outset, we note that the patent

22   examiner in examining the '721 patent expressly considered

23   the Ragnar-Tolf reference during prosecution of the patent.

24           In connection with the notice of allowance, the

25   examiner expressed his reasons for allowance and

1    specifically addressed the Ragnar-Tolf reference.

2              Now, the examiner said that the closest prior

3    art is drawn to Ragnar-Tolf and gives a number, which

4    discloses a pimavanserin formulation; however, the density

5    of the granulation would not allow for the same amount of

6    drug to be present in the capsule.  The incident invention

7    allows for more of the active ingredient to be present in

8    the smaller capsule that is easier to swallow.

9              So, again, Defendants' main reference in

10   obviousness here wasn't just some reference that was listed

11   amongst dozens or hundreds of references on the face of the

12   patent.  It is the reference that the examiner specifically

13   called out and the reasons for allowance, it noted why the

14   claims of the '721 patent were allowable over Ragnar Tolf.

15             Now, the evidence will show that Defendants'

16   obviousness arguments based on Ragnar Tolf is flawed based

17   on hindsight, selective and incomplete readings of the

18   teachings of the prior art, unsupported assumptions,

19   illogical conclusions that don't reflect how a person of

20   skill in the art or a POSA would have understood things.

21             To demonstrate obviousness, the defendants must

22   show by clear and convincing evidence that a POSA would have

23   some motivation to modify the prior art into the claimed

24   invention and a POSA would have had reasonable expectation

25   of success in making such modifications to the prior art.

1    Both elements are required.  Defendants will not be able to

2    sustain their burden on either element.

3            Now, we ask this Court to listen closely to

4    Defendants' testimony.  Defendants claim that a POSA would

5    have been motivated on five grounds to reach the claimed

6    invention:  Pill burden, the color and shape of the tablets,

7    swallowing difficulty, size of the dosage form, taste

8    masking, to arrive at a quote, unquote "ideal" dosage form.

9            The issue is that the prior art references, the

10   Ragnar-Tolf and also the Nuplazid tablets label, don't

11   recognize these as issues with the 17 mg tablet formulation.

12   So Defendants need to go outside of Ragnar-Tolf and the

13   17 mg tablet and go to other references which talk about

14   general considerations of pharmaceutical development and

15   opine that these considerations for an ideal product would

16   have caused a POSA to modify Ragnar-Tolf and Nuplazid into

17   the claimed inventions.

18           In looking outside of Ragnar-Tolf and the

19   Nuplazid tablets for motivation, Defendants rely upon art

20   that's not related to pimavanserin, and they selectively

21   read those references.  Defendants will also fail to

22   establish clear and convincing evidence of reasonable

23   expectation of success.  As it will become evident during

24   the testimony, the reasonable expectation of success are

25   based on hindsight.  And, again, Defendants selectively read

1    the references; they make unsupported assumptions to

2    engineer a result that leads to the asserted claims.

3          Now, Defendants' Section 112 challenges to

4    indefiniteness, written description, and enablement will

5    also fail to satisfy their high burden.  The evidence will

6    show that they're committing many errors in their analysis,

7    including misinterpreting the claims and the patent

8    specification.

9          You will hear a lot of testimony regarding one

10    of the terms "pharmaceutically acceptable capsule."  In

11    order to try to invalidate the '721 patent claims under 112,

12    the defendants go through great lengths to attempt to change

13    the simple and readily understood claim term of

14    "pharmaceutically acceptable capsule" into a very

15    complicated term that excludes certain processes and has

16    numerous other requirements.  While other terms are

17    expressly defined in the patent specification, the evidence

18    will show that "pharmaceutically acceptable capsule" was

19    not, and, therefore, it should retain its ordinary and

20    customary meaning of "generally suitable for use in

21    pharmaceutical compositions," and the term is not

22    indefinite.

23          A central premise of Defendants' claims is that

24    Acadia did not invent granules with pimavanserin tartrate in

25    one or more excipients in the granules with the required

1  bulk densities.  This false premise infects each of

2  Defendants' 112 arguments.  The arguments are also a rehash

3  of claim construction where this Court found that the claims

4  were not limited to pimavanserin granulated alone.  The

5  specification is very clear that Acadia contemplated and

6  disclosed pimavanserin granulated with one or more

7  excipients.

8          Looking at table 2 within the patent, there's a

9  composition of pimavanserin granulation where it's clear

10  that pimavanserin tartrate's granulated to release

11  microcrystalline cellulose.  Continuing on to column 16,

12  line 4, of the '721 patent, it says specifically, "As

13  disclosed herein, it has been demonstrated that pimavanserin

14  can be granulated without the use of a binder, i.e.

15  utilizing water only.  It is however contemplated that in

16  some embodiment-suitable binders, such as cellulose, methyl

17  cellulose, polyvinylpyrrolidone, polyethylene glycol may be

18  used, although not a necessity."  There is express

19  disclosure of using one or more excipients within the

20  granules.

21          Another embodiment shown in column 17, line 34,

22  discloses pimavanserin tartrate granulation containing

23  Avicel and colloidal silicon dioxide, which are both

24  excipients, and there's two examples with them.  And the

25  claimed bulk densities were also disclosed in the patent as

1    well in various places, including in column 22, beginning at

2    line 4, noting that bulk densities greater than 4, such as

3    0.4-0.6, 0.5, 0.51 and 0.508 are contemplated by the

4    invention.

5                Your Honor, we look forward to presenting our

6    evidence to the Court during this trial, and we'll ask that

7    once it's all presented that the Court will find in favor of

8    Acadia, that Aurobindo infringes Claims 4 and 5 of the '721

9    patent, and that Defendants have failed to prove any

10   invalidity defense by clear and convincing evidence.

11               We thank the Court for its time and attention to

12   this matter.

13               MS. CARLAN:  May I approach?

14               THE COURT:  Yes.

15               MS. CARLAN:  May I proceed?

16               THE COURT:  Let me -- let the Court just make

17   one comment first.

18               So, Mr. Peterman, in your opening, I did notice

19   that you referred to Aurobindo's process a lot, and that

20   seems to be contrary to your argument earlier about, you

21   know, this -- about the process language.  So I just note

22   that so the Court's rulings were consistent with allowing

23   that testimony in, and given that you've sort of opened that

24   door, the Court's going to allow that testimony, because you

25   can't use it both as a sword and a shield.

1           MR. PETERMAN:  That's fine, Your Honor.  We

2    understood that that testimony had already been allowed in,

3    so that's why I went forward in the opening as I did.

4           THE COURT:  Okay.  All right.

5           MS. CARLAN:  May I proceed?

6           THE COURT:  Yes.

7           MS. CARLAN:  Good morning, Your Honor.

8           THE COURT:  Good morning.

9           MS. CARLAN:  Janine Carlan of ArentFox Schiff on

10    behalf of Defendant MSN.

11           Despite what Plaintiff just said, this is

12    actually a case about greed.  Acadia's pimavanserin product,

13    Nuplazid, was first marketed as a tablet in 2016.  Acadia

14    decided they would switch it out, and they would switch from

15    that tablet to a capsule, and the capsule was FDA approved

16    in mid-2018.  So Acadia's first set of patents on Nuplazid

17    provides exclusivity all the way through mid-2030, and

18    that's 14 years without any generic competition.

19           But Acadia wanted more here, so in 2017, Acadia

20    filed a provisional patent application directed to this new

21    capsule form of pimavanserin.  This provisional patent led

22    to several issued patents, and the latest of which is the

23    '721 patent, which is at issue today.

24           So the claims that these first patents that led

25    to the -- that issued from the provisional patent, these

1    require regulations of pimavanserin alone -- it's just

2    pimavanserin with water -- and no excipients.  And

3    excipients are the inactive ingredients.

4         So Defendants in this case, both MSN and

5    Aurobindo, developed their own innovative pimavanserin

6    formulations that included excipients, and, therefore, they

7    did not infringe those first patents.  Perhaps because of

8    potential competitors, Acadia obtained broader claims in

9    this '721 patent.  So unlike the prior patents we just

10   looked at in the family, the '721 patent covers granules of

11   pimavanserin with excipients.

12        Unfortunately here for them, they went too far,

13   and the asserted claims of the '721 patent are now so broad

14   that they are invalid.  They're invalid under Section 35 of

15   U.S.C. 103 over the prior art, and they're invalid under

16   Section 35 U.S.C. 112 for lack of written description, lack

17   of enablement, and failing to claim what the inventors told

18   the world was their actual invention, which was pimavanserin

19   without any other ingredient.

20        So in this opening, I'm going to discuss the

21   development of the pimavanserin capsules that led to the

22   '721 patent family and those prior patents.  I'll also

23   discuss some comparative examples in the '721 patent that

24   you'll hear about in this trial.  And specifically, you'll

25   hear about what the inventors said was not their invention

1    and how the asserted claims cover those.

2                Next I'll discuss how the prior art Ragnar-Tolf

3    patent application -- patent publication also reads on the

4    claims, rendering them biased and obvious, and finally I'll

5    introduce Defendants' expert on invalidity issues,

6    Dr. Fernando Muzzio, and we'll discuss his anticipated

7    testimony.

8                So getting into the details, the story, as I

9    mentioned, starts in 2016 with Acadia's original Nuplazid

10   product, the pimavanserin tablet form.  And these tablets

11   each contained 17 mgs of pimavanserin, so the patient would

12   take two tablets, once per day, and that would give a daily

13   dose of 34 mgs.  This was for treatment of Parkinson's

14   disease psychosis.  So as the patent acknowledges,

15   Parkinson's disease patients often have difficulty

16   swallowing.  This affects compliance with their drug

17   treatment, and so to increase their compliance, Acadia

18   wanted to provide patients with a single pill rather than

19   taking two at a time.

20               So with that goal in mind, Acadia engaged a

21   third-party pharmaceutical development company called

22   Catalent to design a capsule form of this pimavanserin that

23   contained the full daily dose of 34 mgs.  So Catalent's

24   development proposal focused on increasing the bulk density

25   of the pimavanserin.

1          So increasing bulk density of pimavanserin may

2     sound complicated, but it's actually kind of a simple

3     concept.  It just means making the pimavanserin more dense,

4     and that allows for more of the pimavanserin to fit into a

5     smaller space.  So that in turn allows the full 34 mgs of

6     pimavanserin to fit into a smaller capsule.  That,

7     obviously, because it's a smaller capsule, is easier to

8     swallow, and we know that was a known problem in Parkinson's

9     patients.

10          So after doing a number of experiments, Catalent

11     found that granulating pimavanserin only with a small amount

12     of water without any excipients increased the bulk density

13     of pimavanserin.  And this allowed the 34 mg dose, all of

14     it, to fit into a smaller capsule.

15          So the '721 patent describes Catalent's work.

16     It repeatedly emphasizes that granulating pimavanserin with

17     a small amount of water without additional excipients is the

18     invention.  So, for example, the '721 patent states that

19     using a small quantity of water without the presence of an

20     excipient is an important reason for the improved properties

21     of pimavanserin.  Moreover, the '721 patent contrasts the

22     granulation of pimavanserin with water alone to these

23     comparative formulations that are in the patent, and that

24     uses binders and other excipients, and those produced

25     unacceptable products.

1          Back to the earlier issuing -- issuing patents,

2    those reflect the concept of using pimavanserin only with

3    water, and that's what they claimed, without any additional

4    excipients in the claims.  So Acadia stipulated that those

5    earlier patents were not infringed by the defendants'

6    formulations, each of which includes excipients.

7          The '721 patent, then, claims include different

8    and broader language, and here, and what we'll be talking

9    about most today, these claims allow for granules that have

10   pimavanserin and excipients.  This is the same subject

11   matter that the patent itself in the comparative examples

12   distinguishes and says is unsuccessful, so this bears

13   repeating:  The '721 patent claims embrace the granules that

14   the inventors themselves, in this same patent, said was not

15   their invention.

16          And now I'll illustrate this.  On the left-hand

17   side of this slide, you'll see portions of the patent claims

18   that are asserted, and these claims, for example, recite

19   that the granules have pimavanserin and excipients and that

20   the bulk density is greater than 0.4 g/mL and that amount of

21   bulk density is an acceptable amount to fit inside a small

22   capsule.

23          So turning to the right side of the slide, this

24   is language from one of the comparative examples in the

25   patent.  Those granules also comprised pimavanserin and

1    excipients and it -- include a binder, and all of this is

2    claimed in the '721 patent claims.  The inventor stated that

3    the granulation made by this comparative example had a fine

4    bulk density, it was acceptable; however, in that same

5    example, the inventors said that the granules in this

6    example were unacceptable because they had an unacceptable

7    stability, unacceptable particle size distribution, and they

8    also had impurities, yet here the asserted claims are

9    written such that they actually include the granules that

10   these inventors said you would not want.  That violates

11   section 112.  And that is just one of the example, and

12   there -- we'll have a lot of others that you will hear about

13   in this case.

14            So the overbreadth of how the claim is written,

15   of course, extends to the prior art.  The prior art

16   Ragnar-Tolf publication also discloses an example of

17   granules comprising pimavanserin and excipients, and it also

18   discloses having an acceptable bulk density.  So, again,

19   looking at the claim language, the asserted claim language

20   on the left side of this slide, and then we can compare on

21   the right here with Ragnar-Tolf.  This is example 9 in the

22   publication.  It discloses granules comprising both

23   pimavanserin and an excipient, a binder, actually, and

24   Ragnar-Tolf shows a bulk density number that meets within

25   the claim requirement.  So now with the way the '721 patent

1    claims have been written, they are broad enough to include

2    this prior art granulation, and that makes them obvious

3    under Section 103.

4           So secondary considerations, if Acadia presents

5    them here, they are not strong enough to overcome the

6    stronger case of prima facie obviousness.  There are no

7    unexpected results here.  I mean, the prior art showed a

8    POSA how to granulate pimavanserin to increase bulk density.

9    And, of course, there's no ex- -- there's no nexus that will

10   be shown to you between the -- any unexpected results in the

11   claims.

12          So when it comes down to it, the case is rather

13   simple.  Acadia obtained first a narrow set of patents,

14   those original earlier patents, that the defendants didn't

15   infringe.  So Acadia went back to the well and obtained a

16   broader patent.  But now that patent is too broad, and,

17   therefore, it's invalid.  So Acadia got greedy; they

18   overreached.

19          Now, a quick word on the expert testifying on

20   invalidity issues in this case.  On behalf of both MSN and

21   Aurobindo, you'll hear from Dr. Fernando Muzzio.  Dr. Muzzio

22   is currently a distinguished professor in the Department of

23   Chemical and Biochemical Engineering at Rutgers.  He's also

24   the director of the National Science Foundation Engineering

25   Research Center on Structured Organic Particulate Systems.

1    Dr. Muzzio will provide background on what a POSA knew about

2    pharmaceutical formulations in general, also about

3    pimavanserin, and will testify as to the issues of

4    invalidity in this case.

5              So in conclusion, the evidence will show that

6    the '721 patent is invalid; it's invalid under section 112

7    for lack of written description, lack of enablement, and for

8    failing to describe the actual invention.  And it's also

9    obvious under Section 103.  And there are no secondary

10   considerations that overcome this case of obviousness.

11             We look forward to presenting our invalidity

12   case, Your Honor.  And now I will turn this over to

13   Aurobindo's counsel for their statement regarding

14   noninfringement.  Thank you, Your Honor.

15             THE COURT:  All right.

16             MR. KRATZ:  May I approach?

17             THE COURT:  Yes.

18             MR. KRATZ:  This is the portion that needs to be

19   sealed as well.

20             THE COURT:  Okay.  Let's seal the courtroom

21   again.  Anybody that is not a member of the trial team or a

22   corporate representative, please exit the courtroom.

23             (Whereupon, the courtroom was sealed .)

24             MR. KRATZ:  May I proceed?

25             THE COURT:  Yes.

1              MR. KRATZ:  Good morning, Your Honor.  Timothy

2    Kratz representing Aurobindo.  We have a noninfringement

3    position in this case.  And I will try to explain it

4    briefly.

5              The patent at issue is the '721, the main claim

6    at issue, the independent claim is Claim 4.  The portion of

7    the Claim 4 that we're mostly talking about is "granules

8    comprising 40 mg pimavanserin tartrate," so it requires

9    granules.

10             This case is astounding to Aurobindo because, as

11   you will hear, we do not granulate.  We have a dry blend

12   process, the very opposite of a granulation process.  Why we

13   were sued in the previous case, why we were sued in this

14   case is beyond me, they've known this forever, and the fact

15   that we are -- dark.

16             I lost that but I can continue.

17             (Discussion held off the record.)

18             MR. KRATZ:  You've seen the patent, you'll see

19   it a couple of times over the next couple of days.  It's

20   almost an Alice in Wonderland situation for us that we're

21   still here.

22             Bottom line is that the evidence will show the

23   plaintiff cannot meet its burden of proving infringement of

24   the product to be sold by Aurobindo as meeting those claims.

25             It requires proof that the product contains

1    granules with 40 mg pimavanserin tartrate, they will not

2    show that.  There's some other aspects of Claim 4 that I

3    think will be problematic as well, and we'll talk about

4    those later.

5              The Court's construction, which is on my second

6    slide -- I need my physical slides.

7              (Discussion held off the record between

8    counsel.)

9              MR. KRATZ:  This is no problem because I'm

10   really going to be brief.

11             The Court's construction is instructive with

12   respect to the -- what the scope of granule includes.

13   And --

14             Does it call out?  I have no control, okay.

15             As Your Honor ruled, "granules comprising 40 mg

16   pimavanserin tartrate" was given its plain and ordinary

17   meaning.  What that essentially means, we're going to have

18   to hear from the experts, right, and it's what a POSA would

19   understand that phrase means in the -- to a person of

20   ordinary skill in the art.

21             "The scope of the term," as Your Honor

22   continued, "granule," which is one of the words inside this,

23   "includes granules granulated with pimavanserin and

24   excipients."  That kind of gets to the issue that -- that is

25   on the invalidity, which is whether or not the scope now

1    includes excipients as well as pimavanserin; that's not an

2    issue on the noninfringement position.

3             But what's interesting about this -- this

4    interpretation of the scope of the term "granule" is it does

5    have an action verb in it; it's "granules granulated with

6    pimavanserin and excipients."  And that's simply missing

7    from the process that Aurobindo has.  The end result is a

8    product, and the product has to have been granulated in Your

9    Honor's construction, and it simply is not.

10             And, in fact, the plaintiff's expert

11   acknowledges this component of what it does mean to have a

12   granule or not.  And in her deposition, and we'll talk about

13   this with her, there was a discussion about clumping, you

14   know, this is a dry process, there's these dry ingredients

15   that are ultimately filled inside of a capsule.

16             And she said, allegorically, you don't really

17   want clumping.  That's unintended agglomeration of the

18   product.  But when you're purposefully agglomerating, that's

19   when you get granules.  That's her testimony; that's the

20   plaintiff's expert testimony.  We don't purposefully clump

21   these things together.  We don't make granules.  And I think

22   the evidence will show that quite clearly.

23             You're going to hear from two experts, and

24   you're going to hear from the -- Dr. Smith that we're going

25   to talk about, that's the plaintiff's expert.  She has a

1    variety of arguments that she makes; one of them relates to

2    the documents that you've seen some of, one of them relates

3    to the testing that she did.

4             And we're going to look at a lot of pictures of

5    microscopic powder, essentially, that has clumped together,

6    and she puts it under a microscope and declares it to be a

7    granule.  We're going to talk to her a lot about that.

8    You're going to hear from our expert, Dr. Christian Moreton.

9             And you'll have to understand and assess the

10   credibility of these experts as it relates to the evidence

11   that they put together.

12            One thing that Dr. Smith does that's really

13   interesting is that -- some of the Aurobindo documents that

14   she points to, we don't think have any weight whatsoever.

15   And, in fact, she has certain documents that weren't even

16   signed by Aurobindo, and yet there are documents of the

17   exact same nature that are signed that don't have the

18   language that you're going to see in here regarding

19   granulation.  And the bottom line is that there's a missing

20   step.  There's no granulation that goes on here.

21            When you get to the pictures that she's going to

22   show, there's going to be interesting testimony about

23   whether or not these things mean anything.  Our position is

24   you won't be able to credibly draw any conclusions from her

25   pictures.

DIRECT EXAMINATION - PAMELA SMITH

1          And as a result of that, we think that she fails

2     to meet the standard of proof required, which is, does our

3     product have granules or not?  We think it clearly does not

4     and we think Your Honor will ultimately agree and find us

5     noninfringing.

6               THE COURT:  All right.  I understand.

7               All right.

8               MR. PETERMAN:  Your Honor, should we proceed

9     with our first witness?

10              THE COURT:  Yes.

11              (Whereupon, a discussion was held off the record

12    between counsel.)

13              MR. PETERMAN:  Your Honor, Acadia calls

14    Dr. Pamela Smith to the stand.

15              Your Honor, may I approach?

16              PAMELA SMITH, having been called on the part and

17    behalf of the Plaintiff as a witness, having first affirmed

18    to tell the truth, testified as follows:

19                    DIRECT EXAMINATION

20    BY MR. PETERMAN:

21    Q.    Good morning, Dr. Smith.

22    A.    Good morning.

23    Q.    Are you comfortable up there?

24    A.    Yes, I am, thank you.

25    Q.    Would you please state your name for the record?

DIRECT EXAMINATION - PAMELA SMITH

1    A.    Yes, my name is Dr. Pamela Smith.

2    Q.    And what is the purpose of your testimony today?

3    A.    I'm here to testify on testing and examinations I did

4    of Aurobindo's product regarding infringement.

5    Q.    Now, Dr. Smith, did you prepare any slides to

6    accompany your testimony today?

7    A.    Yes, I did.

8    Q.    Now, in front of you is a binder with exhibits.

9    Would you turn to PTX-0052?

10    A.    Okay.

11    Q.    And do you recognize this document?

12    A.    Yes, this is my CV.

13    Q.    And does it accurately reflect your professional

14    experience?

15    A.    It does.

16         MR. PETERMAN:  Your Honor, we move PTX-0052 into

17    evidence.

18         MR. KRATZ:  No objection.

19         THE COURT:  All right.  PTX-0052 is admitted.

20         (Exhibit admitted.)

21    BY MR. PETERMAN:

22    Q.    Now, Dr. Smith, what is your current occupation?

23    A.    I am COO and vice president of Improved Pharma.  And

24    I also have an LLC called Leading with Smart Science.

25    Q.    What is Improved Pharma?

DIRECT EXAMINATION - PAMELA SMITH

1　A.　　Improved Pharma is a research and information company

2　focused on developing and improving formulations, processes

3　and methods.

4　Q.　　And what are your responsibilities at Improved

5　Pharma?

6　A.　　I have both administrative, operational and

7　scientific responsibilities.　Speaking scientifically, I'm

8　involved in scientific projects focused on solid-state

9　chemistry and analytical research mostly, in the study of

10　pharmaceuticals.

11　Q.　　And would you briefly describe your higher

12　educational experience?

13　A.　　Yes, I have a PhD in analytical chemistry from Miami

14　University that I earned in 1992.　My focus was on

15　microscopy and microspectroscopy there.　And my

16　undergraduate degree was a BA in chemistry from Illinois

17　Wesleyan University in 1987.

18　Q.　　What sort of analytical capabilities had you had at

19　Improved Pharma?

20　A.　　We have the full suite of typical instruments used to

21　analyze pharmaceuticals in their solid-state form.

22　Q.　　And have you published any of your work?

23　A.　　I have.　I have authored or coauthored over 100

24　publications, posters, presentations, book chapters focused

25　on the field of solid-state chemistry and analytical

DIRECT EXAMINATION - PAMELA SMITH

1   chemistry.

2   Q.     And what particular fields are you -- analytical

3   methods are you familiar with?

4   A.     My expertise lies mainly in microscopy and

5   microspectroscopy techniques, specifically infrared and

6   Raman microspectroscopy and optical microscopy,

7   stereomicroscopy --

8              (Court reporter clarification.)

9              THE WITNESS:  Microspectroscopy, including

10  infrared and Raman.

11             (Court reporter clarification.)

12             THE WITNESS:  R-A-M-A-N.  And then microscopy,

13  you have optical microscopy, stereo microscopy, and

14  polarized light microscopy.

15  BY MR. PETERMAN:

16  Q.     How many times do you estimate that you've used

17  polarized light microscopy to analyze solid dosage forms?

18  A.     Hundreds of times.

19  Q.     How many times would you estimate you've used stereo

20  microscopy techniques to analyze solid dosage forms?

21  A.     Hundreds of times.

22  Q.     What experience do you have with pharmaceutical

23  formulation?

24  A.     I have -- what experience do I have with

25  pharmaceutical formulations?

DIRECT EXAMINATION - PAMELA SMITH

1   Q.      Yes?

2   A.      I have invented some.  I have consulted with clients

3   on some, on ways to improve their formulation.  I have

4   analyzed a lot of formulations, so pretty much the full

5   gamut.

6               MR. PETERMAN:  Your Honor, at this time Acadia

7   proffers Dr. Pamela Smith as an expert in pharmaceutical

8   science, including formulation and characterization of

9   pharmaceutical dosage forms, such as solid dosage forms and

10  development of such formulations.

11              MR. KRATZ:  We have no objection.

12              THE COURT:  All right.  Dr. Smith may testify as

13  an expert in those areas.

14  BY MR. PETERMAN:

15  Q.      Dr. Smith, can you briefly explain what you

16  understand your role in this case to be?

17  A.      My role is to testify on infringement, specifically

18  related to Claims 4 and 5 of Aurobindo's ANDA application

19  product.

20  Q.      And what did you conclude regarding Aurobindo's

21  product as it relates to Acadia's asserted Claims 4 and 5 of

22  the '721 patent?

23  A.      I decide -- I concluded that they infringed Claims 4

24  and 5.

25  Q.      Now, I'd like to talk about the standards that you

DIRECT EXAMINATION - PAMELA SMITH

1    used as part of your opinions.

2              What legal standards did you apply in forming

3    your opinions relating to infringement?

4    A.    I used the standard of literal infringement, which

5    means an ANDA product literally infringes a patent claim if

6    it meets all of the elements of that claim.

7    Q.    And what burden of proof did you apply to your

8    analysis?

9    A.    A preponderance of the evidence, that it would be

10   more likely than not that the ANDA product at issue meets

11   the elements of the asserted claims.

12   Q.    And at part of your analysis, did you consider the

13   level of a person of ordinary skill in the art?

14   A.    I did.

15   Q.    And what did you conclude as to the qualifications of

16   a POSA, if you don't mind me using the term, would have in

17   the context of the '721 patent?

18   A.    Sure, and I'd like to read this directly into the

19   record.

20              "A POSA would have had at least a bachelor's

21   degree in the relevant scientific field.  For example,

22   pharmaceutical sciences, chemistry, chemical engineering, or

23   materials science, or related fields, and several years of

24   real-world experience with the preparation of pharmaceutical

25   formulations.

DIRECT EXAMINATION - PAMELA SMITH

1          "A POSA would also have experience working as

2     part of a multidisciplinary team and would have access to,

3     and draw upon the knowledge of, individuals with comparable

4     levels of education and experience in relevant disciplines

5     that lie outside his or her primary training."

6     Q.     Dr. Smith, the expert on the other side with respect

7     to infringement is Dr. Moreton, correct?

8     A.     Yes.

9     Q.     Does Dr. Moreton offer a definition of a POSA?

10    A.     Yes, I believe he follows Dr. Muzzio's definition.

11    Q.     I'm not going to ask you to read that definition in,

12    but do your opinions change with respect to infringement

13    under Dr. Moreton's definition as opposed to yours?

14    A.     No, they do not.

15    Q.     Now, Dr. Smith, in your binder that's JTX-9.  Do you

16    see that?

17    A.     I do.

18    Q.     What is that document?

19    A.     That is the patent at issue today, the 11,452,721

20    patent.

21    Q.     Is it okay if we call it the '721 patent?

22    A.     Yes.

23    Q.     And is this the patent you're rendering certain

24    opinions about today?

25    A.     It is.

DIRECT EXAMINATION - PAMELA SMITH

1          MR. PETERMAN:  Your Honor, we move JTX-0009 into

2   evidence.

3          MR. KRATZ:  No objection, Your Honor.

4          THE COURT:  JTX-0009 is admitted.

5          (Exhibit admitted.)

6   BY MR. PETERMAN:

7   Q.     Dr. Smith, I'm showing you in this demonstrative,

8   Claims 4 and 5 of the '721 patent.

9          Are these the claims that you have analyzed for

10  infringement?

11  A.     They are.

12  Q.     Would you describe generally what's claimed in Claims

13  4 and 5?

14  A.     We're talking about formulations of pimavanserin,

15  specifically, you know, granulated pimavanserin and

16  excipients in a capsule.

17  Q.     What is pimavanserin?

18  A.     It is the active pharmaceutical agreement in

19  Nuplazid's product and also in Aurobindo's ANDA product.

20  Q.     What is pimavanserin tartrate?

21  A.     Pimavanserin tartrate is the salt form of

22  pimavanserin.

23  Q.     Now, let's turn to Aurobindo's proposed ANDA product.

24         Do you mind if we call it Aurobindo's product

25  throughout your testimony?

DIRECT EXAMINATION - PAMELA SMITH

1    A.    That's fine.

2    Q.    Now, what's -- what was the conclusion that you

3    reached regarding Aurobindo's product?

4    A.    That it -- that it infringed upon Claims 4 and 5.

5    Q.    Now, what steps and evidence did you rely upon to

6    reach your conclusions regarding Aurobindo's infringement?

7    A.    I had several different sources of information that I

8    used.  I relied upon the claims in the patents, the

9    specification in the patient, the *Markman* order from this

10   Court, documents from Aurobindo's ANDA and then my own

11   testing.

12   Q.    Now, let's take a look at Claim 4 first.

13             What is Claim 4?

14   A.    What is Claim 4?  Claim 4 can be broken out into four

15   elements here.

16   Q.    And did you analyze each of these elements with

17   respect to Aurobindo's product?

18   A.    I did.

19   Q.    And just turning to Claim 5, what is Claim 5?

20   A.    Claim 5 is a dependent claim on the independent

21   Claim 4.

22   Q.    Now, let's go back to Claim 4 with respect to

23   Aurobindo's product.

24             Does Aurobindo have a pharmaceutically

25   acceptable capsule?

DIRECT EXAMINATION - PAMELA SMITH

1   A.      Yes, it does.

2   Q.      Is the capsule meant for oral delivery?

3   A.      It is.

4   Q.      Does it have 34 mgs of pimavanserin?

5   A.      It does.

6   Q.      So is it your opinion that Aurobindo's ANDA product

7   meets the limitations in the preamble which you've

8   identified here as Element A?

9   A.      Yes.

10  Q.      And for the record, the preamble is a

11  pharmaceutically acceptable capsule for orally delivering 34

12  mgs of pimavanserin to a patient, correct?

13  A.      Yes.

14  Q.      Now, how did you determine that Aurobindo's product

15  met the preamble of Element A?

16  A.      There was information in some of Aurobindo's ANDA

17  materials that summarized this.

18  Q.      Now, I'd like to direct your attention to

19  JTX-0103-AURO in your binder.

20  A.      Yes.

21  Q.      What is this document?

22  A.      So this document comes from the ANDA application;

23  specifically, it's section 23, "Quality Overall Summary."

24  Q.      And is this one of the documents that you relied upon

25  for your infringement analysis?

DIRECT EXAMINATION - PAMELA SMITH

1   A.      It is.

2               MR. PETERMAN:  Your Honor, we'd move

3   JTX-0103-AURO into evidence.

4               MR. KRATZ:  No objection.

5               THE COURT:  JTX-0103-AURO is admitted.

6               (Exhibit admitted.)

7   BY MR. PETERMAN:

8   Q.      Now, Dr. Smith, you testified that Aurobindo's

9   product was a pharmaceutically accepted capsule, correct?

10  A.      I did.

11  Q.      And how did you determine this?

12  A.      If you turn to page 2 of this document, these issues

13  are addressed.

14  Q.      So just take me through page 2 in terms of your

15  opinion that it's a pharmaceutically acceptable capsule.

16  A.      So if we start with what is the dosage form, the

17  dosage form is listed here as capsules.  If we talk about

18  the route of administration, we see that it's oral, and when

19  we look at the strength of the formulation, the strength of

20  the pimavanserin in the formulation is 34 mgs.

21  Q.      What form is the pimavanserin present in Aurobindo's

22  product?

23  A.      In the tartrate salt form.

24  Q.      I'd like to direct your attention to JTX-0105-AURO.

25  A.      Okay.

DIRECT EXAMINATION - PAMELA SMITH

1    Q.    Dr. Smith, what is this document?

2    A.    This document is another section from the ANDA

3    application.  Specifically, it is 3.2.P.1, "Description and

4    Composition of the Drug Product."

5    Q.    And is this one of the documents that you considered

6    in forming your analysis in this case?

7    A.    It is.

8              MR. PETERMAN:  Your Honor, we'd move

9    JTX-0105-AURO into evidence.

10             MR. KRATZ:  No objection.

11             THE COURT:  All right.  JTX-0105-AURO is

12   admitted.

13             (Exhibit admitted.)

14   BY MR. PETERMAN:

15   Q.    Now, Dr. Smith, does this document provide you with

16   information regarding the contents of Aurobindo's product?

17   A.    It does.

18   Q.    And what does it tell you regarding the active

19   ingredient, and the form of the active ingredient that's

20   present in Aurobindo's product?

21   A.    If we turn to page 2, which is highlighted here, this

22   is the unit composition table, and the first sentence above

23   that states:

24             "The manufacturer of pimavanserin capsules

25   34 mgs is provided below."

DIRECT EXAMINATION - PAMELA SMITH

1           And then the first ingredient listed in the

2     table is pimavanserin tartrate identified as 40 mgs.

3     Q.    And 40 mgs of pimavanserin tartrate, what does that

4     equate to in connection with pimavanserin?

5     A.    40 mgs of pimavanserin tartrate is equivalent to

6     34 mgs of pimavanserin freebase.

7     Q.    And can you tell that based on this document,

8     JTX-0105-AURO?

9     A.    Yes, I can.

10    Q.    And where is that?

11    A.    Oh.  I highlighted it earlier up at the top and in

12    that second one.

13    Q.    Now, in your binder, do you see a document marked

14    PTX-1213?

15    A.    Yes, I do.

16    Q.    What is this document?

17    A.    This document is the prescribing information for

18    Aurobindo's ANDA product.

19    Q.    And did you rely upon this as part of your analysis

20    in this case?

21    A.    I did.

22           MR. PETERMAN:  Your Honor, we move PTX-1213 into

23    evidence.

24           MR. KRATZ:  No objection.

25           THE COURT:  PTX-1213 is admitted.

DIRECT EXAMINATION - PAMELA SMITH

1          (Exhibit admitted.)

2     BY MR. PETERMAN:

3     Q.     Dr. Smith, I'd like to draw your attention to

4     PTX-1213 on page 9, section 11.

5     A.     Yes.

6     Q.     What is set forth here in section 11?

7     A.     Section 11 is a description and here, it's

8     specifically stated in the second sentence, "each capsule

9     contains 40 mgs of pimavanserin tartrate," which is

10    equivalent to 34 mgs of pimavanserin freebase.

11    Q.     So based on the evidence that you've presented so far

12    this morning, is Aurobindo's product a pharmaceutically

13    acceptable capsule for orally delivering 34 mgs of

14    pimavanserin to a patient?

15    A.     Yes, it is.

16    Q.     Let's turn to the next element of Claim 4.

17           You listed it here as Element B, correct?

18    A.     That's correct.

19    Q.     Would you read what that element is, please.

20    A.     "Wherein the capsule has a capsule shell with a

21    capsule shell size 3 or 4."

22    Q.     What size is the capsule shell in Aurobindo's

23    product?

24    A.     I believe it is a size 4 capsule.

25    Q.     And how did you determine that?

DIRECT EXAMINATION - PAMELA SMITH

1    A.    I saw it in some of their ANDA materials.

2    Q.    I'd like to refer you back to JTX-0105 which we

3    looked at earlier.

4         Does -- is there information on page 2 that

5    you're relying upon for your opinion here with respect to

6    capsule size?

7    A.    Yes, there is, and if we look down in the table under

8    "capsule fill weight," the first entry under there is MDV

9    caps -- plus capsules and then they identify it as a size 4

10   capsule.

11   Q.    So what is your opinion with respect to whether or

12   not Aurobindo meets Claim Element 4(b), which is "wherein

13   the capsule has a capsule shell with a capsule shell size 3

14   or 4"?

15   A.    That that element is met.

16   Q.    Now I'd like to take you to the next element that you

17   identified as "that encapsulates a blended pimavanserin

18   composition comprising granules comprising 40 mgs

19   pimavanserin tartrate and one or more pharmaceutically

20   acceptable excipients."

21        Do you see that element?

22   A.    Yes, I do.

23   Q.    Now, it is your opinion that Aurobindo's product

24   meets this claim element which you've identified as 4(c)?

25   A.    Yes.

DIRECT EXAMINATION - PAMELA SMITH

1  Q.    Now, let's take this rather long element in pieces.

2  Let's focus on "granules comprising 40 mgs pimavanserin

3  tartrate."  What is your understanding of the meaning of

4  that term?

5  A.    That this is readily understandable and there's also,

6  I believe, a memorandum of information that helps us with

7  this.

8  Q.    Now, I'd like to turn to the Court's claim

9  construction of this term, what is at Docket 043.

10 Dr. Smith, did you review the Court's claim construction in

11 connection with rendering your opinions in this case?

12 A.    I did.

13 Q.    And did you apply the Court's claim construction with

14 respect to your opinions?

15 A.    Yes.

16 Q.    What did the Court construe the term "granules

17 comprising 40 mgs of pimavanserin tartrate" to mean?

18 A.    "Plain and ordinary meaning; the scope of the term

19 granule includes granules granulated with pimavanserin and

20 excipients."

21 Q.    Now, turning to the larger term within Element (c),

22 which is "granules comprising 40 mgs pimavanserin tartrate

23 and one or more pharmaceutically acceptable excipients," did

24 you review the Court's construction of that term?

25 A.    Yes, I did, and I found it to be exactly the same.

DIRECT EXAMINATION - PAMELA SMITH

1    Q.    And did you apply the construction in connection with

2    your opinions?

3    A.    I did.

4    Q.    Now, beyond the Court's construction, was there any

5    other information that helped inform your understanding of

6    what the term "granule" itself meant?

7    A.    Yes, I looked at the specification in the patent.

8    Q.    Now, Dr. Smith, you do have the patent in front of

9    you.  That's JTX-0009.  How are granules described in the

10   specification?

11   A.    If we look at column 4, there's a highlighted section

12   here where "primary powder particles are made to adhere to

13   form larger, multiparticle entities called granules."

14   Q.    And you're referring to column 4 around lines 43-46?

15   A.    Yes, I am.

16   Q.    And is this the understanding of granules that you

17   applied to your analysis in this case?

18   A.    It is.

19   Q.    Now, did the Court reference this specification

20   language in its claim construction opinion?

21   A.    Yes.

22   Q.    If we could look back at the Court's claim

23   construction opinion, what language in the Court's claim

24   construction opinion addressed granules?

25   A.    That the specification states that granules are

DIRECT EXAMINATION - PAMELA SMITH

1    multiparticle entities consisting of primary powder

2    particles that were made to adhere together.

3    Q.    And did the Court limit the process by which granules

4    could be made?

5    A.    No.

6    Q.    Does Claim 4 include a product-by-process claim

7    limitation?

8    A.    No, it does not.

9    Q.    And do you understand that the Court issued a ruling

10   last week regarding a product-by-process?

11   A.    Yes, I do.

12   Q.    And would you just read the Court's ruling into the

13   record?

14   A.    Yes.  "The asserted claims are not product-by-process

15   claims and do not otherwise involve any process

16   limitations..."

17   Q.    Now, Dr. Smith, beyond what you read from the Court

18   and your analysis of the claims, do any of the claims at

19   issue here, Claims 4 or 5, require any process limitations

20   for making granules?

21   A.    No.

22   Q.    Is your understanding of granules consistent with the

23   claims and the specification?

24   A.    Yes.

25   Q.    Now, does Aurobindo's product contain granules

DIRECT EXAMINATION - PAMELA SMITH

1   comprising 40 mgs of pimavanserin tartrate and one or more

2   pharmaceutically acceptable excipients?

3   A.    Yes.

4   Q.    And how do you know that?

5   A.    I know that from a couple of different sources.

6   Personally, I looked through their ANDA applications and saw

7   references.

8   Q.    And what are the other sources that you're referring

9   to?

10  A.    I did my own analytical testing.

11  Q.    Now, in your binder, you have a document that's

12  marked JTX-0106-AURO?

13  A.    Yes.

14  Q.    And what is this document?

15  A.    This document is another section of the ANDA,

16  specifically 3.2.P.3.3, "Description of the Manufacturing

17  Process and Process Controls."

18  Q.    And just to back up for a second, is it your

19  understanding that an ANDA application gets submitted to the

20  FDA?

21  A.    Yes, it is.

22  Q.    And do you have experience with ANDAs?

23  A.    Yes, I do.

24  Q.    And did you rely upon JTX-0106 in forming your

25  opinions?

DIRECT EXAMINATION - PAMELA SMITH

1   A.      I did.

2               MR. PETERMAN:  Your Honor, we move JTX-0106 into

3   evidence.

4               MR. KRATZ:  No objection.

5               THE COURT:  All right.  JTX-0106-AURO is

6   admitted.

7               (Exhibit admitted.)

8   BY MR. PETERMAN:

9   Q.      Now, also in your binder, do you see a document

10  that's marked JTX-0125-AURO?

11  A.      Yes, I do.

12  Q.      And what is this document?

13  A.      This is another section of the ANDA specifically.

14  This is 3.2.P.2, "Pharmaceutical Development."  This is the

15  Pharmaceutical Development Report.

16  Q.      Did you rely upon this document in your analysis?

17  A.      I did.

18              MR. PETERMAN:  Your Honor, we move JTX-0125-AURO

19  into evidence.

20              MR. KRATZ:  No objection.

21              THE COURT:  JTX-0125-AURO is admitted.

22              (Exhibit admitted.)

23  BY MR. PETERMAN:

24  Q.      Now, Dr. Smith, what do these documents collectively

25  tell you about Aurobindo's product?

DIRECT EXAMINATION - PAMELA SMITH

1    A.      That they were making granules.

2    Q.      Well, do you know that?

3    A.      Because literally I see the word "granule" listed

4    multiple times.

5    Q.      Now, going back to JTX-0106-AURO, which has already

6    been admitted, turning to page 6, what is presented here?

7    A.      What we're looking at here is a high-level process

8    flowchart going from top to bottom, and the steps that I was

9    interested in were the raw material sifting step, the

10   sifting of lubrication materials, and the pre-lubrication

11   and lubrication step.

12   Q.      And, Dr. Smith, what is done in the raw materials

13   sifting step?

14   A.      There's a little bit more detail earlier in this --

15   in this document.

16   Q.      I turn your attention to JTX-0106-AURO, page 4.

17   A.      Yes, page 4.

18   Q.      Would you briefly explain what's -- what's occurring

19   here?

20   A.      Sure.  So we see the headers here.  They're the same

21   three boxes that I highlighted in the process flowchart.

22   And just a high-level summary, in the raw materials sifting

23   step, you're mixing together the API and the excipients, and

24   then you're separately sifting the lubrication material, and

25   then during pre-lubrication and lubrication, you're blending

DIRECT EXAMINATION - PAMELA SMITH

1    all these together.

2    Q.    And based on the documents, what is your

3    understanding of the result of step 3 in Aurobindo's product

4    -- process?

5    A.    That -- that the output from step 3 were granules.

6    Q.    Now, I'd like to refer you back to JTX-0125.

7    A.    Okay.

8    Q.    What is this document again?

9    A.    This document is the Pharmaceutical Development

10   Report.

11   Q.    And is this part of Aurobindo's ANDA?

12   A.    It is.

13   Q.    Now, I'd like to turn you to page 4 of this document.

14   A.    Yes.

15   Q.    What is reflected at the bottom of page 4?

16   A.    This documents the preparation and review process for

17   the Pharmaceutical Development Report, so we see here three

18   levels of review.  There's a "prepared by," and this is

19   typically a scientist prepares -- prepares the report.  And

20   then you have "verified by" with a signature.  That's

21   typically someone in the quality department.  And then you

22   have "approved by," and that's typically someone in

23   management.

24   Q.    And do you see signatures in each of the "prepared

25   by," "verified by," and "approved by"?

DIRECT EXAMINATION - PAMELA SMITH

1    A.    I do.

2    Q.    And there's dates following those signatures as well?

3    A.    Correct.

4    Q.    And the date is April 15th, 2020?

5    A.    Yes, for all three.

6    Q.    Now, turning to page 7 of JTX-125, would you just

7    explain to the Court what the purpose of this document as

8    told by Aurobindo is for JTX-125?

9    A.    Sure.  This executive summary is the best place to

10   see that.  This is essentially a report that is presenting

11   to the FDA all the pharmaceutical development work that was

12   done in order to make the product suitable for submission.

13   Q.    Now, Dr. Smith, would you please turn in your binder

14   to page 25 of JTX-0125.

15   A.    Okay.  I'm there.

16   Q.    Okay.  Now, towards the bottom, there is a photograph

17   titled "3.2.P.2.7, Control Strategy."  Do you see that?

18   A.    I do.

19   Q.    What is reflected in this paragraph?

20   A.    The control strategy is important in pharmaceutical

21   development to make sure that throughout your process you're

22   making what you intend to make, and so typically there will

23   be some tests that are done at various points throughout the

24   process to ensure that it's okay to move forward with the

25   next step.

DIRECT EXAMINATION - PAMELA SMITH

1   Q.      And if we continue on within the document going

2   forward to page 70.

3   A.      Yes, I'm there.

4   Q.      I'd like to look at two sections there, 3.2.P.2.7.3

5   and 3.2.P.2.7.4.  Are you with me?

6   A.      I am.

7   Q.      Would you explain to the Court what is being

8   reflected in both of those sections?

9   A.      Yes.  So in this first section, this is the control

10  strategy for the pre-lubrication process.  So this would be

11  after the sifting step of the excipients and the API, and

12  the very last sentence in this paragraph states:  "The

13  control strategy for blending the granules with

14  extra-granular materials is to blend for 20 minutes."  So

15  they're referring to the output of the sifting step that's

16  granules.

17  Q.      And that's the step 3, as we discussed earlier?

18  A.      Yes.

19  Q.      And if you continue to look at the same section of

20  the document in 3.2.P.2.7.4, the control strategy for

21  lubrication process, could you explain to the Court what's

22  being reflected there?

23  A.      Yes.  So after the magnesium stearate has been added

24  to the step from above, then this step goes into the fact

25  that how long you should -- you should blend that for, and

DIRECT EXAMINATION - PAMELA SMITH

1    then they state at the end, "The control strategy for

2    blending the granules with the extra-granular materials is

3    to lubricate for five minutes."  So this is telling me that

4    what came out of the step above was also granules.

5    Q.    Now, I'd like to turn your attention a little bit

6    earlier within the document to page 46 of JTX-0125.

7    A.    Okay, yes.

8    Q.    What is this section titled?

9    A.    This section is entitled "The Manufacturing Process

10   Development."

11   Q.    And for the record, it's section 3.2.P.2.3, correct?

12   A.    Yes.

13   Q.    What is being reflected within "The Manufacturing

14   Process Development" section?

15   A.    This highlights a very nice process map.  It's a

16   flowchart that we'll get into, and it talks about the

17   important material attributes that you need to make sure are

18   present before you can move forward with the rest of the

19   steps.

20   Q.    And if you would read the highlighted line into the

21   record, please.

22   A.    Yes.

23          "The following figure presents the process map

24   for the finalized formulation of generic pimavanserin

25   capsules 34 mg."

DIRECT EXAMINATION - PAMELA SMITH

1  Q.    And what does "the finalized formulation of generic

2  pimavanserin capsules 34 mgs" mean?

3  A.    That this is their proposed ANDA product.

4  Q.    And the last line in this section, would you also

5  read that into the record?

6  A.    Yes.

7        "It also presents the material attributes and

8  process parameters that can potentially impact intermediate

9  and finished product quality attributes."

10  Q.    And what do you understand by that line?

11  A.    This tells me that they want to ensure that they've

12  got control of their process and that there are certain

13  attributes or characteristics that must be present, and so

14  these would be locations throughout the manufacture where

15  you stop and you take a look at what you've made and maybe

16  do a test and get the go-ahead to more forward with the rest

17  of the manufacturing.

18  Q.    Now, Dr. Smith, I'd like to turn to the next page of

19  JTX-0125, page 47.

20  A.    Yes.

21  Q.    Is this the process map that's referred to in the

22  previous page, 46?

23  A.    It is.

24  Q.    And would you just generally explain to the Court

25  what is occurring in JTX-0125 page 47?

DIRECT EXAMINATION - PAMELA SMITH

1    A.      Yes.  So first I'll start with just highlighting that

2    third column.  So if we highlight that, we can see that at

3    the top, this is the manufacturing process steps.  And, you

4    know, a few moments ago we talked about what those steps

5    were.  So just to familiarize everyone with where we are in

6    the process, this column lists sifting of API and

7    excipients, pre-lubrication and lubrication, and then a

8    capsule fill.

9             So now, if we're looking at this middle step,

10   this pre-lubrication and lubrication step, immediately to

11   the left of that lists the material attributes of the input

12   materials.  So these would be -- since these are the input

13   materials going in the pre-lubrication and lubrication, they

14   are the output materials of the sifting and the API and

15   excipients step above it.

16            And they're saying here that the tests that you

17   need to ensure are proper at this point are granule bulk and

18   tapped density, granule uniformity and granule size

19   distribution.

20   Q.      Would you just explain to the Court what these three

21   things -- four things mean, granule bulk and tapped density,

22   granular uniformity and granule size distribution mean?

23   A.      These are all tests to ensure that the granules that

24   they made are suitable to move forward in the process.

25   Q.      So what does this process map in Aurobindo's ANDA

DIRECT EXAMINATION - PAMELA SMITH

1  tell you?

2  A.     It tells me that they wanted to make granules at that

3  point and then tested to make sure that the granules had the

4  right properties.

5            THE COURT:  So, let me ask a question.  So you

6  said that the inputs on the second line are the outputs of

7  the first process, the sifting of API and excipients?

8            THE WITNESS:  Yes, that's correct, Your Honor.

9            THE COURT:  All right.  And so you're telling me

10 that this dry blending process is saying, all right, we're

11 taking the -- so the blender type, blending time, is that

12 consistent with a dry blending process?

13           THE WITNESS:  Yes, so the blending takes place

14 after they've mixed the API and the excipients together.

15           THE COURT:  Okay.  And then as part of the --

16 that pre-lubrication, lubrication, they're forming these

17 granule testing, is what you're telling me.

18           All right.  I see.  I hear you.

19           THE WITNESS:  Okay.

20 BY MR. PETERMAN:

21 Q.     So, Dr. Smith, just to pick up on the Court's

22 question, where in this process map, you know, are you --

23 based on the steps in Aurobindo's process, are the granules

24 being formed?

25 A.     During the sifting of the API and excipient step.

DIRECT EXAMINATION - PAMELA SMITH

1  Q.    And then what is the next step that occurs with those

2  granules?

3  A.    They are blended.

4  Q.    Now, did you consider other documents from Aurobindo

5  that helped support your opinion that Aurobindo believed its

6  products contained granules?

7  A.    Yes, I did.

8  Q.    In your binder there is a document marked

9  JTX-0134-AURO; do you see that?

10 A.    I do.

11 Q.    And is this a document that you've considered as part

12 of your analysis?

13 A.    It is.

14 Q.    And what is this document?

15 A.    This is a draft master formula card.

16 Q.    Okay.  And as counsel pointed out, it is an unsigned

17 document, correct?

18 A.    That's correct.

19 Q.    Okay.  And so you don't believe that this was

20 submitted to the FDA?

21 A.    I don't believe so, no.

22 Q.    Okay.  But what does this card represent, JTX-134?

23 A.    It represents where they were at in their formulation

24 and how they were experimenting with different types of

25 formulations.

DIRECT EXAMINATION - PAMELA SMITH

1          MR. PETERMAN:  Before I move on, I want to make

2     sure I admit JTX-134-AURO into evidence.

3          MR. KRATZ:  No objection.

4          THE COURT:  All right.  JTX-0134-AURO is

5     admitted.

6          (Exhibit admitted.)

7     BY MR. PETERMAN:

8     Q.    Dr. Smith, briefly, what steps are described here in

9     JTX-0134?

10    A.    We can move to a section, the brief manufacturing

11    process, to help out here.

12          So essentially what we're looking at here are

13    the sifting together of the API and excipients.  And we have

14    a few different co-sifting steps and different excipients

15    that are used, which are the same excipients that I see in

16    the final formulation.

17          And then at the end, after they've resifted the

18    material and sifted the magnesium stearate, and they add the

19    magnesium stearate to the sifted API and excipients together

20    and they blend that, so now we're into that pre-lubrication

21    and lubrication step.  Then at the very end, they mention

22    unload the lubricated granules into suitable containers.

23    Q.    And so what does this mean to you?

24    A.    It means to me that they were making granules at this

25    point.

DIRECT EXAMINATION - PAMELA SMITH

1    Q.    And you mentioned that the process is not exactly the

2    final process, but are there parallels between the process

3    described in JTX-134 and the final process that we discussed

4    earlier?

5    A.    Right, they're similar.  I think there's some minor

6    differences in the order of the sifting, maybe some minor

7    tweaks to the amounts, but similar.

8    Q.    Now, I'd like to turn your attention to

9    JTX-0109-AURO?

10   A.    Yes.

11   Q.    Is this a document that you considered as part of

12   your analysis?

13   A.    It is.

14   Q.    And what is this document?

15   A.    This is another draft master formula card.

16           MR. PETERMAN:  Your Honor, we move JTX-0109-AURO

17   into evidence.

18           MR. KRATZ:  I have no objection.

19           THE COURT:  All right.  JTX-0109-AURO is

20   admitted.

21           (Exhibit admitted.)

22   BY MR. PETERMAN:

23   Q.    Now, Dr. Smith, what does this document tell you?

24   A.    It tells me the same thing that the last document

25   did.  If we look at the brief manufacturing process, I have

DIRECT EXAMINATION - PAMELA SMITH

1   the same conclusions.  It lists, again, the steps -- this is

2   page 3.  If we look at the procedure, it's very similar to

3   the one that we just looked at before.  We're co-sifting the

4   API and the excipients, we are sifting the magnesium

5   stearate; we're then blending those together.  And then at

6   the end of the process, it stipulates to unload the

7   lubricated granules into suitable containers.

8   Q.     And you're referring to section 8.1.8 where it says,

9   "Unload the lubricated granules into suitable containers"?

10  A.     I am.

11  Q.     So what is this telling you regarding what Aurobindo

12  thought about its product?

13  A.     They thought they were making granules.

14  Q.     Now I'd like to provide one more document to you,

15  JTX-0106.  Let me know when you're with me.

16  A.     I have it.

17  Q.     I apologize, I need to show you JTX-0108.

18  A.     Okay.  I'm there.

19  Q.     Okay.  And what is this document?

20  A.     This is another draft master formula card.

21  Q.     Okay.  And as counsel pointed out in opening, this is

22  unsigned?

23  A.     Correct.

24  Q.     Okay.  And so you don't believe this was submitted to

25  the FDA?

DIRECT EXAMINATION - PAMELA SMITH

1    A.    I don't think so.

2    Q.    Okay.  But did you rely upon this as part of your

3    analysis?

4    A.    I did.  Similar as into the last master formula

5    cards.

6              MR. PETERMAN:  Your Honor, we move JTX-0108-AURO

7    into evidence.

8              MR. KRATZ:  No objection.

9              THE COURT:  All right.  JTX-0108-AURO is

10   admitted.

11             (Exhibit admitted.)

12   BY MR. PETERMAN:

13   Q.    Dr. Smith, would you just explain to the Court the

14   relevance of this exhibit?

15   A.    Sure.  So let's move to that same section 8, which is

16   on page 3.  This is a brief manufacturing process, we're

17   mixing the API and the excipients together, then they're

18   being blended, and then the magnesium stearate is being

19   added and it's lubricated.  And then at the end, it's

20   mentioned "unload the lubricated granules into suitable

21   containers."

22   Q.    Now, we've looked at three draft documents.

23             Does your analysis and determination that

24   Aurobindo's product has granules turn on these three

25   documents?

DIRECT EXAMINATION - PAMELA SMITH

1    A.    No.

2    Q.    How did you use these documents in connection with

3    forming your opinions?

4    A.    Since these were documents that were throughout the

5    process of it, the development, this told me that throughout

6    the process, it suggested to me that they were cognizant of

7    the fact that they were making granules.

8    Q.    Now, does your opinion that Aurobindo's product has

9    granules just turn only on the documents that we looked

10   through today?

11   A.    No, I also did testing to show it.

12   Q.    Okay.  Now, what type of testing did you do on

13   Aurobindo's products?

14   A.    I did stereo microscopy and polarized light

15   microscopy.

16   Q.    Would you explain to the Court what stereo microscopy

17   is?

18   A.    Sure.  Stereo microscopy, the best way to think of it

19   is, like, it's looking at --

20            THE WITNESS:  Can you still hear me if I'm

21   sitting back?

22            Okay, great.

23            It's looking at something with a naked eye but

24   zoomed in, so it's a magnified image, looking at it in a

25   reflected light.

DIRECT EXAMINATION - PAMELA SMITH

1  BY MR. PETERMAN:

2  Q.    And how did the stereo microscopy imaging technique

3  here help inform your opinion?

4  A.    It helped me see whether or not granules were

5  present.

6  Q.    And did you record your work in a laboratory

7  notebook?

8  A.    I did.

9  Q.    In front of you is JTX-0062; what is this exhibit?

10  A.    This exhibit are excerpts from our notebooks.  And

11  then it shows some images.

12        MR. PETERMAN:  Your Honor, we move JTX-0062 into

13  evidence.

14        MR. KRATZ:  No objection.

15        THE COURT:  JTX-0062 is admitted.

16        (Exhibit admitted.)

17  BY MR. PETERMAN:

18  Q.    Now, would you -- I want to move forward to an image

19  in -- in here.  This is image that has a legend 12-38-1-1-1,

20  correct?

21  A.    That's correct.

22  Q.    Would you tell the Court what it is seeing here?

23  A.    This is an image of a large granule, approximately

24  2.75 by 3.7 millimeters in size.

25  Q.    And where does this granule come from?

DIRECT EXAMINATION - PAMELA SMITH

1    A.    This granule came from the inside of one of

2    Aurobindo's capsules.

3    Q.    So you actually physically had Aurobindo's capsules

4    in your possession?

5    A.    I did.

6    Q.    And would you just explain how you captured this

7    image?

8    A.    Sure.  So I mentioned that a stereo microscopy is

9    essentially looking at something with a zoomed-in view.

10   This is something that you could easily see with the naked

11   eye, but when we zoom in with the stereo microscope, we can

12   see that this granule consists of an agglomeration of

13   multiparticle entities that are made to stick together.  I

14   can see that this is a grouping of particles sticking

15   together.

16   Q.    Now, do you have other images of Aurobindo's

17   capsules?

18   A.    I do.

19   Q.    Would you explain to the Court what's being shown

20   here in the picture labeled Sieve Number 200-75 micro-2?

21   A.    Yes.  This is a collection of multiple granules just

22   to show what it would look like with the naked eye.  Sorry.

23   Naked eye under stereomicroscope under reflective light.

24   Q.    Is your opinion that Aurobindo has granules based on

25   these images?

DIRECT EXAMINATION - PAMELA SMITH

1    A.    It is, but I wanted to use a technique that would

2    allow me to look more closely at the granules, to look

3    inside them and see how they are actually created.

4    Q.    So what technique did you use to accomplish those

5    goals?

6    A.    Polarized light microscopy.

7    Q.    Now, I have been talking with you for a while, so now

8    I know a lot about polarized light microscopy, but would you

9    educate the Court as to what polarized light microscopy is?

10   A.    I will and I have a diagram that I'll walk through as

11   an illustration.

12           So on the left here is an optical path of what

13   happens to the light in a polarized light microscope.  So

14   we're not going to talk about every component of this but

15   what I want to highlight is that the light is at the bottom.

16   So in this case, we're transmitting light through the sample

17   instead of reflecting it from the top like in stereo

18   microscopy, we're transferring light through the sample.

19           So the sample in this diagram is the rectangular

20   block in the middle -- see if I can do it.  There we go.

21   This is the sample right here, and then this is the light

22   source at the bottom.  And you place a polarizer at this

23   location, so the light from the source comes off in multiple

24   different directions.

25           And by putting a polarizer in place, you're

DIRECT EXAMINATION - PAMELA SMITH

1  limiting it to one polarization, so you have one wavelength

2  of light passing through here coming into the sample.

3          And the most practical application I can use to

4  describe what this means is think about a pair of polarized

5  sunglasses.  So this image on the right, it's same image but

6  the right-hand side is without your polarized sunglasses and

7  the image on the left is with.

8          So what this polarizer does is it gets rid of

9  that unwanted scatter that makes it difficult to see clearly

10  the entire sample.  And so that's what's happening in the

11  microscope.  We put the polarizer in here in order to get

12  rid of all of the scatter and unwanted radiation from here

13  to see a more crisp, clear image at the sample plane.

14          So when I walk through the images, I'm going to

15  show you them in groups of three.  And the first image is

16  always going to be the image with a single polarizer in

17  place, so it would be the equivalent to looking at an image

18  like this, a clear image.

19  Q.    And what's the second type of image you're going to

20  show the Court?

21  A.    The second type of image is called crossed polars.

22  So that means I have two polarizers in place.  So we have a

23  polarizer here, the light comes through the sample.  The

24  sample will interact with that light and then there's a

25  second polarizer up here that's called the analyzer.

DIRECT EXAMINATION - PAMELA SMITH

1          Now, if you think about the polarizer being

2     oriented, say, in an east/west orientation, if you want to

3     cross that polar, the analyzer has to be perpendicular to

4     that, so you would have a north/south orientation.

5          Now, when you add this condition of crossed

6     polars, when the light comes to the sample, if the sample is

7     amorphous, no light will pass through and it will look like

8     a dark field in your view.

9          If you have a crystalline sample, light will

10    pass through.  So looking at a sample on your cross polars

11    is the definitive way as a microscopist to determine whether

12    you have a amorphous material or crystalline material.

13    Q.    Now, this discussion on amorphous material and

14    crystalline material, what relevance does it have to

15    Aurobindo's product?

16    A.    This is important for us because if we look at the

17    ingredients that are in the capsule, you have the API which

18    is amorphous.  You have microcrystalline cellulose, which is

19    crystalline.  You have collodial silicon dioxide which is

20    amorphous and then you have magnesium stearate which is

21    crystalline.

22          So as a microscopist, I have been trained to

23    recognize these materials after looking at hundreds and

24    thousands of images over my lifetime.  So these are easily

25    recognizable images to me.

DIRECT EXAMINATION - PAMELA SMITH

1              And the fact that the amorphous API is

2    amorphous, I can easily distinguish between that and all the

3    other excipients present.

4    Q.      And I believe you referenced a third configuration

5    that you used.

6              Would you explain to the Court what that third

7    configuration is?

8    A.      Yes, the third configuration is a crossed polars with

9    a first order of red compensator plate, that's a lot of

10   words to say, I'm going to put in a filter to make it easier

11   to see some of the differences I'm pointing out.

12   Q.      Okay.  And did you record your PLM imaging in a

13   notebook?

14   A.      Yes, I did.

15   Q.      And I'd like to turn you to JTX-61 in your binder.

16   A.      Yes.

17   Q.      What is this document?

18   A.      These are excerpts from our notebook pages and then

19   the images that I collected.

20              MR. PETERMAN:  Your Honor, we move JTX-61 into

21   evidence.

22              MR. KRATZ:  No objection.

23              THE COURT:  JTX-0061 is admitted.

24              (Exhibit admitted.)

25   BY MR. PETERMAN:

DIRECT EXAMINATION - PAMELA SMITH

1    Q.    Dr. Smith, I want to go to some images in your

2    notebook looking at JTX-61, 15-17.  There's a series of

3    three images here that we've combined on one slide.

4            Would you walk the Court through what you as an

5    expert microscopist see in these images?

6    A.    Yes, I will.  I'll point out that these are two

7    granules and these are the exact same view just with single

8    polarizer, cross polars and then cross polars with the first

9    order red compensator plate.

10           I'll also point out that what's being displayed

11   up there on the screen is not as clear as what's on the

12   monitors in front of us or what's in the printed pictures

13   just because there's too much light in this room for that

14   display.

15   Q.    Okay.  And so would you, within each picture, just

16   explain what you're seeing that leads you to conclude that

17   Aurobindo's product has granules?

18   A.    Yes.  So when the first image, which is the one under

19   "single polarizer," I see two granules, and I can see light

20   areas in the granules and I can see dark areas in the

21   granules.  It's difficult to see on that screen so I would

22   refer you to the computer monitors or the printed pictures

23   to see it more clearly.

24           The second image is where I mentioned we have

25   the cross polars, and so anything that is amorphous will not

DIRECT EXAMINATION - PAMELA SMITH

1   allow light to pass through.  So I can see dark areas within

2   the granules and then I can see light areas within the

3   granules.  And if there is overlap of dark and light,

4   sometimes you can see light coming through but just a little

5   bit less intense that -- if it didn't have anything dark on

6   top of it.

7   Q.    And --

8   A.    And then -- sorry.

9   Q.    Yes, and then --

10  A.    Again, in the third image, that's with the first

11  plate -- compensator plate and we can really see things

12  pretty clearly in the images at this point.

13  Q.    What did these granules consist of?

14  A.    These granules consist of amorphous API and the

15  microcrystalline cellulose.

16  Q.    Now, I'd like to direct your attention to one of the

17  images again that we've blown up a bit.

18        So can -- had some annotations that you put in;

19  is that correct?

20  A.    Right.  Just to explain what it is that I'm seeing.

21  When I talk about an area that's lighter and light is

22  passing through it, I outline some examples of that in these

23  images with the yellow box, that's due to the

24  microcrystalline cellulose.

25        And then if you look at the other areas within

DIRECT EXAMINATION - PAMELA SMITH

1  the granule, you can see opacity, no light passing through.

2  I've outlined a couple of those locations with the green

3  box.  Again, it is a lot more visible on the computer

4  monitors where that is the amorphous API.

5  Q.    And do you see anything but granules in your

6  analysis?

7  A.    I don't see anything but granules here.

8  Q.    Now, how do you know you're seeing microcrystalline

9  cellulose?

10  A.    A couple of reasons:  One, I have looked at

11  microcrystalline cellulose thousands of times.

12          Two, I have a library reference image of

13  microcrystalline cellulose; and, three, in looking at

14  Aurobindo's formulation, that would be the most logical

15  excipient to be present at this point given the amount of

16  cellulose that's in the formulation.

17  Q.    And, Dr. Smith, what does microcrystalline cellulose

18  look like under --

19  A.    I have an image to share.

20          So this is microcrystalline cellulose that I

21  took from a reference sample that we have of our own, and

22  microcrystalline cellulose is a crystalline material.  You

23  can also see that there are degrees of lightness, brightness

24  and shading within these, but there's no area within the

25  microcrystalline cellulose where it is totally opaque to

DIRECT EXAMINATION - PAMELA SMITH

1    light.

2    Q.    Now, what about colloidal silicon dioxide, do you see

3    that in your images?

4    A.    I did see colloidal silicon dioxide in a couple of

5    images, yes.

6    Q.    I'd like to direct your attention to image

7    12-38-1-6-6.

8            Could you explain to the Court what you observed

9    here as an expert microscopist?

10   A.    Yes, this is another image of multiple granules.

11   Like before, I have got microcrystalline cellulose

12   highlighted within that yellow box.

13           Here, you can see that that portion of the

14   microcrystalline cellulose in the granule doesn't have a lot

15   of API on it, so it's nice and bright.

16           In the green box, like before, I can see a

17   darker area, you can even see the particles of the API that

18   are dark and opaque on top of the microcrystalline

19   cellulose.

20           And then if you look in the upper left in this

21   blue box, you see this clear circle.  That is colloidal

22   silicon dioxide.  Silicon oxide is glass so that's what a

23   very small particle of glass looks like.

24   Q.    So are you seeing granules in this image?

25   A.    I am.

DIRECT EXAMINATION - PAMELA SMITH

1  Q.    And can you just, again, refer the Court as to where

2  you're seeing these granules?

3  A.    Throughout the image.  So there are multiple granules

4  in this image.  There's, you know, a granule here and a

5  granule here and here, (indicating) and I could go through

6  and I could circle each one of these groupings.  And I know

7  they're granules because they're stuck together, I have got

8  the microcrystalline cellulose underneath, I have the

9  amorphous API on top of it and they're stuck together.

10  Q.    Now, how do you know that the blue box, that you'e --

11  that there is colloidal silicon dioxide?

12  A.    For a couple of reasons.  One, I know what colloidal

13  silicon dioxide looks like.  I'll show you a reference

14  image, and then I'll also show you what it looks like under

15  cross polars, which is another test.

16        So this is a reference image I have of colloidal

17  silicon dioxide just showing that, you know, these are

18  clear, round -- roundish particles, essentially glass.

19  Q.    Now, Dr. Smith, I want to move on to the next image

20  that you prepared.

21        MR. PETERMAN:  Mr. Campos, if you would bring

22  that up, please.

23  BY MR. PETERMAN:

24  Q.    Now, Dr. Smith, on the screen you have three images,

25  12-38-1-6-4, -5, and -6.  Would you just explain to the

DIRECT EXAMINATION - PAMELA SMITH

1    Court what these images show?

2    A.      Sure.  So that image on the far right was the one

3    that we looked at just a moment ago.  Again, this is the

4    exact same view taken under three different conditions.  The

5    first figure is single polarizer, the second figure is cross

6    polars, and then the third is the cross polars with the

7    first -- the compensator plate.

8              And what I want to point out to you is in the

9    first image, I can see that colloidal silicon dioxide

10   particle right here, and if you look at that same location

11   under cross polars, it disappears.  It goes black.  That

12   tells me that's amorphous.  So that's another way that I can

13   identify this material as the colloidal silicon dioxide

14   because there's nothing else in the formulation that would

15   look like that.

16   Q.     Now, Dr. Smith, did you capture images beyond those

17   that we discussed today?

18   A.      I did.  I collected dozens of images of multiple

19   different sizes of granules.

20   Q.     And, you know, although we could go through all of

21   them, can you generally sum up what you observed in those

22   images?

23   A.      I can.  I've shown you some representative images

24   here, but in every single image that I looked at, I never

25   once saw the API not attached to the microcrystalline

DIRECT EXAMINATION - PAMELA SMITH

1    cellulose.  I always saw them together.

2    Q.    So there was always an adherence between the API and

3    the microcrystalline cellulose?

4    A.    Always.

5    Q.    Now, we've -- so just to be clear, the other images

6    that you took, are those all within the notebooks that have

7    been admitted into evidence?

8    A.    They are, but I should probably also mention that.

9    So our typical process when we prepare a sample to look at

10   it, we look at the entire field of view, we do sort of a

11   scoping look just to make sure, okay, is everything uniform,

12   is there anything unusual, where do I want to collect

13   images?  And if I collected images of absolutely every

14   single granule that was there, there would be, you know,

15   tens of thousands.  So we'll collect representative images

16   throughout.  So in addition to the images that I've got

17   here, I also have -- you know, I'm also testifying that I

18   looked at everything and saw the exact same thing everywhere

19   that I looked.

20   Q.    So I want to talk a little bit, you know, beyond the

21   images in your notebook and what we've already discussed

22   today.  Are you relying upon anything else in terms of your

23   analysis that you've done for your opinion that there are

24   granules present in Aurobindo's product?

25   A.    Anything other than the testing that I've done and

DIRECT EXAMINATION - PAMELA SMITH

1    the specification in the patent language and Aurobindo's

2    ANDA, I think that's it.

3    Q.    Okay.  Now, I want to talk a little bit about the

4    sample prep that you did of Aurobindo's product.

5            Would you just explain to the Court what "sample

6    prep" means?

7    A.    Yes.  So when we go to prepare these images for

8    analysis for polarized light microscopy, the way that you

9    prepare it helps spread out any particles that may be stuck

10   on the surface because you want to have a nice clear image

11   of what it is that you're trying to look at.  So the way you

12   do that is you put your -- your sample on a microscope

13   slide, and then you put a coverslip on top of it, and then

14   at the edge you put a drop of mineral oil.

15           Now, the mineral oil, through capillary action,

16   will get drawn under the coverslip, and it will pass through

17   all those particles, whatever sample you have there, flow

18   over it.  And you can actually watch it under the microscope

19   like a -- like a wave coming through, and as it passes

20   through the material, if you have anything loosely

21   agglomerated onto the surface, it will spread that out so

22   that you can see things more clearly.

23           And a really good example of this is if we go

24   back to that microcrystalline cellulose reference image that

25   I shared.

DIRECT EXAMINATION - PAMELA SMITH

1          Would you mind pulling that back up for me?  The

2    microcrystalline cellulose reference.

3          MR. PETERMAN:  I think it's an image or two

4    back, Mr. Campos.

5          THE WITNESS:  Thank you.

6          So if you look closely at this image, you'll see

7    that there are fine particles scattered around throughout.

8    So when we first put that sample on the microscope slide, it

9    was just a pile of powder, but when you put that coverslip

10   on top and you allow the mineral oil to pass through, it

11   spreads out anything that was loosely aggregated together,

12   so this would -- this is a proper preparation.

13          And what I noted was that every single

14   preparation we did of the Aurobindo materials, this didn't

15   happen.  That meant that how those particles were stuck

16   together was strong enough to withstand my standard sample

17   prep which was meant to dislodge anything that's loosely

18   associated.

19          Does that make sense?

20   BY MR. PETERMAN:

21   Q.    So you're saying that the sample prep with the

22   mineral oil helped to confirm that there were not loose

23   agglomerations of pimavanserin?

24   A.    That's correct.

25   Q.    So, Dr. Smith, based on your analysis that we just

DIRECT EXAMINATION - PAMELA SMITH

1  discussed, is it your opinion that Aurobindo's ANDA product

2  contains granules comprising 40 mgs of pimavanserin tartrate

3  and one or more pharmaceutically acceptable excipients?

4  A.    Yes.

5  Q.    Now, Aurobindo seems to be relying upon an argument

6  that it doesn't have a, quote/unquote, granulation process

7  and, therefore, there's no granules.  What's your response

8  to that?

9  A.    Well, I think their process technically is a

10 granulation process because the end result was a granule.

11 Q.    And do you also understand that Aurobindo has taken

12 the position that the five times that it referenced

13 "granules" in its ANDA submission to the FDA and the various

14 times that "granules" appeared in the draft documents, that

15 those were in error?

16 A.    I would find it surprising to be present as an error

17 so many times.

18 Q.    Regardless of whether it's an error or not, do you

19 have a conclusion that Aurobindo's product still has

20 granules?

21 A.    Yes, because that's what I saw.  That's what I saw in

22 every image I looked at.

23 Q.    Now, counsel has suggested that there is a purposeful

24 requirement in terms of granules.  In the definition of

25 "granules" in the patent that you relied upon, does it

DIRECT EXAMINATION - PAMELA SMITH

1   require granules to be purposefully formed?

2   A.      It doesn't.

3   Q.      Now, Dr. Smith, your counterpart or adversary in this

4   case is Dr. Moreton.  He's criticized some of your PLM

5   imaging techniques.  Do you understand that to be the case?

6   A.      Yes.

7   Q.      Are you aware of whether Dr. Moreton performed any of

8   his own PLM testing on --

9   A.      I don't believe --

10  Q.      -- on Aurobindo's products?

11  A.      I don't believe there was any testing done other than

12  mine.

13  Q.      And you reviewed Dr. Moreton's expert reports in this

14  case, correct?

15  A.      I did.

16  Q.      And did you see any testing that he performed in

17  those expert reports?

18  A.      No, I didn't.

19  Q.      Now, Dr. Moreton says that the lighter versus darker

20  areas in your images are not enough to establish the

21  presence of granules.  What is your response to this

22  criticism?

23  A.      I'm not entirely sure what lighter or darker regions

24  he's looking at, but I think I've shown that the lighter

25  regions would be crystalline and the darker regions would be

DIRECT EXAMINATION - PAMELA SMITH

1    amorphous material, and that -- the only things that those

2    could be are microcrystalline cellulose and the API.

3    Q.    Now, Dr. Moreton also said that the material is just

4    lighter on the extreme outer edges but darker near the

5    center and that this isn't enough to tell you about the

6    presence of granules.  What is your response to that?

7    A.    I'm not sure if there was a particular image he

8    was -- he was looking at, but I can zoom in on any of these

9    images and show you examples where that's not the case, that

10   we can see lightness throughout, and I think I have one

11   image that I can -- I can show just as an example.

12         This might have been the image that was in his

13   report, and if we go to one of the other views of this and

14   we zoom in a bit, there's one where I have -- not these

15   boxes there, just the one yellow box.  Thank you.

16         So this is the same granule, and now I've zoomed

17   in and we're taking a closer look, and you can see the

18   microcrystalline cellulose is pretty much the entire upper

19   half of this granule.  It's hard on that video screen, but

20   on the computer screen, it's quite clear.  We can see the

21   microcrystalline cellulose is shining through from actually

22   the very middle of that granule.

23         So there's -- the API is not only in the center

24   and only cellulose is on the edges.  This is clearly a

25   particle -- a grouping of particles where the

DIRECT EXAMINATION - PAMELA SMITH

1    microcrystalline cellulose is -- is present and the

2    amorphous API is on top of it, but it's not covering it

3    100 percent.

4    Q.    So are you seeing amorphous API throughout the

5    granule?

6    A.    I'm seeing it on all the locations where no light is

7    passing through.

8    Q.    Dr. Moreton also said in his report that since

9    microcrystalline cellulose is opaque to light, light and

10   dark are irrelevant.  Do you have a response to that?

11   A.    I think he must be thinking of stereo microscopy,

12   which is reflective light.  Cellulose under reflective light

13   is opaque, it looks white.  But in transmitted light, it's

14   transparent because it's crystalline.

15   Q.    He also says that the lighter areas versus darker

16   areas are more likely the result of the uneven nature of

17   cellulose fibers.  First of all, what cellulose fibers would

18   he be referring to?

19   A.    Well, microcrystalline cellulose is made from

20   cellulose fibers.  So there's a slight distinction there.

21   But I think what he's referring to in the lighter versus

22   darker areas is if, you know, we go back to that

23   microcrystalline cellulose reference image I have.  You do

24   see lighter areas and darker areas, but they're not opaque.

25   The darkness isn't opaque like amorphous is; it's just

DIRECT EXAMINATION - PAMELA SMITH

1    irregularities within the microcrystalline cellulose itself.

2    There's a difference between light and dark in

3    microcrystalline cellulose than there is light and dark in a

4    granule with amorphous API.

5    Q.    And he also says that you did not look at the

6    individual components of Aurobindo's product and you should

7    have.  What is your response to that?

8    A.    I didn't have the excipients from Aurobindo; however,

9    I have my own excipient library that I can look at, plus

10   I've looked at these excipients hundreds, if not thousands,

11   of times throughout my career.  I know what they look like,

12   and I've provided some reference images here to help educate

13   everyone else what they look like.

14   Q.    Now, does your testing confirm that there are

15   pimavanserin particles adhered to microcrystalline cellulose

16   in Aurobindo's product?

17   A.    Yes, it does.

18   Q.    Now, I'd like to turn to the larger phrase within

19   Claim 4(c), "a blended pimavanserin composition comprising

20   granules comprising 40 mgs pimavanserin tartrate and one or

21   more pharmaceutically acceptable excipients."  What is your

22   understanding of this -- this term?

23   A.    This term that this is -- this is a blended

24   formulation containing the pimavanserin tartrate and

25   excipients in granular form.

DIRECT EXAMINATION - PAMELA SMITH

1    Q.    And how did the Court construe this term?

2    A.    I think we have a copy here.  "Plain and ordinary

3    meaning; an extra-granular component is not required."

4    Q.    And what is -- within Aurobindo's product, did you

5    confirm that it was a blended pimavanserin composition?

6    A.    I did.

7    Q.    And how did you do that?

8    A.    From looking at the documents and from looking at the

9    images, I could see it.

10   Q.    And what -- what steps were you referring to

11   regarding the blend?

12   A.    This would be during the pre-lubrication and

13   lubrication step.

14   Q.    So is it your opinion that claim -- that Aurobindo's

15   product meets the elements of Claim 4, Element (c)?

16   A.    It is.

17   Q.    Now, let's turn to the last element here, which is

18   Claim 4(d), "wherein in the bulk density of the granules is

19   greater than 0.4 grams per mL as determined by USP <616>,

20   method 1."

21   A.    Yes.

22   Q.    Did the Court construe this term?

23   A.    No, it did not.

24   Q.    Did you perform bulk density testing of Aurobindo's

25   product according to the claim?

DIRECT EXAMINATION - PAMELA SMITH

1    A.      I did.

2    Q.      In your binder, do you see the document that's marked

3    JTX-0063?

4    A.      Yes.

5    Q.      What is this document?

6    A.      This document is notebook pages referencing our bulk

7    density testing.

8                MR. PETERMAN:  Your Honor, we move JTX-0063 into

9    evidence.

10                MR. KRATZ:  No objection.

11                THE COURT:  All right.  JTX-0063 is admitted.

12                (Exhibit admitted.)

13    BY MR. PETERMAN:

14    Q.      What did your testing tell you, Dr. Smith?

15    A.      That the granules that are in Aurobindo's capsules

16    have a bulk density of greater than 0.4 g/mL.

17    Q.      And specifically, how many tests did you run?

18    A.      We ran the tests in duplicate.

19    Q.      And what was the results of the first test?

20    A.      The first test, the bulk density was determined to be

21    0.413 grams per mL.

22    Q.      And what about the second test?

23    A.      The bulk density was determined to be 0.415 grams per

24    mL.

25    Q.      Did Aurobindo present bulk -- bulk density testing in

DIRECT EXAMINATION - PAMELA SMITH

1    its own ANDA?

2    A.    Yes.

3    Q.    And what were the results?

4    A.    Interestingly, the result was exactly the same as

5    mine, 0.413.

6    Q.    I'd like to call your attention back to an admitted

7    Exhibit JTX-0106-AURO, 0013.  What is being reflected here?

8    A.    In this table, we've got the untapped bulk density

9    testing results from three different batches of material.

10   The three different lots are highlighted in the second

11   column, and then the results are highlighted in yellow here

12   for you.  The bulk density -- the untapped bulk density was

13   calculated to be 0.413 g/mL for the first sample, 0.407 for

14   the second, and 0.404 for the third, and all of these are

15   greater than the 0.4 value claimed in the patent.

16   Q.    And just to be clear, what we're seeing here in

17   JTX-0106 on page 13, is this testing conducted by Aurobindo?

18   A.    Yes.

19   Q.    And this was testing that Aurobindo is presenting to

20   the FDA in connection with its ANDA document?

21   A.    Yes.

22   Q.    So your results match up with Aurobindo's results; is

23   that correct?

24   A.    Yes.

25   Q.    Now, just taking a step back for further explanation,

1   what is bulk density?

2   A.      Bulk density is the measure of the weight of the

3   material over the apparent volume of the material.

4   Q.      And in the patent, what units are used for expressing

5   bulk density?

6   A.      G/mL.

7   Q.      And in the Aurobindo document that we just looked at

8   at JTX-0106 and the document from your notebook JTX-0063,

9   page 4, what was the -- as your understanding that the units

10  expressed were in g/mL?

11  A.      Yes, that's correct.

12  Q.      And in all of those tests, the claim was met greater

13  than 0.4 g/mL?

14  A.      Yes, it was.

15  Q.      Now, in your binder, do you see the document marked

16  JTX-0057?

17  A.      Yes.

18  Q.      What is this document?

19  A.      This document is USP, version 40.  This covers method

20  <616>, "Bulk Density and Tapped Density of Powders."

21  Q.      Okay.  And did you use this document in connection

22  with your bulk density testing of Aurobindo's product?

23  A.      I did.

24  Q.      And just -- can you just explain to me the steps that

25  you took in terms of testing Aurobindo's product?

DIRECT EXAMINATION - PAMELA SMITH

1    A.    Yes, so the generic steps are to first -- well, we

2    empty the capsules to gather material for testing, you pass

3    it through a filter to make sure that there are no

4    agglomerates present that could bias the results.

5              You introduce this sifted material into the

6    graduated cylinder.  You do it very carefully so that you're

7    not creating any compaction, because this is supposed to be

8    untapped bulk density.  And you typically do that by --

9    you've got your graduated cylinder, you have got a funnel on

10   top, and you're introducing the material in carefully.  And

11   as you're doing that, you're sort of moving the funnel

12   around so that you don't pile everything in one spot.

13   You're trying to level that out.

14             And then there's the step where it says make

15   sure that the level is -- it's -- make sure that it's level.

16   And so we would carefully put a spatula in, and if there was

17   a little pile of powder, maybe gently brush it to the side.

18   The instructions are quite specific about how to do this.

19   And then once you're satisfied that you've carefully

20   introduced this powder and levelled it, then you read the

21   volume.  And then you also have the weight as well that you

22   take.

23             MR. PETERMAN:  If I didn't enter JTX-0057 into

24   evidence, I wish to do so now.

25             MR. KRATZ:  No objection.

DIRECT EXAMINATION - PAMELA SMITH

1          THE COURT:  JTX-0057 is admitted.

2          (Exhibit admitted.)

3     BY MR. PETERMAN:

4     Q.    Now, you used a 25 mL granulated cylinder as part of

5     your testing?

6     A.    I did.

7     Q.    And why did you use that cylinder?

8     A.    That was the largest cylinder we could use based on

9     the amount of material that we had for testing.

10    Q.    And how did you confirm that it was appropriate for

11    use along with the USP <616>, method 1?

12    A.    There were three different sources that allowed --

13    that allowed me to make the decision that this was an

14    appropriate thing to do.  There were prior versions of the

15    USP.  I had a reference book that talked about it being

16    acceptable.  And then we did scientific testing to ensure

17    that it would be an appropriate substitution to make.

18    Q.    And if you look in your binder at JTX-0060, do you

19    see that?

20    A.    I do.

21    Q.    And what is this document?

22    A.    This is the book chapter that I just referenced.

23    Q.    And just for the record, it's titled Particle, Power

24    and Compact Characterization, with the lead author G.E.

25    Amidon?

DIRECT EXAMINATION - PAMELA SMITH

1    A.    That's correct.

2    Q.    And is this the treatise that you relied upon?

3    A.    It is.

4          MR. PETERMAN:  Your Honor, we move JTX-0060 into

5    evidence.

6          MR. KRATZ:  I have no objection.

7          THE COURT:  JTX-0060 is admitted.

8          (Exhibit admitted.)

9    BY MR. PETERMAN:

10   Q.    Now, how did you use JTX-0060?

11   A.    I'd like to turn to section 10.3.1.2, bulk density,

12   please, thank you.

13         So in this section of the chapter, there's

14   reference to the fact that most pharmaceutical powders have

15   densities in the range of 0.1-0.7 g/mL, and a 25 mL

16   graduated cylinder, filled at least 60 percent full, called

17   for a sample mass of 2 to 11 g.  So they reference using a

18   25 mL graduated cylinder here.

19         And then further down in this paragraph it

20   continues, "USP requirements dictate a minimum graduated

21   cylinder size of 25 mL," and then there's a reference.  This

22   is to an older version of USP that specifically mentioned

23   you could use a 25 mL cylinder.  And then they even go so

24   far as to say, "However, if a material is in short supply, a

25   10-mL graduated cylinder may be used."

DIRECT EXAMINATION - PAMELA SMITH

1    So it is common practice that if you don't have

2    enough material to use the 250-mL graduated cylinder that's

3    dictated in version 4 of USP, you have scientific

4    justification to use a different size graduated cylinder.

5    Q.    How many capsules would be required to use -- how

6    many Aurobindo capsules would be required to use a 250-mL

7    cylinder?

8    A.    Probably somewhere between 900 and 1,000 capsules.

9    Q.    And did you have that many capsules to run your test?

10   A.    I did not.

11   Q.    How many capsules did you use with your 25 mL

12   cylinder?

13   A.    I had that noted in the notebook, in the table we had

14   up earlier.  I think the first replicate was done with 92

15   capsules and the second one was done with 89 capsules.

16   Q.    So how did you then confirm that it was appropriate,

17   beyond the documents, to use the 25 mL capsule -- cylinder?

18   A.    Right.  I wanted to make sure that this was

19   scientifically valid and justifiable, and so I conducted

20   testing using a 10-mL, a 25 mL, a 50-mL, a 100-mL and a

21   250-mL on Nuplazid's material and -- to show that I could

22   get the same answer, no matter what size graduated cylinder

23   I used.

24   Q.    And so what degree of confidence do you have that

25   your testing correctly provides the bulk density of

DIRECT EXAMINATION - PAMELA SMITH

1   Aurobindo's product using a 250-mL cylinder?

2   A.      100 percent.

3   Q.      And do your results, again, align with the results of

4   Aurobindo's own testing in its ANDA?

5   A.      They absolutely match, which makes me feel even

6   better that it was an appropriate substitution to make.

7   Q.      So does Aurobindo's product meet the claim elements

8   in Claim Element 4(d) regarding the bulk density?

9   A.      Yes, it does.

10  Q.      So, Dr. Smith, in sum, I'm putting up the four

11  elements again that you identified in Claim 4.  Based on all

12  the testimony you provided today, including, you know, the

13  evidence of Aurobindo's own ANDA, your testing and other

14  testimony, what do you conclude regarding each of these four

15  elements of Claim 4?

16  A.      All four of these elements were met.

17  Q.      Now, just turning on to Claim 5, Claim 5 is the

18  pharmaceutically acceptable capsule of Claim 4, wherein the

19  capsule shell is a hard shell size 4 capsule; is that

20  correct?

21  A.      That's correct.

22  Q.      What's your understanding of this claim?

23  A.      That it is dictating that the size 4 capsule is hard.

24  Q.      Can you just explain the difference between a hard

25  capsule and a capsule that is a different type of capsule?

DIRECT EXAMINATION - PAMELA SMITH

1    A.    Sure, there's also a soft capsule, think of a gel

2    cap.

3    Q.    And does Claim 5 depend on Claim 4?

4    A.    It does.

5    Q.    So with respect to its dependency on Claim 4, do you

6    express the same opinions for infringement on Claim 5 that

7    you did with Claim 4?

8    A.    Yes.

9    Q.    And with respect to the added limitation in Claim 5,

10   how did you determine that Aurobindo's product is a hard

11   shell size 4 capsule?

12   A.    That size is listed in their ANDA applications.  And

13   also, I handled the capsules; I can tell you that they're

14   hard.

15   Q.    And I'd like to direct your attention to

16   JTX-0105-AURO-0010.  What is this document?

17   A.    This is a section from Capsugel, which provided the

18   capsules to Aurobindo.  And we see down here at the bottom

19   it says "Subject:  Empty hard capsule."

20   Q.    So this document helps confirm that Aurobindo has a

21   hard capsule?

22   A.    Yes.

23   Q.    Now, are there any other documents that help support

24   your opinion that Aurobindo has a size 4 hard capsule?

25   A.    Yes.

DIRECT EXAMINATION - PAMELA SMITH

1          MR. PETERMAN:  Mr. Campos, would you please

2   bring up JTX-0105-AURO, page 3.

3               (Court reporter clarification.)

4          MR. PETERMAN:  0105-AURO, page 3.

5   BY MR. PETERMAN:

6   Q.     Dr. Smith, what is reflected here?

7   A.     We have listed here under -- or in the row size, it's

8   identified as size 4.  And then it's got images of the

9   capsules down below.  I recognize those as hard capsules.  I

10  recognize those as being the capsules that I received.  You

11  know, I can tell from this capsule it's meant to be

12  separated, you can twist the two caps apart.  This is what a

13  hard capsule looks like.

14  Q.     So, Dr. Smith, what is, then, your conclusion with

15  respect to Aurobindo's infringement of Claim 5?

16  A.     That infringement is met.

17  Q.     So I'd like to just go back briefly to the definition

18  of granules in the patent, "...primary powder particles are

19  made to adhere to form larger, multiparticle entities called

20  granules."

21          Does your testing show that there were primary

22  powder particles made to adhere to form larger,

23  multiparticle entities called granules?

24  A.     Yes, it did.

25  Q.     And do Aurobindo's documents also show that there

DIRECT EXAMINATION - PAMELA SMITH

1    were primary powder particles made to adhere to form larger,

2    multiparticle entities called granules?

3    A.       Yes.

4    Q.       So, Dr. Smith, in conclusion, is it your opinion that

5    Aurobindo's product infringes Claim 4 and 5 for all the

6    reasons you testified about today?

7    A.       Yes, it is.

8    Q.       I thank you for your time.

9                 MR. PETERMAN:  I pass the witness.

10                THE COURT:  All right.  Let's take the morning

11   break at this time, give the court reporter, the witness a

12   break before we get into cross-examination.  We'll take a

13   15-minute break.

14                (Break taken.)

15                THE COURT:  All right.  You may be seated.

16   Before you start, Mr. Peterman, do you have a copy of the

17   demonstratives for Ms. Smith?

18                MR. PETERMAN:  The ones that were just projected

19   from the hot seat?

20                THE COURT:  Yes.

21                MR. PETERMAN:  We can get those printed off.

22   Because we had the deck that was the slides from the

23   PowerPoint, and then there were call ups that Mr. Campos was

24   doing.  But we'll get a copy printed and get them to counsel

25   and the Court.

CROSS-EXAMINATION - PAMELA SMITH

1          THE COURT:  All right.

2                      CROSS-EXAMINATION

3     BY MR. KRATZ:

4     Q.    I was going to say good morning, Dr. Smith, but I

5     think we've just barely passed it, so good afternoon.

6     A.    Good afternoon.

7     Q.    I don't believe we've met.  I'm Tim Kratz, I

8     represent Aurobindo.

9     A.    Nice to meet you.

10    Q.    Nice to meet you.

11          You still have your notebook in front of you

12    that Mr. Peterman gave you, the direct examination notebook?

13    A.    Yes, I do.

14    Q.    We're going to work primarily from that.

15    A.    Okay.

16    Q.    So if you keep it in front of you, that's great.

17    We're going to turn, in fact, to JTX-0009, the patent, it's

18    towards the front.

19    A.    Okay.

20    Q.    And then on -- so it's that page, the same one,

21    column 4, page 15.  It's where granulation is defined.

22              Down.  There it is.

23              So this -- you recall looking at this in direct

24    examination, correct?

25    A.    Yes.

CROSS-EXAMINATION - PAMELA SMITH

1    Q.      And if I understand it, the specification says that

2    the granulation is a process in which primary powder

3    particles are made to adhere to form larger multiparticle

4    entities called granules, and you and counsel for Acadia

5    went over that on direct, right?

6    A.      Yes.

7    Q.      Is it your testimony that all of the pimavanserin in

8    Aurobindo's pills are -- have been formed into larger

9    multiparticle entities or is it just some of them and

10   there's still primary powder particles in Aurobindo's

11   capsule?

12   A.      I never saw the API not associated in a granule.

13   Q.      So you sifted the contents of Aurobindo's pill,

14   correct?

15   A.      That's correct.

16   Q.      So let's look at that.  JTX-0062 is your notebook.

17   And the second page in has -- one more page -- a table and

18   if I understand it correctly, the contents of Aurobindo's

19   pill was 1-8 sieves of -- of increasingly smaller meshes,

20   correct?

21   A.      That's correct.

22   Q.      Okay.

23   A.      The capsule, then towards the top of the stack of

24   sieves and passed through eight sieves.

25   Q.      And increasingly smaller as it got lower?

CROSS-EXAMINATION - PAMELA SMITH

1    A.    That's correct.

2    Q.    Okay.  And so on the right-hand column of this table

3    is the fraction retained by each of those sieves and then a

4    fraction that went into a collection pan to come up with the

5    total weight as a percentage of the starting contents of the

6    pill; is that a fair way of characterizing the right-hand

7    column of your notebook?

8    A.    Yes.

9    Q.    And so if I understand it correctly, the contents of

10   Aurobindo's pill had a wide variety of sizes that was caught

11   on these increasingly smaller meshes.  So 12 percent got

12   caught by the biggest one and then a little bit more and a

13   little bit more and then it seems like a lot maybe on the

14   size sieve 6 and 7 and there's still stuff that went on in

15   down into the collection pan; that's how you can look at

16   this, correct?

17   A.    That's correct.

18   Q.    And so now my question is:  Going back to the

19   specification that talks about granules being a larger

20   multiparticle entity called granules, are you suggesting

21   that the entirety of Aurobindo's pill is a larger

22   multiparticle entity as opposed to some of it being primary

23   powder particles?

24   A.    Everything that I saw were primary powder particles

25   adhering together, whether I was looking at sieve fraction

CROSS-EXAMINATION - PAMELA SMITH

1   one or the collection pan.

2   Q.      Well, we know what you're looking at because your

3   pictures has -- every single one of your pictures has a

4   designation as to where it came from out of those sieves,

5   correct?

6   A.      That's correct.

7   Q.      So, for example, the big one, that's the -- two more

8   pages in -- that you measured -- can we go two more pages?

9           Now two, one more.  There, there.

10          1-1 at the end of it -- in fact, 12-38-1-1-1,

11  that came from the first pan, so 12 percent were big enough

12  to be caught by the big pan or the big mesh, and that's what

13  that one looked like, correct?

14  A.      I technically see 10 percent of the weight was

15  retained on sieve fraction one and there's an example of

16  what those would have looked like.

17  Q.      Well, yeah, if you went by a percentage of --

18  A.      Mm-hmm.

19  Q.      -- unit, it would be even smaller, right, but weight

20  is a good way of doing this, right?

21  A.      Mm-hmm, yes.

22  Q.      Okay.  I just wanted to make sure I wasn't missing

23  something.

24          So, and then later, you have the pictures with

25  the cool colors and the light fractions and things, and that

CROSS-EXAMINATION - PAMELA SMITH

1    came from whatever that came from.  So typically the fourth

2    pan, sometimes the fifth or sixth, right?

3    A.    Right, and in sieve fraction seven as well.

4    Q.    Okay.  And, in fact, we know for sure that

5    12.4 percent by weight of the pill just scooted all the way

6    through to -- no matter what the mesh was, it went to the

7    bottom, that's reflected in your data, correct?

8    A.    That's correct.

9    Q.    And there's probably 10.52 percent, we don't even

10   know what happened to that at all, because the total weight

11   as a percentage of the starting weight that was weighed out

12   in either a sieve or a collection pan is 89.48 percent, so

13   10.52 percent just didn't get measured at all?

14   A.    Okay.

15   Q.    Correct?

16   A.    Okay.

17   Q.    Okay.  And yet -- so we don't know how many of the --

18   what the percentage of the whole of the pill is -- actually

19   looks like a granule as opposed to, you're just assuming now

20   that the whole thing is, correct?

21   A.    I think that's a fair assumption because based on

22   every image that I looked at, every image that I captured,

23   everything I saw through the microscope, I consistently saw

24   the same thing over and over and over again.

25   Q.    Why is that fair, though?  I mean, I hear what you're

CROSS-EXAMINATION - PAMELA SMITH

1    saying, but how is that fair when you've got clearly

2    multiple sizes of these things, a patent specification that

3    says it's the larger ones that are granules, how is it fair

4    that everything now that comes through these sieves has to

5    be a granule?

6    A.    I don't agree that the larger things are granules.

7    Q.    But that's what the patent spec says?

8    A.    I disagree with that wording.  I think of that

9    wording as, the individual particles are smaller and when

10   you pull multiples of them together, then that is larger

11   than the individual particles.  That's how I define the term

12   "larger."

13   Q.    And that's how they get caught by the sieve because

14   they're larger?

15   A.    And you have multiple different sizes of granules

16   throughout here.  On every single sieve, we collected

17   granules and those granules are varying different sizes,

18   depending on how many different multiparticle entities were

19   made to come together to form that specific granule.

20   Q.    Okay.  So there's -- I'm going to change the subject

21   now.

22              There's nothing in -- well -- okay.

23              There's nothing from your light microscopy that

24   analyzes the surface -- that analyzes the bonds between the

25   particles; it just shows the surface, correct?

CROSS-EXAMINATION - PAMELA SMITH

1   A.      No, it shows -- it's not just the surface.  Stereo

2   microscopy looks at just the surface, but polarized

3   microscopy looks through the particles.

4   Q.      Okay.  But none of it tells you anything about how --

5   why they're adhering?

6   A.      It's not a chemical test, no.

7   Q.      And so the part in the specification that talks about

8   mechanical bonding, you're just disregarding that as

9   relevant to your analysis, correct?

10  A.      It doesn't matter to me how the multiparticle agents

11  are made to adhere together.  What matters is that they are

12  adhering together and they were rigorous enough to withstand

13  my sample preparation technique in order to still be a

14  granule.

15  Q.      Okay.  You agree that in talking about clumping, that

16  clumping is undesired, unintended agglomeration, whereas

17  granulation is purposeful agglomeration, correct?

18  A.      Well, we go back to what we are talking about at that

19  part of my deposition; that was towards the very end.  And

20  if recollection -- I don't have my deposition right in front

21  of me -- but recollection was that there was a comment made

22  about clumping, and I made a comment that clumping is

23  considered to be an undesirable property.

24          And I was talking about purposeful versus

25  accidental in that context, meaning, you know, comparing an

CROSS-EXAMINATION - PAMELA SMITH

1   accidental clumping to something that was intentional, but

2   that's not meant to be all-inclusive.

3           You can have granules whether you intended to

4   make them or you accidentally made them.

5   Q.    Do you disagree that your testimony that we're

6   talking about, the sentence that "clumping is undesired,

7   unintended agglomeration, whereas, granulation is purposeful

8   agglomeration"?

9   A.    Oh.  I'm not denying I said those words.  I'm saying,

10  in the context, I was comparing two different situations and

11  that's not meant to be all-inclusive.

12  Q.    So taking the sentence at face value, it sounds like

13  there's some agglomeration that is not -- you would not

14  consider to be granules because you're saying there's --

15  there's clumping, which is unintended agglomeration and

16  there's granulation, which is purposeful agglomeration, that

17  implies that not all agglomeration is granules, correct?

18  A.    Probably it would be better if we went back and we

19  looked at that whole section of the deposition so that we

20  can talk about it -- this in context of the conversation we

21  were having.

22  Q.    We can, but I just want to know, do you agree with me

23  that agglomeration doesn't necessarily mean it's a

24  granulation?

25  A.    I'd rather go back and look at the words because this

CROSS-EXAMINATION - PAMELA SMITH

1  is important.

2  Q.     It is important.  My question is naked of the

3  deposition, sitting here right now, do you agree that not

4  all agglomeration is granulation or do you disagree with

5  that statement?

6  A.     I think it depends on the situation.  Let's look back

7  at the words I said and let's talk about that.

8  Q.     Dr. Smith, I'm asking you right now, sitting here as

9  a scientist that has some experience in this industry, do

10  you consider all agglomeration to be granulation?  Do you

11  conflate those terms?

12  A.     Well, there's soft agglomerations; there are hard

13  agglomerations; there are granules.  What I'm testifying

14  about in sitting here is talking about the way that this

15  Court defined a granule, and that's what I'm using in my

16  discussions and in my examination of Aurobindo's material.

17  Q.     Okay.

18  A.     If that --

19  Q.     Let's look at that court construction, then.  It's

20  down there at the bottom.  That's what I care about.

21          So "granules comprising 40 mg pimavanserin

22  tartrate," this is what the Court said:  "Plain and ordinary

23  meaning" -- we can all debate that -- "the scope of the term

24  granule includes granules granulated with pimavanserin and

25  excipients."

CROSS-EXAMINATION - PAMELA SMITH

1              Do you agree that that implies that granules

2     have to be granulated to be granules, or are you applying a

3     different definition?

4     A.     No, I think this is clear, a "granule includes,"

5     meaning that's part of it, "granules" that are "granulated

6     with pimavanserin and excipients."

7              So whether it's -- you know, how the granules

8     are made, I don't think is important.  It's the fact that

9     the granules may include pimavanserin and excipients.

10    Q.     You agree that Aurobindo's process is dry mixing and

11    sifting, correct?

12    A.     Yes.

13    Q.     Okay.  Was humidity controlled in your experiments?

14    A.     I'm sorry?

15    Q.     That -- where you -- where you did your sifting and

16    pulled out the big pieces?  Are you controlling humidity?  I

17    don't see it reflected in this -- in your lab notebook.

18    A.     Let me go back to that lab notebook to see if I can

19    point -- point out anything.

20             All right.  I don't see on -- I'm looking -- to

21    be specific, I'm looking in Exhibit JTX-006 --

22             (Court reporter clarification.)

23             THE WITNESS:  Yes, and I'm looking at page 2

24    that described the sieving.  You were asking about the

25    sieving particularly; is that correct, sir?

CROSS-EXAMINATION - PAMELA SMITH

1    BY MR. KRATZ:

2    Q.      Yeah, at some point you opened the pill --

3    A.      Okay.

4    Q.      -- and poured out the contents --

5    A.      Okay.

6    Q.      -- and the question is humidity at that moment.

7    A.      Right, and there's no humidity reading noted on this

8    notebook page.

9    Q.      Okay.  So in the image you provided on the

10   microcrystalline cellulose that was shown -- it had the real

11   gold leaf-looking things -- as a control, that was

12   Avicel PH1112 microcrystalline cellulose, correct?  And

13   I'm -- if you have it in front of you, please look --

14   A.      I think it's 112, not 1112.  But, yes, it's -- it's

15   an Avicel microcrystalline cellulose sample, yes.

16   Q.      Okay.  And Aurobindo's product is -- there actually

17   is two different grades of microcrystalline cellulose, and

18   it's manufactured by Cellucress.  They have the PH112 and

19   the Cellucress PH113, correct?

20   A.      Right, and they are both microcrystalline cellulose.

21   They just differ in their particle size ranges.

22   Q.      Okay.  In this experiment, in addition to the sieves

23   that are grading smaller as you keep going, you're -- you're

24   shaking them, correct?

25   A.      That's correct.

CROSS-EXAMINATION - PAMELA SMITH

1   Q.     And you're shaking them for a minute.  Is it a minute

2   each layer, or is it the whole thing gets shaken?

3   A.     The stack of sieves is shaken for a minute.

4   Q.     So the whole thing?

5   A.     Yes.

6   Q.     And it's shaken for a minute?

7   A.     Yes.

8   Q.     Okay.  And it's shaken at a very fast shakes per

9   minute -- per minute, correct, like 2,000?

10  A.     2,000 vibrations per minute.

11  Q.     "Vibrations," that's the right word.

12  A.     Mm-hmm.

13  Q.     Did you record the magnitude of the shake or just the

14  speed?

15  A.     No, that's the -- that's the definition of it, yes.

16  It's just the speed.

17  Q.     Speed?

18  A.     Yes.

19  Q.     Magnitude would tell you how much power is being

20  exerted on the -- or forces are being exerted on the

21  contents, and speed wouldn't tell you that at all?

22  A.     There is -- this was a Dual-branded sieve shaker, and

23  I believe there is -- I can't remember if I had it in my

24  report or not, maybe not since you're not bringing it up --

25  but there may be more information about the power, but I

CROSS-EXAMINATION - PAMELA SMITH

1    don't recall it off the top of my head.

2    Q.    All right.  Now, today, you're calling the master

3    formula card, the unsigned one, a draft.  You didn't call it

4    a draft in your report, though, did you?

5    A.    I don't recall, but perhaps not.

6    Q.    And you didn't even have in your materials considered

7    the master formula card that was signed, correct?

8    A.    I don't recall.

9    Q.    Okay.  And you didn't look at the batch records at

10    all in Aurobindo's ANDA; you just looked at the -- what

11    you're calling now a draft master formula card and the

12    Pharmaceutical Development Report, correct?

13    A.    That's -- those were the excerpts I decided to

14    include in my report.

15    Q.    Got it.

16        And did you measure the bulk density of the

17    larger pieces of -- that you recovered in these sieves, or

18    was that just impossible to do because you'd need much more

19    material?

20    A.    Oh, I think there's a little confusion here.  The

21    bulk density was done on the contents from the inside of

22    92 capsules.  These weren't sieved prior to bulk density.

23    Those are two separate tests.

24    Q.    Right.  So you didn't pick out the bigger pieces and

25    do the bulk density of those pieces, correct?

CROSS-EXAMINATION - PAMELA SMITH

1   A.     I'm sorry.  What do you mean by "bigger pieces"?

2   Q.     The ones that would have been caught by a sieve.  You

3   didn't do a sieve, so --

4   A.     Oh, we did a sieve.  The very first step of the bulk

5   density is a single sieve --

6   Q.     Yeah.

7   A.     -- that -- <616> dictates that you use that in order

8   to break up any agglomerates.  You're supposed to help

9   encourage things to go through the sieve to make sure that

10  there aren't clumps that could bias things.  So we did a

11  single sieve, but there was no shaking or anything like

12  that.

13  Q.     So my question's a little bit more nuanced than that.

14  A.     Okay.

15  Q.     So say the Court were to find that you're really only

16  going to get credit for part of Aurobindo's pill as being

17  granulated.  Something got caught maybe by the seventh

18  sieve, but not the stuff that goes all the way through or

19  not the stuff you can't account for at all.

20         My question is:  So the stuff that -- in the

21  hypothetical, the part of the pill that might be granulated,

22  did you -- you didn't do anything to test, at the different

23  levels of the sizes passing through that sieve, the bulk

24  density of that material?

25  A.     No, because the definition of "bulk density" is the

CROSS-EXAMINATION - PAMELA SMITH

1  entire capsule contents.

2  Q.      That's the, that's the -- let's look at the claim.

3  So we're back on that patent.  Let's go to Claim 4.  A

4  little bit more cut -- you cut me off.  Whoops.  There you

5  go.

6              "...and wherein the bulk density of the

7  granules..." not the full pill.

8              So if the Court were to find that -- even

9  accepting your testimony that these things that are

10 conglomerated are granules, but not the entirety of the

11 contents of the Aurobindo pill, you wouldn't be able to

12 establish that claim limitation based on the testing you

13 did, correct?

14 A.      I can actually provide you a little bit more

15 information here because I did an analysis that I haven't

16 talked about, and that is that I wanted to error-proof this

17 calculation.  And so there was an extra-granular component

18 called magnesium stearate that was present at 0.5 percent,

19 and if I take that 0.5 percent as not being part of the

20 granules, the granules still infringe and are at 0.4 g/mL or

21 greater.

22 Q.      But if half of the pimavanserin doesn't even qualify

23 as being granulated, you don't have a test for that?

24 A.      Oh, there was much more than half granulated, as I

25 mentioned.  Every -- every API particle I saw was in a

CROSS-EXAMINATION - PAMELA SMITH

1    granule.

2    Q.      All right.  But the ones that you saw were the ones

3    caught by the sieves, so I'm just saying -- as a

4    hypothetical --

5    A.      Well --

6    Q.      -- and maybe --

7    A.      -- actually, I looked at the collection pan; I just

8    didn't collect any images of it.  I looked at every single

9    sieve.  I looked at every single thing that passed --

10   Q.      All right.

11   A.      -- through those sieves and then -- that was in the

12   capsule.

13   Q.      In any event, there's no test for a part of the pill.

14   It's -- you took the whole thing -- in fact, you took not

15   just the whole thing, but you added like 80 of them or

16   100 -- 90?  Something -- I can't remember.

17   A.      That was the amount required --

18   Q.      Yeah.

19   A.      -- to fill 60 percent of the graduated cylinder.

20   Q.      Got it.  Yeah.  That's what I -- I thought.  I

21   thought that was right.  All right.

22           MR. KRATZ:  I believe that's all I have, but let

23   me... if I can just take a minute.

24           THE WITNESS:  Sure.

25           MR. KRATZ:  That was all the questions I have.

REDIRECT-EXAMINATION - PAMELA SMITH

1    Thank you.

2               THE WITNESS:  All right.  Thank you.

3               MR. KRATZ:  Thank you.

4                    REDIRECT EXAMINATION

5    BY MR. PETERMAN:

6    Q.    Dr. Smith, just a couple of questions on redirect.

7    A.    Sure.

8    Q.    Did anything regarding your sample prep create

9    granules in Aurobindo's product?

10   A.    No.

11   Q.    And is it your testimony that of everything you saw,

12   including in the collection pan, you saw pimavanserin in

13   granular form?

14   A.    Yes.

15              MR. PETERMAN:  Thank you.

16              THE COURT:  Dr. Smith, a couple of questions.

17   Would a person of ordinary skill in the art equate dry

18   mixing and sifting to a dry granulation process?

19              THE WITNESS:  I'd say it could be a type if it

20   makes a granule.  I think when people think about dry

21   granulation process, what's most commonly talked about are

22   the ones with some high pressure involved.  I'm not sure how

23   common those -- those would have been in 2017.

24              THE COURT:  The document that is -- so I know we

25   have the three unsigned master formulation cards, but we

REDIRECT-EXAMINATION - PAMELA SMITH

1   also have JTX-0125.

2           THE WITNESS:  0125, yes, sir.

3           THE COURT:  Was that submitted to the FDA?

4           THE WITNESS:  It was, yes.

5           Your Honor, I remember something to your

6   previous question, if I may go back a moment?

7           THE COURT:  Yes.

8           THE WITNESS:  You asked me if a POSA would

9   understand that the dry mixing of ingredients might make a

10  granule.  I want to point out that in the documents we see

11  mentioned that the API is cohesive and that the reason that

12  they want to sift it with the excipients is to break up that

13  cohesive API and break up agglomerates.  And so I don't

14  think it's illogical, then, to assume if the API is cohesive

15  to itself, it could be cohesive to other things like the

16  microcrystalline cellulose, and that's what we saw.  So I

17  don't know if that's helpful to you or not.

18          The fact that the API is cohesive might

19  influence a POSA's opinion during those steps, if that

20  helps.

21          THE COURT:  How would you determine what

22  percentage of the tablets are granular?  Is there a test to

23  do that?

24          THE WITNESS:  What percentage of it, a

25  quantitative test?

REDIRECT-EXAMINATION - PAMELA SMITH

1          THE COURT:  Yes, in follow-up to Mr. Kratz's

2     questions, he was asking did you do any testing to determine

3     what percentage of the capsules were granular.

4          THE WITNESS:  I did not --

5          THE COURT:  You said that every image you saw

6     was granular, so you believe it's a reasonable assumption to

7     believe that the entirety of the capsule is granular.  But

8     is there a test to confirm that?

9          THE WITNESS:  I'm not aware of a quantitative

10    test in order to say that every single -- every single solid

11    that came out of that capsule was a granule, which is why we

12    looked at every -- every sample.  And it would have been

13    impractical to have all of the images in, so we had some.

14    So I have a qualitative answer that implies a quantitative

15    result, if that's helpful.

16          THE COURT:  All right.  Thank you.

17          THE WITNESS:  Thank you.

18          MR. PETERMAN:  May the witness be released, Your

19    Honor?

20          THE COURT:  I'm sorry?

21          MR. PETERMAN:  May the witness be released?

22          THE COURT:  Yes.

23          THE WITNESS:  Thank you.

24          MR. PETERMAN:  My team informed me that

25    Dr. Smith's demonstratives, the pictures, are in the

REDIRECT-EXAMINATION - PAMELA SMITH

1    front --

2              THE COURT:  Are in the front.

3              MR. PETERMAN:  -- are in the front tab of the

4    notebook --

5              THE COURT:  All right.

6              MR. PETERMAN:  -- and I believe that covers

7    everything that Dr. Smith showed.

8              With Dr. Smith coming off the stand, Plaintiffs

9    rest their case on infringement.

10             THE COURT:  Okay.

11             MR. PETERMAN:  And I understand that Aurobindo

12   has a reply case to us on infringement.

13             THE COURT:  Okay.  All right.

14             MR. KRATZ:  Your Honor, before we do that, if

15   necessary, we have a deposition to play, and then we also

16   have an expert in rebuttal, but under Rule 50, we want to

17   move for judgment as a matter of law at this point.

18             I don't think they've met their burden even at

19   this stage to establish that we have granules in our

20   product.  At best, there's maybe some percentage, if all of

21   her testimony is credited as being these things are

22   granules, but to get to the 34 mgs of pimavanserin tartrate,

23   or the 40 mgs of pimavanserin, it has to all be granuled,

24   and it hasn't been established as a matter of law even from

25   her testimony.  The best of her testimony doesn't establish

1    that that's existing in our product.  It's some percentage

2    at best, and as a result of that, the claim limitation which

3    is found in all the asserted claims against us of 40 mgs of

4    pimavanserin tartrate can't be established as a matter of

5    law.  And so that's the basis for it.

6              We further move on the idea that there is no --

7    there has to be an intentional step, and a dry blending

8    process is not the same as even a dry granulation.  And so,

9    because of the fact that the -- Aurobindo does not have the

10   granulation step in its process, it's a different process

11   entirely, then the entire thing is not established as

12   being -- creating granules, because that level of intention

13   is required both under Your Honor's claim construction, as

14   well as the POSA's understanding that it can't just be these

15   things connecting to each other; it has to be intentionally

16   done.

17             And there's insufficient evidence at this point

18   in their case to establish that, which means there's two

19   reasons why we have a -- we're moving for judgment as a

20   matter of law at this time.

21             THE COURT:  All right.  Mr. Peterman?

22             MR. PETERMAN:  Your Honor, we obviously

23   disagree.  Dr. Smith began talking about documents that are

24   in Aurobindo's ANDA, and its representations to the FDA that

25   its product contained granules.  There's no mention of any

 1    of the pimavanserin being outside of -- outside of the

 2    granules.  So Aurobindo's own documents establish that there

 3    is 40 mg of granules within Aurobindo's products.

 4              Moreover, Dr. Smith testified, too, that she did

 5    a thorough analysis.  She, you know, did -- called --

 6    special -- scopic PLM analysis and also, you know, testified

 7    that she, you know, looked at the collection pan, and she

 8    didn't see any evidence of pimavanserin being outside the

 9    granule.

10              So all of the pimavanserin that, you know, she's

11    seen, that she's aware of, and consistently through each pan

12    she didn't see any individual particles of pimavanserin, all

13    of that is within granule.  So we believe that Dr. Smith has

14    done, you know, more to -- you know, than establish her

15    burden with respect to 40 mg of pimavanserin between her

16    testing and the documents.

17              This idea of an intentional step, you know, is

18    not something that I think, you know, is within the Court's

19    claim construction; it's certainly not within the definition

20    of granules that is in the specification, which just

21    requires, you know, individual particles, you know, made to

22    adhere to one another.  That's certainly the case here.

23              Moreover, even if there is an intentional step,

24    Aurobindo's own documents repeatedly refer to the product as

25    granules, and so Aurobindo knew, whether intentionally or

1  unintentionally, that, you know, they were creating a

2  product that had granules.

3          I'm not aware of, you know, claims or this idea

4  of patent infringement, unintentional patent infringement.

5  It would be, I think, opening up, you know, new doors to say

6  that although a product meets a claim, just because the

7  company didn't intend to do it, you know, gives them a free

8  pass with respect to that.

9          So we respectfully, you know, ask for, you know,

10 denial of, you know, JMOL at this time.  And, of course, if

11 the Court wants briefing on this issue once all the evidence

12 is in, you know, we will certainly -- certainly do that.

13          THE COURT:  All right.  At this time the Court

14 is going to deny the motion for judgment as a matter of law.

15          With respect to the infringement claims, giving

16 Acadia the benefit of all reasonable inferences as the

17 nonmoving party, the Court is -- does not find that it has

18 not met its burden.  Dr. Smith testified with respect to the

19 presence of granules in the ANDA product, both through the

20 admissions of a party opponent, Acadia, and its -- I'm

21 sorry, Aurobindo and its own documents, as well as through

22 the independent testing that she performed.

23          With respect to the issue of does a granule need

24 to include the intentional process of granulation, I think

25 the Court's construction says includes, you know, includes,

DEPOSITION TRANSCRIPT - SARAVANAN KANNUSAMY

1    but it's not limited to only that.

2              So for those reasons, there's been testimony

3    about granules being formed -- being present in Aurobindo's

4    ANDA product, how those granules are formed is not really

5    relevant; it's about whether there's a granule or not.

6              So for those reasons, I'm going -- the Court is

7    going to deny the Rule 50 motion at this time.

8              All right.  So what's next?

9              MR. KRATZ:  Your Honor, we have the testimony of

10   Saravanan Kannusamy by deposition.  We did this a little

11   differently.  This is actually a trial deposition *de bene*

12   *esse*, so we give direct examination and then there is a

13   cross-examination.  We've got the designations.  Once these

14   objections got figured out, we've got everything ready to

15   go.  And so we can play it.  It's the four or five exhibits

16   that get admitted under that that we can do after that.

17             MR. PETERMAN:  Your Honor's intentions with

18   respect to -- I think the video is about an hour long.

19             Yeah, so I just wanted to see Your Honor's

20   intentions with respect to --

21             THE COURT:  It's an hour long?  So we can go

22   for -- we'll go until one o'clock and then we'll break for

23   lunch and we'll finish it when we come back.

24             MR. PETERMAN:  Thank you, Your Honor.

25             MR. KRATZ:  So we call Saravanan Kannusamy to

DEPOSITION TRANSCRIPT - SARAVANAN KANNUSAMY

1    the stand by video.

2                    (Video deposition was played.)

3                    (Oath stipulation read and agreed by counsel and

4    witness.)

5    BY MR. HOGAN:

6    Q.    Okay.  Good evening, Mr. Kannusamy.  I know it's late

7    where you are, and it's evening time.  Good morning to

8    everyone here in the United States.

9                    Would you please state your full name and where

10   you reside, for the record?

11   A.    I'm Saravanan Kannusamy.  I'm living in Hyderabad,

12   India.

13   Q.    Who do you work for?

14   A.    I'm working with Aurobindo Pharma Limited.

15   Q.    What is your position there?

16   A.    I'm working as as I don't say associate vice

17   president in formulation, R&D center.

18   Q.    And how long have you been working at Aurobindo?

19   A.    Yeah.  It's about 11 plus years I've been with

20   Aurobindo Pharma Limited.

21   Q.    Okay.  Were you involved with the Aurobindo

22   pimavanserin ANDA product?

23   A.    I involved a senior team leader in the development of

24   pimavanserin capsule formulation development.

25   Q.    What did your work involve in working on the

DEPOSITION TRANSCRIPT - SARAVANAN KANNUSAMY

1   Aurobindo pimavanserin product?

2   A.      It's primarily involved in the development of,

3   formulation development of pimavanserin capsules.

4   Q.      Okay.  And can you tell me what -- what else were you

5   involved with besides formulation in the pimavanserin

6   product?

7   A.      My team members, C. Prabilakaran, Rakesh Sarkar.

8   Ms. Priyanka.

9   Q.      What kind of work did you do in the Aurobindo

10  pimavanserin ANDA product?

11  A.      Well, development work involves evaluation of R&D

12  product, evaluation of the AP characteristics and selection

13  of excipients, and selection of manufacturing process and

14  its -- and compilation of the -- all the legal reports.

15  Q.      Can you repeat that answer, more slowly, please?

16  A.      Sure.  The development works -- involves the

17  characterization of R&D product, the evaluation of the --

18  the AP characteristics, selection of suitable excipients and

19  its grids, and selection of the manufacturing process,

20  evaluation of any legal reports during the development of

21  pimavanserin capsules.

22  Q.      What kind of process is used to make the Aurobindo

23  pimavanserin ANDA product?

24  A.      We selected dry blending process for the development

25  of pimavanserin capsules.

DEPOSITION TRANSCRIPT - SARAVANAN KANNUSAMY

1   Q.    Does manufacture of the Aurobindo pimavanserin ANDA

2   product involve a granulation step to make the product?

3   A.    It is a dry blending process.  No granulation step

4   was involved.

5   Q.    Can I please have DTX-320 on the screen.

6         Okay.  Mr. Kannusamy, do you recognize this

7   document, DTX-320?

8   A.    Yes.

9   Q.    What -- what is this document?

10  A.    I could recognize this document.  It is a part of

11  India dossier.  It describes about formulation process and

12  its manufacturing controls on the pimavanserin capsules, 34

13  mg.

14  Q.    What does this document show?

15  A.    This document describes about pimavanserin capsules

16  manufacturing process, flowchart, equipment, whatever

17  increments we have used, and its manufacturing controls.

18  Q.    Okay.  Can you turn to pages DTX-320, pages 004 to

19  005.  Looking at those two pages, DTX-320, 004 to 005, what

20  is shown there?

21  A.    Page 4 and 5 describes about manufacturing process of

22  pimavanserin capsules, 34 mg.

23  Q.    What kind of manufacturing process is described

24  there?

25  A.    It's a dry blending process.

DEPOSITION TRANSCRIPT - SARAVANAN KANNUSAMY

1   Q.    Are the steps shown there the actual steps used to

2   manufacture the product?

3   A.    Yes.

4   Q.    Where in those steps does it describe a granulation

5   step?

6   A.    It describes a dry blending process, no granulation

7   step was involved.

8   Q.    Can I have DTX-347, please.

9         Do you recognize this document, DTX-347?

10  A.    Yes.

11  Q.    What is this document?

12  A.    It is a master formula card of pimavanserin capsules,

13  34 mg.

14  Q.    What does this document, DTX-347, show?

15  A.    It describes about label claim, packaging components,

16  precautions, manufacturing, formula, environmental condition

17  during the manufacturing, manufacturing process, and

18  packaging.

19  Q.    If you can turn to the pages DTX-347, 003 to 005.  On

20  those pages, what kind of manufacturing process is described

21  there?

22  A.    The described process is dry blending process.

23  Q.    Where on this master formula card is it mentioned

24  granulation or granules?

25  A.    The described process is dry blending process, no

DEPOSITION TRANSCRIPT - SARAVANAN KANNUSAMY

1   granulation step was involved.

2   Q.      What is the date of this document?

3   A.      June 26, 2019.

4   Q.      If you can go to the very first page, page 0001.

5   A.      Sure.

6   Q.      Okay.   Toward -- towards the bottom -- I'm sorry,

7   strike that.

8          Towards the top -- I'm sorry -- in the box at

9   the top, there is a middle row which starts at MFC number,

10  and then below that it ends in 00.   And then two boxes below

11  that it reads: "Supercedes NIL."

12          What does that mean?

13  A.      It is a version of finished product of pimavanserin

14  capsules.

15  Q.      So go down to the bottom of this page, right there.

16  Across the bottom, there's another box with three names,

17  signatures and dates.

18          Can you tell me if one of those signatures is

19  yours?

20  A.      Yes.

21  Q.      And one of those signatures is yours; is that right?

22  A.      Yes, correct.

23  Q.      Can I have DTX-348, please.   So up on the screen is

24  DTX-348.   Do you recognize this document?

25  A.      Yes.

DEPOSITION TRANSCRIPT - SARAVANAN KANNUSAMY

1    Q.    What is this document?

2    A.    It's a master formula card of pimavanserin capsules,

3    34 mg.

4    Q.    How is this master formula card different from the

5    one we just looked at, at DTX-347?

6    A.    01 version is here, superceded with 00 with minor

7    changes.

8    Q.    Let's try it this way.  At the top of DTX-3 -- 348,

9    the box I'm looking at on page 0001, the middle row, there

10   is -- it starts out MFC number and below, there's some

11   numbers below that that ends in 01.  And then two boxes

12   down, it reads, "Supercedes Number 00."

13             What does that mean?

14   A.    It is version -- 01 version is here.  The device

15   version with the minor changes.

16   Q.    What does this document show?

17   A.    This document describes about label claim, packaging

18   information, storage condition, precaution, manufacturing

19   formula in normal condition during the manufacturing,

20   manufacturing process and packaging of pimavanserin

21   capsules.

22             MR. HOGAN:  If you can go to the pages ending in

23   0003 to 0005.

24   BY MR. HOGAN:

25   Q.    So what kind of manufacturing process is shown on

DEPOSITION TRANSCRIPT - SARAVANAN KANNUSAMY

1   pages 0003 to 0005?

2   A.      The manufacturing process describes about dry

3   blending process followed by encapsulation.

4   Q.      Where in those manufacturing steps does it describe

5   granulation or granules?

6   A.      This document describes about dry blending process,

7   no granulation step was involved.

8   Q.      What is the date of this document?

9   A.      The effective date of this document is September 12,

10  2019.

11  Q.      At the bottom of each page of this document, DTX-348,

12  can you scroll down a little bit -- there is a box, and in

13  that box, there appear to be three names, signatures and

14  dates.

15          Can you tell me if one of those signatures is

16  yours?

17  A.      Yes.

18  Q.      So one of those signatures there is yours; is that

19  right?

20  A.      Yes, correct.

21          MR. HOGAN:  Can I have DTX-349, please.

22  BY MR. HOGAN:

23  Q.      Do you recognize this document, DTX-349?

24  A.      Yes.

25  Q.      What is this document?

DEPOSITION TRANSCRIPT - SARAVANAN KANNUSAMY

1   A.      It is a master formula card of pimavanserin capsules

2   34 mg.

3   Q.      How is this master formula card at DTX-349 different

4   from the one we just looked at at DTX-348?

5   A.      02 version is here with the minor changes.

6   Q.      If you can go to the first page of this document,

7   please.

8   A.      Sure.

9   Q.      Okay.   There is a box at the top of this document in

10   the middle row, the top box reads "MFC number ending in 02,"

11   and two boxes below that it reads, "Supercedes the number

12   ending in 01."

13          What does that mean?

14   A.      It is a revised version with the minor changes.

15   Q.      What does that document show?

16   A.      This document describes about label claim, packaging

17   information, storage condition, precautions to be followed

18   during the manufacturing, formula and process, and packaging

19   information.

20   Q.      Okay.   Looking at page DTX-349 0003 to 0005, what

21   kind of manufacturing process is shown there?

22   A.      It's a dry blending process followed by

23   encapsulation.

24   Q.      Where in this master formula card does it describe

25   granulation or granules?

DEPOSITION TRANSCRIPT - SARAVANAN KANNUSAMY

1   A.      This document describes about dry blending process,

2   not the granulation process.

3   Q.      What is the date of this document?

4   A.      The effective date of this document is January 28,

5   2020.

6               MR. HOGAN:  Can I have DTX-324, please?

7   BY MR. HOGAN:

8   Q.      Do you recognize this document, DTX-324?

9   A.      Yes.

10  Q.      What is this document?

11  A.      It is a draft master formula card.

12  Q.      What is a draft master formula card?

13  A.      It is being used in the initial formatting of formula

14  process of master formula.  It's a draft copy.

15  Q.      Draft copy, okay.

16              Can you tell me whether DTX-324, that master

17  formula card, if that describes how the Aurobindo

18  pimavanserin ANDA product will be made?

19  A.      It is a draft copy.  It is not proposed to the final

20  process administering capsules.

21  Q.      Can you tell me whether any draft master formula card

22  would describe how the Aurobindo pimavanserin ANDA product

23  will be made?

24  A.      It is a draft copy.  It is not a finalized one.

25              THE COURT:  All right.  Let's stop it there.

                DEPOSITION TRANSCRIPT - SARAVANAN KANNUSAMY

1     Let's break for lunch.

2               MR. KRATZ:  Your Honor, if I could move those

3     exhibits into evidence just before and then --

4               THE COURT:  Yes.

5               MR. KRATZ:  I agree, I'm hungry as well.

6               So at this time, we're moving AURO DTX-320, AURO

7     DTX-324, AURO DTX-347, AURO DTX-348 and AURO DTX-349 into

8     evidence.

9               THE COURT:  Okay.  All those documents are

10    admitted.

11              (Exhibits admitted.)

12              MR. PETERMAN:  No objection, Your Honor.

13              THE COURT:  All right.  Let's break for

14    50 minutes, come back at 1:55 p.m.

15              (Lunch recess taken.)

16              THE COURT:  All right.  You may be seated.

17              All right.  We can continue the video.

18    BY MR. PETERMAN:

19    Q.    Good afternoon, Mr. Kannusamy.  My name is Chad

20    Peterman, and I'll be asking you a few questions.

21    A.    Sure.

22    Q.    Aurobindo is a large pharmaceutical company, correct?

23    A.    Yes.

24    Q.    And Aurobindo has filed hundreds of ANDAs in

25    connection with its products over the years?

DEPOSITION TRANSCRIPT - SARAVANAN KANNUSAMY

1    A.    Yes.

2    Q.    And Aurobindo is very experienced in dealing with the

3    United States Food and Drug Administration with respect to

4    ANDA filings, correct?

5    A.    Yes.

6    Q.    Aurobindo tries to be truthful in its communications

7    with the FDA, correct?

8    A.    Yes.

9    Q.    And Aurobindo tries to be truthful in its ANDA

10   filings with the FDA, correct?

11   A.    Yes.

12   Q.    And to the extent that Aurobindo believed that there

13   was something filed in error or was incorrect, it would take

14   steps to correct it with the FDA, correct?

15   A.    Could you please repeat the question?

16   Q.    If Aurobindo believed that something was incorrect in

17   its ANDA, it would take steps to correct it with the FDA,

18   correct?

19   A.    Yes.

20   Q.    And you didn't review the patent that's at issue in

21   this litigation, right?

22   A.    Yes.

23   Q.    Correct, you did not review?

24   A.    Could you speak --

25   Q.    Did you review the patent that's at issue in this

DEPOSITION TRANSCRIPT - SARAVANAN KANNUSAMY

1  litigation?

2  A.    Yes.

3  Q.    At what point did you review the patent?

4  A.    I like to emphasize that my core development is a

5  formulation development, not the patent.  I see a part of

6  the literature search, will go through the patent, whatever

7  available in the Orange Book (indiscernible.)

8  Q.    So, when did you review the patent that's at suit in

9  this case?

10  A.    As a part of research development during the

11  (indiscernible) formulation development.

12  Q.    And so that would have been before Aurobindo decided

13  on the final formulation for its product?

14  A.    Could you repeat the question?

15  Q.    Did you review the patent that's at suit in this case

16  before Aurobindo decided on the final formulation for its

17  pimavanserin product?

18  A.    Yes, I -- I read the patent.

19  Q.    Did you review the patent in 2021 or before?

20  A.    Could you spell that number?

21  Q.    Did you review the patent that's at suit in this case

22  in 2021, or before?

23  A.    I'm not exactly sure about that date, but I have

24  reviewed the patent.

25  Q.    Did you review the patent that's in suit in this case

DEPOSITION TRANSCRIPT - SARAVANAN KANNUSAMY

1    before Aurobindo decided on the final formulation for its

2    product?

3    A.    Because the formulation development was happened

4    almost six years back, exact date, I could not able to

5    recollect.

6    Q.    Your counsel showed you a document that was marked as

7    DTX-320.

8          MR. PETERMAN:  Can you -- can we pull that up to

9    take a look at it again?

10   BY MR. PETERMAN:

11   Q.    And Mr. Kannusamy, does this document, DTX-320,

12   reflect the final formulation of Aurobindo's ANDA product

13   for pimavanserin?

14   A.    Yes.

15   Q.    And on the page DTX-3200004, there are a series of

16   steps that are listed there, correct?

17   A.    Yes.

18   Q.    And those series of steps are a total of ten steps on

19   pages 4 and 5 of DTX-320, correct?

20   A.    Yes, there are ten steps.

21   Q.    Now, the first three steps that are listed on

22   DTX-320, page 4, are under the heading "Raw Material

23   Sifting," correct?

24   A.    Yes.

25   Q.    And there are three steps within that heading

DEPOSITION TRANSCRIPT - SARAVANAN KANNUSAMY

1   involving co-sifting or resifting of pimavanserin,

2   microcrystalline cellulose, colloidal silicon dioxides; is

3   that correct?

4   A.      Yes, the sifting process was described.

5   Q.      And this is the process that you are describing as --

6   are you referring to this -- these three steps as the dry

7   blending process?

8   A.      Yes.

9   Q.      In step 1, there is a co-sifting of pimavanserin

10  tartrate and microcrystalline, correct?

11  A.      Yes, co-sifting of pimavanserin with microcrystalline

12  cellulose.

13  Q.      And then step 2, you take the co-sifting material

14  from step 1, and then you sift it again with additional

15  microcrystalline cellulose and colloidal silicon dioxide,

16  correct?

17  A.      Yes.

18  Q.      And then in step 3, you take the material from step 2

19  and then you resift it, correct?

20  A.      Yes.

21  Q.      So at the end of step 3, you have material that's

22  been sifted, including pimavanserin tartrate,

23  microcrystalline cellulose, and the colloidal silicon

24  dioxide, correct?

25  A.      Yes.

DEPOSITION TRANSCRIPT - SARAVANAN KANNUSAMY

1    Q.      And then in a separate step, step 4, you sift

2    magnesium stearate, correct?

3    A.      Yes.

4    Q.      And the material from step 3 is then used in the

5    pre-lubrication and lubrication process that starts at step

6    5, correct?

7    A.      The step number 3 was used to further the

8    pre-lubrication process.

9    Q.      Okay.  So again, the material from step 3 was used in

10   step 5, in the pre-lubrication process, correct?

11   A.      Correct.

12   Q.      The material from step 3 was an input to the

13   pre-lubrication process, correct?

14   A.      Yes.

15   Q.      And then later the material from step 4 was an input

16   into step 6 of the pre-lubrication process, correct?

17   A.      Yes, step 4 was added into step 5.

18   Q.      It appears that step 4 was at -- correct.  So step 4

19   was added into step 5 as part of step 6, correct?

20   A.      Yes.

21   Q.      And then in step 7, the lubricated material from

22   step 6 was unloaded and put into bags, correct?

23   A.      Yes.

24   Q.      And this procedure that we just discussed in DTX-320,

25   that procedure is then also reflected in the manufacturing

DEPOSITION TRANSCRIPT - SARAVANAN KANNUSAMY

1    process of DTX-349, which you discuss with your counsel on

2    direct examination, correct?

3    A.    Yes.

4    Q.    So the process shown in DTX-320 is the same process

5    that's shown in DTX-349, correct?

6    A.    Yes.

7    BY MR. HOGAN:

8    Q.    Now, I would like for the videographer tech to bring

9    up a document with the Exhibit No. JTX-125.  Now,

10   Mr. Kannusamy, JTX-125 is a portion of Aurobindo's ANDA

11   entitled "3.2.P.2, Pharmaceutical Development," correct?

12   A.    Yes.

13   Q.    And on the fourth page of the PDF, page 1 of the

14   document, there are a series of signatures, and your

15   signature is in the box there under "approved by," correct?

16   A.    Yes.

17   Q.    And you approved this document on April 15th, 2020,

18   correct?

19   A.    Yes.

20   Q.    And just to confirm, you approved this document after

21   you had approved the manufacturing process that's reflected

22   in DTX-349, correct?

23   A.    Yes.

24   Q.    You approved the manufacturing process in DTX-349 on

25   January 28th, 2020; is that correct?  I think you may be

DEPOSITION TRANSCRIPT - SARAVANAN KANNUSAMY

1    looking at -- I think you may be looking at the wrong

2    document.

3              My question is:  With respect to DTX-349, you

4    approved the -- let me strike that.

5              DTX-349 was effective on January 28th, 2020,

6    correct?

7    A.    Correct.

8    Q.    And then turning back to JTX-125, you approved the

9    document in JTX-125 after January 28th, 2020, correct?

10   A.    Yes, it is approved after January 2020.

11   Q.    And, again, it's approved April 15th, 2020?

12   A.    April 2020, yes.

13   Q.    Now, JTX-125, as we noted, was the Pharmaceutical

14   Development Report.  And on page 4 of the document, which is

15   page 7 of the PDF that you have in front of you, it provides

16   an executive summary of this document, JTX-125, correct?

17   A.    Yes.

18   Q.    And in this executive summary in the first paragraph,

19   it states:  "The following Pharmaceutical Development Report

20   summarizes the development of pimavanserin capsules 34 mg, a

21   generic version of the reference listed drug, RLD, Nuplazid

22   pimavanserin capsules 34 mg," correct?

23   A.    Yes.

24   Q.    And this is a document that was provided to the FDA

25   as part of Aurobindo's ANDA, correct?

DEPOSITION TRANSCRIPT - SARAVANAN KANNUSAMY

1    A.    Yes.

2    Q.    This document, JTX-125, was something that you

3    approved before it was submitted to the FDA, correct?

4    A.    Yes.

5    Q.    Now, turning to page 43 of the document, JTX-125,

6    which is page 46 of the PDF in front of you, this is a

7    subsection titled "Manufacturing Process Development,"

8    correct?

9    A.    Yes.

10   Q.    And in this paragraph under the heading, Aurobindo

11   states that "the following figure presents the process map

12   for the finalized formulation of generic pimavanserin

13   capsules 34 mgs," correct?

14   A.    Yes.

15   Q.    And then each process step in the manufacturing

16   process is listed in the sequence of occurrence, correct?

17   A.    Yes.

18   Q.    Then it states:  "It also presents the material

19   attributes and process parameters that can potentially

20   impact intermediate and finished product quality attributes,

21   correct?

22   A.    Yes.

23   Q.    And by using the term "material attributes,"

24   Aurobindo means the attributes are characteristics of

25   materials that are used in or created by the manufacturing

DEPOSITION TRANSCRIPT - SARAVANAN KANNUSAMY

1   process, correct?

2   A.      Yes.

3   Q.      And, Mr. Kannusamy, you answered "yes" to my

4   question, correct?

5   A.      Could you repeat the question once?

6   Q.      The term "material attributes," as used on this

7   page 43 of JTX-125, means the attributes are characteristics

8   of the materials that are used in or created by the

9   manufacturing process that Aurobindo uses, correct?

10  A.      Can you reframe the sentence for a better

11  understanding?

12  Q.      What does "material attributes" mean, as used here?

13  A.      Material attributes includes EPA properties are

14  excipient properties.

15  Q.      Now, turning to the next page, which is page 44 of

16  JTX-125.  This is the process map that's referred to on the

17  page before, correct?

18  A.      Yes.

19  Q.      Now, there are four main columns of this process map,

20  correct?

21  A.      Yes.

22  Q.      The first column is "Process Parameters."

23          Do you see that?

24  A.      Yes.

25  Q.      The second column is "Material Attributes of Input

DEPOSITION TRANSCRIPT - SARAVANAN KANNUSAMY

1  Materials."

2              Do you see that?

3  A.    Yes.

4  Q.    The third column is "Manufacturing Process Steps."

5              Do you see that?

6  A.    Yes.

7  Q.    And the fourth column is the "Quality Attributes of

8  Output Materials."

9              Do you see that?

10 A.    Yes.

11 Q.    Now, I'd like to just do a little comparison between

12 the third column, which is the "Manufacturing Process

13 Steps," of JTX-125 and the process steps that we looked at

14 in DTX-320.

15             And my question to you will be:  In JTX-125,

16 there is a first box in the "Manufacturing Process Steps"

17 called "sifting of API and excipients."

18             Does that first box in JTX-125 correspond to the

19 three steps listed under the "Raw Material Sifting" in

20 DTX-320?

21 A.    Yes.

22 Q.    And then also that first box called "sifting of API

23 and excipients" in JTX-125 also includes step 4 of sifting

24 of lubrication materials in DTX-320, correct?

25 A.    Yes.

DEPOSITION TRANSCRIPT - SARAVANAN KANNUSAMY

1    Q.    And the output from the box "sifting of API and

2    excipients in JTX-125" is used as the input for the next box

3    "pre-lubrication and lubrication," correct?

4    A.    Yes.

5    Q.    And the "pre-lubrication and lubrication" box on

6    JTX-125 corresponds to the pre-lubrication/lubrication steps

7    on DTX-320, correct?

8    A.    Yes.

9    Q.    Now, continuing to focus on JTX-125, with respect to

10   the pre-lubrication and lubrication step, Aurobindo has the

11   column "Material Attributes of Input Materials" that

12   includes some attributes that go into the pre-lubrication

13   and lubrication step, correct?

14   A.    Here we would like to emphasize that the main

15   objective of the product development as described in the

16   executive summary... and the same process is being used for

17   the formulation development.  It is described in the

18   different sections, like discriminative dissolution method

19   development for the AP particle selection and formulation

20   development.  The process described here, dry blending

21   process.

22   Q.    Mr. Kannusamy, my question is:  On the process map

23   shown in JTX-125, do you see the box under "Material

24   Attributes of Input Materials" that goes into the box

25   "pre-lubrication and lubrication," correct?

DEPOSITION TRANSCRIPT - SARAVANAN KANNUSAMY

1   A.      Yeah, I could -- I could see.

2   Q.      And in the box under "Material Attributes of Input

3   Materials," for the pre-lubrication, lubrication step, there

4   are three material attributes that are listed there,

5   correct?

6   A.      Yes.

7   Q.      The first material attribute is "granule bulk and

8   tapped density," correct?

9   A.      It should read as here:  Blend by density, bulk and

10  tapped density.  The recent typographical error happened in

11  this box.

12  Q.      But in the document that you provided to the FDA, it

13  says:  "Granule bulk and tapped density"; yes or no?

14  A.      The same document has been submitted as a part of the

15  ANDA dossier.

16  Q.      So the answer to my question is "yes," as the

17  document you submitted to the FDA has the input to

18  pre-lubrication and lubrication, it says "granule bulk and

19  tapped density," correct?

20  A.      The same document has been submitted as a part of the

21  ANDA dossier in the Pharmaceutical Development Report.

22  Q.      And then the second attribute that is identified here

23  and submitted to the FDA is "granule uniformity," correct?

24  A.      Yeah, this document that's being -- has been

25  submitted to the FDA as a part of the ANDA dossier.

DEPOSITION TRANSCRIPT - SARAVANAN KANNUSAMY

1    Q.      And the third attribute in this box that you

2    submitted to the FDA says "granule size distribution,"

3    correct?

4    A.      Yeah... this document has been part of the

5    pharmaceutical development and submitted to the FDA as a

6    part of the dossier.

7    Q.      So "granule bulk and tapped density," "granule

8    uniformity," and "granule size distribution" were identified

9    to the FDA as material attributes of the input materials

10   into the pre-lubrication and lubrication steps, correct?

11   A.      The same flowchart on the document has been submitted

12   to the FDA.

13   Q.      And the "granule bulk and tapped density," the

14   "granule uniformity," and "granule size distribution" in

15   this document that we're looking at refers to material

16   attributes of the output of the sifting of API and excipient

17   steps, correct?

18   A.      The main objective of the formulation development as

19   described in the executive summary, and in formulation

20   development, as well as result of process development, it

21   belongs to the dry blending process.

22           However, the (indiscernable) preparing the

23   table, the table properties has been copied from the other

24   products to here.  So here, the transcription error has been

25   happened.

DEPOSITION TRANSCRIPT - SARAVANAN KANNUSAMY

1   Q.      This is a document that you reviewed and you approved

2   and then submitted to the FDA, correct?

3   A.      Yeah, the same document has been submitted to FDA.

4   Q.      And this document contains your signature as being

5   approved by you, correct?

6   A.      Yes.

7   Q.      And, in fact, the document contains two other

8   signatures in terms of being prepared by one individual and

9   verified by a second individual, correct?

10  A.      Yes.

11  Q.      The document was prepared by Rakesh Sarkar and then

12  verified by C. Prabilakaran.  I might have mispronounced the

13  name, but is that correct?

14  A.      The document is prepared by Mr. Rakesh Sarkar and

15  verified by Mr. C. Prabilakaran.

16  Q.      And then approved by you?

17  A.      Yes.

18  Q.      So at least three people at Aurobindo reviewed and

19  approved -- or reviewed and put their signature on this

20  document, correct?

21  A.      The document is prepared by Mr. Rakesh Sarkar and

22  verified by Mr. Prabilakaran and approved by me.

23  Q.      And all of these signatures were provided on

24  April 15th, 2020, correct?

25  A.      Yes.

DEPOSITION TRANSCRIPT - SARAVANAN KANNUSAMY

1    Q.    So now we are looking at page 67 of JTX-125, the

2    product development report.  The section is titled

3    "3.2.P.2.7.1, Control Strategy of the Raw Material

4    Attributes," correct?

5    A.    Yes.

6    Q.    And this document -- or this document section

7    reflects Aurobindo's control strategy with respect to

8    various manufacturing processes that it uses in connection

9    with its pimavanserin product, correct?

10   A.    Yes.

11   Q.    And, again, this is part of Aurobindo's ANDA

12   submission for its pimavanserin product, correct?

13   A.    Yes.  It is part of the ANDA dossier.

14   Q.    And it's part of the document that you approved,

15   correct?

16   A.    Yes.

17   Q.    In the section that's 3.2.P.2.7.3, there is a control

18   strategy for pre-lubrication process.

19             Do you see that?

20   A.    Yes.

21   Q.    And in this paragraph, it notes that Aurobindo

22   studied the impact of pre-lubrication time on the blend

23   uniformity, correct?

24   A.    Yes.

25   Q.    And it studied the pre-lubrication time of

DEPOSITION TRANSCRIPT - SARAVANAN KANNUSAMY

1    15 minutes, 20 minutes, and 25 minutes, correct?

2    A.    Yes.

3    Q.    And Aurobindo decided that the 20-minute

4    pre-lubrication time was the appropriate amount of time,

5    correct?

6    A.    Yes.

7    Q.    And 20-minute pre-lubrication time is, in fact, what

8    Aurobindo uses in its final process, correct?

9    A.    Yes.

10   Q.    The last sentence of this section goes on to say:

11   "Therefore, control strategy for blending the granules with

12   extra-granular material is to blend for 20 minutes,"

13   correct?

14   A.    Here, I would like to emphasize that Aurobindo uses

15   the FDA example for product development report.  In the same

16   points, whatever it was, mentioned guidance, FDA guidance,

17   we are taking as reference, and that the form development

18   report processes being manufactured, as per this format

19   number.  That is the APL (indiscernible) 040 and 00.  This

20   format for developing the product, as well as the writing

21   the Pharmaceutical Development Report, and it is to be a

22   part of the ANDA commission.

23           So when we are -- to (indiscernible)

24   preparation, the other product development, this is being

25   followed, and the same process is being continued, and it

DEPOSITION TRANSCRIPT - SARAVANAN KANNUSAMY

1    made some transcriptional error in the last line.

2    Q.    Mr. Kannusamy, you don't dispute, though, that the

3    last sentence refers to the control strategy for blending

4    the granules with extra-granular materials, correct?

5    A.    Yeah.

6    Q.    Okay.

7    A.    Mainly described about the blending optimization

8    time, which includes 15, 20, and 25 minutes.  That

9    20 minutes is the optimal timeframe for the pre-lubrication

10    time point.

11    Q.    And in describing the optimal 20 minutes, this

12    sentence uses the terms "granules with extra-granular

13    materials" in describing the materials that are being used

14    in the pre-lubrication step, correct?

15    A.    That is a transcriptional error happened in the last

16    sentence.  The main objective is optimization of

17    pre-lubrication time after sifting.

18    Q.    Moving on to the next part, 3.2.P.7.4, it says:

19    "Control strategy for lubrication process."

20          Do you see that?

21    A.    Yes.

22    Q.    And there the lubrication process was studied in

23    terms of three different time points, correct?

24    A.    Yes.

25    Q.    And the five-minute time point was ultimately chosen,

DEPOSITION TRANSCRIPT - SARAVANAN KANNUSAMY

1    correct?

2    A.    Yes.

3    Q.    And the five-minute time point lines up with the

4    lubrication time that Aurobindo uses in its ANDA product,

5    correct?

6    A.    Five minutes lubrication time for the ANDA product.

7    Q.    And, again, in the last sentence here, it says, "The

8    control strategy for blending the granules with

9    extra-granular materials is to lubricate for 5 minutes,"

10   correct?

11   A.    The same transcription error that has happened that

12   has continued from the (indiscernible) product.

13   Q.    So twice in this paragraph, 3.2.P.2.7.4, it mentions

14   granules and extra-granular materials, correct?

15   A.    Reading the formula, there is no granulation step

16   involved.  This is dry mixing process.  There is no

17   possibility of extra-granular material.  No granulation step

18   was involved in the proposed ANDA product.

19   Q.    But in the document that you approved and Aurobindo

20   provided to the FDA, that is currently in Aurobindo's ANDA,

21   it refers to blending of granules with extra-granular

22   materials, correct?

23   A.    Aurobindo -- Aurobindo's generic pimavanserin,

24   capsules follows a dry mixing process; there is no

25   granulation step involved.  There is a transcriptional error

DEPOSITION TRANSCRIPT - SARAVANAN KANNUSAMY

1   that has happened.  If you remember, 2020 was the peak COVID

2   time.  So that we -- we were working further (indiscernible)

3   hours and days.  Because of that peak COVID period, the

4   review might be less and the transcriptional error has been

5   -- happened.

6   Q.    Mr. Kannusamy, the FDA -- well, strike that.

7           Mr. Kannusamy, the current ANDA that's being

8   evaluated by the FDA includes JTX-125 that we are reviewing

9   right now, correct?

10  A.    Yes, this is part of the ANDA dossier.

11          MR. PETERMAN:  And, counsel, for the record, we

12  want to have JTX-125 entered into evidence.

13          MR. HOGAN:  Okay, no objection.  Along that

14  vein, we would like to have, I believe, DTX-320, DTX-347,

15  DTX-348, and DTX-349, and DTX-324 enter -- entered into

16  evidence.  And I think their designation in this case, they

17  are confidential documents.

18  BY MR. PETERMAN:

19  Q.    Now, Mr. Kannusamy, I would like to direct your

20  attention to JTX-134.

21  A.    Okay.

22  Q.    Mr. Kannusamy, this is a master formula card from

23  Aurobindo, correct?

24  A.    No, it is not a final master formula card.

25  Q.    I understand that your testimony earlier was that

DEPOSITION TRANSCRIPT - SARAVANAN KANNUSAMY

1    these were draft formula cards, correct?

2    A.    It is a draft only.

3    Q.    Okay.  And the -- this is a draft card, and it

4    includes a manufacturing process that involves the

5    co-sifting and blending of materials, correct?

6    A.    It is a draft master formula card.  It is not a final

7    process involved in the Aurobindo ANDA product.

8    Q.    But it includes a process that has co-sifting and

9    blending of materials, correct?

10    A.    It is a draft one, and it is a unapproved copy, so it

11    is not a final one.

12    Q.    But at least in this draft copy, which I understand

13    is unapproved, the step in 8.18 indicated that you unload

14    the lubricated granules into suitable containers, correct?

15    A.    This JTX-10134 is a draft copy.  There is no

16    signature of any one of the scientists involved in this

17    product, and this effective date also not met.  It is not a

18    final process followed by Aurobindo Pharma Limited.

19    Q.    But at this point in time, whoever was drafting this

20    included the line:  "Unload the lubricated granules into

21    suitable containers," correct?

22    A.    It is a draft copy.  It is not a finalist one.  It is

23    an unapproved one.

24    Q.    But this unapproved copy includes the line:  "Unload

25    the lubricated granules into suitable containers," correct?

DEPOSITION TRANSCRIPT - SARAVANAN KANNUSAMY

1    A.    As it is a draft copy, it is not a final to process

2    for Aurobindo's pimavanserin capsules.  Yes.

3    Q.    I understand the qualifications that you are making.

4    But my question is a simple yes or no.  In section 8.1.8,

5    does it say "unload the lubricated granules into suitable

6    containers"?

7    A.    It is an -- a unapproved copy.  It is a draft one,

8    before starting the approved one, so it is not a final one

9    of the Aurobindo's proposed process.

10   Q.    I think the record is clear on that point, but my

11   question is more simple.  Does the document that's in front

12   of you, 8.1.8, state:  "Unload the lubricated granules into

13   suitable containers"; yes or no?

14   A.    It's a draft copy.  The -- the process proposed in

15   the -- this document is not a final one.

16   Q.    So you're unwilling to answer my question yes or no,

17   whether the document that you have in front of you says:

18   "Unload the lubricated granules into suitable containers"?

19   A.    As it is a draft copy, it is not a verified one, so

20   it is not a final process for Aurobindo.

21   Q.    Has Aurobindo performed any polarized light

22   microscopy on its -- the materials that get created during

23   the manufacturing process for Aurobindo's pimavanserin

24   products?

25   A.    Could you please reframe the sentence?

DEPOSITION TRANSCRIPT - SARAVANAN KANNUSAMY

1   Q.    Has Aurobindo performed any polarized light

2   microscopy on the materials that get created in the

3   manufacturing process for its pimavanserin products?

4   A.    Aurobindo's process involves co-sifting of

5   pimavanserin with other excipients like MCC and colloidal

6   silicon dioxide.

7   Q.    My question was different, though.  My question was:

8   Has Aurobindo performed polarized light microscopy on the

9   results or intermediates of its manufacturing process for

10  pimavanserin capsules?

11  A.    It is a -- question is about polarized microscopy?

12  Am I understanding this correct?

13  Q.    Yes.  Has Aurobindo performed polarized light

14  microscopy, analyzing the intermediates or the final results

15  of its manufacturing process?

16  A.    No.

17          MR. PETERMAN:  Pass the witness.

18  BY MR. HOGAN:

19  Q.    Can we look at JTX-125, and go to page 43?  It's page

20  46 of the PDF.

21          You were asked about this page by Mr. Peterman a

22  few minutes ago; isn't that right?

23  A.    Yes.

24  Q.    Okay.  Would you please read the first sentence of

25  that paragraph out loud?

DIRECT EXAMINATION - RICHARD CHRISTIAN MORETON

1   A.      "As discussed in the process selection section,

2   2.2.P.2.2.1.3, dry blending, followed by capsule filling,

3   were chosen as a method of manufacturing for pimavanserin

4   capsules, 34 mg."

5   A.      34 mgs, right.   (Indicating.)

6   Q.      This is -- JTX-125 is the product development report;

7   isn't that right?

8   A.      It is the product development report.

9              MR. HOGAN:  No more questions.

10             (End of deposition.)

11             THE COURT:  Okay.

12             MR. HOGAN:  Your Honor, Aurobindo would like to

13   bring Dr. Moreton to the stand.

14             (Discussion held off the record between

15   counsel.)

16             RICHARD CHRISTIAN MORETON, having been called on

17   the part and behalf of the Defendant as a witness, having

18   first affirmed to tell the truth, testified as follows:

19             MR. HOGAN:  Thank you, Your Honor.

20                       DIRECT EXAMINATION

21   BY MR. HOGAN:

22   Q.      Good afternoon, Dr. Moreton.

23             Could you please state your full name for the

24   record?

25   A.      Richard Christian Moreton.

DIRECT EXAMINATION - RICHARD CHRISTIAN MORETON

1    Q.    Have you been retained as an expert witness in this

2    case?

3    A.    Yes, I have.

4    Q.    In what area do you consider yourself to be an

5    expert?

6    A.    Formulation, pharmaceutical formulation of small

7    molecules.

8    Q.    And what area have you been retained to testify in

9    this case?

10   A.    Pharmaceutical formulation of small molecules.

11   Q.    What is pharmaceutical formulation of small

12   molecules?

13   A.    Pharmaceutical formulation is the science and

14   technology putting the drug products together so that the

15   patient can get benefit from them.  Small molecules defines

16   it so that -- I'm not really an expert in biologic

17   molecules, like vaccines or MRNA molecules, things like

18   that.

19              MR. HOGAN:  We have some exhibit binders.  May I

20   approach, Your Honor?

21              THE COURT:  Yes.

22              MR. HOGAN:  You need two, right.  And, Your

23   Honor, we have hard copies of the slideshow.  Would you like

24   some of those?

25              THE COURT:  You can hand it up.  Thank you.

DIRECT EXAMINATION - RICHARD CHRISTIAN MORETON

1      MR. HOGAN:  Okay.

2  BY MR. HOGAN:

3  Q.      Dr. Moreton, could you please provide the Court with

4  a summary of your educational background after high school?

5  A.      After high school, so I graduated a degree -- with a

6  bachelor's in pharmacy in 1971.  A few years later, I

7  received a master of science in pharmaceutical analysis from

8  the University of Strathclyde in 1987.  And then I went on

9  to study for a PhD in pharmaceuticals at the University of

10  Wales, Cardiff.  And I received that in 1992.  My first

11  degree was from the University of Nottingham.  They are all

12  in the United Kingdom.

13  Q.      Okay.  Could you please describe to the Court a

14  summary of your professional background after you received

15  your PhD?

16  A.      Yes, I worked for six months as a research associate

17  at the Welch Center, postgraduate pharmacy education.  Then

18  I worked for another six months as a standing pharmacist in

19  different pharmacies in South Whales and Southwest England.

20          And then I got a job in a excipient drug

21  delivery company as a technical service manager, so I was

22  going visiting clients, customers around Europe, explaining

23  the benefits and advantages and how to use the different

24  excipients.

25          And then I was transferred to the United States

DIRECT EXAMINATION - RICHARD CHRISTIAN MORETON

1   in 1995 and continued doing a similar job for a couple of

2   years.

3           Then I was promoted to technical director and I

4   was made responsible for all the quality assurance, quality

5   control, and regulatory affairs for the excipient business.

6   And then promoted to -- a few years later to senior

7   director.  And then I also assumed the responsibilities for

8   some of the R&D program in excipients.

9           Then after that I moved to Canada to a generic

10  company, back into formulation.  I was there for about

11  12 months, and then I went worked as a consultant for

12  six months in Canada.  And then I got a job in Massachusetts

13  for a small start-up company as vice president for

14  pharmaceutical sciences.  And I was responsible for all the

15  formulation and analytical development work to get the

16  products into clinical trial.

17          And then eventually we took one to commercial

18  launch with Novartis and then they ran out of compounds for

19  me, so I started out as a consultant in 2007 and I have been

20  doing it ever since.

21  Q.    So for about how many years have you been involved in

22  pharmaceutical formulation work?

23  A.    Since 1972, so 50 years.

24  Q.    Okay.  Do you belong to any professional

25  associations?

DIRECT EXAMINATION - RICHARD CHRISTIAN MORETON

1    A.    Yes, I do.  I belong to the American Association of

2    Pharmaceutical Scientists, the American Chemical Society,

3    the Royal Pharmaceutical Society of Great Britain, and

4    several others as well.

5    Q.    Have you won any awards during your career?

6    A.    Yes, through the United States Pharmacopeia and in

7    2018, I was awarded the Jacob Bigelow award for outstanding

8    contribution to the standard setting process.

9    Q.    What kind of work was that?

10   A.    University -- sorry, the United States Pharmacopeia

11   is a book of standards.  So the volunteers work in teams or

12   committees to produce the standards for new drugs,

13   excipients, and associated methods and administrative good

14   manufacturing practices, things like that.

15   Q.    Do you have any journal publications?

16   A.    Sorry, say that again, please?

17   Q.    Do you have any journal publications?

18   A.    Yes, I do.

19   Q.    About how many?

20   A.    I think something like 50.

21   Q.    Okay.  Have you published any books or book chapters?

22   A.    Yes, I published, I think, five book chapters in

23   different publications.

24   Q.    To what subject matter do those book chapters

25   pertain?

DIRECT EXAMINATION - RICHARD CHRISTIAN MORETON

1    A.    In the general area of excipients and formulation.

2    Q.    Have you presented any papers to any professional

3    organizations in your career?

4    A.    Yes, I have.

5    Q.    About how many?

6    A.    I think probably 50.

7    Q.    Have you done consulting work for the pharmaceutical

8    industry?

9    A.    Yes, I have.

10   Q.    What kind of consulting work was -- or is that?

11   A.    Most of my consulting work is in formulation design

12   and development, and I support small start-up companies and

13   small molecule development.

14         I also do some consulting in excipient work,

15   I've done that for excipient manufacturers and also for some

16   larger pharmaceutical companies who wanted to set up

17   different programs.

18   Q.    Have you ever served as an expert witness in a patent

19   case before?

20   A.    Yes, I have.

21   Q.    About how many times have you testified at trial as

22   an expert witness in a patent case?

23   A.    In the last 4 years, I think it's three or four

24   times.

25   Q.    Okay.

DIRECT EXAMINATION - RICHARD CHRISTIAN MORETON

1           MR. HOGAN:  Your Honor, may I approach the

2    witness?

3           THE COURT:  Yes.

4    BY MR. HOGAN:

5    Q.    So I have it up on the screen and it will be in the

6    your binder, if you want to see it there, the first slide.

7           Do you recognize this document, Dr. Moreton?

8    A.    Yes, I do.  It's a copy of my curriculum vitae.

9    Q.    Is it current and accurate?

10   A.    It was current and accurate at the time I submitted

11   it, but I think there may have been another publication or

12   two since then.

13          MR. HOGAN:  Aurobindo would like to proffer

14   Dr. Moreton as an expert in pharmaceutical formulation.

15          MR. PETERMAN:  No objection.

16          MR. HOGAN:  Like to offer into evidence

17   AURO-DTX-301 as well.

18          THE COURT:  All right.  Dr. Moreton may testify

19   as an expert in pharmaceutical formulation and DTX-301 is

20   admitted.

21          (Exhibit admitted.)

22   BY MR. HOGAN:

23   Q.    Dr. Moreton, do you understand that Aurobindo has

24   filed with the FDA an abbreviated new drug application or

25   ANDA seeking FDA-approval for pimavanserin 34 mg product as

DIRECT EXAMINATION - RICHARD CHRISTIAN MORETON

1    a generic to Acadia's Nuplazid product?

2    A.    Yes, I do.

3    Q.    And do you understand that a response to that ANDA

4    filing, Plaintiff Acadia filed this lawsuit alleging that

5    Aurobindo's ANDA product or ANDA and the product described

6    in the ANDA infringed certain claims of the '721 patent?

7    A.    Yes, that's correct.

8    Q.    I'm going to refer to the Aurobindo Nuplazid ANDA

9    product as the Aurobindo ANDA product if that's okay going

10   forward.

11         What was your assignment in this case?

12   A.    Sorry, say that again, please?

13   Q.    What was your assignment in this case?

14   A.    Sorry, I was asked to examine the patent and the

15   Aurobindo formulation and process, and assess whether the

16   formulation infringes the asserted claim of the patent.

17   Q.    Okay.

18         MR. HOGAN:   Next slide, please.

19   BY MR. HOGAN:

20   Q.    Can you please summarize your opinions on

21   infringement in this case?

22   A.    Yes.   So the asserted claims of the '721 patent are

23   not infringed by Aurobindo's ANDA product.   ANDA --

24   Aurobindo's ANDA product contains no granules comprising 40

25   mg pimavanserin tartrate.

DIRECT EXAMINATION - RICHARD CHRISTIAN MORETON

1   Q.    Can you please summarize the process, generally, how

2   you went about reaching your opinion in this case?

3   A.    I looked at the patent, the specification and the

4   claims.  I looked at the Aurobindo manufacturing documents

5   and formulation documents.  I took into account the Court's

6   claim construction, and I used my experience to come to my

7   conclusions.

8   Q.    Okay.  Did you reach an opinion in this case about

9   the qualifications of a person of ordinary skill in the art

10  or what I'll refer to as a "POSA," with respect to the '721

11  patent?

12  A.    Yes, I did.

13            MR. HOGAN:  Next slide, please.

14  BY MR. HOGAN:

15  Q.    Does this slide reflect your opinion about the

16  qualification and experience of a POSA in this case?

17  A.    Yes, it does.

18  Q.    Can you summarize that definition, please?

19  A.    Yes.  The POSA would have possessed a relatively high

20  level of skill, such as having at least a bachelor's degree,

21  and more likely, a master's degree or a doctoral degree and

22  several years of experience in research and development of

23  pharmaceutically relevant formulations, including but not

24  limited to the manufacturing processes of such formulations

25  and the selection and use of excipient in such formulations.

DIRECT EXAMINATION - RICHARD CHRISTIAN MORETON

1    Q.    Okay.  Now, do you understand that Acadia and its

2    expert have proposed a variation definition?

3    A.    Yes, I do.

4    Q.    Were you at least a person of ordinary skill in the

5    art under either your definition or Acadia's definition at

6    the time the '721 patent issuance?

7    A.    Yes, I was.

8    Q.    And would your opinion in this case change at all

9    depending on which definition of a POSA the Court adopts?

10   A.    No, it would not.

11   Q.    Okay.

12             MR. HOGAN:  Next slide, please.

13   BY MR. HOGAN:

14   Q.    What is your understanding about whether

15   pharmaceutical excipients can have more than one function?

16   A.    Pharmaceutical excipients can have more than one

17   function.  It depends on very much the formulation type, the

18   processing type, and very often the drug substance itself.

19   Q.    Okay.  What is this up on the screen, DTX-338?

20   A.    This is from the United States Pharmacopeia.  It's a

21   part -- part of the first page, chapter 1059, "Excipient

22   Performance," and this is one of the chapters that is

23   associated with the Pharmacopeia.

24   Q.    And what's the called-out text, why is that

25   important?

DIRECT EXAMINATION - RICHARD CHRISTIAN MORETON

1    A.    Well, the called-out text says, "An excipient may be

2    used in multiple ways or for various purposes in drugs" --

3    sorry, the official logo -- thing is -- drug -- anyhow, it's

4    explaining why the excipient can be used in multiple ways

5    depending on the formulation and the process, and how the

6    formulation is put together.

7    Q.    Okay.

8            MR. HOGAN:  I'd like to offer into evidence

9    DTX-338.

10           MR. PETERMAN:  No objection, Your Honor.

11           THE COURT:  DTX-338 is admitted.

12           (Exhibit admitted.)

13           MR. HOGAN:  Next slide, please.

14   BY MR. HOGAN:

15   Q.    What would a person of ordinary skill in the art

16   understand a binder to be in the pharmaceutical formulation

17   context?

18   A.    A binder is something that sticks things together, so

19   it binds them together.

20   Q.    And how does that work?

21   A.    There are two main ways.  There are what we call wet

22   granulation binders and dry granulation binders, and they

23   work in very different ways.

24           Wet granulation binders are sticky substances

25   that dissolve in a granulation fluid or dissolve in some

DIRECT EXAMINATION - RICHARD CHRISTIAN MORETON

1    way, and they are blended into the powders and stick them

2    together.  And then the wet mass is dried and sized to form

3    granules.

4              On dry granulation, there's materials that

5    are -- will bind under high pressure and we're talking about

6    tons per square inch, and they are used to bind all the

7    materials together in crude tablets or ribbons and then they

8    are broken up to form the granules.

9    Q.    Okay.

10             MR. HOGAN:  We'd like to offer into evidence

11   DTX-332.

12             MR. PETERMAN:  No objection.  If it speeds

13   things up, I don't object to any of the exhibits that have

14   been disclosed to us.

15             THE COURT:  All right.  DTX-332 is admitted.

16             (Exhibit admitted.)

17             MR. HOGAN:  Next slide, please.

18   BY MR. HOGAN:

19   Q.    What would a POSA understand a diluent to be in the

20   pharmaceutical formulation context?

21   A.    Diluent is a component of the formulation.  An

22   excipient just adds bulk to the formulation and it allows

23   the formulation to be manufactured.  Sometimes patients who

24   handle -- and the manufacturers handle the drugs more

25   easily, things like that.

DIRECT EXAMINATION - RICHARD CHRISTIAN MORETON

1          Many drugs are very small dose and patients

2     would have difficulty picking up a tablet of 1 mg or even

3     34 mgs of pimavanserin because they're so small and the

4     diluents help bulk it out so it makes it more -- more

5     suitable for the patient.

6     Q.    Okay.  What would a POSA understand dry powder

7     blending to mean in the pharmaceutical formulation context?

8     A.    In pharmaceutical formulations, dry powder blending

9     is simply blending, mixing two dry powders -- two or more

10    dry powders together to form a homogenous mix.

11          MR. HOGAN:  Next slide, please.

12    BY MR. HOGAN:

13    Q.    Dr. Moreton, what is shown up on the screen here?

14    A.    This is a schematic showing what a dry -- a dry blend

15    could look like.

16    Q.    And can you explain what -- what's shown here?

17    A.    Oh, sorry.  So if you look at the different shapes,

18    they could be the different materials, the different

19    excipients.  The black dots would be the active

20    pharmaceutical ingredient, and this is just a random blend

21    showing that they are properly mixed together.

22    Q.    Okay.  What's the source of this schematic drawing

23    that you just described?

24    A.    I drew it about 20 years ago for a training course.

25    Q.    Okay.

DIRECT EXAMINATION - RICHARD CHRISTIAN MORETON

1          MR. HOGAN:  We'd like to offer into evidence

2    DTX-009 as well.

3          MR. PETERMAN:  You're talking about --

4          THE COURT:  The demonstrative?

5          MR. HOGAN:  Yeah.

6          MR. PETERMAN:  I mean, I think we've discussed

7    entering demonstratives into evidence, and I think it's

8    unusual to introduce demonstratives into evidence --

9          THE COURT:  You can --

10          MR. PETERMAN:  -- so we would object to that.

11          THE COURT:  You can use the demonstratives, but

12    demonstratives don't get admitted into evidence.

13          MR. HOGAN:  Okay, Your Honor.  Thank you.

14          Okay.  Next slide, please.

15    BY MR. HOGAN:

16    Q.    Dr. Moreton, what would a POSA understand

17    microcrystalline cellulose to mean in the pharmaceutical

18    formulation context?

19    A.    Microcrystalline cellulose is an excipient that is

20    very often used in solid oil dosage formulations, and it's a

21    cellulose -- it's prepared from cellulose, it's

22    acid-hydrolyzed cellulose, so it's a modified cellulose.

23    Q.    What is your familiarity with microcrystalline

24    cellulose, or I'm going to call it "MCC" for brevity, in the

25    pharmaceutical pharmacy context?

DIRECT EXAMINATION - RICHARD CHRISTIAN MORETON

1    A.      I have been using microcrystalline cellulose since

2    1972 when I first joined the industry.  We formulated a lot

3    of tablets with that -- excipients, used a lot of direct

4    impression, and some dry granulation.  I've also -- and I

5    used it in almost all of the jobs that I've had since.  And

6    I also worked for nine years for an excipient and

7    drug-related company, as I mentioned, and they were one of

8    the major microcrystalline cellulose manufacturers.

9    Q.      What was your -- what was your involvement at the

10   time you worked for the MCC manufacturer, what was your

11   relationship and what was your familiarity with the

12   substance?

13   A.      I was in charge of the quality control, quality

14   assurance, so I was responsible for the manufacturing of all

15   the -- the quality associated with the manufacturing of all

16   the excipients.  And microcrystalline cellulose was one of

17   the major excipients the company had.  And I spent a lot of

18   time in the microcrystalline cellulose plants, mock

19   inspections and making sure that the quality control

20   actually functioned properly, things like that.

21   Q.      In your experience, is there any variability in the

22   properties of MCC from manufacturer to manufacturer?

23   A.      Yes, there is.  It all depends on the processing --

24   and those -- the variables can -- may mean the difference

25   between success and failure in some instances in

DIRECT EXAMINATION - RICHARD CHRISTIAN MORETON

1    formulation.

2    Q.      Okay.  What is the function of MCC in a

3    pharmaceutical formulation?

4    A.      In tablets, it's typically used as a dry binder.  In

5    capsules, it is used as a diluent.

6    Q.      Does the function of MCC depend on the formulation

7    it's being used in, in other words?

8    A.      Yes, it depends very -- excuse me -- depends very

9    much on the formulation and the processing that's used to

10   make it.

11   Q.      Okay.  Can you describe how many formulations you've

12   designed or worked with that involved MCC?

13   A.      Over the years, probably dozens.

14   Q.      And how many formulations have you designed or worked

15   with that used MCC as a diluent?

16   A.      I've used it mostly in capsule formulations, so

17   probably 10 or 12 over the years.  Capsules are not so --

18   are not so common.

19   Q.      In your opinion, how common a practice is it amongst

20   POSAs to use MCC as a diluent in a pharmaceutical

21   formulation?

22   A.      It's very common in capsules, certainly.

23   Q.      And how many pharmaceutical formulations have you

24   designed or worked with that used MCC as a binder?

25   A.      Dozens.  Most of the tablet formulations that I have

DIRECT EXAMINATION - RICHARD CHRISTIAN MORETON

1  formulated and have all been responsible for formulations

2  have included MCC as a binder.

3  Q.    What is required for MCC to function as a binder in a

4  pharmaceutical formulation?

5  A.    It requires there to be sufficient -- the MCC to work

6  as a binder.  It also requires that it's compatible with the

7  other excipients, the other -- an active drug do not

8  interfere with the binding properties of MCC, and there also

9  has to be a process whereby the MCC acts as a binder.

10  Q.    And what process is required for that?

11  A.    That's a compress -- compaction or compression

12  process.

13          MR. HOGAN:  Okay.  Next slide, please.

14  BY MR. HOGAN:

15  Q.    Dr. Moreton, what would a POSA understand "particles"

16  to mean in the pharmaceutical formulation context?

17  A.    A particle is very simply an individual component of

18  a pharmaceutical powder.

19  Q.    And what would a POSA understand a "powder" to mean

20  in the pharmaceutical formulation context?

21  A.    A powder is a collection of finely divided -- sorry,

22  particles.

23  Q.    So what would a POSA understand an "agglomerate" to

24  mean in a pharmaceutical formulation context?

25  A.    An agglomerate is two or more particles associated

DIRECT EXAMINATION - RICHARD CHRISTIAN MORETON

1    with each other in some way.  And there are different types

2    of agglomeration, but two main types:  Loose agglomeration,

3    which is typical of clumping in the powders when you open a

4    bag or the drum of powders and they clump together, and then

5    there's more rigid agglomeration, which has more mechanical

6    bonds between them and so that -- that would be akin to

7    granulation.

8    Q.    Can you give me an example of loose agglomeration?

9    A.    Yes, the powder clumping when it's -- when you open

10   the bag, very often it looks like soft lumps when you pull

11   it out of the bag, that's -- that's agglomeration.

12   Q.    Loose agglomeration?

13   A.    Yeah.

14   Q.    Okay.  And what's an example of rigid agglomeration?

15   A.    Granulation, so dry granulation or wet granulation.

16   Q.    Excuse me.  What would a POSA understand a "granule"

17   to mean in the pharmaceutical formulation context?

18   A.    A granule is simply a collection of smaller particles

19   of one or more materials formed by a granulation process

20   which caused the particles to stick together.

21   Q.    And can you explain that a bit more, please?

22   A.    Yeah, so granules don't form spontaneously.  There

23   has to be a process to stick them together in some way.  So

24   in wet granulation, it's using the wet binder material to

25   coat all the particles and then stick them together when

DIRECT EXAMINATION - RICHARD CHRISTIAN MORETON

1    drying and things like that.  In dry granulation, you're

2    using pressure -- high pressure to cause the dry binder to

3    bind all the materials to stick them together to make the

4    granules.

5              MR. HOGAN:  We'd like to offer into evidence

6    DTX-329 and 330.

7              Okay.  Can I have the next slide, please?

8              THE COURT:  Okay.  DTX-329 and DTX-330 are

9    admitted.

10             (Exhibits admitted.)

11             MR. HOGAN:  Thank you, Your Honor.

12   BY MR. HOGAN:

13   Q.    Dr. Moreton, what's shown up on the screen here?

14   A.    This is just a schematic of a granule structure, and

15   so the small round circles are -- that would be the active

16   drug.  The larger orange circles would be the disintegrant,

17   and the yellow bars and the blue elongated oval would be the

18   two -- other two excipients, and they are all stuck together

19   into a granule.

20   Q.    What's the source of the schematic?

21   A.    It's from a paper I published in 2014.

22   Q.    Are you the main author?

23   A.    I'm the only author.

24   Q.    Okay.  I think you testified a lot moment ago that

25   granules don't spontaneously form.  Why is that -- why is

DIRECT EXAMINATION - RICHARD CHRISTIAN MORETON

1   that the case?

2   A.    You need to impart a lot of energy to form granules,

3   whether it's through the wet granulation process or the dry

4   granulation process.  Like I said, the dry granulation

5   process requires high pressure, high force.  Wet granulation

6   requires mixing with the liquid, drying, and then sizing the

7   granules.  And that -- it all requires energy, and that

8   doesn't happen spontaneously.

9             MR. HOGAN:  Can I have the next slide, please?

10  BY MR. HOGAN:

11  Q.    What does "granulation" mean to a POSA in the

12  pharmaceutical formulation context?

13  A.    It's a granulation.  It's a process of enlargement

14  whereby typically dissimilar particles are caused to stick

15  together, and particles can stick together by the use of

16  binders or granulation fluids.  And the goal is to produce

17  granules that can be filed into capsules or compacted into

18  tablets.

19  Q.    Why would a -- to a POSA, why would they understand

20  why granulation is typically done in a pharmaceutical

21  formulation?

22  A.    Granulation is done to overcome the problems or the

23  disadvantages of the other components in the formulation.

24  Typically the active drug might be very poorly flowing or it

25  may be very cohesive, and granulation can overcome some of

DIRECT EXAMINATION - RICHARD CHRISTIAN MORETON

1   those deficiencies and improve the manufacturability and

2   improve the consistency of the manufacturing process.

3   Q.    So to granulate or not to granulate is a choice by

4   the formulator, yes?

5   A.    That's correct, yes.

6   Q.    What's the result when a pharmaceutical formulation

7   is granulated?

8   A.    The result is that we have a combined materials and

9   that the -- the materials -- the individual variability or

10  the variability of the individual materials can be overcome

11  and make it a more consistent, and we can improve the

12  dissolution of some drugs, we can improve the flowability of

13  the blend, and improve the compactability if you're making a

14  tablet.  That's all due to the granulation process.

15  Q.    Let's say a POSA wants to make a formulation to fill

16  into a capsule.  Must they granulate that formulation?

17  A.    No, there are other methods.

18  Q.    What other methods?

19  A.    Simple dry blending may work, so blending all the

20  materials together and then fill it directly into capsules.

21          MR. HOGAN:  Okay.  Next slide, please.

22  BY MR. HOGAN:

23  Q.    You mentioned granulation.  So what would -- what

24  types of granulation would a POSA know about at the time of

25  the '721 patent?

DIRECT EXAMINATION - RICHARD CHRISTIAN MORETON

1    A.    A POSA would know about wet granulation, and there

2    are three main methods of wet granulation; and dry

3    granulation, there are two methods.  So wet granulation, you

4    have low shear and high shear and fluid bed.  And dry

5    granulation, you have roller compactor -- roller compaction,

6    sorry, and slugging.

7              MR. HOGAN:  I want to offer into evidence

8    DTX-330 and 329, Your Honor.

9              THE COURT:  You already admitted those.

10             MR. HOGAN:  What's left, 332?  Thought so.

11             Sorry, beg your pardon.

12   BY MR. HOGAN:

13   Q.    So I think you testified that -- let me ask you this:

14   Would a POSA expect that granules would form in -- just form

15   in any formulation?

16   A.    No.

17   Q.    Why not?

18   A.    You need a process.  You need to put the energy into

19   the formulation to create the granules.

20             MR. HOGAN:  Okay.  Next slide, please.

21   BY MR. HOGAN:

22   Q.    I'm going to shift gears and now talk about the '721

23   patent.  It's up on the screen here.

24             Dr. Moreton, you mentioned that you considered

25   the '721 patent in forming your opinions in this case,

DIRECT EXAMINATION - RICHARD CHRISTIAN MORETON

1    didn't you?

2    A.    Yes, I did.

3    Q.    What does the '721 patent say generally about

4    granules?

5    A.    It describes the general understanding of granules

6    that was available in the pharmaceutical industry that a

7    person of skill in the art would understand at the time it

8    was written.

9              MR. HOGAN:  Okay.  Can I please have a callout

10   on column 4, lines 43-46?

11   BY MR. HOGAN:

12   Q.    What's shown here on the screen, Dr. Moreton?

13   A.    Yeah, this is just the inventors are defining the

14   term "granulation," and they're saying it's "conventionally

15   used in the pharmaceutical industry" and "refers to the act

16   or process in which primary powder particles are made to

17   adhere to form larger, multiparticle entities called

18   granules."

19   Q.    Is that description there in the '721 patent which

20   you just read consistent with a POSA's knowledge of

21   granulation?

22   A.    Yes, it is.

23             MR. HOGAN:  Can I please have lines 47-50 up?

24   BY MR. HOGAN:

25   Q.    What's shown there up on the screen, Dr. Moreton?

DIRECT EXAMINATION - RICHARD CHRISTIAN MORETON

1   A.      This is explaining how granules are formed, and it

2   says they may be -- for example, they may "be formed by

3   collecting particles together by creating mechanical bonds

4   between them, for example, by compression or by using a

5   binder.  Granulation is extensively used in the

6   manufacturing of tablets and capsules."

7   Q.      Is that description you just read in the '721 patent

8   consistent with a POSA's knowledge of granules?

9   A.      Yes.

10  Q.      Okay.

11          MR. HOGAN:  Can I see column 4, lines 53-58,

12  please?

13  BY MR. HOGAN:

14  Q.      What's shown on the screen there, Dr. Moreton?

15  A.      This is generally explaining the granulation process.

16  And it says, "Generally a granulation process combines one

17  or more particles and forms a granule that will allow

18  tableting or the encapsulation process to be within required

19  limits.

20          "The granulation process can be made predictable

21  and repeatable.  The granulation can be performed in a

22  variety of equipment such as, but not limited to, low shear,

23  high shear granulators, fluid bed granulator, roller

24  compactor, and slugger."

25  Q.      Is the passage you just read from the '721 patent

DIRECT EXAMINATION - RICHARD CHRISTIAN MORETON

1    consistent with the understanding of a POSA about

2    granulation process?

3    A.     Yes, it is.

4    Q.     Would a POSA understand that the machinery identified

5    there is still commonly used to perform granulation?

6    A.     Yes, they would understand that it is.

7    Q.     Okay.  Why would a POSA not want to use granules in a

8    pharmaceutical formulation, for example, forming the

9    formulation into a capsule?

10   A.     It would depend very much on the prototypes of the

11   drug.  So some drugs may not been amendable to granulation.

12   And some companies are more cost-conscious than others, and

13   dry blending and filling is a cheaper process so they could

14   shave costs.

15   Q.     Why is dry blending, for example, cheaper than

16   granulation process?

17   A.     Because dry blending doesn't requires as much energy,

18   as much time in the manufacturing area, so it's generally

19   cheaper.

20   Q.     Okay.  I'm going to switch gears now and talk about

21   the Aurobindo product.

22          MR. HOGAN:  Go to the next slide, please.

23   BY MR. HOGAN:

24   Q.     How would one find the ingredients in the Aurobindo

25   ANDA product?

DIRECT EXAMINATION - RICHARD CHRISTIAN MORETON

1    A.     You would look at the Aurobindo ANDA, the -- and the

2    quality overall summary would be a good place to start.

3    Q.     Okay.  So up on the screen is DTX-313.  Do you

4    recognize that document?

5    A.     Yes, this is part of the Aurobindo ANDA, and it's an

6    overall summary.

7    Q.     Did you consider this document in forming your

8    opinions in this case?

9    A.     Yes, I did.

10   Q.     So what is shown on the screen here in the second

11   panel?

12   A.     Second panel shows -- the panel shows the components,

13   the composition of the Aurobindo capsules.

14   Q.     Okay.  And where in that list of ingredients is a

15   list of granules comprising 35 mg of pimavanserin tartrate?

16   A.     Granules comprising 30 mg pimavanserin tartrate is

17   not listed in that list of excipients.

18   Q.     So are you saying that the Aurobindo product contains

19   no pimavanserin tartrate?

20   A.     No, the pimavanserin tartrate is there.  It's not

21   there, though, as granules; it's there as powder.

22   Q.     In your view, would the Aurobindo product contain

23   particles?

24   A.     Yes, most likely.  Yes.

25   Q.     Can you explain that?

DIRECT EXAMINATION - RICHARD CHRISTIAN MORETON

1    A.    All the materials listed there, apart from the

2    capsules at the bottom and the gas, they are powders, and so

3    powders contain particles.

4    Q.    Okay.  Where in that list of ingredients up on the

5    screen at DTX-313 do you see a binder component?

6    A.    There's no binder component listed.

7    Q.    So what does that mean to a POSA reading the

8    ingredient list?

9    A.    It means it's no binder listed then there's no

10   binding process, there's no granulation process, so this is

11   just a dry blend.

12            THE COURT:  Can MCC, even though it's listed as

13   a diluent, can it be -- can it operate as a binder because,

14   you know -- unintentionally?

15            THE WITNESS:  To operate as a binder, Your

16   Honor, it -- there has to be a sufficient energy put in

17   there.  You have to have the high compression or the wet

18   granulation.  Just mixing the wet -- the microcrystalline

19   cellulose with another component and mixing them for a long

20   time would not give you granules, because there's nothing

21   that would hold the -- the particles together and prevent

22   them from being separated until the handling.

23            THE COURT:  So the MCC would be dry as well?

24            THE WITNESS:  Yes.

25            THE COURT:  So in your opinion, Aurobindo's

DIRECT EXAMINATION - RICHARD CHRISTIAN MORETON

1    capsules are clumps as opposed to granules?

2             THE WITNESS:  You could say that, sir.  Yes.

3             THE COURT:  All right.  I understand.

4             Did you perform any testing?

5             THE WITNESS:  I didn't have to, sir.  I

6    understand the encapsulation process, I understand the

7    encapsulation of microcrystalline cellulose, the use of

8    magnesium stearate, the use of colloidal silicon dioxide.  I

9    have used them many times.

10            THE COURT:  All right.  So you didn't perform

11   any polar light microscopy or stereo microscopy?

12            THE WITNESS:  No, I did not, Your Honor.

13   BY MR. HOGAN:

14   Q.    Dr. Moreton, what is required specifically for MCC to

15   act as a binder in a dry granulation?

16   A.    You need to have high -- high pressure, so we're

17   talking, like I said, ton -- tons per square inch, the

18   metric term is megapascals, 100 to 200 megapascals.

19   Q.    And what happens to the MCC in a dry blending --

20   sorry, let me rephrase that.

21            What happens to MCC in a dry granulation

22   process?

23   A.    The MCC is plastic under those circumstances.  And it

24   deforms and it interlocks and it traps the other materials,

25   and then forms bonds between the different parts of the

DIRECT EXAMINATION - RICHARD CHRISTIAN MORETON

1    blend so you get a compact at the end of it.  It could be a

2    tablet, it could be a ribbon or a slug.  It depends on what

3    you're trying to do.

4            MR. HOGAN:  We want to offer AURO-DTX-313 into

5    evidence.

6            THE COURT:  All right.  DTX-313 is admitted.

7            (Exhibit admitted.)

8    BY MR. HOGAN:

9    Q.    So, Dr. Moreton, we've been looking at the ingredient

10    list for the Aurobindo product.  Is there another way that a

11    POSA could know that Aurobindo's pimavanserin product does

12    or does not contain granules?

13    A.    Yes, you could look at the process, the details of

14    the processing.

15            MR. HOGAN:  Next slide, please.

16    BY MR. HOGAN:

17    Q.    Do you recognize the document up on the screen,

18    Dr. Moreton?

19    A.    Yes, I do.  It's part of the Aurobindo ANDA, and it's

20    actually the section on manufacturing.

21    Q.    And what document is this?

22    A.    It's the Aurobindo ANDA.

23    Q.    I think it's the -- which section of the ANDA is it?

24    A.    That's the quality overall summary.

25    Q.    Okay.  And did you consider this document as part of

DIRECT EXAMINATION - RICHARD CHRISTIAN MORETON

1    your infringement analysis in this case?

2    A.    Yes, I did.

3    Q.    Okay.  What is shown on AURO-DTX-313, pages 57-59?

4    A.    This is the processing used to manufacture the

5    Aurobindo pimavanserin tartrate capsule.

6    Q.    Okay.  And starting on page 57, there's step --

7    there's a step 1, do you see that?

8    A.    Say that again, please.

9    Q.    Starting on page 57, the far left panel, step 1,

10   what's described there?

11   A.    Yes.

12   Q.    What's described there in step 1?

13   A.    Excuse me.  Co-sifting of the pimavanserin tartrate

14   and the -- with part of the microcrystalline cellulose.

15   Q.    Okay.  And step 2?

16   A.    Step 2 is co-sifting the material from step 1 with

17   more of the microcrystalline cellulose and -- along with the

18   colloidal silicon dioxide.

19   Q.    Okay.  And what's co-sifting mean?

20   A.    It means they are fed into the sifter together.

21   Q.    One more time?

22   A.    They are fed into the sifter together.

23   Q.    What's a sifter?

24   A.    The sieve, it's just a screen you pass them through,

25   so they don't -- if you try and blend some materials without

DIRECT EXAMINATION - RICHARD CHRISTIAN MORETON

1    sifting, you don't get a good homogeneous mix, and the

2    sifting helps break up some of the granules so you are

3    better mixing for homogenous.  And very often you will take

4    a blend before the lubrication and pass it again through the

5    screen to further improve the blend uniformity.

6    Q.    Is that a high-pressure process?

7    A.    No, it's a very low-pressure process.

8    Q.    Would a POSA -- how would a POSA consider or compare

9    sifting to granulation?

10   A.    I don't know the details of the forces used in

11   sifting, but they are very weak.  You know, you could put

12   your hand in there and it wouldn't -- wouldn't be a problem.

13   I wouldn't put my hand in there or a slugging machine, they

14   are using tons of square inch force, so...

15   Q.    In your experience, would a POSA confuse or assume

16   co-sifting and granulation are the same process?

17   A.    No, they would not.

18   Q.    What's going on at step 3?

19   A.    Excuse me.  Yes, this is the resifting step,

20   resifting the material from step 2 to get a better mix.

21   Q.    Okay.  And is resifting a high-pressure process?

22   A.    No, it's not.

23   Q.    Is resifting like granulation?

24   A.    No, it's not.

25   Q.    Would a -- in your opinion, would a POSA consider the

DIRECT EXAMINATION - RICHARD CHRISTIAN MORETON

1  output of step 3 to be granulated?

2  A.    No, they would consider it to be a dry blend.

3  Q.    Okay.  Looking at this document, what would a POSA

4  consider whether the Aurobindo product contained granules

5  comprising 40 mg of pimavanserin tartrate?

6  A.    A POSA would not consider that the Aurobindo product

7  contained granules, period.

8  Q.    So there's several more steps in this process

9  identified on the screen, right?

10  A.    Yes.

11  Q.    Are any of those steps high-pressure steps akin to a

12  granulation process?

13  A.    No, they're not.

14  Q.    And a POSA would agree with you?

15  A.    Yes.

16          MR. HOGAN:  Can I have the next slide, please?

17  BY MR. HOGAN:

18  Q.    Dr. Moreton, do you recognize that document?

19  A.    Yes, this is, again, from the Aurobindo ANDA.

20  Q.    And what is this?

21  A.    This is the -- 3.2.P.3.3, so it's the description of

22  the manufacturing process and process controls.

23  Q.    Did you consider this document in forming your

24  opinions in this case?

25  A.    Yes, I did.

DIRECT EXAMINATION - RICHARD CHRISTIAN MORETON

1    Q.    And what does this document show?

2    A.    It shows the manufacturing summary and the controls

3    associated with that.  And it also has a brief packaging

4    summary at the end.

5    Q.    Okay.

6              MR. HOGAN:  Can I have the next slide, please,

7    pages 4-6?

8    BY MR. HOGAN:

9    Q.    I have pages 4-6 of DTX-320 up on the screen,

10   Dr. Moreton, what is described there?

11   A.    This is a brief summary of the manufacturing process,

12   so it's describing the manufacturing process for the

13   pimavanserin capsules, 34 mg.  And it goes through the same

14   steps that we've -- we saw in the previous document.

15   Q.    Okay.

16   A.    And the process flowchart at the end is also the

17   same, showing the same process.

18   Q.    Okay.  And, again, what kind of process is shown on

19   those pages 4-6?

20   A.    This is simply a dry blending process.

21   Q.    Where in this document does it show a granulation

22   step?

23   A.    It does not show any granulation step.

24   Q.    Where in this document does it mention granules?

25   A.    It doesn't mention granules at all.

DIRECT EXAMINATION - RICHARD CHRISTIAN MORETON

1   Q.   Why would that matter to your opinions in this case?

2   A.    It matters because the independent claim at issue

3   requires pimavanserin -- granules containing pimavanserin

4   tartrate 40 mg and that doesn't happen in this formulation

5   process.

6   Q.    What is the Aurobindo product?

7   A.    The Aurobindo product is a dry powder blend filled

8   into hard capsules.

9   Q.    Okay.  I'm going to shift gears now.  I am going to

10  talk about the '721 patent.

11          MR. HOGAN:  Can I have the next slide?

12  BY MR. HOGAN:

13  Q.    Dr. Moreton, you're aware that Acadia is asserting

14  Claims 4 and 5 against Aurobindo in this case, right?

15  A.    Yes.

16  Q.    And we have Claim 13 on this slide because we didn't

17  update it with the latest stipulation, so we won't talk

18  about Claim 13 for now.

19          What type of claim is Claim 4?

20  A.    Claim 4 is an independent claim.

21  Q.    What kind of claim is Claim 5?

22  A.    Claim 5 is a dependent claim.

23  Q.    And what does that mean in terms of your analysis in

24  this case?

25  A.    Well, Claim 5 depends on Claim 4.  So Claim 5

DIRECT EXAMINATION - RICHARD CHRISTIAN MORETON

1   contains all the requirements for Claim 4 in addition to the

2   one specified in Claim 5.

3   Q.    Okay.  So before we move on and talk about your

4   infringement analysis in a little more detail, how did you

5   interpret the claim limitation of granules comprising 40 mg

6   pimavanserin tartrate in your analysis?

7   A.    I used the claim construction that -- that the Court

8   produced and I looked at the ordinary common meaning, plain

9   and ordinary meaning, and I used that to assess the phrase

10  comprising -- granules comprising 40 mg pimavanserin

11  tartrate.

12  Q.    And did you, in your analysis, compare Claim 4 as

13  construed to the Aurobindo product?

14  A.    Yes, I did.

15        MR. HOGAN:  Next slide, please.

16  BY MR. HOGAN:

17  Q.    So looking at this claim chart, what claim limitation

18  was most important to your infringement analysis in this

19  case?

20  A.    As highlighted here, granules comprising 40 mg

21  pimavanserin tartrate.

22  Q.    And we talked about -- we talked a few minutes ago

23  about the contents or the ingredients of the Aurobindo

24  product, didn't we?

25  A.    Yes, we did.

DIRECT EXAMINATION - RICHARD CHRISTIAN MORETON

1   Q.    Okay.  What is your opinion as to whether the

2   Aurobindo product infringes Claim 4 of the '721 patent?

3   A.    It does not -- the Aurobindo product does not contain

4   granules comprising 40 mg pimavanserin tartrate or granules

5   of any kind.

6   Q.    Okay.  And for that reason, you conclude that

7   Aurobindo's product does not infringe Claim 4; do I have

8   that right?

9   A.    That's correct, yes.

10  Q.    And what is your opinion as to whether the Aurobindo

11  product infringes Claim 5 of the '721 patent?

12  A.    Well, since Claim 5 depends from Claim 4, and Claim 4

13  requires granules comprising 40 mg pimavanserin tartrate and

14  they're not present in the Aurobindo product, then Claim 5

15  also does not apply or the Aurobindo product does not

16  infringe Claim 5.

17  Q.    Okay.

18          Okay.  I'm going to shift gears now and talk

19  about a different topic.

20          You're aware that Acadia's expert, Dr. Smith,

21  contends that the MCC in Aurobindo's product acts as a

22  binder, right?

23  A.    That's what I understand, yes.

24  Q.    Do you agree?

25  A.    No, I do not.

DIRECT EXAMINATION - RICHARD CHRISTIAN MORETON

1    Q.    **Why not?**

2    A.    **There's no force, pressure, or anything that could**

3    **cause the microcrystalline cellulose to act as a binder in**

4    **the Aurobindo product.**

5    Q.    **And without that high-pressure force?**

6    A.    **High pressure, there's no wet granulation, there's no**

7    **granulation process.**

8    Q.    **And you're aware that Dr. Smith contends that**

9    **Aurobindo's product contains granules comprising 40 mgs**

10   **pimavanserin tartrate, right?**

11   A.    **Yes.**

12   Q.    **Do you agree?**

13   A.    **I do not agree.**

14   Q.    **Why not?**

15   A.    **Various reasons that we've just stated, we've just**

16   **gone through the whole process.  The blending and filling of**

17   **the Aurobindo capsules does not contain a granulation step,**

18   **does not have sufficient force or the right kind of**

19   **excipients to create a granule.**

20   Q.    **And why is that important?**

21   A.    **Because, as we just discussed, if it doesn't have**

22   **granules, then it can't have granules comprising 40 mg**

23   **pimavanserin tartrate.**

24   Q.    **And did you testify earlier that it's your opinion**

25   **that the Aurobindo product contains no granules at all?**

DIRECT EXAMINATION - RICHARD CHRISTIAN MORETON

1    A.    No granules at all, yes.

2    Q.    Are there any other reasons why you disagree with

3    Dr. Smith's opinions of infringement on this case?

4    A.    Yes, there are some deficiencies in Dr. Smith's

5    reports.

6    Q.    Okay.  Let's talk about Dr. Smith's experiments and

7    her pictures for a minute.

8              First, what about Dr. Smith's experiments in

9    microscopy do you disagree with?

10   A.    Well, there were not sufficient controls.  You need

11   controls to establish what you -- you know, in this case,

12   you need controls to compare something with so it doesn't

13   give you -- you can't just make a bold assumption because

14   you think that's what's there; you need to have something to

15   establish the veracity of your opinion.

16   Q.    Lack of controls, let's talk about that a little

17   more.

18             Do you recall Dr. Smith used a -- I think she

19   called it a "reference standard of MCC," do you recall that?

20   A.    Yes, I do recall that.

21   Q.    And that's in her reply report, right?

22   A.    Yes.

23   Q.    What kind of MCC was used in that -- for that

24   picture?

25   A.    She used a brand of MCC called Avicel PH101.

DIRECT EXAMINATION - RICHARD CHRISTIAN MORETON

1          (Court reporter clarification.)

2              THE WITNESS:  Avicel.

3              THE REPORTER:  Thank you.

4              THE WITNESS:  PH101.

5    BY MR. HOGAN:

6    Q.    And what kind of MCC is used in Aurobindo's product?

7    A.    It's a different manufacturer.  I think it's

8    Cellucress or something like that is the trade name, so it

9    comes from a totally different source.

10   Q.    And is there one -- is there -- describe the MCC in

11   Aurobindo's product.

12   A.    MCC in Aurobindo's product -- well, there are two

13   grades, 112 and 113.  Those differ in particle size, and --

14   but the important thing is also to remember that if you use

15   material from different sources and there may be well

16   different -- differences in the processing of those

17   manufacturing process for those microcrystalline celluloses,

18   that would impact the appearance and the morphology of

19   particles that are seen under the microscope.

20   Q.    Do you think could have affected Dr. Smith's

21   conclusions or her analysis based on her microscopy using

22   that Avicel MCC as a reference?

23   A.    It could have.  You'd have to look at the study

24   materials and see what is right.

25   Q.    So just to be clear, the MCC that Dr. Smith used in

DIRECT EXAMINATION - RICHARD CHRISTIAN MORETON

1    her analysis is not in the Aurobindo product, is it?

2    A.      It is not, no.

3    Q.      Okay.  What else do you disagree with about

4    Dr. Smith's experiments and conclusions?

5    A.      Well, in my opinion, I mean, Dr. Smith disagrees with

6    me, but microcrystalline cellulose, when I've looked at it

7    has been opaque to light and it doesn't really provide

8    information on particle structures like microscopy, because

9    even if you get some penetration, it's distorted.  So you

10   can't, you can't see how the material is constructed.

11           If there are more than one particle, you can't

12   see whether -- how they are fixed together, what the -- how

13   strongly they are bonded together.  There's no information

14   of that nature.

15   Q.      So your opinion is that the microscopy experiments

16   can provide no information about the structure or how

17   strongly bonded together the particles of structure are; is

18   that right?

19   A.      That's correct, yes.

20   Q.      In her reports, Dr. Smith talks about dark areas and

21   light spots of images that provide information about the

22   structure of the particles on her slides.

23           Why isn't that right?

24   A.      Well, the light and dark areas don't really give, as

25   I mentioned, any information on exactly what they are.

DIRECT EXAMINATION - RICHARD CHRISTIAN MORETON

1          Yes, Dr. Smith explained that the lighter areas

2     would be crystalline areas, but magnesium stearate is

3     crystalline, as she said, and would that be part of it?

4          The amorphous -- the colloidal silicon dioxide

5     is amorphous, the pimavanserin tartrate is apparently

6     amorphous, so they would not respond in the same way.  But

7     there's no clear definition as to -- or no clear information

8     as to what those dark areas, those "amorphous," as she

9     called them, areas are because the technique won't do that.

10    Q.    In your opinion, can polarized light microscopy or

11    stereo microscopy tell a POSA how particles, any particles

12    are structured or what they contain?

13    A.    Not in my experience, no.

14    Q.    Why not?

15    A.    Simply, you don't get enough detail.  You don't get

16    enough information about the interactions, the energy of

17    interactions or anything like that, any changes, whether

18    it's hydration changes, anything like that.

19    Q.    So do you have an opinion about Dr. Smith's

20    assertions regarding the physical structure of granules and

21    the physical structure of powder?

22    A.    Would you say that again, please?  I'm having

23    difficulty hearing.

24    Q.    Sorry.

25          Do you have an opinion about Dr. Smith's

DIRECT EXAMINATION - RICHARD CHRISTIAN MORETON

1    assertions regarding the physical structure of granules and

2    the physical structure of powder?

3    A.    Yes, I believe that Dr. Smith conflates the two.  She

4    doesn't make a distinction between, as I explained earlier,

5    loose agglomerates or more rigid agglomerates, and there's a

6    big difference in terms of the energy required to separate

7    the particles.

8         And loose agglomerations will separate and

9    recombine; graules will stay pretty much fast and will not

10   separate and, therefore, do not have to recombine.

11   Q.    And what effect does this -- your complaint with

12   Dr. Smith's assertions have on her conclusions based on her

13   experience and her microscopy diagrams?

14   A.    I think, in my opinion, Dr. Smith's conclusions are

15   invalid because there's no conclusive evidence that she's

16   presented that granules actually formed.  There may be

17   agglomeration, I would expect agglomeration in a dry blend.

18   But there's no conclusive evidence that I've seen in a dry

19   blend form.

20        MR. HOGAN:  Next slide, please.

21   BY MR. HOGAN:

22   Q.    You reviewed Dr. Smith's opening and reply reports on

23   infringement, did you not?

24   A.    Yes, I did.

25   Q.    Okay.  What's shown up on the screen here,

DIRECT EXAMINATION - RICHARD CHRISTIAN MORETON

1   Dr. Moreton?

2   A.      These are two -- this is an image from her reply

3   report and these are two particles from the -- from the

4   material she obtained from the pimavanserin, the Aurobindo

5   pimavanserin tartrate capsules.

6   Q.      Did you consider these images in forming your

7   opinions in this case?

8   A.      Yes, I did.

9   Q.      Do you agree with Dr. Smith that image 10 shows

10  granules comprising 40 mg pimavanserin tartrate?

11  A.      No, I do not.

12  Q.      Why not?

13  A.      There's no information there that says what these

14  particles are composed of.  There is -- you also have to

15  remember that these particles are not two-dimensional like

16  the image; they're three-dimensional.  And so a lot of what

17  Dr. Smith explained may be valid, but there's also the fact

18  that with a three-dimensional particle, there would be

19  thinner parts and -- and thicker parts, and the thinner

20  parts at the edges may just transmit more light.

21  Q.      And why is that important to the question of the

22  presence or absence of granules comprising 40 mgs

23  pimavanserin tartrate in Aurobindo's product?

24  A.      Because this does not demonstrate -- these images do

25  not demonstrate necessarily a granule.  They do not

DIRECT EXAMINATION - RICHARD CHRISTIAN MORETON

1   demonstrate that it even contains pimavanserin tartrate.

2   They just demonstrate that they are particles and there are

3   light and dark areas.

4   Q.     In your opinion, what conclusion would a POSA draw

5   from image 10?

6   A.     Nothing.  They wouldn't draw a conclusion from

7   image 10.

8   Q.     So let's look at image 10 a little bit.  I'm going to

9   use this pointer.  If this blinds anybody, I apologize.

10          So what about the top part of this particle on

11  the left, right?  There's some translucent spots here across

12  the top, a little on the side here, and the same around

13  here.  It looks like there's some spots around here and

14  there (indicating).  Why doesn't that give the POSA

15  information about the contents or the structure of these

16  particles?

17  A.     Yes, there's the translucent areas or there's less

18  opaque areas, and -- but there's no information there as to

19  what they are.  It could be any -- any part of the

20  formulation.  It could be magnesium stearate.  It could be

21  the fact that the microcrystalline cellulose is part of the

22  particles as well.  But there's no information to say what

23  precisely those particles comprise and how they are held

24  together.

25  Q.     So the POSA can't -- in your opinion, the POSA can't

Appx350

DIRECT EXAMINATION - RICHARD CHRISTIAN MORETON

1  determine or conclude from this or this or these parts

2  (indicating) how rigidly or loosely bonded the components,

3  if there's more than one component, in these products are;

4  is that right?

5  A.    Correct, yes.

6  Q.    At the bottom of these two images, there are some

7  blurry -- there's some blurred parts.  This all looks blurry

8  down here.  This is all blurry here on the side.  What's --

9  why is that there, do you know?

10  A.    I think it may be an artifact of the preparation of

11  the slides.  As Dr. Smith explained, she put the particles

12  under a coverslip and then allowed the mineral oil to

13  diffuse in, and I think that -- those blurs are just where

14  the mineral oil has gotten above the edge of the particle.

15  Q.    How does that affect your opinion as to whether these

16  images can confirm or not confirm the presence of granules

17  or whether these are granules comprising 40 mgs of

18  pimavanserin tartrate?

19  A.    It doesn't have any effect.  It's just an artifact of

20  the preparation technique.

21           MR. HOGAN:  Okay.  Next slide, please.

22           THE COURT:  If these were loose agglomerations,

23  Dr. Smith testified that one of her, sort of, safety

24  parameters was the use of the -- covering it and that when

25  you do that, any loose agglomerations would spread out.  But

DIRECT EXAMINATION - RICHARD CHRISTIAN MORETON

1    these remained, which told her that these were -- which also

2    confirmed that these were granules.  How do you respond to

3    that?

4              THE WITNESS:  Yes, Your Honor.  I reply to it

5    this way:  Dr. Smith mentioned this morning or said this

6    morning that she had no information on the relative humidity

7    of the laboratory where she did the experiments in.

8    Pimavanserin tartrate is very highly -- so it draws water

9    from the atmosphere.  And unless Dr. Smith took precautions

10   during her work to reduce the relative humidity in the

11   atmosphere to somewhere around 20 percent, then the -- it's

12   likely -- and it's likely it was at, say, 50 to 60 percent,

13   that over the course of time, the pimavanserin tartrate

14   would absorb water and become -- essentially become a little

15   bit more sticky, tacky.  And then when she used a mineral

16   oil to try and separate out the materials, then it wouldn't

17   happen because they would be bound in a different way.  They

18   would not be loosely -- loose agglomerates.  They would be

19   all bound by the aqueous layer, and the aqueous layer would

20   also repel the mineral oil, and it may not -- it may not

21   work as well as she would want.

22             (Court reporter clarification.)

23             THE WITNESS:  Aqueous layer.

24             THE COURT:  So in essence, the pimavanserin

25   tartrate becomes sort of wet --

DIRECT EXAMINATION - RICHARD CHRISTIAN MORETON

1       THE WITNESS:  Yes.

2       THE COURT:  -- and it binds, is what you're

3   saying to me?

4       THE WITNESS:  Yes, sir.  Thank you.

5       THE COURT:  Okay.

6       MR. HOGAN:  Next slide, please.

7   BY MR. HOGAN:

8   Q.    On this slide, do you recognize what's shown here,

9   Dr. Moreton?

10  A.    Yes, these are also slides from Dr. Smith's reply

11  report.

12  Q.    So -- and I -- so what's the difference between

13  image 11 and image 12 compared to image 10 that we just

14  looked at?

15  A.    Well, as Dr. Smith -- excuse me -- Dr. Smith said

16  this morning, image 10 was just plain polarized light,

17  image 11 is under cross polarizers, image 12 is under cross

18  polarizers but with a reference -- a red reference filter to

19  enhance the contrast and allow -- as Dr. Smith explained,

20  allow some of the detail to be more easily seen.

21  Q.    Okay.  Did you consider these images in forming your

22  opinions in this case?

23  A.    Yes, I did.

24  Q.    Do you agree with Dr. Smith that images 11 and 12

25  show the granules comprising 40 mgs pimavanserin tartrate?

DIRECT EXAMINATION - RICHARD CHRISTIAN MORETON

1    A.    No, I do not.

2    Q.    Why not?

3    A.    There's no information in these images to show that

4    they are granules.  There's no information in these images

5    to show how the granules -- how the granules, if they are

6    granules, how the components of the granules are stuck

7    together or how strongly they are stuck together.  And as I

8    just explained, the humidity may well have affected --

9    relative humidity in the lab may well have affected the

10   results.

11   Q.    Okay.  Again, let's look at image 11 for a moment.

12   In this -- in this view along the top, there's these

13   lighter -- lighter portions, and there's some here.  It

14   looks like there's some colored dots in there, same over

15   here.  There's some light spots over here.  What would that

16   tell a POSA about the components of or how strongly those

17   components are held together in that particle?

18   A.    It wouldn't tell the POSA anything about how strongly

19   the materials are held together.

20   Q.    Why not?

21   A.    It doesn't measure that kind of effect.  It's just --

22   it just says there are areas of those particles that have

23   responded to the cross polarizers.  So as Dr. Smith, you

24   know, said this morning, there's a change in the refractive

25   index and it's more crystalline material.  And so, yeah,

DIRECT EXAMINATION - RICHARD CHRISTIAN MORETON

1    that's fine, but it doesn't tell you how they are held

2    together or how -- what kind of materials are in there.

3    Q.    What about image 12?  I see you've got the red

4    background, and there's lighter -- there's a lighter, more

5    translucent portions up here in the top, and the lower part

6    -- there's some right there, and some little dots down here,

7    and there's the lighter part here and there's some lighter

8    stuff up here.  What would that tell a POSA about the

9    structure or contents of those -- of those particles?

10   A.    Nothing.

11   Q.    Why not?

12   A.    Again, as I explained in slide 11, there's no

13   information here about what they are.  All they're saying --

14   all that Dr. Smith's photographs have shown is that there

15   are some areas that refracted the light differently, but

16   there's no information on what those areas contain or how --

17   if there's more than one component there, how they are held

18   together, and the strength of that, of how they are held

19   together.

20   Q.    How would you characterize Dr. Smith's conclusions

21   based on her microscopy experiments in these images as she's

22   shown the Court today?

23   A.    I think the results that I've seen are inconclusive,

24   and I think -- it's Dr. Smith's opinion, but there's -- I

25   don't see the hard evidence of any kind of structural

CROSS-EXAMINATION - RICHARD CHRISTIAN MORETON

1    component or -- that I would equate with granules.

2              MR. HOGAN:  Last slide, please.

3    BY MR. HOGAN:

4    Q.    Dr. Moreton, would you please summarize your opinions

5    as to the issue of infringement by Aurobindo's product in

6    that case?

7    A.    Yes.  Aurobindo's ANDA product lacks granules

8    comprising 40 mgs of pimavanserin tartrate; therefore, there

9    is no literal infringement of the asserted claims.

10             MR. HOGAN:  Pass the witness, Your Honor.

11             THE COURT:  All right.  All right.  Let's take

12   the afternoon break at this time before we get into the

13   cross.  So let's -- we'll take 15 minutes.

14             (Break taken.)

15             THE COURT:  Continue.

16                  CROSS-EXAMINATION

17   BY MR. PETERMAN:

18   Q.    Good afternoon, Dr. Moreton.

19   A.    Good afternoon.

20   Q.    You may recall we met a few months ago when I took

21   your deposition in this case.

22   A.    Yes, I do remember.

23   Q.    Nice to see you again.

24             Dr. Moreton, you have never handled Aurobindo's

25   pimavanserin product in person, correct?

CROSS-EXAMINATION - RICHARD CHRISTIAN MORETON

1   A.    That's correct.

2   Q.    You didn't perform any of your own testing of

3   Aurobindo's pimavanserin product?

4   A.    No, I did not.  I didn't think I had to.

5   Q.    You didn't perform any imaging studies of Aurobindo's

6   pimavanserin product?

7   A.    No, I did not.

8   Q.    You didn't try to replicate the experiments that

9   Dr. Smith performed?

10  A.    No, I did not.

11  Q.    And you never performed any testing on the active

12  pharmaceutical ingredient of pimavanserin, correct?

13  A.    That's correct.

14  Q.    And you've never spoken with anyone at Aurobindo

15  regarding any aspect of Aurobindo's pimavanserin product,

16  correct?

17  A.    That's correct.

18  Q.    You've never spoken with anyone at Aurobindo

19  regarding Aurobindo's ANDA for pimavanserin, correct?

20  A.    That's correct.

21  Q.    And as we discussed during your deposition, you

22  didn't actually read this Court's claim construction opinion

23  before rendering your opinions in this case, correct?

24  A.    I didn't read it, but I discussed it at length with

25  my counsel and he read it out to me.

CROSS-EXAMINATION - RICHARD CHRISTIAN MORETON

1    Q.     Now, you've made some comments regarding humidity

2    of -- concerns with pimavanserin.  Have you performed any

3    studies with respect to humidity and pimavanserin?

4    A.     No.  I have not performed studies, but it's

5    recognized as a hygroscopic material, and in the

6    manufacturing instructions, the manufacturing area is -- is

7    conditioned below 20 percent relative humidity, which tells

8    me that it's a very hygroscopic material.

9    Q.     But you don't -- you're not offering any opinions as

10   to how long exposure to a certain environment would take to

11   change the characteristics of the product, correct?

12   A.     I'm not offering that directly, but I do understand

13   that with very hygroscopic materials, because I've handled

14   them, that very often only an exposure of an hour can change

15   the whole characteristic of the powder.

16   Q.     Okay.  But you're not telling this Court with any

17   certainty that humidity changed Dr. Smith's results,

18   correct?

19   A.     I'm not saying definitely, but it's an area of

20   considerable concern based on my experience with hygroscopic

21   materials in the past.

22   Q.     But, again, you didn't do any testing to see if it

23   was actually a concern with Dr. Smith's testing, correct?

24   A.     I didn't do any experiments directly, no.

25   Q.     Okay.  And you would agree with me that if you had a

Appx358

CROSS-EXAMINATION - RICHARD CHRISTIAN MORETON

1  dry blend of the excipients and the API as compared to a

2  granulated blend of excipients and API, you'd get a

3  different bulk density?

4  A.    You would -- there would be different -- there would

5  be a bit different bulk density, yes.

6  Q.    Okay.  And you would expect the granulated API and

7  excipients to have a higher bulk density, correct?

8  A.    That depends on the size of the granules and how they

9  pack into the -- into the capsule.

10  Q.    And you would expect a blend that had clumps or

11  agglomerates to have a higher bulk density than a blend that

12  did not have any clumps or agglomerates, correct?

13  A.    Again, it depends on how the agglomerates are packed

14  together and whether -- how easily they are to be broken up.

15  I would expect the agglomerates could -- or -- would be

16  tacky and would break down into a powder and have similar

17  bulk density to -- or tapped density to a regular powder.

18  Q.    Okay.  And you understand that Dr. Smith sifted the

19  material before taking the images that she presented in her

20  report and her testimony today, correct?

21  A.    Would you say that again, please, sir?

22  Q.    You understand that Dr. Smith sifted the materials

23  that she used to image and then testified about today?

24  A.    Yes, she did.

25  Q.    Now, you agree that Claim 4 of the '721 patent

CROSS-EXAMINATION - RICHARD CHRISTIAN MORETON

1  doesn't require a specific granulation process, it just

2  requires granules, correct?

3  A.    It just requires granules, yes.

4  Q.    Without regard to how the granules are made?

5  A.    It's agnostic as to how they're made, yes.

6  Q.    And Claim 4 does not require a compression step?

7  A.    No, it does not, it just requires granules.

8  Q.    And, Dr. Moreton, again, you didn't perform any tests

9  to determine whether Aurobindo's product was a loose blend

10  as opposed to a -- you know, a blend that was harder to

11  separate?

12  A.    No, I did not.

13  Q.    And if it was a loose blend, you would expect that if

14  it was shaken and sieved, the active pharmaceutical

15  ingredient would separate, at least some of it would

16  separate from the rest of the particle?

17  A.    That would depend on circumstances, if you have a

18  certain type of sieve shaker.  I have seen dry blends ball

19  up on the sieve because of the action of the sieve shaker.

20  I don't know what -- the details of Dr. Smith's sieve

21  shaker, but it's a possibility.

22  Q.    Okay.  And you didn't study any -- you know, you

23  didn't use a sieve shaker because you didn't actually do any

24  testing of Aurobindo's product, correct?

25  A.    I didn't use a sieve shaker, no.  But I have used

CROSS-EXAMINATION - RICHARD CHRISTIAN MORETON

1  them extensively in the past.

2  Q.     But in connection with this litigation, your role

3  here, you did not use a sieve shaker with pimavanserin?

4  A.     That's correct.

5  Q.     Now, Dr. Moreton, just directing your attention to

6  the patent, column 4, around line 43.

7          MR. PETERMAN:  And ask Mr. Campos to bring it

8  up.

9  BY MR. PETERMAN:

10  Q.     The specification states here that "granules are

11  multiparticle entities consisting of primary powder

12  particles that were made to adhere"; is that correct?

13  A.     That's correct.

14  Q.     And a POSA would understand that adhere means

15  particles of different types sticking together, correct?

16  A.     That's correct.

17  Q.     And adhere could encompass both a rigid adherence and

18  a looser adherence, correct?

19  A.     Adherence, in simple terms, yes, it can; however, the

20  general understanding of a person of skill in the art, as I

21  understand it, and I'm a person of ordinary skill in the

22  art, they would understand that granulation requires a

23  granulation process.  It's not simply just the electrostatic

24  interaction of powder particles, there's got to be a

25  granulation process.

CROSS-EXAMINATION - RICHARD CHRISTIAN MORETON

1   Q.    Okay.  But you agree here that in this definition of

2   granules, it just uses the term "adhere," without any

3   qualification, correct?

4   A.    That's correct.

5   Q.    Now, Dr. Moreton, in a granule that has two

6   ingredients, the API and excipient, the API and excipients

7   would be adhered together, correct?

8   A.    In a granule, yes.

9   Q.    Okay.  And you believe also that pimavanserin can

10  adhere to microcrystalline cellulose, depending on the

11  particle size, correct?

12  A.    Depending on the particle size, yes.

13             MR. PETERMAN:  And just to continue in the

14  patent, Mr. Campos, if you would go to column 4, lines

15  47-50.

16  BY MR. PETERMAN:

17  Q.    And it says there, Granules may, for example, be

18  formed by collecting particles together by creating

19  mechanical bonds between them, e.g. by compression or using

20  a binder.

21             This provides a nonlimiting example of how

22  granules may be formed, correct?

23  A.    Say that again, a what limiting?

24  Q.    A nonlimiting, it doesn't limit the way that a

25  granule can be formed, correct?

CROSS-EXAMINATION - RICHARD CHRISTIAN MORETON

1    A.     That's correct, yes.

2           MR. PETERMAN:  And, Mr. Campos, if we go down to

3    column 4, lines 56-58.

4    BY MR. PETERMAN:

5    Q.     In the specification, again, it states the

6    granulation can be performed in a variety of equipment, such

7    as, but not limited to, low shear, high shear granulation --

8    granulators, fluid bed granulator, roller compactor, and the

9    slugger, correct?

10   A.     Correct.

11   Q.     So within the specification, these are examples but

12   not a limitation of the types of equipment that could be

13   used, correct?

14   A.     They're examples of the most common types of

15   equipment used, yes.

16   Q.     Now, Dr. Moreton, you don't consider yourself an

17   expert in polarized light microscopy, correct?

18   A.     I don't consider myself an expert in polarized light

19   microscopy, but I have used microscopy and polarized light

20   microscopy in the past.

21   Q.     But prior to this litigation, you never offered

22   opinions regarding polarized light microscopy as a

23   testifying expert?

24   A.     I don't think so.

25   Q.     And you don't -- as asked in your deposition, you

1   don't recall ever operating a polarized microscope, correct?

2   A.      I don't think I've operated one myself, no.

3   Q.      Outside of this litigation, have you ever used PLM or

4   rendered an opinion on PLM in determining the presence of

5   granules in a formulation?

6   A.      PLM has been used in research projects that I have

7   been associated with in the industry, but I don't recall the

8   exact details these days; it's some years ago.

9   Q.      Now, you do admit that there -- well -- have you

10  performed any analyses to understand if the MCC images that

11  Dr. Smith collected versus the MCC that's used in

12  Aurobindo's product appear any differently under a PLM?

13  A.      No, I have not.

14              MR. PETERMAN:  I don't have any further

15  questions, thank you.

16              THE COURT:  Redirect?

17              MR. HOGAN:  No redirect, Your Honor.

18              THE COURT:  All right.  Dr. Moreton, thank you,

19  sir, you may step down.

20              THE WITNESS:  Thank you, sir.

21              MR. HOGAN:  Your Honor, that concludes our

22  noninfringement rebuttal case.

23              THE COURT:  All right.  Next?

24              MR. PETERMAN:  I think -- Your Honor, I think we

25  move on to the next part of the case.

DIRECT EXAMINATION - FERNANDO MUZZIO

1          MS. CARLAN:  Your Honor, we were going to move

2     on to the invalidity part of the case now, and we're going

3     to call our next witness as Dr. Muzzio.  Normally, we would

4     have read the -- or had the transcripts played from what we

5     had argued about this morning.  We'll do that after

6     Dr. Muzzio.  We'll bring that request to you again so you

7     can see the context and make the ruling at that time.

8          THE COURT:  Okay.

9          MS. CARLAN:  So Defendants call Dr. Muzzio.

10         FERNANDO MUZZIO, having been called on the part

11    and behalf of the Defendants as a witness, having first

12    affirmed to tell the truth, testified as follows:

13                      DIRECT EXAMINATION

14    BY MR. FRESE:

15    Q.    Good afternoon, Dr. Muzzio.  Dr. Muzzio, would you

16    please introduce yourself to the Court?

17    A.    Sure, my name is Fernando Javier Muzzio, M-U-Z-Z-I-O.

18    I'm a professor at Rutgers and I live in Long Branch, New

19    Jersey.

20    Q.    And, Dr. Muzzio, have you prepared a slide today to

21    highlight aspects of your education and experience to the

22    Court?

23    A.    Yes, I have.

24    Q.    So would you go ahead and please describe what's

25    showed on the slide in terms of your education and

DIRECT EXAMINATION - FERNANDO MUZZIO

1    experience?

2    A.    Sure.  I have a bachelor's degree in chemical

3    engineering from University of Mar del Plata in Argentina

4    and a PhD in chemical engineering from University of

5    Massachusetts at Amherst, which I obtained in 1991.  I

6    joined Rutgers the year I finished my PhD and I have been

7    there ever since.  So it's now 33 years or so.

8              And for the entire time, I have focused on

9    research on various aspects of pharmaceutical engineering,

10   pharmaceutical processing, pharmaceutical manufacturing.

11   And over the years, I went up the ranks and I was promoted

12   to professor two, which later on was changed to

13   distinguished professor in 2007.  So I have been a

14   distinguished professor for 17 years.

15   Q.    Dr. Muzzio, what does the title distinguished

16   professor mean?

17   A.    So Rutgers usually makes distinguished professors,

18   the people who are recognized for having achieved, you know,

19   a global leadership role in their fields.

20   Q.    Let's go through some details of your qualifications.

21   Have you prepared a slide regarding those?

22   A.    Yes, I have.

23             MR. FRESE:  Can we pull up MUZZIO-DX-3?

24             THE WITNESS:  So describing my research, I have

25   been lucky enough to have been funded by a number of

DIRECT EXAMINATION - FERNANDO MUZZIO

1  government agencies, including DARPA, the National Science

2  Foundation, the Food and Drug Administration, the Department

3  of Energy.  More recently, ASPR.  The United States

4  Pharmacopea, the state of New Jersey, a whole bunch of

5  companies.

6           And 2006, I led a team that was able to attract

7  a -- an engineer and research center for the National

8  Science Foundation.  This is one of the largest grants given

9  by NSF.  On of the largest universities.  The program went

10  on for 10 years, attracted funding in the order of

11  $100 million, and focused entirely on innovation in

12  pharmaceutical product and process development.  So that's

13  the highlights.

14  BY MR. FRESE:

15  Q.    Have you published any research in peer-reviewed

16  journals?

17  A.    Yeah, my nonconfidential research has been published

18  in many different journals.  The last time I looked, it was

19  about 320 papers or so.

20  Q.    Do you have any patents?

21  A.    Yes, I have been named an inventor on a number of

22  patents and there are a few more that are pending right now.

23  Q.    Have you been invited to present at seminars,

24  conferences, or lectures on pharmaceutical manufacturing or

25  pharmaceutical formulation?

DIRECT EXAMINATION - FERNANDO MUZZIO

1   A.      Yeah, I stopped counting about maybe 15 years ago,

2   but by then it was over 500 lectures and presentations and,

3   you know, keynotes and all that.

4   Q.      Has your research received any awards?

5   A.      A few.  A few.  At least there in 2007, I was

6   recognized by the American Institute of Chemical Engineers

7   for my work in mixing theory and practice.  And again, the

8   American Institute of Chemical Engineers, which is my main

9   professional organization, recognized my contributions in

10  the pharmaceutical area for my work in quality by design.

11          In 2018, I was named the inventor of the year by

12  New Jersey Inventors Hall of Fame for the work I'd done in

13  contributions for pharmaceutical manufacturing.  The same

14  year I got the chairman's award at the R&D Council of New

15  Jersey for a large group of companies that we have been

16  working with, it was over 50 companies.

17          And one is dear to my heart.  Last year I was

18  inducted as an elected member of the Argentine Academy of

19  Pharmacy and Biochemistry.  I was the first and only

20  engineer to be inducted into the academy so far.

21  Q.      Would you go ahead and turn to DTX-81 in your witness

22  binder?

23  A.      Yes.

24  Q.      And what is DTX-81?

25  A.      Just one second, Counsel.  I need my glasses.  Okay,

DIRECT EXAMINATION - FERNANDO MUZZIO

1   DTX-81.

2          That's my resume.

3   Q.     And is it a true and accurate representation of your

4   education and work history?

5   A.     It was back in April when I submitted it to you.

6   Q.     And is it a true and accurate representation of your

7   publication history?

8   A.     There's been a few more papers and such, but, yeah.

9   Q.     Okay.

10          MR. FRESE:  We'd like to move DTX-81 into

11   evidence.

12          THE COURT:  Any objection?

13          MR. PETERMAN:  No objection.

14          THE COURT:  All right.  DTX-81 is admitted.

15          (Exhibit admitted.)

16   BY MR. FRESE:

17   Q.     Dr. Muzzio, have you previously been qualified to

18   testify before --

19          MR. FRESE:  Before I get to that question, we

20   can unseal the courtroom at this point, if we haven't done

21   that already.

22          THE COURT:  Okay.  Fine with that?

23          MR. PETERMAN:  Yes, we have no issue, Your

24   Honor.

25          THE COURT:  Let's unseal the courtroom.

DIRECT EXAMINATION - FERNANDO MUZZIO

1          (Whereupon, the sealed portion of the transcript

2     concluded.)

3     BY MR. FRESE:

4     Q.    Dr. Muzzio, have you previously been qualified to

5     testify as an expert witness regarding pharmaceutical

6     formulation at trial?

7     A.    Yeah, I believe this will be my seventh time

8     testifying in front of a federal judge.

9     Q.    Do you consider yourself an expert in the area of

10    pharmaceutical formulation?

11    A.    Yes, I think I have expertise in that area.

12    Q.    Do you consider yourself an expert in the area of

13    manufacturing pharmaceutical formulations?

14    A.    Yes, I do.

15    Q.    And do you consider yourself an expert in the area of

16    development of pharmaceutical formulations?

17    A.    Yes, I have done extensive work in that area.

18          MR. FRESE:  Your Honor, MSN and Aurobindo would

19    like to offer Dr. Fernando Muzzio as an expert in the areas

20    of pharmaceutical formulation, manufacturing of

21    pharmaceutical formulations, and development of

22    pharmaceutical formulations in this case.

23          MR. PETERMAN:  No objection, Your Honor.

24          THE COURT:  All right.  Dr. Muzzio may testify

25    as an expert in the area of pharmaceutical formulation,

DIRECT EXAMINATION - FERNANDO MUZZIO

1  manufacturing pharmaceutical formulations and development of

2  pharmaceutical formulations.

3  BY MR. FRESE:

4  Q.     Dr. Muzzio, I want to talk a little bit about your

5  analysis in this case.  What were you asked to do?

6  A.     I was asked to review the patent at issue and the

7  prior art, and to form opinions regarding the validity of

8  the asserted claim.

9  Q.     And where did you start in connection with that

10 assignment?

11 A.     Well, I started by looking at the patent.

12 Q.     Let's go ahead and turn to JTX-9 in your binder.

13 A.     Yes.

14 Q.     So this is the patent that you reviewed?

15 A.     Yes, it is.

16 Q.     And it is the '721 patent?

17 A.     Yes, it is.

18 Q.     And did you review the entire specification of the

19 '721 patent?

20 A.     Yes, I did.

21 Q.     And do you have a slide discussing what the '721

22 patent relates to generally?

23 A.     I do.

24 Q.     We've got Muzzio DX-4 on the screen.

25            (Court reporter interruption.)

DIRECT EXAMINATION - FERNANDO MUZZIO

1   BY MR. HOGAN:

2   Q.     We have Muzzio DX-4 on the screen.

3          Dr. Muzzio, what generally is the subject matter

4   of the '721 patent?

5   A.     It's capsules containing pimavanserin, processes for

6   making those capsules and pharmaceutical compositions

7   containing pimavanserin.

8   Q.     What is your understanding as to the earliest

9   effective priority date of the '721 patent?

10  A.     This patent claims priority to August 30th, 2017.

11  Q.     And which claims of the '721 patent do you understand

12  are being asserted against MSN and Aurobindo?

13  A.     Until this morning, I thought they were 4, 5, and 13.

14  Now I understand 13 is no longer being asserted.

15  Q.     So it's just Claims 4 and 5?

16  A.     That would be my understanding.

17  Q.     Okay.  In connection with your analysis, did you

18  review the file history of the '721 patent?

19  A.     Yes, at some point I did.

20  Q.     Did you review the Court's claim construction opinion

21  and order regarding the '721 patent?

22  A.     Yes, I did.

23  Q.     And did you apply the constructions from the Court's

24  claim construction opinion and order in arriving at your

25  opinion in this case?

DIRECT EXAMINATION - FERNANDO MUZZIO

1    A.    Yes, I did.

2    Q.    Did you review any prior art literature to the '721

3    patent?

4    A.    Yeah, I did review some prior art literature.

5    Q.    Okay.  In your analysis, have you formed an opinion

6    as to who constitutes the person of ordinary skill in the

7    art with respect to the '721 patent?

8    A.    Yes, I have.

9    Q.    And do you have a demonstrative discussing that?

10   A.    I do.

11         MR. FRESE:  Can we put up slide Muzzio DX-5,

12   please?

13   BY MR. FRESE:

14   Q.    So, Dr. Muzzio, who, in your opinion, would

15   constitute a person of ordinary skill in the art?

16   A.    Well, as shown in the screen and also in my first

17   report, a person of ordinary skill in the art for this

18   patent would have a relatively high level of skill; he will

19   have at least a bachelor's degree, but more than likely a

20   master's or even a PhD in the relevant field.  The relevant

21   field is listed here, include pharmaceutical sciences,

22   chemistry, chemical engineering, or material sciences.

23         And then also have several years of experience

24   working in research and development of pharmaceutically

25   relevant solid dosage formulations including, but not

DIRECT EXAMINATION - FERNANDO MUZZIO

1    limited to, the manufacturing processes of such formulations

2    and the selection and use of ingredients in such

3    formulations.

4    Q.    Now, do people of skill in this particular field

5    regularly work alone?

6    A.    Almost never.  In general, a POSA would represent a

7    team of people working together, having a diversity of

8    degrees and various types of expertise, and they will also

9    benefit from input from other people that they could call

10   upon, like analytical chemists or medical doctors or other

11   experts.

12   Q.    Have you heard some of the other opinions that have

13   been offered further today about who constitutes a person of

14   ordinary skill in the art?

15   A.    Yes, I have.

16   Q.    And under those opinions, would your opinions change?

17   A.    No, they would not.

18   Q.    Okay.  Are you aware that Dr. Little has put forward

19   a definition of the person of ordinary skill in the art?

20   A.    Yes, I am.

21   Q.    And under his definition, do your opinions change?

22   A.    No, they don't.

23   Q.    Okay.  Do you consider yourself at least a person of

24   ordinary skill in the art by your definition?

25   A.    Yes, I do.

DIRECT EXAMINATION - FERNANDO MUZZIO

1   Q.     And do you consider yourself a person of ordinary

2   skill in the art by some of the other definitions that have

3   been put forward in court today?

4   A.     Yes, for sure.

5   Q.     And have you attempted to conduct your analysis from

6   the perspective of a person of ordinary skill in the art in

7   this case?

8   A.     Yes, that was the assignment.

9   Q.     Dr. Muzzio, in your analysis in this case, did you

10  form any opinions regarding whether the asserted claims of

11  the '721 patent are valid or not?

12  A.     I did.

13  Q.     And do you have a slide summarizing those opinions?

14  A.     I do.

15         MR. FRESE:  Can we bring up Muzzio D X-6,

16  please?

17         THE WITNESS:  Yes.

18  BY MR. FRESE:

19  Q.     So, Dr. Muzzio, can you briefly summarize for the

20  Court your opinions on invalidity?

21  A.     Yeah, I believe that the asserted claims are invalid

22  as indefinite.  To the extent that they wouldn't be

23  indefinite, then they are invalid as obvious.

24         They are also invalid because they lack a

25  written description and they lack enablement.

DIRECT EXAMINATION - FERNANDO MUZZIO

1    Q.    Okay.  If we can take a look at Claim 4 of the '721

2    patent, JTX-9, and talk about some of the terms in the

3    claim.

4          First off, we've had some extensive discussion

5    today about granules and granulation.

6    A.    Yes.

7    Q.    What do you understand a person of ordinary skill in

8    the art -- what do you believe a person of ordinary skill in

9    the art would understand granules to be?

10   A.    Well, I think that the understanding of a person of

11   ordinary skill in the art of granules would be consistent

12   with both the Court's construction and the specification.

13         Granules would be particles that are made to

14   stick to each other, and I agree with Dr. Moreton, in a

15   rigid way.  They could be all the same material or they

16   could be various materials, and they could be formed by

17   various processes.

18   Q.    And do you have a slide describing what a person of

19   ordinary skill in the art would understand granules to be?

20   A.    Yes.

21         MR. FRESE:  Can we pull up Muzzio-DX-8?

22   BY MR. FRESE:

23   Q.    So, Dr. Muzzio, how are granules generally made?

24   A.    Generally, granules are made by running a process

25   called granulation that makes the particles stick together

DIRECT EXAMINATION - FERNANDO MUZZIO

1    so that the smaller particles are now permanently bond to

2    each other in a way that doesn't really change the state of

3    aggregation, the face of the particles themselves, but

4    rather bonds them together into a composite particle, a

5    larger particle.

6    Q.    Would a person of ordinary skill in the art know

7    about how to make granules based on their education and

8    experience?

9    A.    Yes.

10   Q.    And what are some common granulation processes that a

11   person of ordinary skill would have known about as of the

12   priority date of the '721 patent?

13   A.    There are a number of them.  The most common would be

14   regulation where basically you would expose the other

15   mixture to a liquid.  Sometimes the liquid could base on a

16   sole binder or sometimes the binder is part of the mixture

17   or sometimes there is no binder, but when exposed to the

18   liquid, capillary action brings the particles together.  And

19   then when you evaporate the liquid, you form solid bridges

20   between the particles, fusing them together, bonding them

21   together.

22   Q.    And what types of dosage forms would a person of

23   ordinary skill in the art know are made through granulation?

24   A.    Typically granulations are used to make either

25   capsules or tablets.

DIRECT EXAMINATION - FERNANDO MUZZIO

1  Q.    And why would a person of ordinary skill in the art

2  use granulations in making tablets and capsules?

3  A.    There are several reasons to granulate, but the one

4  reason to granulate is because you want to make larger

5  particles because the smaller particles can be problematic.

6  They might not flow well, they might be cohesive, they might

7  stick to equipment, they might do a number of things, they

8  might form clumps that you want to prevent so you would

9  granulate to avoid that.

10          You also want to improve the way the material

11  flows, you want to make the material more compressible if

12  you're going to make tablets and you want to increase the

13  density, for example, if you need to put a certain amount of

14  material inside the capsule.

15  Q.    Now, you mentioned flow.  Why is improving flow

16  important?

17  A.    Improving flow is important because, number one,

18  powder mixtures that contain large proportions of their

19  substances tend to flow very poorly.  And when you're trying

20  to fill them into capsules or compress them into tablets,

21  you need those mixtures to flow through relatively small

22  spaces.  And if you don't improve the flow, then material is

23  going to get stuck trying to go through those small

24  orifices, which you would force it to stop the process,

25  remove the glass, start over.  So we want to improve the

DIRECT EXAMINATION - FERNANDO MUZZIO

1   flow.

2           The other reason, when flow is very important,

3   you improve the variability in the dose, either in the

4   capsule or in the tablet.  So you need to have good flow to

5   make tablets and capsules.

6   Q.      Now, why is variability in the dose and capsules and

7   tablets a problem?

8   A.      Oh, that's extremely problematic if you have high

9   variability because if you have high variability in the

10  dose, you end up making some of the doses not having enough

11  drug, but they are not providing (indiscernable, or you

12  could also end up with some doses having too much drug and

13  that would actually be harmful to the patient.

14  Q.      You also mentioned increasing density.  Why would

15  increasing density through granulation be important?

16  A.      There are, again, a number of reasons.  One, for

17  example, is that if we increase the density, we can put more

18  material in the same equipment so we can run a larger batch.

19  That's one reason.  But another very apparent reason,

20  particularly in this case, is if I want to put a certain

21  amount of material in a capsule and increase the density,

22  now we can make a smaller capsule, which is beneficial to

23  the patient.

24          THE COURT:  So the bulk density of a granule

25  will be higher than the bulk density of the material --

DIRECT EXAMINATION - FERNANDO MUZZIO

1          THE WITNESS:  Yes, the bulk density of the

2   granules would be higher than the bulk density of the

3   material the granules are made from.

4          (Court reporter clarification.)

5          THE WITNESS:  I understand.

6          The bulk density of the granules will be higher

7   than the bulk density of the materials the granules are made

8   from.  But in addition to that, clumps, agglomerates tend to

9   be lower density because they have loose clumps of

10  materials, so they tend to have lower density than the

11  purposefully formed granules where you are really bonding

12  the particles together.

13  BY MR. FRESE:

14  Q.     Dr. Muzzio, to His Honor's point, do you have a slide

15  that shows why granulating material increases its bulk

16  density?

17  A.     I do.

18          MR. FRESE:  Can we pull up DX-10, please?

19          THE WITNESS:  Yes.  So this is a schematic that

20  I drew just a couple days ago.  And here the different

21  colors of the little rectangles there would represent

22  different ingredients just for ease of seeing.

23          So the left represents, in my opinion,

24  schematically, in an accurate way what a dry blend looks

25  like, particularly when the material is fine and cohesive.

DIRECT EXAMINATION - FERNANDO MUZZIO

1    The particles touch each other, and they form this very open

2    structure with a lot of voids in between because they are

3    sticking to each other, typically electrostatic forces or

4    Coulomb forces, those kinds of interactions.

5            When you granulate, you force the particles

6    closer together, you turn them into more compact composite

7    particles that are now bonded to each other in a hard way,

8    and so the granules are the answer, and then they also pack

9    together more closely because the larger granules flow more

10   easily and so they pack more tightly.

11           And those are the two reasons why granulations

12   are denser than dry blends.

13   BY MR. FRESE:

14   Q.    Dr. Muzzio, turning back to DX-8, on the lower

15   left-hand corner of the slide, you've highlighted a sentence

16   from the '721 patent at lines 49-50.

17   A.    Yes.

18   Q.    What does that say about granulation?

19   A.    Well, it says the granulation is extensively used in

20   the manufacturing of tablets and capsules, and in my

21   opinion, a majority --

22           (Court reporter clarification.)

23           THE WITNESS:  In my opinion, a majority of

24   tablets and capsules are made by granulation processes.

25           Sorry.

DIRECT EXAMINATION - FERNANDO MUZZIO

1    BY MR. FRESE:

2    Q.    And would that have been true as of the priority

3    date?

4    A.    Oh, that was true then and it is true today.

5    Q.    Let's take a look at DTX-5 in your binder.

6    A.    Yes.

7    Q.    And, Dr. Muzzio, what is DTX-5?

8    A.    It's an article published by a company called

9    Capsugel, and it's authored by Steve Stegemann -- Sven

10   Stegemann.  Sorry.

11   Q.    When was it published?

12   A.    In 2002.

13   Q.    Are you okay if we call this reference "Stegemann

14   2002"?

15   A.    Sure.

16   Q.    And let's turn to page DTX-5_00010 -- 0010.  I think

17   I added a 0.  And look at the paragraph starting " doses

18   over 600 mg" in the left-hand column.  What does this

19   paragraph tell us about what a person of ordinary skill in

20   the art would know about using granulation in making

21   capsules?

22   A.    Well, so the first sentence says that if you want to

23   make a very large dosage form, it's difficult to put all

24   that material inside a capsule of reasonable size, but it

25   says that you can actually increase the dose that you can

DIRECT EXAMINATION - FERNANDO MUZZIO

1   put inside that capsule by increasing the density of the

2   material, and it says, for instance, by granulation.

3          Then it says that granulation improves

4   parameters of the material, such as the flow of the

5   material.  And then you add some other potential benefits of

6   granulation such as, for example, improving the solution of

7   the drug substance.  These are some of the known benefits of

8   granulation.

9   Q.   Let's go ahead and turn to page 12, and let's look at

10  the paragraph under the heading "Choice of hard gelatin

11  capsule."  What does this portion of Stegemann 2002 tell us

12  about what a person of ordinary skill in the art would have

13  known about using granulation in making capsules?

14  A.   Well, it's saying that when the person of ordinary

15  skill in the art is going to formulate a product as a

16  capsule, he's going to have to first and foremost choose a

17  capsule size.  And in choosing a capsule size, the

18  important -- the first important thing is to know how much

19  drug substance or how much of the excipients are you going

20  to need to fill into the capsule.

21          And then it says that there might be more than

22  one choice in capsule size depending upon whether you're

23  able to increase the density of the formulation through

24  granulation or compression.

25  Q.   Let's go back a little bit in the reference and look

DIRECT EXAMINATION - FERNANDO MUZZIO

1  at the page underscore 0005, and I would direct your

2  attention to table 1.

3  A.    Yes.

4  Q.    What does this portion of Stegemann 2002 tell us

5  about what a person of ordinary skill in the art would know

6  about the sizes of available capsule shells?

7  A.    So this table shows -- this table has been around for

8  decades, and it shows the dimensions of the standard

9  capsules going from the 000, which is the largest listed

10  here, to the number 5, which is the smallest listed here.

11  It then says what is the volume that you can fill into the

12  capsule, and then it says based on four different listed

13  densities of the material you're going to put into the

14  capsule, 0.6 g/mL and 0.8 g/mL and so on, how much -- by

15  weight, how much material you can fill inside the capsule.

16         MR. FRESE:  Okay.  We would like to move DTX-5

17  into evidence.

18         MR. PETERMAN:  No objection.

19         THE COURT:  DTX-005 is admitted.

20         (Exhibit admitted.)

21  BY MR. FRESE:

22  Q.    Dr. Muzzio, if you'll recall, Claim 4 recites that

23  the granules have a bulk density of greater than 0.4 g/mL.

24  Do you have a slide that discusses what bulk density is?

25  A.    Yes, I do.

DIRECT EXAMINATION - FERNANDO MUZZIO

1          MR. FRESE:  If we could pull up MUZZIO-DX-9,

2     please?

3     BY MR. FRESE:

4     Q.     Dr. Muzzio, briefly, if you could elucidate what bulk

5     density is and how it would be understood by a person of

6     ordinary skill.

7     A.     Yes, the bulk density, as understood by a POSA, would

8     be the mass of a sample divided by the volume divided by

9     that sample when it's what we describe as "loosely packed."

10    In practice, what that means is that you would pour the

11    sample into a graded container, you know, as one of the ways

12    in which you measure.  You would level the upper surface

13    gently, making sure you're not compressing the sample, and

14    then you would look at what is the volume of that sample and

15    you could divide the grams in the mass of the sample by the

16    milliliters in the volume to obtain the bulk density.

17    Q.     Why is bulk density measured during pharmaceutical

18    development?

19    A.     So I mentioned a few reasons earlier, but I'll give

20    you some more details.  So, for example, if I want to make a

21    batch of product that is 100 kilos and I need to blend it in

22    some piece of equipment, I need to know the density because

23    I need to know how big the blender needs to be so that I can

24    mix all the material so I can make sure that I can fit that

25    much material into a piece of equipment.  That's one reason.

DIRECT EXAMINATION - FERNANDO MUZZIO

1              Another reason I want to know the bulk density

2      is because, to those experienced in the field, the bulk

3      density tells you already how well or how badly that

4      material is likely to flow.  It gives you a first indication

5      on flow properties, right.  If a blend has a bulk density of

6      0.2, I already know that I'm going to have flow difficulties

7      because you get 0.7 and 0.8, I know is going to flow -- most

8      likely is going to flow pretty well.

9              And then a third reason is, again, if I'm trying

10     to -- well, I'll give you fourth.  If I'm trying to make a

11     tablet, I want to have a blend that has a already has a high

12     density to make a tablet because that will tell me how

13     difficult it will be to compress the material then into a

14     denser tablet.  And if I want to put the material into a

15     capsule, the bulk density tells me what is the size of the

16     capsule I'm going to need to put a certain amount of

17     formulation into a capsule shell.

18     Q.    Now, what are some typical bulk densities of granules

19     of pharmaceutical materials?

20     A.    Common values of bulk densities of granulations of

21     pharmaceutical materials go from around 0.4, 0.5, to around

22     0.7 or so.  Those are the most common values.

23     Q.    Go ahead and turn in your --

24              THE COURT:  Are there any granules that would

25     fall with a bulk density of 0.4 g/mL?

DIRECT EXAMINATION - FERNANDO MUZZIO

1          THE WITNESS:  There are some materials that you

2    could consider granulated that would have lower densities.

3    There are some processes where you can agglomerate very fine

4    particles and you end up with clumps that have particularly

5    low density, that are porous materials that are purposely

6    formed to have a lot of empty space inside, and those will

7    have lower densities.

8          There are also some that can be significantly

9    heavier than what I mentioned.  I mean, the span is wider

10   than what I just said.

11   BY MR. FRESE:

12   Q.    All right.  Turning to DTX-274, can you tell me what

13   DTX-274 is?

14   A.    Yes, DTX-274 is a document published by the USP, the

15   United States Pharmacopeia.

16   Q.    And when was this particular document published?

17   A.    This version of the USP was published in 2012.

18   Q.    And go ahead and turn to page underscore 0003, and

19   you'll see the section <616>, "Bulk Density and Tapped

20   Density of Powders."  Are you there?

21   A.    Yes.

22   Q.    Now, Claim 1 of the -- Claim 4 of the '721 patent

23   mentions USP method <616>, correct?

24   A.    Yes, it does.

25   Q.    And if you turn to the next page, page underscore

DIRECT EXAMINATION - FERNANDO MUZZIO

1    0004, does that describe USP method 1 for measuring bulk

2    density?

3    A.    That is correct.

4    Q.    Was this method known before August 30th, 2017?

5    A.    Yes, it was known much earlier than that.  This is

6    the most common method, the simplest method to measure bulk

7    density.

8    Q.    Right.

9         MR. FRESE:  We'd like to move DTX-274 into

10   evidence.

11        MR. PETERMAN:  No objection, Your Honor.

12        THE COURT:  All right.  DTX-274 is admitted.

13        (Exhibit admitted.)

14   BY MR. FRESE:

15   Q.    Now, going back to Claim 4 of the '721 patent, it

16   mentions that the granules contained one or more

17   pharmaceutically acceptable excipients.  Do you have a slide

18   that discusses what different kind of excipients a person of

19   ordinary skill would know about?

20   A.    Yes, I do.

21        MR. FRESE:  Can we pull up MUZZIO-DX-11?

22        THE WITNESS:  So these are the most common

23   classes of excipients used to make tablets or capsules.

24   There are more than these five, but these are the five most

25   common ones.

DIRECT EXAMINATION - FERNANDO MUZZIO

1    BY MR. FRESE:

2    Q.    Briefly, what are diluents?

3    A.    So diluents are materials that are used to -- as it

4    says here, to provide bulk, to provide volume to a mixture.

5    And this is particularly important when, for example, I'm

6    handling very small doses of the drug substance and I need

7    to dilute that small amount of drug substance into a larger

8    volume so I can more easily and more accurately handle that.

9         Another reason why diluents can be important is,

10   for example, so that I can have the right volume I want to

11   put into the capsule.  For example, let's say that the

12   volume I'm trying to fill is 0.21 mL.  I need to make sure

13   that the right amount of drug is going to be in that volume

14   so when I fill the capsule with 0.21 mL, I have the right

15   amount of drug.

16   Q.    What are binders, briefly?

17   A.    So binders, this could refer to two different things,

18   but binders as used in with granulation are typically

19   materials that provide a glue-like function that basically

20   will make particles to permanently stick to each other.

21   There are also compaction binders which are used to stick

22   particles together by compressing them at very high

23   pressures.

24   Q.    What are lubricants, briefly?

25   A.    Lubricants are materials that smear easily and so

DIRECT EXAMINATION - FERNANDO MUZZIO

1   they provide a lubricating effect.  The lubricants are used

2   to help particles pack more tightly, allow them to slide

3   past each other.  Lubricants also prevent ingredients from

4   sticking to each other and they are useful in allowing us to

5   eject tablets, for example, from the tablet press by

6   lubricating the exit of the tablet.

7   Q.     What are glidants, briefly?

8   A.     Glidants typically are composites of very small

9   particles that stick to the surface of other particles and

10  improve their flow by separating them, so they are materials

11  that make other materials flow better.

12  Q.     And briefly, what are disintegrants?

13  A.     Disintegrants are particles that swell when exposed

14  to moisture and break apart a capsule plug or a tablet so

15  that then the -- the product will dissolve more quickly.

16  Q.     Now, Dr. Muzzio, if we go back to Muzzio-DX-6, you

17  state that it's your opinion the asserted claims are invalid

18  as indefinite, correct?

19  A.     That's right.

20  Q.     Do you have a slide providing an overview of your

21  opinions on indefiniteness?

22  A.     I do.

23         MR. FRESE:  Can we bring up MUZZIO-DX-13?

24  BY MR. FRESE:

25  Q.     Dr. Muzzio, if you would, please briefly summarize

DIRECT EXAMINATION - FERNANDO MUZZIO

1    for the Court your opinions on indefiniteness.

2    A.    Yeah.  So all the claims contain this term

3    "pharmaceutically acceptable capsule," and in my opinion,

4    this term when read together with the specification of the

5    patent, it's very difficult for a POSA to understand and

6    know whether a given formulation will infringe or will not

7    infringe the claim.  I think the specification has made this

8    term very, very unclear.

9          To the extent that we set that aside, if we

10   don't -- if we ignore that aspect of that term, then we will

11   have a different problem, which is that then the claims as

12   written would include what in the specification are

13   presented as comparative experiments that lead to

14   unacceptable results.  So if we do not have the term

15   "pharmaceutically acceptable capsules," you know, at a high

16   level, then, we are including into the claims experiments

17   that specifically the specification excludes from the

18   invention.

19   Q.    So let's talk a little bit, first, about the term

20   "pharmaceutically acceptable capsule."  Do you have a slide

21   discussing how a person of ordinary skill in the art would

22   understand the term "pharmaceutically acceptable capsule" in

23   the asserted claims?

24   A.    I do.

25          MR. FRESE:  Can we pull up MUZZIO-DX-14, please?

DIRECT EXAMINATION - FERNANDO MUZZIO

1   BY MR. FRESE:

2   Q.      So, Dr. Muzzio, if you would, please give a brief

3   overview of how a person of ordinary skill in the art would

4   understand this term?

5   A.      So the person reading the claim will see this term

6   present in every claim of the patent, and would understand,

7   reading the claim, that the term refers to the finished

8   dosage form.  The term actually in the claim is referring to

9   the finished product.

10          So reading that the product needs to be

11  pharmaceutically acceptable, right, in this case, and it

12  indicates that it's used for orally delivering a certain

13  amount of the drug substance to the patient, the claim

14  further says that this pharmaceutically acceptable capsule

15  includes the shell of a capsule, the container, which is

16  size three or four, and that within that container, now we

17  have a blended pimavanserin composition, and that

18  composition includes the granules of pimavanserin tartrate.

19  Q.      So how would a person of ordinary skill in the art

20  begin to understand this term further?

21  A.      Well, so the person of ordinary skill in the art has

22  read the whole patent and is trying to understand the claims

23  in view of the patent, would look at the specification to

24  see what is meant by "pharmaceutically acceptable capsule,"

25  and you would find that there's plenty language in the

DIRECT EXAMINATION - FERNANDO MUZZIO

1    specification that talks about some things that are

2    unacceptable versus one thing that is presumably acceptable.

3    Q.    Dr. Muzzio, why does the term "pharmaceutically

4    acceptable capsule" not refer just to the capsule shell?

5    A.    Well, if you read this claim, you immediately realize

6    that the pharmaceutically acceptable capsule of the preamble

7    has several elements in it, right.  It has a shell, it has

8    the contents, and it's there for the specific purpose of

9    delivering this one drug to a patient.  So, clearly, that is

10   referring to the finished product.

11          Alternatively, if we wanted to try to force it

12   to just say the shell, the entire language there doesn't

13   make sense anymore.

14   Q.    Now, during the opening arguments, I believe you

15   heard that this term means that it is a suitable -- it's

16   something that is suitable for use as a dosage form.

17          Why does pharmaceutically acceptable capsule not

18   just have that meaning?

19   A.    Well, you would expect that it would normally.  But

20   in this case, in particular, you go to the specification and

21   you read the specification, and the specification tells you

22   we have invented something novel here that we will describe,

23   first and foremost, by distinguishing it from several, five,

24   in fact, comparable experiments that lead to unacceptable

25   products.  So right there it's saying that when we say we

DIRECT EXAMINATION - FERNANDO MUZZIO

1    invented it, it has to be different than these five

2    unacceptable results.

3         So you read through those examples, and in those

4    examples there are various forms of granulation conducted,

5    all of which are declared to be an unacceptable.  So you

6    say, okay, this must be different than those things that are

7    called unacceptable.

8         The problem is that it doesn't really tell you

9    how to tell apart an unacceptable result from one that is

10   acceptable.  The POSA trying to practice this claim would

11   make a product by some means, right.  There are lots of

12   different ways to granulate.

13        And then the POSA would say, okay, I now need to

14   know if I'm infringing or not, so is this thing that I made

15   acceptable or unacceptable?  And go to the specification and

16   find that there is language that talks about the bulk

17   density, the particle size, impurities and so on and so on

18   and so forth, but it never tells you what values of those

19   parameters would make one particular product acceptable or

20   unacceptable, so the POSA is left with no help making that

21   decision.

22   Q.   Do you have a slide discussing how a person of

23   ordinary skill in the art would learn from the specification

24   about how to produce acceptable granules?

25   A.   Yes, I do.

DIRECT EXAMINATION - FERNANDO MUZZIO

1   Q.    Can we pull up MUZZIO-DX-15?

2   A.    Yes.  So these are excerpts from the patent -- I

3   can't quite see what's at the bottom of the screen, but I

4   believe that that's where these excerpts come from.

5         So if we look at the one on the left, at the

6   top, it says that "Prior to the surprising finding..."

7   right.  So prior to introducing what we consider is the

8   invention, yeah, that "resulting in a robust and reliable

9   filing of 5-34 mg of pimavanserin in capsules..." many

10  experiments were done, right.  So it's saying, before we

11  find the thing that worked, we did a lot of experiments.

12        And then there's a section that starts -- that

13  has that title highlighted there, so that's the title of the

14  section that says, "Comparative experiments resulting in

15  unacceptable products."  So from this passage, I understand

16  that what follows now is different than what was just cited,

17  right, the surprising finding that allows the robust and

18  reliable feeling of 34 mg of pimavanserin, right.

19        This kind of contrasting with what was invented

20  versus what didn't work appears in several places.  So, for

21  example, in the next passage, in the upper right it says

22  that "Contrary to the above disclosed comparative

23  experiments" -- so contrary to these things we just told you

24  that don't work, the present application describes processes

25  and -- to manufacture capsules of size 4 comprising 5-34 mg

DIRECT EXAMINATION - FERNANDO MUZZIO

1    of pimavanserin.  So you say what we invented is different

2    than what we just describe, right.

3          And then it goes on, "As additionally disclosed

4    above it was surprisingly found that 100 percent

5    pimavanserin high-shear granulation" -- nothing else, right.

6    When we do that in a certain way, we can now -- you know,

7    we're using very small amounts of water, you know, in

8    special ways, etc., now we can get what we call the

9    "acceptable outcome," right.

10          There is further -- in the third passage, right.

11   So it's, again, "As disclosed above conventionally high

12   shear granulation" -- which is one of the comparative

13   examples -- utilizes large amounts of water, and that causes

14   over wetting of the material and so on and so forth.

15   There's more details in other places in the specification.

16          As contrasted with what comes next, which says,

17   "The present inventors have demonstrated that an appropriate

18   water application, e.g. using a nozzle" -- using these in a

19   certain way, all of these things combined would "results in

20   granulated pimavanserin having improved bulk density

21   suitable for filing amounts disclosed herein..."

22          So it's contrasting very clearly what they

23   considered invention from all these comparative examples.

24   Q.    Now, looking at the specification, what are the

25   factors that made this granulation suitable for filing into

DIRECT EXAMINATION - FERNANDO MUZZIO

1   capsules having size 4?

2   A.     The only one mentioned here is the improved bulk

3   density, but when you look at the comparative examples,

4   there are a number of other factors listed as rendering all

5   of those other ways of making the product unacceptable.

6   Q.     And just to be clear, the citations you've provided

7   on this slide are the '721 patent at 13:28-33, 24:4-13,

8   15:3-10 and 15:37-46?

9   A.     That is correct.

10  Q.     Now, you have a slide that provides an overview of

11  why the comparative experiments resulted in unacceptable

12  products?

13  A.     Yes, I do.  There is a lot of information in the

14  section that describes these comparative examples.  This is

15  just an attempt to summarize.  So -- and I only really list

16  the first four here.

17          So the first comparative experiment uses a

18  technique called top spray layering, uses excipients, it has

19  acceptable density and flow, but it says to have -- it's

20  said to have an unacceptable stability, unacceptable limits

21  of impurity, unacceptable particle size distribution, less

22  favorable dissolution, so those attributes are mentioned.

23          It does -- it never tells me, though, what level

24  of stability or how was even stability conceded.  There are

25  different things you can mention when you look at stability.

DIRECT EXAMINATION - FERNANDO MUZZIO

1    It doesn't tell me which impurities and which concentrations

2    made those unacceptable, it never lists what is the particle

3    size, distribution that made that particular example,

4    comparative experiment unacceptable.  And so on and so

5    forth.

6              And it goes on.  The second one uses something

7    called Wurster layering, which is similar to top spray

8    layering, it's just spraying from the bottom and moving the

9    particles in a different way, uses excipients, in fact, uses

10   the same exact excipient as the previous one.  And it also

11   says acceptable flow and density, yes, but unacceptable.

12             And it recites the same factors in the same way,

13   unacceptable stability, impurities, particle size

14   distribution.  But I don't know why they are unacceptable

15   because I don't know what exactly was measured, what values

16   are obtained, and what is the boundary between something

17   being acceptable and something being unacceptable.

18             The third one is another method, it's

19   extrusion/spheronization.  It starts with granulation, but

20   then it pushes the granulation through screening that then

21   makes the granule into little spears.  It uses some of the

22   same excipients.  In fact, uses all the excipients in

23   slightly different concentrations.

24             It also says here, it says here acceptable

25   density and flow, so it can be filled into capsules.  But,

                  DIRECT EXAMINATION - FERNANDO MUZZIO

1    again, it says not acceptable because of stability, particle

2    size distribution, impurities.  But, again, it doesn't tell

3    me what is the problem between what would work and what

4    wouldn't.

5              And then there is the last one, which is very

6    different, actually, twin-screw melt granulation.  That

7    basically is a technique where you will use an ingredient

8    that melts at low temperatures and you mix that with the

9    drug substance and you expose it to heat --

10             THE COURT:  Slow down a little bit, Doctor.

11             THE WITNESS:  I'm sorry.  I tend to speak too

12   fast.

13             So the last one mixes the drug substance with

14   another ingredient that has a low melting point, like a wax.

15   And you expose the mixture to heat so that you soften or

16   melt this ingredient.  And then when you cool it down, this

17   ingredient becomes solid again, and now the particles are

18   permanently fused in a rigid way.  And you can melt them if

19   you need to, if you have the right size.

20             So it says you have, again, good density and

21   good flow, but no -- it's not acceptable because, again, you

22   see impurities or you don't see the distribution, you know,

23   it says "less favorable dissolution."  I don't know what

24   less favorable dissolution means in this context, for these

25   products.

DIRECT EXAMINATION - FERNANDO MUZZIO

1          So the invention itself reduces a version of

2     high shear wet granulation of pimavanserin using a small

3     amount of water and some novel parameters to achieve

4     acceptable density and flow.  And now this one is

5     acceptable, but I don't know why.

6     BY MR. FRESE:

7     Q.      Okay.  Let's go ahead and turn to the first of these

8     comparative -- now backing up -- these comparative

9     experiments, they are located in the '721 patent, starting

10    at column 13, line 33, correct?

11    A.      Right.

12    Q.      And they run through column 15, line 2, correct?

13    A.      Yes.

14    Q.      And the contrasting granulation process that's said

15    to be inventive, that starts at line 15:3 and runs through

16    line 46?

17    A.      That is correct.

18    Q.      So let's look at the first comparative example, top

19    spray layering.

20    A.      Yes.

21    Q.      Do you have a slide that describes that example?

22    A.      I do.

23    Q.      So I believe we already went through how these

24    granules were prepared and what excipients they contained.

25    What were the reason these granules were unacceptable?

DIRECT EXAMINATION - FERNANDO MUZZIO

1    A.    If you go to the next bullet, that describes the

2    ingredients that were used, right.  It says how it was

3    actually made, by spraying dissolution from the top onto

4    what is called C particles, they now are coated again and

5    again and again with the drug substance.

6          If you go further, please, it says that they had

7    the acceptable flow and bulk density, that's listed there,

8    again, with no indication of what that is.  But then, in the

9    next bullet, it would say that the resulting granules had an

10   unacceptable stability on particle size distribution, an

11   acceptable amount of impurities and less favorable

12   dissolution.  That could mean many, many different things.

13   Q.    Now, when you say that they have acceptable bulk

14   density and you don't know what that means, what did you

15   mean?

16   A.    Well, I mean, in principle, acceptable bulk density

17   would mean that I can put enough of the material into the

18   size 4 capsule, which is the goal of this patent, so that's

19   probably what it means.

20   Q.    All right.

21   A.    What I'm saying is not -- well, that's my answer.

22   Q.    Does that tell you what acceptable flow constitutes?

23   A.    Yeah, it would be good enough flow so that you can

24   manufacture the capsules as intended.

25   Q.    Let's go on to comparative example 2, or comparative

DIRECT EXAMINATION - FERNANDO MUZZIO

1   experiment 2.

2          Do you have a slide that describes that?

3   A.     I do.

4   Q.     And I believe you talked a little bit about how this

5   one was prepared, but what in particular made these granules

6   unacceptable?

7   A.     So the reasons are exactly the same as in the

8   previous examples.  That's listed in the sentence that

9   starts with -- after bulk density, it says, "but an

10  acceptable stability and particle size distribution as well

11  as an unacceptable amount of impurities.  This unacceptable

12  disadvantages, such as an unacceptable stability, less

13  favorable dissolutio resulted in deeming this process option

14  unsuitable for the current purpose.

15  Q.     Let's go on to comparative example 3.  And this

16  starts at line -- column 14, line 1 of the '721 patent

17  specification, correct?

18  A.     Correct.

19  Q.     And what made these granules unacceptable?

20  A.     So if you look at the fifth line from the bottom,

21  right, after saying -- because now then it says,

22  "unacceptable stability density in particle size dissolution

23  as well as an unacceptable amount of impurities."

24          Then it says, "The particles were milled in

25  order to achieve a uniform particle size, yet the amount of

DIRECT EXAMINATION - FERNANDO MUZZIO

1    impurities and stability were found to be unacceptable."

2    Q.    Now, let's go to comparative experiment 4.

3    A.    Mm-hmm.

4    Q.    Which starts on line 24 of column 14.

5    A.    Yes.

6    Q.    What made these granules unacceptable?

7    A.    Well, after talking about the ingredients that are in

8    use and they made two versions of this.  One using Kollidon

9    as a binder and using hydroxypropyl cellulose as a binder,

10   so you need two versions of these.

11            (Court reporter clarification.)

12            THE WITNESS:  Hydroxypropyl cellulose.

13            THE REPORTER:  Thank you.

14            THE WITNESS:  Yeah.

15            They said in either case, the resulting parties

16   were screened that resulted in particles having an

17   acceptable -- sorry, having an acceptable flow and bulk

18   density, but unacceptable finding of impurities as well as

19   unacceptable dissolution.

20   BY MR. FRESE:

21   Q.    Now, Dr. Muzzio, do any of these comparative

22   experiments that you've looked at provide any quantitative

23   or qualitative guidance as to the level of impurities

24   dissolution, stability or other factors that made them

25   unacceptable?

DIRECT EXAMINATION - FERNANDO MUZZIO

1    A.    No, none of them have any information relative to

2    POSA to understand where the boundary is, where something is

3    acceptable or something that is unacceptable.

4    Q.    Okay.  All right.  Let's move on to the fifth

5    comparative experiment which you discussed, starting at line

6    44 of column 14 -- which is discussed at line 44, column 14

7    of the '721 patent.  Do you have a slide that discusses

8    this?

9    A.    Yes.

10   Q.    Okay.  So what was done here in this fifth

11   comparative experiment?

12   A.    So in this fifth comparative experiment, what they

13   did is something that they described as conventional wet

14   granulation, where apparently they added to the mixture or

15   to the pimavanserin, naturally -- first to the pimavanserin

16   alone, they added a large amount of water and they applied

17   mechanical action to this mixture of the pimavanserin with a

18   large amount of water, and they said that, okay, when you

19   add a lot of water, you end up with a very big and very wet

20   granule and that is very adhesive.

21        And they said that the large quantity of water

22   used would result in high impurities and changes in

23   crystallinity.  So I surmise that they probably didn't even

24   try those granules.

25        And then they said well, they tried then adding

DIRECT EXAMINATION - FERNANDO MUZZIO

1    some excipients that are used -- commonly used to mitigate

2    the impact of high water content, but they said that using

3    those excipients did not improve the results of

4    over-wetting.  And they stop there, they don't provide an

5    assessment of density flow, impurities, or anything else.

6    Q.    So all together, do you have a slide that shows the

7    factors that the specification identifies that could make

8    something a granulation acceptable or unacceptable?

9    A.    I have a slide that has all the factors that have

10   been mentioned.  And so there are these eight factors that

11   are mentioned at different points, particle size

12   distribution, impurity labels, stability, dissolution, flow,

13   bulk density, drying time and crystallinity or lack thereof.

14         And acceptable bulk density, there is no

15   guidance in the claim or anywhere in the specification

16   about what specific ranges of these factors would be used to

17   decide whether something is acceptable and, therefore,

18   infringes or unacceptable and, therefore, it doesn't.

19   Q.    And, Dr. Muzzio, why, in your mind, does that render

20   the claim indefinite?

21   A.    Because a POSA that is trying to granulate

22   pimavanserin to make granules by one of the methods cited

23   here or by some other method, or, you know, any number of

24   ways in which that could be done, would make granules and

25   then would not know whether those granules infringe or don't

DIRECT EXAMINATION - FERNANDO MUZZIO

1   infringe because those granules have all these attributes.

2   They would have a particle size distribution, they could be

3   stable to some extent, they would flow, but a POSA would not

4   know what would make those acceptable or not acceptable as

5   per the claim.

6   Q.     Now, Dr. Muzzio, hypothetically, let's say a person

7   of ordinary skill in the art did a twin-screw melt

8   granulation of pimavanserin with Copovidone, like was done

9   in the patent --

10   A.     Yes.

11   Q.     -- proceed product, measure the impurities levels,

12   particle size distribution, bulk density, flow, the

13   crystallinity of it and determine all of this was fine to

14   them.

15   A.     Yes.

16   Q.     How would they know if that product infringed or not?

17   A.     They wouldn't.

18   Q.     Why not?

19   A.     Well, they would be practicing comparative sample 4

20   in doing that, right.  And they would granulate and they

21   would -- and maybe they are happy with granule, right.  The

22   specification tells you that when you practice it that way,

23   it's unacceptable and therefore outside the scope of the

24   claim.

25           But you don't know whether it would be

DIRECT EXAMINATION - FERNANDO MUZZIO

1    considered acceptable, the different values of these

2    parameters or whichever values of these parameters because

3    apparently, these are the parameters being used to decide

4    that something is not acceptable, but you don't know which

5    values of these parameters lead to that decision.

6    Q.    Now, if we can go ahead to turn to DTX-215 in your

7    witness binder.

8    A.    Yes.

9    Q.    What is this document?

10   A.    This is another patent in the same family.

11   Q.    As the '721 patent?

12   A.    Yes.

13   Q.    Is it okay if we call this the '480 patent?

14   A.    Sure.

15   Q.    And go ahead and turn to DTX-216 in your witness

16   binder.

17         And what is this?

18   A.    This is another patent in the same family.

19   Q.    As the '721 patent?

20   A.    Yes.

21   Q.    And is it okay if we call this the '891 patent?

22   A.    Yes.

23   Q.    And did you review these two patents, DTX-215 and

24   216, in connection with forming your opinions in this case?

25   A.    Yes, I did.

DIRECT EXAMINATION - FERNANDO MUZZIO

1   Q.    Do these two patents have substantially the same

2   specification as the '721 patent?

3   A.    Yeah, they do.

4   Q.    All right.  Now, do you have a slide discussing how

5   these two patents inform your opinion on indefiniteness?

6   A.    I do.

7   Q.    All right.

8           MR. FRESE:  If we can bring up Muzzio-DX-23?

9           THE WITNESS:  So these patents -- here is

10  Claim 1 of each of these patents.  The claims are written to

11  basically be directed to pimavanserin granulated without

12  excipients.  So these are the pimavanserin alone claims.

13          So when reading these claims as written and

14  comparing these claims with the specification and

15  particularly with the comparative experiments in this

16  specification, the POSA would understand that the

17  comparative experiments have excipients, or in the case of

18  comparative sample 5, a lot of water, versus the invention

19  being practiced here doesn't have excipients.  It's

20  granulating pimavanserin alone and is doing that using the

21  teachings of the patent, using only a small amount of water,

22  etc., etc.

23          So in this case, the term "pharmaceutically

24  acceptable capsule" allows for an easy basis for

25  distinguishing from the comparative experiments.  Either you

DIRECT EXAMINATION - FERNANDO MUZZIO

1   used excipients or you didn't.  You don't have the same

2   problem.

3   BY MR. FRESE:

4   Q.    Now what's the issue with the '721 patent?

5   A.    Well, the '721 patent, number one, has that problem

6   where I don't know now how to distinguish from the

7   comparative experiments when it comes to the claims of the

8   '721 patent because the only language in the claim of the

9   '721 patent that allows me to distinguish from the

10  comparative experiments are those three words, a

11  "pharmaceutically acceptable capsule."  There's nothing else

12  in the claims of the '721 patent that would allow the POSA

13  to distinguish what the POSA is doing from, you know, what's

14  acceptable, not acceptable, or to distinguish the claim

15  subject matter from the comparative experiments.

16  Q.    And that because Claim 4 recites granules of

17  pimavanserin including excipients?

18  A.    Correct.

19             MR. FRESE:  Your Honor, we'd like to move

20  DTX-215 and 216 into evidence.

21             MR. PETERMAN:  No objection, Your Honor.

22             THE COURT:  All right.  DTX-215 and DTX-216 are

23  admitted.

24             (Exhibits admitted.)

25  BY MR. FRESE:

DIRECT EXAMINATION - FERNANDO MUZZIO

1    Q.    Dr. Muzzio, does this indefinite issue affect all the

2    asserted claims?

3    A.    Yes.

4    Q.    And do you have a slide discussing why?

5    A.    I do.

6             MR. FRESE:  Can we bring up MUZZIO-DX-24?

7             THE WITNESS:  Yes.

8    BY MR. FRESE:

9    Q.    So, Dr. Muzzio, why does this issue affect all the

10   asserted claims?

11   A.    Well, the same term appears in all the asserted

12   claims.  Claim 5 is a dependent claims, so it reads in all

13   of the elements of Claim 4.  And the POSA trying to practice

14   any of these claims who have the same exact problem, all the

15   independent claim and the dependent claims are all directed

16   to granulating pimavanserin with excipients.  So that's no

17   longer a basis for distinguishing from the comparative

18   examples that lead to unacceptable results.

19            So now, how else do you distinguish from those

20   comparative examples?  It has to be on the basis of the

21   product being pharmaceutically acceptable or not.  And,

22   again, when reading the comparative experiments, we don't

23   really know why those were not acceptable.

24   Q.    Now, you read Dr. Little's rebuttal report in this

25   case, correct?

DIRECT EXAMINATION - FERNANDO MUZZIO

1  A.    Sure, I did.

2  Q.    And in that rebuttal report, he opined that the

3  comparative experiments relate solely to what he considers a

4  pharmaceutical manufacturing embodiment of the invention --

5  A.    Yes.

6  Q.    -- which is not covered by the claims of the '721

7  patent.  Do you agree with that?

8  A.    No.

9  Q.    Why is that?

10 A.    Well, when reading the specification, the comparative

11 experiments are used to distinguish from what is the

12 invention being claimed, and it works throughout.  The

13 specification is mentioned again and again and again, and at

14 no point it separates some special embodiments directed at

15 pharmaceutical manufacturing.

16         My second reason is that the claim as written,

17 right, requires that we will make a capsule, which is a

18 finished product, so that means that we're going to have to

19 fill powder into the capsule.  That's a pharmaceutical

20 manufacturing operation, and we're going to fill the capsule

21 with a mixture that contains granules, which means that

22 somebody has to carry out a granulation process, which is a

23 pharmaceutical manufacturing process.  So there is no way to

24 practice this claim without granulating and filling the

25 capsule, which is essentially pharmaceutical manufacturing.

DIRECT EXAMINATION - FERNANDO MUZZIO

1   Q.    So do you have a slide summarizing why in your

2   opinion the asserted claims are indefinite?

3   A.    I do.

4           MR. FRESE:  Can we bring up MUZZIO-DX-26?

5           THE WITNESS:  So this is the summary of my

6   opinion on why the claims are embodied as indefinite.  So in

7   summary, there were comparative experiments performed and

8   they are described in the specification, and they are

9   described as generating unacceptable products, and the

10  products were declared to be unacceptable for a variety of

11  reasons:  Impurity levels, stability, particle size, etc.,

12  etc.  But when you look at the claims, there is nothing in

13  the claims that tells me what ranges of those parameters

14  would make something to -- you know, would make a result to

15  be comprised within the scope of the claim.  None of those

16  are specified anywhere in the specification or the -- or the

17  claims.

18          MR. FRESE:  Your Honor, just for completeness, I

19  think I did this, but I want to just be sure.  We'd like to

20  move Dr. Muzzio's CV, DTX-81, into evidence.

21          THE COURT:  Okay.  I believe it was admitted,

22  but to the extent it's not, it's admitted.

23          MR. FRESE:  Belt and suspenders, Your Honor.

24  Thank you.  All right.

25          THE COURT:  At the appropriate time, let's stop

DIRECT EXAMINATION - FERNANDO MUZZIO

1   for the day.

2                   MR. FRESE:  Okay.

3                   (Court reporter clarification.)

4                   MR. FRESE:  81.

5                   Your Honor, we can pause here.

6                   THE COURT:  All right.  All right.  We'll stop

7   there for today.

8                   Dr. Muzzio, I'll remind you that you're still on

9   the stand, so you can't speak to your counsel about your

10  testimony during the break.

11                  We will resume tomorrow at -- I'll meet with

12  counsel at 9:00 a.m. to the extent there are objections that

13  need to be resolved.  We'll start back with Dr. Muzzio's

14  testimony thereafter.

15                  MR. PETERMAN:  Your Honor, just a question.  If

16  there's no issues, because I don't think we have any more

17  exchanges, do you want us here at 9:00 to discuss the issue

18  regarding the transcripts that you deferred this morning?

19                  THE COURT:  Yes, yes, yes.  Yeah, we can handle

20  that.

21                  MR. PETERMAN:  Thank you, Your Honor.

22                  THE COURT:  Then we'll go right into testimony.

23                  MS. CARLAN:  Your Honor, we may -- I'll come up.

24  We may not be quite ready for that because Dr. Muzzio's

25  testimony is going to include some more information that

DIRECT EXAMINATION - FERNANDO MUZZIO

1    would be relevant to your decision as to whether to let that

2    testimony in.

3                    THE COURT:  Okay.

4                    All right.  Are there -- so you're saying that

5    there won't be any other sort of unresolved objections; this

6    is the only thing that remains outstanding?

7                    MR. PETERMAN:  I think, Your Honor, it's my

8    understanding we've done all the disclosures for the

9    remaining witnesses for the case, and so I don't think

10   there's any more disclosures happening -- happening this

11   evening.

12                   THE COURT:  Okay.

13                   MR. PETERMAN:  And certainly, I'm willing to,

14   you know, take up the issue regarding the transcripts after

15   Dr. Muzzio finishes his testimony.

16                   THE COURT:  Okay.

17                   MR. PETERMAN:  I think Defense will -- would

18   play those designations after Dr. Muzzio goes anyway.

19                   MS. CARLAN:  Exactly.  We would play it after

20   Dr. Muzzio anyway, and his testimony about 103, where all of

21   this is relevant, hasn't come up yet.

22                   THE COURT:  Okay.

23                   All right.  So let's just plan to start at

24   9:15 a.m. and we'll go from there.

25                   MR. PETERMAN:  Thank you, Your Honor.

DIRECT EXAMINATION - FERNANDO MUZZIO

1          **THE COURT:  All right.**

2          **(Recess.)**

3          **(Whereupon, the following proceeding concluded**

4   **at 5:34 p.m.)**

5              **I hereby certify the foregoing is a true**

6   **and accurate transcript from my stenographic notes in the**

7   **proceeding.**

8                    **/s/ Michele L. Rolfe, RPR, CRR**
                       **U.S. District Court**

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

## $

**$100** [1] - 231:11

## '

**'480** [1] - 271:13
**'721** [72] - 18:20, 26:3, 26:6, 30:23, 31:22, 32:14, 34:11, 35:12, 36:8, 37:23, 38:9, 38:10, 38:13, 38:22, 38:23, 40:15, 40:18, 40:21, 41:7, 41:13, 42:2, 42:25, 44:6, 45:5, 53:22, 54:17, 55:21, 56:8, 178:6, 178:22, 179:10, 180:6, 191:25, 192:22, 192:25, 193:3, 193:19, 194:7, 194:25, 204:10, 206:2, 206:11, 223:25, 235:16, 235:19, 235:21, 236:4, 236:9, 236:11, 236:18, 236:21, 237:2, 237:7, 239:11, 240:1, 241:12, 245:16, 251:22, 252:15, 261:7, 264:9, 266:16, 268:7, 271:11, 271:19, 272:2, 273:4, 273:5, 273:8, 273:9, 273:12, 275:6
**'891** [1] - 271:21

## /

**/s** [1] - 279:8

## 0

**0** [1] - 246:17
**0.1-0.7** [1] - 109:15
**0.2** [1] - 250:6
**0.21** [2] - 253:12, 253:14
**0.4** [9] - 41:20, 103:19, 104:16, 105:15, 106:13, 129:20, 248:23, 250:21, 250:25
**0.4-0.6** [1] - 36:3
**0.404** [1] - 105:14
**0.407** [1] - 105:13
**0.413** [3] - 104:21,

105:5, 105:13
**0.415** [1] - 104:23
**0.5** [4] - 36:3, 129:18, 129:19, 250:21
**0.508** [1] - 36:3
**0.51** [1] - 36:3
**0.6** [2] - 17:13, 248:14
**0.7** [2] - 250:7, 250:22
**0.8** [3] - 17:13, 248:14, 250:7
**00** [4] - 143:10, 144:6, 144:12, 164:19
**000** [1] - 248:9
**0001** [2] - 143:4, 144:9
**0003** [4] - 144:23, 145:1, 146:20, 251:18
**0004** [1] - 252:1
**0005** [4] - 144:23, 145:1, 146:20, 248:1
**0010** [1] - 246:16
**0013** [1] - 105:7
**0018** [1] - 4:25
**003** [1] - 142:19
**004** [2] - 141:18, 141:19
**005** [3] - 141:19, 142:19
**01** [4] - 144:6, 144:11, 144:14, 146:12
**0105-AURO** [1] - 113:4
**0125** [1] - 132:2
**02** [2] - 146:5, 146:10
**040** [1] - 164:19
**043** [1] - 64:9

## 1

**1** [16] - 1:11, 103:20, 108:11, 152:9, 152:14, 154:13, 183:2, 200:7, 200:9, 200:12, 200:16, 248:2, 251:22, 252:1, 266:16, 272:10
**1,000** [1] - 110:8
**1-1** [1] - 118:10
**1-8** [1] - 116:19
**10** [9] - 118:14, 186:17, 213:9, 214:5, 214:7, 214:8, 217:13, 217:16, 231:10
**10-mL** [2] - 109:25, 110:20
**10.3.1.2** [1] - 109:11
**10.52** [2] - 119:9, 119:13

**100** [9] - 14:12, 31:8, 51:23, 101:3, 111:2, 130:16, 198:18, 249:21, 260:4
**100-mL** [1] - 110:20
**103** [4] - 38:15, 43:3, 44:9, 278:20
**1059** [1] - 180:21
**11** [10] - 62:4, 62:6, 62:7, 109:17, 139:19, 217:13, 217:17, 217:24, 218:11, 219:12
**11,452,721** [2] - 26:2, 55:19
**1112** [1] - 125:14
**112** [8] - 34:3, 34:11, 35:2, 38:16, 42:11, 44:6, 125:14, 209:13
**113** [1] - 209:13
**12** [10] - 117:11, 118:11, 145:9, 174:11, 186:17, 217:13, 217:17, 217:24, 219:3, 247:9
**12-38-1-1-1** [2] - 83:19, 118:10
**12-38-1-6-4** [1] - 93:25
**12-38-1-6-6** [1] - 92:7
**12.4** [1] - 119:5
**13** [7] - 18:23, 105:17, 204:16, 204:18, 236:13, 236:14, 264:10
**13:28-33** [1] - 261:7
**14** [5] - 37:18, 266:16, 267:4, 268:6
**15** [6] - 115:21, 164:1, 165:8, 220:13, 232:1, 264:12
**15-17** [1] - 89:2
**15-minute** [1] - 114:13
**15:3** [1] - 264:15
**15:3-10** [1] - 261:8
**15:37-46** [1] - 261:8
**15th** [4] - 71:4, 154:17, 155:11, 162:24
**16** [1] - 35:11
**17** [7] - 25:20, 31:15, 33:11, 33:13, 35:21, 39:11, 230:14
**1971** [1] - 173:6
**1972** [2] - 174:23, 185:2
**1987** [2] - 51:17, 173:8
**1991** [1] - 230:5
**1992** [2] - 51:14, 173:10
**1995** [1] - 174:1
**1:22-cv-01387-GBW**

[1] - 1:5
**1:55** [1] - 148:14

## 2

**2** [16] - 5:5, 35:8, 59:12, 59:14, 60:21, 63:4, 109:17, 124:23, 152:13, 152:18, 200:15, 200:16, 201:20, 264:12, 265:25, 266:1
**2,000** [2] - 126:9, 126:10
**2.2.P.2.2.1.3** [1] - 171:2
**2.75** [1] - 83:24
**20** [11] - 14:8, 28:21, 72:14, 164:1, 164:12, 165:8, 165:9, 165:11, 183:24, 216:11, 222:7
**20-minute** [2] - 164:3, 164:7
**200** [1] - 198:18
**200-75** [1] - 84:20
**2002** [4] - 246:12, 246:14, 247:11, 248:4
**2006** [1] - 231:6
**2007** [3] - 174:19, 230:13, 232:5
**2012** [1] - 251:17
**2014** [1] - 189:21
**2015** [1] - 15:2
**2016** [3] - 25:9, 37:13, 39:9
**2017** [4] - 37:19, 131:23, 236:10, 252:4
**2018** [2] - 175:7, 232:11
**2019** [2] - 143:3, 145:10
**2020** [11] - 71:4, 147:5, 154:17, 154:25, 155:5, 155:9, 155:10, 155:11, 155:12, 162:24, 167:1
**2021** [2] - 150:19, 150:22
**2024** [1] - 1:11
**21** [3] - 12:1, 12:6, 13:12
**216** [2] - 271:24, 273:20
**22** [1] - 36:1

**23** [1] - 58:23
**24** [1] - 267:4
**24:4-13** [1] - 261:7
**25** [11] - 71:14, 108:4, 109:15, 109:18, 109:21, 109:23, 110:11, 110:17, 110:20, 164:1, 165:8
**250-mL** [4] - 110:2, 110:6, 110:21, 111:1
**26** [1] - 143:3
**28** [1] - 147:4
**28th** [3] - 154:25, 155:5, 155:9

## 3

**3** [20] - 1:11, 26:9, 62:21, 63:13, 70:3, 70:5, 72:17, 80:2, 81:16, 113:2, 113:4, 152:18, 152:21, 153:4, 153:7, 153:9, 153:12, 201:18, 202:1, 246:15
**3.2.P.1** [1] - 60:3
**3.2.P.2** [2] - 68:14, 154:11
**3.2.P.2.3** [2] - 27:22, 73:11
**3.2.P.2.7** [1] - 71:17
**3.2.P.2.7.1** [1] - 163:3
**3.2.P.2.7.3** [3] - 28:15, 72:4, 163:17
**3.2.P.2.7.4** [4] - 28:15, 72:5, 72:20, 166:13
**3.2.P.3.3** [1] - 67:16, 202:21
**3.2.P.7.4** [1] - 165:18
**3.7** [1] - 83:24
**30** [1] - 196:16
**30(b)(6** [4] - 11:16, 11:22, 12:23, 17:3
**30th** [2] - 236:10, 252:4
**320** [1] - 231:19
**324** [1] - 8:8
**329** [1] - 192:8
**33** [2] - 230:7, 264:10
**330** [1] - 189:6
**332** [1] - 192:10
**34** [35] - 13:15, 13:20, 14:9, 25:18, 25:21, 25:24, 35:21, 39:13, 39:23, 40:5, 40:13, 58:4, 58:11, 59:20, 60:25, 61:6, 62:10, 62:13, 73:25, 74:2, 134:22, 141:12, 141:22, 142:13,

144:3, 146:2,
155:20, 155:22,
156:13, 171:4,
171:5, 177:25,
183:3, 203:13,
259:18
**347** [1] - 8:8
**348** [2] - 8:8, 144:8
**349** [1] - 8:8
**35** [3] - 38:14, 38:16,
196:15

# 4

**4** [101] - 18:20, 18:23,
25:25, 26:6, 26:8,
26:9, 26:12, 26:13,
26:15, 26:21, 30:13,
35:12, 36:2, 36:8,
45:6, 45:7, 46:2,
53:18, 53:21, 53:23,
56:8, 56:13, 57:4,
57:12, 57:13, 57:14,
57:21, 57:22, 62:16,
62:21, 62:24, 63:9,
63:14, 65:11, 65:14,
66:6, 66:19, 69:16,
69:17, 70:13, 70:15,
103:15, 106:9,
110:3, 111:11,
111:15, 111:18,
111:19, 111:23,
112:3, 112:5, 112:7,
112:11, 112:24,
113:8, 114:5,
115:21, 129:3,
141:21, 151:19,
151:22, 153:1,
153:15, 153:17,
153:18, 155:14,
158:23, 176:23,
193:10, 194:11,
204:14, 204:19,
204:20, 204:25,
205:1, 205:12,
206:2, 206:7,
206:12, 223:25,
224:6, 225:6,
226:14, 227:3,
236:13, 236:15,
240:1, 248:22,
251:22, 252:15,
259:25, 261:1,
265:18, 267:2,
270:19, 273:16,
274:13
**4(b** [1] - 63:12
**4(c** [2] - 63:24, 102:19
**4(d** [2] - 103:18, 111:8
**4-6** [3] - 203:7, 203:9,

203:19
**40** [36] - 25:17, 45:8,
46:1, 46:15, 61:2,
61:3, 61:5, 62:9,
63:18, 64:2, 64:17,
64:22, 67:1, 98:2,
102:20, 106:19,
123:21, 134:23,
135:3, 136:3,
136:15, 178:24,
202:5, 204:4, 205:5,
205:10, 205:20,
206:4, 206:13,
207:9, 207:22,
213:10, 213:22,
215:17, 217:25,
220:8
**43** [4] - 156:5, 157:7,
170:19, 225:6
**43-46** [2] - 65:14,
193:10
**44** [3] - 157:15, 268:6
**46** [5] - 73:6, 74:22,
156:6, 170:20,
264:16
**47** [2] - 74:19, 74:25
**47-50** [2] - 193:23,
226:15
**49** [3] - 12:12, 14:20,
17:9
**49-50** [1] - 245:16

# 5

**5** [48] - 18:20, 18:24,
26:6, 26:12, 26:21,
28:21, 30:13, 36:8,
53:18, 53:21, 53:24,
56:8, 56:13, 57:4,
57:19, 57:20, 66:19,
93:25, 111:17,
112:3, 112:6, 112:9,
113:15, 114:5,
141:21, 151:19,
153:6, 153:10,
153:17, 153:19,
166:9, 204:14,
204:21, 204:22,
204:25, 205:2,
206:11, 206:12,
206:14, 206:16,
236:13, 236:15,
248:10, 272:18,
274:12
**5-34** [2] - 259:9,
259:25
**50** [9] - 14:23, 134:16,
138:7, 148:14,
174:23, 175:20,
176:6, 216:12,

232:16
**50-mL** [1] - 110:20
**500** [1] - 232:2
**53-58** [1] - 194:11
**56-58** [1] - 227:3
**57** [2] - 200:6, 200:9
**57-59** [1] - 200:3
**5:34** [1] - 279:4

# 6

**6** [7] - 20:7, 69:6,
93:25, 117:14,
153:16, 153:19,
153:22
**6-B** [1] - 2:25
**60** [3] - 109:16,
130:19, 216:12
**600** [1] - 246:18
**616** [6] - 103:19,
106:20, 108:11,
128:7, 251:19,
251:23
**67** [1] - 163:1

# 7

**7** [5] - 13:14, 71:6,
117:14, 153:21,
155:15
**70** [1] - 72:2

# 8

**8** [1] - 81:15
**8.1.8** [3] - 80:8, 169:4,
169:12
**8.18** [1] - 168:13
**80** [1] - 130:15
**81** [1] - 277:4
**89** [1] - 110:15
**89.48** [1] - 119:12

# 9

**9** [2] - 42:21, 62:4
**90** [1] - 130:16
**900** [1] - 110:8
**92** [2] - 110:14, 127:22
**99** [3] - 12:1, 12:6,
14:5
**9:00** [3] - 2:25, 277:12,
277:17
**9:15** [1] - 278:24

# A

**a.m** [3] - 2:25, 277:12,
278:24
**abbreviated** [1] -

177:24
**able** [10] - 7:21, 8:3,
20:19, 21:4, 33:1,
48:24, 129:11,
151:4, 231:6, 247:23
**absence** [1] - 213:22
**absolutely** [3] - 16:18,
95:13, 111:5
**absorb** [1] - 216:14
**Academy** [2] - 31:10,
232:18
**academy** [1] - 232:20
**Acadia** [49] - 3:10, 5:1,
9:25, 10:4, 10:5,
11:21, 13:15, 13:19,
13:21, 14:1, 14:10,
14:16, 14:22, 15:14,
15:17, 16:14, 17:15,
24:13, 24:21, 25:12,
25:19, 25:21, 25:23,
26:6, 31:3, 31:15,
31:19, 34:24, 35:5,
36:8, 37:13, 37:19,
38:8, 39:17, 39:20,
41:4, 43:4, 43:13,
43:15, 43:17, 49:13,
53:6, 116:4, 137:16,
137:20, 178:4,
180:1, 204:13
**ACADIA** [2] - 1:4, 2:8
**Acadia's** [6] - 5:1,
24:24, 31:14, 37:12,
37:16, 39:9, 53:21,
178:1, 180:5, 206:20
**Acadia-related** [1] -
31:19
**accept** [1] - 6:10
**acceptable** [65] - 26:8,
34:10, 34:14, 34:18,
41:21, 42:4, 42:18,
57:25, 58:11, 59:15,
62:13, 63:20, 64:23,
67:2, 98:3, 102:21,
108:16, 111:18,
252:17, 255:3,
255:15, 255:20,
255:22, 256:11,
256:14, 256:24,
257:2, 257:4, 257:6,
257:17, 258:10,
258:15, 258:19,
258:24, 260:9,
261:19, 262:11,
262:17, 262:24,
263:1, 263:21,
264:4, 264:5, 265:7,
265:11, 265:13,
265:16, 265:22,
266:10, 267:17,
268:3, 269:8,

269:14, 269:17,
270:4, 271:1, 271:4,
272:24, 273:11,
273:14, 274:21,
274:23
**accepted** [1] - 59:9
**accepting** [1] - 129:9
**access** [1] - 55:2
**accidental** [2] -
121:25, 122:1
**accidentally** [1] -
122:4
**accompany** [1] - 50:6
**accomplish** [1] - 85:4
**according** [1] - 103:25
**account** [3] - 15:23,
128:19, 179:5
**accurate** [4] - 177:9,
177:10, 233:3,
233:6, 244:24, 279:6
**accurately** [2] - 50:13,
253:8
**achieve** [2] - 264:3,
266:25
**achieved** [1] - 230:18
**acid** [1] - 184:22
**acid-hydrolyzed** [1] -
184:22
**acknowledges** [2] -
39:14, 47:11
**act** [3] - 193:15,
198:15, 207:3
**action** [5] - 47:5,
96:15, 224:19,
241:18, 268:17
**active** [11] - 25:10,
32:7, 56:18, 60:18,
60:19, 183:19,
187:7, 189:15,
190:24, 221:11,
224:14
**acts** [2] - 187:9,
206:21
**actual** [6] - 15:11,
15:20, 29:19, 38:18,
44:8, 142:1
**add** [4] - 78:18, 87:5,
247:5, 268:19
**added** [9] - 72:23,
81:19, 112:9,
130:15, 153:17,
153:19, 246:17,
268:14, 268:16
**adding** [1] - 268:25
**addition** [4] - 95:16,
125:22, 205:1, 244:8
**additional** [3] - 40:17,
41:3, 152:14
**additionally** [1] -
260:3

address [2] - 11:2, 19:22
addressed [3] - 32:1, 59:13, 65:24
addressing [2] - 11:2, 26:15
adds [2] - 26:12, 182:22
adhere [14] - 65:12, 66:2, 113:19, 113:22, 114:1, 116:3, 121:11, 136:22, 193:17, 225:12, 225:14, 225:17, 226:2, 226:10
adhered [2] - 102:15, 226:7
adherence [4] - 95:2, 225:17, 225:18, 225:19
adhering [3] - 117:25, 121:5, 121:12
adhesive [1] - 268:20
administering [1] - 147:20
administration [1] - 59:18
Administration [2] - 149:3, 231:2
administrative [2] - 51:6, 175:13
admissions [1] - 137:20
admit [3] - 8:7, 78:2, 228:9
admitted [59] - 17:23, 50:19, 50:20, 56:4, 56:5, 59:5, 59:6, 60:12, 60:13, 61:25, 62:1, 68:6, 68:7, 68:21, 68:22, 69:6, 78:5, 78:6, 79:20, 79:21, 81:10, 81:11, 83:15, 83:16, 88:23, 88:24, 95:7, 104:11, 104:12, 105:6, 108:1, 108:2, 109:7, 109:8, 138:16, 148:10, 148:11, 177:20, 177:21, 181:11, 181:12, 182:15, 182:16, 184:12, 189:9, 189:10, 192:9, 199:6, 199:7, 233:14, 233:15, 248:19, 248:20, 252:12, 252:13, 273:23, 273:24,

276:21, 276:22
adopts [1] - 180:9
Advancement [1] - 31:12
advantages [1] - 173:23
adversary [1] - 99:3
affairs [1] - 174:5
affect [3] - 215:15, 274:1, 274:9
affected [4] - 25:5, 209:20, 218:8, 218:9
affects [1] - 39:16
affirmed [3] - 49:17, 171:18, 229:12
afternoon [8] - 115:5, 115:6, 148:19, 171:22, 220:12, 220:18, 220:19, 229:15
Agarwal [3] - 8:25, 11:16, 16:21
agencies [1] - 231:1
agents [1] - 121:10
agglomerate [3] - 187:23, 187:25, 251:3
agglomerated [1] - 96:21
agglomerates [11] - 107:4, 128:8, 132:13, 212:5, 216:18, 223:11, 223:12, 223:13, 223:15, 244:8
agglomerating [1] - 47:18
agglomeration [22] - 47:17, 84:12, 121:16, 121:17, 122:7, 122:8, 122:13, 122:15, 122:16, 122:17, 122:23, 123:4, 123:10, 188:2, 188:5, 188:8, 188:11, 188:12, 188:14, 212:17
agglomerations [6] - 97:23, 123:12, 123:13, 212:8, 215:22, 215:25
aggregated [1] - 97:11
aggregation [1] - 241:3
agnostic [1] - 224:5
ago [10] - 75:4, 94:3, 170:22, 183:24, 189:24, 205:22, 220:20, 228:8,

232:1, 244:20
agonist [1] - 25:11
agree [19] - 49:4, 120:6, 121:15, 122:22, 123:3, 124:1, 124:10, 148:5, 202:14, 206:24, 207:12, 207:13, 213:9, 217:24, 222:25, 223:25, 226:1, 240:14, 275:7
agreed [1] - 139:3
agreement [1] - 56:18
ahead [10] - 74:16, 229:24, 232:21, 235:12, 247:9, 250:23, 251:18, 264:7, 271:6, 271:15
akin [2] - 188:6, 202:11
al [1] - 1:6
Alice [1] - 45:20
align [1] - 111:3
ALL [1] - 3:2
all-inclusive [2] - 122:2, 122:11
alleged [1] - 30:8
alleging [2] - 26:22, 178:4
allegorically [1] - 47:16
allow [12] - 7:24, 32:5, 36:24, 41:9, 85:2, 90:1, 97:10, 194:17, 217:19, 217:20, 254:2, 273:12
allowable [1] - 32:14
allowance [3] - 31:24, 31:25, 32:13
allowed [5] - 37:2, 40:13, 108:12, 108:13, 215:12
allowing [2] - 36:22, 254:4
allows [7] - 32:7, 40:4, 40:5, 182:22, 259:17, 272:24, 273:9
almost [5] - 23:2, 45:20, 151:4, 185:5, 238:6
alone [7] - 35:4, 38:1, 40:22, 238:5, 268:16, 272:12, 272:20
alternatively [1] - 257:11
amendable [1] - 195:11

amended [1] - 3:16
American [5] - 31:11, 175:1, 175:2, 232:6, 232:8
Amherst [1] - 230:5
Amidon [1] - 108:25
amorphous [21] - 87:7, 87:12, 87:13, 87:18, 87:20, 88:1, 88:2, 89:25, 90:14, 91:4, 93:9, 94:12, 100:1, 101:2, 101:4, 101:25, 102:4, 211:4, 211:5, 211:6, 211:8
amount [24] - 32:5, 40:11, 40:17, 41:20, 41:21, 91:15, 108:9, 130:17, 164:4, 242:13, 243:21, 250:16, 253:7, 253:13, 253:15, 256:13, 264:3, 265:11, 266:11, 266:23, 266:25, 268:16, 268:18, 272:21
amounts [4] - 79:7, 260:7, 260:13, 260:21
Amy [1] - 24:22
analyses [1] - 228:10
analysis [37] - 27:9, 27:11, 34:6, 54:8, 54:12, 58:25, 60:6, 61:19, 65:17, 66:18, 68:16, 77:12, 79:12, 81:3, 81:23, 91:6, 95:23, 96:8, 97:25, 121:9, 129:15, 136:5, 136:6, 173:7, 200:1, 204:23, 205:4, 205:6, 205:12, 205:18, 209:21, 210:1, 235:5, 236:17, 237:5, 239:5, 239:9
analytical [9] - 27:6, 51:9, 51:13, 51:18, 51:25, 52:2, 67:10, 174:15, 238:10
analyze [4] - 51:21, 52:17, 52:20, 57:16
analyzed [2] - 53:4, 56:9
analyzer [2] - 86:25, 87:3
analyzes [2] - 120:24
analyzing [1] - 170:14
AND [1] - 1:2

ANDA [80] - 7:4, 27:12, 27:21, 28:3, 54:3, 54:8, 54:5, 54:10, 56:19, 56:23, 57:10, 58:6, 58:16, 58:22, 60:2, 61:18, 63:1, 67:6, 67:15, 67:19, 68:13, 70:11, 74:3, 75:25, 96:2, 98:1, 98:13, 105:1, 105:20, 111:4, 111:13, 112:12, 127:10, 135:24, 137:19, 138:4, 139:22, 140:10, 140:23, 141:1, 147:18, 147:22, 149:4, 149:9, 149:17, 151:12, 154:10, 155:25, 160:15, 160:21, 160:25, 163:11, 163:13, 164:22, 166:4, 166:6, 166:18, 166:20, 167:7, 167:10, 168:7, 177:25, 178:3, 178:5, 178:6, 178:8, 178:9, 178:23, 178:24, 195:25, 196:1, 196:5, 199:19, 199:22, 199:23, 202:19, 220:7, 221:19
ANDAs [2] - 67:22, 148:24
annotations [1] - 90:18
answer [7] - 110:22, 133:14, 140:15, 160:16, 169:16, 245:8, 265:21
answered [2] - 13:24, 157:3
answers [1] - 13:16
anticipated [1] - 39:6
anticipating [1] - 18:13
any.. [1] - 9:5
anyhow [1] - 181:3
anyway [2] - 278:18, 278:20
AP [3] - 140:12, 140:18, 159:19
apart [4] - 113:12, 197:1, 254:14, 258:9
API [40] - 69:23, 72:11, 75:6, 75:14, 76:7, 76:14, 76:25, 78:13,

78:19, 80:4, 81:17, 87:17, 88:1, 90:14, 91:4, 92:15, 92:17, 93:9, 94:25, 95:2, 100:2, 100:23, 101:2, 101:4, 102:4, 116:12, 129:25, 132:11, 132:13, 132:14, 132:18, 158:17, 158:22, 159:1, 161:16, 223:1, 223:2, 223:6, 226:6
**APL** [1] - 164:19
**apologize** [2] - 80:17, 214:9
**apparent** [2] - 106:3, 243:19
**appear** [5] - 16:13, 19:3, 24:13, 145:13, 228:12
**appearance** [1] - 209:18
**appearances** [1] - 3:5
**APPEARANCES** [1] - 2:1
**appeared** [1] - 98:14
**appearing** [1] - 4:12
**application** [11] - 31:15, 37:20, 39:3, 53:18, 58:22, 60:3, 67:19, 86:3, 177:24, 259:24, 260:18
**applications** [2] - 67:6, 112:12
**applied** [2] - 65:17, 268:16
**apply** [8] - 8:11, 8:18, 54:2, 54:7, 64:13, 65:1, 206:15, 236:23
**applying** [1] - 124:2
**approach** [6] - 24:8, 36:13, 44:16, 49:15, 172:20, 177:1
**appropriate** [8] - 108:10, 108:14, 108:17, 110:16, 111:6, 164:4, 260:17, 276:25
**approval** [3] - 13:17, 28:24, 177:25
**approved** [23] - 24:25, 25:8, 37:15, 70:22, 70:25, 154:15, 154:17, 154:20, 154:21, 154:24, 155:4, 155:8, 155:10, 155:11, 156:3, 162:1, 162:5, 162:16, 162:19,

162:22, 163:14, 166:19, 169:8
**April** [6] - 71:4, 154:17, 155:11, 155:12, 162:24, 233:5
**aqueous** [3] - 216:19, 216:23
**area** [16] - 90:21, 91:24, 92:17, 172:4, 172:8, 176:1, 195:18, 222:6, 222:19, 232:10, 234:9, 234:11, 234:12, 234:15, 234:17, 234:25
**areas** [25] - 53:13, 89:20, 90:1, 90:2, 90:25, 99:20, 101:15, 101:16, 101:22, 101:24, 210:20, 210:24, 211:1, 211:2, 211:8, 211:9, 214:3, 214:17, 214:18, 218:22, 219:15, 219:16, 234:19
**ARENTFOX** [1] - 2:15
**ArentFox** [2] - 3:21, 37:9
**Argentina** [1] - 230:3
**Argentine** [1] - 232:18
**argue** [2] - 8:13, 11:12
**argued** [1] - 229:5
**argument** [8] - 6:4, 6:13, 6:14, 7:3, 8:20, 10:11, 36:20, 98:5
**arguments** [6] - 7:13, 32:16, 35:2, 48:1, 257:14
**arrive** [1] - 33:8
**arriving** [1] - 236:24
**art** [73] - 9:9, 9:15, 10:4, 10:17, 12:2, 12:7, 12:14, 12:20, 12:24, 13:11, 14:3, 14:17, 15:7, 15:11, 15:18, 15:20, 15:23, 16:7, 16:15, 16:23, 17:2, 17:18, 26:4, 32:3, 32:18, 32:20, 32:23, 32:25, 33:9, 33:19, 38:15, 39:2, 42:15, 43:2, 43:7, 46:20, 54:13, 131:17, 179:9, 180:5, 181:15, 193:7, 225:20, 225:22, 235:7, 237:2, 237:4, 237:7,

237:15, 237:17, 238:14, 238:19, 238:24, 239:2, 239:6, 240:8, 240:9, 240:11, 240:19, 241:6, 241:23, 242:1, 246:20, 247:12, 247:15, 248:5, 255:21, 256:3, 256:19, 256:21, 258:23, 270:7
**article** [1] - 246:8
**artifact** [2] - 215:10, 215:19
**aside** [1] - 255:9
**aspect** [2] - 221:15, 255:10
**aspects** [3] - 46:2, 229:21, 230:9
**ASPR** [1] - 231:3
**asserted** [26] - 26:21, 27:16, 34:2, 38:13, 39:1, 41:18, 42:8, 42:19, 53:21, 54:11, 66:14, 135:3, 178:16, 178:22, 220:9, 235:8, 236:12, 236:14, 239:10, 239:21, 254:17, 255:23, 274:2, 274:10, 274:11, 276:2
**asserting** [3] - 18:20, 26:6, 204:13
**assertion** [1] - 29:23
**assertions** [3] - 211:20, 212:1, 212:12
**assess** [3] - 48:9, 178:15, 205:9
**assessment** [1] - 269:5
**assignment** [4] - 178:11, 178:13, 235:10, 239:8
**assisted** [1] - 24:20
**associate** [2] - 139:16, 173:16
**associated** [9] - 25:1, 97:18, 116:12, 175:13, 180:23, 185:15, 187:25, 203:3, 228:7
**Association** [1] - 175:1
**associations** [1] - 174:25
**assume** [3] - 15:24, 132:14, 201:15

**assumed** [1] - 174:7
**assuming** [1] - 119:19
**assumption** [3] - 119:21, 133:6, 208:13
**assumptions** [2] - 32:18, 34:1
**assurance** [2] - 174:4, 185:14
**astounding** [1] - 45:10
**atmosphere** [2] - 216:9, 216:11
**attached** [1] - 94:25
**attempt** [3] - 15:3, 34:12, 261:15
**attempted** [2] - 29:16, 239:5
**attending** [2] - 19:15, 24:21
**attention** [14] - 36:11, 58:18, 59:24, 62:3, 69:16, 73:5, 79:8, 90:16, 92:6, 105:6, 112:15, 167:20, 225:5, 248:7
**attract** [1] - 231:6
**attracted** [1] - 231:10
**attribute** [3] - 160:7, 160:22, 161:1
**Attributes** [6] - 157:25, 158:7, 159:11, 159:24, 160:2, 163:4
**attributes** [22] - 27:25, 28:5, 28:8, 73:17, 74:7, 74:9, 74:13, 75:11, 156:19, 156:20, 156:23, 156:24, 157:6, 157:7, 157:12, 157:13, 159:12, 160:4, 161:9, 161:16, 261:22, 270:1
**August** [3] - 15:2, 236:10, 252:4
**Auro** [1] - 5:19
**AURO** [5] - 148:6, 148:7
**AURO-DTX-301** [1] - 177:17
**AURO-DTX-313** [2] - 199:4, 200:3
**AUROBINDO** [1] - 1:6
**Aurobindo** [144] - 2:11, 2:11, 4:11, 5:6, 5:17, 5:20, 5:23, 6:7, 9:7, 10:8, 10:14, 16:12, 19:11, 19:12, 20:21, 26:7, 26:22,

27:23, 28:3, 28:9, 28:12, 28:18, 29:3, 29:8, 29:14, 29:16, 29:19, 29:22, 30:4, 30:7, 36:8, 38:5, 43:21, 45:2, 45:10, 45:24, 47:7, 48:13, 48:16, 57:24, 63:12, 71:8, 77:4, 77:5, 80:11, 84:24, 97:14, 98:5, 98:11, 102:8, 104:25, 105:17, 105:19, 106:7, 110:6, 112:18, 112:20, 112:24, 115:8, 129:11, 134:11, 135:9, 136:25, 137:21, 139:14, 139:18, 139:20, 139:21, 140:1, 140:9, 140:22, 141:1, 147:17, 147:22, 148:22, 148:24, 149:2, 149:6, 149:9, 149:12, 149:16, 150:12, 150:16, 151:1, 156:10, 156:24, 157:9, 159:10, 162:18, 163:21, 164:3, 164:8, 164:14, 164:4, 166:19, 166:23, 167:23, 168:7, 168:18, 169:20, 169:21, 170:1, 170:8, 170:13, 171:12, 177:13, 177:23, 178:8, 178:9, 178:15, 179:4, 195:21, 195:24, 196:1, 196:5, 196:13, 196:18, 196:22, 199:10, 199:19, 199:22, 200:5, 202:4, 202:6, 202:19, 204:6, 204:7, 204:14, 205:13, 205:23, 206:10, 206:14, 206:15, 207:4, 207:17, 207:25, 210:1, 213:4, 221:14, 221:18, 234:18, 236:12
**Aurobindo's** [130] - 20:24, 21:3, 22:5, 22:7, 22:8, 22:11, 26:20, 26:24, 27:12,

27:13, 27:15, 27:18, 27:21, 28:3, 29:20, 30:1, 30:2, 36:19, 44:13, 50:4, 53:18, 53:20, 56:19, 56:23, 56:24, 57:3, 57:6, 57:10, 57:17, 57:23, 58:6, 58:14, 58:16, 59:8, 59:21, 60:16, 60:20, 61:18, 62:12, 62:22, 63:23, 66:25, 68:25, 70:3, 70:11, 75:25, 76:23, 81:24, 82:8, 82:13, 84:2, 84:3, 84:16, 87:15, 89:17, 91:14, 95:24, 96:1, 96:4, 98:1, 98:19, 99:10, 102:6, 102:16, 103:4, 103:14, 103:24, 104:15, 105:22, 106:22, 106:25, 111:1, 111:4, 111:7, 111:13, 112:10, 113:15, 113:25, 114:5, 116:8, 116:10, 116:13, 116:18, 117:10, 117:21, 123:16, 124:10, 125:16, 127:10, 128:16, 131:9, 135:24, 136:2, 136:3, 136:24, 138:3, 151:12, 154:10, 155:25, 163:7, 163:11, 166:20, 166:23, 169:2, 169:9, 169:23, 170:4, 178:5, 178:23, 178:24, 197:25, 199:11, 206:7, 206:21, 207:9, 209:6, 209:11, 209:12, 213:23, 220:5, 220:7, 220:24, 221:3, 221:5, 221:15, 221:19, 224:9, 224:24, 228:12

**AUROMoreton** [1] - 4:24
**author** [3] - 108:24, 189:22, 189:23
**authored** [2] - 51:23, 246:9
**available** [3] - 150:7, 193:6, 248:6
**Avicel** [6] - 35:23,

125:12, 125:15, 208:25, 209:2, 209:22
**avoid** [1] - 242:9
**award** [2] - 175:7, 232:14
**awarded** [1] - 175:7
**awards** [3] - 31:10, 175:5, 232:4
**aware** [8] - 99:7, 133:9, 136:11, 137:3, 204:13, 206:20, 207:8, 238:18

**B**

**BA** [1] - 51:16
**bachelor's** [5] - 54:20, 173:6, 179:20, 230:2, 237:19
**background** [5] - 11:20, 44:1, 173:4, 173:14, 219:4
**backing** [1] - 264:8
**badly** [1] - 250:3
**bag** [3] - 188:4, 188:10, 188:11
**bags** [1] - 153:22
**Baldwin** [2] - 4:5, 11:1
**BALDWIN** [2] - 2:17, 4:6
**ball** [1] - 224:18
**barely** [1] - 115:5
**Barry** [2] - 4:11, 4:18
**BARRY** [1] - 2:9
**bars** [1] - 189:17
**base** [1] - 241:15
**based** [23] - 5:5, 8:15, 8:16, 8:20, 32:16, 33:25, 61:7, 62:11, 70:2, 76:23, 84:24, 97:25, 108:8, 111:11, 119:21, 129:12, 209:21, 212:12, 219:21, 222:20, 241:7, 248:12
**basis** [4] - 135:5, 272:24, 274:17, 274:20
**batch** [3] - 127:9, 243:18, 249:21
**batches** [1] - 105:9
**bears** [1] - 41:12
**became** [1] - 6:5
**Becnel** [2] - 3:11, 24:19
**BECNEL** [1] - 2:4
**Becnel-Guzzo** [2] -

3:11, 24:19
**BECNEL-GUZZO** [1] - 2:4
**become** [3] - 33:23, 216:14
**becomes** [2] - 216:25, 263:17
**bed** [1] - 192:4, 194:23, 227:8
**BEFORE** [1] - 1:14
**beg** [1] - 192:11
**began** [1] - 135:23
**begin** [1] - 256:20
**beginning** [5] - 2:25, 14:8, 21:16, 23:21, 36:1
**behalf** [10] - 3:10, 4:11, 18:15, 19:12, 24:13, 37:10, 43:20, 49:17, 171:17, 229:11
**belong** [2] - 174:24, 175:1
**belongs** [1] - 161:21
**below** [8] - 60:25, 113:9, 143:10, 144:10, 144:11, 146:11, 222:7
**belt** [1] - 276:23
**Bench** [1] - 1:11
**bench** [2] - 2:24, 7:22
**bene** [1] - 138:11
**beneficial** [1] - 243:22
**benefit** [3] - 137:16, 172:15, 238:9
**benefits** [3] - 173:23, 247:5, 247:7
**BERMAN** [2] - 2:15, 3:25
**Berman** [1] - 3:24
**best** [5] - 71:9, 82:18, 134:20, 134:25, 135:2
**better** [6] - 111:6, 122:18, 157:10, 201:3, 201:20, 254:11
**between** [29] - 9:25, 14:10, 14:15, 14:22, 31:14, 43:10, 46:7, 49:12, 79:2, 88:20, 95:2, 102:2, 110:8, 111:24, 120:24, 136:15, 158:11, 171:14, 185:25, 188:6, 194:4, 198:25, 212:4, 217:12, 226:19, 241:20, 245:2, 262:16, 263:3

**beyond** [9] - 21:21, 22:15, 29:18, 45:14, 65:4, 66:17, 94:16, 95:20, 110:17
**bias** [2] - 107:4, 128:10
**biased** [1] - 39:4
**big** [8] - 118:7, 118:11, 118:12, 124:16, 212:6, 249:23, 268:19
**Bigelow** [1] - 175:7
**bigger** [2] - 127:24, 128:1
**biggest** [1] - 117:12
**bind** [3] - 182:5, 182:6, 189:3
**binder** [46] - 35:14, 42:1, 42:23, 50:8, 55:15, 58:19, 61:13, 67:11, 68:9, 71:13, 77:8, 88:15, 104:2, 106:15, 108:18, 177:6, 181:16, 181:18, 186:4, 186:24, 187:2, 187:3, 187:6, 187:9, 188:24, 189:2, 194:5, 197:5, 197:6, 197:9, 197:13, 197:15, 198:15, 206:22, 207:3, 226:20, 232:22, 235:12, 241:16, 241:17, 246:5, 267:9, 271:7, 271:16
**binders** [11] - 35:16, 40:24, 172:19, 181:22, 181:24, 190:16, 253:16, 253:17, 253:18, 253:21
**binding** [2] - 187:8, 197:10
**binds** [2] - 181:19, 217:2
**Biochemical** [1] - 43:23
**Biochemistry** [1] - 232:19
**biologic** [1] - 172:16
**bit** [23] - 28:2, 69:14, 73:5, 90:5, 90:17, 95:20, 96:3, 100:14, 117:12, 117:13, 128:13, 129:4, 129:14, 145:12, 188:21, 214:8, 216:15, 223:5, 235:4, 247:25,

255:19, 263:10, 266:4
**black** [2] - 94:11, 183:19
**blend** [32] - 28:20, 28:21, 45:11, 72:14, 72:25, 78:20, 103:11, 163:22, 164:12, 183:14, 183:20, 191:13, 197:11, 199:1, 200:25, 201:4, 201:5, 202:2, 204:7, 212:17, 212:19, 223:1, 223:2, 223:10, 223:11, 224:9, 224:10, 224:13, 244:24, 249:21, 250:5, 250:11
**Blend** [1] - 160:9
**blended** [8] - 63:17, 77:3, 81:18, 102:19, 102:23, 103:5, 182:1, 256:17
**blender** [2] - 76:11, 249:23
**blending** [43] - 28:20, 29:7, 69:25, 72:13, 73:2, 76:10, 76:11, 76:12, 76:13, 80:5, 135:7, 140:24, 141:3, 141:25, 142:6, 142:22, 142:25, 145:3, 145:6, 146:22, 147:1, 152:7, 159:20, 161:21, 164:11, 165:3, 165:7, 166:8, 166:21, 168:5, 168:9, 171:2, 183:7, 183:8, 183:9, 191:19, 195:13, 195:15, 195:17, 198:19, 203:20, 207:16
**blends** [2] - 224:18, 245:12
**blinds** [1] - 214:9
**block** [1] - 85:20
**blown** [1] - 90:17
**blue** [3] - 92:21, 93:10, 189:17
**blurred** [1] - 215:7
**blurry** [3] - 215:7, 215:8
**blurs** [1] - 215:13
**Bo** [1] - 31:16
**Bo-Ragnar** [1] - 31:16

**bold** [1] - 208:13
**bond** [1] - 241:1
**bonded** [4] - 210:13, 210:17, 215:2, 245:7
**bonding** [3] - 121:8, 241:20, 244:11
**bonds** [6] - 120:24, 188:6, 194:3, 198:25, 226:19, 241:4
**book** [8] - 31:9, 51:24, 108:15, 108:22, 175:11, 175:21, 175:22, 175:24
**Book** [1] - 150:7
**books** [1] - 175:21
**bottom** [19] - 45:22, 48:19, 69:8, 70:15, 71:16, 85:15, 85:22, 112:18, 119:7, 123:20, 143:6, 143:15, 143:16, 145:11, 197:2, 215:6, 259:3, 262:8, 266:20
**bound** [2] - 216:17, 216:19
**boundary** [2] - 262:16, 268:2
**box** [26] - 90:23, 91:3, 92:12, 92:16, 92:21, 93:10, 100:15, 143:8, 143:16, 144:9, 145:12, 145:13, 146:9, 146:10, 154:15, 158:16, 158:18, 158:22, 159:1, 159:2, 159:5, 159:23, 159:24, 160:2, 160:11, 161:1
**boxes** [5] - 69:21, 100:15, 143:10, 144:11, 146:11
**Bradford** [1] - 4:2
**BRADFORD** [1] - 2:16
**Branch** [1] - 229:18
**brand** [1] - 208:25
**branded** [1] - 126:22
**break** [16] - 114:11, 114:12, 114:13, 114:14, 128:8, 132:12, 132:13, 138:22, 148:1, 148:13, 201:2, 220:12, 220:14, 223:16, 254:14, 277:10
**brevity** [1] - 184:24
**bridges** [1] - 241:19

**brief** [7] - 46:10, 78:10, 79:25, 81:16, 203:3, 203:11, 256:2
**briefing** [1] - 137:11
**briefly** [15] - 30:15, 45:4, 51:11, 53:15, 69:18, 78:8, 113:17, 239:19, 249:4, 253:2, 253:16, 253:24, 254:7, 254:12, 254:25
**bright** [1] - 92:15
**brightness** [1] - 91:23
**bring** [12] - 16:1, 93:21, 113:2, 154:8, 171:13, 225:7, 229:6, 239:15, 254:23, 272:8, 274:6, 276:4
**bringing** [1] - 126:24
**brings** [1] - 241:18
**Britain** [1] - 175:3
**broad** [4] - 7:10, 38:13, 43:1, 43:16
**broader** [4] - 10:15, 38:8, 41:8, 43:16
**broken** [3] - 57:14, 182:8, 223:14
**brought** [3] - 6:7, 10:21, 11:3
**brush** [1] - 107:17
**bulk** [94] - 12:15, 12:16, 12:18, 17:13, 26:11, 28:8, 35:1, 35:25, 36:2, 39:24, 40:1, 40:12, 41:20, 41:21, 42:4, 42:18, 42:24, 43:8, 75:17, 75:21, 103:18, 103:24, 104:6, 104:16, 104:20, 104:23, 104:25, 105:8, 105:12, 106:1, 106:2, 106:5, 106:22, 107:8, 109:11, 110:25, 111:8, 127:16, 127:21, 127:22, 127:25, 128:4, 128:23, 128:25, 129:6, 160:7, 160:9, 160:13, 160:18, 161:7, 161:13, 182:22, 183:4, 223:3, 223:5, 223:7, 223:11, 223:17, 243:24, 243:25, 244:1, 244:2, 244:6, 244:7, 244:15, 248:23, 248:24,

249:4, 249:7, 249:16, 249:17, 250:1, 250:2, 250:5, 250:15, 250:18, 250:20, 250:25, 252:1, 252:6, 253:4, 258:16, 260:20, 261:2, 265:7, 265:13, 265:16, 266:9, 267:17, 269:13, 269:14, 270:12
**Bulk** [2] - 106:20, 251:19
**bullet** [4] - 14:24, 15:1, 265:1, 265:9
**bunch** [1] - 231:4
**burden** [11] - 6:21, 17:1, 31:1, 33:2, 33:6, 34:5, 45:23, 54:7, 134:18, 136:15, 137:18
**business** [1] - 174:5
**BY** [100] - 2:3, 2:5, 2:10, 2:14, 2:15, 49:20, 50:21, 52:15, 53:14, 56:6, 59:7, 60:14, 62:2, 68:8, 68:23, 76:20, 78:7, 79:22, 81:12, 83:1, 83:17, 88:25, 93:23, 97:20, 104:13, 108:3, 109:9, 113:5, 115:3, 125:1, 131:5, 139:5, 144:24, 145:22, 147:7, 148:18, 151:10, 154:7, 167:18, 170:18, 171:21, 173:2, 177:4, 177:22, 178:19, 179:14, 180:13, 181:14, 182:18, 183:12, 184:15, 187:14, 189:12, 190:10, 191:22, 192:12, 192:21, 193:11, 193:24, 194:13, 195:23, 198:13, 199:8, 199:16, 202:17, 203:8, 204:12, 205:16, 209:5, 212:21, 217:7, 220:3, 220:17, 225:9, 226:16, 227:4, 229:14, 231:14, 233:16, 234:3, 235:3, 236:1, 237:13, 239:18,

240:22, 244:13, 245:13, 246:1, 248:21, 249:3, 251:11, 252:14, 253:1, 254:24, 256:1, 264:6, 267:20, 273:3, 273:25, 274:8

# C

**C.A** [1] - 1:5
**calculated** [1] - 105:13
**calculation** [1] - 129:17
**called-out** [2] - 180:24, 181:1
**callout** [1] - 193:9
**callouts** [1] - 21:5
**Campos** [7] - 93:21, 97:4, 113:1, 114:23, 225:7, 226:14, 227:2
**Canada** [2] - 174:9, 174:12
**cannot** [2] - 31:1, 45:23
**cap** [2] - 28:8, 112:2
**capabilities** [1] - 51:18
**capable** [1] - 193:17
**capillary** [2] - 96:15, 241:18
**caps** [2] - 63:9, 113:12
**Capsugel** [2] - 112:17, 246:9
**capsule** [110] - 13:16, 13:20, 13:22, 25:24, 25:25, 26:8, 26:9, 26:13, 32:6, 32:8, 34:10, 34:14, 34:18, 37:15, 37:21, 39:22, 40:6, 40:7, 40:14, 41:22, 47:15, 56:16, 57:25, 58:2, 58:11, 59:9, 59:15, 62:8, 62:13, 62:20, 62:21, 62:22, 62:24, 63:6, 63:8, 63:10, 63:13, 75:8, 87:17, 110:17, 111:18, 111:19, 111:23, 111:25, 112:1, 112:11, 112:19, 112:21, 112:24, 113:11, 113:13, 116:11, 116:23, 129:1, 130:12, 133:7, 133:11, 139:24, 171:2, 186:16,

191:16, 195:9, 200:5, 223:9, 242:14, 243:4, 243:21, 243:22, 246:24, 247:1, 247:11, 247:16, 247:17, 247:20, 247:22, 248:6, 248:12, 248:14, 248:15, 250:15, 250:16, 250:17, 253:11, 253:14, 255:20, 255:22, 256:14, 256:15, 256:24, 257:4, 257:6, 257:17, 272:24, 273:11, 275:17, 275:19, 275:20, 275:25
**Capsule** [1] - 14:9
**capsules** [76] - 13:23, 38:21, 59:17, 60:24, 63:9, 73:25, 74:2, 84:2, 84:3, 84:17, 104:15, 107:2, 110:5, 110:6, 110:8, 110:9, 110:11, 110:15, 112:13, 112:18, 113:9, 113:10, 127:22, 133:3, 140:3, 140:21, 140:25, 141:12, 141:15, 141:22, 142:12, 143:14, 144:2, 144:21, 146:1, 147:20, 155:20, 155:22, 156:13, 166:24, 169:2, 170:10, 171:4, 186:5, 186:17, 186:22, 190:17, 191:20, 194:6, 196:13, 197:2, 198:1, 203:13, 204:8, 207:17, 213:5, 236:5, 236:6, 241:25, 242:2, 242:20, 243:5, 243:6, 245:20, 245:24, 246:21, 247:13, 248:9, 252:23, 255:15, 259:25, 261:1, 262:25, 265:24
**capsules..** [1] - 259:9
**capture** [1] - 94:16
**captured** [2] - 84:6,

119:22
**card** [22] - 77:15, 77:22, 79:15, 80:20, 127:3, 127:7, 127:11, 142:12, 142:23, 144:2, 144:4, 146:1, 146:3, 146:24, 147:11, 147:12, 147:17, 147:21, 167:22, 167:24, 168:3, 168:6
**Cardiff** [1] - 173:10
**cards** [3] - 81:5, 131:25, 168:1
**care** [1] - 123:20
**career** [3] - 102:11, 175:5, 176:3
**carefully** [4] - 107:6, 107:10, 107:16, 107:19
**CARLAN** [24] - 2:16, 3:22, 9:4, 10:18, 11:7, 11:10, 11:12, 11:15, 11:18, 13:3, 13:5, 16:18, 16:20, 17:25, 18:9, 36:13, 36:15, 37:5, 37:7, 37:9, 229:1, 229:9, 277:23, 278:19
**Carlan** [3] - 3:21, 10:18, 37:9
**carry** [1] - 275:22
**case** [98] - 5:14, 6:14, 6:19, 11:1, 12:9, 12:16, 12:25, 17:7, 17:18, 18:18, 19:1, 19:10, 19:11, 20:4, 20:13, 21:4, 24:17, 24:24, 25:15, 26:2, 28:7, 31:17, 37:12, 38:4, 42:13, 43:6, 43:12, 43:20, 44:4, 44:10, 44:12, 45:3, 45:10, 45:13, 45:14, 53:16, 60:6, 61:20, 64:11, 65:17, 85:16, 99:4, 99:5, 99:14, 100:9, 134:9, 134:12, 135:18, 136:22, 150:9, 150:15, 150:21, 150:25, 167:16, 172:2, 172:9, 176:19, 176:22, 178:11, 178:13, 178:21, 179:2, 179:8, 179:16, 180:8, 190:1, 192:25, 196:8, 200:1, 202:24,

204:1, 204:14, 204:24, 205:19, 208:3, 208:11, 213:7, 217:22, 220:6, 220:21, 221:23, 228:22, 228:25, 229:2, 234:22, 235:5, 236:25, 239:7, 239:9, 243:20, 256:11, 257:20, 267:15, 271:24, 272:17, 272:23, 274:25, 278:9
**Catalent** [12] - 10:1, 10:5, 11:25, 14:11, 14:16, 14:22, 15:3, 15:5, 15:6, 15:15, 39:22, 40:10
**Catalent's** [2] - 39:23, 40:15
**caught** [7] - 117:10, 117:12, 118:12, 120:13, 128:2, 128:17, 130:3
**caused** [3] - 33:16, 188:20, 190:14
**causes** [1] - 260:13
**Cellucress** [3] - 125:18, 125:19, 209:8
**cellulose** [68] - 35:11, 35:16, 35:17, 87:18, 90:15, 90:24, 91:9, 91:11, 91:13, 91:16, 91:17, 91:20, 91:22, 91:25, 92:11, 92:14, 92:19, 93:8, 95:1, 95:3, 96:24, 97:2, 100:2, 100:18, 100:21, 100:24, 101:1, 101:9, 101:12, 101:17, 101:19, 101:20, 101:23, 102:1, 102:3, 102:15, 125:10, 125:12, 125:15, 125:17, 125:20, 132:16, 152:2, 152:12, 152:15, 152:23, 184:17, 184:19, 184:21, 184:22, 184:24, 185:1, 185:8, 185:16, 185:18, 197:19, 198:7, 200:14, 200:17, 207:3, 210:6, 214:21, 226:10, 267:9,

267:12
**celluloses** [1] - 209:17
**Center** [2] - 43:25, 173:17
**center** [4] - 100:5, 100:23, 139:17, 231:7
**central** [1] - 34:23
**CEO** [1] - 27:8
**certain** [16] - 12:18, 26:11, 34:15, 48:15, 55:23, 74:12, 178:6, 222:10, 224:18, 242:13, 243:20, 250:16, 256:12, 260:6, 260:19
**certainly** [15] - 15:11, 16:2, 16:3, 16:4, 16:11, 21:2, 21:3, 136:19, 136:22, 137:12, 186:22, 278:13
**certainty** [1] - 222:17
**certify** [1] - 279:5
**CHAD** [1] - 2:5
**Chad** [4] - 3:12, 5:2, 24:16, 148:19
**chair** [1] - 31:6
**chairman's** [1] - 232:14
**challenge** [1] - 31:14
**challenges** [2] - 30:23, 34:3
**change** [10] - 34:12, 55:12, 120:20, 180:8, 218:24, 222:11, 222:14, 238:16, 238:21, 241:2
**changed** [3] - 19:16, 222:17, 230:12
**changes** [7] - 144:7, 144:15, 146:5, 146:14, 211:17, 211:18, 268:22
**chapter** [3] - 108:22, 109:13, 180:21
**chapters** [6] - 31:9, 51:24, 175:21, 175:22, 175:24, 180:22
**characteristic** [1] - 222:15
**characteristics** [6] - 74:13, 140:12, 140:18, 156:24, 157:7, 222:11
**characterization** [3] - 27:3, 53:8, 140:17
**Characterization** [1] -

108:24
**characterize** [1] - 219:20
**characterized** [1] - 25:3
**characterizing** [1] - 117:6
**charge** [1] - 185:13
**chart** [1] - 205:17
**cheaper** [3] - 195:13, 195:15, 195:19
**Chemical** [4] - 43:23, 175:2, 232:6, 232:8
**chemical** [7] - 31:7, 31:8, 54:22, 121:6, 230:2, 230:4, 237:22
**chemistry** [8] - 27:7, 51:9, 51:13, 51:16, 51:25, 52:1, 54:22, 237:22
**chemists** [1] - 238:10
**Choice** [1] - 247:16
**choice** [2] - 191:3, 247:22
**choose** [1] - 247:16
**choosing** [1] - 247:17
**chosen** [2] - 165:25, 171:3
**Christian** [2] - 48:8, 171:25
**CHRISTIAN** [1] - 171:16
**circle** [1] - 92:21, 93:6
**circles** [2] - 189:15, 189:16
**circuit** [1] - 8:3
**circumstances** [2] - 198:23, 224:17
**citations** [1] - 261:6
**cited** [2] - 259:16, 269:22
**Claim** [20] - 6:8, 18:23, 26:8, 26:12, 26:15, 45:6, 45:7, 46:2, 57:12, 57:13, 57:14, 57:19, 57:20, 57:21, 57:22, 62:16, 63:12, 66:6, 102:19, 103:15, 103:18, 111:8, 111:11, 111:15, 111:17, 111:18, 112:3, 112:5, 112:6, 112:7, 112:9, 113:15, 114:5, 129:3, 204:18, 204:19, 204:20, 204:21, 204:25, 205:1, 205:2, 205:12, 206:2,

206:7, 206:11, 206:12, 206:14, 206:16, 223:25, 224:6, 240:1, 248:22, 251:22, 252:15, 272:10, 273:16, 274:12, 274:13
**claim** [74] - 5:10, 6:10, 6:11, 30:13, 33:4, 34:13, 35:3, 38:17, 42:14, 42:19, 42:25, 45:5, 45:6, 54:5, 54:6, 57:20, 63:24, 64:8, 64:10, 64:13, 65:20, 65:22, 65:23, 66:6, 103:14, 103:25, 106:12, 111:7, 111:22, 129:2, 129:12, 135:2, 135:13, 136:19, 137:6, 142:15, 144:17, 146:16, 178:16, 179:6, 204:2, 204:19, 204:20, 204:21, 204:22, 205:5, 205:7, 205:17, 221:22, 235:8, 236:20, 236:24, 240:3, 255:7, 256:5, 256:6, 256:7, 256:8, 256:13, 257:5, 258:10, 269:15, 269:20, 270:5, 270:24, 273:8, 273:14, 274:15, 275:16, 275:24, 276:15
**claimed** [9] - 32:23, 33:5, 33:17, 35:25, 41:3, 42:2, 56:12, 105:15, 275:12
**claims** [69] - 26:16, 26:17, 27:17, 29:14, 32:14, 34:2, 34:7, 34:11, 34:23, 35:3, 37:24, 38:8, 38:13, 39:1, 39:4, 41:4, 41:7, 41:9, 41:13, 41:17, 41:18, 42:2, 42:8, 43:1, 43:11, 45:24, 54:11, 56:9, 57:8, 66:14, 66:15, 66:18, 66:23, 135:3, 137:3, 137:15, 178:6, 178:22, 179:4, 220:9, 236:10, 236:11, 239:10, 239:21,

254:17, 255:2, 255:11, 255:16, 255:23, 256:22, 272:10, 272:12, 272:13, 272:14, 273:7, 273:12, 274:2, 274:10, 274:12, 274:14, 274:15, 275:6, 276:2, 276:6, 276:12, 276:13, 276:17
**Claims** [15] - 18:20, 18:23, 26:6, 26:21, 30:13, 36:8, 53:18, 53:21, 53:23, 56:8, 56:12, 57:4, 66:19, 204:14, 236:15
**clarification** [10] - 52:8, 52:11, 113:3, 124:22, 209:1, 216:22, 244:4, 245:22, 267:11, 277:3
**clarify** [1] - 26:16
**class** [1] - 25:7
**classes** [1] - 252:23
**clear** [21] - 31:2, 32:22, 33:22, 35:5, 35:9, 36:10, 86:13, 86:18, 89:11, 92:21, 93:18, 95:5, 96:10, 100:20, 105:16, 124:4, 169:10, 209:25, 211:7, 261:6
**cleared** [1] - 20:16
**clearly** [11] - 16:6, 47:22, 49:3, 86:9, 89:23, 90:12, 96:22, 100:24, 120:1, 257:9, 260:22
**client's** [1] - 21:15
**clients** [2] - 53:2, 173:22
**clinical** [1] - 174:16
**close** [1] - 21:13
**closely** [4] - 33:3, 85:2, 97:6, 245:9
**closer** [2] - 100:17, 245:6
**closest** [1] - 32:2
**clump** [2] - 47:20, 188:4
**clumped** [1] - 48:5
**clumping** [11] - 47:13, 47:17, 121:15, 121:16, 121:22, 122:1, 122:6, 122:15, 188:3, 188:9
**clumps** [8] - 128:10,

198:1, 223:10, 223:12, 242:8, 244:8, 244:9, 251:4
**co** [13] - 78:14, 80:3, 152:1, 152:9, 152:11, 152:13, 168:5, 168:8, 170:4, 200:13, 200:16, 200:19, 201:16
**co-sifting** [13] - 78:14, 80:3, 152:1, 152:9, 152:11, 152:13, 168:5, 168:8, 170:4, 200:13, 200:16, 200:19, 201:16
**coat** [1] - 188:25
**coated** [1] - 265:4
**coauthored** [1] - 51:23
**cognizant** [2] - 21:2, 82:6
**cohesive** [8] - 132:11, 132:13, 132:14, 132:15, 132:18, 190:25, 242:6, 244:25
**colleague** [4] - 3:11, 11:1, 11:10, 11:12
**colleagues** [1] - 3:12
**collect** [3] - 95:12, 95:15, 130:8
**collected** [5] - 88:19, 94:18, 95:13, 120:16, 228:11
**collecting** [2] - 194:3, 226:18
**collection** [10] - 84:21, 117:4, 117:15, 118:1, 119:12, 130:7, 131:12, 136:7, 187:21, 188:18
**collectively** [1] - 68:24
**collodial** [1] - 87:19
**colloidal** [16] - 35:23, 92:2, 92:4, 92:21, 93:11, 93:12, 93:16, 94:9, 94:13, 152:2, 152:15, 152:23, 170:5, 198:8, 200:18, 211:4
**color** [1] - 33:6
**colored** [1] - 218:14
**colors** [2] - 118:25, 244:21
**column** [30] - 28:4, 35:11, 35:21, 36:1, 65:11, 65:14, 75:2, 75:6, 105:11, 115:21, 117:2,

117:7, 157:22, 157:25, 158:4, 158:7, 158:12, 159:11, 193:10, 194:11, 225:6, 226:14, 227:3, 246:18, 264:10, 264:12, 266:16, 267:4, 268:6
**columns** [1] - 157:19
**combination** [1] - 31:14
**combined** [3] - 89:3, 191:8, 260:19
**combines** [1] - 194:16
**comfortable** [3] - 22:11, 24:3, 49:23
**coming** [4] - 86:2, 90:4, 96:19, 134:8
**comment** [3] - 36:17, 121:21, 121:22
**comments** [1] - 222:1
**commercial** [1] - 174:17
**commission** [1] - 164:22
**committees** [1] - 175:12
**committing** [1] - 34:6
**common** [14] - 110:1, 131:23, 186:18, 186:19, 186:22, 205:8, 227:14, 241:10, 241:13, 250:20, 250:22, 252:6, 252:22, 252:25
**commonly** [3] - 131:21, 195:5, 269:1
**communications** [1] - 149:6
**Compact** [1] - 108:24
**compact** [2] - 199:1, 245:6
**compactability** [1] - 191:13
**compacted** [1] - 190:17
**compaction** [4] - 107:7, 187:11, 192:5, 253:21
**compactor** [3] - 192:5, 194:24, 227:8
**companies** [7] - 31:19, 176:12, 176:16, 195:12, 231:5, 232:15, 232:16
**company** [13] - 9:25, 24:15, 25:13, 39:21,

51:1, 137:7, 148:22, 173:21, 174:10, 174:13, 185:7, 185:17, 246:8
**comparable** [2] - 55:3, 257:24
**comparative** [39] - 38:23, 40:23, 41:11, 41:24, 42:3, 255:13, 259:22, 260:12, 260:23, 261:3, 261:11, 261:14, 261:17, 262:4, 264:8, 264:18, 265:25, 266:15, 267:2, 267:21, 268:5, 268:11, 268:12, 270:19, 272:15, 272:17, 272:18, 272:25, 273:7, 273:10, 273:15, 274:17, 274:20, 274:22, 275:3, 275:10, 276:7
**Comparative** [1] - 259:14
**compare** [4] - 42:20, 201:8, 205:12, 208:12
**compared** [2] - 217:13, 223:1
**comparing** [3] - 121:25, 122:10, 272:14
**comparison** [1] - 158:11
**compatible** [1] - 187:6
**compensator** [4] - 88:9, 89:9, 90:11, 94:7
**competition** [1] - 37:18
**competitors** [1] - 38:8
**compilation** [1] - 140:14
**complaint** [1] - 212:11
**completeness** [1] - 276:18
**compliance** [2] - 39:16, 39:17
**complicated** [2] - 34:15, 40:2
**component** [12] - 47:11, 85:14, 103:3, 129:17, 182:21, 187:17, 197:5, 197:6, 197:19, 215:3, 219:17, 220:1
**components** [8] - 102:6, 142:15,

190:23, 196:12, 215:2, 218:6, 218:16, 218:17
**composed** [1] - 213:14
**composite** [2] - 241:4, 245:6
**composites** [1] - 254:8
**Composition** [1] - 60:4
**composition** [8] - 35:9, 60:22, 63:18, 102:19, 103:5, 196:13, 256:17, 256:18
**compositions** [2] - 34:21, 236:6
**compound** [1] - 25:10
**compounds** [1] - 174:18
**compress** [3] - 187:11, 242:20, 250:13
**compressible** [1] - 242:11
**compressing** [2] - 249:13, 253:22
**compression** [7] - 5:18, 187:11, 194:4, 197:17, 224:6, 226:19, 247:24
**comprise** [1] - 214:23
**comprised** [2] - 41:25, 276:15
**comprising** [33] - 26:10, 42:17, 42:22, 45:8, 46:15, 63:18, 64:2, 64:17, 64:22, 67:1, 98:2, 102:19, 102:20, 123:21, 184:7, 196:15, 196:16, 196:16, 202:5, 205:5, 205:10, 205:20, 206:4, 206:13, 207:9, 207:22, 213:10, 213:22, 215:17, 217:25, 220:8, 259:25
**computer** [3] - 89:22, 91:3, 100:20
**conceded** [1] - 261:24
**concentrations** [2] - 262:1, 262:23
**concept** [2] - 40:3, 41:2
**concern** [2] - 220:20, 222:23
**concerning** [1] - 5:14

concerns [2] - 21:3, 222:2
conclude [7] - 5:12, 53:20, 54:15, 89:16, 111:14, 206:6, 215:11
concluded [3] - 53:23, 234:2, 279:3
concludes [1] - 228:21
conclusion [8] - 27:15, 44:5, 57:2, 98:19, 113:14, 114:4, 214:4, 214:6
conclusions [10] - 32:19, 48:24, 57:6, 80:1, 179:7, 209:21, 210:4, 212:12, 212:14, 219:20
conclusive [2] - 212:15, 212:18
condition [6] - 25:3, 87:5, 142:16, 144:18, 144:19, 146:17
conditioned [1] - 222:7
conditions [1] - 94:4
conduct [1] - 239:5
conducted [5] - 27:11, 29:22, 105:17, 110:19, 258:4
conference [1] - 19:24
conferences [1] - 231:24
confidence [1] - 110:24
confidential [9] - 20:13, 21:17, 22:15, 22:25, 23:10, 23:11, 23:20, 24:1, 167:17
confidentiality [2] - 19:23, 21:3
configuration [3] - 88:4, 88:7, 88:8
confirm [10] - 97:22, 102:14, 103:5, 108:10, 110:16, 112:20, 133:8, 154:20, 215:16
confirmed [1] - 216:2
confirming [1] - 12:20
confirms [2] - 14:25, 17:3
conflate [1] - 123:11
conflates [1] - 212:3
confuse [1] - 201:15
confusion [1] - 127:20
conglomerated [1] - 129:10
congregating [1] -

30:19
connecting [1] - 135:15
connection [17] - 28:14, 29:11, 31:13, 31:20, 31:24, 61:4, 64:11, 65:1, 82:2, 105:20, 106:21, 148:25, 163:8, 225:2, 235:9, 236:17, 271:24
conscious [1] - 195:12
consider [25] - 7:22, 54:12, 77:4, 122:14, 123:10, 172:4, 196:7, 199:25, 201:8, 201:25, 202:2, 202:4, 202:6, 202:23, 213:6, 217:21, 227:16, 227:18, 234:9, 234:12, 234:15, 238:23, 239:1, 251:2, 259:7
considerable [1] - 222:20
consideration [1] - 7:9
considerations [4] - 33:14, 33:15, 43:4, 44:10
considered [9] - 31:22, 60:5, 77:11, 79:11, 121:23, 127:6, 192:24, 260:23, 271:1
considers [1] - 275:3
consist [2] - 90:13, 90:14
consistency [1] - 191:2
consistent [8] - 36:22, 66:22, 76:12, 191:11, 193:20, 194:8, 195:1, 240:11
consistently [3] - 27:19, 119:23, 136:11
consisting [2] - 66:1, 225:11
consists [1] - 84:12
constitute [1] - 237:15
constitutes [3] - 237:6, 238:13, 265:22
constructed [1] - 210:10
Construction [1] - 6:8
construction [24] -

6:11, 35:3, 46:5, 46:11, 47:9, 64:9, 64:10, 64:13, 64:24, 65:1, 65:4, 65:20, 65:23, 65:24, 123:19, 135:13, 136:19, 137:25, 179:6, 205:7, 221:22, 236:20, 236:24, 240:12
constructions [1] - 236:23
construe [3] - 64:16, 103:1, 103:22
construed [2] - 26:14, 205:13
consultant [2] - 174:11, 174:19
consulted [1] - 53:2
consulting [5] - 27:9, 176:7, 176:10, 176:11, 176:14
contain [11] - 5:11, 66:25, 196:22, 197:3, 199:12, 206:3, 207:17, 211:12, 219:16, 242:18, 255:2
contained [9] - 39:11, 39:23, 77:6, 135:25, 202:4, 202:7, 252:16, 264:24
container [3] - 249:11, 256:15, 256:16
containers [11] - 29:10, 78:22, 80:7, 80:9, 81:21, 168:14, 168:21, 168:25, 169:6, 169:13, 169:18
containing [8] - 25:20, 25:24, 27:10, 35:22, 102:24, 204:3, 236:5, 236:7
contains [18] - 6:15, 6:17, 15:21, 26:10, 27:15, 30:9, 45:25, 62:9, 98:2, 162:4, 162:7, 178:24, 196:18, 205:1, 207:9, 207:25, 214:1, 275:21
contemplated [3] - 35:5, 35:15, 36:3
contends [2] - 206:21, 207:8
content [1] - 269:2
contention [1] - 5:13
contentions [1] - 31:5
contents [14] - 60:16,

116:13, 116:18, 117:5, 117:9, 125:4, 126:21, 127:21, 129:1, 129:11, 205:23, 214:15, 219:9, 257:8
context [18] - 13:13, 14:1, 54:17, 121:25, 122:10, 122:20, 181:17, 182:20, 183:7, 184:18, 184:25, 187:16, 187:20, 187:24, 188:17, 190:12, 229:7, 263:24
continue [6] - 45:16, 72:1, 72:19, 148:17, 220:15, 226:13
continued [4] - 46:22, 164:25, 166:12, 174:1
continues [1] - 109:20
continuing [2] - 35:11, 159:9
Contrary [1] - 259:22
contrary [2] - 36:20, 259:23
contrast [1] - 217:19
contrasted [1] - 260:16
contrasting [3] - 259:19, 260:22, 264:14
contrasts [1] - 40:21
contribution [1] - 175:8
contributions [2] - 232:9, 232:13
control [19] - 28:13, 28:19, 46:14, 71:20, 72:9, 72:13, 72:20, 73:1, 74:12, 125:11, 163:7, 163:17, 164:11, 165:3, 165:19, 166:8, 174:5, 185:13, 185:19
Control [3] - 28:16, 71:17, 163:3
controlled [1] - 124:13
controlling [1] - 124:16
controls [8] - 141:12, 141:17, 202:22, 203:2, 208:10, 208:11, 208:12, 208:16
Controls [1] - 67:17
conventional [1] - 268:13

conventionally [2] - 193:14, 260:11
conversation [1] - 122:20
convincing [4] - 31:2, 32:22, 33:22, 36:10
Conway [2] - 3:13, 24:18
CONWAY [1] - 2:6
COO [1] - 50:23
cool [2] - 118:25, 263:16
copied [1] - 161:23
copies [1] - 172:23
Copovidone [1] - 270:8
copy [17] - 103:2, 114:16, 114:24, 147:14, 147:15, 147:19, 147:24, 168:10, 168:12, 168:15, 168:22, 168:24, 169:1, 169:7, 169:14, 169:19, 177:8
core [1] - 150:4
corner [1] - 245:15
corporate [4] - 23:23, 24:21, 44:22
correct [200] - 19:10, 19:18, 29:16, 55:7, 58:12, 59:9, 62:17, 62:18, 71:3, 73:11, 76:8, 77:17, 77:18, 80:23, 83:20, 83:21, 90:19, 97:24, 99:14, 105:23, 106:11, 109:1, 111:20, 111:21, 115:24, 116:14, 116:15, 116:20, 116:21, 117:1, 117:16, 117:17, 118:5, 118:6, 118:13, 119:7, 119:8, 119:15, 119:20, 120:25, 121:9, 121:17, 122:17, 124:11, 124:25, 125:12, 125:19, 125:24, 125:25, 126:9, 127:7, 127:12, 127:25, 129:13, 143:22, 145:20, 148:22, 149:4, 149:7, 149:10, 149:14, 149:17, 149:18, 149:23, 151:16, 151:19, 151:23,

152:3, 152:10, 152:16, 152:19, 152:24, 153:2, 153:6, 153:10, 153:11, 153:13, 153:16, 153:18, 153:19, 153:22, 154:2, 154:5, 154:11, 154:15, 154:18, 154:22, 154:25, 155:6, 155:7, 155:9, 155:16, 155:22, 155:25, 156:3, 156:8, 156:13, 156:16, 156:21, 157:1, 157:4, 157:9, 157:17, 157:20, 158:24, 159:3, 159:7, 159:13, 159:25, 160:5, 160:8, 160:19, 160:23, 161:3, 161:10, 161:17, 162:2, 162:5, 162:9, 162:13, 162:20, 162:24, 163:4, 163:9, 163:12, 163:15, 163:23, 164:1, 164:5, 164:8, 164:13, 165:4, 165:14, 165:23, 166:1, 166:5, 166:10, 166:14, 166:22, 167:9, 167:23, 168:1, 168:5, 168:9, 168:14, 168:21, 168:25, 170:12, 178:7, 191:5, 206:9, 210:19, 215:5, 220:25, 221:1, 221:12, 221:13, 221:16, 221:17, 221:19, 221:20, 221:23, 222:11, 222:18, 222:23, 223:7, 223:12, 223:20, 224:2, 224:24, 225:4, 225:12, 225:13, 225:15, 225:16, 225:18, 226:3, 226:4, 226:7, 226:11, 226:22, 226:25, 227:1, 227:9, 227:10, 227:13, 227:17, 228:1, 251:23, 252:3, 254:18, 261:9, 264:10,

264:12, 264:17, 266:17, 266:18, 273:18, 274:25
**correctly** [3] - 110:25, 116:18, 117:9
**correspond** [1] - 158:18
**corresponds** [1] - 159:6
**cost** [1] - 195:12
**cost-conscious** [1] - 195:12
**costs** [1] - 195:14
**Coulomb** [1] - 245:4
**Council** [1] - 232:14
**COUNSEL** [1] - 3:2
**counsel** [23] - 3:5, 9:3, 13:10, 14:17, 16:12, 21:15, 44:13, 46:8, 49:12, 77:16, 80:21, 98:23, 114:24, 116:4, 139:3, 151:6, 154:1, 167:11, 171:15, 221:25, 232:25, 277:9, 277:12
**counter** [3] - 11:4, 11:6, 18:3
**counter-designation** [1] - 18:3
**counter-designations** [1] - 11:6
**counterpart** [1] - 99:3
**counting** [1] - 232:1
**couple** [12] - 19:7, 45:19, 67:5, 91:2, 91:10, 92:4, 93:12, 131:6, 131:16, 174:1, 244:20
**course** [7] - 11:18, 20:12, 42:15, 43:9, 137:10, 183:24, 216:13
**COURT** [158] - 1:1, 1:15, 3:1, 3:3, 3:15, 3:18, 3:23, 4:1, 4:4, 4:7, 4:9, 4:19, 4:21, 5:22, 5:25, 7:17, 8:22, 9:6, 10:7, 10:12, 10:14, 11:4, 11:8, 11:11, 11:14, 11:17, 13:1, 13:4, 13:7, 15:16, 15:24, 16:12, 16:19, 17:20, 18:2, 18:5, 18:10, 19:8, 19:19, 20:18, 20:25, 21:7, 21:16, 21:19, 22:13, 23:13, 23:16, 23:19, 24:3,

24:7, 24:9, 24:11, 30:17, 36:14, 36:16, 37:4, 37:6, 37:8, 44:15, 44:17, 44:20, 44:25, 49:6, 49:10, 50:19, 53:12, 56:4, 59:5, 60:11, 61:25, 68:5, 68:21, 76:5, 76:9, 76:15, 78:4, 79:19, 81:9, 83:15, 88:23, 104:11, 108:1, 109:7, 114:10, 114:15, 114:20, 115:1, 131:16, 131:24, 132:3, 132:7, 132:21, 133:1, 133:5, 133:16, 133:20, 133:22, 134:2, 134:5, 134:10, 134:13, 135:21, 137:13, 138:21, 147:25, 148:4, 148:9, 148:13, 148:16, 171:11, 172:21, 172:25, 177:3, 177:18, 181:11, 182:15, 184:4, 184:9, 184:11, 189:8, 192:9, 197:12, 197:23, 197:25, 198:3, 198:10, 199:6, 215:22, 216:24, 217:2, 217:5, 220:11, 220:15, 228:16, 228:18, 228:23, 229:8, 233:12, 233:14, 233:22, 233:25, 234:24, 243:24, 248:19, 250:24, 252:12, 263:10, 273:22, 276:21, 276:25, 277:6, 277:19, 277:22, 278:3, 278:12, 278:16, 278:22, 279:1
**court** [9] - 20:16, 114:11, 123:19, 124:22, 216:22, 239:3, 244:4, 245:22, 277:3
**Court** [76] - 4:22, 7:17, 7:18, 7:19, 7:21, 8:16, 15:16, 15:24, 16:13, 17:20, 19:22, 20:11, 20:20, 22:10, 22:16, 23:24, 26:14,

28:6, 33:3, 35:3, 36:6, 36:7, 36:11, 36:16, 52:8, 52:11, 57:10, 64:16, 65:19, 66:3, 66:9, 66:17, 71:7, 72:7, 72:21, 74:24, 75:20, 81:13, 82:16, 83:22, 84:19, 85:9, 86:20, 88:6, 89:4, 92:8, 93:1, 94:1, 96:5, 103:1, 103:22, 113:3, 114:25, 123:15, 123:22, 128:15, 129:8, 137:11, 137:13, 137:17, 138:6, 173:3, 173:13, 180:9, 205:7, 209:1, 219:22, 222:16, 229:16, 229:22, 235:25, 239:20, 255:1, 267:11, 279:8
**Court's** [21] - 7:9, 36:22, 36:24, 46:5, 46:11, 64:8, 64:10, 64:13, 64:24, 65:4, 65:22, 65:23, 66:12, 76:21, 136:18, 137:25, 179:5, 221:22, 236:20, 236:23, 240:12
**Courtroom** [1] - 2:25
**courtroom** [15] - 21:19, 22:1, 22:2, 23:20, 23:24, 23:25, 24:2, 30:16, 30:18, 30:20, 44:20, 44:22, 44:23, 233:20, 233:25
**cover** [2] - 5:20, 39:1
**covered** [2] - 5:21, 275:6
**covering** [2] - 101:2, 215:24
**covers** [3] - 38:10, 106:19, 134:6
**coverslip** [4] - 96:13, 96:16, 97:9, 215:12
**COVID** [2] - 167:1, 167:3
**create** [3] - 131:8, 192:19, 207:19
**created** [5] - 85:3, 156:25, 157:8, 169:22, 170:2
**creating** [5] - 107:7, 135:12, 137:1, 194:3, 226:18
**credibility** [1] - 48:10

**credibly** [1] - 48:24
**credit** [1] - 128:16
**credited** [1] - 134:21
**crisp** [1] - 86:13
**criticism** [1] - 99:22
**criticized** [1] - 99:4
**CROSS** [2] - 115:2, 220:16
**cross** [16] - 15:25, 87:3, 87:10, 89:8, 89:25, 93:15, 94:5, 94:6, 94:11, 114:12, 138:13, 217:17, 218:23, 220:13
**CROSS-EXAMINATION** [2] - 115:2, 220:16
**cross-examination** [3] - 15:25, 114:12, 138:13
**crossed** [3] - 86:21, 87:5, 88:8
**CRR** [2] - 1:25, 279:8
**crude** [1] - 182:7
**crystalline** [11] - 87:9, 87:12, 87:14, 87:19, 87:21, 91:22, 99:25, 101:14, 211:2, 211:3, 218:25
**crystallinity** [3] - 268:23, 269:13, 270:13
**current** [5] - 50:22, 167:7, 177:9, 177:10, 266:14
**curriculum** [1] - 177:8
**customary** [1] - 34:20
**customers** [1] - 173:22
**cut** [2] - 129:4
**CV** [2] - 50:12, 276:20
**cylinder** [18] - 107:6, 107:9, 108:4, 108:7, 108:8, 109:16, 109:18, 109:21, 109:23, 109:25, 110:2, 110:4, 110:7, 110:12, 110:19, 110:22, 111:1, 130:19

**D**

**daily** [2] - 39:12, 39:23
**dark** [14] - 45:15, 87:8, 89:20, 90:1, 90:3, 90:5, 92:18, 101:10, 102:2, 102:3, 210:20, 210:24, 211:8, 214:3

darker [8] - 92:17, 99:19, 99:23, 99:25, 100:4, 101:15, 101:22, 101:24
darkness [1] - 101:25
DARPA [1] - 231:1
data [1] - 119:7
date [12] - 71:4, 143:2, 145:8, 145:9, 147:3, 147:4, 150:23, 151:4, 168:17, 236:9, 241:12, 246:3
dates [4] - 17:5, 71:2, 143:17, 145:14
Daubert [1] - 26:16
days [7] - 18:13, 18:16, 19:7, 45:19, 167:3, 228:8, 244:20
DDX-0017 [1] - 4:24
DDX-17 [1] - 5:19
DDX-18 [1] - 5:20
de [1] - 138:11
deal [1] - 20:23
dealing [2] - 21:17, 149:2
deals [1] - 22:7
dear [1] - 232:17
debate [1] - 123:23
debilitating [1] - 25:3
decades [1] - 248:8
December [1] - 1:11
decide [5] - 13:15, 13:19, 53:23, 269:17, 271:3
decided [6] - 37:14, 127:13, 150:12, 150:16, 151:1, 164:3
decision [5] - 13:19, 108:13, 258:21, 271:5, 278:1
deck [1] - 114:22
declared [2] - 258:5, 276:10
declares [1] - 48:6
deeming [1] - 266:13
defendant [1] - 3:18
Defendant [3] - 2:17, 37:10, 171:17
Defendants [17] - 1:7, 2:11, 5:6, 5:13, 9:17, 10:3, 10:23, 15:20, 15:22, 33:12, 33:19, 33:25, 36:9, 38:4, 229:9, 229:11
defendants [12] - 3:20, 4:12, 18:21, 20:21, 30:22, 31:1, 32:21, 33:1, 33:4, 33:21, 34:12, 43:14
Defendants' [10] -

22:15, 31:4, 31:13, 32:9, 32:15, 33:4, 34:3, 34:23, 35:2, 39:5
defendants' [2] - 15:10, 41:5
Defense [1] - 278:17
defense [1] - 36:10
defer [1] - 21:14
deferred [1] - 277:18
deficiencies [2] - 191:1, 208:4
define [1] - 120:11
defined [3] - 34:17, 115:21, 123:15
defines [1] - 172:15
defining [1] - 193:13
definitely [2] - 12:10, 222:19
definition [20] - 55:9, 55:10, 55:11, 55:13, 98:24, 113:17, 124:3, 126:15, 128:25, 136:19, 179:18, 180:2, 180:5, 180:9, 211:7, 226:1, 238:19, 238:21, 238:24
definitions [1] - 239:2
definitive [1] - 87:11
deforms [1] - 198:24
degree [10] - 51:16, 54:21, 110:24, 173:5, 173:11, 179:20, 179:21, 230:2, 237:19
degrees [2] - 91:23, 238:8
del [1] - 230:3
DELAWARE [1] - 1:2
Delaware [1] - 1:10
delivering [4] - 58:11, 62:13, 256:12, 257:9
delivery [2] - 58:2, 173:21
delusions [3] - 25:1, 25:4, 25:8
demonstrate [5] - 32:21, 213:24, 213:25, 214:1, 214:2
demonstrated [2] - 35:13, 260:17
demonstrative [3] - 56:7, 184:4, 237:9
demonstratives [6] - 114:17, 133:25, 184:7, 184:8, 184:11, 184:12
denial [1] - 137:10
denied [1] - 7:14

dense [1] - 40:3
denser [2] - 245:12, 250:14
densities [11] - 12:15, 12:19, 35:1, 35:25, 36:2, 109:15, 248:13, 250:18, 250:20, 251:2, 251:7
Density [4] - 106:20, 251:19, 251:20
density [105] - 12:16, 17:13, 26:11, 28:8, 32:4, 39:24, 40:1, 40:12, 41:20, 41:21, 42:4, 42:18, 42:24, 43:8, 75:18, 75:21, 103:18, 103:24, 104:7, 104:16, 104:20, 104:23, 104:25, 105:8, 105:12, 106:1, 106:2, 106:5, 106:22, 107:8, 109:11, 110:25, 111:8, 127:16, 127:21, 127:22, 127:25, 128:5, 128:24, 128:25, 129:6, 160:8, 160:9, 160:10, 160:13, 160:19, 161:7, 161:13, 223:3, 223:5, 223:7, 223:11, 223:17, 242:13, 243:14, 243:15, 243:17, 243:21, 243:24, 243:25, 244:1, 244:2, 244:6, 244:7, 244:9, 244:10, 244:16, 247:1, 247:23, 248:23, 248:24, 249:5, 249:7, 249:16, 249:17, 249:22, 250:1, 250:3, 250:5, 250:12, 250:15, 250:25, 251:5, 252:2, 252:7, 258:17, 260:20, 261:3, 261:19, 262:11, 262:25, 263:20, 264:4, 265:7, 265:14, 265:16, 266:9, 266:22, 267:18, 269:5, 269:13, 269:14, 270:12
deny [2] - 137:14, 138:7

denying [1] - 122:9
department [2] - 31:6, 70:21
Department [2] - 43:22, 231:2
dependency [1] - 112:5
dependent [4] - 57:20, 204:22, 274:12, 274:15
deposition [16] - 8:6, 8:25, 23:9, 47:12, 121:19, 121:20, 122:19, 123:3, 134:15, 138:10, 138:11, 139:2, 171:10, 220:21, 221:21, 227:25
describe [17] - 27:19, 44:8, 51:11, 56:12, 86:4, 142:4, 145:4, 146:24, 147:22, 173:13, 186:11, 209:10, 229:24, 249:9, 252:1, 257:22, 260:2
described [23] - 29:4, 65:9, 78:8, 79:3, 124:24, 141:23, 142:20, 142:22, 142:25, 152:4, 159:15, 159:17, 159:20, 161:19, 165:7, 178:5, 183:23, 200:10, 200:12, 203:10, 268:13, 276:8, 276:9
describes [18] - 40:15, 141:11, 141:15, 141:21, 142:6, 142:15, 144:17, 145:2, 145:6, 146:16, 147:1, 147:17, 193:5, 259:24, 261:14, 264:21, 265:1, 266:2
describing [7] - 17:4, 152:5, 165:11, 165:13, 203:12, 230:24, 240:18
description [9] - 30:25, 34:4, 38:16, 44:7, 62:7, 193:19, 194:7, 202:21, 239:25
Description [2] - 60:3, 67:16
deserves [1] - 7:25
design [3] - 39:22, 176:11, 232:10

designated [3] - 9:6, 10:23, 10:25
designation [4] - 13:12, 18:3, 118:4, 167:16
designations [9] - 11:6, 11:25, 13:4, 13:5, 13:12, 14:4, 14:20, 138:13, 278:18
designed [3] - 186:12, 186:14, 186:24
designee [1] - 11:16
despite [2] - 29:12, 37:11
detail [4] - 69:14, 205:4, 211:15, 217:20
details [8] - 39:8, 199:13, 201:10, 224:20, 228:8, 230:20, 249:20, 260:15
determination [2] - 7:23, 81:23
determine [12] - 6:21, 30:8, 58:14, 59:11, 62:25, 87:11, 112:10, 132:21, 133:2, 215:1, 224:9, 270:13
determined [3] - 103:19, 104:20, 104:23
determining [1] - 228:4
develop [3] - 13:19, 13:20, 25:22
developed [3] - 25:13, 25:24, 38:5
developing [3] - 13:22, 51:2, 164:20
development [52] - 11:21, 13:15, 14:7, 14:11, 27:4, 27:10, 33:14, 38:21, 39:21, 39:24, 53:10, 71:11, 71:21, 82:5, 139:23, 139:24, 140:2, 140:3, 140:11, 140:16, 140:20, 140:24, 150:4, 150:5, 150:10, 150:11, 151:3, 155:20, 159:15, 159:17, 159:19, 159:20, 161:5, 161:18, 161:20, 163:2, 164:15, 164:17, 164:24,

171:6, 171:8, 174:15, 176:12, 176:13, 179:22, 231:12, 234:16, 234:21, 235:1, 237:24, 249:18
**Development** [14] - 27:22, 68:14, 68:15, 70:9, 70:17, 73:10, 73:14, 127:12, 154:11, 155:14, 155:19, 156:7, 160:21, 164:21
**device** [1] - 144:14
**diagram** [2] - 85:10, 85:19
**diagrams** [1] - 212:13
**dictate** [1] - 109:20
**dictated** [1] - 110:3
**dictates** [1] - 128:7
**dictating** [1] - 111:23
**differ** [2] - 125:21, 209:13
**difference** [5] - 102:2, 111:24, 185:24, 212:6, 217:12
**differences** [3] - 79:6, 88:11, 209:16
**different** [66] - 41:7, 57:7, 67:5, 77:24, 78:14, 85:24, 94:4, 94:19, 105:9, 105:10, 108:12, 110:4, 111:25, 120:15, 120:17, 120:18, 122:10, 124:3, 125:17, 128:22, 135:10, 144:4, 146:3, 159:18, 165:23, 170:7, 173:19, 173:23, 175:23, 176:17, 181:23, 183:17, 183:18, 188:1, 198:25, 206:19, 209:7, 209:9, 209:15, 209:16, 216:17, 223:3, 223:4, 223:5, 225:15, 231:18, 244:20, 244:22, 248:12, 252:18, 253:17, 255:11, 258:1, 258:6, 258:12, 259:16, 260:1, 261:25, 262:9, 262:23, 263:6, 265:12, 269:11, 271:1
**differently** [3] -

138:11, 219:15, 228:12
**difficult** [5] - 86:9, 89:21, 246:23, 250:13, 255:5
**difficulties** [1] - 250:6
**difficulty** [5] - 12:4, 33:7, 39:15, 183:2, 211:23
**diffuse** [1] - 215:13
**diluent** [6] - 182:19, 182:21, 186:5, 186:15, 186:20, 197:13
**diluents** [4] - 183:4, 253:2, 253:3, 253:9
**dilute** [1] - 253:7
**dimensional** [3] - 213:15, 213:16, 213:18
**dimensions** [1] - 248:8
**dioxide** [16] - 35:23, 87:19, 92:2, 92:4, 92:22, 93:11, 93:13, 93:17, 94:9, 94:13, 152:15, 152:24, 170:6, 198:8, 200:18, 211:4
**dioxides** [1] - 152:2
**direct** [14] - 29:13, 58:18, 59:24, 90:16, 92:6, 112:15, 115:12, 115:23, 116:5, 138:12, 154:2, 167:19, 185:3, 248:1
**DIRECT** [3] - 49:19, 171:20, 229:13
**directed** [6] - 7:5, 26:8, 37:20, 272:11, 274:15, 275:14
**directing** [1] - 225:5
**directions** [1] - 85:24
**directly** [5] - 6:3, 54:18, 191:20, 222:12, 222:24
**director** [4] - 11:20, 43:24, 174:3, 174:7
**disadvantages** [2] - 190:23, 266:12
**disagree** [8] - 9:11, 120:8, 122:5, 123:4, 135:23, 208:2, 208:9, 210:3
**disagrees** [1] - 210:5
**disappears** [1] - 94:11
**disciplines** [1] - 55:4
**disclosed** [10] - 15:13, 28:17, 35:6, 35:13,

35:25, 182:14, 259:22, 260:3, 260:11, 260:21
**discloses** [6] - 16:23, 32:4, 35:22, 42:16, 42:18, 42:22
**disclosure** [1] - 35:19
**disclosures** [2] - 278:8, 278:10
**discriminative** [1] - 159:18
**discuss** [6] - 38:20, 38:23, 39:2, 39:6, 154:1, 277:17
**discussed** [14] - 23:21, 72:17, 79:3, 94:17, 95:21, 98:1, 153:24, 171:1, 184:6, 207:21, 221:21, 221:24, 268:5, 268:6
**discusses** [3] - 248:24, 252:18, 268:7
**discussing** [7] - 10:22, 235:21, 237:9, 255:21, 258:22, 272:4, 274:4
**discussion** [9] - 12:13, 14:6, 45:17, 46:7, 47:13, 49:11, 87:13, 171:14, 240:4
**discussions** [1] - 123:16
**disease** [3] - 25:2, 39:14, 39:15
**diseases** [1] - 12:3
**disintegrant** [1] - 189:16
**disintegrants** [2] - 254:12, 254:13
**dislodge** [1] - 97:17
**display** [1] - 89:14
**displayed** [1] - 89:10
**dispute** [1] - 165:2
**disputes** [2] - 8:4, 26:22
**disregarding** [1] - 121:8
**disruption** [1] - 5:15
**dissimilar** [1] - 190:14
**dissolutio** [1] - 266:13
**dissolution** [11] - 159:18, 191:12, 261:22, 263:23, 263:24, 265:3, 265:12, 266:22, 267:19, 267:24, 269:12
**dissolve** [3] - 181:25,

254:15
**distinction** [2] - 101:20, 212:4
**distinguish** [7] - 88:2, 273:6, 273:9, 273:13, 273:14, 274:19, 275:11
**distinguished** [5] - 43:22, 230:13, 230:14, 230:15, 230:17
**distinguishes** [1] - 41:12
**distinguishing** [3] - 257:23, 272:25, 274:17
**distorted** [1] - 210:9
**distraction** [1] - 6:5
**distribution** [17] - 28:9, 42:7, 75:19, 75:22, 161:2, 161:8, 161:14, 261:21, 262:3, 262:14, 263:2, 263:22, 265:10, 266:10, 269:12, 270:2, 270:12
**DISTRICT** [3] - 1:1, 1:2, 1:15
**District** [1] - 279:8
**diversity** [1] - 238:7
**divide** [1] - 249:15
**divided** [3] - 187:21, 249:8
**Docket** [1] - 64:9
**Doctor** [1] - 263:10
**doctoral** [1] - 179:21
**doctors** [1] - 238:10
**document** [141] - 14:8, 14:10, 14:13, 14:21, 14:24, 14:25, 28:10, 28:12, 28:18, 28:23, 50:11, 55:18, 58:21, 58:22, 59:12, 60:1, 60:2, 60:15, 61:7, 61:13, 61:16, 61:17, 67:11, 67:14, 67:15, 68:9, 68:12, 68:16, 70:5, 70:8, 70:9, 70:13, 71:7, 72:1, 72:20, 73:6, 77:8, 77:11, 77:14, 77:17, 79:11, 79:14, 79:23, 79:24, 80:14, 80:19, 88:17, 104:2, 104:5, 104:6, 105:20, 106:7, 106:8, 106:15, 106:18, 106:19, 106:21, 108:21, 112:16,

112:20, 131:24, 141:7, 141:9, 141:10, 141:14, 141:15, 142:9, 142:11, 142:14, 143:2, 143:24, 144:1, 144:16, 144:17, 145:6, 145:8, 145:9, 145:11, 145:23, 145:25, 146:6, 146:9, 146:15, 146:16, 147:1, 147:3, 147:4, 147:8, 147:10, 151:6, 151:11, 154:9, 154:14, 154:17, 154:20, 155:2, 155:9, 155:14, 155:16, 155:24, 156:2, 156:5, 160:12, 160:14, 160:17, 160:20, 160:24, 161:4, 161:11, 161:15, 162:1, 162:3, 162:4, 162:14, 162:20, 162:21, 163:6, 163:14, 166:19, 166:19, 169:15, 169:17, 177:7, 196:4, 196:7, 199:17, 199:21, 199:25, 202:3, 202:18, 202:23, 203:1, 203:14, 203:21, 203:24, 251:14, 251:16, 271:9
**documents** [43] - 9:25, 14:6, 14:7, 21:5, 21:8, 22:5, 22:7, 27:12, 27:19, 27:20, 29:2, 29:18, 48:2, 48:13, 48:15, 48:16, 57:10, 58:24, 60:5, 68:24, 70:2, 70:16, 77:4, 81:22, 81:25, 82:2, 82:4, 82:9, 98:14, 103:8, 110:17, 112:23, 113:25, 132:10, 135:23, 136:2, 136:16, 136:24, 137:21, 148:9, 167:17, 179:4, 179:5
**done** [28] - 15:3, 15:6, 18:10, 30:2, 30:14, 69:12, 71:12, 71:23, 95:23, 95:25, 99:11,

110:14, 110:15, 127:21, 135:16, 136:14, 176:7, 176:15, 190:20, 190:22, 232:12, 233:20, 234:17, 259:10, 268:10, 269:24, 270:8, 278:8
**door** [2] - 21:13, 36:24
**doors** [1] - 137:5
**dosage** [17] - 13:23, 27:3, 27:4, 33:7, 33:8, 52:17, 52:20, 53:9, 59:16, 59:17, 184:20, 237:25, 241:22, 246:23, 256:8, 257:16
**dose** [10] - 25:21, 25:22, 39:13, 39:23, 40:13, 183:1, 243:3, 243:6, 243:10, 246:25
**doses** [4] - 243:10, 243:12, 246:17, 253:6
**dossier** [7] - 141:11, 160:15, 160:21, 160:25, 161:6, 163:13, 167:10
**dots** [3] - 183:19, 218:14, 219:6
**down** [19] - 28:6, 43:12, 63:7, 109:19, 112:18, 113:9, 115:22, 117:15, 123:20, 143:15, 144:12, 145:12, 215:8, 219:6, 223:16, 227:2, 228:19, 263:10, 263:16
**dozens** [4] - 32:11, 94:18, 186:13, 186:25
**Dr** [200] - 5:6, 5:11, 5:13, 7:19, 8:8, 19:3, 22:4, 23:4, 23:11, 27:1, 27:6, 27:11, 27:18, 29:13, 29:20, 30:1, 30:3, 30:10, 31:3, 31:6, 39:6, 43:21, 44:1, 47:24, 48:8, 48:12, 49:14, 49:21, 50:1, 50:5, 50:22, 53:7, 53:12, 53:15, 55:6, 55:7, 55:9, 55:10, 55:13, 55:15, 56:7, 59:8, 60:1, 60:15, 62:3, 64:10, 65:8, 66:17,

68:24, 69:12, 71:13, 74:18, 76:21, 78:8, 79:23, 81:13, 89:1, 91:17, 93:19, 93:24, 94:16, 97:25, 99:3, 99:4, 99:7, 99:13, 99:19, 100:3, 101:8, 104:14, 111:10, 113:6, 113:14, 114:4, 115:4, 123:8, 131:6, 131:16, 133:25, 134:7, 134:8, 135:23, 136:4, 136:13, 137:18, 171:13, 171:22, 173:3, 177:7, 177:14, 177:18, 177:23, 183:13, 184:16, 187:15, 189:13, 192:24, 193:12, 193:25, 194:14, 198:14, 199:9, 199:18, 202:18, 203:10, 204:13, 206:20, 207:8, 208:3, 208:4, 208:6, 208:8, 208:18, 209:20, 209:25, 210:4, 210:5, 210:20, 211:1, 211:19, 211:25, 212:3, 212:12, 212:14, 212:22, 213:1, 213:9, 213:17, 215:11, 215:23, 216:5, 216:9, 217:9, 217:10, 217:15, 217:19, 217:24, 218:23, 219:14, 219:20, 219:24, 220:4, 220:18, 220:24, 221:9, 222:17, 222:23, 223:18, 223:22, 224:8, 224:20, 225:5, 226:5, 227:16, 228:11, 228:18, 229:3, 229:6, 229:9, 229:15, 229:20, 230:15, 233:17, 234:4, 234:19, 234:24, 235:4, 236:3, 237:14, 238:18, 239:9, 239:19, 240:14, 240:23, 244:14, 245:14, 246:7, 248:22, 249:4,

254:16, 254:25, 256:2, 257:3, 267:21, 269:19, 270:6, 274:1, 274:9, 274:24, 276:20, 277:8, 277:13, 277:24, 278:15, 278:18, 278:20
**draft** [28] - 29:2, 77:15, 79:15, 80:20, 81:22, 98:14, 127:3, 127:4, 127:11, 147:11, 147:12, 147:14, 147:15, 147:19, 147:21, 147:24, 168:1, 168:2, 168:3, 168:6, 168:10, 168:12, 168:15, 168:22, 169:1, 169:7, 169:14, 169:19
**drafting** [1] - 168:19
**draw** [5] - 48:24, 55:3, 62:3, 214:4, 214:6
**drawing** [1] - 183:22
**drawn** [2] - 32:3, 96:16
**draws** [1] - 216:8
**drew** [2] - 183:24, 244:20
**dried** [1] - 182:2
**drop** [1] - 96:14
**dropped** [1] - 19:2
**drug** [27] - 25:14, 32:6, 39:16, 155:21, 172:14, 173:20, 177:24, 180:18, 181:3, 185:7, 187:7, 189:16, 190:24, 195:11, 243:11, 243:12, 247:7, 247:19, 253:6, 253:7, 253:13, 253:15, 256:13, 257:9, 263:9, 263:13, 265:5
**Drug** [3] - 60:4, 149:3, 231:2
**drug-related** [1] - 185:7
**drugs** [6] - 175:12, 181:2, 182:24, 183:1, 191:12, 195:11
**drum** [1] - 188:4
**dry** [63] - 45:11, 47:14, 76:10, 76:12, 124:10, 131:17, 131:18, 131:20, 132:9, 135:7, 135:8,

140:24, 141:3, 141:25, 142:6, 142:22, 142:25, 145:2, 145:6, 146:22, 147:1, 152:6, 159:20, 161:21, 166:16, 166:24, 171:2, 181:22, 182:4, 183:6, 183:8, 183:9, 183:10, 183:14, 185:4, 186:4, 188:15, 189:1, 189:2, 190:3, 190:4, 191:19, 192:2, 192:4, 195:13, 195:15, 195:17, 197:11, 197:23, 198:15, 198:19, 198:21, 202:2, 203:20, 204:7, 212:17, 212:18, 223:1, 224:18, 244:24, 245:12
**drying** [3] - 189:1, 190:6, 269:13
**DTX-005** [1] - 248:19
**DTX-009** [1] - 184:2
**DTX-215** [4] - 271:6, 271:23, 273:20, 273:22
**DTX-216** [2] - 271:15, 273:22
**DTX-274** [5] - 251:12, 251:13, 251:14, 252:9, 252:12
**DTX-3** [1] - 144:8
**DTX-301** [1] - 177:19
**DTX-313** [3] - 196:3, 197:5, 199:6
**DTX-320** [19] - 8:7, 8:8, 141:5, 141:7, 141:18, 141:19, 148:6, 151:7, 151:11, 151:19, 151:22, 153:24, 154:4, 158:14, 158:20, 158:24, 159:7, 167:14, 203:9
**DTX-3200004** [1] - 151:15
**DTX-324** [5] - 147:6, 147:8, 147:16, 148:7, 167:15
**DTX-329** [2] - 189:6, 189:8
**DTX-330** [2] - 189:8, 192:8
**DTX-332** [2] - 182:11, 182:15

**DTX-338** [3] - 180:19, 181:9, 181:11
**DTX-347** [7] - 142:8, 142:9, 142:14, 142:19, 144:5, 148:7, 167:14
**DTX-348** [6] - 143:23, 143:24, 145:11, 146:4, 148:7, 167:15
**DTX-349** [12] - 145:21, 145:23, 146:3, 146:20, 148:7, 154:1, 154:5, 154:22, 154:24, 155:3, 155:5, 167:15
**DTX-5** [3] - 246:5, 246:7, 248:16
**DTX-5_00010** [1] - 246:16
**DTX-81** [6] - 232:21, 232:24, 233:1, 233:10, 233:14, 276:20
**Dual** [1] - 126:22
**Dual-branded** [1] - 126:22
**due** [2] - 90:23, 191:14
**duplicate** [1] - 104:18
**during** [23] - 5:13, 20:11, 21:9, 29:13, 31:23, 33:23, 36:6, 69:25, 76:25, 103:12, 132:19, 140:20, 142:17, 144:19, 146:18, 150:10, 169:22, 175:5, 216:10, 221:21, 249:17, 257:14, 277:10
**dwell** [1] - 21:10
**DX-10** [1] - 244:18
**DX-4** [2] - 235:24, 236:2
**DX-5** [1] - 237:11
**DX-8** [1] - 245:14

## E

**e.g** [2] - 226:19, 260:18
**earliest** [1] - 236:8
**earned** [1] - 51:14
**Ease** [1] - 13:24
**ease** [1] - 244:22
**easier** [3] - 32:8, 40:7, 88:10
**easily** [9] - 84:10, 87:24, 88:2, 182:25, 217:20, 223:14, 245:10, 253:8,

253:25
**east/west** [1] - 87:2
**easy** [1] - 272:24
**edge** [2] - 96:14, 215:14
**edges** [3] - 100:4, 100:24, 213:20
**educate** [2] - 85:9, 102:12
**education** [6] - 55:4, 173:17, 229:21, 229:25, 233:4, 241:7
**educational** [2] - 51:12, 173:4
**effect** [4] - 212:11, 215:19, 218:21, 254:1
**effective** [5] - 145:9, 147:4, 155:5, 168:17, 236:9
**efforts** [1] - 30:7
**eight** [2] - 116:24, 269:10
**either** [9] - 18:5, 18:6, 33:2, 119:12, 180:5, 241:24, 243:3, 267:15, 272:25
**eject** [1] - 254:5
**elected** [1] - 232:18
**electrostatic** [2] - 225:23, 245:3
**Element** [7] - 58:8, 58:15, 62:17, 63:12, 64:21, 103:15, 111:8
**element** [9] - 33:2, 62:16, 62:19, 63:15, 63:16, 63:21, 63:24, 64:1, 103:17
**elements** [15] - 27:16, 29:10, 30:13, 33:1, 54:6, 54:11, 57:15, 57:16, 103:15, 111:7, 111:11, 111:15, 111:16, 257:7, 274:13
**elongated** [1] - 189:17
**elucidate** [1] - 249:4
**embodied** [1] - 276:6
**embodiment** [3] - 35:16, 35:21, 275:4
**embodiment-suitable** [1] - 35:16
**embodiments** [1] - 275:14
**embrace** [1] - 41:13
**emphasize** [3] - 150:4, 159:14, 164:14
**emphasizes** [1] - 40:16
**employee** [2] - 30:5

**employs** [1] - 28:13
**empty** [3] - 107:2, 112:19, 251:6
**enablement** [5] - 30:24, 34:4, 38:17, 44:7, 239:25
**encapsulates** [1] - 63:17
**encapsulation** [5] - 145:3, 146:23, 194:18, 198:6, 198:7
**encompass** [1] - 225:17
**encourage** [1] - 128:9
**end** [22] - 22:12, 23:12, 25:23, 29:8, 47:7, 73:1, 78:17, 78:21, 80:6, 81:19, 98:10, 118:10, 121:19, 152:21, 171:10, 199:1, 203:4, 203:16, 243:10, 243:12, 251:4, 268:19
**ending** [3] - 144:22, 146:10, 146:12
**ends** [2] - 143:10, 144:11
**energy** [7] - 190:2, 190:7, 192:18, 195:17, 197:16, 211:16, 212:6
**Energy** [1] - 231:3
**engaged** [1] - 39:20
**engineer** [3] - 34:2, 231:7, 232:20
**Engineering** [2] - 43:23, 43:24
**engineering** [7] - 31:7, 31:8, 54:22, 230:3, 230:4, 230:9, 237:22
**Engineers** [2] - 232:6, 232:8
**England** [1] - 173:19
**enhance** [1] - 217:19
**enlargement** [1] - 190:13
**ensure** [5] - 71:24, 74:11, 75:17, 75:23, 108:16
**enter** [2] - 107:23, 167:15
**entered** [2] - 167:12, 167:15
**entering** [1] - 184:7
**entire** [11] - 7:11, 22:20, 23:3, 86:10, 95:10, 100:18, 129:1, 135:11, 230:8, 235:18,

257:12
**entirely** [3] - 99:23, 135:11, 231:11
**entirety** [5] - 7:8, 22:6, 117:21, 129:10, 133:7
**entities** [11] - 65:13, 66:1, 84:13, 113:19, 113:23, 114:2, 116:4, 116:9, 120:18, 193:17, 225:11
**entitled** [2] - 73:9, 154:11
**entity** [2] - 117:20, 117:22
**entry** [1] - 63:8
**environment** [1] - 222:10
**environmental** [1] - 142:16
**EPA** [1] - 157:13
**equate** [3] - 61:4, 131:17, 220:1
**equipment** [9] - 141:16, 194:22, 227:6, 227:12, 227:15, 242:7, 243:18, 249:22, 249:25
**equivalent** [4] - 25:17, 61:5, 62:10, 86:17
**error** [13] - 29:19, 98:15, 98:16, 98:18, 129:16, 149:13, 160:10, 161:24, 165:1, 165:15, 166:11, 166:25, 167:4
**error-proof** [1] - 129:16
**errors** [6] - 29:15, 29:17, 30:6, 30:7, 30:8, 34:6
**ESQ** [13] - 2:3, 2:4, 2:5, 2:6, 2:6, 2:7, 2:10, 2:10, 2:14, 2:15, 2:16, 2:16, 2:17
**esse** [1] - 138:12
**essence** [1] - 216:24
**essentially** [9] - 6:4, 46:17, 48:5, 71:10, 78:12, 84:9, 93:18, 216:14, 275:25
**establish** [6] - 6:24, 33:22, 99:20, 129:12, 134:19, 134:25, 135:18, 136:2, 136:14,

208:11, 208:15
**established** [3] - 134:24, 135:4, 135:11
**estimate** [2] - 52:16, 52:19
**et** [1] - 1:6
**etc** [5] - 260:8, 272:22, 276:11, 276:12
**Europe** [1] - 173:22
**evaluated** [1] - 167:8
**evaluation** [4] - 140:11, 140:12, 140:17, 140:20
**evaporate** [1] - 241:19
**evening** [3] - 139:6, 139:7, 278:11
**event** [1] - 130:13
**eventually** [1] - 174:17
**everywhere** [1] - 95:18
**evidence** [74] - 6:16, 6:23, 7:15, 7:22, 15:17, 16:17, 16:22, 17:2, 17:21, 17:23, 20:14, 26:24, 29:15, 29:18, 30:10, 30:12, 30:25, 31:2, 32:15, 32:22, 33:22, 34:5, 34:17, 36:6, 36:10, 44:5, 45:22, 47:22, 48:10, 50:17, 54:9, 56:2, 57:5, 59:3, 60:9, 61:23, 62:11, 63:8, 68:19, 78:2, 79:17, 81:7, 83:13, 88:21, 95:7, 104:9, 107:24, 109:5, 111:13, 135:17, 136:8, 137:11, 148:3, 148:8, 167:12, 167:16, 177:16, 181:8, 182:10, 184:1, 184:7, 184:8, 184:12, 189:5, 192:7, 199:5, 212:15, 212:18, 219:25, 233:11, 248:17, 252:10, 273:20, 276:20
**evident** [1] - 33:23
**EWING** [1] - 2:3
**Ewing** [3] - 3:9, 3:11, 24:19
**ex** [1] - 43:9
**exact** [8] - 48:17, 89:7, 94:4, 95:18, 151:4, 228:8, 262:10, 274:14

**exactly** [10] - 11:7, 17:9, 64:25, 79:1, 105:4, 150:23, 210:25, 262:15, 266:7, 278:19
**examination** [9] - 15:25, 29:13, 114:12, 115:12, 115:24, 123:16, 138:12, 138:13, 154:2
**EXAMINATION** [6] - 49:19, 115:2, 131:4, 171:20, 220:16, 229:13
**examinations** [1] - 50:3
**examine** [1] - 178:14
**examiner** [4] - 31:22, 31:25, 32:2, 32:12
**examining** [1] - 31:22
**example** [36] - 40:18, 41:18, 42:3, 42:5, 42:6, 42:11, 42:16, 42:21, 54:21, 96:23, 100:11, 118:7, 118:15, 164:15, 188:8, 188:14, 194:2, 194:4, 195:8, 195:15, 226:17, 226:21, 242:13, 243:17, 247:6, 249:20, 253:5, 253:10, 253:11, 254:5, 259:21, 262:3, 264:18, 264:21, 265:25, 266:15
**examples** [17] - 35:24, 38:23, 41:11, 41:24, 90:22, 100:9, 227:11, 227:14, 258:3, 258:4, 260:13, 260:23, 261:3, 261:14, 266:8, 274:18, 274:20
**excerpt** [1] - 12:12
**excerpts** [9] - 11:23, 12:23, 16:13, 17:8, 83:10, 88:18, 127:13, 259:2, 259:4
**exchanges** [1] - 277:17
**excipient** [20] - 26:11, 40:20, 42:23, 76:25, 91:15, 102:9, 157:14, 161:16, 173:20, 174:5, 176:14, 176:15,

179:25, 181:1,
181:4, 182:22,
184:19, 185:6,
226:6, 262:10
**Excipient** [1] - 180:21
**excipients** [88] -
34:25, 35:7, 35:19,
35:24, 38:2, 38:3,
38:6, 38:11, 40:12,
40:17, 40:24, 41:4,
41:6, 41:10, 41:19,
42:1, 42:17, 46:24,
47:1, 47:6, 56:16,
63:20, 64:20, 64:23,
67:2, 69:23, 72:11,
75:7, 75:15, 76:7,
76:14, 78:13, 78:14,
78:15, 78:19, 80:4,
81:17, 88:3, 98:3,
102:8, 102:10,
102:21, 102:25,
123:25, 124:6,
124:9, 132:12,
140:13, 140:18,
158:17, 158:23,
159:2, 170:5,
173:24, 174:8,
175:13, 176:1,
180:15, 180:16,
183:19, 185:3,
185:16, 185:17,
187:7, 189:18,
196:17, 207:19,
223:1, 223:2, 223:7,
226:6, 247:19,
252:17, 252:18,
252:23, 261:18,
262:9, 262:22,
264:24, 269:1,
269:3, 272:12,
272:17, 272:19,
273:1, 273:7,
274:16
**exclude** [2] - 7:12,
20:11
**excluded** [1] - 18:6
**excludes** [2] - 34:15,
255:17
**exclusivity** [1] - 37:17
**excuse** [5] - 186:8,
188:16, 200:13,
201:19, 217:15
**executive** [5] - 71:9,
155:16, 155:18,
159:16, 161:19
**exerted** [2] - 126:20
**Exhibit** [25] - 50:20,
56:5, 59:6, 60:13,
62:1, 68:7, 68:22,
78:6, 79:21, 81:11,

83:16, 88:24,
104:12, 105:7,
108:2, 109:8,
124:21, 154:9,
177:21, 181:12,
182:16, 199:7,
233:15, 248:20,
252:13
**exhibit** [4] - 81:14,
83:9, 83:10, 172:19
**exhibits** [11] - 5:4,
5:19, 7:11, 8:7, 8:11,
8:13, 21:6, 50:8,
138:15, 148:3,
182:13
**Exhibits** [3] - 148:11,
189:10, 273:24
**existing** [1] - 135:1
**exit** [3] - 23:24, 44:22,
254:6
**expect** [8] - 19:6,
192:14, 212:17,
223:6, 223:10,
223:15, 224:13,
257:19
**expectation** [3] -
32:24, 33:23, 33:24
**experience** [22] - 27:7,
50:14, 51:12, 52:22,
52:24, 54:24, 55:1,
55:4, 67:22, 123:9,
179:6, 179:16,
179:22, 185:21,
201:15, 211:13,
212:13, 222:20,
229:21, 230:1,
237:23, 241:8
**experienced** [2] -
149:2, 250:2
**experiment** [8] -
125:22, 261:17,
262:4, 266:1, 267:2,
268:5, 268:11,
268:12
**experimentally** [1] -
30:8
**experimenting** [1] -
77:24
**experiments** [30] -
40:10, 124:13,
208:6, 208:8, 210:4,
210:15, 216:7,
219:21, 221:8,
222:24, 255:13,
255:16, 257:24,
259:10, 259:11,
259:14, 259:23,
261:11, 264:9,
267:22, 272:15,
272:17, 272:25,

273:7, 273:10,
273:15, 274:22,
275:3, 275:11, 276:7
**expert** [35] - 7:6, 27:2,
30:1, 39:5, 43:19,
47:10, 47:20, 47:25,
48:8, 53:7, 53:13,
55:6, 89:5, 92:9,
99:13, 99:17,
134:16, 172:1,
172:5, 172:16,
176:18, 176:22,
177:14, 177:19,
180:2, 206:20,
227:17, 227:18,
227:23, 234:5,
234:9, 234:12,
234:15, 234:19,
234:25
**expertise** [3] - 52:4,
234:11, 238:8
**experts** [4] - 9:19,
15:11, 17:8, 46:18,
47:23, 48:10, 238:11
**explain** [24] - 7:3,
45:3, 53:15, 69:18,
71:7, 72:7, 72:21,
74:24, 75:20, 81:13,
82:16, 84:6, 84:19,
88:6, 89:16, 90:20,
92:8, 93:25, 96:5,
106:24, 111:24,
183:16, 188:21,
196:25
**explained** [8] - 8:17,
211:1, 212:4,
213:17, 215:11,
217:19, 218:8,
219:12
**explaining** [4] -
173:22, 181:4,
194:1, 194:15
**explanation** [1] -
105:25
**expose** [3] - 241:14,
263:9, 263:15
**exposed** [2] - 241:17,
254:13
**exposure** [2] - 222:10,
222:14
**express** [2] - 35:18,
112:6
**expressed** [2] - 31:25,
106:10
**expressing** [1] - 106:4
**expressly** [2] - 31:22,
34:17
**extends** [1] - 42:15
**extensive** [2] - 234:17,
240:4

**extensively** [3] -
194:5, 225:1, 245:19
**extent** [8] - 15:10,
15:12, 149:12,
239:22, 255:9,
270:3, 276:22,
277:12
**extra** [11] - 72:14,
73:2, 103:3, 129:17,
164:12, 165:4,
165:12, 166:9,
166:14, 166:17,
166:21
**extra-granular** [11] -
72:14, 73:2, 103:3,
129:17, 164:12,
165:4, 165:12,
166:9, 166:14,
166:17, 166:21
**extreme** [1] - 100:4
**extremely** [1] - 243:8
**extrusion/**
**spheronization** [1] -
262:19
**eye** [4] - 82:23, 84:11,
84:22, 84:23
**Eyzaguirre** [2] - 3:13,
24:18
**EYZAGUIRRE** [2] -
2:7, 3:14

# F

**face** [3] - 32:11,
122:12, 241:3
**facie** [1] - 43:6
**fact** [23] - 6:11, 16:20,
45:14, 47:10, 48:15,
72:24, 82:7, 88:1,
109:14, 115:17,
118:10, 119:4,
124:8, 130:14,
132:18, 135:9,
162:7, 164:7,
213:17, 214:21,
257:24, 262:9,
262:22
**factors** [8] - 260:25,
261:4, 262:12,
267:24, 269:7,
269:9, 269:10,
269:16
**fail** [2] - 33:21, 34:5
**failed** [1] - 36:9
**failing** [2] - 38:17,
44:8
**fails** [1] - 49:1
**failure** [1] - 185:25
**fair** [5] - 117:6,
119:21, 119:25,

120:1, 120:3
**fall** [2] - 8:9, 250:25
**false** [1] - 35:1
**Fame** [1] - 232:12
**familiar** [1] - 52:3
**familiarity** [2] -
184:23, 185:11
**familiarize** [1] - 75:5
**family** [4] - 38:10,
38:22, 271:10,
271:18
**far** [6] - 38:12, 62:11,
94:2, 109:24, 200:9,
232:20
**fast** [3] - 126:8, 212:9,
263:12
**favor** [1] - 36:7
**favorable** [5] - 261:22,
263:23, 263:24,
265:11, 266:13
**FDA** [43] - 24:25,
27:12, 27:19, 27:23,
28:10, 28:18, 28:25,
29:15, 29:17, 30:7,
30:8, 37:15, 67:20,
71:11, 77:20, 80:25,
98:13, 105:20,
132:3, 135:24,
149:7, 149:10,
149:14, 149:17,
155:24, 156:3,
160:12, 160:17,
160:23, 160:25,
161:2, 161:5, 161:9,
161:12, 162:2,
162:3, 164:15,
164:16, 166:20,
167:6, 167:8,
177:24, 177:25
**FDA-approval** [1] -
177:25
**FDA-approved** [1] -
24:25
**fed** [2] - 200:20,
200:22
**federal** [1] - 234:8
**FELIX** [1] - 2:7
**Felix** [2] - 3:13, 24:17
**fellow** [1] - 31:11
**FERNANDO** [1] -
229:10
**Fernando** [4] - 39:6,
43:21, 229:17,
234:19
**few** [14] - 8:3, 75:4,
78:14, 148:20,
170:22, 173:6,
174:6, 205:22,
220:20, 231:22,
232:5, 233:8, 249:19

**fibers** [3] - 101:17, 101:20
**field** [9] - 9:16, 51:25, 54:21, 87:8, 95:10, 237:20, 237:21, 238:4, 250:2
**fields** [3] - 52:2, 54:23, 230:19
**fifth** [5] - 119:2, 266:20, 268:4, 268:10, 268:12
**figure** [5] - 17:16, 73:23, 94:5, 156:11
**figured** [1] - 138:14
**file** [2] - 18:21, 236:18
**filed** [7] - 17:17, 37:20, 148:24, 149:13, 177:24, 178:4, 190:17
**filing** [4] - 178:4, 259:9, 260:21, 260:25
**filings** [2] - 149:4, 149:10
**fill** [13] - 63:8, 75:8, 130:19, 191:15, 191:20, 242:20, 247:20, 248:11, 248:15, 253:12, 253:14, 275:19, 275:20
**filled** [4] - 47:15, 109:16, 204:7, 262:25
**filling** [4] - 171:2, 195:13, 207:16, 275:24
**filter** [3] - 88:10, 107:3, 217:18
**final** [20] - 29:4, 31:4, 78:16, 79:2, 79:3, 147:19, 150:13, 150:16, 151:1, 151:12, 164:8, 167:24, 168:6, 168:11, 168:18, 169:1, 169:8, 169:15, 169:20, 170:14
**finalist** [1] - 168:22
**finalized** [4] - 73:24, 74:1, 147:24, 156:12
**finally** [1] - 39:4
**finding..** [1] - 259:6
**findings** [1] - 27:14
**fine** [10] - 23:15, 37:1, 42:3, 57:1, 97:7, 219:1, 233:22, 244:25, 251:3, 270:13

**finely** [1] - 187:21
**finish** [1] - 138:23
**finished** [10] - 10:10, 10:12, 74:9, 143:13, 156:20, 230:6, 256:7, 256:9, 257:10, 275:18
**finishes** [1] - 278:15
**firm** [2] - 24:18, 27:9
**first** [74] - 5:1, 10:22, 11:2, 11:15, 19:22, 20:23, 22:4, 22:17, 22:24, 25:7, 27:1, 36:17, 37:13, 37:16, 37:24, 38:7, 43:13, 49:9, 49:17, 57:12, 60:22, 61:1, 63:8, 72:9, 75:1, 76:7, 86:15, 88:9, 89:8, 89:18, 90:10, 94:5, 94:7, 94:9, 97:8, 101:17, 104:19, 104:20, 105:13, 107:1, 110:14, 118:11, 128:4, 143:4, 146:6, 151:21, 155:18, 157:22, 158:16, 158:18, 158:22, 160:7, 170:24, 171:18, 173:10, 177:6, 180:21, 185:2, 208:8, 229:11, 232:19, 237:16, 240:4, 246:22, 247:16, 247:18, 250:4, 255:19, 257:23, 261:16, 261:17, 264:7, 264:18, 268:15
**first-in-class** [1] - 25:7
**fit** [5] - 40:4, 40:6, 40:14, 41:21, 249:24
**five** [12] - 33:5, 73:3, 98:12, 138:15, 165:25, 166:3, 166:6, 175:22, 252:24, 257:23, 258:1
**five-minute** [2] - 165:25, 166:3
**fix** [1] - 30:7
**fixed** [1] - 210:12
**flawed** [1] - 32:16
**flip** [1] - 14:5
**flow** [33] - 96:17, 242:6, 242:15, 242:17, 242:19, 242:21, 242:22,

243:1, 243:2, 243:4, 245:9, 247:4, 250:4, 250:5, 250:6, 250:7, 250:8, 254:10, 254:11, 261:19, 262:11, 262:25, 263:21, 264:4, 265:7, 265:22, 265:23, 267:17, 269:5, 269:12, 270:3, 270:12
**flowability** [1] - 191:12
**flowchart** [6] - 69:8, 69:21, 73:16, 141:16, 161:11, 203:16
**flowing** [1] - 190:24
**flows** [1] - 242:11
**fluid** [5] - 181:25, 192:4, 194:23, 227:8
**fluids** [1] - 190:16
**focus** [3] - 51:14, 64:2, 159:9
**focused** [6] - 39:24, 51:2, 51:8, 51:24, 230:8, 231:11
**folks** [1] - 30:18
**follow** [1] - 133:1
**follow-up** [1] - 133:1
**followed** [6] - 145:3, 146:17, 146:22, 164:25, 168:18, 171:2
**following** [6] - 2:24, 71:2, 73:23, 155:19, 156:11, 279:3
**follows** [6] - 49:18, 55:10, 166:24, 171:18, 229:12, 259:16
**Food** [2] - 149:3, 231:2
**FOR** [1] - 1:2
**force** [8] - 190:5, 201:14, 207:2, 207:5, 207:18, 242:24, 245:5, 257:11
**forces** [4] - 126:20, 201:10, 245:3, 245:4
**foregoing** [1] - 279:5
**foremost** [2] - 247:16, 257:23
**forever** [1] - 45:14
**form** [42] - 13:24, 25:16, 25:22, 33:7, 33:8, 37:21, 39:10, 39:22, 51:21, 56:21, 59:16, 59:17, 59:21,

59:23, 60:19, 65:13, 102:25, 113:19, 113:22, 114:1, 116:3, 120:19, 131:13, 164:17, 182:2, 182:8, 183:10, 188:22, 189:25, 190:2, 192:14, 193:17, 212:19, 235:7, 239:10, 241:19, 242:8, 245:1, 246:23, 256:8, 257:16
**format** [2] - 164:18, 164:20
**formation** [1] - 27:3
**formatting** [1] - 147:13
**formed** [16] - 76:24, 99:1, 116:8, 138:3, 138:4, 188:19, 194:1, 194:2, 212:16, 226:18, 226:22, 226:25, 237:5, 240:16, 244:11, 251:6
**forming** [12] - 54:2, 60:6, 67:24, 76:16, 82:3, 192:25, 195:8, 196:7, 202:23, 213:6, 217:21, 271:24
**forms** [10] - 27:4, 52:17, 52:20, 53:9, 194:17, 198:25, 241:22, 258:4
**formula** [28] - 77:15, 79:15, 80:20, 81:4, 127:3, 127:7, 127:11, 142:12, 142:16, 142:23, 144:2, 144:4, 144:19, 146:1, 146:3, 146:18, 146:24, 147:11, 147:12, 147:13, 147:14, 147:17, 157:16, 167:22, 167:24, 168:1, 168:6
**formulate** [1] - 247:15
**formulated** [2] - 185:2, 187:1
**formulation** [89] - 32:4, 33:11, 52:23, 53:3, 53:8, 59:19, 59:20, 73:24, 74:1, 77:23, 78:16, 91:14, 91:16, 94:14,

102:24, 131:25, 139:17, 139:24, 140:3, 140:5, 141:11, 150:5, 150:11, 150:13, 150:16, 151:1, 151:3, 151:12, 156:12, 159:17, 159:19, 161:18, 161:19, 172:6, 172:10, 172:11, 172:13, 174:10, 174:15, 174:22, 176:1, 176:11, 177:14, 177:19, 178:15, 178:16, 179:5, 180:17, 181:5, 181:6, 181:16, 182:20, 182:21, 182:22, 182:23, 183:7, 184:18, 186:1, 186:3, 186:6, 186:9, 186:21, 187:4, 187:16, 187:20, 187:24, 188:17, 190:12, 190:21, 190:23, 191:6, 191:15, 191:16, 192:15, 192:19, 195:8, 195:9, 204:4, 214:20, 228:5, 231:25, 234:6, 234:10, 234:20, 234:25, 247:23, 250:17, 255:6
**formulations** [33] - 27:5, 27:10, 38:6, 40:23, 41:6, 44:2, 51:2, 52:25, 53:4, 53:10, 54:25, 56:14, 77:25, 179:23, 179:24, 179:25, 183:8, 184:20, 186:11, 186:14, 186:16, 186:23, 186:25, 187:1, 234:13, 234:16, 234:21, 234:22, 235:1, 235:2, 237:25, 238:1, 238:3
**formulator** [1] - 191:4
**forth** [6] - 17:23, 28:4, 62:6, 258:18, 260:14, 262:5
**forward** [14] - 13:22, 14:2, 36:5, 37:3, 44:11, 71:24, 72:2, 73:18, 74:16, 75:24, 83:18, 178:10, 238:18, 239:3

**Foundation** [3] - 43:24, 231:2, 231:8
**four** [11] - 57:14, 75:21, 111:10, 111:14, 111:16, 138:15, 157:19, 176:23, 248:12, 256:16, 261:16
**fourth** [4] - 119:1, 154:13, 158:7, 250:10
**fraction** [5] - 117:3, 117:4, 117:25, 118:15, 119:3
**fractions** [1] - 118:25
**free** [1] - 137:7
**freebase** [2] - 61:6, 62:10
**Frese** [1] - 4:2
**FRESE** [47] - 2:16, 4:3, 229:14, 230:23, 231:14, 233:10, 233:16, 233:19, 234:3, 234:18, 235:3, 237:11, 237:13, 239:15, 239:18, 240:21, 240:22, 244:13, 244:18, 245:13, 246:1, 248:16, 248:21, 249:1, 249:3, 251:11, 252:9, 252:14, 252:21, 253:1, 254:23, 254:24, 255:25, 256:1, 264:6, 267:20, 272:8, 273:3, 273:19, 273:25, 274:6, 274:8, 276:4, 276:18, 276:23, 277:2, 277:4
**front** [17] - 50:8, 65:8, 83:9, 89:12, 115:11, 115:16, 115:18, 121:20, 125:13, 134:1, 134:2, 134:3, 155:15, 156:6, 169:11, 169:17, 234:8
**full** [9] - 20:17, 39:23, 40:5, 51:20, 53:4, 109:16, 129:7, 139:9, 171:23
**fully** [1] - 7:3
**function** [6] - 180:15, 180:17, 186:2, 186:6, 187:3, 253:19
**functioned** [1] - 185:20

**funded** [1] - 230:25
**funding** [1] - 231:10
**funnel** [2] - 107:9, 107:11
**fused** [1] - 263:18
**fusing** [1] - 241:20

# G

**G.E** [1] - 108:24
**g/mL** [12] - 41:20, 104:16, 105:13, 106:6, 106:10, 106:13, 109:15, 129:20, 248:14, 248:23, 250:25
**gamut** [1] - 53:5
**gas** [1] - 197:2
**gather** [1] - 107:2
**gears** [4] - 192:22, 195:20, 204:9, 206:18
**gel** [1] - 112:1
**gelatin** [1] - 247:10
**general** [8] - 14:2, 16:15, 33:14, 44:2, 176:1, 193:5, 225:20, 238:6
**generally** [7] - 9:16, 12:17, 14:17, 15:8, 19:9, 34:20, 56:12, 74:24, 94:21, 179:1, 193:3, 194:15, 195:18, 235:22, 236:3, 240:23, 240:24
**Generally** [1] - 194:16
**generating** [1] - 276:9
**generic** [10] - 28:24, 37:18, 73:24, 74:1, 107:1, 155:21, 156:12, 166:23, 174:9, 178:1
**gently** [2] - 107:17, 249:13
**given** [8] - 7:22, 19:6, 23:20, 36:23, 46:16, 91:15, 231:8, 255:6
**glass** [4] - 92:22, 92:23, 93:18, 242:25
**glasses** [1] - 232:25
**glidants** [1] - 254:7
**Glidants** [1] - 254:8
**global** [1] - 230:19
**glue** [1] - 253:19
**glue-like** [1] - 253:19
**glycol** [1] - 35:17
**go-ahead** [1] - 74:16
**goal** [3] - 39:20, 190:16, 265:18

**goals** [1] - 85:5
**gold** [1] - 125:11
**government** [1] - 231:1
**graded** [1] - 249:11
**grades** [2] - 125:17, 209:13
**grading** [1] - 125:23
**graduated** [1] - 107:6, 107:9, 109:16, 109:18, 109:20, 109:25, 110:2, 110:4, 110:22, 130:19, 173:5
**grams** [4] - 103:19, 104:21, 104:23, 249:15
**granted** [1] - 7:7
**granting** [1] - 5:5
**grants** [1] - 231:8
**granular** [18] - 72:14, 73:2, 75:22, 102:25, 103:3, 129:17, 131:13, 132:22, 133:3, 133:6, 133:7, 164:12, 165:4, 165:12, 166:9, 166:14, 166:17, 166:21
**granulate** [12] - 43:8, 45:11, 191:3, 191:16, 242:3, 242:4, 242:9, 245:5, 258:12, 269:21, 270:20
**granulated** [24] - 35:4, 35:6, 35:10, 35:14, 46:23, 47:5, 47:8, 56:15, 64:19, 108:4, 123:24, 124:2, 124:5, 128:17, 128:21, 129:23, 129:24, 191:7, 202:1, 223:2, 223:6, 251:2, 260:20, 272:11
**granulating** [6] - 40:11, 40:16, 244:15, 272:20, 274:16, 275:24
**granulation** [130] - 12:17, 12:20, 15:4, 32:5, 35:9, 35:22, 40:22, 42:3, 43:2, 45:12, 48:19, 48:20, 98:6, 98:10, 115:21, 116:2, 121:17, 122:7, 122:16, 122:24, 123:4,

123:10, 131:18, 131:21, 135:8, 135:10, 137:24, 141:2, 141:3, 142:4, 142:6, 142:24, 143:1, 145:5, 145:7, 146:25, 147:2, 166:15, 166:17, 166:25, 181:22, 181:24, 181:25, 182:4, 185:4, 188:7, 188:15, 188:19, 188:24, 189:1, 190:3, 190:4, 190:5, 190:11, 190:13, 190:16, 190:20, 190:22, 190:25, 191:14, 191:23, 191:24, 192:1, 192:2, 192:3, 192:5, 193:14, 193:21, 194:5, 194:15, 194:16, 194:20, 194:21, 195:2, 195:5, 195:11, 195:16, 197:10, 197:18, 198:15, 198:21, 201:9, 201:16, 201:23, 202:12, 203:21, 203:23, 207:6, 207:7, 207:17, 224:1, 225:22, 225:23, 225:25, 227:6, 227:7, 240:5, 240:25, 241:10, 241:23, 243:15, 245:18, 245:19, 245:24, 246:20, 247:2, 247:3, 247:6, 247:8, 247:13, 247:24, 253:18, 258:4, 260:5, 260:12, 260:25, 262:19, 262:20, 263:6, 264:2, 264:14, 268:14, 269:8, 270:8, 275:22
**granulations** [5] - 17:12, 241:24, 242:2, 245:11, 250:20
**granulator** [2] - 194:23, 227:8
**granulators** [2] - 194:23, 227:8
**granule** [73] - 28:8, 28:9, 46:12, 46:22, 47:4, 47:12, 48:7, 64:19, 65:6, 69:3, 75:17, 75:18, 75:21,

75:22, 76:17, 83:23, 83:25, 84:1, 84:12, 91:1, 92:14, 93:4, 93:5, 95:14, 98:10, 100:16, 100:19, 100:22, 101:5, 102:4, 116:12, 119:19, 120:5, 120:19, 121:14, 123:15, 123:24, 124:4, 130:1, 131:20, 132:10, 133:11, 136:9, 136:13, 137:23, 138:5, 160:7, 160:13, 160:18, 160:23, 161:2, 161:7, 161:8, 161:13, 161:14, 188:16, 188:18, 189:14, 189:19, 194:17, 207:19, 213:25, 226:5, 226:8, 226:25, 243:24, 262:21, 268:20, 270:21
**granuled** [1] - 134:23
**Granules** [1] - 226:17
**granules** [265] - 5:10, 6:15, 6:17, 6:25, 7:1, 26:10, 26:17, 26:24, 27:15, 27:20, 28:11, 28:20, 29:1, 29:5, 29:9, 29:11, 29:21, 29:25, 30:9, 30:11, 34:24, 34:25, 35:20, 38:10, 41:9, 41:13, 41:19, 41:25, 42:5, 42:9, 42:17, 42:22, 45:7, 45:9, 46:1, 46:15, 46:23, 47:5, 47:19, 47:21, 49:3, 63:18, 64:2, 64:16, 64:19, 64:22, 65:9, 65:13, 65:16, 65:24, 65:25, 66:3, 66:20, 66:22, 66:25, 69:1, 70:5, 72:13, 72:16, 73:2, 73:4, 75:23, 76:2, 76:3, 76:23, 77:2, 77:6, 78:22, 78:24, 80:7, 80:9, 80:13, 81:20, 81:24, 82:7, 82:9, 83:4, 84:21, 84:24, 85:2, 89:7, 89:17, 89:19, 89:20, 89:21, 90:2, 90:3, 90:13, 90:14, 91:5, 91:7, 92:10, 92:24, 93:2, 93:3, 93:7, 94:19, 95:24,

98:2, 98:7, 98:13, 98:14, 98:20, 98:24, 98:25, 99:1, 99:21, 100:6, 102:20, 103:18, 104:15, 113:18, 113:20, 113:23, 114:2, 116:4, 117:19, 117:20, 120:3, 120:6, 120:15, 120:17, 122:3, 122:14, 122:17, 123:13, 123:21, 123:24, 124:1, 124:2, 124:5, 124:7, 124:9, 129:10, 129:20, 131:9, 134:19, 134:22, 135:12, 135:25, 136:2, 136:3, 136:20, 136:25, 137:2, 137:19, 138:3, 138:4, 142:24, 145:5, 146:25, 164:11, 165:4, 165:12, 166:8, 166:14, 166:21, 168:14, 168:20, 168:25, 169:5, 169:12, 169:18, 178:24, 182:3, 182:8, 188:22, 189:4, 189:25, 190:2, 190:7, 190:17, 192:14, 192:19, 193:4, 193:5, 193:18, 194:1, 194:8, 195:7, 196:15, 196:16, 196:21, 197:20, 198:1, 199:12, 201:2, 202:4, 202:7, 203:24, 203:25, 204:3, 205:5, 205:10, 205:20, 206:4, 206:13, 207:9, 207:22, 207:25, 208:1, 211:20, 212:1, 212:16, 213:10, 213:22, 215:16, 215:17, 216:2, 217:25, 218:4, 218:5, 218:6, 220:1, 220:7, 223:8, 224:2, 224:3, 224:4, 224:7, 225:10, 226:2, 226:22, 228:5, 240:5, 240:9, 240:11, 240:13,

240:19, 240:23, 240:24, 241:7, 244:2, 244:3, 244:6, 244:7, 244:11, 245:8, 245:9, 248:23, 250:18, 250:24, 252:16, 256:18, 258:24, 264:24, 264:25, 265:9, 266:5, 266:19, 267:6, 268:24, 269:22, 269:24, 269:25, 270:1, 273:16, 275:21

**granules..** [1] - 129:7
**graules** [1] - 212:9
**Great** [1] - 175:3
**great** [4] - 23:18, 34:12, 82:22, 115:16
**greater** [8] - 36:2, 41:20, 103:19, 104:16, 105:15, 106:12, 129:21, 248:23
**greed** [1] - 37:12
**greedy** [1] - 43:17
**green** [2] - 91:2, 92:16
**GREEN** [7] - 2:13, 2:14, 3:19, 3:24, 4:2, 4:5, 4:8
**Green** [2] - 3:20, 3:21
**GREGORY** [1] - 1:14
**grids** [1] - 140:19
**groundbreaking** [1] - 24:24
**grounds** [1] - 33:5
**group** [1] - 232:15
**grouping** [2] - 84:14, 100:25
**groupings** [1] - 93:6
**groups** [1] - 86:15
**guess** [1] - 21:25
**guidance** [4] - 164:16, 267:23, 269:15
**Guzzo** [2] - 3:11, 24:19
**GUZZO** [1] - 2:4

**H**

**hac** [1] - 3:17
**half** [4] - 20:23, 100:19, 129:22, 129:24
**Hall** [1] - 232:12
**hallucinations** [3] - 25:1, 25:4, 25:8
**hand** [9] - 41:16, 86:6, 117:2, 117:6,

172:25, 201:12, 201:13, 245:15, 246:18
**handle** [5] - 19:16, 182:24, 253:8, 277:19
**handled** [3] - 112:13, 220:24, 222:13
**handling** [2] - 197:22, 253:6
**happy** [1] - 270:21
**hard** [18] - 26:13, 100:19, 111:19, 111:23, 111:24, 112:10, 112:14, 112:19, 112:21, 112:24, 113:9, 113:13, 123:12, 172:23, 204:8, 219:25, 245:7, 247:10
**harder** [1] - 224:10
**harmful** [1] - 243:13
**Hastings** [3] - 3:12, 24:16, 24:20
**HASTINGS** [1] - 2:5
**head** [1] - 127:1
**headers** [1] - 69:20
**heading** [4] - 151:22, 151:25, 156:10, 247:10
**hear** [23] - 4:25, 5:22, 6:20, 10:7, 10:14, 12:15, 13:7, 15:16, 17:21, 25:15, 34:9, 38:24, 38:25, 42:12, 43:21, 45:11, 46:18, 47:23, 47:24, 48:8, 76:18, 82:20, 119:25
**heard** [4] - 13:9, 238:12, 257:15
**hearing** [1] - 211:23
**heart** [1] - 232:17
**heat** [2] - 263:9, 263:15
**heavier** [1] - 251:9
**held** [11] - 2:24, 45:17, 46:7, 49:11, 171:14, 214:23, 218:17, 218:19, 219:1, 219:17, 219:18
**help** [10] - 6:24, 9:19, 78:11, 83:3, 102:12, 112:23, 128:8, 183:4, 254:2, 258:20
**helped** [4] - 65:5, 77:5, 83:4, 97:22
**helpful** [2] - 132:17, 133:15
**helping** [1] - 18:17

**helps** [5] - 64:6, 96:9, 112:20, 132:20, 201:2
**hereby** [1] - 279:5
**herein** [1] - 35:13
**herein..** [1] - 260:21
**high** [35] - 15:3, 31:1, 34:5, 69:7, 69:22, 131:22, 173:4, 173:5, 179:19, 182:5, 189:2, 190:5, 192:4, 194:23, 197:17, 198:16, 201:6, 201:21, 202:11, 207:5, 207:6, 227:7, 237:18, 243:8, 243:9, 250:11, 253:22, 255:15, 260:5, 260:11, 264:2, 268:22, 269:2
**high-level** [2] - 69:7, 69:22
**high-pressure** [4] - 201:6, 201:21, 202:11, 207:5
**high-shear** [1] - 260:5
**higher** [6] - 51:11, 223:7, 223:11, 243:25, 244:2, 244:6
**highlight** [3] - 75:2, 85:15, 229:21
**highlighted** [11] - 60:21, 61:11, 65:11, 69:21, 73:20, 92:12, 105:10, 105:11, 205:20, 245:15, 259:13
**highlighting** [1] - 75:1
**highlights** [2] - 73:15, 231:13
**highly** [2] - 12:11, 216:8
**himself** [1] - 10:15
**hindsight** [2] - 32:17, 33:25
**history** [3] - 233:4, 233:7, 236:18
**hmm** [4] - 118:18, 118:21, 126:12, 267:3
**Hogan** [1] - 4:15
**HOGAN** [89] - 4:16, 139:5, 144:22, 144:24, 145:21, 145:22, 147:6, 147:7, 154:7, 167:13, 170:18, 171:9, 171:12, 171:19, 171:21,

172:19, 172:22, 173:1, 173:2, 177:1, 177:4, 177:13, 177:16, 177:22, 178:18, 178:19, 179:13, 179:14, 180:12, 180:13, 181:8, 181:13, 181:14, 182:10, 182:17, 182:18, 183:11, 183:12, 184:1, 184:5, 184:13, 184:15, 187:13, 187:14, 189:5, 189:11, 189:12, 190:9, 190:10, 191:21, 191:22, 192:7, 192:10, 192:12, 192:20, 192:21, 193:9, 193:11, 193:23, 193:24, 194:11, 194:13, 195:22, 195:23, 198:13, 199:4, 199:8, 199:15, 199:16, 202:16, 202:17, 203:6, 203:8, 204:11, 204:12, 205:15, 205:16, 209:5, 212:20, 212:21, 215:21, 217:6, 217:7, 220:2, 220:3, 220:10, 228:17, 228:21, 236:1
**hold** [1] - 197:21
**homogeneous** [1] - 201:1
**homogenous** [2] - 183:10, 201:3
**Honor** [109] - 3:2, 3:9, 3:17, 3:19, 3:22, 4:3, 4:6, 4:8, 4:10, 4:14, 4:20, 5:2, 5:24, 7:6, 8:2, 9:2, 9:11, 9:22, 10:9, 10:18, 13:11, 14:19, 16:4, 16:18, 17:25, 18:4, 18:7, 18:9, 18:15, 19:4, 19:9, 20:9, 20:22, 21:22, 22:21, 24:5, 24:6, 24:8, 24:10, 24:12, 30:14, 30:21, 36:5, 37:1, 37:7, 44:12, 44:14, 45:1, 46:15, 46:21, 49:4, 49:8, 49:13, 49:15, 50:16, 53:6, 56:1, 56:3, 59:2, 60:8, 61:22, 68:2, 68:18,

76:8, 79:16, 81:6,
83:12, 88:20, 104:8,
109:4, 132:5,
133:19, 134:14,
135:22, 138:9,
138:24, 148:2,
148:12, 171:12,
171:19, 172:20,
172:23, 177:1,
181:10, 184:13,
189:11, 192:8,
197:16, 198:12,
216:4, 220:10,
228:17, 228:21,
228:24, 229:1,
233:24, 234:18,
234:23, 252:11,
273:19, 273:21,
276:18, 276:23,
277:5, 277:15,
277:21, 277:23,
278:7, 278:25

**Honor's** [10] - 5:5, 5:8,
8:10, 8:16, 8:20,
47:9, 135:13,
138:17, 138:19,
244:14

**HONORABLE** [1] -
1:14

**horse** [1] - 6:5

**hot** [1] - 114:19

**hour** [3] - 138:18,
138:21, 222:14

**hours** [3] - 11:11,
18:14, 167:3

**Hulina** [1] - 24:22

**humidity** [12] - 124:13,
124:16, 125:6,
125:7, 216:6,
216:10, 218:8,
218:9, 222:1, 222:3,
222:7, 222:17

**hundreds** [6] - 32:11,
52:18, 52:21, 87:23,
102:10, 148:24

**hungry** [1] - 148:5

**Hyderabad** [1] -
139:11

**hydration** [1] - 211:18

**hydrolyzed** [1] -
184:22

**hydroxypropyl** [2] -
267:9, 267:12

**hygroscopic** [4] -
222:5, 222:8,
222:13, 222:20

**hypothetical** [2] -
128:21, 130:4

**hypothetically** [1] -
270:6

**I**

**i.e** [1] - 35:14

**idea** [3] - 135:6,
136:17, 137:3

**ideal** [2] - 33:8, 33:15

**identified** [1] - 27:23,
58:8, 61:2, 63:17,
63:24, 111:11,
113:8, 160:22,
161:8, 195:4, 202:9

**identifies** [1] - 269:7

**identify** [2] - 63:9,
94:13

**ignore** [1] - 255:10

**Illinois** [1] - 51:16

**illogical** [2] - 32:19,
132:14

**illustrate** [1] - 41:16

**illustration** [1] - 85:11

**image** [59] - 82:24,
83:18, 83:19, 83:23,
84:7, 86:5, 86:7,
86:13, 86:15, 86:16,
86:17, 86:18, 86:19,
86:21, 89:18, 89:24,
90:10, 91:12, 91:19,
92:6, 92:10, 92:24,
93:3, 93:4, 93:14,
93:16, 93:19, 94:2,
94:9, 94:24, 96:10,
96:24, 97:3, 97:6,
98:22, 100:7,
100:11, 100:12,
101:23, 119:22,
125:9, 133:5, 213:2,
213:9, 213:16,
214:5, 214:7, 214:8,
217:13, 217:16,
217:17, 218:11,
219:3, 223:23

**images** [47] - 83:11,
84:16, 84:25, 86:14,
87:24, 87:25, 88:19,
89:1, 89:3, 89:5,
90:12, 90:17, 90:23,
92:3, 92:5, 93:24,
94:1, 94:16, 94:18,
94:22, 94:23, 95:5,
95:13, 95:15, 95:16,
95:21, 96:7, 99:20,
100:9, 102:12,
103:9, 113:8, 130:8,
133:13, 210:21,
213:6, 213:24,
215:6, 215:16,
217:21, 217:24,
218:3, 218:4,
219:21, 223:19,
228:10

**imaging** [4] - 83:2,
88:12, 99:5, 221:5

**immediately** [2] -
75:10, 257:5

**impact** [6] - 25:4,
74:8, 156:20,
163:22, 209:18,
269:2

**impart** [1] - 190:2

**implies** [3] - 122:17,
124:1, 133:14

**import** [1] - 6:8

**important** [24] - 11:16,
21:2, 21:4, 24:14,
40:20, 71:20, 73:17,
87:16, 123:1, 123:2,
124:8, 180:25,
205:18, 207:20,
209:14, 213:21,
242:16, 242:17,
243:2, 243:15,
247:18, 253:5, 253:9

**impossible** [1] -
127:18

**impractical** [1] -
133:13

**impression** [1] - 185:4

**improper** [1] - 15:9

**improve** [13] - 53:3,
191:1, 191:2,
191:11, 191:12,
191:13, 201:5,
242:10, 242:22,
242:25, 243:3,
254:10, 269:3

**improved** [4] - 40:20,
260:20, 261:2

**Improved** [6] - 27:8,
50:23, 50:25, 51:1,
51:4, 51:19

**improvement** [1] -
26:4

**improves** [1] - 247:3

**improving** [1] - 51:2,
242:15, 242:17,
247:6

**impurities** [15] - 42:8,
258:17, 262:1,
262:13, 263:2,
263:22, 265:11,
266:11, 266:23,
267:1, 267:18,
267:23, 268:22,
269:5, 270:11

**impurity** [3] - 261:21,
269:12, 276:11

**IN** [2] - 1:1, 1:2

**inactive** [1] - 38:3

**INC** [1] - 1:4

**Inc** [4] - 2:8, 2:11,

2:18, 3:10

**inch** [3] - 182:6,
198:17, 201:14

**incident** [1] - 32:6

**include** [12] - 26:18,
41:7, 42:1, 42:9,
43:1, 66:6, 124:9,
127:14, 137:24,
237:21, 255:12,
277:25

**included** [5] - 18:22,
38:6, 168:20, 187:2

**includes** [19] - 41:6,
46:12, 46:23, 47:1,
64:19, 123:24,
124:4, 137:25,
157:13, 158:23,
159:12, 165:8,
167:8, 168:4, 168:8,
168:24, 256:15,
256:18

**including** [17] - 26:1,
27:2, 27:19, 30:23,
31:10, 34:7, 36:1,
52:9, 53:8, 111:12,
131:12, 152:22,
179:23, 231:1,
237:25, 255:16,
273:17

**inclusive** [2] - 122:2,
122:11

**incomplete** [1] - 32:17

**inconclusive** [1] -
219:23

**inconsistent** [1] -
29:22

**incorrect** [3] - 26:25,
149:13, 149:16

**increase** [7] - 39:17,
43:8, 242:12,
243:17, 243:21,
246:25, 247:23

**increased** [2] - 25:6,
40:12

**increases** [1] - 244:15

**increasing** [5] - 39:24,
40:1, 243:14,
243:15, 247:1

**increasingly** [3] -
116:19, 116:25,
117:11

**increments** [1] -
141:17

**indeed** [2] - 29:20,
30:11

**indefinite** [8] - 34:22,
239:22, 239:23,
254:18, 269:20,
274:1, 276:2, 276:6

**indefiniteness** [5] -

30:24, 34:4, 254:21,
255:1, 272:5

**independent** [6] -
45:6, 57:20, 137:22,
204:2, 204:20,
274:15

**index** [1] - 218:25

**India** [2] - 139:12,
141:11

**indicated** [1] - 168:13

**indicates** [1] - 256:12

**indicating** [3] - 93:5,
171:5, 215:2

**indicating)** [1] -
214:14

**indication** [2] - 250:4,
265:8

**indicative** [1] - 16:6

**indiscernable** [2] -
161:22, 243:11

**indiscernible** [6] -
150:7, 150:11,
164:19, 164:23,
166:12, 167:2

**individual** [10] - 102:6,
120:9, 120:11,
136:12, 136:21,
162:8, 162:9,
187:17, 191:9,
191:10

**individuals** [1] - 55:3

**inducted** [2] - 232:18,
232:20

**induction** [1] - 31:10

**industry** [6] - 123:9,
176:8, 185:2, 193:6,
193:15, 228:7

**infects** [1] - 35:1

**inferences** [1] -
137:16

**influence** [1] - 132:19

**inform** [3] - 65:5, 83:3,
272:5

**information** [49] -
10:1, 10:2, 10:5,
10:16, 14:14, 14:15,
15:14, 15:21, 19:23,
20:3, 20:14, 20:21,
21:17, 21:21, 22:15,
23:21, 24:1, 51:1,
57:7, 58:16, 60:16,
61:17, 63:4, 64:6,
65:5, 126:25,
129:15, 144:18,
146:17, 146:19,
210:8, 210:13,
210:16, 210:21,
210:25, 211:7,
211:16, 213:13,
214:15, 214:18,

214:22, 216:6, 218:3, 218:4, 219:13, 219:16, 261:13, 268:1, 277:25
**informed** [1] - 133:24
**infrared** [2] - 52:5, 52:10
**infringe** [9] - 38:7, 43:15, 129:20, 206:7, 206:16, 255:6, 255:7, 269:25, 270:1
**infringed** [6] - 41:5, 53:23, 57:4, 178:6, 178:23, 270:16
**infringement** [38] - 6:19, 19:11, 19:15, 20:13, 20:24, 21:24, 23:6, 23:8, 26:19, 26:21, 26:22, 30:14, 45:23, 50:4, 53:17, 54:3, 54:4, 55:7, 55:12, 56:10, 57:6, 58:25, 112:6, 113:15, 113:16, 134:9, 134:12, 137:4, 137:15, 178:21, 200:1, 205:4, 205:18, 208:3, 212:23, 220:5, 220:9
**infringes** [7] - 36:8, 54:5, 114:5, 178:16, 206:2, 206:11, 269:18
**infringing** [1] - 258:14
**ingredient** [15] - 25:10, 32:7, 38:19, 60:19, 61:1, 183:20, 197:8, 199:9, 221:12, 224:15, 263:7, 263:14, 263:16, 263:17
**ingredients** [15] - 27:25, 38:3, 47:14, 87:17, 132:9, 195:24, 196:14, 197:4, 205:23, 226:6, 238:2, 244:22, 254:3, 265:2, 267:7
**initial** [1] - 147:13
**innovation** [1] - 231:11
**innovative** [2] - 25:14, 38:5
**input** [10] - 28:5, 28:7, 75:11, 75:12, 153:12, 153:15,

159:2, 160:17, 161:9, 238:9
**Input** [4] - 157:25, 159:11, 159:24, 160:2
**inputs** [2] - 28:10, 76:6
**inside** [11] - 41:21, 46:22, 47:15, 84:1, 85:3, 127:21, 242:14, 246:24, 247:1, 248:15, 251:6
**inspections** [1] - 185:19
**instance** [3] - 28:22, 29:6, 247:2
**instances** [1] - 185:25
**instant** [1] - 28:21
**instead** [3] - 7:3, 29:23, 85:17
**Institute** [1] - 31:11, 232:6, 232:8
**instructions** [2] - 107:18, 222:6
**instructive** [1] - 46:11
**instruments** [1] - 51:20
**insufficient** [1] - 135:17
**intellectual** [1] - 24:23
**intend** [2] - 71:22, 137:7
**intended** [1] - 122:3, 265:24
**intense** [2] - 25:4, 90:5
**intention** [1] - 135:12
**intentional** [5] - 122:1, 135:7, 136:17, 136:23, 137:24
**intentionally** [2] - 135:15, 136:25
**intentions** [2] - 138:17, 138:20
**interact** [1] - 86:24
**interaction** [1] - 225:24
**interactions** [3] - 211:16, 211:17, 245:4
**interacts** [1] - 25:12
**interested** [1] - 69:9
**interesting** [3] - 47:3, 48:13, 48:22
**interestingly** [1] - 105:4
**interfere** [1] - 187:8
**interlocks** [1] - 198:24
**intermediate** [2] - 74:8, 156:20

**intermediates** [2] - 170:9, 170:14
**internal** [10] - 9:25, 10:5, 10:16, 14:6, 14:10, 14:21, 17:10, 27:13, 30:5
**interpret** [1] - 205:5
**interpretation** [1] - 47:4
**interrupt** [1] - 22:23
**interrupted** [1] - 21:13
**interruption** [1] - 235:25
**introduce** [6] - 15:11, 21:24, 39:5, 107:5, 184:8, 229:16
**introduced** [2] - 25:19, 107:20
**introducing** [2] - 107:10, 259:7
**invalid** [11] - 38:14, 38:15, 43:17, 44:6, 212:15, 239:21, 239:23, 239:24, 254:17
**invalidate** [1] - 34:11
**invalidity** [15] - 12:25, 17:7, 17:18, 19:11, 20:8, 23:1, 31:5, 36:10, 39:5, 43:20, 44:4, 44:11, 46:25, 229:2, 239:20
**invent** [1] - 34:24
**invented** [6] - 25:13, 53:2, 257:22, 258:1, 259:19, 260:1
**invention** [18] - 7:20, 9:10, 32:6, 32:24, 33:6, 36:4, 38:18, 38:25, 40:18, 41:15, 44:8, 255:18, 259:8, 260:23, 264:1, 272:18, 275:4, 275:12
**inventions** [2] - 26:1, 33:17
**inventive** [1] - 264:15
**inventor** [9] - 9:18, 10:2, 10:15, 11:19, 12:22, 31:16, 42:2, 231:21, 232:11
**Inventors** [2] - 31:11, 232:12
**inventors** [9] - 9:12, 11:24, 38:17, 38:25, 41:14, 42:5, 42:10, 193:13, 260:17
**inverse** [1] - 25:11
**investors** [1] - 20:10
**invited** [1] - 231:23

**involve** [3] - 66:15, 139:25, 141:2
**involved** [17] - 51:8, 131:22, 139:21, 139:23, 140:2, 140:5, 141:4, 142:7, 143:1, 145:7, 166:16, 166:18, 166:25, 168:7, 168:16, 174:21, 186:12
**involvement** [1] - 185:9
**involves** [5] - 24:24, 140:11, 140:16, 168:4, 170:4
**involving** [1] - 152:1
**ironically** [1] - 20:14
**irregularities** [1] - 102:1
**irrelevant** [1] - 101:10
**issuance** [1] - 180:6
**issue** [29] - 10:24, 11:2, 16:4, 20:4, 26:2, 26:20, 30:22, 33:9, 37:23, 45:5, 45:6, 46:24, 47:2, 54:10, 55:19, 66:19, 137:11, 137:23, 149:20, 149:25, 204:2, 220:5, 233:23, 235:6, 273:4, 274:1, 274:9, 277:17, 278:14
**issued** [3] - 37:22, 37:25, 66:9
**issues** [9] - 10:20, 12:5, 19:10, 33:11, 39:5, 43:20, 44:3, 59:12, 277:16
**issuing** [2] - 41:1
**itself** [7] - 27:14, 41:11, 65:6, 102:1, 132:15, 180:18, 264:1

## J

**Jacob** [1] - 175:7
**JAMES** [1] - 2:14
**James** [1] - 3:20
**JANINE** [1] - 2:16
**Janine** [3] - 3:21, 10:18, 37:9
**January** [5] - 147:4, 154:25, 155:5, 155:9, 155:10
**Javier** [1] - 229:17
**Jennifer** [2] - 3:11, 24:18

**JENNIFER** [1] - 2:4
**Jersey** [4] - 229:19, 231:4, 232:12, 232:15
**JMOL** [1] - 137:10
**job** [3] - 173:20, 174:1, 174:12
**jobs** [1] - 185:5
**John** [1] - 4:17
**Johnna** [1] - 24:20
**joined** [3] - 3:10, 185:2, 230:6
**joint** [1] - 4:22
**journal** [2] - 175:15, 175:17
**journals** [2] - 231:16, 231:18
**JTX-0009** [4] - 56:1, 56:4, 65:9, 115:17
**JTX-0057** [3] - 106:16, 107:23, 108:1
**JTX-006** [1] - 124:21
**JTX-0060** [4] - 108:18, 109:4, 109:7, 109:10
**JTX-0061** [1] - 88:23
**JTX-0062** [4] - 83:9, 83:12, 83:15, 116:16
**JTX-0063** [4] - 104:3, 104:8, 104:11, 106:8
**JTX-0103-AURO** [3] - 58:19, 59:3, 59:5
**JTX-0105** [1] - 63:2
**JTX-0105-AURO** [5] - 59:24, 60:9, 60:11, 61:8, 113:2
**JTX-0105-AURO-0010** [1] - 112:16
**JTX-0106** [5] - 67:24, 68:2, 80:15, 105:17, 106:8
**JTX-0106-AURO** [5] - 67:12, 68:5, 69:5, 69:16, 105:7
**JTX-0108** [1] - 80:17
**JTX-0108-AURO** [2] - 81:6, 81:9
**JTX-0109-AURO** [3] - 79:9, 79:16, 79:19
**JTX-0125** [6] - 70:6, 71:14, 73:6, 74:19, 74:25, 132:1
**JTX-0125-AURO** [3] - 68:10, 68:18, 68:21
**JTX-0134** [1] - 78:9
**JTX-0134-AURO** [2] - 77:9, 78:4
**JTX-10134** [1] - 168:15
**JTX-125** [26] - 28:3, 71:6, 71:8, 154:9,

154:10, 155:8, 155:9, 155:13, 155:16, 156:2, 156:5, 157:7, 157:16, 158:13, 158:15, 158:18, 158:23, 159:2, 159:6, 159:9, 159:23, 163:1, 167:8, 167:12, 170:19, 171:6
**JTX-134** [4] - 29:6, 77:22, 79:3, 167:20
**JTX-134-AURO** [1] - 78:2
**JTX-61** [3] - 88:15, 88:20, 89:2
**JTX-9** [3] - 55:15, 235:12, 240:2
**JUDGE** [1] - 1:15
**judge** [1] - 234:8
**judgment** [5] - 17:21, 18:3, 134:17, 135:19, 137:14
**June** [1] - 143:3
**justifiable** [1] - 110:19
**justification** [1] - 110:4

## K

**Kannusamy** [18] - 8:6, 8:15, 23:10, 138:10, 138:25, 139:6, 139:11, 141:6, 148:19, 151:11, 154:10, 157:3, 159:22, 165:2, 167:6, 167:7, 167:19, 167:22
**Kannusamy's** [1] - 8:18
**keep** [2] - 115:16, 125:23
**keynotes** [1] - 232:3
**kilos** [1] - 249:21
**kind** [22] - 22:6, 40:2, 46:24, 140:9, 140:22, 141:23, 142:20, 144:25, 146:21, 175:9, 176:10, 203:18, 204:21, 206:5, 207:18, 208:23, 209:6, 218:21, 219:2, 219:25, 252:18, 259:19
**kinds** [1] - 245:4
**Kingdom** [1] - 173:12
**knowing** [1] - 7:25

**knowledge** [7] - 9:8, 9:14, 10:16, 55:3, 193:20, 194:8
**known** [32] - 9:16, 10:1, 10:2, 12:2, 12:7, 12:14, 12:15, 12:19, 12:21, 12:24, 13:11, 14:3, 14:17, 15:8, 15:15, 15:18, 16:6, 16:24, 17:5, 17:11, 17:12, 17:15, 17:16, 25:2, 40:8, 45:14, 241:11, 247:7, 247:13, 252:4, 252:5
**Kollidon** [1] - 267:8
**Kratz** [5] - 4:11, 4:13, 4:18, 45:2, 115:7
**KRATZ** [44] - 2:9, 2:10, 4:14, 5:24, 6:1, 19:9, 19:21, 22:23, 23:7, 23:15, 23:18, 24:6, 44:16, 44:18, 44:24, 45:1, 45:18, 46:9, 50:18, 53:11, 56:3, 59:4, 60:10, 61:24, 68:4, 68:20, 78:3, 79:18, 81:8, 83:14, 88:22, 104:10, 107:25, 109:6, 115:3, 125:1, 130:22, 130:25, 131:3, 134:14, 138:9, 138:25, 148:2, 148:5
**Kratz's** [1] - 133:1

## L

**lab** [3] - 124:17, 124:18, 218:9
**label** [4] - 33:10, 142:15, 144:17, 146:16
**labeled** [1] - 84:20
**labels** [1] - 269:12
**Laboratories** [1] - 2:17
**laboratory** [2] - 83:6, 216:7
**lack** [11] - 15:23, 30:24, 38:16, 44:7, 208:16, 239:24, 239:25, 269:13
**lacks** [1] - 220:7
**language** [16] - 5:14, 5:16, 7:7, 36:21, 41:8, 41:24, 42:19, 48:18, 65:20, 65:23, 96:1, 256:25,

257:12, 258:16, 273:8
**large** [9] - 83:23, 148:22, 232:15, 242:18, 246:23, 260:13, 268:16, 268:18, 268:21
**larger** [24] - 64:21, 65:13, 102:18, 113:19, 113:22, 114:1, 116:3, 116:8, 117:19, 117:21, 120:3, 120:6, 120:10, 120:12, 120:14, 127:17, 176:16, 189:16, 193:17, 241:5, 242:4, 243:18, 245:9, 253:7
**largest** [4] - 108:8, 231:8, 231:9, 248:9
**last** [17] - 66:10, 72:12, 74:4, 79:24, 81:4, 103:17, 164:10, 165:1, 165:3, 165:15, 166:7, 176:23, 220:2, 231:18, 232:17, 263:5, 263:13
**late** [4] - 11:9, 11:11, 139:6
**latest** [2] - 37:22, 204:17
**launch** [1] - 174:18
**law** [5] - 134:17, 134:24, 135:5, 135:20, 137:14
**lawsuit** [1] - 178:4
**layer** [4] - 126:2, 216:19, 216:23
**layering** [4] - 261:18, 262:7, 262:8, 264:19
**lead** [6] - 27:14, 108:24, 255:13, 257:24, 271:5, 274:18
**leader** [1] - 139:23
**leadership** [1] - 230:19
**Leading** [1] - 50:24
**leads** [3] - 34:2, 89:16
**leaf** [1] - 125:11
**leaf-looking** [1] - 125:11
**learn** [1] - 258:23
**least** [11] - 26:11, 54:20, 109:16, 162:18, 168:12, 179:20, 180:4,

224:15, 232:5, 237:19, 238:23
**lectures** [2] - 231:24, 232:2
**led** [4] - 37:21, 37:24, 38:21, 231:6
**left** [14] - 41:16, 42:20, 75:11, 85:12, 86:7, 92:20, 192:10, 200:9, 214:11, 244:23, 245:15, 246:18, 258:20, 259:5
**left-hand** [3] - 41:16, 245:15, 246:18
**legal** [3] - 54:2, 140:14, 140:20
**legend** [1] - 83:19
**length** [1] - 221:24
**lengths** [1] - 34:12
**less** [8] - 90:5, 167:4, 214:17, 261:21, 263:23, 263:24, 265:11, 266:12
**letter** [2] - 10:21
**level** [13] - 54:13, 69:7, 69:22, 107:13, 107:15, 135:12, 179:20, 237:18, 249:12, 255:16, 261:23, 267:23
**levelled** [1] - 107:20
**levels** [5] - 55:4, 70:18, 128:23, 270:11, 276:11
**library** [2] - 91:12, 102:9
**lie** [1] - 55:5
**lies** [1] - 52:4
**life** [1] - 25:5
**lifetime** [1] - 87:24
**light** [59] - 52:14, 52:17, 82:14, 82:25, 84:23, 85:6, 85:8, 85:9, 85:13, 85:15, 85:16, 85:18, 85:21, 85:23, 86:2, 86:23, 86:24, 87:6, 87:7, 87:9, 89:13, 89:19, 90:1, 90:2, 90:3, 90:4, 90:21, 91:1, 92:1, 96:8, 101:6, 101:9, 101:12, 101:13, 102:2, 102:3, 118:25, 120:23, 169:21, 170:1, 170:8, 170:13, 198:11, 210:7, 210:21, 210:24, 211:10,

213:20, 214:3, 217:16, 218:15, 219:15, 227:17, 227:18, 227:19, 227:22
**lighter** [15] - 90:21, 99:19, 99:23, 99:24, 100:4, 101:15, 101:21, 101:24, 211:1, 218:13, 219:4, 219:7
**lightness** [2] - 91:23, 100:10
**likely** [9] - 54:10, 101:16, 179:21, 196:24, 216:12, 237:19, 250:4, 250:8
**limine** [3] - 6:6, 20:15, 26:16
**limit** [2] - 66:3, 226:24
**limitation** [5] - 6:10, 6:18, 7:2, 26:18, 66:7, 112:9, 129:12, 135:2, 205:5, 205:17, 227:12
**limitations** [5] - 3:11, 58:7, 66:19
**limitations..** [1] - 66:16
**limited** [8] - 15:17, 16:13, 35:4, 138:1, 179:24, 194:22, 227:7, 238:1
**LIMITED** [1] - 1:6
**Limited** [4] - 2:11, 139:14, 139:20, 168:18
**limiting** [1] - 86:1, 226:23
**limits** [2] - 194:19, 261:20
**line** [25] - 13:14, 14:8, 35:12, 35:21, 36:2, 45:22, 48:19, 73:20, 74:4, 74:10, 76:6, 165:1, 168:20, 168:24, 225:6, 264:10, 264:12, 264:15, 264:16, 266:16, 266:20, 267:4, 268:5, 268:6
**lines** [8] - 65:14, 166:3, 193:10, 193:23, 194:11, 226:14, 227:3, 245:16
**linked** [1] - 25:5
**liquid** [5] - 190:6, 241:15, 241:18, 241:19

**list** [8] - 28:5, 196:14, 196:15, 196:17, 197:4, 197:8, 199:10, 261:15
**listed** [25] - 32:10, 59:17, 61:1, 62:17, 69:3, 112:12, 113:7, 151:16, 151:21, 155:21, 156:16, 158:19, 160:4, 196:17, 197:1, 197:6, 197:9, 197:12, 237:21, 248:9, 248:10, 248:12, 261:4, 265:7, 266:8
**listen** [1] - 33:3
**lists** [6] - 13:20, 27:24, 75:6, 75:11, 80:1, 262:2
**literal** [2] - 54:4, 220:9
**literally** [2] - 54:5, 69:3
**literature** [3] - 150:6, 237:2, 237:4
**litigation** [7] - 24:15, 29:14, 149:21, 150:1, 225:2, 227:21, 228:3
**Little's** [1] - 274:24
**live** [4] - 13:2, 19:3, 31:4, 229:18
**living** [1] - 139:11
**Livizos** [2] - 3:9, 24:19
**LIVIZOS** [3] - 2:3, 3:8, 3:16
**LLC** [1] - 50:24
**LLP** [4] - 2:3, 2:5, 2:9, 2:15
**located** [1] - 264:9
**location** [2] - 85:23, 94:10
**locations** [3] - 74:14, 91:2, 101:6
**logical** [1] - 91:14
**logo** [1] - 181:3
**look** [68] - 12:22, 13:11, 13:12, 13:13, 36:5, 44:11, 48:4, 57:12, 59:19, 63:7, 65:11, 65:22, 72:4, 72:19, 74:15, 79:25, 80:2, 84:22, 85:2, 87:7, 87:16, 90:25, 91:18, 92:20, 94:10, 94:15, 95:9, 95:10, 95:11, 96:11, 97:6, 100:17, 102:5, 102:9, 102:11, 102:13, 108:18, 116:16, 117:15,

122:25, 123:6, 123:19, 125:13, 127:9, 129:2, 151:9, 170:19, 183:15, 183:17, 196:1, 199:13, 209:23, 214:8, 218:11, 240:1, 246:5, 246:17, 247:9, 247:25, 249:14, 256:23, 259:5, 261:3, 261:25, 264:18, 266:20, 276:12
**looked** [35] - 38:10, 63:3, 65:7, 67:6, 80:3, 81:22, 82:9, 91:10, 94:3, 94:24, 95:18, 95:19, 98:22, 102:10, 106:7, 118:13, 118:16, 119:22, 122:19, 127:10, 130:7, 130:8, 130:9, 133:12, 136:7, 144:5, 146:4, 158:13, 179:3, 179:4, 205:8, 210:6, 217:14, 231:18, 267:22
**looking** [42] - 6:18, 10:10, 17:15, 17:16, 33:18, 35:8, 42:19, 69:7, 75:9, 78:12, 82:19, 82:23, 82:24, 84:9, 86:17, 87:10, 87:23, 89:2, 91:13, 99:24, 100:8, 103:8, 115:23, 117:25, 118:2, 124:20, 124:21, 124:23, 125:11, 141:19, 144:9, 146:20, 155:1, 161:15, 163:1, 199:9, 202:3, 205:17, 235:11, 260:24
**looks** [14] - 16:13, 92:23, 93:13, 93:14, 101:13, 113:13, 119:19, 121:2, 121:3, 188:10, 214:13, 215:7, 218:14, 244:24
**loose** [12] - 97:22, 188:2, 188:8, 188:12, 212:5, 212:8, 215:22, 215:25, 216:18, 224:9, 224:13, 244:9

**loosely** [6] - 96:20, 97:11, 97:17, 215:2, 216:18, 249:9
**looser** [1] - 225:18
**lost** [1] - 45:16
**loud** [1] - 170:25
**low** [7] - 192:4, 194:22, 201:7, 227:7, 251:5, 263:8, 263:14
**low-pressure** [1] - 201:7
**lower** [7] - 116:25, 219:5, 244:9, 244:10, 245:14, 251:2, 251:7
**Ltd** [1] - 2:18
**lubricants** [4] - 253:24, 253:25, 254:1, 254:3
**lubricate** [2] - 73:3, 166:9
**lubricated** [14] - 29:8, 29:9, 78:22, 80:7, 80:9, 81:19, 81:20, 153:21, 168:14, 168:20, 168:25, 169:5, 169:12, 169:18
**lubricating** [2] - 254:1, 254:6
**lubrication** [59] - 28:7, 28:16, 69:10, 69:11, 69:24, 69:25, 72:10, 72:21, 75:7, 75:10, 75:13, 76:16, 78:20, 78:21, 103:12, 103:13, 153:5, 153:8, 153:10, 153:13, 153:16, 158:24, 159:3, 159:5, 159:10, 159:12, 159:13, 159:25, 160:3, 160:18, 161:10, 163:18, 163:22, 163:25, 164:4, 164:7, 165:9, 165:14, 165:17, 165:19, 165:22, 166:4, 166:6, 201:4
**lubrication/ lubrication** [1] - 159:6
**lubrications** [1] - 28:16
**lucky** [1] - 230:25
**lumps** [1] - 188:10
**lunch** [3] - 138:23, 148:1, 148:15

**M**

**M-U-Z-Z-I-O** [1] - 229:17
**machine** [1] - 201:13
**machinery** [1] - 195:4
**magnesium** [11] - 72:23, 78:18, 78:19, 80:4, 81:18, 87:20, 129:18, 153:2, 198:8, 211:2, 214:20
**magnified** [1] - 82:24
**magnitude** [2] - 126:13, 126:19
**main** [11] - 32:9, 45:5, 157:19, 159:14, 161:18, 165:16, 181:21, 188:2, 189:22, 192:2, 232:8
**major** [2] - 185:8, 185:17
**majority** [2] - 245:21, 245:23
**management** [1] - 70:23
**manager** [1] - 173:21
**manufacturability** [1] - 191:1
**manufacture** [6] - 74:14, 141:1, 142:2, 200:4, 259:25, 265:24
**manufactured** [3] - 125:18, 164:18, 182:23
**manufacturer** [5] - 60:24, 185:10, 185:22, 209:7
**manufacturers** [3] - 176:15, 182:24, 185:8
**manufacturing** [71] - 7:8, 27:24, 28:14, 29:11, 29:24, 74:17, 75:3, 78:10, 79:25, 81:16, 140:13, 140:19, 141:12, 141:16, 141:17, 141:21, 141:23, 142:16, 142:17, 142:20, 144:18, 144:19, 144:20, 144:25, 145:2, 145:4, 146:18, 146:21, 153:25, 154:21, 154:24, 156:15, 156:25, 157:9, 163:8, 168:4, 169:23, 170:3, 170:9, 170:15,

171:3, 175:14, 179:4, 179:24, 185:14, 185:15, 191:2, 194:6, 195:18, 199:20, 202:22, 203:2, 203:11, 203:12, 209:17, 222:6, 230:10, 231:24, 232:13, 234:13, 234:20, 235:1, 238:1, 245:20, 275:4, 275:15, 275:20, 275:23, 275:25
**Manufacturing** [8] - 27:22, 67:16, 73:9, 73:13, 156:7, 158:4, 158:12, 158:16
**map** [10] - 28:4, 73:15, 73:23, 74:21, 75:25, 76:22, 156:11, 157:16, 157:19, 159:22
**Mar** [1] - 230:3
**marked** [7] - 61:13, 67:12, 68:10, 77:8, 104:2, 106:15, 151:6
**marketed** [1] - 37:13
**Markman** [1] - 57:9
**Marshals** [1] - 21:13
**masking** [1] - 33:8
**mass** [4] - 109:17, 182:2, 249:8, 249:15
**Massachusetts** [2] - 174:12, 230:5
**master** [24] - 77:15, 79:15, 80:20, 81:4, 127:2, 127:7, 127:11, 131:25, 142:12, 142:23, 144:2, 144:4, 144:6, 146:3, 146:24, 147:11, 147:12, 147:14, 147:16, 147:21, 167:22, 167:24, 168:6, 173:7
**master's** [2] - 179:21, 237:20
**match** [3] - 17:18, 105:22, 111:5
**Material** [7] - 151:22, 157:25, 158:19, 159:11, 159:23, 160:2, 163:3
**material** [85] - 27:24, 28:5, 28:8, 69:9, 69:24, 73:17, 74:7, 75:11, 78:18, 87:12, 87:13, 87:14, 91:22,

94:13, 96:20, 100:1, 100:3, 105:9, 106:3, 107:2, 107:5, 107:10, 108:9, 109:24, 110:2, 110:21, 123:16, 127:19, 128:24, 152:13, 152:18, 152:21, 153:4, 153:9, 153:12, 153:15, 153:21, 156:18, 156:23, 157:6, 157:12, 157:13, 160:4, 160:7, 161:9, 161:15, 164:12, 166:17, 188:24, 200:16, 201:20, 209:15, 210:10, 213:4, 218:25, 222:5, 222:8, 223:19, 237:22, 240:15, 242:10, 242:11, 242:14, 242:22, 243:18, 243:21, 243:25, 244:3, 244:15, 244:25, 246:24, 247:2, 247:4, 247:5, 248:13, 248:15, 249:24, 249:25, 250:4, 250:13, 250:14, 260:14, 265:17

**Materials** [5] - 158:1, 158:8, 159:11, 159:24, 160:3

**materials** [62] - 27:13, 28:5, 28:20, 54:23, 58:17, 63:1, 69:10, 69:12, 69:22, 72:14, 73:2, 75:12, 75:13, 75:14, 87:23, 97:14, 127:6, 156:25, 157:8, 158:24, 161:9, 165:4, 165:13, 166:9, 166:14, 166:22, 168:5, 168:9, 169:22, 170:2, 182:4, 182:7, 183:18, 188:19, 189:3, 191:8, 191:9, 191:10, 191:20, 197:1, 198:24, 200:25, 209:24, 216:16, 218:19, 219:2, 222:13, 222:21, 223:22, 240:16, 244:7, 244:10, 250:19,

250:21, 251:1, 251:5, 253:3, 253:19, 253:25, 254:10, 254:11

**matter** [14] - 36:12, 41:11, 110:22, 119:6, 121:10, 134:17, 134:24, 135:4, 135:20, 137:14, 175:24, 204:1, 236:3, 273:15

**matters** [2] - 121:11, 204:2

**MCC** [32] - 170:5, 184:24, 185:10, 185:22, 186:2, 186:6, 186:12, 186:15, 186:20, 186:24, 187:2, 187:3, 187:5, 187:8, 187:9, 197:12, 197:23, 198:14, 198:19, 198:21, 198:23, 206:21, 208:19, 208:23, 208:25, 209:6, 209:10, 209:12, 209:22, 209:25, 220:10, 228:11

**MDV** [1] - 63:8

**me..** [1] - 130:23

**mean** [39] - 16:3, 21:23, 21:24, 22:6, 22:23, 43:7, 47:11, 48:23, 64:17, 74:2, 75:21, 75:22, 78:23, 119:25, 122:23, 128:1, 143:12, 144:13, 146:13, 157:12, 183:7, 184:6, 184:17, 185:24, 187:16, 187:19, 187:24, 188:17, 190:11, 197:7, 200:19, 204:23, 210:5, 230:16, 251:9, 265:12, 265:15, 265:16, 265:17

**meaning** [11] - 34:20, 46:17, 64:3, 64:18, 103:3, 121:25, 123:23, 124:5, 205:8, 205:9, 257:18

**means** [23] - 7:2, 40:3, 46:17, 46:19, 54:5, 78:24, 86:4, 86:22, 96:6, 135:18, 156:24, 157:7, 197:9, 200:20,

225:14, 249:10, 257:15, 258:11, 263:24, 265:14, 265:19, 275:18, 275:21

**meant** [8] - 58:2, 65:6, 97:15, 97:17, 113:11, 122:2, 122:11, 256:24

**measure** [6] - 106:2, 127:16, 218:21, 249:12, 252:6, 270:11

**measured** [4] - 118:8, 119:13, 249:17, 262:15

**measuring** [1] - 252:1

**mechanical** [5] - 121:8, 188:5, 194:3, 226:19, 268:17

**medical** [1] - 238:10

**meet** [7] - 31:1, 45:23, 49:2, 111:7, 115:9, 115:10, 277:11

**meeting** [1] - 45:24

**meets** [9] - 27:16, 42:24, 54:6, 54:10, 58:7, 63:12, 63:24, 103:15, 137:6

**megapascals** [2] - 198:18

**melt** [4] - 263:6, 263:16, 263:18, 270:7

**melting** [1] - 263:14

**melts** [1] - 263:8

**member** [3] - 23:22, 44:21, 232:18

**members** [2] - 20:10, 140:7

**memorandum** [2] - 26:15, 64:6

**mention** [7] - 30:4, 78:21, 95:8, 135:25, 203:24, 203:25, 261:25

**mentioned** [24] - 39:9, 79:1, 81:20, 84:8, 89:24, 109:22, 129:25, 132:11, 142:23, 164:16, 185:7, 191:23, 192:24, 210:25, 216:5, 242:15, 243:14, 249:19, 251:9, 261:2, 261:22, 269:10, 269:11, 275:13

**mentions** [3] - 166:13, 251:23, 252:16

**mere** [1] - 29:15

**mesh** [2] - 118:12, 119:6

**meshes** [2] - 116:19, 117:11

**met** [13] - 6:21, 7:2, 30:13, 58:15, 63:15, 106:12, 111:16, 113:16, 115:7, 134:18, 137:18, 168:17, 220:20

**method** [12] - 103:20, 106:19, 108:11, 159:18, 171:3, 251:23, 252:1, 252:4, 252:6, 262:18, 269:23

**methods** [8] - 51:3, 52:3, 175:13, 191:17, 191:18, 192:2, 192:3, 269:22

**methyl** [1] - 35:16

**metric** [1] - 198:18

**MFC** [3] - 143:9, 144:10, 146:10

**mg** [41] - 13:15, 13:20, 14:9, 31:15, 33:11, 33:13, 40:13, 45:8, 46:1, 46:15, 73:25, 123:21, 136:3, 136:15, 141:13, 141:22, 142:13, 144:3, 146:2, 155:20, 155:22, 171:4, 177:25, 178:25, 183:2, 196:15, 196:16, 202:5, 203:13, 204:4, 205:5, 205:10, 205:20, 206:4, 206:13, 207:22, 213:10, 246:18, 259:9, 259:18, 259:25

**mgs** [39] - 25:17, 25:18, 25:20, 25:21, 25:24, 39:11, 39:13, 39:23, 40:5, 58:4, 58:12, 59:20, 60:25, 61:2, 61:3, 61:5, 61:6, 62:9, 62:10, 62:13, 63:18, 64:2, 64:17, 64:22, 67:1, 74:2, 98:2, 102:20, 134:22, 134:23, 135:3, 156:13, 171:5, 183:3, 207:9, 213:22, 215:17, 217:25, 220:8

**Miami** [1] - 51:13

**MICHAEL** [1] - 2:17

**Michael** [3] - 4:5, 4:15, 11:1

**Michele** [3] - 1:25, 24:19, 279:8

**Michelle** [1] - 3:9

**MICHELLE** [1] - 2:3

**micro-2** [1] - 84:20

**microcrystalline** [56] - 35:11, 87:18, 90:15, 90:24, 91:8, 91:11, 91:13, 91:17, 91:20, 91:22, 91:25, 92:11, 92:14, 92:18, 93:8, 94:25, 95:3, 96:24, 97:2, 100:2, 100:18, 100:21, 101:1, 101:9, 101:19, 101:23, 102:1, 102:3, 102:15, 125:10, 125:12, 125:15, 125:17, 125:20, 132:16, 152:2, 152:10, 152:11, 152:15, 152:23, 184:17, 184:19, 184:23, 185:1, 185:8, 185:16, 185:18, 197:18, 198:7, 200:14, 200:17, 207:3, 209:17, 210:6, 214:21, 226:10

**microscope** [10] - 48:6, 84:11, 85:13, 86:11, 96:12, 96:18, 97:8, 119:23, 209:19, 228:1

**microscopic** [1] - 48:5

**microscopist** [4] - 87:11, 87:22, 89:5, 92:9

**microscopy** [44] - 51:15, 52:4, 52:6, 52:12, 52:13, 52:14, 52:17, 52:20, 82:14, 82:15, 82:16, 82:18, 82:23, 84:8, 85:6, 85:8, 85:9, 85:18, 96:8, 101:11, 120:23, 121:2, 121:3, 169:22, 170:2, 170:8, 170:11, 170:14, 198:11, 208:9, 209:21, 210:8, 210:15, 211:10, 211:11, 212:13, 219:21, 227:17,

227:19, 227:20, 227:22
**microspectroscopy** [4] - 51:15, 52:5, 52:6, 52:9
**mid-2018** [1] - 37:16
**mid-2030** [1] - 37:17
**middle** [6] - 75:9, 85:20, 100:22, 143:9, 144:9, 146:10
**might** [15] - 8:2, 10:2, 100:12, 128:21, 132:9, 132:18, 162:12, 167:4, 190:24, 242:6, 242:7, 242:8, 247:21
**MIL** [5] - 5:5, 5:21, 8:10, 8:16
**milled** [1] - 266:24
**milliliters** [1] - 249:16
**millimeters** [1] - 83:24
**million** [1] - 231:11
**mind** [6] - 11:24, 39:20, 54:16, 56:24, 97:1, 269:19
**mine** [3] - 23:1, 99:12, 105:5
**mineral** [8] - 96:14, 96:15, 97:10, 97:22, 215:12, 215:14, 216:15, 216:20
**minimum** [1] - 109:20
**minor** [6] - 79:5, 79:6, 144:6, 144:15, 146:5, 146:14
**minute** [11] - 126:1, 126:3, 126:6, 126:9, 126:10, 130:23, 165:25, 166:3, 208:7
**minutes** [18] - 20:7, 28:21, 72:14, 73:3, 148:14, 164:1, 164:12, 165:8, 165:9, 165:11, 166:6, 166:9, 170:22, 205:22, 220:13
**misinterpreting** [1] - 34:7
**mispronounced** [1] - 162:12
**misrepresenting** [1] - 16:9
**missing** [3] - 47:6, 48:19, 118:22
**MIT** [1] - 31:8
**mitigate** [1] - 269:1
**mix** [5] - 183:10, 201:1, 201:20, 249:24, 263:8

**mixed** [2] - 76:14, 183:21
**mixes** [1] - 263:13
**mixing** [13] - 69:23, 81:17, 124:10, 131:18, 132:9, 166:16, 166:24, 183:9, 190:6, 197:18, 197:19, 201:3, 232:7
**mixture** [7] - 241:15, 241:16, 253:4, 263:15, 268:14, 268:17, 275:21
**mixtures** [2] - 242:18, 242:21
**mL** [13] - 103:19, 104:21, 104:24, 108:4, 109:15, 109:18, 109:21, 109:23, 110:11, 110:17, 110:20, 253:12, 253:14
**mock** [1] - 185:18
**modifications** [1] - 32:25
**modified** [1] - 184:22
**modify** [2] - 32:23, 33:16
**moisture** [1] - 254:14
**molecule** [1] - 176:13
**molecules** [6] - 172:7, 172:10, 172:12, 172:15, 172:17
**moment** [5] - 94:3, 125:6, 132:6, 189:24, 218:11
**moments** [1] - 75:4
**monitors** [3] - 89:12, 89:22, 91:4
**months** [5] - 173:16, 173:18, 174:11, 174:12, 220:20
**morbidity** [1] - 25:6
**moreover** [3] - 40:21, 136:4, 136:23
**Moreton** [46] - 5:6, 5:13, 5:19, 8:8, 30:1, 48:8, 55:7, 55:9, 99:4, 99:7, 99:19, 100:3, 101:8, 171:13, 171:22, 171:25, 173:3, 177:7, 177:14, 177:18, 177:23, 183:13, 184:16, 187:15, 189:13, 192:24, 193:12, 193:25, 194:14, 198:14, 199:9,

199:18, 202:18, 203:10, 204:13, 213:1, 217:9, 220:4, 220:18, 220:24, 224:8, 225:5, 226:5, 227:16, 228:18, 240:14
**MORETON** [1] - 171:16
**Moreton's** [4] - 5:11, 7:19, 55:13, 99:13
**Morgan** [1] - 24:18
**morning** [40] - 3:1, 3:2, 3:8, 3:14, 3:15, 3:19, 3:22, 3:23, 3:25, 4:1, 4:3, 4:4, 4:6, 4:9, 4:10, 4:14, 4:16, 5:2, 5:24, 5:25, 7:14, 8:17, 20:2, 24:12, 37:7, 37:8, 45:1, 49:21, 49:22, 62:12, 114:10, 115:4, 139:7, 216:5, 216:6, 217:16, 218:24, 229:5, 236:13, 277:18
**morphology** [1] - 209:18
**most** [16] - 41:9, 86:3, 91:14, 109:14, 131:21, 176:11, 186:25, 196:24, 205:18, 227:14, 241:13, 250:7, 250:22, 252:6, 252:22, 252:24
**mostly** [3] - 45:7, 51:9, 186:16
**motion** [5] - 6:6, 7:5, 20:15, 137:14, 138:7
**Motion** [1] - 6:7
**motions** [1] - 26:16
**motivated** [1] - 33:5
**motivation** [6] - 9:19, 9:20, 12:9, 12:25, 32:23, 33:19
**motivations** [1] - 9:8
**move** [33] - 50:16, 56:1, 59:2, 60:8, 61:22, 68:2, 68:18, 71:24, 73:18, 75:24, 78:1, 78:10, 79:16, 81:6, 81:15, 83:12, 83:18, 88:20, 93:19, 104:8, 109:4, 134:17, 135:6, 148:2, 205:3, 228:25, 229:1, 233:10, 248:16, 252:9, 268:4,

273:19, 276:20
**moved** [1] - 174:9
**moving** [5] - 107:11, 135:19, 148:6, 165:18, 262:8
**MR** [308] - 3:14, 3:19, 3:24, 3:25, 4:2, 4:3, 4:5, 4:6, 4:8, 4:10, 4:14, 4:15, 4:16, 4:17, 4:20, 5:2, 5:24, 6:1, 8:2, 9:1, 9:5, 9:11, 10:9, 10:13, 13:9, 15:19, 16:2, 18:4, 18:7, 18:15, 19:9, 19:21, 20:22, 21:1, 21:8, 21:18, 21:22, 22:21, 22:23, 23:6, 23:7, 23:15, 23:18, 24:5, 24:6, 24:8, 24:10, 24:12, 30:21, 37:1, 44:16, 44:18, 44:24, 45:1, 45:18, 46:9, 49:8, 49:13, 49:20, 50:16, 50:18, 50:21, 52:15, 53:6, 53:11, 53:14, 56:1, 56:3, 56:6, 59:2, 59:4, 59:7, 60:8, 60:10, 60:14, 61:22, 61:24, 62:2, 68:2, 68:4, 68:8, 68:18, 68:20, 68:23, 76:20, 78:1, 78:3, 78:7, 79:16, 79:18, 79:22, 81:6, 81:8, 81:12, 83:1, 83:12, 83:14, 83:17, 88:20, 88:22, 88:25, 93:21, 93:23, 97:3, 97:20, 104:8, 104:10, 104:13, 107:23, 107:25, 108:3, 109:4, 109:6, 109:9, 113:1, 113:4, 113:5, 114:9, 114:18, 114:21, 115:3, 125:1, 130:22, 130:25, 131:3, 131:5, 131:15, 133:18, 133:21, 133:24, 134:3, 134:6, 134:11, 134:14, 135:22, 138:9, 138:17, 138:24, 138:25, 139:5, 144:22, 144:24, 145:21, 145:22, 147:6, 147:7, 148:2, 148:5, 148:12, 148:18, 151:8, 151:10,

154:7, 167:11, 167:13, 167:18, 170:17, 170:18, 171:9, 171:12, 171:19, 171:21, 172:19, 172:22, 173:1, 173:2, 177:1, 177:4, 177:13, 177:15, 177:16, 177:22, 178:18, 178:19, 179:13, 179:14, 180:12, 180:13, 181:8, 181:10, 181:13, 181:14, 182:10, 182:12, 182:17, 182:18, 183:11, 183:12, 184:1, 184:3, 184:5, 184:6, 184:10, 184:13, 184:15, 187:13, 187:14, 189:5, 189:11, 189:12, 190:9, 190:10, 191:21, 191:22, 192:7, 192:10, 192:12, 192:20, 192:21, 193:9, 193:11, 193:23, 193:24, 194:11, 194:13, 195:22, 195:23, 198:13, 199:4, 199:8, 199:15, 199:16, 202:16, 202:17, 203:6, 203:8, 204:11, 204:12, 205:15, 205:16, 209:5, 212:20, 212:21, 215:21, 217:6, 217:7, 220:2, 220:3, 220:10, 220:17, 225:7, 225:9, 226:13, 226:16, 227:2, 227:4, 228:14, 228:17, 228:21, 228:24, 229:14, 230:23, 231:14, 233:10, 233:13, 233:16, 233:19, 233:23, 234:3, 234:18, 234:23, 235:3, 236:1, 237:11, 237:13, 239:15, 239:18, 240:21, 240:22, 244:13, 244:18, 245:13, 246:1, 248:16, 248:18, 248:21, 249:1,

249:3, 251:11, 252:9, 252:11, 252:14, 252:21, 253:1, 254:23, 254:24, 255:25, 256:1, 264:6, 267:20, 272:8, 273:3, 273:19, 273:21, 273:25, 274:6, 274:8, 276:4, 276:18, 276:23, 277:2, 277:4, 277:15, 277:21, 278:7, 278:13, 278:17, 278:25
**MRNA** [1] - 172:17
**MS** [25] - 3:8, 3:16, 3:22, 9:4, 10:18, 11:7, 11:10, 11:12, 11:15, 11:18, 13:3, 13:5, 16:18, 16:20, 17:25, 18:9, 36:13, 36:15, 37:5, 37:7, 37:9, 229:1, 229:9, 277:23, 278:19
**MSN** [15] - 2:17, 2:18, 3:20, 10:19, 10:23, 18:21, 19:12, 22:25, 26:7, 26:20, 37:10, 38:4, 43:20, 234:18, 236:12
**MSN's** [1] - 20:8
**multidisciplinary** [1] - 55:2
**multiparticle** [14] - 65:13, 66:1, 84:13, 113:19, 113:23, 114:2, 116:3, 116:9, 117:20, 117:22, 120:18, 121:10, 193:17, 225:11
**multiple** [10] - 69:4, 84:21, 85:23, 92:10, 93:3, 94:18, 120:2, 120:15, 181:2, 181:4
**multiples** [1] - 120:10
**must** [5] - 32:21, 74:13, 101:11, 191:16, 258:6
**MUZZIO** [1] - 229:10
**Muzzio** [44] - 39:6, 43:21, 44:1, 229:3, 229:6, 229:9, 229:15, 229:17, 229:20, 230:15, 233:17, 234:4, 234:19, 234:24, 235:4, 235:24, 236:2, 236:3, 237:11, 237:14,

239:9, 239:15, 239:19, 240:23, 244:14, 245:14, 246:7, 248:22, 249:4, 254:16, 254:25, 256:2, 257:3, 267:21, 269:19, 270:6, 274:1, 274:9, 277:8, 278:15, 278:18, 278:20
**Muzzio's** [4] - 55:10, 276:20, 277:13, 277:24
**MUZZIO-DX-11** [1] - 252:21
**MUZZIO-DX-13** [1] - 254:23
**MUZZIO-DX-14** [1] - 255:25
**MUZZIO-DX-15** [1] - 259:1
**Muzzio-DX-23** [1] - 272:8
**MUZZIO-DX-24** [1] - 274:6
**MUZZIO-DX-26** [1] - 276:4
**MUZZIO-DX-3** [1] - 230:23
**Muzzio-DX-6** [1] - 254:16
**Muzzio-DX-8** [1] - 240:21
**MUZZIO-DX-9** [1] - 249:1
**MYER** [5] - 2:10, 4:10, 4:15, 4:17, 4:20
**Myer** [1] - 4:11

**N**

**naked** [5] - 82:23, 84:10, 84:22, 84:23, 123:2
**name** [8] - 49:25, 50:1, 139:9, 148:19, 162:13, 171:23, 209:8, 229:17
**named** [3] - 31:16, 231:21, 232:11
**names** [2] - 143:16, 145:13
**narrow** [2] - 18:17, 43:13
**narrowed** [1] - 19:13
**narrowing** [2] - 19:1, 19:7
**National** [4] - 31:10, 43:24, 231:1, 231:7

**naturally** [1] - 268:15
**nature** [4] - 23:20, 48:17, 101:16, 210:14
**near** [1] - 100:4
**necessarily** [2] - 122:23, 213:25
**necessary** [1] - 134:15
**necessity** [1] - 35:18
**need** [35] - 8:13, 15:20, 18:16, 20:16, 23:14, 33:12, 46:6, 73:17, 75:17, 80:17, 127:18, 137:23, 172:22, 190:2, 192:18, 198:16, 208:10, 208:12, 208:14, 232:25, 242:13, 242:21, 243:4, 247:20, 249:21, 249:22, 249:23, 250:16, 253:6, 253:12, 258:13, 263:19, 267:10, 277:13
**needed** [1] - 8:20
**needing** [1] - 18:13
**needs** [3] - 44:18, 249:23, 256:10
**never** [12] - 30:6, 94:24, 116:12, 220:24, 221:11, 221:14, 221:18, 227:21, 238:6, 258:18, 261:23, 262:2
**new** [4] - 37:20, 137:5, 175:12, 177:24
**New** [4] - 229:18, 231:4, 232:12, 232:14
**next** [42] - 23:13, 39:2, 45:19, 62:16, 63:16, 71:25, 74:18, 77:1, 93:19, 138:8, 157:15, 159:2, 165:18, 178:18, 179:13, 180:12, 181:13, 182:17, 183:11, 184:14, 187:13, 189:7, 190:9, 191:21, 192:20, 195:22, 199:15, 202:16, 203:6, 204:11, 205:15, 212:20, 215:21, 217:6, 228:23, 228:25, 229:3, 251:25, 259:21, 260:16,

265:1, 265:9
**nexus** [1] - 43:9
**nice** [6] - 73:15, 92:15, 96:10, 115:9, 115:10, 220:23
**NIL** [1] - 143:11
**nine** [2] - 18:14, 185:6
**noncompliance** [1] - 12:5
**nonconfidential** [1] - 231:17
**none** [3] - 121:4, 268:1, 276:15
**noninfringement** [5] - 23:5, 44:14, 45:2, 47:2, 228:22
**noninfringing** [1] - 49:5
**nonlimiting** [2] - 226:21, 226:24
**nonmoving** [1] - 137:17
**nonobvious** [1] - 26:3
**normal** [1] - 144:19
**normally** [2] - 229:3, 257:19
**north/south** [1] - 87:4
**note** [5] - 8:4, 8:12, 8:19, 31:21, 36:21
**NOTE** [1] - 2:24
**notebook** [16] - 83:7, 88:13, 88:18, 89:2, 95:21, 104:6, 106:8, 110:13, 115:11, 115:12, 116:16, 117:7, 124:17, 124:18, 125:8, 134:4
**notebooks** [2] - 83:10, 95:6
**noted** [7] - 16:11, 29:8, 32:13, 97:13, 110:13, 125:7, 155:13
**notes** [2] - 163:21, 279:6
**nothing** [10] - 22:25, 94:14, 120:22, 120:23, 197:20, 214:6, 219:10, 260:5, 273:11, 276:12
**notice** [2] - 31:24, 36:18
**noting** [1] - 36:2
**Nottingham** [1] - 173:11
**Novartis** [1] - 174:18
**novel** [2] - 257:22, 264:3
**nozzle** [1] - 260:18

**NSF** [1] - 231:9
**nuanced** [1] - 128:13
**Number** [2] - 84:20, 144:12
**number** [22] - 11:22, 29:7, 32:3, 40:10, 42:24, 143:9, 144:10, 146:10, 146:11, 150:20, 153:7, 164:19, 230:25, 231:21, 241:13, 242:7, 242:17, 243:16, 248:10, 261:4, 269:23, 273:5
**numbers** [1] - 144:11
**numerous** [3] - 29:12, 30:22, 34:16
**Nuplazid** [16] - 13:17, 24:25, 25:7, 25:14, 25:19, 25:21, 25:22, 33:10, 33:16, 33:19, 37:13, 37:16, 39:9, 155:21, 178:1, 178:8
**Nuplazid's** [2] - 56:19, 110:21

**O**

**o'clock** [1] - 138:22
**oath** [1] - 139:3
**object** [2] - 182:13, 184:10
**objected** [2] - 9:23, 12:13
**objecting** [1] - 11:5
**objection** [37] - 5:1, 5:5, 8:4, 8:5, 8:9, 8:12, 8:15, 8:19, 9:7, 15:12, 50:18, 53:11, 56:3, 59:4, 60:10, 61:24, 68:4, 68:20, 78:3, 79:18, 81:8, 83:14, 88:22, 104:10, 107:25, 109:6, 148:12, 167:13, 177:15, 181:10, 182:12, 233:12, 233:13, 234:23, 248:18, 252:11, 273:21
**objections** [8] - 3:6, 4:23, 8:24, 16:10, 18:11, 138:14, 277:12, 278:5
**objective** [3] - 159:15, 161:18, 165:16
**observed** [2] - 92:8, 94:21
**obtain** [1] - 249:16

**obtained** [6] - 38:8, 43:13, 43:15, 213:4, 230:5, 262:16
**obvious** [4] - 39:4, 43:2, 44:9, 239:23
**obviously** [6] - 19:14, 19:25, 21:1, 21:12, 40:7, 135:22
**obviousness** [8] - 12:10, 30:24, 31:13, 32:10, 32:16, 32:21, 43:6, 44:10
**occupation** [1] - 50:22
**occurrence** [1] - 156:16
**occurring** [2] - 69:18, 74:25
**occurs** [1] - 77:1
**OF** [1] - 1:2
**offer** [9] - 55:9, 177:16, 181:8, 182:10, 184:1, 189:5, 192:7, 199:4, 234:19
**offered** [3] - 9:12, 227:21, 238:13
**offering** [2] - 222:9, 222:12
**official** [1] - 181:3
**often** [6] - 39:15, 180:18, 184:20, 188:10, 201:3, 222:14
**OGTROP** [1] - 2:13
**Ogtrop** [1] - 3:20
**oil** [9] - 96:14, 96:15, 97:10, 97:22, 184:20, 215:12, 215:14, 216:16, 216:20
**older** [1] - 109:22
**once** [8] - 23:25, 36:7, 39:12, 94:25, 107:19, 137:11, 138:13, 157:5
**one** [125] - 6:23, 9:12, 10:22, 11:3, 11:13, 11:25, 12:1, 17:8, 26:11, 27:20, 28:21, 29:6, 34:9, 34:25, 35:6, 35:19, 36:17, 41:24, 42:11, 46:22, 48:1, 48:2, 48:12, 58:24, 60:5, 61:12, 63:19, 64:23, 67:1, 80:3, 80:14, 84:1, 86:1, 89:3, 89:18, 90:16, 91:10, 93:6, 93:12, 94:2, 98:3, 100:10, 100:13,

100:14, 100:15, 102:20, 107:12, 110:15, 115:20, 116:17, 117:12, 118:1, 118:3, 118:7, 118:9, 118:13, 118:15, 127:3, 136:22, 138:22, 143:18, 143:21, 144:5, 145:15, 145:18, 146:4, 147:24, 162:8, 168:10, 168:11, 168:16, 168:22, 168:23, 169:7, 169:8, 169:15, 169:19, 174:17, 180:15, 180:16, 180:22, 185:7, 185:16, 188:19, 194:16, 195:24, 200:21, 205:2, 209:10, 210:11, 215:3, 215:23, 219:17, 228:2, 231:8, 232:17, 232:25, 242:3, 242:17, 243:16, 243:19, 247:22, 249:11, 249:25, 252:16, 257:2, 257:9, 258:9, 258:19, 259:5, 260:12, 261:2, 262:6, 262:10, 262:18, 263:5, 263:13, 264:4, 266:5, 267:8, 269:22, 273:5
**ones** [8] - 6:2, 114:18, 120:3, 128:2, 130:2, 131:22, 252:25
**opacity** [1] - 91:1
**opaque** [8] - 91:25, 92:18, 101:9, 101:13, 101:24, 101:25, 210:7, 214:18
**open** [5] - 22:2, 30:17, 188:3, 188:9, 245:1
**opened** [2] - 36:23, 125:2
**opening** [19] - 20:1, 20:3, 20:6, 20:7, 20:8, 20:12, 20:19, 20:22, 21:9, 21:12, 22:25, 23:22, 36:18, 37:3, 38:20, 80:21, 137:5, 212:22, 257:14

**openings** - 22:14
**operate** [2] - 197:13, 197:15
**operated** [1] - 228:2
**operating** [1] - 228:1
**operation** [1] - 275:20
**operational** [1] - 51:6
**opine** [1] - 33:15
**opined** [1] - 275:2
**opinion** [56] - 5:8, 26:15, 58:6, 59:15, 63:5, 63:11, 63:23, 65:20, 65:23, 65:24, 77:5, 82:8, 83:3, 84:24, 95:23, 98:1, 103:14, 112:24, 114:4, 132:19, 179:2, 179:8, 179:15, 180:8, 186:19, 197:25, 201:25, 206:1, 206:10, 207:24, 208:15, 210:5, 210:15, 211:10, 211:19, 211:25, 212:14, 214:4, 214:25, 215:15, 219:24, 221:22, 228:4, 236:20, 236:24, 236:25, 237:5, 237:14, 244:23, 245:21, 245:23, 254:17, 255:3, 272:5, 276:2, 276:6
**opinions** [33] - 54:1, 54:3, 55:12, 55:24, 64:11, 64:14, 65:2, 67:25, 82:3, 112:6, 178:20, 192:25, 196:8, 202:24, 204:1, 208:3, 213:7, 217:22, 220:4, 221:23, 222:9, 227:22, 235:7, 238:12, 238:16, 238:21, 239:10, 239:13, 239:20, 254:21, 255:1, 271:24
**opponent** [1] - 137:20
**opposed** [6] - 10:16, 55:13, 117:22, 119:19, 198:1, 224:10
**opposite** [1] - 45:12
**optical** [3] - 52:6, 52:13, 85:12
**optimal** [2] - 165:9, 165:11

**optimization** [2] - 165:7, 165:16
**option** [1] - 266:13
**oral** [2] - 58:2, 59:18
**orally** [3] - 58:11, 62:13, 256:12
**Orange** [1] - 150:7
**orange** [1] - 189:16
**order** [15] - 9:18, 34:11, 57:9, 71:12, 79:6, 86:11, 88:9, 89:9, 121:13, 128:7, 133:10, 231:10, 236:21, 236:24, 266:25
**orderly** [1] - 6:6
**ordinary** [44] - 9:9, 10:17, 34:19, 46:16, 46:20, 54:13, 64:18, 103:2, 123:22, 131:17, 179:9, 180:4, 181:15, 205:8, 205:9, 225:21, 237:6, 237:15, 237:17, 238:14, 238:19, 238:24, 239:1, 239:6, 240:7, 240:8, 240:11, 240:19, 241:6, 241:11, 241:23, 242:1, 246:19, 247:12, 247:14, 248:5, 249:6, 252:19, 255:21, 256:3, 256:19, 256:21, 258:23, 270:7
**Organic** [1] - 43:25
**organization** [1] - 232:9
**organizations** [1] - 176:3
**orientation** [2] - 87:2, 87:4
**oriented** [1] - 87:2
**orifices** [1] - 242:24
**original** [2] - 39:9, 43:14
**originally** [1] - 6:7
**otherwise** [2] - 27:16, 66:15
**outcome** [1] - 260:9
**outer** [1] - 100:4
**outline** [1] - 90:22
**outlined** [1] - 91:2
**Output** [1] - 158:8
**output** [6] - 70:5, 72:15, 75:14, 159:1, 161:16, 202:1
**outputs** [1] - 76:6

**outset** [1] - 31:21
**outside** [11] - 10:3, 25:23, 30:19, 33:12, 33:18, 55:5, 136:1, 136:8, 228:3, 270:23
**outstanding** [2] - 175:7, 278:6
**oval** [1] - 189:17
**over-wetting** [1] - 269:4
**Overall** [1] - 58:23
**overall** [3] - 196:2, 196:6, 199:24
**overbreadth** [1] - 42:14
**overcome** [5] - 43:6, 44:10, 190:22, 190:25, 191:10
**overlap** [1] - 90:3
**overreached** [1] - 43:18
**overreaching** [1] - 7:12
**overview** [3] - 254:20, 256:3, 261:10
**own** [14] - 27:18, 38:5, 57:10, 67:10, 91:21, 99:8, 102:9, 105:1, 111:4, 111:13, 136:2, 136:24, 137:21, 221:2
**owner** [1] - 24:14
**oxide** [1] - 92:22

**P**

**P.A** [1] - 2:13
**p.m** [2] - 148:14, 279:4
**pack** [4] - 223:9, 245:8, 245:10, 254:2
**packaging** [7] - 142:15, 142:18, 144:17, 144:20, 146:16, 146:18, 203:3
**packed** [2] - 223:13, 249:9
**page** [73] - 12:1, 12:6, 12:12, 13:12, 14:5, 14:12, 14:20, 14:23, 17:9, 59:12, 59:14, 60:21, 62:4, 63:4, 69:6, 69:16, 69:17, 70:13, 70:15, 71:6, 71:14, 72:2, 73:6, 74:18, 74:19, 74:22, 74:25, 80:2, 81:16, 105:17, 106:9, 113:2, 113:4, 115:20, 115:21,

116:17, 124:23,
125:8, 141:21,
143:4, 143:15,
144:9, 145:11,
146:6, 146:20,
151:15, 151:22,
154:13, 155:14,
155:15, 156:5,
156:6, 157:7,
157:15, 157:17,
163:1, 170:19,
170:21, 180:21,
200:6, 200:9,
246:16, 247:9,
248:1, 251:18,
251:25
**pages** [16] - 88:18,
104:6, 118:8,
141:18, 141:19,
142:19, 142:20,
144:22, 145:1,
151:19, 200:3,
203:7, 203:9, 203:19
**pair** [1] - 86:4
**Pamela** [6] - 19:3,
22:4, 27:1, 49:14,
50:1, 53:7
**PAMELA** [1] - 49:16
**pan** [11] - 117:4,
117:15, 118:1,
118:11, 118:12,
119:2, 119:12,
130:7, 131:12,
136:7, 136:11
**panel** [4] - 196:11,
196:12, 200:9
**paper** [1] - 189:21
**papers** [3] - 176:2,
231:19, 233:8
**paragraph** [11] -
71:19, 72:12,
109:19, 155:18,
156:10, 163:21,
166:13, 170:25,
246:17, 246:19,
247:10
**paragraphs** [2] - 7:6,
7:18
**parallels** [1] - 79:2
**Parameters** [1] -
157:22
**parameters** [11] -
74:8, 156:19,
215:24, 247:4,
258:19, 264:3,
271:2, 271:3, 271:5,
276:13
**pardon** [1] - 192:11
**Parkinson's** [6] - 12:4,
16:25, 25:2, 39:13,

39:15, 40:8
**part** [58] - 12:9, 12:25,
15:25, 16:22, 19:14,
22:19, 28:23, 49:16,
54:1, 54:12, 55:2,
61:19, 70:11, 76:15,
77:11, 79:11, 81:2,
108:4, 121:7,
121:19, 124:5,
128:16, 128:21,
129:19, 130:13,
141:10, 150:5,
150:10, 153:19,
155:25, 160:14,
160:20, 160:25,
161:4, 161:6,
163:11, 163:13,
163:14, 164:22,
165:18, 167:10,
171:17, 180:21,
196:5, 199:19,
199:25, 200:14,
211:3, 214:10,
214:19, 214:21,
219:5, 219:7,
228:25, 229:2,
229:10, 241:16
**particle** [33] - 42:7,
92:23, 94:10,
100:25, 125:21,
129:25, 159:19,
187:17, 209:13,
210:8, 210:11,
213:18, 214:10,
215:14, 218:17,
224:16, 226:11,
226:12, 241:4,
241:5, 258:17,
261:21, 262:2,
262:13, 263:1,
265:10, 266:10,
266:22, 266:25,
269:11, 270:2,
270:12, 276:11
**Particle** [1] - 108:23
**particles** [82] - 65:12,
66:2, 84:14, 92:17,
93:18, 96:9, 96:17,
97:7, 97:15, 100:25,
102:15, 113:18,
113:22, 114:1,
116:3, 116:10,
117:23, 117:24,
120:9, 120:11,
120:25, 121:3,
136:12, 136:21,
187:15, 187:22,
187:25, 188:18,
188:20, 188:25,
190:14, 190:15,
193:16, 194:3,

194:17, 196:23,
197:3, 197:21,
209:19, 210:17,
210:22, 211:11,
212:7, 213:3,
213:14, 213:15,
214:2, 214:16,
214:22, 214:23,
215:11, 218:22,
219:9, 225:12,
225:15, 225:24,
226:18, 240:13,
240:25, 241:1,
241:3, 241:18,
241:20, 242:5,
244:12, 245:1,
245:5, 245:7, 251:4,
253:20, 253:22,
254:2, 254:9,
254:13, 262:9,
263:17, 265:4,
266:24, 267:16
**particular** [9] - 12:14,
52:2, 100:7, 238:4,
251:16, 257:20,
258:19, 262:3, 266:5
**particularly** [8] - 7:10,
20:21, 124:25,
243:20, 244:25,
251:4, 253:5, 272:15
**Particulate** [1] - 43:25
**parties** [3] - 4:25,
18:13, 267:15
**partner** [2] - 14:11,
25:24
**parts** [7] - 20:17,
198:25, 213:19,
213:20, 215:1, 215:7
**party** [5] - 11:24,
23:24, 39:21,
137:17, 137:20
**pass** [12] - 87:7,
87:10, 90:1, 96:16,
97:10, 107:2, 114:9,
137:8, 170:17,
200:24, 201:4,
220:10
**passage** [4] - 194:25,
259:15, 259:21,
260:10
**passages** [1] - 15:13
**passed** [3] - 115:5,
116:24, 130:9
**passes** [1] - 96:19
**passing** [5] - 86:2,
90:22, 91:1, 101:7,
128:23
**past** [8] - 19:6, 19:7,
24:1, 222:21, 225:1,
227:20, 254:3

**Patent** [1] - 26:1
**patent** [156] - 5:9, 6:9,
8:1, 17:5, 17:6,
17:17, 18:20, 24:14,
26:2, 26:3, 26:5,
26:7, 31:15, 31:21,
31:22, 31:23, 32:12,
32:14, 34:7, 34:11,
34:17, 35:8, 35:12,
35:25, 36:9, 37:20,
37:21, 37:23, 37:25,
38:9, 38:10, 38:13,
38:22, 38:23, 39:3,
39:14, 40:15, 40:18,
40:21, 40:23, 41:7,
41:11, 41:13, 41:14,
41:17, 41:25, 42:2,
42:25, 43:16, 44:6,
45:5, 45:18, 53:22,
54:5, 54:17, 55:19,
55:20, 55:21, 55:23,
56:8, 65:7, 65:8,
96:1, 98:25, 105:15,
106:4, 113:18,
115:17, 120:2,
120:7, 129:3, 137:4,
149:20, 149:25,
150:3, 150:5, 150:6,
150:8, 150:15,
150:18, 150:19,
150:21, 150:24,
150:25, 176:18,
176:22, 178:6,
178:14, 178:16,
178:22, 179:3,
179:11, 180:6,
191:25, 192:23,
192:25, 193:3,
193:19, 194:7,
194:25, 204:10,
206:2, 206:11,
223:25, 225:6,
226:14, 235:6,
235:11, 235:14,
235:16, 235:19,
235:22, 236:4,
236:9, 236:10,
236:11, 236:18,
236:23, 237:3,
237:7, 237:18,
239:11, 240:2,
241:12, 245:16,
251:22, 252:15,
255:5, 256:6,
256:22, 256:23,
259:2, 261:7, 264:9,
265:18, 266:16,
268:7, 270:9,
271:10, 271:11,
271:13, 271:18,
271:19, 271:21,

272:2, 272:21,
273:4, 273:5, 273:8,
273:9, 273:12, 275:7
**patent-in-suit** [2] -
17:6, 26:5
**patented** [1] - 25:25
**patents** [20] - 9:13,
26:1, 37:16, 37:22,
37:24, 38:7, 38:9,
38:22, 41:1, 41:5,
43:13, 43:14, 57:8,
231:20, 231:22,
271:23, 272:1,
272:5, 272:9, 272:10
**patents'** [1] - 30:23
**path** [1] - 85:12
**patient** [11] - 12:8,
39:11, 57:9, 58:12,
62:14, 172:15,
183:5, 243:13,
243:23, 256:13,
257:9
**patients** [8] - 12:3,
13:24, 16:24, 39:15,
39:18, 40:9, 182:23,
183:1
**PAUL** [1] - 2:5
**Paul** [3] - 3:12, 24:16,
24:20
**pause** [1] - 277:5
**PDF** [4] - 154:13,
155:15, 156:6,
170:20
**PDP** [3] - 25:2, 25:3,
25:8
**PDP-related** [1] - 25:8
**PEACHMAN** [1] - 2:6
**Peachman** [2] - 3:13,
24:17
**peak** [2] - 167:1, 167:3
**peer** [2] - 31:9, 231:15
**peer-reviewed** [2] -
31:9, 231:15
**pending** [1] - 231:22
**penetration** [1] -
210:9
**people** [6] - 131:20,
162:18, 230:18,
238:4, 238:7, 238:9
**per** [12] - 18:14, 39:12,
103:19, 104:21,
104:23, 126:8,
126:9, 126:10,
164:18, 182:6,
198:17, 270:5
**percent** [17] - 101:3,
109:16, 111:2,
117:11, 118:11,
118:14, 119:5,
119:9, 119:12,

119:13, 129:18, 129:19, 130:19, 216:11, 216:12, 222:7, 260:4
**percentage** [9] - 117:5, 118:17, 119:11, 119:18, 132:22, 132:24, 133:3, 134:20, 135:1
**perfectly** [1] - 23:15
**perform** [7] - 103:24, 195:5, 198:4, 198:10, 221:2, 221:5, 224:8
**Performance** [1] - 180:22
**performed** [15] - 99:7, 99:16, 137:22, 169:21, 170:1, 170:8, 170:13, 194:21, 221:9, 221:11, 222:2, 222:4, 227:6, 228:10, 276:7
**perhaps** [4] - 6:2, 22:24, 38:7, 127:5
**period** [3] - 23:2, 167:3, 202:7
**permanently** [3] - 241:1, 253:20, 263:18
**perpendicular** [1] - 87:3
**person** [43] - 9:9, 10:3, 10:17, 32:19, 46:19, 54:13, 131:17, 179:9, 180:4, 181:15, 193:7, 220:25, 225:20, 225:21, 237:6, 237:15, 237:17, 238:13, 238:19, 238:23, 239:1, 239:6, 240:7, 240:8, 240:10, 240:18, 241:6, 241:11, 241:22, 242:1, 246:19, 247:12, 247:14, 248:5, 249:5, 252:18, 255:21, 256:3, 256:5, 256:19, 256:21, 258:22, 270:6
**personally** [1] - 67:6
**perspective** [1] - 239:6
**pertain** [1] - 175:25
**PETER** [1] - 2:6
**Peter** [2] - 3:13, 24:18

**PETERMAN** [120] - 2:5, 5:2, 8:2, 9:1, 9:5, 9:11, 10:9, 10:13, 13:9, 15:19, 16:2, 18:4, 18:7, 18:15, 20:22, 21:1, 21:8, 21:18, 21:22, 22:21, 23:6, 24:5, 24:8, 24:10, 24:12, 30:21, 37:1, 49:8, 49:13, 49:20, 50:16, 50:21, 52:15, 53:6, 53:14, 56:1, 56:6, 59:2, 59:7, 60:8, 60:14, 61:22, 62:2, 62:8, 68:8, 68:18, 68:23, 76:20, 78:1, 78:7, 79:16, 79:22, 81:6, 81:12, 83:1, 83:12, 83:17, 88:20, 88:25, 93:21, 93:23, 97:3, 97:20, 104:8, 104:13, 107:23, 108:3, 109:4, 109:9, 113:1, 113:4, 113:5, 114:9, 114:18, 114:21, 131:5, 131:15, 133:18, 133:21, 133:24, 134:3, 134:6, 134:11, 135:22, 138:17, 138:24, 148:12, 148:18, 151:8, 151:10, 167:11, 167:18, 170:17, 177:15, 181:10, 182:12, 184:3, 184:6, 184:10, 220:17, 225:7, 225:9, 226:13, 226:16, 227:2, 227:4, 228:14, 228:24, 233:13, 233:23, 234:23, 248:18, 252:11, 273:21, 277:15, 277:21, 278:7, 278:13, 278:17, 278:25
**Peterman** [11] - 3:12, 5:3, 19:17, 20:18, 24:16, 36:18, 114:16, 115:12, 135:21, 148:20, 170:21
**Peterman's** [1] - 20:5
**PH101** [2] - 208:25, 209:4
**PH1112** [1] - 125:12
**PH112** [1] - 125:18

**PH113** [1] - 125:19
**PHARMA** [1] - 1:6
**Pharma** [11] - 2:11, 2:11, 27:8, 50:23, 50:25, 51:1, 51:5, 51:19, 139:14, 139:20, 168:18
**pharmaceutical** [87] - 11:21, 24:25, 26:9, 27:2, 27:3, 27:10, 33:14, 34:21, 39:21, 44:2, 52:22, 52:25, 53:7, 53:9, 54:22, 54:24, 56:18, 71:11, 71:20, 109:14, 148:22, 161:5, 172:6, 172:10, 172:11, 172:13, 173:7, 174:14, 174:22, 176:7, 176:16, 177:14, 177:19, 180:15, 180:16, 181:16, 182:20, 183:7, 183:8, 183:20, 184:17, 184:25, 186:3, 186:20, 186:23, 187:4, 187:16, 187:18, 187:20, 187:24, 188:17, 190:12, 190:20, 191:6, 193:6, 193:15, 195:8, 221:12, 224:14, 230:9, 230:10, 231:12, 231:24, 231:25, 232:10, 232:13, 234:5, 234:10, 234:13, 234:16, 234:20, 234:21, 234:22, 234:25, 235:1, 235:2, 236:6, 237:21, 249:17, 250:19, 250:21, 275:4, 275:15, 275:19, 275:23, 275:25
**Pharmaceutical** [12] - 68:14, 68:15, 70:9, 70:17, 127:12, 154:11, 155:13, 155:19, 160:21, 164:21, 175:2, 175:3
**pharmaceutically** [30] - 34:10, 34:14, 34:18, 57:24, 58:11, 59:9, 59:15, 62:12, 63:19, 64:23, 67:2, 98:3, 102:21,

111:18, 179:23, 237:24, 252:17, 255:3, 255:15, 255:20, 255:22, 256:11, 256:14, 256:24, 257:3, 257:6, 257:17, 272:23, 273:11, 274:21
**pharmaceuticals** [3] - 51:10, 51:21, 173:9
**Pharmaceuticals** [3] - 2:8, 2:18, 3:10
**PHARMACEUTICALS** [1] - 1:4
**pharmacies** [1] - 173:19
**pharmacist** [1] - 173:18
**Pharmacopea** [1] - 231:4
**Pharmacopeia** [5] - 175:6, 175:10, 180:20, 180:23, 251:15
**pharmacy** [3] - 173:6, 173:17, 184:25
**Pharmacy** [1] - 232:19
**PhD** [8] - 27:6, 31:8, 51:13, 173:9, 173:15, 230:4, 230:6, 237:20
**photograph** [1] - 71:16
**photographs** [1] - 219:14
**phrase** [3] - 46:19, 102:18, 205:9
**physical** [5] - 46:6, 211:20, 211:21, 212:1, 212:2
**physically** [1] - 84:3
**pick** [2] - 76:21, 127:24
**picking** [1] - 183:2
**picture** [3] - 84:20, 89:15, 208:24
**pictures** [11] - 30:12, 48:4, 48:21, 48:25, 89:12, 89:22, 118:3, 118:24, 133:25, 208:7
**piece** [2] - 249:22, 249:25
**pieces** [7] - 6:23, 64:1, 124:16, 127:17, 127:24, 127:25, 128:1
**pile** [3] - 97:9, 107:12, 107:17

**pill** [16] - 16:25, 33:6, 39:18, 116:13, 116:19, 117:6, 117:10, 117:21, 119:5, 119:18, 125:2, 128:16, 128:21, 129:7, 129:11, 130:13
**pills** [2] - 12:8, 116:8
**pimavanserin** [210] - 13:15, 13:20, 15:4, 25:11, 25:13, 25:16, 25:17, 25:18, 25:20, 25:25, 26:10, 27:14, 28:25, 31:19, 32:4, 33:20, 34:24, 35:4, 35:6, 35:9, 35:10, 35:13, 35:22, 37:12, 37:21, 38:1, 38:2, 38:5, 38:11, 38:18, 38:21, 39:10, 39:11, 39:22, 39:25, 40:1, 40:3, 40:4, 40:6, 40:11, 40:13, 40:16, 40:21, 40:22, 41:2, 41:10, 41:19, 41:25, 42:17, 42:23, 43:8, 44:3, 45:8, 46:1, 46:16, 46:23, 47:1, 47:6, 56:14, 56:15, 56:17, 56:20, 56:21, 56:22, 58:4, 58:12, 59:20, 59:21, 60:24, 61:2, 61:3, 61:4, 61:5, 61:6, 62:9, 62:10, 62:14, 63:17, 63:19, 64:2, 64:17, 64:19, 64:22, 67:1, 73:24, 74:2, 97:23, 98:2, 102:15, 102:19, 102:20, 102:24, 103:5, 116:7, 123:21, 123:24, 124:6, 124:9, 129:22, 131:12, 134:22, 134:23, 135:4, 136:1, 136:8, 136:10, 136:12, 136:15, 139:22, 139:24, 140:1, 140:3, 140:5, 140:10, 140:21, 140:23, 140:25, 141:1, 141:12, 141:15, 141:22, 142:12, 143:13, 144:2, 144:20, 146:1, 147:18, 147:22, 150:17, 151:13, 152:1,

**preponderance** [1] - 54:9
**prescribing** [1] - 61:17
**presence** [7] - 40:19, 99:21, 100:6, 137:19, 213:22, 215:16, 228:4
**present** [23] - 29:21, 31:3, 32:6, 32:7, 59:21, 60:20, 73:18, 74:13, 83:5, 88:3, 91:15, 95:24, 98:16, 101:1, 104:25, 107:4, 129:18, 138:3, 206:14, 231:23, 256:6, 259:24, 260:17
**presentations** [2] - 51:24, 232:2
**presented** [7] - 36:7, 62:11, 69:6, 176:2, 212:16, 223:19, 255:13
**presenting** [4] - 36:5, 44:11, 71:10, 105:19
**presents** [5] - 43:4, 73:23, 74:7, 156:11, 156:18
**president** [4] - 24:22, 50:23, 139:17, 174:13
**press** [2] - 20:10, 254:5
**pressure** [13] - 131:22, 182:5, 189:2, 190:5, 198:16, 201:6, 201:7, 201:21, 202:11, 207:2, 207:5, 207:6
**pressures** [1] - 253:23
**presumably** [1] - 257:2
**pretrial** [1] - 19:24
**pretty** [5] - 53:4, 90:12, 100:18, 212:9, 250:8
**prevent** [3] - 197:21, 242:8, 254:3
**preview** [2] - 22:24, 23:7
**previous** [6] - 45:13, 74:22, 132:6, 203:14, 262:10, 266:8
**previously** [2] - 233:17, 234:4
**prima** [1] - 43:6
**primarily** [2] - 115:14,

140:2
**primary** [12] - 55:5, 65:12, 66:1, 113:18, 113:21, 114:1, 116:2, 116:10, 117:22, 117:24, 193:16, 225:11
**principle** [1] - 265:16
**printed** [4] - 89:12, 89:22, 114:21, 114:24
**priority** [4] - 236:9, 236:10, 241:12, 246:2
**private** [2] - 14:15
**Private** [1] - 2:17
**privilege** [1] - 24:13
**privy** [1] - 10:5
**Priyanka** [1] - 140:8
**pro** [1] - 3:17
**problem** [10] - 40:8, 46:9, 201:12, 243:7, 255:11, 258:8, 263:3, 273:2, 273:5, 274:14
**problematic** [3] - 46:3, 242:5, 243:8
**problems** [1] - 190:22
**procedure** [3] - 80:2, 153:24, 153:25
**proceed** [6] - 24:10, 36:15, 37:5, 44:24, 49:8, 270:11
**proceeding** [2] - 279:3, 279:7
**Process** [10] - 27:22, 67:17, 73:9, 73:14, 156:7, 157:22, 158:4, 158:12, 158:16
**process** [215] - 5:7, 5:10, 5:11, 5:14, 5:16, 5:17, 6:9, 6:10, 6:12, 6:16, 6:18, 7:8, 7:21, 12:17, 20:14, 26:17, 26:18, 26:23, 28:1, 28:4, 29:3, 29:4, 29:10, 29:24, 36:19, 36:21, 45:12, 47:7, 47:14, 66:3, 66:6, 66:10, 66:14, 66:15, 66:19, 69:7, 69:21, 70:4, 70:16, 71:21, 71:24, 72:10, 72:21, 73:15, 73:23, 74:8, 74:12, 74:21, 75:3, 75:6, 75:24, 75:25, 76:7, 76:10, 76:12, 76:22, 76:23, 78:11, 79:1, 79:2,

79:3, 79:25, 80:6, 81:16, 82:5, 82:6, 95:9, 98:6, 98:9, 98:10, 116:2, 124:10, 131:18, 131:21, 135:8, 135:10, 137:24, 140:13, 140:19, 140:22, 140:24, 141:3, 141:11, 141:16, 141:21, 141:23, 141:25, 142:6, 142:17, 142:20, 142:22, 142:25, 144:20, 144:25, 145:2, 145:3, 145:6, 146:18, 146:21, 146:22, 147:1, 147:2, 147:14, 147:20, 152:4, 152:5, 152:7, 153:5, 153:8, 153:10, 153:13, 153:16, 154:1, 154:4, 154:21, 154:24, 155:11, 156:15, 156:16, 156:19, 157:1, 157:9, 157:16, 157:19, 158:13, 159:16, 159:20, 159:21, 159:22, 161:20, 161:21, 163:18, 164:8, 164:25, 165:19, 165:22, 166:16, 166:24, 168:4, 168:7, 168:8, 168:18, 169:1, 169:9, 169:14, 169:20, 169:23, 170:3, 170:4, 170:9, 170:15, 171:1, 175:8, 178:15, 179:1, 181:5, 187:9, 187:10, 187:12, 188:19, 188:23, 190:3, 190:4, 190:5, 190:13, 191:2, 191:14, 192:18, 193:16, 194:15, 194:16, 194:18, 194:20, 195:2, 195:13, 195:16, 197:10, 198:6, 198:22, 199:13, 201:6, 201:7, 201:16, 201:21, 202:8, 202:12, 202:22, 203:11, 203:12, 203:16,

203:17, 203:18, 203:20, 204:5, 207:7, 207:16, 209:17, 224:1, 225:23, 225:25, 231:12, 240:24, 242:24, 264:14, 266:13, 275:22, 275:23
**processes** [17] - 5:17, 5:20, 27:24, 28:17, 29:2, 34:15, 51:2, 163:8, 164:18, 179:24, 236:5, 238:1, 240:17, 241:10, 245:24, 251:3, 259:24
**processing** [7] - 180:18, 185:23, 186:9, 199:14, 200:4, 209:16, 230:10
**produce** [3] - 175:12, 190:16, 258:24
**produced** [2] - 40:24, 205:8
**Product** [2] - 14:9, 60:4
**product** [178] - 6:9, 6:10, 6:12, 6:15, 6:17, 6:24, 7:20, 13:22, 24:25, 26:17, 26:20, 27:14, 28:25, 29:20, 30:9, 31:20, 33:15, 37:12, 39:10, 45:24, 45:25, 47:8, 47:18, 49:3, 50:4, 53:19, 53:21, 54:5, 54:10, 56:19, 56:23, 56:24, 57:3, 57:17, 57:23, 58:6, 58:14, 59:9, 59:22, 60:16, 60:20, 61:18, 62:12, 62:23, 63:23, 66:6, 66:10, 66:14, 66:25, 68:25, 70:3, 71:12, 74:3, 74:9, 80:12, 81:24, 82:8, 87:15, 89:17, 95:24, 96:4, 98:1, 98:19, 102:6, 102:16, 103:4, 103:15, 103:25, 106:22, 106:25, 111:1, 111:7, 112:10, 114:5, 125:16, 131:9, 134:20, 135:1, 135:25, 136:24, 137:2, 137:6, 137:19, 138:4,

139:22, 140:1, 140:6, 140:10, 140:12, 140:17, 140:23, 141:2, 142:2, 143:13, 147:18, 147:22, 150:13, 150:17, 151:2, 151:12, 156:20, 159:15, 163:2, 163:9, 163:12, 164:15, 164:20, 164:24, 166:4, 166:6, 166:12, 166:18, 168:7, 168:17, 171:6, 171:8, 177:25, 178:1, 178:5, 178:9, 178:23, 178:24, 195:21, 195:25, 196:18, 196:22, 199:10, 199:11, 202:4, 202:6, 204:6, 204:7, 205:13, 205:24, 206:2, 206:3, 206:7, 206:11, 206:14, 206:15, 206:21, 207:4, 207:9, 207:25, 209:6, 209:11, 209:12, 210:1, 213:23, 220:5, 220:7, 220:25, 221:3, 221:6, 221:15, 222:11, 224:9, 224:24, 228:12, 231:12, 247:15, 249:21, 254:15, 256:9, 256:10, 257:10, 258:11, 258:19, 261:5, 270:11, 270:16, 274:21, 275:18
**product-by-process** [6] - 6:10, 6:12, 26:17, 66:6, 66:10, 66:14
**products** [27] - 22:8, 22:12, 26:7, 26:23, 27:15, 27:20, 29:4, 29:23, 30:2, 40:25, 77:6, 82:13, 99:10, 136:3, 148:25, 161:24, 169:24, 170:3, 172:14, 174:16, 215:3, 257:25, 259:15, 261:12, 263:25, 276:9, 276:10
**professional** [5] -

50:13, 173:14, 174:24, 176:2, 232:9
**professor** [6] - 43:22, 229:18, 230:12, 230:13, 230:14, 230:16
**professors** [1] - 230:17
**proffer** [1] - 177:13
**proffers** [1] - 53:7
**Profile** [1] - 14:9
**program** [2] - 174:8, 231:9
**programs** [1] - 176:17
**prohibited** [1] - 5:6
**projected** [1] - 114:18
**projects** [2] - 51:8, 228:6
**promoted** [3] - 174:3, 174:6, 230:11
**proof** [6] - 6:22, 31:1, 45:25, 49:2, 54:7, 129:16
**proper** [3] - 7:23, 75:17, 97:12
**properly** [2] - 183:21, 185:20
**properties** [8] - 40:20, 76:4, 157:13, 157:14, 161:23, 185:22, 187:8, 250:5
**property** [2] - 24:23, 121:23
**proportions** [1] - 242:18
**proposal** [1] - 39:24
**proposed** [8] - 26:7, 56:23, 74:3, 147:19, 166:18, 169:9, 169:14, 180:2
**prosecution** [1] - 31:23
**prototypes** [1] - 195:10
**prove** [3] - 6:14, 10:3, 36:9
**provide** [15] - 39:18, 44:1, 60:15, 80:14, 129:14, 173:3, 210:7, 210:16, 210:21, 253:4, 253:19, 254:1, 267:22, 269:4
**provided** [10] - 60:25, 102:12, 111:12, 112:17, 125:9, 155:24, 160:12, 162:23, 166:20, 261:6
**provides** [1] - 37:17,

110:25, 155:15, 226:21, 261:10
**providing** [2] - 243:11, 254:20
**proving** [1] - 45:23
**provisional** [3] - 37:20, 37:21, 37:25
**psychosis** [2] - 25:2, 39:14
**PTX-0052** [3] - 50:9, 50:16, 50:19
**PTX-1213** [4] - 61:14, 61:22, 61:25, 62:4
**public** [2] - 15:8, 20:10
**publication** [5] - 39:3, 42:16, 42:22, 177:11, 233:7
**publications** [5] - 31:9, 51:24, 175:15, 175:17, 175:23
**publicly** [1] - 15:15
**published** [11] - 51:22, 175:21, 175:22, 189:21, 231:15, 231:17, 246:8, 246:11, 251:14, 251:16, 251:17
**pull** [10] - 120:10, 151:8, 188:10, 230:23, 240:21, 244:18, 249:1, 252:21, 255:25, 259:1
**pulled** [1] - 124:16
**pulling** [1] - 97:1
**purpose** [5] - 15:9, 50:2, 71:7, 257:8, 266:14
**purposeful** [5] - 98:23, 121:17, 121:24, 122:7, 122:16
**purposefully** [4] - 47:18, 47:20, 99:1, 244:11
**purposely** [1] - 251:5
**purposes** [1] - 181:2
**pursue** [1] - 13:15
**pursuing** [1] - 18:23
**pushes** [1] - 262:20
**put** [34] - 3:5, 11:21, 17:23, 48:11, 86:11, 88:10, 90:18, 96:12, 96:13, 96:14, 97:8, 97:9, 107:16, 153:22, 162:19, 181:6, 192:18, 197:16, 201:11,

201:13, 215:11, 237:11, 238:18, 239:3, 242:13, 243:17, 243:20, 246:23, 247:1, 248:13, 250:14, 250:16, 253:11, 265:17
**puts** [1] - 48:6
**putting** [4] - 16:21, 85:25, 111:10, 172:14

## Q

**qualification** [1] - 179:16, 226:3
**qualifications** [4] - 54:15, 169:3, 179:9, 230:20
**qualified** [2] - 233:17, 234:4
**qualify** [1] - 129:22
**qualitative** [2] - 133:14, 267:23
**quality** [13] - 25:5, 70:21, 74:9, 156:20, 174:4, 185:13, 185:15, 185:19, 196:2, 199:24, 232:10
**Quality** [2] - 58:23, 158:7
**quantitative** [4] - 132:25, 133:9, 133:14, 267:23
**quantity** [2] - 40:19, 268:21
**question's** [1] - 128:13
**questions** [11] - 13:14, 13:18, 14:7, 14:13, 130:25, 131:6, 131:16, 133:2, 148:20, 171:9, 228:15
**quick** [1] - 43:19
**quickly** [1] - 254:15
**quite** [5] - 47:22, 100:20, 107:18, 259:3, 277:24
**quote** [3] - 12:15, 17:12, 33:8
**quote/unquote** [1] - 98:6
**quoted** [2] - 5:15, 5:16

## R

**R&D** [5] - 139:17,

140:11, 140:17, 174:8, 232:14
**R-A-M-A-N** [1] - 52:12
**radiation** [1] - 86:12
**Ragnar** [15] - 31:16, 31:17, 31:23, 32:1, 32:3, 32:14, 32:16, 33:10, 33:12, 33:16, 33:18, 39:2, 42:16, 42:21, 42:24
**Ragnar-Tolf** [12] - 31:17, 31:23, 32:1, 32:3, 33:10, 33:12, 33:16, 33:18, 39:2, 42:16, 42:21, 42:24
**raised** [2] - 8:9, 30:22
**Rakesh** [4] - 140:7, 162:11, 162:14, 162:21
**Raman** [2] - 52:6, 52:10
**ran** [2] - 104:18, 174:18
**random** [1] - 183:20
**range** [2] - 17:13, 109:15
**ranges** [3] - 125:21, 269:16, 276:13
**ranks** [1] - 230:11
**rather** [6] - 21:12, 39:18, 43:12, 64:1, 122:25, 241:4
**Raw** [3] - 151:22, 158:19, 163:3
**raw** [3] - 69:9, 69:12, 69:22
**reach** [3] - 33:5, 57:6, 179:8
**reached** [1] - 57:3
**reaching** [1] - 179:2
**read** [29] - 10:24, 11:1, 33:21, 33:25, 54:18, 55:11, 62:19, 66:12, 66:17, 73:20, 74:5, 107:20, 139:3, 150:18, 160:9, 170:24, 193:20, 194:7, 194:25, 221:22, 221:24, 221:25, 229:4, 255:4, 256:22, 257:5, 257:21, 258:3, 274:24
**readily** [2] - 34:13, 64:5
**reading** [10] - 14:25, 125:7, 166:15, 197:7, 256:5, 256:7, 256:10, 272:13, 274:22, 275:10

**readings** [1] - 32:17
**reads** [6] - 39:3, 143:11, 144:12, 146:10, 146:11, 274:12
**ready** [3] - 4:23, 138:14, 277:24
**real** [2] - 54:24, 125:10
**real-world** [1] - 54:24
**realize** [1] - 257:5
**really** [18] - 12:2, 12:7, 12:24, 46:10, 47:16, 48:12, 90:11, 96:23, 128:15, 138:4, 172:16, 210:7, 210:24, 241:2, 244:11, 258:8, 261:15, 274:23
**Rearguing** [1] - 6:8
**reason** [13] - 40:20, 132:11, 206:6, 242:4, 243:2, 243:19, 249:25, 250:1, 250:9, 253:9, 264:25, 275:16
**reasonable** [6] - 32:24, 33:22, 33:24, 133:6, 137:16, 246:24
**reasons** [18] - 13:21, 31:25, 32:13, 91:10, 93:12, 114:6, 135:19, 138:2, 138:6, 207:15, 208:2, 242:3, 243:16, 245:11, 249:19, 266:7, 276:11
**rebuttal** [6] - 7:19, 23:11, 134:16, 228:22, 274:24, 275:2
**received** [6] - 4:22, 113:10, 173:7, 173:10, 173:14, 232:4
**recent** [2] - 26:15, 160:10
**recently** [1] - 231:3
**receptor** [1] - 25:12
**recess** [2] - 148:15, 279:2
**recite** [1] - 41:18
**recited** [1] - 7:19
**recites** [3] - 248:22, 262:12, 273:16
**recognizable** [1] - 87:25
**recognize** [16] - 33:11, 50:11, 87:23, 113:9,

113:10, 141:6,
141:10, 142:9,
143:24, 145:23,
147:8, 177:7, 196:4,
199:17, 202:18,
217:8
**recognized** [4] -
222:5, 230:18,
232:6, 232:9
**recollect** [1] - 151:5
**recollection** [2] -
121:20, 121:21
**recombine** [2] - 212:9,
212:10
**recommended** [1] -
25:20
**record** [22] - 3:5, 8:12,
18:19, 45:17, 46:7,
49:11, 49:25, 54:19,
58:10, 66:13, 73:11,
73:21, 74:5, 83:6,
88:12, 108:23,
126:13, 139:10,
167:11, 169:10,
171:14, 171:24
**recorded** [1] - 8:14
**records** [1] - 127:9
**recovered** [1] - 127:17
**rectangles** [1] -
244:21
**rectangular** [1] - 85:19
**recurring** [1] - 6:1
**red** [4] - 88:9, 89:9,
217:18, 219:3
**REDIRECT** [1] - 131:4
**redirect** [3] - 131:6,
228:16, 228:17
**reduce** [1] - 216:10
**reduces** [1] - 264:1
**refer** [9] - 63:2, 70:6,
89:22, 93:1, 136:24,
178:8, 179:10,
253:17, 257:4
**reference** [29] - 25:15,
31:17, 31:18, 31:23,
32:1, 32:9, 32:10,
32:12, 65:19, 91:12,
91:21, 93:13, 93:16,
96:24, 97:2, 101:23,
102:12, 108:15,
109:14, 109:17,
109:21, 155:21,
164:17, 208:19,
209:22, 217:18,
246:13, 247:25
**referenced** [3] - 88:4,
98:12, 108:22
**references** [7] - 29:12,
32:11, 33:9, 33:13,
33:21, 34:1, 67:7

**referencing** [2] - 12:2,
104:6
**referred** [4] - 31:16,
36:19, 74:21, 157:16
**referring** [12] - 14:24,
17:22, 65:14, 67:8,
72:15, 80:8, 101:18,
101:21, 103:10,
152:6, 256:8, 257:10
**refers** [5] - 161:15,
165:3, 166:21,
193:15, 256:7
**reflect** [7] - 15:14,
29:2, 32:19, 41:2,
50:13, 151:12,
179:15
**reflected** [12] - 70:15,
71:19, 72:8, 72:22,
73:13, 82:25, 105:7,
113:6, 119:7,
124:17, 153:25,
154:21
**reflecting** [2] - 12:7,
85:17
**reflective** [3] - 84:23,
101:12
**reflects** [3] - 9:13,
31:18, 163:7
**refracted** [1] - 219:15
**refractive** [1] - 218:24
**reframe** [2] - 157:10,
169:25
**regard** [1] - 224:4
**regarding** [34] - 4:25,
13:10, 13:14, 14:8,
19:22, 31:19, 34:9,
44:13, 48:18, 50:4,
53:20, 57:3, 57:6,
60:16, 60:18, 66:10,
80:11, 103:11,
111:8, 111:14,
131:8, 211:20,
212:1, 221:15,
221:19, 222:1,
227:22, 230:21,
234:5, 235:7,
236:21, 239:10,
277:18, 278:14
**regardless** [1] - 98:18
**regions** [3] - 99:23,
99:25
**regular** [1] - 223:17
**regularly** [1] - 238:5
**regulation** [1] - 241:14
**regulations** [1] - 38:1
**regulatory** [1] - 174:5
**rehash** [1] - 35:2
**relate** [2] - 12:24,
275:3
**related** [6] - 25:8,

31:19, 33:20, 53:18,
54:23, 185:7
**relates** [6] - 12:18,
48:1, 48:2, 48:10,
53:21, 235:22
**relating** [1] - 54:3
**relationship** [1] -
185:11
**relative** [5] - 216:6,
216:10, 218:9,
222:7, 268:1
**relatively** [4] - 20:23,
179:19, 237:18,
242:21
**release** [1] - 35:10
**released** [2] - 133:18,
133:21
**relevance** [2] - 9:7,
81:14, 87:14
**relevant** [17] - 7:9, 9:8,
9:10, 9:23, 12:10,
12:11, 27:7, 54:21,
55:4, 121:19, 138:5,
179:23, 237:20,
237:25, 278:1,
278:21
**reliable** [2] - 259:8,
259:18
**relied** [4] - 57:8,
58:24, 98:25, 109:2
**relies** [2] - 27:21,
29:23
**rely** [6] - 33:19, 57:5,
61:19, 67:24, 68:16,
81:2
**relying** [3] - 63:5,
95:22, 98:5
**remained** [1] - 216:1
**remaining** [4] - 8:4,
8:24, 9:2, 278:9
**remains** [1] - 24:4,
278:6
**remember** [8] - 23:16,
126:23, 130:16,
132:5, 167:1,
209:14, 213:15,
220:22
**remind** [1] - 277:8
**remove** [1] - 242:25
**render** [1] - 269:19
**rendered** [1] - 228:4
**rendering** [5] - 39:4,
55:23, 64:11,
221:23, 261:4
**reopen** [3] - 21:21,
22:16, 23:25
**repeat** [4] - 140:15,
149:15, 150:14,
157:5
**repeatable** [1] -

194:21
**repeatedly** [3] - 28:25,
40:16, 136:24
**repeating** [1] - 41:13
**repel** [1] - 216:20
**rephrase** [1] - 198:20
**replicate** [2] - 110:14,
221:8
**reply** [6] - 134:12,
208:21, 212:22,
213:2, 216:4, 217:10
**Report** [8] - 68:15,
70:10, 70:17,
127:12, 155:14,
155:19, 160:21,
164:21
**report** [21] - 7:6, 7:19,
70:19, 71:10,
100:13, 101:8,
126:24, 127:4,
127:14, 163:2,
164:15, 164:18,
171:6, 171:8,
208:21, 213:3,
217:11, 223:20,
237:17, 274:24,
275:2
**reporter** [12] - 52:8,
52:11, 113:3,
114:11, 124:22,
209:1, 216:22,
235:25, 244:4,
245:22, 267:11,
277:3
**REPORTER** [2] -
209:3, 267:13
**REPORTER'S** [1] -
2:24
**reports** [7] - 99:13,
99:17, 140:14,
140:20, 208:5,
210:20, 212:22
**represent** [4] - 77:22,
115:8, 238:6, 244:21
**representation** [2] -
233:3, 233:6
**representations** [1] -
135:24
**representative** [6] -
23:23, 24:22, 44:22,
94:23, 95:15
**represented** [1] -
29:14
**representing** [2] -
16:5, 45:2
**represents** [3] - 26:3,
77:23, 244:23
**request** [1] - 229:6
**requested** [1] - 17:10
**require** [6] - 5:11,

38:1, 66:19, 99:1,
224:1, 224:6
**required** [13] - 33:1,
34:25, 49:2, 103:3,
110:5, 110:6,
130:17, 135:13,
187:3, 187:10,
194:18, 198:14,
212:6
**requirement** [3] -
26:13, 42:25, 98:24
**requirements** [3] -
34:16, 109:20, 205:1
**requires** [16] - 45:8,
45:25, 136:21,
187:5, 187:6, 190:5,
190:6, 190:7,
195:17, 204:3,
206:13, 224:2,
224:3, 224:7,
225:22, 275:17
**research** [14] - 27:9,
51:1, 51:9, 150:10,
173:16, 179:22,
228:6, 230:9,
230:24, 231:7,
231:15, 231:17,
232:4, 237:24
**Research** [1] - 43:25
**reserve** [2] - 17:20,
18:3
**reside** [1] - 139:10
**resift** [1] - 152:19
**resifted** [1] - 78:17
**resifting** [5] - 152:1,
201:19, 201:20,
201:21, 201:23
**resolved** [1] - 277:13
**respect** [40] - 4:24,
5:4, 5:8, 7:10, 8:5,
8:10, 8:13, 12:20,
14:19, 15:14, 16:10,
20:19, 22:14, 23:19,
26:19, 46:12, 55:6,
55:12, 57:17, 57:22,
63:5, 63:11, 64:14,
112:5, 112:9,
113:15, 136:15,
137:8, 137:15,
137:18, 137:23,
138:18, 138:20,
149:3, 155:3, 159:9,
163:7, 179:10,
222:3, 237:7
**respected** [1] - 27:8
**respectfully** [1] -
137:9
**respond** [2] - 211:6,
216:2
**responded** [1] -

218:23
**response** [7] - 31:4, 98:7, 99:21, 100:6, 101:10, 102:7, 178:3
**responsibilities** [3] - 51:4, 51:7, 174:7
**responsible** [4] - 174:4, 174:14, 185:14, 187:1
**rest** [5] - 22:24, 73:18, 74:16, 134:9, 224:16
**result** [20] - 12:18, 18:25, 26:23, 29:4, 29:24, 34:2, 47:7, 49:1, 70:3, 98:10, 101:16, 105:4, 133:15, 135:2, 161:20, 191:6, 191:8, 258:9, 268:22, 276:14
**resulted** [4] - 29:11, 261:11, 266:13, 267:16
**resulting** [4] - 259:8, 259:14, 265:9, 267:15
**Resulting** [1] - 17:12
**results** [22] - 27:25, 43:7, 43:10, 104:19, 105:3, 105:9, 105:11, 105:22, 107:4, 111:3, 170:9, 170:14, 218:10, 219:23, 222:17, 255:14, 258:2, 260:19, 269:3, 274:18
**resume** [2] - 233:2, 277:11
**retain** [1] - 34:19
**retained** [4] - 117:3, 118:15, 172:1, 172:8
**review** [21] - 64:10, 64:24, 70:16, 70:18, 149:20, 149:23, 149:25, 150:3, 150:8, 150:15, 150:19, 150:21, 150:25, 167:4, 235:6, 235:18, 236:18, 236:20, 237:2, 237:4, 271:23
**reviewed** [9] - 31:9, 99:13, 150:24, 162:1, 162:18, 162:19, 212:22, 231:15, 235:14
**reviewing** [1] - 167:8
**revised** [2] - 18:22, 146:14

**ribbon** [1] - 199:2
**ribbons** [1] - 182:7
**RICHARD** [2] - 2:15, 171:16
**Richard** [2] - 3:24, 171:25
**rid** [2] - 86:8, 86:12
**right-hand** [3] - 86:6, 117:2, 117:6
**rigid** [6] - 188:5, 188:14, 212:5, 225:17, 240:15, 263:18
**rigidly** [1] - 215:2
**rigorous** [1] - 121:12
**RLD** [1] - 155:21
**robust** [2] - 259:8, 259:17
**role** [4] - 53:16, 53:17, 225:2, 230:19
**Rolfe** [2] - 1:25, 279:8
**roller** [4] - 192:5, 194:23, 227:8
**room** [1] - 89:13
**round** [2] - 93:18, 189:15
**roundish** [1] - 93:18
**route** [1] - 59:18
**row** [5] - 28:6, 113:7, 143:9, 144:9, 146:10
**Royal** [1] - 175:3
**RPR** [2] - 1:25, 279:8
**Rule** [2] - 134:16, 138:7
**ruled** [1] - 46:15
**ruling** [7] - 7:18, 8:11, 8:21, 17:21, 66:9, 66:12, 229:7
**rulings** [1] - 36:22
**run** [4] - 104:17, 110:9, 243:18, 264:12
**running** [1] - 240:24
**runs** [1] - 264:15
**Rutgers** [4] - 43:23, 229:18, 230:6, 230:17

**S**

**safety** [1] - 215:23
**salt** [3] - 25:16, 56:21, 59:23
**sample** [36] - 85:16, 85:18, 85:19, 85:21, 86:2, 86:10, 86:13, 86:23, 86:24, 87:6, 87:9, 87:10, 91:21, 95:9, 96:4, 96:5, 96:12, 96:17, 97:8,

97:16, 97:21, 105:13, 109:17, 121:13, 125:15, 131:8, 133:12, 249:8, 249:9, 249:11, 249:13, 249:14, 249:15, 270:19, 272:18
**samples** [1] - 27:13
**Saravanan** [5] - 8:6, 8:15, 138:10, 138:25, 139:11
**Sarkar** [4] - 140:7, 162:11, 162:14, 162:21
**satisfied** [1] - 107:19
**satisfy** [1] - 34:5
**SAUL** [1] - 2:3
**Saul** [3] - 3:9, 3:11, 24:19
**saw** [20] - 15:1, 18:12, 63:1, 67:6, 94:25, 95:1, 95:18, 98:21, 116:12, 117:24, 119:23, 129:25, 130:2, 131:11, 131:12, 132:16, 133:5, 203:14
**scatter** [2] - 86:9, 86:12
**scattered** [1] - 97:7
**schematic** [5] - 183:14, 183:22, 189:14, 189:20, 244:19
**schematically** [1] - 244:24
**SCHIFF** [1] - 2:15
**Schiff** [1] - 37:9
**school** [2] - 173:4, 173:5
**Science** [5] - 31:12, 43:24, 50:24, 231:1, 231:8
**science** [5] - 27:2, 53:8, 54:23, 172:13, 173:7
**sciences** [4] - 54:22, 174:14, 237:21, 237:22
**scientific** [5] - 51:7, 51:8, 54:21, 108:16, 110:3
**scientifically** [2] - 51:7, 110:19
**scientist** [2] - 70:19, 123:9
**scientists** [1] - 168:16
**Scientists** [1] - 175:2
**scooted** [1] - 119:5

**scope** [10] - 19:13, 19:16, 46:12, 46:21, 46:25, 47:4, 64:18, 123:23, 270:23, 276:15
**scopic** [1] - 136:6
**scoping** [1] - 95:11
**Scott** [2] - 3:12, 24:17
**SCOTT** [1] - 2:6
**screen** [28] - 89:11, 89:21, 93:24, 100:19, 100:20, 141:5, 143:23, 177:5, 180:19, 183:13, 189:13, 192:23, 193:12, 193:25, 194:14, 196:3, 196:10, 197:5, 199:17, 200:24, 201:5, 202:9, 203:9, 212:25, 235:24, 236:2, 237:16, 259:3
**screened** [1] - 267:16
**screening** [1] - 262:20
**screw** [2] - 263:6, 270:7
**scroll** [1] - 145:12
**seal** [5] - 21:19, 21:25, 22:14, 22:19, 44:20
**SEALED** [1] - 1:11
**sealed** [4] - 24:2, 44:19, 44:23, 234:1
**sealing** [1] - 23:20
**search** [1] - 150:6
**seat** [1] - 114:19
**seated** [3] - 3:3, 114:15, 148:16
**second** [27] - 10:24, 19:6, 28:4, 31:4, 46:5, 61:12, 62:8, 67:18, 76:6, 86:19, 86:21, 86:25, 89:24, 94:5, 104:22, 105:10, 105:14, 110:15, 116:17, 157:25, 160:22, 162:9, 196:10, 196:12, 232:25, 262:6, 275:16
**secondary** [2] - 43:4, 44:9
**section** [39] - 22:2, 27:22, 28:19, 42:11, 44:6, 58:23, 60:2, 62:4, 62:6, 62:7, 65:11, 67:15, 68:13, 72:9, 72:19, 73:8, 73:9, 73:11, 73:14, 74:4, 78:10, 80:8,

81:15, 109:11, 109:13, 112:17, 122:19, 163:2, 163:6, 163:17, 164:10, 169:4, 171:1, 199:20, 199:23, 251:19, 259:12, 259:14, 261:14
**Section** [5] - 34:3, 38:14, 38:16, 43:3, 44:9
**sections** [4] - 28:15, 72:4, 72:8, 159:18
**see** [104] - 8:23, 9:22, 13:6, 14:8, 15:21, 16:22, 21:20, 28:6, 30:11, 41:17, 45:18, 48:18, 55:16, 59:18, 61:13, 63:21, 68:9, 69:3, 69:20, 70:17, 70:24, 71:10, 71:17, 75:2, 76:18, 77:9, 78:15, 83:4, 84:10, 84:12, 84:14, 85:3, 85:20, 86:9, 86:13, 88:11, 89:5, 89:19, 89:20, 89:21, 89:23, 90:1, 90:2, 90:4, 90:11, 91:1, 91:5, 91:7, 91:23, 92:2, 92:4, 92:13, 92:16, 92:17, 92:21, 94:9, 96:22, 97:6, 99:16, 100:10, 100:17, 100:20, 101:24, 103:9, 104:2, 106:15, 108:19, 112:18, 118:14, 124:17, 124:18, 124:20, 132:10, 136:8, 136:12, 138:19, 150:5, 157:23, 158:2, 158:5, 158:9, 159:23, 160:1, 163:19, 165:20, 177:6, 194:11, 197:5, 200:7, 209:24, 210:10, 210:12, 219:3, 219:25, 220:23, 222:22, 229:7, 251:19, 256:5, 258:24, 259:3, 263:22
**seeing** [10] - 83:22, 89:16, 90:20, 91:8, 92:24, 93:2, 101:4, 101:6, 105:16, 244:22

**seeking** [2] - 28:24, 177:25
**Seitz** [1] - 3:20
**SEITZ** [1] - 2:13
**selected** [1] - 140:24
**selection** [8] - 140:12, 140:13, 140:18, 140:19, 159:19, 171:1, 179:25, 238:2
**selective** [2] - 25:11, 32:17
**selectively** [2] - 33:20, 33:25
**seminars** [1] - 231:23
**senior** [3] - 11:20, 139:23, 174:6
**sense** [2] - 97:19, 257:13
**sensitive** [3] - 20:6, 20:8, 20:20
**sensitivities** [1] - 21:15
**sensitivity** [1] - 21:11
**sent** [1] - 10:21
**sentence** [16] - 60:22, 62:8, 72:12, 122:6, 122:12, 157:10, 164:10, 165:3, 165:12, 165:16, 166:7, 169:25, 170:24, 245:15, 246:22, 266:8
**separate** [10] - 10:25, 127:23, 153:1, 212:6, 212:8, 212:10, 216:16, 224:11, 224:15, 224:16
**separated** [2] - 113:12, 197:22
**separately** [1] - 69:24
**separates** [1] - 275:14
**separating** [1] - 254:10
**September** [1] - 145:9
**sequence** [2] - 20:5, 156:16
**series** [6] - 13:18, 14:7, 89:2, 151:15, 151:18, 154:14
**serotonin** [1] - 25:12
**served** [1] - 176:18
**service** [1] - 173:21
**set** [5] - 37:16, 43:13, 62:6, 176:16, 255:9
**sets** [1] - 28:4
**setting** [1] - 175:8
**seven** [1] - 119:3
**seventh** [2] - 128:17, 234:7

**several** [13] - 13:21, 26:14, 37:22, 54:23, 57:7, 175:4, 179:22, 202:8, 237:23, 242:3, 257:7, 257:23, 259:20
**severely** [1] - 25:4
**shading** [1] - 91:24
**shake** [1] - 126:13
**shaken** [5] - 126:2, 126:3, 126:6, 126:8, 224:14
**shaker** [7] - 126:22, 224:18, 224:19, 224:21, 224:23, 224:25, 225:3
**shakes** [1] - 126:8
**shaking** [3] - 125:24, 126:1, 128:11
**shape** [1] - 33:6
**shapes** [1] - 183:17
**share** [1] - 91:19
**shared** [4] - 14:10, 14:22, 15:3, 96:25
**shave** [1] - 195:14
**shear** [9] - 192:4, 194:22, 194:23, 227:7, 260:5, 260:12, 264:2
**shell** [16] - 25:25, 26:9, 26:13, 62:20, 62:21, 62:22, 63:13, 111:19, 112:11, 250:17, 256:15, 257:4, 257:7, 257:12
**shells** [1] - 248:6
**shield** [1] - 36:25
**shift** [3] - 192:22, 204:9, 206:18
**shining** [1] - 100:21
**short** [5] - 8:3, 13:6, 20:23, 22:2, 109:24
**short-circuit** [1] - 8:3
**shorter** [1] - 19:5
**show** [38] - 15:20, 17:1, 26:24, 30:11, 30:12, 30:25, 32:15, 32:22, 34:6, 34:18, 44:5, 45:22, 46:2, 47:22, 48:22, 80:17, 82:11, 84:22, 86:15, 86:20, 93:13, 93:14, 94:1, 100:9, 100:11, 110:21, 113:21, 113:25, 141:14, 142:14, 144:16, 146:15, 203:1, 203:21, 203:23, 217:25, 218:3, 218:5
**showed** [4] - 43:7,

134:7, 151:6, 229:25
**showing** [6] - 17:19, 56:7, 93:17, 183:14, 183:21, 203:17
**shown** [28] - 29:6, 35:21, 43:10, 84:19, 94:23, 99:24, 125:10, 141:20, 142:1, 144:25, 146:21, 154:4, 154:5, 159:23, 183:13, 183:16, 189:13, 193:12, 193:25, 194:14, 196:10, 200:3, 203:18, 212:25, 217:8, 219:14, 219:22, 237:16
**shows** [14] - 29:19, 29:20, 42:24, 83:11, 120:25, 121:1, 196:12, 203:2, 213:9, 244:15, 248:7, 248:8, 269:6
**side** [9] - 18:14, 41:17, 41:23, 42:20, 55:6, 86:6, 107:17, 214:12, 215:8
**sides** [1] - 24:3
**Sieve** [1] - 84:20
**sieve** [25] - 117:14, 117:25, 118:15, 119:3, 119:12, 120:13, 120:16, 126:22, 128:2, 128:3, 128:4, 128:5, 128:9, 128:11, 128:18, 128:23, 130:9, 200:24, 224:18, 224:19, 224:20, 224:23, 224:25, 225:3
**sieved** [2] - 127:22, 224:14
**sieves** [11] - 116:19, 116:24, 117:3, 118:4, 120:4, 125:22, 126:3, 127:17, 130:3, 130:11
**sieving** [2] - 124:24, 124:25
**sift** [3] - 132:12, 152:14, 153:1
**sifted** [7] - 78:18, 78:19, 107:5, 116:13, 152:22, 223:18, 223:22
**sifter** [3] - 200:20, 200:22, 200:23

**Sifting** [2] - 151:23, 158:19
**sifting** [42] - 29:7, 69:9, 69:10, 69:13, 69:22, 69:24, 72:11, 72:15, 75:6, 75:14, 76:7, 76:25, 78:13, 78:14, 79:6, 80:3, 80:4, 124:11, 124:15, 131:18, 152:1, 152:4, 152:9, 152:11, 152:13, 158:17, 158:22, 158:23, 159:1, 161:16, 165:17, 168:5, 168:8, 170:4, 200:13, 200:16, 200:19, 201:1, 201:2, 201:9, 201:11, 201:16
**signature** [5] - 70:20, 154:15, 162:4, 162:19, 168:16
**signatures** [1] - 70:24, 71:2, 143:17, 143:18, 143:21, 145:13, 145:15, 145:18, 154:14, 162:8, 162:23
**signed** [3] - 48:16, 48:17, 127:7
**significantly** [1] - 251:8
**silicon** [18] - 35:23, 87:19, 92:2, 92:4, 92:22, 93:11, 93:13, 93:17, 94:9, 94:13, 152:2, 152:15, 152:23, 170:6, 198:8, 200:18, 211:4
**similar** [8] - 29:3, 79:5, 79:7, 80:2, 81:4, 174:1, 223:16, 262:7
**simple** [7] - 34:13, 40:2, 43:13, 169:4, 169:11, 191:19, 225:19
**simplest** [1] - 252:6
**simply** [10] - 6:3, 12:19, 47:6, 47:9, 183:9, 187:17, 188:18, 203:20, 211:15, 225:23
**single** [17] - 25:22, 39:18, 86:16, 89:7, 89:19, 94:5, 94:24, 95:14, 97:13, 118:3, 120:16, 128:5, 128:11, 130:8,

130:9, 133:10
**sitting** [4] - 82:21, 123:3, 123:8, 123:14
**situation** [2] - 45:20, 123:6
**situations** [1] - 122:10
**six** [4] - 151:4, 173:16, 173:18, 174:12
**sixth** [1] - 119:2
**size** [57] - 25:25, 26:9, 26:13, 28:9, 33:7, 42:7, 62:21, 62:22, 62:24, 63:6, 63:9, 63:13, 75:18, 75:22, 83:24, 109:21, 110:4, 110:22, 111:19, 111:23, 112:11, 112:12, 112:24, 113:7, 113:8, 117:14, 125:21, 161:2, 161:8, 161:14, 209:13, 223:8, 226:11, 226:12, 246:24, 247:17, 247:22, 250:15, 256:16, 258:17, 259:25, 261:1, 261:21, 262:3, 262:13, 263:2, 263:19, 265:10, 265:18, 266:10, 266:22, 266:25, 269:11, 270:2, 270:12, 276:11
**sized** [1] - 182:2
**sizes** [7] - 94:19, 117:10, 120:2, 120:15, 120:17, 128:23, 248:6
**sizing** [1] - 190:6
**skill** [44] - 9:9, 10:4, 10:17, 32:20, 46:20, 54:13, 131:17, 179:9, 179:20, 180:4, 181:15, 193:7, 225:20, 225:21, 237:6, 237:15, 237:17, 237:18, 238:4, 238:14, 238:19, 238:24, 239:2, 239:6, 240:7, 240:8, 240:11, 240:19, 241:6, 241:11, 241:23, 242:1, 246:19, 247:12, 247:15, 248:5, 249:6, 252:19, 255:21, 256:3,

256:19, 256:21, 258:23, 270:7

**slide** [59] - 41:17, 41:23, 42:20, 46:6, 89:3, 96:13, 97:8, 177:6, 178:18, 179:13, 179:15, 180:12, 181:13, 182:17, 183:11, 184:14, 187:13, 189:7, 190:9, 191:21, 192:20, 195:22, 199:15, 202:16, 203:6, 204:11, 204:16, 205:15, 212:20, 215:21, 217:6, 217:8, 219:12, 220:2, 229:20, 229:25, 230:21, 235:21, 237:11, 239:13, 240:18, 244:14, 245:15, 248:24, 252:17, 254:2, 254:20, 255:20, 258:22, 261:7, 261:10, 264:21, 266:2, 268:7, 269:6, 269:9, 272:4, 274:4, 276:1

**slides** [7] - 20:2, 46:6, 50:5, 114:22, 210:22, 215:14, 217:10

**slideshow** [1] - 172:23

**slight** [1] - 101:20

**slightly** [1] - 262:23

**slow** [1] - 263:10

**slowly** [1] - 140:15

**slug** [1] - 199:2

**slugger** [2] - 194:24, 227:9

**slugging** [2] - 192:6, 201:13

**small** [23] - 40:11, 40:17, 40:19, 41:21, 92:23, 172:6, 172:10, 172:11, 172:15, 174:13, 176:12, 176:13, 183:1, 183:3, 189:15, 242:21, 242:23, 253:6, 253:7, 254:8, 260:7, 264:2, 272:21

**smaller** [15] - 32:8, 40:5, 40:6, 40:7, 40:14, 116:19, 116:25, 117:11, 118:19, 120:9,

125:23, 188:18, 241:1, 242:5, 243:22

**smallest** [1] - 248:10

**Smart** [1] - 50:24

**smear** [1] - 253:25

**Smith** [86] - 19:3, 22:4, 23:4, 23:11, 27:1, 27:6, 27:11, 27:18, 29:13, 29:20, 30:3, 30:10, 47:24, 48:12, 49:14, 49:21, 50:1, 50:5, 50:22, 53:7, 53:12, 53:15, 55:6, 55:15, 56:7, 59:8, 60:1, 60:15, 62:3, 64:10, 65:8, 66:17, 68:24, 69:12, 71:13, 74:18, 76:21, 78:8, 79:23, 81:13, 89:1, 91:17, 93:19, 93:24, 94:16, 97:25, 99:3, 104:14, 111:10, 113:6, 113:14, 114:4, 114:17, 115:4, 123:8, 131:6, 131:16, 134:7, 134:8, 135:23, 136:4, 136:13, 137:18, 206:20, 207:8, 208:18, 209:25, 210:5, 210:20, 211:1, 212:3, 213:9, 213:17, 215:11, 215:23, 216:5, 216:9, 217:15, 217:19, 217:24, 218:23, 221:9, 223:18, 223:22, 228:11

**SMITH** [1] - 49:16

**Smith's** [19] - 133:25, 208:3, 208:4, 208:6, 208:8, 209:20, 210:4, 211:19, 211:25, 212:12, 212:14, 212:22, 217:10, 219:14, 219:20, 219:24, 222:17, 222:23, 224:20

**so..** [2] - 20:17, 201:14

**Society** [2] - 175:2, 175:3

**soft** [3] - 112:1, 123:12, 188:10

**soften** [1] - 263:15

**sold** [1] - 45:24

**sole** [2] - 26:4, 241:16

**solely** [1] - 275:3

**solid** [12] - 27:4, 51:8, 51:21, 51:25, 52:17, 52:20, 53:9, 133:10, 184:20, 237:25, 241:19, 263:17

**solid-state** [3] - 51:8, 51:21, 51:25

**solution** [1] - 247:6

**someone** [3] - 30:18, 70:21, 70:22

**sometimes** [6] - 90:4, 119:2, 182:23, 241:15, 241:16, 241:17

**somewhat** [2] - 19:13, 19:24

**somewhere** [2] - 110:8, 216:11

**sorry** [26] - 10:9, 19:21, 23:7, 84:22, 90:8, 124:14, 128:1, 133:20, 137:21, 143:6, 143:8, 175:10, 175:16, 178:12, 178:14, 181:3, 183:17, 187:21, 192:6, 192:11, 198:20, 211:24, 245:25, 246:10, 263:11, 267:17

**sort** [10] - 16:15, 21:13, 22:9, 36:23, 51:18, 95:10, 107:11, 215:23, 216:25, 278:5

**sound** [1] - 40:2

**sounds** [3] - 17:25, 21:16, 122:12

**source** [5] - 82:5, 85:23, 183:22, 189:20, 209:9

**sources** [5] - 57:7, 67:5, 67:8, 108:12, 209:15

**South** [1] - 173:19

**Southwest** [1] - 173:19

**space** [2] - 40:5, 251:6

**spaces** [1] - 242:22

**span** [1] - 251:9

**spatula** [1] - 107:16

**speaking** [1] - 51:7

**spears** [1] - 262:21

**spec** [1] - 120:7

**special** [3] - 136:6, 260:8, 275:14

**specializing** [1] - 27:9

**specific** [6] - 107:18, 120:19, 124:21,

224:1, 257:8, 269:16

**specifically** [18] - 14:23, 15:5, 32:1, 32:12, 35:12, 38:24, 52:5, 53:17, 56:15, 58:23, 60:3, 62:8, 67:16, 68:13, 104:17, 109:22, 198:14, 255:17

**specification** [45] - 34:8, 34:17, 35:5, 57:9, 65:7, 65:10, 65:19, 65:25, 66:23, 96:1, 116:1, 117:19, 120:2, 121:7, 136:20, 179:3, 225:10, 227:5, 227:11, 235:18, 240:12, 255:4, 255:7, 255:12, 255:17, 256:23, 257:1, 257:20, 257:21, 258:15, 258:23, 260:15, 260:24, 266:17, 269:7, 269:15, 270:22, 272:2, 272:14, 272:16, 275:10, 275:13, 276:8, 276:16

**specifics** [1] - 16:14

**specified** [2] - 205:2, 276:16

**speed** [4] - 126:14, 126:16, 126:17, 126:21

**speeds** [1] - 182:12

**spell** [1] - 150:20

**spent** [1] - 185:17

**spoken** [2] - 221:14, 221:18

**spontaneously** [3] - 188:22, 189:25, 190:8

**spot** [1] - 107:12

**spots** [4] - 210:21, 214:11, 214:13, 218:15

**spray** [3] - 261:18, 262:7, 264:19

**spraying** [2] - 262:8, 265:3

**spread** [3] - 96:9, 96:21, 215:25

**spreads** [1] - 97:11

**square** [3] - 136:6, 198:17, 201:14

**stability** [15] - 42:7, 261:20, 261:24, 261:25, 262:13,

263:1, 265:10, 266:10, 266:12, 266:22, 267:1, 267:24, 269:12, 276:11

**stable** [1] - 270:3

**stack** [2] - 116:23, 126:3

**stage** [1] - 134:19

**stand** [6] - 19:21, 49:14, 134:8, 139:1, 171:13, 277:9

**standard** [6] - 49:2, 54:4, 97:16, 175:8, 208:19, 248:8

**standards** [4] - 53:25, 54:2, 175:11, 175:12

**standing** [1] - 173:18

**start** [12] - 5:1, 22:14, 59:16, 75:1, 114:16, 174:13, 176:12, 196:2, 235:9, 242:25, 277:13, 278:23

**start-up** [2] - 174:13, 176:12

**started** [5] - 3:4, 19:20, 24:7, 174:19, 235:11

**starting** [11] - 12:1, 13:14, 117:5, 119:11, 169:8, 200:6, 200:9, 246:17, 264:9, 268:5

**starts** [11] - 12:12, 39:9, 143:9, 144:10, 153:5, 259:12, 262:19, 264:15, 266:9, 266:16, 267:4

**state** [12] - 18:19, 49:25, 51:8, 51:21, 51:25, 73:1, 139:9, 169:12, 171:23, 231:4, 241:2, 254:17

**statement** [6] - 14:2, 15:7, 15:15, 16:15, 44:13, 123:5

**statements** [2] - 14:16, 20:1

**states** [9] - 40:18, 60:23, 65:25, 72:12, 155:19, 156:11, 156:18, 225:10, 227:5

**STATES** [2] - 1:1, 1:15

**States** [8] - 139:8, 149:3, 173:25, 175:6, 175:10, 180:20, 231:3, 251:15

**stay** [1] - 212:9
**stearate** [11] - 72:23, 78:18, 78:19, 80:5, 81:18, 87:20, 129:18, 153:2, 198:8, 211:2, 214:20
**Stegemann** [5] - 246:9, 246:10, 246:13, 247:11, 248:4
**stenographic** [1] - 279:6
**step** [86] - 5:18, 28:7, 48:20, 69:9, 69:11, 69:13, 69:23, 70:3, 70:5, 71:25, 72:11, 72:15, 72:17, 72:24, 73:4, 75:9, 75:10, 75:15, 76:25, 77:1, 78:21, 103:13, 105:25, 107:14, 128:4, 135:7, 135:10, 136:17, 136:23, 141:2, 141:3, 142:5, 142:7, 143:1, 145:7, 152:9, 152:13, 152:14, 152:18, 152:21, 153:1, 153:4, 153:5, 153:7, 153:9, 153:10, 153:12, 153:15, 153:16, 153:17, 153:18, 153:19, 153:21, 153:22, 156:15, 158:23, 159:10, 159:13, 160:3, 165:14, 166:15, 166:17, 166:25, 168:13, 200:6, 200:7, 200:9, 200:12, 200:15, 200:16, 201:18, 201:19, 201:20, 202:1, 203:22, 203:23, 207:17, 224:6, 228:19
**Steps** [3] - 158:4, 158:13, 158:16
**steps** [38] - 5:12, 9:18, 29:7, 57:5, 69:8, 73:19, 75:3, 75:4, 76:23, 78:8, 78:14, 80:1, 103:10, 106:24, 107:1, 132:19, 142:1, 142:4, 145:4, 149:14, 149:17, 151:16, 151:18, 151:20, 151:21,

151:25, 152:6, 158:13, 158:19, 159:6, 161:10, 161:17, 202:8, 202:11, 203:14
**stereo** [13] - 52:13, 52:19, 82:14, 82:16, 82:18, 83:2, 84:8, 84:11, 85:17, 101:11, 121:1, 198:11, 211:11
**stereomicroscope** [1] - 84:23
**stereomicroscopy** [1] - 52:7
**Steve** [1] - 246:9
**Steven** [2] - 19:3, 31:3
**stick** [14] - 84:13, 182:1, 188:20, 188:23, 188:25, 189:3, 190:14, 190:15, 240:14, 240:25, 242:7, 253:20, 253:21, 254:9
**sticking** [4] - 84:14, 225:15, 245:3, 254:4
**sticks** [1] - 181:18
**sticky** [2] - 181:24, 216:15
**still** [12] - 18:13, 19:10, 45:21, 82:20, 98:19, 115:11, 116:10, 117:14, 121:13, 129:20, 195:5, 277:8
**stipulated** [2] - 26:20, 41:4
**stipulates** [1] - 80:6
**stipulation** [6] - 18:12, 18:17, 18:22, 18:25, 139:3, 204:17
**stop** [6] - 74:15, 147:25, 242:24, 269:4, 276:25, 277:6
**stopped** [1] - 232:1
**storage** [2] - 144:18, 146:17
**story** [1] - 39:8
**strategies** [2] - 28:13, 28:16
**Strategy** [2] - 71:17, 163:3
**strategy** [12] - 28:19, 71:20, 72:10, 72:13, 72:20, 73:1, 163:7, 163:18, 164:11, 165:3, 165:19, 166:8
**Strathclyde** [1] - 173:8
**Streifthau** [2] - 3:9,

24:19
**STREIFTHAU** [3] - 2:3, 3:8, 3:16
**Streifthau-Livizos** [2] - 3:9, 24:19
**STREIFTHAU-LIVIZOS** [3] - 2:3, 3:8, 3:16
**strength** [3] - 59:19, 219:18
**strike** [3] - 143:7, 155:4, 167:6
**strong** [2] - 43:5, 97:16
**stronger** [1] - 43:6
**strongly** [5] - 210:13, 210:17, 218:7, 218:16, 218:18
**structural** [1] - 219:25
**structure** [11] - 189:14, 210:16, 210:17, 210:22, 211:20, 211:21, 212:1, 212:2, 214:15, 219:9, 245:2
**Structured** [1] - 43:25
**structured** [1] - 211:12
**structures** [1] - 210:8
**stuck** [8] - 93:7, 93:9, 96:9, 97:15, 189:18, 218:6, 218:7, 242:23
**studied** [3] - 163:22, 163:25, 165:22
**studies** [3] - 221:5, 222:3, 222:4
**study** [4] - 51:9, 173:9, 209:23, 224:22
**stuff** [5] - 117:14, 128:18, 128:19, 128:20, 219:8
**subject** [5] - 41:10, 120:20, 175:24, 236:3, 273:15
**Subject** [1] - 112:19
**submission** [4] - 4:22, 71:12, 98:13, 163:12
**submissions** [1] - 27:19
**submitted** [18] - 27:12, 67:19, 77:20, 80:24, 132:3, 156:3, 160:14, 160:17, 160:20, 160:23, 160:25, 161:2, 161:5, 161:11, 162:2, 162:3, 177:10, 233:5
**subsection** [1] - 156:7
**substance** [10] -

180:18, 185:12, 247:7, 247:19, 253:6, 253:7, 256:13, 263:9, 263:13, 265:5
**substances** [2] - 181:24, 242:19
**substantially** [1] - 272:1
**substitution** [2] - 108:17, 111:6
**success** [4] - 32:25, 33:23, 33:24, 185:25
**sued** [2] - 45:13
**suffering** [1] - 12:3
**sufficient** [4] - 187:5, 197:16, 207:18, 208:10
**suggest** [3] - 14:18, 21:23, 21:25
**suggested** [2] - 82:6, 98:23
**suggesting** [1] - 117:20
**suggests** [2] - 7:7, 29:16
**suit** [6] - 17:6, 26:5, 150:8, 150:15, 150:21, 150:25
**suitable** [21] - 29:9, 34:20, 35:16, 71:12, 75:24, 78:22, 80:7, 80:9, 81:20, 140:18, 168:14, 168:21, 168:25, 169:5, 169:13, 169:18, 183:5, 257:15, 257:16, 260:21, 260:25
**suite** [1] - 51:20
**sum** [2] - 94:21, 111:10
**summarize** [7] - 178:20, 179:1, 179:18, 220:4, 239:19, 254:25, 261:15
**summarized** [1] - 58:17
**summarizes** [1] - 155:20
**summarizing** [2] - 239:13, 276:1
**summary** [15] - 69:22, 71:9, 155:16, 155:18, 161:19, 173:4, 173:14, 196:2, 196:6, 199:24, 203:2, 203:4, 203:11,

276:5, 276:7
**Summary** [1] - 58:23
**summary..** [1] - 159:16
**sunglasses** [2] - 86:5, 86:6
**superceded** [1] - 144:6
**supercedes** [1] - 143:11
**Supercedes** [2] - 144:12, 146:11
**supply** [1] - 109:24
**support** [5] - 9:20, 17:7, 77:5, 112:23, 176:12
**supportive** [1] - 17:17
**supposed** [2] - 107:7, 128:8
**surface** [8] - 96:10, 96:21, 120:24, 120:25, 121:1, 121:2, 249:12, 254:9
**surmise** [1] - 268:23
**surprising** [3] - 98:16, 259:6, 259:17
**surprisingly** [1] - 260:4
**suspenders** [1] - 276:23
**sustain** [1] - 33:2
**Sven** [1] - 246:9
**swallow** [2] - 32:8, 40:8
**swallowing** [5] - 12:4, 13:25, 16:25, 33:7, 39:16
**swell** [1] - 254:13
**switch** [4] - 22:1, 37:14, 195:20
**sword** [1] - 36:25
**Systems** [1] - 43:25

---

**T**

**tab** [1] - 134:3
**table** [13] - 35:8, 60:22, 61:2, 63:7, 105:8, 110:13, 116:17, 117:2, 161:23, 248:2, 248:7
**tablet** [19] - 25:20, 31:15, 31:20, 33:11, 33:13, 37:13, 37:15, 39:10, 183:2, 186:25, 191:14, 199:2, 243:4, 250:11, 250:12, 250:14, 254:5, 254:6, 254:14

**tableting** [1] - 194:18
**tablets** [21] - 33:6, 33:10, 33:19, 39:10, 39:12, 132:22, 182:7, 185:3, 186:4, 190:18, 194:6, 241:25, 242:2, 242:12, 242:20, 243:5, 243:7, 245:20, 245:24, 252:23, 254:5
**tacky** [2] - 216:15, 223:16
**talks** [8] - 9:24, 28:12, 73:16, 117:19, 121:7, 210:20, 257:1, 258:16
**tapped** [9] - 75:18, 75:21, 160:8, 160:10, 160:13, 160:19, 161:7, 161:13, 223:17
**Tapped** [2] - 106:20, 251:19
**Target** [1] - 14:9
**tartrate** [57] - 15:4, 25:16, 25:17, 26:10, 34:24, 35:22, 45:8, 46:1, 46:16, 56:20, 56:21, 59:23, 61:2, 61:3, 61:5, 62:9, 63:19, 64:3, 64:17, 64:22, 67:1, 98:2, 102:20, 102:24, 123:22, 134:22, 135:4, 152:10, 152:22, 178:25, 196:15, 196:16, 196:19, 196:20, 200:5, 200:13, 202:5, 204:4, 205:6, 205:11, 205:21, 206:4, 206:13, 207:10, 207:23, 211:5, 213:5, 213:10, 213:23, 214:1, 215:18, 216:8, 216:13, 216:25, 217:25, 220:8, 256:18
**tartrate's** [1] - 35:10
**taste** [1] - 33:7
**teachings** [2] - 32:18, 272:21
**team** [9] - 21:24, 23:22, 44:21, 55:2, 133:24, 139:23, 140:7, 231:6, 238:7
**teams** [1] - 175:11
**tech** [1] - 154:8

**technical** [2] - 173:21, 174:3
**technically** [2] - 98:9, 118:14
**technique** [8] - 83:2, 85:1, 85:4, 121:13, 211:9, 215:20, 261:18, 263:7
**techniques** [3] - 52:5, 52:20, 99:5
**technology** [1] - 172:14
**temperatures** [1] - 263:8
**ten** [2] - 151:18, 151:20
**tend** [4] - 242:19, 244:8, 244:10, 263:11
**tens** [1] - 95:15
**term** [41] - 26:17, 34:13, 34:15, 34:21, 46:21, 47:4, 54:16, 64:4, 64:9, 64:16, 64:18, 64:21, 64:24, 65:6, 102:22, 102:23, 103:1, 103:22, 120:11, 123:23, 156:23, 157:6, 193:14, 198:18, 226:2, 255:2, 255:4, 255:8, 255:10, 255:14, 255:19, 255:22, 256:4, 256:5, 256:7, 256:8, 256:20, 257:3, 257:15, 272:23, 274:11
**terms** [16] - 26:14, 34:10, 34:16, 59:14, 95:22, 98:24, 106:25, 123:11, 162:8, 165:12, 165:23, 204:23, 212:6, 225:19, 229:25, 240:2
**test** [15] - 30:2, 74:16, 93:15, 104:19, 104:20, 104:22, 110:9, 121:6, 128:22, 129:23, 130:13, 132:22, 132:25, 133:8, 133:10
**tested** [1] - 76:3
**testified** [13] - 49:18, 59:8, 114:6, 136:4, 136:6, 137:18, 171:18, 176:21, 189:24, 192:13,

215:23, 223:23, 229:12
**testify** [12] - 13:2, 27:18, 44:3, 50:3, 53:12, 53:17, 172:8, 177:18, 207:24, 233:18, 234:5, 234:24
**testifying** [8] - 11:23, 13:10, 27:2, 43:19, 95:17, 123:13, 227:23, 234:8
**testimony** [52] - 5:12, 6:20, 7:24, 8:6, 8:15, 8:18, 8:24, 9:7, 9:12, 9:13, 9:14, 9:19, 10:23, 10:25, 11:19, 16:5, 16:10, 22:6, 22:20, 33:4, 33:24, 34:9, 36:23, 36:24, 37:2, 39:7, 47:19, 47:20, 48:22, 50:2, 50:6, 56:25, 111:12, 111:14, 116:7, 122:5, 129:9, 131:11, 134:21, 134:25, 138:2, 138:9, 167:25, 223:20, 277:10, 277:14, 277:22, 277:25, 278:2, 278:15, 278:20
**testing** [43] - 22:7, 29:19, 29:23, 48:3, 50:3, 57:11, 67:10, 76:17, 82:11, 82:12, 95:25, 99:8, 99:11, 99:16, 102:14, 103:24, 104:7, 104:14, 104:25, 105:9, 105:17, 105:19, 106:22, 106:25, 107:2, 108:5, 108:9, 108:16, 110:20, 110:25, 111:4, 111:13, 113:21, 129:12, 133:2, 136:16, 137:22, 198:4, 221:2, 221:11, 222:22, 222:23, 224:24
**tests** [10] - 30:2, 71:23, 75:16, 75:23, 104:17, 104:18, 106:12, 127:23, 224:8
**text** [2] - 180:24, 181:1
**Thallemer** [1] - 4:17
**THE** [205] - 1:1, 1:2,

3:1, 3:3, 3:15, 3:18, 3:23, 4:1, 4:4, 4:7, 4:9, 4:19, 4:21, 5:22, 5:25, 7:17, 8:22, 9:6, 10:7, 10:12, 10:14, 11:4, 11:8, 11:11, 11:14, 11:17, 13:1, 13:4, 13:7, 15:16, 15:24, 16:12, 16:19, 17:20, 18:2, 18:5, 18:10, 19:8, 19:19, 20:18, 20:25, 21:7, 21:16, 21:19, 22:13, 23:13, 23:16, 23:19, 24:3, 24:7, 24:9, 24:11, 30:17, 36:14, 36:16, 37:4, 37:6, 37:8, 44:15, 44:17, 44:20, 44:25, 49:6, 49:10, 50:19, 52:9, 52:12, 53:12, 56:4, 59:5, 60:11, 61:25, 68:5, 68:21, 76:5, 76:8, 76:9, 76:13, 76:15, 76:19, 78:4, 79:19, 81:9, 82:20, 83:15, 88:23, 97:5, 104:11, 108:1, 109:7, 114:10, 114:15, 114:20, 115:1, 124:23, 130:24, 131:2, 131:16, 131:19, 131:24, 132:2, 132:3, 132:4, 132:7, 132:8, 132:21, 132:24, 133:1, 133:4, 133:5, 133:9, 133:16, 133:17, 133:20, 133:22, 133:23, 134:2, 134:5, 134:10, 134:13, 135:21, 137:13, 138:21, 147:25, 148:4, 148:9, 148:13, 148:16, 171:11, 172:21, 172:25, 177:3, 177:18, 181:11, 182:15, 184:4, 184:9, 184:11, 189:8, 192:9, 197:12, 197:15, 197:23, 197:24, 197:25, 198:2, 198:3, 198:5, 198:10, 198:12, 199:6, 209:2, 209:3, 209:4, 215:22, 216:4, 216:23, 216:24, 217:1,

217:2, 217:4, 217:5, 220:11, 220:15, 228:16, 228:18, 228:20, 228:23, 229:8, 230:24, 233:12, 233:14, 233:22, 233:25, 234:24, 239:17, 243:24, 244:1, 244:5, 244:19, 245:23, 248:19, 250:24, 251:1, 252:12, 252:22, 263:11, 267:12, 267:13, 267:14, 272:9, 273:22, 274:7, 276:5, 276:21, 276:25, 277:6, 277:19, 277:22, 278:3, 278:12, 278:16, 278:22, 279:1
**theirs** [1] - 22:25
**theme** [1] - 6:2
**themselves** [2] - 41:14, 241:3
**theory** [1] - 232:7
**thereafter** [1] - 277:14
**therefore** [10] - 34:19, 38:6, 43:17, 98:7, 164:11, 212:10, 220:8, 269:17, 269:18, 270:23
**thereof** [1] - 269:13
**they've** [8] - 6:21, 7:5, 28:25, 45:14, 74:11, 76:14, 78:17, 134:18
**thicker** [1] - 213:19
**thinking** [1] - 101:11
**thinner** [1] - 213:19
**third** [17] - 11:24, 12:12, 28:6, 39:21, 75:2, 88:4, 88:6, 88:8, 90:10, 94:6, 105:14, 158:4, 158:12, 161:1, 250:9, 260:10, 262:18
**third-party** [1] - 39:21
**thorough** [2] - 27:11, 136:5
**thousands** [4] - 87:24, 91:11, 95:15, 102:10
**three** [37] - 7:6, 7:18, 11:11, 18:13, 18:16, 20:10, 28:10, 69:21, 70:17, 71:5, 75:20, 81:22, 81:24, 86:15, 89:3, 91:13, 93:24,

94:4, 105:9, 105:10, 108:12, 131:25, 143:16, 145:13, 151:21, 151:25, 152:6, 158:19, 160:4, 162:18, 165:23, 176:23, 192:2, 213:16, 213:18, 256:16, 273:10

**three-dimensional** [2] - 213:16, 213:18

**throughout** [16] - 25:15, 31:17, 56:25, 71:21, 71:23, 74:14, 82:4, 82:5, 93:3, 95:16, 97:7, 100:10, 101:4, 102:11, 120:16, 275:12

**tightly** [2] - 245:10, 254:2

**Tim** [1] - 115:7

**timeframe** [1] - 165:9

**Timothy** [2] - 4:12, 45:1

**TIMOTHY** [1] - 2:10

**title** [3] - 230:15, 259:13

**titled** [7] - 6:7, 14:9, 71:17, 73:8, 108:23, 156:7, 163:2

**today** [24] - 4:12, 19:15, 24:13, 37:23, 41:9, 50:2, 50:6, 55:19, 55:24, 82:10, 94:17, 95:22, 111:12, 114:6, 127:2, 219:22, 223:20, 223:23, 229:20, 238:13, 239:3, 240:5, 246:4, 277:7

**together** [71] - 47:21, 48:5, 48:11, 66:2, 69:23, 70:1, 76:14, 78:13, 78:19, 80:5, 81:17, 84:13, 84:15, 93:7, 93:9, 95:1, 97:11, 97:16, 117:25, 120:10, 120:19, 121:11, 121:12, 172:14, 181:6, 181:18, 181:19, 182:2, 182:7, 183:10, 183:21, 188:4, 188:20, 188:23, 188:25, 189:3, 189:18, 190:15, 191:20, 194:3,

279:6

**transcription** [2] - 161:24, 166:11

**transcriptional** [4] - 165:1, 165:15, 166:25, 167:4

**transcripts** [3] - 229:4, 277:18, 278:14

**transferred** [1] - 173:25

**transferring** [1] - 85:18

**translucent** [3] - 214:11, 214:17, 219:5

**transmit** [1] - 213:20

**transmitted** [1] - 101:13

**transmitting** [1] - 85:16

**transparent** [1] - 101:14

**traps** [1] - 198:24

**treatise** [1] - 109:2

**treatment** [4] - 25:1, 25:7, 39:13, 39:17

**Trial** [1] - 1:11

**trial** [19] - 2:24, 5:14, 5:15, 6:6, 7:15, 7:22, 8:14, 8:25, 16:20, 16:21, 19:6, 23:22, 36:6, 38:24, 44:21, 138:11, 174:16, 176:21, 234:6

**triblending** [1] - 5:17

**tried** [1] - 268:25

**tries** [2] - 149:6, 149:9

**Trojan** [1] - 6:5

**trouble** [3] - 12:8, 16:24, 16:25

**true** [9] - 8:14, 14:4, 14:19, 233:3, 233:6, 246:2, 246:4, 279:5

**truth** [3] - 49:18, 171:18, 229:12

**truthful** [2] - 149:6, 149:9

**try** [8] - 34:11, 45:3, 144:8, 200:25, 216:16, 221:8, 257:11, 268:24

**trying** [18] - 9:17, 9:18, 14:18, 15:9, 15:22, 24:17, 96:11, 107:13, 199:3, 242:19, 242:23, 250:9, 250:10, 253:12, 256:22, 258:10, 269:21, 274:13

197:21, 200:20, 200:22, 210:12, 210:13, 210:17, 214:24, 218:7, 218:17, 218:19, 219:2, 219:18, 219:19, 223:14, 225:15, 226:7, 226:18, 238:7, 240:25, 241:4, 241:18, 241:20, 241:21, 244:12, 245:6, 245:9, 253:22, 255:4, 269:6

**Tolf** [15] - 31:16, 31:17, 31:23, 32:1, 32:3, 32:14, 32:16, 33:10, 33:12, 33:16, 33:18, 39:2, 42:16, 42:21, 42:24

**tomorrow** [2] - 19:17, 277:11

**ton** [1] - 198:17

**tons** [3] - 182:6, 198:17, 201:14

**took** [9] - 91:21, 95:6, 106:25, 130:14, 174:17, 179:5, 216:9, 220:20

**top** [27] - 61:11, 69:8, 75:3, 85:17, 90:6, 92:18, 93:9, 96:13, 97:10, 101:2, 107:10, 116:23, 127:1, 143:8, 143:9, 144:8, 146:9, 146:10, 214:10, 214:12, 218:12, 219:5, 259:6, 261:18, 262:7, 264:18, 265:3

**topic** [1] - 206:19

**topics** [1] - 11:22

**total** [3] - 117:5, 119:10, 151:18

**totally** [2] - 91:25, 209:9

**touch** [1] - 245:1

**TOUHEY** [1] - 2:10

**Touhey** [1] - 4:10

**toward** [1] - 143:6

**towards** [7] - 26:8, 71:16, 115:18, 116:23, 121:19, 143:6, 143:8

**trade** [1] - 209:8

**trained** [1] - 87:22

**training** [2] - 55:5, 183:24

**transcript** [2] - 234:1,

**Tuesday** [1] - 1:11

**turn** [36] - 23:8, 30:15, 40:5, 44:12, 50:9, 56:23, 59:12, 60:21, 62:16, 64:8, 69:16, 70:13, 71:13, 73:5, 74:18, 79:8, 81:24, 82:9, 88:15, 102:18, 103:17, 109:11, 115:17, 141:18, 142:19, 232:21, 235:12, 245:6, 246:16, 247:9, 250:23, 251:18, 251:25, 264:7, 271:6, 271:15

**turning** [13] - 28:2, 30:21, 41:23, 57:19, 64:21, 69:6, 71:6, 111:17, 155:8, 156:5, 157:15, 245:14, 251:12

**tweaks** [1] - 79:7

**twice** [2] - 28:18, 166:13

**twin** [2] - 263:6, 270:7

**twin-screw** [2] - 263:6, 270:7

**twist** [1] - 113:12

**two** [56] - 5:4, 5:19, 6:18, 10:20, 11:25, 19:2, 19:10, 20:10, 35:24, 39:12, 39:19, 47:23, 72:4, 86:22, 89:6, 89:19, 91:12, 97:3, 113:12, 118:7, 118:8, 118:9, 122:10, 125:17, 127:23, 135:18, 141:19, 143:10, 144:11, 146:11, 162:7, 172:22, 177:12, 181:21, 183:9, 187:25, 188:2, 189:18, 192:3, 209:12, 212:3, 213:2, 213:3, 213:15, 215:6, 226:5, 230:12, 245:11, 253:17, 267:8, 267:10, 271:23, 272:1, 272:5

**two-dimensional** [1] - 213:15

**type** [10] - 76:11, 82:12, 86:19, 86:21, 111:25, 131:19, 180:17, 180:18, 204:19, 224:18

**types** [9] - 77:24,

188:1, 188:2, 191:24, 225:15, 227:12, 227:14, 238:8, 241:22

**typical** [4] - 51:20, 95:9, 188:3, 250:18

**typically** [14] - 70:19, 70:21, 70:22, 71:22, 107:8, 119:1, 186:4, 190:14, 190:20, 190:24, 241:24, 245:3, 253:18, 254:8

**typographical** [3] - 29:15, 30:6, 160:10

## U

**U.S** [2] - 26:1, 279:8

**U.S.C** [2] - 38:15, 38:16

**ultimately** [3] - 47:15, 49:4, 165:25

**unacceptable** [46] - 40:25, 42:6, 42:7, 255:14, 257:2, 257:24, 258:2, 258:5, 258:7, 258:9, 258:15, 258:20, 259:15, 261:5, 261:11, 261:20, 261:21, 262:2, 262:4, 262:11, 262:13, 262:14, 262:17, 264:25, 265:10, 266:6, 266:11, 266:12, 266:19, 266:22, 266:23, 267:1, 267:6, 267:18, 267:19, 267:25, 268:3, 269:8, 269:18, 270:23, 274:18, 276:9, 276:10

**unapproved** [5] - 168:10, 168:13, 168:23, 168:24, 169:7

**unclear** [1] - 255:8

**under** [42] - 8:9, 34:11, 38:14, 38:15, 43:3, 44:6, 44:9, 48:6, 55:13, 63:7, 63:8, 84:23, 89:18, 91:18, 93:14, 94:4, 94:11, 96:16, 96:18, 101:12, 113:7, 134:16, 135:13, 138:16, 151:22, 154:15, 156:10,

158:19, 159:23, 160:2, 180:5, 182:5, 198:23, 209:19, 215:12, 217:17, 228:12, 238:16, 238:21, 247:10
**undergraduate** [1] - 51:16
**underneath** [1] - 93:8
**underscore** [3] - 248:1, 251:18, 251:25
**understandable** [1] - 64:5
**understood** [8] - 6:12, 8:2, 22:21, 32:20, 34:13, 37:2, 249:5, 249:7
**undesirable** [1] - 121:23
**undesired** [2] - 121:16, 122:6
**uneven** [1] - 101:16
**unexpected** [2] - 43:7, 43:10
**unfortunately** [1] - 38:12
**uniform** [2] - 95:11, 266:25
**uniformity** [8] - 28:9, 75:18, 75:22, 160:23, 161:8, 161:14, 163:23, 201:5
**unintended** [4] - 47:17, 121:16, 122:7, 122:15
**unintentional** [1] - 137:4
**unintentionally** [2] - 137:1, 197:14
**unit** [2] - 60:22, 118:19
**UNITED** [2] - 1:1, 1:15
**United** [9] - 139:8, 149:3, 173:12, 173:25, 175:6, 175:10, 180:20, 231:3, 251:15
**units** [2] - 106:4, 106:9
**universities** [1] - 231:9
**University** [9] - 31:7, 51:14, 51:17, 173:8, 173:9, 173:11, 175:10, 230:3, 230:4
**unless** [1] - 216:9
**unlike** [1] - 38:9
**unlikely** [1] - 6:25

**unload** [9] - 78:22, 80:6, 81:20, 168:13, 168:20, 168:24, 169:5, 169:12, 169:18
**Unload** [1] - 80:9
**unloaded** [3] - 29:8, 29:9, 153:22
**unnecessary** [2] - 5:15, 6:5
**unquote** [1] - 33:8
**unresolved** [1] - 278:5
**unseal** [3] - 30:15, 233:20, 233:25
**unsealed** [1] - 30:20
**unsigned** [4] - 77:16, 80:22, 127:3, 131:25
**unsuccessful** [1] - 41:12
**unsuitable** [1] - 266:14
**unsupported** [2] - 32:18, 34:1
**untapped** [3] - 105:8, 105:12, 107:8
**unusual** [2] - 95:12, 184:8
**unwanted** [2] - 86:9, 86:12
**unwilling** [1] - 169:16
**up** [80] - 9:18, 10:3, 11:3, 11:21, 12:22, 19:21, 22:3, 30:18, 49:23, 61:11, 67:18, 76:21, 86:25, 89:11, 90:17, 93:22, 94:21, 97:1, 105:22, 110:14, 111:10, 113:2, 117:4, 126:24, 128:8, 132:12, 132:13, 133:1, 137:5, 143:23, 151:8, 154:9, 166:3, 172:25, 174:13, 176:12, 176:16, 177:5, 180:19, 182:8, 182:13, 183:2, 183:13, 189:13, 192:23, 193:23, 193:25, 196:3, 197:4, 199:17, 201:2, 203:9, 212:25, 219:5, 219:8, 223:14, 224:19, 225:8, 230:11, 230:23, 237:11, 239:15, 240:21, 243:10, 243:12,

244:18, 249:1, 251:4, 252:21, 254:23, 255:25, 259:1, 264:8, 268:19, 272:8, 274:6, 276:4, 277:23, 278:14, 278:21
**upcoming** [1] - 5:14
**update** [1] - 204:17
**upper** [4] - 92:20, 100:18, 249:12, 259:21
**ups** [1] - 114:23
**USA** [1] - 2:11
**usable** [1] - 9:15
**useful** [1] - 254:4
**uses** [15] - 40:24, 157:9, 163:8, 164:8, 164:14, 165:12, 166:4, 226:2, 261:17, 261:18, 262:6, 262:9, 262:21, 262:22
**USP** [11] - 103:19, 106:19, 108:11, 108:15, 109:20, 109:22, 110:3, 251:14, 251:17, 251:23, 252:1
**utilizes** [1] - 260:13
**utilizing** [1] - 35:15

**V**

**vaccines** [1] - 172:17
**valid** [3] - 110:19, 213:17, 239:11
**validity** [5] - 22:2, 30:15, 30:22, 30:23, 235:7
**value** [2] - 105:15, 122:12
**values** [7] - 250:20, 250:22, 258:18, 262:15, 271:1, 271:2, 271:5
**VAN** [1] - 2:13
**Van** [1] - 3:20
**variability** [7] - 185:21, 191:9, 191:10, 243:3, 243:6, 243:9
**variables** [1] - 185:24
**variation** [1] - 180:2
**variety** [5] - 48:1, 117:10, 194:22, 227:6, 276:10
**various** [15] - 5:16, 26:1, 27:25, 28:13,

36:1, 71:23, 98:13, 163:8, 181:2, 207:15, 230:9, 238:8, 240:16, 240:17, 258:4
**varying** [1] - 120:17
**vein** [1] - 167:14
**veracity** [1] - 208:15
**verb** [1] - 47:5
**verified** [7] - 70:20, 70:25, 162:9, 162:12, 162:15, 162:22, 169:19
**version** [13] - 106:19, 109:22, 110:3, 143:13, 144:6, 144:14, 144:15, 146:5, 146:14, 155:21, 251:17, 264:1
**versions** [3] - 108:14, 267:8, 267:10
**versus** [8] - 99:19, 101:15, 101:21, 121:24, 228:11, 257:2, 259:20, 272:18
**vibrations** [2] - 126:10, 126:11
**vice** [4] - 24:22, 50:23, 139:16, 174:13
**video** [7] - 23:9, 30:5, 100:19, 138:18, 139:1, 139:2, 148:17
**videographer** [1] - 154:8
**view** [8] - 84:9, 87:8, 89:7, 94:4, 95:10, 196:22, 218:12, 256:23
**viewing** [1] - 7:18
**views** [1] - 100:13
**violates** [1] - 42:10
**visible** [1] - 91:3
**visiting** [1] - 173:22
**vitae** [1] - 177:8
**Vitti** [1] - 24:20
**voids** [1] - 245:2
**volume** [11] - 106:3, 107:21, 248:11, 249:8, 249:14, 249:16, 253:4, 253:8, 253:10, 253:12, 253:13
**Volume** [1] - 1:11
**volunteers** [1] - 175:11

**W**

**Wales** [1] - 173:10
**walk** [3] - 85:10, 86:14, 89:4
**wants** [3] - 20:9, 137:11, 191:15
**watch** [1] - 96:18
**watching** [1] - 20:11
**water** [20] - 35:15, 38:2, 40:12, 40:17, 40:19, 40:22, 41:3, 216:8, 216:14, 260:7, 260:13, 260:18, 264:3, 268:16, 268:18, 268:19, 268:21, 269:2, 272:18, 272:21
**wave** [1] - 96:19
**wavelength** [1] - 86:1
**wax** [1] - 263:14
**ways** [10] - 53:3, 181:2, 181:4, 181:21, 181:23, 249:11, 258:12, 260:8, 261:5, 269:24
**weak** [1] - 201:11
**week** [1] - 66:10
**weigh** [4] - 6:21, 7:15, 7:22, 15:17
**weighed** [1] - 119:11
**weighing** [1] - 6:20
**weight** [12] - 7:25, 48:14, 63:8, 106:2, 107:21, 117:5, 118:14, 118:19, 119:5, 119:10, 119:11, 248:15
**Welch** [1] - 173:17
**well-respected** [1] - 27:8
**Wesleyan** [1] - 51:17
**wet** [18] - 181:21, 181:24, 182:22, 188:15, 188:24, 190:3, 190:5, 192:1, 192:2, 192:3, 197:17, 197:18, 207:6, 216:25, 264:2, 268:13, 268:19
**wetting** [2] - 260:14, 269:4
**Whales** [1] - 173:19
**whatsoever** [1] - 48:14
**whereas** [2] - 121:16, 122:7
**whereby** [2] - 187:9,

190:14
**wherein** [5] - 62:20, 63:12, 103:18, 111:18, 129:6
**whichever** [1] - 271:2
**white** [1] - 101:13
**whole** [12] - 13:13, 119:18, 119:20, 122:19, 126:2, 126:4, 130:14, 130:15, 207:16, 222:15, 231:4, 256:22
**whoops** [1] - 129:4
**wide** [1] - 117:10
**wider** [1] - 251:9
**WILLIAMS** [1] - 1:14
**willing** [1] - 278:13
**Wilmington** [1] - 1:10
**wish** [1] - 107:24
**withstand** [2] - 97:16, 121:12
**witness** [36] - 7:11, 10:25, 11:22, 13:1, 13:10, 14:25, 16:8, 22:4, 22:17, 23:4, 23:5, 23:6, 23:8, 23:14, 27:1, 31:4, 49:9, 49:17, 114:9, 114:11, 133:18, 133:21, 139:4, 170:17, 171:17, 172:1, 176:18, 176:22, 177:2, 220:10, 229:3, 229:11, 232:21, 234:5, 271:7, 271:15
**WITNESS** [45] - 52:9, 52:12, 76:8, 76:13, 76:19, 82:20, 97:5, 124:23, 130:24, 131:2, 131:19, 132:2, 132:4, 132:8, 132:24, 133:4, 133:9, 133:17, 133:23, 197:15, 197:24, 198:2, 198:5, 198:12, 209:2, 209:4, 216:4, 216:23, 217:1, 217:4, 228:20, 230:24, 239:17, 244:1, 244:5, 244:19, 245:23, 251:1, 252:22, 263:11, 267:12, 267:14, 272:9, 274:7, 276:5
**witnesses** [3] - 19:1, 19:3, 278:9

**won** [1] - 175:5
**Wonderland** [1] - 45:20
**word** [3] - 43:19, 69:3, 126:11
**wording** [2] - 120:8, 120:9
**words** [7] - 46:22, 88:10, 122:9, 122:25, 123:7, 186:7, 273:10
**works** [2] - 140:16, 275:12
**world** [2] - 38:18, 54:24
**worth** [1] - 7:16
**worthy** [1] - 7:9
**writing** [1] - 164:20
**written** [13] - 30:25, 34:4, 38:16, 42:9, 42:14, 43:1, 44:7, 193:8, 239:25, 255:12, 272:10, 272:13, 275:16
**Wurster** [1] - 262:7

## X

**X-6** [1] - 239:15

## Y

**yeah..** [1] - 161:4
**year** [4] - 230:6, 232:11, 232:14, 232:17
**years** [23] - 37:18, 54:23, 139:19, 148:25, 151:4, 173:6, 174:2, 174:6, 174:21, 174:23, 176:23, 179:22, 183:24, 185:6, 186:13, 186:17, 228:8, 230:7, 230:11, 230:14, 231:10, 232:1, 237:23
**yellow** [5] - 90:23, 92:12, 100:15, 105:11, 189:17
**you'e** [1] - 93:10
**yourself** [8] - 172:4, 227:16, 229:16, 234:9, 234:12, 234:15, 238:23, 239:1

## Z

**zoom** [3] - 84:11, 100:8, 100:14
**zoomed** [3] - 82:24, 84:9, 100:16
**zoomed-in** [1] - 84:9

1

                    IN THE UNITED STATES DISTRICT COURT

2
                    IN AND FOR THE DISTRICT OF DELAWARE

3

4   ACADIA PHARMACEUTICALS INC.,              )
                    Plaintiff,               )
5     v.                                      )    C.A. No.
                                              )    1:22-cv-01387-GBW
6   AUROBINDO PHARMA LIMITED, et al.,         )
                                              )
7                   Defendants.               )
                                              )

8

9
                              - - - -

10

11                            Wilmington, Delaware
                              Tuesday, December 4, 2024
                              Bench Trial Volume 2

12
                              - - - -

13

14

     BEFORE:   HONORABLE GREGORY B. WILLIAMS
15             UNITED STATES DISTRICT COURT JUDGE

16
                              - - - -

17

18

19

20

21

22

23

24

25
                              Michele L. Rolfe, RPR, CRR

1      APPEARANCES:

2

3                          SAUL EWING LLP
                           BY: MICHELLE C. STREIFTHAU-LIVIZOS, ESQ.
4                              JENNIFER BECNEL-GUZZO, ESQ.
                                    -and-
5                          PAUL HASTINGS LLP
                           BY:  CHAD J. PETERMAN, ESQ.
6                               SCOTT F. PEACHMAN, ESQ.
                                PETER E. CONWAY, ESQ.
7                               FELIX A. EYZAGUIRRE, ESQ.

8                          For Plaintiff ACADIA Pharmaceuticals, Inc.

9

                           KRATZ & BARRY LLP
10                         BY: R. TOUHEY MYER, ESQ.
                               TIMOTHY H. KRATZ, ESQ.
11                         For Defendants Aurobindo Pharma Limited and
                           Aurobindo Pharma USA, Inc.

12

13

                           SEITZ, VAN OGTROP & GREEN, P.A.
14                         BY:  JAMES S. GREEN, ESQ.
                                    -and-
15                         ARENTFOX SCHIFF LLP
                           BY:  RICHARD J. BERMAN, ESQ.
16                              JANINE A. CARLAN, ESQ.
                                BRADFORD C. FRESE, ESQ.
17                              MICHAEL BALDWIN, ESQ.
                           For Defendant MSN Laboratories Private
18                         Ltd., and MSN Pharmaceuticals, Inc.

19

20

21                              - - - - -

22                          P R O C E E D I N G S

23

24          (REPORTER'S NOTE:  The following bench trial was held

25      in Courtroom 6-B beginning at 9:00 a.m.)

1

2    **Michele L. Rolfe, RPR, CRR**

3    **Judge Williams**

4

5              **THE COURT:  Good morning.  You may be seated.**

6              **Dr. Muzzio, you want to retake the stand,**

7    **please.**

8                   **DIRECT EXAMINATION CONTINUED**

9    **BY MR. FRESE:**

10   Q.    **Good morning, Dr. Muzzio.  Welcome back.**

11   A.    **Thank you, Counsel.  Good morning.**

12   Q.    **Now, if you'll recall, when we left off yesterday, we**

13   **were discussing your opinion as to why the asserted claims**

14   **were indefinite, correct?**

15   A.    **Correct.**

16   Q.    **Now, if the term "pharmaceutically acceptable**

17   **capsule" does not exclude the comparative experiments in the**

18   **'721 patent specification, are the claims valid?**

19   A.    **No, they are not.**

20   Q.    **And do you have a slide summarizing why?**

21   A.    **Yes, I do.**

22              **MR. FRESE:  Can we pull up MUZZIO-DX-27?**

23              **THE WITNESS:  So if the term "pharmaceutically**

24   **acceptable capsule" doesn't exclude the comparative**

25   **examples, then the claim would include them and, therefore,**

DIRECT EXAMINATION - FERNANDO MUZZIO

1    it would include subject matter that the inventors didn't

2    regard as their invention, because Claim 4 and 5 and 13, as

3    written, read on the comparative examples.

4    BY MR. FRESE:

5    Q.    Now, do you have a slide discussing what language in

6    the patent would lead a person of ordinary skill in the art

7    to conclude that the inventors did not regard the

8    comparative experiments as their invention?

9    A.    Yes, I do.

10              MR. FRESE:  Can we pull up MUZZIO-DX-28, please?

11              THE WITNESS:  Right, so these passages in the

12   specification made that point clear.  The first excerpt on

13   the left says that, Contrary to the above-disclosed

14   experiments, the present application describes processes to

15   manufacture capsules.  So it's differentiating with respect

16   to the comparative experiments.

17              And then in the center, the second excerpt, he's

18   talking about that the conventional high shear granulation

19   utilizes large amounts of water, which led to over-wetting,

20   etc.  And in comparison to that, in contrast with that, the

21   present inventors have demonstrated that an appropriate

22   amount of water applied in a certain way results in

23   granulated pimavanserin having improved bulk density, so

24   differentiating.

25              What they're saying is the invention, from what

DIRECT EXAMINATION - FERNANDO MUZZIO

1   they're saying, led to unacceptable results.  The excerpts

2   on the right, again, make the same point.  So it says,

3   Disclosed herein are formulation, granulation, and dry

4   milling, blending and encapsulation of pimavanserin

5   containing novel elements.

6          And then prior to what they call the surprising

7   finding, the pimavanserin could be successfully wet

8   granulated, achieving the target improved physical

9   properties, and mentions bulk density, without the addition

10  of a binder.  And adding only a small amount of water.

11          So the patent distinguishes process for making

12  capsules of size 4 that would contain the 34 mgs of

13  pimavanserin, distinguishes those from the comparative

14  experiments.  The focus of the description is on the use of

15  a small amount of water and some granulation parameters that

16  are described as novel, which are different than what was in

17  the comparative experiments.

18  BY MR. FRESE:

19  Q.    And you're reading from the '721 patent at column 15,

20  lines 3-10; column 15, lines 37-46; column 10, lines 39-41;

21  and column 10, lines 54-62?

22  A.    That's correct.

23  Q.    So what would this tell a person of ordinary skill in

24  the art about what the inventors regarded as their

25  invention?

DIRECT EXAMINATION - FERNANDO MUZZIO

1  A.    As described here, what the inventors regarded as

2  their invention was the use of a small amount of water, the

3  exclusion of excipients, and the addition of that small

4  amount of water using these novel parameters or novel

5  elements.

6  Q.    So do you have a slide discussing how Claim 4 reads

7  on the comparative experiments in the '721 patent?

8  A.    I do.

9            MR. FRESE:  Can we pull up MUZZIO-DX-29, please?

10           THE WITNESS:  So now --

11           THE COURT:  Let me ask you something,

12  Dr. Muzzio.  You said that the inventors regarded as their

13  invention the use of a small amount of water, but the

14  exclusion of excipients.

15           THE WITNESS:  Yes.

16           THE COURT:  But doesn't the claim language

17  itself refer to excipients?

18           THE WITNESS:  And that's exactly the problem,

19  Your Honor.  In the specification, they are very clearly

20  identifying the invention as granulating pimavanserin alone,

21  but then they come back and they get a claim that now

22  includes excipients, even though the specification says

23  that's not our invention.

24  BY MR. FRESE:

25  Q.    So, Dr. Muzzio, take us through why Claim 4 would

DIRECT EXAMINATION - FERNANDO MUZZIO

1   read on the comparative experiments in the specification?

2   A.      Right, just to further clarify, so as they described

3   the invention in the specification, it's not supposed to

4   include excipients, and it's only supposed to use a small

5   amount of water.  However, then this claim, as written, does

6   include the excipients and actually reads in, into the scope

7   of the claim, these examples that in the specification are

8   supposed to be excluded.

9           So Claim 4 says that what's invented here,

10  according to Claim 4, is a pharmaceutically acceptable

11  capsule for delivering 34 mgs of pimavanserin to a patient

12  wherein the capsule has a size 3 or a size 4 capsule shell.

13  In the comparative experiments, you could arrive at

14  densities that would allow you to fill this 5 to 34 mgs of

15  pimavanserin in a capsule size 3 or size 4, such as a size 4

16  capsule.

17          The claim as written further says that the

18  pharmaceutically acceptable capsule contains a blended

19  pimavanserin composition comprising granules comprising 40

20  mgs of pimavanserin tartrate and one or more

21  pharmaceutically acceptable excipients.

22          Well, that's precisely what the comparative

23  experiments that are meant to be excluded actually do;

24  comparative experiment 1 and 2, the granules comprise

25  pimavanserin tartrate and excipients, including PVP, which

DIRECT EXAMINATION - FERNANDO MUZZIO

1    is a binder.

2           Same with comparative example 3, which is also

3    supposed to be excluded.  The granules in example 3 comprise

4    pimavanserin tartrate and again PVP, which is a binder.  And

5    the same with example 4.  Example 4 is now granules

6    comprising pimavanserin tartrate and Kollidon VA64.  So

7    that's copovidone or hydroxypropyl cellulose, both of which

8    are binders.

9           And finally, the claim says that wherein the

10   bulk density of the granules is greater than 0.4 g/mL as

11   determined by the USP method.

12          All four examples -- all examples are supposed

13   to be excluded actually disclose that the bulk density that

14   was observed was acceptable for the purpose of filling 5 to

15   34 mgs pimavanserin capsules, size 3 or size 4.

16   Q.    Now, do you have a slide discussing how Claim 5 reads

17   on the comparative experiments in the '721 patent?

18   A.    I do.  So Claim 5, all it really is doing is

19   narrowing from a size 3 or size 4 to just a size 4.  So for

20   the same reasons that Claim 4 reads in the comparative

21   examples that are meant to be excluded, Claim 5 also reads

22   them in.

23   Q.    So do you have a slide that summarizes your positions

24   on indefiniteness?

25   A.    I do.  So in general, I see this to be indefinite for

DIRECT EXAMINATION - FERNANDO MUZZIO

1    at least two reasons.  There is the "pharmaceutically

2    acceptable capsule" term that would render the claim

3    indefinite because, as I said yesterday, a POSA would try to

4    understand what is meant by pharmaceutically acceptable

5    capsule in the context of this patent.

6            And we see all of these examples that are

7    supposedly excluded from the invention, but the POSA would

8    not know what value of all of these different factors would

9    determine that a -- even granulation would actually be

10   included or excluded.  There is no information in

11   qualitative values, actually, that would make an outcome of

12   a comparative experiment unacceptable versus acceptable.

13           And if we set that aside and we say, okay, let's

14   assume that that's not an issue, then the problem that we

15   have is that then the claim, as written, doesn't exclude the

16   comparative experiments anymore, even though the

17   specification says that they're supposed to be excluded.

18           So the claims as written, if that doesn't -- if

19   the term "pharmaceutically acceptable capsules" does not

20   operate to exclude the comparative experiments, then there's

21   nothing else to exclude them, then they are included.  And

22   then the claim would read in something that the inventor

23   said, this is not what we invented.

24   Q.    All right.  Now, if you make the assumption that the

25   claims are definite --

DIRECT EXAMINATION - FERNANDO MUZZIO

1    A.    Okay.

2    Q.    -- do you have an opinion as to whether they are

3    valid or invalid as obvious?

4    A.    I do.

5    Q.    And what is that opinion?

6    A.    That they are still invalid.

7    Q.    And have you provided a slide --

8    A.    Yes.

9    Q.    -- that demonstrates an overview of your opinions on

10   obviousness?

11   A.    I have.

12              MR. FRESE:  Let's pull up MUZZIO-DX-33.

13              THE WITNESS:  So this is my overview of why I

14   believe that the claims would be invalid as obvious, if we

15   set aside the indefiniteness problem.  And, basically, I

16   believe that the POSA would -- all it would need is to be

17   aware of the prior art tablets and the label and the one

18   Ragnar-Tolf reference.

19              And the POSA would, if they have a skill that we

20   have described, would be able to make minor changes to the

21   Ragnar-Tolf in view of the prior art tablets to basically

22   create a capsule with the required attributes, because the

23   differences between the claimed invention and the prior art

24   are very small, and those changes would have been obvious to

25   a POSA.

DIRECT EXAMINATION - FERNANDO MUZZIO

1    Q.    All right.  How, if at all, was pimavanserin

2    formulated as of the priority date, August 30, 2017?

3    A.    Say again, please.

4    Q.    How was pimavanserin available or formulated as of

5    the priority date of the '721 patent, August 30, 2017?

6    A.    Those are the prior art tablets.  So it was

7    formulated as tablets containing 17 mgs of pimavanserin

8    base, or 20 mgs of pimavanserin tartrate, in tablets that

9    were round, white or off-white, and film-coated.

10   Q.    Go ahead and turn to JTX-12 in your binder.

11   A.    Yes.

12   Q.    What is JTX-12?

13   A.    This is the label that was released in April 2016

14   when the product was first approved.

15   Q.    Go ahead and turn to the second page of JTX-12.  And

16   look at section 1, Indications and Usage.  What does the

17   Nuplazid label tell a person of ordinary skill in the art

18   about the condition that pimavanserin treats?

19   A.    So the label of the prior art tablets indicates that

20   Nuplazid is indicated for the treatment of hallucinations

21   and delusions associated with Parkinson's disease psychosis.

22   Q.    And if we look at section 2.1 of the Nuplazid label,

23   what does that tell a person of ordinary skill in the art

24   about the condition -- or about the dose of pimavanserin?

25   A.    So the label on the prior art tablets will tell the

DIRECT EXAMINATION - FERNANDO MUZZIO

1    whole world that the recommended dose for Nuplazid is

2    34 mgs, which is taken orally as two of these 17 mg strength

3    tablets once a day.

4    Q.    And what does this tell a person of ordinary skill in

5    the art about the frequency of administration of Nuplazid

6    tablets?

7    A.    That the two tablets are supposed to be taken once a

8    day, meaning the two tablets are to be taken together.

9    Q.    And for how long are these tablets to be taken?

10   A.    This is a chronic condition so the patient would have

11   to take these tablets for a long time.

12   Q.    Go ahead and turn to page 6 of the Nuplazid label and

13   look at section 8.5.  What does the Nuplazid label tell a

14   person of ordinary skill in the art about the patient

15   population Nuplazid is to treat?

16   A.    So the label of the prior art tablets would tell the

17   POSA that the disease, Parkinson's disease, is a condition

18   affecting primarily older individuals.  It says that -- it

19   discloses it occurs in the population that was used -- as

20   the minimum age of the patients was 71 years of age, that

21   about half of them were between 65 and 75, and close to a

22   third were older than 75.

23   Q.    And let's turn to section 11.  And if we look at the

24   molecule there, what would that tell a person of ordinary

25   skill in the art about the molecular class of pimavanserin?

DIRECT EXAMINATION - FERNANDO MUZZIO

1    A.    The molecular class would be a small molecule

2    and that is actually formulated using the tartrate salt of

3    the freebase.

4    Q.    And if we look at the paragraph that starts "Nuplazid

5    tablets..."  starting at the bottom of page 7 and going over

6    to page 8, what would that paragraph disclose to a person of

7    ordinary skill in the art about pimavanserin?

8    A.    Well, there are several things that would be

9    important to the POSA.  It says that this is an oral dose,

10   so it's intended to be given via the mouth.  It says that

11   these are round, white to off-white, immediate-release

12   film-coated tablets.  And they contain 20 mgs of

13   pimavanserin tartrate, which is equivalent to the 17 mgs of

14   the freebase.

15   Q.    And what would this tell a person of ordinary skill

16   in the art about the inactive ingredients that were present

17   in Nuplazid tablets?

18   A.    It says that these tablets contain also

19   pregelatinized starch, magnesium stearate, and

20   microcrystalline cellulose.

21            MR. FRESE:  Your Honor, we'd like to move JTX-12

22   into evidence.

23            MR. PETERMAN:  No objection.

24            THE COURT:  Okay.  JTX-12 is admitted.

25            (Exhibit admitted.)

Appx468

DIRECT EXAMINATION - FERNANDO MUZZIO

1   BY MR. FRESE:

2   Q.    Dr. Muzzio, do you have a slide summarizing what a

3   person of ordinary skill in the art would have gleaned from

4   the Nuplazid tablets label?

5   A.    I do.

6             MR. FRESE:  Can we bring up MUZZIO-DX-34,

7   please?

8             THE WITNESS:  The label of the prior art tablets

9   tells a POSA a number of things that the POSA would benefit

10  from knowing.  It says that Nuplazid is pimavanserin

11  tartrate.  It says that the way in which this is

12  administered to the patient is as a single oral 34 mg once

13  daily, given as two 17 mg tablets; that 17 mgs of

14  pimavanserin is equivalent to 20 mgs of pimavanserin

15  tartrate; that this medication is for treating

16  hallucinations associated with Parkinson's disease

17  psychosis; that Parkinson's disease is a condition affecting

18  elderly populations; that the treatment is chronic; and that

19  the prior art tablets are round, white to off-white, and

20  film-coated.

21  BY MR. FRESE:

22  Q.    Now, Dr. Muzzio, do you have a slide discussing where

23  a person of ordinary skill in the art would begin

24  development of a new dosage form of pimavanserin?

25  A.    I do.

DIRECT EXAMINATION - FERNANDO MUZZIO

1      MR. FRESE:  Can we bring up MUZZIO-DDX-35,

2 please?

3      THE WITNESS:  So a person of ordinary skill in

4 the art seeking to develop a new version of this product

5 would start by a literature search looking for information

6 about preformulation or formulation studies that have been

7 performed for this particular drug substance.

8      In addition to that, as necessary, the person of

9 ordinary skill in the art would plan to perform

10 preformulation studies so that it would lead to collecting

11 information about the drug substance itself, physical

12 characteristics of the particle size, distribution of the

13 drug substance, the crystal form, the bulk density, tapped

14 density, etc., the flavor, the taste.

15      The person of ordinary skill in the art would

16 test the solubility of the drug substance in various fluids.

17 It's a very important factor when you're formulating a

18 product, and it would look to determine in those studies or

19 through literature what is the physical and chemical

20 compatibility between the drug substance and the various

21 excipients that could be used in developing the product and

22 then use all of this information to begin to put together a

23 target product profile for the reformulated product.

24 BY MR. FRESE:

25 Q.    Dr. Muzzio, what is a target product profile?

DIRECT EXAMINATION - FERNANDO MUZZIO

1    A.    It's a statement of various things that are known

2    about the product or that need to be imparted to the target

3    drug product to serve the patient population.

4    Q.    Dr. Muzzio, do you have a slide discussing what a

5    POSA would know about a target product profile for

6    pimavanserin from the Nuplazid tablets label?

7    A.    Yeah, I put together what would be a draft of such a

8    product -- target product profile.

9    Q.    All right.  So we have MUZZIO-DX-36 on the screen.

10   A.    So this actually reflects what the POSA would know

11   just after reading the label of the prior art tablets.  You

12   would know that the condition to be treated are

13   hallucinations and delusions associated with Parkinson's

14   disease psychosis; that the patients are elderly patients;

15   that these are patients that are known to have a high pill

16   burden and difficulty swallowing because they're older

17   patients with Parkinson's disease; that the treatment is

18   chronic; that the drug substance is a small molecule; that

19   the drug is to be taken daily; that the route of

20   administration is oral; that the dosage form should be easy

21   to swallow and should be immediate release; and that the

22   dose of the API in the dosage form would be 34 mgs of

23   pimavanserin formulated as 40 mgs of the tartrate salt.

24   Q.    Now, Dr. Muzzio, you mentioned that a person of

25   ordinary skill in the art would start their process of

DIRECT EXAMINATION - FERNANDO MUZZIO

1    reformulation with a literature search?

2    A.    Yes.

3    Q.    What literature would a POSA have found from such a

4    literature search?

5    A.    Well, the POSA would have found Ragnar-Tolf

6    immediately.

7    Q.    All right.  Go ahead and turn to JTX-11 in your

8    binder.  What is this?

9    A.    This is the Ragnar-Tolf patent application.

10   Q.    And when was it published?

11   A.    This was published in November 2007, almost -- almost

12   ten years before the '721 patent.

13   Q.    Take a look at the abstract of Ragnar-Tolf.  What

14   does Ragnar-Tolf generally relate to?

15   A.    So this entire patent application concerns itself

16   with stable pharmaceutical formulations of pimavanserin.

17   Q.    Okay.  Let's go ahead and turn to paragraph 67 of

18   Ragnar-Tolf.  What would a person of ordinary skill in the

19   art learn from paragraph 67 regarding the doses of

20   pimavanserin tartrate that can be put in the dosage form?

21   A.    So reading this paragraph, the person of ordinary

22   skill in the art would immediately learn that Ragnar-Tolf

23   has concerned itself with dosages containing anywhere from

24   1 mg to maybe up to 80 mg where the 40 mg that is not the

25   intended dose is in the middle of this range.

DIRECT EXAMINATION - FERNANDO MUZZIO

1    Q.    Go ahead and turn to example 7 of Ragnar-Tolf and

2    take a look at paragraph 102.

3    A.    So this example is disclosing already some of the

4    information that the POSA would be looking for in order to

5    figure out how to formulate the product.  It basically

6    indicates that there was an excipient compatibility study

7    performed for pimavanserin tartrate -- it says "crystalline

8    Form A" -- where mixtures of the drug substance and then

9    14 excipients, as well as both gelatin and hydroxypropyl

10   methylcellulose capsule shells and the drug substance alone,

11   so 17 things here, are going to be tested in terms of their

12   stability.

13            And so those 17 things are the drug alone, the

14   drug in these two capsule shells, and then the drug mixed

15   with 14 other materials.  And looking at the list of

16   ingredients that are being tested here, the POSA would see

17   the most likely excipients to be used in either making the

18   tablet or making the capsule.

19   Q.    Would a person of ordinary skill in the art recognize

20   example 7 as a preformulation experiment?

21   A.    Yes.

22   Q.    And do you have a slide discussing what a person of

23   ordinary skill in the art would learn from this

24   preformulation experiment in the example 7?

25   A.    Yes.

DIRECT EXAMINATION - FERNANDO MUZZIO

1          MR. FRESE:  Can we bring up MUZZIO-DX-37,

2    Mr. Mortenson?

3          THE WITNESS:  So there are a number of things

4    that would be learned from here.  The most important thing

5    here is the table, table 4, which basically gives the

6    results of this compatibility study, and a POSA looking at

7    this would immediately recognize the formula.  All of these

8    materials are tested under two sets of conditions.  They are

9    tested as dry blends, and they are also tested as wet

10   blends.  So that would tell the POSA immediately that the

11   people doing this study are thinking already about either

12   dry blending under that compression or wet blending because

13   both conditions are being examined.

14          And also a person of ordinary skill in the art

15   reading this would realize that the people who designed this

16   study would be thinking about either a table or a capsule,

17   because they are already testing the compatibility of the

18   drug substance with the two most common types of hard shell

19   capsules which are HPMC capsules and gelatin capsules.

20   BY MR. FRESE:

21   Q.    Let's go ahead and turn to the next example,

22   example 8, which starts at paragraph 125.  What would

23   example 8 disclose to a person of ordinary skill in the art?

24   A.    So this example then formulates the product as a

25   compression tablet, as a dry blended tablet.  It says that

DIRECT EXAMINATION - FERNANDO MUZZIO

1   they prepare blends that would lead to making tablets

2   containing 1 mg, 5 mgs, or 20 mgs of pimavanserin tartrate,

3   and it says for direct compression.  So dry blending when

4   compressed leads to direct compression, but dry blends can

5   also be fit into capsules.  I just want to clarify the

6   language here.

7          And then it says that these blends were made

8   using lactose, microcrystalline cellulose, and magnesium

9   stearate.  And then when they did this, they discovered that

10  during blending, the mixture tended to form aggregates,

11  which would potentially affect content uniformity.  So the

12  POSA in this example learns that the pimavanserin drug

13  substance has a tendency to form clumps.

14         Then it says that they tried to fix this problem

15  by using something very common in the industry, which is by

16  repeatedly sieving and blending and sieving and blending the

17  mixture trying to break up those clumps.

18  Q.   So, Dr. Muzzio, do you have a slide discussing what a

19  person of ordinary skill in the art would have learned from

20  example 8 of Ragnar-Tolf?

21  A.   I do.

22         MR. FRESE:  Mr. Mortenson, can we bring up

23  DDX-38?

24         THE WITNESS:  So in here, it's highlighted that

25  the POSA would know, would learn that this drug substance

DIRECT EXAMINATION - FERNANDO MUZZIO

1    tends to form clumps.  And then there is a table, table 6,

2    which discloses some of the results that were obtained when

3    these tablets -- the 1 mg, 5 mg, and 20 mg tablets -- were

4    actually prepared.  And an important part of this table is

5    the second-to-last row that talks about the Rsd percent.

6    Rsd is shorthand for relative standard deviation.  That is

7    the statistical measurement of how much variability is

8    observed in the product.

9            The generally accepted limit for Rsd that would

10   make a product acceptable is 6 percent.  If you exceed

11   6 percent, you automatically fail that batch.  The POSA

12   would look at this data and say, well, two out of the four

13   are showing relative standard deviations that are more than

14   6 percent.  So dry blending has a high risk of content

15   uniformity failure.

16   BY MR. FRESE:

17   Q.    Dr. Muzzio, what is the general solution in the art

18   to such content uniformity failures?

19   A.    So when a POSA would see that the drug has a tendency

20   to form clumps and that those clumps can lead to these

21   problems for what's relatively a low-dose product, the most

22   common approach to solve this problem is to wet granulate.

23   Q.    And does Ragnar-Tolf include an example where

24   pimavanserin tartrate was wet granulated?

25   A.    Right, so right on cue, the very next thing in

DIRECT EXAMINATION - FERNANDO MUZZIO

1    Ragnar-Tolf after example 8 is example 9 where they do what

2    is the most common solution to the problem.  They go ahead

3    and they wet granulate.

4    Q.    All right.  And do you have a slide discussing how

5    pimavanserin tartrate was granulated and blended in

6    example 9 of Ragnar-Tolf?

7    A.    I do.  So in this slide, it talks about -- which is

8    example 9 -- it talks about how now they are implementing a

9    regulation process here.  The process that they implement

10   includes preblending the drug substance with excipients in

11   what they describe as an intensive mixer.  Then the mixture

12   is granulated using a solution of povidone in ethanol.

13   Following that, they would basically dry these wet granules

14   to evaporate the ethanol so that they would form these hard

15   bonds between the pimavanserin particles.

16          Following that, they would sieve, so they would

17   adjust the size of the dry granules by passing them through

18   a screen, forcing them to pass through a screen, and

19   finally, they would lubricate these granules using magnesium

20   stearate as an extra-granular ingredient.

21   Q.    Dr. Muzzio, briefly, what are the excipients that are

22   present in these granules of pimavanserin?

23   A.    So mannitol and pregelatinized starch are the two

24   that are inside, together with Kollidon, which is the binder

25   that's also inside the granules.  So those are the

DIRECT EXAMINATION - FERNANDO MUZZIO

1    intergranular materials.  And then there is magnesium

2    stearate, the lubricant, which is outside the granules as --

3    as it's supposed to be.

4    Q.    And do you have a slide describing why Ragnar-Tolf

5    used ethanol as the granulating solvent here?

6    A.    I do.

7              MR. FRESE:  Can we bring up MUZZIO-DDX-40,

8    please?

9              THE WITNESS:  So the example says that when they

10   first tried to granulate using water, they observed

11   discoloration.  Typically that means that the blend turned

12   brownish, and that's usually an indication of problems with

13   stability.  You know, and so they wanted to avoid that.  So

14   the first thing they did is they replaced the lactose that

15   they had used initially with mannitol, but that didn't fix

16   the problem.  They saw that when they granulated with water

17   and with mannitol, they still observed this discoloration.

18             So the next thing they did is they said, okay,

19   instead of water, let's use ethanol.  And that's when now

20   they did not see the discoloration, so they concluded that

21   granulating with ethanol would avoid this problem.  So the

22   POSA would learn from this to minimize the use of water.

23   BY MR. FRESE:

24   Q.    Go ahead and turn to paragraph 64 of Ragnar-Tolf and

25   look about four lines down.

DIRECT EXAMINATION - FERNANDO MUZZIO

1    A.    Yes.  So it's saying that in some embodiments, a

2    formulation with water is to be avoided or the amount of

3    water present needs to be reduced to less than, and it says

4    less than 30 percent, less than 20 percent, less than

5    10 percent, less than 5 percent by weight.  So it's, again,

6    providing guidance to avoid or minimize water in this

7    granulation.

8    Q.    Do you have a slide discussing the physical

9    properties of the resulting wet granulated blends prepared

10   in example 9 for Ragnar-Tolf?

11   A.    I do.

12   Q.    We are at MUZZIO-DX-41.

13   A.    Yeah, so in here we have two tables.  We have table 7

14   which tells us what are the actual compositions of the

15   granulations that are being prepared when they intend to

16   make the 1 mg, 5 mg and 20 mg tablets of the example.

17        And table 8 down there is an excerpt of the

18   actual table 8 in the patent showing the bulk densities and

19   tapped densities of the granules that were prepared showing

20   that for all these granulations with all these different

21   compositions, they would observe bulk densities between

22   about 0.56 and about 0.61.

23   Q.    Dr. Muzzio, in your opinion, is there a significant

24   amount of variability in the bulk density measures here?

25   A.    Yeah, the Pharmacopeia Medical listed is known to

DIRECT EXAMINATION - FERNANDO MUZZIO

1    have a significant amount of variability.  You're putting

2    powder into a jar, basically.  And then you have to level

3    the top and then you have to eyeball where in the jar is the

4    top level of the powder.  So there's quite a bit of

5    variation usually that middle consistent with the results

6    observed here, you know, going from 0.56 to 0.61 and some of

7    these are supposedly replicates of each other showing values

8    that are a little bit different.

9    Q.    Okay.  So in your opinion, would there be a great

10   quantity of variabilities or a small quantity of

11   variability?

12   A.    No, there would be a couple percent variabilities

13   pretty common in this method.

14   Q.    Now, are these bulk density measurements conducted on

15   a blend of granules and excipients or of granules alone?

16   A.    Okay, let me look at this.  This is the blended

17   material that is going to be compressing the tablets next.

18   Q.    And what other component besides the granules is

19   included in these blends?

20   A.    The 2 percent magnesium stearate.

21            (Court reporter clarification.)

22            THE WITNESS:  Magnesium stearate.

23            Sorry.  The one-and-a-half-percent magnesium

24   stearate for 1 and 5 mgs and 2 percent magnesium stearate

25   for the 20 mg blend.

DIRECT EXAMINATION - FERNANDO MUZZIO

1   BY MR. FRESE:

2   Q.    And how would a person of ordinary skill in the art

3   expect the bulk density of these blends to compare to the

4   bulk density of the granules alone?

5   A.    For these blends in particular, which are

6   granulations mixed with a small amount of magnesium

7   stearate, the person of ordinary skill in the art would

8   expect that the bulk densities of the lubricated blend would

9   actually be very similar to the bulk density of the granules

10  because there's only a small amount of magnesium stearate

11  and because the granules being granules are very

12  free-flowing so the presence of magnesium stearate, which

13  connect in addition to a lubricant, would not really have an

14  impact of the bulk density of the blend.

15  Q.    Let's go ahead and turn to the example of the blend

16  of Ragnar-Tolf.

17  A.    Yes.

18  Q.    Starting at paragraph 132, do you have a slide

19  discussing what a person of ordinary skill in the art would

20  learn from example 10?

21  A.    Yeah, the person of ordinary skill in the art reading

22  example 10 would immediately learn that pimavanserin

23  tartrate has what is described here as a "pronounced bitter

24  taste," so a very bad taste.

25  Q.    And turn to paragraph 63.

DIRECT EXAMINATION - FERNANDO MUZZIO

1      What would paragraph 63 of Ragnar-Tolf teach a

2   person of ordinary skill in the art regarding formulations

3   of pimavanserin tartrate?

4   A.    So in this paragraph, the person reading this would

5   learn that already Ragnar-Tolf were aware of these bad

6   tastes, so they're saying that you have to use

7   taste-masking.  So it's saying the tablets will be coated

8   with a taste-masking film.

9           And in addition, in the immediate sentence

10   following that, it says that, "Instead of compressing into

11   tablets, a dry or wet blend such as those described above

12   would be placed in a gelatin or an HPMC capsule."  So it's

13   saying that you will use capsules as solution to the bad

14   taste problem.

15   Q.    Do you have a slide summarizing what Ragnar-Tolf

16   would have generally taught a person of ordinary skill in

17   the art about formulating pimavanserin into a dosage form?

18   A.    Yes.

19           MR. FRESE:  Can we bring up MUZZIO-DX-43,

20   please?

21           THE WITNESS:  So the person of ordinary skill in

22   the art reading Ragnar-Tolf would learn that the drug

23   substance has a tendency to form these clumps that could

24   lead to content uniformity problems.  They see two of the

25   four compression blends failing when compressing to tablets.

DIRECT EXAMINATION - FERNANDO MUZZIO

1   They would see that it has a pronounced bitter taste that

2   requires taste-masking.  They would see that the product can

3   be formulated either as capsules or tablets.

4          They see that in example 7 where it shows that

5   the pimavanserin tartrate is compatible with many different

6   excipients used to take tablets or capsules, they further

7   see that they already established that pimavanserin tartrate

8   is compatible with HPMC and gelatin capsule shells, capsule

9   shells.

10         They see that it's contemplated to make those

11  dosages anywhere from 1 mg to 80 mgs.  They see wet

12  granulated with excipients so that you make granules with

13  bulk densities around 0.6 g/mL.  And they also see that

14  pimavanserin tartrate degrades when exposed to large amounts

15  of water during form granulation, so the aqueous solvents

16  should be minimized.

17         MR. FRESE:  Your Honor, we would like to move

18  JTX-11 into evidence.

19         MR. PETERMAN:  No objection.

20         THE COURT:  JTX-11 is admitted.

21         (Exhibit admitted.)

22  BY MR. FRESE:

23  Q.    So, Dr. Muzzio, do you have a slide that illustrates

24  how Ragnar-Tolf would have informed the person of ordinary

25  skill in the arts identification of a target product profile

DIRECT EXAMINATION - FERNANDO MUZZIO

1   for pimavanserin?

2   A.    I do.

3               MR. FRESE:  Can we bring up MUZZIO-DX-44,

4   please?

5               THE WITNESS:  So at this point, the person of

6   ordinary skill in the art has the prior art tablets label

7   and Ragnar-Tolf, and Ragnar-Tolf reinforces and further

8   specifies what the person of ordinary skill in the art knows

9   that -- how to do.  So it reenforces that you can use

10  capsules or, alternatively, tablets with taste-masking

11  coating.  It basically says you can make a granulation to be

12  able to formulate this product.

13              And the person of ordinary skill in the art is

14  aware that this is intended for elderly patients, which are

15  known to have a high pill burden and trouble swallowing.

16  BY MR. FRESE:

17  Q.    What is "pill burden"?

18  A.    Pill burden is the number of tablets or capsules that

19  a person needs to take in the course of a day.

20  Q.    Let's go ahead and turn to DTX-9 in your binder.

21              What is DTX-9?

22  A.    It's a study that looks into problems -- or the

23  tendency of patients to abandon therapy as a function of

24  various factors, including pill burden.

25  Q.    And is it okay if we refer to this as the "Chapman"

DIRECT EXAMINATION - FERNANDO MUZZIO

1    reference?

2    A.    Yes.

3    Q.    When was it published?

4    A.    In 2005.

5    Q.    Go ahead and turn to DTX-10 in your binder.

6          What is DTX-10?

7    A.    It's another study that looked at patients' behavior

8    in both Japan and the US, particularly Parkinson's disease

9    patients.  And, you know, their responses to therapy.

10   Q.    Is it okay if we refer to this as the "Hattori"

11   reference?

12   A.    Yes.

13   Q.    When was it published?

14   A.    In 2012.

15   Q.    Go ahead and turn to DTX-11.

16          What is this reference?

17   A.    This is a study focusing on pill burden and also

18   socioeconomic status of patients and their effects on

19   adherence to pharmacological therapy in older patients.

20   Q.    And is it okay if we refer to this as the "Kumar"

21   reference?

22   A.    Yes.

23   Q.    And when was it published?

24   A.    2014.

25   Q.    So do you have a slide discussing how the Chapman,

DIRECT EXAMINATION - FERNANDO MUZZIO

1   Hattori and Kumar references illustrate the general

2   knowledge of a person of ordinary skill in the art?

3   A.     Yes.

4           MR. FRESE:  Can we bring up DTX-45, please,

5   Mr. Mortenson?

6           THE WITNESS:  So basically these studies would

7   reenforce something that the POSA already knew, either from

8   education or from common experience as caring for older

9   parents or grandparents, right.

10          It says, for example, that a very large

11  percentage of physicians thought that it would be beneficial

12  to patients to reduce pill burden.

13          The second excerpt says that pill burden is a

14  major factor influencing patent drug compliance, while

15  socioeconomic status did not seem to have a significant

16  effect.

17          The next excerpt indicates that simplifying the

18  drug regime by eliminating even one pill would give benefits

19  for patient adherence to therapy.

20          So elderly patients with Parkinson's disease are

21  known to have substantial pill burdens because they are

22  older and because they have conditions that need to be

23  treated.  That pill burden is a well-known concern in dosage

24  form design.  I mean, whenever possible, you want to reduce

25  the number of dosages given to a patient.

DIRECT EXAMINATION - FERNANDO MUZZIO

1          So there is a motivation to try to minimize the

2    number of tablets or capsules administered to a patient.

3    That reducing the number of dosage forms could basically

4    reduce pill burden.  And that consolidating dosage forms so

5    that you put all of the medication, or sometimes you have

6    more than one medication, in a single pill reduces pill

7    burden and also reduces manufacturing and material costs.

8    Q.    So how would a POSA have known that consolidating two

9    pills into one would reduce manufacturing and costs?

10   A.    Anybody working in the pharmaceutical company would

11   know that if you can treat the patient with a smaller number

12   of tablets and capsules means that you need to make fewer

13   tablets and capsules, and that's less expensive than making

14   more tablets and capsules.

15          The POSA would know, absolutely would know that

16   reducing the number of tablets and capsules you need to make

17   would save the company money; in addition, it's common

18   sense.

19          MR. FRESE:  Your Honor, we'd like to move DTX-9,

20   10, and 11 into evidence.

21          MR. PETERMAN:  No objection.

22          THE COURT:  All right.  DTX-009, DTX-010,

23   DTX-011 are admitted.

24          (Exhibit admitted.)

25   BY MR. FRESE:

DIRECT EXAMINATION - FERNANDO MUZZIO

1    Q.    Right.

2          And just to be clear, Dr. Muzzio, the portions

3    you've excerpted here on the upper left is DTX-10.0005?

4    A.    Yes.

5    Q.    And the portion below that is from DTX-11.0002?

6    A.    Yes.

7    Q.    And the portion in the right column is from

8    DTX-009.0004, right-hand column?

9    A.    Indeed.

10   Q.    So how would the concept of pill burden motivate a

11   person of ordinary skill in the art to reformulate Nuplazid

12   tablets?

13   A.    It would motivate a person of ordinary skill in the

14   art to try to formulate it in such a way where you can put

15   all 40 mgs of pimavanserin tartrate in a single dosage form.

16   Q.    And what other reasons would a person of ordinary

17   skill in the art have to consolidate the full 34 mgs of

18   pimavanserin tartrate into a single dosage form?

19   A.    Well, as I said, there would also be savings, it will

20   cost less money.  It would also free up manufacturing

21   capacity.  If you're making half of the dosage forms, you

22   don't need to basically use up your manufacturing capacity

23   that long, you're basically being able to release

24   manufacturing capacity, which is also a very significant

25   savings and factor for the company.

DIRECT EXAMINATION - FERNANDO MUZZIO

1   Q.     All right.  If we go back to MUZZIO-DX-43 -- sorry,

2   this should be DX-44.  Can we bring -- thank you.

3          You mentioned difficulty swallowing in the

4   patient population here?

5   A.     Yes.

6   Q.     Why would a person of ordinary skill in the art be

7   concerned with the patient population having difficulty

8   swallowing?

9   A.     Because it's one of the key factors that leads to the

10  patient not complying with medication.  Because the person

11  of ordinary skill in the art knows that this is for patients

12  that have Parkinson's disease, which are elder patients, the

13  POSA would know that these older patients have difficulty

14  swallowing.

15  Q.     And would a person of ordinary skill in the art know

16  this from their education and training?

17  A.     They would, and also from common sense and normal

18  common experience caring for an elderly parent or a

19  grandparent.

20  Q.     And have you reviewed references that back up this

21  concept that a person of ordinary skill in the art would be

22  concerned with swallowing difficulties?

23  A.     Yes.

24  Q.     Go ahead and turn to DTX-13.  What is DTX-13?

25  A.     So it's a study that looks at how to improve

DIRECT EXAMINATION - FERNANDO MUZZIO

1   acceptability of medicines.  So it's looking at the factor

2   that causes difficulties in patients adhering to treatment

3   for both pediatric and geriatric populations.

4   Q.    And is it okay if we refer to this as the Liu

5   reference?

6   A.    Yes.

7   Q.    And when was it published?

8   A.    In October 2014.

9   Q.    Go ahead and turn to the page DTX-13_0003.  And let's

10  look at the right-hand column, the bottom two lines, where

11  it starts "the prevalence of dysphagia"?

12  A.    Yes.

13  Q.    And can you read that sentence for us?

14  A.    Yeah.  It says, "The prevalence of dysphagia" --

15  difficulty swallowing -- "is particularly high in patients

16  with age-related diseases, such as Parkinson's disease."

17  And then it says "80 percent of such patients have trouble

18  swallowing."

19  Q.    How does this reference show that a person of

20  ordinary skill in the art would have known elderly patients

21  have difficulty swallowing?

22  A.    It says that.  It says that directly, saying that

23  older patients with Parkinson's disease are affected by

24  dysphagia in very large portions.

25         MR. FRESE:  Your Honor, we'd like to move DTX-13

DIRECT EXAMINATION - FERNANDO MUZZIO

1    into evidence.

2              MR. PETERMAN:  No objection.

3              THE COURT:  All right.  DTX-013 is admitted.

4              (Exhibit admitted.)

5    BY MR. FRESE:

6    Q.    So knowing that Parkinson's patients have difficulty

7    swallowing, what would that motivate a person of ordinary

8    skill in the art to do with regard to formulating

9    pimavanserin?

10   A.    It would motivate a person of ordinary skill in the

11   art to formulate pimavanserin into a dosage form that is as

12   easy to swallow as possible.

13   Q.    Okay.  If we can go back to DTX-5, the Stegemann 2002

14   reference.  Let's take a look at page 0012.  And let's start

15   with the paragraph in the column on the left-hand side that

16   reads "the key elements."

17              Are you there?

18   A.    I am.

19   Q.    And can you read this paragraph briefly?

20   A.    Sure.  It says that the key elements of solid oral

21   dosage form design that determines ease of swallowing by

22   patient and consumers are the size, the shape, the surface

23   area and the surface structure of the dosage form.

24              And then it cites a study that compares the

25   perception of tablets and capsules.  And in this study, it

DIRECT EXAMINATION - FERNANDO MUZZIO

1    was found that 66 percent of patients choose capsules

2    relative to 18 percent who choose coated tablets, and only

3    4 percent choose uncoated tablets as easy to swallow.

4    Q.    And what does this show that a person of ordinary

5    skill in the art would have known about making dosage forms

6    that are easy to swallow?

7    A.    That capsules are preferred by patients as being easy

8    to swallow.

9    Q.    And how would a POSA have known that?

10   A.    Well, the POSA takes medications, too, so the POSA

11   would know that some big dosage forms are difficult to

12   swallow and smaller dosage forms are easier to swallow.  The

13   POSA, presumably, also has all their parents and

14   grandparents who take medications.  The POSA would have had

15   education and been exposed to literature such as these,

16   telling the POSA that a smaller capsule would be easy to

17   swallow.

18   Q.    Let's go ahead and turn to DTX-0006 in your binder.

19   What is this reference?

20   A.    So this is another reference by Sven Stegemann, which

21   is talking about the value of colored capsules as -- for

22   direct safety particularly in the title.

23   Q.    And when was this published?

24   A.    2005.

25   Q.    Is it okay if we refer to this reference as

DIRECT EXAMINATION - FERNANDO MUZZIO

1    "Stegemann 2005"?

2    A.    Sure.

3    Q.    Let's go ahead and turn to page 5 of Stegemann 2005.

4    A.    Yes.

5    Q.    I would like to direct your attention to the

6    left-hand column, and look at the paragraph that begins "to

7    maintain the identification..."

8    A.    Yes.

9    Q.    Can you read that paragraph and tell us what it shows

10   that a person of ordinary skill in the art would have known

11   about capsules?

12   A.    So this passage talks about something that is also

13   mentioned in some of the other references that we have been

14   talking about, which is basically that -- it says for elder

15   patients who take a number of medications every day, they

16   need to identify those medications, right.  Some are to be

17   taken in the morning, some are to be taken in the evening,

18   etc.  And so it says that to help the patients automatically

19   process, distinguish, you know, figure out how to take the

20   medication, the dosage form should be easy for the person to

21   identify.

22         And then it says that by using capsules that

23   have bright colors and, in particular, sometimes each

24   capsule having two colors helps the patient identify the

25   medication and differentiate them from white tablets -- I

DIRECT EXAMINATION - FERNANDO MUZZIO

1   wasn't done with it, sorry -- from white rounded tablets

2   that only differ from each other by size.

3          So here, it's the same point as we made.  So

4   colored two-piece capsules remain easily detectible and

5   distinguishable, while the white tablets only vary in -- the

6   rounded white tablets only vary in size, which is difficult

7   to distinguish.

8   Q.    And would a person of ordinary skill in the art have

9   known this from his or her experience and training?

10  A.    Yes.

11  Q.    And how does this comport with your personal

12  experience as both a person of ordinary skill in the art and

13  a patient?

14  A.    As a person of ordinary skill in the art, I'm very

15  familiar with capsules with bright colors and having two

16  colors and being easily distinguishable as opposed to, you

17  know, tablets which tend to be white and tend to be rounded.

18         As a patient, I take a whole bunch of

19  medications and, in my own personal experience, it is

20  sometimes difficult to tell apart tablets that are all white

21  and just a little different in size.

22  Q.    Going down further in the next paragraph, the one

23  that's up on the screen, there's a sentence that doctors and

24  pharmacists -- "doctors or pharmacists..." and can you go

25  ahead and read the rest of that and tell us what -- how it

DIRECT EXAMINATION - FERNANDO MUZZIO

1    would affect a person of ordinary skill in the art's

2    motivation to select a capsule for pimavanserin?

3    A.    It's basically saying that caregivers can help

4    patients develop the proper practices of when and how to

5    take different medications.  Patients that are taking lots

6    of different medications can actually -- that the caregivers

7    can use the color of the medication to help the patient

8    learn when and how to take each medication in the course of

9    a day.

10             And that would improve compliance, would avoid

11    the patient taking the same medication twice, for example,

12    right, make sure that the patient is taking each medication

13    every day at the right time and so on and so forth.

14    Q.    And would a person of ordinary skill in the art have

15    known this from his or her experience and training?

16    A.    Yes, and also from common sense.

17    Q.    Now, can one impart color to tablets?

18    A.    You can.

19    Q.    How would one impart color to a tablet?

20    A.    Typically tablets, you can make even one color, not

21    two.  And to do that, you have to usually -- if you want to

22    give the tablet a bright color, you coat it with a film of a

23    polymer that contains a dye.

24    Q.    What are some of the issues that a person of ordinary

25    skill in the art would know about with film coating tablets?

DIRECT EXAMINATION - FERNANDO MUZZIO

1    A.      The person of ordinary skill in the art would know

2    that film coating a tablet is a complex process, it's also

3    an expensive process, it's a time-consuming process, and

4    it's also a process that can have failures.  If you're just

5    coating the tablet to make it pretty, it's one thing.  But

6    if you're coating the tablet also to mask taste, then you

7    would be very concerned with something called film failure.

8            When you're film coating a tablet, the tablets

9    can stick to each other, they can stick to equipment.  And

10   then, as you further process them and they unstick, that

11   results in films that have defects, that have holes.  Also,

12   films can crack.  If you leave your medicine in the glove

13   compartment of your car and it's a hot day, it's not unusual

14   for the tablets to expand and the films to crack.  And also,

15   when you're coating tablets, you're coating a million

16   tablets, say, and you are applying this film, tablets would

17   get different amounts of coating, not every tablet gets the

18   same exact amount of coating.

19           So as a result of all of this, some tablets

20   would be taste-masked, but there would be some that are not

21   properly taste-masked and so, once in a while, the patient

22   would actually experience a bitter taste of the medicine.

23   That doesn't happen with capsules because the power doesn't

24   leak out of the capsule.

25           MR. FRESE:  Your Honor, we'd like to move DTX-6

DIRECT EXAMINATION - FERNANDO MUZZIO

1   into evidence.

2            MR. PETERMAN:  No objection.

3            THE COURT:  DTX-006 is admitted.

4            (Exhibit admitted.)

5   BY MR. FRESE:

6   Q.     Let's go back to DTX-5, which is the Ragnar-Tolf

7   reference -- or sorry, the Stegemann 2002 reference.

8   A.     Yeah.

9   Q.     And if we turn to page 0012, there's a paragraph

10  starting table 6.  Do you see that?

11  A.     Yes.

12  Q.     And can you read that paragraph and let me know what

13  it shows that a person of ordinary skill in the art would

14  have known about capsules?

15  A.     So this brief paragraph says that capsules are --

16  both soft and hard capsules are lustrous and precise in

17  appearance, have a narrow shape, are smooth and flexible in

18  texture and mask taste or odor, which makes them a preferred

19  dosage form.

20  Q.     And would a person of ordinary skill in the art have

21  known this from his or her experience and training?

22  A.     Yes.

23  Q.     So given Ragnar-Tolf's disclosure that pimavanserin

24  has a pronounced bitter taste, how would that motivate a

25  person of ordinary skill in the art to formulate it?

DIRECT EXAMINATION - FERNANDO MUZZIO

1   A.      So given that Ragnar-Tolf is saying that pimavanserin

2   has a bitter taste and that Ragnar-Tolf is also saying that

3   one way to fix that is to put the product inside of a

4   capsule, a person of ordinary skill in the art would have

5   said, I should try to put this 40 mgs of this dosage form --

6   sorry, of this drug substance in a capsule.

7   Q.      Now, let's turn back to DTX-11.  And I want to turn

8   your attention to page 0011 -- I'm sorry, not DTX- --

9   DTX-13.  I want to turn your attention to page 0011 of

10  DTX-13.

11  A.      Yes.

12  Q.      And you'll see that the Liu reference here mentions

13  "acceptability of other flexible oral solid dosage forms."

14  Do you see that?

15  A.      Yes.

16  Q.      All right.  So I wanted to ask you some questions

17  about these.  Turn down to section 5.1, "Multiparticulate

18  Dosage Forms."

19          Why would a person of ordinary skill in the art

20  have made a capsule instead of a multiparticulate dosage

21  form?

22  A.      Well, there are a number of reasons.  First of all,

23  these are not very common compared to capsules.  Capsules

24  are much more common.  Multiparticulate dosage forms

25  basically are dosage forms that you would open so that you

DIRECT EXAMINATION - FERNANDO MUZZIO

1    would disperse the material into food or into drink.  So

2    they would actually increase the amount of contact between

3    saliva and the drug substance, right?  You're giving the

4    patient a lot of little particles now rather than the

5    material inside of a capsule.  They are also more expensive

6    to make.  They require the caregiver to do more work.  The

7    caregiver has to disperse the dosage form in applesauce or

8    orange juice or what have you, milk, yogurt, to give to the

9    patient.

10          So there are a number of reasons why you would

11   only do something like this if there is some other reason

12   why a capsule is not going to work.

13   Q.    Let's go down to section 5.2, "Dispersible, Soluble,

14   and Effervescent Tablets."  Why would a person of ordinary

15   skill in the art make a capsule instead of a dispersible,

16   soluble, or effervescent tablet of pimavanserin?

17   A.    Same reasons it says right there in the -- starting

18   in the third line:  "These dosage forms require effective

19   taste-masking."  That's because there is more contact

20   between the saliva and the drug substance in these kind of

21   dosage forms.  They also require more effort by the

22   caregiver.  They're also more expensive to make.

23   Effervescent tablets have more failure points.  You have to

24   continuously keep them away from moisture.

25          So, again, you would only do something like this

DIRECT EXAMINATION - FERNANDO MUZZIO

1   if the much simpler and much more common solution of putting

2   the drug substance in a capsule would not work for some

3   other reason.

4   Q.    Go ahead and turn to page 0013, and let's look at

5   section 5.3, "Orally Disintegrating Formulations."

6   A.    Yes.

7   Q.    Why would a person of ordinary skill in the art make

8   a capsule instead of an orally disintegrating formulation?

9   A.    All of the same reasons.  So these are dosage forms

10  you put in the mouth and they break apart in the mouth,

11  right?  And so they break apart into the mouth into very

12  many small fragments, so you're increasing, again, the

13  contact between saliva and all of those fragments, so if a

14  medication has a bitter taste, that increases the

15  probability of the patient experiencing that bitter taste.

16  And also they are more expensive to make.  They are more

17  complex.  They require more -- you know, more protection

18  from exposure to moisture particularly.

19            So one more time, you don't do these unless and

20  until the simpler, more common solution of a capsule or a

21  tablet has failed.

22  Q.    Let's look at section 5.4, "Chewable Tablets."  What

23  are some reasons that a person of ordinary skill in the art

24  would select a capsule instead of a chewable tablet?

25  A.    So one more time, chewable tablets require the

DIRECT EXAMINATION - FERNANDO MUZZIO

1    patient to put the dosage form in the mouth and actively

2    chew it to disperse it in the mouth.  So, again, you are

3    increasing contact with saliva for a medication that has bad

4    taste.  That increases the probability of the patient to

5    experience the bad taste, or you have to take even more

6    strong measures to shield the drug substance from saliva.

7    And they are also, generally speaking, more expensive to

8    make.

9         And so you would not do this unless and until

10   the simpler, more common solutions of tablets and -- regular

11   tablets and capsules have failed for some reason.

12   Q.    All right.  And let's turn to section 5.5, "Films and

13   Jellies."  Why would a person of ordinary skill in the art

14   have made a capsule instead of a film or jelly?

15   A.    Very much the same reasons that we have been talking

16   about.  Films are not that common as a dosage form.  They

17   have been used, but they're not that -- that common.  And

18   they have a large surface area that increases the contact

19   between the material containing the drug substance and

20   saliva.  They're also more expensive to make than tablets or

21   capsules.  Jellies, again, would disperse in the mouth.

22        So for a poorly tasting drug substance, both of

23   these could increase the likelihood that the patient would

24   experience the poor taste of a -- of the medication.

25   Q.    Dr. Muzzio, in your career, about how many

DIRECT EXAMINATION - FERNANDO MUZZIO

1   dispersible tablets, soluble tablets, effervescent tablets,

2   orally disintegrating tablets, chewable tablets, films, or

3   jellies have you worked on in formulating?

4   A.    I have worked on some chewable tablets.  I have

5   worked on films.  You know, I have worked at companies

6   through consulting on liquids -- products, I mean, but

7   they're not very common.  I mean, compared to a tablet or

8   capsule, these are relatively rare.

9   Q.    All right.  For a person of ordinary skill in the art

10  who is looking to develop an easy-to-swallow formulation,

11  what would be the conventional line of thinking that he or

12  she would follow?

13  A.    The conventional line of thinking.  So the person of

14  ordinary skill in the art looking to formulate this product

15  as a 40 mg dosage form for an older patient that has trouble

16  swallowing and basically that is taking many different

17  medications and the medicine needs taste-masking, that

18  person would have been motivated to put the drug substance

19  in a small capsule that's easy to swallow, provides

20  effective taste-masking, and helps the patient identify that

21  drug relative to the many other drugs that that patient is

22  likely taking.

23  Q.    So do you have a slide summarizing why a person of

24  ordinary skill in the art would be motivated to select a

25  capsule?

DIRECT EXAMINATION - FERNANDO MUZZIO

1   A.      Yeah.

2           MR. FRESE:  Can we pull up MUZZIO-DX-46, please,

3   Mr. Mortenson?

4           THE WITNESS:  Right, so this summarizes

5   basically where the person of ordinary skill in the art is

6   after reading the label of the prior art tablets and after

7   reading Ragnar-Tolf and being aware that this is an older

8   patient population with difficulty swallowing, who needs

9   help basically, you know, distinguishing the medications.

10          So it would know, as indicated in the excerpt in

11  the left, that capsules are recognized as being easy to

12  swallow by many patients and that if the patient is taking

13  many dosage forms, a capsule that comes in a couple

14  different colors, as shown in the picture in the middle,

15  could benefit from that and that capsules provide very good

16  taste-masking.

17          In fact, capsules were first developed more than

18  150 years ago precisely to shield the taste and smell of

19  medications from the patient.  That was the main reason why

20  capsules came to be.

21          And then knowing specifically that this

22  particular drug substance has a pronounced bitter taste

23  would be further motivated to attempt to develop a capsule

24  that would contain the full 40 mgs and would be easy to

25  swallow.

DIRECT EXAMINATION - FERNANDO MUZZIO

1    BY MR. FRESE:

2    Q.    Now, Dr. Muzzio, with respect to the references that

3    are excerpted on this slide, on the left-hand side, is that

4    DTX-5.0012 in the left-hand column Stegemann 2002?

5    A.    Yeah.

6    Q.    And with respect to the figure in the middle, does

7    that come from Stegemann 2005, DTX-006.005?

8    A.    Yes.

9    Q.    And with respect to the reference on the right, does

10   that come from paragraph 132 of Ragnar-Tolf?

11   A.    Indeed.

12   Q.    Now, Dr. Muzzio, in your opinion, would a person of

13   ordinary skill in the art be motivated to select a size for

14   a capsule shell for a pimavanserin formulation?

15   A.    Yeah.

16   Q.    And what would a person of ordinary skill know from

17   his or her experience and training about the relationship

18   between capsule shell size and ease of swallowing?

19   A.    Both from training and from common sense, the person

20   of ordinary skill in the art would know that a smaller

21   capsule is easier to swallow than a big one.

22   Q.    Let's go ahead and turn to DTX-7 in your witness

23   binder.

24   A.    Yes.

25   Q.    What is this reference?

DIRECT EXAMINATION - FERNANDO MUZZIO

1  A.    This is a reference that studies the factors

2  affecting difficulties in swallowing capsules and tablets.

3  Q.    And when was that published?

4  A.    In 2012.

5  Q.    Is it okay if we refer to this as the "Schiele

6  reference"?

7  A.    Yes.

8  Q.    And do you have a slide discussing how Schiele would

9  back up a person of ordinary skill in the art's commonsense

10  notion that smaller capsules are easier to swallow?

11  A.    Yes.

12        MR. FRESE:  Can we look at MUZZIO-DX-47,

13  Mr. Mortenson?

14        THE WITNESS:  So in here in the table at the top

15  which is taken from Schiele, the table lists in the -- well,

16  in the first column, it talks about different dosage forms

17  having different shapes, being tablets, being capsules, etc.

18  The next column indicates the size of the tablets that are

19  difficult -- the tablets and capsules that are difficult to

20  swallow.  So those and larger would be difficult to swallow.

21        The third column indicates the size of tablets

22  and capsules that did not cause difficulties to the

23  patients.  So those sizes and smaller would be easy to

24  swallow.  And what it says here is that capsules are easy to

25  swallow when they are smaller than 6.4 mm in diameter and

DIRECT EXAMINATION - FERNANDO MUZZIO

1    17.5 mm in length.

2              In comparison to that, what we see below is that

3    excerpt from the table in Stegemann, I think, or in -- well,

4    the table giving the sizes of capsules of different, you

5    know, dimensions.  So it says there that a capsule size 4

6    has a length of 14.3 mm, so less than 17.5, and a diameter

7    of 5.3 mm, less than 6.4.  So this would be a capsule size

8    that is easy to swallow.

9    BY MR. FRESE:

10   Q.    Would a person of ordinary skill in the art have had

11   access to such capsule size tables as of the priority date

12   as of August 30th, 2017?

13   A.    Yeah, capsule size charts have been around for

14   decades.  I have used them for decades.

15   Q.    So what would this tell a person of ordinary skill in

16   the art about selecting a capsule size for a pimavanserin

17   formulation?

18   A.    It would have said that the size 4 was a good choice

19   for this formulation because, as per the data in Schiele, it

20   would be easy to swallow.

21   Q.    So from Ragnar-Tolf and the Nuplazid label, do you

22   have a slide discussing what a person of ordinary skill in

23   the art would select for the target product profile for

24   delivering 34 mgs of pimavanserin to a patient?

25   A.    I do.

DIRECT EXAMINATION - FERNANDO MUZZIO

1          MR. FRESE:  Can we bring up MUZZIO-DX-48,

2     Mr. Mortenson?

3          THE WITNESS:  So at this point, the target

4     product profile that a person of ordinary skill in the art

5     would be putting together would now include that because of

6     the taste-masking requirement and because of the need to

7     have a product that is easy to swallow, a size 4 capsule

8     would be a good choice to put the 34 mgs of pimavanserin as

9     in the form of 40 mgs of pimavanserin tartrate.

10    BY MR. FRESE:

11    Q.    Now, Dr. Muzzio, do you have a slide discussing how a

12    person of ordinary skill in the art would go about achieving

13    the goal of putting the full 40 mg dose of pimavanserin

14    tartrate into a size 4 capsule?

15    A.    I do.

16          MR. FRESE:  Can we bring up MUZZIO-DX-49,

17    please, Mr. Mortenson?

18          THE WITNESS:  So from the previous target

19    product profile, the person of ordinary skill in the art now

20    is trying to develop a formulation that allows him or her to

21    put 40 mgs of pimavanserin tartrate into a size 4 capsule.

22    BY MR. FRESE:

23    Q.    And what would be the solution to that?

24    A.    They want to do that in a way that the capsule is

25    easy to manufacture effectively, and so the solution would

DIRECT EXAMINATION - FERNANDO MUZZIO

1    be to granulate so that you have sufficient density to be

2    able to put all of the 40 mgs inside a size 4 capsule

3    efficiently and effectively.

4    Q.    And where would a person of ordinary skill in the art

5    look to know how to do that?

6    A.    Ragnar-Tolf.

7    Q.    So going back to JTX-11, Ragnar-Tolf, do you have a

8    slide discussing what that reference would have taught a

9    person of ordinary skill in the art about how to fit the

10   full 40 mg dose into a size 4 capsule?

11   A.    Right.  So Ragnar-Tolf has already taught the POSA

12   that you can granulate.  It's already taught the POSA that

13   you could do that in a capsule.  It has already told the

14   POSA that you could contemplate 1 to 8 mgs of pimavanserin

15   in a single dosage form, and it has told the POSA that you

16   can achieve densities -- bulk densities, you know, around

17   0.6 with fairly good consistency.  There are five different

18   cases here where the drug substance concentration has been

19   varied from about 1 percent to about 20 percent, all of them

20   showing densities higher than 0.56.

21   Q.    Okay.  So looking at these 20 mg -- these 20 percent

22   blends that you've highlighted in green here --

23   A.    Yes.

24   Q.    -- what would a POSA know about why those would not

25   fit in a size 4 capsule to deliver the full 40 mg dose?

DIRECT EXAMINATION - FERNANDO MUZZIO

1    A.    Right, so the POSA would say, okay, if I keep the

2    concentration at 20 percent, to put 40 mgs of pimavanserin

3    tartrate, I'm going to need 200 mgs of the final blend.  But

4    in a size 4 capsule with a density of around 0.6, the most

5    you can put inside a size 4 capsule is 126 mgs of total

6    blend.  He needs 200, but the most he can put is 126 at that

7    density of 0.6.

8    Q.    So how would a person of ordinary skill in the art go

9    about solving that problem?

10   A.    Well, the obvious thing to do is to increase the

11   concentration a little higher than 20 percent.

12   Q.    Okay.  And do you have a slide discussing how a

13   person of ordinary skill in the art would know to increase

14   the drug concentration in the granules?

15   A.    Yes, I do.

16          MR. FRESE:  Let's bring up MUZZIO-DX-51.

17          THE WITNESS:  So Ragnar-Tolf in table 7, which

18   is part of the same example, is actually showing to the POSA

19   that you can increase the drug substance from 1 to 5 to 20

20   by taking out some of the diluent by reducing the mannitol

21   from 91 percent to 87 percent to 71 percent while keeping

22   everything else pretty much constant.

23          The only difference there is that magnesium

24   stearate increase from 1.5 to 2 percent.  So the POSA looks

25   at this data and says, okay, I need to put more drug in the

DIRECT EXAMINATION - FERNANDO MUZZIO

1   blend.  I need to increase the concentration of drug in the

2   blend so that I can put my 40 mgs within the 126 mgs of

3   total blend that I can put inside that capsule.

4          So the next obvious thing to try is to do this

5   calculation, right; is to say, okay, if the 40 mgs of

6   pimavanserin tartrate need to be contained in 126 mgs of

7   final blend, that means that the concentration of

8   pimavanserin tartrate in the final blend is going to be

9   31.7 percent.

10         And because 2 percent of that blend is magnesium

11  stearate, it would say that the granules themselves need to

12  have a little higher concentration, about 32.4 percent.

13         So the POSA would say, okay, if I assume that a

14  density is going to stay at 0.6 because it has been pretty

15  stable around 0.56 to 0.6, then I can prepare a blend at

16  least 24 percent, a little higher than 20.  And I can do

17  that just by taking some of the mannitol out.  Instead of

18  the 71, I will use 59, almost 60 percent.  I will keep the

19  other things the same.  I will use the same amount of

20  ethanol and I will try that.

21         And when you granulate that way, if your density

22  comes out at 0.6, as would be the expectation, problem

23  solved.

24         Now, you put 126 mgs of that final blend into

25  the capsule and you have your 40 mgs of pimavanserin

DIRECT EXAMINATION - FERNANDO MUZZIO

1   tartrate.

2   BY MR. FRESE:

3   Q.    Now, what if the density comes out a little higher or

4   a little lower?

5   A.    Let's say that the density is 0.6, comes up 0.62,

6   then you will want to put a little bit less than 12 -- than,

7   you know, 32.4 percent, so you would then run one more

8   experiment and you would go down to maybe 34 percent.

9         Conversely, if the density comes out, let's say,

10  0.57, now you're off by about three percentage points.  So

11  you could say, oh, maybe I need to run one more experiment;

12  instead of 32.4 percent, I need to go to maybe 34 percent,

13  right.  And almost for sure that second experiment would

14  have been right where you needed to be.

15  Q.    So in your opinion, would a person of ordinary skill

16  in the art have had a reasonable expectation of success of

17  granulating pimavanserin tartrate such that one could fit

18  the full 40 mg dose of pimavanserin tartrate into a size 4

19  capsule?

20  A.    Looking at the state that a person of ordinary skill

21  in the art would have succeeded at being able to create a

22  formulation with granulated pimavanserin tartrate such that

23  you can put the 40 mgs inside that size 4 capsule within one

24  or maybe two experiments.

25  Q.    And do you have a slide explaining why?

DIRECT EXAMINATION - FERNANDO MUZZIO

1  A.    Yeah.

2        MR. FRESE:  Can we bring up MUZZIO-DX-52?

3        THE WITNESS:  So just to summarize what I just

4  said, the bulk density has remained very consistent as the

5  pimavanserin tartrate increased from 1 to 5 to 20 percent,

6  so increased by a factor of 20 to 1 and didn't change much.

7        So the POSA would expect the density to remain

8  roughly there when the concentration is increased from 20 to

9  32 percent.  And if he was off, then it could be adjusted

10 quickly with one more experiment so that the POSA would

11 expect that for those densities, you know, 0.5 to 0.6, those

12 are very typical densities for these kind of granulations,

13 you would arrive at the formulation with the right

14 granulation that allows you to put the 40 mgs in a size 4

15 capsule with very little effort.

16 BY MR. FRESE:

17 Q.    Now, Dr. Muzzio, if you look back at example 9 of

18 Ragnar-Tolf, paragraph 129, it says that these wet

19 granulations are used for making tablets.

20        Would that have dissuaded a person of ordinary

21 skill in the art from using the granulation to fill a

22 capsule?

23 A.    No, it's very common in companies to have a tablet

24 version of the product and a capsule version of the product,

25 and it's also very common sometimes to just take the

DIRECT EXAMINATION - FERNANDO MUZZIO

1   formulation that was used to make a tablet and to fill it

2   inside the capsule.  That happens all the time.

3   Q.    And do you have a slide explaining why this would not

4   dissuade a person of ordinary skill in the art from using

5   this granulation in making tablets -- in capsules?

6   A.    Yes.

7           MR. FRESE:  Can we bring up MUZZIO-DX-53?

8           THE WITNESS:  So Ragnar-Tolf says right there

9   that, instead of compressing into a tablet, the blend

10  described above can be placed inside a gelatin or an HPMC

11  capsule and a POSA already knows that a pimavanserin

12  tartrate is compatible with both gelatin and HPMC capsules.

13          And moreover, you know, granulation is very

14  commonly used to make tablets and capsules.  I mean, 70 to

15  80 percent of the time.

16  BY MR. FRESE:

17  Q.    Now, Dr. Muzzio, in your opinion, is there anything

18  surprising about being able to granulate pimavanserin

19  tartrate into something that would fit into a size 4

20  capsule, the full 40 mg dose?

21  A.    No, I don't find anything surprising about that.

22  Q.    All right.  Turn to JTX- 13 in your binder.

23          Dr. Muzzio, what is JTX- 13?

24  A.    This is document that was put together -- apparently,

25  when Acadia was discussing with Catalent, apparently this is

DIRECT EXAMINATION - FERNANDO MUZZIO

1    a Catalent document proposing how they are going to go about

2    branding pimavanserin.

3    Q.    What is Catalent?

4    A.    Catalent is a company development or contract

5    manufacturing company or it was.  It's been recently

6    acquired.  But at the time, they were a company dedicated to

7    developing products and manufacturing products for other

8    companies.

9    Q.    Are you familiar with Catalent in your personal

10   experience?

11   A.    I'm very familiar with Catalent.  I have contracted

12   with them for many, many years.  I have visited the site

13   where the -- the address is provided here.  They are in New

14   Jersey about 15 minutes from my office.  Yes, I know this

15   company very well.

16   Q.    Okay.  Now, let's turn to page 002 and look at the

17   paragraph above the table.

18   A.    Okay.

19   Q.    And you'll see a paragraph there that starts, "the

20   goal of this development..."

21   A.    Mm-hmm.

22   Q.    Do you see that?

23   A.    Yes.

24   Q.    Can you read that paragraph?

25   A.    Yeah.

DIRECT EXAMINATION - FERNANDO MUZZIO

1          It says, "The goal of this development is to

2     produce a finished product that can be filled into a

3     two-piece hard shell capsule no larger than a size 3

4     capsule."

5     Q.    And going on, take a look at the table of capsule

6     capacity versus bulk density, do you see that?

7     A.    Yes.

8     Q.    What does that table show?

9     A.    This is an excerpt from the size charts that we've

10    been talking about earlier.  It shows the volumes of capsule

11    size 3 and 4 as being 0.3 mLs and 0.21 mLs, respectively.

12          And then it shows how much you can fit into one

13    of these capsules as a function of the bulk density 0.6,

14    0.7, 0.8, 0.9.

15    Q.    And are the numbers here consistent with what's

16    reported in table 1 of Stegemann 2002, DTX-5?

17    A.    I believe they are the same numbers.

18    Q.    Go ahead and turn to page JTX-13.0003.  And in the

19    second paragraph here, I want you to look about four lines

20    down where it says, "Other fluid bed technologies."

21          Do you see that?

22    A.    Yes.

23    Q.    Okay.  What does that say and what does it indicate

24    to you?

25    A.    This is -- there are other fluid bed technologies,

DIRECT EXAMINATION - FERNANDO MUZZIO

1   such as layering and it says, either top spray or Wurster

2   layer, those are two different kinds, can produce

3   free-flowing material, so material that can flow with the

4   required bulk density and will be considered.

5   Q.     And what does that indicate to you?

6   A.     In the case that it was known in the field that even

7   before trying, the people who had put together this quote

8   knew and expected that these techniques would produce high

9   enough bulk densities to allow filling the intended amount

10  of pimavanserin into a size 3 or 4 capsule.

11  Q.     Okay.  Let's go ahead and take a look at page

12  JTX-13.0004.  And I want to direct your attention to the

13  second sentence underneath the -- the first bullet point

14  underneath the heading "High-Shear Granulation."

15  A.     Yes.

16  Q.     And can you read that bullet point?

17  A.     Yeah, it's saying that the granulations that get

18  result from high-shear granulation are known to be capable

19  of bulk densities in the 0.6 to 0.8 g/mL range.

20  Q.     And what does that indicate to you as a person of

21  ordinary skill in the art?

22  A.     It tells me that the people who were providing this

23  document to Acadia knew, before doing anything, that this

24  granulation technique can generate bulk densities that are

25  high enough to be able to put the full 40 mgs of

DIRECT EXAMINATION - FERNANDO MUZZIO

1    pimavanserin inside a size 3 or size 4 capsule.

2              MR. FRESE:  Your Honor, we'd like to move JTX-

3    13 into evidence.

4              MR. PETERMAN:  No objection, Your Honor.

5              THE COURT:  All right.

6              MR. FRESE:  And as a bit of a housekeeping, we'd

7    also like to move DTX-7 into evidence.

8              THE COURT:  All right.  JTX-0013 is admitted and

9    DTX-7 is admitted.

10             (Exhibits admitted.)

11   BY MR. FRESE:

12   Q.    Dr. Muzzio, do you have a slide summarizing your

13   opinions on the obviousness claims of Claims 4 and 5?

14   A.    Yes, I do.

15             MR. FRESE:  Can we bring up MUZZIO-DX-54.

16             THE WITNESS:  This is a claim chart that

17   compares the elements of Claim 4 to what the POSA would know

18   when reading the prior art tablet label in view of the

19   Ragnar-Tolf prior art reference.

20             So the first element in the claim, which is a

21   pharmaceutically acceptable capsule for delivering 34 mgs of

22   pimavanserin to a patient.  The label disclosed that a daily

23   dose was 34 mgs and that it was given as two tablets once a

24   day, each one containing 20 mgs.

25             The POSA would know that Ragnar-Tolf already

DIRECT EXAMINATION - FERNANDO MUZZIO

1    disclosed tablets that could contain from 1 to 80 mgs of

2    pimavanserin tartrate and Ragnar-Tolf also disclosed that

3    the formulations could be made as either tablets or

4    capsules.

5            The second element would say that the capsule

6    has a size 3 or 4 capsule shell.  The POSA would have been

7    motivated to select a size 4 capsule shell to make the

8    capsule easy to swallow for the older patients that have

9    Parkinson's disease as stated in the label.

10           The third element says that these capsule shell

11   would contain a blended pimavanserin composition comprising

12   granules comprising 40 mgs of pimavanserin tartrate and one

13   or more pharmaceutically acceptable excipients.

14           So Ragnar-Tolf discloses pimavanserin tartrate,

15   discloses granules comprising 20 percent pimavanserin

16   tartrate and granulated with excipients, blended with

17   2 percent magnesium stearate.

18           But the POSA would be able to determine with a

19   very quick calculation that in order to put 40 mgs of

20   pimavanserin tartrate in a size 4 capsule would need to

21   increase the concentration to about 32, 33 percent,

22   something like that.

23           And then the last claim element says, "wherein

24   the bulk density of the granules is greater than 4 g/mLs."

25           Ragnar-Tolf is already disclosing granules that

DIRECT EXAMINATION - FERNANDO MUZZIO

1   have a bulk density somewhere between 0.56 and 0.61 for a

2   wide range of drug concentrations from 1 percent to

3   20 percent.

4   Q.    And what about Claim 5?

5   A.    So Claim 5, all it does is it narrows the second

6   claim element from a size 3 or 4 to just a size 4.  So for

7   the same reasons that the POSA would have found obvious,

8   Claim 4, the POSA would find Claim 5 also obvious.

9   Q.    And does Ragnar-Tolf also talk about hard capsule

10  shells?

11  A.    Yes.

12  Q.    Now, again, do you have a slide that provides an

13  overview on your opinions of indefiniteness -- of

14  obviousness?

15  A.    I do.

16          MR. FRESE:  Can we bring up Muzzio DTX-56?

17          THE WITNESS:  So in summary, the POSA would have

18  been motivated to consolidate the full 34 mgs of

19  pimavanserin of the two prior art tablets into a single

20  dosage form in order to reduce pill burden to the patient.

21          The POSA would have been motivated to

22  reformulate pimavanserin tartrate in a size 4 capsule to

23  make it easy to swallow and particularly use a capsule to

24  provide effective taste-masking and to make the medication

25  easy to identify for the patient.

DIRECT EXAMINATION - FERNANDO MUZZIO

1          The POSA would have looked to Ragnar-Tolf to

2   find ways to granulate pimavanserin tartrate and would have

3   found those methods there so that the POSA would then feed

4   the pimavanserin tartrate into smaller capsule.

5          The POSA would have learned from Ragnar-Tolf

6   that pimavanserin tartrate is compatible with hard capsule

7   shells; in fact, example 7 of Ragnar-Tolf is clearly

8   indicating to the POSA that they are considering either

9   tablets or capsules.

10         And the POSA would have very straightforwardly

11  been able to determine that the concentration of

12  pimavanserin tartrate in the Ragnar-Tolf granulation needs

13  to be increased to 32 or 33 percent in order to be able to

14  put the 40 mgs of pimavanserin tartrate used in that

15  particular way to granulate with a reasonable expectation of

16  success.

17  BY MR. FRESE:

18  Q.     Now, to the extent the claims are definite,

19  Dr. Muzzio, do you have an opinion as to whether they are

20  invalid as lacking written description?

21  A.     I do.

22  Q.     And have you prepared a slide that provides an

23  overview of your opinions on written description?

24  A.     Yes, I have.

25         MR. FRESE:  Mr. Mortenson, can we bring up

DIRECT EXAMINATION - FERNANDO MUZZIO

1    MUZZIO-DX-58?

2    BY MR. FRESE:

3    Q.    Dr. Muzzio, would you please provide us with a brief

4    overview of your opinions on written description?

5    A.    Yeah, there are two things here.  So first, the

6    patent specification doesn't really describe granules

7    comprising 40 mgs pimavanserin tartrate and one or more

8    pharmaceutically acceptable excipients.  The one or more

9    pharmaceutically acceptable excipients in this case have to

10   be intragranular components.  They have to be within the

11   granules.

12         The claims as written is extremely broad.  It

13   claims any excipient, any number of excipients in any amount

14   having any function, so the entire universe of excipients in

15   principle is now a claim here.  But the specification, in

16   comparison, has very, very limited instances of

17   intragranular components.

18         In addition to that, the claim now is claiming

19   any densities higher than 0.4 g/mL.  But nowhere in the

20   specification I find any guidance on how to go to bulk

21   densities of 0.7 g/mL, 0.8 g/mL, 0.9 g/mL.  The

22   specification doesn't teach how to do that.  It doesn't show

23   that the inventors actually had what imposition of a method

24   to achieve those bulk densities.

25   Q.    Now, do you have a slide that discusses why the

DIRECT EXAMINATION - FERNANDO MUZZIO

1   claims you say are as broad as you say with respect to the

2   excipients?

3   A.     I do.

4          MR. FRESE:  Can we bring up MUZZIO-DX-59,

5   please?

6          THE WITNESS:  Yes, so that's the language in the

7   claim, "granules comprising 40 mgs of pimavanserin and one

8   or more from a pharmaceutically acceptable excipient."  So

9   that doesn't limit at all how many excipients I can use.  I

10  can use one or 20.

11         It doesn't tell me what those excipients are or

12  what they are supposed to do, so any kind of excipient

13  presumably.  It doesn't tell me how much to use of any one

14  excipient.  So essentially, any -- and it doesn't even say

15  how the granulation is done.  So any granulation made by any

16  means containing any amounts of any materials now is being

17  claimed here.

18  BY MR. FRESE:

19  Q.     Now, we discussed the -- now, do you have a slide

20  that shows what the '721 patent does disclose regarding

21  granules with intragranular excipients besides the

22  comparative examples?

23  A.     Yes.

24         MR. FRESE:  Can we bring up MUZZIO-DX-60?

25         THE WITNESS:  So these are the three spots in

DIRECT EXAMINATION - FERNANDO MUZZIO

1   the specification where there is reference to granulations

2   containing intragranular excipients outside of the

3   comparative examples.

4          In the excerpt in the left, after discussing why

5   you don't want to use a binder, then it says, okay, it is

6   however possible to include a binder, but for various

7   reasons that's not preferred.  So it's actually been telling

8   you, you know, that -- basically try not to use a binder.

9          And then there are these other two brief

10  paragraphs in the excerpt in the right where what it's

11  saying is that in another embodiment, you might want to

12  premix the pimavanserin tartrate granulation with less than

13  10 percent of a mixture of one specific particular

14  excipient, Avicel 302, and colloidal silicon dioxide.  And

15  it further says that that mixture of Avicel and colloidal

16  silicon dioxide has to contain less than 60 percent of the

17  Avicel.

18         And the middle -- the paragraph says, okay, you

19  can also have granulation that has the pimavanserin tartrate

20  granulation containing, again, less than 10 percent of this

21  other mixture of Avicel 101 instead of 302, and colloidal

22  silicon dioxide.  And it tells you basically what silicon

23  dioxide to use and that the Avicel itself has to be less

24  than 60 percent of that mixture.

25         These are the only places where, outside of the

DIRECT EXAMINATION - FERNANDO MUZZIO

1   comparative examples, the specification talks about putting

2   anything inside the granules.

3   BY MR. FRESE:

4   Q.    Now, during the opening statement, counsel referred

5   to column 16, lines 4-10 of the '721 patent, JTX-9.  Could

6   you direct your attention there?

7   A.    Yes.

8   Q.    All right.  Why, in your opinion, does this not

9   provide a written description of granules with one or more

10  pharmaceutically acceptable excipients?

11  A.    I'm sorry.  I have trouble seeing here.  It's only

12  talking about binders.

13          MR. FRESE:  And so if we could put up

14  MUZZIO-DX-60 again.

15  BY MR. FRESE:

16  Q.    Is that similar to the excerpt you provided on the

17  left that talks about binders?

18  A.    Right.

19  Q.    And that's an excerpt at column 12, lines 37-42?

20  A.    Right.

21  Q.    And the excerpt on the right is provided at column

22  17, lines 34-49?

23  A.    Correct.

24  Q.    Now, we discussed the comparative experiments earlier

25  as containing excipients within the granules, correct?

DIRECT EXAMINATION - FERNANDO MUZZIO

1   A.      Yes.

2   Q.      Would a person of ordinary skill in the art recognize

3   those as a written description of an invention with

4   intragranular excipients?

5   A.      No.

6   Q.      Why not?

7   A.      Those are the comparative examples.

8   Q.      And what did the specification say about the

9   comparative examples that would lead a person of ordinary

10  skill in the art not to regard them as a written

11  description?

12  A.      That they lead to unacceptable results.  It's telling

13  the person of ordinary skill in the art, don't do this.

14          THE COURT:  Leads to unacceptable?

15          THE WITNESS:  Unacceptable results.

16  BY MR. FRESE:

17  Q.      Now, do you have a slide that discusses whether the

18  one example that works provided in the '721 patent

19  specification included any excipients in the granules?

20  A.      I do.

21          MR. FRESE:  Can we bring up MUZZIO-DX-61,

22  please?

23          THE WITNESS:  So this is the one and only

24  working example in the patent that is identified as the

25  thing that actually worked.  And it basically very clearly

DIRECT EXAMINATION - FERNANDO MUZZIO

1    stating that you are going to granulate only pimavanserin.

2            So it says that pimavanserin, full stop, is

3    charged through a mesh into the high shear granulator,

4    nothing else is being charged.  Then water is sprayed at a

5    controlled rate.  In the next step, it says that you then

6    mix that mixture of water and pimavanserin tartrate for

7    five minutes -- I mean, it says wet massing, which means you

8    mix it, you knead it, as if you were kneading dough, for

9    five minutes.

10           And then you discharge that into a fluid-bed

11   dryer, so you're drying now this water, pimavanserin

12   mixture.  And after you finish drying it, you discharge the

13   resulting granules, which are 100 percent pure pimavanserin,

14   you discharged those dry granules, and you save them -- you

15   screen them and you save them from future use.

16   BY MR. FRESE:

17   Q.    So what exactly is done here in this pre-blending

18   step?

19   A.    In this pre-blending step, you're just mixing the

20   pimavanserin itself, fluffing it up, if you will, to make

21   sure that you have the same particle size everywhere in the

22   system, you know, you're just pre-mixing the pure drug

23   substance.

24   Q.    All right.  Now, Dr. Muzzio, do you have a slide

25   showing when excipients were added in this example?

DIRECT EXAMINATION - FERNANDO MUZZIO

1    A.    I do.

2              MR. FRESE:  Can we bring up MUZZIO-DX-62?

3              THE WITNESS:  So the example continues, and

4    explains how you take this pure 100 percent pimavanserin

5    granules that have been now dried.  And it says the

6    screened, dried pimavanserin granulation, those are just

7    granules only containing pimavanserin, are then dispensed

8    for blending/encapsulation unit operations.

9              So it says that you now add to the

10   pimavanserin-alone granules, you add two excipients, you add

11   a diluent and you add a lubricant, and now you mix that to

12   form the final blend.  And then that's what you're going to

13   fill into capsules.

14             And it refers to table 2 as basically one

15   instance of using one of these diluents, in this case,

16   again, microcrystalline cellulose, and one of these

17   lubricants, magnesium stearate, both of which are outside

18   the granules, to fill in the capsule.

19   BY MR. FRESE:

20   Q.    Dr. Muzzio, why is it your opinion that the

21   microcrystalline cellulose and magnesium stearate are

22   outside the granules?

23   A.    Well, when I read the example, it's telling me very

24   clearly that the pimavanserin was in granulated alone, and

25   then the diluent, which is the microcrystalline cellulose,

DIRECT EXAMINATION - FERNANDO MUZZIO

1    and the lubricant, which is the magnesium stearate, were

2    then added to the granules.

3            So there are several other reasons.

4            (Court reporter clarification.)

5            THE WITNESS:  So there are several other

6    reasons.  One of the reasons is magnesium stearate is a

7    lubricant and it's hydrophobic and we don't put it inside

8    the granules, especially as something that has been

9    described as an immediate-release product.

10            If you put the magnesium stearate inside the

11   granules, you lose the lubricating function, number one.

12   And number two, you can make the granules hydrophobic, which

13   could take longer to dissolve, so you would no longer have

14   an immediate-release problem.  This is a very common

15   problem, right, that magnesium stearate can provide.  So

16   when I see magnesium stearate, I know that it's outside the

17   granules.

18   BY MR. FRESE:

19   Q.    Dr. Muzzio, what does hydrophobic mean?

20   A.    It that means you repel water.

21   Q.    Dr. Muzzio, I want to turn your attention to

22   column 19 of the '721 patent, around line 50.

23   A.    Yes.

24   Q.    And, Dr. Muzzio, if you read that, is that an

25   embodiment where the microcrystalline cellulose and the

DIRECT EXAMINATION - FERNANDO MUZZIO

1    magnesium stearate are outside of the granules or within the

2    granules?

3    A.    They're outside.

4    Q.    Why?

5    A.    It says, "34 mg of pimavanserin (granulated), 59 mg

6    of microcrystalline cellulose, for example Avicel PH302 or

7    an equivalent microcrystalline cellulose, and/or 1 mg

8    magnesium stearate, for example vegetable grade, are

9    encapsulated in a" size -- "in a capsule of size 4, for

10   example, a two-piece capsule."

11   Q.    Dr. Muzzio, do you have a slide summarizing why the

12   claims lack a written description of "granules comprising

13   40 mgs pimavanserin tartrate and one or more

14   pharmaceutically acceptable excipients"?

15   A.    I do.

16        MR. FRESE:  Can we bring up MUZZIO-DX-63,

17   please, Mr. Mortenson?

18        THE WITNESS:  So on the left side, I have the

19   scope of the claim as written, which places no limits to how

20   much excipients the granules can contain, no limits on what

21   those excipients can be, no limits on what those excipients

22   are or what they do, and no limits on the amounts of those

23   excipients, so basically anything.

24        In comparison, what the inventors actually were

25   in possession of is listed on the right, right, which is

DIRECT EXAMINATION - FERNANDO MUZZIO

1    what they described.  They said you could use a binder,

2    which is one kind of excipient, but you don't even prefer to

3    do that.

4              And then it has two instances where in each of

5    these two instances one particle excipient is identified,

6    not even a kind, one excipient, Avicel PH302 or Avicel

7    PH101.  And that one excipient, having some amount of

8    silicon dioxide, is going to be added in an amount less than

9    10 percent.

10             That's all that is disclosed outside of the

11   comparative examples in comparison to a claim that is so

12   broad that, in my opinion, it includes any conceivable

13   granulation of pimavanserin tartrate at all.

14   BY MR. FRESE:

15   Q.    All right.  Now, you also mentioned that the patent

16   does not adequately provide a written description of

17   granules having a bulk density of greater than 0.4 g/mL.  Do

18   you have a slide discussing what that limitation means in

19   the claims?

20   A.    I do.

21             MR. FRESE:  Can we bring up MUZZIO-DX-64?

22   BY MR. FRESE:

23   Q.    So, Dr. Muzzio, what do the claims mean when they

24   recite that the granules have a bulk density of greater than

25   0.4 g/mL?

DIRECT EXAMINATION - FERNANDO MUZZIO

1    A.    Well, I think that if I read it as written, it's

2    basically saying that any granules with any density higher

3    than 0.4 would now be covered by the claim, and that would

4    include granules that have densities of 0.7, 0.8, 1, 1.1,

5    1.2, and so on and so forth.  In comparison with that, the

6    patent doesn't even disclose the bulk density of even one

7    granulation, not really.

8              There is no upper bound in this claim as to what

9    the bulk density would be that is covered by the claim.  So

10   I think that the claim is extremely broad also in terms of

11   bulk densities.  It claims pretty much the whole range of

12   bulk densities that could considerably -- conceivably be

13   achieved.

14   Q.    So you say -- you said that the patent specification

15   describes one example that's not really even a bulk density

16   of the granules.

17   A.    That's my opinion.

18   Q.    What does the patent -- do you have a slide

19   discussing what the patent specification says about that?

20   A.    Yeah.

21             MR. FRESE:  Can we turn to DTX-65, please?

22             THE WITNESS:  So this slide has a replicate of

23   the two tables that appear in the patent.  So in table 2

24   which I saw, there is that composition of the 40 mgs of

25   pimavanserin tartrate granulated alone and then mixed with

DIRECT EXAMINATION - FERNANDO MUZZIO

1    59 mgs of microcrystalline cellulose and 1 mg of magnesium

2    stearate to form the final blend that's going to be filled

3    into the capsules.

4              And table 1 discloses the density of that blend.

5    As it says there in table 1 -- the asterisks says that the

6    density is the density of the final blend as disclosed in

7    the example herein and below in table 2.  And it says that

8    that blend has a bulk density of 0.508 g/mL.

9    BY MR. FRESE:

10   Q.    So what portion of that blend in table 2 is made up

11   of pimavanserin granules, in your opinion?

12   A.    40 percent.

13   Q.    Now, the table 1 and table 2 mention "pimavanserin

14   granulation."  Would that tell a person of ordinary skill in

15   the art that all of the ingredients listed in table 2 are

16   within the granules?

17   A.    No.

18   Q.    Why not?

19   A.    Well, first of all, from reading the example, we know

20   that the microcrystalline cellulose and the magnesium

21   stearate are outside the granules.  Number two, from common

22   experience, we know that magnesium stearate doesn't go

23   inside the granules.  And if this was intended for

24   compression, a POSA would not put the microcrystalline

25   cellulose inside a wet-granulated granule because you would

DIRECT EXAMINATION - FERNANDO MUZZIO

1  lose a lot of the compression binder compatibility of

2  microcrystalline cellulose when you put it inside the

3  granule.

4           The reason why this is called "the granulation"

5  is because unfortunately people in the field, because they

6  use granulation so often, they often call the final blend

7  the granulation.  And we've even seen an instance of that

8  yesterday, right.  So that is a very common mistake.

9  Q.     Dr. Muzzio, does the '721 patent disclose any other

10  granules of pimavanserin with a bulk density of higher than

11  0.7?

12  A.     No.

13  Q.     And are those sorts of granulations -- are those

14  sorts of bulk densities achievable of granulations as known

15  in the art?

16  A.     Yes, they are.

17  Q.     So do you have a slide summarizing your opinions on

18  written description?

19  A.     I do.

20           MR. FRESE:  Can we bring up DX-66?

21           THE WITNESS:  So in summary, the '721 patent

22  doesn't describe the full scope of what's now claimed,

23  "granules comprising 40 mgs pimavanserin tartrate and one or

24  more pharmaceutically acceptable excipients."  That is a

25  very, very broad claim that comprises any excipients, any

DIRECT EXAMINATION - FERNANDO MUZZIO

1   number of them in any amount.

2           In comparison, the specification discloses only

3   using binders and actually advises the POSA that that's not

4   a preferred embodiment.  And it has two instances where in

5   each one specific diluent premixed with one specific glidant

6   is in a small amount and that's it.

7           And in addition to that, even though the claim

8   now claims any densities higher than 0.4, there's nowhere in

9   the '721 patent a disclosure of granules with densities of

10  0.7, 0.8, or greater.

11  BY MR. FRESE:

12  Q.    Now, Dr. Muzzio, to the extent that the claims are

13  definite, do you have an opinion as to whether they are

14  invalid as lacking enablement?

15  A.    I do.

16  Q.    And have you prepared a slide that provides an

17  overview of your opinions on enablement?

18  A.    I have.

19          MR. FRESE:  Can we bring up MUZZIO-DX-68,

20  please?

21          THE WITNESS:  So this is closely related to what

22  I was just saying where basically by the same token that the

23  specification doesn't disclose any granulations with

24  densities higher than above 0.7, the claim is claiming any

25  densities higher than 0.4.  But the only example gives

DIRECT EXAMINATION - FERNANDO MUZZIO

1    limited density about the density that is achievable.  It

2    only provides the disclosure of one final blend having a

3    density of 0.508 and nothing else.  So a POSA reading that

4    claim who wants to achieve a density of let's say 0.7, finds

5    no guidance in the specification about how to achieve that

6    claimed density.

7    BY MR. FRESE:

8    Q.    So, Dr. Muzzio, have you prepared a slide on the

9    guidance the specification does provide regarding making

10   granules with bulk densities of 0.7 g/mL or greater?

11   A.    Yes.

12           MR. FRESE:  Can we look at DX-69, please,

13   Mr. Mortenson?

14   BY MR. FRESE:

15   Q.    So starting on the left-hand side of the slide,

16   Dr. Muzzio, can you tell us about the conventional wet

17   granulation process that's disclosed here and what it tells

18   you about how to make granulations?

19   A.    So, again, this is one of the comparative experiments

20   that are meant to be excluded from the scope of the

21   invention.  This is one instance where they talk about what

22   they describe as conventional wet granulation, which is one

23   of the common ways to wet granulate, which is to use

24   something called high-shear granulation.

25           And it says that this process, they attempted to

DIRECT EXAMINATION - FERNANDO MUZZIO

1   practice it using the large amounts of water that are

2   typical of this approach.  And they said that they ended up

3   observing large wet adhesive granules that could not be

4   easily dried in a fluid bed dryer, and therefore, there is

5   no information provided about the size or the density of the

6   granules that resulted by this method.

7   Q.     So, Dr. Muzzio, given the comparative experiments,

8   where would a POSA look for guidance in determining how to

9   granulate pimavanserin in a way that would achieve a higher

10  bulk density?

11  A.     By the way, I forgot to mention that they also say

12  here that they used some excipients to try to make this

13  work, but it didn't work, but they don't even say which

14  excipients they used, right.

15           So a POSA that, let's say, for some reason wants

16  to make a granulation with a density of 0.7 or higher would

17  basically, you know, first wonder, okay, is the

18  specification teaching me how to do that by the novel

19  features of the invention, right.  That's on the right side.

20  And, again, in there, it talks about something described as

21  novel where you're using a small amount of water, but you're

22  using a nozzle to disperse the water in a special way and

23  then you're using a special set of values of the -- you

24  know, the chopper and the agitator, etc., right, all of

25  that.

DIRECT EXAMINATION - FERNANDO MUZZIO

1        Nowhere in there it tells me how those

2   parameters would lead to even higher densities than the one

3   density that is listed later.  So that specification doesn't

4   tell the POSA how to go to higher densities.

5        So the next thing the POSA would do is to say,

6   okay, well, if I really want a higher density, I need to do

7   some experiments here, I need to do some work.

8   Q.    Okay.  And the novel salient features that you're

9   pointing to on the right-hand side of this slide, those come

10  from column 10, lines 39-62, and column 15, lines 3-52, of

11  the '721 patent?

12  A.    They do.

13  Q.    And if you look at those, what here does the

14  specification tell a person of ordinary skill about how to

15  vary water quantity to increase bulk density to, say,

16  0.7 g/mL?

17  A.    Nothing.

18  Q.    What here does the specification tell a person of

19  ordinary skill in the art about how to vary the distribution

20  of the water, that is, the spraying, in order to achieve a

21  granule with a bulk density of 0.7 g/mL?

22  A.    It says nothing about that.

23  Q.    Right.  And if you look at the quote on the right,

24  the portion from column 15, lines 3-52, what does this tell

25  you about applying a spray -- it talks about an appropriate

DIRECT EXAMINATION - FERNANDO MUZZIO

1    water application of -- "capable of spraying water over a

2    large area of the API."  What does that tell you about how

3    to increase the bulk density of the granules to, say,

4    0.7 g/mL?

5    A.    Again, it doesn't say anything.

6    Q.    It mentions chopper and impeller speed by controlling

7    amperage.

8    A.    Yes.

9    Q.    What does that tell you about how to control the

10   chopper and impeller speed to achieve a bulk density of,

11   say, 0.7 of a granule of pimavanserin with excipients?

12   A.    It says nothing.

13   Q.    Now, Dr. Muzzio, if you also look in the second part

14   of that paragraph, it mentions, Applying a spray of water

15   having a droplet size such as 0.05-1.15 mm... using a

16   novel -- "nozzle spraying the water and resulting in

17   adequate wetting."

18   A.    Yes.

19   Q.    What does that tell you about how to vary the droplet

20   size of the water in order to increase the bulk density of

21   the granules to 0.7?

22   A.    That doesn't tell me anything about how to vary that

23   parameters to go even higher in density.

24   Q.    Now, Dr. Muzzio, can you think of a hypothetical

25   situation when the person of ordinary skill in the art would

DIRECT EXAMINATION - FERNANDO MUZZIO

1  need to achieve a density of pimavanserin granules greater

2  than 0.6 g/mL?

3  A.    Yes, I can.

4  Q.    What is that?

5  A.    Well, let's say, for example, that some POSA in the

6  future would like to put a second medication within the

7  capsule to treat some other aspect of Parkinson's disease so

8  that the patient, you know, basically would receive what is

9  called a fixed-dose combination where you have now more than

10  one drug substance within the product, and that, in this

11  particular case, is likely to be very desirable because we

12  know that we're talking about patients that are already

13  taking lots of medications, right.

14        So if the POSA wants to put 40 mgs of

15  pimavanserin tartrate and wants to also put something else

16  there, the POSA might very well need to make room for that

17  something else, and the only way to make room here would be

18  to -- well, one way to make room, not the only, would be to

19  increase the density of the granules even further so that

20  they take less space so now there is room for that new thing

21  that the POSA may want to adhere.  So it's a very

22  conceivable situation.

23  Q.    So based upon the '721 patent specification, the

24  comparative experiments, the experiments that are disclosed

25  as working, and the person of ordinary skill in the art's

DIRECT EXAMINATION - FERNANDO MUZZIO

1    knowledge, how would a person of ordinary skill in the art

2    go about making denser granules containing pimavanserin and

3    excipients?

4    A.    Basically what's disclosed in the specification, the

5    person of ordinary skill in the art would not know how to do

6    that.

7    Q.    Okay.  And have you prepared a slide on the level of

8    experimentation that would be required to make granules with

9    bulk densities of 0.7 or greater?

10   A.    Yes.

11   Q.    All right.

12         MR. FRESE:  Can we turn to MUZZIO-DX-70, please?

13         THE WITNESS:  So the POSA that is now looking to

14   make this even denser granules that are claimed in the

15   patent but are not enabled in my opinion, would then have to

16   run a research program which would include examining which

17   different -- which other excipients, which excipients,

18   actually, to use and the amounts of those excipients and the

19   process that would be needed to achieve those higher

20   densities.

21         Even if you incorporate Ragnar-Tolf and you look

22   there for help, there is nothing there to be found.  So the

23   POSA would have to do a lot of trial and error experiments,

24   varying the materials, varying the amount of granulation

25   liquid, varying the methodology used to make the granules

DIRECT EXAMINATION - FERNANDO MUZZIO

1  potentially using more than one method to make the granules,

2  varying the parameters so that's equivalent in scope to a

3  PhD dissertation, basically.

4  BY MR. FRESE:

5  Q.    Would it involve trial and error experimentation?

6  A.    Yes.

7  Q.    So, Dr. Muzzio, in conclusion, do you have a slide

8  summarizing your opinions on patent invalidity in this case

9  and the basis for it?

10  A.    Yes.

11        MR. FRESE:  Can we bring up DX-72?

12        THE WITNESS:  So in my opinion, the asserted

13  claims are invalid as indefinite because there is no way to

14  determine the boundaries of the factors that would make the

15  comparative experiment outcomes -- you know, acceptable or

16  nonacceptable in this case.

17        And if we set that aside, then the claim, as

18  written now, doesn't exclude any more of the comparative

19  experiments.  So we end up with a claim that is claiming

20  something that the specification does that is not what the

21  patentee understood to be their invention.

22        Even if we said the definition -- the

23  definiteness issues aside, then the claims, in my opinion,

24  would be invalid as obvious, just based on the Nuplazid

25  table label, Ragnar-Tolf, and common knowledge the POSA

1    would have had and common sense.

2                Even if I assume to be definitely, the asserted

3    claims lack the written description in the specification

4    needed to demonstrate that the inventors were in possession

5    of a broad claim of granules comprising "one or more

6    pharmaceutically acceptable excipient" without limitation,

7    and also that the inventors were not in possession of the

8    full scope of granules having a bulk density greater than

9    0.4 g/mL.

10               And even if definite, the claims are not enabled

11   because the specification doesn't teach without new

12   experimentation how to make granules with a bulk density

13   greater than 0.4 g/mL.

14               MR. FRESE:  Thank you, Dr. Muzzio.

15               I pass the witness.

16               THE COURT:  All right.  Let's take the morning

17   break at this time, before we get into the cross.  We'll

18   take 15 minutes.

19               (Break taken.)

20               THE COURT:  You may be seated.

21               MR. PETERMAN:  Your Honor, may I approach with

22   the cross binders?

23                         CROSS-EXAMINATION

24   BY MR. PETERMAN:

25   Q.    Dr. Muzzio, I'm Chad Peterman.  Nice to see you

CROSS-EXAMINATION - FERNANDO MUZZIO

1    again.  We had a virtual deposition a few months ago.

2    A.    Nice to see you again.

3    Q.    I want to turn to Claim 4 of the '721 patent.  The

4    first phrase in Claim 4 is, "a pharmaceutically acceptable

5    capsule for orally delivering 34 mg of pimavanserin to a

6    patient," correct?

7    A.    That's what it says.

8    Q.    And that's the preamble of this claim, right?

9    A.    Yes, it is.

10   Q.    And it introduces the other elements of the claim?

11   A.    Mm-hmm, yes.

12   Q.    Okay.  And it states the intended use for the

13   capsule, it's for orally delivering 34 mgs of pimavanserin

14   to a patient, correct?

15   A.    Correct.

16   Q.    And then also -- then goes on to describe the size of

17   the capsule shell, 3 or 4?

18   A.    It says that.

19   Q.    And a size 4 capsule is actually smaller than a size

20   3 capsule, right?

21   A.    That's correct.

22   Q.    A little bit of the inverse of what you would expect.

23         Now, the next phrase goes on to say that

24   encapsulates the blended pimavanserin composition, correct?

25   A.    Correct.

CROSS-EXAMINATION - FERNANDO MUZZIO

1    Q.    And then the rest of what follows that element sets

2    forth, you know, informs a POSA, what is required to be

3    included within that blended pimavanserin composition,

4    correct?

5    A.    Correct.

6    Q.    So granules compromising of 40 mgs of pimavanserin

7    tartrate and one or more pharmaceutically acceptable

8    excipients, correct?

9    A.    Correct.

10   Q.    And certain bulk density of greater than 0.4 g/mL,

11   correct?

12   A.    Yes.

13   Q.    So this claim is to one capsule, correct?

14   A.    To one capsule.

15   Q.    It doesn't require you to have five capsules in order

16   to infringe this claim, correct?

17   A.    I think it's talking about the capsule as an entity.

18   Q.    Okay.  So if you have one product, one capsule that

19   has the pimavanserin composition meeting these requirements,

20   you could infringe the patent claim, correct?

21   A.    I -- I'm not a lawyer and I'm not an expert in patent

22   law, so I don't know whether one capsule out of two million

23   would infringe the patent or not.

24   Q.    Okay.

25   A.    It says what it says.

CROSS-EXAMINATION - FERNANDO MUZZIO

1   Q.    All right.  So it doesn't say that 1,000

2   pharmaceutically accepted capsules for orally delivering 34

3   mgs of pimavanserin --

4            (Court reporter clarification.)

5            THE WITNESS:  I couldn't make out what you are

6   saying.

7   BY MR. PETERMAN:

8   Q.    It doesn't say one thousand pharmaceutically

9   acceptable capsules for orally delivering 34 mgs of

10  pimavanserin, correct?

11  A.    It doesn't say 1,000.

12  Q.    So it says, "a pharmaceutically acceptable capsule,"

13  right?

14  A.    As a kind of a thing, I guess, yes.

15  Q.    So this claim does not require large-scale

16  pharmaceutical manufacturing of these capsules, correct?

17  A.    When you read the claim in the context of the

18  specification trying to understand what the claim is about,

19  which I think is what you need to do, it's very clear to me

20  that the specification is teaching or attempting to teach or

21  failing to teach, but intending to teach how to make these

22  capsules in an effective and efficient manner.

23            And there are many, many passages in the

24  specification that indicate to the POSA that the purpose of

25  the invention is to enable the large-scale manufacturing of

CROSS-EXAMINATION - FERNANDO MUZZIO

1  the product.

2          So if I read the claim in the context of the

3  specification, I believe that the claim is aimed at the

4  efficient and effective large-scale manufacturing of the

5  product.

6  Q.    Okay.  So you're saying there's a process, a

7  manufacturing process that's required by this claim?

8  A.    I am saying that when the POSA reads this claim, the

9  POSA reads that it's a blended composition, so somebody

10  blended something; compressing granules, so somebody

11  granulated; and then filled that into a capsule, so somebody

12  ran a process known as capsule filling; and, moreover, is

13  telling me that I'm going to need granules with a certain

14  bulk density and I only need granules with a certain bulk

15  density for 40 mgs of pimavanserin.  If I'm going to do that

16  using what's usually known as a capsule-filling machine,

17  because just to do one capsule with 40 mgs of pimavanserin

18  alone and nothing else, I don't need to granulate.

19          So I think the POSA reading this claim learns

20  that a certain bulk density is called for and the POSA would

21  know that that -- so that you can do this in a

22  capsule-filing machine typically, and the POSA learns that

23  there are two, maybe three typical pharmaceutical

24  manufacturing steps involved in doing this.

25  Q.    Okay.  So your view is that a POSA looks at this

CROSS-EXAMINATION - FERNANDO MUZZIO

1   claim and automatically thinks of processing and

2   manufacturing steps, correct?

3   A.    The POSA reads this claim and the POSA knows that to

4   practice the claim, the POSA has to engage in what's known

5   as pharmaceutical manufacturing steps.

6   Q.    Would this claim cover a manufacturing that happens

7   in a compounding pharmacy?

8   A.    It could and sometimes compounding pharmacies use

9   steps, there is a kind of compounding pharmacy that actually

10  makes products in relatively large amounts.

11  Q.    So you look at this claim and you see large amounts

12  of capsules, correct?

13  A.    I see that when you develop a product this way and

14  when a POSA develops a product this way, it would do that

15  for the purpose of making a large amount of product.  There

16  is no real reason for a compounding pharmacy to engage in

17  granulation, there's no real reason for a compounding

18  pharmacy that wants to put 40 mg of a substance in this

19  format to granulate with a density of a certain value.

20        Compounding pharmacies can use a spatula and put

21  the 40 mg of the pure granule capsule because the

22  compounding pharmacies are going to.

23  Q.    Now, the claims don't expressly recite limitations

24  regarding the capsules to be fillable at a commercial

25  operational speed, correct?

CROSS-EXAMINATION - FERNANDO MUZZIO

1    A.    Those words are not there, but the words that are

2    there requiring a certain density measured in a certain way.

3             And by the way, you're every going to USP 606

4    method 1, you're going to prepare 20 mgs, right, so you have

5    in mind fill more than one capsule to do that, otherwise

6    using method 1 doesn't make sense.

7    Q.    And so --

8    A.    Sorry, I haven't finished my answer.

9    Q.    Okay.

10    A.    And reads the claim regarding the density and it

11    wonders why, why am I being asked to achieve that density

12    here?  What sense does this make?  And then goes to the

13    specification and sees that the purpose of achieving that

14    density is to be able to efficiently and effectively fill

15    the capsules with additional language that says, you know,

16    that -- not doing this would not work when you try to do it

17    at a commercial manufacturing scale.

18             The POSA understands that the aim and the

19    purpose of the language in the claim is to enable that

20    manufacture -- that kind of manufacturing.

21    Q.    And the claims don't expressly recite any limitations

22    requiring FDA-approval for the pharmaceutically acceptable

23    capsule, correct?

24    A.    No, the claims do not recite any, any limitations

25    that require an FDA-approval and -- okay, but...

CROSS-EXAMINATION - FERNANDO MUZZIO

1    Q.    The claims don't require the most efficient

2    manufacturing process to be used to make the capsules?

3    A.    Could you repeat the question, please?

4    Q.    The claims don't require the most efficient

5    manufacturing process be used to make the capsules?

6    A.    They don't require the most efficient process, no.

7    Q.    There's, in fact -- there's no, there's no efficiency

8    requirement in the claims, correct?

9    A.    The claims, as written, don't recite an efficiency

10   requirement.  The claims do require a certain density, which

11   is a precondition for being able to efficiently manufacture

12   and the specification talks about efficiently manufacturing

13   in multiple places.

14   Q.    So you're bringing the efficient manufacturing from

15   the specification into this claim?

16   A.    I think the POSA reading the claim is going to try to

17   understand the claim.  And when the POSA reads that you want

18   to put 40 mgs of pimavanserin into a size 3 or 4 capsule,

19   and the POSA then sees, oh, but I have to do that by

20   granulating and achieving a certain density, the POSA is

21   going to go to the spec trying to understand why is that

22   required in the claim?  Why was that then?  How is that part

23   of the invention?

24          And the POSA is going to see that the inventors

25   themselves are saying that that's something that you would

CROSS-EXAMINATION - FERNANDO MUZZIO

1    achieve by granulating so that you can achieve efficient

2    manufacturing.  So I think the POSA will get the idea.

3    Q.    And the claim does not require the most economical

4    process be used to make the capsules, correct?

5    A.    No.  One more time, there is language in the spec

6    that says actually the POSA says okay, what is the purpose

7    here requiring this density in the context of this

8    invention.  Okay, what is the purpose density in the context

9    of this invention?  What this invention really is that it

10   requires this density and goes to the spec and finds the

11   language that talks about efficient large-scale

12   manufacturing.  It would justify language saying that it

13   would not be economically feasible to do these, you know, by

14   hand.  So the POSA is, again, directed towards understanding

15   this in that context.

16   Q.    And a patient is not required to actually take this

17   product in order to -- for the capsule to infringe, correct?

18   A.    Yeah, I think you're asking me a legal question.

19   Q.    Well, you did in this case -- and I know you're not

20   testifying about it today, but you did present an expert

21   report with respect to infringement in this case, correct?

22   A.    I did.

23   Q.    So you're familiar with the -- the idea of what's

24   required for infringement under -- under a claim?

25   A.    I have a general understanding, yes.

CROSS-EXAMINATION - FERNANDO MUZZIO

1  Q.    Okay.  And you looked at this claim in connection

2  with both infringement and in connection with your validity

3  positions that you spent this morning testifying about,

4  correct?

5  A.    At some point I did.

6  Q.    Okay.  Do you have an understanding as to whether or

7  not there's a requirement for a patient to take this capsule

8  of Claim 4 in order for there to be infringement?

9  A.    I don't believe you need the patient to consume the

10 capsule for it to be infringement.

11 Q.    Okay.  So if you had a capsule in front of you --

12 A.    Mm-hmm.

13 Q.    -- that met the limitations of 34 mgs of

14 pimavanserin, you know, meaning 40 mgs of pimavanserin

15 tartrate granules, with one or more pharmaceutically

16 acceptable excipients and a bulk density of greater than

17 0.4 g/mL, you could determine whether or not there's

18 infringement, right?

19 A.    Not necessarily.

20 Q.    Why not?

21 A.    Among other things, as I said extensively, was I may

22 not be able to determine whether that is a pharmaceutically

23 acceptable capsule as described in the specification, that's

24 one reason.

25 Q.    So in your infringement opinion in this case, you

CROSS-EXAMINATION - FERNANDO MUZZIO

1    didn't offer a noninfringement basis on the term

2    "pharmaceutically acceptable capsule," did you?

3    A.    Can you repeat, please?

4    Q.    When you offered infringement opinions in your expert

5    reports in this case, did you offer a noninfringement

6    position on pharmaceutically acceptable capsule?

7    A.    No, that's part of my indefiniteness opinion.

8    Q.    Now, pharmaceutically acceptable capsule appears in

9    the preamble, as we discussed, correct?

10   A.    Yes.

11   Q.    It doesn't appear in the rest of the claim, correct?

12   A.    I believe that claim elements only need to appear

13   once.

14   Q.    I'm just asking you -- it's not a trick question.  Do

15   the -- does the term "pharmaceutically acceptable capsule"

16   appear more than once in the claim?

17   A.    Those three words together are only recited once in

18   the claim.

19   Q.    Okay.  And there's another term, "pharmaceutically

20   acceptable excipients," do you see that?

21   A.    I do.

22   Q.    Okay.  And you believe that there's a plain and

23   ordinary meaning for "pharmaceutically acceptable

24   excipients," correct?

25   A.    Yes, there is a plain and ordinary meaning to that

CROSS-EXAMINATION - FERNANDO MUZZIO

1  term.  In addition, that term is not rendered ambiguous in

2  this patent by introducing additional language that would

3  confuse the meaning of that term.

4  Q.    Okay.  So your opinion is that "pharmaceutically

5  acceptable excipients" is understandable and not indefinite,

6  but "pharmaceutically acceptable capsules" is indefinite for

7  the various reasons you testified about this morning?

8  A.    My opinion is that, among other things, what makes an

9  excipient pharmaceutically acceptable is not the same as

10 what would make a finished product pharmaceutically

11 acceptable or would make a piece of equipment

12 pharmaceutically acceptable in a manufacturing context.

13        So, indeed, there are different ways in which

14 you need to look at the words "pharmaceutically acceptable"

15 and see what it is that they are modifying to understand

16 what that means.

17 Q.    And what is a pharmaceutically acceptable excipient?

18 A.    A pharmaceutically acceptable excipient, in general,

19 is an excipient that has been proved to be pharmaceutically

20 acceptable by a regulatory authority.

21        (Court reporter clarification.)

22        THE WITNESS:  That has been proved to be

23 pharmaceutically acceptable by a regulatory authority.

24 BY MR. PETERMAN:

25 Q.    And a pharmaceutically acceptable excipient would be

CROSS-EXAMINATION - FERNANDO MUZZIO

1   a -- generally suitable for use in a pharmaceutical

2   composition?

3   A.    When used the right way and in the correct amount.

4   In addition to the material itself being -- meeting certain

5   composition specifications, meaning nontoxic, it has to not

6   affect adversely the drug substance, and then it has to be

7   used in amounts and in ways that would not cause problems to

8   the patient.

9   Q.    But your understanding is that a POSA could figure

10  that out?

11  A.    In general, unless you add language to the

12  specification that would tend to confuse the POSA and modify

13  the meaning for the proper -- for the purpose of

14  understanding that term in that patent, yes.

15  Q.    Okay.  So, again, it's your view that a POSA reads

16  this Claim 4, gets through the whole thing, then goes to the

17  specification, reads that, and says, Hey, there's all this

18  exceptions, you know, the unacceptable, etc., I need to go

19  back to the claim and see how I can incorporate all those

20  comparative examples and other things in the specification

21  into the claim, correct?

22  A.    Well, you're paraphrasing my testimony and in some

23  way making it sound, you know, trivial.  But my testimony is

24  that when there are five comparative examples that I'm told

25  lead to an acceptable results, right, there's the word

CROSS-EXAMINATION - FERNANDO MUZZIO

1    "unacceptable," that it closely related to acceptable, the

2    POSA would want to know, if I practice a granulation method

3    and I get a result, I make a capsule, is that capsule going

4    to be considered to be pharmaceutically acceptable or not as

5    per these specifications.

6            So, yes, I think the POSA, in this case of this

7    patent, having a very long section titled Comparative

8    Experiments Leading to Acceptable Results, we want to use

9    that information to understand what is now meant by this

10   preamble in this claim.

11   Q.    What is meant by "pharmaceutically acceptable

12   capsule"?

13   A.    Yes.

14   Q.    Do you know how many times the phrase

15   "pharmaceutically acceptable" appears in the entirety of the

16   '721 patent?

17   A.    I haven't counted.

18   Q.    It appears twice, both in Claim 4, "pharmaceutically

19   acceptable capsule" and "pharmaceutically acceptable

20   excipients."

21   A.    I'm sorry, I'm not following.

22   Q.    Well, I'm just asking you if you counted the number

23   of times that the term "pharmaceutically acceptable"

24   appeared in the '721 patent?

25   A.    I haven't counted, no.

CROSS-EXAMINATION - FERNANDO MUZZIO

1   Q.    So would it surprise you -- and I'll represent to you

2   that I have counted, and it appears twice, both times in

3   Claim 4.

4   A.    Okay.

5   Q.    Now, your view, then, is that a POSA would take a

6   look at the various comparative examples and glean some

7   understanding regarding the scope of Claim 4 from those

8   comparative examples, correct?

9   A.    My view is that the POSA would read the whole patent.

10  Q.    Okay.  But in terms of narrowing Claim 4 or putting

11  limitations into Claim 4, are you looking at the comparative

12  examples and saying that a POSA would look at those examples

13  and understand that those examples aren't covered by

14  Claim 4?

15  A.    I'm not trying to put claims or additional claim

16  elements into Claim 4 or I'm not trying to narrow Claim 4.

17  I'm just trying to understand it the way a POSA would.

18  Q.    Okay, but --

19  A.    A POSA seeking to understand what is or what isn't

20  going to infringe is going to read the whole patent.  And,

21  okay, so "pharmaceutically acceptable" doesn't appear, what

22  appears is "unacceptable," which I think a POSA would

23  connect with that in trying to understand the term.  I

24  would.

25              And I think that the people that I identify as

CROSS-EXAMINATION - FERNANDO MUZZIO

1   POSAs would read the whole patent, would find that section

2   about the unacceptable examples, would try to understand,

3   how does this claim make sense in the context of the entire

4   document.  So, yes.

5   Q.    So are you saying that the term "pharmaceutically

6   acceptable capsule" should be construed by this Court to

7   have all these limitations from the specification that

8   exclude the comparative examples?

9   A.    I don't believe that I'm in a position to tell the

10  Court how to construe a claim.  I believe that that's a

11  fairly important process.  And I'm just saying that a POSA

12  reading the claim, trying to understand what the claim

13  means, having read the entire patent, having encountered a

14  section that has five comparative experiments, deeming not

15  to be acceptable, would try to understand how the

16  information disclosing the specification about the

17  unacceptable comparative experiments that are used to

18  differentiate from the invention would try to understand,

19  what is the invention that has something different than

20  those comparative examples.

21          And in looking at the claim, they would see that

22  the only language in the claim that differentiates from

23  those examples are those three words, "pharmaceutically

24  acceptable capsule."  There is nothing else in this claim

25  that differentiates the invention from the comparative

CROSS-EXAMINATION - FERNANDO MUZZIO

1  examples.  So, yes, the POSA would try to use the

2  information provided in those comparative examples to

3  ascertain what is the invention being claimed.

4  Q.    So what does "pharmaceutically acceptable capsule"

5  mean here in this claim, then?

6  A.    What does it mean in this claim?

7  Q.    Yes?

8  A.    I don't know.  And I don't think a POSA would it, and

9  that's exactly the problem.

10  Q.    Now, you reviewed the prosecution history of this

11  '721 patent, correct?

12  A.    At some point, I did.

13  Q.    Okay.  And the patent examiner who looked at this

14  claim is considered a POSA, right?

15  A.    I would expect so.

16  Q.    Okay.  And the examiner did not issue any rejections

17  to this patent based on "pharmaceutically acceptable

18  capsule," correct?

19  A.    I think that's correct.

20  Q.    The examiner didn't require that some stability

21  limitation be added to these claims, correct?

22  A.    Yeah, the particular examiner that examined this

23  particular patent application did not say that.

24  Q.    The examiner didn't require certain dissolution rates

25  to be added to this claim, correct?

CROSS-EXAMINATION - FERNANDO MUZZIO

1    A.    I'm not sure why you're asking about dissolution

2    rates in particular as opposed to dissolution in general,

3    which is what is identified in the comparative examples as

4    being less favorable, whatever that means.  But, no, the

5    examiner did not ask the patentees to include a limitation

6    about dissolution, period.

7    Q.    Okay.  The examiner didn't ask the patentees to

8    include a limitation regarding moisture content, correct?

9    A.    Moisture content?  Or do you mean the amount of

10   moisture used to granulate?

11   Q.    Yes.  The amount of moisture used --

12   A.    To granulate.

13   Q.    -- to granulate -- okay.  Sure.  We'll use your

14   words.

15         The examiner didn't require any limitation be

16   added regarding the amount of moisture being used to

17   granulate?

18   A.    I believe in the example 5 -- in the comparative

19   example 5, what has been identified as the thing that made

20   unacceptable outcomes unacceptable is that they needed to

21   use a lot of moisture to granulate.  That's the only reason

22   why I'm trying to clarify the point.

23         But, no, the claim as allowed is not including

24   any language about a certain either moisture content or a

25   certain amount of moisture used to granulate.

CROSS-EXAMINATION - FERNANDO MUZZIO

1  Q.    In your binder that I put up, your cross-examination

2  binder, there's a document DTX-217.

3          Do you see that?

4  A.    217?

5  Q.    Yeah, it's maybe about a third of the way -- a third

6  to half of the way into your binder.

7  A.    Yeah, okay.  I found it.

8  Q.    Do you recognize this as the PCT application that

9  eventually lead to the '721 patent?

10 A.    Yes, I do.

11 Q.    And I just want to direct your attention to claims --

12          MR. PETERMAN:  Mr. Campos, if you could bring up

13 DTX-217, I'm going to take a look at page 36, Claim 2.

14          THE WITNESS:  Page 36?

15 BY MR. PETERMAN:

16 Q.    Yes.  Well, it's page 36 on the big, bold number on

17 the bottom.

18 A.    Un-huh.  Okay.  Page 34 of the document?

19 Q.    Yes.

20 A.    Okay.

21 Q.    These are claims that were listed in this PCT

22 application, and you see "Claim 32" is a process for

23 manufacturing a capsule comprising 5-34 mg of pimavanserin

24 or pharmaceutically acceptable salt thereof, correct?

25 A.    Yes.

CROSS-EXAMINATION - FERNANDO MUZZIO

1   Q.    And you see following that, there's the series of

2   manufacturing steps.

3           Do you see that?

4   A.    Yes, thank you.

5   Q.    And so you would understand from this claim that the

6   patentees, when they wanted to claim a particular process

7   for manufacturing, knew how to do so by specifically calling

8   out a process for manufacturing and listing manufacturing

9   steps, right?

10  A.    I see a claim drafted to specify a series of steps to

11  be used to granulate pimavanserin alone without actually

12  including any excipients in the granules.

13  Q.    And moving ahead to page 38 of the document,

14  Claim 48, there's another claim where, you know, dependent

15  upon earlier claims, claiming a process wherein the

16  granulation of pimavanserin is a wet granulation.

17  A.    Counsel, to be honest, I'm a little hard of hearing,

18  and I'm having trouble making out those words.

19  Q.    Continuing on in DTX-217 --

20  A.    Yes.

21  Q.    -- looking at page 38 --

22  A.    Yes.

23  Q.    -- Claim 48.

24  A.    48.

25  Q.    That includes a claim directed to a process according

CROSS-EXAMINATION - FERNANDO MUZZIO

1   to one of the earlier claims, 32-47, wherein the granulation

2   of pimavanserin is a wet granulation, correct?

3   A.     I see that, yes.

4   Q.     Okay.  So the patentees knew how to specify a

5   particular type of granulation when they wanted to, correct?

6   A.     Well, wet granulation actually comprises a whole

7   bunch of different ways to granulate.  It's also the most

8   common way to granulate.  So it's not really narrowing the

9   scope of granulation all that much to say "wet granulation."

10  You have high shear, low shear, fluid bed, twin screw.  But

11  they are specifying granulation.

12  Q.     But it certainly narrows it to say that it's not dry

13  granulation, correct?

14  A.     Yeah, it would exclude things like dry granulation,

15  or dry blending would not there be either.

16  Q.     Okay.  You can put that document aside.

17          And just going back to Claims 4 and 5 of the

18  '721 patent --

19  A.     Okay.

20  Q.     -- I just want to confirm that the word "process"

21  does not appear in either of these claims, correct?

22  A.     Not explicitly.  It appears, I think, implicitly.

23  Q.     And I think we understand that from your testimony,

24  but explicitly, expressly, the word "process" is not there?

25  A.     I don't see the word "process" explicitly included in

CROSS-EXAMINATION - FERNANDO MUZZIO

1    the claim.

2    Q.    Okay.  And the word "manufacturing" is not explicitly

3    included in the claim?

4    A.    The word itself is not explicitly included in the

5    claim.

6    Q.    Now, I want to take a look at the comparative

7    experiments that you're referring to in your testimony.  Do

8    you have the '721 patent in front of you, which is JTX-9?  I

9    think it's in both binders.

10   A.    JTX-9.  Yes, I do.

11   Q.    So the comparative examples that you rely upon, I

12   believe they're found in column 13; is that correct?

13   A.    That is correct.

14   Q.    Okay.  So starting at or around line 35 going down to

15   line 58, that's first comparative example, correct?

16   A.    Yeah.

17   Q.    And it refers to a "fluid bed layering"?

18   A.    Yes.

19   Q.    Okay.  And can you tell me whether or not the words

20   "pharmaceutically acceptable" or "pharmaceutically

21   unacceptable" appear in this example?

22   A.    Well, it says in the title, right, of the whole

23   section that this is a comparative experiment resulting in

24   unacceptable products.

25   Q.    Well, I --

CROSS-EXAMINATION - FERNANDO MUZZIO

1    A.      What it says here --

2    Q.      -- I can read that as well.  What I'm asking you

3    is --

4    A.      I was trying --

5    Q.      -- whether the term "pharmaceutically acceptable"

6    appears in the first comparative example that I directed you

7    to.

8    A.      The word "unacceptable" appears several times.

9    Q.      Okay.

10   A.      The word "pharmaceutical," I don't think it appear in

11   this -- actually, I take that back.  The word

12   "pharmaceutical" appears in the first line; for example, a

13   "pharmaceutical industry," so "pharmaceutical" is there.

14   Q.      My -- my question --

15   A.      And then "unacceptable" --

16           (Cross talking.)

17   Q.      My question for you, though, I'm asking you -- it's a

18   very simple question.  Does the phrase "pharmaceutically

19   acceptable" --

20   A.      Oh, they --

21   Q.      -- or --

22           (Court reporter clarification.)

23   BY MR. PETERMAN:

24   Q.      Does the phrase "pharmaceutically acceptable" or

25   "pharmaceutically unacceptable" appear in that example?

CROSS-EXAMINATION - FERNANDO MUZZIO

1    A.    No, the two words together don't appear in the

2    example.

3    Q.    Does "capsule shell size 3 or 4" appear in that

4    example?

5    A.    Within the text between lines 35 and 58, the word

6    "capsule shell size 3 or 4" doesn't.  It is immediately

7    above the title of the section, so it's in lines 31, 32, 33,

8    right immediately, providing context to the comparative

9    experiments.

10   Q.    But the lines you point out, 29-32, don't say that

11   the comparative experiments were run using a size 3 or 4

12   capsule, correct?

13   A.    No, what they say is that -- it says, "Prior to the

14   surprising finding... the herein disclosed processes and

15   composition resulting in a robust and reliable filling of...

16   pimavanserin to size 3 or 4 capsules, many experiments were

17   done."  And then he proceeds to describe the experiments as

18   producing unacceptable products.  So it's providing context,

19   you know, immediately -- the sentences immediately before

20   provide context to how to look at these comparative

21   examples.

22   Q.    I understand what you're saying, but does the

23   comparative example itself say that it's using a size 3 or 4

24   capsule?

25   A.    The comparative example as described between lines 35

CROSS-EXAMINATION - FERNANDO MUZZIO

1    and 58 do -- does not contain the words "size 3 capsule" or

2    "size 4 capsule."

3    Q.     And similarly, the comparative example that we're

4    looking at between column 13, lines 35-58, does not say that

5    the comparative example used 34 mgs of pimavanserin,

6    correct?

7    A.     The brief passage itself, by itself doesn't say that,

8    although that is the context in which I would read it.

9    Q.     Well, the context that you pointed to me earlier said

10   "5-34 mgs of pimavanserin," correct?

11   A.     Yes.

12   Q.     So the next example, the Wurster layering, which goes

13   from column 13, line 59, I think just to the bottom of that

14   column, line 67 -- are you with me?

15   A.     Yes.

16   Q.     Does that example use the word "pharmaceutically

17   acceptable" or "pharmaceutically unacceptable"?

18   A.     So that example, like the one before, says that you

19   obtain acceptable density, which I would understand and the

20   POSA would understand as meaning that it's enough density to

21   fill the intended capsule with the intended amount of drug

22   because that's what was said immediately before, but then it

23   gives other reasons other than density for why -- and

24   it's -- both examples say that there are other reasons other

25   than density why these two examples were unacceptable.

CROSS-EXAMINATION - FERNANDO MUZZIO

1      So presumably, a POSA reading this would

2  conclude that, okay, the density was acceptable, so I could

3  put that amount of drug in that size capsule, but there were

4  some other reasons why --

5  Q.     My question --

6         (Cross talking.)

7  A.     -- unacceptable.

8  Q.     My question, which you -- which you seem to be

9  annoying -- ignoring, is whether the words "pharmaceutically

10 acceptable" or "pharmaceutically unacceptable" appear in

11 that example, and I think that's a simple yes or no.

12 A.     I think I gave you a similar answer.  I said, okay,

13 the words themselves don't appear.  So I don't believe I'm

14 ignoring or annoying your question, either one.

15 Q.     Do the words or a description of a size 3 or 4

16 capsule appear in that second comparative example, Wurster

17 layering?

18 A.     So in my opinion, the words do not appear, so that's

19 the answer to your question.  But the POSA reading that the

20 density was acceptable would understand that to mean that

21 you can put the right amount of drug in that size capsule.

22 Q.     Does that example for Wurster layering disclose a

23 34 mg of pimavanserin?

24 A.     In my opinion, yes.

25 Q.     Okay.  Show me where in that example from

CROSS-EXAMINATION - FERNANDO MUZZIO

1    lines 59-68, in column 13, 34 mg of pimavanserin appears.

2    A.      When you say that you have an acceptable flow and

3    bulk density, to me that means that the flow was good enough

4    and the bulk density was high enough so that you could put

5    the 34 mgs of pimavanserin in the size 4 capsule because

6    that's what presumably is the goal of doing all of these,

7    because it identifies other things other than flow and

8    density as being unacceptable.  So that would be line 53 in

9    column 13, saying that the particles have an acceptable flow

10   and bulk density.  "Acceptable" meaning what, right, meaning

11   that you can put that amount that you intend to put in that

12   sized capsule, but an acceptable stability and an acceptable

13   particle size distribution, so this example did not work for

14   reasons other than the density.

15   Q.      My questions are so much -- so much simpler than your

16   answers.  The question was -- and I think we can look at the

17   document itself -- it's not disclosed that the testing that

18   was done for the Wurster layering used 34 mgs of

19   pimavanserin, correct?

20   A.      We don't know that.  It just says that the density

21   was acceptable.

22   Q.      Okay.  Similarly for all the rest of the comparative

23   examples listed in column 14, we don't know whether or not

24   34 mgs of pimavanserin was used for that testing?

25   A.      With another pimavanserin was used for that testing?

CROSS-EXAMINATION - FERNANDO MUZZIO

1  Sorry, I don't understand that.

2  Q.    If you look at the examples in column 14, none of

3  them say that 34 mgs of pimavanserin was used for the

4  testing that's shown there, correct?

5  A.    So I apologize.  So I misunderstood your question.

6        It says pimavanserin tartrate was used.

7  Examples 1 through 4 all say that the density was

8  acceptable.  Example 5 doesn't say anything about the

9  density, but 1 through 4 say that the density was

10  acceptable.  And when you read the patent and you say what

11  is the purpose of talking about density, the entire patent

12  is to ensure that flow is good enough to fill the capsules

13  sufficiently with 34 mgs of pimavanserin.

14        So my reading, a POSA's reading, of this

15  language finding the sentence "acceptable density" would

16  understand that the density was acceptable for the purpose

17  of putting 34 mgs of pimavanserin into a size 4 capsule.

18  Q.    Again --

19        (Cross talking.)

20  A.    But the --

21  Q.    But, again, my question revolves around the testing

22  that was done and was disclosed here in columns 13 and

23  columns 14.  I read through it very closely, hundreds --

24  hundreds of times by this point.  I cannot see anywhere

25  where it says that these tests were conducted using 34 mgs

CROSS-EXAMINATION - FERNANDO MUZZIO

1   of pimavanserin in a size 3 or 4 capsule.  Do you see that

2   anywhere expressly within columns 13 and 14 regarding the

3   comparative examples?

4   A.    So one more time, I don't see the words explicitly

5   listed.  What I see is a reference to an acceptable density.

6   That, to me, would mean that, indeed, the POSA would

7   understand that using these comparative examples, you can

8   put the target amount of drug substance in the target

9   capsule size.

10   Q.    And also just to complete this line of questioning,

11   looking at the words that appear on the patent in column 14,

12   do any of the examples say "pharmaceutically acceptable" or

13   "pharmaceutically unacceptable"?

14   A.    No, I guess I need to -- confusion.  It just says

15   "unacceptable."

16   Q.    Now, Dr. Muzzio, if you would turn your attention

17   within the '721 patent to column 2, lines 33-41.

18   A.    Okay.

19           MR. PETERMAN:  Mr. Campos, if you would bring

20   that up, please.

21   BY MR. PETERMAN:

22   Q.    All right.  Let me know when you're with me, sir.

23   A.    Okay.

24   Q.    There, within the specification, there is a section

25   called "definitions," correct?

CROSS-EXAMINATION - FERNANDO MUZZIO

1   A.   Yes.

2   Q.   And it says, "Unless defined otherwise, all technical

3   and scientific terms used herein have the same meaning as is

4   commonly understood by one of ordinary skill in the art,"

5   correct?

6   A.   Correct.

7   Q.   Then if you look a little bit further down, maybe at

8   around line 42 of column 2, and even going down, there are

9   several definitions that are given there, correct?

10  A.   Yes.

11  Q.   Pharmaceutical composition, physiologically

12  acceptable, and pharmaceutically acceptable salt, for

13  instance, correct?

14  A.   Yes.

15  Q.   And even continuing further down in -- over into

16  column 3, there are even more definitions.  Going into

17  column 4, even more definitions.

18            Do you see that?  And do you agree with me?

19  A.   I do, yes.

20  Q.   I might not have heard you this time, did you --

21  A.   Yes.  Yes, I did.

22  Q.   So the patentee defined lots of different words in

23  this patent, correct?

24  A.   Un-huh, yes.

25  Q.   Is there a definition of pharmaceutically acceptable

CROSS-EXAMINATION - FERNANDO MUZZIO

1    capsule in this patent?

2    A.      Not explicitly, no.

3    Q.      Now, continuing along with the '721 patent, I want to

4    take a look at column 16, lines 4-10.  And I believe you

5    spoke about this during your direct examination.  Where it

6    says, "As disclosed herein, it has been demonstrated that

7    pimavanserin can be granulated without the use of a binder,

8    i.e., utilizing water only."

9    A.      Correct.

10   Q.      "It is however contemplated that in some embodiments,

11   suitable binders such as cellulose, methylcellulose,

12   polyvinyl pyrrolidone and polyethylene glycol may be used,

13   although not a necessity?

14   A.      It says that.

15   Q.      You agree here that this is a disclosure of

16   granulation with another excipient, correct?

17   A.      I would agree that this is a disclosure of

18   granulation with binders.

19   Q.      Binders are excipients, correct?

20   A.      One kind of excipients, there are many kinds of

21   excipients.

22   Q.      Okay.  But you would agree with me that even

23   though -- well, let's call them binders -- there are one,

24   two, three, four binders that are disclosed there, correct?

25   A.      Let me actually amend my previous answer, it's with

CROSS-EXAMINATION - FERNANDO MUZZIO

1    granulation binders.  Not even all binders, not even all

2    kinds of binders, only with granulation binders.

3    Q.    Okay.  So with your qualification, there are one,

4    two, three, four, quote/unquote, granulation binders that

5    are disclosed there, correct?

6    A.    Yes.

7    Q.    And if we continue on to column 17, lines 34-49, I

8    believe this was another embodiment that you identified

9    during your direct examination.

10          There's a composition here with a pimavanserin

11    tartrate granulation containing Avicel and colloidal silicon

12    dioxide, correct?

13    A.    Containing Avicel PH302.

14    Q.    Okay.  And the next embodiment, there's the

15    pimavanserin tartrate granulation containing Avicel PH101

16    and colloidal silicon dioxide, correct?

17    A.    Yes.

18    Q.    And if you look at column 16, from around lines

19    19-45.

20    A.    19-45.

21    Q.    There is a -- I think really starting at line 23.

22    A.    Okay.

23    Q.    It says, "One embodiment of the composition described

24    herein, includes pimavanserin tartrate granulation without

25    binder."

CROSS-EXAMINATION - FERNANDO MUZZIO

1    A.    Yes.

2    Q.    "Dried, and thereafter, blended with less than 60

3    percent weight-by-weight microcrystalline cellulose, such as

4    Avicel."

5    A.    Yes.

6    Q.    Do you see that?

7    A.    Yes.

8    Q.    And then in the next paragraph, it says, "In some

9    embodiments, the compositions described herein, comprises

10   granulated pimavanserin and microcrystalline cellulose."

11             Do you see that?

12   A.    Those are all extragranulars now.

13   Q.    So you read this as being extra-granular as opposed

14   to being internal?

15   A.    It reads that way.

16   Q.    And you also understand that at line 41, there's a

17   description of compositions described herein with granulated

18   pimavanserin tartrate and microcrystalline cellulose and

19   magnesium stearate.

20             Do you see that?

21   A.    I do see that but that, again, is granulated

22   pimavanserin and then extra-granular microcrystalline

23   cellulose and magnesium stearate.

24   Q.    Well, I think there's a reading where it

25   is granulated pimavanserin and microcrystalline cellulose

CROSS-EXAMINATION - FERNANDO MUZZIO

1    magnesium stearate.

2    A.      There's --

3    Q.      There's no commas, there's no commas in between each

4    of those -- each of those elements or each of those

5    excipients that have been identified, correct?

6    A.      But if you read it that way, you're putting the

7    magnesium stearate inside the granule and you don't do that

8    for an immediate-release product, you know, particularly,

9    one you want to turn into a tablet.  You don't put the

10   lubricant inside the granular, everybody knows that.

11   Q.      So now --

12   A.      So that way of reading it doesn't make sense to the

13   POSA.

14   Q.      All right.  So you disagree that these are, you know,

15   showing additional excipients within the granule, I

16   understand that.

17           You do acknowledge that there are places within

18   the specification where there is granulation with additional

19   excipients, correct?

20   A.      As I said in my direct, there are a few very limited

21   instances that mention binders or that mention Avicel PH101

22   and Avicel PH302, plus silicon dioxide.

23   Q.      Now, just turning to -- is colloidal silicon dioxide

24   a lubricant?

25   A.      It's generally described as a glidant.

CROSS-EXAMINATION - FERNANDO MUZZIO

1   Q.    Now, turning to --

2   A.    And it can be put inside a granule without a problem.

3   Q.    You said it can be put inside a granule without a

4   problem?

5   A.    Yes, yes, it can.  It's not -- well, actually let me

6   take that back.

7         You want to be careful not to select a

8   hydrophobic grade, so hydrophilic grades, generally

9   speaking, can be put inside granules for immediate-release

10  products.

11  Q.    Now, Dr. Muzzio, I want to look at figure 1 of the

12  '721 patent.

13  A.    Okay.

14  Q.    Now, this figure is just simply disclosing

15  specifications of capsule sizes that were commercially

16  available at the time of the invention, correct?

17  A.    Some of them.

18  Q.    And this is not specific to pimavanserin tartrate,

19  correct?

20  A.    No, those capsules are not specific -- those are

21  capsule shells.

22  Q.    Okay.

23  A.    Those are the sizes of capsule shells, some of

24  them -- some of the ones that were commercially available

25  and, yes, this table is not specific to pimavanserin.

CROSS-EXAMINATION - FERNANDO MUZZIO

1    Q.    And so when it says "typical powder density," that is

2    not a reference specific to pimavanserin, correct?

3    A.    That reference to typical power density is the

4    typical powder density of things that we put inside capsule

5    shells, it's not specific to pimavanserin.

6    Q.    Okay.  And typical powder density is different than,

7    you know, the bulk density of a granule, correct?

8    A.    Um, that typical powder density that's referred there

9    refers to the density of the blend you're going to put

10   inside the capsule.  Whether it's powders or granules or a

11   mixture of both, doesn't matter.  What matters here is that

12   it's telling the POSA that if your blend has this density,

13   that's the amount you can put in that sized capsule.

14   Q.    And this is not saying that a density for

15   pimavanserin could be achieved at 0.7 or 1.0, correct?

16   A.    That's not saying that you could or that you couldn't

17   achieve an even density of that final blend containing

18   pimavanserin tartrate.

19   Q.    Now, going back into the specification of the '721

20   patent.  Column 22.  Lines 3-14.

21   A.    You say column 22, line 3-14?

22   Q.    Yes.

23   A.    Yes.

24   Q.    There, there are two disclosures.  One relating --

25   strike that.

CROSS-EXAMINATION - FERNANDO MUZZIO

1              One relating to the bulk density of the blended

2      composition, correct?

3      A.     The first one mentions the blended composition.

4      Q.     Okay.  And then it says, in terms of bulk densities

5      greater than 0.4 g/mL, such as 0.4 to 0.6 g/mL, such as

6      about 0.5 g/mL?

7      A.     It says that.

8      Q.     Okay.  Again, determined according to USP <616>

9      method 1, do you see that?

10     A.     Yes.

11     Q.     Okay.  Then continues on to say, in some embodiments,

12     the bulk density of the composition is greater than

13     0.4 g/mL, such as about 0.5 g/mL, such as 0.51 g/mL, such as

14     0.508 g/mL, direct?

15     A.     Yes.

16     Q.     And the next paragraph is similar, except that it

17     refers to the bulk density of pimavanserin granulation,

18     correct?

19     A.     It uses different words, I think he's talking about

20     the same thing.

21     Q.     But there's two paragraphs, top and bottom here.  One

22     starts off, "the bulk density of the blended composition;"

23     the other starts off, "the bulk density of the pimavanserin

24     granulation," correct?

25     A.     Yeah, the reason I think he's talking about the same

1    thing is that if you look at the bottom of the paragraph and

2    it lists the same exact 0.508 g/mL, which in table 1, it

3    does say that that is the final blend.

4           So, you know, they have, they have me confused,

5    the granulation and the blend in this patent, but 0.508 is

6    the same with exact figures listed in table 1 where it says

7    in the asterisks, "this is the final blend that was filled

8    into the capsules."

9           So the numbers are identical for both.  The

10   likelihood that you would get the same exact identical value

11   with three significant figures for a granulation and then a

12   blend that has only 40 percent of the granules in it is

13   very, very small, so I read these two to be just different

14   words talking about the same thing.

15   Q.    But you didn't review the underlying lab notebooks or

16   experiments that led to what's in the specification here,

17   correct?

18   A.    I did not --

19   Q.    Okay.

20   A.    -- have that material to review, no.

21   Q.    And you didn't talk with the inventors to understand

22   the results of their testing, correct?

23   A.    No, I'm reading this the way a POSA would.

24   Q.    Okay.

25   A.    And I think a POSA would read it that way.

CROSS-EXAMINATION - FERNANDO MUZZIO

1  Q.    Now, I just want to turn to your obviousness

2  argument.

3         Now, your opinions that Claims 4 and 5 are

4  obvious in view of Ragnar-Tolf and the Nuplazid 17 mgs

5  tablets from Acadia, correct?

6  A.    I'm sorry.  I couldn't quite hear every word you

7  said.

8  Q.    The grounds for your 103 obviousness argument, is

9  that -- Claims 4 and 5 are obvious over Nuplazid 17 mg

10  tablets and Ragnar-Tolf, correct?

11  A.    Subjected to the assumption that they were not

12  indefinite, yes.

13  Q.    I didn't actually catch the last part.

14  A.    Subject to the assumption that they were not

15  indefinite.

16  Q.    Okay.  So your hierarchy, indefiniteness first, if

17  not indefinite then obvious, if not obvious then written

18  description and enablement?

19  A.    No, I don't believe that I gave you a hierarchy or --

20  I just said that my analysis of obviousness assumes that we

21  set aside the fact that I believe that the claim is

22  indefinite.

23  Q.    Okay.  So with that assumption or caveat, you're

24  combining Nuplazid 17 mg along with Ragnar-Tolf, correct?

25  A.    Yes.

CROSS-EXAMINATION - FERNANDO MUZZIO

1   Q.      Okay.  And you understand that Ragnar-Tolf was an

2   Acadia inventor associated with Acadia?

3   A.      I take your word for that.

4   Q.      Okay.  And Ragnar-Tolf describes the 17 mg tablets?

5   A.      Among other things, yes.

6   Q.      Okay.  And just turning, again, back to the '721

7   patent, on the first page, you understand, because you have

8   several patents yourself, that there are patent application

9   numbers that go along with patents?

10  A.      Yes.

11  Q.      Okay.  And in this case, the '721 patent's

12  application number is 17/693, 830?

13  A.      Okay.

14  Q.      And there's a list of references that's cited over to

15  the right side of the cover page of the patent?

16  A.      Yes, there are.

17  Q.      Okay.  And you understand that, you know, Ragnar-Tolf

18  was one of the references that was cited in connection with

19  this patent?

20  A.      Just one second.

21  Q.      And I can -- and I can take you -- I can take you

22  there, I don't want to send you on a goose chase.

23  A.      No, no, I wanted to agree with you, it is one among I

24  don't know how many hundreds of references listed here, yes.

25  Q.      Okay.  So the -- and as you pointed out, you actually

CROSS-EXAMINATION - FERNANDO MUZZIO

1    predicted my next question, there are hundreds of references

2    that are identified as prior art for the examiner, correct?

3    A.    There are.

4    Q.    Okay.  And Ragnar-Tolf is one of the references, and

5    it appears towards the bottom of page 2 of the document.

6    And if you look at your screen, I mean, we have called it

7    out.

8    A.    Okay.

9    Q.    And this is the Ragnar-Tolf reference that you're

10   relying upon for your obviousness analysis?

11   A.    I believe that's correct.

12   Q.    Now, I want to turn to JTX-10.  Do you understand

13   this is an excerpt from the patent prosecution history that

14   led to the '721 patent?  You can see on the face it's

15   Application Number 17/693,830?

16   A.    Yes.

17   Q.    I'd like to admit JTX-10 into evidence.

18            MR. FRESE:  No objection.

19            THE COURT:  JTX-0010 is admitted.

20            (Exhibit admitted.)

21   BY MR. PETERMAN:

22   Q.    Now, the portion of JTX-10 that -- well, JTX-10 is

23   the notice of allowance and fees due, do you understand

24   that?

25   A.    Yes.

CROSS-EXAMINATION - FERNANDO MUZZIO

1   Q.     Okay.  And if we turn in this document towards the

2   end, there is a section called Reasons for Allowance, and

3   it's on page JTX-10-2404.

4          Do you see that?

5   A.     I do.

6   Q.     And then it says "reasons for allowance," then it

7   states:  "The following is an examiner statement of reasons

8   for allowance," correct?

9   A.     Yes.

10  Q.     It goes on to say, The claims are drawn to a capsule

11  formulation -- comprising capsule formulation comprising 34

12  mgs of pimavanserin tartrate in a capsule shell size 3 or 4

13  where the bulk density is greater than 0.4 g/mL, correct?

14  A.     It says that.

15  Q.     Then it says the closest prior art is drawn to

16  Ragnar-Tolf, et al., 2007/0264330, which discloses a

17  pimavanserin formulation, correct?

18  A.     Yes.

19  Q.     And this is the Ragnar-Tolf reference that you're

20  relying upon for your obviousness combination, correct?

21  A.     Yes.

22  Q.     Then the examiner states:  "However, the density of

23  the granulation would not allow for the same amount of the

24  drug to be present in the capsule.  The instant invention

25  allows for more of the active ingredient to be present in a

CROSS-EXAMINATION - FERNANDO MUZZIO

1    smaller capsule that is easier to swallow."

2            Do you see that?

3    A.    I see that.

4    Q.    And so the examiner took a look at the same reference

5    that you looked at and identified it as being the closest

6    prior art, correct?

7    A.    He did.

8    Q.    Okay.  And despite identifying it as being the

9    closest prior art, the examiner distinguished the claims of

10   the '721 patent from the Ragnar-Tolf, and issued the claims

11   over Ragnar-Tolf, correct?

12   A.    Apparently, the examiner missed the very obvious

13   flag, that the POSA could simply increase the concentration

14   of the drug in the granulation and then reach the target

15   amount of pimavanserin, which is a very obvious thing to

16   try.

17   Q.    Okay.  So I understand your position, but you agree

18   with me that we're looking and reading the page where the

19   examiner specified the reasons for allowing the '721 patent

20   over Ragnar-Tolf, correct?

21   A.    I'm not giving you a position, I'm giving you my

22   opinion.  And my opinion is that, yeah, the examiner allowed

23   this, and apparently missed the very obvious thing to try,

24   which is to increase the drug concentration to reach the

25   target dose.

CROSS-EXAMINATION - FERNANDO MUZZIO

1    Q.    Now, you talk about -- or you talked about a number

2    of motivations with respect to going from Ragnar-Tolf and

3    Nuplazid, 17 mg tablets, to the claimed inventions, correct?

4    A.    Yes.

5    Q.    You talked about the pill burden, the color and shape

6    of the tablets, the swallowing difficulty, size of tablet,

7    foul taste and taste-masking, correct?

8    A.    Yes.

9    Q.    Is there a disclosure within the Nuplazid, 17 mg,

10   prescribing information that pill burden was recognized as a

11   problem for pimavanserin?

12   A.    There is a disclosure that the patient population is

13   elderly, and it's a well-known fact, it's a very well-known

14   fact that patients over the age of 60 consume 80 percent of

15   the medication in this country.  So it's very well-known

16   that the target population has a high pill burden.

17   Q.    But there's nothing within the label itself which

18   says we need to have a lower pill burden here, correct?

19   A.    No, that would be part of the knowledge of the POSA,

20   based on the POSA's experience, training, and life

21   experience.  Common sense knowledge.

22   Q.    And similarly, there's nothing in Ragnar-Tolf saying

23   we need to have lower pill burden, correct?

24   A.    I don't believe Ragnar-Tolf explicitly talks about

25   low pill burden.  Again, you're talking about a medication

CROSS-EXAMINATION - FERNANDO MUZZIO

1    for Parkinson's, for older people who have lots of other

2    conditions.  And everybody knows this.

3    Q.    And there's nothing in the Nuplazid 17 mg prescribing

4    information that says we need a different color or shape,

5    correct?

6    A.    So, again, the label doesn't talk about needing a

7    different color or a different shape.  That would be, again,

8    common sense and the experience of anybody who has

9    interacted with patients in that age group.

10   Q.    And there's nothing in Ragnar-Tolf that says the 17

11   mg tablet needs a different color or different shape,

12   correct?

13   A.    Ragnar-Tolf discloses both tablets and capsules,

14   discloses various doses, it doesn't say that you need to

15   have a specific color or a specific shape.

16   Q.    Okay.  Similarly, the prescribing information for the

17   17 mg tablet doesn't say this is difficult to swallow,

18   correct?

19   A.    No, it says that patients have Parkinson's disease

20   and, again, the POSA would have known that older patients in

21   general have difficulty swallowing.  And upon doing a

22   literature search, or maybe just from experience, would know

23   that Parkinson's disease, elderly patients have difficulty

24   swallowing.

25   Q.    And Ragnar-Tolf doesn't say you need to reformulate

CROSS-EXAMINATION - FERNANDO MUZZIO

1   the 17 mg tablet because of swallowing difficulty, correct?

2   A.      No, Ragnar-Tolf doesn't say that.

3   Q.      And the pimavanserin Nuplazid 17 mg prescribing

4   information doesn't say we need to reformulate to deal with

5   foul taste or taste-masking, correct?

6   A.      It would be absurd for a label -- for a product to

7   say that that product needs to be reformulated.  That's

8   just, I -- I -- it doesn't make any sense for a label to say

9   something like that.

10  Q.      And the label doesn't say that the size of the tablet

11  used is too big either, correct?

12  A.      Well, actually, the label says that you have to give

13  the patient two tablets, right, so the label is telling you

14  that you need to subdivide those into smaller portions,

15  right.  Because otherwise, why do you give the patient two

16  tablets at the same time as opposed to just one bigger

17  tablet?  So yeah, the label is telling the POSA that there

18  was a reason to subdivide the dose into smaller portions.

19  Q.      I think it's a creative interpretation, but the

20  tablets themselves are 17 mg tables, correct?

21  A.      The tablets contain 17 mgs of pimavanserin.

22  Q.      And I understand you need to take two of them,

23  correct?

24  A.      Yes.

25  Q.      But with respect to the 17 mg tablet itself, is there

CROSS-EXAMINATION - FERNANDO MUZZIO

1  anything in the -- in either the prescribing information or

2  Ragnar-Tolf saying that the tablet size of that 17 mg was

3  too big?

4  A.     I don't think anybody has said that the 17 mg tablet

5  itself was too big.  I don't know why -- I don't

6  understand -- maybe I'm misunderstanding what you're asking.

7  I don't think I have ever said that either.

8  Q.     Now, you have testified and it's your opinion that --

9  you showed some charts -- that a POSA would gravitate

10  towards a capsule, you talked about ease of swallowing and

11  some other -- you know, some other characteristics that make

12  a capsule attractive, correct?

13  A.     My testimony is that all of those characteristics

14  would make a size 4 capsule a very likely choice for the

15  POSA.

16  Q.     Okay.  But you would agree with me that if I walked

17  out of this courtroom, crossed the street up a block to

18  Walgreens, and went into the aisles, I would see hundreds of

19  OTC medications that were in tablet form, correct?

20  A.     Yes, they are the most common.

21  Q.     Okay.  And if I had a prescription, went to the

22  actual pharmacists, there are, you know, thousands of more,

23  you know, tablets that I could purchase, correct?

24  A.     There are thousands of tablets approved for

25  dispensing to patients in the US, yes.

CROSS-EXAMINATION - FERNANDO MUZZIO

1    Q.    So not all and even not most, because you said

2    tablets are most common, so not all or even most dosage

3    forms are capsule forms, correct?

4    A.    About -- about, I would say, somewhere between 25 and

5    30 percent of oral dosage forms are capsules.

6                MR. PETERMAN:  Now, Mr. Campos, if you would

7    bring up PTX-21.

8    BY MR. PETERMAN:

9    Q.    This is a patent -- this is one of your patents,

10   correct?

11   A.    That's one of my patents.

12   Q.    Okay.  And you're the lead inventor on this?

13   A.    I am.

14   Q.    And it's U.S. Patent 10,004,682?

15   A.    Yeah.

16   Q.    And if we go to column 14, around line 25.

17   A.    Do you mind if I look for the exhibit?  What's the

18   number, DTX-?

19   Q.    PTX-21.

20   A.    Do I have it?  Oh, yes, I have it.

21   Q.    Okay.  So at line 25 in column 14, you and your

22   coinventor state:  "The tablet, the most frequently

23   prescribed commercial dosage form, is stable, elegant and

24   effective.  It provides the patient with a convenient

25   product for handling, identification and administration."

CROSS-EXAMINATION - FERNANDO MUZZIO

1          Correct?

2     A.     Yes, all of that is true.

3     Q.     You can put that aside.

4            Now, Dr. Muzzio, are you aware of any complaints

5     from, you know, doctors or patients or any other healthcare

6     professional or anyone regarding the two, you know, 17 mg

7     tablets for pimavanserin?

8     A.     I'm not aware of complaints.  I haven't reviewed any

9     complaints.  I haven't looked for that information.

10    Q.     Earlier during your testimony on direct, you looked

11    at several different articles or publications.  One of them

12    was DTX-5, and we can just, you know, bring up the -- the

13    cover here.  This was one of the articles or publications

14    that you looked at, correct?

15    A.     Yeah.

16    Q.     Okay.  And am I correct that Capsugel is a

17    manufacturer of capsules?

18    A.     They are a manufacturer of capsules, indeed.

19    Q.     Okay.  And Sven Stegemann, it appears on this page,

20    is an employee of Capsugel?

21    A.     He was an employee of Capsugel, yes.

22    Q.     Okay.  So -- and this document, "Hard gelatin

23    capsules today -- and tomorrow," was produced by a company

24    that makes capsules, correct?

25    A.     Yes.

CROSS-EXAMINATION - FERNANDO MUZZIO

1    Q.    And you pointed to, I think, some of the, you know,

2    text within the document relating to a perception of ease of

3    swallowability, correct?

4    A.    Yeah, I referred to an excerpt where that is

5    mentioned, yes.

6    Q.    Okay.  So it's a perception, not necessarily a fact,

7    of ease of swallowability with respect to capsules, correct?

8    A.    Right, but when you're talking about patients

9    adhering to medication, their perception is their reality.

10    To them, it is a fact.

11    Q.    So now taking look at DTX-6, which is another

12    document you relied upon.

13    A.    Sorry.  DTX-6 now?

14    Q.    Correct.

15    A.    Yes.

16    Q.    Okay.  This is another document from Sven Stegemann,

17    the same author of DTX-5, correct?

18    A.    Yeah.

19    Q.    Okay.  Again, identified as being an employee of

20    Capsugel?

21    A.    That's who he was.

22    Q.    Okay.  And so this document that you're relying upon

23    comes from a capsule manufacturer, correct?

24    A.    This document among others, this one comes from a

25    capsule manufacturer, yes.

CROSS-EXAMINATION - FERNANDO MUZZIO

1          MR. PETERMAN:  If I failed to do so, I wanted to

2   enter PTX-21 into evidence, which was the patent that we

3   looked at from Dr. Muzzio.

4          MR. FRESE:  No objection.

5          THE COURT:  PTX-0021 is admitted.

6          (Exhibit admitted.)

7          MR. PETERMAN:  And also I don't remember if I

8   entered DTX-217, which was the original patent application,

9   the PCT application that we discussed as well.

10          MR. FRESE:  Again, no objection.

11          THE COURT:  DTX-217 is admitted.

12          (Exhibits admitted.)

13   BY MR. PETERMAN:

14   Q.    Now, Dr. Muzzio, you referred to a number of portions

15   in Ragnar-Tolf in connection with your testimony earlier

16   today, correct?

17   A.    I did.

18   Q.    Do you have Ragnar-Tolf in front of you?  It's

19   JTX-11.

20   A.    I'm sorry.  Which number again?

21   Q.    It's JTX-11.  It was admitted earlier.

22   A.    Yeah.

23   Q.    Now, Ragnar-Tolf does not disclose the use of a

24   size 3 or 4 capsule for a pimavanserin composition, correct?

25   A.    Ragnar-Tolf discloses the testing of compatibility of

CROSS-EXAMINATION - FERNANDO MUZZIO

1    pimavanserin with HPMC and gelatin capsules.  It does not

2    explicitly talk about any one size other than size 00.

3    Q.    Okay.  You anticipated my next question.  Could you

4    look at table 2 which is on page 14 of Ragnar-Tolf?  It

5    talks about the assays and then lists size 0.

6    A.    Size 0, sorry.  I stand corrected.  Size 0.

7    Q.    I think that's what you said, but --

8    A.    No, I said "00," but --

9    Q.    Okay.

10   A.    Anyway.

11   Q.    Okay.  So there's just a size 0 capsule that's

12   disclosed here in Ragnar-Tolf, correct?

13   A.    Which chemically has the same composition as the

14   size 3 or 4.

15   Q.    Okay.  But it has a different size, correct?

16   A.    It has a different size, right.  It's being used for

17   a different purpose.

18   Q.    Now, Ragnar-Tolf mentions many different dosage forms

19   throughout the document, correct?

20   A.    It does refer to dosage forms from 1 to 80 mg.

21   Q.    And it actually talks about different types of ways

22   to formulate, including tablets, pills, liquids, gels,

23   syrups, slurries, suspensions, correct?

24   A.    Yeah.  However, when they disclosed the excipient

25   compatibility study that it really is saying that -- either

CROSS-EXAMINATION - FERNANDO MUZZIO

1 tablets or capsules.

2 Q.    Now, paragraph 121 of Ragnar-Tolf --

3 A.    Yeah.

4 Q.    -- this notes -- maybe about four lines down, it

5 says, "In general, if formulating with water,

6 microcrystalline cellulose, calcium phosphate, dibasic,

7 sodium croscarmellose, sodium starch glycolate, gelatin

8 capsule, and HPMC capsule may be problematic," correct?

9 A.    It says that.

10 Q.    Okay.  And so at least in this instance in this type

11 of formulation, it identifies a capsule as maybe being

12 problematic?

13 A.    Yeah, and two or three paragraphs later, it actually

14 says that they are fine.

15 Q.    Now, you took a look at example 8 of Ragnar-Tolf,

16 correct?

17 A.    It's one of the things I relied on, yes.

18 Q.    Okay.  And that example 8, which is on page 16, is a

19 direct compression of pimavanserin tartrate crystalline

20 form A, correct?

21 A.    Right, it's a dry blending process.

22 Q.    Okay.  And you understood from that example that

23 there was, I think, some issues with -- with agglomerates.

24 You say -- maybe five lines down, "It was discovered that

25 during blending, the mixture tended to form aggregates,

CROSS-EXAMINATION - FERNANDO MUZZIO

1    potentially affecting content uniformity," correct?

2    A.      Yeah, they say that.

3    Q.      Okay.  And then you took a look at the table that

4    accompanies example 8 --

5    A.      Mm-hmm.

6    Q.      -- and that's table 6, correct?

7    A.      Yes.

8    Q.      Okay.  And based on this table, you determined that

9    the Rsd percent values here, you know, made this, you know,

10   I guess, an undesirable example to take a look at or to

11   follow for your analysis, correct?

12   A.      Um, to be precise, my testimony is that when you have

13   a value at 7.8 percent, the column on the right, or

14   8.5 percent, the column on the left, you know, based on what

15   the regulations are, that those two experiments, if they

16   were commercial batches, would have failed, would not have

17   been approved for distribution to humans.  So you will

18   conclude from that that in those two instances, something

19   caused this large level of viability in the -- in the

20   content of the drug in the finished product.  That is my

21   testimony --

22   Q.      Okay.  So looking at --

23   A.      -- for the 1 mg and the 5 mg experiments listed

24   there.

25   Q.      Okay.  So looking at the Rsd percent was important

CROSS-EXAMINATION - FERNANDO MUZZIO

1    for your analysis, correct?

2    A.    It was an indication, yes.

3    Q.    And it was an indication that led you away from

4    considering this example further, correct?

5    A.    It's some indication -- I -- no, I did consider it in

6    full.  It's an indication -- when you see that kind of thing

7    in a dry blending experiment, it raises a red flag that I'm

8    dealing with an API that has a tendency to agglomerate.

9    They tell me that at the beginning of the example.  And even

10   after they do this sieving and blending repeatedly, they're

11   still seeing that problem for the 1 mg and 5 mg experiments

12   that they disclose here.

13   Q.    But you agree, though, that the 20 mg is less than

14   the 6 percent Rsd?

15   A.    It is, yes.

16   Q.    All right.

17   A.    However, let me tell you what else is true.

18   Typically when you see this level of variability among

19   experiments, usually that 8.5 -- I mean, the way this is

20   normally done, they prepare 10 or 20 -- well, they analyze

21   10 or 20 units of product, right.  Those are the two most

22   common numbers, either 10 or 20, sometimes 30.  And they

23   measure the amount of drug in each of those, 10, 20, or 30,

24   right.  And usually what you find is that most are okay, and

25   then one or two or three are way off.  That's typical of dry

CROSS-EXAMINATION - FERNANDO MUZZIO

1    blends that have agglomerates because you will find

2    agglomerates in -- not in every single product ever, but in

3    a couple of them, two or three.

4            And so you could have an Rsd of -- of 3 percent

5    and you think you're okay simply because you got lucky that

6    your sample did not include the one or two that would

7    actually have had an agglomerate.  If they did, suddenly you

8    see an 8 or a 9 percent, and I have actually written quite a

9    bit about this.  You might have found some of the papers

10   I've written on this.  So it's a red flag.  It's saying this

11   API has a tendency to agglomerate; it would likely result in

12   finished product having agglomerates, and at some point, I'm

13   going to find them and have a failed product.  I'm better

14   off not doing this.

15   Q.    Okay.  So looking at the Rsd, you see a lot of

16   variability, correct?

17   A.    For those two sets of experiments, I see a high level

18   of variability, and when I compare the various experiments,

19   I see various levels of variability, yes.

20   Q.    Okay.  So with the Rsd number, let me just make sure

21   that I've summarized your testimony correctly.  There are

22   two -- two samples that have an Rsd of greater than

23   6 percent, and that's -- that's undesirable?

24   A.    That's undesirable.

25   Q.    And on top of that, the four Rsd values that are

CROSS-EXAMINATION - FERNANDO MUZZIO

1    listed here show a great amount of variability; that's also

2    undesirable?

3    A.    I want to make I'm following you.  The 1 mg shows a

4    high level of variability.  That is undesirable.  The

5    5 mg -- one of the 5 mg shows a high level of viability.

6    The other one doesn't.  So when you compare the two 5 mgs,

7    one having an Rsd of 7.8 and one having an Rsd of 2.8 and

8    you wonder why, that's probably because a lack of the drug,

9    like they say, the samples that they do for the first 5 mg

10   didn't have one capsule with an agglomerate, while the one

11   that they did for -- on the right only had one or two

12   agglomerates, and that's why they see those two very

13   different results, right.  And that would -- that's what I

14   mean, it would raise a red flag.

15          So the 20 mg did not have an Rsd as high, and

16   that could be due to two separate reasons, if that's where

17   you're going with this.

18   Q.    Okay.  So just ultimately, though, the Rsd values

19   here raised a red flag for you in your analysis of

20   Ragnar-Tolf, correct?

21   A.    Yes.

22          THE COURT:  All right.  Is this an appropriate

23   time to stop for the lunch break, or do you --

24          MR. PETERMAN:  Sure.  Yeah, I mean, I have a

25   decent amount, you know, left.  It's not like five minutes

CROSS-EXAMINATION - FERNANDO MUZZIO

1    left, but, you know, we can break for lunch.

2                   THE COURT:  All right.  Let's take the lunch

3    break.  We'll come back at 2:00 p.m.

4                   MR. PETERMAN:  Thank you, Your Honor.

5                   (Lunch recess taken.)

6                   THE COURT:  All right.  You may be seated.

7                   MR. PETERMAN:  Thank you.

8    BY MR. PETERMAN:

9    Q.    Welcome back, Dr. Muzzio.

10   A.    Thank you so much.

11   Q.    When we left, we were talking about example 8, and

12   the Rsd values there.

13                   Just to confirm in table 6 -- and, again,

14   Ragnar-Tolf, we're talking about here with JTX-11 on page

15   16, there's table 6?

16   A.    Correct.

17   Q.    Okay.  The dosage strengths that are listed there are

18   1, 5, and 20, correct?

19   A.    That's correct.

20   Q.    Now, just turning to example 9, example 9 is also

21   something you relied upon in your analysis?

22   A.    I'm sorry, I can't --

23   Q.    Example 9 is also something you relied upon in your

24   analysis, correct?

25   A.    That is correct.

CROSS-EXAMINATION - FERNANDO MUZZIO

1    Q.    And table 8, of example 9, was something that you

2    referred to?

3    A.    Yes, I did.

4    Q.    Okay.  And that's where you got the bulk and tapped

5    density values that you applied in your analysis?

6    A.    That's one of the places that I relied on, yes.

7    Q.    And you confirmed, looking at table 8, that there's

8    no reference to Rsd in table 8, correct?

9    A.    Yeah, that is correct, there is no reference to Rsd.

10    Q.    Thank you.

11          Okay.  Turning to another document, JTX-13.

12    A.    Yeah.

13    Q.    This is a development strategy for 40 mgs IR

14    pimavanserin capsule, do you see that?

15    A.    Oh, I'm sorry, I had the wrong document.

16    Q.    No problem, take your time.

17    A.    13?

18    Q.    13.  I have it as the last --

19    A.    DTX-13?

20    Q.    JTX-13.

21    A.    Oh, JTX-13.

22    Q.    Yeah, depending on what binder you have --

23          THE COURT:  It's DTX-1175 there.

24          MR. PETERMAN:  I'm sorry?

25          THE WITNESS:  I said, I think it's also

CROSS-EXAMINATION - FERNANDO MUZZIO

1    PTX-1175.

2    BY MR. PETERMAN:

3    Q.    Okay.  Yeah.  There -- certainly could be the same.

4    A.    I don't have JTX-13, what document --

5                THE COURT:  In the binder.

6    BY MR. PETERMAN:

7    Q.    Yes, so -- so, Dr. Muzzio, you have two binders.

8    Look at the one that's your direct examination binder.

9    A.    Okay.  What do I look for?

10   Q.    I believe it's the last document in that binder.

11   A.    Now I have it, yes.

12   Q.    This is titled "Development Strategy for 40 mg IR

13   pimavanserin capsule," correct?

14   A.    Yes, that's the title.

15   Q.    Okay.  And it's a document that appears to have been

16   between Acadia and the Catalent company that you testified

17   about earlier, correct?

18   A.    That's what it appears to be, yes.

19   Q.    And as far as you're aware, this is not a publicaly

20   available document, correct?

21   A.    That would be correct.

22   Q.    And you're not considering this document itself to be

23   prior art, correct?

24   A.    No, I'm not looking at this document as prior art,

25   I'm only looking -- well, that's my answer, I'm not looking

CROSS-EXAMINATION - FERNANDO MUZZIO

1    at it as prior art.

2    Q.    Okay.  So tell me, how are you looking at this

3    document?

4    A.    Well, this document shows that people who were POSAs

5    were already aware of the densities that could be achieved

6    by various types of granulation strategies.

7    Q.    And this is actually specifically an individual,

8    Stephen Abele?

9    A.    That's the lead author of the document.

10   Q.    And you know --

11   A.    Or the only author of the document, yes.

12   Q.    And you didn't, you know, talk or review any

13   deposition testimony from Stephen Abele, correct?

14   A.    I have not.

15   Q.    Okay.  And so you don't know specifically what he

16   meant by any of the statements here in this document,

17   correct?

18   A.    I only know what I can see in the document.

19   Q.    Okay.

20             MR. PETERMAN:  I don't have any further

21   questions, thank you.

22             THE WITNESS:  I'm done.

23             THE COURT:  Hold on, there.

24             Any redirect?

25             MR. FRESE:  No redirect, Your Honor, thank you.

CROSS-EXAMINATION - FERNANDO MUZZIO

1          THE COURT:  I had a couple of questions for you.

2          THE WITNESS:  Oh, sure.

3          THE COURT:  So the term "pharmaceutically

4    acceptable capsule," independent of the '721 patent, do you,

5    as a POSA, do you have a plain and ordinary meaning for it?

6          THE WITNESS:  Yeah, if we were not reading the

7    specification of the patent and all the stuff that it brings

8    in, yes, as a POSA, I would understand what that means.

9          THE COURT:  Okay.  And so what you're saying is

10   that as a POSA, you would have a plain and ordinary meaning

11   of "pharmaceutically acceptable capsule," but once you read

12   this patent, it confused you?

13         THE WITNESS:  Yes.

14         THE COURT:  But help me understand, why would a

15   POSA not understand a pharmaceutically acceptable capsule to

16   mean a capsule capable of delivering 40 mgs of pimavanserin

17   that is easy to swallow, effectively masks taste, all the

18   things that you said?

19         THE WITNESS:  It's because there is a number of

20   other attributes that could come into play for making a

21   capsule pharmaceutically acceptable.

22         You would have to presumably dissolve in a

23   certain way so that the drug is released at a certain rate.

24         It would need to contain lists and certain

25   amounts of certain impurities to make sure that it has no

CROSS-EXAMINATION - FERNANDO MUZZIO

1    potential harmful effects, it would have to have a number of

2    other attributes.

3            It would have to be stable, so -- and that could

4    mean one of multiple things.  It could mean that the drug

5    doesn't crystallized within the dosage form, it also means

6    that the drug substance, that's a degrade beyond a certain

7    limit over time.

8            It could mean that the drug doesn't change the

9    way it behaves as a function of time.  I have seen this on

10    the pharmacy shelf.

11            You know, there's a lot of things that come into

12    play and a POSA would normally understand how to deal with

13    those factors, but in the case of the patent specifically,

14    when there are all these other examples that say, when you

15    do these, the result is not acceptable; when you do these,

16    the result is not acceptable but then you say why?

17            If I am a POSA now, and I make a capsule now, I

18    don't know whether it is or it is not pharmaceutically

19    acceptable as per the patent because the patent is changing

20    the meaning but it's not giving me all the elements I need

21    to understand how that meaning has been changed.

22            THE COURT:  So you are equating acceptable with

23    invention, right?

24            THE WITNESS:  No, I'm -- well, in a way, I

25    guess, yes, in a way.  The only thing that being claimed to

CROSS-EXAMINATION - FERNANDO MUZZIO

1    being invented is the acceptable one, right, because that's

2    what the preamble said, it has to be acceptable.  But it

3    doesn't tell me how to differentiate what's acceptable from

4    what's not in this patent.

5            THE COURT:  All right.  That's all the questions

6    I have.

7            THE WITNESS:  Thank you, Your Honor.

8            MS. CARLAN:  Your Honor, Defendants have

9    withdrawn -- are withdrawing our request to play the

10   testimony of Agarwal.  So at this time, we have no more

11   witnesses to present during our invalidity case.  And we

12   rest the invalidity case.

13           THE COURT:  All right.

14           MS. CARLAN:  Thank you, Your Honor.

15           MR. PETERMAN:  Your Honor, we're going to begin

16   our response to the validity case.  We have Dr. Steven

17   Little coming to the stand, he'll be directed by my

18   colleague, Scott Peachman.

19           MR. PEACHMAN:  Good afternoon, Your Honor.

20           THE COURT:  All right.

21

22           STEVEN LITTLE, having been called on the part

23   and behalf of the Plaintiff as a witness, having first

24   affirmed to tell the truth, testified as follows:

25

1    THE COURT:  So I'm told that there is a fire

2    issue in the building, so there's somebody that wants to

3    talk to me.

4         (Discussion held off the record.)

5    THE COURT:  So there's a water main break in the

6    front of the building, so there's no water to the building,

7    so it creates both a fire risk because of no sprinklers,

8    etc., so they have asked for the courthouse to be shutdown.

9         The chief judge is going to go until 2:30 in the

10   case he's going on, so we can at least go to 2:30.

11        Would you rather start and do some of this or

12   just shut down now and come back tomorrow?

13        MR. PETERMAN:  Thank you, Your Honor.  Given the

14   circumstances, we'd rather shut down now and come back

15   tomorrow.

16        THE COURT:  Okay.  All right.

17        All right.  So let's do that, we'll adjourn for

18   the day.

19        MR. PETERMAN:  What time would the Court like to

20   start -- well, assuming that the building does reopen?

21        THE COURT:  Let's plan to start at 9:00 a.m.

22   tomorrow, let's plan to start -- is that a problem for

23   either side because I know we normally start at 9:30?

24        MR. PETERMAN:  It's fine for us, assuming that

25   courthouse opens at its normal time.

CROSS-EXAMINATION - FERNANDO MUZZIO

1          THE COURT:  Okay.  All right.  So assuming that

2     we're open, we'll start at 9:00 a.m.

3          MR. PETERMAN:  Thank you, Your Honor.

4          (Whereupon, the following proceeding concluded

5     at 2:15 p.m.)

6               I hereby certify the foregoing is a true

7     and accurate transcript from my stenographic notes in the

8     proceeding.

9                              /s/ Michele L. Rolfe, RPR, CRR
                                U.S. District Court

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**'**

**'721** [32] - 282:18, 284:19, 285:7, 287:17, 290:5, 296:12, 346:20, 348:5, 349:18, 352:22, 357:9, 357:21, 358:9, 361:11, 363:23, 367:3, 379:16, 379:24, 382:11, 384:9, 386:18, 387:8, 394:17, 396:3, 400:12, 401:19, 405:6, 405:11, 406:14, 408:10, 408:19, 427:4

---

**/**

**/s** [1] - 431:9

---

**0**

**0** [4] - 417:5, 417:6, 417:11
**0.05-1.15** [1] - 362:15
**0.21** [1] - 339:11
**0.3** [1] - 339:11
**0.4** [15] - 287:10, 345:19, 354:17, 354:25, 355:3, 358:8, 358:25, 366:9, 366:13, 368:10, 375:17, 402:5, 402:13, 407:13
**0.5** [3] - 336:11, 402:6, 402:13
**0.508** [5] - 356:8, 359:3, 402:14, 403:2, 403:5
**0.51** [1] - 402:13
**0.56** [5] - 303:22, 304:6, 332:20, 334:15, 343:1
**0.57** [1] - 335:10
**0.6** [13] - 307:13, 332:17, 333:4, 333:7, 334:14, 334:15, 334:22, 335:5, 336:11, 339:13, 340:19, 363:2, 402:5
**0.61** [2] - 303:22, 304:6, 343:1
**0.62** [1] - 335:5
**0.7** [16] - 339:14,

---

**1**

345:21, 355:4, 357:11, 358:10, 358:24, 359:4, 359:10, 360:16, 361:16, 361:21, 362:4, 362:11, 362:21, 364:9, 401:15
**0.8** [5] - 339:14, 340:19, 345:21, 355:4, 358:10
**0.9** [2] - 339:14, 345:21
**00** [2] - 417:2, 417:8
**0011** [2] - 322:8, 322:9
**0012** [2] - 315:14, 321:9
**0013** [1] - 324:4
**002** [1] - 338:16

---

**1**

**1** [35] - 286:24, 290:16, 296:24, 299:2, 300:3, 303:16, 304:24, 307:11, 332:14, 332:19, 333:19, 336:5, 336:6, 339:16, 342:1, 343:2, 353:7, 355:4, 356:1, 356:4, 356:5, 356:13, 372:4, 372:6, 393:7, 393:9, 400:11, 402:9, 403:2, 403:6, 417:20, 419:23, 420:11, 422:3, 423:18
**1,000** [2] - 369:1, 369:11
**1.0** [1] - 401:15
**1.1** [1] - 355:4
**1.2** [1] - 355:5
**1.5** [1] - 333:24
**10** [14] - 284:20, 284:21, 303:5, 305:20, 305:22, 311:20, 347:13, 347:20, 354:9, 361:10, 420:20, 420:21, 420:22, 420:23
**10,004,682** [1] - 413:14
**100** [2] - 350:13, 351:4
**101** [1] - 347:21
**102** [1] - 297:2
**103** [1] - 404:8
**11** [2] - 291:23, 311:20
**12** [2] - 335:6, 348:19

---

**121** [1] - 418:2
**125** [1] - 298:22
**126** [5] - 333:5, 333:6, 334:2, 334:6, 334:24
**129** [1] - 336:18
**13** [13] - 283:2, 337:22, 337:23, 341:3, 387:12, 390:4, 390:13, 392:1, 392:9, 393:22, 394:2, 424:17, 424:18
**132** [2] - 305:18, 328:10
**14** [10] - 297:9, 297:15, 392:23, 393:2, 393:23, 394:2, 394:11, 413:16, 413:21, 417:4
**14.3** [1] - 330:6
**15** [6] - 284:19, 284:20, 338:14, 361:10, 361:24, 366:18
**150** [1] - 327:18
**16** [5] - 348:5, 396:4, 397:18, 418:18, 423:15
**17** [26] - 290:7, 291:2, 292:13, 293:13, 297:11, 297:13, 348:22, 397:7, 404:4, 404:9, 404:24, 404:25, 409:3, 409:9, 410:3, 410:10, 410:17, 411:1, 411:3, 411:20, 411:21, 411:25, 412:2, 412:4, 414:6
**17.5** [2] - 330:1, 330:6
**17/693** [1] - 405:12
**17/693,830** [1] - 406:15
**18** [1] - 316:2
**19** [1] - 352:22
**19-45** [2] - 397:19, 397:20
**1:22-cv-01387-GBW** [1] - 280:5

---

**2**

**2** [18] - 280:11, 286:24, 304:20, 304:24, 333:24, 334:10, 342:17, 351:14, 355:23, 356:7, 356:10, 356:13, 356:15, 384:13,

---

394:17, 395:8, 406:5, 417:4
**2.1** [1] - 290:22
**2.8** [1] - 422:7
**20** [30] - 290:8, 292:12, 293:14, 299:2, 300:3, 303:4, 303:16, 304:25, 332:19, 332:21, 333:2, 333:11, 333:19, 334:16, 336:5, 336:6, 336:8, 341:24, 342:15, 343:3, 346:10, 372:4, 420:13, 420:20, 420:21, 420:22, 420:23, 422:15, 423:18
**200** [2] - 333:3, 333:6
**2002** [4] - 315:13, 321:7, 328:4, 339:16
**2005** [5] - 309:4, 316:24, 317:1, 317:3, 328:7
**2007** [1] - 296:11
**2007/0264330** [1] - 407:16
**2012** [2] - 309:14, 329:4
**2014** [2] - 309:24, 314:8
**2016** [1] - 290:13
**2017** [3] - 290:2, 290:5, 330:12
**2024** [1] - 280:11
**217** [1] - 384:4
**22** [2] - 401:20, 401:21
**23** [1] - 397:21
**24** [1] - 334:16
**25** [3] - 413:4, 413:16, 413:21
**29-32** [1] - 389:10
**2:00** [1] - 423:3
**2:15** [1] - 431:5
**2:30** [2] - 430:9, 430:10

---

**3**

**3** [28] - 286:12, 286:15, 287:2, 287:3, 287:15, 287:19, 339:3, 339:11, 340:10, 341:1, 342:6, 343:6, 367:17, 367:20, 373:18, 389:3, 389:6, 389:11, 389:16, 389:23, 390:1, 391:15,

---

**4**

394:1, 395:16, 407:12, 416:24, 417:14, 421:4
**3-10** [1] - 284:20
**3-14** [2] - 401:20, 401:21
**3-52** [2] - 361:10, 361:24
**30** [6] - 290:2, 290:5, 303:4, 413:5, 420:22, 420:23
**302** [2] - 347:14, 347:21
**30th** [1] - 330:12
**31** [1] - 389:7
**31.7** [1] - 334:9
**32** [5] - 336:9, 342:21, 344:13, 384:22, 389:7
**32-47** [1] - 386:1
**32.4** [3] - 334:12, 335:7, 335:12
**33** [3] - 342:21, 344:13, 389:7
**33-41** [1] - 394:17
**34** [33] - 284:12, 286:11, 286:14, 287:15, 291:2, 293:12, 295:22, 312:17, 330:24, 331:8, 335:8, 335:12, 341:21, 341:23, 343:18, 353:5, 367:5, 367:13, 369:2, 369:9, 375:13, 384:18, 390:5, 391:23, 392:1, 392:5, 392:18, 392:24, 393:3, 393:13, 393:17, 393:25, 407:11
**34-49** [2] - 348:22, 397:7
**35** [3] - 387:14, 389:5, 389:25
**35-58** [1] - 390:4
**36** [3] - 384:13, 384:14, 384:16
**37-42** [1] - 348:19
**37-46** [1] - 284:20
**38** [2] - 385:13, 385:21
**39-41** [1] - 284:20
**39-62** [1] - 361:10

---

**4**

**4** [80] - 280:11, 283:2, 284:12, 285:6, 285:25, 286:9,

286:10, 286:12, 286:15, 287:5, 287:15, 287:19, 287:20, 298:5, 316:3, 330:5, 330:18, 331:7, 331:14, 331:21, 332:2, 332:10, 332:25, 333:4, 333:5, 335:18, 335:23, 336:14, 337:19, 339:11, 340:10, 341:1, 341:13, 341:17, 342:6, 342:7, 342:20, 342:24, 343:6, 343:8, 343:22, 353:9, 367:3, 367:4, 367:17, 367:19, 373:18, 375:8, 378:16, 379:18, 380:3, 380:7, 380:10, 380:11, 380:14, 380:16, 386:17, 389:3, 389:6, 389:11, 389:16, 389:23, 390:2, 391:15, 392:5, 393:7, 393:9, 393:17, 394:1, 395:17, 404:3, 404:9, 407:12, 412:14, 416:24, 417:14
**4-10** [2] - 348:5, 396:4
**40** [43] - 286:19, 295:23, 296:24, 312:15, 322:5, 326:15, 327:24, 331:9, 331:13, 331:21, 332:2, 332:10, 332:25, 333:2, 334:2, 334:5, 334:25, 335:18, 335:23, 336:14, 337:20, 340:25, 342:12, 342:19, 344:14, 345:7, 346:7, 353:13, 355:24, 356:12, 357:23, 363:14, 368:6, 370:15, 370:17, 371:18, 371:21, 373:18, 375:14, 403:12, 424:13, 425:12, 427:16
**41** [1] - 398:16
**42** [1] - 395:8

**48** [3] - 385:14, 385:23, 385:24

## 5

**5** [31] - 283:2, 286:14, 287:14, 287:16, 287:18, 287:21, 299:2, 300:3, 303:5, 303:16, 304:24, 317:3, 333:19, 336:5, 341:13, 343:4, 343:5, 343:8, 383:18, 383:19, 386:17, 393:8, 404:3, 404:9, 419:23, 420:11, 422:5, 422:6, 422:9, 423:18
**5-34** [2] - 384:23, 390:10
**5.1** [1] - 322:17
**5.2** [1] - 323:13
**5.3** [2] - 324:5, 330:7
**5.4** [1] - 324:22
**5.5** [1] - 325:12
**50** [1] - 352:22
**53** [1] - 392:8
**54-62** [1] - 284:21
**58** [3] - 387:15, 389:5, 390:1
**59** [4] - 334:18, 353:5, 356:1, 390:13
**59-68** [1] - 392:1

## 6

**6** [11] - 291:12, 300:1, 300:10, 300:11, 300:14, 321:10, 419:6, 420:14, 421:23, 423:13, 423:15
**6-B** [1] - 281:25
**6.4** [2] - 329:25, 330:7
**60** [5] - 334:18, 347:16, 347:24, 398:2, 409:14
**606** [1] - 372:3
**616** [1] - 402:8
**63** [2] - 305:25, 306:1
**64** [1] - 302:24
**65** [1] - 291:21
**66** [1] - 316:1
**67** [3] - 296:17, 296:19, 390:14

## 7

**7** [8] - 292:5, 297:1,

297:20, 297:24, 303:13, 307:4, 333:17, 344:7
**7.8** [2] - 419:13, 422:7
**70** [1] - 337:14
**71** [3] - 291:20, 333:21, 334:18
**75** [2] - 291:21, 291:22

## 8

**8** [16] - 292:6, 298:22, 298:23, 299:20, 301:1, 303:17, 303:18, 332:14, 418:15, 418:18, 419:4, 421:8, 423:11, 424:1, 424:7, 424:8
**8.5** [3] - 291:13, 419:14, 420:19
**80** [7] - 296:24, 307:11, 314:17, 337:15, 342:1, 409:14, 417:20
**830** [1] - 405:12
**87** [1] - 333:21

## 9

**9** [10] - 301:1, 301:6, 301:8, 303:10, 336:17, 421:8, 423:20, 423:23, 424:1
**91** [1] - 333:21
**9:00** [3] - 281:25, 420:1, 431:2
**9:30** [1] - 430:23

## A

**a.m** [3] - 281:25, 430:21, 431:2
**abandon** [1] - 308:23
**Abele** [2] - 426:8, 426:13
**able** [13] - 289:20, 308:12, 312:23, 332:2, 335:21, 337:18, 340:25, 342:18, 344:11, 344:13, 372:14, 373:11, 375:22
**above-disclosed** [1] - 283:13
**absolutely** [1] - 311:15
**abstract** [1] - 296:13
**absurd** [1] - 411:6

**ACADIA** [2] - 280:4, 281:8
**Acadia** [6] - 337:25, 340:23, 404:5, 405:2, 425:16
**acceptability** [2] - 314:1, 322:13
**Acceptable** [1] - 379:8
**acceptable** [95] - 282:16, 282:24, 286:10, 286:18, 286:21, 287:14, 288:2, 288:4, 288:12, 288:19, 300:10, 341:21, 342:13, 345:8, 345:9, 346:8, 348:10, 353:14, 357:24, 365:15, 366:6, 367:4, 368:7, 369:9, 369:12, 372:22, 375:16, 375:23, 376:2, 376:6, 376:8, 376:15, 376:20, 376:23, 377:5, 377:6, 377:9, 377:11, 377:12, 377:14, 377:17, 377:18, 377:20, 377:23, 377:25, 378:25, 379:1, 379:4, 379:11, 379:15, 379:19, 379:23, 380:21, 381:6, 381:15, 381:24, 382:4, 382:17, 384:24, 387:20, 388:5, 388:19, 388:24, 390:17, 390:19, 391:2, 391:10, 391:20, 392:2, 392:9, 392:10, 392:12, 392:21, 393:8, 393:10, 393:15, 393:16, 394:5, 394:12, 395:12, 395:25, 427:4, 427:11, 427:15, 427:21, 428:15, 428:16, 428:19, 428:22, 429:1, 429:2, 429:3
**accepted** [2] - 300:9, 369:2
**access** [1] - 330:11
**accompanies** [1] - 419:4
**according** [3] -

286:10, 385:25, 402:8
**accurate** [1] - 431:7
**achievable** [2] - 357:14, 359:1
**achieve** [13] - 332:16, 345:24, 359:4, 359:5, 360:9, 361:20, 362:10, 363:1, 364:19, 372:11, 374:1, 401:17
**achieved** [3] - 355:13, 401:15, 426:5
**achieving** [4] - 284:8, 331:12, 372:13, 373:20
**acknowledge** [1] - 399:17
**acquired** [1] - 338:6
**active** [1] - 407:25
**actively** [1] - 325:1
**actual** [3] - 303:14, 303:18, 412:22
**add** [5] - 351:9, 351:10, 351:11, 378:11
**added** [6] - 350:25, 352:2, 354:8, 382:21, 382:25, 383:16
**adding** [1] - 284:10
**addition** [10] - 284:9, 285:3, 294:8, 305:13, 306:9, 311:17, 345:18, 358:7, 377:1, 378:4
**additional** [5] - 372:15, 377:2, 380:15, 399:15, 399:18
**address** [1] - 338:13
**adequate** [1] - 362:17
**adequately** [1] - 354:16
**adhere** [1] - 363:21
**adherence** [2] - 309:19, 310:19
**adhering** [2] - 314:2, 415:9
**adhesive** [1] - 365:3
**adjourn** [1] - 430:17
**adjust** [1] - 301:17
**adjusted** [1] - 336:9
**administered** [2] - 293:12, 311:2
**administration** [3] - 291:5, 295:20, 413:25
**admit** [1] - 406:17

**admitted** [20] - 292:24, 292:25, 307:20, 307:21, 311:23, 311:24, 315:3, 315:4, 321:3, 321:4, 341:8, 341:9, 341:10, 406:19, 406:20, 416:5, 416:6, 416:11, 416:12, 416:21
**adversely** [1] - 378:6
**advises** [1] - 358:3
**affect** [3] - 299:11, 319:1, 378:6
**affected** [1] - 314:23
**affecting** [4] - 291:18, 293:17, 329:2, 419:1
**affirmed** [1] - 429:24
**afternoon** [1] - 429:19
**Agarwal** [1] - 429:10
**age** [5] - 291:20, 314:16, 409:14, 410:9
**age-related** [1] - 314:16
**agglomerate** [4] - 420:8, 421:7, 421:11, 422:10
**agglomerates** [5] - 418:23, 421:1, 421:2, 421:12, 422:12
**aggregates** [2] - 299:10, 418:25
**agitator** [1] - 360:24
**ago** [2] - 327:18, 367:1
**agree** [8] - 395:18, 396:15, 396:17, 396:22, 405:23, 408:17, 412:16, 420:13
**ahead** [23] - 290:10, 290:15, 291:12, 296:7, 296:17, 297:1, 298:21, 301:2, 302:24, 305:15, 308:20, 309:5, 309:15, 313:24, 314:9, 316:18, 317:3, 318:25, 324:4, 328:22, 339:18, 340:11, 385:13
**aim** [1] - 372:18
**aimed** [1] - 370:3
**aisles** [1] - 412:18
**al** [2] - 280:6, 407:16
**allow** [3] - 286:14, 340:9, 407:23
**allowance** [3] -

406:23, 407:6, 407:8
**Allowance** [1] - 407:2
**allowed** [2] - 383:23, 408:22
**allowing** [1] - 408:19
**allows** [3] - 331:20, 336:14, 407:25
**almost** [4] - 296:11, 334:18, 335:13
**alone** [10] - 285:20, 297:10, 297:13, 304:15, 305:4, 351:10, 351:24, 355:25, 370:18, 385:11
**alternatively** [1] - 308:10
**ambiguous** [1] - 377:1
**amend** [1] - 396:25
**amount** [40] - 283:22, 284:10, 284:15, 285:2, 285:4, 285:13, 286:5, 303:2, 303:24, 304:1, 305:6, 305:10, 320:18, 323:2, 334:19, 340:9, 345:13, 354:7, 354:8, 358:1, 358:6, 360:21, 364:24, 371:15, 378:3, 383:9, 383:11, 383:16, 383:25, 390:21, 391:3, 391:21, 392:11, 394:8, 401:13, 407:23, 408:15, 420:23, 422:1, 422:25
**amounts** [11] - 283:19, 307:14, 320:17, 346:16, 353:22, 360:1, 364:18, 371:10, 371:11, 378:7, 427:25
**amperage** [1] - 362:7
**analysis** [8] - 404:20, 406:10, 419:11, 420:1, 422:19, 423:21, 423:24, 424:5
**analyze** [1] - 420:20
**AND** [1] - 280:2
**annoying** [2] - 391:9, 391:14
**answer** [5] - 372:8, 391:12, 391:19, 396:25, 425:25
**answers** [1] - 392:16
**anticipated** [1] - 417:3

**anyway** [1] - 417:10
**apart** [3] - 318:20, 324:10, 324:11
**API** [4] - 295:22, 362:2, 420:8, 421:11
**apologize** [1] - 393:5
**appear** [16] - 355:23, 376:11, 376:12, 376:16, 380:21, 386:21, 387:21, 388:10, 388:25, 389:1, 389:3, 391:10, 391:13, 391:16, 391:18, 394:11
**appearance** [1] - 321:17
**APPEARANCES** [1] - 281:1
**appeared** [1] - 379:24
**applesauce** [1] - 323:7
**Application** [1] - 406:15
**application** [11] - 283:14, 296:9, 296:15, 362:1, 382:23, 384:8, 384:22, 405:8, 405:12, 416:8, 416:9
**applied** [2] - 283:22, 424:5
**Applying** [1] - 362:14
**applying** [2] - 320:16, 361:25
**approach** [3] - 300:22, 360:2, 366:21
**appropriate** [3] - 283:21, 361:25, 422:22
**approval** [2] - 372:22, 372:25
**approved** [3] - 290:14, 412:24, 419:17
**April** [1] - 290:13
**aqueous** [1] - 307:15
**area** [3] - 315:23, 325:18, 362:2
**ARENTFOX** [1] - 281:15
**argument** [2] - 404:2, 404:8
**arrive** [2] - 286:13, 336:13
**art** [114] - 283:6, 284:24, 289:17, 289:21, 289:23, 290:6, 290:17, 290:19, 290:23, 290:25, 291:5,

291:14, 291:16, 291:25, 292:7, 292:16, 293:3, 293:8, 293:19, 293:23, 294:4, 294:9, 294:15, 295:11, 295:25, 296:19, 296:22, 297:19, 297:23, 298:14, 298:23, 299:19, 300:17, 305:2, 305:7, 305:19, 305:21, 306:2, 306:17, 306:22, 308:6, 308:8, 308:13, 310:2, 312:11, 312:14, 312:17, 313:6, 313:11, 313:15, 313:21, 314:20, 315:8, 315:11, 316:5, 317:10, 318:8, 318:12, 318:14, 319:14, 319:25, 320:1, 321:13, 321:20, 321:25, 322:4, 322:19, 323:15, 324:7, 324:23, 325:13, 326:9, 326:14, 326:24, 327:5, 327:6, 328:13, 328:20, 330:10, 330:16, 330:23, 331:4, 331:12, 331:19, 332:4, 332:9, 333:8, 333:13, 335:16, 335:21, 336:21, 337:4, 340:21, 341:18, 341:19, 343:19, 349:2, 349:10, 349:13, 356:15, 357:15, 361:19, 362:25, 364:1, 364:5, 395:4, 406:2, 407:15, 408:6, 408:9, 425:23, 425:24, 426:1
**art's** [3] - 319:1, 329:9, 363:25
**articles** [2] - 414:11, 414:13
**arts** [1] - 307:25
**ascertain** [1] - 382:3
**aside** [7] - 288:13, 289:15, 365:17, 365:23, 386:16,

404:21, 414:3
**aspect** [1] - 363:7
**assays** [1] - 417:5
**asserted** [3] - 282:13, 365:12, 366:2
**associated** [4] - 290:21, 293:16, 295:13, 405:2
**assume** [3] - 288:14, 334:13, 366:2
**assumes** [1] - 404:20
**assuming** [3] - 430:20, 430:24, 431:1
**assumption** [4] - 288:24, 404:11, 404:14, 404:23
**asterisks** [2] - 356:5, 403:7
**attempt** [1] - 327:23
**attempted** [1] - 359:25
**attempting** [1] - 369:20
**attention** [8] - 317:5, 322:8, 322:9, 340:12, 348:6, 352:21, 384:11, 394:16
**attractive** [1] - 412:12
**attributes** [3] - 289:22, 427:20, 428:2
**August** [3] - 290:2, 290:5, 330:12
**AUROBINDO** [1] - 280:6
**Aurobindo** [2] - 281:11, 281:11
**author** [3] - 415:17, 426:9, 426:11
**authority** [2] - 377:20, 377:23
**automatically** [3] - 300:11, 317:18, 371:1
**available** [4] - 290:4, 400:16, 400:24, 425:20
**Avicel** [8] - 347:14, 347:15, 347:17, 347:21, 347:23, 353:6, 354:6, 397:11, 397:13, 397:15, 398:4, 399:21, 399:22
**avoid** [4] - 302:13, 302:21, 303:6, 319:10
**avoided** [1] - 303:2
**aware** [8] - 289:17, 306:5, 308:14,

327:7, 414:4, 414:8, 425:19, 426:5

## B

**bad** [5] - 305:24, 306:5, 306:13, 325:3, 325:5
**BALDWIN** [1] - 281:17
**BARRY** [1] - 281:9
**base** [1] - 290:8
**based** [6] - 363:23, 365:24, 382:17, 409:20, 419:8, 419:14
**basis** [2] - 365:9, 376:1
**batch** [1] - 300:11
**batches** [1] - 419:16
**BECNEL** [1] - 281:4
**BECNEL-GUZZO** [1] - 281:4
**bed** [6] - 339:20, 339:25, 350:10, 360:4, 386:10, 387:17
**BEFORE** [1] - 280:14
**begin** [3] - 293:23, 294:22, 429:15
**beginning** [2] - 281:25, 420:9
**begins** [1] - 317:6
**behalf** [1] - 429:23
**behaves** [1] - 428:9
**behavior** [1] - 309:7
**below** [3] - 312:5, 330:2, 356:7
**Bench** [1] - 280:11
**bench** [1] - 281:24
**beneficial** [1] - 310:11
**benefit** [2] - 293:9, 327:15
**benefits** [1] - 310:18
**BERMAN** [1] - 281:15
**better** [1] - 421:13
**between** [17] - 289:23, 291:21, 294:20, 301:15, 303:21, 323:2, 323:20, 324:13, 325:19, 328:18, 343:1, 389:5, 389:25, 390:4, 399:3, 413:4, 425:16
**beyond** [1] - 428:6
**big** [6] - 316:11, 328:21, 384:16, 411:11, 412:3, 412:5
**bigger** [1] - 411:16
**binder** [25] - 284:10,

287:1, 287:4, 290:10, 296:8, 301:24, 308:20, 309:5, 316:18, 328:23, 337:22, 347:5, 347:6, 347:8, 354:1, 357:1, 384:1, 384:2, 384:6, 396:7, 397:25, 424:22, 425:5, 425:8, 425:10
**binders** [18] - 287:8, 348:12, 348:17, 358:3, 366:22, 387:9, 396:11, 396:18, 396:19, 396:23, 396:24, 397:1, 397:2, 397:4, 399:21, 425:7
**bit** [7] - 304:4, 304:8, 335:6, 341:6, 367:22, 395:7, 421:9
**bitter** [8] - 305:23, 307:1, 320:22, 321:24, 322:2, 324:14, 324:15, 327:22
**blend** [33] - 302:11, 304:15, 304:25, 305:8, 305:14, 305:15, 306:11, 333:3, 333:6, 334:1, 334:2, 334:3, 334:7, 334:8, 334:10, 334:15, 334:24, 337:9, 351:12, 356:2, 356:4, 356:6, 356:8, 356:10, 357:6, 359:2, 401:9, 401:12, 401:17, 403:3, 403:5, 403:7, 403:12
**blended** [14] - 286:18, 298:25, 301:5, 304:16, 342:11, 342:16, 367:24, 368:3, 370:9, 370:10, 398:2, 402:1, 402:3, 402:22
**blending** [15] - 284:4, 298:12, 299:3, 299:10, 299:16, 300:14, 350:17, 350:19, 386:15, 418:21, 418:25, 420:7, 420:10
**blending/ encapsulation** [1] - 351:8
**blends** [12] - 298:9, 298:10, 299:1,

299:4, 299:7, 303:9, 304:19, 305:3, 305:5, 306:25, 332:22, 421:1
**block** [1] - 412:17
**bold** [1] - 384:16
**bonds** [1] - 301:15
**bottom** [7] - 292:5, 314:10, 384:17, 390:13, 402:21, 403:1, 406:5
**bound** [1] - 355:8
**boundaries** [1] - 365:14
**BRADFORD** [1] - 281:16
**branding** [1] - 338:2
**break** [9] - 299:17, 324:10, 324:11, 366:17, 366:19, 422:23, 423:1, 423:3, 430:5
**brief** [3] - 321:15, 345:3, 347:9, 390:7
**briefly** [2] - 301:21, 315:19
**bright** [3] - 317:23, 318:15, 319:22
**bring** [30] - 293:6, 294:1, 298:1, 299:22, 302:7, 306:19, 308:3, 310:4, 313:2, 331:1, 331:16, 333:16, 336:2, 337:7, 341:15, 343:16, 344:25, 346:4, 346:24, 349:21, 351:2, 353:16, 354:21, 357:20, 358:19, 365:11, 384:12, 394:19, 413:7, 414:12
**bringing** [1] - 373:14
**brings** [1] - 427:7
**broad** [6] - 345:12, 346:1, 354:12, 355:10, 357:25, 366:5
**brownish** [1] - 302:12
**building** [4] - 430:2, 430:6, 430:20
**bulk** [64] - 283:23, 284:9, 287:10, 287:13, 294:13, 303:18, 303:21, 303:24, 304:14, 305:3, 305:4, 305:8, 305:9, 305:14, 307:13, 332:16,

336:4, 339:6, 339:13, 340:4, 340:9, 340:19, 340:24, 342:24, 343:1, 345:20, 345:24, 354:17, 354:24, 355:6, 355:9, 355:11, 355:12, 355:15, 356:8, 357:10, 357:14, 359:10, 360:10, 361:15, 361:21, 362:3, 362:10, 362:20, 364:9, 366:8, 366:12, 368:10, 370:14, 370:20, 375:16, 392:3, 392:4, 392:10, 401:7, 402:1, 402:4, 402:12, 402:17, 402:22, 402:23, 407:13, 424:4
**bullet** [2] - 340:13, 340:16
**bunch** [2] - 318:18, 386:7
**burden** [19] - 295:16, 308:15, 308:17, 308:18, 308:24, 309:17, 310:12, 310:13, 310:23, 311:4, 311:7, 312:10, 343:20, 409:5, 409:10, 409:16, 409:18, 409:23, 409:25
**burdens** [1] - 310:21
**but..** [1] - 372:25
**BY** [57] - 281:3, 281:5, 281:10, 281:14, 281:15, 282:9, 283:4, 284:18, 285:24, 293:1, 293:21, 294:24, 298:20, 300:16, 302:23, 305:1, 307:22, 308:16, 311:25, 315:5, 321:5, 328:1, 330:9, 331:10, 331:22, 335:2, 336:16, 337:16, 341:11, 344:17, 345:2, 346:18, 348:3, 348:15, 349:16, 350:16, 351:19, 352:18, 354:14, 354:22, 356:9, 358:11, 359:7,

359:14, 365:4, 366:24, 369:7, 377:24, 384:15, 388:23, 394:21, 406:21, 413:8, 416:13, 423:8, 425:2, 425:6

## C

**C.A** [1] - 280:5
**calcium** [1] - 418:6
**calculation** [2] - 334:5, 342:19
**Campos** [3] - 384:12, 394:19, 413:6
**cannot** [1] - 393:24
**capable** [3] - 340:18, 362:1, 427:16
**capacity** [4] - 312:21, 312:22, 312:24, 339:6
**Capsugel** [4] - 414:16, 414:20, 414:21, 415:20
**capsule** [173] - 282:17, 282:24, 286:11, 286:12, 286:15, 286:16, 286:18, 288:2, 288:5, 289:22, 297:10, 297:14, 297:18, 298:16, 306:12, 307:8, 316:16, 317:24, 319:2, 320:24, 322:4, 322:6, 322:20, 323:5, 323:12, 323:15, 324:2, 324:8, 324:20, 324:24, 325:14, 326:8, 326:19, 326:25, 327:13, 327:23, 328:14, 328:18, 328:21, 330:5, 330:7, 330:11, 330:13, 330:16, 331:7, 331:14, 331:21, 331:24, 332:2, 332:10, 332:13, 332:25, 333:4, 333:5, 334:3, 334:25, 335:19, 335:23, 336:15, 336:22, 336:24, 337:2, 337:11, 337:20, 339:3, 339:4, 339:5, 339:10, 340:10,

341:1, 341:21, 342:5, 342:6, 342:7, 342:8, 342:10, 342:20, 343:9, 343:22, 343:23, 344:4, 344:6, 351:18, 353:9, 353:10, 363:7, 367:5, 367:13, 367:17, 367:19, 367:20, 368:13, 368:14, 368:17, 368:18, 368:22, 369:12, 370:11, 370:12, 370:16, 370:17, 370:22, 371:21, 372:5, 372:23, 373:18, 374:17, 375:7, 375:10, 375:11, 375:23, 376:2, 376:6, 376:8, 376:15, 379:3, 379:12, 379:19, 381:6, 381:24, 382:4, 382:18, 384:23, 389:3, 389:6, 389:12, 389:24, 390:1, 390:2, 390:21, 391:3, 391:16, 391:21, 392:5, 392:12, 393:17, 394:1, 394:9, 396:1, 400:15, 400:21, 400:23, 401:4, 401:10, 401:13, 407:10, 407:11, 407:12, 407:24, 408:1, 412:10, 412:12, 412:14, 413:3, 415:23, 415:25, 416:24, 417:11, 418:8, 418:11, 422:10, 424:14, 425:13, 427:4, 427:11, 427:15, 427:16, 427:21, 428:17
**capsule-filling** [1] - 370:22
**capsule-filling** [1] - 370:16
**capsules** [78] - 283:15, 284:12, 287:15, 288:19, 298:19, 299:5, 306:13, 307:3, 307:6, 308:10, 308:18, 311:2, 311:12, 311:13,

311:14, 311:16, 315:25, 316:1, 316:7, 316:21, 317:11, 317:22, 318:4, 318:15, 320:23, 321:14, 321:15, 321:16, 322:23, 325:11, 325:21, 327:11, 327:15, 327:17, 327:20, 329:2, 329:10, 329:17, 329:19, 329:22, 329:24, 330:4, 337:5, 337:12, 337:14, 339:13, 342:4, 344:9, 351:13, 356:3, 368:15, 369:2, 369:9, 369:16, 369:22, 371:12, 371:24, 372:15, 373:2, 373:5, 374:4, 377:6, 389:16, 393:12, 400:20, 403:8, 410:13, 413:5, 414:17, 414:18, 414:23, 414:24, 415:7, 417:1, 418:1
**car** [1] - 320:13
**career** [1] - 325:25
**careful** [1] - 400:7
**caregiver** [3] - 323:6, 323:7, 323:22
**caregivers** [2] - 319:3, 319:6
**caring** [2] - 310:8, 313:18
**CARLAN** [3] - 281:16, 429:8, 429:14
**case** [17] - 340:6, 345:9, 351:15, 363:11, 365:8, 365:16, 374:19, 374:21, 375:25, 376:5, 379:6, 405:11, 428:13, 429:11, 429:12, 429:16, 430:10
**cases** [1] - 332:18
**Catalent** [7] - 337:25, 338:1, 338:3, 338:4, 338:9, 338:11, 425:16
**catch** [1] - 404:13
**caused** [1] - 419:19
**causes** [1] - 314:2
**caveat** [1] - 404:23
**cellulose** [20] - 287:7,

292:20, 299:8, 351:16, 351:21, 351:25, 352:25, 353:6, 353:7, 356:1, 356:20, 356:25, 357:2, 396:11, 398:3, 398:10, 398:18, 398:23, 398:25, 418:6
**center** [1] - 283:17
**certain** [19] - 283:22, 368:10, 370:13, 370:14, 370:20, 371:19, 372:2, 373:10, 373:20, 378:4, 382:24, 383:24, 383:25, 427:23, 427:25, 428:6
**certainly** [2] - 386:12, 425:3
**certify** [1] - 431:6
**Chad** [1] - 366:25
**CHAD** [1] - 281:5
**change** [2] - 336:6, 428:8
**changed** [1] - 428:21
**changes** [2] - 289:20, 289:24
**changing** [1] - 428:19
**Chapman** [2] - 308:25, 309:25
**characteristics** [3] - 294:12, 412:11, 412:13
**charged** [2] - 350:3, 350:4
**chart** [1] - 341:16
**charts** [3] - 330:13, 339:9, 412:9
**chase** [1] - 405:22
**chemical** [1] - 294:19
**chemically** [1] - 417:13
**chew** [1] - 325:2
**Chewable** [1] - 324:22
**chewable** [4] - 324:24, 324:25, 326:2, 326:4
**chief** [1] - 430:9
**choice** [3] - 330:18, 331:8, 412:14
**choose** [3] - 316:1, 316:2, 316:3
**chopper** [3] - 360:24, 362:6, 362:10
**chronic** [3] - 291:10, 293:18, 295:18
**circumstances** [1] - 430:14
**cited** [2] - 405:14,

405:18
**cites** [1] - 315:24
**claim** [86] - 282:25, 285:16, 285:21, 286:5, 286:7, 286:17, 287:9, 288:2, 288:15, 288:22, 341:16, 341:20, 342:23, 343:6, 345:15, 345:18, 346:7, 353:19, 354:11, 355:3, 355:8, 355:9, 355:10, 357:25, 358:7, 358:24, 359:4, 365:17, 365:19, 366:5, 367:8, 367:10, 368:13, 368:16, 368:20, 369:15, 369:17, 369:18, 370:2, 370:3, 370:7, 370:8, 370:19, 371:1, 371:3, 371:4, 371:6, 371:11, 372:10, 372:19, 373:15, 373:16, 373:17, 373:22, 374:3, 374:24, 375:1, 376:11, 376:12, 376:16, 376:18, 378:19, 378:21, 379:10, 380:15, 381:3, 381:10, 381:14, 381:21, 381:22, 381:24, 382:5, 382:6, 382:14, 382:25, 383:23, 385:5, 385:6, 385:10, 385:14, 385:25, 387:1, 387:3, 387:5, 404:21
**Claim** [30] - 283:2, 285:6, 285:25, 286:9, 286:10, 287:16, 287:18, 287:20, 287:21, 341:17, 343:4, 343:5, 343:8, 367:3, 367:4, 375:8, 378:16, 379:18, 380:3, 380:7, 380:10, 380:11, 380:14, 380:16, 384:13, 384:22, 385:14, 385:23
**claimed** [8] - 289:23, 346:17, 357:22, 359:6, 364:14, 382:3, 409:3, 428:25

**claiming** [4] - 345:18, 358:24, 365:19, 385:15
**claims** [38] - 282:13, 282:18, 288:18, 288:25, 289:14, 341:13, 344:18, 345:12, 345:13, 346:1, 353:12, 354:19, 354:23, 355:11, 358:8, 358:12, 365:13, 365:23, 366:3, 366:10, 371:23, 372:21, 372:24, 373:1, 373:4, 373:8, 373:9, 373:10, 380:15, 382:21, 384:11, 384:21, 385:15, 386:1, 386:21, 407:10, 408:9, 408:10
**Claims** [4] - 341:13, 386:17, 404:3, 404:9
**clarification** [5] - 304:21, 352:4, 369:4, 377:21, 388:22
**clarify** [3] - 286:2, 299:5, 383:22
**class** [2] - 291:25, 292:1
**clear** [3] - 283:12, 312:2, 369:19
**clearly** [4] - 285:19, 344:7, 349:25, 351:24
**close** [1] - 291:21
**closely** [3] - 358:21, 379:1, 393:23
**closest** [3] - 407:15, 408:5, 408:9
**clumps** [6] - 299:13, 299:17, 300:1, 300:20, 306:23
**coat** [1] - 319:22
**coated** [5] - 290:9, 292:12, 293:20, 306:7, 316:2
**coating** [10] - 308:11, 319:25, 320:2, 320:5, 320:6, 320:8, 320:15, 320:17, 320:18
**coinventor** [1] - 413:22
**colleague** [1] - 429:18
**collecting** [1] - 294:10
**colloidal** [6] - 347:14, 347:15, 347:21,

397:11, 397:16, 399:23
**color** [10] - 319:7, 319:17, 319:19, 319:20, 319:22, 409:5, 410:4, 410:7, 410:11, 410:15
**colored** [2] - 316:21, 318:4
**colors** [5] - 317:23, 317:24, 318:15, 318:16, 327:14
**column** [42] - 284:19, 284:20, 284:21, 312:7, 312:8, 314:10, 315:15, 317:6, 328:4, 329:16, 329:18, 329:21, 348:5, 348:19, 348:21, 352:22, 361:10, 361:24, 387:12, 390:4, 390:13, 390:14, 392:1, 392:9, 392:23, 393:2, 394:11, 394:17, 395:8, 395:16, 395:17, 396:4, 397:7, 397:18, 401:20, 401:21, 413:16, 413:21, 419:13, 419:14
**columns** [3] - 393:22, 393:23, 394:2
**combination** [2] - 363:9, 407:20
**combining** [1] - 404:24
**coming** [1] - 429:17
**commas** [2] - 399:3
**commercial** [4] - 371:24, 372:17, 413:23, 419:16
**commercially** [2] - 400:15, 400:24
**common** [33] - 298:18, 299:15, 300:22, 301:2, 304:13, 310:8, 311:17, 313:17, 313:18, 319:16, 322:23, 322:24, 324:1, 324:20, 325:10, 325:16, 325:17, 326:7, 328:19, 336:23, 336:25, 352:14, 356:21, 357:8, 359:23, 365:25, 366:1,

386:8, 409:21, 410:8, 412:20, 413:2, 420:22
**commonly** [2] - 337:14, 395:4
**commonsense** [1] - 329:9
**companies** [3] - 326:5, 336:23, 338:8
**company** [9] - 311:10, 311:17, 312:25, 338:4, 338:5, 338:6, 338:15, 414:23, 425:16
**Comparative** [1] - 379:7
**comparative** [59] - 282:17, 282:24, 283:3, 283:8, 283:16, 284:13, 284:17, 285:7, 286:1, 286:13, 286:22, 286:24, 287:2, 287:17, 287:20, 288:12, 288:16, 288:20, 346:22, 347:3, 348:1, 348:24, 349:7, 349:9, 354:11, 359:19, 360:7, 363:24, 365:15, 365:18, 378:20, 378:24, 380:6, 380:8, 380:11, 381:8, 381:14, 381:17, 381:20, 381:25, 382:2, 383:3, 383:18, 387:6, 387:11, 387:15, 387:23, 388:6, 389:8, 389:11, 389:20, 389:23, 389:25, 390:3, 390:5, 391:16, 392:22, 394:3, 394:7
**compare** [3] - 305:3, 421:18, 422:6
**compared** [2] - 322:23, 326:7
**compares** [7] - 315:24, 341:17
**comparison** [7] - 283:20, 330:2, 345:16, 353:24, 354:11, 355:5, 358:2
**compartment** [1] - 320:13
**compatibility** [7] - 294:20, 297:6,

298:6, 298:17, 357:1, 416:25, 417:25
**compatible** [4] - 307:5, 307:8, 337:12, 344:6
**complaints** [3] - 414:4, 414:8, 414:9
**complete** [1] - 394:10
**complex** [2] - 320:2, 324:17
**compliance** [2] - 310:14, 319:10
**complying** [1] - 313:10
**component** [1] - 304:18
**components** [2] - 345:10, 345:17
**comport** [1] - 318:11
**composition** [19] - 286:19, 342:11, 355:24, 367:24, 368:3, 368:19, 370:9, 378:2, 378:5, 389:15, 395:11, 397:10, 397:23, 402:2, 402:3, 402:12, 402:22, 416:24, 417:13
**compositions** [4] - 303:14, 303:21, 398:9, 398:17
**compounding** [7] - 371:7, 371:8, 371:9, 371:16, 371:17, 371:20, 371:22
**compressed** [1] - 299:4
**compressing** [5] - 304:17, 306:10, 306:25, 337:9, 370:10
**compression** [8] - 298:12, 298:25, 299:3, 299:4, 306:25, 356:24, 357:1, 418:19
**comprise** [2] - 286:24, 287:3
**comprises** [3] - 357:25, 386:6, 398:9
**comprising** [14] - 286:19, 287:6, 342:11, 342:12, 342:15, 345:7, 346:7, 353:12, 357:23, 366:5, 384:23, 407:11
**compromising** [1] -

368:6
**conceivable** [2] - 354:12, 363:22
**conceivably** [1] - 355:12
**concentration** [12] - 332:18, 333:2, 333:11, 333:14, 334:1, 334:7, 334:12, 336:8, 342:21, 344:11, 408:13, 408:24
**concentrations** [1] - 343:2
**concept** [2] - 312:10, 313:21
**concern** [1] - 310:23
**concerned** [4] - 296:23, 313:7, 313:22, 320:7
**concerns** [1] - 296:15
**conclude** [3] - 283:7, 391:2, 419:18
**concluded** [2] - 302:20, 431:4
**conclusion** [1] - 365:7
**condition** [6] - 290:18, 290:24, 291:10, 291:17, 293:17, 295:12
**conditions** [4] - 298:8, 298:13, 310:22, 410:2
**conducted** [2] - 304:14, 393:25
**confirm** [2] - 386:20, 423:13
**confirmed** [1] - 424:7
**confuse** [2] - 377:3, 378:12
**confused** [2] - 403:4, 427:12
**confusion** [1] - 394:14
**connect** [2] - 305:13, 380:23
**connection** [4] - 375:1, 375:2, 405:18, 416:15
**consider** [1] - 420:5
**considerably** [1] - 355:12
**considered** [3] - 340:4, 379:4, 382:14
**considering** [3] - 344:8, 420:4, 425:22
**consistency** [1] - 332:17
**consistent** [3] - 304:5, 336:4, 339:15
**consolidate** [2] -

312:17, 343:18
**consolidating** [2] - 311:4, 311:8
**constant** [1] - 333:22
**construe** [1] - 381:10
**construed** [1] - 381:6
**consulting** [1] - 326:6
**consume** [2] - 375:9, 409:14
**consumers** [1] - 315:22
**consuming** [1] - 320:3
**contact** [5] - 323:2, 323:19, 324:13, 325:3, 325:18
**contain** [11] - 284:12, 292:12, 292:18, 327:24, 342:1, 342:11, 347:16, 353:20, 390:1, 411:21, 427:24
**contained** [1] - 334:6
**containing** [16] - 284:5, 290:7, 296:23, 299:2, 325:19, 341:24, 346:16, 347:2, 347:20, 348:25, 351:7, 364:2, 397:11, 397:13, 397:15, 401:17
**contains** [2] - 286:18, 319:23
**contemplate** [1] - 332:14
**contemplated** [2] - 307:10, 396:10
**content** [9] - 299:11, 300:14, 300:18, 306:24, 383:8, 383:9, 383:24, 419:1, 419:20
**context** [13] - 288:5, 369:17, 370:2, 374:7, 374:8, 374:15, 377:12, 381:3, 389:8, 389:18, 389:20, 390:8, 390:9
**continue** [1] - 397:7
**CONTINUED** [1] - 282:8
**continues** [2] - 351:3, 402:11
**continuing** [3] - 385:19, 395:15, 396:3
**continuously** [1] - 323:24
**contract** [1] - 338:4

**contracted** [1] - 338:11
**Contrary** [1] - 283:13
**contrast** [1] - 283:20
**control** [1] - 362:9
**controlled** [1] - 350:5
**controlling** [1] - 362:6
**convenient** [1] - 413:24
**conventional** [5] - 283:18, 326:11, 326:13, 359:16, 359:22
**conversely** [1] - 335:9
**CONWAY** [1] - 281:6
**copovidone** [1] - 287:7
**correct** [148] - 282:14, 282:15, 284:22, 348:23, 348:25, 367:6, 367:14, 367:15, 367:21, 367:24, 367:25, 368:4, 368:5, 368:8, 368:9, 368:11, 368:13, 368:16, 368:20, 369:10, 369:16, 371:2, 371:12, 371:25, 372:23, 373:8, 374:4, 374:17, 374:21, 375:4, 376:9, 376:11, 376:24, 378:3, 378:21, 380:8, 382:11, 382:18, 382:19, 382:21, 382:25, 383:8, 384:24, 386:2, 386:5, 386:13, 386:21, 387:12, 387:13, 387:15, 389:12, 390:6, 390:10, 392:19, 393:4, 394:25, 395:5, 395:6, 395:9, 395:13, 395:23, 396:9, 396:16, 396:19, 396:24, 397:5, 397:12, 397:16, 399:5, 399:19, 400:16, 400:19, 401:2, 401:7, 401:15, 402:2, 402:18, 402:24, 403:17, 403:22, 404:5, 404:10, 404:24, 406:2, 406:11, 407:8, 407:13,

407:17, 407:20, 408:6, 408:11, 408:20, 409:3, 409:7, 409:18, 409:23, 410:5, 410:12, 410:18, 411:1, 411:5, 411:11, 411:20, 411:23, 412:12, 412:19, 412:23, 413:3, 413:10, 414:1, 414:14, 414:16, 414:24, 415:3, 415:7, 415:14, 415:17, 415:23, 416:16, 416:24, 417:12, 417:15, 417:19, 417:23, 418:8, 418:16, 418:20, 419:1, 419:6, 419:11, 420:1, 420:4, 421:16, 422:20, 423:16, 423:18, 423:19, 423:24, 423:25, 424:8, 424:9, 425:13, 425:17, 425:20, 425:21, 425:23, 426:13, 426:17
**corrected** [1] - 417:6
**correctly** [1] - 421:21
**cost** [1] - 312:20
**costs** [2] - 311:7, 311:9
**counsel** [2] - 348:4, 385:17
**Counsel** [1] - 282:11
**counted** [4] - 379:17, 379:22, 379:25, 380:2
**country** [1] - 409:15
**couple** [4] - 304:12, 327:13, 421:3, 427:1
**course** [2] - 308:19, 319:8
**court** [1] - 388:22
**COURT** [37] - 280:1, 280:15, 282:5, 285:11, 285:16, 292:24, 307:20, 311:22, 315:3, 321:3, 341:5, 341:8, 349:14, 366:16, 366:20, 406:19, 416:5, 416:11, 422:22, 423:2, 423:6, 424:23, 425:5, 426:23,

427:1, 427:3, 427:9, 427:14, 428:22, 429:5, 429:13, 429:20, 430:1, 430:5, 430:16, 430:21, 431:1
**Court** [8] - 304:21, 352:4, 369:4, 377:21, 381:6, 381:10, 430:19, 431:9
**courthouse** [2] - 430:8, 430:25
**Courtroom** [1] - 281:25
**courtroom** [1] - 412:17
**cover** [3] - 371:6, 405:15, 414:13
**covered** [3] - 355:3, 355:9, 380:13
**crack** [2] - 320:12, 320:14
**create** [2] - 289:22, 335:21
**creates** [1] - 430:7
**creative** [1] - 411:19
**croscarmellose** [1] - 418:7
**cross** [6] - 366:17, 366:22, 384:1, 388:16, 391:6, 393:19
**CROSS** [1] - 366:23
**cross-examination** [1] - 384:1
**CROSS-EXAMINATION** [1] - 366:23
**crossed** [1] - 412:17
**CRR** [3] - 280:25, 282:2, 431:9
**crystal** [1] - 294:13
**crystalline** [2] - 297:7, 418:19
**crystallized** [1] - 428:5
**cue** [1] - 300:25

**D**

**daily** [3] - 293:13, 295:19, 341:22
**data** [3] - 300:12, 330:19, 333:25
**date** [3] - 290:2, 290:5, 330:11
**DDX-38** [1] - 299:23
**deal** [2] - 411:4, 428:12
**dealing** [1] - 420:8

**decades** [2] - 330:14
**December** [1] - 280:11
**decent** [1] - 422:25
**dedicated** [1] - 338:6
**deeming** [1] - 381:14
**defects** [1] - 320:11
**Defendant** [1] - 281:17
**Defendants** [2] - 280:7, 281:11
**defendants** [1] - 429:8
**defined** [2] - 395:2, 395:22
**definite** [4] - 288:25, 344:18, 358:13, 366:10
**definitely** [1] - 366:2
**definiteness** [1] - 365:23
**definition** [2] - 365:22, 395:25
**definitions** [4] - 394:25, 395:9, 395:16, 395:17
**degrade** [1] - 428:6
**degrades** [1] - 307:14
**DELAWARE** [1] - 280:2
**Delaware** [1] - 280:10
**deliver** [1] - 332:25
**delivering** [8] - 286:11, 330:24, 341:21, 367:5, 367:13, 369:2, 369:9, 427:16
**delusions** [2] - 290:21, 295:13
**demonstrate** [1] - 366:4
**demonstrated** [2] - 283:21, 396:6
**demonstrates** [1] - 289:9
**denser** [2] - 364:2, 364:14
**densities** [32] - 286:14, 303:18, 303:19, 303:21, 305:8, 307:13, 332:16, 332:20, 336:11, 336:12, 340:9, 340:19, 340:24, 345:19, 345:21, 345:24, 355:4, 355:11, 355:12, 357:14, 358:8, 358:9, 358:24, 358:25, 359:10, 361:2, 361:4, 364:9,

364:20, 402:4, 426:5
**density** [110] - 283:23, 284:9, 287:10, 287:13, 294:13, 294:24, 303:24, 304:14, 305:3, 305:4, 305:9, 305:14, 332:1, 333:4, 333:7, 334:14, 334:21, 335:3, 335:5, 335:9, 336:4, 336:7, 339:6, 339:13, 340:4, 342:24, 343:1, 354:17, 354:24, 355:2, 355:6, 355:9, 355:15, 356:4, 356:6, 356:8, 357:10, 359:1, 359:3, 359:4, 359:6, 360:5, 360:10, 360:16, 361:3, 361:6, 361:15, 361:21, 362:3, 362:10, 362:20, 362:23, 363:1, 363:19, 366:8, 366:12, 368:10, 370:14, 370:15, 370:20, 371:19, 372:2, 372:10, 372:11, 372:14, 373:10, 373:20, 374:7, 374:8, 374:10, 375:16, 390:19, 390:20, 390:23, 390:25, 391:2, 391:20, 392:3, 392:4, 392:8, 392:10, 392:14, 392:20, 393:7, 393:9, 393:11, 393:15, 393:16, 394:5, 401:1, 401:3, 401:4, 401:6, 401:7, 401:8, 401:9, 401:12, 401:14, 401:17, 402:1, 402:12, 402:17, 402:22, 402:23, 407:13, 407:22, 424:5
**dependent** [1] - 385:14
**deposition** [2] - 367:1, 426:13
**describe** [6] - 301:11, 345:6, 357:22, 359:22, 367:16, 389:17

**described** [16] - 284:16, 285:1, 286:2, 289:20, 305:23, 306:11, 337:10, 352:9, 354:1, 360:20, 375:23, 389:25, 397:23, 398:9, 398:17, 399:25
**describes** [3] - 283:14, 355:15, 405:4
**describing** [1] - 302:4
**description** [14] - 284:14, 344:20, 344:23, 345:4, 348:9, 349:3, 349:11, 353:12, 354:16, 357:18, 366:3, 391:15, 398:17, 404:18
**design** [2] - 310:24, 315:21
**designed** [1] - 298:15
**desirable** [1] - 363:11
**despite** [1] - 408:8
**detectible** [1] - 318:4
**determine** [7] - 288:9, 294:18, 342:18, 344:11, 365:14, 375:17, 375:22
**determined** [3] - 287:11, 402:8, 419:8
**determines** [1] - 315:21
**determining** [1] - 360:8
**develop** [6] - 294:4, 319:4, 326:10, 327:23, 331:20, 371:13
**developed** [1] - 327:17
**developing** [2] - 294:21, 338:7
**Development** [1] - 425:12
**development** [4] - 293:24, 338:4, 339:1, 424:13
**development..** [1] - 338:20
**develops** [1] - 371:14
**deviation** [1] - 300:6
**deviations** [1] - 300:13
**diameter** [2] - 329:25, 330:6
**dibasic** [1] - 418:6
**differ** [1] - 318:2

**difference** [1] - 333:23
**differences** [1] - 289:23
**different** [36] - 284:16, 288:8, 303:20, 304:8, 307:5, 318:21, 319:5, 319:6, 320:17, 326:16, 327:14, 329:16, 329:17, 330:4, 332:17, 340:2, 364:17, 377:13, 381:19, 386:7, 395:22, 401:6, 402:19, 403:13, 410:4, 410:7, 410:11, 414:11, 417:15, 417:16, 417:17, 417:18, 417:21, 422:13
**differentiate** [3] - 317:25, 381:18, 429:3
**differentiates** [2] - 381:22, 381:25
**differentiating** [2] - 283:15, 283:24
**difficult** [7] - 316:11, 318:6, 318:20, 329:19, 329:20, 410:17
**difficulties** [4] - 313:22, 314:2, 329:2, 329:22
**difficulty** [12] - 295:16, 313:3, 313:7, 313:13, 314:15, 314:21, 315:6, 327:8, 409:6, 410:21, 410:23, 411:1
**diluent** [4] - 333:20, 351:11, 351:25, 358:5
**diluents** [1] - 351:15
**dimensions** [1] - 330:5
**dioxide** [9] - 347:14, 347:16, 347:22, 347:23, 354:8, 397:12, 397:16, 399:22, 399:23
**DIRECT** [1] - 282:8
**direct** [14] - 299:3, 299:4, 316:22, 317:5, 340:12, 348:6, 384:11, 396:5, 397:9, 399:20, 402:14,

414:10, 418:19, 425:8
**directed** [4] - 374:14, 385:25, 388:6, 429:17
**directly** [1] - 314:22
**disagree** [1] - 399:14
**discharge** [2] - 350:10, 350:12
**discharged** [1] - 350:14
**disclose** [10] - 287:13, 292:6, 298:23, 346:20, 355:6, 357:9, 358:23, 391:22, 416:23, 420:12
**Disclosed** [1] - 284:3
**disclosed** [17] - 283:13, 341:22, 342:1, 342:2, 354:10, 356:6, 359:17, 363:24, 364:4, 389:14, 392:17, 393:22, 396:6, 396:24, 397:5, 417:12, 417:24
**discloses** [10] - 291:19, 300:2, 342:14, 342:15, 356:4, 358:2, 407:16, 410:13, 410:14, 416:25
**disclosing** [4] - 297:3, 342:25, 381:16, 400:14
**disclosure** [7] - 321:23, 358:9, 359:2, 396:15, 396:17, 409:9, 409:12
**disclosures** [1] - 401:24
**discoloration** [3] - 302:11, 302:17, 302:20
**discovered** [2] - 299:9, 418:24
**discussed** [4] - 346:19, 348:24, 376:9, 416:9
**discusses** [2] - 345:25, 349:17
**discussing** [21] - 282:13, 283:5, 285:6, 287:16, 293:22, 295:4, 297:22, 299:18, 301:4, 303:8,

305:19, 309:25, 329:8, 330:22, 331:11, 332:8, 333:12, 337:25, 347:4, 354:18, 355:19
**discussion** [1] - 430:4
**disease** [16] - 290:21, 291:17, 293:16, 293:17, 295:14, 295:17, 309:8, 310:20, 313:12, 314:16, 314:23, 342:9, 363:7, 410:19, 410:23
**diseases** [1] - 314:16
**Disintegrating** [1] - 324:5
**disintegrating** [2] - 324:8, 326:2
**dispensed** [1] - 351:7
**dispensing** [1] - 412:25
**disperse** [5] - 323:1, 323:7, 325:2, 325:21, 360:22
**Dispersible** [1] - 323:13
**dispersible** [2] - 323:15, 326:1
**dissertation** [1] - 365:3
**dissolution** [4] - 382:24, 383:1, 383:2, 383:6
**dissolve** [2] - 352:13, 427:22
**dissuade** [1] - 337:4
**dissuaded** [1] - 336:20
**distinguish** [2] - 317:19, 318:7
**distinguishable** [2] - 318:5, 318:16
**distinguished** [1] - 408:9
**distinguishes** [2] - 284:11, 284:13
**distinguishing** [1] - 327:9
**distribution** [4] - 294:12, 361:19, 392:13, 419:17
**District** [1] - 431:9
**DISTRICT** [3] - 280:1, 280:2, 280:15
**doctors** [3] - 318:23, 318:24, 414:5
**document** [32] - 337:24, 338:1,

340:23, 381:4, 384:2, 384:18, 385:13, 386:16, 392:17, 406:5, 407:1, 414:22, 415:2, 415:12, 415:16, 415:22, 415:24, 417:19, 424:11, 424:15, 425:4, 425:10, 425:15, 425:20, 425:22, 425:24, 426:3, 426:4, 426:9, 426:11, 426:16, 426:18
**done** [8] - 318:1, 346:15, 350:17, 389:17, 392:18, 393:22, 420:20, 426:22
**dosage** [42] - 293:24, 295:20, 295:22, 296:20, 306:17, 310:23, 311:3, 311:4, 312:15, 312:18, 312:21, 315:11, 315:21, 315:23, 316:5, 316:11, 316:12, 317:20, 321:19, 322:5, 322:13, 322:20, 322:24, 322:25, 323:7, 323:18, 323:21, 324:9, 325:1, 325:16, 326:15, 327:13, 329:16, 332:15, 343:20, 413:2, 413:5, 413:23, 417:18, 417:20, 423:17, 428:5
**Dosage** [1] - 322:18
**dosages** [3] - 296:23, 307:11, 310:25
**dose** [15] - 290:24, 291:1, 292:9, 295:22, 296:25, 300:21, 331:13, 332:10, 332:25, 335:18, 337:20, 341:23, 363:9, 408:25, 411:18
**doses** [2] - 296:19, 410:14
**dough** [1] - 350:8
**down** [15] - 302:25, 303:17, 318:22, 322:17, 323:13, 335:8, 339:20,

387:14, 395:7, 395:8, 395:15, 418:4, 418:24, 430:12, 430:14
**Dr** [50] - 282:6, 282:10, 285:12, 285:25, 293:2, 293:22, 294:25, 295:4, 295:24, 299:18, 300:17, 301:21, 303:23, 307:23, 312:2, 325:25, 328:2, 328:12, 331:11, 336:17, 337:17, 337:23, 341:12, 344:19, 345:3, 350:24, 351:20, 352:19, 352:21, 352:24, 353:11, 354:23, 357:9, 358:12, 359:8, 359:16, 360:7, 362:13, 362:24, 365:7, 366:14, 366:25, 394:16, 400:11, 414:4, 416:3, 416:14, 423:9, 425:7, 429:16
**draft** [1] - 295:7
**drafted** [1] - 385:10
**drawn** [2] - 407:10, 407:15
**dried** [4] - 351:5, 351:6, 360:4, 398:2
**drink** [1] - 323:1
**droplet** [2] - 362:15, 362:19
**drug** [54] - 294:7, 294:11, 294:13, 294:16, 294:20, 295:3, 295:18, 295:19, 297:8, 297:10, 297:13, 297:14, 298:18, 299:12, 299:25, 300:19, 301:10, 306:22, 310:14, 310:18, 322:6, 323:3, 323:20, 324:2, 325:6, 325:19, 325:22, 326:18, 326:21, 327:22, 332:18, 333:14, 333:19, 333:25, 334:1, 343:2, 350:22, 363:10, 378:6, 390:21, 391:3, 391:21, 394:8,

407:24, 408:14, 408:24, 419:20, 420:23, 422:8, 427:23, 428:4, 428:6, 428:8
**drugs** [1] - 326:21
**dry** [17] - 284:3, 298:9, 298:12, 298:25, 299:3, 299:4, 300:14, 301:13, 301:17, 306:11, 350:14, 386:12, 386:14, 386:15, 418:21, 420:7, 420:25
**dryer** [2] - 350:11, 360:4
**drying** [2] - 350:11, 350:12
**DTX** [2] - 322:8, 413:18
**DTX-0006** [1] - 316:18
**DTX-006** [1] - 321:3
**DTX-006.005** [1] - 328:7
**DTX-009** [1] - 311:22
**DTX-009.0004** [1] - 312:8
**DTX-010** [1] - 311:22
**DTX-011** [1] - 311:23
**DTX-013** [1] - 315:3
**DTX-10** [2] - 309:5, 309:6
**DTX-10.0005** [1] - 312:3
**DTX-11** [2] - 309:15, 322:7
**DTX-11.0002** [1] - 312:5
**DTX-1175** [1] - 424:23
**DTX-13** [6] - 313:24, 314:25, 322:9, 322:10, 424:19
**DTX-13_0003** [1] - 314:9
**DTX-217** [5] - 384:2, 384:13, 385:19, 416:8, 416:11
**DTX-45** [1] - 310:4
**DTX-5** [5] - 315:13, 321:6, 339:16, 414:12, 415:17
**DTX-5.0012** [1] - 328:4
**DTX-56** [1] - 343:16
**DTX-6** [2] - 320:25, 415:11, 415:13
**DTX-65** [1] - 355:21
**DTX-7** [3] - 328:22, 341:7, 341:9
**DTX-9** [3] - 308:20,

308:21, 311:19
**due** [2] - 406:23, 422:16
**during** [8] - 299:10, 307:15, 348:4, 396:5, 397:9, 414:10, 418:25, 429:11
**DX-44** [1] - 313:2
**DX-66** [1] - 357:20
**DX-69** [1] - 359:12
**DX-72** [1] - 365:11
**dye** [1] - 319:23
**dysphagia** [3] - 314:11, 314:14, 314:24

# E

**ease** [5] - 315:21, 328:18, 412:10, 415:2, 415:7
**easier** [4] - 316:12, 328:21, 329:10, 408:1
**easily** [3] - 318:4, 318:16, 360:4
**easy** [21] - 295:20, 315:12, 316:3, 316:6, 316:7, 316:16, 317:20, 326:10, 326:19, 327:11, 327:24, 329:23, 329:24, 330:8, 330:20, 331:7, 331:25, 342:8, 343:23, 343:25, 427:17
**easy-to-swallow** [1] - 326:10
**economical** [1] - 374:3
**economically** [1] - 374:13
**education** [3] - 310:8, 313:16, 316:15
**effect** [1] - 310:16
**effective** [6] - 323:18, 326:20, 343:24, 369:22, 370:4, 413:24
**effectively** [4] - 331:25, 332:3, 372:14, 427:17
**effects** [2] - 309:18, 428:1
**Effervescent** [1] - 323:14
**effervescent** [3] - 323:16, 323:23,

326:1
**efficiency** [2] - 373:7, 373:9
**efficient** [8] - 369:22, 370:4, 373:1, 373:4, 373:6, 373:14, 374:1, 374:11
**efficiently** [4] - 332:3, 372:14, 373:11, 373:12
**effort** [2] - 323:21, 336:15
**either** [18] - 297:17, 298:11, 298:16, 307:3, 310:7, 340:1, 342:3, 344:8, 383:24, 386:15, 386:21, 391:14, 411:11, 412:1, 412:7, 417:25, 420:22, 430:23
**elder** [2] - 313:12, 317:14
**elderly** [8] - 293:18, 295:14, 308:14, 310:20, 313:18, 314:20, 409:13, 410:23
**elegant** [1] - 413:23
**element** [6] - 341:20, 342:5, 342:10, 342:23, 343:6, 368:1
**elements** [10] - 284:5, 285:5, 315:16, 315:20, 341:17, 367:10, 376:12, 380:16, 399:4, 428:20
**eliminating** [1] - 310:18
**embodiment** [6] - 347:11, 352:25, 358:4, 397:8, 397:14, 397:23
**embodiments** [4] - 303:1, 396:10, 398:9, 402:11
**employee** [3] - 414:20, 414:21, 415:19
**enable** [2] - 369:25, 372:19
**enabled** [2] - 364:15, 366:10
**enablement** [3] - 358:14, 358:17, 404:18
**encapsulated** [1] - 353:9
**encapsulates** [1] - 367:24

**encapsulation** [1] - 284:4
**encountered** [1] - 381:13
**end** [2] - 365:19, 407:2
**ended** [1] - 360:2
**engage** [2] - 371:4, 371:16
**ensure** [1] - 393:12
**enter** [1] - 416:2
**entered** [1] - 416:8
**entire** [5] - 296:15, 345:14, 381:3, 381:13, 393:11
**entirety** [1] - 379:15
**entity** [1] - 368:17
**equating** [1] - 428:22
**equipment** [2] - 320:9, 377:11
**equivalent** [4] - 292:13, 293:14, 353:7, 365:2
**error** [2] - 364:23, 365:5
**especially** [1] - 352:8
**ESQ** [13] - 281:3, 281:4, 281:5, 281:6, 281:6, 281:7, 281:10, 281:10, 281:14, 281:15, 281:16, 281:16, 281:17
**essentially** [1] - 346:14
**established** [1] - 307:7
**et** [2] - 280:6, 407:16
**etc** [7] - 283:20, 294:14, 317:18, 329:17, 360:24, 378:18, 430:8
**ethanol** [6] - 301:12, 301:14, 302:5, 302:19, 302:21, 334:20
**evaporate** [1] - 301:14
**evening** [1] - 317:17
**eventually** [1] - 384:9
**everywhere** [1] - 350:21
**evidence** [9] - 292:22, 307:18, 311:20, 315:1, 321:1, 341:3, 341:7, 406:17, 416:2
**EWING** [1] - 281:3
**exact** [4] - 320:18, 403:2, 403:6, 403:10
**exactly** [3] - 285:18, 350:17, 382:9
**EXAMINATION** [2] -

282:8, 366:23
**examination** [4] -
384:1, 396:5, 397:9,
425:8
**examined** [2] -
298:13, 382:22
**examiner** [16] -
382:13, 382:16,
382:20, 382:22,
382:24, 383:5,
383:7, 383:15,
406:2, 407:7,
407:22, 408:4,
408:9, 408:12,
408:19, 408:22
**examining** [1] -
364:16
**example** [78] - 287:2,
287:3, 287:5, 297:1,
297:3, 297:20,
297:24, 298:21,
298:22, 298:23,
298:24, 299:12,
299:20, 300:23,
301:1, 301:6, 301:8,
302:9, 303:10,
303:16, 305:15,
305:20, 305:22,
307:4, 310:10,
319:11, 333:18,
336:17, 344:7,
349:18, 349:24,
350:25, 351:3,
351:23, 353:6,
353:8, 353:10,
355:15, 356:7,
356:19, 358:25,
363:5, 383:18,
383:19, 387:15,
387:21, 388:6,
388:12, 388:25,
389:2, 389:4,
389:23, 389:25,
390:3, 390:5,
390:12, 390:16,
390:18, 391:11,
391:16, 391:22,
391:25, 392:13,
393:8, 418:15,
418:18, 418:22,
419:4, 419:10,
420:4, 420:9,
423:11, 423:20,
423:23, 424:1
**examples** [38] -
282:25, 283:3,
286:7, 287:12,
287:21, 288:6,
346:22, 347:3,
348:1, 349:7, 349:9,

354:11, 378:20,
378:24, 380:6,
380:8, 380:12,
380:13, 381:2,
381:8, 381:20,
381:23, 382:1,
382:2, 383:3,
387:11, 389:21,
390:24, 390:25,
392:23, 393:2,
393:7, 394:3, 394:7,
394:12, 428:14
**exceed** [1] - 300:10
**except** [1] - 402:16
**exceptions** [1] -
378:18
**excerpt** [15] - 283:12,
283:17, 303:17,
310:13, 310:17,
327:10, 330:3,
339:9, 347:4,
347:10, 348:16,
348:19, 348:21,
406:13, 415:4
**excerpted** [2] - 312:3,
328:3
**excerpts** [1] - 284:1
**excipient** [18] - 297:6,
345:13, 346:8,
346:12, 346:14,
347:14, 354:2,
354:5, 354:6, 354:7,
366:6, 377:9,
377:17, 377:18,
377:19, 377:25,
396:16, 417:24
**excipients** [60] -
285:3, 285:14,
285:17, 285:22,
286:4, 286:6,
286:21, 286:25,
294:21, 297:9,
297:17, 301:10,
301:21, 304:15,
307:6, 307:12,
342:13, 342:16,
345:8, 345:9,
345:13, 345:14,
346:2, 346:9,
346:11, 346:21,
347:2, 348:10,
348:25, 349:4,
349:19, 350:25,
351:10, 353:14,
353:20, 353:21,
353:23, 357:24,
357:25, 360:12,
360:14, 362:11,
364:3, 364:17,
364:18, 368:8,

375:16, 376:20,
376:24, 377:5,
379:20, 385:12,
396:19, 396:20,
396:21, 399:5,
399:15, 399:19
**exclude** [8] - 282:17,
282:24, 288:15,
288:20, 288:21,
365:18, 381:8,
386:14
**excluded** [9] - 286:8,
286:23, 287:3,
287:13, 287:21,
288:7, 288:10,
288:17, 359:20
**exclusion** [2] - 285:3,
285:14
**exhibit** [1] - 413:17
**Exhibit** [7] - 292:25,
307:21, 311:24,
315:4, 321:4,
406:20, 416:6
**Exhibits** [2] - 341:10,
416:12
**expand** [1] - 320:14
**expect** [6] - 305:3,
305:8, 336:7,
336:11, 367:22,
382:15
**expectation** [3] -
334:22, 335:16,
344:15
**expected** [1] - 340:8
**expensive** [7] -
311:13, 320:3,
323:5, 323:22,
324:16, 325:7,
325:20
**experience** [17] -
310:8, 313:18,
318:9, 318:12,
318:19, 319:15,
320:22, 321:21,
325:5, 325:24,
328:17, 338:10,
356:22, 409:20,
409:21, 410:8,
410:22
**experiencing** [1] -
324:15
**experiment** [11] -
286:24, 288:12,
297:20, 297:24,
335:8, 335:11,
335:13, 336:10,
365:15, 387:23,
420:7
**experimentation** [3] -
364:8, 365:5, 366:12

**Experiments** [1] -
379:8
**experiments** [36] -
282:17, 283:8,
283:14, 283:16,
284:14, 284:17,
285:7, 286:1,
286:13, 286:23,
287:17, 288:16,
288:20, 335:24,
348:24, 359:19,
360:7, 361:7,
363:24, 364:23,
365:19, 381:14,
381:17, 387:7,
389:9, 389:11,
389:16, 389:17,
403:16, 419:15,
419:23, 420:11,
420:19, 421:17,
421:18
**expert** [3] - 368:21,
374:20, 376:4
**explaining** [2] -
335:25, 337:3
**explains** [1] - 351:4
**explicitly** [9] - 386:22,
386:24, 386:25,
387:2, 387:4, 394:4,
396:2, 409:24, 417:2
**exposed** [2] - 307:14,
316:15
**exposure** [1] - 324:18
**expressly** [4] - 371:23,
372:21, 386:24,
394:2
**extensively** [1] -
375:21
**extent** [2] - 344:18,
358:12
**extra** [3] - 301:20,
398:13, 398:22
**extra-granular** [3] -
301:20, 398:13,
398:22
**extragranulars** [1] -
398:12
**extremely** [2] -
345:12, 355:10
**eyeball** [1] - 304:3
**EYZAGUIRRE** [1] -
281:7

# F

**face** [1] - 406:14
**fact** [8] - 327:17,
344:7, 373:7,
404:21, 409:13,
409:14, 415:6,

415:10
**factor** [5] - 294:17,
310:14, 312:25,
314:1, 336:6
**factors** [6] - 288:8,
308:24, 313:9,
329:1, 365:14,
428:13
**fail** [1] - 300:11
**failed** [5] - 324:21,
325:11, 416:1,
419:16, 421:13
**failing** [2] - 306:25,
369:21
**failure** [3] - 300:15,
320:7, 323:23
**failures** [2] - 300:18,
320:4
**fairly** [2] - 332:17,
381:11
**familiar** [4] - 318:15,
338:9, 338:11,
374:23
**far** [1] - 425:19
**favorable** [1] - 383:4
**FDA** [2] - 372:22,
372:25
**FDA-approval** [2] -
372:22, 372:25
**feasible** [1] - 374:13
**features** [2] - 360:19,
361:8
**feed** [1] - 344:3
**fees** [1] - 406:23
**FELIX** [2] - 367:1, 399:20
**few** [2] - 361:1, 399:20
**fewer** [1] - 311:12
**field** [2] - 340:6, 357:5
**figure** [6] - 297:5,
317:19, 328:6,
378:9, 400:11,
400:14
**figures** [2] - 403:6,
403:11
**filing** [1] - 370:22
**fill** [9] - 286:14,
336:21, 337:1,
351:13, 351:18,
372:5, 372:14,
390:21, 393:12
**fillable** [1] - 371:24
**filled** [4] - 339:2,
356:2, 370:11, 403:7
**filling** [5] - 287:14,
340:9, 370:12,
370:16, 389:15
**film** [11] - 290:9,
292:12, 293:20,
306:8, 319:22,
319:25, 320:2,

320:7, 320:8, 320:16, 325:14
**film-coated** [3] - 290:9, 292:12, 293:20
**films** [6] - 320:11, 320:12, 320:14, 325:16, 326:2, 326:5
**Films** [1] - 325:12
**final** [12] - 333:3, 334:7, 334:8, 334:24, 351:12, 356:2, 356:6, 357:6, 359:2, 401:17, 403:3, 403:7
**finally** [2] - 287:9, 301:19
**finding..** [1] - 389:14
**fine** [2] - 418:14, 430:24
**finish** [1] - 350:12
**finished** [5] - 339:2, 372:8, 377:10, 419:20, 421:12
**fire** [2] - 430:1, 430:7
**first** [21] - 283:12, 290:14, 302:10, 302:14, 322:22, 327:17, 329:16, 340:13, 341:20, 345:5, 356:19, 360:17, 367:4, 387:15, 388:6, 388:12, 402:3, 404:16, 405:7, 422:9, 429:23
**fit** [6] - 299:5, 332:9, 332:25, 335:17, 337:19, 339:12
**five** [8] - 332:17, 350:7, 350:9, 368:15, 378:24, 381:14, 418:24, 422:25
**fix** [3] - 299:14, 302:15, 322:3
**fixed** [1] - 363:9
**fixed-dose** [1] - 363:9
**flag** [5] - 408:13, 420:7, 421:10, 422:14, 422:19
**flavor** [1] - 294:14
**flexible** [2] - 321:17, 322:13
**flow** [6] - 340:3, 392:2, 392:3, 392:7, 392:9, 393:12
**flowing** [2] - 305:12, 340:3
**fluffing** [1] - 350:20

**fluid** [6] - 339:20, 339:25, 350:10, 360:4, 386:10, 387:17
**fluid-bed** [1] - 350:10
**fluids** [1] - 294:16
**focus** [1] - 284:14
**focusing** [1] - 309:17
**follow** [2] - 326:12, 419:11
**following** [9] - 281:24, 301:13, 301:16, 306:10, 379:21, 385:1, 407:7, 422:3, 431:4
**follows** [2] - 368:1, 429:24
**food** [1] - 323:1
**FOR** [1] - 280:2
**forcing** [1] - 301:18
**foregoing** [1] - 431:6
**forgot** [1] - 360:11
**Form** [1] - 297:8
**form** [37] - 293:24, 294:13, 295:20, 295:22, 296:20, 299:10, 299:13, 300:1, 300:20, 301:14, 306:17, 306:23, 307:15, 310:24, 312:15, 312:18, 315:11, 315:21, 315:23, 317:20, 321:19, 322:5, 322:21, 323:7, 325:1, 325:16, 326:15, 331:9, 332:15, 343:20, 351:12, 356:2, 412:19, 413:23, 418:20, 418:25, 428:5
**format** [1] - 371:19
**forms** [19] - 311:3, 311:4, 312:21, 316:5, 316:11, 316:12, 322:13, 322:24, 322:25, 323:18, 323:21, 324:9, 327:13, 329:16, 413:3, 413:5, 417:18, 417:20
**Forms** [1] - 322:18
**formula** [1] - 298:7
**formulate** [7] - 297:5, 308:12, 312:14, 315:11, 321:25, 326:14, 417:22
**formulated** [6] -

290:2, 290:4, 290:7, 292:2, 295:23, 307:3
**formulates** [1] - 298:24
**formulating** [5] - 294:17, 306:17, 315:8, 326:3, 418:5
**formulation** [16] - 284:3, 294:6, 303:2, 324:8, 326:10, 328:14, 330:17, 330:19, 331:20, 335:22, 336:13, 337:1, 407:17, 407:17, 418:11
**Formulations** [1] - 324:5
**formulations** [3] - 296:16, 306:2, 342:3
**forth** [3] - 319:13, 355:5, 368:2
**foul** [2] - 409:7, 411:5
**four** [9] - 292:12, 300:12, 302:25, 306:25, 339:19, 396:24, 397:4, 418:4, 421:25
**fragments** [2] - 324:12, 324:13
**free** [3] - 305:12, 312:20, 340:3
**free-flowing** [2] - 305:12, 340:3
**freebase** [2] - 292:3, 292:14
**frequency** [1] - 291:5
**frequently** [1] - 413:22
**FRESE** [88] - 281:16, 282:9, 282:22, 283:4, 283:10, 284:18, 285:9, 285:24, 289:12, 292:21, 293:1, 293:6, 293:21, 294:1, 294:24, 298:1, 298:20, 299:22, 300:16, 302:7, 302:23, 305:1, 306:19, 307:17, 307:22, 308:3, 308:16, 310:4, 311:19, 311:25, 314:25, 315:5, 320:25, 321:5, 327:2, 328:1, 329:12, 330:9, 331:1, 331:10, 331:16, 331:22, 333:16, 335:2, 336:2, 336:16,

337:7, 337:16, 341:2, 341:6, 341:11, 341:15, 343:16, 344:17, 344:25, 345:2, 346:4, 346:18, 346:24, 348:3, 348:13, 348:15, 349:16, 349:21, 350:16, 351:2, 351:19, 352:18, 353:16, 354:14, 354:21, 354:22, 355:21, 356:9, 357:20, 358:11, 358:19, 359:7, 359:12, 359:14, 364:12, 365:4, 365:11, 366:14, 406:18, 416:4, 416:10, 426:25
**front** [4] - 375:11, 387:8, 416:18, 430:6
**full** [13] - 312:17, 327:24, 331:13, 332:10, 332:25, 335:18, 337:20, 340:25, 343:18, 350:2, 357:22, 366:8, 420:6
**function** [5] - 308:23, 339:13, 345:14, 352:11, 428:9
**future** [2] - 350:15, 363:6

## G

**g/mL** [28] - 287:10, 307:13, 340:19, 345:19, 345:21, 354:17, 354:25, 356:8, 359:10, 361:16, 361:21, 362:4, 363:2, 366:9, 366:13, 368:10, 375:17, 402:5, 402:6, 402:13, 402:14, 403:2, 407:13
**g/mLs** [1] - 342:24
**gelatin** [9] - 297:9, 298:19, 306:12, 307:8, 337:10, 337:12, 414:22, 417:1, 418:7
**gels** [1] - 417:22
**general** [9] - 287:25, 300:17, 310:1, 374:25, 377:18,

378:11, 383:2, 410:21, 418:5
**generally** [7] - 296:14, 300:9, 306:16, 325:7, 378:1, 399:25, 400:8
**generate** [1] - 340:24
**geriatric** [1] - 314:3
**given** [9] - 292:10, 293:13, 310:25, 321:23, 322:1, 341:23, 360:7, 395:9, 430:13
**glean** [1] - 380:6
**gleaned** [1] - 293:3
**glidant** [2] - 358:5, 399:25
**glove** [1] - 320:12
**glycol** [1] - 396:12
**glycolate** [1] - 418:7
**goal** [4] - 331:13, 338:20, 339:1, 392:6
**goose** [1] - 405:22
**grade** [2] - 353:8, 400:8
**grades** [1] - 400:8
**grandparent** [1] - 313:19
**grandparents** [2] - 310:9, 316:14
**granular** [4] - 301:20, 398:13, 398:22, 399:10
**granulate** [23] - 300:22, 301:3, 332:1, 332:12, 334:21, 332:19, 337:8, 344:2, 344:15, 350:1, 359:23, 360:9, 370:18, 371:19, 383:10, 383:12, 383:13, 383:17, 383:21, 383:25, 385:11, 386:7, 386:8
**granulated** [20] - 283:23, 284:8, 300:24, 301:5, 301:12, 302:16, 303:9, 307:12, 335:22, 342:16, 351:24, 353:5, 355:25, 356:25, 370:11, 396:7, 398:10, 398:17, 398:21, 398:25
**granulating** [6] - 285:20, 302:5, 302:21, 335:17, 373:20, 374:1

**Granulation** [1] - 340:14
**granulation** [60] - 283:18, 284:3, 284:15, 288:9, 303:7, 307:15, 308:11, 336:14, 336:21, 337:5, 337:13, 340:18, 340:24, 344:12, 346:15, 347:12, 347:19, 347:20, 351:6, 354:13, 355:7, 356:14, 357:4, 357:6, 357:7, 359:17, 359:22, 359:24, 360:16, 364:24, 371:17, 379:2, 385:16, 386:1, 386:2, 386:5, 386:6, 386:9, 386:11, 386:13, 386:14, 396:16, 396:18, 397:1, 397:2, 397:4, 397:11, 397:15, 397:24, 399:18, 402:17, 402:24, 403:5, 403:11, 407:23, 408:14, 426:6
**granulations** [11] - 303:15, 303:20, 305:6, 336:12, 336:19, 340:17, 347:1, 357:13, 357:14, 358:23, 359:18
**granulator** [1] - 350:3
**granule** [10] - 356:25, 357:3, 361:21, 362:11, 371:21, 399:7, 399:15, 400:2, 400:3, 401:7
**granules** [86] - 286:19, 286:24, 287:3, 287:5, 287:10, 301:13, 301:17, 301:19, 301:22, 301:25, 302:2, 303:19, 304:15, 304:18, 305:4, 305:9, 305:11, 307:12, 333:14, 334:11, 342:12, 342:15, 342:24, 342:25, 345:6, 345:11, 346:7, 346:21, 348:2, 348:9, 348:25,

349:19, 350:13, 350:14, 351:5, 351:7, 351:10, 351:18, 351:22, 352:2, 352:8, 352:11, 352:12, 352:17, 353:1, 353:2, 353:12, 353:20, 354:17, 354:24, 355:2, 355:4, 355:16, 356:11, 356:16, 356:21, 356:23, 357:10, 357:23, 358:9, 359:10, 360:3, 360:6, 362:3, 362:21, 363:1, 363:19, 364:2, 364:8, 364:14, 364:25, 365:1, 365:5, 366:8, 366:12, 368:6, 370:10, 370:13, 370:14, 375:15, 385:12, 400:9, 401:10, 403:12
**gravitate** [1] - 412:9
**great** [2] - 304:9, 422:1
**greater** [16] - 287:10, 342:24, 354:17, 354:24, 358:10, 359:10, 363:1, 364:9, 366:8, 366:13, 368:10, 375:16, 402:5, 402:12, 407:13, 421:22
**green** [1] - 332:22
**GREEN** [2] - 281:13, 281:14
**GREGORY** [1] - 280:14
**grounds** [1] - 404:8
**group** [1] - 410:9
**guess** [4] - 369:14, 394:14, 419:10, 428:25
**guidance** [5] - 303:6, 345:20, 359:5, 359:9, 360:8
**GUZZO** [1] - 281:4

**H**

**half** [4] - 291:21, 304:23, 312:21, 384:6
**hallucinations** [3] - 290:20, 293:16,

295:13
**hand** [9] - 312:8, 314:10, 315:15, 317:6, 328:3, 328:4, 359:15, 361:9, 374:14
**handling** [1] - 413:25
**Hard** [1] - 414:22
**hard** [7] - 298:18, 301:14, 321:16, 339:3, 343:9, 344:6, 385:17
**harmful** [1] - 428:1
**HASTINGS** [1] - 281:5
**Hattori** [2] - 309:10, 310:1
**heading** [1] - 340:14
**healthcare** [1] - 414:5
**hear** [1] - 404:6
**heard** [1] - 395:20
**hearing** [1] - 385:17
**held** [2] - 281:24, 430:4
**help** [6] - 317:18, 319:3, 319:7, 327:9, 364:22, 427:14
**helps** [2] - 317:24, 326:20
**hereby** [1] - 431:6
**herein** [8] - 284:3, 356:7, 389:14, 395:3, 396:6, 397:24, 398:9, 398:17
**hierarchy** [2] - 404:16, 404:19
**high** [17] - 283:18, 295:15, 300:14, 308:15, 314:15, 340:8, 340:18, 340:25, 350:3, 359:24, 386:10, 392:4, 400:16, 421:17, 422:4, 422:5, 422:15
**High** [1] - 340:14
**High-Shear** [1] - 340:14
**high-shear** [2] - 340:18, 359:24
**higher** [18] - 332:20, 333:11, 334:12, 334:16, 335:3, 345:19, 355:2, 357:10, 358:8, 358:24, 358:25, 360:9, 360:16, 361:2, 361:4, 361:6, 362:23, 364:19
**highlighted** [2] -

299:24, 332:22
**history** [2] - 382:10, 406:13
**hmm** [4] - 338:21, 367:11, 375:12, 419:5
**hold** [1] - 426:23
**holes** [1] - 320:11
**honest** [1] - 385:17
**Honor** [18] - 285:19, 292:21, 307:17, 311:19, 314:25, 320:25, 341:2, 341:4, 366:21, 423:4, 426:25, 429:7, 429:8, 429:14, 429:15, 429:19, 430:13, 431:3
**HONORABLE** [1] - 280:14
**hot** [1] - 320:13
**housekeeping** [1] - 341:6
**HPMC** [7] - 298:19, 306:12, 307:8, 337:10, 337:12, 417:1, 418:8
**humans** [1] - 419:17
**hundreds** [5] - 393:23, 393:24, 405:24, 406:1, 412:18
**hydrophilic** [1] - 400:8
**hydrophobic** [4] - 352:7, 352:12, 352:19, 400:8
**hydroxypropyl** [2] - 287:7, 297:9
**hypothetical** [1] - 362:24

**I**

**i.e** [1] - 396:8
**idea** [2] - 374:2, 374:23
**identical** [2] - 403:9, 403:10
**identification** [2] - 307:25, 413:25
**identification..** [1] - 317:7
**identified** [9] - 349:24, 354:5, 383:3, 383:19, 397:8, 399:5, 406:2, 408:5, 415:19
**identifies** [2] - 392:7, 418:11
**identify** [6] - 317:16,

317:21, 317:24, 326:20, 343:25, 380:25
**identifying** [2] - 285:20, 408:8
**ignoring** [2] - 391:9, 391:14
**illustrate** [1] - 310:1
**illustrates** [1] - 307:23
**immediate** [7] - 292:11, 295:21, 306:9, 352:9, 352:14, 399:8, 400:9
**immediate-release** [5] - 292:11, 352:9, 352:14, 399:8, 400:9
**immediately** [10] - 296:6, 296:22, 298:7, 298:10, 305:22, 389:6, 389:8, 389:19, 390:22
**impact** [1] - 305:14
**impart** [2] - 319:17, 319:19
**imparted** [1] - 295:2
**impeller** [2] - 362:6, 362:10
**implement** [1] - 301:9
**implementing** [1] - 301:8
**implicitly** [1] - 386:22
**important** [6] - 292:9, 294:17, 298:4, 300:4, 381:11, 419:25
**imposition** [1] - 345:23
**improve** [2] - 313:25, 319:10
**improved** [2] - 283:23, 284:8
**impurities** [1] - 427:25
**IN** [2] - 280:1, 280:2
**inactive** [1] - 292:16
**Inc** [3] - 281:8, 281:11, 281:18
**INC** [1] - 280:4
**include** [12] - 282:25, 283:1, 286:4, 286:6, 300:23, 331:5, 347:6, 355:4, 364:16, 383:5, 383:8, 421:6
**included** [8] - 288:10, 288:21, 304:19, 349:19, 368:3, 386:25, 387:3, 387:4
**includes** [5] - 285:22, 301:10, 354:12,

385:25, 397:24
**including** [5] - 286:25, 308:24, 383:23, 385:12, 417:22
**incorporate** [2] - 364:21, 378:19
**increase** [14] - 323:2, 325:23, 333:10, 333:13, 333:19, 333:24, 334:1, 342:21, 361:15, 362:3, 362:20, 363:19, 408:13, 408:24
**increased** [4] - 336:5, 336:6, 336:8, 344:13
**increases** [3] - 324:14, 325:4, 325:18
**increasing** [2] - 324:12, 325:3
**indeed** [5] - 312:9, 328:11, 377:13, 394:6, 414:18
**indefinite** [10] - 282:14, 287:25, 288:3, 365:13, 377:5, 377:6, 404:12, 404:15, 404:17, 404:22
**indefiniteness** [5] - 287:24, 289:15, 343:13, 376:7, 404:16
**independent** [1] - 427:4
**indicate** [4] - 339:23, 340:5, 340:20, 369:24
**indicated** [2] - 290:20, 327:10
**indicates** [5] - 290:19, 297:6, 310:17, 329:18, 329:21
**indicating** [1] - 344:8
**indication** [5] - 302:12, 420:2, 420:3, 420:5, 420:6
**Indications** [1] - 290:16
**individual** [1] - 426:7
**individuals** [1] - 291:18
**industry** [2] - 299:15, 388:13
**influencing** [1] - 310:14
**information** [15] - 288:10, 294:5, 294:11, 294:22, 297:4, 360:5, 379:9,

381:16, 382:2, 409:10, 410:4, 410:16, 411:4, 412:1, 414:9
**informed** [1] - 307:24
**informs** [1] - 368:2
**infringe** [5] - 368:16, 368:20, 368:23, 374:17, 380:20
**infringement** [8] - 374:21, 374:24, 375:2, 375:8, 375:10, 375:18, 375:25, 376:4
**ingredient** [2] - 301:20, 407:25
**ingredients** [3] - 292:16, 297:16, 356:15
**inside** [24] - 301:24, 301:25, 322:3, 323:5, 332:2, 333:5, 334:3, 335:23, 337:2, 337:10, 341:1, 348:2, 352:7, 352:10, 356:23, 356:25, 357:2, 399:7, 399:10, 400:2, 400:3, 400:9, 401:4, 401:10
**instance** [5] - 351:15, 357:7, 359:21, 395:13, 418:10
**instances** [6] - 345:16, 354:4, 354:5, 358:4, 399:21, 419:18
**instant** [1] - 407:24
**Instead** [1] - 306:10
**instead** [10] - 302:19, 322:20, 323:15, 324:8, 324:24, 325:14, 334:17, 335:12, 337:9, 347:21
**intend** [2] - 303:15, 392:11
**intended** [8] - 292:10, 296:25, 308:14, 340:9, 356:23, 367:12, 390:21
**intending** [1] - 369:21
**intensive** [1] - 301:11
**interacted** [1] - 410:9
**intergranular** [1] - 302:1
**internal** [1] - 398:14
**interpretation** [1] - 411:19
**intragranular** [5] -

345:10, 345:17, 346:21, 347:2, 349:4
**introduces** [1] - 367:10
**introducing** [1] - 377:2
**invalid** [7] - 289:3, 289:6, 289:14, 344:20, 358:14, 365:13, 365:24
**invalidity** [3] - 365:8, 429:11, 429:12
**invented** [3] - 286:9, 288:23, 429:1
**invention** [27] - 283:2, 283:8, 283:25, 284:25, 285:2, 285:13, 285:20, 285:23, 286:3, 288:7, 289:23, 349:3, 359:21, 360:19, 365:21, 369:25, 373:23, 374:8, 374:9, 381:18, 381:19, 381:25, 382:3, 400:16, 407:24, 428:23
**inventions** [1] - 409:3
**inventor** [3] - 288:22, 405:2, 413:12
**inventors** [12] - 283:1, 283:7, 283:21, 284:24, 285:1, 285:12, 345:23, 353:24, 366:4, 366:7, 373:24, 403:21
**inverse** [1] - 367:22
**involve** [1] - 365:5
**involved** [1] - 370:24
**IR** [2] - 424:13, 425:12
**issue** [3] - 288:14, 382:16, 430:2
**issued** [1] - 408:10
**issues** [3] - 319:24, 365:23, 418:23
**itself** [16] - 285:17, 294:11, 296:15, 296:23, 347:23, 350:20, 378:4, 387:4, 389:23, 390:7, 392:17, 409:17, 411:25, 412:5, 425:22

## J

**JAMES** [1] - 281:14
**JANINE** [1] - 281:16

**Japan** [1] - 309:8
**jar** [2] - 304:2, 304:3
**Jellies** [1] - 325:13
**jellies** [2] - 325:21, 326:3
**jelly** [1] - 325:14
**JENNIFER** [1] - 281:4
**Jersey** [1] - 338:14
**JTX** [3] - 337:22, 337:23, 341:2
**JTX-0010** [1] - 406:19
**JTX-0013** [1] - 341:8
**JTX-10** [4] - 406:12, 406:17, 406:22
**JTX-10-2404** [1] - 407:3
**JTX-11** [7] - 296:7, 307:18, 307:20, 332:7, 416:19, 416:21, 423:14
**JTX-12** [5] - 290:10, 290:12, 290:15, 292:21, 292:24
**JTX-13** [4] - 424:11, 424:20, 424:21, 425:4
**JTX-13.0003** [1] - 339:18
**JTX-13.0004** [1] - 340:12
**JTX-9** [3] - 348:5, 387:8, 387:10
**Judge** [1] - 282:3
**JUDGE** [1] - 280:15
**judge** [1] - 430:9
**juice** [1] - 323:8
**justify** [1] - 374:12

## K

**keep** [3] - 323:24, 333:1, 334:18
**keeping** [1] - 333:21
**key** [3] - 313:9, 315:16, 315:20
**kind** [10] - 323:20, 336:12, 346:12, 354:2, 354:6, 369:14, 371:9, 372:20, 396:20, 420:6
**kinds** [3] - 340:2, 396:20, 397:2
**knead** [1] - 350:8
**kneading** [1] - 350:8
**knowing** [3] - 293:10, 315:6, 327:21
**knowledge** [5] - 310:2, 364:1, 365:25, 409:19,

409:21
**known** [25] - 295:1, 295:15, 303:25, 308:15, 310:21, 310:23, 311:8, 314:20, 316:5, 316:9, 317:10, 318:9, 319:15, 321:14, 321:21, 340:6, 340:18, 357:14, 370:12, 370:16, 371:4, 409:13, 409:15, 410:20
**knows** [6] - 308:8, 313:11, 337:11, 371:3, 399:10, 410:2
**Kollidon** [2] - 287:6, 301:24
**KRATZ** [2] - 281:9, 281:10
**Kumar** [2] - 309:20, 310:1

## L

**lab** [1] - 403:15
**label** [28] - 289:17, 290:13, 290:17, 290:19, 290:22, 290:25, 291:12, 291:13, 291:16, 293:4, 293:8, 295:6, 295:11, 308:6, 327:6, 330:21, 341:18, 341:22, 342:9, 365:25, 409:17, 410:6, 411:6, 411:8, 411:10, 411:12, 411:13, 411:17
**Laboratories** [1] - 281:17
**lack** [3] - 353:12, 366:3, 422:8
**lacking** [2] - 344:20, 358:14
**lactose** [2] - 299:8, 302:14
**language** [14] - 283:5, 285:16, 299:6, 346:6, 372:15, 372:19, 374:5, 374:11, 374:12, 377:2, 378:11, 381:22, 383:24, 393:15
**large** [16] - 283:19, 307:14, 310:10, 314:24, 325:18,

360:1, 360:3, 362:2, 369:15, 369:25, 370:4, 371:10, 371:11, 371:15, 374:11, 419:19
**large-scale** [4] - 369:15, 369:25, 370:4, 374:11
**larger** [2] - 329:20, 339:3
**last** [5] - 300:5, 342:23, 404:13, 424:18, 425:10
**law** [1] - 368:22
**lawyer** [1] - 368:21
**layer** [1] - 340:2
**layering** [6] - 340:1, 387:17, 390:12, 391:17, 391:22, 392:18
**lead** [12] - 283:6, 294:10, 299:1, 300:20, 306:24, 349:9, 349:12, 361:2, 378:25, 384:9, 413:12, 426:9
**Leading** [1] - 379:8
**leads** [3] - 299:4, 313:9, 349:14
**leak** [1] - 320:24
**learn** [10] - 296:19, 296:22, 297:23, 299:25, 302:22, 305:20, 305:22, 306:5, 306:22, 319:8
**learned** [3] - 298:4, 299:19, 344:5
**learns** [3] - 299:12, 370:19, 370:22
**least** [4] - 288:1, 334:16, 418:10, 430:10
**leave** [1] - 320:12
**led** [5] - 283:19, 284:1, 403:16, 406:14, 420:3
**left** [16] - 282:12, 283:13, 312:3, 315:15, 317:6, 327:11, 328:3, 328:4, 347:4, 348:17, 353:18, 359:15, 419:14, 422:25, 423:1, 423:11
**left-hand** [5] - 315:15, 317:6, 328:3, 328:4, 359:15
**legal** [1] - 374:18
**length** [2] - 330:1,

330:6
**less** [19] - 303:3, 303:4, 303:5, 311:13, 312:20, 330:6, 330:7, 335:6, 347:12, 347:16, 347:20, 347:23, 354:8, 363:20, 383:4, 398:2, 420:13
**level** [8] - 304:2, 304:4, 364:7, 419:19, 420:18, 421:17, 422:4, 422:5
**levels** [1] - 421:19
**life** [1] - 409:20
**likelihood** [2] - 325:23, 403:10
**likely** [5] - 297:17, 326:22, 363:11, 412:14, 421:11
**limit** [3] - 300:9, 346:9, 428:7
**limitation** [6] - 354:18, 366:6, 382:21, 383:5, 383:8, 383:15
**limitations** [6] - 371:23, 372:21, 372:24, 375:13, 380:11, 381:7
**Limited** [1] - 281:11
**LIMITED** [1] - 280:6
**limited** [3] - 345:16, 359:1, 399:20
**limits** [4] - 353:19, 353:20, 353:21, 353:22
**line** [17] - 323:18, 326:11, 326:13, 352:22, 387:14, 387:15, 388:12, 390:13, 390:14, 392:8, 394:10, 395:8, 397:21, 398:16, 401:21, 413:16, 413:21
**lines** [26] - 284:20, 284:21, 302:25, 314:10, 339:19, 348:5, 348:19, 348:22, 361:10, 361:24, 389:5, 389:7, 389:10, 389:25, 390:4, 392:1, 394:17, 396:4, 397:7, 397:18, 401:20, 418:4, 418:24
**liquid** [1] - 364:25
**liquids** [2] - 326:6, 417:22

**list** [2] - 297:15, 405:14
**listed** [12] - 303:25, 353:25, 356:15, 361:3, 384:21, 392:23, 394:5, 403:6, 405:24, 419:23, 422:1, 423:17
**listing** [1] - 385:8
**lists** [4] - 329:15, 403:2, 417:5, 427:24
**literature** [7] - 294:5, 294:19, 296:1, 296:3, 296:4, 316:15, 410:22
**LITTLE** [1] - 429:22
**Liu** [2] - 314:4, 322:12
**LIVIZOS** [1] - 281:3
**LLP** [4] - 281:3, 281:5, 281:9, 281:15
**look** [53] - 290:16, 290:22, 291:13, 291:23, 292:4, 294:18, 296:13, 297:2, 300:12, 302:25, 304:16, 314:10, 315:14, 317:6, 324:4, 324:22, 329:12, 332:5, 336:17, 338:16, 339:5, 339:19, 340:11, 359:12, 360:8, 361:13, 361:23, 362:13, 364:21, 371:11, 377:14, 380:6, 380:12, 384:13, 387:6, 389:20, 392:16, 393:2, 395:7, 396:4, 397:18, 400:11, 403:1, 406:6, 408:4, 413:17, 415:11, 417:4, 418:15, 419:3, 419:10, 425:8, 425:9
**looked** [9] - 309:7, 344:1, 375:1, 382:13, 408:5, 414:9, 414:10, 414:14, 416:3
**looking** [24] - 294:5, 297:4, 297:15, 298:6, 314:1, 326:10, 326:14, 332:21, 335:20, 364:13, 380:11, 381:21, 385:21, 390:4, 394:11,

408:18, 419:22, 419:25, 421:15, 424:7, 425:24, 425:25, 426:2
**looks** [4] - 308:22, 313:25, 333:24, 370:25
**lose** [2] - 352:11, 357:1
**low** [3] - 300:21, 386:10, 409:25
**low-dose** [1] - 300:21
**lower** [1] - 335:4, 409:18, 409:23
**Ltd** [1] - 281:18
**lubricant** [7] - 302:2, 305:13, 351:11, 352:1, 352:7, 399:10, 399:24
**lubricants** [1] - 351:17
**lubricate** [1] - 301:19
**lubricated** [1] - 305:8
**lubricating** [1] - 352:11
**lucky** [1] - 421:5
**lunch** [4] - 422:23, 423:1, 423:2, 423:5
**lustrous** [1] - 321:16

# M

**machine** [2] - 370:16, 370:22
**magnesium** [30] - 292:19, 299:8, 301:19, 302:1, 304:20, 304:22, 304:23, 304:24, 305:6, 305:10, 305:12, 333:23, 334:10, 342:17, 351:17, 351:21, 352:1, 352:6, 352:10, 352:15, 352:16, 353:1, 353:8, 356:1, 356:20, 356:22, 398:19, 398:23, 399:1, 399:7
**main** [2] - 327:19, 430:5
**maintain** [1] - 317:7
**major** [1] - 310:14
**manner** [1] - 369:22
**mannitol** [5] - 301:23, 302:15, 302:17, 333:20, 334:17
**manufacture** [4] - 283:15, 331:25, 372:20, 373:11

**manufacturer** [4] - 414:17, 414:18, 415:23, 415:25
**manufacturing** [30] - 311:7, 311:9, 312:20, 312:22, 312:24, 338:5, 338:7, 369:16, 369:25, 370:4, 370:7, 370:24, 371:2, 371:5, 371:6, 372:17, 372:20, 373:2, 373:5, 373:12, 373:14, 374:2, 374:12, 377:12, 384:23, 385:2, 385:7, 385:8, 387:2
**mask** [2] - 320:6, 321:18
**masked** [2] - 320:20, 320:21
**masking** [12] - 306:7, 306:8, 307:2, 308:10, 323:19, 326:17, 326:20, 327:16, 331:6, 343:24, 409:7, 411:5
**masks** [1] - 427:17
**massing** [1] - 350:7
**material** [20] - 304:17, 311:7, 323:1, 323:5, 325:19, 340:3, 378:4, 403:20
**materials** [5] - 297:15, 298:8, 302:1, 346:16, 364:24
**matter** [2] - 283:1, 401:11
**matters** [1] - 401:11
**mean** [20] - 310:24, 326:6, 326:7, 337:14, 350:7, 352:19, 354:23, 382:5, 382:6, 383:9, 391:20, 394:6, 406:6, 420:19, 422:14, 422:24, 427:16, 428:4, 428:8
**meaning** [15] - 291:8, 375:14, 376:23, 376:25, 377:3, 378:5, 378:13, 390:20, 392:10, 395:3, 427:5, 427:10, 428:20, 428:21
**means** [13] - 302:11, 311:12, 334:7, 346:16, 350:7,

352:20, 354:18, 377:16, 381:13, 383:4, 392:3, 427:8, 428:5

**meant** [7] - 286:23, 287:21, 288:4, 359:20, 379:9, 379:11, 426:16

**measure** [1] - 420:23

**measured** [1] - 372:2

**measurement** [1] - 300:7

**measurements** [1] - 304:14

**measures** [2] - 303:24, 325:6

**Medical** [1] - 303:25

**medication** [18] - 293:15, 311:5, 311:6, 313:10, 317:20, 317:25, 319:7, 319:8, 319:11, 319:12, 324:14, 325:3, 325:24, 343:24, 363:6, 409:15, 409:25, 415:9

**medications** [12] - 316:10, 316:14, 317:15, 317:16, 318:19, 319:5, 319:6, 326:17, 327:9, 327:19, 363:13, 412:19

**medicine** [3] - 320:12, 320:22, 326:17

**medicines** [1] - 314:1

**meeting** [2] - 368:19, 378:4

**mention** [4] - 356:13, 360:11, 399:21

**mentioned** [5] - 295:24, 313:3, 317:13, 354:15, 415:5

**mentions** [6] - 284:9, 322:12, 362:6, 362:14, 402:3, 417:18

**mesh** [1] - 350:3

**met** [1] - 375:13

**method** [9] - 287:11, 304:13, 345:23, 360:6, 365:1, 372:4, 372:6, 379:2, 402:9

**methodology** [1] - 364:25

**methods** [1] - 344:3

**methylcellulose** [1] - 297:10, 396:11

**mg** [59] - 291:2, 293:12, 293:13, 296:24, 299:2, 300:3, 303:16, 304:25, 307:11, 326:15, 331:13, 332:10, 332:21, 332:25, 335:18, 337:20, 353:5, 353:7, 356:1, 367:5, 371:18, 371:21, 384:23, 391:23, 392:1, 404:9, 404:24, 405:4, 409:3, 409:9, 410:3, 410:11, 410:17, 411:1, 411:3, 411:20, 411:25, 412:2, 412:4, 414:6, 417:20, 419:23, 420:11, 420:13, 422:3, 422:5, 422:9, 422:15, 425:12

**mgs** [80] - 284:12, 286:11, 286:14, 286:20, 287:15, 290:7, 290:8, 291:2, 292:12, 292:13, 293:13, 293:14, 295:22, 295:23, 299:2, 304:24, 307:11, 312:15, 312:17, 322:5, 327:24, 330:24, 331:8, 331:9, 331:21, 332:2, 332:14, 333:2, 333:3, 333:5, 334:2, 334:5, 334:6, 334:24, 334:25, 335:23, 336:14, 340:25, 341:21, 341:23, 341:24, 342:1, 342:12, 342:19, 343:18, 344:14, 345:7, 346:7, 353:13, 355:24, 356:1, 357:23, 363:14, 367:13, 368:6, 369:3, 369:9, 370:15, 370:17, 372:4, 373:18, 375:13, 375:14, 390:5, 390:10, 392:5, 392:18, 392:24, 393:3, 393:13, 393:17, 393:25, 404:4, 407:12, 411:21, 422:6, 424:13,

427:16

**MICHAEL** [1] - 281:17

**Michele** [3] - 280:25, 282:2, 431:9

**MICHELLE** [1] - 281:3

**microcrystalline** [18] - 292:20, 299:8, 351:16, 351:21, 351:25, 352:25, 353:6, 353:7, 356:1, 356:20, 356:24, 357:2, 398:3, 398:10, 398:18, 398:22, 398:25, 418:6

**middle** [5] - 296:25, 304:5, 327:14, 328:6, 347:18

**might** [4] - 347:11, 363:16, 395:20, 421:9

**milk** [1] - 323:8

**milling** [1] - 284:4

**million** [2] - 320:15, 368:22

**mind** [2] - 372:5, 413:17

**minimize** [3] - 302:22, 303:6, 311:1

**minimized** [1] - 307:16

**minimum** [1] - 291:20

**minor** [1] - 289:20

**minutes** [5] - 338:14, 350:7, 350:9, 366:18, 422:25

**missed** [2] - 408:12, 408:23

**mistake** [1] - 357:8

**misunderstanding** [1] - 412:6

**misunderstood** [1] - 393:5

**mix** [3] - 350:6, 350:8, 351:11

**mixed** [3] - 297:14, 305:6, 355:25

**mixer** [1] - 301:11

**mixing** [2] - 350:19, 350:22

**mixture** [11] - 299:10, 299:17, 301:11, 347:13, 347:15, 347:21, 347:24, 350:6, 350:12, 401:11, 418:25

**mixtures** [1] - 297:8

**mLs** [2] - 339:11

**mm..** [1] - 362:15

**modify** [1] - 378:12

**modifying** [1] - 377:15

**moisture** [10] - 323:24, 324:18, 383:8, 383:9, 383:10, 383:11, 383:16, 383:21, 383:24, 383:25

**molecular** [2] - 291:25, 292:1

**molecule** [3] - 291:24, 292:1, 295:18

**money** [2] - 311:17, 312:20

**months** [1] - 367:1

**moreover** [2] - 337:13, 370:12

**morning** [7] - 282:5, 282:10, 282:11, 317:17, 366:16, 375:3, 377:7

**Mortenson** [10] - 298:2, 299:22, 310:5, 327:3, 329:13, 331:2, 331:17, 344:25, 353:17, 359:13

**most** [19] - 297:17, 298:4, 298:18, 300:21, 301:2, 333:4, 333:6, 373:1, 373:4, 373:6, 374:3, 386:7, 412:20, 413:1, 413:2, 413:22, 420:21, 420:24

**motivate** [5] - 312:10, 312:13, 315:7, 315:10, 321:24

**motivated** [7] - 326:18, 326:24, 327:23, 328:13, 342:7, 343:18, 343:21

**motivation** [2] - 311:1, 319:2

**motivations** [1] - 409:2

**mouth** [7] - 292:10, 324:10, 324:11, 325:1, 325:2, 325:21

**move** [7] - 292:21, 307:17, 311:19, 314:25, 320:25, 341:2, 341:7

**moving** [1] - 385:13

**MR** [122] - 282:9, 282:22, 283:4, 283:10, 284:18, 285:9, 285:24, 289:12, 292:21,

292:23, 293:1, 293:6, 293:21, 294:1, 294:24, 298:1, 298:20, 299:22, 300:16, 302:7, 302:23, 305:1, 306:19, 307:17, 307:19, 307:22, 308:3, 308:16, 310:4, 311:19, 311:21, 311:25, 314:25, 315:2, 315:5, 320:25, 321:2, 321:5, 327:2, 328:1, 329:12, 330:9, 331:1, 331:10, 331:16, 331:22, 333:16, 335:2, 336:2, 336:16, 337:7, 337:16, 341:2, 341:4, 341:6, 341:11, 341:15, 343:16, 344:17, 344:25, 345:2, 346:4, 346:18, 346:24, 348:3, 348:13, 348:15, 349:16, 349:21, 350:16, 351:2, 351:19, 352:18, 353:16, 354:14, 354:21, 354:22, 355:21, 356:9, 357:20, 358:11, 358:19, 359:7, 359:12, 359:14, 364:12, 365:4, 365:11, 366:14, 366:21, 366:24, 369:7, 377:24, 384:12, 384:15, 388:23, 394:19, 394:21, 406:18, 406:21, 413:8, 416:1, 416:4, 416:7, 416:10, 416:13, 422:24, 423:4, 423:7, 423:8, 424:24, 425:2, 425:6, 426:20, 426:25, 429:15, 429:19, 430:13, 430:19, 430:24, 431:3

**MS** [2] - 429:8, 429:14

**MSN** [2] - 281:17, 281:18

**Multiparticulate** [1] - 322:17

**multiparticulate** [2] -

322:20, 322:24
**multiple** [2] - 373:13, 428:4
**Muzzio** [50] - 282:6, 282:10, 285:12, 285:25, 293:2, 293:22, 294:25, 295:4, 295:24, 299:18, 300:17, 301:21, 303:23, 307:23, 312:2, 325:25, 328:2, 328:12, 331:11, 336:17, 337:17, 337:23, 341:12, 343:16, 344:19, 345:3, 350:24, 351:20, 352:19, 352:21, 352:24, 353:11, 354:23, 357:9, 358:12, 359:8, 359:16, 360:7, 362:13, 362:24, 365:7, 366:14, 366:25, 394:16, 400:11, 414:4, 416:3, 416:14, 423:9, 425:7
**MUZZIO-DDX-35** [1] - 294:1
**MUZZIO-DDX-40** [1] - 302:7
**MUZZIO-DX-27** [1] - 282:22
**MUZZIO-DX-28** [1] - 283:10
**MUZZIO-DX-29** [1] - 285:9
**MUZZIO-DX-33** [1] - 289:12
**MUZZIO-DX-34** [1] - 293:6
**MUZZIO-DX-36** [1] - 295:9
**MUZZIO-DX-37** [1] - 298:1
**MUZZIO-DX-41** [1] - 303:12
**MUZZIO-DX-43** [2] - 306:19, 313:1
**MUZZIO-DX-44** [1] - 308:3
**MUZZIO-DX-46** [1] - 327:2
**MUZZIO-DX-47** [1] - 329:12
**MUZZIO-DX-48** [1] - 331:1
**MUZZIO-DX-49** [1] - 331:16

**MUZZIO-DX-51** [1] - 333:16
**MUZZIO-DX-52** [1] - 336:2
**MUZZIO-DX-53** [1] - 337:7
**MUZZIO-DX-54** [1] - 341:15
**MUZZIO-DX-58** [1] - 345:1
**MUZZIO-DX-59** [1] - 346:4
**MUZZIO-DX-60** [2] - 346:24, 348:14
**MUZZIO-DX-61** [1] - 349:21
**MUZZIO-DX-62** [1] - 351:2
**MUZZIO-DX-63** [1] - 353:16
**MUZZIO-DX-64** [1] - 354:21
**MUZZIO-DX-68** [1] - 358:19
**MUZZIO-DX-70** [1] - 364:12
**MYER** [1] - 281:10

## N

**narrow** [2] - 321:17, 380:16
**narrowing** [3] - 287:19, 380:10, 386:8
**narrows** [2] - 343:5, 386:12
**necessarily** [2] - 375:19, 415:6
**necessary** [1] - 294:8
**necessity** [1] - 396:13
**need** [39] - 289:16, 295:2, 310:22, 311:12, 311:16, 312:22, 317:16, 331:6, 333:3, 333:25, 334:1, 334:6, 334:11, 335:11, 335:12, 342:20, 361:6, 361:7, 363:1, 363:16, 369:19, 370:13, 370:14, 370:18, 375:9, 376:12, 377:14, 378:18, 394:14, 409:18, 409:23, 410:4, 410:14, 410:25, 411:4, 411:14, 411:22,

427:24, 428:20
**needed** [4] - 335:14, 364:19, 366:4, 383:20
**needing** [1] - 410:6
**needs** [8] - 303:3, 308:19, 326:17, 327:8, 333:6, 344:12, 410:11, 411:7
**new** [4] - 293:24, 294:4, 363:20, 366:11
**New** [1] - 338:13
**next** [17] - 298:21, 300:25, 302:18, 304:17, 310:17, 318:22, 329:18, 334:4, 350:5, 361:5, 367:23, 390:10, 397:14, 398:8, 402:16, 406:1, 417:3
**nice** [2] - 366:25, 367:2
**nonacceptable** [1] - 365:16
**none** [1] - 393:2
**noninfringement** [2] - 376:1, 376:5
**nontoxic** [1] - 378:5
**normal** [2] - 313:17, 430:25
**normally** [3] - 420:20, 428:12, 430:23
**NOTE** [1] - 281:24
**notebooks** [1] - 403:15
**notes** [2] - 418:4, 431:7
**nothing** [5] - 288:21, 350:4, 359:3, 361:17, 361:22, 362:12, 364:22, 370:18, 381:24, 409:17, 409:22, 410:3, 410:10
**notice** [1] - 406:23
**notion** [1] - 329:10
**novel** [8] - 284:5, 284:16, 285:4, 360:18, 360:21, 361:8, 362:16
**November** [1] - 296:11
**nowhere** [3] - 345:19, 358:8, 361:1
**nozzle** [2] - 360:22, 362:16
**Number** [1] - 410:18
**number** [26] - 293:9, 298:3, 308:18,

310:25, 311:2, 311:3, 311:11, 311:16, 317:15, 322:22, 323:10, 345:13, 352:11, 352:12, 356:21, 358:1, 379:22, 384:16, 405:12, 409:1, 413:18, 416:14, 416:20, 421:20, 427:19, 428:1
**numbers** [5] - 339:15, 339:17, 403:9, 405:9, 420:22
**Nuplazid** [23] - 290:17, 290:20, 290:22, 291:1, 291:5, 291:12, 291:13, 291:15, 292:4, 292:17, 293:4, 293:10, 295:6, 312:11, 330:21, 365:24, 404:4, 404:9, 404:24, 409:3, 409:9, 410:3, 411:3

## O

**objection** [9] - 292:23, 307:19, 311:21, 315:2, 321:2, 341:4, 406:18, 416:4, 416:10
**observe** [1] - 303:21
**observed** [5] - 287:14, 300:8, 302:10, 302:17, 304:6
**observing** [1] - 360:3
**obtain** [1] - 390:19
**obtained** [1] - 300:2
**obvious** [15] - 289:3, 289:14, 289:24, 333:10, 334:4, 343:7, 343:8, 365:24, 404:4, 404:9, 404:17, 408:12, 408:15, 408:23
**obviousness** [8] - 289:10, 341:13, 343:14, 404:1, 404:8, 404:20, 406:10, 407:20
**occurs** [1] - 291:19
**October** [1] - 314:8
**odor** [1] - 321:18
**OF** [1] - 280:2
**of..** [1] - 389:15

**off-white** [3] - 290:9, 292:11, 293:19
**offer** [2] - 376:1, 376:5
**offered** [1] - 376:4
**office** [1] - 338:14
**often** [2] - 357:6
**OGTROP** [1] - 281:13
**older** [13] - 291:18, 291:22, 295:16, 309:19, 310:8, 310:22, 313:13, 314:23, 326:15, 327:7, 342:8, 410:1, 410:20
**once** [9] - 291:3, 291:7, 293:12, 320:21, 341:23, 376:13, 376:16, 376:17, 427:11
**one** [107] - 286:20, 289:17, 304:23, 310:18, 311:6, 311:9, 313:9, 318:22, 319:17, 319:19, 319:20, 320:5, 322:3, 324:19, 324:25, 328:21, 335:7, 335:11, 335:17, 335:23, 336:10, 339:12, 341:24, 342:12, 345:7, 345:8, 346:7, 346:10, 346:13, 347:13, 348:9, 349:18, 349:23, 351:14, 351:15, 351:16, 352:6, 352:11, 353:13, 354:2, 354:5, 354:6, 354:7, 355:6, 355:15, 357:23, 358:5, 359:2, 359:19, 359:21, 359:22, 361:2, 363:10, 363:18, 365:1, 366:5, 368:7, 368:13, 368:14, 368:18, 368:22, 369:8, 370:17, 372:5, 374:5, 375:15, 375:24, 386:1, 390:18, 391:14, 394:4, 395:4, 396:20, 396:23, 397:3, 399:9, 401:24, 402:1, 402:3, 402:21, 405:18, 405:20, 405:23,

406:4, 411:16,
413:9, 413:11,
414:11, 414:13,
415:24, 417:2,
418:17, 420:25,
421:6, 422:5, 422:6,
422:7, 422:10,
422:11, 424:6,
425:8, 428:4, 429:1
**One** [1] - 397:23
**one-and-a-half-
percent** [1] - 304:23
**ones** [1] - 400:24
**open** [2] - 322:25,
431:2
**opening** [1] - 348:4
**opens** [1] - 430:25
**operate** [1] - 288:20
**operational** [1] -
371:25
**operations** [1] - 351:8
**opinion** [27] - 282:13,
289:2, 289:5,
303:23, 304:9,
328:12, 335:15,
337:17, 344:19,
348:8, 351:20,
354:12, 355:17,
356:11, 358:13,
364:15, 365:12,
365:23, 375:25,
376:7, 377:4, 377:8,
391:18, 391:24,
408:22, 412:8
**opinions** [10] - 289:9,
341:13, 343:13,
344:23, 345:4,
357:17, 358:17,
365:8, 376:4, 404:3
**opposed** [4] - 318:16,
383:2, 398:13,
411:16
**oral** [6] - 292:9,
293:12, 295:20,
315:20, 322:13,
413:5
**orally** [7] - 291:2,
324:8, 326:2, 367:5,
367:13, 369:2, 369:9
**Orally** [1] - 324:5
**orange** [1] - 323:8
**order** [9] - 297:4,
342:19, 343:20,
344:13, 361:20,
362:20, 368:15,
374:17, 375:8
**ordinary** [100] - 283:6,
284:23, 290:17,
290:23, 291:4,
291:14, 291:24,

292:7, 292:15,
293:3, 293:23,
294:3, 294:9,
294:15, 295:25,
296:18, 296:21,
297:19, 297:23,
298:14, 298:23,
299:19, 305:2,
305:7, 305:19,
305:21, 306:2,
306:16, 306:21,
307:24, 308:6,
308:8, 308:13,
310:2, 312:11,
312:13, 312:16,
313:6, 313:11,
313:15, 313:21,
314:20, 315:7,
315:10, 316:4,
317:10, 318:8,
318:12, 318:14,
319:1, 319:14,
319:24, 320:1,
321:13, 321:20,
321:25, 322:4,
322:19, 323:14,
324:7, 324:23,
325:13, 326:9,
326:14, 326:24,
327:5, 328:13,
328:16, 328:20,
329:9, 330:10,
330:15, 330:22,
331:4, 331:12,
331:19, 332:4,
332:9, 333:8,
333:13, 335:15,
335:20, 336:20,
337:4, 340:21,
349:2, 349:9,
349:13, 356:14,
361:14, 361:19,
362:25, 363:25,
364:1, 364:5,
376:23, 376:25,
395:4, 427:5, 427:10
**original** [1] - 416:8
**OTC** [1] - 412:19
**otherwise** [3] - 372:5,
395:2, 411:15
**outcome** [1] - 288:11
**outcomes** [2] -
365:15, 383:20
**outside** [10] - 302:2,
347:2, 347:25,
351:17, 351:22,
352:16, 353:1,
353:3, 354:10,
356:21
**over-wetting** [1] -

283:19
**overview** [6] - 289:9,
289:13, 343:13,
344:23, 345:4,
358:17
**own** [1] - 318:19

## P

**P.A** [1] - 281:13
**p.m** [2] - 423:3, 431:5
**page** [29] - 290:15,
291:12, 292:5,
292:6, 314:9,
315:14, 317:3,
321:9, 322:8, 322:9,
324:4, 338:16,
339:18, 340:11,
384:13, 384:14,
384:16, 384:18,
385:13, 385:21,
405:7, 405:15,
406:5, 407:3,
408:18, 414:19,
417:4, 418:18,
423:14
**papers** [1] - 421:9
**paragraph** [32] -
292:4, 292:6,
296:17, 296:19,
296:21, 297:2,
298:22, 302:24,
305:18, 305:25,
306:1, 306:4,
315:15, 315:19,
317:6, 317:9,
318:22, 321:9,
321:12, 321:15,
328:10, 336:18,
338:17, 338:19,
338:24, 339:19,
347:18, 362:14,
398:8, 402:16,
403:1, 418:2
**paragraphs** [3] -
347:10, 402:21,
418:13
**parameters** [5] -
284:15, 285:4,
361:2, 362:23, 365:2
**paraphrasing** [1] -
378:22
**parent** [1] - 313:18
**parents** [2] - 310:9,
316:13
**Parkinson's** [17] -
290:21, 291:17,
293:16, 293:17,
295:13, 295:17,
309:8, 310:20,

313:12, 314:16,
314:23, 315:6,
342:9, 363:7, 410:1,
410:19, 410:23
**part** [8] - 300:4,
333:18, 362:13,
373:22, 376:7,
404:13, 409:19,
429:22
**particle** [4] - 294:12,
350:21, 354:5,
392:13
**particles** [3] - 301:15,
323:4, 392:9
**particular** [12] - 294:7,
305:5, 317:23,
327:22, 344:15,
347:13, 363:11,
382:22, 382:23,
383:2, 385:6, 386:5
**particularly** [6] -
309:8, 314:15,
316:22, 324:18,
343:23, 399:8
**pass** [2] - 301:18,
366:15
**passage** [2] - 317:12,
390:7
**passages** [2] - 283:11,
369:23
**passing** [1] - 301:17
**Patent** [1] - 413:14
**patent** [80] - 282:18,
283:6, 284:11,
284:19, 285:7,
287:17, 288:5,
290:5, 296:9,
296:12, 296:15,
303:18, 310:14,
345:6, 346:20,
348:5, 349:18,
349:24, 352:22,
354:15, 355:6,
355:14, 355:18,
355:19, 355:23,
357:9, 357:21,
358:9, 361:11,
363:23, 364:15,
365:8, 367:3,
368:20, 368:21,
368:23, 377:2,
378:14, 379:7,
379:16, 379:24,
380:9, 380:20,
381:1, 381:13,
382:11, 382:13,
382:17, 382:23,
384:9, 386:18,
387:8, 393:10,
393:11, 394:11,

394:17, 395:23,
396:1, 396:3,
400:12, 401:20,
403:5, 405:7, 405:8,
405:15, 405:19,
406:13, 406:14,
408:10, 408:19,
413:9, 416:2, 416:8,
427:4, 427:7,
427:12, 428:13,
428:19, 429:4
**patent's** [1] - 405:11
**patentee** [2] - 365:21,
395:22
**patentees** [4] - 383:5,
383:7, 385:6, 386:4
**patents** [4] - 405:8,
405:9, 413:9, 413:11
**patient** [47] - 286:11,
291:10, 291:14,
293:12, 295:3,
310:19, 310:25,
311:2, 311:11,
313:4, 313:7,
313:10, 315:22,
317:24, 318:13,
318:18, 319:7,
319:11, 319:12,
320:21, 323:4,
323:9, 324:15,
325:1, 325:4,
325:23, 326:15,
326:20, 326:21,
327:8, 327:12,
327:19, 330:24,
341:22, 343:20,
343:25, 363:8,
367:6, 367:14,
374:16, 375:7,
375:9, 378:8,
409:12, 411:13,
411:15, 413:24
**patients** [39] - 291:20,
295:14, 295:15,
295:17, 308:14,
308:23, 309:9,
309:18, 309:19,
310:12, 310:20,
313:11, 313:12,
313:13, 314:2,
314:15, 314:17,
314:20, 314:23,
315:6, 316:1, 316:7,
317:15, 317:18,
319:4, 319:5,
327:12, 329:23,
342:8, 363:12,
409:14, 410:9,
410:19, 410:20,
410:23, 412:25,

414:5, 415:8
**patients'** [1] - 309:7
**PAUL** [1] - 281:5
**PCT** [3] - 384:8, 384:21, 416:9
**Peachman** [1] - 429:18
**PEACHMAN** [2] - 281:6, 429:19
**pediatric** [1] - 314:3
**people** [8] - 298:11, 298:15, 340:7, 340:22, 357:5, 380:25, 410:1, 426:4
**per** [3] - 330:19, 379:5, 428:19
**percent** [63] - 300:5, 300:10, 300:11, 300:14, 303:4, 303:5, 304:12, 304:20, 304:23, 304:24, 314:17, 316:1, 316:2, 316:3, 332:19, 332:21, 333:2, 333:11, 333:21, 333:24, 334:9, 334:10, 334:12, 334:16, 334:18, 335:7, 335:8, 335:12, 336:5, 336:9, 337:15, 342:15, 342:17, 342:21, 343:2, 343:3, 344:13, 347:13, 347:16, 347:20, 347:24, 350:13, 351:4, 354:9, 356:12, 398:3, 403:12, 409:14, 413:5, 419:9, 419:13, 419:14, 419:25, 420:14, 421:4, 421:8, 421:23
**percentage** [2] - 310:11, 335:10
**perception** [4] - 315:25, 415:2, 415:6, 415:9
**perform** [1] - 294:9
**performed** [2] - 294:7, 297:7
**period** [1] - 383:6
**person** [99] - 283:6, 284:23, 290:17, 290:23, 291:4, 291:14, 291:24, 292:6, 292:15, 293:3, 293:23, 294:3, 294:8,

294:15, 295:24, 296:18, 296:21, 297:19, 297:22, 298:14, 298:23, 299:19, 305:2, 305:7, 305:19, 305:21, 306:2, 306:4, 306:16, 306:21, 307:24, 308:5, 308:8, 308:13, 308:19, 310:2, 312:11, 312:13, 312:16, 313:6, 313:10, 313:15, 313:21, 314:19, 315:7, 315:10, 316:4, 317:10, 317:20, 318:8, 318:12, 318:14, 319:1, 319:14, 319:24, 320:1, 321:13, 321:20, 321:25, 322:4, 322:19, 323:14, 324:7, 324:23, 325:13, 326:9, 326:13, 326:18, 326:23, 327:5, 328:12, 328:16, 328:19, 329:9, 330:10, 330:15, 330:22, 331:4, 331:12, 331:19, 332:4, 332:9, 333:8, 333:13, 335:15, 335:20, 336:20, 337:4, 340:20, 349:2, 349:9, 349:13, 356:14, 361:14, 361:18, 362:25, 363:25, 364:1, 364:5
**personal** [3] - 318:11, 318:19, 338:9
**PETER** [1] - 281:6
**Peterman** [1] - 366:25
**PETERMAN** [35] - 281:5, 292:23, 307:19, 311:21, 315:2, 321:2, 341:4, 366:21, 366:24, 369:7, 377:24, 384:12, 384:15, 388:23, 394:19, 394:21, 406:21, 413:6, 413:8, 416:1, 416:7, 416:13, 422:24, 423:4, 423:7, 423:8, 424:24, 425:2,

425:6, 426:20, 429:15, 430:13, 430:19, 430:24, 431:3
**PH101** [3] - 354:7, 397:15, 399:21
**PH302** [4] - 353:6, 354:6, 397:13, 399:22
**Pharma** [2] - 281:11, 281:11
**PHARMA** [1] - 280:6
**pharmaceutical** [11] - 296:16, 311:10, 369:16, 370:23, 371:5, 378:1, 388:10, 388:12, 388:13, 395:11
**pharmaceutically** [73] - 282:16, 282:23, 286:10, 286:18, 286:21, 288:1, 288:4, 288:19, 341:21, 342:13, 345:8, 345:9, 346:8, 348:10, 353:14, 357:24, 366:6, 367:4, 368:7, 369:2, 369:8, 369:12, 372:22, 375:15, 375:22, 376:2, 376:6, 376:8, 376:15, 376:19, 376:23, 377:4, 377:6, 377:9, 377:10, 377:12, 377:14, 377:17, 377:18, 377:19, 377:23, 377:25, 379:4, 379:11, 379:15, 379:18, 379:19, 379:23, 380:21, 381:5, 381:23, 382:4, 382:17, 384:24, 388:5, 388:18, 388:24, 388:25, 390:16, 390:17, 391:9, 391:10, 394:12, 394:13, 395:12, 395:25, 427:3, 427:11, 427:15, 427:21, 428:18
**Pharmaceuticals** [2] - 281:8, 281:18
**PHARMACEUTICALS** [1] - 280:4
**pharmacies** [3] - 371:8, 371:20,

371:22
**pharmacists** [2] - 318:24, 412:22
**pharmacists..** [1] - 318:24
**pharmacological** [1] - 309:19
**Pharmacopeia** [1] - 303:25
**pharmacy** [5] - 371:7, 371:9, 371:16, 371:18, 428:10
**PhD** [1] - 365:3
**phosphate** [1] - 418:6
**phrase** [5] - 367:4, 367:23, 379:14, 388:18, 388:24
**physical** [4] - 284:8, 294:11, 294:19, 303:8
**physicians** [1] - 310:11
**physiologically** [1] - 395:11
**picture** [1] - 327:14
**piece** [4] - 318:4, 339:3, 353:10, 377:11
**pill** [22] - 295:15, 308:15, 308:17, 308:18, 308:24, 309:17, 310:12, 310:13, 310:18, 310:21, 310:23, 311:4, 311:6, 312:10, 343:20, 409:5, 409:10, 409:16, 409:18, 409:23, 409:25
**pills** [2] - 311:9, 417:22
**pimavanserin** [175] - 283:23, 284:4, 284:7, 284:13, 285:20, 286:11, 286:15, 286:19, 286:20, 286:25, 287:4, 287:6, 287:15, 290:1, 290:4, 290:7, 290:8, 290:18, 290:24, 291:25, 292:7, 292:13, 293:10, 293:14, 293:24, 295:6, 295:23, 296:16, 296:20, 297:7, 299:2, 299:12, 300:24, 301:5, 301:15, 301:22, 305:22,

306:3, 306:17, 307:5, 307:7, 307:14, 308:1, 312:15, 312:18, 315:9, 315:11, 319:2, 321:23, 322:1, 323:16, 328:14, 330:16, 330:24, 331:8, 331:9, 331:13, 331:21, 332:14, 333:2, 334:6, 334:8, 334:25, 335:17, 335:18, 335:22, 336:5, 337:11, 337:18, 338:2, 340:10, 341:1, 341:22, 342:2, 342:11, 342:12, 342:14, 342:15, 342:20, 343:19, 343:22, 344:2, 344:4, 344:6, 344:12, 344:14, 345:7, 346:7, 347:12, 347:19, 350:1, 350:2, 350:6, 350:11, 350:13, 350:20, 351:4, 351:6, 351:7, 351:10, 351:24, 353:5, 353:13, 354:13, 355:25, 356:11, 356:13, 357:10, 357:23, 360:9, 362:11, 363:1, 363:15, 364:2, 367:5, 367:13, 367:24, 368:3, 368:6, 368:19, 369:3, 369:10, 370:15, 370:17, 373:18, 375:14, 384:23, 385:11, 385:16, 386:2, 389:16, 390:5, 390:10, 391:23, 392:1, 392:5, 392:19, 392:24, 392:25, 393:3, 393:6, 393:13, 393:17, 394:1, 396:7, 397:10, 397:15, 397:24, 398:10, 398:18, 398:22, 398:25, 400:18, 400:25, 401:2, 401:5, 401:15, 401:18, 402:17, 402:23, 407:12,

407:17, 408:15, 409:11, 411:3, 411:21, 414:7, 416:24, 417:1, 418:19, 424:14, 425:13, 427:16
**pimavanserin-alone** [1] - 351:10
**placed** [2] - 306:12, 337:10
**places** [5] - 347:25, 353:19, 373:13, 399:17, 424:6
**plain** [4] - 376:22, 376:25, 427:5, 427:10
**Plaintiff** [3] - 280:4, 281:8, 429:23
**plan** [3] - 294:9, 430:21, 430:22
**play** [3] - 427:20, 428:12, 429:9
**plus** [1] - 399:22
**point** [13] - 283:12, 284:2, 308:5, 318:3, 331:3, 340:13, 340:16, 375:5, 382:12, 383:22, 389:10, 393:24, 421:12
**pointed** [3] - 390:9, 405:25, 415:1
**pointing** [1] - 361:9
**points** [2] - 323:23, 335:10
**polyethylene** [1] - 396:12
**polymer** [1] - 319:23
**polyvinyl** [1] - 396:12
**poor** [1] - 325:24
**poorly** [1] - 325:22
**population** [8] - 291:15, 291:19, 295:3, 313:4, 313:7, 327:8, 409:12, 409:16
**populations** [2] - 293:18, 314:3
**portion** [5] - 312:5, 312:7, 356:10, 361:24, 406:22
**portions** [5] - 312:2, 314:24, 411:14, 411:18, 416:14
**POSA** [127] - 288:3, 288:7, 289:16, 289:19, 289:25, 291:17, 292:9, 293:9, 295:5, 295:10, 296:3,

296:5, 297:4, 297:16, 298:6, 298:10, 299:12, 299:25, 300:11, 300:19, 302:22, 310:7, 311:8, 311:15, 313:13, 316:9, 316:10, 316:13, 316:14, 316:16, 332:11, 332:12, 332:14, 332:15, 332:24, 333:1, 333:18, 333:24, 334:13, 336:7, 336:10, 337:11, 341:17, 341:25, 342:6, 342:18, 343:7, 343:8, 343:17, 343:21, 344:1, 344:3, 344:5, 344:8, 344:10, 356:24, 358:3, 359:3, 360:8, 360:15, 361:4, 361:5, 363:5, 363:14, 363:16, 363:21, 364:13, 364:23, 365:25, 368:2, 369:24, 370:8, 370:9, 370:19, 370:20, 370:22, 370:25, 371:3, 371:4, 371:14, 372:18, 373:16, 373:17, 373:19, 373:20, 373:24, 374:2, 374:6, 374:14, 378:9, 378:12, 378:15, 379:2, 379:6, 380:5, 380:9, 380:12, 380:17, 380:19, 380:22, 381:11, 382:1, 382:8, 382:14, 390:20, 391:1, 391:19, 394:6, 399:13, 401:12, 403:23, 403:25, 408:13, 409:19, 410:20, 411:17, 412:9, 412:15, 427:5, 427:8, 427:10, 427:15, 428:12, 428:17
**POSA's** [2] - 393:14, 409:20
**POSAs** [2] - 381:1, 426:4
**position** [4] - 376:6, 381:9, 408:17,

408:21
**positions** [2] - 287:23, 375:3
**possession** [3] - 353:25, 366:4, 366:7
**possible** [3] - 310:24, 315:12, 347:6
**potential** [1] - 428:1
**potentially** [3] - 299:11, 365:1, 419:1
**povidone** [1] - 301:12
**powder** [6] - 304:2, 304:4, 401:1, 401:4, 401:6, 401:8
**powders** [1] - 401:10
**power** [2] - 320:23, 401:3
**practice** [3] - 360:1, 371:4, 379:2
**practices** [1] - 319:4
**pre** [3] - 350:17, 350:19, 350:22
**pre-blending** [2] - 350:17, 350:19
**pre-mixing** [1] - 350:22
**preamble** [4] - 367:8, 376:9, 379:10, 429:2
**preblending** [1] - 301:10
**precise** [2] - 321:16, 419:12
**precisely** [2] - 286:22, 327:18
**precondition** [1] - 373:11
**predicted** [1] - 406:1
**prefer** [1] - 354:2
**preferred** [4] - 316:7, 321:18, 347:7, 358:4
**preformulation** [4] - 294:6, 294:10, 297:20, 297:24
**pregelatinized** [2] - 292:19, 301:23
**premix** [1] - 347:12
**premixed** [1] - 358:5
**prepare** [4] - 299:1, 334:15, 372:4, 420:20
**prepared** [8] - 300:4, 303:9, 303:15, 303:19, 344:22, 358:16, 359:8, 364:7
**prescribed** [1] - 413:23
**prescribing** [5] - 409:10, 410:3, 410:16, 411:3, 412:1
**prescription** [1] -

412:21
**presence** [1] - 305:12
**present** [9] - 283:14, 283:21, 292:16, 301:22, 303:3, 374:20, 407:24, 407:25, 429:11
**presumably** [5] - 316:13, 346:13, 391:1, 392:6, 427:22
**pretty** [5] - 304:13, 320:5, 333:22, 334:14, 355:11
**prevalence** [2] - 314:11, 314:14
**previous** [2] - 331:18, 396:25
**primarily** [1] - 291:18
**principle** [1] - 345:15
**priority** [3] - 290:2, 290:5, 330:11
**Private** [1] - 281:17
**probability** [2] - 324:15, 325:4
**problem** [20] - 285:18, 288:14, 289:15, 299:14, 300:22, 301:2, 302:16, 302:21, 306:14, 333:9, 334:22, 352:14, 352:15, 382:9, 400:2, 400:4, 409:11, 420:11, 424:16, 430:22
**problematic** [2] - 418:8, 418:12
**problems** [5] - 300:21, 302:12, 306:24, 308:22, 378:7
**proceeding** [2] - 431:4, 431:8
**proceeds** [1] - 389:17
**process** [30] - 284:11, 295:25, 301:9, 317:19, 320:2, 320:3, 320:4, 320:10, 359:17, 359:25, 364:19, 370:6, 370:7, 370:12, 373:2, 373:5, 373:6, 374:4, 381:11, 384:22, 385:6, 385:8, 385:15, 385:25, 386:20, 386:24, 386:25, 418:21
**processes** [2] - 283:14, 389:14
**processing** [1] - 371:1
**produce** [3] - 339:2,

340:2, 340:8
**produced** [1] - 414:23
**producing** [1] - 389:18
**product** [48] - 290:14, 294:4, 294:18, 294:21, 294:23, 294:25, 295:2, 295:3, 295:5, 295:8, 297:5, 298:24, 300:8, 300:10, 300:21, 307:2, 307:25, 308:12, 322:3, 326:14, 330:23, 331:4, 331:7, 331:19, 336:24, 339:2, 352:9, 363:10, 368:18, 370:1, 370:5, 371:13, 371:14, 371:15, 374:17, 377:10, 399:8, 411:6, 411:7, 413:25, 419:20, 421:2, 421:12, 421:13
**products** [7] - 326:6, 338:7, 371:10, 387:24, 389:18, 400:10
**professional** [1] - 414:6
**profile** [8] - 294:23, 294:25, 295:5, 295:8, 307:25, 330:23, 331:4, 331:19
**program** [1] - 364:16
**pronounced** [4] - 305:23, 307:1, 321:24, 327:22
**proper** [2] - 319:4, 378:13
**properly** [1] - 320:21
**properties** [2] - 284:9, 303:9
**proposing** [1] - 338:1
**prosecution** [2] - 382:10, 406:13
**protection** [1] - 324:17
**proved** [2] - 377:19, 377:22
**provide** [8] - 327:15, 343:24, 345:3, 348:9, 352:15, 354:16, 359:9, 389:20
**provided** [7] - 289:7, 338:13, 348:16,

348:21, 349:18, 360:5, 382:2
**provides** [6] - 326:19, 343:12, 344:22, 358:16, 359:2, 413:24
**providing** [4] - 303:6, 340:22, 389:8, 389:18
**psychosis** [3] - 290:21, 293:17, 295:14
**PTX-0021** [1] - 416:5
**PTX-1175** [1] - 425:1
**PTX-21** [3] - 413:7, 413:19, 416:2
**publicaly** [1] - 425:19
**publications** [2] - 414:11, 414:13
**published** [8] - 296:10, 296:11, 309:3, 309:13, 309:23, 314:7, 316:23, 329:3
**pull** [5] - 282:22, 283:10, 285:9, 289:12, 327:2
**purchase** [1] - 412:23
**pure** [4] - 350:13, 350:22, 351:4, 371:21
**purpose** [11] - 287:14, 369:24, 371:15, 372:13, 372:19, 374:6, 374:8, 378:13, 393:11, 393:16, 417:17
**put** [56] - 294:22, 295:7, 296:20, 311:5, 312:14, 322:3, 322:5, 324:10, 325:1, 326:18, 331:8, 331:21, 332:2, 333:2, 333:5, 333:6, 333:25, 334:2, 334:3, 334:24, 335:6, 335:23, 336:14, 337:24, 340:7, 340:25, 342:19, 344:14, 348:13, 352:7, 352:10, 356:24, 357:2, 363:6, 363:14, 363:15, 371:18, 371:20, 373:18, 380:15, 384:1, 386:16, 391:3, 391:21, 392:4, 392:11,

394:8, 399:9, 400:2, 400:3, 400:9, 401:4, 401:9, 401:13, 414:3
**putting** [8] - 304:1, 324:1, 331:5, 331:13, 348:1, 380:10, 393:17, 399:6
**PVP** [2] - 286:25, 287:4
**pyrrolidone** [1] - 396:12

## Q

**qualification** [1] - 397:3
**qualitative** [1] - 288:11
**quantity** [3] - 304:10, 361:15
**questioning** [1] - 394:10
**questions** [5] - 322:16, 392:15, 426:21, 427:1, 429:5
**quick** [1] - 342:19
**quickly** [1] - 336:10
**quite** [3] - 304:4, 404:6, 421:8
**quote** [2] - 340:7, 361:23
**quote/unquote** [1] - 397:4

## R

**Ragnar** [81] - 289:18, 289:21, 296:5, 296:9, 296:13, 296:14, 296:18, 296:22, 297:1, 299:20, 300:23, 301:1, 301:6, 302:4, 302:24, 303:10, 305:16, 306:1, 306:5, 306:15, 306:22, 307:24, 308:7, 321:6, 321:23, 322:1, 322:2, 327:7, 328:10, 330:21, 332:6, 332:7, 332:11, 333:17, 336:18, 337:8, 341:19, 341:25, 342:2, 342:14, 342:25, 343:9, 344:1, 344:5, 344:7, 344:12, 364:21,

365:25, 404:4, 404:10, 404:24, 405:1, 405:4, 405:17, 406:4, 406:9, 407:16, 407:19, 408:10, 408:11, 408:20, 409:2, 409:22, 409:24, 410:10, 410:13, 410:25, 411:2, 412:2, 416:15, 416:18, 416:23, 416:25, 417:4, 417:12, 417:18, 418:2, 418:15, 422:20, 423:14
**Ragnar-Tolf** [80] - 289:18, 289:21, 296:5, 296:9, 296:13, 296:14, 296:18, 296:22, 297:1, 299:20, 300:23, 301:1, 301:6, 302:4, 302:24, 303:10, 305:16, 306:1, 306:5, 306:15, 306:22, 307:24, 308:7, 321:6, 322:1, 322:2, 327:7, 328:10, 330:21, 332:6, 332:7, 332:11, 333:17, 336:18, 337:8, 341:19, 341:25, 342:2, 342:14, 342:25, 343:9, 344:1, 344:5, 344:7, 344:12, 364:21,
**Ragnar-Tolf's** [1] - 321:23
**raise** [1] - 422:14
**raised** [1] - 422:19

**raises** [1] - 420:7
**ran** [1] - 370:12
**range** [4] - 296:25, 340:19, 343:2, 355:11
**rare** [1] - 326:8
**rate** [2] - 350:5, 427:23
**rates** [2] - 382:24, 383:2
**rather** [3] - 323:4, 430:11, 430:14
**reach** [2] - 408:14, 408:24
**read** [28] - 283:3, 286:1, 288:22, 314:13, 315:19, 317:9, 318:25, 321:12, 338:24, 340:16, 351:23, 352:24, 355:1, 369:17, 370:2, 380:9, 380:20, 381:1, 381:13, 388:2, 390:8, 393:10, 393:23, 398:13, 399:6, 403:13, 403:25, 427:11
**reading** [24] - 284:19, 295:11, 296:21, 298:15, 305:21, 306:4, 306:22, 327:6, 327:7, 341:18, 356:19, 359:3, 370:19, 373:16, 381:12, 391:1, 391:19, 393:14, 398:24, 399:12, 403:23, 408:18, 427:6
**reads** [14] - 285:6, 286:6, 287:16, 287:20, 287:21, 315:16, 370:8, 370:9, 371:3, 372:10, 373:17, 378:15, 378:17, 398:15
**real** [2] - 371:16, 371:17
**reality** [1] - 415:9
**realize** [1] - 298:15
**really** [10] - 287:18, 305:13, 345:6, 355:7, 355:15, 361:6, 374:9, 386:8, 397:21, 417:25
**reason** [12] - 323:11, 324:3, 325:11, 327:19, 357:4,

360:15, 371:16, 371:17, 375:24, 383:21, 402:25, 411:18
**reasonable** [2] - 335:16, 344:15
**Reasons** [1] - 407:2
**reasons** [23] - 287:20, 288:1, 312:16, 322:22, 323:10, 323:17, 324:9, 324:23, 325:15, 343:7, 347:7, 352:3, 352:6, 377:7, 390:23, 390:24, 391:4, 392:14, 407:6, 407:7, 408:19, 422:16
**receive** [1] - 363:8
**recently** [1] - 338:5
**recess** [1] - 423:5
**recite** [5] - 354:24, 371:23, 372:21, 372:24, 373:9
**recited** [1] - 376:17
**recognize** [4] - 297:19, 298:7, 349:2, 384:8
**recognized** [2] - 327:11, 409:10
**recommended** [1] - 291:1
**record** [1] - 430:4
**red** [4] - 420:7, 421:10, 422:14, 422:19
**redirect** [2] - 426:24, 426:25
**reduce** [5] - 310:12, 310:24, 311:4, 311:9, 343:20
**reduced** [1] - 303:3
**reduces** [2] - 311:6, 311:7
**reducing** [3] - 311:3, 311:16, 333:20
**reenforce** [1] - 310:7
**reenforces** [1] - 308:9
**refer** [8] - 285:17, 308:25, 309:10, 309:20, 314:4, 316:25, 329:5, 417:20
**reference** [29] - 289:18, 309:1, 309:11, 309:16, 309:21, 314:5, 314:19, 315:14, 316:19, 316:20, 316:25, 321:7,

322:12, 328:9,
328:25, 329:1,
329:6, 332:8,
341:19, 347:1,
394:5, 401:2, 401:3,
406:9, 407:19,
408:4, 424:8, 424:9
**references** [9] - 310:1,
313:20, 317:13,
328:2, 405:14,
405:18, 405:24,
406:1, 406:4
**referred** [5] - 348:4,
401:8, 415:4,
416:14, 424:2
**referring** [1] - 387:7
**refers** [4] - 351:14,
387:17, 401:9,
402:17
**reflects** [1] - 295:10
**reformulate** [4] -
312:11, 343:22,
410:25, 411:4
**reformulated** [2] -
294:23, 411:7
**reformulation** [1] -
296:1
**regard** [4] - 283:2,
283:7, 315:8, 349:10
**regarded** [3] - 284:24,
285:1, 285:12
**regarding** [11] -
296:19, 306:2,
346:20, 359:9,
371:24, 372:10,
380:7, 383:8,
383:16, 394:2, 414:6
**regime** [1] - 310:18
**regular** [1] - 325:10
**regulation** [1] - 301:9
**regulations** [1] -
419:15
**regulatory** [2] -
377:20, 377:23
**reinforces** [1] - 308:7
**rejections** [1] - 382:16
**relate** [1] - 296:14
**related** [3] - 314:16,
358:21, 379:1
**relating** [3] - 401:24,
402:1, 415:2
**relationship** [1] -
328:17
**relative** [4] - 300:6,
300:13, 316:2,
326:21
**relatively** [3] - 300:21,
326:8, 371:10
**release** [2] - 292:11,
295:21, 312:23,

352:9, 352:14,
399:8, 400:9
**released** [2] - 290:13,
427:23
**reliable** [1] - 389:15
**relied** [5] - 415:12,
418:17, 423:21,
423:23, 424:6
**rely** [1] - 387:11
**relying** [3] - 406:10,
407:20, 415:22
**remain** [2] - 318:4,
336:7
**remained** [1] - 336:4
**remember** [1] - 416:7
**render** [1] - 288:2
**rendered** [1] - 377:1
**reopen** [1] - 430:20
**repeat** [2] - 373:3,
376:3
**repeatedly** [2] -
299:16, 420:10
**repel** [1] - 352:20
**replaced** [1] - 302:14
**replicate** [1] - 355:22
**replicates** [1] - 304:7
**report** [1] - 374:21
**reported** [1] - 339:16
**reporter** [5] - 304:21,
352:4, 369:4,
377:21, 388:22
**REPORTER'S** [1] -
281:24
**reports** [1] - 376:5
**represent** [1] - 380:1
**request** [1] - 429:9
**require** [16] - 323:6,
323:18, 323:21,
324:17, 324:25,
368:15, 369:15,
372:25, 373:1,
373:4, 373:6,
373:10, 374:3,
382:20, 382:24,
383:15
**required** [8] - 289:22,
340:4, 364:8, 368:2,
370:7, 373:22,
374:16, 374:24
**requirement** [4] -
331:6, 373:8,
373:10, 375:7
**requirements** [1] -
368:19
**requires** [2] - 307:2,
374:10
**requiring** [3] - 372:2,
372:22, 374:7
**research** [1] - 364:16
**respect** [9] - 283:15,

328:2, 328:6, 328:9,
346:1, 374:21,
409:2, 411:25, 415:7
**respectively** [1] -
339:11
**response** [1] - 429:16
**responses** [1] - 309:9
**rest** [5] - 318:25,
368:1, 376:11,
392:22, 429:12
**result** [6] - 320:19,
340:18, 379:3,
421:11, 428:15,
428:16
**resulted** [1] - 360:6
**resulting** [5] - 303:9,
350:13, 362:16,
387:23, 389:15
**Results** [1] - 379:8
**results** [11] - 283:22,
284:1, 298:6, 300:2,
304:5, 320:11,
349:12, 349:15,
378:25, 403:22,
422:13
**retake** [1] - 282:6
**review** [3] - 403:15,
403:20, 426:12
**reviewed** [3] - 313:20,
382:10, 414:8
**revolves** [1] - 393:21
**RICHARD** [1] - 281:15
**right-hand** [3] - 312:8,
314:10, 361:9
**risk** [2] - 300:14, 430:7
**robust** [1] - 389:15
**Rolfe** [3] - 280:25,
282:2, 431:9
**room** [4] - 363:16,
363:17, 363:18,
363:20
**roughly** [1] - 336:8
**round** [3] - 290:9,
292:11, 293:19
**rounded** [3] - 318:1,
318:6, 318:17
**route** [1] - 295:19
**row** [1] - 300:5
**RPR** [3] - 280:25,
282:2, 431:9
**Rsd** [18] - 300:5,
300:6, 300:9, 419:9,
419:25, 420:14,
421:4, 421:15,
421:20, 421:22,
421:25, 422:7,
422:15, 422:18,
423:12, 424:8, 424:9
**run** [4] - 335:7,
335:11, 364:16,

389:11

---

## S

---

**safety** [1] - 316:22
**salient** [1] - 361:8
**saliva** [6] - 323:3,
323:20, 324:13,
325:3, 325:6, 325:20
**salt** [4] - 292:2,
295:23, 384:24,
395:12
**sample** [1] - 421:6
**samples** [2] - 421:22,
422:9
**SAUL** [1] - 281:3
**save** [3] - 311:17,
350:14, 350:15
**savings** [2] - 312:19,
312:25
**saw** [2] - 302:16,
355:24
**scale** [5] - 369:15,
369:25, 370:4,
372:17, 374:11
**Schiele** [4] - 329:5,
329:8, 329:15,
330:19
**SCHIFF** [1] - 281:15
**scientific** [1] - 395:3
**scope** [8] - 286:6,
353:19, 357:22,
359:20, 365:2,
366:8, 380:7, 386:9
**SCOTT** [1] - 281:6
**Scott** [1] - 429:18
**screen** [6] - 295:9,
301:18, 318:23,
350:15, 406:6
**screened** [1] - 351:6
**screw** [1] - 386:10
**search** [4] - 294:5,
296:1, 296:4, 410:22
**seated** [2] - 282:5,
366:20, 423:6
**second** [3] - 283:17,
290:15, 300:5,
310:13, 335:13,
339:19, 340:13,
342:5, 343:5,
362:13, 363:6,
391:16, 405:20
**second-to-last** [1] -
300:5
**section** [16] - 290:16,
290:22, 291:13,
291:23, 322:17,
323:13, 324:5,
324:22, 325:12,
379:7, 381:1,

381:14, 387:23,
389:7, 394:24, 407:2
**see** [62] - 287:25,
288:6, 297:16,
300:19, 302:20,
306:24, 307:1,
307:2, 307:4, 307:7,
307:10, 307:11,
307:13, 321:10,
322:12, 322:14,
330:2, 338:19,
338:22, 339:6,
339:21, 352:16,
366:25, 367:2,
371:11, 371:13,
373:24, 376:20,
377:15, 378:19,
381:21, 384:3,
384:22, 385:1,
385:3, 385:10,
386:3, 386:25,
393:24, 394:1,
394:4, 394:5,
395:18, 398:6,
398:11, 398:20,
398:21, 402:9,
406:14, 407:4,
408:2, 408:3,
412:18, 420:6,
420:18, 421:8,
421:15, 421:17,
421:19, 422:12,
424:14, 426:18
**seeing** [2] - 348:11,
420:11
**seeking** [2] - 294:4,
380:19
**seem** [2] - 310:15,
391:8
**sees** [2] - 372:13,
373:19
**SEITZ** [1] - 281:13
**select** [7] - 319:2,
324:24, 326:24,
328:13, 330:23,
342:7, 400:7
**selecting** [1] - 330:16
**send** [1] - 405:22
**sense** [2] - 311:18,
313:17, 319:16,
328:19, 366:1,
372:6, 372:12,
381:3, 399:12,
409:21, 410:8, 411:8
**sentence** [5] - 306:9,
314:13, 318:23,
340:13, 393:15
**sentences** [1] - 389:19
**separate** [1] - 422:16
**series** [2] - 385:1,

385:10
**serve** [1] - 295:3
**set** [5] - 288:13, 289:15, 360:23, 365:17, 404:21
**sets** [3] - 298:8, 368:1, 421:17
**several** [7] - 292:8, 352:3, 352:5, 388:8, 395:9, 405:8, 414:11
**shape** [7] - 315:22, 321:17, 409:5, 410:4, 410:7, 410:11, 410:15
**shapes** [1] - 329:17
**Shear** [1] - 340:14
**shear** [6] - 283:18, 340:18, 350:3, 359:24, 386:10
**shelf** [1] - 428:10
**shell** [12] - 286:12, 298:18, 328:14, 328:18, 339:3, 342:6, 342:7, 342:10, 367:17, 389:3, 389:6, 407:12
**shells** [1] - 297:10, 297:14, 307:8, 307:9, 343:10, 344:7, 400:21, 400:23, 401:5
**shield** [2] - 325:6, 327:18
**shorthand** [1] - 300:6
**show** [6] - 314:19, 316:4, 339:8, 345:22, 391:25, 422:1
**showed** [1] - 412:9
**showing** [8] - 300:13, 303:18, 303:19, 304:7, 332:20, 333:18, 350:25, 399:15
**shown** [2] - 327:14, 393:4
**shows** [9] - 307:4, 317:9, 321:13, 339:10, 339:12, 346:20, 422:3, 422:5, 426:4
**shut** [2] - 430:12, 430:14
**shutdown** [1] - 430:8
**side** [8] - 315:15, 328:3, 353:18, 359:15, 360:19, 361:9, 405:15, 430:23
**sieve** [1] - 301:16

**sieving** [3] - 299:16, 420:10
**significant** [5] - 303:23, 304:1, 310:15, 312:24, 403:11
**silicon** [9] - 347:14, 347:16, 347:22, 354:8, 397:11, 397:16, 399:22, 399:23
**similar** [4] - 305:9, 348:16, 391:12, 402:16
**similarly** [4] - 390:3, 392:22, 409:22, 410:16
**simple** [2] - 388:18, 391:11
**simpler** [4] - 324:1, 324:20, 325:10, 392:15
**simplifying** [1] - 310:17
**simply** [3] - 400:14, 408:13, 421:5
**single** [7] - 293:12, 311:6, 312:15, 312:18, 332:15, 343:19, 421:2
**site** [1] - 338:12
**situation** [2] - 362:25, 363:22
**size** [91] - 284:12, 286:12, 286:15, 287:15, 287:19, 294:12, 301:17, 315:22, 318:2, 318:6, 318:21, 328:13, 328:18, 329:18, 329:21, 330:5, 330:7, 330:11, 330:13, 330:16, 330:18, 331:7, 331:14, 331:21, 332:2, 332:10, 332:25, 333:4, 333:5, 335:18, 335:23, 336:14, 337:19, 339:3, 339:9, 339:11, 340:10, 341:1, 342:6, 342:7, 342:20, 343:6, 343:22, 350:21, 353:9, 360:5, 362:15, 362:20, 367:16, 367:19, 373:18, 389:3, 389:6, 389:11,

389:16, 389:23, 390:1, 390:2, 391:3, 391:15, 391:21, 392:5, 392:13, 393:17, 394:1, 394:9, 407:12, 409:6, 411:10, 412:2, 412:14, 416:24, 417:2, 417:5, 417:6, 417:11, 417:14, 417:15, 417:16
**sized** [2] - 392:12, 401:13
**sizes** [4] - 329:23, 330:4, 400:15, 400:23
**skill** [97] - 283:6, 284:23, 289:19, 290:17, 290:23, 291:4, 291:14, 291:25, 292:7, 292:15, 293:3, 293:23, 294:3, 294:9, 294:15, 295:25, 296:18, 296:22, 297:19, 297:23, 298:14, 298:23, 299:19, 305:2, 305:7, 305:19, 305:21, 306:2, 306:16, 306:21, 307:25, 308:6, 308:8, 308:13, 310:2, 312:11, 312:13, 312:17, 313:6, 313:11, 313:15, 313:21, 314:20, 315:8, 315:10, 316:5, 317:10, 318:8, 318:12, 318:14, 319:1, 319:14, 319:25, 320:1, 321:13, 321:20, 321:25, 322:4, 322:19, 323:15, 324:7, 324:23, 325:13, 326:9, 326:14, 326:24, 327:5, 328:13, 328:16, 328:20, 329:9, 330:10, 330:15, 330:22, 331:4, 331:12, 331:19, 332:4, 332:9, 333:8, 333:13, 335:15, 335:20, 336:21, 337:4, 340:21, 349:2, 349:10,

349:13, 356:14, 361:14, 361:19, 362:25, 363:25, 364:1, 364:5, 395:4
**slide** [46] - 282:20, 283:5, 285:6, 287:16, 287:23, 289:7, 293:2, 293:22, 295:4, 297:22, 299:18, 301:4, 301:7, 302:4, 303:8, 305:18, 306:15, 307:23, 309:25, 326:23, 328:3, 329:8, 330:22, 331:11, 332:8, 333:12, 335:25, 337:3, 341:12, 343:12, 344:22, 345:25, 346:19, 349:17, 350:24, 353:11, 354:18, 355:18, 355:22, 357:17, 358:16, 359:8, 359:15, 361:9, 364:7, 365:7
**slurries** [1] - 417:23
**small** [17] - 284:10, 284:15, 285:2, 285:3, 285:13, 286:4, 289:24, 292:1, 295:18, 304:10, 305:6, 305:10, 324:12, 326:19, 358:6, 360:21, 403:13
**smaller** [12] - 311:11, 316:12, 316:16, 328:20, 329:10, 329:23, 329:25, 344:4, 367:19, 408:1, 411:14, 411:18
**smell** [1] - 327:18
**smooth** [1] - 321:17
**socioeconomic** [2] - 309:18, 310:15
**sodium** [2] - 418:7
**soft** [1] - 321:16
**solid** [2] - 315:20, 322:13
**solubility** [1] - 294:16
**Soluble** [1] - 323:13
**soluble** [2] - 323:16, 326:1
**solution** [8] - 300:17, 301:2, 301:12, 306:13, 324:1, 324:20, 331:23,

331:25
**solutions** [1] - 325:10
**solve** [1] - 300:22
**solved** [1] - 334:23
**solvent** [1] - 302:5
**solvents** [1] - 307:15
**solving** [1] - 333:9
**sometimes** [6] - 311:5, 317:23, 318:20, 336:25, 371:8, 420:22
**somewhere** [2] - 343:1, 413:4
**sorry** [17] - 304:23, 313:1, 318:1, 321:7, 322:6, 322:8, 348:11, 372:8, 379:21, 393:1, 404:6, 415:13, 416:20, 417:6, 423:22, 424:15, 424:24
**sorts** [2] - 357:13, 357:14
**sound** [1] - 378:23
**space** [1] - 363:20
**spatula** [1] - 371:20
**speaking** [2] - 325:7, 400:9
**spec** [3] - 373:21, 374:5, 374:10
**special** [2] - 360:22, 360:23
**specific** [10] - 347:13, 358:5, 400:18, 400:20, 400:25, 401:2, 401:5, 410:15
**specifically** [5] - 327:21, 385:7, 426:7, 426:15, 428:13
**specification** [49] - 282:18, 283:12, 285:19, 285:22, 286:1, 286:3, 286:7, 288:17, 345:6, 345:15, 345:20, 345:22, 347:1, 348:1, 349:8, 349:19, 355:14, 355:19, 358:2, 358:23, 359:5, 359:9, 360:18, 361:3, 361:14, 361:18, 363:23, 364:4, 365:20, 366:3, 366:11, 369:18, 369:20, 369:24, 370:3, 372:13, 373:12,

**statistical** [1] - 300:7
**status** [2] - 309:18, 310:15
**stay** [1] - 334:14
**stearate** [30] - 292:19, 299:9, 301:20, 302:2, 304:20, 304:22, 304:24, 305:7, 305:10, 305:12, 333:24, 334:11, 342:17, 351:17, 351:21, 352:1, 352:6, 352:10, 352:15, 352:16, 353:1, 353:8, 356:2, 356:21, 356:22, 398:19, 398:23, 399:1, 399:7
**Stegemann** [11] - 315:13, 316:20, 317:1, 317:3, 321:7, 328:4, 328:7, 330:3, 339:16, 414:19, 415:16
**stenographic** [1] - 431:7
**step** [3] - 350:5, 350:18, 350:19
**Stephen** [2] - 426:8, 426:13
**steps** [7] - 370:24, 371:2, 371:5, 371:9, 385:2, 385:9, 385:10
**Steven** [1] - 429:16
**STEVEN** [1] - 429:22
**stick** [2] - 320:9
**still** [3] - 289:6, 302:17, 420:11
**stop** [2] - 350:2, 422:23
**straightforwardly** [1] - 344:10
**strategies** [1] - 426:6
**strategy** [1] - 424:13
**Strategy** [1] - 425:12
**street** [1] - 412:17
**STREIFTHAU** [1] - 281:3
**STREIFTHAU-LIVIZOS** [1] - 281:3
**strength** [1] - 291:2
**strengths** [1] - 423:17
**strike** [1] - 401:25
**strong** [1] - 325:6
**structure** [1] - 315:23
**studies** [5] - 294:6, 294:10, 294:18, 310:6, 329:1
**study** [11] - 297:6,

298:6, 298:11, 298:16, 308:22, 309:7, 309:17, 313:25, 315:24, 315:25, 417:25
**stuff** [1] - 427:7
**subdivide** [2] - 411:14, 411:18
**subject** [2] - 283:1, 404:14
**subjected** [1] - 404:11
**substance** [30] - 294:7, 294:11, 294:13, 294:16, 294:20, 295:18, 297:8, 297:10, 298:18, 299:13, 299:25, 301:10, 306:23, 322:6, 323:3, 323:20, 324:2, 325:6, 325:19, 325:22, 326:18, 327:22, 332:18, 333:19, 350:23, 363:10, 371:18, 378:6, 394:8, 428:6
**substantial** [1] - 310:21
**succeeded** [1] - 335:21
**success** [2] - 335:16, 344:16
**successfully** [1] - 284:7
**suddenly** [1] - 421:7
**sufficient** [1] - 332:1
**sufficiently** [1] - 393:13
**suitable** [2] - 378:1, 396:11
**summarize** [1] - 336:3
**summarized** [1] - 421:21
**summarizes** [2] - 287:23, 327:4
**summarizing** [8] - 282:20, 293:2, 306:15, 326:23, 341:12, 353:11, 357:17, 365:8
**summary** [2] - 343:17, 357:21
**supposed** [9] - 286:3, 286:4, 286:8, 287:3, 287:12, 288:17, 291:7, 302:3, 346:12
**supposedly** [2] - 288:7, 304:7
**surface** [3] - 315:22,

315:23, 325:18
**surprise** [1] - 380:1
**surprising** [4] - 284:6, 337:18, 337:21, 389:14
**suspensions** [1] - 417:23
**Sven** [3] - 316:20, 414:19, 415:16
**swallow** [26] - 295:21, 315:12, 316:3, 316:6, 316:8, 316:12, 316:17, 326:10, 326:19, 327:12, 327:25, 328:21, 329:10, 329:20, 329:24, 329:25, 330:8, 330:20, 331:7, 342:8, 343:23, 408:1, 410:17, 427:17
**swallowability** [2] - 415:3, 415:7
**swallowing** [20] - 295:16, 308:15, 313:3, 313:8, 313:14, 313:22, 314:15, 314:18, 314:21, 315:7, 315:21, 326:16, 327:8, 328:18, 329:2, 409:6, 410:21, 410:24, 411:1, 412:10
**syrups** [1] - 417:23
**system** [1] - 350:22

**T**

**table** [41] - 298:5, 298:16, 300:1, 300:4, 303:13, 303:17, 303:18, 321:10, 329:14, 329:15, 330:3, 330:4, 333:17, 338:17, 339:5, 339:8, 339:16, 351:14, 355:23, 356:4, 356:5, 356:7, 356:10, 356:13, 356:15, 365:25, 400:25, 403:2, 403:6, 417:4, 419:3, 419:6, 419:8, 423:13, 423:15, 424:1, 424:7, 424:8
**tables** [4] - 303:13, 330:11, 355:23,

411:20
**tablet** [30] - 297:18, 298:25, 319:19, 319:22, 320:2, 320:5, 320:6, 320:8, 320:17, 323:16, 324:21, 324:24, 326:7, 336:23, 337:1, 337:9, 341:18, 399:9, 409:6, 410:11, 410:17, 411:1, 411:10, 411:17, 411:25, 412:2, 412:4, 412:19, 413:22
**tablets** [101] - 289:17, 289:21, 290:6, 290:7, 290:8, 290:19, 290:25, 291:3, 291:6, 291:7, 291:8, 291:9, 291:11, 291:16, 292:12, 292:17, 292:18, 293:4, 293:8, 293:13, 293:19, 295:6, 295:11, 299:1, 300:3, 303:16, 304:17, 306:7, 306:11, 306:25, 307:3, 307:6, 308:6, 308:10, 308:18, 311:2, 311:12, 311:13, 311:14, 311:16, 312:12, 315:25, 316:2, 316:3, 317:25, 318:1, 318:5, 318:6, 318:17, 318:20, 319:17, 319:20, 319:25, 320:8, 320:14, 320:15, 320:16, 320:19, 323:23, 324:25, 325:10, 325:11, 325:20, 326:1, 326:2, 326:4, 327:6, 329:2, 329:17, 329:18, 329:19, 329:21, 336:19, 337:5, 337:14, 341:23, 342:1, 342:3, 343:19, 344:9, 404:5, 404:10, 405:4, 409:3, 409:6, 410:13, 411:13, 411:16, 411:20, 411:21, 412:23, 412:24, 413:2,

373:15, 375:23, 378:12, 378:17, 378:20, 381:7, 381:16, 394:24, 399:18, 401:19, 403:16, 427:7
**specifications** [3] - 378:5, 379:5, 400:15
**specified** [1] - 408:19
**specifies** [1] - 308:8
**specify** [2] - 385:10, 386:4
**specifying** [1] - 386:11
**speed** [3] - 362:6, 362:10, 371:25
**spent** [1] - 375:3
**spots** [1] - 346:25
**spray** [3] - 340:1, 361:25, 362:14
**sprayed** [1] - 350:4
**spraying** [3] - 361:20, 362:1, 362:16
**sprinklers** [1] - 430:7
**stability** [4] - 297:12, 302:13, 382:20, 392:12
**stable** [4] - 296:16, 334:15, 413:23, 428:3
**stand** [3] - 282:6, 417:6, 429:17
**standard** [2] - 300:6, 300:13
**starch** [3] - 292:19, 301:23, 418:7
**start** [9] - 294:5, 295:25, 315:14, 430:11, 430:20, 430:21, 430:22, 430:23, 431:2
**starting** [7] - 292:5, 305:18, 321:10, 323:17, 359:15, 387:14, 397:21
**starts** [6] - 292:4, 298:22, 314:11, 338:19, 402:22, 402:23
**state** [2] - 335:20, 413:22
**statement** [3] - 295:1, 348:4, 407:7
**statements** [1] - 426:16
**STATES** [2] - 280:1, 280:15
**states** [3] - 367:12, 407:7, 407:22
**stating** [1] - 350:1

414:7, 417:22, 418:1
**Tablets** [2] - 323:14, 324:22
**tablets..** [1] - 292:5
**talks** [14] - 300:5, 301:7, 301:8, 317:12, 329:16, 348:1, 348:17, 360:20, 361:25, 373:12, 374:11, 409:24, 417:5, 417:21
**tapped** [3] - 294:13, 303:19, 424:4
**target** [15] - 284:8, 294:23, 294:25, 295:2, 295:5, 295:8, 307:25, 330:23, 331:3, 331:18, 394:8, 408:14, 408:25, 409:16
**tartrate** [66] - 286:20, 286:25, 287:4, 287:6, 290:8, 292:2, 292:13, 293:11, 293:15, 295:23, 296:20, 297:7, 299:2, 300:24, 301:5, 305:23, 306:3, 307:5, 307:7, 307:14, 312:15, 312:18, 331:9, 331:14, 331:21, 333:3, 334:6, 334:8, 335:1, 335:17, 335:18, 335:22, 336:5, 337:12, 337:19, 342:2, 342:12, 342:14, 342:16, 342:20, 343:22, 344:2, 344:4, 344:6, 344:12, 344:14, 345:7, 347:12, 347:19, 350:6, 353:13, 354:13, 355:25, 357:23, 363:15, 368:7, 375:15, 393:6, 397:11, 397:15, 397:24, 398:18, 400:18, 401:18, 407:12, 418:19
**taste** [34] - 294:14, 305:24, 306:7, 306:8, 306:14, 307:1, 307:2, 308:10, 320:6, 320:20, 320:21, 320:22, 321:18,

321:24, 322:2, 323:19, 324:14, 324:15, 325:4, 325:5, 325:24, 326:17, 326:20, 327:16, 327:18, 327:22, 331:6, 343:24, 409:7, 411:5, 427:17
**taste-masked** [2] - 320:20, 320:21
**taste-masking** [12] - 306:7, 306:8, 307:2, 308:10, 323:19, 326:17, 326:20, 327:16, 331:6, 343:24, 409:7, 411:5
**tastes** [1] - 306:6
**tasting** [1] - 325:22
**taught** [4] - 306:16, 332:8, 332:11, 332:12
**teach** [6] - 306:1, 345:22, 366:11, 369:20, 369:21
**teaching** [2] - 360:18, 369:20
**technical** [1] - 395:2
**technique** [1] - 340:24
**techniques** [1] - 340:8
**technologies** [2] - 339:20, 339:25
**ten** [1] - 296:12
**tend** [3] - 318:17, 378:12
**tended** [2] - 299:10, 418:25
**tendency** [6] - 299:13, 300:19, 306:23, 308:23, 420:8, 421:11
**tends** [1] - 300:1
**term** [16] - 282:16, 282:23, 288:2, 288:19, 376:1, 376:15, 376:19, 377:1, 377:3, 378:14, 379:23, 380:23, 381:5, 388:5, 427:3
**terms** [5] - 297:11, 355:10, 380:10, 395:3, 402:4
**test** [1] - 294:16
**tested** [5] - 297:11, 297:16, 298:8, 298:9
**testified** [4] - 377:7, 412:8, 425:16, 429:24
**testifying** [2] - 374:20,

375:3
**testimony** [12] - 378:22, 378:23, 386:23, 387:7, 412:13, 414:10, 416:15, 419:12, 419:21, 421:21, 426:13, 429:10
**testing** [8] - 298:17, 392:17, 392:24, 392:25, 393:4, 393:21, 403:22, 416:25
**tests** [1] - 393:25
**text** [2] - 389:5, 415:2
**texture** [1] - 321:18
**THE** [84] - 280:1, 280:2, 282:5, 282:23, 283:11, 285:10, 285:11, 285:15, 285:16, 285:18, 289:13, 292:24, 293:8, 294:3, 298:3, 299:24, 302:9, 304:22, 306:21, 307:20, 308:5, 310:6, 311:22, 315:3, 321:3, 327:4, 329:14, 331:3, 331:18, 333:17, 336:3, 337:8, 341:5, 341:8, 341:16, 343:17, 346:6, 346:25, 349:14, 349:15, 349:23, 351:3, 352:5, 353:18, 355:22, 357:21, 358:21, 364:13, 365:12, 366:16, 366:20, 369:5, 377:22, 384:14, 406:19, 416:5, 416:11, 422:22, 423:2, 423:6, 424:23, 424:25, 425:5, 426:22, 426:23, 427:1, 427:2, 427:3, 427:6, 427:9, 427:13, 427:14, 427:19, 428:22, 428:24, 429:5, 429:7, 429:13, 429:20, 430:1, 430:5, 430:16, 430:21, 431:17
**themselves** [4] - 334:11, 373:25, 391:13, 411:20

**therapy** [4] - 308:23, 309:9, 309:19, 310:19
**thereafter** [1] - 398:2
**therefore** [2] - 282:25, 360:4
**thereof** [1] - 384:24
**thinking** [4] - 298:11, 298:16, 326:11, 326:13
**thinks** [1] - 371:1
**third** [6] - 291:22, 323:18, 329:21, 342:10, 384:5
**thousand** [1] - 369:8
**thousands** [2] - 412:22, 412:24
**three** [11] - 335:10, 346:25, 370:23, 376:17, 381:23, 396:24, 397:4, 403:11, 418:13, 420:25, 421:3
**throughout** [1] - 417:19
**time-consuming** [1] - 320:3
**TIMOTHY** [1] - 281:10
**title** [4] - 316:22, 387:22, 389:7, 425:14
**titled** [2] - 379:7, 425:12
**today** [3] - 374:20, 414:23, 416:16
**together** [9] - 291:8, 294:22, 295:7, 301:24, 331:5, 337:24, 340:7, 376:17, 389:1
**token** [1] - 358:22
**Tolf** [80] - 289:18, 289:21, 296:5, 296:9, 296:13, 296:14, 296:18, 296:22, 297:1, 299:20, 300:23, 301:1, 301:6, 302:4, 302:24, 303:10, 305:16, 306:1, 306:5, 306:15, 306:22, 307:24, 308:7, 321:6, 322:1, 322:2, 327:7, 328:10, 330:21, 332:6, 332:7, 332:11, 333:17, 336:18, 337:8, 341:19, 341:25, 342:2, 342:14,

342:25, 343:9, 344:1, 344:5, 344:7, 365:25, 404:4, 404:10, 404:24, 405:1, 405:4, 405:17, 406:4, 406:9, 407:16, 407:19, 408:10, 408:11, 408:20, 409:2, 409:22, 409:24, 410:10, 410:13, 410:25, 411:2, 412:2, 416:15, 416:18, 416:23, 416:25, 417:4, 417:12, 417:18, 418:2, 418:15, 422:20, 423:14
**Tolf's** [1] - 321:23
**tomorrow** [4] - 414:23, 430:12, 430:15, 430:22
**took** [3] - 408:4, 418:15, 419:3
**top** [6] - 304:3, 304:4, 329:14, 340:1, 402:21, 421:25
**total** [2] - 333:5, 334:3
**TOUHEY** [1] - 281:10
**towards** [4] - 374:14, 406:5, 407:1, 412:10
**training** [7] - 313:16, 318:9, 319:15, 321:21, 328:17, 328:19, 409:20
**transcript** [1] - 431:7
**treat** [3] - 291:15, 311:11, 363:7
**treated** [2] - 295:12, 310:23
**treating** [1] - 293:15
**treatment** [4] - 290:20, 293:18, 295:17, 314:2
**treats** [1] - 290:18
**trial** [3] - 281:24, 364:23, 365:5
**Trial** [1] - 280:11
**trick** [1] - 376:14
**tried** [2] - 299:14, 302:10
**trivial** [1] - 378:23
**trouble** [5] - 308:15, 314:17, 326:15, 348:11, 385:18
**true** [3] - 414:2, 420:17, 431:6
**truth** [1] - 429:24

**try** [16] - 288:3, 311:1, 312:14, 322:5, 334:4, 334:20, 347:8, 360:12, 372:16, 373:16, 381:2, 381:15, 381:18, 382:1, 408:16, 408:23
**trying** [12] - 299:17, 331:20, 340:7, 369:18, 373:21, 380:15, 380:16, 380:17, 380:23, 381:12, 383:22, 388:4
**Tuesday** [1] - 280:11
**turn** [38] - 290:10, 290:15, 291:12, 291:23, 296:7, 296:17, 297:1, 298:21, 302:24, 305:15, 305:25, 308:20, 309:5, 309:15, 313:24, 314:9, 316:18, 317:3, 321:9, 322:7, 322:9, 322:17, 324:4, 325:12, 328:22, 337:22, 338:16, 339:18, 352:21, 355:21, 364:12, 367:3, 394:16, 399:9, 404:1, 406:12, 407:1
**turned** [1] - 302:11
**turning** [5] - 399:23, 400:1, 405:6, 423:20, 424:11
**twice** [3] - 319:11, 379:18, 380:2
**twin** [1] - 386:10
**two** [61] - 288:1, 291:2, 291:7, 291:8, 293:13, 297:14, 298:8, 298:18, 300:12, 301:23, 303:13, 306:24, 311:8, 314:10, 317:24, 318:4, 318:15, 319:21, 335:24, 339:3, 340:2, 341:23, 343:19, 345:5, 347:9, 351:10, 352:12, 353:10, 354:4, 354:5, 355:23, 356:21, 358:4, 368:22, 370:23, 389:1, 390:25, 396:24,

397:4, 401:24, 402:21, 403:13, 411:13, 411:15, 411:22, 414:6, 418:13, 419:15, 419:18, 420:21, 420:25, 421:3, 421:6, 421:17, 421:22, 422:6, 422:11, 422:12, 422:16, 425:7
**two-piece** [3] - 318:4, 339:3, 353:10
**type** [2] - 386:5, 418:10
**types** [3] - 298:18, 417:21, 426:6
**typical** [9] - 336:12, 360:2, 370:23, 401:1, 401:3, 401:4, 401:6, 401:8, 420:25
**typically** [4] - 302:11, 319:20, 370:22, 420:18

## U

**U.S** [2] - 413:14, 431:9
**ultimately** [1] - 422:18
**un-huh** [2] - 384:18, 395:24
**unacceptable** [25] - 284:1, 288:12, 349:12, 349:14, 349:15, 378:18, 379:1, 380:22, 381:2, 381:17, 383:20, 387:21, 387:24, 388:8, 388:15, 388:25, 389:18, 390:17, 390:25, 391:7, 391:10, 392:8, 394:13, 394:15
**uncoated** [1] - 316:3
**under** [4] - 298:8, 298:12, 374:24
**underlying** [1] - 403:15
**underneath** [2] - 340:13, 340:14
**understandable** [1] - 377:5
**understood** [3] - 365:21, 395:4, 418:22
**undesirable** [5] - 419:10, 421:23, 421:24, 422:2, 422:4
**unfortunately** [1] -

357:5
**uniformity** [5] - 299:11, 300:15, 300:18, 306:24, 419:1
**unit** [1] - 351:8
**UNITED** [2] - 280:1, 280:15
**units** [1] - 420:21
**universe** [1] - 345:14
**Unless** [1] - 395:2
**unless** [3] - 324:19, 325:9, 378:11
**unstick** [1] - 320:10
**unusual** [1] - 320:13
**up** [49] - 282:22, 283:10, 285:9, 289:12, 293:6, 294:1, 296:24, 298:1, 299:17, 299:22, 302:7, 306:19, 308:3, 310:4, 312:20, 312:22, 313:20, 318:23, 327:2, 329:9, 331:1, 331:16, 333:16, 335:5, 336:2, 337:7, 341:15, 343:16, 344:25, 346:4, 346:24, 348:13, 349:21, 350:20, 351:2, 353:16, 354:21, 356:10, 357:20, 358:19, 360:2, 365:11, 365:19, 384:1, 384:12, 394:20, 412:17, 413:7, 414:12
**upper** [2] - 312:3, 355:8
**US** [2] - 309:8, 412:25
**USA** [1] - 281:11
**Usage** [1] - 290:16
**uses** [1] - 402:19
**USP** [3] - 287:11, 372:3, 402:8
**utilizes** [1] - 283:19
**utilizing** [1] - 396:8

## V

**VA64** [1] - 287:6
**valid** [2] - 282:18, 289:3
**validity** [2] - 375:2, 429:16
**value** [5] - 288:8, 316:21, 371:19,

403:10, 419:13
**values** [8] - 288:11, 304:7, 360:23, 419:9, 421:25, 422:18, 423:12, 424:5
**VAN** [1] - 281:13
**variabilities** [2] - 304:10, 304:12
**variability** [10] - 300:7, 303:24, 304:1, 304:11, 420:18, 421:16, 421:18, 421:19, 422:1, 422:4
**variation** [1] - 304:5
**varied** [1] - 332:19
**various** [1] - 294:16, 294:20, 295:1, 308:24, 347:6, 377:7, 380:6, 410:14, 421:18, 421:19, 426:6
**vary** [6] - 318:5, 318:6, 361:15, 361:19, 362:19, 362:22
**varying** [4] - 364:24, 364:25, 365:2
**vegetable** [1] - 353:8
**version** [3] - 294:4, 336:24
**versus** [2] - 288:12, 339:6
**via** [1] - 292:10
**viability** [2] - 419:19, 422:5
**view** [7] - 289:21, 341:18, 370:25, 378:15, 380:5, 380:9, 404:4
**virtual** [1] - 367:1
**visited** [1] - 338:12
**Volume** [1] - 280:11
**volumes** [1] - 339:10

## W

**Walgreens** [1] - 412:18
**walked** [1] - 412:16
**wants** [6] - 359:4, 360:15, 363:14, 363:15, 371:18, 430:2
**water** [34] - 283:19, 283:22, 284:10, 284:15, 285:2, 285:4, 285:13, 286:5, 302:10, 302:16, 302:19, 302:22, 303:2,

303:3, 303:6, 307:15, 350:4, 350:6, 350:11, 352:20, 360:1, 360:21, 360:22, 361:15, 361:20, 362:1, 362:14, 362:16, 362:20, 396:8, 418:5, 430:5, 430:6
**ways** [6] - 344:2, 359:23, 377:13, 378:7, 386:7, 417:21
**weight** [2] - 303:5, 398:3
**weight-by-weight** [1] - 398:3
**welcome** [2] - 282:10, 423:9
**well-known** [4] - 310:23, 409:13, 409:15
**wet** [21] - 284:7, 298:9, 298:12, 300:22, 300:24, 301:3, 301:13, 303:9, 306:11, 307:11, 336:18, 350:7, 356:25, 359:16, 359:22, 359:23, 360:3, 385:16, 386:2, 386:6, 386:9
**wet-granulated** [1] - 356:25
**wetting** [2] - 283:19, 362:17
**wherein** [5] - 286:12, 287:9, 342:23, 385:15, 386:1
**white** [12] - 290:9, 292:11, 293:19, 317:25, 318:1, 318:5, 318:6, 318:17, 318:20
**whole** [9] - 291:1, 318:18, 355:11, 378:16, 380:9, 380:20, 381:1, 386:6, 387:22
**wide** [1] - 343:2
**Williams** [1] - 282:3
**WILLIAMS** [1] - 280:14
**Wilmington** [1] - 280:10
**withdrawing** [1] - 429:9
**withdrawn** [1] - 429:9
**WITNESS** [47] - 282:23, 283:11,

285:10, 285:15,
285:18, 289:13,
293:8, 294:3, 298:3,
299:24, 302:9,
304:22, 306:21,
308:5, 310:6, 327:4,
329:14, 331:3,
331:18, 333:17,
336:3, 337:8,
341:16, 343:17,
346:6, 346:25,
349:15, 349:23,
351:3, 352:5,
353:18, 355:22,
357:21, 358:21,
364:13, 365:12,
369:5, 377:22,
384:14, 424:25,
426:22, 427:2,
427:6, 427:13,
427:19, 428:24,
429:7
**witness** [3] - 328:22,
366:15, 429:23
**witnesses** [1] - 429:11
**wonder** [2] - 360:17,
422:8
**wonders** [1] - 372:11
**word** [13] - 378:25,
386:20, 386:24,
386:25, 387:2,
387:4, 388:8,
388:10, 388:11,
389:5, 390:16,
404:6, 405:3
**words** [19] - 372:1,
376:17, 377:14,
381:23, 383:14,
385:18, 387:19,
389:1, 390:1, 391:9,
391:13, 391:15,
391:18, 394:4,
394:11, 395:22,
402:19, 403:14
**works** [1] - 349:18
**world** [1] - 291:1
**written** [23] - 283:3,
286:5, 286:17,
288:15, 288:18,
344:20, 344:23,
345:4, 345:12,
348:9, 349:3,
349:10, 353:12,
353:19, 354:16,
355:1, 357:18,
365:18, 366:3,
373:9, 404:17,
421:8, 421:10
**Wurster** [5] - 340:1,
390:12, 391:16,

391:22, 392:18

## Y

**years** [4] - 291:20,
296:12, 327:18,
338:12
**yesterday** [3] -
282:12, 288:3, 357:8
**yogurt** [1] - 323:8
**yourself** [1] - 405:8